UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAC'QUANN (ADMIRE)
HARVARD; J.H., a minor, by and
through his parent and natural
guardian, Valentine Robinson;
ANGEL MEDDLER; JUAN
ESPINOSA; JEROME BURGESS
(a/k/a SHAM'LA GOD ALLAH);
and JAMES W. KENDRICK, JR.,
on behalf of themselves and all
others similarly situated,

              Plaintiffs

         v.

MARK INCH, in his official
capacity as Secretary of the Florida
Department of Corrections, and
FLORIDA DEPARTMENT OF
CORRECTIONS, an Agency of the
State of Florida

             Defendants.

Case No.:   19-cv-212

**CLASS ACTION COMPLAINT
FOR DECLARATORY AND
INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

I. INTRODUCTION _____ 1

II. JURISDICTION _____ 5

III. VENUE _____ 5

IV. PARTIES _____ 5

   A. Plaintiffs _____ 5

     i. Admire Harvard _____ 5

     ii. J.H. _____ 8

     iii. Angel Meddler _____ 9

     iv. Juan Espinosa _____ 11

     v. Jerome Burgess (a/k/a Sham'la God Allah) _____ 14

     vi. James W. Kendrick, Jr. _____ 16

   B. Defendants _____ 18

V. FACTUAL ALLEGATIONS _____ 19

   A. Well-Known Harms of Isolation _____ 21

   B. FDC's Labels for Isolation _____ 32

   C. Conditions in Isolation Cells _____ 36

   D. Deprivation of Normal Human Contact _____ 39

   E. Deprivation of Environmental Stimulation_____ 44

   F. Deprivation of Exercise _____ 47

   G. Degrading and Dehumanizing Security Measures _____ 49

   H. Defendants' Deliberate Indifference_____ 55

   I. No Legitimate Penological Purpose _____ 63

   J. Disability Discrimination _____ 66

VI. CLASS ACTION ALLEGATIONS _____ 72

   A. Plaintiff Class _____ 72

   B. Disability Subclass _____ 75

VII. CLAIMS FOR RELIEF_____ 78

   A. First Cause of Action _____ 78

   B. Second Cause of Action _____ 80

   C. Third Cause of Action _____ 82

VIII. PRAYER FOR RELIEF _____ 84

# I.    INTRODUCTION

1.      Solitary confinement, also known as "isolation," is increasingly recognized by medical and mental health professionals, scholars, scientists, and advocates throughout the United States and around the world as torture. Individuals subject to isolation are more likely to exhibit anxiety, depression, insomnia, confusion, withdrawal, emotional flatness, cognitive disturbances, hallucinations, paranoia, psychosis, and suicidality.[1]  These effects begin to manifest within hours or days of isolation, worsening with time and causing permanent damage to individuals, especially those who linger in isolation for months or years.  Isolation inflicts devastating harm on the individuals who experience it, places them and their families and communities at risk when they are released, is inordinately expensive when appropriately staffed, and does not reduce prison violence or promote public safety.

2.      Nearly one out of every seven individuals in isolation in the United States is in the custody of the Florida Department of Corrections ("FDC").  Every day, FDC isolates approximately 10,000 people in tiny, cramped cells for nearly 24 hours a day; many endure these conditions for months or years at a time.  FDC separates all 10,000 of these individuals from the general prison population, and

---

[1] Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 CRIME & DELINQ. 124, 130-131 (2003).

severely restricts their access to normal human contact, exercise, rehabilitative programs, and mental stimulation.  The United States Department of Justice and correctional experts refer to this practice as "isolation" or "solitary confinement" because people in these conditions are isolated from the general prison population, confined in a small cell at least 22 hours a day, subjected to the highest security measures, and deprived of basic human needs.  FDC uses different names for isolation in its facilities such as close management or confinement, but no matter the name, the practice violates constitutional standards.

3.     Many states are significantly reducing or abandoning the use of isolation in correctional systems because it has proven ineffective at modifying behavior and has harmful health consequences.  For these reasons, psychological, correctional, legal, and human rights professionals have recognized that isolation should not be used or used only sparingly with stringent procedural safeguards.

4.     FDC, in contrast, refuses to reduce its use of isolation, rendering Florida an outlier in correctional systems in the United States.  FDC uses isolation to manage 10% of its total prison population which is more than twice the national average for prison systems using isolation.  It uses isolation indiscriminately as a catch-all punishment for people with behavior problems ranging from minor to severe, including individuals whose behavior is a manifestation of their disability. Each day, people in FDC's custody suffer from mental and physical health

consequences due to its isolation policies and practices.  Since 2013, a majority of the suicides in Florida prisons have occurred in isolation—where only 10% of the prison population is housed.

5.    FDC knows that the cumulative effect of the deprivations in isolation subjects people to a substantial risk of serious harm.  It knows that its isolation policies and practices are draconian and outdated.  It also knows that people in its custody are suffering from harmful health consequences caused by isolation.  Yet, it has failed to take appropriate action to prevent this harm.  It fails to consistently monitor people for signs of declining mental and physical health, or to meaningfully respond to those who are obviously suffering from the damaging effects caused by isolation.  Unlike many other states, FDC isolates people who suffer from a heightened risk of harm, such as teenagers, people with mental illness or intellectual disabilities, and people with physical disabilities, even though it is aware of the heightened risk to these populations.

6.    FDC also fails to limit the amount of time people spend in isolation and subjects people to this increasing risk of harm for months or years after any emergency or serious threat has abated, if there ever was one.  This excessive and prolonged use of isolation includes hundreds of people who have been in isolation for six to twenty years.

7.     FDC's isolation policies and practices are inconsistent with evolving standards of decency in a civilized society.  FDC is deliberately indifferent to the substantial risk of harm caused by its isolation policies and practices that are not supported by any legitimate penological purpose.

8.     FDC, through policy and practice, also discriminates against people with disabilities in its use of isolation.  It fails to reasonably modify its policies and procedures when the modifications are necessary to avoid discrimination on the basis of disability; it fails to ensure that people with disabilities in isolation have equal access to programs, services, and activities; and it fails to ensure that people with disabilities in isolation are housed in the most integrated setting appropriate to meet their needs.

9.     Defendants Mark Inch and FDC have acted, and are acting, under color of state law to deprive Plaintiffs and Class Members of their constitutionally protected right to be free from cruel and unusual punishment, guaranteed by the Eighth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment.  They have also acted, and are acting, under color of state law to discriminate against Plaintiffs and Class Members with disabilities in violation of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.  Plaintiffs and Class Members seek declaratory and injunctive relief to address these violations of their constitutional and statutory rights.

4

## II.   JURISDICTION

10.    The claims alleged herein arise under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution; the Americans with Disabilities Act (ADA), 42 U.S.C. § 12131, *et seq*.; and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

11.    The jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331, 1343, and 1367.  Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202, and 42 U.S.C. § 1983.

## III.   VENUE

12.    Venue is proper in the Northern District of Florida under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims brought by Plaintiffs and the class have occurred in this District and Defendants are in this District.

## IV.   PARTIES

### A. Plaintiffs

#### i.   *Admire Harvard*

13.    Jac'Quann ("Admire") Harvard is a 28-year-old black transgender woman in isolation at Florida State Prison, a men's prison.  She is diagnosed with schizoaffective disorder, gender dysphoria, and hypertension.  Defendants have subjected her to isolation for nearly ten years, starting when she was 18 years old.

5

She remains in Disciplinary Confinement to date and has also been concurrently in Close Management I since 2010.

14.    Defendants initially placed Ms. Harvard in isolation for the offense of "lying to staff" when she allegedly asked for a "high calorie" meal in the dining hall after she had been in prison for only two months.  Although Ms. Harvard was only 18 years old, diagnosed with bipolar disorder, and prescribed anti-anxiety medications, Defendants sentenced her to 60 days in Disciplinary Confinement for this infraction.  Within her first three months of isolation, Defendants found her guilty of nine new disciplinary infractions, adding an additional 270 days in isolation, for one fight with her cellmate, yelling, kicking her cell door, and disrespecting staff.  Within that same period, Defendants began prescribing her powerful mood-stabilizing and anti-psychotic medications and noted that due to her mental illness she suffered from anxiety and impulsivity, among other symptoms.

15.    Defendants refuse to modify their isolation policies and practices to accommodate Ms. Harvard's disability and protect her from harm caused by isolation.  Over the last nine years, Ms. Harvard has suffered from ongoing severe mental health symptoms in isolation, including hallucinations, delusions, and suicidality.  Defendants have hospitalized her for psychiatric reasons approximately 20 times.  They have placed her in a suicide-watch cell more than

50 times.  She has cut or otherwise injured herself at least 40 times.  After each psychiatric hospitalization or time in a suicide-watch cell, where Defendants also frequently subjected her to isolation, Defendants returned Ms. Harvard directly to Close Management and Disciplinary Confinement.

16.     Defendants have found Ms. Harvard guilty of at least 127 disciplinary infractions, the vast majority for non-violent behaviors related to her mental health symptoms.  They have also repeatedly left her in a bare cell with nothing but her underwear for several days at a time as punishment.  Despite the obvious harm to Ms. Harvard, Defendants extend her time in Disciplinary Confinement for each disciplinary infraction, amounting to a term of more than 11 consecutive years, and hold her in indefinite isolation in Close Management I.  Defendants have never provided Ms. Harvard with personal visits, reading materials other than religious texts, education, or exercise outside of a cage.  During all her time in Disciplinary Confinement and Close Management, Defendants have permitted her only one phone call when a family member died.

17.     Ms. Harvard has filed several grievances notifying Defendants of the risk of harm and disability discrimination she suffers from isolation.  She has exhausted available administrative remedies.  She is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B).

*ii.*    ***J.H.***

18.    J.H. is a 17-year-old black teenager in isolation at Florida State Prison.  He arrived in Defendants' custody as a 14-year-old on July 6, 2016.  Since that time, Defendants have cycled him in and out of isolation in response to behaviors related to his immaturity and difficulty adapting to prison at such a young age.  In October 2018, at Suwannee Correctional Institution, Defendants removed him from a housing unit with other teenage boys to serve 90 days in Disciplinary Confinement.  He was 16 years old.  Defendants transferred him to indefinite isolation at Florida State Prison, an adult prison, where he remains, and is one of only two teenagers there.

19.    Since his arrival at Florida State Prison in December 2018, Defendants have kept J.H. separated from all other incarcerated people and rarely let him out of his cell.  In the last five months, they have taken him to the exercise cages once and dayroom twice, each time completely alone.  They take him out to the shower cell, alone, only two or three times a week for no more than ten minutes each time.  They provide him with minimal anger management counseling through the cell door and no mental health services.  Most of the time, he has nothing to do in his cell.  Despite recently changing his status from Close Management II to

Close Management III, Defendants still subject J.H. to the same severe restrictions on his out-of-cell time, in-cell activities, and contact with other people.

20. J.H. would like to continue his education, but this is nearly impossible in isolation. A teacher infrequently speaks to J.H. through his cell door and gives him worksheets to complete. During these brief interactions, the teacher provides no individualized instruction and the worksheets do not help him meet G.E.D. requirements.

21. As a result of the severe deprivations of exercise, mental stimulation, and normal social contact over the last several months, J.H. has no release for his adolescent energy and his mental health is beginning to deteriorate. He often thinks about death, and cycles through feelings of agitation, frustration, depression, and extreme restlessness.

22. J.H. has repeatedly notified Defendants of the risk of harm he suffers from isolation, including through the grievance process. He has exhausted available administrative remedies. He appears in this action through his mother and natural guardian, Valentine Robinson.

### iii.   *Angel Meddler*

23. Angel Meddler is a 21-year-old black woman in isolation at Lowell Correctional Institution Annex. Since she arrived at FDC, Defendants have diagnosed her with asthma, as well as anxiety and mood disorders. Despite these

diagnoses and her young age, Defendants have continuously isolated her for over three years.

24.     Within three days of her arrival at FDC, on November 11, 2015, Defendants isolated Ms. Meddler for 30 days in Disciplinary Confinement because she refused to do push-ups as ordered by a correctional officer.  She was only 17 at the time.  Four months later, she was still in isolation after receiving new disciplinary infractions for yelling, banging on her cell door, using "threatening speech," and being disrespectful to staff.  Defendants then placed her in Close Management I after a correctional officer accused her of battery—an infraction of which Defendants found her not guilty.  Defendants have continued her isolation for a variety of disciplinary infractions that are mostly non-violent and related to her immaturity and disability.  Recently, after a long period without any major disciplinary infractions, Ms. Meddler became agitated after Defendants refused to take her to the exercise cage for the third week in a row.  Defendants gave her two new disciplinary infractions after her agitation resulted in a verbal altercation with a correctional officer.  She is currently in both Disciplinary Confinement and Close Management III.

25.     In isolation, Ms. Meddler has repeatedly experienced suicidal ideation and tied a sheet around her neck several times as a plea for help.  Defendants hospitalized her for suicidality for approximately one month in 2016.  They have

also placed her in a suicide watch cell at least twelve times; each time sending her back to isolation without any enhanced mental health treatment.  In addition to suicidality, isolation has caused Ms. Meddler to suffer from anxiety, mental agitation, poor impulse control, disturbed sleep, and paranoia.

26.     Ms. Meddler is eligible for special education services and wants to receive her G.E.D.  But this goal is nearly impossible in isolation as Defendants provide her with no more than a couple hours a week of education services with little to no individualized instruction.

27.     Ms. Meddler has repeatedly notified Defendants of the risk of harm and disability discrimination she suffers from isolation, including through the grievance process.  She has exhausted available administrative remedies.  She is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B).

### iv.    *Juan Espinosa*

28.     Juan Espinosa is a 58-year-old Hispanic man in isolation at the Reception and Medical Center.  Defendants have diagnosed him with paranoid schizophrenia, major depressive disorder, and bipolar disorder.  He suffers from anxiety, depression, paranoia, hallucinations, and mood swings.  He tried to kill himself at least five times before he was placed in isolation.  He also suffers from tumors in his throat that impede his ability to eat and swallow.  Defendants have

referred him to multiple specialists, including an oncologist, and he has undergone

multiple surgical procedures since he has been in isolation.  The most recent

surgical procedure was to remove all his teeth.  In January 2019, he permanently

and completely lost his voice after a surgical procedure to remove one of the

tumors.  He can no longer speak.

29.     Defendants began isolating Mr. Espinosa in June 2018 after accusing

him of spitting at a correctional officer.  They first assigned him to Close

Management I, and then Close Management II.  Defendants take him to the

exercise cages only once a week, and deny him access to visits, dayroom time, and

phone calls.  He has spoken to his family only once since June 2018.  Since losing

his voice, Defendants have not given him a Text Telephone or other similar device

that would allow him to make phone calls.  Defendants have failed to escort or

transport him to several medical appointments, including to see his specialists,

since he has been in isolation.

30.     Mr. Espinosa attempts to communicate through handwritten notes,

hand gestures, and by mouthing words, but he is difficult to understand.

Defendants have refused to provide him with any services to help him learn to

communicate effectively without a voice.  Healthcare staff who perform infrequent

"rounds" in isolation check on his health status only by asking him cursory

questions through his cell door, to which he is unable to properly respond.

12

Defendants also isolate him in a cell without a call button to alert staff of an emergency.

31.     Mr. Espinosa is afraid of dying of cancer and the lack of in-cell activities leave him little else to think about while locked in his tiny cell.  He often thinks about suicide.  His depression and mood swings have worsened in isolation, prompting Defendants to increase his psychiatric medications but otherwise providing no meaningful mental health services.

32.     In December 2018, Mr. Espinosa lost his balance and fell while trying to walk escorted by a correctional officer and fully restrained at his hands and feet. The strain of the leg irons during the fall broke three bones in his right foot.  After his injury, his doctor ordered crutches for him, but staff refused to provide them, forcing Mr. Espinosa to hop around his tiny cell on one foot for several weeks. When he would leave his cell for medical care, Defendants would chain him to a wheelchair to transport him.  He now uses a walking boot, and despite his obvious risk of falls Defendants continue to restrain his hands at his waist with handcuffs, a black box,[2] and belly chain when he leaves his cell.

---

[2] The black box is a device used in combination with a belly chain that fixes the handcuffs at waist level, creating a more rigid and severe restraint that prevent people from freely moving their hands and arms beyond their waist.

33.     Mr. Espinosa has repeatedly notified Defendants of the risk of harm and disability discrimination he suffers from isolation, including through the grievance process.  He has exhausted available administrative remedies.  He is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B).

### v.     *Jerome Burgess (a/k/a Sham'la God Allah)*

34.     Jerome Burgess is a 46-year-old black man isolated at Suwannee Correctional Institution.  He uses a wheelchair due to paralysis on the left side of his body and cannot urinate without the assistance of a catheter.  He is diagnosed with seizure disorder and major depressive disorder.  Defendants have subjected Mr. Burgess to isolation since September 25, 2017.  He is currently isolated in Close Management II.

35.     Defendants refuse to modify their isolation policies and practices to accommodate Mr. Burgess's disabilities and prevent the harm caused by isolation. He is losing mobility and range of motion on his right side because the tiny cell where Defendants isolate him at least 22 hours a day barely leaves him enough space to use his wheelchair and leaves him no space to ambulate.  Defendants have also failed to provide him with the accommodations he needs to meaningfully participate in recreation in the exercise cages.

14

36.     Defendants have failed to implement a system to ensure staff are immediately notified when Mr. Burgess has a seizure and to provide him with prompt medical attention.  There is no call button in his cell for him to alert staff if he feels warning signs of a seizure, or for a cellmate to use (when and if he has one) to alert staff if Mr. Burgess is suffering from a seizure.  He must rely on other incarcerated people to yell and bang on their doors on his behalf, at risk of receiving "disorderly conduct" or "inciting a riot" disciplinary charges, and for correctional officers to respond quickly and appropriately, which does not always occur.

37.     Defendants have also failed to modify their policies and practices to prevent further harm to Mr. Burgess once they are aware that he has had a seizure. On October 23, 2018, for example, staff were unaware that he was seizing in his cell until another incarcerated person in a nearby cell sensed something was wrong with Mr. Burgess and chose to alert them.  Staff found Mr. Burgess unresponsive in his cell, placed him in his wheelchair, and fully restrained him, including by chaining his right ankle to his wheelchair despite the risk that he might have another seizure.

38.     In isolation, in contrast to general population where he can go to the medical clinic as needed to obtain his medical supplies, Mr. Burgess is dependent on medical staff to deliver catheters to his cell front.  Defendants do not

consistently bring him the right type or quantity, forcing him at times to wash and re-use old disposable catheters without adequate cleaning supplies in his filthy cell. As a result, the blockage in Mr. Burgess's urinary tract has worsened and he suffers from heavy bleeding and painful urinary tract infections. In recent months, he underwent an invasive procedure to remedy these preventable and painful health consequences.

39.    Mr. Burgess has repeatedly notified Defendants, including through the grievance process, of the risk of harm he suffers in isolation, and requested modifications to their isolation policies and practices to accommodate his disabilities. He has exhausted available administrative remedies. He is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B).

*vi.*    ***James W. Kendrick, Jr.***

40.    James W. Kendrick, Jr. is a 39-year-old black man isolated at Florida State Prison. Defendants have diagnosed him with diabetes, high blood pressure, and obesity. He has also developed depression in isolation, for which Defendants have recently prescribed him medications. Defendants isolated Mr. Kendrick in Maximum Management on June 20, 2018, after accusing him of battering a correctional officer. Defendants held Mr. Kendrick in Maximum Management until October 25, 2018, and then moved him to Close Management I. In recent weeks, although he remains assigned as Close Management I, Defendants have

16

isolated him in a wing with people assigned to Disciplinary Confinement even

though they have not charged him with any new disciplinary infractions.

Defendants restrict Mr. Kendrick's out-of-cell exercise, visits, phone calls, and

reading materials under their written Disciplinary Confinement policies and

procedures despite his current assignment to Close Management I.

41.     Defendants' isolation practices cause Mr. Kendrick to be at risk of

physical harm.  He needs regular activity and exercise to avoid heart disease due to

his diabetes, high blood pressure, and obesity, but is unable to do so while locked

in his tiny cell.  Defendants routinely fail to provide Mr. Kendrick with the limited

amount of out-of-cell exercise required under their written policies, but even when

they do Mr. Kenrick cannot get the exercise and activity he needs in a small cage

for a few hours a week.

42.     Defendants attempt to treat Mr. Kendrick's diabetes at cell-front

through the rusty, dirty food slot in his cell door.  Specifically, nurses attempt to

administer pre-loaded syringes of insulin through the food slot, which often leads

them to improperly insert the needle or inject him in an un-sanitized area of his

arm.  They also fail to appropriately time his insulin delivery with his meals.  As a

result, Mr. Kendrick is frequently compelled to reject his treatment to avoid

infection or passing out.

43.     When Defendants isolated Mr. Kendrick in June 2018, they determined he had no mental health symptoms.  But after months of suffering deprivations of basic human needs in isolation, he has become anxious and depressed and has contemplated suicide.  Due to these symptoms, in November 2018, mental health staff began providing him with minimal outpatient mental services, and eventually began giving him psychiatric medications.  Despite these services, his depression continues to worsen in isolation.

44.     Mr. Kendrick has repeatedly notified Defendants of the risk of harm and disability discrimination he suffers from isolation, including through the grievance process.  He has exhausted available administrative remedies.  He is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B).

## B. Defendants

45.     Defendant Mark Inch ("Inch") is the Secretary of Corrections for the Florida Department of Corrections.  He became Secretary of FDC in January 2019. In this capacity, Defendant Inch is responsible for the overall management and operation of the entire adult corrections system in Florida and for protecting the constitutional and statutory rights of all people in FDC custody.[3]  Additionally,

---

[3] "The secretary is responsible for planning, coordinating, and managing the corrections system of the state.  The secretary shall ensure that the programs and services of the department are

Defendant Inch is responsible for the policies, procedures, and practices regarding management, personnel, and overall operation of FDC, including the operation of isolation at prisons throughout FDC. Defendant Inch authorizes or ratifies the policy and practice of subjecting people to a substantial risk of serious harm and discrimination based on disability by isolating them from the general population as described herein. Defendant Inch has directly and proximately caused, and continues to cause, the constitutional and statutory violations set forth herein. At all relevant times, Defendant Inch was acting under color of state law and as an official representative of FDC. Defendant Inch is sued in his official capacity for declaratory and injunctive relief.

46. Defendant FDC is the administrative department for the State of Florida responsible for administering and exercising the direct and effective control over penal and corrections institutions throughout the State of Florida. Defendant FDC is an instrumentality of the State of Florida.

47. Defendant FDC receives federal financial assistance.

## V.   FACTUAL ALLEGATIONS

48. Defendants (collectively herein "FDC" or "Defendants"), through their policies and practices, confine and isolate approximately 10,000 people in

---

administered in accordance with state and federal laws, rules, and regulations, with established program standards, and consistent with legislative intent."   § 20.315(3), Fla. Stat. (2018).

small cells for at least 22 hours a day for weeks, months, or years at a time in prisons throughout the State of Florida.  The United States Department of Justice defines "isolation" or "solitary confinement" as "the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others."[4]  This definition expressly includes people who are single or double-celled, as practiced by FDC.

49.    People in isolation live in cells that are smaller than the 162 square feet of a standard parking space.[5]  Most of the cells are only 45 to 70 square feet and fail to meet the American Correctional Association standard of 80 square feet. They contain one or two steel bed frames, a combined toilet and sink, a property storage box, and sometimes two shelves, all of which, collectively, leave very limited room for movement.  People often spend 48 straight hours in this tiny space with only a five-to-ten-minute shower before the next 48 straight hours.

---

[4] U.S. Department of Justice, *Investigation of State Correctional Institution at Cresson*, at 5 (May 31, 2013), http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf (last visited Apr. 17, 2019); *cf. Wilkinson v. Austin*, 545 U.S. 209, 214, 224 (2005) (describing isolation as limiting human contact for 23 hours per day); *Tillery v. Owens*, 907 F.2d 418, 422 (3d Cir. 1990) (21 to 22 hours per day).

[5] *See, e.g.,* Columbus, Ohio, Code of Ordinances, Title 33, Zoning Code, § 3312.29 ("A parking space shall be a rectangular area of not less than nine feet by 18 feet …"), https://library.municode.com/oh/columbus/codes/code_of_ordinances?nodeId=TIT33ZOCO_CH3312OREPALO_3312.29PASP (last visited Apr. 17, 2019); South San Francisco, California, Municipal Code, § 20.330.010 ("The minimum basic dimension for standard parking spaces is 8 ½ feet by 18 feet."), http://www.qcode.us/codes/southsanfrancisco/view.php?topic=20-iv-i-20_330-20_330_010&frames=on (last visited Apr. 19, 2019).

50.    FDC is deliberately indifferent to the substantial risk of harm caused by its isolation policies and practices.  Through its use of isolation, FDC deprives Plaintiffs and the class members of human contact, exercise, and environmental stimulation.  These deprivations of basic human needs, combined with intolerable cell conditions and oppressive safety and security measures, cumulatively pose an unreasonable risk of serious damage to their health and subject them to a substantial risk of serious harm.  Plaintiffs and members of the class are suffering from psychological and medical symptoms that mirror those reported in the research about individuals subjected to isolation.

### A. Well-Known Harms of Isolation

51.    Isolation causes painful, severe, and sometimes irreversible harm. There is a substantial body of literature from over the last 200 years[6] documenting

---

[6] In 1833, Alexis de Tocqueville said this about isolation: "[I]n order to reform them, they had been submitted to complete isolation; but this absolute solitude, if nothing interrupt it, is beyond the strength of man; it destroys the criminal without intermission and without pity, it does not reform, it kills."  GUSTAVE DE BEAUMONT & ALEXIS DE TOCQUEVILLE, ON THE PENITENTIARY SYSTEM IN THE UNITED STATE: AND ITS APPLICATION IN FRANCE 5 (Philadelphia, Carey, Lea & Blanchard 1833), https://babel.hathitrust.org/cgi/pt?id=pst.000001152418;view=1up;seq=7 (last visited Apr. 17, 2019).

In 1842, Charles Dickens wrote:

> I believe that very few men are capable of estimating the immense amount of torture and agony which this dreadful punishment, prolonged for years, inflicts upon the sufferers; and in guessing at it myself, and in reasoning from what I have seen written upon their faces, and what to my certain knowledge they feel within, I am only the more convinced that there is a depth of terrible endurance in which

the harms of isolation, even for short periods of time.  Over a century ago, the

United States Supreme Court noted that:

> [People subject to isolation] fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community.

*In re Medley,* 134 U.S. 160, 168 (1890).  The Supreme Court again noted in

2015 that prolonged isolation "exacts a terrible price," including "common

side-effects … [of] anxiety, panic, withdrawal, hallucinations, self-

mutilation, and suicidal thoughts and behaviors."  *Davis v. Ayala,* 135 S.Ct.

2187, 2210 (Kennedy, J., concurring) (citing Grassian, *Psychiatric Effects of*

*Solitary Confinement,* 22 Wash. U.J.L. & Pol'y 325 (2006)).

52.     There is broad consensus in the medical and psychiatric communities

on the harms from isolation.[7]  People in isolation "suffer from a similar range of

---

none but the sufferers themselves can fathom, and which no man has a right to inflict upon his fellow creature. . . .

I hold this slow and daily tampering with the mysteries of the brain to be immeasurably worse than any torture of the body; and because its ghastly signs and tokens are not so palpable to the eye and sense of touch as scars upon the flesh; because its wounds are not upon the surface, and it extorts few cries that human ears can hear; therefore the more I denounce it, as a secret punishment which slumbering humanity is not roused up to stay.

CHARLES DICKENS, AMERICAN NOTES FOR GENERAL CIRCULATION 238-39 (London, Chapman and Hall 1842).

[7] Grassian, *supra* p. 22, at 338 ("By now the potentially catastrophic effects of restricted environmental stimulation have been the subject of voluminous medical literature."); Ass'n of

symptoms irrespective of differences in the physical conditions in various prisons and in the treatment of isolated inmates."[8]  Studies also show that some people will continue to suffer from the consequences of isolation after they are released, with some suffering from permanent harms.[9]

53.     The most widely documented consequences of isolation are its psychological effects.  As one prison staff psychiatrist stated in 2002, "[i]t's a standard psychiatric concept, if you put people in isolation, they will go insane … Most people in isolation will fall apart."[10]  The psychological effects include anxiety, depression, insomnia, confusion, withdrawal, emotional flatness, cognitive disturbances, hallucinations, paranoia, psychosis, and suicidality. [11]  These effects begin to manifest within hours or days of isolation, worsening with time and causing permanent damage to individuals, especially those who linger in isolation

---

State Corr. Adm'rs & Arthur Liman Pub. Interest Program, *Aiming to Reduce Time-In-Cell*, YALE L. SCH., at 22 (2016), https://law.yale.edu/system/files/area/center/liman/document/aimingtoreducetic.pdf (last visited Apr. 17, 2019).

[8] Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, 34 CRIME & JUSTICE 441, 488 (2006), https://www.jstor.org/stable/10.1086/500626?seq=1#metadata_info_tab_contents (last visited Apr. 17, 2019).

[9] Craig Haney & Mona Lynch, *Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement*, 23 N.Y.U. REV. L. & SOC. CHANGE 477, 534-39 (1997); Grassian, *supra* p. 22, 332-33.

[10] Human Rights Watch, *Ill-Equipped: U.S. Prisons and Offenders with Mental Illness*, at 149 (2003), https://www.hrw.org/sites/default/files/reports/usa1003.pdf (emphasis omitted) (last visited Apr. 17, 2019).

[11] Haney, *supra* note 1, at 130-31.

for months or years.  For some people, isolation "can be as clinically distressing as physical torture."[12]

54.     Numerous studies show that people in isolation are more likely to engage in self-harm, self-mutilation, and suicide than those in the general prison population.[13]  For example, one study concluded that people in isolation in New York City jails were approximately 6.9 times more likely to commit suicide and self-mutilation than those in the general jail population.[14]  Another study in Oregon identified isolation as one of the main risk factors in suicidal thoughts and suicide attempts.[15]  In systems where the percentage of people in isolation is 2% to 8% (i.e., less than Florida's isolation population of at least 10%), 50% of the suicides in those systems occurred in isolation.[16]  From January 2013 to August 2018, at

---

[12] Jeffrey Metzner & Jamie Fellner, *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. AM. ACAD. PSYCHIATRY & L. 104, 104 (2010), http://jaapl.org/content/jaapl/38/1/104.full.pdf (last visited Apr. 17, 2019).

[13] Haney, *supra* note 1, at 131-32.

[14] Fatos Kaba, et. al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates,* 104(3) AMERICAN JOURNAL OF PUBLIC HEALTH 442, 445 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3953781/pdf/AJPH.2013.301742.pdf (last visited Apr. 17, 2019).

[15] Ildiko Suto, Inmates Who Attempted Suicide in Prison; A Qualitative Study, at 23, 29  (July 27, 2007) (Ph.D. dissertation, Pacific University), https://commons.pacificu.edu/cgi/viewcontent.cgi?article=1061&context=spp (last visited Apr. 18, 2019).

[16] Stuart Grassian & Terry Kupers, *The Colorado Study vs. the Reality of Supermax Confinement*, at 11 (Mar. 6, 2012), https://www.probono.net/prisoners/stopsol-reports/416638.The_Colorado_Study_vs_the_Reality_of_Supermax_Confinement (last visited Apr. 18, 2019).

least 57% of all suicides in Florida prisons occurred in isolation—where only 10% of the population is housed.

55.     The research also shows that people in isolation are at risk of physiological consequences.  Common physical symptoms include: severe headaches; heart palpitations and increased heart rate; chest, abdominal, neck, and back pain; problems with digestion, diarrhea, and weight loss; loss of appetite; and dizziness and fainting.[17]  Researchers have observed lower levels of brain function because of isolation, including a decline of electroencephalogram activities after only seven days in isolation.[18]  Sensory deprivation causes the body to produce increased cortisol, "well-documented to have negative health consequences for both the body and the brain," and negatively affecting cognition, mood, and well-being.[19]  The detrimental effects of sensory deprivation occur after as little as two days, and the risk increases the longer an individual is subjected to deprivation.[20] Because human brains are designed for social interaction, social isolation also results in neurological changes to the brain, quickly degrading brain function.[21]

---

[17] Smith, *supra* note 8, at 489-90.
[18] Grassian, *supra* p. 22, at 335-336.
[19] Edward Vessel & Steven Russo, *Effects of Reduced Sensory Stimulation and Assessment of Countermeasures for Sensory Stimulation Augmentation*, NASA, at 20, 23, 28, 51-52, 65-66 (May 2015), https://ston.jsc.nasa.gov/collections/trs/_techrep/TM-2015-218576.pdf (last visited Apr. 18, 2019).
[20] *Id.* at 22, 28.
[21] Grassian, *supra* p. 22, at 331.

56.     Although all incarcerated people placed in isolation are at risk of harm, some people are more susceptible to serious health consequences because of their disabilities, age, health conditions, or other characteristics.  People with psychiatric or intellectual disabilities are more sensitive and reactive to psychological stressors and emotional pain.  As a result, isolation may worsen and intensify pre-existing mental health related symptoms such as depression, paranoia, psychosis, and anxiety, and can cause severe impairment in isolated individuals' ability to function.[22]

57.     Youth are generally less equipped to manage the psychological stressors of isolation, and it is especially difficult for those with recent histories of trauma, abuse, neglect, or mental disabilities.  The risk of permanent damage from isolation is acute for all youths as their brains have not fully developed.

58.     People with hearing and vision challenges are even more isolated from human contact and environmental stimulation in isolation, and thus are at heightened risk of physical or mental harm.  People with mobility disabilities are also at heightened risk of falls when restrained, and the lack of exercise and movement may result in the loss of physical functioning and ambulation.

---

[22] Human Rights Watch, *Callous and Cruel: Use of Force against Inmates with Mental Disabilities in US Jails and Prisons* (May 12, 2015), https://www.hrw.org/report/2015/05/12/callous-and-cruel/use-force-against-inmates-mental-disabilities-us-jails-and (last visited Apr. 18, 2019).

59.     People with serious and chronic medical conditions may suffer from exacerbations of their symptoms due to the stress, lack of exercise, reduced access to healthcare, and inability of staff to detect and quickly respond to medical emergencies, including, for example, seizures that could result in fatalities in the absence of an immediate response.

60.     Pregnant women suffer from a heightened risk of falls while restrained, and they cannot receive the exercise and movement they need to maintain a healthy pregnancy.  Common pre-existing feelings of stress and depression are exacerbated, and higher levels of stress increase the risk of miscarriage and birth complications.

61.     Several professional correctional and healthcare organizations recommend, and FDC is aware, that isolation should be used only sparingly, if at all.  For example, the American Psychiatric Association advises against isolation of people with mental illness and juveniles.[23]  The National Commission on Correctional Health Care states that people with mental illness, juveniles, and pregnant women should never be in isolation, and no one should be there for more

---

[23] Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (Apr. 2013), https://www.dhcs.ca.gov/services/MH/Documents/2013_04_AC_06c_APA_ps2012_PrizSeg.pdf (last visited Apr. 19, 2019); Am. Psychiatric Ass'n, *Position Statement on Solitary Confinement (Restricted Housing) of Juveniles* (July 2018), https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Solitary-Confinement-Restricted-Housing-of-Juveniles.pdf (last visited Apr. 18, 2019).

than 15 days.[24]  The American Public Health Association advises against isolating

juveniles and people with mental illness, and states that no one should be isolated

as a disciplinary sanction. [25]  The American Bar Association asserts that isolation

should not be allowed for anyone.[26]

      62.    The U.S. Department of Justice ("DOJ"), in 2016, also recommended

significantly limiting the use of isolation. [27]  Specifically, it recommended against

placing juveniles and pregnant women in isolation.[28]  It also recommended that

absent special circumstances, people with serious mental illness should not be

placed in isolation.[29]  It said that isolation for "low level" offenses should be

eliminated, and that people should spend less time in isolation for other offenses. [30]

When people must be isolated, they should be housed "in the least restrictive

---

[24] Nat'l Comm'n on Corr. Health Care, *Solitary Confinement (Isolation)* (Apr. 2016), https://www.ncchc.org/solitary-confinement (last visited Apr. 18, 2019).

[25] *See* Am. Pub. Health Ass'n, *Solitary Confinement as a Public Health Issue*, https://apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/14/13/30/solitary-confinement-as-a-public-health-issue (last visited Apr. 18, 2019); AM. PSYCHIATRIC ASS'N, PSYCHIATRIC SERVICES IN CORRECTIONAL FACILITIES (3d ed. 2016).

[26] AM. BAR ASS'N, ABA STANDARDS FOR CRIMINAL JUSTICE, TREATMENT OF PRISONERS 95 (3d ed. 2011) ("Conditions of extreme isolation should not be allowed regardless of the reasons for a prisoner's separation from the general population. Conditions of extreme isolation generally include a combination of sensory deprivation, lack of contact with other persons, enforced idleness, minimal out-of-cell time, and lack of outdoor recreation."), https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/Treatment_of_Prisoners.authcheckdam.pdf (last visited Apr. 18, 2019).

[27] U.S. Dep't of Justice, *Report and Recommendations Concerning the Use of Restrictive Housing*, at 104-16 (Jan. 2016), https://www.justice.gov/archives/dag/file/815551/download (last visited Apr. 18, 2019).

[28] *Id.* at 101, 102.

[29] *Id.* at 99-101.

[30] *Id.* at 109-10

setting necessary" to ensure the safety of all people; that placement be based on specific, "clearly articulate[d] reasons;" and that the placement serve "a specific penological purpose."[31]  The then-President of the United States ordered executive departments and agencies to implement these recommendations – "it is critical that DOJ accelerate efforts to reduce the number of Federal inmates and detainees held in restrictive housing and that Federal correctional and detention systems be models for facilities across the United States."[32]

63.     Human rights organizations and authorities recognize the harms of isolation and advocate for severe limitations on its use.  The United States Special Rapporteur on Torture, for example, determined that more than 15 days in isolation amounts to torturous, cruel, and unusual punishment, and should be abolished. The European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment recommended that, due to its potentially hazardous effects, isolation should only be used as punishment in exceptional cases and for the shortest period possible.  In 2015, the U.N. General Assembly revised its Standard Minimum Rules for the Treatment of Prisoners (renamed the "Mandela Rules") to state that, "[s]olitary confinement shall be used only in exceptional

---

[31] *Id.* at 94.

[32] Presidential Memorandum on Limiting the Use of Restrictive Housing by the Fed. Gov't from President Barack Obama to the Heads of Exec. Dep't and Agencies (Mar. 1, 2016), https://obamawhitehouse.archives.gov/the-press-office/2016/03/01/presidential-memorandum-limiting-use-restrictive-housing-federal (last visited Apr. 18, 2019).

cases as a last resort, for as short a time as possible and subject to independent

review." [33]   The Mandela Rules forbid indefinite or prolonged use of isolation

(defined as anything more than 15 consecutive days) and restrict its use for people

with mental of physical disabilities.[34]

64.    Other state correctional systems recognize the substantial risk of harm

caused by isolation and have voluntarily implemented measures to dramatically

reduce its use.  In Colorado, for example, after subjecting himself to just 20 hours

in isolation, the former Director of Corrections implemented policies that reduced

the population in isolation from over 7% to less than 1% of its prison population.[35]

Since these reforms began, the rate of assaults on staff have decreased by half.[36]

Maine enacted reforms that cut its population in isolation by half, and provided

increased programming and environmental stimulation for those that remain in

isolation.  There has been no statistically significant rise in violence, and by some

measures the violence in Maine has decreased.[37]  Mississippi enacted reforms at

---

[33] G.A. Res. 70/175, at 17, U.N. Doc. A/RES/70/175 (Dec. 17, 2015),
https://undocs.org/A/RES/70/175 (last visited Apr. 18, 2019).
[34] *Id.*
[35] Risk Raemisch, Op-Ed., *My Night in Solitary,* N.Y. Times, Feb. 20, 2014,
https://www.nytimes.com/2014/02/21/opinion/my-night-in-solitary.html (last visited Apr. 18,
2019); Rick Raemisch & Kellie Wasko, Colo. Dep't of Corr., *Open the Door—Segregation
Reforms in Colorado*, at 2-3 (2015),
https://drive.google.com/file/d/0B30yLl0I1yBRY2h2UDBCZ0Q5WlE/view (last visited Apr. 18,
2019).
[36] *Id.* at 9.
[37] American Civil Liberties Union of Me., *Change is Possible: A Case Study of Solitary
Confinement Reform in Maine*, at 31 (Mar. 2013),

one institution that cut its population in isolation down from 1000 to 150, and eventually closed the entire unit.[38]  Idaho is just beginning its reforms, but it has already stopped placing women in isolation, and reduced the number of men it isolates by more than 50%.[39]  Since 2015, North Dakota has reduced its population in isolation by 60 to 70%, and has experienced a sharp decline in prison violence.[40] Since 2016, New York has reduced its population in isolation by 30%, reduced the average length of stay in isolation by 31%, and reduced the number of individuals serving over 365 days in isolation by 72%.[41]

65.     As reflected by these organizations, agencies, and authorities, isolation is degrading, inhumane, dangerous, and should never be used as

---

[38] Terry A. Kupers, et al., *Beyond Supermax Administrative Segregation:  Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs*, 36 CRIMINAL JUSTICE & BEHAVIOR 1037, 1041 (2009), https://www.aclu.org/sites/default/files/field_document/asset_upload_file359_41136.pdf (last visited Apr. 18, 2019); John Buntin, *Exodus:  How America's Reddest State – And Its Most Notorious Prison – Became a Model of Corrections Reform*, GOVERNING, Aug. 2010, at 20, 27, https://drjdbij2merew.cloudfront.net/GOV/GOV_Mag_Aug10.pdf (last visited Apr. 18, 2019).

[39] Ass'n of State Corr. Adm'rs & Arthur Liman Pub. Interest Program, *Working to Limit Restrictive Housing: Efforts in Four Jurisdictions to Make Changes*, YALE L. SCH., at 7 (2018), https://law.yale.edu/system/files/documents/pdf/Liman/asca_liman_2018_workingtolimit.pdf, (last visited Apr. 17, 2019).

[40] *Id.* at 8; David Kidd, *Tender Justice, North Dakota is Conducting a Prison Experiment Unlike Anything Else in the United States*, GOVERNING, Aug. 2018, at 46, 50-51, https://archives.erepublic.com/GOV/GOV_Mag_Aug2018.pdf  (last visited Apr. 18, 2019).

[41] New York Department of Corrections and Community Supervision, *2018 Annual Update: DOCCS Continues to Improve the Conditions and Reduce the Use of Solitary Confinement in its Facilities*, http://www.doccs.ny.gov/DoccsNews/2018/Annual%20Update%20-%202018.pdf, (last visited Apr. 18, 2019).

punishment.  If it's ever used, it should be used only as a last resort for the shortest duration possible to remedy a current and serious threat to safety and security.  It is a form of psychological torture, inflicts psychological and physical pain, and exposes everyone to a substantial risk of serious harm.  These authorities also demonstrate that it violates contemporary standards of decency in a civilized society to expose prisoners in isolation in Florida to such a risk.

## B. FDC's Labels for Isolation

66.     Despite the well-known risk of harm, FDC confines and isolates people in their cells for an average of 22 or more hours a day in nearly all FDC prisons throughout the state.  Although it uses different labels for isolation throughout the prison system—Maximum Management, Disciplinary Confinement, Close Management, and Administrative Confinement—FDC subjects people in each of these to deprivations of human contact, environmental stimulation, and exercise, layered with oppressive and unnecessary security measures.  No matter what label FDC chooses, the cumulative effect of the deprivations and conditions in these isolation cells subjects people to a substantial risk of serious psychological and physiological harm.

67.     As of March 1, 2019, there were 10,557 people assigned to Maximum Management, Disciplinary Confinement, Close Management, and/or Administrative Confinement, which is more than 10% of FDC's total population.

68.     The typical path for people in isolation is to begin in Administrative Confinement while FDC investigates allegations of safety and security risks or pending disciplinary charges; people remain there for weeks or months.  FDC also isolates people when they seek protective custody and request to "check in" to Administrative Confinement; they can be in isolation for months while FDC determines whether they require such protection.  The deprivations that a person suffers are the same regardless of whether FDC has placed the person in Administrative Confinement to investigate pending disciplinary charges or the person has "checked in" to Administrative Confinement seeking protection.

69.     FDC assigns people it finds guilty of disciplinary charges to Disciplinary Confinement.  Each guilty charge leads to at least one specific term in isolation, but there is no limit to the number of terms for which a person can be sentenced even for the same incident.  The terms are almost always served consecutively.  For example, when Plaintiff Meddler, who has a history of mental illness, was 17 years old, FDC placed her in isolation for refusing to do push-ups as ordered by the correctional staff.  After nearly six weeks in isolation, she became agitated and yelled obscenities and banged on the door of her cell.  For this one incident, FDC isolated her an additional 30 days in confinement for "disobeying a verbal order," another 30 days for "threatening speech," and another 30 days for "creating, participating in or inciting a major disturbance," to be served

consecutively.  This stacking of charges resulting in prolonged isolation is typical of what happens to members of the class.

70.     Although the maximum number of days for one disciplinary type of charge is 60 days, there are people who have enough consecutive terms to be in isolation for the next twenty years.  Many people, especially those suffering from mental illness, are trapped in a perpetual, vicious cycle of isolation in Disciplinary Confinement.  Disciplinary charges lead people suffering from mental illness to spend weeks in isolation, which exacerbates their mental health symptoms, causing them to become agitated and act out, leading to more disciplinary charges and more time in isolation with seemingly no end in sight.

71.     Under FDC's policy, people are assigned to Close Management when FDC determines they have "demonstrated an inability to live in the general population without abusing the rights and privileges of others."[42]  The assignment to Close Management does not require a formal disciplinary charge.  There are three levels of Close Management (CM I, II, and III), with Level I being the most restrictive and Level III being the least restrictive.  There are no time limits for any of these levels; FDC can, and does, isolate people in Close Management indefinitely.  While the average duration for someone in CM is one to three years,

_____

[42] Fla. Admin. Code R. 33-601.800(1)(d).

there are several hundred people who have been there for more than six years, and many for almost twenty years.[43]

72.    FDC assigns people whom it has deemed "extreme security risk[s]" to Maximum Management, with or without a guilty disciplinary finding.[44]  Although it is supposed to be a "temporary status," there is no time limit for Maximum Management.[45]  On information and belief, the average duration for someone in Maximum Management is six months.

73.    Based on policy and practice, FDC subjects people in each type of isolation to cell searches, restraints, strip searches, and "property restriction."[46]  It also restricts access to personal visits, phone calls, exercise, dayroom time to socialize with others, reading materials, canteen, hygiene items, and personal property ("privileges").   Under FDC's written policies, the level of restrictions differs in each type of isolation only by a matter of degree.  But despite FDC's written policies, in practice it determines restrictions by staffing availability, housing location, whether someone is in more than one type of isolation at the

---

[43] FDC has designated six prisons to house people assigned to Close Management, but it does not have enough beds for this population at these prisons.  As of March 1, 2019, there were hundreds of people waiting in Administrative Confinement and Disciplinary Confinement cells throughout the state who were supposed to be in Close Management at those six prisons.  While they wait, typically for several months, FDC restricts them according to the Administrative Confinement and Disciplinary Confinement policies.

[44] Fla. Admin. Code R. 33-601.820(1)(b).

[45] *See* Fla. Admin. Code R. 33-601.820(1)(b).

[46] "Property restriction," discussed in more detail in Paragraphs 110 – 111, refers to FDC's policy and practice of removing all property in someone's cell—including their clothes and bedding—for a period of 72 hours, and sometimes longer.

same time, and other arbitrary reasons.  Mr. Kendrick, for example, due to his
housing location, is currently restricted as if he were assigned to Disciplinary
Confinement although he is solely assigned to Close Management I.  And even if
FDC followed its own written policies, which it frequently does not, the paltry
amount of "privileges" and out-of-cell time in these written policies does not
prevent the substantial harm caused by isolation.

74.    No matter what the label, FDC knowingly subjects people to an
objective risk of harm and inhumane treatment by isolating them in small cells at
least 22 hours a day, under the highest security measures, while depriving them of
basic human needs.

### C. Conditions in Isolation Cells

75.    The deprivations of basic human needs, cell conditions, severe
restrictions, and oppressive security measures, collectively, subject people in
FDC's care to a substantial risk of serious health consequences.

76.    The tiny isolation cells where people spend nearly 24 hours a day for
prolonged periods are generally composed of monotone concrete walls, a concrete
floor and ceiling, and a steel door.  The steel door typically has a small,
approximately one-foot square plexiglass window.  The door also has a steel flap
for passing all objects in and out of the cell, including food trays, medications,
mail, or filthy mops.  It is also used to apply and remove handcuffs, and to use

pepper spray on people inside the cell.  If there is a window to the outdoors, in many units it is painted over or partially covered with steel, allowing in minimal natural light or view of the outdoors.  People typically cannot open these windows for fresh air, although some are broken allowing in a steady stream of cold air during the winter.  Almost none of the cells are air conditioned despite the sweltering Florida summer heat.  The only ventilation of these cells happens via an exhaust fan that recirculates stifling air throughout the unit with a loud and constant whirring noise.

77.     Many of the cells were built well over 50 years ago and are antiquated, dirty, and in disrepair.  There is no way for staff to see inside the cells unless they stand directly in front of the cell door.  There are no call buttons or intercoms inside the cells for people to notify staff of emergencies. These cells were not designed for prolonged isolation.  Instead, they were designed for sleeping and to allow people to walk in and out of their cells into the common area and beyond during waking hours.  In contrast, in other prison systems, cells specifically designed for prolonged isolation include more square footage, call buttons and intercoms, desks for writing and eating, and cameras for staff to view inside the cells.

78.     Confinement units are loud, 24 hours a day.  Adding to the exhaust fans, prison staff slam doors and knock metal restraints and keys on steel

throughout the unit.  They yell at people and people yell back.  Automatic door locks pop loudly and frequently.  Chains rattle as people in full restraints shuffle through the unit.  People suffering from mental health symptoms howl, scream, and talk to themselves or anyone who will listen.  People pound on their doors to get the attention of staff for legitimate concerns, or as an emotional release.  There is more yelling and commotion when teams of guards in riot gear use pepper spray or forcibly enter a cell to "extract" or use other force against someone, a common occurrence.  Gunfire from FDC shooting ranges punctuate the sounds from within the units.

79.     Prison staff control the lights inside cells.  Lights are turned off late at night and back on early in the morning for a period of darkness totaling only four to six hours.  On the weekends, staff sometimes do not bother to turn the lights on at all.  Staff prohibit people from hanging any personal items, such as photographs or drawings, on the walls.  Most cells do not have mirrors for people to see themselves.  There are no clocks.

80.     Unlike people in general population, people in isolation must eat, sleep, and defecate in their small, barren cells.  Instead of eating communally in dining halls, they must wait for their food to be delivered on a tray through the slot in the door.  They must eat on their beds or the floor, mere inches from their toilet. In many cells, the toilet flushes are timed and controlled by correctional officers.

Thus, people must often eat their meals accompanied by the smell of feces and urine stagnating in their unflushed toilets.

## D. Deprivation of Normal Human Contact

81.     FDC, through policy and practice, deliberately deprives people in isolation of normal human contact.  In the general population, people have many opportunities to communicate with other incarcerated people, correctional officers, family members, healthcare staff, religious clergy, teachers, and work supervisors. They can engage in such communications without mechanical restraints or physical barriers between them.  In contrast, people in isolation rarely if ever have these opportunities.  Staff punish people for trying to communicate with incarcerated people in other cells—shouting is prohibited by rule, and staff frequently enforce "no-talking" rules, punishable by disciplinary reports leading to more time in isolation, pepper spray, property restrictions, cell extraction, or even more extreme denial of privileges.  During the limited occasions FDC permits people in isolation to communicate with people outside of their cells, it almost always occurs while shackled at the hands and feet, usually through glass, fencing, steel mesh, or doors.

82.     FDC does not eliminate the risk of harm from isolation by confining two people in the same cell.  People forced to live together in the same isolation cell for 22 hours or more a day do not have normal social interactions.  Indeed, it is

next to impossible to have normal interactions with a stranger while forced to spend nearly every minute of every day sharing less than 80 square feet.  The cells are more cramped, the movement more limited.  They must constantly violate each other's personal space.  They must defecate in a toilet that is flushed infrequently and located mere inches from their beds.  The stress of living with another human being in this tiny space is relentless.  Instead of reducing the pain of isolation, double-celling can intensify the suffering by forcing people to navigate around another person's habits and tribulations in intolerable conditions.  This is why the DOJ's definition of isolation and solitary confinement expressly includes being confined with another person.

83.    Nearly all communication between prison staff and people in isolation occurs through the cell door.  During security checks, correctional officers simply look inside each cell, and if they speak at all to the person inside, they do not open the cell door.  Medical staff who deliver medications do not stop at every cell, and when they do stop at a cell, the interaction is limited to a few words said from outside the cell door when the medication is passed through the slot in the door.  If healthcare staff make "rounds" to check on people, they yell just a few cursory questions, also through the cell door, if there is any interaction at all.  Many people in isolation refuse to have frank discussions through a heavy solid door, in part

because they do not want to shout personal information that can be heard by other incarcerated people and correctional staff.

84.     Conversations with mental health counselors and psychiatrists, who generally only speak to people diagnosed with mental illness, are not therapeutic or normal in any sense.  Often, their sole attempts to speak to their patients are through the cell door.  If they want to speak to their patients outside of their cells, they must ask correctional officers to remove them.  In many instances, correctional officers refuse.  If they remove them, the patients must submit to strip searches, cell searches, and full hand and leg restraints.  In some isolation units, correctional staff bring the patient to the shower for the "therapeutic" contact.  The shower is in the middle of the common area, with no visual or auditory confidentiality.  The patient stands in the shower, fully restrained, while attempting to talk to the clinician through the bars in the shower door.  If not the shower, correctional staff frequently lock the patient in a phone booth-sized cage, where the patient must stand or awkwardly sit on a narrow bench, fully restrained, and speak to the clinician through steel mesh.  Correctional officers often intentionally position themselves within earshot of the conversation.

85.     Clinicians speak to their patients in isolation no more than once a week for the most acutely ill, but typically only once every 30 to 90 days. Clinicians also conduct group therapy once a week for only those diagnosed with

41

serious mental illness.  For the fraction of people in isolation who do receive group therapy, it is conducted in the dayroom, in the presence of other prison staff, while people are shackled at hands and feet and sometimes locked in individual cages.

86.    At Suwannee and Union Correctional Institutions, during group therapy, correctional officers restrain people, lock them in individual cages or separate them by partitions, and the clinicians speak to their patients from another room through a microphone and speaker.  For many in these conditions, they cannot hear or understand what the clinicians and other incarcerated people are saying.  Clinicians do not consistently provide therapeutic support to manage psychological stressors, instead loosely facilitating chats about random topics. Many people refuse to divulge personal and sensitive information to their clinicians in these conditions in either group or individual therapy.

87.    Due to FDC's policies and practices restricting access to personal visits and phone calls, many people go for years without seeing or speaking to their friends and family.  For example, FDC denied one person the opportunity to see or talk to his twin brother for at least 16 years, or to meet his twin brother's children.

88.    For those infrequently permitted to receive personal visits, FDC confines the incarcerated person alone in a visiting booth, separated from his or her loved ones by thick glass.  Staff add another level of humiliation because they do not remove the person's restraints after confining him or her in the booth even

though it would be possible to do so through a slot in the door, and there is no way to harm or receive contraband from the visitors on the other side of the glass.  They must speak loudly to their loved ones through a metal grate that garbles their voices and makes it difficult to communicate.

89.     FDC, through policy and practice, deliberately denies people in isolation the basic human need of normal physical touch.  They are generally never in proximity to other incarcerated people unless restrained or separated by physical barriers.  Parents cannot hug or touch their children during visits.  People in isolation cannot even shake their visitors' hands.  One person in long-term isolation no longer trusts his own sense of when it is appropriate to shake another person's hand because it has been so many years since he's had the opportunity to do so.  Recently, another person's first normal human touch since 2008 was his attorney's handshake during a legal visit.  The only human touch that people in isolation experience is from correctional officers during strip searches, when placed in or removed from restraints, during escorts, and from medical staff during examinations.  These types of clinical and security contacts do not make up for the deprivation of normal human conversations and normal human touch.

## E. Deprivation of Environmental Stimulation

90.     FDC has a policy and practice of forced idleness for people in isolation.  It refuses to provide meaningful rehabilitative programming and severely limits people's activities in their cells.

91.     FDC partially or completely covers or obscures the windows to the outdoors in isolation cells, denying many people the opportunity to look at the sky, birds, trees, and grass.  It punishes people if they stand and look out their cell doors or windows for more than a few minutes.

92.     FDC prohibits televisions and tablets in isolation cells.  It also prohibits radios for those isolated in Disciplinary Confinement and Administrative Confinement.  It allows radios only in Close Management, and in Maximum Management after the first 12 months, if people have the funds to buy them.  Many people do not have such funds, including for the batteries to operate the radios, especially because FDC prohibits them from prison jobs and isolates them from their families.

93.     FDC severely limits people's access to reading materials.  Based on the written policies, FDC prohibits people in Maximum Management from possessing non-religious books for the first six months, and people in Disciplinary Confinement from possessing any non-religious materials at all, even people who have enough minor disciplinary infractions to be in disciplinary confinement for

decades.  The written policies limit reading materials for those in Close

Management to only three non-religious books at a time each week and five

periodicals.  They permit people in Administrative Confinement to possess only

one book at a time each week.  When FDC follows its written policies, due to the

absence of other in-cell activities, most people finish their reading materials

quickly and have nothing to read for most of the week, and few people can pass

every waking hour, for weeks, months, or years at a time, reading.  Frequently,

FDC fails to follow its written policies, and people have no access to any reading

materials, forcing them to sit idle in their cells staring at the walls.

94.    FDC prohibits people in isolation from participating in any form of

communal worship or prayer.  Their only outlet for religious expression is solitary

expression in their cells, with infrequent visits by a Christian chaplain, regardless

of their faith, who speaks to them briefly through the cell door.

95.    FDC also prohibits people in isolation from meaningfully

participating in their education, including juveniles, people with disabilities under

age 21 enrolled in special education classes, and others who are working towards

their G.E.D.s  For the vast majority of those in isolation, at most, a teacher comes

to the cell door every few days or weeks and slips them a few worksheets that they

may have difficulty completing on their own, or that do not further their

degree/certificate requirements.  Any interaction with a teacher is very brief,

through the cell door.  The teacher provides no individualized assistance with the worksheets.  If people are able to finish the worksheets, once they do they have no other learning materials to keep their minds occupied.

96.     FDC takes a very limited number of people in isolation to a classroom, including Plaintiff Meddler, for instruction no more than a couple hours once a week, where they are chained to desks and receive little to no individualized assistance.  For countless others in Disciplinary Confinement (including Plaintiff Harvard and others who will be in that status for decades) and Maximum Management, FDC provides no education materials whatsoever.  FDC also prohibits people in isolation from participating in any vocational programming.

97.     For most people in isolation, the passing of time is measured by meal times, security checks, medication passes, and the few hours when the lights are out at night.  Showers, which are supposed to happen three times a week for no more than five to ten minutes, offer little respite, and some people refuse showers because they do not want to suffer the humiliation of restraints and strip and cell searches.  To otherwise remain oriented to time, people must rely on staff who are kind enough to tell them the time upon request.  For many, the boredom, anxiety, or mental agitation become acute after days on end with nothing to do other than reading whatever materials they have, writing letters, daydreaming, staring at the walls, talking and singing quietly to themselves, and sleeping.

## F.  Deprivation of Exercise

98.     FDC, through policy and practice, deprives people in each type of

isolation of out-of-cell exercise.  FDC knowingly violates the American

Correctional Association ("ACA") standard requiring that people in confinement

receive "a minimum of one hour of exercise per day outside their cells, five days

per week, unless security or safety considerations dictate otherwise."  According to

the ACA, the failure to meet this standard "poses a negative impact on the quality

of life of inmates in [isolation] … This is especially of concern when coupled with

below standard square footage per inmate…."  FDC refuses to meet this standard

for even the least restrictive form of isolation, Close Management, instead

providing at most only two days per week of out-of-cell exercise for three hours

each time or one day a week for six hours.  Although it is a total of six hours, the

ACA explicitly states this schedule is noncompliant with its standard, recognizing

that people need to exercise more than once or twice a week to maintain their

health and sanity.  The people in the other types of isolation, which is at least two-

thirds of the total solitary population, receive at most only three hours a week of

out-of-cell exercise, with many receiving none for stretches of 30 days and longer.

99.     FDC's isolation cells are too small to engage in meaningful exercise.

For out-of-cell exercise, FDC moves people to a row of cages, each cage

approximately six by ten feet, that resemble outdoor dog kennels.  The cages are

enclosed by fencing on the top and sides, with no shade or cover. FDC typically confines one prisoner in each cage. At some prisons, staff remove a person's restraints once inside the cage, but at other prisons staff leave the person restrained. There is no toilet. There is no exercise equipment other than pull-up or dip bars. There is nothing to sit on other than the ground. There is no alternative space during inclement weather, which leads staff to cancel exercise time or people to refuse to go stand in the rain, heat, or cold.

100.   Many people refuse to go to these exercise cages because they are not much bigger than their cells, there is nothing to do in the cages, and they do not want to experience the indignity of restraints and strip-searches when going to and returning from the cage. Some people cannot sit or stand in the cage for long periods of time due to their disabilities, which FDC refuses to accommodate. People also refuse to go to the exercise cages because staff search their cells during exercise time, sometimes destroying people's limited belongings such as photographs of loved ones, either intentionally or inadvertently, as they conduct the searches.

101.   Although completely inadequate, for many people time in the exercise cage is precious because it offers a very brief respite from their tiny cells and an opportunity to feel the outdoors. However, FDC denies even this brief respite: it frequently cancels exercise due to staffing shortages. FDC also does not have

enough exercise cages for everyone in isolation.  At Florida State Prison, for example, there are only 18 exercise cages available for units with 90 people in isolation, and staff fail to rotate through the cells to ensure everyone gets out. Even when staff attempt to rotate through the cells, the total time for exercise is counted from the time the first person is taken out of his cell to the time the last person is returned to his cell resulting in a drastic decrease in the time an individual is outside and able to exercise compared to what is written in the policies.  Staff also search for reasons to deny people their exercise time, including for trivial and pretextual offenses such as having fingernails too long, cells that are unclean, or the failure to be immediately ready at the cell door without warning.  It is also common for staff to falsely claim that people refused to exercise or to blatantly ignore someone's request to go.

102.   FDC's policy and practice of taking people infrequently to an exercise cage not much larger than the cells where they live for less time than is recommended by the ACA does not prevent the harms caused by isolation 22 hours or more a day.  Collectively with other deprivations, the deprivation of daily out-of-cell exercise enhances the substantial risk of harm from isolation.

## G. Degrading and Dehumanizing Security Measures

103.   FDC layers its deprivations of basic human needs in isolation with its unnecessary use of degrading and dehumanizing security measures.  Its use of

49

restraints, cell searches, strip searches, exercise cages, dayroom cages, and non-contact visiting booths are not based on individualized assessments of safety and security threats.  They are used as a one-size-fits-all approach to respond to all types of behaviors.  FDC applies the same security measures to the most diminutive people with no recent history of violence as it does the most physically imposing people with significant histories of recent violence.  It applies the same security measures to those who are in isolation because they are seeking protection from violence as it does the people who are accused of perpetrating violence.  Regardless of why someone is in isolation, FDC's oppressive security measures enhance the traumatic experience of being locked in a tiny cell for nearly 24 hours each day.

104.   With few exceptions, FDC restrains people in isolation whenever they leave their cells.  At the very least, staff use handcuffs to restrain their arms behind them, but more typically staff restrain people with multiple mechanical restraints at the same time.  Their ankles are restrained with leg irons that force people to take very short steps or shuffle their feet.  If their arms are restrained in front of them with handcuffs, the handcuffs are then covered with black metal devices ("black boxes") that cover the handcuff chain and keyholes.  The black box is used in combination with a belly chain that fixes the handcuffs at waist level, creating a

more rigid and severe restraint that prevent people from freely moving their hands and arms beyond their waist.

105.   FDC's policies permit, and with few exceptions require, staff to apply these restraints to all people in isolation, even those who use mobility devices such as walkers and wheelchairs, sometimes even chaining the person, including Plaintiffs Burgess and Espinosa, to the device.  Except for when staff remove the restraints in the exercise cages and showers, people in isolation must spend every scant minute out of their cells with steel wrapped around their limbs, constricting their movement.  Staff even refuse to remove the restraints during medical exams, forcing people to lie back awkwardly on the examination table, with their arms bound behind them, including for procedures such as EKGs.

106.   At Lowell Correctional Institution Annex ("Lowell Annex"), a women's prison, staff use "escort chairs" (restraint chairs on wheels) to transport women in isolation who have been accused of battery.  After restraining women in leg irons, handcuffs, waist chains, and black boxes, staff strap their heads, arms, and legs to the chair on wheels.  Using these excessive restraints, several correctional staff push individual women to wherever they need to go, including to legal interviews where staff sometimes refuse to unstrap them for the duration of their attorney visits, and insist on videotaping the interviews from a window outside the room.  The straps are so tight, and their movement so constrained, that

nurses must check the women's circulation every 15 minutes.  FDC's policies do not prohibit staff from using these chairs on people who are especially vulnerable, including, for example, teenagers and other people with mental illness such as Plaintiff Meddler.

107.   FDC's use of restraints frequently causes cuts and bruises to people's wrists and ankles.  Women at Lowell Annex, for example, suffer from bleeding cuts on their ankles after walking a few hundred yards in restraints to the medical units from their isolation units.  Plaintiff Espinosa's leg restraints broke his foot after he lost his balance and fell while wearing them.

108.   Staff subject people who leave their cells for any reason to strip and cell searches.  During strip searches, correctional staff force people to remove all clothes, squat, and cough in the presence of others; there is no privacy for these searches.  During cell searches, staff go through all their belongings, often scattering their legal papers, opening and emptying their hygiene products, and generally making a mess of their cells.

109.   Based on policy and practice, FDC operates its isolation units with strict but unnecessary rules.  Beginning early in the morning, people in isolation must get out of bed and fully dress in their uniforms for the duration of the day.  They must also make their beds first thing in the morning, and cannot use their sheets or blankets, even for warmth despite the unavailability of warm clothing in

the winter, until evening.  They cannot leave any property on the floor.  They

cannot hang anything on their cell walls, doors, or windows.  They cannot talk too

loudly or be disrespectful.  They cannot spend more than a few minutes at their cell

doors or windows.  FDC responds to people who fail to follow these rules by

extending their time in isolation, using pepper spray, subjecting them to property

restrictions, or engaging in violent cell extractions.

110.   FDC responds to minor behavioral problems with a practice known as

"property restriction."  This practice occurs with or without a disciplinary charge

or guilty finding, and it is imposed as pure punishment—it serves no penological

purpose, other than the wanton infliction of discomfort, humiliation, and emotional

distress.  Based on unwritten policies, in prisons throughout the state, staff force

people to give up everything, or almost everything, in their cell, leaving many

people "stripped" in just their underwear, for 72 hours or longer.  At the men's

prisons, staff remove everything except the bolted down fixtures in the cell.

People cannot have their uniforms and t-shirts, bed linens, reading and writing

materials, hygiene items, or mattress for three days or longer.  At the women's

prisons, FDC leaves the women with one set of clothing, hygiene products,

sometimes their mattress and linens, and nothing else for 72 hours.  During this

three-day period, most people are unable to sleep without a mattress on a steel bed

frame, or without a blanket and clothing in cells that frequently dip down to 50

degrees at night in the winter months.  For those who are almost naked, cold, or sleep-deprived, 72 hours amounts to the wanton and unnecessary infliction of pain.

111.   Staff have punished people with this barbaric practice for offenses such as standing at their cell door to look out the tiny window, hanging something over a cell window, leaving a pillow on the floor, or leaving their property in disarray.  If a unit becomes too loud, staff have picked people at random to place on property restriction as punishment.  After suicide attempts or gestures, instead of taking people to a suicide observation cell where they can receive an evaluation, treatment, and be removed from anything they can use to hurt themselves, staff frequently punish people, including Plaintiff Harvard, in their cells with property restriction.

112.   Staff place frail people with physical disabilities on property restriction with no regard to how their bodies will respond to sleeping on bare steel.  If FDC places someone with a cellmate on property restriction, staff also take the cellmate's belongings even if he or she has not violated any rules.  For some people with serious mental illness, property restriction tips them over the edge and they respond with acts of physical self-harm or mutilation.  FDC's practice of depriving people of all belongings, including people who pose no risk to themselves, serves no legitimate penological purpose and heightens the risk of harm from isolation.

113.    People in isolation become so desperate that they frequently declare "psychological emergencies" that, based on accepted standards, should result in correctional officers immediately removing the person from his or her cell for a mental health evaluation.  Correctional officers frequently ignore people who declare psychological emergencies; make their own determination, without consulting with clinical staff, that the person is not in psychiatric distress; or proclaim that because "there is no blood, there is no emergency."  They also retaliate against people who declare such emergencies by using excessive force, destroying their belongings in a cell search, placing them on property restriction, refusing to deliver meals, or refusing to take them to the exercise cages.  As a result, some people are reluctant to ask for help because they fear retaliation.  Prison staff's callous and retaliatory responses to people's suffering in isolation intensify the deprivations they experience and heighten the risk of harm.

## H. Defendants' Deliberate Indifference

114.    Defendants know that the cumulative effect of the lack of human contact, lack of exercise, lack of environmental stimulation, cell conditions, and oppressive security measures subjects people in their care to a substantial risk of serious harm.  Defendants are also aware of the authorities described in Section V.A., *supra*, demonstrating that isolation subjects people to a substantial risk of serious harm, and that there are people in Defendants' custody who have suffered,

55

and continue to suffer, from actual psychological and physiological harm because of their placement in isolation.  Nonetheless, Defendants refuse to significantly curtail their use of isolation.

115.   Defendants are aware that correctional standards are evolving to reflect the national consensus that isolation is degrading and inhumane and should be used only as a last resort, if ever.  In 2016, FDC issued a press release touting that the then-Secretary of Corrections, Julie Jones, attended a "criminal justice reform colloquium" at Yale Law School.  The press release characterized isolation "as one of the most important issues facing criminal justice reform today" for which "industry experts and leaders share a commitment to reducing both the number of individuals held in isolation and the degrees of isolation …".

116.   On information and belief, FDC staff attended a similar program at the University of Pittsburgh in 2016 that included panel discussions from renowned healthcare experts describing the physical and psychological harms of isolation.  Defendants also know that their policies and practices regarding out-of-cell exercise, and the size of their isolation cells, are deficient as the American Correctional Association has admonished FDC repeatedly for several years in reports that Defendants receive and review.

117.   Defendants are aware that the rate of suicide is much higher for people who are in or have been in isolation.  From January 2013 to August 2018, at

least 46 of the 80 people (57%) who died by suicide in FDC did so while they were in isolation.  Although not in isolation at the time they died by suicide, an additional eight of those 80 people had been in isolation in the year prior to killing themselves.  A stunning 88% of the people who died by suicide had been in isolation at some point during their incarceration in FDC.

118.   Defendants are also aware that people in isolation are more likely to require inpatient hospitalization, including from suicide attempts.  According to a document drafted by FDC's Director of Mental Health, Dr. Aufderheide, "Whereas Close Management status represents about 3% of the total inmate population, 40% of the inmates receiving necessary inpatient mental health treatment came from a Close Management status."  He also wrote that "47% of the inmates requiring court-ordered treatment at a Corrections Mental Health Treatment Facility (CMHTF) were admitted from Close Management status."  He further noted that Defendants had to hospitalize 13% of people in Close Management placed in suicide observation status compared to only 4% of people in general population placed in the same status.

119.   Defendants know that because of their policies and practices, people with mental illness are overrepresented in isolation.  According to Dr. Aufderheide:

- Mentally ill inmates are about 80% more likely to receive a Disciplinary Report (DR) for a major rule infraction than non-mentally ill inmates.
- Mentally ill inmates are more likely than non-mentally ill inmates to be placed in Administrative/Disciplinary Confinement and more than five times as likely to be placed in Close Management.
- Although mentally ill inmates represent about 18% of the total population, they represent nearly half of all the inmates in Close Management.
- Inmates in Close Management are more than three times more likely to have a severe and persistent mental illness than inmates in the general population.

120.   Defendants also know that people with mental illness, and with intellectual disabilities or traumatic brain injuries, are more likely to spend prolonged periods in isolation because they have difficulty conforming their behavior with FDC rules, demands, and norms.  Due to FDC's lack of reasonable modifications and accommodations for persons with disabilities, once FDC places these individuals in isolation because of some nonconforming behavior resulting from their disabilities, it is extremely difficult for them to get out.

121.   The deprivations and punitive environment of isolation exacerbate or cause symptoms of mental illness, including anxiety, agitation, paranoia, panic, delusions, mania, depression, poor impulse-control, psychosis, insomnia, and hallucinations.  These symptoms may lead to more misbehaviors, which lead to more disciplinary charges.  These additional charges typically lead to an indefinite stay in isolation (Close Management) that is supposed to end when incarcerated

58

people can demonstrate an ability to live in the general population, something nearly impossible to show as they continue to deteriorate.

122.   Given their pre-existing symptoms, even people who manage to maintain their baseline psychological functioning despite the deprivations of isolation have difficulty demonstrating the near-perfect behavior that is required to get out of indefinite isolation.  Plaintiffs Harvard and Meddler, for example, have been caught in a perpetual cycle for years of deteriorating symptoms, new disciplinary infractions related to those symptoms, suicide watch cell placements, and in-patient hospitalizations, interspersed with periods of only minor disciplinary infractions, if any.  Defendants ignore these periods of low-level or infraction-free behavior in determining whether people with mental illness, intellectual disabilities, or traumatic brain injuries can be released from isolation.

123.   Despite the obvious risk of harm demonstrated by the constant cycling between suicide observation cells, inpatient mental health unit hospitalization, and isolation, Defendants refuse to eliminate, or even reduce, the deprivations of isolation and the unnecessary security measures in isolation.  Instead, Defendants continue to perpetuate the cycle by sending people straight from in-patient mental health care back to isolation.  This is true even after someone makes a serious suicide attempt; Defendants not only send them directly back into isolation after having knowledge of the risk of suicide for those specific individuals, but also

often add more time in isolation because people "destroyed state property" or "disobeyed verbal orders" while trying to kill themselves.

124.   Defendants also repeatedly receive notice of the harms of isolation through the hundreds of complaints they receive each year from people in isolation through FDC's internal prison grievance process.  In these complaints, people in isolation specifically describe the mental health and physical health consequences that they are experiencing.  Defendants' typical response is to ignore the suffering they describe and tersely state that the individual is in isolation as a result of his or her own behavior.

125.   Despite their knowledge of the risk of harm, Defendants have no policies to exclude known vulnerable people from isolation, including, but not limited to, people with serious mental illness or intellectual disabilities, pregnant women, juveniles, or people with histories of suicide attempts.  They also have no policies to exclude people who are at substantial risk of harm because of medical conditions that could be exacerbated by isolation, or that require immediate responses to medical symptoms to prevent serious injury or death (e.g., seizure disorders).

126.   Defendants provide no call buttons or other mechanisms for people in isolation to notify staff of an emergency; people can only yell or bang on their doors at the risk of receiving disciplinary charges and more isolation time for

"inciting a riot" or "creating a disturbance."  People who experience seizures in their cells, including Plaintiff Burgess, are physically unable to notify staff in this manner.

127.    Defendants fail to adequately monitor people for health risks prior to and during their time in isolation for signs of worsening mental illness, self-harm, and suicidality in isolation.  According to their own healthcare audits conducted between 2016 and 2018, healthcare staff frequently failed to complete rounds and evaluations of people in isolation.  For example, healthcare staff at Lowell Correctional Institution Annex completed "pre-confinement physicals" only 10% of the time and weekly mental health rounds only 50% of the time.  At Suwannee Correctional Institution, a prison with a large population in isolation, including juveniles, healthcare staff completed timely evaluations of people with serious mental illness only 32% of the time, daily rounds by nursing staff only 66% of the time, and weekly mental health rounds only 55% of the time.  At Lake Correctional Institution, healthcare staff completed daily nursing rounds only 42% of the time, and evaluations of people with serious mental illness only 25% of the time.  At the Reception and Medical Center, where people with serious and chronic health conditions are sent for treatment, healthcare staff completed "pre-confinement physicals" only 55% of the time.

128.   Defendants do not provide mental health treatment to everyone in isolation, and the treatment they do provide to some people does not prevent harm caused by isolation.  Defendants provide regular group and individual therapy to only those they have identified as having a serious mental illness, ignoring everyone else at substantial risk of developing mental health symptoms due to the deprivations of human needs in isolation.  Defendants fail to identify all people who have serious mental illness, and therefore many who suffer from a heightened risk of harm do not receive mental health services in isolation.

129.   Defendants fail to hire enough staff to ensure that people receive exercise, other out-of-cell time, and escorts to their medical appointments. Isolation is staff-intensive because it requires correctional staff to apply restraints; escort people when they leave their cells for healthcare appointments, showers, and exercise; respond to psychological emergencies; escort healthcare staff during medication delivery; and conduct security checks and cell searches, among other tasks.  Throughout the prison system, including in non-isolation units, correctional staffing is insufficient to safely provide critical safety and security operations.  The ramification of this systemic short-staffing is that FDC cannot comply with its written isolation policies and procedures, and fails to consistently provide showers, security checks, out-of-cell exercise, dayroom time, and healthcare to people in isolation, including to people with several complex needs, like Plaintiff Espinosa.

130.    For the last several years, Defendants have admitted to American Correctional Association auditors that they cannot and will not provide adequate out-of-cell exercise to people in isolation.  Defendants also claim repeatedly that they will "request funding for additional staff, change segregation policy, and adjust staffing charts to comply with the standard pending funding approval." However, to date, on information and belief, Defendants have failed to take any of these actions.

131.   Despite their knowledge of the substantial risk of serious harm, Defendants impose no limit on the duration of isolation.  As a result, there are people in FDC who have been suffering in isolation for nearly 20 years with no end in sight.

132.   Despite their knowledge of the substantial risk of serious harm caused by isolation, Defendants have done little to nothing to prevent this harm.

## I.  No Legitimate Penological Purpose

133.   There is no legitimate penological purpose that supports FDC's policy and practice of subjecting people to the substantial risk of harm from its isolation policies and practices as they are currently implemented and enforced.  With adequate security measures, other states have developed ways of providing daily exercise, social interactions, and programming to individuals who are similarly

situated to those FDC has placed into isolation and claims cannot be permitted to have these interactions because they are such a danger.

134.   There are very few people, if any, and certainly not thousands, in FDC's custody who pose an ongoing imminent security threat such that they cannot safely leave their cells each day for exercise, social interactions, and programs.  Even for people who have engaged in behaviors that posed an imminent risk to the physical safety of others in the past, there is no safety or security reason to deprive them of basic human needs after the immediate threat has subsided.

135.   There is no safety or security reason to deny people in isolation non-contact visits or phone calls, especially because familial support is often critical to improve behaviors and success upon release from prison.[47]  In fact, a study of FDC, commissioned by the Florida Legislature and received and reviewed by FDC, urged FDC to focus on its visitation policies because "one of the primary incarceration factors that reduces recidivism is the number of family visits."[48]  By depriving people of basic human needs, including but not limited to contact with

---

[47] NORMAN HOLT & DONALD MILLER, EXPLORATIONS IN INMATE-FAMILY RELATIONSHIPS. SACRAMENTO RESEARCH DIVISION, at ch. VI (Cal. Dep't of Corr. 1972), https://fcnetwork.org/reading/reading-holt-miller-holt-millersum.html (last visited Apr. 18, 2019); N.E. Schafer, *Exploring the Link Between Visits and Parole Success: A Survey of Prison Visitors*, 38 INT'L JOURNAL OF OFFENDER THERAPY & COMPARATIVE CRIMINOLOGY 17-32 (1994).

[48] Fla. Legislature Office of Program Policy Analysis and Gov't Accountability, *Study of Operations of the Florida Department of Corrections*, at 103 (Nov. 2015), http://www.oppaga.state.fl.us/MonitorDocs/Reports/pdf/15-FDC.pdf (last visited Apr. 19, 2019).

their families, FDC is increasing the risk to public safety, especially as most people in isolation will be released at some point back into their communities.

136.   Indeed, at the conclusion of their prison terms, FDC frequently releases people in isolation directly back into the community after subjecting them to months or years of deprivations without any rehabilitative services.  On information and belief, if any of these individuals returns to FDC within two years, no matter the reason or their recent behaviors, FDC immediately places them back in isolation.  FDC's willingness to release people it has deemed too high of a security threat to live in a general prison population back into the community without any sort of transitional services, and then to put them back into isolation regardless of any actual current threat, highlights the arbitrariness of its isolation policies and practices.

137.   There is no safety or security justification for FDC's blanket policy and practice of limiting reading materials and education, and depriving access to televisions, radios, tablets, and other in-cell mental stimulation for people in isolation.  There is also no safety or security justification for FDC's policy and practice of limiting hygiene items for people in isolation, including sanitary napkins for women.  These policies and practices, absent some rare and particularized threat, are purely punitive, and, collectively with the other deprivations, unnecessarily subject people to substantial risk of serious harm.

65

138.   There is no legitimate penological purpose served by holding people in isolation for the lengths of time that the Defendants do, nor is there a legitimate penological purpose for extending isolation time for minor disciplinary infractions, as Defendants frequently do.  This is especially true when people have no ability to conform their conduct to FDC rules because of a mental illness or intellectual disability, and when their time in isolation is continually extended for minor disciplinary infractions such as not keeping one's cell clean.

139.   Instead of isolating people for prolonged periods, correctional systems that have successfully reduced their isolation populations *increase* interactions with staff and other incarcerated people through programming and treatment so that they can work on changing their behaviors, and staff can make informed decisions about when to lessen security measures.  These states have significantly reduced their isolation populations with no increase, and often a decrease, in prison violence.  Even FDC recognizes that increased social interactions decrease incidents of violence.

## J.  Disability Discrimination

140.   FDC, through its policies and practices, discriminates against people with disabilities in its use of isolation.  It fails to reasonably modify its isolation policies and procedures when the modifications are necessary to avoid discrimination on the basis of disability; it fails to ensure that people with

disabilities in isolation have access to, are permitted to participate in, and are not denied the benefits of, programs, services, and activities because of their disabilities; and it fails to ensure that people with disabilities in isolation are housed in the most integrated setting appropriate to meet their needs.

141.   FDC fails to modify its policies and procedures to ensure that people with disabilities are not placed in isolation because of their disabilities.  For example, many people with psychiatric and intellectual disabilities have difficulty regulating their behaviors or respond erratically or inappropriately to conflict, stress, staff, and other incarcerated people, and therefore cannot comply with some disciplinary rules.  Some also have a hard time understanding or conforming their behavior to prison rules.  Instead of providing individualized mental health treatment or programming through a reasonable modification, FDC responds to their disability-related behaviors by charging them with disciplinary infractions and sending them to isolation, including, for example, Plaintiffs Harvard and Meddler.

142.   After failing to modify its policies and procedures to consider people's psychiatric and intellectual disabilities upon initial placement in isolation, FDC also fails to modify its isolation policies and procedures when they remain in isolation by offering adequate out-of-cell time, social interaction, environmental stimulation, and mental health treatment to prevent worsening mental health

symptoms.  As a result of these failures, many people with psychiatric and intellectual disabilities in isolation experience further psychiatric harm and engage in self-harm behaviors such as swallowing razors or other objects, smashing their heads into walls, compulsively cutting their flesh, and trying to hang themselves. Plaintiff Harvard, for example, has scars up and down her arms from the numerous times she has cut herself in isolation.

143.  FDC's failure to modify its policies for individuals in isolation for behaviors directly related to their worsening mental health symptoms such as refusing to follow orders, yelling and banging on the door, inadequate personal and cell hygiene, and destroying property results in further disciplinary charges that prolong their isolation.  FDC also extends isolation for acts of self-harm instead of providing a reasonable modification that includes enhanced mental health treatment.

144.  FDC is aware that modifications to its isolation policies and practices are necessary to accommodate people with psychiatric disabilities.  In 2017, FDC's Director of Mental Health Services, Dr. Aufderheide, advised that "measures for accountability must be individualized, more flexible and take into account the inmate's mental illness."[49]  FDC takes the opposite approach; its isolation policies

---

[49] Dean Aufderheide, Florida Dep't of Corr., Mental Illness in Corrections: An Inconvenient Truth; The Need for a Public Safety/Public Health Model, at 5 (2017) (on file with author).

and practices are universal, inflexible, and do not consider people's disabilities.  As a result, according to Dr. Aufderheide, people with mental illness are 80% more likely to be disciplined, are five times more likely to be placed in isolation than those without mental illness, and represent nearly half of all the people in indefinite isolation.[50]

145.   FDC harms people with other types of disabilities because it systemically fails to make reasonable modifications to its isolation policies and practices.  For example, it is difficult and dangerous for people with mobility impairments, including those who use walkers and canes, to ambulate while restrained at the hands and feet.  Nonetheless, FDC refuses to modify its restraint policies and practices, thereby subjecting people with mobility disabilities to injuries and heightened risk of falls.  It fails to provide people with mobility or medical disabilities, including Plaintiffs Burgess and Kendrick, access to the exercise, such as physical therapy and exercise equipment, that they need to maintain or increase their ambulation and avoid exacerbation of medical symptoms and chronic pain.  It fails to reasonably modify its strip search policies for people with mobility impairments or catheters, including Plaintiffs Burgess, to reduce the risk of injury and needless humiliation.  It fails to modify its cell search policies for people with vision impairments who have difficulty finding their belongings after

---

[50] *Id.* at 9, 16, 17.

staff move them during the searches.  It fails to reasonably modify its policies to ensure that people with vision, speech, or hearing disabilities, including Plaintiff Espinosa, who are more isolated than others because of their disabilities have equal access to social interaction and environmental stimulation.  It fails to remove people with diabetes, including Plaintiff Kendrick, from their cells as often as needed for insulin injections; instead nurses inject people through the rusty, dirty food ports.  It also refuses to modify the schedule for medication delivery to ensure it is appropriately timed with insulin injections to avoid dangerous spikes in blood sugar levels.

146.   FDC lacks policies and procedures to ensure that people with disabilities in isolation have access to, are permitted to participate in, and are not denied the benefits of, programs, services, and activities.  For example, it fails to aid people in wheelchairs to complete their activities of daily living in their cells, including but not limited to transferring to the bed and toilet.  It also chains people in wheelchairs to their wheelchairs using restraints whenever they leave their cells; this is dangerous, humiliating, and degrading, and makes it impossible for people with mobility disabilities to ambulate unassisted.  FDC denies people with physical disabilities access to their medical supplies and assistive devices in isolation.  It denies people with medical disabilities access to the healthcare they need, including dialysis treatment.  People with psychiatric and intellectual disabilities

languish in isolation without access to programs, services, and activities available to those in the general prison population. They do not receive the support they need to avoid new disciplinary infractions while they are locked in their cells nearly 24 hours a day and therefore have very little prospect for release.

147.   FDC also lacks policies and procedures to ensure that individuals with disabilities are housed in the most integrated setting appropriate to meet their needs, which, under FDC's policies and practices, cannot be met in isolation. FDC isolates people with psychiatric and intellectual disabilities who engage in nonconforming behaviors because of their disabilities instead of housing them in settings where they can receive the treatment and services they need to safely live with other people. Plaintiff Harvard, for example, experiences fewer mental health symptoms and does not receive disciplinary infractions when she receives more intensive mental health services that are unavailable to her in isolation.

148.   The unnecessary placement of people with disabilities in isolation perpetuates unwarranted assumptions that they are incapable of participating in and benefiting from prison services, activities, and programs. Such placement also causes harm by severely limiting their independence and daily activities, including but not limited to family relations, social contacts, educational advancement, and healthcare.

149.   Other prison systems have safely integrated people with disabilities into the general prison population by providing adequate therapeutic and programmatic support, and by developing adequate systems to ensure the availability of accessible beds in general population dorms and cells.  FDC refuses to develop and implement such policies and practices.

## VI.   CLASS ACTION ALLEGATIONS

### A. Plaintiff Class

150.   Plaintiffs bring this action on behalf of themselves and all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(a), (b)(1) and (b)(2).

151.   Plaintiffs seek to represent a class consisting of all people in the custody of the Florida Department of Corrections who are, or will be in the future, locked in their cells, alone or with a cellmate, for an average of 22 hours or more per day ("Plaintiff Class").[51]

### Numerosity: Fed. R. Civ. P. 23(a)(1)

152.   The class is so numerous that joinder of all members is impracticable. The class is fluid, as prisoners regularly enter and leave the class as a result of FDC's policies and practices, but it includes at a minimum the roughly 10,000

---

[51] This proposed class does not include people sentenced to death and housed in Florida State Prison or Union Correctional Institution.

72

class members in isolation on any given day.  Due to FDC's policies and practices, all class members are at substantial risk of harm.

## Commonality: Fed. R. Civ. P. 23(a)(2)

153.   There are questions of law and fact common to the members of the class, including but not limited to:

- whether FDC's policies and practices regarding isolation constitute cruel and unusual punishment proscribed by the Eighth Amendment;

- whether FDC has been deliberately indifferent to the serious risk of mental and physical harm of class members;

- whether there is no legitimate penological purpose for FDC's policies and practices regarding isolation.

FDC is expected to raise common defenses to these claims, including denying that its actions violate the law.

## Typicality:  Fed. R. Civ. P. 23(a)(3)

154.   The claims of the Plaintiffs are typical of those of the Plaintiff Class, as their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the class's claims.

## Adequacy: Fed. R. Civ. P. 23(a)(4)

155.   Plaintiffs are capable of fairly and adequately protecting the interests of the Plaintiff Class because Plaintiffs do not have any interests antagonistic to the

class.  Plaintiffs, as well as the Plaintiff Class members, seek to enjoin the unlawful acts and omissions of FDC.  Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

## Fed. R. Civ. P. 23(b)(1)(A) and (B)

156.   This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of class members is approximately 10,000, and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for FDC.  Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

## Fed. R. Civ. P. 23(b)(2)

157.   This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because FDC's policies, practices, actions, and omissions that form the basis of this Complaint are common to and apply generally to all members of the class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class. Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive

relief or corresponding declaratory relief is appropriate respecting the class as a whole.  All state-wide isolation policies are centrally promulgated, disseminated, and enforced from the central headquarters of FDC.  The injunctive and declaratory relief sought is appropriate and will apply to all members of the Plaintiff Class.

### B. Disability Subclass

158.   Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick bring this action on behalf of themselves and, pursuant to Rule 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all qualified individuals with disabilities, as that term is defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B), in the custody of the Florida Department of Corrections who are, or will be in the future, locked in their cells, alone or with a cellmate, for an average of 22 hours or more per day ("Disability Subclass").[52]

### Numerosity:  Fed. R. Civ. P. 23(a)(1)

159.   The subclass is so numerous that joinder of all members is impracticable.  The class is fluid, as people with disabilities regularly enter and leave the class as a result of FDC's isolation policies and practices.  The exact number of subclass members is unknown, but members are identifiable using

---

[52] This proposed subclass does not include people with disabilities sentenced to death and housed at Florida State Prison or Union Correctional Institution.

records maintained in the ordinary course of business by FDC.  On information and belief, there are at least several thousand subclass members.  Due to FDC's isolation policies and practices, all members of the subclass are at risk of suffering from discrimination.

## Commonality: Fed. R. Civ. P. 23(a)(2)

160.   There are questions of law and fact common to the members of the subclass, including but not limited to whether FDC violates the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.  FDC is expected to raise common defenses to these claims, including denying that its actions violate the law.

## Typicality:  Fed. R. Civ. P. 23(a)(3)

161.   The claims of Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick are typical of those of the Disability Subclass, as their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the class's claims.

## Adequacy: Fed. R. Civ. P. 23(a)(4)

162.   Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick are capable of fairly and adequately protecting the interests of the Disability Subclass because they do not have any interests antagonistic to the subclass.  Plaintiffs

Harvard, Burgess, Meddler, and Kendrick as well as the Disability Subclass members, seek to enjoin the unlawful acts and omissions of FDC.  Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

## Fed. R. Civ. P. 23(b)(1)(A) and (B)

163.   Since the number of the Disability Subclass is approximately a few thousand, prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for FDC.  Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

## Fed. R. Civ. P. 23(b)(2)

164.   This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because FDC's policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all members of the subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass. Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole. All state-wide isolation policies are centrally promulgated, disseminated, and enforced from the central headquarters of FDC.  The injunctive and declaratory relief sought is appropriate and will apply to all members of the Disability Subclass.

## VII.   CLAIMS FOR RELIEF

### A. First Cause of Action

(All Plaintiffs and the Plaintiff Class v. Defendant Inch)
*42 U.S.C. § 1983; Eighth and Fourteenth Amendments*

165.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 – 164 as if fully set forth herein.

166.   Through the policies and practices described herein, Defendant Inch subjects all Plaintiffs and the Plaintiff Class to a substantial risk of serious harm and deprives Plaintiffs and the Class of the minimal civilized measure of life's necessities and human dignity, through the excessive and inappropriate use of isolation.  These policies and procedures are inconsistent with evolving standards of decency in a civilized society.  Defendant Inch has caused the wanton infliction of pain upon Plaintiffs and the Plaintiff Class.

167.   There is no legitimate penological purpose for Defendant Inch's isolation policies and procedures as implemented and enforced, and they amount to the unnecessary and wanton infliction of pain.

168.     These policies have been and continue to be implemented by Defendant Inch and his agents, officials, employees, and all persons acting in concert under the color of state law, in their official capacities, and are the direct and proximate cause of the Plaintiffs' and the Plaintiff Class's ongoing deprivation of rights secured under the Eighth and Fourteenth Amendments.

169.     Defendant Inch has been and is aware of all deprivations complained of herein and has condoned or been deliberately indifferent to such conduct. Defendant also has been and is aware of the substantial risk of harm caused by these deprivations and has not acted to eliminate this risk of harm.  It should be obvious to Defendant Inch, and to any reasonable person, that the conditions imposed on Plaintiffs and the Class cause tremendous mental anguish, physical harm, suffering, and pain to such individuals.

170.     As a direct and proximate cause of these actions and omissions, Plaintiffs and the Plaintiff Class have suffered, and will continue to suffer, from a substantial risk of serious harm and actual harm.  These harms will continue unless enjoined by this Court.

## B. Second Cause of Action

(Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick
and the Disability Subclass v. Defendant FDC)
*Americans with Disabilities Act*

171.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1-164 as if set forth fully herein.

172.   Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick and other Disability Subclass members are qualified individuals with disabilities as defined in the Americans with Disabilities (ADA).  They have mental or physical impairments that substantially limit one or more major life activities, they have records of such impairments, or they are regarded as having such impairments.  All people in the Disability Subclass meet the essential eligibility requirements for the receipt of services of the participation in programs and activities provided by Defendants.  42 U.S.C. § 12102(2); 42 U.S.C § 12131(2).

173.   Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick and other Disability Subclass members are qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in FDC custody within the meaning of Title II of the ADA.

174.   Defendant FDC is a public entity as defined under 42 U.S.C. § 12131(1)(A), and it has an affirmative duty to create policies and procedures to prevent discrimination based on disability.

80

175.   Defendant FDC violates the ADA by failing to ensure that people with disabilities have access to, are permitted to participate in, and are not denied the benefits of, programs, services, and activities provided by Defendant.  42 U.S.C. § 12132; 28 C.F.R. § 35.152(b)(1).

176.   Defendant FDC violates the ADA by failing to make "reasonable modifications to policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability…." 28 C.F.R. § 35.130(b)(7).

177.   Defendant FDC discriminates against "qualified individual[s] with a disability" within the meaning of the ADA by administering programs and services for individuals with disabilities in a manner that denies them the opportunity to receive services in the most integrated setting appropriate to their needs.  28 C.F.R. § 35.152(b)(2).

178.   Defendant FDC utilizes criteria or methods of administration that have the effect of subjecting Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick and the Disability Subclass to discrimination and that defeat or substantially impair accomplishment of objectives of FDC programs, services, and activities.  28 C.F.R. § 35.130(b)(3).

179.   As a result of Defendant's policies and practices regarding individuals with disabilities, Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick and

the Disability Subclass are unnecessarily placed and retained in isolation due to their disabilities; are denied equal access to activities, programs, and services for which they are otherwise qualified; and are denied the opportunity to receive services in the most integrated setting appropriate to their needs.

180.   As a direct and proximate cause of these actions and omissions, Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick and the Disability Subclass have suffered and continue to suffer from harm and violation of their ADA rights.  These harms will continue unless enjoined by this Court.

## C. Third Cause of Action

(Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick
and the Disability Subclass v. Defendant FDC)
*Section 504 of the Rehabilitation Act*

181.   Plaintiffs incorporate by reference each and every allegation contained in Paragraphs 1 – 164 as if set forth fully herein.

182.   Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick and the Disability Subclass are individuals with disabilities as defined in Section 504 of the Rehabilitation Act, 29 U.S.C. §§ 705(20), 794.

183.   Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick and the Disability Subclass are qualified to participate in the services, programs, activities, and benefits provided to incarcerated people in FDC custody within the meaning Section 504 of the Rehabilitation Act.

184.   Defendant FDC is a program or activity receiving federal financial assistance within the meaning of the Rehabilitation Act.  29 U.S.C. § 794.

185.   Defendant FDC excludes Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick and the Disability Subclass from participation in, and denies them the benefits of programs or activities, by reason of their disabilities. 29 U.S.C. § 794(a); 28 C.F.R. § 42.503(a).

186.   Defendant FDC discriminates against "qualified individual[s] with a disability" within the meaning of the Rehabilitation Act by administering programs and services for individuals with disabilities in a manner that denies them the opportunity to receive services in the most integrated setting appropriate to their needs.  29 U.S.C. § 794; 45 C.F.R. § 84.4(b)(2).

187.   Defendant FDC denies Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kenrick and the Disability Subclass the opportunity afforded others to participate in program or activities.  28 C.F.R. § 42.503(b)(1).

188.   Defendant FDC utilizes criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, and defeat or substantially impair accomplishment of the objectives of Defendant's programs or activities with respect to handicapped persons. 28 C.F.R. § 42.503(b)(3).

189.   Defendant FDC violates Section 504 of the Rehabilitation Act by failing to reasonably accommodate people with disabilities in its facilities, programs, activities, and services.

190.   As a result of Defendant FDC's discrimination and failure to provide reasonable accommodations, Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick and members of the Disability Subclass do not have equal access to the FDC's activities, programs, and services for which they are otherwise qualified.

191.   As a direct and proximate cause of these policies and practices, Plaintiffs Harvard, Meddler, Espinosa, Burgess, and Kendrick and the Disability Subclass have suffered and continue to suffer from harm and violation of their rights under Section 504 of the Rehabilitation Act.  These harms will continue unless enjoined by this Court.

## VIII.  PRAYER FOR RELIEF

192.   Plaintiffs and the class and subclass they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of the Defendants as alleged herein, unless Plaintiffs are granted the relief they request.  Defendants' policies and practices are the direct causation of the violations of the Eighth and Fourteenth

Amendments to the Constitution of the United States, the ADA, and Section 504 of the Rehabilitation Act as alleged herein.

193.   WHEREFORE, Plaintiffs on behalf of themselves and the class and subclass they represent, respectfully request that this Court:

a.   assume jurisdiction;

b.   declare this suit is maintainable as a class action pursuant to Rules 23(a) and 23(b)(1) and (2) of the Federal Rule of Civil Procedure;

c.   adjudge and declare that the conditions, acts, omission, policies, and practices of Defendants and their agents, officials, and employees are in violation of the rights of Plaintiffs and the class and subclass they represent under the Eighth and Fourteenth Amendments to the U.S. Constitution, the ADA, and Section 504 of the Rehabilitation Act;

d.   permanently enjoin Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, from continuing the unlawful acts, conditions, and practices described in this Complaint;

e.   order Defendants, their agents, officials, employees, and all persons acting in concert with them under color of state law or otherwise, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm described herein, and to ensure that

people are not placed and retained in isolation without a legitimate
penological purpose;

f.  order Defendants, their agents, officials, employees, and all persons
acting in concert under color of state law or otherwise, to provide
equal access to programs, services, and activities for people with
disabilities, including but not limited to housing them in the least
restrictive and most integrated settings appropriate to their needs;

g.  order Defendants, their agents, officials, employees, and all persons
acting in concert under color of state law or otherwise, to modify its
isolation policies and practices to accommodate the needs of people
with disabilities and minimize the traumatic impact of isolation;

h.  award Plaintiffs, pursuant to 29 U.S.C. § 794a, 42 U.S.C. §§ 1988,
12205, and 12133, the costs of this suit and reasonable attorneys' fees
and litigation expenses;

i.  retain jurisdiction of this case until Defendants have fully complied
with the orders of this Court, and there is reasonable assurance that
Defendants will continue to comply in the future absent continuing
jurisdiction; and

j.   award such other and further relief as the Court deems just and proper.

Respectfully Submitted,

Dated: May 8, 2019

Kelly Knapp
Fla. Bar No. 1011018
Southern Poverty Law Center
4770 Biscayne Blvd., Suite 760
Miami, FL 33137
Telephone: (786) 347-2056
kelly.knapp@splcenter.org

Shalini Goel Agarwal
Fla. Bar No. 90843
Sumayya Saleh
Fla. Bar No. 119372
Southern Poverty Law Center
106 East College Ave., #1010
Tallahassee, FL 32302
Telephone: (850) 521-3024
shalini.agarwal@splcenter.org
sumayya.saleh@splcenter.org

Lisa Graybill*
Texas Bar No. 24054454
Southern Poverty Law Center
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
Telephone: (334) 549-0498
lisa.graybill@splcenter.org

Andrea Costello
Fla. Bar No. 532991
Christopher M. Jones
Fla. Bar No. 994642
Jennifer Painter
Fla. Bar No. 110966
Florida Legal Services

87

122 E. Colonial Drive, Suite 100
Orlando, FL 32801
Telephone: (407) 801-0332 (direct)
andrea@floridalegal.org
christopher@floridalegal.org
jennifer.painter@floridalegal.org

Dante P. Trevisani
Fla. Bar No. 72912
Florida Justice Institute, Inc.
100 SE 2nd St., Ste 3750
Miami, FL 33131
Telephone: (305) 358-2081
dtrevisani@floridajusticeinstitute.org

*Pro hac vice* application forthcoming

**Attorneys for Plaintiffs**