UNITED STATES DISTRICT COURT, N.D. FLA., TALLAHASSEE DIV.

HARVARD, et al.

v.

INCH

Case No.: 4:19-cv-212

LEGAL MAIL
Provided to Florida State Prison on
7/20/20 for mailing by _____

## MOTION TO JOIN HARVARD v INCH WITH THE NEWLY FILED COMPLAINT IN SUSSMAN v INCH (see Exhibit A)

1. In Harvard v Inch, this Hon. Court ruled that "there is a logical relationship between the claims of all seven named Plaintiff's because the underlying facts giving rise to each Plaintiff's claim is the same — namely: policies and practices promulgated by high-level officials in Tallahassee. Therefore, joinder of their claims ... is proper." Id., 28 Fla. L. Wkly FED at D44. See newly filed complaint in Sussman v Inch, case # unknown, attached hereon as Exhibit A

2. Sub judice, Sussman, who already has standing as a class member in Harvard v Inch, clearly alleges on page 3 of his Complaint that the "sole Defendant: DOC Sec. Mark Inch('s) ... alleged involvement is the promulgation and enforcement of statewide policies and practices that have resulted in Sussman being held in isolation ... in violation of the 8th Amend; the ... ADA; and the ... RA ... for over 90% of his 20 year sentence." See pg. 3 of Complaint at Exhib. A. Moreover, he "adopts ... all of the facts, arguments and authorities set forth in the operative complaint in Harvard, ... Doc. 13 ..., and ... alleges he has been arbitrarily swept into a perpetual state of isolation by the DOC's statewide policies, promulgated in Tallahassee, of isolating over 10,000 people in the box as a matter of course." See par. 19 of Complaint (citing Harvard, Doc. 13 at paragraphs 2, 59 and 75). Indeed, virtually all of his allegations of personal suffering track those in Harvard. See par. 19 of Complaint (citing Harvard at Doc. 13 throughout). Thus, to show that joinder of this instant case with Harvard is proper, Sussman relies on this Hon. Court's opinion in Doc. 54 of Harvard, 28 Fla. L. Wkly FED at D44. See Sussman's Complaint attached hereon as Exhibit A.

3. WHEREFORE, Sussman respectfully asks this Hon. Court to join Harvard v. Inch with Sussman v. Inch.

FILED USDC FLND TL
JUL 24 '20 PM 4:30

UNDER PENALTY OF PERJURY, I declare the foregoing facts to be true on this 20th day

of July, 2020

David Charles Sussman, Petitioner, pro se

I CERTIFY that I gave copies of this motion to jail mail, 1st class postage

prepaid, for mailing to Fla. Atty. General, Tallahassee ; and to DOC General

Counsel, Tallahassee, and to the Clerk of U.S. Dist. Court

Courthouse, Tallahassee, on 7/20/20 , 2020.

David Charles Sussman,

-2-

# EXHIBIT A

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT, NORTHERN
DISTRICT OF FLA., TALLAHASSEE DIVISION

DAVID CHARLES SUSSMAN,
a.k.a. "El Maestro", Plaintiff,

v.                                              Case No.: 4:20-cv-

MARK INCH, Sec., Fla. Dept.
of Corrections, Defendant.

42 U.S.C. §1983 CIVIL RIGHTS COMPLAINT ALLEGING IM-
MINENT DANGER; MOTION FOR A PRELIMINARY
INJUNCTION (TRO); and MOTION TO JOIN THIS CASE
WITH HARVARD v. INCH, 4:19-cv-212 (N.D. FLA.)

   **I.** Plaintiff, David Charles Sussman, a.k.a. "El Maestro," Fla.
Dept. of Corrections (DOC) #J06481, is currently confined in
close management (CM) at Fla. State Prison (FSP), P.O. Box 800,
Raiford, FL 32083.

   **II.** This complaint follows the format of this Honorable Court's
preprinted form, makes allegations against DOC Sec. Mark Inch only,
in his official capacity only, and seeks injunctive and declaratory re-
lief only without prejudice to sue Inch and others in their official
and/or individual capacities for damages after Sussman is released
from prison, and free of the constraints of the Prison Litigation
Reform Act (PLRA).

   **III.** Sussman has initiated at least for lawsuits in U.S. Dist. Cts,
M.D. Fla., that were dismissed as frivolous or failure to state a claim
in cases #'d 3:09-cv-694; 3:10-cv-45; 3:12-cv-985; and 6:13-
cv-541. Therefore, he is a 3-Striker under 28 U.S.C. §1915(g),
and cannot proceed in forma pauperis (IFP) unless he alleges
imminent danger herein, which he sufficiently does. See para-
graphs 19-28, 54 and their accompanying footnotes, infra.

   **IV.** To the extent that Sussman alleges herein a continuing pattern

of unconstitutional retention in solitary confinement (the box); abuse by DOC staff; the DOC's failure to protect him from violence, and deliberate indifference to his protection needs; and its improper consideration of retaliatory acts by DOC staff or the DOC itself when it assigned him to CM, he has filed several suits in state and federal courts that dealt or deal substantively with some (but not all) of the facts alleged herein. See complaints filed in Fla. 2nd Jud. Cir. Ct., Jefferson Co., case 2015-CA-54; Fla. 14th Jud. Cir. Ct., Jackson Co. case 2015-B31-CA; Fla. 2nd Jud. Cir. Ct. case 2015-CA-558 (alleging, inter alia, abuse by DOC staff; failure to protect; cruel, prolonged time in box) and its accompanying Appendices B & E-I attached hereon as Exhibit A[FN1]; Fla. 2nd Jud. Cir. Ct., Leon Co. case 2020-CA-438 attached hereon as Exhibit C (challeging FSP DR# 205-192686 that is attached hereon as Exhibit J at 4-7); U.S. Dist. Ct., S.D. Fla. case 1:13-cv-22818 (alleging abuse by DOC staff) attached hereon as Exhibit A's App. I; Habe Petition with its accompanying Exhibits A-C filed in Fla. 8th Jud. Cir. Ct., Bradford Co. case 04-2019-CA-261 (alleging, inter alia, retaliatory placement in CM) attached hereon as Exhibit B[2]; Habeas Petition filed in Fla. 14th Jud. Cir. Ct., Wash. Co case 2016-CA-117 (attached hereon as Exhibit M). However, the only one of these actions that seeks relief similar to that sought herein is the Bradford Habeas Petition (seeking release from CM), but Sussman's arguments for such relief are based on Fla. law as opposed to the 8th Amend. which he primarily relies on herein.

## V. PARTIES, AND THEIR INVOLVEMENTS

Sole Plaintiff: David Charles Sussman (see section I, supra).

---

1. Accordingly, references to the Appendices in Leon Co. case 2015-CA-558 will be cited herein as "Exhibit A's App. *" followed by the appropriate appendix letter.
2. Accordingly, references to the exhibits in Bradford Co. case 19-CA-261 will be cited herein as "Exhibit B's Exhibit *" followed by the appropriate exhibit letter.

Sole Defendant: DOC Sec. Mark Inch (see section II, supra). His alleged involvement is his promulgation and enforcement of statewide policies and practices that have resulted in Sussman being held in isolation in the DOC in violation of the 8th Amend., the Amer. With Disabilities Act (A.D.A.); the Rehabilitation Act (R.A.); and the Prison Rape Elimination Act (PREA)[3] for over 90% of his 20 year prison sentence.

## VI.  STATEMENT OF FACTS

1.  Sussman is a 62 year old male incarcerated in the DOC serving a 20 year sentence for having engaged in premarital, consensual sex with his own lawful wife when she was supposedly 15 years old. Consequently, he is labled as a so-called "sex offender." Despite his advanced age; and despite the benign, extenuating circumstances of his so-called crime, his fellow inmates and the DOC cops constantly harass him, and physically abuse him. See Exhibit A and its concomitant Appendices B-I; see also Exhibits B and E-M. Accordingly, as early as May 2005, he sought protective management unit placement (PMU). Instead of giving him PMU placement, however, the DOC retaliated against him for seeking such, and began a campaign of sexual harassment, physical abuse, and pretextual, retaliatory disciplinary reports (DR's) that continues unabated to this day, and has kept him in the box for more than 90% of his time in prison.

2.  For example, immediately after he sought protection in May of 2005, Gulf C.I. officials Totten and Guanza, among others, in addition to continuously harassing him sexually and threatening him with rape, stacked 6-10 bogus DR's on him. When, on 7/17/05, while his box cellmate, Juan Carlos Castro, was momentarily out of the cell, Sussman sought a PM review

3.  Therefore, venue properly lies in this Honorable Court. To show such, Sussman relies on, and asks this Court to take judicial notice of, _Harvard v. Inch_, case 4:19-cv-212, Doc. 52 (N.D. Fla. 10/11/19), which is attached hereon as Exhibit D, in its entirety. See _id._ (denying DOC's motion to transfer venue) (citing 28 U.S.C. §1391).

against him by invoking PREA, Gulf Capt. Belelis ordered Sussman to let Castro back in the cell in the first of 40 uses of force (UOF's) that would be employed against him after Sussman refused to cuff up and let Castro back in the cell. In addition, Belelis wrote Sussman more DR's.[4]

FOOTNOTE 4

4. As of the filing of this instant complaint, the DOC has employed 40 UOF's on Sussman, and written him over 100 DRs. While most UOF's and retaliatory DR's were pretextual, many were very obviously and blatantly written in direct retaliation for Sussman having sought protection. See, e.g., DR# 510-170759 at Exhibit E at 1-5 ("refusing to go to compound" out of fear); DR#185-180810 at Exhibit E at 6-7 ("Because I... feared my cellmate, he should have written [me] a PM review, not a DR."); DR#185-180907 at Exhibit E at 8-10 ("...I feared for my life to enter the cell."); DR#106-181600 at Exhibit E at 16 (written in retaliation for refusing cellmate); DR#122-181825 at Exhibit B's Exhibit C (written in retaliation for seeking protection); DR's #'d 102-160772 and 160773 (UOF and 2 DR's written in retaliation for seeking protection from cellmate Larry Brooks); DR #102-160697 (UOF and a DR in retaliation for refusing cellmate William Johns); DR#102-160804 (fighting with William Johns after being forced into his cell); DR#102-160828 (refused cellmate Kurt James out of fear); DR#102-160699 (UOF and DR; forced into cell despite fear of Tori Moore). UOF in Feb. or March of 2010 at Col. C.I. (see par. 3, infra); UOF Oct. 2013 when Dade C.I. officers dragged Sussman along the floor, and forced him into a cell with Christopher Kyle, with whom he was pending PM review; UOF Jan. of 2017 at N.W.Fla. Recep. Ctr. Annx for refusing out of fear to get on transport bus; UOF Jan. 2017 at Hamilton C.I. for refusing to accept cellmate; UOF Feb. or March 2017 Hamilton C.I. refusing cellmate; UOF Sept. 3 or 4 of 2017 at Tomoka C.I. refusing cellmate; UOF's 9/8/17 and 9/17/17 (see par. 9, infra); UOF Nov. 18 or 19 at Wakulla C.I. for refusing Ryan Lawrence as a cellmate; DR's at ACI #'d 102-153009 and 102-160670 (both DR's for refusing to accept a cellmate out of fear).

END OF FOOTNOTE 4

3. By June of 2006, Sussman was placed in CM for no good reason, was housed alone, but still menaced and assaulted by other inmates. Accordingly, upon his release from CM on 12/30/09, he was placed in the PMU at Columbia C.I. Incredibly, he was still not released from the box. Not surprisingly, by Feb. or March of 2010, he had a fight with his cellmate, Inmate Martin Northard, (DC# K58309) notified his dorm Sargeant, and refused to reenter the cell they shared. In response, said Sargeant physically forced him into the

— 4 —

cell with Northard. Soon thereafter, that unauthorized UOF was documented and investigated by the DOC's Office of Inspector General (OIG or IG).

4. Next, on 12/23/10, while in the box at the DOC's S.Fla. Recep. Ctr. (SFRC), Sussman refused to "cuff up" to accept Inmate Calvin Crawford as a cellmate. In response, SFRC Sgt. Trevor Hampton improperly rolled his cell door open, and battered him. See Complaint in <u>Sussman v. Hampton</u>, case 1:13-cv-22818 (S.D. Fla.) at Exhibit A's App. I.

5. In the interim, in Nov. of 2010, for no good reason, the DOC stripped Sussman of his PMW placement, and reclassified him as a general population (gen. pop.) inmate. He administratively appealed said reclassification, but was denied, Exhibit A's App. B at 1-3, and was even threatened by the DOC with placement in CM if he "failed to thrive" in general pop. Exhibit A's App. B at 2. Soon thereafter, he was, indeed, put on CM where, in retaliation for the nature of his so-called crime; and in retaliation for the nature of his so-called crime; and in retaliation for his incessant requests for protection; and in retaliation for his incessant litigiousness in general, DOC staff orchestrated several attacks on his person by his fellow inmates. See attacks of 8/19/11, 10/20/11 and 5/31/12 described on pages 1-13 of Complaint in case 2015-CA-558 at Exhibit A; see also Exhibit A's Appendices E-G.[5]

6. Sussman was released from CM in June of 2013, but continued to seek protection as he was assaulted at, and transferred to and from, a myriad of different camps. That was, until April 2014, when he was placed in an "over 50" years of age housing at Zephyrhills C.I. (ZCI).[6] Incred-

---

5. Also on CM at Suwannee C.I., on 1/5/13, Sussman suffered a PREA attack by his cellmate Johnnie Chandler, DC# 103378. He admin'ly grieved the attack, see DC1-303 #13-6-06623 (denied), which was investigated by the DOC's OIG. However, in violation of DOC PREA Proc. 602.053(9)(a), Sussman was never given the results of said investigation. See also FN 9, infra.

6. It should be noted that even at ZCI, Sussman was housed in the box more than 90% of the time for 4 DR's, 3 of which were subsequently reversed by the DOC.

ibly, in blatant retaliation for his litigiousness, ZCI Asst. Warden Cumbie wrote him a DR for nothing more than expressing his intent to sue the DOC, and then designated him to be a "security threat" for nothing more than he having filed a lawsuit against her in Fla's 2nd Jud. Cir. Cf., Leon Co. case 2014-CA-1766 (alleging a very petty, non-violent, benign claim of 1st Amend. retaliation against her). This "security threat" designation dogs Sussman to this day. See Exhibit M and its attachments.

7.  From ZCI, Sussman was kept in the box at the mental health unit (MHU) at Charlotte C.I. until circa 11/22/14, when he was released to gen. pop. en route to Apalachee C.I. (ACI), which had always been a gang infested, punishment camp where litigious inmates (a.k.a. writ writers) are routinely sent in retaliation for their litigiousness.  Not surprisingly, while in layover at the DOC's Recep. & Med. Ctr. (RMC) in Lake Butler (yet another prison camp that is infamous, like FSP, for its abuse of inmates by staff), Sussman was menaced and extorted by Inmate Aeurleas McClarity, sought protection from him, was denied such by RMC guards, left in gen. pop. with him, and, on 12/14/17, was physically forced on a transport bus with him, on which he was almost murdered by him.[7] Consequently, Sussman fears being housed at RMC, and repeatedly refuses under duress of imminent violence medical care that might necessitate that he would be housed there.[8]

---

7. See pages 13-15 of Complaint in case 2015-CA-558 at Exhibit A; see also Exhibit A's Appx. H. Since that attack, Sussman suffers from mild to severe headaches, and infrequent petit mal seizures, but has been denied medical care for it. See Exhibit A's Appx. H at 8-10.

8.  For example, even if RMC staff did not routinely perpetrate violence on inmates like Sussman (which they do), see par. 1, supra, if he were to seek a surgeon's consult regarding his hernia (which he does not out of fear and duress), in spite of said hernia and his "light lift pass no > 15 lbs", Ex H at 2, they would force him to either carry all of his property (including approx. 50 lbs. of legal files), or abandon it to be discarded in the trash. In other words, if he were to seek medical attention for his hernia, the DOC's   (FOOTNOTE 8 continues next page)

8. Sussman was treated at Madison C.I. for his severe head wounds he suffered at the hands of McClarity on the RMC bus. Instead of transferring to ACI, however, he was emergency transferred to Jefferson C.I. (JCI). Immediately upon his arrival, he was questioned by Classification Supervisor Ellison and Capt. Collins as to why ZCI officials had labeled him a security threat. Sussman responded he had a petty lawsuit pending against Cumbie, but was not in any way a security threat to the DOC. Regardless, he was, thereupon, put in the box under a bogus, retaliatory investigation under the pretext of a PM review, see Exhibit M at 1 n.1 and its accompanying text (citing Declaration By Ernetta Roberts that's attached hereon as Exhibit M at 5), and would remain in the box for more than 90% of his time under a myriad of pretexts right up to the filing of this instant complaint. See facts alleged in Habeas Petition #2016-CA-117 at Exhibit M at 1-3 (describing pretextual isolation at JCI and ACI); and see facts alleged in Habeas Petition #04-2019-CA-261 at Exhibit B and its accompanying exhibits (describing retaliatory placement in CM); & see FN 53, infra, and facts alleged in Petition #2020-CA-438 (describing pretextual DR's at FSP keeping him indefinitely on CM) at Exhibit C and FN 23 & its accompanying text, infra.

9. In the interim, on 9/8/17, while he was pending a PM review, and after having notified Tomoka C.I. (TCI) Asst. Warden Duncan 24 hours earlier of threats of sexual violence directed at him by other inmates in the box, and of his genuine, bonafide fear of them, Duncan

---

(FOOTNOTE 8 continued) de facto policy of forcing him to carry all of his property would result in the worsening of his hernia (especially in the crucial days immediately following the surgery, so that, in violation of the A.D.A. and R.A., he is completely foreclosed from getting the surgery he needs to correct it. Similarly, and also under the threat of imminent harm, he has refused hearing and eye exams, both of which he desperately needs, as such exams might necessitate that he would be housed at RMC, where he would surely suffer some form of abuse. Thus, said refusals cannot be said to have been made voluntarily, but were done under duress.

physically threw Sussman on a hurricane evacuation bus with said inmates. Exhibit F at 1 thru 5. Not surprisingly, he was sexually assaulted on that bus. Exhibit F at 1-5. Even worse, when the bus arrived at Union C.I. (UCI) where he was evacuated to, all of his attempts to report it were ignored or denied, and UCI guards even retaliated by misleading the other inmates to believe he had sexually molested a child under 12 years old. See Exhibit F at 10-11. When verbal threats from said inmates made it apparent he would suffer yet more abuse on the bus ride scheduled for 9/18/17 back to TCI, Sussman, on 9/17/17, began to self harm until officers sprayed him with mace in a videotaped UOF. It was only after Sussman had reported the assault of 9/8/17 on that OIG bound UOF video that said assault was finally documented. Unfortunately, UCI medical and security both subjected him to yet more retaliatory physical abuse and sexual humiliation and degradation in violation of PREA. Exhibit F at 6-9. He reported it, but, in violation of PREA, was ignored. Exhibit F at 6-9. See DOC Proc. 602.053(2)(f)(mandating the notification of OIG of PREA allegations); (3)(d)(same as (2)(f)); and (9)(a)(mandating victim is given a final copy of OIG's PREA report).[9]

10. On 9/18/17, while on suicide watch, Sussman was transferred on a van (as opposed to a bus) back to TCI. As noted in par. 8, supra, his odyssey of receiving pretextual, retaliatory DR's continued unabated, as did UOF's and sexual harassment,[10] all of which eventually led to his retaliatory placement in CM on 1/4/19. See Exhibit B and its accompany Exhibits A thru C (describing Sussman's placement in CM for, interalia, seeking protection).

11. On 4/25/19, Sussman was emergency transferred to CM at FSP for, inter alia, swallowing a toothbrush. After he suffered from a bloody

---

9. Despite the fact the DOC has the Fed. PREA on their Lexis Nexis DVD collection, Exhibit F at 13, they have denied Sussman access to it. Exhibit F at 12-13. Therefore, he can only cite the DOC's coordinate PREA Proc. 602.053 herein, but it tracks the Fed. PREA, and is authoritative.

10. See also FN 4, supra, and it cited Exhibits E at 6-16 (attached hereon).

anal discharge the next day, he was brought to the FSP med. clinic's exam room where, in violation of A.D.A. and PREA, and in retaliation for he having declared a psych and med. emergency, he was sexually harassed and brutally beaten by FSP Sargeants Halsey and Porr at the behest of Nurse K. Smith, M.A., and Nurse Doe". See Exhibit G at 1-2, 16-17[12].

12. On 8/8/19, Sussman received a copy of the D.O.C.'s O.I.G.'s final PREA report concerning the events described in the preceding par. Exhibit G at 3. Much to his dismay, said report did not, inter alia, discuss the scar Porr received during the 4/26/19 attack on Sussman's person, Exhibit G at 5, or identify Nurse Doe by name. Exhibit G at 5. So, he wrote an admin. grievance demanding a supplemental report, and, on 8/13/19, stuck it out of a crack in his cell door to be picked up by FSP's grievance Coordinator. Unfortunately, before the Coordinator arrived, one of Porr's cohorts in the 4/26/19 attack, FSP Sgt. Scott, grabbed said grievance, read it, and warned Sussman to not submit it. Not to be deterred, Sussman commanded Scott to return it, and submitted it shortly thereafter. Minutes later, Scott demanded to see the actual PREA report. When Sussman refused to show it to him, Scott threatened to enter his isolation cell to "get it." Soon thereafter, under the pretext of putting Sussman on property restriction for supposedly having a messy cell[13]; and in retaliation

---

11. More specifically, all four of these state actors accused Sussman of "wanting attention" and the nurses acted as look outs during the attack. Nurse Doe's identity is being covered up by the DOC as is alleged in par. 12, next.

12. Exhibit G at 1, to wit: DC1-303#19-6-22476, is missing because it was stolen as is alleged in par. 12, next. See also Exhibit G at 5-70.

13. "Property restriction" in FSP's poorly heated, drafty cells is very accurately described in, and Sussman asks this Hon. Court to take judicial notice of, Harvard v. Sec. DOC, Inch, 4:19-cv-212, Doc. 13 at ? (N.D. Fla. 1/19)(describing "property restriction" as being isolated in a cell with no property whatsoever — no mattress, no blanket, no clothing, no socks, no shoes — except for boxer underwear in a cell in which the temperature drops as low as the lower 50's F (not including wind chill factor) for 72 hours (usually more) during which the inmate is unable to sleep, all of which serves no valid penological interest, and which is cruel and unusual under the 8th Amend. to the U.S. Const.).

for, inter alia, submitting said grievance; and for the express purpose of steal-ing his PREA report[14], Scott and his Lt. Philbert forcefully extracted him from his cell, and stole, inter alia, said PREA report and grievance #19-6-22476 that precipitated said report. See Exhibit G at 1-2, 4-10; see also foot-note 12, supra. In addition, Philbert wrote him a bogus DR. Exhibit G at 4.

13. Still not to be deterred, Sussman continued to grieve all of the above events, Exhibit G at 5-10, 14-21, and the DOC continued to retaliate with, inter alia, more DR's. Exhibit G at 11-21; see also Exhibits H-J and footnotes 37 and 53, infra. All of his grievances were either ignored, destroyed or denied. In fact, from the day of his arrival at FSP, any grievance Sussman submitted there which alleged any violations of PREA, ADA or the U.S. Const. were des-troyed by FSP officials. When he properly took those grievances to the next level as is allowed by F.A.C. 33-103.011(4), or as an emergency grievance alleging retaliation under 33-103.007(6), the DOC Sec. Inch improperly denied every last one of them as if Sussman had procedur-ally defaulted the issues raised therein (which he had not). See Exhibits G at 6, 8, 10, 15, 17, 19, 21; Exhibit H at 6, 8, 9-2, 9-4[FN15]; Exhibit I at 2, 4, 4-2, 6, 10; Exhibit J at 8 thru 8-2, 12 thru 29-4.

14. In the meantime, given the severity of the 4/26/19 PREA attack on his person, Sussman began to decompensate psychologically with, inter alia, depression, suicidal thoughts, acts of self-harm, panic attacks,

14. Note that when Sussman alleges an event was done for an "ex-plicit" or "express" purpose, it means the actor involved specifically verbalized such.

15. It should be noted that Exhibit H at 9 (to wit: DC6-236# 205-1912-0577), in which Sussman managed to allege A.D.A. and 8th Amend. violations tracking those in *Harvard v Inch* without it being destroyed in FSP grievance coordinator's trash can, miraculously made it to FSP Classification Officer Johnston, who denied it. See Exhibit H at 9 (citing *Harvard v Inch*, 28 Fla. L. Wkly FED D41, D47-48(N.D. Fla. 1/10/20)). Nevertheless, when Sussman appealed it, that appeal was destroyed by said Coordinator; then, when he took it to the DOC Sec. Inch under 33-103.011(4)(next level), Inch improperly denied it as if Sussman had procedurally defaulted it (which he did not). See also sworn declaration by IM Bryant Williams at Exhibit G at 22.

hallucinations, insomnia, and weight loss. Exhibit H at 7 thru 9-4. Additionally, given FSP med. staff's involvement in said PREA attack; and given that one of his attackers (Sgt. Halsey) was permanently posted in the med. clinic; and given Sgt. Porr's. and his cohorts ongoing, relentless sexual harassment of him, Sussman naturally feared returning to the med. clinic, Exhibit G at 14-17, Exhibit H at 5 thru 9-4, and similarly feared seeking psychological help.[16] Exhibit G at 14-15; Exhibit H at 7 thru 9-4. In fact, med. staff even played on his fear of Halsey to discourage him from accessing med. attention, and threatened him with exposure to Halsey should he dare to seek such. Exhibit H @ 5-8. Notwithstanding, after seven months had passed, Sussman took a chance, tried his luck, and went to the clinic. Incredibly, med. staff called Halsey off of his new post on J-Wing to the clinic to menace Sussman, who was forced under duress to sign a refusal for treatment. Exhibit H at 12-13. Even worse, in explicit retaliation for seeking med. attention[17], and for grieving under PREA the events of 4/26/19, he was written yet another retaliatory DR#205-192410, Exhibit G at 13, which was thrown out. See also Exhibit G at 14-15; Exhibit H at 7, 12.

15.   Aside from being denied access to med. & psych care as is described in paragraphs 11 and 14, supra, and in footnotes 8 and 11 and their accompanying texts, supra; and aside from the retaliatory DR#205-192410 he received for trying to access med. care, Exhibit G at 13-15, even when he risks his life to be seen by the med. doctor, Sussman is still denied medical

16.   It should be noted that, from approx. 2005-2018, Sussman's psych grade was at the highest level — to wit: psych grade 3 (entitling him to a wide array of services) — but that, in May of 2018, without his knowledge or consent, the DOC dropped his psych grade to level one. Because F.A.C. and/or DOC procedure (and common sense) prohibit the lowering of an inmate's psych level while he is in isolation, the DOC violated A.D.A. and R.A. when it lowered Sussman's psych grade as he was in the box when they lowered it. Sussman grieved it under R.A. and A.D.A., but was denied.

17.   See footnote 14, supra.

services to which he is entitled under A.D.A. and R.A. See Exhibit H at 1-4, 15-16 (denied access to hernia belt)[18]; Exhibit H at 5-6 (denied access to hemorrhoid medication under threat of violence); Exhibit H at 10-13 (denied hemocult testing of bloody stool); Exhibit H at 15-17 (denied access to light lift and low bunk pass for hernia relief); Exhibit H at 18 thru 19-2 (denied access to pillow for hemorrhoid relief); Exhibit H at 20 thru 21-2 (denied access to arch supports for flat feet)[18]; Exhibit H at 22 thru 25 (denied access to hemorrhoid cream)[18]; Exhibit K at 6-15 (denied access to high calorie diet pass at 5'11", 126 lbs.)[19].

16. In the meantime, in violation of the 8th Amend. and PREA, sexual harassment, threats of sexual violence, and falsely identifying Sussman as the rapist of a child under 12 years of age continues unabated. Exhibit I at 1-2 (on 10/10/19, FSP Sgt. White falsely identifying Sussman as rapist of child<12, and encourages sexual violence against him, but DOC takes no action); Exhibit I at 3 thru 4-2 (same on 12/18/19 with FSP Sgt. Watson).[20] See also FN 37 and its accompanying text, infra (discussing recent violations PREA).

17. In the interim, on 12/21/19, an anonymous FSP dorm Sgt. (no name tag) expressed his disapproval of Sussman litigating cases against the DOC. The next day, 12/22/19, in retaliation for Sussman, and for the express

---

18. It should be noted that Sussman suffers from pain & suffering from, inter alia, a hernia, hemorrhoids and flat feet.

19. In fact, unless an FSP inmate buys food from either canteen or the black market he will starve from a nutritionally deficient diet as is a 5'11", 126 lb. Sussman. Exhibit H at 9 thru 9-2. Exhibit K at 1-20. Of course, the fact that officers deny Sussman food does not help. Exhibit G at 18-19.

20. It appears Watson was also involved in the overdose drug death of another inmate that same day. If so, that death was covered up by DOC Sec. Inch. Exhibit I at 5-6. Additionally, the very next time Watson worked where Sussman was housed, in explicit retaliation for Sussman having grieved the events of 12/18/19, see FN 14, supra; and under the false pretext of his cell being messy, Watson put Sussman on "property restriction", see footnote 13, supra; and wrote him a bogus DR for disobeying an order. Exhibit I at 7-8. Sussman filed appeals, but the DOC destroyed and ignored them. Exhibit I at 9-10.

purpose of preventing him from, litigating said cases against the DOC,[21] and in express retaliation for having written the grievances against Watson that are discussed in the preceding paragraph and its accompanying footnote 20, said anonymous dorm sergeant, and his Lt. Woodard, under the false pretext of maintaining a messy cell, sprayed Sussman with mace; put him on full property restriction, vandalized and stole a bunch of his property, Exhibit J at 8-23; and wrote him 3 bogus DR's.[22] Exhibit J at 1-7.[23] Even worse, and again for the explicit purpose of preventing him from litigating his ongoing cases against the DOC[21], and in violation of the A.D.A., said anonymous dorm sergeant discarded all of Sussman's state issued and personal reading glasses in the trash.[24-1] Exhibit J at 8, 12, 14, 16, 18, 20, 22. Sussman grieved it, Exhibit J at 8-23, and even agreed under duress to pay for a replacement pair, Exhibit J at 16, 20, 22, but all of his admin. grievances were either destroyed or denied as if they had been procedurally defaulted (which they had not been). Exhibit J at 8 thru 29-4. Finally, on 5/7/20, after 4½ months of suffering eyestrain and headaches with no glasses, Sussman received his replacement pair.

10. But it does not end there. Also for the explicit purpose of preventing him from litigating his ongoing cases against that DOC[21], and in violation of the A.D.A., DOC staff refuse to turn on Sussman's light, and leave him in a dark, windowless cell 2-3 days a week.[24] Exhibit J at 30-36.

---

21. See Footnote 14, supra.

22. It should be noted that this was the second of four occasions (two of which involved UOF's) where DR's were written at FSP against Sussman under the false pretext of having a messy cell, and in explicit retaliation for his litigiousness. See Footnote 13 & its accompanying text, supra; see also footnote 20, supra. Even worse, on all four occasions, he was put on 72-hours of total property restriction. See also FN 37, infra.

23. Mandamus review of one of those DR's is currently pending in Sussman v. DOC, Fla 2nd Jud. Cir. Ct., Leon Co, #2020-CA-430, Exhib. O.

24. It should be noted Sussman has mild cataracts, and is night blind.

24-1. See FN 39, infra for tentative identification of Anon. Dorm. Sgt.

## VII. STATEMENT OF CLAIMS: INTRODUCTION

19. In support of all of his claims asserted herein, Sussman adopts, and asks this Hon. Court to take judicial notice of, all of the facts, arguments and authorities set forth in the operative complaint in _Harvard v. Inch_, DOC Sec, 4:19-cv-212, Doc. 13 (N.D.Fla. 2019), and in this Court's order denying the DOC's motion to dismiss. _Id.,_ 28 Fla. L. WKly FED D41 (1/10/20). More specifically, Sussman alleges that he has been arbitrarily swept into a perpetual state of isolation by the DOC's statewide policy, promulgated in Tallhassee, of isolating over 10,000 people in the box as a matter of course, _id.,_ Doc. 13 at par's 2, 59, 75; that, even in the absence of his horrific facts alleged above, "the cumulative effects of various forms of deprivation [associated with the DOC's isolation policy] subject[s] [him] to a substantial risk of serious psychological[25] and physiological harm," _id,_ 28 FLW Fed at D45, in violation of the 8th Amend, _id._ at Doc. 13 at par's 5, 7, 54, 59, 75, 83; "that policy-makers in Tallhassee have exhibited deliberate indifference toward these risks," _id,_ at D42       (citing Doc. 13 at par's 5, 7, 54, 59, 75, 83); and that the DOC discriminates against him in spite of his disabilities through said policy and practice.[26] _Id._ at Doc. 13 at par's 8, 151-60. Indeed, in admin. grievance #205-1912-0577 (Exhibit H at 9), Sussman informed the DOC:

> I am disabled under A.D.A. and R.A. insofar as I have mood swings and cataracts. To the extent that I've received DR's for behavior related to my bi-polar disorder at FSP[27], I'm being discriminated

---

25. It should be noted that, in Aug. 2005, the DOC diagnosed Sussman with inter-alia, bi-polar/manic depressive disorder (BP/MDD), post-traumatic stress disorder (PTSD), and attention-deficit/hyperactivity disorder (ADHD). Additionally, his mental illness and prolonged box time predisposes him to self harm. See also par. 14, supra (alleging psychological decompensation on CM at FSP). Accordingly, Sussman alleges that these disabilities, and those alleged in footnote 18 & it's accompanying text, supra, and in footnote 24 supra, "'... substantially limit... his major life activities.'" _Harvard v. Inch,_ 28 Fla. L. WKly FED D41, D45 (N.D. Fla., 1/10/20) (quoting 42 U.S.C. §12102(1)).

26. See footnote 24 & it's accompanying text, supra; see also footnote 25, supra.

27. Footnote 27 is on the next page.

against. Also, this last year on CM has caused my eyesight to deteriorate rapidly due to lack of outside exercise, and being outside.[28] Combined with lack of exercise and environmental stimuli, lack of a proper diet (I've lost 25 lbs [at] ... FSP)[29], my core grievance is that [the] DOC's policy of isolation for petit DR's is cruel under [the] 8th Amend.

DOC Admin. Grievance #205-1912-0577 at Exhibit H at 9 (citing Harvard v Inch, 28 Fla. L. Wkly FED at D47      ; see also Exhibit H at 9-3 (alleging Sussman has "been retaliated against by DOC staff regardless of [his] psych and medical disabilities."). Thus, even in his admin grievances to the DOC Sussman had, and in this instant §1983 Complaint Sussman has, sufficiently stated an 8th Amend. claim alleging cruel and unusual punishment as is contemplated by this Hon. Court in Harvard, 28 FLW Fed at D45 ; see also id., at D45          ("Plain-tiff's have alleged sufficient facts to render their 8th Amend. claim plausible."); additionally, said "grievance contained sufficient details to exhaust [his] admin remedies." Id., 28 FLW Fed at D47 (ruling that multiple A.D.A. and 8th Amendment claims are exhausted where "the core of Plaintiff's claims is that [DOC's] policy and practice of isolation cause them substantial harm and discriminate against them based on their disabilities.").

<u>CLAIM (1): DOC's ISOLATION POLICY IS IMMINENTLY DANGEROUS. 8th AMEND. VIOL.</u>

20. Sub judice, Sussman has sufficiently alleged he has a long history

27. To the extent that Sussman was put on CM for supposedly "refus[ing] to leave the confinement unit," Exhibit B's Exhibit B at 1, he alleges his inability to assimilate into, and concomitant fear of, the PMU population is related to his mental illness. See also Complaint in <u>Sussman v DOC</u>, case 04-2019-CA-261 at 1-2 (8th Jud. Cir. Ct., Bradford Co.) at Exhibit B at 1-2 (alleging CM placement in retaliation for seeking protection from other inmates). Similarly, so too are DR's of 1/29/19 and 4/30/19 for disrespect, Exhibit N at 1, and his DR of 12/7/19, Exhibit N at 3, all 3 of which are keeping him retained in CM, related to his mental illness as is noted in footnote 25 and its accompanying text, supra. see also FN4 & its accompanying text, supra.

28. For the same reasons Sussman fears, and is foreclosed from, seeking medical or psychiatric attention, see par's 11 & 14, supra, and FN's 8 and 11, supra, he naturally fears, and is foreclosed from, going to outside rec. See Exhibit I at 11 ("... guys make [PREA] threats... I can't even go to rec [at FSP].").

29. As noted in FN 19 & its accompanying text, supra, at 5'11", Sussman bottomed out at 126 lbs., but was still denied a "high calorie, nutritionally sufficient diet. See Exhibit K at 1-20.

of mental illness and self harm[30], and that his prolonged time of 13 (and counting) years in the box[31] predisposes him to acts of self-harm. See FN 25, supra; see also par. 9, supra (in reaction to officers mislabling him as a child rapist, "... Sussman, on 9/17/17, began to self harm..."); par. 11, supra ("On 4/25/19, Suss... swallowed a toothbrush."); par. 14, supra ("... Suss... [is] decompensating... with... depression; suicidal thoughts; acts of self-harm; panic attacks; [etc]... [but] fears seeking psychological help."); FN 16, supra. To show that the manner by which the DOC has kept Sussman isolated for over 90% of his time in prison since 2004 is cruel and unusual[31]; and to show his mental illness and prolonged box time predisposes him to self harm, so that he is in imminent danger of psych decompensation and self-harm[32]; and to show he's foreclosed from seeking psych help; and to show the DOC Sec. is deliberately indifferent to all of the above, Sussman relies on the facts, arguments and authorities set forth in par's 1-19, supra. <u>Wallace v. Baldwin</u>, 895 F.3d 481, 485 (7th Cir. 2018) ("Wallace has spent eleven years in solitary confinement, and has a history of attempting to harm himself. He raises a genuine concern that negative psychological effects of isolation will drive him to self-harm. So Wallace has plausibly alleged his continued segregation places him in imminent danger of serious bodily injury.") (U.S. Sup. Ct. cites omitted); see also <u>id.</u> (Wallace's situation is indistinguishable from... <u>Sanders v. Melvin</u>.... Sanders had spent [8] years in [the box], and had a history of self harm when he filed suit...

---

30. It should be noted that, since 2005, more than 2 years of Sussman's time in prison has been spent in psych wards for committing acts of self-harm.

31. To the extent the DOC might argue that this Court's examination of the conditions of Sussman's box time should extend no further back in time than Nov. of 2018 (the last time he was in gen./open pop) as opposed to 2004 (the year he arrived in the DOC), case law requires all of his different forms of box time since 2004 should be aggregated for the purpose of a <u>Sandin</u> Due Process or 8th Amend. analysis. <u>Sealey v. Giltner</u>, 197 F.3d 578, 587 n.7 (2nd Cir. 1999) (citing <u>Sandin v Conner</u>, 515 U.S. 472, 484 (1995).

32. See paragraphs 9 and 14, supra; see also footnotes 16 and 25, supra (alleging that mental illness and prolonged box time predisposes Sussman to commit acts of self-harm.); see also FN 33, infra.

He alleged his mental illness and prolonged segregation predisposed him to self-harm. We concluded Sander's allegations satisfied imminent-danger exception to the [PLRA's] 3-strikes rule." (citing Sanders, 873 F.3d 957, 959-60 (7th Cir. 2017)).[33]   Wherefore, Sussman has sufficiently stated an 8th Amend. claim that satisfies the PLRA's imminent-danger exception.  Id.

CLAIM (2): DOC's ISOLATION POLICY SUBJECTS SUSSMAN TO AN ONGO-ING PATTERN OF VIOLENT ACTS, SO THAT HE IS IN IMMINENT DANGER OF VIOLENCE IN VIOLATION OF 8th AMEND AT FSP

21.   In support of Claim (2), Sussman alleges the DOC's statewide isola-tion policy promulgated by Sec. Inch in Tallhassee currently subjects him to an "ongoing pattern of acts that [indicate he is in] imminent danger [of violence on CM at FSP]." Chavis v Chappius, 618 F.3d 162, 170 (2nd Cir. 2010) (citing Ashley v. Dilworth, 147 F.3d 715, 717 (8th Cir. 1998); see also Brown v John-son, 387 F.3d 1344, 1349 (11th Cir. 2004) (adopting reasoning of Ashley in 11th Cir.).  For example, on 2/12/08, at FSP on CM, he was assaulted by Inmate Demetrius Spires, DOC # 890750.[34]  Exhibit L at 1-2.  Then, on 11/30/09, at FSP, he was assaulted by Inmate Robert Dawson, DOC # R07859.[35]

22.  Years later, on 3/30/11, while in the box at SFRC, the same Sgt. Hampton that had abused Sussman the year before, see par. 4, supra, attacked him again causing several deep lacerations requiring over a dozen sutures.  See Exhibit A's App. I.  Hampton was never disciplined for either attack on Sussman's

---

33.  It should be noted that, on 5/16/20, as Sussman was writing his final draft of this instant footnote's accompanying par. 20, FSP Sgt. Armbrust and Ofc. Welcher, see FN37, infra (discussing abuse perpetrated by Armbrust and Welcher), denied him food for a fourth time that week.  As all of his verbal and writ-ten complaints fell on deaf ears, and "as [FSP] mental-health staff ignore prob-lems of inmate's in [the box] unless they engage in self-harm," Sanders, 873 F.3d at 960, Sussman, indeed, began to self-harm, tried to declare a psych emergency, but was told by mental health staff his problems stemmed from a security issue, so that it was not a psych emergency.  He was, therefore, denied help, and continued to self harm.  Thus, just as did Wallace and Sanders, Sussman "ha[s] a history of self-harm when he filed [this instant] suit," Wallace, 895 F.3d at 485, and "ha[s] satisfied [the PLRA's] imminent-danger exception," id, as contemplated by 7th Cir. in Wallace and Sanders.
34. Sussman received DR# 205-080382, Exhibit L at 2, but it was thrown out.
35. This time, Dawson received the DR.  Exhibit L at 1.

person. In fact, discovery in <u>Sussman v. Hampton</u>, 1:13-cv-22818 (S.D. Fla.) revealed the DOC had destroyed videotapes of the events of 3/30/11.[36] The DOC Sec. was, and is, aware of all of these facts, but was, and is, deliberately indifferent.

23. Later that year, on 8/19/11, while on CM at Union C.I. (UCI), UCI Ofc. Sanchez, as is described in Leon Co. 2nd Jud. Cir. Ct., Fla, case 2015-CA-558, Exhibit A at 7-8, as he was escorting Sussman and CM Inmate Tracy Wright, both of whom were handcuffed and shackled, misinformed Wright that Sussman had raped a girl under 12 years old.[37] Minutes later, Sanchez removed all of Wright's restraints, but left Sussman's on, beat him physically, and ordered Wright to do the same. Exhibit A at 7-8 (citing Exhibit A's Appx. E).

FOOTNOTES 36 and 37

36. It was not until Hampton was arrested for raping an inmate that he was finally fired in 2017. That rape happened at Homestead C.I. in Dade Co., Fla.

37. According to Wright, Sanchez showed him my DOC facesheet, which listed my so-called crime as a "lewd assault on a child 12-15", but covered up the "15" to make it appear Sussman's victim was under 12. By no means was this the first, or last, time DOC staff lied to other inmates about the age of his so-called victim. In fact, Sanchez got the idea to do so after he read a grievance describing how officer's at SFRC did the exact same thing. See Exhibit A's Appx. E (describing events at SFRC and UCI). Apparently, this retaliatory act of mislabeling is something DOC staff does pro cursous as is described in par. 5, supra (describing how, in 2011-12, SWCI staff set up attacks on Sussman "in retaliation for the nature of his so-called crime") (citing exhibits); and as is described in par. 9, supra (describing how, in 2017, UCI staff misled "other inmates to believe [Sussman] had molested a child under 12...") (citing Exhibits); and as is desribed in par. 16, supra (desribing same at FSP); also FN 55 infra (same). Indeed, as recently as 4/28/20, FSP Ofc. Welcher — after his Sgt. Armbrust and Lt. Andrews, for a fourth time, put Sussman on property restriction, and wrote him a bogus DR, under the false pretext of having a messy cell, Exhibit I at 13-thru 18 — hollared for all the other inmates to hear that he was a "Cho Mo." Exhib. I at 19-22; see also FN 33, supra (describing more subsequent retaliatory acts committed by Armbrust and Welcher). As the law is well-settled that identifying an inmate to others as a child rapist exposes him to imminent-danger of violence, <u>Williams v. Param</u>, 775 F.3d 1182, 1190 (9th Cir. 2015) (inmate stated claim of imminent danger where officers told others she had prior convictions child molestation) (citing <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007); <u>Leary v. Livingston</u>, 528 F.3d 438, 442 (6th Cir. 2008) (similar), it is axiomatic Sussman is in imminent danger of violence while at FSP.  (FN 37 continued next page)

24. Next, on 10/20/11, while handcuffed on CM at Suwannee CI (SWCI), officers gave Inmate Deaxtre Whitley, DOC #192503, "one click" on his cuffs so that he could slip out of them, and attack Sussman, which he did. As is described in Leon Co., Fla., case 2015-CA-558, Exhibit A at 9-10, Sussman received numerous injuries, and no officer was ever disciplined for his malfeasance. Exhibit A at 9-10 (citing Exhibit A's Appx. F).

25. Similarly, on 5/31/12, while handcuffed on CM at SWCI, officers left Inmate Bartee, DOC #X04771, uncuffed, and allowed him to use his empty cuff as a weapon to beat and stab Sussman for about one minute. As is described in Leon Co., Fla, case 2015-CA-558, Sussman received several serious facial and head wounds. See Exhibit A at 10-13 (citing Exhibit A's Appx. G). No officer was ever disciplined for his malfeasance.

26. Most recently, while on CM at FSP, in addition to the brutal attack of 4/26/19 on Sussman's person described in par. 11, supra (citing Exhibits), for which no officer has ever been disciplined, the DOC continues to be deliberately indifferent to his protection needs.[38] See, e.g. Exhibit L at 1-7 (describing an assault on Sussman's person on 10/15/19). More specifically, on 4/15/20, after Sussman refused to cuff up for a retaliatory cell search, the anonymous dorm sergeant discussed in par. 17, supra, became enraged, and swore vengence in the form of physical violence against Sussman.[39] See Exhibit

27. Also, in March of 2020, Sussman learned of a conspiracy between several FSP officers and inmates known as "Indio/99" and Donald "Cave Man" Richardson to allow said inmates access to Sussman to murder him in retaliation

---

FN 37 (continued) And he is not the only one. FSP CM Inmate Ryan P. Johnson, DOC #169340, among many others, has suffered numerous abusive acts in retaliation for his sex-offender status, but does not grieve it for fear of yet more retaliatory acts.

38. It should noted that Sussman is an inmate out of a protection management unit (PMU), so that he is on CM with protection needs. As soon as he is released from CM, he will be returned to a PMU.

39. Said anonymous dorm sgt. has been tentatively identified as Sgt. Cason, and has a widespread reputation for committing extreme acts of violence against inmates. All of Sussman's grievances concerning the events of 4/15/20 have been lost or destroyed by the DOC.

for his so-called sex offender status.[40] See Exhibit I at 11-12, 19-20. Sussman alerts the DOC Sec. to all of these threats on his life, but he will not even identify his enemies to him, Exhibit I at 11-12, 19-20, and remains deliberately indifferent to the imminent danger he is in. Exhibit I at 11-12, 19-20.

28. WHEREFORE, because the case law is well-settled that all of the documented injuries Sussman has suffered at the hands of inmates and staff since 2004, virtually all of which happened while he was either on CM or in the box, exposes him to a substantial risk of irreparable harm that requires injunctive relief, Laube v. Haley, 234 F. Supp. 2d 1227, 1251 (M.D. Ala. 2002)(where inmates had already been injured, a substantial threat of more harm looms); and given the fact he is a so-called sex offender on CM with protection needs; and given his allegations, which are supported by a couple dozen exhibits, that the FSP grievance coordinator ignores or destroys grievances seeking protection[41], Exhibit G at 5-10, 14-22, Exhibit H at 7-8, Exhibit I at 1-6, 11-12, 19-22; Exhibit J at 8 thru 8-2, 12-21; and given his allegations that DOC and FSP staff continually mislead other inmates to believe he is a child rapist, see par. 16, see also FN37 and its accompanying text, supra (citing exhibits and authorities); and given the fact that no DOC (staff) has ever been reprimanded for any of the violence Sussman has suffered at their hands, or in their custody; and given the fact that a sex offender was recently murdered at FSP, and said murder was allegedly orchestrated by DOC staff, see FN 40, supra; given all of these facts and allegations, Sussman has sufficiently shown herein an "ongoing pattern of [violent] acts," Chavis v. Chappius, 618 F.3d at 170, which indicate that the DOC's policy of isolation promulgated in Tallahassee has failed to protect him from violence from 2004

40. It should be noted that, as recently as July or Aug. of 2019, a CM inmate labeled a sex offender was murdered on I Wing at FSP, and that murder is alleged to have been set up by FSP officers. See Exhibit I at 1 (discussing murder of inmate sex offender in July or Aug of 2019).

41. Indeed, the FSP grievance coordinator destroys as a matter of course any and all grievances submitted by any and all inmates that allege any misconduct by staff whatsoever. See par. 13 & its accompanying FN15, supra ("All of his grievances were... destroyed...")(citing Exhibits); Exhibit G at 22 (sworn declaration by Inmate Bryant Keith Williams).

thru 2020, id., so that he is now in imminent-danger of violence at FSP, id., as contemplated by both _Chavis_ and _Lamb_, supra, so that DOC Sec. Inch "[is] aware of facts from which an inference could be drawn that a substantial risk of serious [imminent] harm [to him] exists, and [Inch] should draw that inference," _Farmer v. Brennan_, 511 U.S. 825, 837 (1994); and so that this instant Claim (2) sufficiently states an 8th Amend. claim of imminent-danger; and so that he should be granted all of the declaratory and injunctive relief he seeks in sec. VIII, pars. 55(a)-(k), infra.

_Thomas v. Bryant_, 614 F.3d 1288, 22 FLW Fed C1352, 1360 (11th Cir. 8/27/10) ("... it is well-established that injunctive relief is appropriate to prevent a substantial risk of serious injury from ripening into actual harm.'") (quoting _Farmer_, 511 U.S. at 845; and citing _Ramos v. Lamb_, 639 F.2d 559, 572 (10th Cir. 1980) (an inmate "does not have to wait until he is actually assaulted before obtaining [injunctive] relief.")); _Brown v. Johnson_, 387 F.3d at 1349 ("Inmates ought to be able to complain about... life threatening conditions... without waiting for something to happen to them."); _Kapps v. Wing_, 404 F.3d 105, 123 (2nd Cir. 2005) ("[W]here a history of violations is before the district court, [it may] conclude that future violations... are likely.") (adopted by 11th Cir. in _Thomas v. Bryant_ supra), as all of the prerequisites of a TRO — to wit: (a) claim likely to succeed; (b) necessary to prevent irreparable injury; (c) threatened injury to Sussman outweighs harm to DOC; and (d) TRO not adverse to public interest, _Parker v. State_, 275 F.3d 1032, 1034-35 (11th Cir. 2001) — have been met. See _Laube_, 234 F.Supp. 2d at 1251 (where inmate had already been injured, there is a "substantial likelihood to succeed on [cruel & unusual punishment] claim"); _id_ at 1252 ("threatened harm to Plaintiff outweighs harm to [DOC who] will suffer no harm" by "reducing the risk of assault and harm to [plaintiff inmate]"); _id_. _id_. ("Threat of harm to [inmate] cannot be outweighed by... financial burdens or inconvenence to [DOC]."); _id_. ("The public interest is in no way served by... incarcerating inmates in dangerous conditions."); _Deerfield Med. Ctr. v. City of Deerfield Bch._, 661 F.2d 328, 338 (5th Cir. [Fla] 1981) (Violation of const'l liberty constitutes irreparable injury that justifies grant of TRO); _Gannett Co. v. De Pasquale_, 443 U.S. 368, 383 (1979) (" It is always in the public's interest to

prevent the violation of a person's const'l rights."); 11A Charles Allen Wright, et al., _Fed. Prac. & Proc._, §2948.1 (2nd ed. 1995) ("When an alleged deprivation of a constitutional right is involved, ... no further showing of irreparable injury is necessary."). WHEREFORE, Sussman should be granted the declaratory and injunctive relief he seeks in sec. VIII, par. 55 (a) - (k), infra.

## CLAIM (3): VIOLATIONS OF ADA and RA

29. To state a claim under the ADA and RA, Sussman must allege that he has a disability that limits a major life activity, and that the DOC denied him benefits to which he was entitled by reason of his disability. _Harvard v. Inch_, 28 Fla. L. Weekly FED at D45. "Further, 'a]n ADA claim may proceed on the [lone] theory that the [DOC] failed to reasonably accommodate the Plantiff's disability.'" _Id._, 28 Fla. L. WKly at D46 (quoting _Lonergan v. FDOC_, 623 F. Appx. 990, 992 (11th Cir. 2015)).

30. To show that Sussman has sufficiently alleged sub judice that he suffers from several mental disabilities; and to show that he was "placed and retained in isolation for behaviors related to his disabilities" as is contemplated by this Honorable Court in _Harvard_, 28 FLW Fed at D46; and to show that, by virtue of his isolation, he is in imminent danger of committing acts of self-harm[42], so "that the [DOC] has failed to reasonably accommodate [his] disability," _id._, at D46 (cite (cite omitted); and so that he has sufficiently alleged ADA and RA claims herein; and so that he should be granted the declaratory and injunctive relief he seeks in par. 55 (a) - (l), infra, Sussman relies on the facts, arguments and authorities put forth in paragraphs 19-20 and their accompanying footnotes, supra. Similarly, to show that he is foreclosed by a bonafide, legitimate fear of harm from seeking psych or medical attention at FSP and RMC; and to show that his psych grade was improperly dropped, so "that the [DOC] denies him services, and has failed to reasonably accomodate [his] disability," _Id._, Sussman relies on FN16 and its accompanying

_____

42. It should be noted that FSP is not the only prison that ignores an Inmate's psych issues unless they self harm as is discussed in FN33 and its accompanying text, supra. See, e.g., par. 9, supra ("When... it [became] apparent [Sussman] would suffer yet more abuse..., [he] began to self harm [at UCI].").

par. 14, supra.

31. Likewise, to show that Sussman truly, accurately and legitimately fears visiting or being housed temporarily at RMC (the DOC's only medical center), so that, in violation of ADA and RA, he is foreclosed from seeking medical attention for, inter alia, his hernia, severe headaches, seizures, hemorrhoids, eyesight, hearing, etc.; and so "that the [DOC denies him services, and] has failed to reasonably accommodate [his] disability," id., he relies on the facts alleged in par. 7 and its accompanying footnotes 7 and 8, supra.

32. Additionally, to show that he legitimately and accurately fears visiting the med. clinic, or otherwise accessing medical attention at FSP, so that he is foreclosed from doing so; and to show that, even when he risked his safety, and visited the clinic, he was denied medical services in violation of ADA and RA, so "that the [DOC]... failed to reasonably accommodate [his] disability," id., Sussman relies on the facts alleged in paragraphs 11-15 and their accompanying footnotes, supra.

33. Finally, to show that, from 12/22/19 - 5/7/20, in violation of the ADA and RA, the DOC denied Sussman of any access whatsoever to eyeglasses, and left him in a dark cell 2-3 days a week, so "that the [DOC]... failed to reasonably accommodate [his] disability," id., Sussman relies on the facts alleged in paragraphs 17-18 and their accompanying footnotes, supra.[43]

34. WHEREFORE, based on the facts, arguments and authorities put forth and adopted in paragraphs 29-33, supra (adopting paragraphs 7, 9, 11-15, 17-20 and their accompanying footnotes, supra), Sussman has sufficiently stated several ADA and RA violations in this instant Claim (3), and this Hon. Court should grant the injunctive and declaratory relief he seeks in sec. VIII, par. 55 (a) - (1), infra.

---

43. It should be noted that, all throughout the months Sussman was denied access to eyeglasses, he suffered from "eyestrain, eyeaches and headaches" in violation of the 8th Amend. Gibbs v. Coupe, 192 F. Supp. 3d 503, 507-08 (D.Del. 2016). To add insult to injury, the DOC rejected his invocation of the ADA to regain access to his glasses. See Exhibit J at 19 ("...this is a property issue, not an ADA issue."); see also Exhibit J at 14-19.

CLAIM (4)

IDENTIFYING AN INMATE AS A CHILD MOLESTOR IS "SEXUAL HARASSMENT" so that it VIOLATES PREA[44]

35.   DOC PREA Proc. 602.053, Def. (21)(c)&(d) defines "sexual harassment," respectively, as "statements... with sexual or inappropriate connotation," or "coercive statements of a sexual nature." The DOC's policy for dealing with such is supposed to be one of zero-tolerance. See Proc. 602.053, PURPOSE at par. 1; see also id. at (2)(c)1 (same); id. at (4)(a) 1 (similar). Once the DOC receives an allegation of sexual harassment, however tenuous it may seem, it must report it "immediately" to the DOC's Office of the Insp. Gen. (OIG). Id. at (2)(f)2; id. at (4)(a) 3 ("Any... staff member... who knows or should have known any person has committed... sexual harassment of an inmate shall notify the ... OIG, which shall conduct an investigation...").

36.  Sub judice, Sussman alleges that, since 2005, "DOC cops constantly harass him, and physically abuse him" because "he is labled as a so-called 'sex offender,'". Par. 1, supra. "For example, ... in May of 2005, Gulf C I officials ... harassed him sexually, and threatened him with rape" by inmates they had told he was a child rapist. Par. 2, supra. Indeed, by July of 2005, his cellmate had threatened him with rape. Par. 2, supra. The same thing happened in 2013 at SWCI, except that Sussman was actually assaulted sexually. FN5 and its accompanying text, supra. In 2011, on CM at UCI, an officer manipulated his facesheet to make it appear his so-called victem was under 12, showed it to another inmate, and instructed that inmate to attack him. FN 37 and its accompanying text, supra.

37.  This mislabling of Sussman as a child rapist continued as a matter of course on CM at SWCI, par. 5, supra, and in the box at TCI and UCI in 2017. Par. 9, supra (citing Exhibit F at 10-11); see also FN 37 and its accompanying text, supra. It was only after he began to self harm that he was able to officially report

_____

44. As noted in FN9, supra, the DOC has denied Sussman access to 28 CFR 115 (PREA); but, since DOC Proc. 602.053 tracks its Fed PREA counterpart, it is authoritative in this Court. See DOC Proc. 602.053, PURPOSE at par. 4; see also id., Def. (15)(defining PREA).

any of the abuse at UCI. Par. 9, supra; see also FN 37, supra. Even then, as he received a PREA compliant med exam, UCI guards and a nurse humiliated Sussman as he tried to urinate, Exhibit F at 6-7, which violated PREA Def. (26) (defining Voyeurism). Immediately thereafter, those same guards retaliated against him with physical abuse, Exhibit F at 8-9, in violation of DOC Proc. 602.053 (2)(F) 5 and (4)(a) 7. Similar incidents occurred in 2018 in the box at Blackwater River Corr. Fac. (BRCF), Exhibit E at 14-15; have increased in frequency since he arrived at FSP in April of 2019, see par. 16, supra (citing Exhibit I at 1 thru 4-2), continued at FSP as he completed his final copy of this instant complaint, FN 37, supra; see also Exhibit I at 19-22; FN 55, infra; and will surely continue up until the day that Sussman leaves FSP as even this Hon. Courts TRO, should it issue, would not be enough to change the deep-seated culture of corrupt, abusive behavior that is programmed into the "us vs. them" mentality that dominates staff at FSP, and pervades much of the rest of the DOC. The DOC Sec. is aware of all of these facts, but remains deliberately indifferent to the incessant sexual harassment suffered by Sussman, thereby establishing in the DOC a de facto, sub silencio policy that allegations of a DOC guard informing the inmate population that another inmate is a child rapist in no way implicates PREA. See, e.g., Exhibit I at 1 thru 4-2; Exhibit I at 19-22; see also FN 55, infra ("describing yet another incident of "sexual harassment" implicating PREA that happened 6/28/20).

38. It is axiomatic that identifying (or misidentifying) Sussman to his fellow inmates as a child rapist is a "statement... with a sexual or inappropriate connotation" meant to "coerce" him as is contemplated by the plain language of DOC PREA Proc. 602.053, Def. (21)(c) & (d). Thus, given that Proc. 602.053 strictly prohibits this type of sexually harassing speech; and given Sussman's well-pled allegations, supported by exhibits, that DOC officers have been engaging in such PREA prohibited speech at his expense since 2005; and given his allegations of having suffered beatings by both inmates and guards, most of which were documented by the DOC's medi clinic, as a result of DOC guards having engaged in such speech; and given the well-established

case law that such speech has put him in imminent-danger of violence at FSP, see FN 37 and its accompanying text, supra (citing <u>Williams v. Paramo</u>; and citing <u>Leary v. Livingston</u>); and given the DOC Sec. Inch's deliberate-indifference to such mislabling and misidentification of Sussman as a child rapist to his fellow inmates as is evidenced by his failure to meaningfully investigate any of Sussman's allegations of such speech, or to protect him from it, or to discipline guards that use it, this Hon. Court should issue a declaratory judgment that Sussman's allegations of such speech properly states violations of the 8th Amend., and of DOC Proc. 602.053 — and, ipso facto, PREA[45] — and should grant all of the injunctive relief that he seeks in sec. VIII, par. 55 (c)-(K).

To show that this state of imminent-danger that Sussman properly alleges in this instant Claim (4) exposes him to a substantial risk of irreparable harm that requires the issuance of this Court's TRO, <u>Laube</u>; <u>Chaviz</u>; <u>Farmer</u>, and that it satisfies all of the prerequisites of a TRO, <u>Parker</u>, he relies on the facts, arguments and authorities put forth, and those adopted by reference, in par. 28 and its accompanying footnotes, supra.

## <u>CLAIM (5): PROPERTY RESTRICTION VIOLATES 8th AMEND.</u>

39. As is alleged in FN 13, supra, an inmate on property restriction spends at least 3-5 days with no blanket, no mattress, no socks, and no clothing whatsoever in a cell as cold as 50° F plus wind chill. See FN 13 & its accompanying text, supra (citing <u>Harvard v Inch</u>, 4:19-cv-212, Doc. 13 at   (N.D. Fla)). In fact, those were the exact conditions Sussman suffered from 12/22/19 — 12/26/19, and again in Jan. of 2020, when he was twice put on property restriction without good cause as is alleged, respectively, in FN 22 & its accompanying text, supra, and in FN 20, supra, except that his floor had puddles of water laden with mace, and his cell was filthy as is described in Doc. 54 of <u>Harvard</u>, 2B FLW Fed at D44 ("... describing condition of [FSP] cell(s) as 'antiquated, dirty and in disrepair...' ")( quoting Doc. 13 at par. 86). Consequently, he was unable to sleep for over 100 hours in FSP's cold, filthy cell, which, as is alleged

---

45. See FN 44, supra.

in Harvard, Doc.13 at   , serves no legitimate penological interest, and is cruel and unusual, id.; and, as is alleged in footnotes 32, 33 and 42 and their accompanying texts, supra, is enough to put Sussman, or any inmate, in imminent-danger of self-harm. Indeed, even after an inmate has tried to kill himself, he is given three indestructible items specially constructed to prevent him from committing further acts of mischief; to wit: a mattress, a blanket, and a very warm "turtle suit" that wraps around his entire torso. The DOC Sec. is aware of all of these facts, but is deliberately indifferent to them. See Exhibit J at 12-17 (alleging prop. restriction is cruel & unusual).

40. Sussman posits that the provision of these three items (blanket; mattress; turtle suit) would render the DOC's policy of property restriction to be constitutionally acceptable under the 8th Amend. Moreover, given that the DOC already provides them to inmates on suicide watch, the DOC cannot show it would suffer any sort of harm by providing them to inmates on property restriction, or otherwise argue that this Court's TRO should not issue. To show that the 3-5 days of sleep deprivation inmates suffer in a filthy, unsanitary cell when on property restriction is cruel & unusual in violation of the 8th Amend, Sussman relies on FN 13 & its accompanying text, supra (same)(citing Harvard, 4:19-cv-212, Doc.13 at   (N.D. Fla.  ) 119)); see also Harper v Showers, 174 F.3d 716, 720 (5th Cir. 1999)("Harper alleges the [DOC]... deprived him of cleanliness [and] sleep... in filthy unsanitary cells. Such conditions,...designed to prevent sleep, might violate the 8th Amend.")(citing Davis v Scott, 157 F.3d 1003, 1006 (5th Cir. 1998), "and cases cited therein."); Robinson v Danberg, 729 F.Supp. 2d 666, 683 (D. Del. 2010)(same)(citing Harper v Showers). Additionally, to show that this Hon. Court's order mandating the provision of an indestructible blanket, mattress and "turtle suit" to all inmates on property restriction satisfies all of the prerequisites of a TRO, Sussman relies on Parker v State, supra (listing the criteria of a TRO); on Deerfield Med. Ctrs., supra (violation of constitutional liberty is irreparable injury that justifies the grant of a TRO); on Gannett Co., supra ("It is always in the public's interest to prevent the

violation of a prisoner's constitutional rights."); and on Fed. Prac. & Proc., supra ("... deprivation of a constitutional right is ... irreparable injury ... "). Finally, as Sussman has already shown herein that the DOC will suffer no harm by providing a blanket, mattress and "turtle suit" to inmates on property restriction, it is axiomatic that this claim is likely to succeed on its merits as is contemplated by the 11th Cir. in Garcia-Mir v. Meese, 781 F.2d 1450, 1453 (11th Cir. 1986) ("[Where the] balance of the equities weighs heavily in favor of granting the [TRO]," the movant need only show a "substantial case on the merits."). WHEREFORE, as this instant Claim (5) satisfies all of the criteria of a TRO, this Hon. Court should issue its TRO mandating the provision of a blanket, mattress and "turtle suit" to all DOC inmates on property restriction.

## CLAIM (6): NUTRITIONALLY DEFICIENT DIET VIOLATES 8th AMEND.

41. "The Eighth Amendment requires that inmates be provided '"well-balanced meal[s] containing sufficient nutritional value to preserve health."'" Berry v. Brady, 192 F.3d 504, 507 (5th Cir. 1999) ( quoting Green v Ferrell, 801 F.2d 765, 770 (5th Cir. 1986) (quoting Smith v Sullivan, 553 F.2d 373, 380 (5th Cir. Fla. 1977)); [46] see also Robles v. Coughlin, 725 F.2d 12, 15 (2nd Cir. 1983) ("... Eighth Amendment requires that prisoners be served 'nutritionally adequate food...'") (quoting Ramos v Lamb, 639 F.2d at 570-71). To state a claim for "food deprivation", Barney v Pulsipher, 143 F.3d 1299, 1310 (10th Cir. 1998), a prisoner must allege both (1) a "'sufficiently serious'" deprivation of "'the minimal civilized measure of life's necessities'", id (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)), and (2) "deliberate indifference" by the DOC to a "'substantial risk of serious harm to an inmate.'" Id. (quoting Farmer, 511 U.S. at 834).

42. Sub judice, Sussman, who has never had money to buy canteen food, properly alleges that, "unless [he] buys food from... the black market, he will starve from a nutritionally deficient diet as [he] is 5' 11" [and] 126 lbs." FN 19 & its accompanying text, supra (citing Exhibit Kat 1-end). He also alleges that "officers deny

---

46. In Benner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981), the 11th Cir. adopted ⊕ precedent rendered by the 5th Cir. before 10/1/81.

him food," FN 19, supra (citing Exhibit G at 18-19); see also FN 33, supra ("[Offi-cers] denied [Sussman] food for a fourth time that week."); FN 53, infra (same), and Sec. Inch is deliberately indifferent insofar as, even after "[he] bottomed out at 126 lbs., [he] was still denied a high calorie, nutritionally sufficient diet [pass]." FN 29 & its accompanying text, supra (citing Exhibit K at 1-end); see also Exhibit K at 1 ("my health and vital organs are at risk."); Exhibit K at 16 ("[The DOC] cheat[s] me out of food and nutrition every day... [and serves] rotten oranges."); Exhibit K at 17 ("...give me a nutritionally sufficient diet."); Exhibit K at 10 (at 5'11", 126 lbs, Sussman was denied a high cal. diet pass); Exhib-it K at 14 (alleging a poisonous prescription for "megace has no nutritional value and makes me sick. I need [more] food, not garbage."). These allegations are clearly sufficient to state an 8th Amend. claim for deprivation of food. <u>Strope v Kansas DOC</u>, 189 F. Appx. 764, 765-66 (10th Cir. 2006) (inmate stated claim where he alleges he "goe[s] to bed hungry... deprived of an adequate diet [that lacks] prop-er calories [and] vitamins," so that "[he] is forced to buy food from [the] canteen to survive" due to DOC's "everyday and ongoing practice."); <u>Antonelli v Sheahan</u>, 81 F. 3d 1422, 1432 (7th Cir. 1996) (inmate stated claim alleging "not just 'rancid food' [sic], but also a 'nutritionally deficient diet'"); <u>Robles</u>, supra (inmate stated claim where "complaint alleges starvation... as well as contamination of food..."); <u>Shapely v. Wolff</u>, 568 F. 2d 1310, (9th Cir. 1978) (inmate stated claim alleging nutritionally inadequate food); <u>Cunningham v. Jones</u>, 567 F. 2d 653, 659-60 (6th Cir. 1977) (same). WHEREFORE, Sussman has suffi-ciently stated an 8th Amend. claim for deprivation of food.

CLAIM (7): SUSSMAN HAS SUFFICIENTLY ALLEGED 1st AMEND. RETAL-IATION CLAIMS THAT VIOLATE PREA, and that the DOC IS DELIB-ERATELY INDIFFERENT TO SUCH ALLEGATIONS & PREA VIOLATIONS

43. Pursuant to DOC PREA Proc. 602.053 (2)(f), and, ipso facto, PREA[47], any allegation of retaliation by staff against an inmate for having previously reported a PREA violation should be forwarded to the DOC OIG. See <u>id</u> at (2)(f)5 in

47. See FN 44, supra.

pari materia with (2)(f)2; see also id. at (4)(a)7 ("Inmates... will be monitored for retaliation for... 90 days."); id. at (4)(a)2 ("...[DOC will] secure the safety of the inmate...").

44. Sub judice, Sussman properly alleges that "his attempts to report [a PREA violation] were ignored or denied [at UCI], and UCI guards even retaliated by misleading other inmates to believe he had sexually molested a child less than 12." Par. 9, supra (citing Exhibit F at 10-11). He alleges further that they "physically abused and sexually humiliated [him] in violation of PREA, [and that] [h]e reported it, but... was ignored." Par. 9, supra (citing Exhibit F at 6-9).

45. In addition, he alleges that, at FSP, he was "brutally beaten," par. 11, that said beating implicated PREA, par. 11, but that the final PREA report "did not, inter alia, discuss the scar [his attacker] received... or ID Nurse Doe by name ... So, he wrote an admin. grievance demanding a supplemental report," par. 12 (citing Exhibit G at 1-2, 5, 16-17), but, in retaliation, "FSP Sgt. Scott grabbed [it, and] demanded to see the actual PREA report. When Sussman refused..., Scott and his Lt. Philbert forcefully extracted him from his cell, and stole, inter alia, said PREA report and grievance #19-6-22476 that precipitated said report." Par. 12, supra (citing Exhibit G at 1-10, and citing FN 12, supra). He alleges further that Scott denied him food later that same day. See Exhibit G at 18-21.

46. Finally, he alleges he was written several DR's in retaliation for having filed grievances alleging PREA violations. See par. 12, supra (DR written by Philbert) (citing Exhibit G at 4); par. 14, supra (" for grieving PREA events of 4/26/19, he was written yet another retaliatory DR") (citing Exhibit G at 13); par. 17, supra ("... in express retaliation for having written [PREA] grievances against Watson..., Lt. Woodard... wrote him 3 bogus DR's.") (citing Exhibit J at 1-7).[48.1] Thus, Sussman has properly alleged 1st Amend. retaliation claims that violate DOC. Proc. 602-053(2)(F)2&5, and (4)(a)2&7—and, ipso facto, PREA[48], and has properly alleged that the DOC Sec. Inch "ignored" his allegations, so that Inch is deliberately indifferent to them. Therefore, given his well-pled allegations; and given Inch's

_____

48. See FN 44, supra.    48.1. See also FN 53, infra (citing Exhib. J at 1 et seq.).

deliberate indifference to such as is evidenced by his failure to meaningfully investigate any of his allegations of retaliation, or protect Sussman from it, or discipline any guards that perpetrated it; this Hon. Court should issue a declaratory judgment stating that Sussman properly alleged to the DOC 1st Amend. claims that violate PREA, but that Inch was, and is, deliberately indifferent to them.   In addition, this Court should grant him all of the injunctive relief he seeks in section VIII, par. 55(s); infra.

## CLAIMS (8) and (9)

CLAIM (8):  FROM 2005 thru 2020, THE DOC SEC. HAS PERPETUATED and PROMULGATED a DE FACTO POLICY of KEEPING SUSSMAN IN THE BOX and ON CM IN RETALIATION FOR SEEKING PROTECTION FROM VIOLENCE, and FOR HIS LITIGIOUSNESS;

CLAIM (9): FSP's GRIEVANCE COORDINATOR DESTROYS GRIEVANCES

47.  As a preliminary matter, in support of this instant Claim (8), Sussman adopts, and asks this Hon. Court to take judicial notice of, the facts alleged in his Habeas Petition that was improperly dismissed by Fla's 8th Jud. Cir. Court, Bradford Co. case 04-2019-CA-261, appeal pending in Fla's 1st DCA case 1D19-2163. See said Habeas Petition and its accompanying exhibits attached hereon as Exhibit B (describing his placement on CM in retaliation for, inter alia, seeking protection from violence at Blackwater River Corr. Fac. (BRCF) and WCI); see also FN4 and its accompanying text, supra (listing approx. a dozen DR's written in retaliation for Sussman having sought protection from violence)(citing numerous exhibits); par. 12, supra (describing a DR at FSP written in retaliation for submitting a grievance)(citing Exhibit G at 4); par. 14, supra ("In retaliation for... grieving under PREA, he was written yet another retaliatory DR at FSP.")(citing Exhibit G at 13-15); FN20 and its accompanying text, supra ("[I]n retaliation for Sussman having grieved [a PREA] event, ... [FSP Sgt.] Watson... wrote him a bogus DR.")(citing Exhibit I at 7-8); FN22 and its accompanying text, supra (describing "DR's... written at FSP against Sussman in retaliation for his litigiousness")(citing Exhibit J at 1-7); FN37, supra ("F.S.P. ... Sgt. Armbrust... wrote him a [retaliatory,] bogus DR")(citing Exhibit I at 13-20); FN53, infra (citing most recent retaliatory DR's at FSP at Exhibit J at 1 thru 13).

48. As a secondary matter, on 5/26/20, as Sussman was writing the final draft of this instant complaint, FSP Warden Davis, by his own personal admission to Sussman, approved the issuance of yet another retaliatory, bogus DR for having supposedly "lied." Exhibit G at 23. Said DR falsely alleged that "Sussman reported 'Warden Davis is destroying my grievances.'"[49] Exhibit G at 23, 26. According to Davis, this statement appeared in a written grievance.[49] Ex. G 23, 26-27

49. For over 30 years, it has been well-established that "prison officials may not retaliate against inmates for filing... grievances." Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986); Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989); Williams v. Brown, 347 Fed. Appx. 429, 435 (11th Cir. 2009). So, too, too, is the law is clear that "prison officials may not retaliate against an inmate for exercising a constitutionally protected right," Adams v. James, 784 F.2d 1077, 1082 (11th Cir. 1986), and that seeking protection from violence is one of these rights. Farmer v. Brennan, 511 U.S. 825, 833 (1994) (citing 8th Amend.). Accordingly, when Fla. DOC Inmate Glenn Smith alleged he was given a DR in retaliation for seeking protection from violence, the Federal court ruled that he sufficiently stated a 1st Amendment violation. Smith v. Villapando, 268 Fed. Appx. 682, 685-86 (11th Cir 2008).

50. As is summarized in par. 47, supra, Sussman sufficiently alleges sub judice a myriad of DR's written, UOF's employed, and other retaliatory acts taken against him in retaliation for, inter alia, his litigiousness. See par's 47-48, supra. Many of these DR's were written at FSP, par. 47, supra (citing Exhibit G at 4, 13-15; and citing Exhibit I at 7-8, 13-20; and citing Exhibit J at 1-7), so that they are keeping him retained on CM. Moreover, he properly alleges that two of the DR's which were considered at his initial CM placement were

---

49. It appears that it was "emergency grievance" #20-6-18545 that engendered this retaliatory DR as the DOC Sec. stated in his response that he had notified the FSP Warden of my allegations that his office destroys grievances. See Exhibit G at 24-25. Indeed, just as Sussman alleges herein, this grievance does not personally name Warden Davis as is falsely alleged in said DR. Compare Exhibit G at 24 (grievance #20-6-18545) with Exhibit G at 23 (retaliatory DR). Instead, said grievance reads, "grievances... at FSP are [being] destroyed by FSP Warden," Exhibit G at 24, as in his office, but not as in him personally.

written in retaliation for he having sought protection from violence, see par. 47, supra (adopting facts from complaint in Bradford Co, Fla. case 2019-CA-261 (attached hereon as Exhibit B)), so that these retaliatory DR's effectuated his CM placement, and so that he was effectually placed in CM for having sought protection from violence.[50] See Smith v Villapando, supra.

51. Indeed, the most recent DR of 5/26/20 is so blatantly retaliatory, it is laughable, par. 48, supra (citing Exhibit G at 23), as, even if Sussman had named Warden Davis in a grievance as is alleged in said DR (which he did not)[51], such speech is protected by the 1st Amend. Wilson v Greetan, 571 F. Supp. 2d 948, 957, 960 (W.D. Wis. 2007) (inmates speech telling officer he was "corrupt" for writing a bogus DR addressed a "public concern", and was, therefore, protected). In fact, since he arrived at FSP in April of 2019, Sussman has used the word "destroyed" or "disappeared" in at least a couple dozen grievances, see, e.g., Exhibit G 1-2, 5, 14, 26-29; Exhibit H at 7; Exhibit I at 1, 3, 4-1, 5, 11, 19, 21; Exhibit J at 12, 16, as such is required by FAC 33-103.007(6)(a)1 when filing a grievance of reprisal, and by 33-103.011(4) before he may take a grievance to the "next level" after the Warden fails to respond. Id.; see also FN41, supra. Additionally, such an allegation is required for Sussman to exhaust his DOC admin. remedies under 42 U.S.C. § 1997e(a) (the PLRA) as a prerequisite to seeking relief in this Fed. Court for a constitutional violation alleged in a given grievance. Thus, such a statement in a written grievance, even if Sussman had accused Warden Davis of personally destroying grievances (which he did not)[51], would undoubtedly qualify as "'litigation undertaken in good faith by a prisoner motivated to... bring about change, and protect constitutional rights...'". Osterback v. Kemp, 300 F. Supp. 2d 1238, 1254 (N.D. Fla. 2003) (quoting Adams, 784 F.2d at 1081). As such, it "'is a form of political

---

50. Of course, Sussman proffers both documentary and video evidence to prove these allegations, and to prove that neither retaliatory DR is supported by substantial, competent evidence. See Bradford Co, Fla. complaint 04-2019-CA-261 at FN's 3 and 6 and their accompanying texts (attached hereon as Exhibit B).

51. See FN 49, supra.

expression," and ... is protected by the First Amend." Osterback (quoting Adams). Moreover, the issuance of this retaliatory DR, Exhibit G at 23, not only violates the 1st Amend., but it lends credibility to Sussman's allegations that FSP's grievance coordinator (who wrote said DR) is destroying grievances pro cur- sus. See also Exhibit G at 22 (sworn statement by Inmate Bryant Keith Williams alleging FSP "fails to process grievances").[FN52]

52.   WHEREFORE, Sussman has, at the very least, sufficiently alleged that he was initially placed, and is being retained, on CM in retaliation for his exercise of 1st Amend. rights; and that the FSP grievance coordinator is des- troying grievances in an effort to prevent inmates from properly exhausting their admin remedies, so that they cannot access the courts for redress of con- stitutional claims, which, in Sussman's case, has left him in imminent-danger of serious harm, as he has shown in Claims (1) thru (4) and (7), supra. To show that FSP's denial of access to the DOC's admin. grievance procedure — and, ipso facto, the Fla. & Fed. courts — serves to perpetuate the state of imminent- danger that Sussman has properly alleged in Claims (1)-(4) and (7), supra; and, thereby, exposes him to a substantial risk of irreparable harm that requires the issuance of this Hon. Court's TRO, Laube; Chavis; Farmer, that would guar- antee all FSP inmates access to said grievance procedure; and to show that a a guarantee of such access satisfies all of the prerequisites of a TRO, Parker, Sussman relies on the facts, arguments and authorities set forth, and those adopted by reference, in par. 28 and its accompanying footnotes, supra. There- fore, this Hon. Court should issue its TRO enabling Sussman, and all FSP inmates,

FN 52. It should be noted that, although several of Sussman's fellow FSP inmates are willing to testify in support of his allegation of the pro cursus destruction of grievances, out of fear of retaliation, they refuse to submit sworn declara- tions to Sussman until such time that they leave FSP's CM Unit. They include, but are not limited to Brandon Fleming, DOC#L62598, Brian Kirsch, #S09482; Ronnie Ford, DC#H25B67; Aspilaire Rubens, DOC#Y49912; a named Plaintiff in Harvard and Kendrick, et al. v Inch, supra, namely: James Ken- drick, Jr., DC#Y49912; Ulysses Crouse, K81748; Ryan P. Johnson, #169340; Dean Harshbarger, #R38772.

to file all of their grievances with either an unbiased, trustworthy civilian designated by this Court, or with this Court itself, which would properly log them, and then reroute them to the DOC.

53. FINALLY, based on the facts, arguments and authorities put forth, and those adopted by reference, herein, this Hon. Court should issue a declaratory judgment indicating that, from 2005-2020, the DOC Sec. has perpetuated and promulgated a de facto policy of retaining Sussman in isolation and on CM in retaliation for having sought protection from violence, and in retaliation for his litigiousness. In addition, Sussman asks this Hon. Court to issue a declaratory judgment stating that retaliatory DR's from BRCF and WCI that are referenced in paragraphs 47 and 50, supra, effectuated his CM placement, so that he was effectually placed on CM for having sought protection from violence.

<u>CLAIM (10): IMMINENT-DANGER UNDER 28 U.S.C. §1915(g)</u>

54. To show that Sussman has sufficiently alleged imminent-danger under 28 U.S.C. § 1915(g), so that he may proceed IFP before this Hon. Court in spite of the 3-strikes he has accumulated under the PLRA, he relies on the facts, arguments and authorities put forth in paragraphs 19-28 and their accompanying footnotes, supra.

<u>VIII.   RELIEF   REQUESTED</u>

55. Sussman very respectfully asks this Hon. Court to grant him the same relief requested in Doc. 13 of <u>Harvard v. Inch</u>, 4:19-cv-212 (N.D. Fla.) that is prayed for as a means to remedy policies and practices that were promulgated by DOC Sec. Inch and his cronies in Tallahassee that have resulted in more than 10,000 Fla. DOC inmates languishing in solitary confinement on any given day. Additionally, he requests:

(a) Concerning claims (1) and (3), supra, a declaratory judgment stating that the DOC's policy of isolation has put Sussman in a perpetual state of imminent danger of psychological harm, physiological harm, and self-harm in violation of the 8th Amend; and that the DOC Sec. is deliberately indifferent to this danger.

(b) With respect to claim (3), supra, a declaratory judgment stating that,

in violation of the ADA and RA, Sussman was placed, and is being retained, in isolation; that, by virtue of such isolation, he is in imminent-danger of committing acts of self-harm; is legitimately foreclosed by bona fide fear from seeking psych or medical attention at FSP and RMC; that his psych grade was improperly lowered at BRCF; that he was denied access to eyeglasses from 12/22/19 thru 5/7/20 at FSP; that, even when he was able to visit the med clinic at FSP, he was improperly denied access to a hernia belt pass, a light lift pass, a low bunk pass, an arch support pass, a butt cushion pass, a high calorie diet pass, and hemorrhoid cream with vasoconstrictor; and that the DOC Sec. is deliberately indifferent.

(c)  Regarding claim (2), supra, a declaratory judgment stating that the DOC's policy of isolation subjects Sussman to an ongoing pattern of violent acts on his person, so that he is in imminent danger of violence at FSP in violation of 8th Amend.

(d)  Respecting claims (2) and (4), supra, a declaratory judgment stating that allegations by an inmate that an officer has identified him as a child molester to his fellow inmates sufficiently states a claim of sexual harassment under PREA, and, if true, puts him in imminent-danger, so that he has also stated an 8th Amend. violation.

(e)  Also respecting claims (2) and (4), supra, a declaratory judgment stating that, in violation of PREA and the 8th Amend., the DOC Sec. failed to properly investigate Sussman's well-pled allegations of sexual harassment, denied him access to PREA reports of incidents he alleged to have occurred on 9/8/17 and 9/18/17 at UCI, on 1/3/13 at SWCI, and on 4/26/20 at FSP, and was deliberately indifferent to Sussman's allegations.

(f)  Concerning claims (1)-(4), supra, a TRO directing the DOC to transfer Sussman from FSP post haste. FN5 2.1. It is Sussman's position that a "TRO" is nothing more than a preliminary injunction.

(g)  Also concerning claims (1)-(4), a TRO directing the DOC to either: (A) Release Sussman from CM, and put him back in a PMU; or (B) Place him in a transitional CM mental health unit (MHU) that is designed to transition him off CM.

(h)  With regard to claims (2) and (4), a TRO directing the DOC to positively identify "Cave Man" and "Indio", see pars. 27, supra (citing Exhibit I at 11-12, 19-20),

and to put them both on Sussman's "special review"/enemy list for his protection.

(i) With respect to claim (4), supra, a TRO directing the DOC that, unless he signs a voluntary acceptance of a cellmate while on CM or in the box, Sussman is to be housed alone while on CM or in the box.

(j) Regarding claims (1)-(4), a TRO directing the DOC to issue Sussman post haste all of the medical passes and devices he was denied access to which are listed in subsec. (b), supra.

(K) Also regarding claims (1)-(4), a TRO directing the DOC that, if Sussman is ever transferred to RMC, the RMC warden is to be personally notified of such at least 24-hours in advance to ensure Sussman will be housed alone as is described in subsec. (i), supra, that he is not required to carry more than 20 lbs. of his property, and that he is allowed to keep in his cell with him all 6000 pages (approx. 50-70 lbs.) of his legal files.

(l) Respecting claim (3), supra, a TRO directing the DOC to, within 60-days, give Sussman access to a doctor qualified to determine if corrective surgery is a viable, advisable option to fix his hernia, see FN 8, supra, and to give him access to an MRI and/or CAT scan to determine what, if any, permanent damage he suffered from the head injuries he suffered on 12/17/14, and what is the cause of his petty mal seizures. See FN 7 and its accompanying text, supra (citing Exhibit A's App. H at B-10).

(m) Concerning claim (5), supra, a declaratory judgment stating that the DOC's policy of putting inmates on property restriction as Sussman describes in par's 39-40, supra (citing FN 13, supra) serves no valid penological interest, is cruel under the 8th Amend., and the DOC Sec. is deliberately indifferent.

(n) A TRO directing the DOC to provide inmates on property restriction with a minimum of a blanket, a full torso "turtle suit", and a mattress, all three of which are specially designed to prevent self-harm or destruction, in a cell with a temperature of no less than 65° F.

(o) With regard to claim (6), supra, a declaratory judgment stating that, while he was in the box and/or on CM from 11/19/18 thru 1/23/20 Sussman lost

approx. 40 lbs, and bottomed out at 126 lbs, as a result of being fed a nutritionally deficient diet in violation of the 8th Amend., and the DOC Sec. is deliberately indifferent to such. (that)

(p)  Also with regard to claim (6), supra, a TRO directing the DOC to change its formula for calculating body mass and weight as a means to determine an inmate's need for a high calorie diet to exclude all chains and clothing, and to take into account bone density and thickness.

(q)  Also regarding claim (6), supra, a TRO directing the DOC to furnish Sussman a high calorie diet of at least 2600 calories per day until such time that he weighs no less than 155 lbs.

(r)  With respect to claim (7), supra, a declaratory judgment stating that, in violation of PREA and the 8th Amend., the DOC Sec. was deliberately indifferent to Sussman's allegations of retaliation that occurred at UCI from 9/8/17 – 9/18/17 as is alleged in par. 9, supra;  and of retaliation that happened at FSP on 4/26/19, 8/13/19; 11/21/19; 12/22/19; and 1/7/20 as is alleged, respectively, in par. 11; par. 12-13; par. 14 (citing DR#205-192410 at Exhibit G at 13); par. 17; and par. 16 and its accompanying FN 20, all supra.

(s)  Also respecting claim (7), supra, an injunction directing the DOC OIG to reinvestigate all of the PREA allegations referenced in the preceding subsec. (r), to furnish Sussman with copies of the final PREA reports, and to replace the documents that were stolen on 8/13/19 as is alleged in par. 12, supra (citing Exhibit G at 1-2, 4-10; and citing FN 12, supra); see also subsec. (e), supra; FN 5, supra.

(t)  Concerning claim (8), supra, the two declaratory judgments prayed for in par. 53, supra.

(v)  With regard to claim (9), supra, a TRO enabling Sussman, and all FSP inmates, to file all of their grievances with either an unbiased, trustworthy civilian designated by this Court, or with this Court itself, which would properly log them, and then reroute them to the DOC.

(v)  Also regarding claim (9), supra, a declaratory judgment stating that Sussman has been denied access to the DOC's admin. grievance procedure at FSP, which,

in turn, prevents him from properly exhausting his admin. remedies, which, in turn, frustrates his access to the courts, all of which violates the 1st Amend., and which, in Sussman's case, has left him to languish in a state of imminent-danger of harm.

(W) With respect to claim (10), supra, a declaratory judgment that Sussman has sufficiently alleged imminent-danger under 28 U.S.C. §1915(g), so he may proceed IFP sub judice.

## SUPPLEMENTAL FOOTNOTES and FACTS

FN 53. On 6/24/20, the first time since FSP Ofc. Gustafson, who wrote Sussman a retaliatory DR on 12/29/19, see par. 17, supra (citing Exhibit J at 1), was assigned to a dorm on which Sussman was housed, Gustafson denied him the main portion of his lunch. In response, Sussman demanded he call a Captain, and used his arms to prevent the inmate worker who was serving food from passing by his cell with the food cart until the Capt. arrived. Well, instead of getting a handheld camera and calling a Capt. as is mandatory under F.A.C. 33-602.210(2)(e)and(3) before engaging in a use of force (UOF), Gustafson took it upon himself to use his legs to detach Sussman's arms from the food cart, and forcefully grabbed him; even worse, he wrote Sussman three DR's falsely stating that, inter alia, Sussman grabbed his leg. See Exhibit J at 1-1 thru 1-3. Accordingly, Sussman alleges herein that Gustafson denied him food and wrote him these DR's in retaliation for his litigiousness and his so-called sex-offender status as is alleged in par. 17, supra, and to keep him retained indefinitely on CM. Insofar as Sussman may have overreacted in response to being denied food, he states that the DR's which resulted from his overreaction, and which will surely keep him retained on CM for years to come, are related to his mental illness as is alleged in FN's 25 & 27, supra. Additionally, he relies on Claim (6), supra (alleging starvation), to show that his reaction was, at the very least, understandable, if not appropriate. Finally, the video of this UOF, which is in the possession of the DOC Insp. Gen. pursuant to 33-602.210(11)(h), will prove Sussman never grabbed Gustafson, but Gustafson needlessly grabbed Sussman.

FN 54. In addition to the bogus, retaliatory DR Sussman received on 5/26/20, see paragraphs 48 & 51, supra, he got yet another one for supposedly refusing to shave, Exhibit G at 30, which is a lie. Unlike the DR of 5/26/20, however, this one was not dismissed in spite of the fact that the audio/video of this event on 6/26/20, had it been meaningfully considered, would have proven it's a bogus DR; and in spite of the fact it failed to allege his beard had reached ½ inch (which it had not) as is required by 33-602.101(4)(entitling inmates "to grow... a half inch beard"), and as is required by the RLUIPA as was enunciated by the U.S. Sup. Court in Holt v Hobbs, 25 Fla. L. Wkly FED S43(1/30/15)(same as 33-602.101(4)), before a Jew like Sussman may be punished for refusing to shave. Thus, this latest DR of 6/26/20 is not only bogus and retaliatory, but it violates the RLUIPA (Religious Land Use Institutionalized Persons Act). To add insult to injury, Sussman lost 15 days gain time credits. Exhibit G at 30 et seq.

FN 55. Unfortunately, just as Sussman predicted in par. 37, supra, "sexual harassment" in violation of PREA continues unabated at FSP as, on 6/28/20, FSP Ofc. Coleman misinformed his next door neighbor, Inmate Ulysses Crouse, DOC# K81748, that he molested "little kids." As he grieves this latest PREA violation, Sussman will supplement Exhibit I at 23 et seq. with documents concerning such.

## IX. MOTION TO JOIN THIS CASE WITH HARVARD v. INCH, 4:19-cv-212 (N.D. Fla.)

56. In Harvard v. Inch, this Hon. Court ruled that "there is a logical relation-ship between the claims of [all seven named] Plaintiffs because the underlying facts giving rise to each Plaintiff's claim is the same — [namely:] policies and practices promulgated by high-level officials in Tallahassee. Therefore, joinder of [their] claims ... is proper." Id., 28 Fla. L. Wkly FED at D44.

57. Sub judice, Sussman, who already has standing as a class member in Harvard v. Inch, clearly alleges on page 3, supra, that the "[sole] Defendant: DOC Sec. Mark Inch['s] ... alleged involvement is the promulgation and enforcement of statewide policies and practices that have resulted in Sussman being held in isolation ... in violation of the 8th Amend; the ... ADA; [and] the ... RA ... for over 90% of his 20 year sentence." See pg. 3, supra.
        Moreover, he "adopts ... all of the facts, arguments and authorities set forth in the operative complaint in Harvard, ... Doc. 13 ...; and ... alleges he has been arbitrarily swept into a perpetual state of isola-tion by the DOC's statewide policies, promulgated in Tallahassee, of isolating over 10,000 people in the box as a matter of course." See par. 19, supra (citing Harvard, Doc. 13 at paragraphs 2, 59 and 75). Indeed, virtually all of his allegations of personal suffering track those in Harvard. See par. 19, supra        (citing Harvard at Doc. 13 throughout). Thus, to show that joinder of this instant case with Har-vard is proper, Sussman relies on this Hon. Court's opinion in Doc. 54 of Harvard, 28 Fla. L. Wkly FED at D44.

58. WHEREFORE, Sussman respectfully asks this Hon. Court to join Harvard v. Inch with this instant case.

David Sussman #J06481

~~WAKULLA C.I. ANNEX~~
~~110 MELALEUCA DRIVE~~
~~CRAWFORDVILLE, FL 32327~~

FSP  P.O. Box 800
Raiford, FL  32083

Mailed From A State
Correctional Institution



CHECKED  JUL 21 2020

U. S. Dist. Court
Clerk of Court
111 N. Adams St., Suite 232
Tallahassee, FL  32301-7730

Case No. 4:19-cv-212

L MAIL