**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | | |
|---|---|---|
| HARVARD, *et al*., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 4:19-cv-00212-MW-CAS |
| | ) | |
| | ) | |
| MARK S. INCH, *et al*., | ) | |
| | ) | |
| Defendants. | ) | |

_____

**PLAINTIFFS' MOTION FOR PROTECTIVE ORDER**
**WITH INCORPORATED MEMORANDUM OF LAW**

Secretary Mark Inch and Florida Department of Corrections (Defendants) have interfered with the fair adjudication of this case by retaliating against putative class members for participating in Plaintiffs' Rule 34 facility inspections. Plaintiffs have completed three inspections and expect to complete more before the close of discovery, including one at Suwannee Correctional Institution on December 8 and 9, 2020. Without judicial intervention, Plaintiffs worry that Defendants' conduct will continue, grow more brazen, and further threaten Plaintiffs' fact gathering.

To ensure the fair adjudication of their case, Plaintiffs, by and through their undersigned counsel, hereby move for an order that protects putative class members

1

from retaliatory, chilling, or harassing conduct, and prohibits Defendants from improperly communicating with putative class members about this lawsuit.

## FACTUAL BACKGROUND

1.      Plaintiffs and putative class members depend completely on Defendants for food, showers, human contact, health care, and safety. ECF 13 ¶¶ 89, 91, 107, and 109. They risked these basic human needs to challenge Defendants' statewide policy and practice of isolating people for more than 22 hours a day in cells smaller than the average parking space. ECF 13 ¶¶ 57-59.

2.      Defendants' verbal and physical retaliation against them has made the cost of claiming their constitutional and statutory rights almost unbearable.

### Florida State Prison Inspection

3.      Plaintiffs completed their first Rule 34 inspection at Florida State Prison on September 15 and 16, 2020.[1] Two of Plaintiffs' attorneys and two of Plaintiffs' experts attended.[2]

4.      On the first day of the inspection, a group of around 15, comprised of Florida Department of Corrections (FDC) staff and Defendants' lawyers, followed Plaintiffs' team as they attempted to conduct cell front interviews.[3] Plaintiffs' counsel stopped several cell front interviews to ask FDC's representatives to step

---

[1] Andrea Costello Declaration ¶ 2.
[2] Sumayya Saleh Declaration ¶ 2.
[3] Sumayya Saleh Declaration ¶¶ 3-4.

back from the interview to preserve the confidentiality guaranteed by the inspection stipulation.[4] In one instance, an Assistant Warden stood behind Plaintiffs' counsel, stared at a putative class member, and shook his head, "No."[5]

5.      On the second day, Plaintiffs' experts interviewed people individually in a gymnasium with Plaintiffs' counsel.[6] Before an interview, an officer told a putative class member, "just keep your mouth shut"; "[l]et them know nothing is going on," and threatened to beat him and deny him food if he spoke to Plaintiffs' counsel or experts.[7]

6.      In the gymnasium, Defendants seated Plaintiffs' experts, Plaintiffs' counsel, and putative-class-member interviewees in chairs next to bleachers.[8] Defendants fully shackled the interviewees and chained them to chairs bolted to the floor.[9] Correctional officers sat close to them on the first two rows of the bleachers and ignored requests to move further away.[10] In one interview, a putative class member whispered and expressed discomfort about speaking candidly with

---

[4] Andrea Costello Declaration ¶ 4; Sumayya Saleh Declaration ¶ 4; ECF 157 ¶ 8.
[5] Derrick Grantley Declaration ¶ 2.
[6] Andrea Costello Declaration ¶ 5.
[7] Jhony Milo Declaration ¶ 2.
[8] Andrea Costello Declaration ¶ 5.
[9] Andrea Costello Declaration ¶ 5.
[10] Andrea Costello Declaration ¶ 5.

correctional officers so close to him.[11] During another interview, an Assistant Warden stared at a putative class member and shook his head.[12]

7.     In the weeks after this inspection, Defendants harassed and abused people who spoke to Plaintiffs' counsel: they called them "snitches,"[13] denied them food and showers,[14] asked about their conversations with Plaintiffs' counsel,[15] and said they would "see them" when "things calmed down."[16]

**Santa Rosa Inspection**

8.     Plaintiffs completed their second inspection on October 13-15, 2020, at Santa Rosa Correctional Institution and Annex (Santa Rosa). Plaintiffs' legal team consisted of two experts, two attorneys, and one paralegal.

9.     On the first day of the inspection, officers told one putative class member not to talk to Plaintiffs' counsel because they did not represent their interests and wanted to keep them in isolation.[17]

10.    Also on the first day, a group of up to 17 FDC representatives accompanied Plaintiffs' team of five people in the isolation units as they interviewed

---

[11] Andrea Costello Declaration ¶ 5.
[12] Derrick Grantley Declaration ¶ 4.
[13] Marcus Broadnax Declaration ¶¶ 3-4; Jhony Milo Declaration ¶ 5.
[14] Jhony Milo Declaration ¶¶ 5, 7.
[15] Jhony Milo Declaration ¶ 6.
[16] Marcus Broadnax Declaration ¶ 5.
[17] Curley Andre Williams Declaration ¶ 1.

putative class members at cell front.[18] The officers ignored multiple requests to step back to preserve the interviews' confidentiality.[19]

11.    When Plaintiffs left that first day, officers called a person a snitch.[20]

12.    That night, Plaintiffs' counsel sent Defendants' counsel a list of putative class members for their experts to interview in a private setting and explained that they wished to interview them in the order identified on the list.[21] The next morning, Ms. Saleh, one of Plaintiffs' attorneys, reminded them of the same.[22]

13.    On the second and third days of the inspection, officers announced to the putative class members that they had legal callouts, and made comments such as, "You know what time it is if you come out. Are you still willing to come out?"[23] Officers subjected one man to a humiliating and intrusive strip search that included forcing him to show his penis and pull back his foreskin.[24] For those who agreed to meet with Plaintiffs' counsel and experts, officers locked them in shower cells without seats or toilets and left them fully restrained in handcuffs, black boxes, and

---

[18] Sumayya Saleh Declaration ¶ 6; Daniel Pacholke Declaration ¶ 17.
[19] Amber Eriksson Declaration ¶ 4.
[20] Michael Lowery Declaration ¶ 2.
[21] Sumayya Saleh Declaration ¶ 8.
[22] Sumayya Saleh Declaration ¶ 8.
[23] Mack Simmons Declaration ¶ 2.
[24] Odell Lee Declaration ¶ 2.

leg irons to wait for the interviews.[25] Defendants forced some people to stand in these showers for up to seven and a half hours before seeing Plaintiffs' experts.[26]

14.    As putative class members waited in these shower cells, officers told them that they could not eat lunch or receive canteen or use the bathroom because of their interviews.[27] If they refused their interviews, officers said they could eat lunch.[28] Officers also told a man with a broken arm that if he spoke to Plaintiffs' counsel, they would break his other arm.[29]

15.    During the interviews, Plaintiffs' counsel noticed that one of the putative class members' handcuffs were so tight they appeared to cut into and leave marks on his wrists.[30] Some putative class members only received lunch after a request from Plaintiffs' counsel.[31]

16.    After the interviews, officers brought some putative class members back to the shower cells and prevented them from using the toilet, let alone sitting down, until 7:00 p.m.[32] One of them was in restraints that day for a total of 11

---

[25] Dillon "Dylicia" Gresham Declaration ¶¶ 2-3; Lewis Johnson Declaration ¶ 4; Odell Lee Declaration ¶ 2; Michael Lowery Declaration ¶ 3; Mack Simmons Declaration ¶ 3.
[26] Dillon "Dylicia" Gresham Declaration ¶ 3 (seven and a half hours); Odell Lee Declaration ¶ 2 (six hours and forty five minutes); Michael Lowery Declaration ¶ 3 (five hours); Lewis Johnson Declaration ¶¶ 4-5 (two hours); and Mack Simmons Declaration ¶ 3 (hour and a half).
[27] Michael Lowery Declaration ¶ 3; Mack Simmons Declaration ¶¶ 4-6.
[28] Dillon "Dylicia" Gresham Declaration ¶ 4.
[29] Lewis Johnson Declaration ¶ 4; Dan Pacholke Declaration ¶ 21.
[30] Sumayya Saleh Declaration ¶ 11.
[31] Amber Eriksson Declaration ¶ 7; and Odell Lee Declaration ¶ 3.
[32] Lewis Johnson Declaration ¶ 5; Odell Lee Declaration ¶ 3.

hours.[33] At least one putative class member did not receive any food after the interview that day.[34]

17.     The day after the inspection, Dan Pacholke, the former Secretary of the Department of Corrections for the State of Washington and one of Plaintiffs' expert witnesses, contacted Plaintiffs' counsel to express his concern for the interviewees' safety. He worried that people would suffer retaliation for participating in interviews because so many of the people he talked to, in different units throughout the prison, described similar retaliatory conduct, including that staff threatened to break one person's arm for speaking with him.[35] Mr. Pacholke has toured over 20 prisons and jails as an expert witness or consultant.[36] This is the only time that he has felt compelled to make a call like this.[37]

18.     In the days after the inspection, officers continued to attempt to punish putative class members for talking with Plaintiffs' counsel: they tried to convince cellmates to attack one putative class member;[38] they refused to allow another to leave her cell for two weeks;[39] they served one person a special management meal

---

[33] Odell Lee Declaration ¶ 4.
[34] Dillon "Dylicia" Gresham Declaration ¶¶ 6-8.
[35] Dan Pacholke Declaration ¶¶ 21, 32-33.
[36] Dan Pacholke Declaration ¶ 6.
[37] Dan Pacholke Declaration ¶ 34.
[38] Lewis Johnson Declaration ¶ 6.
[39] Dillon "Dylicia" Gresham Declaration ¶ 9.

("loaf") for three days;[40] they confiscated and destroyed others' property;[41] they denied a man a work assignment;[42] and called some snitches.[43]

19.     During subsequent legal visits and calls, officers attempted to discourage putative class members from speaking to Plaintiffs' counsel. They interrupted legal visits,[44] made them stand during legal calls,[45] refused to keep legal calls confidential,[46] forced them to take the calls in full restraints and hold the phone between their shoulder and ear,[47] told them, "Don't act up and we won't put you on your head,"[48] threatened to deny them food if they spoke to Plaintiffs' counsel,[49] asked them to describe their legal calls with Plaintiffs' counsel and threatened to take their property if they refused.[50]

**Lowell Annex Inspection**

20.     Plaintiffs completed their third inspection at Lowell Correctional Institution Annex on November 17 and 18, 2020.

---

[40] Curley Andre Williams Declaration ¶ 5.
[41] Curley Andre Williams Declaration ¶¶ 4, 5; Dillon "Dylicia" Gresham Declaration ¶¶ 9-10.
[42] Michael Lowery Declaration ¶ 4.
[43] Michael Lowery Declaration ¶ 4; Dillon "Dylicia" Gresham Declaration ¶ 12.
[44] Amber Eriksson Declaration ¶ 15.
[45] Michael Lowery Declaration ¶ 4, Michelle Llosa Declaration ¶ 11.
[46] Odell Lee Declaration ¶ 6, Amber Eriksson Declaration ¶¶ 11-12; Michelle Llosa Declaration ¶¶ 4-7.
[47] Michelle Llosa Declaration ¶ 11, Michael Lowery Declaration ¶ 4.
[48] Nicholas Cruz Declaration ¶ 2.
[49] Nicholas Cruz Declaration ¶ 3, Curley Andre Williams Declaration ¶ 7.
[50] Curley Andre Williams Declaration ¶ 6.

21.     On the first day of the inspection, an officer threatened a putative class member with a disciplinary infraction if she spoke to Plaintiffs' counsel.[51] Another officer told a putative class member she could not speak to Plaintiffs' counsel.[52] That same night, officers did not deliver canteen items or turn off the lights in a wing where putative class members had spoken to Plaintiffs' counsel.[53]

22.     During the second day, an officer called a putative class member a snitch when she came out of her cell to speak with Plaintiffs' experts.[54]

**The Parties' Meet-and-Confer**

23.     To investigate some of the putative class members' allegations at Santa Rosa, on October 30, 2020, Plaintiffs requested that Defendants preserve and produce video from the isolation units during the relevant time period.[55] Defendants initially refused.[56] Then, they agreed to preserve it, but not produce it.[57]

24.     Plaintiffs described officers' conduct at Florida State Prison and Santa Rosa in broad strokes to Defendants in emails on November 12, 2020, and in a telephone call on November 16, 2020.[58] To prevent court intervention, Plaintiffs asked Defendants to enter a stipulation that would prevent Defendants' employees

---

[51] Mindy Letho Declaration ¶ 2.
[52] Jessica McDaniel Declaration ¶ 2.
[53] Simone Littles Declaration ¶ 2.
[54] Simone Littles Declaration ¶ 2.
[55] Kelly Knapp Declaration ¶ 3.
[56] Kelly Knapp Declaration ¶¶ 3-5, 9.
[57] Kelly Knapp Declaration ¶¶ 3-5, 9.
[58] Kelly Knapp Declaration ¶¶ 6, 8.

from discussing the case with putative class members and discouraging them from participating in the case. Defendants were reluctant to agree, instead requesting specific information about each allegation. Plaintiffs explained this matter is urgent, given the upcoming inspections, and that only a protective order would provide putative class members the security they need to participate freely in this case. Plaintiffs again asked for the Santa Rosa video. Defendants requested until November 20 to decide.[59]

25.    Defendants notified Plaintiffs on November 20, 2020, that although they had preserved the Santa Rosa video, they would not agree to produce it.[60] They stated that the "proper procedure is for Plaintiffs to propound an [Request for Production] to which Defendants can formally respond." But Plaintiffs already served Request for Production No. 135 to Inch, on August 13, 2019, for "[a]ll video and audio preserved by agreement between the parties in this litigation."[61]

26.    Defendants also notified Plaintiffs on November 20, 2020, that they would not agree to a stipulation prohibiting retaliation.[62] Instead, they asked Plaintiffs to provide specific details "which the Department can investigate and

---

[59] Kelly Knapp Declaration ¶ 8.
[60] Kelly Knapp Declaration ¶ 9.
[61] Kelly Knapp Declaration ¶ 10.
[62] Kelly Knapp Declaration ¶ 9.

address on a case by case basis." Defendants did not respond to Plaintiffs' concern regarding improper communications with putative class members.

## **MEMORANDUM**

A protective order is necessary to allow the Court to adjudicate this case fairly. In general, the Court has the "inherent equitable power to issue protective orders to limit any retaliation that would preclude this Court from fairly adjudicating a case." ECF No. 96 at 2-3. In the class action context, this power is especially important because, while "[c]lass actions serve an important function in our system of civil justice," they also create "opportunities for abuse as well as problems for courts and counsel in the management of cases." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99-00 (1981). As a result, the Court "has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and the parties." *Id.*

The Court's broad power to manage class action litigation includes the power to enter protective orders to prevent class opponents from engaging in conduct that "is abusive in that it threatens the proper functioning of the litigation." *Alequin v. Darden Restaurants, Inc.*, No. 12-61742-CIV, 2013 WL 3939373, at *11 (S.D. Fla. July 12, 2013).

Conduct threatens the proper function of the litigation when it "coerce[s] prospective class members into excluding themselves from the litigation," misleads

putative class members, or "undermine[s] cooperation with or confidence in class counsel." *Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 698 (S.D. Ala. 2003) (listing cases) (internal citations and footnotes omitted). *See also Ben David v. Travisono*, 495 F.2d 562, 564 (1st Cir. 1974) ("The findings necessary to support such a protective order are simply that the plaintiffs reasonably fear retaliation and that the court's fact-finding may be materially impaired unless there is provided the tangible protection of a suitable court order."). Because this damage could be "irreparable," "the trial court is empowered to enter prophylactic orders designed to prevent harm before it happens." *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1203, 1206 (11th Cir. 1985).

District courts in the Eleventh Circuit have protected putative and actual class members from class opponents in several ways. In *Titre v. Platinum Partners LLC*, the court barred Defendants from "intimidating, threatening, or harassing" current or putative plaintiffs. No. 08-61254-CIV, 2008 WL 11331817, at *2 (S.D. Fla. Oct. 1, 2008).

In *Beck v. Boce Group, L.C.*, the court prevented Defendants from communicating with prospective class members "*regarding this lawsuit*." No. 04-20683, 2005 WL 8155884, at *3 (S.D. Fla. June 15, 2005), *report and recommendation adopted,* No. 04-20683-CIV, 2005 WL 8155891 (S.D. Fla. Sept. 28, 2005) (emphasis in original).

And, in *Ojeda-Sanchez v. Bland Farms*, the court prohibited Defendants from communicating with "Plaintiffs, Opt-in Plaintiffs, Potential Opt-in Plaintiffs, and their family members regarding this lawsuit, their decision to participate as plaintiffs in this lawsuit, or their representation." 600 F. Supp. 2d 1373, 1381 (S.D. Ga. 2009).

At every stage of the inspections, Defendants interfered with putative class members' ability to cooperate with Plaintiffs' counsel. Before the interviews, Defendants' officers told putative class members not to speak to class counsel.[63] When several people agreed to meet with Plaintiffs' counsel and experts, officers threatened them with violence or a disciplinary infraction,[64] called them a snitch,[65] or forced them to stand, fully restrained, in shower cells without toilets for hours.[66] While waiting to speak with Plaintiffs' counsel and experts, Defendants made the putative class members decide between cooperating in the case and (a) using the bathroom,[67] (b) receiving canteen privileges,[68] (c) eating,[69] and (d) sitting down.[70]

---

[63] Derrick Grantley Declaration ¶ 2; Jhony Milo Declaration ¶ 2; Derrick Grantley Declaration ¶ 4; Jessica McDaniel Declaration ¶ 2.

[64] Lewis Johnson Declaration ¶ 4; Marcus Broadnax Declaration ¶ 5; Mack Simmons Declaration ¶ 2; Nicholas Cruz Declaration ¶ 2; Mindy Lethco Declaration ¶ 2.

[65] Simone Littles Declaration ¶ 2.

[66] Dillon "Dylicia" Gresham Declaration ¶¶ 2-5; Lewis Johnson Declaration ¶ 5; Odell Lee Declaration ¶ 2; Michael Lowery Declaration ¶ 3; Mack Simmons Declaration ¶ 3.

[67] Mack Simmons Declaration ¶¶ 4-5; Michael Lowery Declaration ¶ 3.

[68] Michael Lowery Declaration ¶ 3.

[69] Mack Simmons Declaration ¶ 6; Michael Lowery Declaration ¶ 3; Jhony Milo Declaration ¶ 2; Dillon "Dylicia" Gresham Declaration ¶¶ 3-4; Nicholas Cruz Declaration ¶ 3; Curley Andre Williams Declaration ¶ 7.

[70] Mack Simmons Declaration ¶ 3; Odell Lee Declaration ¶ 2; Michael Lowery Declaration ¶ 3.

After these cell front and individual interviews, officers called them snitches,[71] threatened them,[72] confiscated and destroyed their property,[73] denied them work assignments,[74] and asked about their conversations with Plaintiffs' counsel.[75]

Since the inspections, during subsequent legal visits and calls, officers attempted to discourage putative class members from speaking to Plaintiffs' counsel by interrupting legal visits,[76] making them stand during the legal calls,[77] refusing to keep legal calls confidential,[78] and forcing them to take the calls in full restraints and hold the phone between their shoulder and ear.[79]

On top of all this, they misled one putative class member, telling him that Plaintiffs' counsel was "against" him and wanted to keep him in isolation.[80]

As a result of Defendants' conduct before, during, and after the past three inspections, and the risk that it will continue during future inspections, Plaintiffs cannot afford to wait months, or even weeks, for Defendants to investigate every

---

[71] Marcus Broadnax Declaration ¶¶ 3-4; Jhony Milo Declaration ¶ 5; Michael Lowery Declaration ¶ 2; Dillon "Dylicia" Gresham Declaration ¶ 12.
[72] Lewis Johnson Declaration ¶ 6.
[73] Curley Andre Williams Declaration ¶¶ 4-5; Dillon "Dylicia" Gresham Declaration ¶¶ 9-10.
[74] Michael Lowery Declaration ¶ 4.
[75] Jhony Milo Declaration ¶ 6; John Gilday Declaration ¶ 3.
[76] Amber Eriksson Declaration ¶ 15.
[77] Michael Lowery Declaration ¶ 4.
[78] Odell Lee Declaration ¶ 6; Amber Eriksson Declaration ¶¶ 11-12; Michelle Llosa Declaration ¶ 2-7.
[79] Michelle Llosa Declaration ¶ 11-12.
[80] Curley Andre Williams Declaration ¶ 2.

allegation of retaliation. This conduct threatens the fair adjudication of this case and merits a protective order.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion and enter a Protective Order prohibiting FDC staff from:

1. Retaliating against, chilling, or harassing the Named Plaintiffs and putative class because they participate in this case or communicate with Plaintiffs' legal team or experts; and

2. Communicating with the Named Plaintiffs or putative class members about Plaintiffs' legal team, experts, or this case unless otherwise agreed upon by the parties.

Date: November 23, 2020                    Respectfully Submitted,

                                           s/ Sam Thypin-Bermeo
                                           Sam Thypin-Bermeo
                                           Fla. Bar No. 1019777
                                           Dante P. Trevisani
                                           Fla. Bar No. 72912
                                           Laura A. Ferro
                                           Fla. Bar No. 1015841
                                           Marcel A. Lilavois Jr.
                                           Fla. Bar No. 1016175
                                           Florida Justice Institute, Inc.
                                           100 SE 2nd St., Ste 3750
                                           Miami, FL 33131

Telephone: (305) 358-2081
sthypin-
bermeo@floridajusticeinstitute.org
dtrevisani@floridajusticeinstitute.org
lferro@floridajusticeinstitute.org
mlilavois@floridajusticeinstitute.org

Kelly Knapp
Fla. Bar No. 1011018
Southern Poverty Law Center
2 South Biscayne Boulevard
Miami, FL 33131
Telephone: (786) 347-2056
kelly.knapp@splcenter.org

Sumayya Saleh
Fla. Bar No. 119372
Southern Poverty Law Center
106 East College Ave., #1010
Tallahassee, FL 32302
Telephone: (850) 521-3024
sumayya.saleh@splcenter.org

Andrea Costello
Fla. Bar No. 532991
Christopher M. Jones
Fla. Bar No. 994642
Jennifer M. Painter
Fla. Bar No. 110966
Aimee Lim
Fla. Bar. No. 116209
Florida Legal Services
122 E. Colonial Drive, Suite 100
Orlando, FL 32801
Telephone: (407) 801-0332 (direct)
andrea@floridalegal.org
christopher@floridalegal.org

16

aimee@floridalegal.org
jennifer.painter@floridalegal.org

**Attorneys for Plaintiffs**

### Local Rule 7.1(B) Certificate

Under N.D. Local Rules 7.1(B) and (C), the undersigned counsel hereby certifies that Plaintiffs' counsel has conferred with Defendants' counsel about the relief sought in this motion. Defendants object to the relief requested.

s/ Sam Thypin-Bermeo
Sam Thypin-Bermeo

### Local Rule 7.1(F) Certificate

Under N.D. Local Rule 7.1(F), the undersigned counsel hereby certifies that this motion contains 3,449 words.

s/ Sam Thypin-Bermeo
Sam Thypin-Bermeo