IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


JAC'QUANN (ADMIRE) HARVARD,
et al.,

      Plaintiffs,

vs.                                                  Case No. 4:19cv212-MW-MAF

MARK S. INCH, and the FLORIDA
DEPARTMENT OF CORRECTIONS,

      Defendants.

_____/


## O R D E R

      This civil rights action challenges the Florida Department of

Corrections' practice of placing inmates in isolation or solitary confinement.

The amended complaint, ECF No. 13, alleged that the Department "uses

different names for isolation in its facilities such as close management or

confinement, but no matter the name," the effect is the same - inmates are

isolated from the general prison population.  ECF No. 13 at 4.  Plaintiffs

claimed that the isolation "practice violates constitutional standards."

      Discovery has been underway pursuant to the Initial Scheduling

Order, ECF No. 24, and a subsequent Order modifying that Order, ECF

No. 165.  As part of discovery, Plaintiffs have been conducting Rule 34

facility inspections "to assess all aspects of the operations of restrictive

housing."  ECF No. 157.  The parties entered into a stipulation to facilitate

the inspections and guide "confidential interviews of Plaintiffs and putative

class members."  *Id.* at 1.  During the first three facility inspections,[1] issues

arose which led to Plaintiffs filing a motion for a protective order, ECF No.

183, to protect "putative class members from retaliatory, chilling, or

harassing conduct" and to prohibit "Defendants from improperly

communicating with putative class members about this lawsuit."  *Id.* at 1-2.

The motion was supported by twenty declarations, although six have since

been withdrawn.  *See* ECF Nos. 212-213, 216, and 228.  Plaintiffs seek

issuance of a protective order pursuant to Federal Rules of Civil Procedure

23(d) and 26(c) and argue that the Court has the inherent equitable power

to issue "appropriate orders governing the conduct of counsel and the

parties."  *Id.* at 11 (quoting Gulf Oil Co. v. Bernard, 452 U.S. 89, 100, 101

S. Ct. 2193, 2200, 68 L. Ed. 2d 693 (1981) (stating "a district court has both

---

[1] The inspections were conducted at the Florida State Prison, Santa Rosa Correctional Institution, and the Lowell Correctional Institution Annex.  There was no showing of any problems during the facility inspection and interviews conducted at Suwannee Correctional Institution, *see* ECF No. 199 at 3, which took place after Plaintiffs' filed the motion for protective order.

the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties.")).

Defendants responded to Plaintiffs' motion with their own, opposing declarations.  ECF No. 199.  Defendants argued that Plaintiffs allegations of harassment and retaliation were "either taken out of context, half-truths, gross exaggerations, or simply untrue."  *Id.* at 5.  Defendants' declarations sought to explain certain contentions made by Plaintiffs (such as why officers were "standing close by" during cell front interviews; why the witnesses were held in shower cells – sometimes for hours – prior to their interviews; why certain witnesses may have lost privileges or been denied food) or, in general, contradicted statements made in Plaintiffs' declarations.

Because the facts necessary to resolve Plaintiffs' motion were disputed, an evidentiary hearing was scheduled.[2]  ECF No. 204 at 11 (citing McDonald's Corp. v. Robertson, 147 F.3d 1301, 1311-12 (11th Cir.

---

[2] The parties were advised that an evidentiary hearing would not be held if they were "able to agree to a stipulation prohibiting retaliation."  ECF No. 204 at 11. Although Defendants agreed that "there are already Florida regulations and laws in place that prohibit" acts of retaliation, a stipulation was not submitted.

1998) (pointing out that "an evidentiary hearing is normally required to decide credibility issues")).  After five days of testimony, twenty-three witnesses, and the submission of numerous exhibits, the parties were provided an opportunity to submit proposed orders.  They did so, *see* ECF Nos. 237, 238, and their submissions have been considered.

Notably, Plaintiffs seek a protective order under Rule 23(d) and have not requested an injunction under Rule 65.  This matter was referred to the undersigned, *see* ECF No. 200, and may be ruled on in an Order as a pre-trial discovery issue; a Report and Recommendation is not required.  *See* 28 U.S.C. § 636(b)(1).

**Relevant Evidence**

Inmate Gilday provided credible testimony in which he explained that an officer who escorted him to meet with Plaintiffs' legal team questioned him about why he was seeing the lawyers, what they were asking about, and what he was telling them.  ECF No. 229 at 175-176, 179-180.  Other officers in his dormitory did so as well.  *Id.* at 175.  Although he did not feel the questing was "threatening," he did say that it was "intimidating" and made him anxious.  *Id.* at 176; *see also* ECF No. 229 at 197.  He testified that he feared retaliation, and that he felt the officers were generally

discouraging him from participating.  *Id.* at 180-181, 199-200.  Inmate

Gilday said the officers also made little comments undermining the reasons

for the litigation, saying things like the lawyers were "just trying to line their

pockets" and they were "not trying to look out for none of the inmates."  *Id.*

Inmate Cruz was also asked by an officer what he had spoken to

counsel about, comments which made him feel "intimidated and offended."

ECF No. 229 at 12.  Similarly, inmate Williams also testified that a sergeant

told him that he should not talk with Plaintiff's legal team "because they are

really against y'all."  ECF No. 230 at 10.  Inmate Williams said that Lt.

McCrainie told the inmates to be on their "best behavior," and a third officer

told the inmates that they needed to make "them look good and don't talk

to the visitors that's coming."  *Id.* at 9-10; *see also* at 39-40.  He testified

that as many as five or six officers made similar comments.  *Id.* at 11.  In

addition, after making a "legal call," he said that officers "tried to intimidate"

him and were asking what he had said on the telephone.  *Id.* at 27.  At

another time, inmate Williams said that officers were trying to talk him out

of going to a legal visit by offering him extra food trays and "extra soap and

extra things" that inmates don't get in confinement.  *Id.* at 28.

Inmate Milo also testified that the officer who escorted him to the gymnasium to be interviewed by Plaintiffs' legal team "threatened" him to "not say anything."  ECF No. 230 at 155, 157.  He said that the threat was that he would not get fed or he would "get jumped on."  *Id.* at 157.  Inmate Milo also testified that he felt threatened by the warden whose greeting and harsh pat on the shoulder seemed more like a warning than a genuine greeting.  *Id.* at 159-160.  He also indicated that the officers who escorted him to be interviewed were asked by counsel to back up "a little bit because they were too close, they were hearing the conversation," but the officers refused to move.  *Id.* at 160-161.  Additionally, once he was returned to his cell, other officers called him "a snitch," a word serious "enough to get you killed."  *Id.* at 162-163.  Inmate Milo also said that he was not fed his evening meal or given a shower that night.  *Id.* at 165.  Instead, he was given "an air bag."  *Id.*  He testified that he was also given an "air bag" the following day and did not take a shower because he feared that "they would jump on" him if he did.  *Id.* at 167-168.

Inmate McDaniel testified that she also feared retaliation due to speaking with Plaintiffs' legal team.  ECF No. 229 at 121-123.  She testified that Officer Botticello told her that she could not speak to the lawyers, but a

higher ranking officer (Lt. Brown) said that she could do so.  *Id.* at 126.

Inmate McDaniel was able to speak with Plaintiffs' legal team, but she

expressed fear of being written up for disobeying the verbal order given to

her by the officer.  *Id.* at 122.  She explained that disciplinary action could

have been taken against her by the officer, and disciplinary infractions

could, in turn, keep her in confinement longer.  *Id.* at 123-124, 130.

Similarly, inmate Lethco testified that she wanted to speak with

Plaintiffs' legal team, but feared getting in trouble.  *Id.* at 100.  She testified

that Lt. Brown told one inmate that "if she spoke she would be written up."

*Id.* at 101.  In addition, she testified that when she was taken to speak with

the attorneys, Officer Botticello made a "big sound" like a "hmm" that

inmate Lethco interpreted to mean that she "was pushing it."  *Id.* at 102-

103.  Inmate Lethco said it made her feel "uncomfortable" like she "was

doing something [she] shouldn't have done" by going to speak with

counsel.  *Id.*

Inmate Lee testified that he was unable to have a confidential "legal

call" with counsel for Plaintiffs.  ECF No. 229 at 91-92.  He said that

because officers would not shut the door and stood "by the door," the

telephone call was not "confidential" and was cut short.  *Id.*  Inmate

Gresham encountered the same behavior.[3]  ECF No. 230 at 87.  The officers refused to close the door and the legal call was forced to end prematurely.  *Id.*  Moreover, officers reported that inmate Gresham "told on them about not closing the door for [her] legal call," which prompted another officer to yell on the wing "that he did not like snitches" and he yelled that inmate Gresham was "a snitch."[4]  *Id.* at 87.

Inmate Broadnax testified to a similar experience, stating that a sergeant came to his cell and told him that he "was a snitch now" because the sergeant heard that he had been talking to a lawyer.  ECF No. 230 at 186.  The sergeant told inmate Broadnax not to worry, that he would be back and had "something for" him.  *Id.*  Inmate Broadnax said that another sergeant told him that "he had heard what [he] did" and called him a snitch. *Id.* at 188.

Inmate Grantley testified that while he was speaking to Plaintiffs' legal team at his cell front, the assistant warden began shaking "his head no" as though he were trying tell him not to speak to Plaintiffs' team.  ECF

---

[3] Further, inmate Gresham testified that officers refused to provide her with a grievance form because she spoke to the lawyers.  ECF No. 230 at 105.

[4] Being label a "snitch" is "a bad label to have" and makes an inmate more vulnerable to physical attack.  ECF No. 230 at 88.

No. 230 at 117-118.  Inmate Grantley interpreted this action as a direction not to talk with the lawyers.  *Id.* at 118.

Inmate Lethco testified that she feared retaliation from prison staff. ECF No. 229 at 109-110.  Although Defendants questioned whether inmate Lethco feared retaliation because she spoke to Plaintiffs' legal team or because of a grievance she had filed, the questioning highlighted that she feared retaliation due to engaging in protected First Amendment activities.[5] *Id.* at 110-112.  Ms. Lethco acknowledged that she had filed two grievances complaining about two different acts of retaliation.  *Id.* at 112. Such testimony points out the perception of inmates that they may suffer retaliation for the simple act of filing a grievance or taking other protected actions.

That perception was shared by inmate Milo who testified that he did not want to file a grievance about issues he experienced because "all it does is add more – more fire to the fuel."  ECF No. 230 at 169.  He said that officers would just "shoot at you even harder" by not serving a meal,

---

[5] Filing a grievance is a constitutionally protected activity.  Pittman v. Tucker, 213 F. App'x 867, 870 (11th Cir. 2007).

failing to provide a shower or shave, or by "jumping" on an inmate.  *Id.* at 169.

In addition to inmate Lethco's fear of being written a disciplinary report as an act of retaliation, there was testimony about other retaliatory actions which are taken.  Inmate Williams testified that after he spoke to Plaintiffs' legal team, he was placed on property restriction and given "management loaf."  *Id.* at 16-18.  Inmate Williams testified that Lt. McCrainie told him that he was going on property restriction because he "made them look bad."  *Id.* at 16.  He further testified that he had gotten into trouble previously for not having his bed made or not being in his "class A uniform," but he was never placed on property restriction or given the special management loaf meal.  *Id.* at 22-23; 50-51.  His perception was that the true reason underlying the disciplinary action was retaliation.

Inmate Broadnax testified that an officer questioned him about a legal call, asking what it "was about."  ECF No. 230 at 189.  Inmate Broadnax answered that "it was none of his business."  *Id.*  Later that day, inmate Broadnax needed to request that the toilet in his cell be flushed, but when he asked the officer to do so, the officer told him "that it was none of his business" and refused to flush his toilet.  *Id.* at 189-190.  In addition, Inmate

Broadnax testified that Sergeant Prock threatened him because of legal mail he sent out, and he believed the threat was for "some type of physical harm," more than just an "air tray."  ECF No. 230 at 189.

Likewise, inmate Cruz testified that an officer threatened to put him on his head if he did not "act right" during his legal visit.  ECF No. 229 at 10.  He said that the comment made him fear for his physical well being since he was testifying against the Department of Corrections.  *Id.* at 14; *see also* ECF No. 229 at 32.  Inmate Johnson also testified that he was physically threatened by the officers who escorted him to his interview with Plaintiffs' legal team.  ECF No. 229 at 46.  He had a broken arm at the time of his interview, and a "white shirt" officer said that if he said anything to those "people," that "possibly [his] other arm [could] be broken too."  *Id.*

Inmate Broadnax also related an incident where a foreign substance had been put on his food tray.  ECF No. 230 at 190.  He said that inmate orderlies who pass out the food trays told them that a sergeant did it.  *Id.* at 190-191.  Furthermore, inmate Broadnax testified that at another time, he was told that disciplinary reports could "disappear" if he "quit talking to those lawyers."  *Id.* at 192.  He said that the officer refused to take him to "DR court" (a disciplinary hearing).  *Id.* at 191-192.

Several inmates also testified to receiving an "air tray" or "air bag" which is a food tray delivered to an inmate which has the appearance of the inmate receiving a meal but which is empty. *See, e.g.,* ECF No. 230 at 83, 106, and 184. An empty bag or tray is delivered to the inmate instead. Inmate Gresham gave credible testimony that she was served "air trays" after speaking to Plaintiffs' legal team, but had never received one before. *Id.* at 84. Inmate Broadnax testified that prior to giving testimony in the hearing, he was threatened by Sergeant Fowler that if he testified, he would not "eat another tray." ECF No. 230 at 184, 201. At one time, inmate Broadnax reported to a Sergeant that he did not have any food on his tray, and the Sergeant told inmate Broadnax "that that wasn't from him; it was from Sergeant G." *Id.* at 192. Inmate Broadnax testified to receiving "four to five, maybe six" "air trays" and explaining that when he complained about it, an officer told him that "next time" he would "know not to talk to those lawyers, run [his] mouth to those lawyers." *Id.* at 195.[6]

---

[6] Remarkably, three officers with significant time working in the Department of Corrections testified that they had never heard of that practice and said they were unfamiliar with the term "air tray" or air bag." *See* ECF No. 232 at 114-115; ECF No. 232 at 133-134; ECF No. 231 at 179. Other officers at least acknowledged they were aware of the term, even if they denied ever refusing an inmate his or her food. ECF No. 232 at 23

There was also testimony which revealed that inmates were taken to holding or shower cells prior to being interviewed by Plaintiffs' legal team. Some of the inmates were left in those cells for as much as an hour or two while in restraints. *See* ECF No. 229 at 46-47, 53, 86, 89-90, 137-139, 150; ECF No. 230 at 77; ECF No. 234 at 61. Some indicated in their declarations that it was longer, and they were in full restraints. *See* ECF No. 183-10; ECF No. 183-11. Such conduct is, presumptively, against the rules[7] of the Department but, more importantly, it is reasonably viewed as retaliatory. Leaving inmates in restraints for a lengthy period of time, unable to sit down in a chair, is reasonably construed as punishment or harassment for an inmate's willingness to speak with counsel.

Inmate Gresham testified that she experienced harassment while waiting in the "shower cell" to be taken for her confidential interview. ECF No. 120 at 78. She said that lunch was served while she was in the shower holding cell, but her request for a tray was refused. She was told that if she wanted to eat lunch, she would have to go back to her cell and

---

[7] Assistant Warden Jeffrey Smith testified that the Department has a holding cell policy that specifies the time frames individuals may be kept in a holding cell. ECF No. 231 at 107. He recalled the policy as specifying "up to two hours continuous, four hours with the approval of a chief, but not to exceed six hours a day." *Id.*

refuse the legal call.  *Id.*  Similarly, inmate Gresham was denied water

unless she refused the legal call and went back to her cell.  *Id.*  That was

inconsistent with an earlier experience in which she was given a meal while

held in the shower cell, and she was not kept in full restraints.  *Id.* at 79-80.

Inmate Gresham also testified that after being returned to her cell she

requested a dinner tray.  *Id.* at 80-81.  That request was also refused

because she "had spoken to the attorneys."  *Id.* at 81.

Notably, Defendants questioned whether inmate Gresham felt that

the retaliation and harassment she described was directly related to this

case (speaking with Plaintiffs' legal team) or was for reporting a PREA

[Prison Rape Elimination Act] complaint or even due to her gender identity.

*Id.* at 96; *see also id.* at 97-98.  Inmate Gresham acknowledged filing

several grievances for "continued reprisal" for using the grievance system

and reporting sexual assault.  *Id.* at 96-102.  The Court concludes that such

a distinction in the basis for retaliation is immaterial; suffering harassment

for reporting an unlawful sexual assault in a grievance or for participating in

a lawsuit is, in either case, retaliation which violates the First Amendment.

Inmate Gresham further testified that she feared retaliation after

testifying during the evidentiary hearing.  ECF No. 230 at 88.  Specifically,

she expected that she would "be put on strip," that is stripped of her

property and left with nothing "but boxers[8] and a mattress." *Id.*

That same concern was expressed by Inmate Grantley who feared

that by speaking with Plaintiffs' legal team he would be "put on strip or

gassed or" continued on close management without cause. ECF No. 230

at 118. Inmate Grantley testified that it was "common practice" for inmates

to "get retaliated against whenever they cooperate with attorneys pertaining

to situations that goes on within the prison [sic]." *Id.* at 119. He said that

he felt like assistant warden McClellan was "upset and angry" that he

continue to speak with counsel and was expecting that there would be

"consequences" for doing so. *Id.* at 122-123. Inmate Grantley testified that

he did receive a consequence - despite the recommendation from his

classification officer to be released to general population and the

agreement of two persons on the ICT (Institutional Classification Team), he

was kept on CM-III by Mr. McClellan. *Id.* at 125-129, 133.

Mr. Pacholke participated in the prison inspections at issue. ECF No.

234 at 11. He said that he spoke with approximately 150 of the inmates at

cell front, and had 40 confidential interviews at four separate facilities. *Id.*

---

[8] Ms. Gresham is "a transgender woman" housed in a male institution. *Id.* at 88.

at 14.  He explained that it is important to talk to as many people as possible, "especially in separate locations," to get a "sense of how the institution operates, at least from their perspective," and "some sense of the consistency in their testimony."  *Id.* at 15.

Mr. Pacholke testified that on the first day of the inspection, during the cell front interviews, there were as many as seventeen staff present. *Id.* at 18.  In other prison facilities, only four to five staff were present.  *Id.* at 18-19.  The large number of staff present during the facility inspection was likely to create an atmosphere of intimidation, and having less "presence" while "doing the cell-side interviews" would improve the situation.  *Id.* at 36. Mr. Pacholke expressed his belief that the prisoners were nervous with so many staff present and the "presence of ranking staff members."  *Id.* at 20-

21.[9]  He indicated that, at times, staff were too close during those cell front interviews but would move away when asked.  *Id.* at 57-58.

During the confidential interviews at FSP, Mr. Pacholke said that the first several inmate interviewees indicated they were nervous to talk with officers "20 to 25 feet away with no physical separation."  ECF No. 234 at 30.  One inmate wrote a note to Mr. Pacholke "because he didn't want anyone to hear."  *Id.*  He further said that at one point, a member of the Plaintiffs' legal team asked the officers if they would move further up the bleachers because they were "making people nervous."  *Id.*  After checking with a supervisor, the officers refused to move.  *Id.*

Similarly, the interviews at Santa Rosa began in a visiting park room where officers were sitting approximately 20 feet or less away.  ECF No.

_____

[9] Defense counsel pointed out that the stipulation, ECF No. 157, prohibited discussions between staff and Mr. Pacholke.  ECF No. 234 at 37.  That appears to conflict with the testimony of Assistant Warden Smith who testified that they had their "command staff" or "leadership staff at the institution level" present "to provide any response or answer any questions that needed to be answered from their areas of expertise . . . ."  ECF No. 231 at 70-71.  However, Mr. Pacholke testified that he was "told repeatedly" to not ask staff questions, but to refer any questions to Plaintiffs' lead attorney who would seek answers.  ECF No. 234 at 38-39.  Mr. Pacholke said that in other tours, it is not unusual to be able to "ask some basic questions" but Florida did not permit even "general conversation."  *Id.* Certainly the officers could properly refuse to answer questions, and require that all such questions be directed through counsel, but it is completely disingenuous to justify a large staff presence by saying you wanted the staff to be available to answer inquiries while at the same time refusing to make them available to answer such questions.

234 at 30.  The inmates "expressed concerns, once again, about staff being so close and being able to listen."  *Id.* at 31.  At that location, the interviews were halted and moved to offices in the Classification area where they could at least close a door and have "some degree of privacy." *Id.* at 31.  In general, the escorting officers sat in the hallway approximately six or seven feet away from the door.  *Id.*  However, Mr. Pacholke testified that one officer "literally sat on the other side of the door window within maybe an inch or two, I mean, literally almost had his nose pressing up against the window and was looking directly at the offender."  ECF No. 234 at 32.  Mr. Pacholke asked the officer to move across the hallway as the other officers had done, but he "indicated he could not and stayed there." *Id.*

While the office provided some privacy, he testified that he could hear the "chatter" between the officers on the other side of the door.  ECF No. 234 at 32-33.  Because Mr. Pacholke could hear them, he assumed that the officers could also hear him.  *Id.* at 33.  He testified that the interview situation made the inmates "uncomfortable" and it had "a chilling effect" as the inmates would, "on many, many occasions" ask him to keep his voice down.  *Id.*  He explained that the interviews held at Lowell and Suwannee

Correctional Institutions were "better because [they] were in private offices

and there seemed to be a greater degree of separation." *Id.* at 36.  Mr.

Pacholke said that the third and fourth interviews which were conducted at

Lowell C.I. and Suwannee C.I. were much better than at FSP and Santa

Rosa C.I.  ECF No. 234 at 75.  He related that there was more separation

between staff and the inmates members which alleviated concerns.  *Id.* at

76-77, 81.

Balanced against the testimony of the inmates called in this case was

testimony from a number of prison officials.  Warden Leavens testified that

when correctional officers are hired, they go through an orientation process

which educates them on ethics and legal topics, which covers "reprisal and

retaliation."  ECF No. 231 at 14.  The Department of Corrections already

has "policies and procedures" in place to protect inmates from retaliation by

staff.  *Id.* at 13-14.  In addition to those policies, Secretary Inch issued a

memorandum "in regards to this specific lawsuit" on February 13, 2020.  *Id.*

at 15-16.  The memo went to all staff, and, according to Warden Leavins,

the memo was "placed on all of the staff bulletin boards," and is reviewed in

orientation, through "in-service training, through our on-boarding program,

during our staff briefings, and during our shift supervisor meetings." *Id.* at

16.  Warden Leavins read the memo which, in relevant part, states:

> The Florida Department of Corrections has a zero tolerance for
> retaliation of any kind. As secretary, it is my commitment to the
> members of the Department that any individual who comes
> forward with an issue or concern does not face retaliation.  This
> commitment extends to the Department, inmate and offender
> population. Under no circumstances should any inmate who
> brings a lawsuit or communicates with counsel be subject to the
> fear and anxiety associated with possible retaliation.  Anything
> less would be contradictory to our character and commitment
> as . . . corrections professionals.

*Id.* at 16.

Warden Leavens testified that if an inmate submitted a grievance

which alleged "improper conduct or misconduct by" staff, it would be

accepted as true and the grievance referred "to the Inspector General's

Office through the MINS system."  ECF No. 231 at 26.  The Inspector

General's Office investigates to determine "if there is any substantial

evidence to validate the allegations."  *Id.*  If the allegations are not

substantiated, the grievance is returned to the institution and then denied,

although the chief of security could review the allegations and conduct his

or her own investigation.  *Id.* at 27, 28.  If validated, it would be referred to

the warden and to Human Resources at Central Office to begin a

disciplinary process for the staff involved.  *Id.* at 27.  He acknowledged that

Santa Rosa Correctional Institution receives "a lot of retaliation

grievances."  *Id.* at 31.

Furthermore, a protective order was previously issued in this case by

the Chief Judge of the Northern District of Florida to protect named Plaintiff

Johnny Hill, but Warden Leavins was unaware of that order.  *Id.* at 44-45.

Notably, "Johnny Hill was housed at Santa Rosa" C.I. as recently as two

months ago, and Warden Leavins has been at that institution since July 10,

2020.  *Id.* at 13, 45.

Assistant Warden Jeffrey Smith also testified at the hearing.  ECF

No. 231 at 68.  He was present when the inmates at Santa Rosa had cell

front interviews with Plaintiffs' team.  The cells either had "holes cut in the

window" so an inmate could communicate to a person outside his cell, or

the inmates had to stand by a "seam[10] at the back of the door" to talk with

the team.  *Id.* at 81.  Officers were present during those interviews and

"were told to stay back a reasonable amount of feet where they could at

least maintain a visual observation, but provide some level of confidentiality

---

[10] The "seam" is "along the back of the cell doors" where the door "slides along a track."  ECF No. 231 at 83.  The crack "goes between the door and the wall."  *Id.*  The food flap/mail slot or "cuffing portal" was not opened for interviews.  *Id.* at 83-84.

and privacy for the conversation."  *Id.*  Mr. Smith explained the need for the

officers' positioning was for safety, to "maintain visual contact" during the

interviews because in 2020, there were seventy-seven recorded batteries

by inmates in the confinement cells using "liquid expulsion."  *Id.* at 82; *see*

*also* at 85-86.

Assistant Warden Smith also explained that he was present on the

following two days when the personal interviews took place.  ECF No. 231

at 94, 97.  He said the interviews started in the "visiting park" but were

stopped and moved to a different location because Plaintiffs' team had

privacy concerns about the confidential interviews taking place in the

visiting park, which was the original location selected.[11]  ECF No. 231 at

93-94.  The interviews were moved to two conference rooms in the

Classification building.  *Id.* at 94-95.  That move caused delay, *see id.* at

99-100, as did the failure to communicate that Plaintiffs' legal team wanted

to interview inmates in a particular order.  *Id.* at 97; *see also* at 126-128.

Mr. Smith explained that certain cells were used as "holding cells,"

where inmates were taken prior to going into the interview room.  ECF No.

---

[11] Major Richter testified that Plaintiffs' legal team was "under the impression that staff members, you know, [were] possibly hearing their conversations, so they wanted to move everything to Classification . . . ."  ECF No. 231 at 128.

231 at 101.  Some holding cells were available in the Classification building,[12] but the shower cells within each housing unit were also "used to prepare and stage inmates for appointments."  *Id.* at 101-102, 105-106. Testimony from Major Richter clarified that they used two holding cells which were close to the interview area and they "left two open for medical emergencies that may occur in the compound or psychological emergencies, you know."  ECF No. 231 at 130-131.  The inmates were taken out of their individual cells, placed in the shower cell in the dorm, and then eventually taken to the holding cells in the Classification building.  *Id.*

Mr. Smith acknowledged the possibility that some inmates may have been in the holding cells restrained for a considerable length of time because, for example, "count took an exceptionally long time" one morning. *Id.* at 107.  But Mr. Smith added that, "we don't typically leave them in those cells restrained for any length of time.  It's designed to be placed in there and the restraints to be removed while they're waiting."  *Id.* at 107-108.  Major Richter was unaware of how long inmates "sat in the showers." *Id.* at 131.

_____

[12] Five holding cells are located in the Classification, but some of them would have also been used for inmates being brought for dental services.  ECF No. 231 at 105.

Assistant Warden Smith was aware of the prior protective order entered in this case on behalf of inmate Johnny Hill.  ECF No. 231 at 114.  He also was familiar with the February 2020 memorandum Secretary Inch issued regarding retaliation, although when first asked about it he said he was unaware of it.  *Id.* at 117-119.

Major Richter was also present for all three days of the inspections at Santa Rosa C.I.  ECF No. 231 at 122.  He testified that he never discouraged any inmate from speaking with Plaintiffs' legal team.  *Id.* at 124.  He also said he did not communicate with inmate Curley Williams on the day of the inspection and, in fact, "couldn't even tell you what that inmate looks like."  *Id.* at 124-125.  He said he did not witness any property being stripped from any inmate on those days either.  *Id.* at 125.  However, he acknowledged that he went from dorm to dorm with Plaintiffs' legal team during the days of the inspections and had "no knowledge about whether someone was put on property restriction in the dorm immediately after Plaintiffs' team left."  *Id.* at 141-142.  Yet he said that he did not "recall any inmate" speaking to him or complaining about a property restriction" being placed on them after the inspection.  *Id.* at 143-144, 150.  He further said that he was unaware of any inmate "placed on property restriction following

plaintiffs' inspection" in any dorm.  *Id.* at 144-145, 150.  He said that a property restriction should be noted on an inmate's DC6-229 form, but he is aware of "times that someone was on property restrictions and it was not listed on their DC6-229" form.  *Id.* at 146, 148, 153, 155.

Major Richter also testified that usually only one officer remains with an inmate to monitor him during a legal call.  ECF No. 231 at 136-137.  When the call is finished, officers "call for assistance, if needed, to escort the inmate back" to his cell, "but it only takes one officer to escort an inmate."  *Id.* at 137-138.  He clarified that two officers are required to remove an inmate from a cell, "but only one officer to escort the inmate." *Id.* at 138.

Lt. McCrainie, assigned to Santa Rosa C.I., was also present during the inspections.  ECF No. 231 at 161.  She said she did not communicate with any inmate and tell them they should not speak with Plaintiffs' legal team.  *Id.* at 161.  She further testified that inmates "have to have their beds made at a certain time every day."  ECF No. 213 at 166.  On week days, beds must be made by 7 a.m., but the time is later on the weekends so they can "sleep in a little bit."  *Id.* at 166.  She did not recall whether inmate Curley Williams had his bed made during the inspections or not, nor

did she recall whether he went on property restriction in the days following the inspection.  *Id.* at 166-167.  Lt. McCrainie said it was possible that it happened, but she did not "remember placing anybody on property restriction."  *Id.* at 167.

Lt. McCrainie also testified that inmate Williams would have legal calls in her office.  ECF No. 231 at 167-168.  When asked whether Mr. Williams could sit down during the legal calls, Lt. McCrainie responded that neither she nor her "staff ever told him he could not sit down."  *Id.* at 169; *see also* at 170.  She further testified that no one ever advised her that Mr. Williams "remained standing during his legal calls."  *Id.* at 169.  Additionally, Lt. McCrainie said she did not "recall ever placing inmate Williams on the loaf,[13] or management meal."  *Id.* at 170.  It was possible that another colleague did so, but she was unaware of that happening.  *Id.* at 172.  Lt. McCrainie clarified that only an "officer in charge [OIC]" or someone on that level could place an inmate on the special management meal.  *Id.* at 171.

---

[13] Lt. McCrainie explained that an inmate gets "placed on loaf" for the "misuse of food service items or bodily fluids."  ECF No. 231 at 171.  For example "if the attempt to spit on staff, they get placed on management meal, or throw urine or feces on a staff member or water with a food service cup or utilize a food service tray to either break a sprinkler head or try to bust out a light or a window or hit on their cell door with" it.  *Id.*

Inmate Curley Williams testified that within 20 minutes after the inspections, four to five inmates were "put on property restriction, strip." ECF No. 230 at 11-13.  Inmate Williams said that Lt. McCrainie also put him on property restriction because he did not have his bed made and was not in "a Class A" uniform.  *Id.* at 14.  He testified that the reasons for the restriction were "bogus because that was the day that we could lay in, and we didn't have to have our bed made, or we didn't have to have our Class A on that day."  *Id.*  Inmate Williams said that Lt. McCrainie would give "a speech" saying what days they could "lay in and not be in Class A."  *Id.* at 15.  He said that would happen "three days out of the week."  *Id.*  Inmate Williams further testified that Lt. McCrainie told him that he was going on property restriction because he "made them look bad" and had "snitched them out."  ECF No. 230 at 16.  That testimony conflicted with inmate Williams' written declaration in which he said that Sergeant Cade told him he was going on strip.  *See* ECF No. 230 at 37;

Mr. Williams' testimony was not credible, especially in light of his testimony that he was also put "on management loaf."  *See* ECF No. 230 at 18.  He said that his weight was fluctuating between 160 pounds before the management loaf and 146 pounds afterwards because he did not eat the

Case No. 4:19cv212-MW-MAF

management loaf (which lasted for seven days).  *Id.* at 21-22.  Yet he

acknowledged that his written declaration said it was only for three days, *id.*

at 32 and 38, and that he "didn't really get on the scale, but" estimated he

lost "a good 10, 20 pounds."  *Id.* at 51; *see also* ECF No. 230 at 64-68.

His testimony about his legal visit with "Ms. Amber" (from Plaintiffs'

legal team) was also not credible.  He testified that she wanted to stop the

meeting and stop the actions and comments of the officers nearby, but he

"told her to just let it go" and "let's just move on."  *Id.* at 34-35.  Inmate

Williams also said that when he was taken to Lt. McCrainie's office for his

legal call, he was fully shackled with his hands, his ankles, and a chain

around his waist.  ECF No. 230 at 24.  He said four officers stood outside

the door with Lt. McCrainie during his call, watching him through a window

in the door.  *Id.* at 26.  He testified that Lt. McCrainie told him that he "was

not allowed to sit in her chair, so [he] had to stand up the whole time in the

hand restraints" for the legal call which lasted "a good hour."  *Id.* at 27.

That testimony is suspect.

Sergeant Alexander also testified in this hearing.  ECF No. 231 at

175.  He has been employed with the Department of Corrections for 33

years and works at Florida State Prison ["FSP"].  *Id.*  He testified that "meal

delivery" is one of his responsibilities. *Id.* at 176. He had no recollection of

failing to deliver a meal to inmate Johnny Milo. *Id.* He said there was "no

reason that [he] would not deliver a meal to Mr. Milo" and added, "I would

not do that." *Id.* at 176-177. He said that if he were "on the wing and the

meals were delivered, yes, [he] would give him the meal." *Id.* at 182. He

also testified that he had "never really heard of an air bag."[14] *Id.* at 179.

He testified that he had "never heard of it" and does not "know things like

that." *Id.* That testimony from a 33-year veteran was not credible.

Sergeant Alexander also said he did not "recall" ever calling inmate

Milo a "snitch." ECF No. 231 at 177. He said that they might "have been

talking sometime and joking around and maybe something like that was

said, but" he was "not sure." *Id.* That, also, is not believable. Whether it

was said in jest or not, use of the word "snitch" has obvious real world

implications for an inmate, and this is known to the officers who provide

direct supervision of the inmates.

Sergeant Fowler has worked at FSP for eight years, with five of those

years on the close management wing. ECF No. 232 at 5-6. Part of his

---

[14] Sergeant Alexander explained that when a "food cart gets on the wing, [they] get it organized and feed chow." ECF No. 231 at 180.

duties include delivering meals to the inmates on C-Wing. *Id.* at 9. That task involves two inmates known as "orderlies" or "runarounds," another officer, and himself. *Id.* Sergeant Fowler stands in front of the food cart and hands the orderly a tray who then gives it to the inmate in the cell. *Id.* Sergeant Fowler said that he inspects "the food tray first," making "sure everything is there;" and then the inmate behind him gives out the juice, and the second officer "shuts the flap." *Id.*

Sergeant Fowler denied ever threatening inmate Broadnax for testifying in this case, and said he had never discussed inmate Broadnax's declaration with him. *Id.* at 12. He also said that he never refused to feed him "because he was talking to lawyers," never threatened to do so, and never called him a "snitch." *Id.* at 12-13. He further acknowledged that inmate Broadnax would "claim retaliation" whenever he "got in trouble." *Id.* at 14-15. Sergeant Fowler did say that he knew "what an air bag or an air tray" was, explaining that it is "when an inmate doesn't get any food." ECF No. 232 at 23. Although he had "heard of it," he said he was not aware of it happening at FSP. *Id.* at 23-24.

Lt. Brown was working at Lowell C.I. during the inspection by Plaintiffs' team. ECF No. 232 at 29. She directed the inmates to "get

inspection ready," meaning make sure their bunks were made and they had on their "Class As," and put masks on (face coverings) in case anyone wanted to talk to them.  *Id.* at 31-32.  She explained that "normally the inmates are told to stand against the wall across from their bunks, stand up so we can make sure that they are properly dressed, the beds are made, the hygiene product is visible so we can make sure they have everything they need."  *Id.* at 32.  However, on the day of the inspections they were told to "stay on their bunks" because they "didn't want them to have to stand and wait so long for the lawyers to come around."  *Id.* at 33.  It was not intended that the inmates were required to "sit on their bunks and not move for seven hours."  *Id.* at 50-51.

Colonel Cannon has worked in the Department of Corrections for over twenty-five years and is currently assigned to Santa Rosa Correctional Institution.  ECF No. 232 at 54.  He explained that during the inspections, staff who were normally assigned to "run outside work crews" were utilized to provide security in the close management units.  *Id.* at 55.  The outside staff were also used to assist with the escorting, searching and restraining the inmates.  *Id.* at 75-76.

Further, Colonel Cannon said that after receiving the list of inmates to be interviewed, staff had planned to pull inmates from one dormitory at a time to be taken to the interviews.  *Id.* at 57-58.  They planned to pull inmates about a half hour before an interview was scheduled and temporarily house the inmates "in the shower/holding cells in" the dormitories while awaiting the interviews.  *Id.* at 58-60.  However, Colonel Cannon testified that they pulled all the inmates from Bravo dorm at the same time and put them in the temporary holding cells.  *Id.* at 60.  He said that they were pulled based on the assumption that "the interviews would take, you know, 30, 45 minutes, something like that."  *Id.* at 61.  Thus, it was anticipated that the inmates would be held in the shower cells for approximately 30 minutes.  *Id.* at 66.  This testimony is nonsensical.  If all the inmates were pulled at the same time, and the interviews were expected to last 30-45 minutes, it is simply not possible that the inmates would be in the holding cells/showers for a mere 30 minutes.  Some of them would necessarily be in the holding areas for several hours.

The plan also included feeding the inmates at the same time the inmates on the housing wing were fed.  ECF No. 232 at 61.  Additionally, if an inmate was in a shower cell and requested water, it would be given to

him.  *Id.* at 61-62.  Moreover, if an inmate held in the holding cell said he needed to use the restroom, he would be removed from the holding cell, re-restrained, and escorted back to his housing cell.  ECF No. 232 at 62.  It does not appear that the inmates were ever asked if they needed water or to use the restroom on any regular basis, but instead were merely offered such necessities if the inmate raised the issue first.  ECF No. 232 at 92-93.

Colonel Cannon provided somewhat confusing testimony as to the manner in which inmates were escorted from their cells for the confidential interviews.  He testified that the inmates were escorted to the holding areas "in handcuffs" and then the restraints were removed.  *Id.* at 63.  However, he also said that the inmates "were secured in the shower cells in restraints."  *Id.*  His answers were not clear or consistent as to whether inmates were left in the temporary holding cells in restraints, *see* ECF No. 232 at 62-63, but he did state that "no inmate had restraints on while he received his meal."  *Id.* at 63.

Colonel Cannon also said that the plan was for the inmates to "wear the basic restraints from their cell to the shower cell," but once in the shower cell "the restraints would be removed and inmates would remain in the shower unrestrained awaiting notification that it was their interview

time." ECF No. 232 at 86-87. That suggests that inmates were only in basic restraints, yet he further said that inmates were restrained "behind the back for removal from the cell, but the black box requires handcuffs to be placed in the front." *Id.* at 87-88. Other testimony noted above indicated inmates were escorted in full restraints, including a "black box" and not just basic handcuffs. Thus, the Colonel was not clear in testifying as to the restraints worn.

Moreover, he was not clear in explaining how long the inmates were held in restraints. He first said that "once the inmates were secured in the shower cells and" staff verified the time for interviews, "the restraints were removed." *Id.* at 88. That suggests that the plan was to first verify that "there would be a wait" before removing the restraints. *Id.* at 87-88. It was unclear whether inmates were placed in the shower cells[15] and had their restraints removed right away. *Id.* at 87-88.

Colonel Cannon said that he reviewed the security video footage from the fixed wing cameras in the week following the inspection. ECF No. 232 at 68. He testified that the only mattresses that he recalled seeing removed from cells were "based on use-of-force incidents." *Id.*

---

[15] Notably, there are no chairs or toilets in the shower cells. ECF No. 232 at 91.

Case No. 4:19cv212-MW-MAF

Finally, he testified that if an inmate was in a shower cell and needed to get the attention of an officer for water or to go to the restroom, he could "just call out" or speak to an officer who was passing by making rounds. ECF No. 232 at 92.  Officers are not required to come by and check to see if the inmate needs anything, *id.* at 93, but officers do conduct rounds in the housing dormitories every 30 minutes.  *Id.* at 99.  Colonel Cannon said that inmates "are permitted to get a staff member's attention if they have an issue."  *Id.* at 96.  However, the rules for the confinement housing unit state that "inmates are not permitted to yell to staff members to gain their attention or to remain on the door unless there is a true emergency or being addressed by a staff member."  *Id.* at 98.

Captain Raben also testified during the hearing, explaining that he is involved in the grievance process.  ECF No. 232 at 104-105.  He reviews grievances that involve his staff.  *Id.*  Captain Raben received a grievance from inmate Gresham and responded by questioning her about the grievance.  *Id.* at 105-106.  inmate Gresham said at that time that she did not want a shower, but Captain Raben had her escorted to the shower anyway and "given the opportunity" to shower so "there was no question that she was afforded the opportunity or not."  *Id.* at 108.  While she was in

the shower, her cell was searched pursuant to policy and items of contraband were thrown away.  *Id.* at 110, 113.

Although Captain Raben has worked with the Department of Corrections for eight years and responds to grievances, he testified that he never heard of the term "air tray" before.  *Id.* at 114-115.  Further, he said that when receiving inmate Gresham's grievance about not receiving a shower, which she alleged was due to retaliation, he acted to resolve the issue with the shower but took no action to forward the grievance to the Inspector General's Office concerning the retaliation allegation.  ECF No. 232 at 121-124.  Thus, Captain Raben did not simply accept the allegation of retaliation as true and submit it to the Inspector General.  *Id.* at 123-124.

Finally, testimony was provided by Mr. Kirkland, the Deputy Director of Institutional Operations with the Florida Department of Corrections.  ECF No. 234 at 94.  He testified that inmates are able to have legal telephone calls in a "designated room" with a closed door.  *Id.* at 96.  "The door has a window on it" so officers can visually monitor the inmate, but officers remain outside the room.  *Id.* at 96-97.  Staff are "not supposed to position themselves in a way to be able to listen to the call, only to observe in the

room . . . for security concerns." *Id.* at 97.  The process is the same for inmates in close management.  *Id.* at 97-98.

When cell front interviews occur, which happen on a daily basis as medical staff make "sick call rounds," staff are present but "position themselves far enough away to allow for the confidentiality of that conversation." *Id.* at 106.  There are, however, no distance requirements which guide prison staff in such instances; it is up to the officer to determine for himself the distance from which he could react if necessary, but maintain confidentiality.  *Id.*

**Analysis**

As a preliminary matter, the issues raised in the underlying motion for a protective order have arisen in the context of existing litigation.  No statute or rule prevents Plaintiffs from raising these issues, nor is the Court precluded from resolving these issues, despite the fact that specific allegations of retaliation may not have been first presented to prison officials through the inmate grievance procedure.  The exhaustion requirement of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), is relevant for case initiation procedures, but is immaterial when presented in the context of ongoing litigation.  This process and protective order are not

intended to supplant or replace the grievance process that currently exists.

Second, Federal Rule of Civil Procedure 26(c) permits a party to file a motion for a protective order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]" Fed. R. Civ. P. 26(c) (quoted in Ekokotu v. Fed. Exp. Corp., 408 F. App'x 331, 335 (11th Cir. 2011)).  A protective order may be issued if "good cause" is shown through a "particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements."  United States v. Garrett, 571 F.2d 1323, 1326 n.3 (5th Cir. 1978) (quoted in Ekokotu, 408 F. App'x at 335-36).  In addition to the good cause[16] requirement, a court must "balance the interests of those requesting the order" and those opposing it. Ekokotu, 408 F. App'x at 336; In re: Chiquita Brands Int'l, Inc., 965 F.3d 1238, 1250 (11th Cir. 2020); Farnsworth v. Procter & Gamble Co., 758 F.2d 1545, 1547 (11th Cir. 1985).  Threats of physical violence and retaliation have been sufficient to show "good cause" for issuance of a protective order.  Does v. Swearingen, No. 618cv1731-ORL-41LRH, 2019 WL 4386936, at *3 (M.D. Fla. Sept. 13, 2019) (noting that threats of

---

[16] "'Good cause' is a well established legal phrase. Although difficult to define in absolute terms, it generally signifies a sound basis or legitimate need to take judicial action."  In re Alexander Grant & Co. Litig., 820 F.2d 352, 356 (11th Cir. 1987).

physical violence and retaliation supported allowing plaintiffs to proceed anonymously and requiring the parties to "confer and file a motion for protective order that satisfies Plaintiffs' confidentiality concerns").  The Court concludes that it has authority to enter a protective order under Rule 26, as well as having the inherent authority to control discovery and protect the integrity of litigation.  Peer v. Lewis, 606 F.3d 1306, 1315 (11th Cir. 2010) (noting that a "'court may safely rely on its inherent power' to sanction bad faith conduct in the course of litigation") (citations omitted).

It is well established that retaliation by prison officials for an inmate's participation in a lawsuit violates the First Amendment.  Redd v. Conway, 160 F. App'x 858, 862 (11th Cir. 2005) (citing Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986), and Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997)).  A plausible retaliation claim is presented when an inmate shows that he or she suffered adverse action, causally connected to the exercise of First Amendment rights, such that a prison official's conduct "would likely deter a person of ordinary firmness from engaging in" the protected speech.  Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008); see Bennett v. Hendrix, 423 F.3d 1247, 1254 (11th Cir. 2005) (concluding that "[a] plaintiff suffers adverse action if the defendant's allegedly

retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights").  Thus, it is immaterial that the specific inmates who testified in this hearing indicated their continued willingness to participate in this litigation.  Rather, the issue is whether facts were presented which demonstrate that a person of ordinary firmness would fear retaliation, or whether events and issues have been described which would deter such an ordinary person from providing testimony or becoming involved in this litigation.  That showing has been made.

In ruling on Plaintiff's motion for a protective order, this Court has carefully considered the testimony and documentary evidence which shows actual overt retaliation by prison officials, as well as threats of retaliation.  It is not just actual retaliation that is a concern, but the threat of retaliation, or even the reasonable perception — by the inmates — that they may be retaliated against.  It's not just alleged violent acts, the denial of food or other necessities, or other improper treatment that is at issue.  Nor is it the alleged threat of such evil acts. It's the perceived threat that may result from a "shhh!" from a guard, a cold stare from across the room, a hard pat on the back from a warden, or a "hmmm" as they leave the room.  The inmates deserve the assurance that their participation in the discovery —

and indeed the lawsuit — will not result in any negative backlash.  Only through a clear order from the court guaranteeing these protections against retaliation and laying out how discovery shall proceed will they receive such an assurance.

Notably, Defendant Mark S. Inch, Secretary of the Florida Department of Corrections, previously issued a memorandum to all Departmental employees on February 13, 2020.  Defendants' Ex. D29.  In relevant part, the memorandum stated:

> The Florida Department of Corrections has zero tolerance for retaliation of any kind.  As Secretary, it is my commitment to the members of our Department that any individual who comes forward with an issue or concern does not face retaliation.  This commitment extends to the Department's inmate and offender population.  Under no circumstances should any inmate who brings a lawsuit or communicates with counsel be subjected to the fear and anxiety associated with possible retaliation.

Ex. D29.  This memorandum at least tacitly admits that retaliation is an ongoing threat despite the existence of a grievance process that is intended to prevent such retaliation.  Otherwise, why would there be a need for such a memorandum at all.  In issuing this Order, the Court declares that it, too, has "zero tolerance for retaliation," or threats of retaliation, against any person who participates in this litigation.  This Court

is also committed to ensuring that witnesses and members of Plaintiffs' class do not face retaliation for their participation in this lawsuit.

Absolute proof of retaliation is not required where the perception of inmates is that retaliation is imminent, likely, and forth-coming if they participate in litigation against the Department of Corrections. Such a perception was adequately conveyed in this hearing. Moreover, credible testimony was presented that revealed retaliation exists and is feared. Grievances are filed alleging retaliation which are stopped within the institution and do not proceed to outside investigation. ECF No. 232 at 123-124. The grievance process has certainly not eliminated the potential that an inmate would feel threatened with retaliation. In fact, the threat or perception of retaliation was sufficiently present to motivate the Secretary to issue a memorandum condemning such retaliation, despite the fact that policies and rules already exist which specifically forbid such conduct. An Order from this Court would merely reinforce these principles and specifically advise the inmate/witnesses that their right to participate in the process should be protected.

Inmates in close management are completely dependent on housing line staff for nearly every aspect of their lives. Staff must bring meals to the

inmates, take the inmates to the shower cells, take them outside for

recreation, and accompany them anytime they come outside their cell.

ECF No. 231 at 41.  In some cases, inmates lack the ability to even flush

the toilet in their confinement cells.  ECF No. 230 at 189.  For inmates held

in close management, staff must give inmates grievance forms to use in

submitting a grievance, and staff must accept a written grievance form

back from an inmate for any action to be taken on the grievance.  ECF No.

231 at 41-42, 46.  The opportunity for harassment and retaliation, or even

the ability to threaten such actions, in close management is great.

This record establishes that retaliation, harassment, and threats of

retaliation continued despite the Secretary's memorandum.  Such behavior

raises substantial concern for the fairness and integrity of this litigation if

prison officials are intimidating and threatening potential plaintiff prisoners

or, at the least, prisoners who may be called to testify as witnesses.  Such

intimidation happens by persons who control the most basic attributes of

life - the provision of meals, the ability to use (and flush) the toilet, access

to showers or time outside of one's cell, advancement to less restrictive

housing, and the means by which to report issues and seek redress of

grievances.  The actions described, and feared, would reasonably deter

most people; all but the toughest or most stubborn among us would refuse to be involved in an endeavor which is likely to cause greater harm than the potential good promised.  Plaintiffs have sufficiently shown the need for issuance of another protective order, and the motion is granted.

The stipulation previously entered in this case was to specify the "time, place, and manner for the inspections" pursuant to Rule 34(b).  *See* ECF No. 157.  The stipulation provided for "confidential interviews of Plaintiffs' and putative class members by Plaintiffs' experts and representatives."  *Id.* at 1.  While permitting Plaintiffs' team "to speak with putative class members at cell front who consent to such conversations," *see* ECF No. 157 at 5, prison officials were to "stand a reasonable distance away from the cells when these conversations take place to allow Plaintiffs' team to speak confidentially with the putative class members."  *Id.* at 5-6. Furthermore, Defendants must "provide sufficient space for . . . confidential interviews with" the Plaintiffs and putative class members, and were prohibited from participating in, or listening to, the interviews.  *Id.* at 9-10. Terms like "reasonable" and "sufficient" are vague and subjective.  The evidentiary hearing revealed a need for greater clarification and guidance.

To avoid any confusion and to lessen the potential for conflict between the parties regarding the appropriateness of actions during these inspections, the Court will attempt to specifically provide guidelines for the upcoming interviews, both the cell-front interviews and the more private legal callouts.  This order is necessarily prophylactic – it is intended to prevent a harm which may never occur.  Moreover, the requirements of safety and security at the facilities requires that these guidelines remain somewhat flexible, as the input and experience of the line personnel is essential in maintaining the safety of the inmates, the officers and the interviewing parties, as well as the general security of the facilities.  This Court is certainly not intending to dictate protocols in such areas.  With this understanding, the following are the areas of concern as identified by the Court:

**Statements and Interactions Between Correctional Officers and Inmates regarding Inspections/Interviews**.  Discussions between correctional officers and the Inmates regarding the inspection/interviews, the experts/interviewers, or the claims at issue in this case should be limited to information sharing regarding the timing of such events and should not involve any discussion regarding the purpose of the

inspections/interviews or the wisdom or propriety of participating in the process. If inquiry is made by an inmate with a correctional officer regarding the reason for the inspection/interview the simple response should be that the inmate should feel free to discuss the matter with the interviewers if they have any questions. Under no circumstances should a correctional officer discourage an inmate's participation in the process. In the event Plaintiffs believe there is an issue with such improper statements during the inspection/interview process they must raise such issues as soon as practicable, but should certainly not delay raising such issues until after the interview/inspection is completed.

**Presence and Proximity of Correctional Officers** – Obviously line staff will necessarily be present during the inspections. The number and proximity of this staff is an issue which must be addressed. The inmates should be permitted to have confidential conversations with the interviewers. The correctional officers should take steps to ensure this. In the absence of an agreement between the parties, the Court will arbitrarily select a "safe distance" which has no basis in fact or law, but which will at least provide clear direction for the parties. The officers are directed to maintain at least a ten (10) foot distance from the inmate/witness and

interviewers during the cell front interviews.  This distance, of course, is subject to change depending on specific security needs are deemed to exist regarding a particular inmate.  In circumstances where the correctional staff believes ten (10) feet is too great a distance for a particular inmate, they must articulate their concerns in writing with the interviewers.  Such information should be provided the day prior to the cell front interviews so there is no question that a particular inmate presents a specific security threat.  If Plaintiffs' counsel takes issue with the distance observed by the line officers during the interviews they must raise this issue at the time of the alleged infringement so that it can be addressed immediately.  The cell front interviews at the Lowell and Suwannee facilities should serve as a model for the cell front interviews going forward

With respect to the number of officers present during the interviews, the Court will not dictate a specific number or ratio of officers/interviewers because this would improperly involve the Court in security decisions, but will specifically state that there is no reason to have staff present that are not involved in direct supervision of inmates.  By way of example, video evidence confirmed an inordinate number of "white shirt" supervisory officers on the floor during the inspections.  Because it is now clear that

these persons were not present for the purpose of answering questions posed by the interviewers, and the supervisory officers were not involved in frontline security and observation, there is no need for such a large number to be present during the inspections.  If Plaintiffs' counsel believes this to be an issue they are directed to raise this matter at the time so that it can be resolved.  Obviously, the presence of upper management officers on the floor during the inspection could reasonably be considered an effort at intimidation of the inmates and should be avoided.

**Location and Observation of Private Interviews**.  The private interviews should be conducted in a place and manner that provides the inmates and interviewers with as much privacy as would be afforded legal counsel conducting a legal visit.  There should not be direct involvement of correctional staff in these interviews unless there are specific security or safety concerns.  If there are concerns about a specific inmate, correctional staff must inform Plaintiffs' counsel of such concerns in writing the day prior to the interviews.  These concerns should be addressed prior to the interviews to avoid any unnecessary conflict.  If Plaintiffs' counsel believes that there are issues with the privacy of the interviews they must raise such concerns immediately so that any such issues can be resolved.  A clear

plan and schedule should be agreed to prior to the inspections/ interviews

occurring so there is no basis for confusion regarding how and where the

inspection/interview will proceed.  The interviews at the Lowell and

Suwannee facilities should serve as a model for the interviews going

forward.  Private offices or cubicles are to be preferred to gymnasiums or

visitation centers.

**Use of Holding Cells Prior to or after Private Interviews**.  It is

contemplated that inmates may be placed in holding cells prior to their

confidential interviews.  However, they should not be forced to remain in

those cells for a period of time in excess of two (2) hours. Also, holding

cells are preferred to shower cells, and holding cells should be used if they

are available.  While it may be entirely appropriate to use a shower cell for

a short period of time (15 to 30 minutes), using such an uncomfortable area

as a holding cell could be perceived as retaliation even if it was not

intended as such.  Additionally, the inmates will not be improperly

restrained in the holding cells so that they may sit down while they wait.  If

the restraints can be removed, or at least limited, while they are in the

holding areas they should be so that the inmates can be as comfortable as

possible while maintaining the safety and security of the facility and all of

Case No. 4:19cv212-MW-MAF

those involved.  Moreover, to the extent they are in the cell during mealtime they will be provided with food/water and will not be improperly restrained while they eat.  At least one time every forty-five minutes correctional staff will inquire whether the inmate needs to use the bathroom or if they need something to drink.  The inmates should not be required to "call out" in order to receive such necessities, especially when "calling out" may be considered a violation of policy.

In order to prevent the unnecessary use of holding cells, Plaintiffs will provide the list and order of inmates they wish to interview, and will work with correctional staff to insure that such order does not change.  The Court acknowledges that much of the inordinate use of holding cells at the prior inspections was driven by the failure by Plaintiffs' counsel to timely address the order of the interviews and the lack of clear direction to the line staff.  That problem should not be repeated.

**Denial of Food and/or Other Necessities**.  It should go without saying that an inmate should not be denied any right or necessity because of their participation in the inspections/interviews.  Toward that end, correctional staff will specifically confirm that participants are fed and are otherwise provided with their necessities during the process.  If there is a

specific reason why an inmate that participated in the process is being denied some necessity, such a denial must be confirmed in writing so that there is no chance of confusion regarding the basis for this denial.

**Disputes**.  As noted throughout this Order, any issues with the manner in which the inspections/interviews are being conducted should be raised immediately.  Failure to do so may be considered a waiver of such issues, especially where raising such issues earlier may have been confirmed or refuted by other available evidence such as documentation or video evidence.  To the extent the parties cannot resolve the issue between themselves, they may file an appropriate Motion to Enforce with the Court and it will be dealt with expeditiously to prevent any delay in the process.  Again, this process is not intended to supplant or replace the grievance process.  The use of the grievance process is a parallel proceeding, and the resolution of any Motion to Enforce will not impact the grievance process or vice versa.

Accordingly, it is

**ORDERED**:

1.  Plaintiffs' motion for a protective order, ECF No. 183, is

**GRANTED**.

2. Retaliation and threats of retaliation of any kind relating to an inmate's participation in the ongoing discovery and/or civil litigation will not be tolerated.

3.  In order to ensure an orderly and efficient inspection and interview process the parties shall abide by the guidelines addressed above.

4.  To the extent there is a deviation from the guidelines above the parties are directed to raise such issues immediately, but certainly before the conclusion of the process at the specific facility.  Failure to timely raise such issues may result in a waiver of the ability to claim a violation of this Order, especially where the failure to timely raise the issue has resulted in the loss of evidence which would either confirm or refute the alleged violation.

5.  In the event the parties are not able to resolve any dispute arising from the inspections/interviews they are directed to file an appropriate Motion with this Court and the matter will be resolved expeditiously.  Again,

this process is not intended to supplant or replace the grievance process,

which process should proceed on a separate and parallel process.

**DONE AND ORDERED** on February 8, 2021.


**S/   Martin A. Fitzpatrick**
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**