UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAC'QUANN (ADMIRE)
HARVARD; J.H., a minor, by and
through his parent and natural
guardian, Valentine Robinson;
ANGEL MEDDLER; JUAN
ESPINOSA; JEROME BURGESS
(a/k/a SHAM'LA GOD ALLAH);
JAMES W. KENDRICK, JR.; and
JOHNNY HILL; on behalf of
themselves and all others similarly
situated,

      Plaintiffs,

vs.                          CASE NO.:  4:19-cv-00212-MW-MAF

MARK INCH, in his official
capacity as Secretary of the Florida
Department of Corrections, and
FLORIDA DEPARTMENT OF
CORRECTIONS, an Agency of the
State of Florida,

      Defendants.

_____/

**DEFENDANTS' AMENDED MOTION FOR RELIEF FROM, AND
OBJECTIONS TO, THE MAGISTRATE JUDGE'S ORDER [D.E. 240]
AND INCORPORATED MEMORANDUM OF LAW[1]**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72, Defendants move for relief

from, and object to, Magistrate Judge Fitzpatrick's Order entered on Plaintiffs'

---

[1] Defendants file this Amended Motion solely to correct several instances in their Motion where Defendants referred to Magistrate Judge Fitzpatrick as "Magistrate."  No other amendments or changes are made to this Motion other than to reflect the new word count.

Motion for Protective Order [D.E. 240 (hereinafter the "Order")] for the following reasons:

1.  The Order, which enjoins future conduct and communications, was beyond the Magistrate Judge's authority to enter under 28 U.S.C. § 636(b)(1)(A);

2.  The Order improperly applies Federal Rule of Civil Procedure 26 to the matter at issue, even though the dispute does not concern discovery, Plaintiffs do not have standing to raise these issues, good cause was not shown, and the scope of relief ordered was not allowable under Rule 26(c);

3.  The Order, to the extent entered under the Court's inherent authority, was not based on any findings that the alleged conduct and communications impaired the Court's ability to administer justice or Plaintiffs' ability to complete their fact-finding; and the "inherent authority" of the Court cannot be used to side-step the requirements of the First Amendment, Rule 65, Rule 23, or the separation of powers doctrine;

4.  The Order is not permissible under Rule 23(d) because the relief ordered is not available under that Rule, there were no findings satisfying the *Gulf Oil* standard, and the findings made were not based on a clear record;

5.  The Order violates the separation of powers doctrine;

6.  The Order is an unconstitutional prior restraint on speech;

7.  The Order violates the Prison Litigation Reform Act; and

8.  The Order is impermissibly vague.

## I.   __BACKGROUND__

Plaintiffs moved for a protective order on November 23, 2020. [D.E. 183 (hereinafter "Motion")]. Plaintiffs alleged that the Department of Corrections (hereinafter "the Department") was interfering with Plaintiffs' Rule 34 inspections of prison facilities, which was governed by a jointly agreed-upon stipulation ("Stipulation"), [D.E. 157]—and that without judicial intervention, "Plaintiffs' fact gathering" from these inspections would be threatened by the Department's allegedly retaliatory behavior towards inmates due to the inmates' participation in this lawsuit. Motion at 1. Defendants responded, denying the allegations. [D.E. 199].

This Court referred the matter to Magistrate Judge Fitzpatrick. [D.E. 200]. Magistrate Judge Fitzpatrick found that, because the facts necessary to resolve Plaintiffs' motion were in dispute, an evidentiary hearing was warranted. [D.E. 204].

A five-day evidentiary hearing was held from January 11–15, 2021. [D.E. 229–234, 247–48]. Both parties called as witnesses individuals who submitted

declarations in support of their papers, although both parties withdrew certain declarations. Following the hearing, both parties submitted proposed orders. [D.E. 237, 238]. After consideration, Magistrate Judge Fitzpatrick entered the subject Order, granting Plaintiffs' Motion in whole. *See* Order. Notably, Magistrate Judge Fitzpatrick found he had the authority to enter the Order as "a pre-trial discovery issue" and that "a Report and Recommendation [was] not required." *Id.* at 4.

To date, six facility inspections have occurred. At the time of the filing of Plaintiffs' Motion, the following inspections occurred: Florida State Prison ("FSP"), Santa Rosa Correctional Institution and Annex ("Santa Rosa"), and Lowell Correctional Institution Annex ("Lowell"). Motion at 1–2. Since the filing of the Motion, Plaintiffs' team has inspected Suwannee Correctional Institution (Dec. 8–9, 2020), Hamilton Correctional Institution and Annex (Feb. 9–10, 2021), and Union Correctional Institution (Feb. 11–12, 2021). *See* [D.E. 241, 245].

On February 9, 2021, the Court, after conducting a telephonic hearing on the parties' emergency motions concerning the upcoming inspections at Hamilton and Union, [D.E. 241, 242], stayed the Order for fourteen days and permitted the parties to file objections to the Order. [D.E. 245].

## II.   <u>LEGAL STANDARD</u>

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure, when a magistrate judge issues an order stating his decision as to a non-dispositive matter,

the district judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fla. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A).

On the other hand, Rule 72(b)(1) requires that for dispositive motions, magistrate judges "must enter a recommended disposition, including, if appropriate, proposed findings of fact." *See also* 28 U.S.C. § 636(b)(1)(B). "The district judge must determine de novo any part of the magistrate judge's disposition that that has been properly objected to. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C).

Importantly, "[t]he terms 'dispositive' and 'nondispositive' in Rule 72 do not perfectly coincide with the categories listed in 28 U.S.C. § 636(b)(1)." *Quatama Park Townhomes Owners Ass'n v. RBC Real Estate Fin., Inc.*, 365 F. Supp. 3d 1129, 1132 (D. Ore. 2019). For example, Section 636(b)(1)(A) states: "a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court, *except a motion for injunctive relief* . . . ." 28 U.S.C. § 636(b)(1)(A) (emphasis added). Rather, "the term 'dispositive' refers to the list of motions that a magistrate judge may not determine found in § 636(b)(1)(A)." *Vaquillas Ranch Co. v. Texaco Exploration & Prod., Inc.*, 844 F. Supp. 1156, 1162

(S.D. Tex. 1994) (citations omitted); *see also Steelworkers of Am., AFL-CIO v. Bishop*, 598 F.2d 408, 411 (5th Cir. 1979)[2] ("[A] magistrate lacks power to enter an injunction even in a case where the district court has jurisdiction.").

## III.   ARGUMENT AND OBJECTIONS

### A.    The Order Exceeds the Magistrate Judge's Authority Under Section 636(b)(1)

The Magistrate Judge lacked the authority to enter the Order because it is not merely a "pre-trial discovery" order and instead imposes a statewide injunction, without limit or duration, on the Department and its staff. *See, e.g.*, *Cobell v. Kempthorne*, 455 F.3d 317, 322 (D.C. Cir. 2006) (finding jurisdiction to review Rule 23(d) order under Section 1292 because the order was an injunction); *Gates v. Fordice*, 234 F.3d 221, 227–28 n.5 (5th Cir. 2000) (regarding no contact order as an injunction for purposes of appellate jurisdiction); *Great Rivers Coop. of Se. Iowa v. Farmland Indus.*, 59 F.3d 764, 765–66 (8th Cir. 1995) (holding that Rule 23(d) order restraining communication with potential class members was "in the nature of an injunction"); *Sewell v. D'Alessandro & Woodyard, Inc.*, No. 2:07-cv-343-FTM029SPC, 2008 WL 2445765, at *3 (M.D. Fla. June 16, 2008) (stating that Rule 23(d) order precluding contact with class members is essentially an injunction).

---

[2] Cases decided by the former Fifth Circuit prior to October 1, 1981, are binding precedent within the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

The Magistrate Judge did not have the authority to enter the injunctive relief contained in the Order and the Order should be vacated.

**B.     The Order Erroneously Applies Rule 26(c)**

Despite the recognition that "Plaintiffs seek a protective order under Rule 23(d)," the Order analyzes the Motion under Federal Rule of Civil Procedure 26(c).[3] Order at 2, 39. As a result, the Magistrate Judge abused his discretion and the Order is clearly erroneous and contrary to law.

(1)     Rule 26 Is Not Applicable to Informal Interviews

Plaintiffs' Motion for Protective Order sought to prohibit retaliation and communications with putative class members, generally. It did not actually seek protection from any "discovery [ ] sought." *See* Fed. R. Civ. P. 26(c).

The Federal Rules of Civil Procedure contain six main forms of discovery: depositions, interrogatories, requests to produce, requests to admit, non-party production subpoenas, independent medical examinations, site visits, and product testing. What all of these have in common is that they impose a court-imposed requirement that they be responded to under penalty of contempt.

With their Motion, Plaintiffs did not seek protection from a deposition or a non-party subpoena, but instead sought to impose conditions concerning the

---

[3] Defendants did not address Rule 26 in their Response to Plaintiffs' Motion because, as the Magistrate Judge recognized, Plaintiffs' Motion was a "moving target" and Plaintiffs did not state that they were seeking relief under Rule 26(c) until the first day of the hearing. [D.E. 248 at 15–16]; *see also* [D.E. 247 at 32].

interactions between Department staff and the inmates during informal interviews

conducted in the course of facility inspections. However, an informal interview is

not "discovery" under Rule 26. *See Redus v. CSPH, Inc.*, No. 3:15-CV-2364-M,

2017 WL 2079807, at *3 (N.D. Tex. May 15, 2017); *see also* Fed. R. Civ. P.

26(a)(5) (pre-2007 version) (setting forth the methods to discover additional

information, and not listing informal interviews). In examining this specific issue,

one court succinctly held:

> However, Fed. R. Civ. P. 26 contains general provisions
> concerning discovery. Rule 26(a) lists the specific
> methods by which parties may obtain discovery, and
> Rule 26(c) gives the court authority to issue protective
> orders, for good cause shown, concerning these methods
> of discovery. Informal witness interviews are not
> encompassed by Rule 26, and therefore this court has no
> authority under that rule to issue the requested protective
> order.

*Amarin Plastics, Inc. v. Md. Cup Corp.*, 116 F.R.D. 36, 38 (D. Mass. 1987); *see*

*also Davis v. Abercrombie*, No. CIV. 11-00144 LEK-BM, 2014 WL 7366685, at

*2 (D. Haw. Dec. 24, 2014) (finding Rule 26(c) did not apply because the motion

for protective order addressed ongoing concerns at the correctional center related

to participation in this lawsuit).

Simply put, Rule 26(c) is inapplicable to the present matter because this is

not a discovery dispute. Plaintiffs seek an order protecting putative class members

from retaliatory conduct and improper communications. There is no "discovery" pending from which Plaintiffs or non-party putative class members seek protection.

    (2)   <u>Plaintiffs Do Not Have Standing Under Rule 26(c) to Seek the Protections Imposed by the Order</u>

Even if Rule 26(c) applied, Plaintiffs do not have standing to seek protections on behalf of non-parties under Rule 26(c).[4] *See Renuen Corp. v. Lameira*, No. 6:14-cv-1754-ORL, 2015 WL 1815698, at *1 (M.D. Fla. Apr. 22, 2015) (finding defendants failed to show that they have standing to bring a motion for protective order on behalf of non-parties); *Adamson-James v. Fla. Dep't of Corr.*, No. 6:11-CV-628-ORL-35TB, 2013 WL 1703541, at *2 (M.D. Fla. Mar. 22, 2013), *R&R adopted by* No. 6:11-CV-628-ORL-36, 2013 WL 1703520, at *1 (M.D. Fla. Apr. 19, 2013) (finding the plaintiff failed to demonstrate standing to bring the motion to protect non-party witnesses); *see also Refoule v. Ellis*, 74 F. Supp. 336, 343 (N.D. Ga. 1947).

The only path to relief for Plaintiffs on behalf of these non-parties is based on their status as putative class members under Rule 23(d). This was recognized by Plaintiffs in their Motion. Yet, the Order applies Rule 26(c) instead, without explanation. This is clear error.

---

[4] No declarations were filed by Plaintiffs claiming retaliation before, after, or during these inspections despite the fact that several Plaintiffs were housed at these facilities during the inspections and were interviewed by the experts during the inspections.

### (3)   The Order Fails to Articulate Good Cause

A court "must articulate its reasons for granting a protective order sufficient for appellate review." *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 355 (11th Cir. 1987). The Order plainly fails to state the reason it was entered. Presumably, because it was entered under Rule 26(c), it was entered based on "good cause" shown. *See* Fed. R. Civ. P. 26(c).

As a start, the Order states in a conclusory fashion that "[t]hreats of physical violence and retaliation have been sufficient to show 'good cause' for issuance of a protective order." Order at 38 (citing *Does v. Swearingen*, No. 6:18-cv-1731-ORL-41LRH, 2019 WL 4386936, at *3 (M.D. Fla. Sept. 13, 2019)). Yet, *Swearingen* concerned several sex offender-plaintiffs' request to proceed anonymously in a case challenging a state disclosure statute. *Id.* at *1. The *Swearingen* plaintiffs sought to proceed in the case anonymously because "being forced to proceed under their own names will require them to disclose matters of the utmost intimacy and will subject them to physical violence and harassment." *Id.* The court granted the motion and then ordered, without discussion, the parties to "confer and file an appropriate motion for protective order" likely governing how the anonymity of the plaintiffs will be handled in discovery. *Id.* at *3. *Swearingen* is inapplicable to this case.

Apart from that conclusory statement and citation to *Swearingen*, the Order is silent as to what facts or testimony specifically demonstrated the "good cause" justifying the relief granted. Assuming the Court found "good cause" based on purported "threats of physical violence and retaliation" it is hard to pin-point which threats supported this conclusion. The Order only identifies two inmates for which the Magistrate Judge found their testimony credible. *See* Order at 4 (Inmate Gilday) and 12 (Inmate Gresham). And, the "credible" testimony cited for both inmates did not concern "threats of physical violence and retaliation." *Id.*

Thus, Defendants, as well as this Court, must speculate as to the reasons the Order was entered.

(a)     *"Actual Overt Retaliation"*

The Order provides: "In ruling on Plaintiff's motion for a protective order, this Court has carefully considered the testimony and documentary evidence which shows actual overt retaliation by prison officials, as well as threats of retaliation." Order at 40. Yet, no citation to any testimony or witness is provided in this section.

Presumably, the Court found "actual overt retaliation" occurred as a result of the inmates' exercise of their First Amendment rights. *See* Order at 39. However, to prevail on a claim of retaliation based on exercise of First Amendment rights, an inmate must establish: "(1) his speech was constitutionally protected; (2) the inmate suffered adverse action such that the administrator's allegedly retaliatory

11

conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Smith v. Mosley*, 532 F.3d 1270, 1278–79 (11th Cir. 2008).

In addition to failing to identify the "adverse action" at issue, there are no findings in the Order that there was a "causal relationship" between these alleged adverse acts and the inmates' attempt to speak with Plaintiffs' team. In fact, Magistrate Judge Fitzpatrick makes the bold statement that the "distinction in the basis for the retaliation is immaterial," (Order at 14), erroneously ignoring the causation requirement for a retaliation claim.

Further, if these "adverse actions" are being used to support a "good cause" showing for this protective order, then there must be a connection between the "adverse action" and this lawsuit. Plaintiffs alleged that it was these inmates' participation *in this lawsuit* that was causing them to be retaliated against and thus requested relief so inmates could participate *in this lawsuit* without being harassed. Motion at 15. Yet the Order's conflation of acts, and the Magistrate Judge's statement that the basis for the act is immaterial, makes his Order clearly erroneous.

To hold that claims of "retaliation" unconnected to the litigation can be used to enter protective orders of this scope would otherwise allow inmates to routinely seek protective orders prohibiting retaliation in their personal lawsuits simply

because a correctional officer took an adverse action against them, even if the act was demonstrably unrelated to the subject litigation. This is not the standard.

In addition to the above elements, a plaintiff claiming retaliation must come forward with more than "general attacks" on the defendant's motivations and must provide "affirmative evidence" of retaliation. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998). "The relevant showing . . . must be more than the prisoner's 'personal belief that he is the victim of retaliation.'" *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997) (quoting *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995)). And, whether the adverse action suffered "would likely deter" an inmate presents an objective standard. *Smith*, 532 F.3d at 1277.

Further, appropriate deference should be afforded to prison officials "in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir. 1995) (citing *Sandin v. Conner*, 515 U.S. 472, 482 (1995)). Because regulatory actions taken by prison officials are presumed to be reasonable, the inmate must produce "specific, nonconclusory factual allegations that establish improper motive causing cognizable injury." *Crawford-El*, 523 U.S. at 598; *Harris v. Ostrout,* 65 F.3d 912, 916–17 (11th Cir. 1995); *see also Colon v. Coughlin,* 58 F.3d 865, 872 (2nd Cir. 1995) (noting that because claims of retaliation may be easily fabricated, they should be reviewed with skepticism). If the inmate comes forward with appropriate

evidence of retaliation, the burden shifts to the defendant to prove that he would have taken the same actions anyway for legitimate reasons. *Leland v. Parramore*, No. 4:06-cv-569, 2009 WL 320698, at \*9 (N.D. Fla. Feb. 6, 2009).

There are no findings in the Order consistent with these requirements. The Order is silent as to the penological justifications for much of the conduct that occurred and no deference is afforded to the prison officials who testified. There are no findings that "affirmative evidence," other than the say-so of these incarcerated witnesses, was offered supporting the claims of retaliation, much less evidence that these "adverse actions" were as a result of these inmates' participation in this lawsuit. *Manley v. Paynter*, No. 4:07CV392-WS, 2009 WL 2489229, at \*3 (N.D. Fla. Aug. 12, 2009) ("[C]ourts should approach prisoner claims of retaliation 'with skepticism and particular care' due to the 'near inevitability' that prisoners will take exception with the decisions of prison officials and 'the ease with which claims of retaliation may be fabricated.'") (citation omitted).

Even the two instances of "credible" inmate testimony identified in the Order do not support a finding of "actual overt retaliation."  The first inmate, John Gilday, testified:

> Q.   And, Mr. Gilday, I want to focus first on that conversation with the officer when you were walking back to your dorm and he was questioning you. What

specifically, to the best of your memory, did that officer say to you?

A.    He was -- it wasn't really like -- like he just -- he just basically just asked me, like, you know, What are those people here for, you know what I'm saying?  Like, What are they talking about, you know what I'm saying? Was it anything important? You know, he wasn't really -- he never really came to me in a threatening manner, you know, but he was basically just trying to get -- you know what I'm saying, find out what y'all were asking me about, you know what I'm saying, what I knew about the situation.

Q.    And how did that make you feel when the officer was asking you those questions?

A.    I mean, like I said, even though he wasn't really – he wasn't really threatening towards me, he never really came at me in a threatening manner, anything like that, you know what I'm saying, it can really be seen, you know what I'm saying, like a little intimidating when it's coming from an officer and you are in handcuffs and shackles. It can -- it can be -- it can give you some anxiety, you know.

[D.E. 229 at 175–76]. This testimony fails to demonstrate "actual overt retaliation." Even construing these comments as "harassment," such statements would not constitute retaliation as the Eleventh Circuit has found that verbal abuse and threats, alone, are insufficient to state a constitutional claim. *See Hernandez v. Fla. Dept. of Corr.*, 281 F. App'x 862, 866 (11th Cir. 2008) (affirming dismissal of retaliation claim based on verbal acts) (citations omitted); *see also McFadden v. Lucas*, 713 F.2d 143, 146 (5th Cir. 1983) ("[A]s a rule, merely threatening

language and gestures of custodial office do not, even if true, amount to constitutional violations." (internal quotations omitted)).

The second inmate, Dylicia Gresham, was identified as offering credible testimony that she received an "air tray" after speaking with Plaintiffs' team, but never before that date. Order at 12. Yet, the Order never explains why the Magistrate Judge found this portion of Inmate Gresham's testimony credible, especially considering the fact that Inmate Gresham grieved several other incidents during this same time frame, and failure to receive her meals was not one of them. [D.E. 230 at 89–103]. The Order also fails to discuss why these "adverse actions" were as a result of Inmate Gresham's speaking with the lawyers, as Inmate Gresham grieved a different incident against an officer the day before these interviews and claimed similar retaliation. *Id.* at 94–97. Finally, there was no other evidence presented that Inmate Gresham did not receive her meals other than her own say-so, and the portion of the video surveillance which may have refuted this testimony was not requested to be preserved by Plaintiffs and therefore was not available to be offered in defense.

The Order fails to state the basis for the "good cause" shown. Conclusory statements that "actual overt retaliation occurred," without more, is not sufficient to justify the Order granted.

*(a)     Reasonable Perception of Retaliation is Not Good Cause*

In addition to unidentified "actual overt retaliation" the Order further states:

> It is not just actual retaliation that is a concern, but the
> threat of retaliation, or even the reasonable perception –
> by the inmates – that they may be retaliated against. It's
> not just alleged violent acts, the denial of food or other
> necessities, or other improper treatment that is at issue.
> Nor is it the alleged threat of such evil acts. It's the
> perceived threat that may result from a "shhh!" from a
> guard, a cold stare from across the room, a hard pat on
> the back from a warden, or a "hmmm" as they leave the
> room.   The inmates deserve the assurance that their
> participation in the discovery – and indeed in the lawsuit
> – will not result in any negative backlash.

Order at 40–41.

However, the Eleventh Circuit has held that "generalized, subjective assertions of fear" are insufficient to justify good cause in entering a protective order. *See In re: Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1251 (11th Cir. 2020) (finding the evidence presented only a vague fear of retaliation). In this portion of the Order, no case was cited, nor are Defendants aware of any authority from this Circuit, where a court adopted the "perceived threat of retaliation" standard in imposing a protective order. If this were the standard, then a protective order enjoining future retaliation would be routinely entered in any prisoners' lawsuit simply based on the fact that the plaintiff is in custody. It also imposes an impossible standard on Defendants moving forward in that every time an officer frowns at an inmate, this could be "perceived" by the inmate as retaliation and

argued a violation of this very Order. A subjective perception of fear is insufficient to warrant good cause for entering a protective order that essentially enjoins a state agency and all of its employees and bans future communications, indefinitely.

Further, even if subjective fear could amount to "good cause" in certain circumstances, the Order fails to explain why the subjective fear of the individual inmates who testified at the evidentiary hearing should be extrapolated to all inmates who may interact with Plaintiffs' counsel during some future inspection that has not yet been scheduled. Simply because Inmate McDaniel, for example, had the irrational fear of being written up for talking to Plaintiffs' team, despite the fact that Lt. Brown told her she could do so, (Order at 6–7), does not mean that all other inmates in the custody of the Department will have this same irrational fear. As the Magistrate Judge recognized during the hearing, all inmates perceive fear based on the mere fact that they are inmates. [D.E. 234 at 24]. There is no way to protect against this. *Id.* (noting that he had not "heard anything from [Pacholke] yet that would give [the magistrate judge] an avenue for correcting that fear or trepidation [that all inmates have]"). "Perceived fear of retaliation" is insufficient good cause warranting this Order.

### (b)    *No Balancing of Interests Occurred*

Even assuming "good cause" was shown, which it was not, the Order fails to demonstrate that the Magistrate Judge engaged in the "balancing of interests"

required by the Eleventh Circuit in assessing "good cause." *Chiquita*, 965 F.3d at 1251 (citing *Farnsworth v. Procter & Gamble Co.*, 758 F.2d 1545, 1547 (11th Cir. 1985)).

Despite the testimony of eleven Department staff, ranging from sergeants all the way to wardens, the Order fails to balance the interests of Defendants in maintaining the security of the inmates and the facilities with the relief ordered here. The Order fails to take into consideration how the relief ordered will impact the day-to-day operations of the facilities. The Order fails to take into consideration the legitimate, penological justifications for certain conduct alleged.

> (c)   *No Good Cause Articulated for Expanding Order Beyond Inspections*

The Order is indefinite and fails to specify any limits on time or scope. If this truly was a Motion for Protective Order filed under Rule 26(c), then the dispute concerns discovery and the Order should have been limited to the scope of the physical Rule 34 inspections. Instead, the Order has an indeterminate duration, which indicates it does more than merely decide a discovery issue. Yet, no "good cause" is articulated explaining the need for such an indefinite Order if the dispute truly concerns the Rule 34 facility inspections and conduct during discovery.

> (d)   *No Good Cause Articulated for Protection Regarding Future Inspections*

The Order fails to explain why "good cause" was shown justifying the need for a protective order regarding future inspections. Before the Magistrate Judge was testimony from eleven inmates housed at four institutions. Those inmates did not offer consistent stories of retaliation. Instead, the testimony made clear that their claims were based on independent, separate, and unrelated events and communications not commonly shared.

The allegations were further not based on any policy of the Department. Instead, the disparate claims were based on alleged acts and communications by officers that, if they did occur, would be in violation of Department policies and procedures. Thus, it is not clear how inmates' individual claims of retaliation by individual officers would constitute good cause sufficient to enter an Order governing other facilities and other employees.

For example, it is well-settled that Section 1983 liability does not rest on a *respondeat superior* theory and liability against an entity depends on constitutional deprivations resulting from (1) an unconstitutional action taken pursuant to an officially promulgated policy statement, decision, regulation, or ordinance; or (2) governmental custom, even though not authorized by written law  *See Martinez v. City of Opa-Locka*, 971 F.2d 708, 713 (11th Cir. 1992) (citing *Monell v. Dep't of Social Services of City of N.Y.*, 436 U.S. 658, 690–91 (1978)). Therefore, a plaintiff must demonstrate that the constitutional violation at issue was caused by an official

policy or custom. *See Monell*, 436 U.S. at 694. The plaintiff must also demonstrate that, through its deliberate conduct, the defendant was the "moving force" behind the injury alleged. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997). In order to demonstrate a policy or custom, it is generally necessary to show a persistent and wide-spread practice; random acts or isolated incidents are insufficient. *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004).

No widespread practice was shown during the evidentiary hearing demonstrating a common policy of retaliating against inmates for speaking with the lawyers. Instead, several random and isolated incidents were presented from a few self-selected inmates which were labeled retaliation for participating in this lawsuit. Thus, to the extent the Magistrate Judge based his "good cause" finding on these random and isolated incidents, the Order is clearly erroneous in that there was no justification offered for expanding the protection to future inspections when no policy of the Department was at issue.

This argument is further reinforced by the fact that the Magistrate Judge found that "[t]here was no showing of any problems during the facility inspection and interviews conducted at Suwannee Correctional Institution [ ] which took place after Plaintiffs' filed their motion for protective order." Order at 2 n.1. And, the Order in fact finds that the interviews at the Lowell and Suwannee facilities (the third and fourth inspections) should serve as a model going forward. *Id.* at 47, 49;

*see also id.* at 18–19.[5]   This was likely based on Pacholke's admission that if the cell-front interviews were conducted as they were at Lowell and Suwannee, he would have no issue. [D.E. 234 at 74–76].

These express findings demonstrate that "good cause" was not shown warranting protection for *future* inspections. If the Magistrate Judge determined that the third and fourth inspections should be used as a model going forward, then that necessarily conflicts with any finding that future protection is needed regarding these inspections. The Order is clearly erroneous to the extent it finds "good cause" based on events that occurred during the first two inspections, when the evidence demonstrated that these concerns were alleviated with the third and fourth inspections.

### (4)   Relief Goes Beyond That Allowed By Rule 26

The Order grants Plaintiffs' Motion for Protective Order which sought relief that is beyond that which is allowable under Rule 26(c). *See* Fed. R. Civ. P. 26(c). The Motion requested an order prohibiting Department staff from:

1. Retaliating against, chilling, or harassing the Named Plaintiffs and putative class because they participate in this case or communicate with Plaintiffs' legal team or experts; and

2. Communicating with the Named Plaintiffs or putative class members about Plaintiffs' legal team, experts, or this case unless otherwise agreed upon by the parties.

---

[5] The Lowell inspection occurred before Plaintiffs filed their motion.

Motion at 15.  This injunctive relief, unconnected to any discovery, is simply not available under Rule 26(c). *See, e.g.*, *Memphis Invest, GP v. Waite*, No. 2:13-CV-01282-JAD-NJ, 2014 WL 547962, at *5 (D. Nev. Feb. 11, 2014) (finding Rule 26(c) did not authorize an order prohibiting contact with witnesses which was essentially request for injunctive relief).

* * *

The Order is clearly erroneous and contrary to law because: it evaluates the Motion for Protective Order under Rule 26(c) when the matter at hand does not concern discovery, fails to address Plaintiffs' lack of standing, makes insufficient findings regarding good cause, and orders relief beyond the scope of Rule 26(c).

### C.    The Inherent Authority of the Court Does Not Allow for the Order Entered

The Order appears to be entered under Rule 26(c); however there is a single reference to the court "having the inherent authority to control discovery and protect the integrity of litigation." Order at 39 (citing *Peer v. Lewis*, 606 F.3d 1306, 1315 (11th Cir. 2010)).[6] Yet, there are no findings regarding or referencing this "inherent authority" or explaining why such inherent authority allows for the relief ordered here. And, the single case cited in the Order in support of this proposition

---

[6] There is a reference to "substantial concern for the fairness and integrity of this litigation" based on alleged intimidation of "potential plaintiff prisoners" and potential witnesses. Order at 43. However, it is not clear whether this relates to a determination under the Court's inherent authority or justification for a protective order under Rule 26(c).

is not applicable to the circumstances presented in Plaintiffs' Motion. *Peer* concerned a court's inherent power *to impose sanctions.* 606 F.3d at 1314–15. And, *Peer* noted that the "key to unlocking a court's inherent power is a finding of bad faith." *Id.* at 1315 (quoting *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998)). There was no finding of bad faith in the Order.

Although Defendants recognize that a district court has the inherent power to enter orders which promote the administration of justice, this power is not without limits. *See Dietz v. Bouldin*, 136 S. Ct. 1885, 1891 (2016). "First, the exercise of an inherent power must be a reasonable response to the problems and needs confronting the court's fair administration of justice." *Id.* at 1892 (internal quotations omitted). "Second, the exercise of an inherent power cannot be contrary to any express grant of or limitation on the district court's power contained in a rule of statute." *Id.* And, a district court's inherent powers must be exercised with restraint. *Id.* at 1893.

One appellate court has explained that a district court's "inherent power is limited and interpreted narrowly, and its reach is limited by its ultimate source – the court's need to orderly and expeditiously perform its duties." *Newby v. Enron Corp.*, 302 F.3d 295, 302 (5th Cir. 2002). And, although the Court's inherent power may support an injunction in appropriate circumstances, the use of that authority is still bounded by the limits of Article III and the usual requirements for

24

issuance of an injunction. *In re Stewart*, 647 F.3d 553, 557–58 (5th Cir. 2011); *see also Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004) (finding injunction granted under the inherent equitable powers of the court must satisfy the usual requirements for an injunction).

Here, Plaintiffs argued that the Court had the inherent power to issue the requested protective order to protect the Court's ability to "fairly adjudicate" this case. Motion at 11. Plaintiffs claimed in the Motion that the "fair adjudication of this case" has been interfered with as a result of retaliation "against putative class members for participating in Plaintiffs' Rule 34 facility inspections." *Id.* at 1. There is a passing mention that the purported conduct threatens Plaintiffs' "fact-gathering," but the remainder of Plaintiffs' legal argument focuses on a series of cases analyzed under Rule 23(d) where the issue was not one of fact-gathering, but whether the putative class members would exclude themselves from the class. *See* Motion.

To the extent the Order was entered under the "inherent authority" of the Court based on claims that Plaintiffs' "fact-gathering" has been hampered or that such hindrance has impaired the Court's ability to "fairly adjudicate" the case, the Order is clearly erroneous.

First, the Order does not address any problem or need confronting the Court's fair administration of justice. There are no findings that Plaintiffs' fact-

gathering has been or will be compromised. In fact, the inmate witnesses uniformly testified to multiple post-inspection communications with Plaintiffs' team. [D.E. 229 at 20–21, 54–57, 108, 151–54, 185–86, 188–89; D.E. 230 at 33–36, 43–46, 147–48, 170–74, 203–05]. And, Plaintiffs' expert testified that he was able to interview about 150 inmates cell-front and had 40 confidential interviews. [D.E. 234 at 11, 14]. Thus, based on the record, the evidence failed to establish the court's fact-finding would be materially impaired unless this Order was entered. *See, e.g.*, *Adams v. NaphCare*, No. 2:16-CV-229, 2016 WL 10492102, at *13–14 (E.D. Va. July 25, 2016) (denying  motion for protective order seeking to prevent retaliation from jail personnel and finding that evidence failed to establish fact-finding would be materially impaired, especially based on the fact that the inmate witnesses gave statements to the plaintiffs and the press).

Further, if the concern raised by Plaintiffs' Motion was fact-gathering, then it is not clear why these cell-front interviews and confidential interviews bear any relevance to the case at hand. None of these inmates have been identified as witnesses in Plaintiffs' discovery responses, initial disclosures, or during their depositions. And, importantly, this case is a putative class action. It is presumed that Plaintiffs will argue that the class should be certified under Rule 23(b) because the issues concerning confinement are common among the putative class and that the named representatives' claims are typical of the class. If that is the case, then

why would Plaintiffs need "fact investigation" into the putative class members' individual circumstances? In fact, Plaintiffs' insistence on these interviews belies their position that this class is certifiable. *See, e.g.*, *In re Carbon Dioxide Indus. Antitrust Litig.*, 155 F.R.D. 209, 211–12 (M.D. Fla. 1993) (finding the efficiencies of a class action would be thwarted if routine discovery of absent class members was permitted); *see also Coffey v. WCW & Air, Inc.*, No. 3:17cv90-TKW-HTC, 2019 WL 9089615 (N.D. Fla. July 30, 2019) (discussing the difference between discovery of absent class members and fact witnesses).

Likewise, Plaintiffs' claim that their fact-investigation has been or will be hampered unless a protective order is entered is disingenuous in light of the fact that since the filing of their Motion, they continue to move forward with inspections without such a "necessary" order in place. [D.E. 241, 245]. If there truly was a hindrance being placed on their fact investigation, sufficient to justify this Order, then they would have postponed these inspections until a ruling by the Court.

And, if the issue is conduct which may cause these absent class members to exclude themselves from the class (as opposed to offering testimony or factual information), then that matter is best analyzed under Rule 23(d), which governs the procedural requirements over class actions. The Court should not use its inherent authority to bypass the requirements of Rule 23(d) and the First Amendment

merely at Plaintiffs' request. That would not be "a reasonable response to the problems and needs confronting the court's fair administration of justice." *Dietz,* 136 S. Ct. at 1892.

Further, the Order allows these non-party inmates to sidestep the grievance process and make claims based on "perceived" retaliation without ever having to plead or prove those claims. This Order also allows these inmates the benefit of an injunction without ever having to satisfy Article III or Rule 65. Such an Order is not a "reasonable response" to the problems at hand and exceeds the Court's inherent authority to enter. *See, e.g., Bemben v. Fuji Photo Film U.S.A., Inc.*, No. 01 CIV.8616(KMW)(DF), 2004 WL 1052975, at *2 (S.D.N.Y. May 10, 2004) (denying motion for protective order, finding defendants are seeking to "short-cut any proper legal process, by asserting *no* formal claim for defamation or any other violation of law, and yet asking this Court to find, based on an informal motion for protective order, that [the plaintiff] has been making defamatory statements to the point where an injunction against his future speech is appropriate"); *Lopez v. Reliable Clean-Up & Support Servs. LLC*, No. 3:16-CV-2595-D, 2017 WL 6611615, at *4 (N.D. Tex. Nov. 15, 2017), *objections overruled*, No. 3:16-CV-2595-D, 2017 WL 6611578, at *1 (N.D. Tex. Dec. 27, 2017) (denying motion for protective order seeking to prevent witness intimidation and harassment, finding that the request could be interpreted as a request for a preliminary injunction based

on a FLSA retaliation claim which they have not pled, which "would not be a proper grounds for entering the order they seek"); *see also Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, No. CV1402139MWFVBKX, 2015 WL 12746215, at *3 (C.D. Cal. June 15, 2015) (denying motion regarding limiting communications with witnesses, finding that the court lacked the authority to enter the injunctive relief requested, whether under its inherent authority or under Rule 23, as the requested injunction presents "grave First Amendment concerns").

Finally, the inherent authority of the Court should not be invoked here because rather than managing this case with a "view toward the efficient and expedient resolution" of this case, *Dietz*, 136 S. Ct. at 1892, this Order now implants this Court as a super-warden, subjecting this Court to a parallel review proceeding of all grievance, affronts, and complaints that an inmate may have simply because the inmate "perceives" it as retaliation. When an inmate has his lunch delivered late or a correctional officer coughs too loudly, this Court will now likely hear about it because under this Order that inmate could reasonably "perceive" that act as retaliation or a threat of retaliation and, according to the Order, the basis for such retaliation is immaterial. This Order will result in the future intervention of this Court in the day-to-day operations of the Florida prison system and the thousands of inmates within its custody. That certainly is not an efficient means to expedite resolution of this case.

* * *

The inherent authority of the Court does not justify the Order entered and, to the extent Plaintiffs' Motion for Protective Order was granted based on that authority, the Order is clearly erroneous and contrary to law.

### D.      Rule 23(d) Does Not Authorize the Order Entered

Plaintiffs filed a motion for protection under Rule 23(d). *See generally* Motion; Order at 4. Yet, the Magistrate Judge erroneously failed to address this Rule or standard in the Order. Nevertheless, even if this Rule and standard were addressed, Plaintiffs' Motion for Protective Order would fail.

### (1)      The Relief Ordered is Unavailable Under Rule 23(d)

Rule 23(d) states:

> In conducting an action under this rule, the court may issue orders that:
>
> (A) determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;
>
> (B) require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of: (i) any step in the action; (ii) the proposed extent of the judgment; or (iii) the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;
>
> (C) impose conditions on the representative parties or on intervenors;

> (D) require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or
>
> (E) deal with similar procedural matters.

Fed. R. Civ. P. 23(d).

Subparts (A), (B), (C), and (D) are clearly inapplicable to the relief sought by Plaintiffs and Ordered by the Court.[7] Arguably, the only provision of Rule 23(d) that could apply to Plaintiffs' Motion, although never cited in the Motion or Order, is Rule 23(d)(1)(E). However, the Order, which grants Plaintiffs' Motion in whole, contains relief that goes far beyond the "similar procedural matters" identified in Rule 23(d). *See* Motion at 15.

The broad relief ordered is beyond the "procedural matters" contemplated by Rule 23. The Order enjoins the behavior of thousands of Department employees, statewide, for an indeterminate time, without Plaintiffs making the proper showing under Federal Rule of Civil Procedure 65. Further, it functions as a prior restraint on speech without any of the constitutional safeguards first being examined. Accordingly, the relief sought is substantive in nature and Rule 23(d)(1)(E) is inapplicable. Thus, the Order, if analyzed under Rule 23(d) is clearly erroneous in that it grants relief not available under Rule 23(d).

---

[7] Rule 23(d)(1)(C) is not applicable to defendants, rather it only applies to "representative parties or on intervenors." *See Cobell v. Kempthorne*, 455 F.3d 317, 323 (D.C. Cir. 2006); *see also* Fed. R. Civ. P. 23 advisory cmte's note (1966 amend.).

(2)     The Order does not meet the *Gulf Oil* standard

In *Gulf Oil Co. v. Bernard*, the U.S. Supreme Court reviewed a lower court order that "imposed a complete ban on all communications concerning the class action between parties or their counsel and any actual or potential class member who was not a formal party, without the prior approval of the court." 452 U.S. 89, 94–95 (1981). Before reaching the question of whether the order violated the parties' First Amendment rights, the Court found the question before it was whether this order was "consistent with the general policies embodied in Rule 23." *Id.* at 99. Ultimately, it found the order was not.

The *Gulf Oil* Court noted how class actions present "opportunities for abuse as well as problems for courts and counsel in the management of cases." *Id.* at 99–100. Because of this potential for abuse, the Court found district courts have both "the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. *But this discretion is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules*." *Id.* at 100 (emphasis added). The Court found that in order to address First Amendment concerns:

> [A]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties. Only such a determination can ensure that the court is furthering, rather than hindering,

> the policies embodied in the Federal Rules of Civil Procedure, especially Rule 23. In addition, such a weighing—identifying the potential abuses being addressed—should result in a carefully drawn order that limits speech as little as possible, consistent with the rights of the parties under the circumstances.

*Id.* at 101–02.

The Order is clearly erroneous under the *Gulf Oil* standard. First, the Order prohibits future conduct, not simply communications, which is not a form of relief available under Rule 23(d).

Second, the Order is not carefully drawn to limit speech as little as possible. Instead, it limits truthful and non-misleading communications concerning the inspections, the interviews, the experts, the interviewers, and the claims in this case. Order at 45–46. Defendants have no intention of allowing correctional officers to discuss this case or the Plaintiffs' team with putative class members. However, this Order is a two-way ban on communications and, as written, it could potentially result in sanctions if a putative inmate initiates a conversation regarding this case and then claims that a prohibited "communication" occurred. *See, e.g.*, [D.E. 232 at 15 (Sgt. Fowler testified that whenever Inmate Broadnax had a problem he claimed retaliation related to this lawsuit, i.e., communicated with Sgt. Fowler about this lawsuit)].

There could also be a claimed violation of this Order based on an otherwise truthful, non-misleading communication which exceeded the scope of the Order,

even if unintentionally made. For example, the Order states that communications about the matters in this case "should be limited to information sharing regarding the timing of such events," but otherwise leaves out a whole host of innocuous communications that may naturally occur before, during, and after the inspections, such as: (1) to be inspection ready, meaning having on appropriate clothes and having the inmates' cell in order before the Plaintiffs' inspections, (2) questions from inmates about how lunch and other appointments which may occur during the inspections will be handled, and (3) the coordination of legal calls and legal visits. The Order is clearly erroneous and contrary to law because it is not "carefully drawn" and does not "limit speech as little as possible."

Third, with respect to the communications at issue, there is no clear record before this Court justifying such an order. The record before this Court is not based on uniform, written communications to the putative class, but rather on the testimony of incarcerated individuals claiming a myriad of statements made by different correctional officers. And, as discussed above, the Order only identifies two inmates' statements as credible. Order at 4, 12.

And, because the claims of retaliation have been raised by inmates, the Magistrate Judge failed to make specific findings that each inmate-witness exhausted their administrative remedies regarding these alleged claims as required

under 42 U.S.C. Section 1997e(a). *See Davis*, 2014 WL 7366685, at *4. In fact, the evidence demonstrates that they did not. Order at 37.

Moreover, the Magistrate Judge made no findings that the conduct alleged by these inmates was caused by their participation in this lawsuit, further making the Order clearly erroneous. *See, e.g.*, *Alequin v. Darden Restaurants, Inc.*, 2013 WL 3939373, at *11 (S.D. Fla. July 12, 2013) (finding "there is no indication that this alleged intimidation or retaliation was related specifically to the back-wages payment program that Plaintiffs here challenge"); *Whitmire v. Monat Glob. Corp.*, 2018 WL 2021355, *2 (S.D. Fla. 2018) (denying motion for protective order under Rule 23(d) because the communications at issue were not about the class action).

Further, there is no finding that the complained-of conduct "threatens the proper functioning of the litigation." *Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 697–98 (S.D. Ala. 2003). "[C]ommunications that have been found to be violative of the principles of Rule 23 include misleading communications to the class members regarding the litigation, communications that misrepresent the status or effect of the pending action, communications that coerce prospective class members into excluding themselves from the litigation, and communications that undermine cooperation with or confidence in class counsel." *Jones v. Jeld-Wen, Inc.*, 250 F.R.D. 554, 561 (S.D. Fla. 2008). Yet, as the inmate witnesses testified, they have not been dissuaded from communicating

with Plaintiffs' counsel and have no plans to exclude themselves from this litigation. [D.E. 229 at 29, 68, 103; D.E. 230 at 61, 170]. This fact was pushed aside by the Magistrate Judge. Order at 40.

Finally, the Order fails to reference a single case cited by Plaintiffs in their Motion, except for *Gulf Oil*, supporting the relief ordered. Nevertheless, none of the cases cited by Plaintiffs allowed for the relief requested or ordered here. There simply is no support, in this Circuit or outside this Circuit, for any notion that the Order entered is appropriate under Rule 23(d). The Order is clearly erroneous and contrary to law.

### E.    The Order Violates the Separation of Powers Doctrine

The United States Supreme Court has repeatedly recognized the importance of prison officials' interests in prison management security, and allowed prison officials great deference in the administration of prison affairs:

> [C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform. Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the Legislative and Executive branches of Government. *Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities.*

*Turner v. Safley*, 482 U.S. 78, 84–85 (1987) (emphasis added); *see also Thornburgh v. Abbott*, 490 U.S. 401, 407–08 (1989) ("Acknowledging the expertise of these officials and that the judiciary is 'ill equipped' to deal with the difficult and delicate problems of prison management, this Court has afforded considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."); *Cruz v. Beto*, 405 U.S. 319, 321 (1972) (finding prison officials are "accorded latitude in the administration of prison affairs"); *Bell v. Wolfish*, 441 U.S. 520, 562 (1979) (cautioning federal courts not to become "enmeshed in the minutiae of prison operations"); *Prison Legal News v. Sec'y, Fla. Dept. of Corr.*, 890 F.3d 954, 965 (11th Cir. 2018) (recognizing that the Court does not sit "as a super-warden to second-guess the decisions of the real wardens").

The Order seems to agree by stating:

> [T]he requirements of safety and security at the facilities requires that these guidelines remain somewhat flexible, as the input and experience of the line personnel is essential in maintaining the safety of the inmates, the officers and the interviewing parties, as well as the general security of the facilities. This Court is certainly not intended to dictate protocols in such areas.

Order at 45. Magistrate Judge Fitzpatrick further commented during the evidentiary hearing: "I am not going to make security decisions. That is not my role. I'm not going to be the guy that says, we only need one guy, and then that

wing gets overthrown by some behavior. That is something that is controlled by folks that know a whole lot more about this issue than I do." [D.E. 234 at 25].

Yet, despite these statements, the Order then goes on to do what it said it would not – make security decisions. The Order removes all discretion and flexibility from the Department and the leaders of the individual facilities and imposes a one-size-fits-all approach for future inspections. The Order is clearly erroneous and contrary to law because it invades the separation of powers and attempts to manage how future inspections will be conducted with no regard for the potential security implications of its Order. The Department does not seek to prevent any inmate from communicating with Plaintiffs' team or participating in this lawsuit, otherwise it never would have agreed to these facility inspections or the inmate interviews in the first place. *See* [D.E. 157]. However, the Order, which places the inmates' right to speak with counsel above all else, including the security interests of the institutions, is unworkable and contrary to law. *See Smith*, 532 F.3d at 1277 ("[A]n inmate's First Amendment right to free speech is not protected if affording protection would be inconsistent with the inmate's status as a prisoner or with the legitimate penological objectives of the corrections system." (internal quotation omitted)).

For example, the Order attempts to arbitrarily dictate the distance correctional officers must maintain during cell front interviews, and does not allow

for any on-the-spot assessments that the present circumstances warrant closer supervision.[8] Order at 46–47. It also does not account for the fact that the Stipulation provided that normal operations will continue during these inspections and now prevents officers from performing security checks or pulling inmates for appointments if doing so would mean the officer comes within ten feet of the cell-front interview.

The Order describes which officers may be present during the cell-front interviews, again ignoring the additional security interests that are raised when up to eight additional outside civilians[9] enter the housing unit to speak to violent inmates, with their faces in close proximity to the cell door. Order at 47.

The Order directs how inmates can be housed before the interviews occur, including where, for how long, and the level of restraints that can be used. Order at 49. Again, this takes all discretion away from the facilities in determining the security needs based on the individual inmate and the circumstances of the inspection.

The Order states that Plaintiffs can determine the order in which the inmates are pulled for the confidential interviews, ignoring the testimony of Colonel

---

[8] The Order only allows flexibility if any "articulated concerns" regarding that "particular inmate" are given to Plaintiffs' team the day before the cell front interviews. This provision calls into question the Magistrate Judge's concern that singling out inmates based on behavior would be construed as retaliation. [D.E. 234 at 26, 79–80].

[9] The Stipulation provides that up to 8 persons from Plaintiffs' team may attend the inspection. [D.E. 157 at ¶ 1].

Cannon, Assistant Warden Smith, and the other command staff of Santa Rosa, who explained the inordinate burden that these interviews place on the institution and the need to pull inmates based on their housing location. *See, e.g.*, [D.E. 231 at 94, D.E. 232 at 101]; Order at 50. It also ignores the testimony of Pacholke, who stated these inspections are "a big logistical coordination on the part of the institution." [D.E. 234 at 81].

Simply put, the Order oversteps this Court's authority and dictates the security measures that must be in place during these inspections, without regard for the implications of such order on the safety and security of the facilities. The Stipulation is intentionally vague in certain places because the parties recognized that many security decisions are fluid, based on the individual circumstances of the inmate, the location, and the day. There cannot be a one-size-fits-all approach to these inspections. Thus, the Order which invades the separation of powers is clearly erroneous and contrary to law.

### F.    The Order Is An Unconstitutional Prior Restraint on Speech

The Supreme Court has held that while prior restraints on communications are not *per se* unconstitutional, they come to the court "bearing a heavy presumption against its constitutional validity." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975) (internal quotations omitted). The *Conrad* Court stated:

> The presumption against prior restraints is heavier – and
> the degree of protection broader – than that against limits

> on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

*Id.*

Although the Supreme Court in *Gulf Oil* did not decide what standards are mandated by the First Amendment in a Rule 23(d) motion for protective order because it decided the case on statutory grounds, it did observe that the order at issue "involved serious restraints on expression." 452 U.S. at 103–04. And before reaching the Supreme Court, the Fifth Circuit Court of Appeals found the order on review—the one barring parties and counsel from contacting the class without approval—violated the First Amendment. *See Bernard v. Gulf Oil*, 619 F.2d 459, 473–78 (5th Cir. 1980).

The Order issued here is strikingly similar to the order at issue in *Gulf Oil* and suffers from the same constitutional flaws. It is not narrowly-tailored in that it impacts truthful, non-misleading speech. Further, there was no finding that a compelling interest justified its imposition. As a result, the Order is clearly erroneous and contrary to law because it is an unconstitutional prior restraint on speech.

### G.     The Order Violates the Prison Litigation Reform Act

The Prison Litigation Reform Act ("PLRA") establishes a comprehensive set of standards to govern prospective relief in prison conditions cases. 18 U.S.C. § 3626. Section 3626(a)(1) provides that prospective relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs."  Thus, a court faced with a prison conditions suit may not grant or approve prospective relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* That subsection closes by requiring courts to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief." *Id.*

Section 3626(a)(2) "operates simultaneously to restrict the equity jurisdiction of federal courts and to protect the bargaining power of prison administrators—no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum." *Gilmore v. People of the State of California*, 220 F.3d 987, 999 (9th Cir. 2000).

The Order is essentially a "do not retaliate" injunction and thus provides prospective relief related to concerns of prison conditions. *See, e.g.*, Order at 41 ("Only through a clear order from the court guaranteeing these protections against

retaliation . . . . "). However, the Order does not comply with the PLRA because it fails to explain how it is narrowly drawn, extends no further than necessary to effect the changes it deems necessary, or how it is the least intrusive means for effective such change. *See, e.g.*, *Hoffer v. Sec'y, Fla. Dept. of Corr.*, 973 F.3d 1263, 1278 (11th Cir. 2020). It also fails to give substantial weight to any adverse impact to the prisons that will inevitably be caused by this Order. In fact, this adverse impact goes unaddressed. As a result, the Order is clearly erroneous and contrary to law.

## H.   The Order Impermissibly Rewrites the Inspection Stipulation

Not only does the Order "grant" Plaintiffs' motion, but it goes a step further and provides "guidelines" essentially modifying a negotiated agreement between the parties, the Inspection Stipulation. [D.E. 157]. Importantly, not only was this determination contrary to law, but it was not even requested by Plaintiffs in their Motion or at the hearing.

Courts cannot add terms, modify, or rewrite agreements entered into between the parties. *See In re Checking Acct. Overdraft Litig. MDL No. 2036*, 674 F.3d 1252, 1256 (11th Cir. 2012) (finding it is improper for a court to rewrite the terms of a contract); *Am. Fam. Life Assurance Co. of Columbus v. Intervoice, Inc.*, 560 F. App'x 931, 936 (11th Cir. 2014) (finding the court has no power to rewrite a contract or add language to a contract); *Hudson Marine Mgmt. Servs., Inc. v.*

*Thomas Miller (Miami) Inc.*, No. 06-21315-CIV, 2008 WL 11455055, at *12 (S.D. Fla. Apr. 18, 2008) (finding court cannot rewrite the subject agreement to now include a clause where the parties did not see fit to do so).

The "guidelines" regarding future inspections were not a part of the Stipulation entered into between the parties. The Stipulation was a well-negotiated document, only agreed to after months of discussions over the safety and security concerns of the facilities and weighing those concerns with Plaintiffs' requests. The Court cannot now come in and add terms that may have been specifically excluded by the Parties during their negotiations or change terms to which the Parties expressly agreed. The Order which adds new terms to the Stipulation changes the basis for any agreement by Defendants in authorizing these inspections because of the security concerns raised by the Order. In other words, Defendants would not have consented to Plaintiffs' teams conducting these inspections in the first place had Plaintiffs insisted upon the guidelines now imposed by the Magistrate Judge.

The Order, which rewrites the Inspection Stipulation, is clearly erroneous and contrary to law.

## I.    The Order Enjoining Future Retaliation Is Impermissibly Vague

As the Supreme Court has pointed out, "basic fairness requires that those enjoined receive    explicit   notice   of precisely what conduct is outlawed."

*Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Thus, an injunction may not simply order a defendant to "obey the law." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1412 (11th Cir. 1998) (quoting *Hughey v. JMS Dev.*, 78 F.3d 1523, 1531 (11th Cir. 1996)); *see also Fla. Ass'n of Rehab Facilities, Inc. v. State of Fla. Dep't of HRS*, 225 F.3d 1208, 1222–23 (11th Cir. 2000) (finding the Eleventh Circuit "has held repeatedly that 'obey the law' injunctions are unenforceable")

Yet, presumably that is what this Order does here. By its own terms it states: "policies and rules already exist which specifically forbid such [retaliatory] conduct. An Order from this Court would merely reinforce these principles and specifically advise the inmate/witness that their right to participate in the process should be protected." Order at 42. This is nothing more than an "obey the law" injunction and thus is so impermissibly vague that Defendants cannot know what conduct would risk contempt and thus no court can enforce it. *See D'Amico v. Jones*, No. 4:18cv494-RH/CAS, 2019 WL 3976570, at *2 (N.D. Fla. Aug. 7, 2019).

## IV.   OBJECTIONS TO FACTUAL FINDINGS

As stated above, Defendants contend the Order was impermissibly entered under Section 636(b)(1)(A) as it concerns claims for injunctive relief. As such, should the Court fail to vacate the Order for lack of jurisdiction and instead

construe it as a Report and Recommendation, Defendants provide their objections to the factual findings and recommendations in the Order as evidence that a de novo review supports rejecting the Order's findings. 28 U.S.C. § 636(b)(1)(C):

1.      Defendants object to numerous factual findings in the Order, and incorporate by reference their proposed order submitted which references the contradictory evidence regarding the inmates' allegations and legitimate, penological justifications for certain decisions made during the inspections. [D.E. 237]. Much of this evidence goes uncited in the Order; therefore, it is not clear whether it was even considered by the Magistrate Judge.

2.      Defendants object to the speculation that the memorandum issued by Secretary Inch on February 13, 2020 ("Inch Memo"), "tacitly admits" that retaliation is an ongoing threat. Order at 41. This finding is unsupported by evidence and is based on pure speculation. The inception of this memorandum was not at issue for this hearing; as such no evidence was presented as to the reasons why it was issued. As a result, the Order's statement that this memorandum is somehow an admission is unsupported and unfounded.

3.      Defendants object to the factual finding that Inmates Gilday and Gresham were credible. Order at 4, 12. The Order fails to address the potential bias and animus of Gilday against the Department based on his receiving a disciplinary infraction the week before the inspection and being angry about that. D.E. 229 at

190-94. The Order also omits Inmate Gilday's statement that he did not think he would suffer any retaliation for his testimony at the evidentiary hearing. *Id.* at 199–200.

As for Inmate Gresham, the Order found she gave credible testimony that she received "air trays" after speaking with Plaintiffs, despite never receiving one before. Order at 12. The Order does not question how Inmate Gresham knew what an air tray was, despite not ever receiving one before. The Order also omits Gresham's long history of filing grievances on a variety of topics, many of which were detailed on cross examination, *see generally*, [D.E. 230 at 89], and in Defendants' proposed order. *See generally* [D.E. 237]. Defendants object to the finding that Inmate Gresham's testimony was credible in this regard given the testimony that she complained of mistreatment due to her gender identity, her PREA complaint, her numerous grievances, etc. Assuming Gresham was served an air tray—which Defendants deny—there still was not established a causal nexus between this action and Inmate Gresham's participation in this lawsuit.

In fact, Gresham conceded that she was not even aware her alleged retaliation may be connected to this lawsuit until she "found out that [she] wasn't the only one [allegedly] experiencing that," and made that connection on her own. [D.E. 230 at 102]. This lack of causal link, i.e., an actual showing that the alleged

retaliation she suffered was actually connected to this lawsuit, brings her credibility into question.

Defendants also object to any findings within the Order predicated on the testimony of Inmate Williams. The Order—for good cause—found Inmate Williams's testimony incredible due to major discrepancies. Order at 28–29. Yet despite this, numerous claims by Williams remain in the "Relevant Evidence" section. *See, e.g.*, Order at 5, 10, 27. It is incongruous that Williams' testimony can be incredible yet also able to provide "relevant evidence." More troubling is that the Order's analysis and determinations seem based, in part, on Inmate Williams' testimony, e.g., Inmate Williams testified that Sgt. White told him to "shh" during a meeting he had with Plaintiffs, [D.E. 230 at 30], and the Order found that "the perceived threat that may result from a 'shhh!' from a guard," constitutes retaliation. Order at 40.

4.    Defendants object to the mischaracterization of testimony of numerous Department employees. The Order found Sgt. Alexander's testimony that he had never heard of an "air tray" or "air bag" incredible. Order at 29. Yet, Sgt. Alexander stated he had no reason not to deliver meals to inmates. [D.E. 231 at 176]. As such, given that the sergeant testified he always delivers inmates their meals, why would he be familiar for the terms where inmates are allegedly not given their meals? This is compounded by the fact that as a sergeant, Alexander

does not review grievances, which is generally where inmates raise such complaints about air bags and trays. There was ample testimony to this point, i.e., that only supervisory staff review grievances, a fact the Order conceded. Order at 35.

Further, the Order mischaracterized Sgt. Alexander's statement regarding whether he ever referred to Inmate Milo as a snitch. Order at 29. Sgt. Alexander never admitted to calling Inmate Milo a snitch, in fact he testified that he did not recall ever calling Inmate Milo a snitch. His caveat that, because Inmate Milo and him "talk a lot," and that they "may have been talking sometime and joking around *and maybe something like that was said*," [D.E. 231 at 177 (emphasis added)], is not an admission of ever having called Milo a snitch. Why the Order finds these statements by Alexander "not believable" is unclear. Order at 29. Additionally, the Order omits the context of Sgt. Alexander's statements and instead baldly declares that whether in jest or not, saying the word "snitch" has "obvious real world implications for an inmate." *Id.*

Defendants also object to the Order's findings regarding Colonel Cannon. *Id.* at 31–35. Specifically, the Order found the colonel's testimony regarding the order in which Santa Rosa staff pulled inmates from their cells to prepare them for their one-on-one interviews "nonsensical." *Id.* at 32. Defendants are left wondering why, if this testimony was so "nonsensical," did Magistrate Judge Fitzpatrick not

question Colonel Cannon further on it, as he did with many of the witnesses.[10] Moreover, Defendants' proposed order explained this decision by Santa Rosa staff, i.e., the colonel testified the decision was made to pull inmates in the routine fashion, starting with Bravo Dorm (the first alphabetically), and then moving to Charlie Dorm, etc. [D.E. 237 at 5]. This, along with Cannon's testimony, explains why Santa Rosa staff pulled inmates when they did, why they pulled them in the order they did, etc. [*Id.*; *see also* D.E. 232 at 57–58]. Namely, Colonel Cannon testified his staff was only given a list of the inmates who were to be interviewed, and were not told the order in which Plaintiffs wished to interview them. [D.E. 232 at 57]. Thus, the decision was made to pull inmates *from the same dorm* at the same time, and house them in the shower cells so that all the inmates from that dorm would be staged and ready for their interviews. After that, they would pull inmates from the next dorm and the next.

The colonel testified this is their normal procedure, and it is done this way to minimize the time inmates are kept in the shower cells. *Id.* at 57–58. In fact, Colonel Cannon testified that it was not the plan to pull all inmates who had interviews at the same time. *Id.* at 58. He also testified not knowing the number of inmates for any one dorm that were to be interviewed and had to assume the length of the interviews. These failures on behalf of Plaintiffs to communicate the order in

---

[10] Magistrate Judge Fitzpatrick did in fact briefly question the colonel, *e.g.*, [D.E. 231 at 60–61], yet apparently not enough to clear up these perceived misconceptions.

which they wished to speak to the inmates and for how long are unfairly found by the Order to be mistakes by Colonel Cannon and the Department.

Defendants also object to the Order's finding that Colonel Cannon's testimony was "somewhat confusing" regarding the manner in which inmates were escorted from their cells. Order at 33. In fact, the colonel clearly testified that inmates would be placed "in handcuffs to escort them from their housing cell to the holding area, and then the restraints would be removed . . . once they were placed in there, awaiting . . . notification that they would be up for the interview." [D.E. 231 at 63].[11] Colonel Cannon also stated that restraints were removed once the inmates were placed inside the shower cell. *Id.* The Order's mischaracterization is disproven by the clear testimony of Colonel Cannon.

The Order also misstates the colonel's testimony regarding the types of restraints inmates wore in the holding cells. Order at 33–34. As noted above, Colonel Cannon explained inmates were restrained in handcuffs from housing cell to shower cell. Once in the shower cell, the restraints were removed. Then, "the escorting officer would notify the dormitory" when they were en route to the dorm to get the inmate, at which point "the inmate who was awaiting would be placed into the proper escort restraints – full restraints." [D.E. 231 at 65]. This delineates

---

[11] Defendants also note that Plaintiffs' video exhibit showing Inmate Lee being escorted from his housing cell to the shower cell, and later from the shower cell to his interview, objectively shows this process and confirms Colonel Cannon's testimony.

the difference between the restraints inmates wore from housing to shower cell (basic handcuffs) versus shower cell to their interview (full restraints). *Id.* Colonel Cannon reiterated this on cross-examination, *id.* at 86–88, and clarified that basic restraints, i.e., handcuffs, worn from housing to shower cell, go behind the back, whereas the full restraints, i.e., black box, etc., worn from shower cell to interview, are done in the front. Defendants are unclear what is confusing regarding this testimony, and to the extent any such credibility determinations about the colonel were based on the Order's mischaracterization and misunderstanding of this testimony, Defendants object.

5.      Defendants object to the Order in that it fails to consider the inmates' past criminal history and the fact that they are housed in restrictive housing. The inmates who testified are all felons. [D.E. 248 at 12–13]. This fact went overlooked in the Order and it is unclear whether this fact was taken into consideration in the Magistrate Judge's credibility determinations.

Further, the inmates who testified were all (or still are) in some level of restrictive housing, including maximum management. Despite the fact that these inmates' housing status reflects on their past-behavior and potential motivations, the Order spends sparse time reflecting on their credibility. As noted above, only one inmate was found incredible. The Department objects to the Order finding the testimony of individuals in restrictive housing as equally—if not more—credible

than that of Department staff, especially given the objective record evidence (cited in Defendants' proposed order and this motion) that disproves many of the claims by these inmates.

6.     Defendants object to the Order's misunderstanding regarding the role of Department staff during the inspections. Order at 17 n.9, 47–48. The Order finds it "[o]bvious[] . . . [that] the presence of upper management officers on the floor during the inspection could reasonably be considered an effort at intimidation of the inmates and should be avoided." *Id.* at 48. Such a finding is not supported by the record. Rather, the Order misinterprets Assistant Warden Smith's testimony, which was that the reason behind the number of staff escorting the inspection group was "to provide security and to ensure that all the guidelines and protocols were being followed." [D.E. 231 at 70]. Further, command staff was also there to answer questions, while line staff was there to provide security. *Id.* at 70–71; *see also* [D.E. 157, ¶ 7, D.E. 234 at 37-39]

## V.    <u>RENEWED HEARING OBJECTIONS</u>

Defendants renew the following objections which were lodged, but overruled, during the evidentiary hearing:

1.     <u>D.E. 230 at 88:20-21, 114:11, 117:18–118:10, 123:11-13</u>:  objections that such question calls for speculation.

2.      D.E. 230 at 193–94 and 196–99 – objection to new evidence that was not disclosed in the declaration or before the hearing.

3.      D.E. 232 at 122–24 – during Cpt. Raben's re-cross examination, Magistrate Judge Fitzpatrick himself objected and started questioning the witness. Defense counsel objected to the line of questioning.

4.      D.E. 234 at 14–15 – the Department renews its objections to Pacholke's testimony, specifically as he was there testifying as a lay witness. Yet the Order cites many of Pacholke's observations and seems to give it the credibility reserved for expert witnesses. Order at 15–19.

5.      D.E. 234 at 20, 22 – the Department renews its objection to Pacholke speculating as to the inmates' perceived nervousness or the reason for their nervousness, which the Order cited. Order at 16. The Department also objects to Pacholke's opinion testimony regarding the perceived factors inhibiting the cell front interviews, which the Order cited. *Id.* at 16–17.

6.      D.E. 234 at 21, 23–24, 33, 34, 40 – the Department renews its objection to the hearsay relayed and injected throughout Pacholke's testimony. Pacholke was there as a fact witness, not an expert witness. [D.E. 226]. And, the Magistrate Judge previously granted Defendants' Motion in Limine to exclude Pacholke as an expert witness and stated on the record that Pacholke could not act as a conduit for hearsay. [D.E. 226; D.E. 232 at 162, 165–66].

## VI.   **CONCLUSION**

For the foregoing reasons, Defendants request this Court vacate the Magistrate Judge's Order for lack of jurisdiction, or find the order clearly erroneous and/or contrary to law and, accordingly, deny Plaintiffs' Motion for Protective Order.

### **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)**

In accordance with Local Rule 7.1(B), the undersigned counsel certifies that the parties have met and conferred regarding Plaintiffs' motion for protective order, [D.E. 183], and counsel have been unsuccessful in their efforts to resolve said disputes to the underlying motion. A five-day evidentiary hearing was held, a magistrate judge's order was issued, [D.E. 240], and the Court has given the parties leave to file objections to that order. [D.E. 245].

### **CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F)**

In accordance with Local Rule 7.1(F), the undersigned counsel certifies compliance with the word limits in Local Rule 7.1(F).  There are 12,963 words in this Motion for Relief and Objections. Defendants previously moved for an increase in word limits to 15,000, which was unopposed by Plaintiffs. [D.E. 252]. This motion to increase word limits to 15,000 was granted in part by the Court, allowing an increase to 13,000 words. [D.E. 253].

Respectfully submitted,

/ s / Samantha C. Duke
DANIEL J. GERBER, ESQUIRE
Florida Bar No. 0764957
SAMANTHA C. DUKE, ESQUIRE
Florida Bar No. 091403
RUMBERGER, KIRK & CALDWELL
Lincoln Plaza, Suite 1400
300 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida  32802-1873
Telephone:  (407) 872-7300
Telecopier:  (407) 841-2133
Email:  dgerber@rumberger.com
           sduke@rumberger.com

and

NICOLE SMITH, ESQUIRE
Florida Bar No. 0017056
JEFFREY J. GROSHOLZ, ESQUIRE
Florida Bar No. 1018568
RUMBERGER, KIRK & CALDWELL
Post Office Box 10507
Tallahassee, Florida  32302-2507
Telephone:  (850) 222-6550
Telecopier:  (850) 222-8783
E-mail:  nsmith@rumberger.com

**Attorneys for Defendants,**
 **Mark Inch and Florida**
 **Department of Corrections**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 23, 2021, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which will

send a notice of electronic filing to the following: Leonard J. Laurenceau at leo.laurenceau@splcenter.org; Kelly Jean Knapp at Kelly.knapp@splcenter.org; Dante Pasquale Trevisani at dtrevisani@floridajusticeinstitute.org; Marcel Lilavois, Jr., at mlilavois@floridajusticeinstitute.org; Laura Anne Ferro at lferro@floridajusticeinstitute.org and mllosa@floridajusticeinstitute.org; Sam Thypin-Bermeo at sthypin-bermeo@floridajusticeinstitute.org; Kari Sheli Wallis at kwallis@floridajusticeinstitute.org; Andrea Costello at andrea@floridalegal.org; Christopher M. Jones at Christopher@floridalegal.org; Jennifer Painter at Jennifer.painter@floridalegal.org; Aimee Lim at aimee.lim@floridalegal.org and Lori Rifkin at lrifkin@rifkinlawoffice.com.

/ s / Samantha C. Duke
DANIEL J. GERBER, ESQUIRE
Florida Bar No. 0764957
SAMANTHA C. DUKE, ESQUIRE
Florida Bar No. 091403
RUMBERGER, KIRK & CALDWELL
Lincoln Plaza, Suite 1400
300 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida  32802-1873
Telephone:  (407) 872-7300
Telecopier:  (407) 841-2133
Email:  dgerber@rumberger.com
         sduke@rumberger.com

and

NICOLE SMITH, ESQUIRE
Florida Bar No. 0017056
JEFFREY J. GROSHOLZ, ESQUIRE

Florida Bar No. 1018568
RUMBERGER, KIRK & CALDWELL
Post Office Box 10507
Tallahassee, Florida  32302-2507
Telephone:  (850) 222-6550
Telecopier:  (850) 222-8783
E-mail:   nsmith@rumberger.com

**Attorneys for Defendants,**
 **Mark Inch and Florida**
  **Department of Corrections**

14726861.v1