UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAC'QUANN (ADMIRE)
HARVARD; JEREMIAH HILL;
JUAN ESPINOSA; JEROME
BURGESS (a/k/a SHAM'LA GOD
ALLAH); JAMES W.
KENDRICK, JR.; JOHNNY HILL;
AMY FERGUSON; and TRACEY
DEAN; on behalf of themselves
and all others similarly situated,

        Plaintiffs

        v.

MARK INCH, in his official
capacity as Secretary of the Florida
Department of Corrections, and
FLORIDA DEPARTMENT OF
CORRECTIONS, an Agency of the
State of Florida,

        Defendants.

Case No.: 4:19-cv-00212-MW-MAF

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
WITH INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................... 2

II.   STATEMENT OF FACTS............................................................................................. 5

   A.FDC Implements Centralized, Systemic Policies to Isolate More than Ten Percent of
Its Population. _____ 5

   B. FDC Deprives All People in Isolation of Normal Human Contact, Environmental
Stimulation, and Exercise While Locking Them in Decrepit Cells for 22 Hours a Day._ 8

   C. FDC Subjects All People in Isolation to Oppressive and Unnecessarily Punitive
Security Measures. _____ 12

   D. FDC Routinely Denies People in Isolation Even the Minimum Programming Provided
Under FDC's Written Policies._____ 14

   E.  FDC's Policies and Practices Create a Substantial Risk of Serious Harm to People in
Isolation. _____ 16

   F. FDC Fails to Implement a System to Ensure Reasonable Accommodations for People
with Disabilities in Isolation. _____ 19

   G. Named Plaintiffs Are Subject to a Substantial Risk of Serious Harm and Disability
Discrimination in Isolation. _____ 27

III.  ARGUMENT ................................................................................................................ 28

   A. Plaintiffs Satisfy the Numerosity, Commonality, Typicality, and Adequacy
Requirements of Rule 23(a). _____ 28
   1.  The Size of the Class and Subclasses Satisfy Numerosity. ..................................................28
   2.  The Class and Subclasses Satisfy Commonality Because Their Claims Present Common Issues of Fact
     and Law Capable of Classwide Resolution. .......................................................................30
     a.  Eighth Amendment Claim .........................................................................................30
       i.    FDC's isolation policies and practices are systemic and common. ..........................31
       ii.   FDC's systemic isolation policies and practices cause the same injury of a substantial risk of
      serious harm..........................................................................................................35
       iii.  Plaintiffs' challenge to FDC's isolation policies and practices raises common questions
      susceptible to classwide proof and resolution. .........................................................36
       iv.   All class members experience the same core deprivations and conditions. ...................38
       v.    The relief sought supports commonality. ..................................................................41
     b. Disability Discrimination Claim ................................................................................41
       i.    Physical Disabilities Subclass ...............................................................................46
       ii.   SMI Subclass.......................................................................................................47
   3.  Named Plaintiffs' Claims are Typical of Those of the Class and Subclasses..............................48
   4.  Named Plaintiffs and Their Counsel Will Adequately Protect the Interests of the Class and
     Subclasses. ...........................................................................................................................50

   B.  Plaintiffs Meet the Requirements of Rule 23(b)(2) Because This Case Seeks
Declaratory and Injunctive Relief from Systemic Policies and Practices. _____ 53

IV.   CONCLUSION ............................................................................................................. 55

# I.    INTRODUCTION

This case arises from the Florida Department of Corrections' (FDC) statewide policy and practice of isolating people in filthy, 60-to-80 square feet cells—smaller than an average parking space—for 22 to 24 hours a day, and depriving them of normal human contact, minimal levels of exercise, and environmental stimulation for months or years at a time.   FDC compounds the pain, humiliation, and degradation of these deprivations through its daily use of punitive, inhumane, and counterproductive security measures.   FDC uses various labels for this policy and practice, but they all meet the U.S. Department of Justice definition of "solitary confinement" and "isolation."[1]

It is well known by corrections experts and administrators, including FDC, that the cumulative impact of these conditions causes people to deteriorate psychologically and physically, including by inducing or exacerbating depression, psychosis, anxiety, insomnia, and suicidality.[2]   Due to these devastating effects, an increasing number of jurisdictions across the country recognize that solitary

---

[1] *See, e.g.*, Letter from Thomas E. Perez, Assistant Attorney Gen., U.S. Dep't of Justice, Civil Rights Div., to Tom Corbett, Governor of Pa., Re: Investigation of the State Correctional Institution at Cresson and Notice of Expanded Investigation, at 5 (May 31, 2013), http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf (last visited May 23, 2021).

[2] *See, e.g.*, Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325 (2006).

confinement constitutes torture and are taking measures to eliminate it.[3]   FDC, despite its knowledge of this serious harm, has taken the opposite approach and continues to isolate more than ten percent of its incarcerated population—one of the highest rates in the nation.[4]

FDC also discriminates against people with disabilities by placing and keeping them in isolation without implementing a system to provide reasonable accommodations.   As a result, FDC isolates people with disabilities even further, effectively shutting them out from the barest opportunities for engagement, exercise, and mental stimulation afforded to other people in isolation.

Named Plaintiffs are people FDC has subjected to a risk of harm, and harmed, through its unconstitutional and discriminatory isolation policies and practices. They seek certification of the following class and subclasses:

- **Plaintiff Class**: All people in the custody of FDC who are, or will be in the future, in Administrative Confinement, Disciplinary Confinement, Close Management, Maximum Management or any substantially equivalent restrictive housing unit used by FDC where people are locked in their cells, alone or with a cellmate, for 22 hours or more per day.

- **Youth Subclass**: All people in the custody of FDC who are under 21 years old and who are, or will be in the future, in Administrative

---

[3] The Corr. Leaders Assoc. & The Arthur Liman Ctr. for Pub. Interest Law at Yale Law Sch., *Time-In-Cell 2019: A Snapshot of Restrictive Housing based on a Nationwide Survey of U.S. Prison Systems* 80-85 (2020), *available at* https://law.yale.edu/sites/default/files/area/center/liman/document/time-in-cell_2019.pdf; Exhibit C-4, 150:11–151:4

[4] *Time-In-Cell 2019*, *supra* note 3, at 87.

Confinement, Disciplinary Confinement, Close Management, Maximum Management or any substantially equivalent restrictive housing unit used by FDC where people are locked in their cells, alone or with a cellmate, for 22 hours or more per day.

- **Subclass of Persons with Serious Mental Illness (SMI Subclass)**: All people with serious mental illness[5] in the custody of FDC who are or will be in the future, in Administrative Confinement, Disciplinary Confinement, Close Management, Maximum Management or any substantially equivalent restrictive housing unit used by FDC where people are locked in their cells, alone or with a cellmate, for 22 hours or more per day.

- **Subclass of Persons with Physical Disabilities (Physical Disability Subclass)**: All qualified individuals with physical disabilities,[6] as "disabilities" is defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B), in the custody of FDC who are or will be in the future, in Administrative Confinement, Disciplinary Confinement, Close Management, Maximum Management or any substantially equivalent restrictive housing unit used by FDC where people are locked in their cells, alone or with a cellmate, for 22 hours or more per day.

Plaintiffs meet all requirements for class certification. The Plaintiff Class includes at least 9,000 individuals; the Youth Subclass at least 160 individuals; the SMI Subclass at least 860 individuals; and the Physical Disability Subclass at least

---

[5] As defined by FDC, "serious mental illness" refers to [1] psychotic, bipolar, and major depressive disorders; or [2] any other diagnosed mental disorder (excluding substance abuse disorders) currently associated with serious impairment in psychological, cognitive, or behavioral functioning that substantially interferes with the person's ability to meet the ordinary demands of living and requires an individualized treatment plan by a qualified mental health professional. Psychological impairments relate to the mental and emotional state of the individual, cognitive impairments relate to cognitive or intellectual disabilities, and behavioral impairments relate to observable actions or reactions in response to external or internal stimuli. Ex. G-10 at 3.

[6] "Physical disabilities" refers to all disabilities not encompassed within the definition of "serious mental illness."

80 individuals.  Plaintiffs challenge FDC's statewide isolation policies and practices, raising common questions that can be answered in one stroke and addressed through systemwide injunctive and declaratory relief.  The harms Named Plaintiffs suffer are typical of the same harms FDC's systemic isolation policies and practices cause class members.  Named Plaintiffs and class counsel will fairly and adequately protect the interests of the proposed class and subclasses.  In sum, the factual and legal issues in this case warrant class certification.

## II.    STATEMENT OF FACTS

### A. FDC Implements Centralized, Systemic Policies to Isolate More than Ten Percent of Its Population.

FDC isolates more than 10 percent of the approximately 94,000[7] people in its custody on any given day, and condemns them to languish there for weeks, months, years—even decades—at a time. Exhibits (Exs.) C-4, 150:11–151:4; B-6; D-3, Nos. 119, 131, 134; E-4.  FDC cycles many people from one type of isolation to another for months or years with no clear path out.[8]  Declaration of Dan Pacholke (Pacholke Decl.), ¶26.

---

[7] As of January 2021, there are approximately 80,000 people in FDC prisons, but this is due to the ramifications of COVID-19, and FDC expects the population to soon rise to at least its pre-pandemic level of 94,000 people. Fla. Dep't of Corr., *Strategic Plan 2021 – 2024* 12 (2021), *available at* http://www.dc.state.fl.us/pub/annual/1819/2020-2021-Strategic-Plan.pdf (last visited May 26, 2021).

[8] *See, e.g.,* Exs. A-2, ¶33; A-21, ¶12; A-14, ¶10; A-20, ¶14; A-31, ¶9; A-18, ¶24. Declaration of James Kendrick (Kendrick), ¶17; Declaration of Jerome Burgess (Burgess), ¶4.

FDC regulates all aspects of isolation through centralized policies, including the Florida Administrative Code, ██████████, ████████, and healthcare procedures.   Exs. C-6, 23:16–24:3 (████████); C-4, 25:11-27:11, 32:3-12 (████████); C-1, 12:7–13:10; F-5; Pacholke Decl., ¶¶11-25.  Although FDC uses different labels for isolation (Administrative Confinement, Disciplinary Confinement, Close Management, and Maximum Management), the conditions differ only by a matter of degree that is insignificant to the risk of harm resulting from solitary confinement.  Pacholke Decl., ¶ 25.  FDC collectively refers to all these types of isolation units as "restrictive housing."  Ex. C-4, 63:4-14, 64:4-8.  In policy and practice, all units also meet the U.S. Department of Justice's and American Correctional Association's definitions of "solitary confinement": "(1) removal from the general inmate population, whether voluntary or involuntary; (2) placement in a locked room or cell, whether alone or with another inmate; and (3) inability to leave the room or cell for the vast majority of the day, typically 22 hours or more."[9]  Ex. C-4, 93:19–96:9; Pacholke, ¶25.

Administrative Confinement (AC) is the first step in the isolation process, defined as the "temporary separation of an inmate from inmates in general

---

[9] U.S. Dep't of Justice, *Report And Recommendations Concerning The Use Of Restrictive Housing, Executive Summary* (Jan. 2016), 2,
https://www.justice.gov/archives/dag/file/815561/download (last visited May 26, 2021)

population" before "a more permanent inmate management decision process can be concluded." Fla. Admin. Code Ann. r. (FAC) 33-602.220(1)(a). FDC isolates people it finds guilty of disciplinary charges in Disciplinary Confinement (DC). FAC 33-602.222(1)(d). FDC isolates people in Close Management (CM) "for reasons of security or the order and effective management of the institution." FAC 33-601.800(1)(a). CM includes three levels, with Level I supposed to be the most restrictive and Level III the least. FAC 33-601.800(1)(b). FDC isolates people in Maximum Management (MM) because of "extreme security risk[s] to the Department." FAC 33-601.820(1)(b).

There is no maximum time limit for isolation. Ex. D-3 at Nos. 123, 125, 126, 127. For DC, people are sentenced to specific amounts of time, but sentences can run consecutively with no maximum. *Id.* at Nos. 114-119. For AC, CM, and MM, people are sent to isolation indefinitely. Although there are periodic reviews, it is completely within FDC's discretion whether to release someone from isolation. Pacholke Decl., ¶26; Ex. D-3, Nos. 123, 125, 126-127.

On any given day, FDC isolates at least 9,000 people, divided roughly in thirds between AC, CM, and DC, with up to 20 people in MM. Ex. B-6. Within CM, there are approximately 1,300 people in Level I; 1,600 people in Level II; and 1,000 people in Level III. Ex. E-2.

**B. FDC Deprives All People in Isolation of Normal Human Contact, Environmental Stimulation, and Exercise While Locking Them in Decrepit Cells for 22 Hours a Day.**

The differences between conditions in general population and isolation are stark.  In general population, people retain at least some agency to go to the dining hall to eat, the health clinic for treatment, the recreation yard to exercise, the dayroom to socialize, the visiting park to hug their children, the chapel to pray, the library for books, the laundry for clothes, the showers for hygiene, the phone area to call their families, and to prison staff for assistance.  In isolation, FDC denies and restricts these services or forces people to rely on prison staff to come to their cell door; FDC does not permit people in isolation to even call out to staff for help unless it is a "true emergency." *See*, *e.g.*, Ex. E-3, ¶2; Ex. B-7, ¶¶5–11.

All isolation cells are essentially the same.  Most cells do not meet the American Correctional Association (ACA) standard of 80 square feet (including 35 unencumbered feet), which is half the size of a standard parking space.[10]  Ex. G-13 at DHA00153073; G-12; Ex. B-1.  Some cells have no windows; cells that do are often covered or frosted over, prohibiting people from viewing the world outside.[11]

---

[10] *See, e.g.,* Columbus, Ohio, Code of Ordinances, Title 33, Zoning Code, § 3312.29 ("A parking space shall be a rectangular area of not less than nine feet by 18 feet …"), https://library.municode.com/oh/columbus/codes/code_of_ordinances?nodeId=TIT33ZOCO_CH3312OREPALO_3312.29PASP (last visited May 18, 2021).

[11] *See, e.g.,* Exs. A-7, ¶6; A-15, ¶7; A-1, ¶6; A-9, ¶3; A-22, ¶9; A-12, ¶8; A-4, ¶4; Burgess ¶9; Declaration of Amy Ferguson (Ferguson), ¶7.

*See, e.g.,* Ex. B-2; Pacholke Decl., ¶33.  Many cells are grimy and infested with rats and cockroaches.[12]  The plumbing in many cells is in disrepair or controlled by staff, forcing people to eat and sleep inches from toilets full of human waste.[13]  Pacholke Decl., ¶34, Venters Decl., ¶14.   Yet, FDC permits showers only three times a week. Pacholke Decl., ¶46.

FDC denies people in all types of isolation normal human contact.  FDC's policies prohibit people from communicating with those in neighboring cells.[14] Pacholke Decl., ¶31; Ex. E-3, ¶¶2-4.  People in DC or AC receive no personal visits or phone calls unless specifically approved by the Warden or due to emergency. FAC  33-602.222(4)(i)(1),  (4)(1);  FAC  33-602.220(5)(i),  (5)(j).   Under  FDC's written policies, people in CM can receive phone calls and visits only after 30 days without major rule violations, and even then, the policies provide only one call and visit every thirty days in CM I; one call and visit every fourteen days in CM II; and one call and visit every week in CM III.  FAC 33-601.800(11)(b)5, 11(6)(a-c).  But in practice, FDC frequently suspends all visits and phone calls, as well as other CM

---

[12] *See, e.g.,* Exs. A-19, ¶5; A-23, ¶5; A-11, ¶7; A-17, ¶5; A-26, ¶6; A-15, ¶6; A-21, ¶4; A-12, ¶8; A-25, ¶6; A-3, ¶8; Declaration of Juan Espinosa (Espinosa), ¶8; Declaration of Jeremiah Hill (Jeremiah Hill), ¶4.

[13] *See, e.g.,* Exs. A-27, ¶6; A-6, ¶6; A-22, ¶4; A-8, ¶5; A-23, ¶6; A-1, ¶5; A-18, ¶7; A-13, ¶11; Ferguson, ¶8; Kendrick, ¶4; Declaration of Admire Harvard (Harvard), ¶5.

[14] *See, e.g.,* Exs. A-29, ¶6; A-6, ¶8; A-27, ¶8; A-20, ¶ 7; A-21, ¶5; Kendrick, ¶5; Declaration of Johnny Hill (Johnny Hill), ¶4; Jeremiah Hill, ¶5.

privileges, for weeks or months at a time.  Ex. G-7; Exs. C-5, 374:6-378-12; D-4 at Nos. 99-104.  Except for those in CM III, any visits that do occur are non-contact, forcing people to talk to their loved ones through thick glass and a metal grate while fully restrained.   FAC 33-601.800(11)(6)(d).   FDC denies dayroom—a barren common area with only benches or metal tables and chairs—access for those in AC, DC, MM or CM I, and, as discussed below, people in CM II and III do not consistently receive the few hours of dayroom afforded under FDC policies.  Ex. C-7, 421:7-11.

FDC also denies people environmental stimulation in isolation.  FDC does not provide vocational programming for anyone in isolation, withholds job assignments from the vast majority, and provides limited rehabilitative programming to only a select few of the people in CM II and III, if that.  Pacholke Decl., ¶¶ 38, 49; Ex. C-5, 574:9-17, 577:24-578:6.  FDC prohibits televisions in isolation cells, and does not provide radios.  Pacholke Decl., ¶40.  People in CM and AC, and MM only after 12 months, can buy Walkman radios and batteries if they have the funds from family or friends.  *Id.*  No one has access to tablets, except for those in CM III when and if officers let them into the dayroom to charge them.[15]  Ex. C-7, 411:14-412:12.  FDC

---

[15] *See e.g.,* Exs. A-4, ¶14; A-16, ¶16; A-23, ¶¶7,10; A-1, ¶11; A-28, ¶6; A-7 ¶9.

restricts access to books and periodicals in all types of isolation. [16]  Pacholke Decl., ¶39.  Indeed, FDC does not even let people hang artwork or family photos on the cell walls so they have something to stare at other than concrete, steel, and filth while they deteriorate in forced idleness.  Ex. B-7, ¶21.

FDC also deprives people in isolation of regular exercise.  Other than inside their tiny cells, the only place FDC permits people in isolation to exercise is in an outdoor fenced-in cage, ███████████████████████, resembling a dog kennel.  Exs. C-7, 404:11-17; B-4; B-11.  Inside are ████████████████, ███████████████████████████████████████.  Exs. B-3; B-5; B-11.  Yet, even these cages are off-limits during the first 30 days in isolation.  Pacholke Decl., ¶47.  After that, FDC allows a maximum of two hours, three times a week, for people in CM; three hours a week for people in DC and AC; and two hours a week after six months in MM.  *Id.*  This policy violates ACA standards, and, in practice, most people do not receive even this meager amount.[17]  Pacholke Decl., ¶48.

---

[16] *See e.g.,* Exs. A-3, ¶18; A-22, ¶9; A-12, ¶12; A-11, ¶12; Jeremiah Hill, ¶7; Burgess, ¶32; Johnny Hill, ¶11.

[17] *See, e.g.,* Exs. A-3, ¶19; A-4 ¶8; A-6, ¶¶10-11; A-8, ¶10; A-9, ¶29; A-12, ¶13; A-16, ¶15; Kendrick ¶14; Jeremiah Hill ¶9; Espinosa ¶9.

## C. FDC Subjects All People in Isolation to Oppressive and Unnecessarily Punitive Security Measures.

On top of these deprivations of basic human needs, FDC regularly subjects people in all forms of isolation to needlessly harsh and punitive strip searches, mechanical restraints, cell searches, property restriction, chemical agents, and cell extractions.  Pacholke Decl, ¶52-60, 63, 65-66, 68-69.

FDC prohibits people in isolation from leaving their cells without mechanical restraints, a strip search, and a cell search.  ████████████████████████

████████████████████████████████████████████████████ █ ██

██████.  Ex. B-7, ¶20.  FDC requires staff to "thoroughly search" or "█

██████" every person whenever they leave their cell or unit.  FAC 33-601.800(14)(a)(3), 33-601.820(9)(b)(7), 33-602.220(6)(c), 33-602.222(6)(c); Ex. B-7, ¶7.  In practice, staff conduct these searches by requiring people to remove all their clothes, lift their genitals, squat, and cough, with no privacy, and sometimes while officers laugh and sexually harass them.[19]  ████████████████████████

████████████████████████████.  Ex. B-7, ¶21.  In practice, staff—at the

---

[18] The "black box" is a metal device that is locked over a pair of handcuffs and is typically affixed to a waist chain so that the individual is unable to move their hands and arms away from and higher than their waist.

[19] *See, e.g.*, Exs. A-22, ¶ 11; A-28, ¶12; A-31, ¶8; A-1, ¶23; A-5, ¶21; A-4, ¶11; A-11, ¶15; A-2, ¶21; A-18, ¶¶13,19; A-9, ¶31; Burgess, ¶ 26; Jeremiah Hill, ¶10; Harvard, ¶19; Ferguson, ¶12; Johnny Hill, ¶17.

direction of leadership—use cell searches to "wreak havoc" like a "hurricane" any time a person leaves their cell by going through all their belongings, scattering their legal papers, opening and emptying their hygiene products, and generally making a mess of their cells.[20] Ex. B-8 at 4; Ex. F-1 at 9; Ex. F-2 at 2; Pacholke Decl., ¶¶ 52-53, 63, 68.

FDC also routinely uses extreme security measures in isolation: including, property restriction (known as "strip" by people in isolation), chemical agents, and cell extractions.  Pacholke Decl., ¶¶54-60, 63, 65-66, 68; Venters Decl., ¶¶ 30-31, 41.  FDC permits staff to remove "any item" to "prevent the inmate from inflicting injury to himself or others or to prevent the destruction of property or equipment," a practice known as "property restriction."  FAC 33-601.800(10)(1).  As a matter of course, property restriction involves stripping someone down to their underwear and removing all state and personal property, including hygiene items and mattresses, for 72 hours.[21]  Pacholke Decl., ¶¶ 54-55; Burns Decl., ¶ 21; Ex. C-7, 385:1-18.  FDC uses property restriction for transgressions as minor as having property in the wrong place or failing to get dressed or make the bed.  Ex. G-1; Pacholke Decl., ¶¶ 58-60.

---

[20] *See, e.g.,* Exs.A-15, ¶14; A-6, ¶14; A-27, ¶10; A-20, ¶9; A-22, ¶10; A-7, ¶11; A-14, ¶7; A-24 ¶23; A-25, ¶13; Espinosa, ¶9; Burgess, ¶27; Kendrick, ¶16; Harvard, ¶6; Ferguson, ¶12, Jeremiah Hill, ¶ 10; Johnny Hill, ¶16.

[21] *See, e.g.,* Exs. A-21, ¶10; A-9, ¶33; A-1, ¶19; A-14, ¶8; A-28, ¶13-14; A-16, ¶11; A-2, ¶24-25; A-3, ¶21; A-26, ¶13; A-10, ¶11; A-18, ¶10-11; Harvard, ¶16; Ferguson, ¶13; Burgess, ¶22; Johnny Hill ¶14.

FDC uses physical force and chemical agents on people in isolation at an alarming frequency, often for behaviors likely related to psychological decompensation such as yelling and self-harm.[22]  Pacholke Decl., ¶¶ 63, 66, 70-71; Kraus Decl., ¶¶ 51-52.  FDC also commonly conducts cell extractions, in which a team of officers in riot gear enter a cell to forcibly remove someone in isolation— including in response to people in mental distress.  Haney Decl., ¶¶ 60, 70; Pacholke Decl., ¶ 66.  This practice often results in people being slammed into the floor or wall by an officer's shield, beaten, restrained, and dragged from their cells.[23]

### D. FDC Routinely Denies People in Isolation Even the Minimum Programming Provided Under FDC's Written Policies.

In practice, FDC systemically denies people in isolation even the scant programs and services permitted under FDC's written policies.

First, FDC's admittedly dangerous levels of understaffing result in the failure to provide people in isolation with services including recreation, dayroom, phone calls, and security checks.[24]  Ex. G-2 at 3; G-3 at 3; G-4 at 3 (suicides occurred in

---

[22] *See, e.g.,* Exs. A-30, ¶9; A-22, ¶14; A-11, ¶16; A-19, ¶¶9, 15; A-10, ¶14; A-12, ¶15; Burgess, ¶23; Kendrick, ¶¶5, 9.

[23] *See, e.g.,* Exs. A-8, ¶¶12-13; A-1, ¶20; A-11, ¶16; A-2, ¶¶22-23; A-16, ¶18; A-25, ¶16; Ferguson, ¶¶13,15; Jeremiah Hill, ¶13.

[24] *See* Laura Cassels, FL Legislature 2021: Top Corrections Chief Says State Prison System is in Crisis and Could Collapse, Fla. Phoenix, (Feb. 22, 2021), https://www.floridaphoenix.com/2021/02/22/fl-legislature-2021-top-corrections-chief-says-state-prison-system-is-in-crisis-and-could-collapse/; *see also* Study of Operations of the Florida.

units that were short-staffed); G-5 at 2 (FDC Deputy Secretary states "we are at a breaking point").

Second, FDC denies many people in CM purported CM privileges because FDC concurrently assigns them to AC or DC, or because FDC has suspended their privileges. For example, when FDC approves people for CM but has not transferred them to a CM facility, FDC assigns them to both CM and AC. Exs. G-11 (298 people in AC/CM); C-4, 136:25-137:24. When FDC finds people in CM guilty of a rule violation, it assigns them to both CM and DC. Exs. D-3 at Nos. 98, 105, 106; E-6 (797 people in DC/CM). FDC uses the more restrictive status to determine privileges. Exs. C-5, 374:6-378:12; D-3 at Nos. 99-104. Additionally, FDC has a policy and practice of suspending CM privileges, such as visitation, recreation, and dayroom access for months or years at a time, or indefinitely, in response to rule violations. Exs. C-7, 426:24-430:11; G-7; C-2, 32:7-34:18; C-3, 48:9-49:22.

Third, FDC pressures people in isolation to refuse showers, recreation, dayroom, and healthcare appointments to avoid repercussions based on its policies and practices such as: degrading strip searches and restraints; destruction of property

---

Department of Corrections, Fla. Legislature Office of Program Policy Analysis & Gov't Accountability, 41 (Nov. 2015), https://www.prisonlegalnews.org/media/publications/Study%20of%20Operation%20of%20the%20FL%20DOC%2C%20CGL%2C%202015.pdf.

during cell searches; and rampant use of disciplinary charges, chemical agents, and physical assault by correctional officers.[25]  Pacholke Decl., ¶¶ 46, 52-53, 63, 65, 68-69.

### E. FDC's Policies and Practices Create a Substantial Risk of Serious Harm to People in Isolation.

As a result of the cumulative effect of lack of human contact, exercise, and environmental stimulation; cell conditions; and oppressive security measures, FDC subjects everyone in isolation to a substantial risk of serious harm.  Declaration of Dr. Craig Haney (Haney), ¶¶11, 14, 54, 82, 84-86; Declaration of Dr. Kathryn Burns (Burns Decl.), ¶22; Declaration of Dr. Homer Venters (Venters Decl.), ¶62; Declaration of Dr. Louis Kraus (Kraus Decl.), ¶¶32, 50.  Numerous scientific studies confirm that people disproportionately suffer from devastating psychological and physical symptoms when forced to endure deprivations of basic human needs in isolation conditions.  Haney Decl., ¶¶11-14; 19-42; 45-53; Venters Decl., ¶¶18-20; Burns Decl., ¶¶13-15; Kraus Decl., ¶¶19-26.   Psychological symptoms include:

> appetite and sleep disturbances, anxiety, panic, a sense of impending emotional breakdown, lethargy, hypersensitivity to stimuli, irritability, aggression, rage, loss of control, ruminations, paranoia, perceptual distortions, cognitive dysfunction, hallucinations, depression, self-mutilation, suicidal ideation and behavior, and social withdrawal.

---

[25] *See, e.g.* Exs. A-21, ¶8; A-9, ¶30; A-27, ¶10; A-29, ¶¶ 8-9; A-4, ¶¶9-11; A-6, ¶14; A-15, ¶13; A-1, ¶¶22-24; Harvard, ¶6; Jeremiah Hill, ¶10; Burgess, ¶¶26-27; Johnny Hill, ¶17.

Haney Decl., ¶ 28; *see also* Burns Decl., ¶ 14; Kraus ¶¶19-25.  In addition, the stress from social isolation and inactivity, and barriers to exercise and healthcare, often exacerbate and create new physical illnesses and injuries.  Haney Decl., ¶¶22-24, 27-29, 38-39; Burns Decl., ¶14; Venters Decl., ¶¶19, 21, 42, 57; Kraus Decl., ¶¶35, 39.

The conditions and deprivations in FDC isolation mirror the conditions and deprivations that scientists have studied for decades.  Haney Decl., ¶¶14, 54, 61, 84-86; Burns Decl., ¶21; Venters Decl., ¶¶18-21, 29, 62; Kraus Decl., ¶¶48, 50.  Plaintiffs' four nationally-renowned healthcare experts have inspected eight FDC prisons to observe isolation conditions, privately interviewed at least 125 class members, spoken to several hundred additional class members at cell-front, and reviewed voluminous FDC records.  Haney Decl., ¶10; Burns Decl., ¶¶8-11; Venters Decl., ¶¶11-17; Kraus Decl., ¶¶12-16.  Based on this information, they have identified the same types of symptoms in the Plaintiff class documented in the scientific research about isolation.  Haney Decl., ¶¶14, 54, 61, 69, 84-86; Burns Decl., ¶26; Venters Decl., ¶62; Kraus Decl., ¶¶39, 50.

Plaintiffs' experts also found that two particularly vulnerable groups, youths under age 21 and people with serious mental illness, suffer from a heightened risk of harm in FDC isolation.  Haney Decl., ¶¶15, 43-53, 61-62, 69-70, 83, 86; Burns Decl., ¶¶23, 25; Kraus Decl., ¶¶19-26, 39, 50-52.  It is firmly established that youths

are especially susceptible to mental health consequences when isolated from others because they are still developing socially, psychologically, and neurologically. Kraus Decl., ¶¶19-26.  Researchers also agree that people with serious mental illness face a particularly high risk of serious harm because the conditions in isolation tend to worsen pre-existing symptoms such as paranoia, hallucinations, depression, and anxiety, including those that could result in serious self-injury or suicide.  Haney Decl., ¶¶15, 43-53, 61-62, 69-72, 83, 86; Burns Decl., ¶¶13-15, 22; Kraus Decl., ¶19-21, 25.  Despite these increased vulnerabilities, FDC isolates hundreds of youths and people with serious mental illness on any given day—although the number of people with undiagnosed serious mental illness undoubtedly includes hundreds or thousands more.

One of the most telling indicators of how this risk of harm in FDC isolation manifests is the drastically and disproportionately high suicide rate.  From 2015 to 2019, the 10% of the FDC population who were housed in isolation units accounted for 58% of the suicides in FDC custody.  Haney Decl., ¶81.  The graph below shows the disproportionate suicide rate in isolation by year.



These suicides are only the tip of the iceberg; for every person who completes a suicide, there are many more attempts or acts of self-harm, and experiences of acute psychological distress.   Haney Decl., ¶¶ 29, 42, 53, 79; Burns Decl., ¶¶14, 39; Venters Decl., ¶20; Kraus Decl., ¶¶20-21.

### F. FDC Fails to Implement a System to Ensure Reasonable Accommodations for People with Disabilities in Isolation.

By policy, FDC identifies and tracks people in their custody who qualify as having a disability as defined under the Americans with Disabilities Act (ADA).  Ex. F-4 at 4.  This system shows that people with physical and/or mental disabilities, as identified by FDC, comprise a substantial percentage of the approximately 9,000 people in isolation across the state.  For instance, according to FDC, of the 3,940 people isolated in Close Management in 2019, 23% (897) were diagnosed with a

serious mental illness.  Ex. E-5 at 3.  That number does not account for the people with serious mental illness in AC, DC, MM, where the other two-thirds of FDC's isolated population is confined.  *Id.*  FDC also reported that, as of April 27, 2021, there were 81 people with mobility, hearing, or vision disabilities, and 14 people with developmental disabilities in restrictive housing.  Ex. G-11.  This does not include people with medical disabilities, such as diabetes and seizure disorders.  But despite these numbers, FDC does not exclude anyone from isolation based on disability or pre-existing health condition, with the possible exception of some people with diagnosed intellectual disabilities.  Exs. C-8, 123:7-124:20; D-3 at Nos. 35–70, 75 – 78; G-11.

FDC performs only one health-related assessment when a person is entering isolation ("pre-special housing assessment)."  Ex. G-8 at 3-4.  In this assessment, the nurse briefly observes the person, often while the individual is restrained in a shower or through a grille gate in a holding cell, and reviews their medical records.  Exs. G-8 at 3-4; C-1, 34:9–36:6, 38:17–39:5, 44:22–47:2.  The assessment form requires the health care provider to indicate: (1) if someone has "infirmities or impairment," and what those are; and (2) if the person already had an accommodation for that disability prior to their placement in isolation that will remain with them in isolation.  Exs. B-10; C-1, 20:12–22:3.  The nurse always completes this observation in the presence of officers.  Ex. C-1, 40:11–40:13. Often, the interaction is limited to an inquiry

about injuries and/or complaints related to use of force connected to the isolation placement.  Ex. C-1, 38:17– 39:5.

The substantial differences between general population and isolation can impact even the most basic needs for communication, programs, and services for persons with disabilities.  However, FDC does not have any policy, procedure, or practice for evaluating whether any additional accommodations are needed for people with disabilities in isolation.  Exs. G-8; C-1, 231:9-232:12, 253:11–254:8; C-9, 74:24 – 75:4.  For example, someone who is blind may have had informal access to other incarcerated people to help them read and write letters while in the general population.  When individuals are confined alone in isolation, this is often not the case.[26]  FDC does not assign assistants to people with physical disabilities in isolation like it often does for people with physical disabilities in general population, which may be necessary, for example, to allow people with vision impairments to read and respond to letters from family, or to assist people with activities of daily living for which they receive help while in the general population.[27]  Ex. C-10, 64:23-66:1, 77:23-78:5.

Moreover, FDC does not routinely provide means for people with communication deficits in isolation to communicate during security checks or

---

[26] *See, e.g.,* Johnny Hill, ¶12; Ex. A-5, ¶¶7-12.

[27] *See, e.g.,* Exs. A-3, ¶11; A-4, ¶23; A-5, ¶8.

nursing rounds, or in an emergency through, for example, the use of a call button.[28]
Exs. D-3 at Nos. 175-178; C-10, 84:6–85:7, 85:21-87:4.   While someone who is
deaf, blind, or unable to speak may be helped by others in general population to
know when officers are present or to get assistance in an emergency, no such help is
available in isolation.

FDC does not provide exercise equipment for people with physical disabilities
in the bare recreation cages or exercise plans to assist people with physical
disabilities to exercise in their tiny cells.[29]   Exs. C-10, 61:24–62:12; C-9, 103:25–
105:18.   Nor will FDC modify a double-cell assignment in isolation for a wheelchair
user so that they can more readily maneuver around the tiny cell they are locked in
day and night without running into their cellmate.[30]   Ex. C-9, 77:19–78:6.   FDC also
does not provide any additional out-of-cell time as an accommodation for
individuals with mobility or medical disabilities in isolation who, for example, need
more time to ambulate to and from the shower or recreation, or to avoid worsening
medical symptoms.   Ex. C-10, 61:15–61:23.

In practice, the accommodations FDC provides someone with physical
disabilities in isolation are generally limited to assistive devices, despite needs for

---

[28] *See, e.g.,* Burgess, ¶¶19-20; Espinosa, ¶¶12-13; Ex. A-30, ¶¶4,6.

[29] *See, e.g.,* Exs. A-3, ¶19; A-6, ¶11; A-26, ¶7; Burgess, ¶¶29-30.

[30] *See, e.g,* Burgess, ¶10; Exs. A-4, ¶17; A-6 ¶7.

other accommodations.  Exs. C-1, 230:3–233:11, 253:12–254:8; C-9, 75:5-76:18;

C-10, 61:15-61:23; B-10; G-8.  Even then, FDC fails to consider how isolation

practices may need to be modified to allow people to use their assistive devices. For

example, while FDC policy permits people with visual impairments to have a talking

book player in isolation, the talking book players need to be charged. Ex C-10, 39:24

– 40:7.  In general population, there are outlets people can use in the dayroom, but

in isolation, the cells have no outlets and there is no procedure for people to request

charging for their talking book players.[31]  Ex. C-10, 40:8–41:6.

Similarly, by policy and procedure, FDC does not consider or provide any

accommodations for persons with serious mental illness housed in isolation to

address how the conditions and deprivations of FDC's restrictive housing exacerbate

mental health symptoms.  Mental health staff play no role in the pre-special housing

assessment, nor does the nurse performing the assessment evaluate whether any

mental health-related accommodations are needed.  Ex. C-8, 56:24– 57:2; 57:15-

57:24.

Following an individual's placement in isolation, there is a mental health

special screening evaluation, but FDC does not use this evaluation to identify

reasonable accommodations for people with serious mental illness. Ex. G-8 at 5-6;

C-8, 57:25 - 58:5.  Depending on a person's previously diagnosed mental health

---

[31] *See also* Ex. A-6, ¶22.

level, FDC can wait up to 30 days after placement in isolation to complete this evaluation.  Ex. G-8 at 4.  Mental health staff also are required to perform a Close Management Referral Assessment to determine whether someone needs inpatient mental health treatment.  Exs. G-8 at 7; C-8, 100:6–100:18, 101:1–101:10; D-2.  If a person is determined not to require inpatient treatment, they are simply approved for Close Management, but FDC does not consider whether any other accommodations are appropriate for that person in isolation based on mental illness.  Exs. D-2; C-8, 110:10–16.  Despite the knowledge that the isolation's stark conditions are particularly devastating to people with mental illness and can hinder access to services that may maintain their mental health to the same degree as someone without serious mental illness, FDC makes no accommodation for psychiatric disabilities.  For example, FDC does not modify its isolation policies to provide people with serious mental illness access to additional out-of-cell time or sensory stimulation that may assist in preventing their mental health from deteriorating.  Ex. C-8, 185:1–185:20; FAC 33-601.800, 33-601.820, 33-602.220, 33-602.222.

Not only does FDC fail to meaningfully assess whether people with disabilities require accommodations specific to the conditions of isolation, but FDC's policies and practices make it impermissibly difficult for a person housed in isolation to request and obtain reasonable accommodations.  FDC splits the

responsibility for requests for accommodation and assistance between two different bureaus: the Office of Health Services (OHS) and the central office ADA Coordinator and their staff.  Exs. C-10, 21:25–22:6; C-9, 20:6 – 21:1; F-3; G-9.  Each requires a different form and procedure to request an accommodation.  Exs. F-3; G-9; C-10, 27:2–28:10; C-9, 21:2–21:6.  FDC does not provide people in restrictive housing any guidance or instruction about how to determine which request must be submitted to which office.  Even though the OHS and ADA teams share a common email distribution group, if a person submits a request to OHS that should have been submitted to the ADA coordinator, OHS will reject the request and tell the person to start the entire process over, and vice versa, extending the time that a person may be without a reasonable accommodation.  Exs. C-10, 23:25–25:10, 27:2– 29:13; C-9, 21:13–22:22, 94:21–95:12.  FDC's position is that this is appropriate rather than for the OHS and ADA offices to communicate about the accommodations because "[t]he inmate themselves, they have the responsibility to follow the proper procedure."  Exs. C-9, 98:14–98:24; Ex C-10, 27:20–28:10.  This system prevents people from receiving even the minimum available accommodations in isolation—certain assistive devices—in a timely manner.

Finally, even when a person with a physical disability enters isolation with an assistive device or manages to secure one while in isolation, FDC fails to ensure that they can retain and utilize that device during their time in isolation.  Prior to 2018,

FDC's policy and practice was to remove assistive devices from everyone placed in isolation as a security measure, with no individual assessment about whether the person was using the device appropriately.  Ex. C-1, 247:14–249:9.  Although FDC purports to have changed its policies, it remains the widespread institutional practice to withhold assistive devices from people while they are in isolation.[32]  Exs. C-1, 282:11–283:25, 284:21–285:10; C-9, 59:3–63:13; G-5; G-6.   Moreover, under current policy and practice, officers continue to be permitted to use the discretionary practice of "property restriction" to limit people's access to their property in isolation for up to 72 hours, including by removing people's assistive devices.[33]   Ex. C-7, 379:18–380:21.  Unlike a permanent removal of an assistive device, staff are not required to document whether they have confiscated an ADA assistive device, and there is no FDC policy or procedure for reviewing property restriction practices for inappropriate removal of assistive devices.  Ex. C-10, 58:1-58:10; Ex C-9, 86:2–86:25; C-1, 109:24-110:21; C-7, 392:19-394:12.

---

[32] *See, e.g.,* Exs. A-6, ¶¶19-25; A-3; ¶¶8-15; A-4, ¶¶6-8; A-5, ¶¶3-4; A-30, ¶¶3-7; A-7, ¶¶3-4; Johnny Hill, ¶¶10-13; Burgess, ¶¶14-15.

[33] *See, e.g.,* Exs. A-4, ¶12; A-5, ¶20; A-7, ¶12; A-26, ¶13; Burgess, ¶22.

### G. Named Plaintiffs Are Subject to a Substantial Risk of Serious Harm and Disability Discrimination in Isolation.

Named Plaintiffs are all currently incarcerated in various FDC prisons. Each has spent months or years in some combination of AC, DC, CM, or MM.[34]

Although they each suffer from the same threshold risk of harm, Named Plaintiffs are vulnerable in different ways to the conditions, and failures to accommodate their disabilities, in isolation. FDC diagnosed Plaintiffs Harvard, Espinosa, Ferguson, Dean, and Johnny Hill with serious mental illness; Plaintiff Kendrick with depression and insulin-dependent diabetes; and Plaintiff Burgess with depression and a seizure disorder.[35] Plaintiff Burgess also uses a wheelchair.[36] Plaintiff Espinosa is unable to speak.[37] Plaintiff Jeremiah Hill is only 19 years old; FDC first placed him in isolation at only 14 years old.[38] Each of them is dedicated to serving as named plaintiffs in this action.

---

[34] Kendrick, ¶3; Ferguson, ¶¶5-6; Burgess, ¶4; Espinosa, ¶7; Harvard, ¶¶3-4; Johnny Hill, ¶¶2-3; Jeremiah Hill, ¶3; Ex. A-1 (Dean), ¶4.

[35] Harvard, ¶10; Espinosa, ¶4; Ferguson, ¶4; Johnny Hill, ¶5; Kendrick, ¶¶5-7; Burgess, ¶¶5-8; Ferguson, ¶4; Ex. A-1 (Dean), ¶3.

[36] Burgess, ¶6.

[37] Espinosa, ¶5.

[38] Jeremiah Hill, ¶3.

## III.   ARGUMENT

### A. Plaintiffs Satisfy the Numerosity, Commonality, Typicality, and Adequacy Requirements of Rule 23(a).

For a district court to certify a class, Named Plaintiffs must satisfy the numerosity, commonality, typicality, and adequacy of representation requirements of Rule 23(a) and at least one of the requirements of Rule 23(b).  *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1187-88 (11th Cir. 2003).  Plaintiffs meet these requirements.

### 1.   The Size of the Class and Subclasses Satisfy Numerosity.

The proposed class and subclasses are each "so numerous that joinder of all members is impracticable."   Fed. R. Civ. P. 23(a)(1).   The Eleventh Circuit recognizes that "generally less than twenty-one [members] is inadequate, more than forty adequate, with numbers between varying according to other factors."  *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986).  But "[a] plaintiff need not show the precise number of members in the class."  *Jones v. Desantis*, No. 4:19cv300-RH/MJF, 2020 WL 5646124, at *3 (N.D. Fla. April 7, 2020) (citation omitted).  Rather, it is sufficient to show that joinder would be impracticable or that certification promotes judicial economy.  *Hill v. Butterworth*, 170 F.R.D. 509, 514 (N.D. Fla. 1997); *Braggs v. Dunn*, 317 F.R.D. 634, 653-54 (M.D. Ala. 2016).

FDC subjects at least 9,000 people to the same, systemic isolation policies and practices on any given day.  Exs. B-6; C-4, 148:20-150:20.  This number includes

approximately 160 youths under age 21.  Exs. G-11; E-1 (17 and under).  It also includes at least 897 persons FDC has identified as being diagnosed with a serious mental illness and at least 81 persons FDC has identified as having a physical disability.  Exs. E-5 at 3; G-11.  Thus, the proposed classes and subclasses are so numerous that joinder of all members would be impracticable, and class certification promotes judicial economy by avoiding scores of lawsuits that would raise the same issues and seek the same relief.  *See e.g.*, *Hill*, 170 F.R.D. at 514 (N.D. Fla. 1997); *Braggs*, 317 F.R.D. at 654.

The fluid nature of the proposed class and subclasses—including unidentifiable future members who revolve in and out of isolation—also support class certification.  *See Kilgo v. Bowman Transp. Inc.*, 789 F.2d 859, 878 (11th Cir. 1986) (affirming a certified class of 31 present members as well as future members who could not be identified); *see also Braggs,* 317 F.R.D. at 653 (noting the fluid nature of the class in the prison litigation context especially counsels in favor of certification).  For example, joinder is impracticable for Youth Subclass members who move in and out of restrictive housing multiple times before reaching age 21.  Similarly, joinder is impracticable for people with a serious mental illness who often cycle between the general population, isolation, and inpatient mental health units due to the nature of their disability.  Ex. D-1 at EHA00056481, EHA00056483.  The inclusion of these unidentified class and subclass members seeking only injunctive

and declaratory relief "actually bolsters a finding of the requisite numerosity." *Hill*,

170 F.R.D. at 514.

> **2.** **The Class and Subclasses Satisfy Commonality Because Their Claims Present Common Issues of Fact and Law Capable of Classwide Resolution.**

To meet the commonality requirement, there must be "questions of law or fact

common to the class." Rule 23(a)(2). Class members must suffer the same injuries,

and the claims arising out of those injuries "must depend upon a common contention

. . . of such a nature that it is capable of classwide resolution—which means that the

determination of its truth or falsity will resolve an issue that is central to the validity

of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.

338, 350 (2011). "[W]hat matters to class certification … [is] the capacity of a

classwide proceeding to generate common answers apt to drive the resolution of the

litigation." *Id.* (emphasis in original). "[E]ven a single common question will do."

*Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 984 (11th Cir. 2016). Plaintiffs satisfy

commonality because they challenge systemic, statewide policies; their claims raise

questions of fact and law common to all members of the proposed class and

subclasses; and their claims are capable of classwide resolution.

> **a. Eighth Amendment Claim**

Plaintiffs' Eighth Amendment claim meets the commonality requirement

because FDC's systemic isolation policies and practices subject all people in

isolation to the same substantial risk of serious harm. *Farmer v. Brennan,* 511 U.S. 825, 834 (1994) (Eighth Amendment standard met when there are "objectively, sufficiently serious" conditions causing a substantial risk of serious harm to which prison officials are deliberately indifferent); *see also Parsons v. Ryan,* 754 F.3d 657, 678 (9th Cir. 2014) ("[E]very inmate suffers exactly the same constitutional injury when he is exposed to a single statewide . . . policy or practices that creates a substantial risk of serious harm."). Plaintiffs' Eighth Amendment claim also raises common questions that, when answered, will resolve all class members' claims. *See Wal-Mart*, 564 U.S. at 350; *see also Dockery v. Fischer*, 253 F. Supp. 832, 853-855 (S.D. Miss 2015) (finding commonality because the answers to the common questions regarding prison officials' knowledge of a risk of harm and any responsive action would resolve the Eighth Amendment claims).

### i. **FDC's isolation policies and practices are systemic and common.**

As an initial matter, the threshold question for class certification for Plaintiffs' Eighth Amendment claim is whether FDC's isolation policies and practices are systemic and common to all members of the class, not whether FDC, through those policies and procedures, violates the Eighth Amendment. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds,* 568 U.S. 455, 466 (2013) (holding that merits questions are to be considered only to the extent they are relevant to the Rule 23 determination); *Braggs*, 317 F.R.D. at 655 ("[Plaintiffs] need to show that the

policies and practices they challenge are common, not (yet) that the common policies and practices are unconstitutional.").

There is ample evidence of FDC's systemic and common isolation policies and practices. FDC regulates the conditions in isolation through its centralized policies for operations in AC, DC, CM, and MM that apply across all prisons. Despite the differing labels, FDC recognizes the conditions are substantially similar, referring to all forms, collectively, as "restrictive housing." Each unit also meets both the DOJ's and the ACA's definitions of "solitary confinement."

FDC's system-wide implementation of its isolation policies establishes a single, statewide policy and practice that isolates all class members in the same way: FDC locks them in tiny, decrepit cells for 22 to 24 hours a day for months and years on end; deprives them of normal human contact, environmental stimulation, and exercise; and subjects them to dehumanizing, punitive, and unnecessary security measures.

In all forms of isolation, FDC deprives people of normal human contact by prohibiting or severely restricting phone calls, personal visits, dayroom access, and conversations with other people in isolation. Any "human" contact that does occur in isolation is abnormal, even within the prison context, because it happens through barriers such as a closed cell door, glass window, steel mesh, or fence; under threat of punishment; and under close monitoring by correctional officers. Even when two

people are isolated in the same cell, the nature of their interactions is dehumanized by being forced to spend 22 or more hours each day in one cramped space, eating, sleeping, and defecating with a stranger.[39]   Haney Decl., ¶18.   There is no opportunity for affectionate or even neutral human touch.[40]  Rather, class members are touched only by prison staff in order to be restrained, examined, or controlled. During their rare out-of-cell time, people in isolation can interact with others only while restrained at the hands and feet, or in a "recreation" cage the size of a dog kennel that dehumanizes them and separates them from others.  They are further dehumanized when their meal trays are delivered through a slot in the door and officers peer through the window during security checks.[41]

In all forms of isolation, FDC deprives people of environmental stimulation. They spend each day within the same four drab, moldy walls that FDC forbids them from putting anything on, even family photos or art.  In many cells, they cannot see even a sliver of the outside world though their frosted window.  Officers threaten to punish anyone who stands and looks out their cell door.[42]  There is not even a mirror

---

[39] *See, e.g.,* Exs. A-4, ¶17; A-8, ¶9; A-9, ¶25; A-10, ¶9; A-13, ¶10; Kendrick ¶10; Burgess ¶35.

[40] *See, e.g.* Exs. A-2, ¶¶18-19; A-11, ¶10; A-18, ¶16; A-25, ¶9; Harvard, ¶12.

[41] *See, e.g.*, Exs. A-15, ¶9; A-3, ¶10; Kendrick ¶¶5,11.

[42] *See, e.g.*, Exs. A-4, ¶¶4, 19; A-9, ¶3; A-24, ¶18; A-29, ¶5; Burgess, ¶31; Ferguson, ¶10.

to look at their reflections.[43]  Access to programming, job assignments, and books is extremely limited if available at all.

In isolation, FDC deprives people of sufficient exercise.  FDC's written policies allow at most two hours of out-of-cell exercise three days a week, but few people receive even this because officers routinely refuse to provide it.  This minimal amount of exercise takes place in a 10 by 20 feet "dog run" cage that is empty except for dip and pull-up bars, most without any roof or other shield from the Florida sun and rain.

As a matter of course, FDC subjects people in all forms of isolation to oppressive security measures rarely used in general population.  Any time someone in isolation leaves or returns to their cells or housing unit, officers subject them to intrusive strip-searches and layers of mechanical restraints.  While they are away from their cells, officers search all their belongings, often destroying or leaving their few precious possessions, such as family photos and letters, in disarray.  Officers also frequently spray people in isolation with searing chemical agents, forcibly remove them from their cells ("cell extraction"), and confiscate all their property ("property restriction"), leaving them naked except for their underwear to sleep on a metal bedframe for up to 72 hours.

---

[43] *See, e.g.,* Exs. A-23, ¶6; A-1, ¶7.

None of these conditions and deprivations common to FDC's isolation units throughout the system are in dispute because FDC's written policies expressly require them.   Thus, "[p]laintiffs have offered more than adequate evidence to establish the existence of the common policies and practices they challenge." *Braggs*, 317 F.R.D. at 657 (finding commonality when plaintiffs pointed to "very concrete policies and practices . . . that undisputedly occur").

### ii.   FDC's systemic isolation policies and practices cause the same injury of a substantial risk of serious harm.

Through the conditions and deprivations described above, FDC subjects all people in isolation to the same baseline, substantial risk of serious mental and physical harm.   *See Helling v. McKinney*, 509 U.S. 25, 35 (1993) (holding cognizable injury under Eighth Amendment is the "unreasonable risk of serious damage to … future health").   Plaintiffs' experts have found that, in fact, people in FDC isolation suffer devastating health consequences consistent with the harms documented in the scientific research about solitary confinement.   Burns Decl., ¶¶22, 26, 39; Kraus Decl., ¶¶27, 32, 39, 46-52.; Venters Decl., ¶¶29, 42, 62; Haney Decl., ¶¶54, 58, 84-85.   Thirty putative class members also submit declarations in support of this motion in which they describe in excruciating detail the harmful effects of isolation they have experienced.   Exs. A2-A31.

While the Youth and SMI Subclasses share the same threshold risk of harm as the Plaintiff Class, the risk of harm isolation poses to these subclasses is also

amplified because of their youth and mental illness, respectively.  Again, Plaintiffs'

experts have found these same severe mental health consequences are present in the

Youth and SMI Subclasses in FDC.  Haney Decl., ¶¶61, 68-72, 81-83, 86; Kraus

Decl., ¶¶32, 38-40, 46-52; Burns ¶¶23, 26, 40-41.  Indeed, FDC itself has recognized

this risk for the SMI Subclass by creating a Secure Treatment Unit to remove a small

number of them from prolonged isolation.  Ex.G-10 at 3.

Through this evidence, Plaintiffs meet their burden to show that FDC's

systemic isolation policies and practices are the "alleged source of the harm to class

members."  *Groover v. Prisoner Transp. Servs., LLC*, No. 15-CV-61902, 2018 WL

6831119, at *10–11 (S.D. Fla. Dec. 26, 2018) (finding commonality based on expert

testimony that systemic policies created risk of harm); *Lippert v. Baldwin*, No. 10 C

4603, 2017 WL 1545672, at *5 (N.D. Ill. Apr. 28, 2017)  (commonality satisfied

where expert report identified policies creating risk of harm based on inspections,

interviews, and record reviews); *Parsons*, 754 at F.3d 683 (finding common policy

allegedly caused risk of harm based on expert reports, internal prison documents,

and named plaintiffs' declarations).

### iii.   **Plaintiffs' challenge to FDC's isolation policies and practices raises common questions susceptible to classwide proof and resolution.**

Plaintiffs' Eighth Amendment claim raises common questions that will drive

the resolution of this litigation.  To succeed on the merits, Plaintiffs must prove that

FDC's isolation policies and practices create a substantial risk of serious harm and FDC is deliberately indifferent to this risk. *Farmer*, 511 U.S. at 834; *Helling*, 509 U.S. at 35.   One common question is whether the cumulative impact of the deprivations and conditions in isolation subject all class members, regardless of their individual risk factors, to a substantial risk of serious harm. *See Lippert*, 2017 WL 1545672, at *4 (N.D. Ill. April 28, 2017) ("The question common to all plaintiffs … is whether each of defendants' policies and practices do in fact put inmates with serious medical conditions at risk.").   This question focuses on the common conditions and deprivations that create a baseline future risk for all class members, as opposed to the individual characteristics of each member of the class; the answer to this question is common to the class. *See Jones v. Gusman,* 296 F.R.D. 416, 466 (E.D. La. 2013) ("Whether certain conditions … either by themselves, or through a mutually enforcing effect, put inmates at a substantial risk of harm is amenable to a common answer.") (internal punctuation omitted).

The Plaintiff Class, Youth Subclass, and SMI Subclass also share the common question of whether FDC has been deliberately indifferent to the substantial risk of harm caused by its isolation policies and practices.   The answer to this question will resolve Plaintiffs' Eighth Amendment claims in "one stroke." *See Wal-Mart*, 564 U.S. at 350; *Postawko v. Missouri Dep't of Corr.*, 910 F.3d. 1030, 1038 (8th Cir. 2018) (answering the common question of whether a policy or custom constitutes

deliberate indifference "will resolve an issue central to the validity of each of the class members' claims") (internal punctuation omitted).

An additional common question for each of the Youth and SMI Subclasses is whether their risk from the cumulative impact of the deprivations and conditions is so high, given their respective vulnerabilities, that FDC should exclude them from isolation. *See, e.g., V.W. v. Conway*, 236 F. Supp. 3d 554, 583-84 (N.D.N.Y. 2017) (certifying class where cumulative effects of deprivations of basic human needs in solitary confinement subject juveniles to unreasonable risk of serious psychological and physiological harm because of their continuing development); *Braggs*, 257 F. Supp. 3d at 1185 (finding placement in segregation endangers mentally ill prisoners). The answer to this question applies to all members of each subclass.

These common questions with common answers demonstrate that class treatment is appropriate.

      **iv.**   **All class members experience the same core deprivations and conditions.**

Because FDC subjects all class members in isolation to the same core conditions and deprivations—and corollary risk of serious harm—distinctions among isolation units in FDC's written policies or between the actual harms suffered by individual class members do not hinder a finding of commonality. *See Cooper v. Southern Co.,* 390 F.3d 695, 714 (11th Cir. 2004) ("[F]actual differences among

the claims of the putative class members do not defeat certification.") (internal citations omitted).

Moreover, because of how FDC's isolation units function in practice the minor differences in the types of isolation under FDC's written policies virtually disappear.  As described above, FDC's chronic understaffing results in the failure to provide even the minimal privileges afforded under FDC's written policies, thus diminishing the differences between the forms of isolation.  For example, FDC does not have enough staff to provide out-of-cell recreation and dayroom access to everyone who is eligible, while also performing other required correctional operations in the isolation housing units.  FDC's practice of placing people on multiple statuses at once (such as CM and DC, or CM and AC), and applying the more restrictive policies also blurs the forms of isolation.

FDC's excessively punitive security measures in all forms of isolation also dissolves any distinctions between restrictive housing types by discouraging people from accessing what meager out-of-cell opportunities they are theoretically afforded.  For many people in isolation, going from their small cell to a slightly larger outdoor cage for a couple hours is not worth suffering the degradation of being intrusively strip searched, restrained and escorted in chains, and having their few possessions ransacked.  Due to the culture of retribution and abuse in FDC's isolation units, people also reasonably fear that every additional interaction with staff that comes

with leaving their cells increases the risk of being charged with a new disciplinary infraction, prolonging their stay in isolation.  For the same reasons, they also fear staff will spray them with chemical agents, use physical force against them, or place them on property restriction.

Because FDC subjects all people in isolation units to the same baseline risk of serious harm, Plaintiffs meet commonality regardless of whether individuals in isolation may in fact suffer different degrees of health consequences.  *See Postawko*, 910 F.3d at 1038-1039 (while the "physical symptoms eventually suffered by each class member may vary . . . the question asked by each class member is susceptible to common resolution").  "Although a presently existing risk may ultimately result in different future harm for different inmates—ranging from no harm at all to death—every inmate suffers the same constitutional injury when he is expose to a single statewide … policy or practice that creates a substantial risk of serious harm." *Parsons*, 754 F.3d at 678.  When looking at the constitutional injury at issue—the risk of future serious harm—FDC's isolation policies and practices cause all members of the class to suffer the same substantial risk of serious harm.  *Id.* at 678; *see also Yates v. Collier*, 868 F.3d 354, 361-65 (5th Cir. 2017) (affirming commonality despite varying health consequences of excessive heat on class members because they all suffered from the same substantial risk of serious harm).

###### v.     The relief sought supports commonality.

Finally, the relief that Plaintiffs seek to remedy their Eighth Amendment claim also demonstrates commonality.  Plaintiffs seek injunctive and declaratory relief to remedy the substantial risk of serious harm to the Plaintiff Class, Youth Subclass, and SMI Subclass caused by FDC's isolation policies and practices.  If the Court ultimately finds on the merits that FDC is deliberately indifferent to such a harm, the Court could enjoin the unconstitutional policies as applied to the entire class and subclasses. *See*, *e.g.*, *Murray v. Auslander*, 244 F.3d 807, 812 (11th Cir. 2001) (finding commonality satisfied in part because Plaintiffs sought classwide injunctive and declaratory relief); *Hughes v. Judd*, No. 8:12-CV-568-T-23MAP, 2013 WL 1821077, at *23 (M.D. Fla. Mar. 27, 2013), *report and recommendation adopted as modified*, No. 8:12-CV-568-T-23MAP, 2013 WL 1810806 (M.D. Fla. Apr. 30, 2013) (finding commonality satisfied in part because Plaintiffs sought "permanent injunctive and declaratory relief that would enjoin allegedly unconstitutional behavior as applied to the entire class").  This is precisely the type of systemic civils rights reform case supporting a finding of commonality.  *Jones*, 2020 WL 5646124, at *4.

#### b.  Disability Discrimination Claim

Plaintiffs' proposed physical disability and serious mental illness subclasses satisfy the commonality requirement because they challenge centralized and

systemic policies and practices, and their claims are therefore susceptible to classwide proof and resolution. Plaintiffs allege systemic violations of the ADA and Rehabilitation Act based on common contentions across all proposed subclass members. The ADA and Rehabilitation Act require that FDC "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. 35.130(b)(7)(i); *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1088, n.21 (11th Cir. 2007) (finding same standards govern Rehabilitation Act claim). FDC discriminates against people with disabilities by failing to provide systems that consistently provide equal access to programs, services, and activities in isolation.[44] Members of the respective disability subclasses suffer the same core injury, and the remedy for Defendants' systemic failure will be statewide.

Commonality is satisfied in cases where people with disabilities seek injunctive relief for systemic violations of their rights. *See, e.g., Brown v. District of Columbia*, 928 F.3d 1070, 1079-82 (D.C. Cir. 2019) (finding commonality

---

[44] In correctional facilities, where prison staff control nearly all aspects of prisoners' daily lives, almost everything provided to people in isolation is a public service, program, or activity within the ambit of the ADA, including: eating, showering, toileting, communicating by mail and telephone, exercising, safety and security, FDC's administrative, disciplinary, and classification proceedings, medical, mental health, and dental services, the library, and educational classes. See 28 C.F.R. § Pt. 35, App. A (U.S. Department of Justice Guidance, explaining that "correctional facilities are unique facilities under title II" because prisoners "cannot leave the facilities and must have their needs met by the corrections system," which "include, but are not limited to, proper medication and medical treatment, accessible toilet and shower facilities, devices such as a bed transfer or a shower chair, and assistance with hygiene methods for prisoners with physical disabilities")

because common proof would lead to common answers in case alleging class members with disabilities were being unnecessarily kept in nursing home facilities*);* *Postawko*, 910 F.3d at 1038 n.4 (affirming commonality of ADA class where Plaintiffs alleged a failure to properly screen for and treat a life-threatening disease because the entire proposed class was exposed to the same unconstitutional injury despite varying physical symptoms suffered by each class member); *Hernandez v. County of Monterey*, 305 F.R.D. 132, 142-43, 153-54, 157-59 (N.D. Cal. 2015) (granting class certification in ADA jail case involving allegations of, *inter alia*, failure to provide accommodations and access to health services, and physical inaccessibility); *Lane v. Kitzhaber*, 283 F.R.D. 587, 595 (D. Or. 2012) ("[A] class of disabled individuals seeking reasonable accommodation may be certified without the need for an individualized assessment of each class member's disability or the type of accommodation needed.").

FDC's failure to implement a system to ensure reasonable modifications of isolation policies and practices so that people with disabilities can access even the minimal programs, activities, and services in isolation impacts all proposed subclass members similarly. *See Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) *overruled on other grounds by Johnson v. California*, 543 U.S. 499 (2005) (finding that class members "suffer similar harm from [a defendant's] failure to accommodate their disabilities"). This commonality holds true across members of

the physical disability and mental illness subclasses, respectively, regardless of a subclass member's specific disability or required accommodation. *See Dunn v. Dunn*, 318 F.R.D. 652, 662-63 (M.D. Ala. 2016) (certifying an ADA class encompassing people with a wide range of disabilities, because the class claim challenged "not the denial of the accommodations themselves, but the denial of a system that would have the effect of ensuring that they and their fellow prisoners were appropriately accommodated"); *see also Ass'n For Disabled Americans, Inc. v. Amoco Oil Co.,* 211 F.R.D. 457, 463 (S.D. Fla. 2002) ("[I]t is settled under Rule 23(a) that the representative plaintiffs need not have the identical disabilities as the class.") (citations omitted); *Access Now, Inc. v. AHM CGH, Inc*., No. 983004CIVGOLDSIMONTON, 2000 WL 1809979, at *3-4 (S.D. Fla. July 12, 2000) (finding commonality where people with different disabilities had claims with "the same legal predicate"); *Armstrong*, 275 F.3d at 868 (rejecting defendants' argument that representative lawsuits should have been filed by people with different types of disabilities because despite the differences between them, they suffered the same harm from defendant's failure to accommodate their disabilities). To address such systemic issues through individual lawsuits would be grossly inefficient and unnecessary when the injunctive and declaratory relief Plaintiffs request in this matter would resolve these issues on behalf of all subclass members in isolation in FDC.

Plaintiffs' ADA and Rehabilitation Act claims also do not require the Court to individually assess whether each proposed subclass member has a qualifying disability because the subclasses are defined as people already identified as having a physical or mental disability that impairs a major life function. *Compare Murray*, 244 F.3d at 812 (affirming commonality where Defendants had already identified individuals with disabilities eligible to receive services and individualized determinations were not required) *with Hoffer v. Inch*, 382 F. Supp. 3d 1288, 1298 (N.D. Fla. 2019) (decertifying a class as to Plaintiffs' ADA claims because the claims required an individualized assessment of whether each person with Hepatitis C had a disability and therefore should be included in the class), *and Stafford v. Carter*, 2018 WL 4361639, at *21 (S.D. Ind. Sep. 13, 2018) (decertifying class of all persons in Indiana DOC diagnosed with HCV because "it is not clear that all class members, as the class is currently defined, suffer from the limitation of a major life activity"). Nor do Plaintiffs' ADA and Rehabilitation Act clams require the Court to determine what specific modifications must be provided to which specific individuals in isolation. Rather, this case calls for FDC to implement a system-wide policy and procedure for ensuring that people with disabilities in restrictive housing are assessed for and provided necessary accommodations.

### i.  Physical Disabilities Subclass

Plaintiffs' ADA and Rehabilitation Act claims that FDC discriminates against people with physical disabilities in isolation raise the common question of whether FDC's policies and practices result in the systemic denial of equal access to programs, services, and activities.

There is ample evidence of the systemic ways in which FDC's policies and practices deny people with physical disabilities in isolation equal access.  FDC's accommodations for people with physical disabilities in isolation are limited to providing assistive equipment.  FDC does not modify any of its isolation policies and practices, even when these result in the denial of equal access for people with physical disabilities to, for example, exercise/recreation, written communication with friends and family, or even activities of daily living.  FDC does not account for the myriad ways in which people with physical disabilities in prison often depend upon help from their fellow prisoners to communicate with or alert staff to emergencies that are unavailable in restrictive housing, failing even to install something as simple as a call button for those with communication deficits.

FDC also fails to provide an effective mechanism for requesting and obtaining reasonable modifications or accommodations in isolation.  FDC has implemented an unreasonable and obtuse process for requesting accommodations that splits responsibility between two offices and—rather than coordinate among the

professional staff in those offices who share an email list to provide accommodations—penalizes prisoners who proceed to the "wrong" office by rejecting their request and telling them to start the process anew. Yet, nowhere does FDC provide instruction to people with physical disabilities about these two different accommodation request pathways and how to distinguish between them.

Further, FDC widely uses "property restriction" in restrictive housing units to remove assistive devices from people with physical disabilities for up to 72 hours at a time, with no review or oversight. This practice, already unduly punitive for all class members, is thus made even worse for people with physical disabilities.

### ii.   SMI Subclass

Plaintiffs' claims that FDC discriminates against people with serious mental illness in isolation in violation of the ADA and Rehabilitation Act raise the common question of whether FDC's policies and practices result in systemic denial of equal access to programs, services, and activities to people with serious mental illness. In addition to the threshold risk of harm that isolation poses to all people, isolation particularly affects people with serious mental illness in ways that require accommodations to ensure that members of this subclass can participate in services, programs, and activities, including activities of daily living, to an equal extent as people without serious mental illness. This should include accommodations that counteract the otherwise exacerbating and debilitating effects of isolation on mental

illness, such as additional out-of-cell time or sensory stimulation.  But, as a matter of policy and procedure, FDC does not make any such modifications to their isolation policies and procedures for people with serious mental illness.  As a result, they can lose the psychological stability and mental functioning that are necessary to complete even the basic functions available in restrictive housing.  *See, e.g.,* Haney Decl., ¶86.

### 3.  Named Plaintiffs' Claims are Typical of Those of the Class and Subclasses.

Named Plaintiffs' claims are "typical of the claims or defenses of the class" because the class representatives share the same interest and injuries as the proposed class members.  Rule 23(a)(3); *Busby v. JRHBW Realty, Inc.,* 513 F.3d 1314, 1322 (11th Cir. 2008) (typicality met when plaintiffs' claims share a "sufficient nexus" with those of the class).

The interests of Named Plaintiffs and the Class are aligned because their claims arise from the same isolation policies and practices and are based on the same legal theories of deliberate indifference under the Eighth Amendment and disability discrimination under the ADA and Rehabilitation Act.  *Groover,* 2018 683119 at *11 (finding typicality where plaintiffs' claims were based on the same Eighth Amendment claims of the class); *Ass'n For Disabled Americans, Inc.*, 211 F.R.D. at 464 (finding typicality when plaintiffs raised the same claims as class members regarding "compliance with the ADA").  They all share the same interest in

enjoining FDC from violating their constitutional and statutory rights through its isolation policies and practices.

As a result of FDC's use of the same isolation policies system-wide, Named Plaintiffs suffer the same injury—a baseline substantial risk of serious harm—as the other class members.  Burns Decl., ¶¶32, 38, 42; Venters Decl., ¶¶55-61; Kraus Decl., ¶¶45-46; Haney Decl., ¶¶73-78, 82.  Plaintiffs Harvard, Espinosa, Ferguson, and Hill, whom FDC has diagnosed with serious mental illness, share the same injury of a heightened risk of serious harm with the SMI Subclass members because of their vulnerabilities related to their mental illness.  Burns Decl., ¶¶32, 38, 42; Haney Decl., ¶¶74, 76, 82-83.  Plaintiff Jeremiah Hill, as a youth under 21 years old, shares that same heightened risk with the Youth Subclass because of the vulnerabilities associated with their ongoing development.  Kraus Decl., ¶¶45-46, 50.  FDC also caused Named Plaintiffs with disabilities to share the same injury of disability discrimination with the Physical Disability and SMI Subclass members by failing to implement systems that consistently provide people with disabilities equal access to programs, services, and activities in isolation.

As with commonality, the fact that some people in isolation suffer different healthcare consequences or different denial of programs, services, or activities in isolation than Named Plaintiffs does not defeat typicality.  *Murray*, 244 F.3d at 811 (internal quotations and citations omitted) ("The typicality requirement may be

satisfied despite substantial factual differences . . . when there is a strong similarity of legal theories."); *see also Dunn v. Dunn*, 318 F.R.D. 652, 666 (M.D. Ala. 2016), *modified sub nom. Braggs v. Dunn*, No. 2:14CV601-MHT, 2020 WL 2395987 (M.D. Ala. May 12, 2020) (typicality satisfied even though the named representatives and proposed class members had "diverse disabilities" and required "various different accommodations," because the class representatives were "challeng[ing] practices with which they all interact and from which they all allegedly suffer.").   Because Named Plaintiffs' and other class members' Eighth Amendment and disability discrimination claims are based on the same legal theories, and arise from the same systemic isolation policies and practices, Named Plaintiffs' claims are typical of the those of the Class and Subclasses.

### 4.  Named Plaintiffs and Their Counsel Will Adequately Protect the Interests of the Class and Subclasses.

Named Plaintiffs will "fairly and adequately represent and protect the interests of the class" as required under Federal Rule 23(a)(4).  This requirement is met when 1) "plaintiffs' counsel are qualified, experienced, and generally able to conduct the proposed litigation," and 2) when there are no "interests antagonistic to those of the rest of the class."  *Griffin v. Carlin,* 755 F.2d 1516, 1533 (11th Cir. 1985).  Where a case seeks only injunctive relief, "[a]dequate representation is usually presumed in the absence of contrary evidence . . . because there is no monetary pie to be sliced up."  *Braggs*, 317 F.R.D. at 666 (internal citations omitted); *see also Access Now,*

*Inc. v. Ambulatory Surgery Ctr. Grp., Ltd.*, 197 F.R.D. 522, 528 (S.D. Fla. 2000). Plaintiffs satisfy these criteria here.

Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation. They have the experience, resources, and commitment needed to prosecute this case. *Id.*; *see Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1307 (N.D. Fla. 2017) (appointing class counsel after considering their qualifications, experience, and advocacy in the litigation so far). Plaintiffs' counsel include attorneys from three civil rights organizations, founded in the 1970s, dedicated to bringing impact and class action cases: Southern Poverty Law Center (SPLC), Florida Legal Services (FLS), and Florida Justice Institute (FJI). Declaration of Kelly Knapp (Knapp), ¶¶4-7. Rifkin Law Office, founded in 2013, is similarly dedicated to and experienced in pursuing civil rights cases. *Id.*, ¶¶8-9. There are no conflicts between counsel, Plaintiffs, and the proposed class members that would compromise their ability to represent the class. *Id.*, ¶¶12-13.

None of Named Plaintiffs have any conflicts of interest with the class and subclasses. They share the common goal of ending the unconstitutional and

discriminatory treatment of people in FDC isolation.[45]   Named Plaintiffs seek declaratory and injunctive relief that will benefit the entire class and subclasses, and do not seek monetary or individual gain.  *See Ass'n For Disabled Americans, Inc.*, *v. Amoco Oil Co.*, 211 F.R.D. 457, 464 (S.D. Fla. 2002) (explaining that adequacy is presumed even when the plaintiffs have different disabilities because the requested injunctive relief will equally benefit all members of the class).   They have been actively working with Plaintiffs' counsel and plan to continue to do so throughout the lifetime of this case.[46]   Thus, there is no antagonistic conflict nor is there any likelihood that one could develop.

Plaintiffs' counsel also meet the requirements of Federal Rule 23(g) to be appointed as class counsel.  They have investigated and litigated this matter since 2018.  Knapp Decl., ¶10.  As explained above, counsel are well-versed in applicable constitutional and civil rights laws, experienced in handling class actions and complex litigation, and have sufficient resources to vigorously prosecute this case.  *See* Fed. R. Civ. P. 23(g); *see also* Knapp Decl., ¶¶4-10.

---

[45] Kendrick ¶20; Ferguson ¶2; Burgess ¶2; Espinosa ¶2; Harvard ¶21; Hill ¶21; J.H. ¶15.

[46] Kendrick ¶2; Ferguson ¶3; Burgess ¶3; Espinosa ¶3; Harvard ¶2; Hill ¶22; J.H. ¶16.

**B. Plaintiffs Meet the Requirements of Rule 23(b)(2) Because This Case Seeks Declaratory and Injunctive Relief from Systemic Policies and Practices.**

To be certified, a class action must also satisfy one of the provisions of Rule 23(b).  Because the class members seek uniform relief from a practice applicable to all members, this case fits squarely within Rule 23(b)(2), authorizing class certification where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or correspondence declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2); *Hughes*, 2013 WL 1821077, at *25.  "The key to [a] (b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Wal-Mart*, 564 U.S. at 360 (internal quotation omitted).

Rule 23b(2) is "almost automatically satisfied in actions primarily seeking injunctive relief," including cases challenging prison policies and practices.  *Baby Neal for and by Kanter v. Casey,* 43 F. 3d 48, 58 (3rd Cir. 1994); *Braggs*, 317 F.R.D. at 669 (finding a constitutional challenge to Alabama's prison system's mental health treatment practices and policies for incarcerated people was "exactly the kind of case for which Rule 23(b)(2) was intended"); *Bradley v. Harrelson*, 151 F.R.D. 422, 427 (M.D. Ala. 1993) (subsection (b)(2) "is particularly applicable to suits . . .

involv[ing] conditions of confinement in a correctional institution"). Indeed, the Supreme Court has affirmed broad injunctive relief to remedy widespread Eighth Amendment violations resulting from prison conditions. *Brown v. Plata*, 563 U.S. 493 (2011).

Certification is appropriate under Rule 23(b)(2) because Plaintiffs challenge Defendant's unconstitutional and discriminatory isolation practices, seeking only declaratory and injunctive relief on behalf of the entire class. Defendants' policies and practices are "generally applicable" to all class members because each person within the class is subject to FDC's systemic isolation practices and policies. *See Anderson v. Garner*, 22 F. Supp.2d 1379, 1387 (N.D. Ga. 1997) (certifying a (b)(2) class because alleged excessive force was systemic and applied generally to all putative class members). All proposed class members are at substantial risk of serious harm due to Defendants' centralized isolation policies and practices. *See Parsons,* 754 F.3d at 678 (affirming (b)(2) class alleging "a substantial risk of harm by specific set of centralized [prison] policies and practices of uniform and statewide application"). Similarly, all members of the Physical Disability and SMI Subclasses are subject to Defendants' discriminatory policies and practices that violate the ADA and Section 504 of the Rehabilitation Act. *See Henderson v. Thomas*, 289 F.R.D. 506, 512 (M.D. Ala. 2012) (certifying (b)(2) class where injunctive and declaratory relief sought to enjoin discriminatory state prison system policy segregating all HIV-

positive prisoners). Therefore, this action is exactly the type of case where certification under Rule 23(b)(2) is proper.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court certify, under Rule 23(a) and (b)(2), the proposed class and subclasses.   Plaintiffs also request that the Court appoint the undersigned as class counsel under Rule 23(g).

Dated:  May 28, 2021                    Respectfully submitted,

_s/ Kelly Knapp_

Kelly Knapp
Fla. Bar No. 1011018
Leonard L. Laurenceau
Fla. Bar No. 106987
Marta Jaszczolt
Fla. Bar No. 119537
Southern Poverty Law Center
2 South Biscayne Boulevard
Miami, FL 33131
Telephone: (786) 457-7310
kelly.knapp@splcenter.org
leo.laurenceau@splcenter.org
marta.jaszczolt@splcenter.org

Dante P. Trevisani
Fla. Bar No. 72912
Laura A. Ferro
Fla. Bar No. 1015841
Sam Thypin-Bermeo
Fla. Bar No. 1019777
Marcel A. Lilavois, Jr.
Fla. Bar No. 1016175
Kara Wallis
Fla. Bar No. 1028563

Florida Justice Institute, Inc.
PO BOX 370747
Miami, FL 33137
Telephone: (305) 358-2081
dtrevisani@floridajusticeinstitute.org
lferro@floridajusticeinstitute.org
sthypin-bermeo@floridajustice.org
kwallis@floridajusticeinstitute.org

Andrea Costello
Fla. Bar No. 532991
Christopher M. Jones
Fla. Bar No. 994642
Rachel Ortiz
Fla. Bar No. 83842
Florida Legal Services
122 E. Colonial Drive, Suite 100
Orlando, FL 32801
Telephone: (407) 801-0332
andrea@floridalegal.org
christopher@floridalegal.org
rachel.ortiz@floridalegal.org

Lori Rifkin*
CA Bar No. 244081
Rifkin Law Office
3630 Hight St. #18917
Oakland, CA
Telephone: (510) 414-4132
lrifkin@rifkinlawoffice.com

* *Admitted Pro hac vice*

**Attorneys for Plaintiffs**

## <u>CERTIFICATE OF WORD LIMIT</u>

The undersigned certifies that this Motion complies with the limitation set forth in

ECF No. 304 because it contains 12,793 words.

*s/ Kelly Knapp*  
Kelly Knapp  
Fla. Bar No. 1011018