**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

| | |
|---|---|
| JAC'QUANN (ADMIRE) HARVARD; JEREMIAH HILL; JUAN ESPINOSA; JEROME BURGESS; (a/k/a SHAM'LA GOD ALLAH); JAMES W. KENDRICK, JR.; JOHNNY HILL; and AMY FERGUSON; on behalf of themselves and all others similarly situated, | Case No.: 4:19-cv-00212-MW-MAF |
| Plaintiffs, | |
| v. | DECLARATION OF CRAIG HANEY, PH.D., J.D., IN SUPPORT OF PLAINTIFFS MOTION FOR CLASS CERTIFICATION |
| MARK INCH, in his official Capacity as Secretary of the Florida Department of Corrections, and FLORIDA DEPARTMENT OF CORRECTIONS, as an Agency of the State of Florida | |
| Defendants. | |

1

I, Craig Haney, Ph.D., J.D., declare as follows:

As an overview, I have been retained by counsel for plaintiffs in <u>Harvard et al. v. Inch et al.</u> to analyze and form expert opinions about several inter-related issues: 1) the current state of scientific knowledge about the effects of solitary or isolated confinement on incarcerated persons; 2) what is scientifically known about those effects on persons with mental illness in particular; and; 3) whether and how the actual conditions of isolated confinement in certain housing units in the Florida Department of Corrections ("FDC"), including the related practices and procedures, affect the people who are confined in those units. My specific opinions are summarized and detailed in sections III through VII below.

## I.      Expert Qualifications

1.      I am a Distinguished Professor of Psychology and a former UC Presidential Chair at the University of California, Santa Cruz, where I have previously served as the chair of two academic departments (Psychology and Sociology) and the Director of the Program in Legal Studies. My area of academic specialization is in what is generally termed "psychology and law," which is the application of psychological data and principles to legal issues. I teach graduate and undergraduate courses in social psychology, psychology and law, and research methods. I received a bachelor's degree in psychology from the University of Pennsylvania, an M.A. and Ph.D. in Psychology and a J.D. degree from Stanford University, and I have been the recipient of a number of scholarship, fellowship, and other academic awards. A copy of my current curriculum vitae is attached to this Declaration as **Appendix A**.

2.      I have published numerous scholarly articles and book chapters on topics in law and psychology, including encyclopedia and handbook chapters on the backgrounds and social histories of persons accused of violent crimes, the psychological effects of imprisonment, and the nature and consequences of solitary or "supermax"-type confinement. In addition to these

2

scholarly articles and book chapters, I have solely authored three books: <u>Death by Design:
Capital Punishment as a Social Psychological System</u> (Oxford University Press, 2005),
<u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u> (American
Psychological Association Books, 2006), and <u>Criminality in Context: The Psychological
Foundations of Criminal Justice Reform</u> (American Psychological Association Books, 2020). As
a member of the National Academy of Sciences Committee that was charged with studying the
causes and consequences of the high rates of incarceration that occurred in the United States over
the last several decades, I co-authored a fourth book with my committee colleagues, <u>The Growth
of Incarceration in the United States: Exploring the Causes and Consequences</u> (National
Academies Press, 2014).

3.       I have served as a consultant to numerous governmental, law enforcement, and
legal agencies and organizations on jail- and prison-related issues. Those agencies and
organizations include the Palo Alto Police Department, various California Legislative Select
Committees, the National Science Foundation, the American Association for the Advancement
of Science, the United States Department of Justice, the Department of Health and Human
Services (HHS), the Department of Homeland Security, and the White House (under two
separate administrations). In 2012, I testified as an expert witness before the Judiciary
Committee of the United States Senate in an historic first-ever Senate hearing on solitary
confinement and that same year was appointed as a member of a National Academy of Sciences
committee analyzing the causes and consequences of high rates of incarceration in the United
States.

4.       In the course of my academic work in psychology and law, I have lectured and
given invited addresses throughout the country on the role of social and institutional histories in

explaining criminal violence, the psychological effects of living and working in institutional settings (typically maximum security prisons), and the psychological consequences of solitary confinement. I have given these lectures and addresses at various law schools, bar associations, university campuses, and numerous professional psychology organizations such as the American Psychological Association.

5.     My academic interest in the psychological effects of various prison conditions is long-standing and dates back to 1971, when I was still a graduate student. I was one of the principal researchers in what has come to be known as the "Stanford Prison Experiment," in which my colleagues Philip Zimbardo, Curtis Banks, and I randomly assigned normal, psychologically healthy college students to the roles of either "prisoner" or "guard" within a simulated prison environment that we had created in the basement of the Psychology Department at Stanford University. The study has since come to be regarded as a "classic" study in the field, demonstrating the power of institutional settings to change and transform the people who enter them.[1]

6.     Since then, I have been studying the psychological effects of living and working in real (as opposed to simulated) institutional environments, including juvenile facilities, mainline adult prison and jail settings, and specialized correctional housing units (such as solitary and "supermax"-type confinement).  In the course of that work over the past forty-five years, I have toured and inspected numerous maximum security state prisons and related

---

[1] For example, *see* Craig Haney, Curtis Banks & Philip Zimbardo, Interpersonal Dynamics in a Simulated Prison, 1 International Journal of Criminology and Penology 69 (1973); Craig Haney & Philip Zimbardo, The Socialization into Criminality:  On Becoming a Prisoner and a Guard, in Law, Justice, and the Individual in Society:  Psychological and Legal Issues. (J. Tapp and F. Levine, eds., 1977) [hereafter "Haney & Zimbardo, The Socialization into Criminality (1977)"; and Craig Haney & Philip Zimbardo, Persistent Dispositionalism in Interactionist Clothing: Fundamental Attribution Error in Explaining Prison Abuse, Personality and Social Psychology Bulletin, 35, 807-814 (2009).

facilities (in Alabama, Arkansas, Arizona, California, Colorado, Florida, Georgia, Guam, Hawaii, Idaho, Illinois, Louisiana, Maine, Massachusetts, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, New York, Ohio, Oregon, Pennsylvania, Tennessee, Texas, Utah, and Washington), many maximum security federal prisons (including the Administrative Maximum or "ADX" facility in Florence, Colorado), and prisons in Canada, Cuba, England, Hungary, and Mexico. I also have conducted thousands of interviews with correctional officials, guards, and prisoners to assess the impact of penal confinement, and have statistically analyzed aggregate data from numerous correctional documents and official records to examine the effects of specific conditions of confinement on the quality of prison life and the ability of prisoners to adjust to them.[2]

7.      In recent years, I have been directly involved in several innovative programs designed to assist correctional departments around the country seeking to reform and humanize their conditions, practices, and procedures. This work has included serving as a member of the Advisory Board for the Vera Institute of Justice's Safe Alternatives to Segregation Program that collaborates with state and local prison and jail administrators to reduce the use of solitary confinement in their facilities, and a joint University of California and Norwegian Correctional Service Program—"Amend at UCSF"—that provides training and ongoing guidance to prison

---

[2] For example, Haney & Zimbardo, The Socialization into Criminality (1977), supra note 1; Craig Haney, Psychology and Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law, Psychology, Public Policy, and Law, 3, 499-588 (1997); Craig Haney, The Consequences of Prison Life: Notes on the New Psychology of Prison Effects, in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing (2008); Craig Haney, On Mitigation as Counter-Narrative: A Case Study of the Hidden Context of Prison Violence, University of Missouri-Kansas City Law Review, 77, 911-946 (2009); Craig Haney, Demonizing the "Enemy": The Role of Science in Declaring the "War on Prisoners," Connecticut Public Interest Law Review, 9, 139-196 (2010); Craig Haney, The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement, American Criminal Law Review, 48, 121-141 (2011) [Reprinted in: S. Ferguson (Ed.), Readings in Race, Ethnicity, Gender and Class. Sage Publications (2012)]; and Craig Haney, Prison Effects in the Age of Mass Imprisonment, The Prison Journal, 92, 1-24 (2012).

officers and officials in state prison and jail systems (e.g., California, Idaho, New York, North Dakota, Oregon, Rhode Island) through interventions that incorporate Norwegian correctional principles.

8.     I have been qualified and have testified as an expert in various federal courts, including United States District Courts in Alabama, Arkansas, California, Georgia, Nevada, New Mexico, Pennsylvania, Texas, and Washington, and in numerous state courts, including courts in Arizona, Colorado, Florida, Montana, New Jersey, New Mexico, Ohio, Oregon, Tennessee, Utah, and Wyoming as well as, in California, the Superior Courts of Alameda, Calaveras, Kern, Los Angeles, Marin, Mariposa, Monterey, Orange, Sacramento, San Diego, San Francisco, San Mateo, Santa Clara, Santa Cruz, Shasta, Tulare, Ventura, and Yolo counties. My research, writing, and testimony have been cited by state courts, including the California Supreme Court, and by Federal District Courts, Circuit Courts of Appeal, and the United States Supreme Court.[3]

## II.     Basis of Expert Opinion

9.     I have been retained by counsel for the plaintiffs in Harvard et al. v. Inch, et al. to provide expert opinions on three inter-related topics: a) a summary of what is scientifically known about the negative psychological consequences of solitary or isolated confinement (including what is known in the Florida prison system as "Maximum Management," "Disciplinary Confinement," and "Close Management," and "Administrative Confinement"); b) whether and how those negative consequences are exacerbated for prisoners who are suffering from mental illness; and, finally, c) the extent to which prisoners housed in different Florida Department of Corrections ("FDC") facilities, including those who suffer from mental illness,

---

[3] For example, see Brown v. Plata, 563 U.S. 493 (2011); see also **Appendix A** for a list of some of the legal cases citing my research and testimony.

are subjected to solitary-type confinement that places them at significant risk of serious psychological harm.

10.     My opinions on these topics are based on a number of sources, including a review of the extensive and updated published literature that addresses the psychological effects of solitary confinement, and case-specific discovery that I have requested and also reviewed. A document index that contains a detailed list of all of the official documents that I have reviewed is attached to this Declaration as **Appendix B.**  In summary, I have been provided FDC policy and procedure documents that govern the use of solitary confinement, FDC data that document aspects of its use, FDC responses to certain discovery requests, documents summarizing FDC data compiled by Plaintiffs' counsel, documents related to inspections of FDC facilities, and medical records for individuals I interviewed.  I also conducted 33 telephonic interviews with FDC prisoners who were currently or had recently been housed in one or another type of isolated confinement in different state facilities. The interviews included four of the named Plaintiffs in the case, as well as Tracey Dean, whom I understand may become a named Plaintiff.  I have also reviewed the healthcare and custody records for these interviewees.  Because of the COVID-19 pandemic, I have not yet been able to tour and directly inspect current FDC facilities. However, I reviewed video from FDC confinement units that was provided through discovery, as well as photographs that were provided to me by counsel for Plaintiffs, depicting conditions observed during facility tours that were conducted over the last several months. These are included in Appendix B. I have also toured isolation/restricted housing units in a number of FDC facilities (including Florida State Prison, Santa Rosa Correctional Institution, Washington Correctional Institution, Columbia Correctional Institution, Union Correctional Institution, Charlotte Correctional Institution, and the Lowell Annex) as part of prior work in 2001-2003.  I will begin

conducting in-person inspections and interviews in May, 2021, and reserve the ability to update or amend the opinions I offer herein based on that information.

### III.     Summary of Expert Opinions

11.     By way of summary, it is my expert opinion that being housed in solitary confinement is known to produce a number of negative psychological effects and to place prisoners at significant risk of serious psychological harm. These effects are clearly and consistently described in the scientific literature and have now been well understood for a number of years. Scientific knowledge about the direct effects of solitary confinement derives from empirical studies. The findings are "robust"—that is, they come from studies that were conducted by researchers and clinicians from diverse backgrounds and perspectives, were completed and published over a period of many decades, and are empirically very consistent. With remarkably few exceptions, virtually every one of these studies has documented the pain and suffering that isolated prisoners endure and the risk of psychological harm that they confront.

12.     In addition, the empirical conclusions from these studies are grounded in sound scientific theory. That is, there is a well-understood and widely accepted scientific framework that explains <u>why</u> long-term isolation, the absence of meaningful social interaction and activity, and the other severe deprivations that are common under conditions of isolated or solitary confinement have harmful psychological consequences. That framework has been developed and validated through years of extensive scientific research documenting the various ways in which social isolation produces adverse psychological effects in contexts <u>other</u> than prison—that is, in society at large. The significantly harsher conditions that prevail in correctional settings intensify

or exacerbate the well-understood adverse outcomes that have been extensively studied in other environments.

13.     In addition, the fact that prisoners who suffer from mental illness are less able to tolerate the painful experience of isolation or solitary confinement is an extension of another widely accepted scientific framework. All other things equal, mentally ill persons are more susceptible in general to stressful and traumatic experiences of the sort that occur more often in solitary confinement. In addition, many of the most prevalent adverse effects of isolation (such as depression) are similar to and aggravate many of the symptoms that are associated with various forms of mental illness, adding to or worsening already existing psychiatric conditions. Finally, isolation removes people from the stabilizing and normalizing influence of social contact and social connection, undermining personal identity and one's sense of self. This is especially problematic for mentally ill persons whose contact with social reality may already be fragile and tenuous.

14.     It is also my opinion that the conditions of confinement in the various FDC isolation units, including Maximum Management, Close Management, Disciplinary Confinement, and Administrative Confinement place the people housed in them at significant risk of serious psychological harm consistent with the harm found by empirical studies of social isolation generally and solitary confinement more specifically. Based on my review of the material specific to this case and the Florida prison conditions at issue, including my own interviews with prisoners and the statements of FDC prison administrators and staff in depositions I reviewed, the extremely harsh conditions of confinement in the FDC isolation units are <u>exactly</u> the type of conditions that are commonly described in the scientific literature as "solitary confinement." The prisoners whom I interviewed who experienced isolated

confinement in the FDC reported high levels of psychological suffering, including many symptoms of psychological stress and trauma and the psychopathological effects of isolation. My own professional experience and study and the decades of scientific research that has been conducted by other scholars and researchers collectively have established that these kinds of conditions of confinement place all prisoners at significant risk of serious harm. They undermine the psychological health and well-being of all prisoners exposed to them, regardless of the prisoners' pre-existing mental health status.

15. The risk of serious psychological harm is significantly heightened for the very high number of mentally ill prisoners who are housed in isolated confinement in the FDC. Mentally ill prisoners are not adequately screened out of isolated confinement, and the severely constricted conditions of FDC's isolated confinement aggravate their symptoms of existing mental illness in ways that FDC does not address. In fact, as currently constituted, FDC's isolated/solitary confinement units are counter-therapeutic—that is, the conditions of confinement themselves and procedures under which they operate work impede meaningful and effective treatment. Therefore, the heightened risk of harm for mentally ill prisoners cannot be adequately ameliorated short of changes to those conditions of confinement.

## IV. The Adverse Psychological Effects of Social Isolation and Solitary Confinement

16. It is important to note at the outset of reviewing the general literature on "solitary confinement" that it is a term of art in correctional practice and scholarship, one that encompasses a number of different labels that denote essentially the same kind of severely isolating housing arrangements and procedures. The term does not refer to literal complete isolation from any form of human contact—that does not exist in prison and never has. Instead, the term is generally used to refer to conditions of extreme (but never total) isolation from others.

17.     As I noted above, there are several terms that are applied to isolated conditions of confinement in the FDC that denote housing units in which prisoners are confined to their cells for 22 or more hours per day, denied opportunities for normal social contact, and subjected to numerous other deprivations (such as access to meaningful activities and positive environmental stimulation). FDC appears to use the terms Maximum Management,  Close Management, Disciplinary Confinement, and Administrative Confinement primarily to reflect differences in the stated reasons for placing prisoners in these differently designated units. Although there are some minor differences in the nature of some of the restrictions placed on prisoners housed within one or another of them, in actual practice, all of them impose the type of conditions that are typically considered "solitary confinement" in the scientific literature and in correctional jurisdictions across the country. I will refer to these conditions as "isolation/solitary confinement" throughout this Declaration.

18.     It is also important to note that some prisoners who are housed nearly around-the-clock inside their cells and otherwise denied access to activities and resource available to the general prison population also are housed with cellmates (i.e., are "double-celled"). They nonetheless still suffer the effects of isolated confinement. Forced double-celling under these onerous conditions does not mitigate, and indeed may exacerbate, the psychological impact of this kind of confinement. The kind of forced and strained "interactions" that take place between prisoners who are confined nearly around-the-clock in a small cell do not constitute "meaningful" social contact. To the contrary, under these harsh and deprived conditions, the forced presence of another person frequently becomes an additional stressor and source of tension (even conflict) that makes the negative reactions brought about by this kind of segregated

confinement worse. Indeed, in my experience, assaults (and sometimes lethal violence) between cellmates who are in isolated confinement is a serious problem in these kinds of units.[4]

19. What we know about the negative psychological effects of prison isolation is situated in a much larger scientific literature about the harmfulness of social isolation, loneliness, and social exclusion in society more generally. There is a wealth of scientific knowledge, based on methodologically sophisticated studies conducted over many decades, about the adverse consequences of these negative experiences as they occur in contexts and settings outside of prison. The data produced have corroborated and deepened what many of us who have been studying prison solitary confinement have learned as well—namely, that meaningful social contact is a fundamental human need whose deprivation has a range of potentially very serious psychological, and even physical, effects.

20. Psychology and other behavioral sciences have recognized for decades that the need for social contact is fundamental to establishing and maintaining emotional health and well-

---

[4] I discussed this issue in a 2018 publication, writing that:

> Even prisoners in solitary confinement who are double-celled (i.e., housed with another prisoner) may nonetheless suffer many of the negative psychological effects that are described in the following pages. In fact, in some ways, prisoners who are double-celled in prison solitary confinement units have the worst of both worlds: they are "overcrowded" by virtue of being confined nearly around-the-clock with another person inside a typically very small cell, but they are also---and this is the crux of their isolation---simultaneously kept apart from the rest of the mainstream prisoner population as well as being deprived of even minimal freedom of movement, prohibited from access to meaningful prison programs, and denied opportunities for normal, meaningful social interaction. This is especially problematic if prisoners are involuntarily double-celled, have little or no choice over the identity of the person with whom they are housed, and have no practical or feasible means of changing cellmates if they are (or become) incompatible. Because of the inevitable tensions that are created by forcing persons to live around-the-clock in such cramped, deprived conditions, double-celling in solitary confinement units tends to increase the likelihood of violent conflict.

Haney, C., Restricting the Use of Solitary Confinement, Annual Review of Criminology, 1, 285-310 (2018) (hereafter, "Haney, Restricting Solitary Confinement (2018)"), p. 290.

being.[5] Researchers have concluded that, as social neuroscientist Matthew Lieberman put it, the human brain is literally "wired to connect" to other persons and meaningful social contact is crucial to normal human development.[6] Impairing or depriving persons of the ability to connect to others undermines psychological well-being, produces a range of interrelated maladies in children as well as adults, and increases physical morbidity and mortality.[7]

21.     In society at large, social isolation and loneliness are significant risk factors for a wide range of mental health problems.[8] Specifically, social isolation increases the prevalence of

---

[5] *See* Roy Baumeister & Mark Leary, The Need to Belong: Desire for Interpersonal Attachments as a Fundamental Human Motivation, Psychological Bulletin, 117, 497-529 (1995).

[6] Matthew Lieberman, Social: Why Our Brains Are Wired to Connect. New York: Random House (2013). Lieberman wrote that: "Our brains evolved to experience threats to our social connections in much the same way they experience physical pain… The neural link between social and physical pain also ensures that staying socially connected will be a lifelong need, like food and warmth." At 4–5.

[7] *See, e.g.*, Linda Chernus, Separation/Abandonment/Isolation Trauma: What We Can Learn From Our Nonhuman Primate Relatives, Journal Emotional Abuse, 8, 469-492  (2008), p. 470 (discussing the harmful developmental consequences of early social deprivation in the form of maternal loss for humans and non-human primates).

[8] Although very closely related, the experiences of "loneliness" and "social isolation" are not identical. Loneliness is the negative *subjective* feeling of being isolated or disconnected from others, whereas social isolation is the *objective* condition of that disconnection. *See, e.g.*, Nancy Newall & Verena Menec, Loneliness and Social Isolation of Older Adults: Why It Is Important to Examine These Social Aspects Together, Journal of Social & Personal Relationships, 36, 925-939 (2019).

depression and anxiety among adolescents and adults,[9] and is related to psychosis,[10] paranoia,[11] and suicidal behavior.[12] Among those persons who already have been diagnosed or identified as suffering from psychiatric disorders in free society, isolation has been implicated in the persistence of delusional or psychotic beliefs,[13] a lack of insight into one's psychiatric symptoms,[14] and a higher rate of hospitalization and re-hospitalization.[15] Persons experiencing

---

[9] See, e.g., Joshua Hyong-Jin Cho et al., Associations of Objective Versus Subjective Social Isolation with Sleep Disturbance, Depression, and Fatigue in Community-Dwelling Older Adults, Aging & Mental Health, 23, 1130-1138 (2019); Nathaniel Dell et al., Loneliness and Depressive Symptoms in Middle Aged and Older Adults Experiencing Serious Mental Illness, Psychiatric Rehabilitation, 42, 113-120 (2019); Lixia Ge et al., Social Isolation, Loneliness and Their Relationships with Depressive Symptoms: A Population-based Study, PLoS ONE, 12(8), e0182145(2017); S. Häfner et al., Association Between Social Isolation and Inflammatory Markers in Depressed and Non-depressed Individuals: Results from the MONICA/KORA Study, Brain, Behavior, & Immunity, 25, 17011707 (2011); Lisa Jaremka et al., Pain, Depression and Fatigue: Loneliness as a Longitudinal Risk Factor, Health Psychology, 33, 948-957 (2013); C. Richardson et al., The Moderating Role of Sleep in the Relationship Between Social Isolation and Internalising Problems in Early Adolescence, Child Psychiatry & Human Development, 50, 1011-1020 (2019); Ilse van Beljouw et al., "Being All Alone Makes Me Sad": Loneliness in Older Adults With Depressive Symptoms, International Psychogeriatrics, 26, 1541-1551 (2014).

[10] See, e.g., Anson Chau, Loneliness and The Psychosis Continuum: A Meta-analysis on Positive Psychotic Experiences and a Meta-Analysis on Negative Psychotic Experiences, International Review of Psychiatry, 31, 471-490 (2019); Dorothy DeNiro, Perceived Alienation in Individuals with Residual-type Schizophrenia, Issues in Mental Health Nursing, 16, 185-200 (1995).

[11] See, e.g., Sarah Butter, Social Isolation and Psychosis-Like Experiences: A UK General Population Analysis, Psychosis, 9, 291-300 (2017).

[12] See, e.g., Raffaella Calati et al., Suicidal Thoughts and Behaviors and Social Isolation: A Narrative Review of the Literature, Affective Disorders, 245, 653-667 (2019); INSTITUTE OF MEDICINE, REDUCING SUICIDE: A NATIONAL IMPERATIVE (S.K. Goldsmith et al. eds., 2002); John L. Oliffe et al., Injury, Interiority, and Isolation in Men's Suicidality, American Journal of Men's Health, 11, 888-899 (2017).

[13] See, e.g., P. Garety et al., A Cognitive Model of the Positive Symptoms of Psychosis, Psychological Medicine, 31, 189-195 (2001), at p. 190–91 (writing about the way that social marginalization contributes to beliefs about the self as "vulnerable to threat, or about others as dangerous" and the way that "social isolation contributes to the acceptance of . . . psychotic appraisal by reducing access to alternative more normalizing explanations").

[14] See, e.g., R. White et al., The Social Context of Insight in Schizophrenia, Social Psychiatry and Psychiatric Epidemiology, 35, 500-507 (2000).

[15] See, e.g., Tennyson Mgutshini, Risk Factors for Psychiatric Re-Hospitalization: An Exploration, International Journal of Mental Health Nursing, 19, 257-257 (2010); Graham Thornicroft, Social

mental health crises also report severe loneliness which may, in turn, exacerbate their mental illness,[16] creating a downward spiral toward decompensation.

22.     In addition, there are a number of well-documented harmful physical and medical outcomes associated with social isolation and loneliness in humans, including adverse effects on neurological and endocrinological processes. As one group of researchers summarized, "[t]hese findings indicate that loneliness may compromise the structural and functional integrity of multiple brain regions."[17]

23.     In part because of what is now understood about the dramatic life-shortening effects of loneliness and social isolation, they have become a "global concern."[18] Indeed, the well-documented negative psychological and physical effects of social isolation and loneliness have been acknowledged as creating a worldwide public health crisis.[19] In 2020, the former Surgeon General of the United States, Vivek Murthy, described many of the negative effects of social isolation, made recommendations about how to best combat them, and promoted what he

---

Deprivation and Rates of Treated Mental Disorder: Developing Statistical Models to Predict Psychiatric Service Utilisation, British Journal of Psychiatry, 158, 475-484 (1991).

[16] See, e.g., Jingyi Wang et al., Epidemiology of Loneliness In a Cohort of UK Mental Health Community Crisis Service Users, Social Psychiatry and Psychiatric Epidemiology, 55, 811-822 (2019).

[17] Laetitia Mwilambwe-Tshilobo et al., Loneliness and Meaning in Life Are Reflected in the Basic Network Architecture of the Brain, Social Cognitive and Affective Neuroscience, 14, 423-433 (2019), at p. 424 (2019). See also Jacob Stein et al., Perceived Social Support, Loneliness, and Later Life Telomere Length Following Wartime Captivity, Health Psychology, 37, 1067-1076 (2018).

[18] Cathrine Mihalopoulos et al., The Economic Costs of Loneliness: A Review of Cost-of-Illness and Economic Evaluation Studies, Social Psychiatry and Psychiatric Epidemiology, 55, 823-836(2019), at p. 834. Although the authors concluded that it was difficult to precisely estimate the economic costs of loneliness and social isolation, they noted that most studies "reported excess healthcare costs associated with loneliness/isolation," and that the projected costs "are likely to be under-estimated." Id.

[19] See, e.g., N. Leigh-Hunt, An Overview of Systematic Reviews on the Public Health Consequences of Social Isolation and Loneliness, Public Health, 152, 157-171 (2017).

called "the healing power of human connection."[20] Finally, also in 2020, in a study designed to contribute to "a larger global effort to combat the adverse health impacts of social isolation,"[21] a National Academy of Sciences Committee concluded that the negative consequences of social isolation "may be comparable to or greater than other well-established risk factors such as smoking, obesity, and physical inactivity,"[22] and another group of prominent researchers termed the experience of loneliness a "lethal behavioral toxin" that accounted for more annual deaths than cancer or strokes.[23]

24.     The broad base of scientific knowledge about the harmfulness of social isolation in society at large forms the larger context for understanding the risk of harm from solitary confinement. Because of the harsh and forceful ways that solitary confinement is imposed in correctional settings, and the other deprivations that typically accompany them, the level of harmfulness is exacerbated in prison. The degree of isolation is more complete, inescapable, and occurs in addition to other extreme deprivations.[24] Indeed, researchers have consistently documented the many ways that solitary confinement damages the overall mental health of prisoners.[25] The long-term absence of meaningful human contact and social interaction, the

---

[20] Vivek Murthy, Together: The Healing Power of Human Connection in a Sometimes Lonely World. New York: Harper Collins (2020).

[21] National Academy of Science, Engineering, and Medicine, Social Isolation and Loneliness in Older Adults. Washington, DC: National Academies Press (2020), p. xii.

[22] Id. at 2–12.

[23] Dilip V. Jeste, Ellen E. Lee, and Stephanie Cacioppo, Battling the Modern Behavioral Epidemic of Loneliness: Suggestions for Research and Interventions, JAMA Psychiatry, 77(6), 553 (2020), at 553.

[24] For example, see the extended discussion of this issue in Craig Haney, The Science of Solitary: Expanding the Harmfulness Narrative, Northwestern University Law Review, 115, 211-256.

[25] The "perfect" study of the effects of solitary confinement would be relatively straightforward to design but impossible to implement. The realities of prison life and the practical and ethical challenges of conducting research in prisons (including, for example, "random assignment" to conditions) would

enforced idleness and inactivity, and the oppressive security and surveillance procedures (and the weapons, hardware, and other paraphernalia that go along with them) all combine to create starkly deprived conditions of confinement that are both hurtful and harmful. These conditions predictably impair the psychological functioning of many prisoners who are subjected to them.[26] The measured effects are cognitive, emotional, and behavioral in nature. In addition to causing irreparable damage to a person's overall psychological and physical functioning, they can be life-threatening as well.

25.     A substantial body of published literature clearly documents these distinctive patterns of psychological harm. They have been consistently identified in systematic research conducted on the nature and effects of solitary confinement, personal accounts written by persons confined in isolation, and in descriptive studies authored by mental health professionals who worked in many such places. The studies span a period of many decades, and were

---

prevent such a study from ever being conducted. For a more in-depth discussion of these issues and an extended example of the problems that can arise, see Craig Haney, The Psychological Effects of Solitary Confinement: A Systematic Critique. Crime and Justice, 47, 365-416 (2018). Notwithstanding the lack of a "perfect" study, there are numerous direct studies of solitary confinement and a vast, related scientific literature on the effects of social isolation, social exclusion, and loneliness in the larger society that definitively establish the harmful effects.

[26] For example, see: Bruce Arrigo & J. Bullock, The Psychological Effects of Solitary Confinement on Prisoners in Supermax Units: Reviewing What We Know and What Should Change, International Journal of Offender Therapy and Comparative Criminology, 52, 622-640 (2008); Kristin Cloyes, David Lovell, David Allen & Lorna Rhodes, Assessment of Psychosocial Impairment in a Supermaximum Security Unit Sample, Criminal Justice and Behavior, 33, 760-781 (2006); Stuart Grassian, Psychiatric Effects of Solitary Confinement, Washington University Journal of Law & Policy, 22, 325-383 (2006); Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement. Crime & Delinquency, 49, 124-156 (2003) (hereafter "Haney, Mental Health Issues in Long-Term Solitary (2003)"); Craig Haney, Restricting Solitary Confinement (2018), supra note 4; Craig Haney & Mona Lynch, Regulating Prisons of the Future: The Psychological Consequences of Solitary and Supermax Confinement, New York Review of Law & Social Change, 23, 477-570 (1997); and Peter Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, in Michael Tonry (Ed.), Crime and Justice (pp. 441-528). Volume 34. Chicago: University of Chicago Press (2006). There are a few outlier studies that purport to find few if any negative effects. For a detailed discussion of the serious methodological flaws that plague these studies, see: Haney, A Systematic Critique, (2018), supra note 25.

conducted in locations across several continents by researchers with different professional expertise, ranging from psychiatrists to sociologists and architects.[27]

26. Mental health and correctional staff who have worked in disciplinary segregation and isolation units have reported observing a range of problematic symptoms manifested by the prisoners confined in these places.[28] The authors of one of the early studies of solitary confinement summarized their findings by concluding that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances."[29]

27. A decade later, Professor Hans Toch's large-scale psychological study of prisoners "in crisis" in New York State correctional facilities included important observations about the effects of isolation.[30] After he and his colleagues had conducted numerous in-depth interviews of prisoners, Toch concluded that "isolation panic" was a serious problem in solitary confinement. The symptoms that Toch reported included rage, panic, loss of control and breakdowns, psychological regression, and a build-up of physiological and psychic tension that led to incidents of self-mutilation.[31] Professor Toch noted that although isolation panic could

---

[27] For example, see the studies referenced in the review articles listed in footnotes 24-26 above, and in international literature cited in footnote 33 below.

[28] Discussions of and citations to these studies appear in the review articles listed in footnotes 24-26 above and footnote 33 below.

[29] Bruno Cormier & Paul Williams, Excessive Deprivation of Liberty, Canadian Psychiatric Association Journal, 11, 470-484 (1966), at p. 484. For other early studies of solitary confinement, see: Paul Gendreau, N. Freedman, G. Wilde, & George Scott, Changes in EEG Alpha Frequency and Evoked Response Latency During Solitary Confinement, Journal of Abnormal Psychology, 79, 54-59 (1972); George Scott & Paul Gendreau, Psychiatric Implications of Sensory Deprivation in a Maximum Security Prison, Canadian Psychiatric Association Journal, 12, 337-341 (1969); Richard H. Walters, John E. Callagan & Albert F. Newman, Effect of Solitary Confinement on Prisoners, American Journal of Psychiatry, 119, 771-773 (1963).

[30] Hans Toch, Men in Crisis: Human Breakdowns in Prisons. Aldine Publishing Co.: Chicago (1975).

[31] Id. at 54.

occur under other conditions of confinement it was "most sharply prevalent in segregation." Moreover, it marked the "distinction between imprisonment, which is tolerable, and isolation, which is not."[32]

28.     More recent studies have identified numerous problematic and potentially dangerous symptoms that prisoners housed in solitary confinement disproportionately suffer. Those symptoms include: appetite and sleep disturbances, anxiety, panic, a sense of impending emotional breakdown, lethargy, hypersensitivity to stimuli, irritability, aggression, rage, loss of control, ruminations, paranoia, perceptual distortions, cognitive dysfunction, hallucinations, depression, self-mutilation, suicidal ideation and behavior, and social withdrawal.[33]

---

[32] Ibid.

[33] In addition to the numerous studies cited in the articles referenced supra at note 27-29, there is a significant international literature on the adverse effects of solitary confinement. For example, see Henri Barte, L'Isolement Carceral, Perspectives Psychiatriques, 28, 252 (1989). Barte analyzed what he called the "psychopathogenic" effects of solitary confinement in French prisons and concluded that prisoners placed there for extended periods of time could become schizophrenic instead of receptive to social rehabilitation. He argued that the practice was unjustifiable, counterproductive, and "a denial of the bonds that unite humankind." In addition, see: Reto Volkart, Einzelhaft: Eine Literaturubersicht (Solitary confinement: A literature survey), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 1-24 (1983) (reviewing the empirical and theoretical literature on the negative effects of solitary confinement); Reto Volkart, Adolf Dittrich, Thomas Rothenfluh, & Paul Werner, Eine Kontrollierte Untersuchung uber Psychopathologische Effekte der Einzelhaft (A controlled investigation on psychopathological effects of solitary confinement), Psychologie - Schweizerische Zeitschrift fur Psychologie und ihre Anwendungen, 42, 25-46 (1983) (when prisoners in "normal" conditions of confinement were compared to those in solitary confinement, the latter were found to display considerably more psychopathological symptoms that included heightened feelings of anxiety, emotional hypersensitivity, ideas of persecution, and thought disorders); Reto Volkart, et al., Einzelhaft als Risikofaktor fur Psychiatrische Hospitalisierung (Solitary confinement as a risk for psychiatric hospitalization), Psychiatria Clinica, 16, 365-377 (1983) (finding that prisoners who were hospitalized in a psychiatric clinic included a disproportionate number who had been kept in solitary confinement); Boguslaw Waligora, Funkcjonowanie Czlowieka W Warunkach Izolacji Wieziennej (How men function in conditions of penitentiary isolation), Seria Psychologia I Pedagogika NR 34, Poland (1974) (concluding that so-called "pejorative isolation" of the sort that occurs in prison strengthens "the asocial features in the criminal's personality thus becoming an essential cause of difficulties and failures in the process of his resocialization").  See, also, Ida Koch, Mental and Social Sequelae of Isolation: The Evidence of Deprivation Experiments and of Pretrial Detention in Denmark, in The Expansion of European Prison Systems, Working Papers in European Criminology, No. 7, 119 (Bill Rolston & Mike Tomlinson eds. 1986) who found evidence of "acute isolation syndrome" among detainees that occurred after only a few days in isolation and included "problems of concentration, restlessness, failure of

29.     In addition, there are correlational studies of the relationship between housing type and various kinds of incident reports in prison. They show that self-mutilation and suicide are more prevalent in isolated, punitive housing units such as administrative segregation and security housing where prisoners are subjected to solitary-like conditions of confinement. For example, clinical researchers Ray Patterson and Kerry Hughes attributed higher suicide rates in solitary confinement-type units to the heightened levels of "environmental stress" that are generated by the "isolation, punitive sanctions, [and] severely restricted living conditions" that exist there.[34]  These authors reported that "the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide."[35]  In addition, signs of deteriorating mental and physical health (beyond self-injury),

---

memory, sleeping problems and impaired sense of time an ability to follow the rhythm of day and night" (at p. 124). If the isolated confinement persisted—"a few weeks" or more—there was the possibility that detainees would develop "chronic isolation syndrome," including intensified difficulties with memory and concentration, "inexplicable fatigue," a "distinct emotional lability" that can include "fits of rage," hallucinations, and the "extremely common" belief among isolated prisoners that "they have gone or are going mad" (at p. 125). See, also: Michael Bauer, Stefan Priebe, Bettina Haring & Kerstin Adamczak, Long-Term Mental Sequelae of Political Imprisonment in East Germany, Journal of Nervous & Mental Disease, 181, 257-262 (1993), who reported on the serious and persistent psychiatric symptoms suffered by a group of former East German political prisoners who sought mental health treatment upon release and whose adverse conditions of confinement had included punitive isolation.

[34] Raymond Patterson & Kerry Hughes, Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999-2004, Psychiatric Services, 59, 676-682 (2008), at p. 678.

[35] Ibid. See also: Lindsay M. Hayes, National Study of Jail Suicides: Seven Years Later. Special Issue: Jail Suicide: A Comprehensive Approach to a Continuing National Problem, Psychiatric Quarterly, 60, 7 (1989); Alison Liebling, Vulnerability and Prison Suicide, British Journal of Criminology, 36, 173-187 (1995); Alison Liebling, Prison Suicide and Prisoner Coping, Crime and Justice, 26, 283-359 (1999); and Paolo Roma, Maurizio Pompili, David Lester, Paolo Giradi, & Stefano Ferracito. Incremental Conditions of Isolation as a Predictor of Suicide in Prisoners. Forensic Science International, 233 (2013), e1-e2. Prisoners appear to be at greatest risk of suicide early in their stay in solitary confinement, but they remain at risk throughout. See Bruce Way, Donald Sawyer, Sharen Barboza, & Robin Nash, Inmate Suicide and Time Spent in Special Disciplinary Housing in New York State Prison. Psychiatric Services, 58(4), 558-560 (2007). Homer Venters and his colleagues have found similar increased risk of self-harm among isolated jail inmates. See: Fatos Kaba, Anrea Lewis, Sarah Glowa-Kollisch, James Hadler, et al. (2014). Solitary Confinement and Risk of Self-Harm among Jail Inmates. American Journal of Public Health, 104(3), 442-447 (2014).

other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence are also more prevalent in these units.[36]

30.      The painfulness and damaging potential of extreme forms of solitary confinement is underscored by its use in so-called "brainwashing" and certain forms of torture. In fact, many of the negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress disorder ("PTSD") and the kind of psychiatric sequelae that plague victims of what are called "deprivation and constraint" torture techniques.[37]

31.      The prevalence of psychological symptoms (that is, the extent to which prisoners who are placed in these units suffer from these and related symptoms) is often very high. For example, in an early study that I conducted of a representative sample of one hundred prisoners

---

[36] For example, see Howard Bidna, Effects of Increased Security on Prison Violence, Journal of Criminal Justice, 3, 33-46 (1975); K. Anthony Edwards, Some Characteristics of Prisoners Transferred from Prison to a State Mental Hospital, Behavioral Sciences and the Law, 6, 131-137 (1988); Elmer H. Johnson, Felon Self-Mutilation: Correlate of Stress in Prison, in Bruce L. Danto (Ed.) Jail House Blues. Michigan: Epic Publications (1973); Anne Jones, Self-Mutilation in Prison: A Comparison of Mutilators and Nonmutilators, Criminal Justice and Behavior, 13, 286-296 (1986); Peter Kratcoski, The Implications of Research Explaining Prison Violence and Disruption, Federal Probation, 52, 27-32 (1988); Ernest Otto Moore, A Prison Environment: Its Effect on Health Care Utilization, Dissertation Abstracts, Ann Arbor, Michigan (1980); Frank Porporino, Managing Violent Individuals in Correctional Settings, Journal of Interpersonal Violence, 1, 213-237 (1986); and Pamela Steinke, Using Situational Factors to Predict Types of Prison Violence, 17 Journal of Offender Rehabilitation, 17, 119-132 (1991).

[37] Solitary confinement is among the most frequently used psychological torture techniques.  In D. Foster, Detention & Torture in South Africa: Psychological, Legal & Historical Studies, Cape Town: David Philip (1987), Psychologist Foster listed solitary confinement among the most common "psychological procedures" used to torture South African detainees (at p. 69), and concluded that "[g]iven the full context of dependency, helplessness and social isolation common to conditions of South African security law detention, there can be little doubt that solitary confinement under these circumstances should in itself be regarded as a form of torture" (at p. 136). See also: Matthew Lippman, The Development and Drafting of the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 27 Boston College International & Comparative Law Review, 27, 275 (1994); Tim Shallice, Solitary Confinement—A Torture Revived? New Scientist, November 28, 1974; F.E. Somnier & I.K. Genefke, Psychotherapy for Victims of Torture, British Journal of Psychiatry, 149, 323-329 (1986); and Shaun R. Whittaker, Counseling Torture Victims, The Counseling Psychologist, 16, 272-278 (1988).

who were housed in the Security Housing Unit at Pelican Bay Prison in California, I found that every symptom of psychological distress that I measured but one (fainting spells) was suffered by more than half of the prisoners who were interviewed.[38] Many of the symptoms were reported by two-thirds or more of the prisoners assessed in this isolation housing unit, and some were suffered by nearly everyone. Well over half of the Pelican Bay isolated prisoners in this study reported a constellation of symptoms—headaches, trembling, sweaty palms, and heart palpitations—that is commonly associated with hypertension.

32.     With respect to a separate set of symptoms—those that have been identified in the literature as direct psychopathological effects of isolation—I also found that almost all of the prisoners whom I evaluated reported ruminations or intrusive thoughts, an oversensitivity to external stimuli, irrational anger and irritability, difficulties with attention and often with memory, and a tendency to socially withdraw. Almost as many prisoners reported a constellation of symptoms indicative of mood or emotional disorders—concerns over emotional flatness or losing the ability to feel, swings in emotional responding, and feelings of depression or sadness that did not go away. Finally, sizable minorities of the prisoners reported symptoms that are typically only associated with more extreme forms of psychopathology—hallucinations, perceptual distortions, and thoughts of suicide.

33.     In addition to these specific symptoms of psychological stress and the psychopathological reactions to isolation that have been well-documented by myself and others, the extreme and long-term deprivation of social contact destabilizes a person's sense of self,

---

[38] See discussions of these data in Haney, Mental Health Issues in Long-Term Solitary (2003), supra note 26, and more recent data collected at the same facility, showing much the same pattern of results, Haney, Restricting Solitary Confinement (2018), cited in footnote 4 above.

undermines their social identity, and ultimately can destroy their ability to function normally in free society.

34.     The experience of social isolation is psychologically harmful and potentially destabilizing in part because it deprives people of the opportunity to affiliate with others. The importance of "affiliation"—the opportunity to have meaningful contact with others—in reducing anxiety in the face of uncertain or fear-arousing stimuli is long-established in social psychological literature.[39]  In addition, one of the ways that people determine the appropriateness of their feelings—indeed, how we establish the very nature and tenor of our emotions—is through contact with others.[40]

35.     Solitary confinement is a socially pathological environment that forces long-term inhabitants to develop their own socially pathological adaptations—ones premised on the absence of meaningful contact with people—in order to function and survive. As a result, prisoners gradually change their patterns of thinking, acting and feeling to cope with their largely asocial world and the impossibility of relying on social support or the routine feedback that comes from normal contact with others. These adaptations thus represent "social pathologies"

---

[39] For example, see: Stanley Schachter, The Psychology of Affiliation: Experimental Studies of the Sources of Gregariousness. Stanford, CA: Stanford University Press (1959); Irving Sarnoff & Philip Zimbardo, Anxiety, Fear, and Social Affiliation, Journal of Abnormal Social Psychology, 62, 356-363 (1961); Philip Zimbardo & Robert Formica, Emotional Comparison and Self-Esteem as Determinants of Affiliation, Journal of Personality, 31, 141-162 (1963).

[40] For example, see: A. Fischer, A. Manstead, & R. Zaalberg, Social Influences on the Emotion Process, in M. Hewstone & W. Stroebe (Eds.), European Review of Social Psychology (pp. 171-202). Volume 14. Wiley Press (2004); C. Saarni, The Development of Emotional Competence. New York: Guilford Press (1999); Stanley Schachter & Jerome Singer, Cognitive, Social, and Physiological Determinants of Emotional State, Psychological Review, 69, 379-399 (1962); L. Tiedens & C. Leach (Eds.), The Social Life of Emotions. New York: Cambridge University Press (2004); and S. Truax, Determinants of Emotion Attributions: A Unifying View, Motivation and Emotion, 8, 33-54 (1984).

brought about by the socially pathological environment of isolation. However, , they can become internalized so deeply that they persist long after time in isolation has ended.

36.     For example, in order to cope with the asociality of their daily existence, some prisoners move from initially being starved for social contact to eventually being disoriented and even frightened by it. As they become increasingly unfamiliar and uncomfortable with social interaction, they are further alienated from others and made anxious in their presence.  Indeed, this explains the seeming paradox where some prisoners socially withdraw even further from the world around them, receding even more deeply into themselves than the sheer physical isolation of solitary confinement and its attendant procedures require. .

37.     Although social deprivation is at the core of solitary confinement, and what seemingly accounts for its most intense psychological pain and the greatest risk of harm, prison isolation units inflict additional deprivations on prisoners that negatively impact their health in significant ways. The characteristically high levels of repressive control, enforced idleness, reduced positive environmental stimulation, and physical and material deprivations also lead to psychological distress and can create even more lasting negative consequences. Indeed, most of the things that we know are beneficial to prisoners—such as increased participation in institutional programming, visits with persons from outside the prison, physical exercise, and so on[41]—are either functionally denied or greatly restricted in solitary confinement units.

38.     People also require a certain level of mental and physical activity in order to remain healthy. The extremely limited opportunities for movement and exercise in most solitary confinement units unquestionably impacts prisoners' mental as well as physical health.  Simply

---

[41] John Wooldredge, Inmate Experiences and Psychological Well-Being, <u>Criminal Justice and Behavior</u>, <u>26</u>, 235-250 (1999).

put, without sufficient access to normal physical activity, prisoners are also placed at risk of harm.

39.    Apart from the profound social, psychological, and physical deprivations that solitary confinement imposes, isolated prisoners experience extended periods of monotony and idleness. Many of them experience a form of sensory deprivation—there is an unvarying sameness to the physical stimuli that surround them, they exist within the same limited spaces and are subjected to the same repetitive routines, and there is little or no external variation to the experiences they are permitted to have or can create for themselves. This loss of perceptual and cognitive or mental stimulation may result in the atrophy of important related skills and capacities.[42]

40.    Scientific research also indicates that the adverse effects of isolated confinement can persist <u>long after</u> such confinement ends,[43] including even after a person has been released from prison. For example, solitary confinement survivors suffer post-prison adjustment problems at higher rates than the already high rates experienced by formerly incarcerated persons in general, including being more likely to manifest symptoms of PTSD.[44]

---

[42] See the articles cited in the reviews referenced in footnotes 24-26 above. In addition, see: Stanley Brodsky & Forrest Scogin, Inmates in Protective Custody: First Data on Emotional Effects, <u>Forensic Reports</u>, <u>1(4)</u>, 267-289 (1988).

[43] For example, a group of Stanford researchers found that behavioral patterns and psychological reactions developed in the course of adapting to solitary confinement were persistent and problematic when formerly long-term isolated prisoners attempted to transition back to mainline prison housing. *See* Human Rights in Trauma Mental Health Lab, Stanford University, <u>Mental Health Consequences Following Release From Long-Term Solitary Confinement in California</u> (2017)  available at https://ccrjustice.org/sites/default/files/attach/2018/04/CCR_StanfordLab-SHUReport.pdf [https://perma.cc/5WGK-UBBN]. Psychiatrist Terry Kupers, who has written extensively about the mental health risks of solitary confinement, has termed the lingering effects of the experience "SHU postrelease syndrome." See: Kupers, T. (2017). <u>Solitary: The Inside Story of Supermax Isolation and What We Can Do to Abolish It</u>. Oakland, CA: University of California Press, especially pp. 151-167.

[44] See e.g., Brian Hagan et al., History of Solitary Confinement Is Associated with Post-Traumatic Stress Disorder Symptoms among Individuals Recently Released from Prison, <u>Journal of Urban Health</u>, <u>95,</u> 141-

41.     Relatedly, the stressfulness and long-term damage that is inflicted by solitary confinement can adversely affect someone's life expectancy. A recent study done by medical researcher Lauren Brinkley-Rubinstein and her colleagues, analyzing the experiences of more than 200,0000 people who were released from a state prison system between 2000 and 2015, confirmed this. The researchers found that those persons who spent *any* time in solitary-type confinement (such as administrative or disciplinary segregation) "were 24% more likely to die in the first year after release."[45] Prisoners who spent time in solitary-type confinement also were more likely to commit suicide (78% more likely than other inmates) and to be victims of homicide (54% more likely) after being released from prison,[46] and they were "127% more likely to die of an opioid overdose in the first 2 weeks after release."[47]

42.     Not every isolated prisoner will experience all nor necessarily even most of the range of adverse reactions that I have described above. But the nature and magnitude of the negative psychological consequences underscore the stressfulness of this kind of confinement, the lengths to which prisoners must go to adapt and adjust to it, and the grave risk of harm that is created by isolation and its broad range of severe stressors and deprivations. The devastating effects of solitary confinement are reflected in the disproportionately high numbers of suicide deaths and incidents of self-harm and self-mutilation that occur there.  Years of sustained

---

148 (2018); and Arthur Ryan & Jordan DeVylder, Previously Incarcerated Individuals with Psychotic Symptoms Are More Likely to Report a History of Solitary Confinement. Psychiatry Research, 290, 113064 (2020). https://doi.org/10.1016/j.psychres.2020.113064.

[45] Lauren Brinkley-Rubinstein, et al., Association of Restrictive Housing During Incarceration With Mortality After Release, Journal of American Medicine (October 4, 2019), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2752350.

[46] Id.

[47] Id.

research on solitary confinement and the observable outcomes produced by this form of incarceration across time and locality underscore its severe, negative impact the cognitive, emotional, and behavioral functioning of persons exposed to it. The effects are long-lasting and, for some persons, will prove irreversible.

## V.     The Exacerbating Effects of Isolation on Mental Illness

43.     Although isolated confinement creates risks of harm for all persons subjected to it, most experts acknowledge that the adverse psychological effects of such confinement vary as a function not only of the specific nature and duration of the isolation (such that more deprived conditions experienced for longer amounts of time are likely to have more detrimental consequences), but also as a function of the characteristics of the prisoners subjected to it. Unusually resilient prisoners may be able to withstand even harsh forms of solitary confinement with few or minor adverse effects. Conversely, some prisoners are especially vulnerable to the psychological pain and pressure of solitary confinement. Mentally ill prisoners are particularly at risk in these environments and have been precluded from them in some jurisdictions precisely because of this.[48]

44.     Several factors explain the heightened vulnerability of persons with mental illness in isolated confinement. For one, as I have noted, solitary confinement or isolation is a significantly more stressful and psychologically painful form of prison confinement. Mentally ill prisoners are generally more sensitive and reactive to psychological stressors and emotional pain. In many ways, the harshness and severe levels of deprivation that are imposed on them in

---

[48] For example, see: Madrid v. Gomez, 889 F.Supp. 1146 (N.D. Cal. 1995); Ruiz v. Johnson, 37 F.Supp.2d 855 (S.D. Tex. 1999); Jones'El v. Berge, 164 F. Supp.2d 1096 (W.D. Wisc. 2001); and Ind. Protection and Advocacy Comm'n v. Comm'r, Ind. Dep't of Corr., No. 1:08-CV-01317-TWP, 2012 WL 6738517 (S.D. Ind. 2012).

isolation are the antithesis of the benign and socially supportive atmosphere that mental health clinicians seek to create within therapeutic environments. Not surprisingly, mentally ill prisoners generally deteriorate and decompensate when they are placed in harsh and stressful isolation units.

45.     Some of the exacerbation of mental illness that occurs in isolated confinement comes about as a result of the critically important role that social contact and social interaction play in maintaining psychological equilibrium. Psychologists and psychiatrists know that social contact and social interaction are essential components in the creation and maintenance of normal social identity and social reality. One of the most fundamental ways that solitary confinement psychologically destabilizes prisoners is by undermining their sense of self or social identity and eroding their connection to a shared social reality. Isolated prisoners have few if any opportunities to receive feedback about their feelings and beliefs, which become increasingly untethered from any normal social context. As Cooke and Goldstein put it:

A socially isolated individual who has few, and/or superficial contacts with family, peers, and community cannot benefit from social comparison. Thus, these individuals have no mechanism to evaluate their own beliefs and actions in terms of reasonableness or acceptability within the broader community. They are apt to confuse reality with their idiosyncratic beliefs and fantasies and likely to act upon such fantasies, including violent ones.[49]

In extreme cases, a related pattern emerges: isolated confinement becomes so painful, so bizarre, and so impossible to make sense of that some prisoners create their own reality—they live in a world of fantasy instead of the intolerable one that surrounds them.

46.     Finally, many of the direct negative psychological effects of isolation are themselves very similar if not identical to certain symptoms of mental illness. Even though these

---

[49] Compare, also, Margaret Cooke & Jeffrey Goldstein, Social Isolation and Violent Behavior, Forensic Reports, 2, 287-294 (1989), at p. 288.

specific effects are typically thought to be less chronic or persistent when produced by the prisoner's conditions of confinement than those that derive from a diagnosable mental illness, when they occur in combination, they are likely to exacerbate not only the outward manifestation of the symptoms but also the internal experience of the disorder. For example, many studies have documented the degree to which isolated confinement contributes to feelings of lethargy, hopelessness, and depressed mood. For clinically depressed prisoners, these situational effects are likely to exacerbate their pre-existing chronic condition and lead to worsening of their depressed state. Similarly, the mood swings that some prisoners report in isolation would be expected to amplify the emotional instability that prisoners diagnosed with bipolar disorder suffer. Prisoners who suffer from disorders of impulse control would likely find their pre-existing condition made worse by the frustration, irritability, and anger that many isolated prisoners report experiencing. And prisoners prone to psychotic breaks may suffer more in isolated confinement due to conditions that deny them the stabilizing influence of normal social feedback.

47.     As a result of the special vulnerability of mentally ill prisoners to the psychological effects of solitary confinement, numerous corrections officials and courts that have considered the issue have prohibited them from being placed in such units.[50] Mental health staff in many prison systems with which I am familiar are charged with the responsibility of screening prisoners in advance of their possible placement in isolation (so that the mentally ill can be excluded). In addition, mental health staff in these systems also typically conduct ongoing monitoring of non-mentally ill prisoners housed in solitary confinement, to detect signs of emerging mental illness that would require their removal.

---

[50] See the cases cited in footnote 48.

48.     For example, twenty-five years ago, one federal court that was presented with systematic evidence of the psychological risk of harm that solitary confinement entailed concluded that the seriously mentally ill must be excluded from such environments. The court noted that those prisoners for whom the psychological risks were "particularly"—and unacceptably—high included anyone suffering from "overt paranoia, psychotic breaks with reality, or massive exacerbations of existing mental illness as a result of the conditions in [solitary confinement]."[51]  The court elaborated on this conclusion by noting that those who should be excluded from isolated confinement included:

> [T]he already mentally ill, as well as persons with borderline personality disorders, brain damage or mental retardation, impulse-ridden personalities, or a history of prior psychiatric problems or chronic depression. For these inmates, placing them in [isolated confinement] is the mental equivalent of putting an asthmatic in a place with little air to breathe. The risk is high enough, and the consequences serious enough, that we have no hesitancy in finding that the risk is plainly "unreasonable."[52]

49.     In addition to federal courts that have directly considered the issue, many professional organizations have recommended drastic limitations on the use of solitary confinement or the outright prohibitions against placing certain vulnerable populations (such as the mentally ill) in isolated housing. For example, the American Psychological Association acknowledged that solitary confinement was associated with heightened risk of self-mutilation and suicidality, a range of adverse psychological symptoms such as anxiety, depression, sleep disturbance, paranoia and aggression as well as the exacerbation of pre-existing mental illness

---

[51] Madrid v. Gomez, 889 F.Supp. 1146, 1265 (N.D. Cal. 1995) (citation omitted).

[52] Ibid.

and trauma-related symptoms.[53] The American Public Health Association issued a statement in which it detailed the public-health harms posed by solitary confinement, urged correctional authorities to "eliminate solitary confinement for security purposes unless no other less restrictive option is available to manage a current, serious, and ongoing threat to the safety of others," and recommended that "[p]unitive segregation should be eliminated."[54]

50.     Similarly, the American Psychiatric Association recommended that "Prolonged segregation of adult inmates with serious mental illness, with rare exceptions, should be avoided due to the potential for harm to such inmates."[55] The position statement of the Society of Correctional Physicians similarly acknowledged "that prolonged segregation of inmates with serious mental illness, with rare exceptions, violates basic tenets of mental health treatment," and recommended against holding these prisoners in segregated housing for more than four weeks).[56]

51.     Other organizations have also recommended banning the use of solitary confinement outright for use with prisoners who are mentally ill, including the United Nations,[57] and the National Commission on Correctional Healthcare.[58] Similarly, the National Alliance on

---

[53] American Psychological Association. 2017. Solitary Confinement of Juvenile Offenders. https://www.apa.org/about/gr/issues/cyf/solitary.pdf

[54] American Public Health Association. 2013. Solitary Confinement as a Public Health Issue. Policy No. 201310. http://www.apha.org/advocacy/policy/policysearch/default.htm?id=1462

[55] American Psychiatric Association. 2012. Position Statement on Segregation of Prisoners with Mental Illness. http://www.psych.org/File%20Library/Learn/Archives/ps2012_PrisonerSegregation.pdf.

[56] Society of Correctional Physicians. 2013. Position Statement, Restricted Housing of Mentally Ill Inmates. http://societyofcorrectionalphysicians.org/resources/position-statements/restricted-housing-of-mentally-ill-inmates

[57] Commission on Crime Prevention and Criminal Justice, United Nations Standard Minimum Rules for the Treatment of Prisoners. New York: UN Economic and Social Council (2015), commonly known as the "Mandela Rules."

[58] Specifically, the NCCHC Position Statement included the provision that juveniles, mentally ill individuals, and pregnant women should be "excluded from solitary confinement of any duration"

Mental Illness issued a statement "oppos[ing] the use of solitary confinement and equivalent forms of extended administrative segregation for persons with mental illnesses."[59]

52.     Finally, a number of jurisdictions across the U.S. are moving towards severely restricting or ending the use of long-term solitary confinement based on the scientific findings and outcomes I have summarized above.  For example, in 2017, Colorado, led by the director of its Department of Corrections, barred the use of isolation in its prisons other than for serious disciplinary infractions and limited the length of stay to no longer than 15 days. In 2019, New Jersey passed a law prohibiting use of solitary confinement in prisons and jails statewide for more than 20 consecutive days or longer than 30 days during a 60-day period. New Jersey also prohibited use of solitary confinement for people with serious mental illness. Also in 2019, Washington State Department of Corrections joined a number of states that have entered into a partnership with the Vera Institute of Justice to reduce the use of restrictive housing.  I am a member of this Advisory Board of the Vera Institute program, called Safe Alternatives to

---

(emphasis added), and that health care staff should advocate to correctional officials that stays in solitary confinement should never exceed 15 days continuous duration, and also advocate to them that they should bar juveniles and mentally ill prisoners entirely from such confinement.

[59] National Alliance on Mental Illness. 2016. Public Policy Platform of the National Alliance on Mental Illness. 12th Edition. Arlington, VA: NAMI. https://www.nami.org/About-NAMI/Policy-Platform, Section 9.8. Similarly, in 2018, a group of international legal, medical, mental health, and human rights scholars and experts were convened in Santa Cruz, California, to produce a set of "guiding principles" designed to advance solitary confinement reform in the United States and internationally. The principles established in the Consensus Statement that resulted included the overarching admonitions that solitary confinement should only be used when absolutely necessary (i.e., in response to exigent circumstances that cannot be addressed any other way), for the shortest amount of time possible (from periods of a few hours to no more than a 15-day maximum), and never with certain vulnerable populations (such as juveniles and the mentally ill). Haney, C., Williams, B., & Ahalt, C., Consensus statement from the Santa Cruz Summit on Solitary Confinement and Health, Northwestern University Law Review, 115, 335-360 (2020).

Segregation, and can attest that, over the last several years, a number of state correctional and county jail systems also have enrolled in this program and have implemented steps to significantly reduce the population of prisoners held in isolation/solitary confinement, significantly improve the conditions of confinement to which they are subjected, and imposed time limits on lengths of stay in these units. Even more recently, New York State enacted legislation prohibiting prison and jails statewide from holding people in solitary confinement for more than 15 consecutive days, and disallowing solitary confinement completely for people under 22 or over 54 years of age, those who are pregnant, people with disabilities, and people with serious mental illness.[60]

53.     To summarize: The accumulated weight of the scientific evidence that I have cited to and summarized above demonstrates the negative psychological effects of isolated confinement—what happens to people who are deprived of normal social contact for extended periods of time. This evidence underscores the substantial dangers that isolation creates for human beings in the form of mental pain and suffering and increased tendencies towards self-harm and suicide, and even physical damage, susceptibility to harmful medical conditions, and heightened mortality. The evidence further underscores the psychological _and_ medical importance of meaningful social contact and interaction, and in essence establishes these things as identifiable human needs. Over the long-term, they may be as essential to a person's psychological well-being as adequate food, clothing, and shelter are to his or her physical well-being.

---

[60] Links to news reports that detail these solitary confinement reforms can be found here: https://www.nytimes.com/2021/04/01/nyregion/solitary-confinement-restricted.html; https://www.governor.ny.gov/news/governor-cuomo-signs-halt-solitary-confinement-act-law; https://www.aclu.org/blog/prisoners-rights/solitary-confinement/why-i-ended-horror-long-term-solitary-colorados-prisons; https://www.aclu-nj.org/news/2019/07/11/gov-murphy-signs-isolated-confinement-restriction-act-law; https://www.doc.wa.gov/news/2020/10282020.htm

VI.     **The Nature and Effects of Isolation/Solitary Confinement in the FDC**

54.     Despite the scientifically well-established significant risk of serious harm that isolation/solitary confinement represents, and notwithstanding a host of professional mental health, human rights, legal, and correctional mandates and admonitions against its use, the FDC subjects a very high number of prisoners—upwards of 10% or more of its total population—to these dangerous conditions.

A.     **Harsh and Dangerous Conditions, Procedures, and Treatment in Isolation/Solitary Confinement in the Florida Department of Corrections (FDC)**

55.     Isolated/solitary confinement takes one of several forms in the FDC, all of which deny prisoners opportunities for adequate levels of meaningful social contact and subject them to a range of other severe deprivations. Prisoners in the FDC typically enter isolated/solitary confinement through placement in Administrative Confinement (where prisoners who are being investigated for possible disciplinary infractions are placed, along with those being separated from general population housing for protection or safety reasons). [61] Persons who are found guilty of having committed a disciplinary infraction are sentenced to a term in Disciplinary Confinement.[62] Although the terms are specific in duration, they can and often are "stacked"—a single incident resulting in a prisoner being charged and sentenced for multiple infractions—resulting in lengthy stays in isolation.

56.     Placement in another widespread form of isolated/solitary confinement, Close Management ("CM"), is largely discretionary in nature. Placement in Close Management does not require any specific disciplinary infraction or offense—only the FDC's judgment that

---

[61] EHA00112521 at 4-5.

[62] Id.

someone has "demonstrated an inability to live in the general population without abusing the rights and privileges of others."[63] A person can be, and many are, housed in CM for many years, with no recourse to secure their release.

57.     Finally, whether or not they have been found guilty of a specific disciplinary infraction, persons can be placed on "Maximum Management" on the basis of being deemed an "extreme security risk."[64] There is no time limit for Maximum Management confinement.

58.     Whatever the specific designation of the particular FDC isolation/solitary confinement unit, they <u>all</u> greatly restrict and essentially prevent access to meaningful social interaction and subject prisoners to additional severe deprivations.[65] They vary only minimally in the degree of social and other forms of deprivation to which prisoners housed in them are subjected. They all constitute a form of isolated/solitary confinement of the type that has been studied in scientific research and found to place persons at significant risk of serious physical and psychological harm.

59.     More specifically, no matter which official label the FDC applies to the particular housing unit, persons in AC, DC, CM, and Max Management are all confined in small cells 22 or more hours per day, are subjected to severe forms of monitoring and control, and are deprived of access to positive environmental stimulation and material goods and services to which prisoners in FDC general population housing units have routine access.[66] They eat, sleep, and defecate in

---

[63] Id.

[64] Id.

[65] DHA00017301-04 (33-602.820 Maximum Management); DHA00026770-76 (33-602.222 Disciplinary Confinement); DHA00027133-40 (33-602.220 Administrative Confinement); DHA00000088-100 (33-601.800 Close Management).

[66] EHA00014451-68 at 5-8, 15-16.

the same small cells, ones that they are virtually never allowed to leave. Seemingly mundane but critically important aspects of the prisoners' day-to-day lives are controlled by correctional staff. Officers turn lights off late at night and back on early in the morning, and may neglect to do so. In some units, the flushing of toilets is timed and controlled by officers; when they fail to do so, cells smell of waste in unflushed toilets.

60.     The deprivation of meaningful social contact and interaction is especially severe in these units. FDC prohibits prisoners in isolation/solitary confinement from yelling to prisoners in other cells and punishes them with additional segregation time when they attempt to do so. Prisoners who violate "no talking" rules in these units may also be pepper sprayed or cell extracted for the infraction. Communication with correctional staff (including mental health and medical staff) typically occurs "cell front"—which means that it is mediated by the solid steel doors on the isolation/solitary confinement cells. For obvious reasons, this impedes candor and undermines the nature and quality of the information that can be shared.

61.     As I noted earlier, there is a widespread consensus among mental health professionals and others (including by the National Commission on Correctional Healthcare) that mentally ill persons are especially likely to be harmed by isolation and therefore should be excluded from solitary confinement. If they are placed in these kinds of environments, even for short periods of time, the very minimum that they should receive is careful, ongoing monitoring (to detect potential decompensation) and enhanced mental health services, to assist them in withstanding the additional stressors to which they are subjected. Otherwise, their conditions are likely to significantly worsen and they are great risk of engaging in self-harm, including suicide. None of these precautions appear to be followed in the FDC isolation/solitary confinement units.

A shockingly high number of mentally ill prisoners are housed in these housing units,[67] where they receive minimal to no meaningful mental health monitoring at all, and where most receive no actual mental health therapy other than psychotropic medications.

62.    Mental health "contacts" appear to be limited to at most weekly cell-front status "check-ins" that are not only brief or in passing but non-confidential and do not involve any kind of clinical interview. Out-of-cell contacts with medical and mental health staff are discouraged by correctional officers, require that prisoners be "strip searched" before they are escorted from their cells in full restraints, and sometimes take place in inhospitable settings such as unit showers or telephone booth-sized cages that are semi-public and non-confidential (in part because correctional officers are often within earshot of the conversations).  Even when they are taken to an office on the unit, a correctional officer is nearby during the visit. The regular contacts that mentally ill prisoners in FDC's isolation/solitary confinement units—held in the same inhospitable and non-confidential settings—are infrequent. Except for the most seriously mentally ill, who are seen on a weekly basis, regular clinical contacts are limited to every 30 or 90 days. Group therapy is made available to only a small percentage of mentally ill prisoners in isolation/solitary confinement, is typically conducted in the presence of non-clinical prison staff, and proceeds with prisoners shackled at their hands and feet, including when they are placed in individual cages.

63.    FDC prisoners in isolation/solitary confinement are not only deprived of meaningful social contact inside their housing units but also have extremely limited access to outside visitation. Except for CM III prisoners, visitation is conducted on a non-contact basis.

---

[67] FDC reported that 23% (897) of the people locked in Close Management were diagnosed with Serious Mental Illness.  EHA00112521 (1) at 3.

This restriction means that the overwhelming majority of prisoners in isolation/solitary confinement in the FDC are forced to go for months or years (and, in extreme cases, decades), without being able to touch another human being with affection.

64.     In addition to the deprivation of meaningful social contact and interaction, FDC prisoners housed in isolation/solitary confinement conditions are prevented from having access to positive environmental stimulation, or to programs, activities, and material possessions that are essential to their well-being. Prisoners are confined in units that limit and restrict their access to the natural environment. In fact, in some units, windows that look provide views of the outside world have been obstructed or covered. Prisoners cannot see the surroundings—sky, grass, trees—outside the cells and housing units in which they are confined, and are sometimes punished for standing and looking at the outside world for too long.

65.     Prisoners in these units are deprived of access to meaningful recreation and rehabilitation. For example, none of the prisoners in FDC's isolation/solitary confinement units are permitted to have televisions. FDC prohibits tablets for anyone in isolation except for those in CM III. Those in Maximum Management can have radios only after six months with approval from a Regional Director, those in Disciplinary Confinement can never have them, and everyone else can have radios only if they have the funds to purchase them and batteries. Outdoor recreation is limited to being alone in cages that resemble "dog runs" and is provided, at maximum, six hours per week. Access to other kinds of activities is also greatly restricted. For example, FDC does not provide prisoners in isolation/solitary confinement with meaningful rehabilitative programming such as educational or vocational training. "Education" is for the most part limited to in-cell worksheets and sporadic contact with teachers who interact with prisoners very briefly and at their cell-front. No more than a very few prisoners in

isolation/solitary confinement are taken to classrooms, for no more than a few hours per week, where they receive educational instruction while chained to their desks. FDC regulations greatly restricts prisoners' access to reading materials in isolation/solitary confinement.

66.     Finally, it is important to note that the FDC employs these different forms of isolation/solitary confinement at rates that are much higher than the national average.[68] According to the FDC's available data, approximately 3,982 persons (or 4.22% of the total prisoner population) were held in Administrative Confinement, another 3,673 (3.89% of the total prisoner population) were in Disciplinary confinement, 3,940 (4.08% of the total prisoner population) were in Close Management, and 20 prisoners were housed in Maximum Management.[69] The total number of 11,615 prisoners in one or another form of isolation/solitary confinement represents a total of 13.2% of the overall prisoner population (87,736 as of June 30, 2020).[70] The average lengths of stay in these units are also long. Prisoners spend on average 15 days in Administrative Confinement, 17 days in Disciplinary Confinement and, in Close Management, the units with the highest population, they stay on average 442 days.[71] In certain cases, the lengths of stay are even longer. In fact, as of 2018, a total of 61 FDC prisoners had been in some form of isolation/solitary confinement for ten years or more.[72]

---

[68] See Correctional Leaders Association & Arthur Liman Center for Public Interest at Yale Law School, Time-in-Cell 2019: A Snapshot of Restrictive Housing based on Nationwide Survey of U.S. Prisons, (2020) at pp. 6-9.

[69] See EHA00112521 (1) at page 3.

[70] PLS0007136-7207_2020-2021-Stratgic Plan, p. 47.

[71] See EHA00112521 (1) at page 3.

[72] EHA00514428.

67.     FDC also found that median lengths of stay in Close Management for people with serious mental illness, as indicated by history of inpatient mental health treatment, are <u>more than twice</u> the median lengths of stay for people without a history of inpatient mental health treatment: 883 days versus 368 days.[73] Thus, the median length of stay in Close Management for persons whose mental illness was serious enough to require inpatient hospitalization far exceeds <u>two years.</u>

### B.     Data on the Effects of Harsh and Dangerous Conditions, Procedures Treatment in FDC Isolation/Solitary Confinement Units from FDC Prisoner Interviews and Files

68.     During the interviews that I conducted in November and December, 2020 and February through May, 2021, the prisoners with whom I spoke consistently voiced numerous, very similar and serious complaints about the conditions under which they were being forced to live, the cruel and uncaring ways in which they were being treated, and adverse consequences for their mental health and well-being. They not only acknowledged suffering in isolation/solitary confinement but also identified specific forms of psychological deterioration that they were experiencing. The symptoms they reported were entirely consistent with my own understanding of the harsh and dangerous nature of the conditions that exist in these units and the ways in which they threaten the health and well-being of the persons confined in them.  They were consistent in nature and degree with symptoms that have been reported to me in other especially harsh and dangerous isolation/solitary confinement units.

69.     More specifically, the thirty-three prisoners whom I interviewed, including some of the named Plaintiffs, consistently described the painfulness of their isolated confinement and

---

[73] EHA00000049869 at pages 5-6.

the various ways in which they were being harmed by the experience. The negative, painful symptoms they are reported, with very few exceptions, included high levels of psychological stress- and trauma-related symptoms and even higher levels of isolation-related symptomatology. The symptoms they reported included, among other things: troubled sleep, anxiety, feelings of impending breakdown, ruminations, oversensitivity to external stimuli, irrational anger, cognitive decline, depression, and social withdrawal. In more extreme cases, prisoners acknowledged experiencing hallucinations (hearing or seeing things that others did not), engaging in acts of self-harm, and suicidality. Their complaints and concerns and reported symptoms appeared to me to be genuine and justified by the severity of the conditions and levels of deprivation to which they described being subjected. They are not only painful to experience but represent a form of psychological harm that is potentially long-lasting, dangerous and, in some instances, could prove to be fatal. As I noted above, they were entirely consistent with those that I have documented elsewhere.

70.    In addition, some of the prisoners I interviewed, in my opinion, should never have been placed in the harsh and dangerous conditions that prevail in the FDC's isolation/solitary confinement units. That is, a very high percentage of the people I interviewed reported that they had received psychiatric diagnoses in the FDC (including schizophrenia, bipolar disorder, PTSD, and depression), were on the prison's mental health caseload, and had been prescribed psychotropic medications by the FDC mental health staff (including Risperdal, Zoloft, Zyprexa, Depakote, Buspar, Remeron, Haldol, and Seroquel). Many of them not only described extremely harsh treatment inflicted by correctional officers but also complained about a lack of careful attention from mental health staff.

71.     The fact that these prisoners were on the FDC's mental health caseload meant that the prison system itself had recognized that they suffered from a diagnosed mental illness and were in need of treatment. Some of these prisoners recounted long psychiatric histories to me, in some instances histories that dated back to their childhoods. A number of these psychiatric histories included instances of suicidality and mental health conditions that were recognized by clinicians as so serious that they required hospitalization in mental health facilities, years before they came to prison. Among the high number who acknowledged lengthy mental health histories that predated their time in prison, most indicated that the psychiatric conditions from which they suffered noticeably worsened in isolation/solitary confinement. In some instances, their deteriorating mental health conditions included increased levels of suicidality.

72.     Despite these extensive psychiatric histories, diagnosed psychiatric conditions, and their past and current psychotropic medications, a number of the prisoners I spoke to complained about receiving inadequate mental health care in the FDC's isolation/solitary confinement units. Some said that they were hardly seen by anyone on the mental health staff, even though they were housed in the psychological stressful and dangerous environment of isolation/solitary confinement. As I noted earlier, isolation/solitary confinement units are inherently counter-therapeutic. In addition to the extremely stressful atmosphere inside, and its effects on prisoners, the location, configuration, and operation of the units make the delivery of meaningful, effective psychiatric intervention virtually impossible. This is the reason that courts, professional organizations, and human rights groups have concluded that mentally ill persons should be excluded entirely from such units. Indeed, the mentally ill prisoners with whom I spoke were virtually unanimous in reporting that the mental health care they were receiving in isolation/solitary confinement was woefully inadequate to address their psychological needs and

42

that their mental health conditions were deteriorating as a result of conditions to which they were exposed.

73.     In several of the paragraphs that follow, I briefly discuss some of the pertinent information that I obtained from the named Plaintiffs whom I interviewed, including the nature of the conditions of isolated/solitary confinement under which they are living and ways in which they are being adversely affected by those conditions and by their treatment at the hands of correctional staff.

74.     Johnny Hill is a 34-year-old man who has been held in restrictive housing for a total of approximately ten years.  He entered FDC custody for the first time as a youthful offender in 2008, when he was held in isolation until he was released in 2009. At the present time, Mr. Hill has been in isolation continuously for almost seven years. Mr. Hill has been diagnosed with major depressive disorder, and has a history of auditory and visual hallucinations, suicidal ideation, and self-harm.  He has made numerous very serious suicide attempts.  Following several of these attempts, he was transferred to the inpatient psychiatric unit, and then placed directly back into isolation. As a result of suffering brain damage while attempting suicide by hanging, Mr. Hill is now legally blind. Mr. Hill told me that he has long-standing psychiatric problems that predate his time in prison, but that his extensive time spent in Close Management greatly exacerbated them. His mental health continued to deteriorate and he was eventually diagnosed with depression, bi-polar disorder, and schizophrenia and has been given a large number of psychotropic medications. He reported high levels of psychological stress- and trauma-related symptoms and especially high levels of isolation-related symptoms (including ruminations, anger, cognitive problems, depression, and distrust of others).

75.     Jerome Burgess is a 48-year-old man who has been held in isolation periodically for months and years at a time since his current incarceration term began in 2002. He is diagnosed with depressive disorder, seizure disorder, and has severely limited mobility on his left side, requiring the use of a wheelchair and catheter.  His many medical problems have been a source of heightened anxiety and friction with correctional staff (on whom he is dependent for care). Mr. Burgess told me that he had a long mental health history, dating back to childhood, when, among other things, he was hospitalized at Bellevue Hospital in New York City for psychiatric issues. When I interviewed him in March, 2021, he had been released from Administrative Confinement for about a month. He estimated that he had spent a total of more than half of his 22 years in Florida prisons in Close Management where, he said, he developed a number of mental health problems that, as he put it, "stay with you" even after you are released. Mr. Burgess reported suffering from high levels of stress-related symptoms and very high levels of isolation-related maladies (including ruminations, depression, and discomfort around others). He reported that, although he knows he suffers from isolation-related psychological problems for which he should receive treatment, but that he does not trust prison mental health staff or have confidence in them to help him.

76.     Admire Harvard is a 30-year-old transgender woman who has been held in restrictive housing in men's prisons for approximately ten years, starting when she was 18 years old.  She has been diagnosed with a variety of psychiatric conditions in the past, including gender dysphoria, schizoaffective disorder, bipolar disorder, and anxiety, as well as with hypertension. Ms. Harvard has a history of severe mental health symptoms including hallucinations and suicidal ideation and attempts.  She was only recently released from isolation for the first time since 2009 and is currently in a psychiatric unit.  FDC has placed her in

44

inpatient treatment approximately 20 times, and has been on suicide watch more than 50 times. Each time she has been released from placement in an inpatient psychiatric unit, she has been returned to restrictive housing. She reported that many of her mental health symptoms have abated in her current psychiatric unit, compared to the deterioration she experienced in Close Management. Although she is still anxious, depressed, and hears voices, she reported feeling more in control of her emotions, more trusting and willing to interact with others, and less suicidal than in the past, now that she is in a treatment-oriented unit.

77.    James Kendrick is a 41-year-old man who has been held in restrictive housing continuously for almost three years, going from Administrative Confinement to Maximum Management to Close Management. Prior to entering restrictive housing, he was diagnosed with high blood pressure, diabetes, and obesity. At the time he was placed in restrictive housing, FDC evaluated him as having no mental health symptoms. Within five months of being housed in isolation he developed symptoms of depression and anxiety and experienced suicidal ideation. FDC then placed him on psychiatric medication.  Mr. Kendrick told me that he had been in the foster care system growing up and, as a result, had prior contact with the mental health system on an outpatient basis. However, he indicated that his mental health problems worsened when he came to prison, including becoming extremely depressed and beginning to have suicidal thoughts. He told me that, although these problems were manageable in general population, they were greatly exacerbated once he was placed in Close Management. He said that he felt "pushed in a corner," lost hope, and became more depressed, especially because he was removed from the programming that he had been actively involved in (computer, parenting, and life skills classes) in general population. He described the Close Management Unit officers at Santa Rosa as cruel and the mental health staff as uncaring. Based on the interview that I conducted with him, I can

report that his reported levels of stress-related symptoms were extremely high and the number of isolation-related pathological reactions were even higher.

78.     Tracey Dean is a 27 year-old woman who reported spending about half of the six years she has spent in prison in some form of solitary confinement/restrictive housing. When I interviewed her, Ms. Dean was in the Transitional Care Unit for inpatient mental health treatment, but remained classified as Close Management, which is where she was housed prior to inpatient treatment. Although she reported that she had extensive contact with the mental health system before coming to prison, including numerous stays as an inpatient in mental health facilities, and having received multiple serious psychiatric diagnoses (including psychosis and PTSD), and been prescribed numerous psychotropic conditions for her mental health conditions, she was often housed in Close Management. She reported that the conditions in these units were so stressful and had such an adverse effect on her mental health condition that she repeatedly cut herself in Close Management and otherwise deteriorated badly during the time she was housed there. Her transfer to TCU improved her condition somewhat, and she acknowledged that many of her worst symptoms were improved by virtue of having much more out-of-cell time, the opportunity to participate in groups with other women prisoners, and regular, ongoing contact with a caring mental health provider.

79.     Finally, as I mentioned in Paragraphs 29 and 42 above, one measure of the high level of psychological stress and trauma to which prisoners are subjected in isolation/solitary confinement is the amount of self-harm and suicidal behavior that occurs there. These acts of desperation are in many ways extreme indicators of the even broader levels of suffering that typically occur in such units. Moreover, completed suicides are an extreme indicator that omits data on self-harm and attempted suicides that, although they may not have resulted in death,

46

nonetheless reflect a very high level of psychological trauma. Yet, because data on completed suicides tend to be more carefully and reliably documented by correctional officials than most other symptoms of trauma, they can serve as important sources of information about the negative psychological effects of particular conditions of confinement in particular prison systems.

80.     With these things in mind, I evaluated data depicting the numbers and rates of completed suicides in the FDC. One document, DHA00914037, contained FDC's own calculations of the amount, nature, and location of suicides. Although it is difficult to determine the exact time frame, it appears to depict suicides that occurred among Florida prisoners over a fourteen-year period, including calendar years 2003-2016. By the FDC's own calculations, 61% of the suicides that occurred during this period took place within some form of isolated/solitary confinement housing (primarily Disciplinary Confinement and Administrative Confinement). Fewer than a third (29%) took place in general population housing and 10% occurred in the prison system's inpatient hospitals.

81.     A more recent set of calculations, based on data provided by the FDC that encompassed calendar years 2015-2019, indicates that there were 96 suicides that occurred in the FDC over this five-year period. A total of 56 of them occurred in isolated/solitary confinement. Thus, although the population of prisoners in isolation/solitary confinement represented approximately one-tenth of the overall FDC prison population during this recent five-year period, more than half—approximately 58%—of the suicides occurred in these units.[74] Put in even starker terms, although the overall rate of suicides in the FDC ranged from between 16.7 to

_____

[74] FDC's documents provide inconsistent numbers for suicides that suggest there may be an even greater disparity.  One of FDC's documents shows 44 total suicides for 2015-2017, with 34 of them occurring in segregation.  DHA00914037.  This would mean that over that three-year period, 77% of the suicides in FDC's system occurred in segregation.  Above, I have used the most conservative numbers I found.

27.4 per 100,000 prisoners, the rate in isolated/solitary confinement was many times that number, ranging from 72.7 to 129.8 per 100,000 prisoners. In my opinion, these dramatic differences in part reflect the levels of psychological stress and trauma to which prisoners in these units are subjected as well as the high concentration of psychologically vulnerable prisoners whom the FDC places in various forms of restrictive housing.

82.     In summary, as I have noted in the previous paragraphs in this section, virtually all of the prisoners whom I interviewed are suffering in these units and are at significant risk of serious psychological harm. They reported suffering from a very high number of symptoms that are associated psychological stress and trauma and those identified as psychopathological reactions to extreme isolation. As I have described, these serious adverse psychological effects were present among the named Plaintiffs as well as among the other prisoners whom I interviewed. Both groups of prisoners described the acute pains of the extreme isolation and the additional deprivations to which they were being subjected.

83.     Many of the prisoners I interviewed also acknowledged having lengthy, serious psychiatric histories. They also described being prescribed psychotropic medications in the FDC, typically as treatment for very serious forms of mental illness, including schizophrenia, psychosis, bipolar disorder, major depression, and PTSD. These prisoners are especially vulnerable to the significant risk of the grave psychological harm that isolated/solitary confinement can inflict, including the dangerous exacerbation of their pre-existing psychiatric conditions.

## VII.   Conclusions

84.     Despite a widespread scientific and professional consensus about the well-known damaging effects of isolation/solitary confinement, the FDC continues to subject upwards of

48

10% or more of its prisoner population to a very dangerous set of living conditions. The prisoners in these units experience extreme forms of social isolation that are exacerbated by other enforced deprivations. Many of them are subjected to these painful and harmful conditions for long periods of time that last for months or years in duration. This means that literally thousands of prisoners in the FDC are being subjected to very significant risks of serious psychological and physical harm.

85.     The adverse reactions and serious symptoms the prisoners I interviewed reported were consistent with one another and with those that have been reported to me by prisoners in other correctional facilities who were subjected to damaging and extreme forms of social isolation. They are clear indications of the effects of the severe isolation to which the prisoners in these units are being subjected and the significant risk of psychological and even physical harm to which they are exposed.

86.     Also contrary to sound forensic clinical practice, the weight of psychological and psychiatric opinion, and international human rights standards, FDC also currently houses a high percentage of mentally ill prisoners in these units. As I have noted, the prison system's failure to exclude mentally ill prisoners from these units places them at an unreasonable risk of grave harm. The harms that they and other prisoners in these units are at risk of are extremely serious and sometimes irreversible, including loss of psychological stability, impaired mental functioning, self-mutilation, and even death.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this **24**th day of May, 2021.

Craig Haney, Ph.D., J.D.
_____
Craig Haney, Ph.D., J.D.

# Appendix A

## Curriculum Vitae

CURRICULUM VITAE


Craig William Haney
Distinguished Professor of Psychology
UC Presidential Chair, 2015-2018
University of California, Santa Cruz 95064

home address:     317 Ocean View Ave.
                  Santa Cruz, California 95062
phone:            (831) 459-2153
fax:              (831) 425-3664
email:            psylaw@ucsc.edu

PREVIOUS EMPLOYMENT

| | |
|---|---|
| 2015-2018 | University of California Presidential Chair |
| 2014-present | Distinguished Professor of Psychology, University of California, Santa Cruz |
| 1985-2014 | University of California, Santa Cruz, Professor of Psychology |
| 1981-85 | University of California, Santa Cruz, Associate Professor of Psychology |
| 1978-81 | University of California, Santa Cruz, Assistant Professor of Psychology |
| 1977-78 | University of California, Santa Cruz, Lecturer in Psychology |
| 1976-77 | Stanford University, Acting Assistant Professor of Psychology |


EDUCATION

| | |
|---|---|
| 1978 | Stanford Law School, J.D. |
| 1978 | Stanford University, Ph.D. (Psychology) |

1

1972                    Stanford University, M.A. (Psychology)

1970                    University of Pennsylvania, B.A.


HONORS AWARDS GRANTS

2021            Finalist, Association of American Publishers, Professional and
                Scholarly Excellence (PROSE) Award for Excellence in Social
                Science (for Criminality in Context: Psychological Foundations of
                Criminal Justice Reform).

2020            Finalist, Stockholm Prize in Criminology (for "outstanding
                achievements in criminological research or for the application of
                research results by practitioners for the reduction of crime and the
                advancement of human rights").

2018            Emerald Literati Award for "Outstanding Paper" (for "Reducing the
                Use and Impact of Solitary Confinement in Corrections").

2016            Vera Institute of Justice "Reimagining Prisons" Initiative Advisory
                Council.

                Psychology Department "Most Inspiring Lecturer"

2015            University of California Presidential Chair (2015-2018 Term)

                Martin F. Chemers Award for Outstanding Research in Social
                Science

                Excellence in Teaching Award (Academic Senate Committee on
                Teaching).

                President's Research Catalyst Award for "UC Consortium on
                Criminal Justice Healthcare" (with Brie Williams and Scott Allen).

                Vera Institute of Justice "Safe Alternatives to Segregation" (SAS)
                Initiative Advisory Council.

                Who's Who in Psychology (Top 20 Psychology Professors in
                California) [http://careersinpsychology.org/psychology-degrees-
                schools-employment-ca/#ca-psych-prof]

2014            Distinguished Faculty Research Lecturer, University of California,
                Santa Cruz.

| | |
|---|---|
| 2013 | Distinguished Plenary Speaker, American Psychological Association Annual Convention. |
| 2012 | Appointed to National Academy of Sciences Committee to Study the Causes and Consequences of High Rates of Incarceration in the United States. |
| | Invited Expert Witness, United States Senate, Judiciary Committee. |
| 2011 | Edward G. Donnelly Memorial Speaker, University of West Virginia Law School. |
| 2009 | Nominated as American Psychological Foundation William Bevan Distinguished Lecturer. |
| | Psi Chi "Best Lecturer" Award (by vote of UCSC undergraduate psychology majors). |
| 2006 | Herbert Jacobs Prize for Most Outstanding Book published on law and society in 2005 (from the Law & Society Association, for <u>Death by Design</u>). |
| | Nominated for National Book Award (by American Psychological Association Books, for <u>Reforming Punishment: Psychological Limits to the Pains of Imprisonment</u>). |
| | "Dream course" instructor in psychology and law, University of Oklahoma. |
| 2005 | Annual Distinguished Faculty Alumni Lecturer, University of California, Santa Cruz. |
| | Invited Expert Witness, United States House of Representatives, Subcommittee on Immigration, Border Security, and Claims, Committee on the Judiciary |
| | Arthur C. Helton Human Rights Award from the American Immigration Lawyers Association (co-recipient). |
| | Scholar-in-Residence, Center for Social Justice, Boalt Hall School of Law (University of California, Berkeley). |
| 2004 | "Golden Apple Award" for Distinguished Teaching, awarded by the Social Sciences Division, University of California, Santa Cruz. |
| | National Science Foundation Grant to Study Capital Jury Decision-making |

2002   Santa Cruz Alumni Association Distinguished Teaching Award, University of California, Santa Cruz.

United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project.

American Association for the Advancement of Science/American Academy of Forensic Science Project: "Scientific Evidence Summit" Planning Committee.

Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

2000   Invited Participant White House Forum on the Uses of Science and Technology to Improve National Crime and Prison Policy.

Excellence in Teaching Award (Academic Senate Committee on Teaching).

Joint American Association for the Advancement of Science-American Bar Association Science and Technology Section National Conference of Lawyers and Scientists.

1999   American Psychology-Law Society Presidential Initiative Invitee ("Reviewing the Discipline: A Bridge to the Future")

National Science Foundation Grant to Study Capital Jury Decision-making (renewal and extension).

1997   National Science Foundation Grant to Study Capital Jury Decision-making.

1996   Teacher of the Year (UC Santa Cruz Re-Entry Students' Award).

1995   Gordon Allport Intergroup Relations Prize (Honorable Mention)

Excellence in Teaching Convocation, Social Sciences Division

1994   Outstanding Contributions to Preservation of Constitutional Rights, California Attorneys for Criminal Justice.

1992   Psychology Undergraduate Student Association Teaching Award

SR 43 Grant for Policy-Oriented Research With Linguistically Diverse Minorities

| 1991 | Alumni Association Teaching Award ("Favorite Professor") |
|---|---|
| 1990 | Prison Law Office Award for Contributions to Prison Litigation |
| 1989 | UC Mexus Award for Comparative Research on Mexican Prisons |
| 1976 | Hilmer Oehlmann Jr. Award for Excellence in Legal Writing at Stanford Law School |
| 1975-76 | Law and Psychology Fellow, Stanford Law School |
| 1974-76 | Russell Sage Foundation Residency in Law and Social Science |
| 1974 | Gordon Allport Intergroup Relations Prize, Honorable Mention |
| 1969-71 | University Fellow, Stanford University |
| 1969-74 | Society of Sigma Xi |
| 1969 | B.A. Degree Magna cum laude with Honors in Psychology |
| | Phi Beta Kappa |
| 1967-1969 | University Scholar, University of Pennsylvania |

## UNIVERSITY SERVICE AND ADMINISTRATION

| 2010-2016 | Director, Legal Studies Program |
|---|---|
| 2010-2014 | Director, Graduate Program in Social Psychology |
| 2009 | Chair, Legal Studies Review Committee |
| 2004-2006 | Chair, Committee on Academic Personnel |
| 1998-2002 | Chair, Department of Psychology |
| 1994-1998 | Chair, Department of Sociology |
| 1992-1995 | Chair, Legal Studies Program |
| 1995 (Fall) | Committee on Academic Personnel |
| 1995-1996 | University Committee on Academic Personnel (UCAP) |

| 1990-1992 | Committee on Academic Personnel |
|---|---|
| 1991-1992 | Chair, Social Science Division Academic Personnel Committee |
| 1984-1986 | Chair, Committee on Privilege and Tenure |

## WRITINGS AND OTHER CREATIVE ACTIVITIES IN PROGRESS

Books:

Counting Casualties in the War on Prisoners: Toward a Just and Lasting Peace (working title, in preparation).

Articles:

"The Psychological Foundations of Capital Mitigation: Why Social Historical Factors Are Central to Assessing Culpability," in preparation.

## PUBLISHED WRITINGS AND CREATIVE ACTIVITIES

Books

| 2020 | Criminality in Context: The Psychological Foundations of Criminal Justice Reform. Washington, DC: American Psychological Association Books. |
|---|---|
| 2014 | The Growth of Incarceration in the United States: Exploring the Causes and Consequences (with Jeremy Travis, Bruce Western, et al.). [Report of the National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration in the United States.] Washington, DC: National Academy Press. |
| 2006 | Reforming Punishment: Psychological Limits to the Pains of Imprisonment, Washington, DC: American Psychological Association Books. |
| 2005 | Death by Design: Capital Punishment as a Social Psychological System. New York: Oxford University Press. |

Monographs and Technical Reports

1989      Employment Testing and Employment Discrimination (with A. Hurtado). Technical Report for the National Commission on Testing and Public Policy. New York: Ford Foundation.

2005      Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal (Appendix C in Study of Asylum Seekers in Expedited Removal As Authorized by Section 605 of International Religious Freedom Act of 1998).

Articles in Professional Journals and Book Chapters

2021      "Sykes's Prison in Context: Change and Continuity in the Life Span of a Penitentiary," in B. Crewe, A. Goldsmith, & M. Halsey (Eds.), Power and authority in the modern prison: Revisiting the Society of Captives. New York: Oxford University Press, in press.

2020      "Solitary Confinement, Loneliness, and Psychological Harm," in Jules Lobel and Peter Scharff Smith (Eds.), Solitary Confinement: Effects, Practices, and Pathways to Reform (129-152). New York: Oxford University Press.

"Continuing to Acknowledge the Power of Dehumanizing Environments: Responding to Haslam, et al. (2019) and Le Texier (2019)" (with Philip Zimbardo), American Psychologist, 75(3), 400-402.

"Framing Criminal Justice and Crime in the News, 2015-2017" (with Camille Conrey), Journal of Crime and Justice, in press.

"The Science of Solitary: Expanding the Harmfulness Narrative," Northwestern Law Review, 115(1), 211-256.

"Consensus Statement from the Santa Cruz Summit on Solitary Confinement and Health" (with Brie Williams and Cyrus Ahalt), Northwestern Law Review, 115(1), 335-360.

"Solitary Confinement is Not Solitude: The Worst Case Scenario of Being 'Along' in Prison," in Robert Coplan, Julie Bowker, & Larry Nelson (Eds.), Handbook of Solitude: Psychological Perspectives on Isolation, Social Withdrawal, and Being Alone. Second Edition. New York: Wiley-Blackwell, in press.

2019      "Afterword," in Robert Johnson, <u>Condemned to Die: Life Under Sentence of Death</u> (pp. 137-141). Second Edition. New York: Routledge.

"Changing Correctional Culture: Exploring the Role of U.S.-Norway Exchange in Placing Health and Well-Being at the Center of U.S. Prison Reform" (with Cyrus Ahalt, Brie Williams, and Kim Ekhaugen), <u>American Journal of Public Health</u>, <u>110(S1)</u>, S27-S29.

2018      "Restricting the Use of Solitary Confinement," <u>Annual Review of Criminology</u>, <u>1</u>, 285-310.

"Death Qualification in Black and White: Racialized Decision-Making and Death-Qualified Juries" (with Mona Lynch), <u>Law & Policy</u>, <u>40(2)</u>, 148-171.

"Balancing the Rights to Protection and Participation: A Call for Expanded Access to Ethically Conducted Correctional Research. <u>Journal of General Internal Medicine</u>, 33(22). DOI: 10.1007/s11606-018-4318-9.

"The Plight of Long-Term Mentally-Ill Prisoners" (with Camille Conrey and Roxy Davis), in Kelly Frailing and Risdon Slate (Eds.), <u>The Criminalization of Mental Illness</u> (pp. 163-180). Durham, NC: Carolina Academic Press.

"The Psychological Effects of Solitary Confinement: A Systematic Critique," <u>Crime and Justice</u>, <u>47</u>, 365-416.

"The Media's Impact on the Right to a Fair Trial: A Content Analysis of Pretrial Publicity in Capital Cases (with Shirin Bakhshay), <u>Psychology, Public Policy, and Law</u>, <u>24</u>, 326-346.

2017      "Mechanisms of Moral Disengagement and Prisoner Abuse" (with Joanna Weill). <u>Analyses of Social Issues and Public Policy</u>, <u>17</u>, 286-318.

"'Madness' and Penal Confinement: Observations on Mental Illness and Prison Pain," <u>Punishment and Society</u>, <u>19</u>, 310-326.

"Contexts of Ill-Treatment: The Relationship of Captivity and

Prison Confinement to Cruel, Inhuman, or Degrading Treatment and Torture" (with Shirin Bakhshay), in Metin Başoğlu (Ed.), <u>Torture and Its Definition in International Law: An Interdisciplinary Approach</u> (pp. 139-178). New York: Oxford.

Special Issue: "Translating Research into Policy to Advance Correctional Health" (guest editor with B. Williams, C. Ahalt, S. Allen, & J. Rich), Part II, <u>International Journal of Prisoner Health</u>, <u>13</u>, 137-227.

"Reducing the Use and Impact of Solitary Confinement in Corrections" (with Cyrus Ahalt, Sarah Rios, Matthew Fox, David Farabee, and Brie Williams), <u>International Journal of Prisoner Health</u>, <u>13</u>, 41-48.

2016   "Examining Jail Isolation: What We Don't Know Can Be Profoundly Harmful" (with Joanna Weill, Shirin Bakhshay, and Tiffany Winslow), <u>The Prison Journal</u>, <u>96</u>, 126-152.

"On Structural Evil: Disengaging From Our Moral Selves," Review of the book <u>Moral Disengagement: How People Do Harm and Live With Themselves</u>, by A. Bandura], <u>PsycCRITIQUES</u>, 61(8).

2015   "When Did Prisons Become Acceptable Mental Healthcare Facilities?," Report of the Stanford Law School Three Strikes Project (with Michael Romano et al.) [available at: http://law.stanford.edu/wp-content/uploads/sites/default/files/child-page/632655/doc/slspublic/Report_v12.pdf ].

"Emotion, Authority, and Death: (Raced) Negotiations in Capital Jury Negotiations" (with Mona Lynch), <u>Law & Social Inquiry</u>, <u>40</u>, 377-405.

"Prison Overcrowding," in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 415-436). Washington, DC: APA Books.

"The Death Penalty" (with Joanna Weill & Mona Lynch), in B. Cutler & P. Zapf (Eds.), <u>APA Handbook of Forensic Psychology</u> (pp. 451-510). Washington, DC: APA Books.

"'Prisonization' and Latinas in Alternative High Schools" (with Aida Hurtado & Ruby Hernandez), in J. Hall (Ed.), <u>Routledge Studies in</u>

<u>Education and Neoliberalism: Female Students and Cultures of Violence in the City</u> (pp. 113-134). Florence, KY: Routledge.

2014    "How Healthcare Reform Can Transform the Health of Criminal Justice-Involved Individuals" (with Josiah Rich, et al.), <u>Health Affairs</u>, <u>33:3</u> (March), 1-6.

2013    "Foreword," for H. Toch, Organizational Change Through Individual Empowerment: Applying Social Psychology in Prisons and Policing. Washington, DC: APA Books.

"Foreword," for J. Ashford & M. Kupferberg, <u>Death Penalty Mitigation: A Handbook for Mitigation Specialists, Investigators, Social Scientists, and Lawyers</u>. New York: Oxford University Press.

2012    "Politicizing Crime and Punishment: Redefining 'Justice' to Fight the 'War on Prisoners,'" <u>West Virginia Law Review</u>, <u>114</u>, 373-414.

"Prison Effects in the Age of Mass Incarceration," <u>Prison Journal</u>, <u>92</u>, 1-24.

"The Psychological Effects of Imprisonment," in J. Petersilia & K. Reitz (Eds.), <u>Oxford Handbook of Sentencing and Corrections</u> (pp. 584-605). New York: Oxford University Press.

2011    "The Perversions of Prison: On the Origins of Hypermasculinity and Sexual Violence in Confinement," <u>American Criminal Law Review</u>, <u>48</u>, 121-141. [Reprinted in: S. Ferguson (Ed.), <u>Readings in Race, Gender, Sexuality, and Social Class</u>. Sage Publications (2012).]

"Mapping the Racial Bias of the White Male Capital Juror: Jury Composition and the 'Empathic Divide'" (with Mona Lynch), <u>Law and Society Review</u>, <u>45</u>, 69-102.

"Getting to the Point: Attempting to Improve Juror Comprehension of Capital Penalty Phase Instructions" (with Amy Smith), <u>Law and Human Behavior</u>, <u>35</u>, 339-350.

"Where the Boys Are: Macro and Micro Considerations for the Study of Young Latino Men's Educational Achievement" (with A. Hurtado & J. Hurtado), in P. Noguera & A. Hurtado (Eds.),

<u>Understanding the Disenfranchisement of Latino Males:
Contemporary Perspectives on Cultural and Structural Factors</u> (pp.
101-121). New York: Routledge Press.

"Looking Across the Empathic Divide: Racialized Decision-Making
on the Capital Jury" (with Mona Lynch), <u>Michigan State Law
Review</u>, 2011, 573-608.

2010        "Demonizing the 'Enemy': The Role of Science in Declaring the
'War on Prisoners,'" <u>Connecticut Public Interest Law Review</u>, <u>9</u>,
139-196.

"Hiding From the Death Penalty," <u>Huffington Post</u>, July 26, 2010
[www.huffingtonpost.com/craig-haney/hiding-from-the-death-
pen-pen_b_659940.html]; reprinted in <u>Sentencing and Justice
Reform Advocate</u>, <u>2</u>, 3 (February, 2011).

2009        "Capital Jury Deliberation: Effects on Death Sentencing,
Comprehension, and Discrimination" (with Mona Lynch), <u>Law and
Human Behavior</u>, <u>33</u>, 481-496.

"The Social Psychology of Isolation: Why Solitary Confinement is
Psychologically Harmful," <u>Prison Service Journal UK</u> (Solitary
Confinement Special Issue), Issue 181, 12-20. [Reprinted: <u>California
Prison Focus</u>, #36, 1, 14-15 (2011).]

"The Stanford Prison Experiment," in John Levine & Michael Hogg
(Eds.), <u>Encyclopedia of Group Processes and Intergroup Relations</u>.
Thousand Oaks, CA: Sage Publications.

"Media Criminology and the Death Penalty," <u>DePaul Law Review</u>,
<u>58</u>, 689-740. (Reprinted: <u>Capital Litigation Update</u>, 2010.)

"On Mitigation as Counter-Narrative: A Case Study of the Hidden
Context of Prison Violence," <u>University of Missouri-Kansas City
Law Review</u>, <u>77</u>, 911-946.

"Persistent Dispositionalism in Interactionist Clothing:
Fundamental Attribution Error in Explaining Prison Abuse," (with
P. Zimbardo), <u>Personality and Social Psychology Bulletin</u>, <u>35</u>, 807-
814.

2008        "Counting Casualties in the War on Prisoners," <u>University of San
Francisco Law Review</u>, <u>43</u>, 87-138.

11

"Evolving Standards of Decency: Advancing the Nature and Logic of Capital Mitigation," Hofstra Law Review, 36, 835-882.

"A Culture of Harm: Taming the Dynamics of Cruelty in Supermax Prisons," Criminal Justice and Behavior, 35, 956-984.

"The Consequences of Prison Life: Notes on the New Psychology of Prison Effects," in D. Canter & R. Zukauskiene (Eds.), Psychology and Law: Bridging the Gap (pp. 143-165). Burlington, VT: Ashgate Publishing.

"The Stanford Prison Experiment," in J. Bennett & Y. Jewkes (Eds.), Dictionary of Prisons (pp. 278-280). Devon, UK: Willan Publishers.

"Capital Mitigation," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 60-63). Volume I. Thousand Oaks, CA: Sage Publications.

Death Qualification of Juries," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 190-192). Volume I. Thousand Oaks, CA: Sage Publications.

"Stanford Prison Experiment," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 756-757) (with P. Zimbardo). Volume II. Thousand Oaks, CA: Sage Publications.

"Supermax Prisons," in Brian Cutler (Ed.), The Encyclopedia of Psychology and the Law (pp. 787-790). Volume II. Thousand Oaks, CA: Sage Publications.

2006    "The Wages of Prison Overcrowding: Harmful Psychological Consequences and Dysfunctional Correctional Reactions," Washington University Journal of Law & Policy, 22, 265-293. [Reprinted in: N. Berlatsky, Opposing Viewpoints: America's Prisons. Florence, KY: Cengage Learning, 2010.]

"Exonerations and Wrongful Condemnations: Expanding the Zone of Perceived Injustice in Capital Cases," Golden Gate Law Review, 37, 131-173.

"Preface," D. Jones (Ed.), Humane Prisons. San Francisco, CA: Radcliffe Medical Press.

2005    "The Contextual Revolution in Psychology and the Question of Prison Effects," in Alison Liebling and Shadd Maruna (Eds.), <u>The Effects of Imprisonment</u> (pp. 66-93). Devon, UK: Willan Publishing.

"Achieving Educational Equity: Beyond Individual Measures of Merit," (with A. Hurtado), <u>Harvard Journal of Hispanic Policy</u>, <u>17</u>, 87-92.

"Conditions of Confinement for Detained Asylum Seekers Subject to Expedited Removal," in M. Hetfield (Ed.), <u>Report on Asylum Seekers in Expedited Removal</u>. Volume II: Expert Reports. Washington, DC: United States Commission on International Religious Freedom.

2004    "Special Issue on the Death Penalty in the United States" (co-edited with R. Weiner), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-621.

"Death Is Different: An Editorial Introduction" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 374-378.

"The Death Penalty in the United States: A Crisis of Conscience" (with R. Wiener), <u>Psychology, Public Policy, and Law</u>, <u>10</u>, 618-621.

"Condemning the Other in Death Penalty Trials: Biographical Racism, Structural Mitigation, and the Empathic Divide," <u>DePaul Law Review</u>, <u>53</u>, 1557-1590.

"Capital Constructions: Newspaper Reporting in Death Penalty Cases" (with S. Greene), <u>Analyses of Social Issues and Public Policy (ASAP)</u>, <u>4</u>, 1-22.

"Abu Ghraib and the American Prison System," <u>The Commonwealth</u>, <u>98 (#16)</u>, 40-42.

"Disciplinary Segregation," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (240-244). Volume 1. Thousand Oaks, CA: Sage Publications.

"Super-Maximum Secure Prisons," in Mary Bosworth (Ed.), <u>Encyclopedia of U.S. Prisons and Correctional Facilities</u> (pp. 938-944). Volume 2. Thousand Oaks, CA: Sage Publications.

2003    "Mental Health Issues in Long-Term Solitary and 'Supermax'

Confinement," <u>Crime & Delinquency</u> (special issue on mental health and the criminal justice system), <u>49</u>, 124-156. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), <u>Psychology and Law: Criminal and Civil Perspectives</u>. Hampshire, UK: Ashgate (2007).]

"The Psychological Impact of Incarceration: Implications for Post-Prison Adjustment," in Travis, J., & Waul, M. (Eds.), <u>Prisoners Once Removed: The Impact of Incarceration and Reentry on Children, Families, and Communities</u> (pp. 33-66). Washington, DC: Urban Institute Press.

"Comments on "Dying Twice": Death Row Confinement in the Age of the Supermax," <u>Capital University Law Review</u>.

2002      "Making Law Modern: Toward a Contextual Model of Justice, <u>Psychology, Public  Policy, and Law</u>, <u>7</u>, 3-63.

"Psychological Jurisprudence: Taking Psychology and Law into the Twenty-First Century," (with John Darley, Sol Fulero, and Tom Tyler), in J. Ogloff (Ed.), <u>Taking Psychology and Law into the Twenty-First Century</u> (pp. 35-59). New York: Kluwer Academic/ Plenum Publishing.

"Science, Law, and Psychological Injury: The <u>Daubert</u> Standards and Beyond," (with Amy Smith), in Schultz, I., Brady, D., and Carella, S., <u>The Handbook of Psychological Injury</u> (pp. 184-201). Chicago, IL: American Bar Association. [CD-ROM format]

2001      "Vulnerable Offenders and the Law: Treatment Rights in Uncertain Legal Times" (with D. Specter). In J. Ashford, B. Sales, & W. Reid (Eds.), <u>Treating Adult and Juvenile Offenders with Special Needs</u> (pp. 51-79). Washington, D.C.: American Psychological Association.

"Afterword," in J. Evans (Ed.), <u>Undoing Time</u> (pp. 245-256). Boston, MA: Northeastern University Press.

2000      "Discrimination and Instructional Comprehension: Guided Discretion, Racial Bias, and the Death Penalty" (with M. Lynch), <u>Law and Human Behavior</u>, <u>24</u>, 337-358.

"Cycles of Pain: Risk Factors in the Lives of Incarcerated Women and Their Children," (with S. Greene and A. Hurtado), <u>Prison Journal</u>, <u>80</u>, 3-23.

14

1999    "Reflections on the Stanford Prison Experiment: Genesis, Transformations, Consequences ('The SPE and the Analysis of Institutions')," In Thomas Blass (Ed.), <u>Obedience to Authority: Current Perspectives on the Milgram Paradigm</u> (pp. 221-237). Hillsdale, NJ: Erlbaum.

"Ideology and Crime Control," <u>American Psychologist</u>, <u>54</u>, 786-788.

1998    "The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment," (with P. Zimbardo), <u>American Psychologist</u>, <u>53</u>, 709-727. [Reprinted in special issue of Norweigian journal as: USAs fengselspolitikk i fortid og fremtid, <u>Vardoger</u>, 25, 171-183 (2000); in H. Tischler (Ed.), <u>Debating Points: Crime and Punishment</u>. Englewood Cliffs, NJ: Prentice-Hall (2001); <u>Annual Editions</u>: <u>Criminal Justice</u>. Guilford, CT: Dushkin/McGraw-Hill, in press; Herman, Peter (Ed.), <u>The American Prison System</u> (pp. 17-43) (Reference Shelf Series). New York: H.W. Wilson (2001); and in Edward Latessa & Alexander Holsinger (Eds.), <u>Correctional Contexts: Contemporary and Classical Readings</u>. Fourth Edition. Oxford University Press (2010).]

"Riding the Punishment Wave: On the Origins of Our Devolving Standards of Decency," <u>Hastings Women's Law Journal</u>, <u>9</u>, 27-78.

"Becoming the Mainstream: "Merit," Changing Demographics, and Higher Education in California" (with A. Hurtado and E. Garcia), <u>La Raza Law Journal</u>, <u>10</u>, 645-690.

1997    "Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement," (with M. Lynch), <u>New York University Review of Law and Social Change</u>, <u>23</u>, 477-570.

"Psychology and the Limits to Prison Pain: Confronting the Coming Crisis in Eighth Amendment Law," <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 499-588.

"Commonsense Justice and the Death Penalty: Problematizing the 'Will of the People,'" <u>Psychology, Public Policy, and Law</u>, <u>3</u>, 303-337.

"Violence and the Capital Jury: Mechanisms of Moral Disengagement and the Impulse to Condemn to Death," <u>Stanford Law Review</u>, <u>49</u>, 1447-1486.

"Mitigation and the Study of Lives: The Roots of Violent Criminality and the Nature of Capital Justice." In James Acker, Robert Bohm, and Charles Lanier, America's Experiment with Capital Punishment: Reflections on the Past, Present, and Future of the Ultimate Penal Sanction. Durham, NC: Carolina Academic Press, 343-377.

"Clarifying Life and Death Matters: An Analysis of Instructional Comprehension and Penalty Phase Arguments" (with M. Lynch), Law and Human Behavior, 21, 575-595.

"Psychological Secrecy and the Death Penalty: Observations on 'the Mere Extinguishment of Life,'" Studies in Law, Politics, and Society, 16, 3-69.

1995     "The Social Context of Capital Murder: Social Histories and the Logic of Capital Mitigation," Santa Clara Law Review, 35, 547-609. [Reprinted in part in David Papke (Ed.), Law and Popular Culture, Lexis/Nexis Publications, 2011)].

"Taking Capital Jurors Seriously," Indiana Law Journal, 70, 1223-1232.

"Death Penalty Opinion: Myth and Misconception," California Criminal Defense Practice Reporter, 1995(1), 1-7.

1994     "The Jurisprudence of Race and Meritocracy: Standardized Testing and 'Race-Neutral' Racism in the Workplace," (with A. Hurtado), Law and Human Behavior, 18, 223-248.

"Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions" (with M. Lynch), Law and Human Behavior, 18, 411-434.

"Felony Voir Dire: An Exploratory Study of Its Content and Effect," (with C. Johnson), Law and Human Behavior, 18, 487-506.

"Broken Promise: The Supreme Court's Response to Social Science Research on Capital Punishment" (with D. Logan), Journal of Social Issues (special issue on the death penalty in the United States), 50, 75-101.

"Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death" (with L. Sontag and S. Costanzo),

Journal of Social Issues (special issue on the death penalty in the United States), 50, 149-176. [Reprinted in Koosed, M. (Ed.), Capital Punishment. New York: Garland Publishing (1995).]

"Modern' Death Qualification: New Data on Its Biasing Effects," (with A. Hurtado and L. Vega), Law and Human Behavior, 18, 619-633.

"Processing the Mad, Badly," Contemporary Psychology, 39, 898-899.

"Language is Power," Contemporary Psychology, 39, 1039-1040.

1993    "Infamous Punishment: The Psychological Effects of Isolation," National Prison Project Journal, 8, 3-21. [Reprinted in Marquart, James & Sorensen, Jonathan (Eds.), Correctional Contexts: Contemporary and Classical Readings (pp. 428-437). Los Angeles: Roxbury Publishing (1997); Alarid, Leanne & Cromwell, Paul (Eds.), Correctional Perspectives: Views from Academics, Practitioners, and Prisoners (pp. 161-170). Los Angeles: Roxbury Publishing (2001).]

"Psychology and Legal Change: The Impact of a Decade," Law and Human Behavior, 17, 371-398. [Reprinted in: Roesch, R., & Gagnon, N. (Eds.), Psychology and Law: Criminal and Civil Perspectives. Hampshire, UK: Ashgate (2007).]

1992    "Death Penalty Attitudes: The Beliefs of Death-Qualified Californians," (with A. Hurtado and L. Vega). Forum, 19, 43-47.

"The Influence of Race on Sentencing: A Meta-Analytic Review of Experimental Studies." (with L. Sweeney). Special issue on Discrimination and the Law. Behavioral Science and Law, 10, 179-195.

1991    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," Law and Human Behavior, 15, 183-204.

1988    "In Defense of the Jury," Contemporary Psychology, 33, 653-655.

1986    "Civil Rights and Institutional Law: The Role of Social Psychology in Judicial Implementation," (with T. Pettigrew), <u>Journal of Community Psychology</u>, <u>14</u>, 267-277.

1984    "Editor's Introduction.  Special Issue on Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 1-6.

"On the Selection of Capital Juries:  The Biasing Effects of Death Qualification," <u>Law and Human Behavior</u>, <u>8</u>, 121-132.

"Examining Death Qualification:  Further Analysis of the Process Effect," <u>Law and Human Behavior</u>, <u>8</u>, 133-151.

"Evolving Standards and the Capital Jury," <u>Law and Human Behavior</u>, <u>8</u>, 153-158.

"Postscript," <u>Law and Human Behavior</u>, <u>8</u>, 159.

"Social Factfinding and Legal Decisions:  Judicial Reform and the Use of Social Science."  In Muller, D., Blackman, D., and Chapman, A. (Eds.), <u>Perspectives in Psychology and Law</u>.  New York:  John Wiley, pp. 43-54.

1983    "The Future of Crime and Personality Research:  A Social Psychologist's View," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavioral Behavior</u>. Lexington, Mass.:  Lexington Books, pp. 471-473.

"The Good, the Bad, and the Lawful:  An Essay on Psychological Injustice," in Laufer, W. and Day, J. (Eds.), <u>Personality Theory, Moral Development, and Criminal Behavior</u>.  Lexington, Mass.: Lexington Books, pp. 107-117.

"Ordering the Courtroom, Psychologically," <u>Jurimetrics</u>, <u>23</u>, 321-324.

1982    "Psychological Theory and Criminal Justice Policy:  Law and Psychology in the 'Formative Era,'" <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Presser, S. and Zainaldin, J. (Eds.), <u>Law and American History: Cases and Materials</u>. Minneapolis, MN: West Publishing, 1989; and in C. Kubrin, T. Stucky & A. Tynes (Eds.) <u>Introduction to Criminal Justice: A Sociological Perspective</u>. Palo Alto, CA: Stanford University Press (2012).]

"Data and Decisions: Social Science and Judicial Reform," in P. DuBois (Ed.), <u>The Analysis of Judicial Reform</u>.  Lexington, Mass.: D.C. Heath, pp. 43-59.

"Employment Tests and Employment Discrimination:  A Dissenting Psychological Opinion," <u>Industrial Relations Law Journal</u>, <u>5</u>, pp. 1-86.

"To Polygraph or Not:  The Effects of Preemployment Polygraphing on Work-Related Attitudes," (with L. White and M. Lopez), <u>Polygraph</u>, <u>11</u>, 185-199.

1981 "Death Qualification as a Biasing Legal Process," <u>The Death Penalty Reporter</u>, <u>1</u> (<u>10</u>), pp. 1-5. [Reprinted in <u>Augustus: A Journal of Progressive</u> <u>Human Sciences</u>, <u>9(3)</u>, 9-13 (1986).]

1980 "Juries and the Death Penalty:  Readdressing the <u>Witherspoon</u> Question," <u>Crime and Delinquency</u>, October, pp. 512-527.

"Psychology and Legal Change: On the Limits of a Factual Jurisprudence," <u>Law and Human Behavior</u>, <u>6</u>, 191-235. [Reprinted in Loh, Wallace (Ed.), <u>Social Research and the Judicial Process.</u> New York: Russell Sage, 1983.]

"The Creation of Legal Dependency:  Law School in a Nutshell" (with M. Lowy), in R. Warner (Ed.), <u>The People's Law Review</u>. Reading, Mass.: Addison-Wesley, pp. 36-41.

"Television Criminology:  Network Illusions of Criminal Justice Realities" (with J. Manzolati), in E. Aronson (Ed.), <u>Readings on the Social Animal</u>. San Francisco, W.H. Freeman, pp. 125-136.

1979 "A Psychologist Looks at the Criminal Justice System," in A. Calvin (Ed.), <u>Challenges and Alternatives to the Criminal Justice System.</u> Ann Arbor: Monograph Press, pp. 77-85.

"Social Psychology and the Criminal Law," in P. Middlebrook (Ed.), <u>Social Psychology and Modern Life</u>. New York: Random House, pp. 671-711.

"Bargain Justice in an Unjust World:  Good Deals in the Criminal Courts" (with M. Lowy), <u>Law and Society Review</u>, <u>13</u>, pp. 633-650. [Reprinted in Kadish, Sanford and Paulsen, Robert (Eds.), <u>Criminal Law and Its Processes</u>. Boston: Little, Brown, 1983.]

1977            "Prison Behavior" (with P. Zimbardo), in B. Wolman (Ed.), The Encyclopedia of Neurology, Psychiatry, Psychoanalysis, and Psychology, Vol. IX, pp. 70-74.

"The Socialization into Criminality:  On Becoming a Prisoner and a Guard" (with P. Zimbardo), in J. Tapp and F. Levine (Eds.), Law, Justice, and the Individual in Society: Psychological and Legal Issues (pp. 198-223).  New York: Holt, Rinehart, and Winston.

1976            "The Play's the Thing:  Methodological Notes on Social Simulations," in P. Golden (Ed.), The Research Experience, pp. 177-190. Itasca, IL: Peacock.

1975            "The Blackboard Penitentiary:  It's Tough to Tell a High School from a Prison" (with P. Zimbardo).  Psychology Today, 26ff.

"Implementing Research Results in Criminal Justice Settings," Proceedings, Third Annual Conference on Corrections in the U.S. Military, Center for Advanced Study in the Behavioral Sciences, June 6-7.

"The Psychology of Imprisonment:  Privation, Power, and Pathology"  (with P. Zimbardo, C. Banks, and D. Jaffe), in D. Rosenhan and P. London (Eds.), Theory and Research in Abnormal Psychology.  New York:  Holt Rinehart, and Winston.  [Reprinted in:  Rubin, Z. (Ed.), Doing Unto Others:  Joining, Molding, Conforming, Helping, Loving.  Englewood Cliffs:  Prentice-Hall, 1974.  Brigham, John, and Wrightsman, Lawrence (Eds.) Contemporary Issues in Social Psychology.  Third Edition. Monterey:  Brooks/Cole, 1977. Calhoun, James  Readings, Cases, and Study Guide for Psychology of Adjustment and Human Relationships. New York: Random House, 1978; translated as: La Psicologia del encarcelamiento: privacion, poder y patologia, Revisita de Psicologia Social, 1, 95-105 (1986).]

1973            "Social Roles, Role-Playing, and Education" (with P. Zimbardo), The Behavioral and Social Science Teacher, Fall, 1(1), pp. 24-45. [Reprinted in:  Zimbardo, P., and Maslach, C. (Eds.) Psychology For Our Times. Glenview, Ill.:  Scott, Foresman, 1977.  Hollander, E. and Hunt, R. (Eds.) Current Perspectives in Social Psychology. Third Edition. New York: Oxford University Press, 1978.]

"The Mind is a Formidable Jailer:  A Pirandellian Prison" (with P. Zimbardo, C. Banks, and D. Jaffe), The New York Times Magazine, April 8, Section 6, 38-60.  [Reprinted in Krupat, E. (Ed.), Psychology Is Social:  Readings and Conversations in Social Psychology. Glenview, Ill.: Scott, Foresman, 1982.]

"Interpersonal Dynamics in a Simulated Prison" (with C. Banks and P. Zimbardo), International Journal of Criminology and Penology, 1, pp. 69-97.  [Reprinted in:  Steffensmeier, Darrell, and Terry, Robert (Eds.) Examining Deviance Experimentally. New York: Alfred Publishing, 1975; Golden, P. (Ed.) The Research Experience. Itasca, Ill.: Peacock, 1976; Leger, Robert (Ed.) The Sociology of Corrections. New York:  John Wiley, 1977; A kiserleti tarsadalom-lelektan foarma. Budapest, Hungary: Gondolat Konyvkiado, 1977; Johnston, Norman, and Savitz, L. Justice and Corrections. New York: John Wiley, 1978; Research Methods in Education and Social Sciences. The Open University, 1979; Goldstein, J. (Ed.), Modern Sociology. British Columbia:  Open Learning Institute, 1980; Ross, Robert R. (Ed.), Prison Guard/ Correctional Officer: The Use and Abuse of Human Resources of Prison. Toronto:  Butterworth's 1981; Monahan, John, and Walker, Laurens (Eds.), Social Science in Law: Cases, Materials, and Problems. Foundation Press, 1985: Siuta, Jerzy (Ed.), The Context of Human Behavior. Jagiellonian University Press, 2001; Ferguson, Susan (Ed.), Mapping the Social Landscape: Readings in Sociology. St. Enumclaw, WA: Mayfield Publishing, 2001 & 2010; Pethes, Nicolas (Ed.), Menschenversuche (Experiments with Humans). Frankfurt, Germany: Suhrkamp Verlag, 2006.]

"A Study of Prisoners and Guards" (with C. Banks and P. Zimbardo).  Naval Research Reviews, 1-17. [Reprinted in Aronson, E. (Ed.) Readings About the Social Animal. San Francisco: W.H. Freeman, 1980; Gross, R. (Ed.) Key Studies in Psychology. Third Edition. London: Hodder & Stoughton, 1999; Collier, C. (Ed.), Basic Themes in Law and Jurisprudence. Anderson Publishing, 2000.]

MEMBERSHIP/ACTIVITIES IN PROFESSIONAL ASSOCIATIONS

American Psychological Association

American Psychology and Law Society

Law and Society Association

National Council on Crime and Delinquency

INVITED ADDRESSES AND PAPERS PRESENTED AT PROFESSIONAL ACADEMIC
MEETINGS AND RELATED SETTINGS (SELECTED)

2019     "The Recent History of Corrections in Norway and the United
States," Plenary Address, Justice Reinvestment Summit, Salem, OR,
February.

"The Dimensions of Suffering in Solitary Confinement," Plenary
Address, Washington College of Law at American University,
Washington, DC, March.

"Implementing Norwegian Correctional Principles to Change Prison
Culture in Oregon Prisons," Invited Address, Oregon Department of
Corrections Leadership Team, Salem, OR, June.

"Humanizing American Jails and Prisons," Center for Court
Innovation, International Summit, New York, NY, June.

"From the Stanford Prison Experiment to Supermax Prisons and
Back Again: Changing the Narrative in Criminal Justice Reform,"
Invited Address, Norwegian Correctional Academy, Oslo, Norway,
September.

Plenary Address, "Perspectives on Solitary Confinement,"
Northwestern University Law Review Symposium, Chicago, IL,
November.

2018     "The Art and Science of Capital Mitigation," Federal Death Penalty
Training Conference, Atlanta, Georgia, June.

"From Eastern State Penitentiary to Supermax Prisons," Safe
Alternatives to Segregation Conference, Vera Institute of Justice,
Philadelphia, PA, June.

Plenary Address, "Advancing Prisoners' Rights Through Law and
Psychology," Denver Law Prisoners' Advocates Conference,
University of Denver Sturm College of Law, Denver, CO, October.

"In Praise of Positivism in the Age of 'Fake News' and 'Alternative
Facts,'" Research Frontiers Conference, Santa Cruz, CA, October.

2017     "Neuroscience in Policy: Solitary Confinement in California," Law &
Neuroscience Conference, San Francisco, CA, February.

"In My Solitude: The Detrimental Effects of Solitary Confinement on the Brain," Exploratorium-Fisher Bay Observation Gallery, San Francisco, CA, February.

"Brief History of Correctional Reform in the United States," Community Corrections Partnership/Smart on Crime Community Forum, Santa Cruz Civic Auditorium, May.

"Reducing and Eliminating the Use of Solitary Confinement in Irish Prisons," Joint Conference with the Irish Prison Service, Department of Justice, and Irish Penal Reform Trust, Dublin, Ireland, June.

"The Emerging Consensus on When, for How Long, and On Whom Solitary Confinement Should Ever Be Imposed," Leadership, Culture and Managing Prisons: Knowledge Exchange between the USA and Europe (LEADERS), Trinity College, Dublin, Ireland, June.

"Sykes and Solitary: The Transformation of the Penal Subject in the Devolution from a 'Society of Captives' to Supermax Prisons," Power and Authority in Modern Prisons: Essays in Memory of Gresham Sykes Workshop, Centre for Prison Research, Cambridge University, Cambridge, England, September.

"Context Is Everything: The Social Psychology of Imprisonment," Joint USA/Scandinavian Correctional Exchange Program, Oslo, Norway, September.

2016    "The Culture of Punishment," American Justice Summit, New York, January.

"Mental Illness and Prison Confinement," Conference on Race, Class, Gender and Ethnicity (CRCGE), University of North Carolina Law School, Chapel Hill, NC, February.

"Reforming the Treatment of California's Mentally Ill Prisoners: Coleman and Beyond," Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, April.

"Bending Toward Justice? The Urgency (and Possibility) of Criminal Justice Reform," UC Santa Cruz Alumni Association "Original Thinkers" Series, San Jose, CA (March), and Museum of Tolerance, Los Angeles (April).

"Isolation and Mental Health," International and Inter-Disciplinary Perspectives on Prolonged Solitary Confinement, University of Pittsburgh Law School, Pittsburgh, PA, April.

"Mechanisms of Moral Disengagement in the Treatment of Prisoners" (with Joanna Weill), Conference of the Society for the Study of Social Issues, Minneapolis, June.

2015    "Reforming the Criminal Justice System," Bipartisan Summit on Criminal Justice Reform, American Civil Liberties Union/Koch Industries co-sponsored, Washington, DC, March.

"PrisonWorld: How Mass Incarceration Transformed U.S. Prisons, Impacted Prisoners, and Changed American Society," Distinguished Faculty Research Lecture, UC Santa Cruz, March.

"Think Different, About Crime and Punishment," Invited Lecture, UC Santa Cruz 50th Anniversary Alumni Reunion, April.

"The Intellectual Legacy of the Civil Rights Movement: Two Fifty-Year Anniversaries," College 10 Commencement Address, June.

"Race and Capital Mitigation," Perspectives on Racial and Ethnic Bias for Capital and Non-Capital Lawyers, New York, September.

"The Dimensions of Suffering in Solitary Confinement," Vera Institute of Justice, "Safe Alternatives to Solitary Confinement-A Human Dignity Approach" Conference, Washington, DC, September.

"Mental Health and Administrative Segregation," Topical Working Group on the Use of Administrative Segregation in the U.S., National Institute of Justice/Department of Justice, Washington, DC, October.

"The Psychological Effects of Segregated Confinement," Ninth Circuit Court of Appeals "Corrections Summit," Sacramento, CA, November.

"How Can the University of California Address Mass Incarceration in California and Beyond?," Keynote Address, Inaugural Meeting of the UC Consortium on Criminal Justice & Health, San Francisco, November.

24

2014  "Solitary Confinement: Legal, Clinical, and Neurobiological Perspectives," American Association for the Advancement of Science (AAAS), Chicago, IL February.

"Overcrowding, Isolation, and Mental Health Care, Prisoners' Access to Justice: Exploring Legal, Medical, and Educational Rights," University of California, School of Law, Irvine, CA, February.

"The Continuing Significance of Death Qualification" (with Joanna Weill), Annual Conference of the American Psychology-Law Society, New Orleans, March.

"Using Psychology at Multiple Levels to Transform Adverse Conditions of Confinement," Society for the Study of Social Issues Conference, Portland, OR, June.

"Humane and Effective Alternatives to Isolated Confinement," American Civil Liberties Union National Prison Project Convening on Solitary Confinement, Washington, DC, September.

"Community of Assessment of Public Safety," Community Assessment Project of Santa Cruz County, Year 20, Cabrillo College, November.

"Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," Chief Justice Earl Warren Institute on Law & Social Policy, Boalt Hall Law School, Berkeley, CA, November.

"Presidential Panel, Overview of National Academy of Sciences Report on Causes and Consequences of High Rates of Incarceration," American Society for Criminology, San Francisco, November.

"Presidential Panel, National Academy of Sciences Report on Consequences of High Rates of Incarceration on Individuals," American Society for Criminology, San Francisco, November.

"Findings of National Academy of Sciences Committee on the Causes and Consequences of High Rates of Incarceration," Association of Public Policy Analysis and Management Convention (APPAM), Albuquerque, NM, November.

"Politics and the Penal State: Mass Incarceration and American Society," New York University Abu Dhabi International Scholars Program, Abu Dhabi, United Arab Emirates, December.

2013        "Isolation and Mental Health," <u>Michigan Journal of Race and Law</u> Symposium, University of Michigan School of Law, Ann Arbor, MI, February.

"Social Histories of Capital Defendants" (with Joanna Weill), Annual Conference of Psychology-Law Society, Portland, OR, March.

"Risk Factors and Trauma in the Lives of Capital Defendants" (with Joanna Weill), American Psychological Association Annual Convention, Honolulu, HI, August.

"Bending Toward Justice: Psychological Science and Criminal Justice Reform," Invited Plenary Address, American Psychological Association Annual Convention, Honolulu, HI, August.

"Severe Conditions of Confinement and International Torture Standards," Istanbul Center for Behavior Research and Therapy, Istanbul, Turkey, December.

2012        "The Psychological Consequences of Long-term Solitary Confinement," Joint Yale/Columbia Law School Conference on Incarceration and Isolation, New York, April.

"The Creation of the Penal State in America," Managing Social Vulnerability: The Welfare and Penal System in Comparative Perspective, Central European University, Budapest, Hungary, July.

2011        "Tensions Between Psychology and the Criminal Justice System: On the Persistence of Injustice," opening presentation, "A Critical Eye on Criminal Justice" lecture series, Golden Gate University Law School, San Francisco, CA, January.

"The Decline in Death Penalty Verdicts and Executions: The Death of Capital Punishment?" Presentation at "A Legacy of Justice" week, at the University of California, Davis King Hall Law School, Davis, CA, January.

"Invited Keynote Address: The Nature and Consequences of Prison Overcrowding—Urgency and Implications," West Virginia School of Law, Morgantown, West Virginia, March.

"Symposium: The Stanford Prison Experiment—Enduring Lessons 40 Years Later," American Psychological Association Annual Convention, Washington, DC, August.

"The Dangerous Overuse of Solitary Confinement: Pervasive Human Rights Violations in Prisons, Jails, and Other Places of Detention" Panel, United Nations, New York, New York, October.

"Criminal Justice Reform: Issues and Recommendation," United States Congress, Washington, DC, November.

2010    "The Hardening of Prison Conditions," Opening Address, "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Desensitization to Inhumane Treatment: The Pitfalls of Prison Work," panel presentation at "The Imprisoned" Arthur Liman Colloquium Public Interest Series, Yale Law School, New Haven, CN, March.

"Mental Ill Health in Immigration Detention," Department of Homeland Security/DOJ Office for Civil Rights and Civil Liberties, Washington, DC, September.

2009    "Counting Casualties in the War on Prisoners," Keynote Address, at "The Road to Prison Reform: Treating the Causes and Conditions of Our Overburdened System," University of Connecticut Law School, Hartford, CN, February.

"Defining the Problem in California's Prison Crisis: Overcrowding and Its Consequences," California Correctional Crisis Conference," Hastings Law School, San Francisco, CA, March.

2008    "Prisonization and Contemporary Conditions of Confinement," Keynote Address, Women Defenders Association, Boalt Law School, University of California, November.

"Media Criminology and the Empathic Divide: The Continuing Significance of Race in Capital Trials," Invited Address, Media, Race, and the Death Penalty Conference, DePaul University School of Law, Chicago, IL, March.

"The State of the Prisons in California," Invited Opening Address,

27

Confronting the Crisis: Current State Initiatives and Lasting Solutions for California's Prison Conditions Conference, University of San Francisco School of Law, San Francisco, CA, March.

"Mass Incarceration and Its Effects on American Society," Invited Opening Address, Behind the Walls Prison Law Symposium, University of California Davis School of Law, Davis, CA, March.

2007        "The Psychology of Imprisonment: How Prison Conditions Affect Prisoners and Correctional Officers," United States Department of Justice, National Institute of Corrections Management Training for "Correctional Excellence" Course, Denver, CO, May.

"Statement on Psychologists, Detention, and Torture," Invited Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"Prisoners of Isolation," Invited Address, University of Indiana Law School, Indianapolis, IN, October.

"Mitigation in Three Strikes Cases," Stanford Law School, Palo Alto, CA, September.

"The Psychology of Imprisonment," Occidental College, Los Angeles, CA, November.

2006        "Mitigation and Social Histories in Death Penalty Cases," Ninth Circuit Federal Capital Case Committee, Seattle, WA, May.

"The Crisis in the Prisons: Using Psychology to Understand and Improve Prison Conditions," Invited Keynote Address, Psi Chi (Undergraduate Psychology Honor Society) Research Conference, San Francisco, CA, May.

"Exoneration and 'Wrongful Condemnation': Why Juries Sentence to Death When Life is the Proper Verdict," Faces of Innocence Conference, UCLA Law School, April.

"The Continuing Effects of Imprisonment: Implications for Families and Communities," Research and Practice Symposium on Incarceration and Marriage, United States Department of Health and Human Services, Washington, DC, April.

"Ordinary People, Extraordinary Acts," National Guantanamo Teach In, Seton Hall School of Law, Newark, NJ, October.

28

"The Next Generation of Death Penalty Research," Invited Address, State University of New York, School of Criminal Justice, Albany, NY, October.

2005    "The 'Design' of the System of Death Sentencing: Systemic Forms of 'Moral Disengagement in the Administration of Capital Punishment, Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Humane Treatment for Asylum Seekers in U.S. Detention Centers," United States House of Representatives, Washington, DC, March.

"Prisonworld: What Overincarceration Has Done to Prisoners and the Rest of Us," Scholar-in-Residence, invited address, Center for Social Justice, Boalt Hall School of Law (Berkeley), March.

"Prison Conditions and Their Psychological Effects on Prisoners," European Association for Psychology and Law, Vilnius, Lithuania, July.

2004    "Recognizing the Adverse Psychological Effects of Incarceration, With Special Attention to Solitary-Type Confinement and Other Forms of 'Ill-Treatment' in Detention," International Committee of the Red Cross, Training Program for Detention Monitors, Geneva, Switzerland, November.

"Prison Conditions in Post-"War on Crime" Era: Coming to Terms with the Continuing Pains of Imprisonment," Boalt Law School Conference, After the War on Crime: Race, Democracy, and a New Reconstruction, Berkeley, CA, October.

"Cruel and Unusual? The United States Prison System at the Start of the 21st Century," Invited speaker, Siebel Scholars Convocation, University of Illinois, Urbana, IL, October.

"The Social Historical Roots of Violence: Introducing Life Narratives into Capital Sentencing Procedures," Invited Symposium, XXVIII International Congress of Psychology, Beijing, China, August.

"Death by Design: Capital Punishment as a Social Psychological System," Division 41 (Psychology and Law) Invited Address,

American Psychological Association Annual Convention, Honolulu, HI, July.

"The Psychology of Imprisonment and the Lessons of Abu Ghraib," Commonwealth Club Public Interest Lecture Series, San Francisco, May.

"Restructuring Prisons and Restructuring Prison Reform," Yale Law School Conference on the Current Status of Prison Litigation in the United States, New Haven, CN, May.

"The Effects of Prison Conditions on Prisoners and Guards: Using Psychological Theory and Data to Understand Prison Behavior," United States Department of Justice, National Institute of Corrections Management Training Course, Denver, CO, May.

"The Contextual Revolution in Psychology and the Question of Prison Effects: What We Know about How Prison Affects Prisoners and Guards," Cambridge University, Cambridge, England, April.

"Death Penalty Attitudes, Death Qualification, and Juror Instructional Comprehension," American Psychology-Law Society, Annual Conference, Scottsdale, AZ, March.

2003   "Crossing the Empathic Divide: Race Factors in Death Penalty Decisionmaking," DePaul Law School Symposium on Race and the Death Penalty in the United States, Chicago, October.

"Supermax Prisons and the Prison Reform Paradigm," PACE Law School Conference on Prison Reform Revisited: The Unfinished Agenda, New York, October.

"Mental Health Issues in Supermax Confinement," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Roundtable on Capital Punishment in the United States: The Key Psychological Issues," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Psychology and Legal Change: Taking Stock," European Psychology and Law Conference, University of Edinburgh, Scotland, July.

"Economic Justice and Criminal Justice: Social Welfare and Social Control," Society for the Study of Social Issues Conference, January.

"Race, Gender, and Class Issues in the Criminal Justice System," Center for Justice, Tolerance & Community and Barrios Unidos Conference, March.

2002 "The Psychological Effects of Imprisonment: Prisonization and Beyond." Joint Urban Institute and United States Department of Health and Human Services Conference on "From Prison to Home." Washington, DC, January.

"On the Nature of Mitigation: Current Research on Capital Jury Decisionmaking." American Psychology and Law Society, Mid-Winter Meetings, Austin, Texas, March.

"Prison Conditions and Death Row Confinement." New York Bar Association, New York City, June.

2001 "Supermax and Solitary Confinement: The State of the Research and the State of the Prisons." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"Mental Health in Supermax: On Psychological Distress and Institutional Care." Best Practices and Human Rights in Supermax Prisons: A Dialogue. Conference sponsored by University of Washington and the Washington Department of Corrections, Seattle, September.

"On the Nature of Mitigation: Research Results and Trial Process and Outcomes." Boalt Hall School of Law, University of California, Berkeley, August.

"Toward an Integrated Theory of Mitigation." American Psychological Association Annual Convention, San Francisco, CA, August.

Discussant: "Constructing Class Identities—The Impact of Educational Experiences." American Psychological Association Annual Convention, San Francisco, CA, August.

"The Rise of Carceral Consciousness." American Psychological Association Annual Convention, San Francisco, CA, August.

2000      "On the Nature of Mitigation: Countering Generic Myths in Death Penalty Decisionmaking," City University of New York Second International Advances in Qualitative Psychology Conference, March.

"Why Has U.S. Prison Policy Gone From Bad to Worse? Insights From the Stanford Prison Study and Beyond," Claremont Conference on Women, Prisons, and Criminal Injustice, March.

"The Use of Social Histories in Capital Litigation," Yale Law School, April.

"Debunking Myths About Capital Violence," Georgetown Law School, April.

"Research on Capital Jury Decisionmaking: New Data on Juror Comprehension and the Nature of Mitigation," Society for Study of Social Issues Convention, Minneapolis, June.

"Crime and Punishment: Where Do We Go From Here?" Division 41 Invited Symposium, "Beyond the Boundaries: Where Should Psychology and Law Be Taking Us?" American Psychological Association Annual Convention, Washington, DC, August.

1999      "Psychology and the State of U.S. Prisons at the Millennium," American Psychological Association Annual Convention, Boston, MA, August.

"Spreading Prison Pain: On the Worldwide Movement Towards Incarcerative Social Control," Joint American Psychology-Law Society/European Association of Psychology and Law Conference, Dublin, Ireland, July.

1998      "Prison Conditions and Prisoner Mental Health," Beyond the Prison Industrial Complex Conference, University of California, Berkeley, September.

"The State of US Prisons: A Conversation," International Congress of Applied Psychology, San Francisco, CA, August.

"Deathwork: Capital Punishment as a Social Psychological System," Invited SPPSI Address, American Psychological Association Annual Convention, San Francisco, CA, August.

"The Use and Misuse of Psychology in Justice Studies: Psychology and Legal Change: What Happened to Justice?," (panelist), American Psychological Association Annual Convention, San Francisco, CA, August.

"Twenty Five Years of American Corrections: Past and Future," American Psychology and Law Society, Redondo Beach, CA, March.

1997 "Deconstructing the Death Penalty," School of Justice Studies, Arizona State University, Tempe, AZ, October.

"Mitigation and the Study of Lives," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, Chicago, August.

1996 "The Stanford Prison Experiment and 25 Years of American Prison Policy," American Psychological Association Annual Convention, Toronto, August.

1995 "Looking Closely at the Death Penalty: Public Stereotypes and Capital Punishment," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Race and the Flaws of the Meritocratic Vision," Invited Address, Arizona State University College of Public Programs series on Free Speech, Affirmative Action and Multiculturalism, Tempe, AZ, April.

"Taking Capital Jurors Seriously," Invited Address, National Conference on Juries and the Death Penalty, Indiana Law School, Bloomington, February.

1994 "Mitigation and the Social Genetics of Violence: Childhood Treatment and Adult Criminality," Invited Address, Conference on the Capital Punishment, Santa Clara Law School, October, Santa Clara.

1992 "Social Science and the Death Penalty," Chair and Discussant, American Psychological Association Annual Convention, San Francisco, CA, August.

1991    "Capital Jury Decisionmaking," Invited panelist, American Psychological Association Annual Convention, Atlanta, GA, August.

1990    "Racial Discrimination in Death Penalty Cases," Invited presentation, NAACP Legal Defense Fund Conference on Capital Litigation, August, Airlie, VA.

1989    "Psychology and Legal Change: The Impact of a Decade," Invited Address to Division 41 (Psychology and Law), American Psychological Association Annual Convention, New Orleans, LA., August.

"Judicial Remedies to Pretrial Prejudice," Law & Society Association Annual Meeting, Madison, WI, June.

"The Social Psychology of Police Interrogation Techniques" (with R. Liebowitz), Law & Society Association Annual Meeting, Madison, WI, June.

1987    "The Fourteenth Amendment and Symbolic Legality: Let Them Eat Due Process," APA Annual Convention, New York, N.Y. August.

"The Nature and Function of Prison in the United States and Mexico: A Preliminary Comparison," InterAmerican Congress of Psychology, Havana, Cuba, July.

1986    Chair, Division 41 Invited Address and "Commentary on the Execution Ritual," APA Annual Convention, Washington, D.C., August.

"Capital Punishment," Invited Address, National Association of Criminal Defense Lawyers Annual Convention, Monterey, CA, August.

1985    "The Role of Law in Graduate Social Science Programs" and "Current Directions in Death Qualification Research," American Society of Criminology, San Diego, CA, November.

"The State of the Prisons:  What's Happened to 'Justice' in the '70s and '80s?" Invited Address to Division 41 (Psychology and Law); APA Annual Convention, Los Angeles, CA, August.

1983   "The Role of Social Science in Death Penalty Litigation." Invited Address in National College of Criminal Defense Death Penalty Conference, Indianapolis, IN, September.

1982   "Psychology in the Court:  Social Science Data and Legal Decision-Making." Invited Plenary Address, International Conference on Psychology and Law, University College, Swansea, Wales, July.

1982   "Paradigms in Conflict: Contrasting Methods and Styles of Psychology and Law." Invited Address, Social Science Research Council, Conference on Psychology and Law, Wolfson College, Oxford University, March.

1982   "Law and Psychology: Conflicts in Professional Roles." Invited paper, Western Psychological Association Annual Meeting, April.

1980   "Using Psychology in Test Case Litigation," panelist, American Psychological Association Annual Convention, Montreal, Canada, September.

      "On the Selection of Capital Juries: The Biasing Effects of Death Qualification." Paper presented at the Interdisciplinary Conference on Capital Punishment. Georgia State University, Atlanta, GA, April.

      "Diminished Capacity and Imprisonment: The Legal and Psychological Issues," Proceedings of the American Trial Lawyers Association, Mid-Winter Meeting, January.

1975   "Social Change and the Ideology of Individualism in Psychology and Law." Paper presented at the Western Psychological Association Annual Meeting, April.

## SERVICE TO STAFF OR EDITORIAL BOARDS OF FOUNDATIONS, SCHOLARLY JOURNALS OR PRESSES

2018-present: Editorial Consultant, PLoS ONE.

2016-present     Editorial Consultant, <u>Translational Issues in Psychological Science</u>.

2016-present     Editorial Consultant, <u>International Journal of Law and Psychiatry</u>.

2016-present     Editorial Consultant, <u>Justice Quarterly.</u>

2015-present     Editorial Consultant, <u>Criminal Justice Review</u>.

2015-present     Editorial Consultant, <u>American Journal of Criminal Justice.</u>

2015-present     Editorial Consultant, <u>American Journal of Psychology.</u>

2015-present     Editorial Consultant, <u>Criminal Justice Policy Review.</u>

2014-2018        Editorial Board Member, <u>Law and Social Inquiry</u>.

2013-present     Editorial Consultant, <u>Criminal Justice and Behavior</u>.

2012-present:    Editorial Consultant, <u>American Sociological Review.</u>

2012-present:    Editorial Consultant, <u>Criminology</u>.

2011-present     Editorial Consultant, <u>Social Psychological and Personality Science</u>.

2008-present     Editorial Consultant, <u>New England Journal of Medicine</u>.

2007-present     Editorial Board Member, <u>Correctional Mental Health Reporter</u>.

2007-present     Editorial Consultant, <u>Journal of Offender Rehabilitation</u>.

2004-2016        Editorial Board Member, American Psychology and Law Society Book Series, Oxford University Press.

2000-2003        Reviewer, Society for the Study of Social Issues Grants-in-Aid Program.

2000-present:    Editorial Consultant, <u>Punishment and Society</u>.

2000-2015        Editorial Board Member, <u>ASAP</u> (on-line journal of the Society for the Study of Social Issues)

1997-2004        Editorial Board Member, <u>Psychology, Public Policy, and Law</u>

1997-present     Editorial Consultant, <u>Psychology, Public Policy, and Law</u>

| 1991 | Editorial Consultant, Brooks/Cole Publishing |
|------|---------------------------------------------|
| 1989-present | Editorial Consultant, <u>Journal of Personality and Social Psychology</u> |
| 1988-present | Editorial Consultant, <u>American Psychologist</u> |
| 1985 | Editorial Consultant, <u>American Bar Foundation Research Journal</u> |
| 1985-2006 | <u>Law and Human Behavior</u>, Editorial Board Member |
| 1985 | Editorial Consultant, Columbia University Press |
| 1985-present | Editorial Consultant, <u>Law and Social Inquiry</u> |
| 1980-present | Reviewer, National Science Foundation |
| 1997 | Reviewer, National Institutes of Mental Health |
| 1980-present | Editorial Consultant, <u>Law and Society Review</u> |
| 1979-present | Editorial Consultant, <u>Law and Human Behavior</u> |
| 1997-present | Editorial Consultant, <u>Legal and Criminological Psychology</u> |

## GOVERNMENTAL, LEGAL AND CRIMINAL JUSTICE CONSULTING

Training Consultant, Palo Alto Police Department, 1973-1974.

Evaluation Consultant, San Mateo County Sheriff's Department, 1974.

Design and Training Consultant to Napa County Board of Supervisors, County Sheriff's Department (county jail), 1974.

Training Consultation, California Department of Corrections, 1974.

Consultant to California Legislature Select Committee in Criminal Justice, 1974, 1980-1981 (effects of prison conditions, evaluation of proposed prison legislation).

Reviewer, National Science Foundation (Law and Social Science, Research Applied to National Needs Programs), 1978-present.

Consultant, Santa Clara County Board of Supervisors, 1980 (effects of jail overcrowding, evaluation of county criminal justice policy).

Consultant to Packard Foundation, 1981 (evaluation of inmate counseling and guard training programs at San Quentin and Soledad prisons).

Member, San Francisco Foundation Criminal Justice Task Force, 1980-1982 (corrections expert).

Consultant to NAACP Legal Defense Fund, 1982- present (expert witness, case evaluation, attorney training).

Faculty, National Judicial College, 1980-1983.

Consultant to Public Advocates, Inc., 1983-1986 (public interest litigation).

Consultant to California Child, Youth, Family Coalition, 1981-82 (evaluation of proposed juvenile justice legislation).

Consultant to California Senate Office of Research, 1982 (evaluation of causes and consequences of overcrowding in California Youth Authority facilities).

Consultant, New Mexico State Public Defender, 1980-1983 (investigation of causes of February, 1980 prison riot).

Consultant, California State Supreme Court, 1983 (evaluation of county jail conditions).

Member, California State Bar Committee on Standards in Prisons and Jails, 1983.

Consultant, California Legislature Joint Committee on Prison Construction and Operations, 1985.

Consultant, United States Bureau of Prisons and United States Department of the Interior (Prison History, Conditions of Confinement Exhibition, Alcatraz Island), 1989-1991.

Consultant to United States Department of Justice, 1980-1990 (evaluation of institutional conditions).

Consultant to California Judicial Council (judicial training programs), 2000.

Consultant to American Bar Association/American Association for Advancement

of Science Task Force on Forensic Standards for Scientific Evidence, 2000.

Invited Participant, White House Forum on the Uses of Science and Technology to Improve Crime and Prison Policy, 2000.

Member, Joint Legislative/California Department of Corrections Task Force on Violence, 2001.

Consultant, United States Department of Health & Human Services/Urban Institute, "Effects of Incarceration on Children, Families, and Low-Income Communities" Project, 2002.

Detention Consultant, United States Commission on International Religious Freedom (USCIRF). Evaluation of Immigration and Naturalization Service Detention Facilities, July, 2004-2005.

Consultant, International Committee of the Red Cross, Geneva, Switzerland, Consultant on international conditions of confinement.

Member, Institutional Research External Review Panel, California Department of Corrections, November, 2004-2008.

Consultant, United States Department of Health & Human Services on programs designed to enhance post-prison success and community reintegration, 2006.

Consultant/Witness, U.S. House of Representatives, Judiciary Committee, Evaluation of legislative and budgetary proposals concerning the detention of undocumented persons, February-March, 2005.

Invited Expert Witness to National Commission on Safety and Abuse in America's Prisons (Nicholas Katzenbach, Chair); Newark, New Jersey, July 19-20, 2005.

Testimony to the United States Senate, Judiciary Subcommittee on the Constitution, Civil Rights, and Property Rights (Senators Brownback and Feingold, co-chairs), Hearing on "An Examination of the Death Penalty in the United States," February 7, 2006.

National Council of Crime and Delinquency "Sentencing and Correctional Policy Task Force," member providing written policy recommendations to the California legislature concerning overcrowding crisis in the California Department of Corrections and Rehabilitation.

Trainer/Instructor, Federal Bureau of Prisons and United States Department of Justice, "Correctional Excellence" Program, providing instruction concerning conditions of confinement and psychological stresses of living and working in correctional environments to mid-level management corrections professionals, May, 2004-2008.

39

Invited Expert Witness, California Commission on the Fair Administration of Justice, Public Hearing, Santa Clara University, March 28, 2008.

Invited Participant, Department of Homeland Security, Mental Health Effects of Detention and Isolation, 2010.

Invited Witness, Before the California Assembly Committee on Public Safety, August 23, 2011.

Consultant, "Reforming the Criminal Justice System in the United States" Joint Working Group with Senator James Webb and Congressional Staffs, 2011 Developing National Criminal Justice Commission Legislation.

Invited Participant, United Nations, Forum with United Nations Special Rapporteur on Torture Concerning the Overuse of Solitary Confinement, New York, October, 2011.

Invited Witness, Before United States Senate Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights Hearing on Solitary Confinement, June 19, 2012.

Member, National Academy of Sciences Committee to Study the Causes and Consequences of the High Rate of Incarceration in the United States, 2012-2014.

Member, National Academy of Sciences Briefing Group, briefed media and public officials at Pew Research Center, Congressional staff, and White House staff concerning policy implications of <u>The Growth of Incarceration in the United States: Exploring the Causes and Consequences</u> (2014), April 30-May 1.

Consultant to United States Department of Justice and White House Domestic Policy Council on formulation of federal policy concerning use of segregation confinement, 2015.

<u>PRISON AND JAIL CONDITIONS EVALUATIONS AND LITIGATION</u>

Hoptowit v. Ray [United States District Court, Eastern District of Washington, 1980; 682 F.2d 1237 (9th Cir. 1982)].  Evaluation of psychological effects of conditions of confinement at Washington State Penitentiary at Walla Walla for United States Department of Justice.

Wilson v. Brown (Marin Country Superior Court; September, 1982, Justice Burke).  Evaluation of effects of overcrowding on San Quentin mainline inmates.

40

Thompson v. Enomoto (United States District Court, Northern District of California, Judge Stanley Weigel, 1982 and continuing).  Evaluation of conditions of confinement on Condemned Row, San Quentin Prison.

Toussaint v. McCarthy [United States District Court, Northern District of California, Judge Stanley Weigel, 553 F. Supp. 1365 (1983); 722 F. 2d 1490 (9th Cir. 1984) 711 F. Supp. 536 (1989)].  Evaluation of psychological effects of conditions of confinement in lockup units at DVI, Folsom, San Quentin, and Soledad.

In re Priest (Proceeding by special appointment of the California Supreme Court, Judge Spurgeon Avakian, 1983).  Evaluation of conditions of confinement in Lake County Jail.

Ruiz v. Estelle [United States District Court, Southern District of Texas, Judge William Justice, 503 F. Supp. 1265 (1980)].  Evaluation of effects of overcrowding in the Texas prison system, 1983-1985.

In re Atascadero State Hospital (Civil Rights of Institutionalized Persons Act of 1980 action). Evaluation of conditions of confinement and nature of patient care at ASH for United States Department of Justice, 1983-1984.

In re Rock (Monterey County Superior Court 1984).  Appointed to evaluate conditions of confinement in Soledad State Prison in Soledad, California.

In re Mackey (Sacramento County Superior Court, 1985).  Appointed to evaluate conditions of confinement at Folsom State Prison mainline housing units.

Bruscino v. Carlson (United States District Court, Southern District of Illinois 1984 1985).  Evaluation of conditions of confinement at the United States Penitentiary at Marion, Illinois [654 F. Supp. 609 (1987); 854 F.2d 162 (7th Cir. 1988)].

Dohner v. McCarthy [United States District Court, Central District of California, 1984-1985; 636 F. Supp. 408 (1985)].  Evaluation of conditions of confinement at California Men's Colony, San Luis Obispo.

Invited Testimony before Joint Legislative Committee on Prison Construction and Operations hearings on the causes and consequences of violence at Folsom Prison, June, 1985.

Stewart v. Gates [United States District Court, 1987]. Evaluation of conditions of confinement in psychiatric and medical units in Orange County Main Jail, Santa Ana, California.

Duran v. Anaya (United States District Court, 1987-1988). Evaluation of conditions of confinement in the Penitentiary of New Mexico, Santa Fe, New Mexico [Duran v. Anaya, No. 77-721 (D. N.M. July 17, 1980); Duran v. King, No. 77-721 (D. N.M. March 15, 1984)].

Gates v. Deukmejian (United States District Court, Eastern District of California, 1989). Evaluation of conditions of confinement at California Medical Facility, Vacaville, California.

Kozeak v. McCarthy (San Bernardino Superior Court, 1990). Evaluation of conditions of confinement at California Institution for Women, Frontera, California.

Coleman v. Gomez (United States District Court, Eastern District of California, 1992-3; Magistrate Moulds, Chief Judge Lawrence Karlton, 912 F. Supp. 1282 (1995). Evaluation of study of quality of mental health care in California prison system, special mental health needs at Pelican Bay State Prison.

Madrid v. Gomez (United States District Court, Northern District of California, 1993, District Judge Thelton Henderson, 889 F. Supp. 1146 (N.D. Cal. 1995). Evaluation of conditions of confinement and psychological consequences of isolation in Security Housing Unit at Pelican Bay State Prison, Crescent City, California.

Clark v. Wilson, (United States District Court, Northern District of California, 1998, District Judge Fern Smith, No. C-96-1486 FMS), evaluation of screening procedures to identify and treatment of developmentally disabled prisoners in California Department of Corrections.

Turay v. Seling [United States District Court, Western District of Washington (1998)]. Evaluation of Conditions of Confinement-Related Issues in Special Commitment Center at McNeil Island Correctional Center.

In re: The Commitment of Durden, Jackson, Leach, & Wilson. [Circuit Court, Palm Beach County, Florida (1999).] Evaluation of Conditions of Confinement in Martin Treatment Facility.

Ruiz v. Johnson [United States District Court, Southern District of Texas, District Judge William Wayne Justice, 37 F. Supp. 2d 855 (SD Texas 1999)]. Evaluation of current conditions of confinement, especially in security housing or "high security" units.

Osterback v. Moore (United States District Court, Southern District of Florida (97-2806-CIV-MORENO) (2001) [see, Osterback v. Moore, 531 U.S. 1172 (2001)]. Evaluation of Close Management Units and Conditions in the Florida Department of Corrections.

Valdivia v. Davis (United States District Court, Eastern District of California, 2002). Evaluation of due process protections afforded mentally ill and developmentally disabled parolees in parole revocation process.

Ayers v. Perry (United States District Court, New Mexico, 2003). Evaluation of conditions of confinement and mental health services in New Mexico Department of Corrections "special controls facilities."

Disability Law Center v. Massachusetts Department of Corrections (Federal District Court, Massachusetts, 2007). Evaluation of conditions of confinement and treatment of mentally ill prisoners in disciplinary lockup and segregation units.

Plata/Coleman v. Schwarzenegger (Ninth Circuit Court of Appeals, Three-Judge Panel, 2008). Evaluation of conditions of confinement, effects of overcrowding on provision of medical and mental health care in California Department of Corrections and Rehabilitation. [See Brown v. Plata, 563 U.S. 493 (2011).]

Ashker v. Brown (United States District Court, Northern District of California, 2013-2015). Evaluation of the effect of long-term isolated confinement in Pelican Bay State Prison Security Housing Unit.

Parsons v. Ryan (United States District Court, District of Arizona, 2012-14). Evaluation of conditions of segregated confinement for mentally ill and non-mentally ill prisoners in statewide correctional facilities. [See Parsons v. Ryan, 754 F.3d 657 (9th Cir. 2014)].

Coleman v. Brown (United States District Court, District of California, 2013-2014). Evaluation of treatment of mentally ill prisoners housed in administrative segregation in California prisons. [See Coleman v. Brown, 28 F.Supp.3d 1068 (2014).]

Braggs v. Dunn (United States District Court, Middle District of Alabama, 2015-2017). Evaluation of mental health care delivery system, overcrowded conditions of confinement, and use of segregation in statewide prison system. [See Braggs v. Dunn, 257 F. Supp. 3d 1171 (M.D. Ala. 2017).]

# Appendix B

## List of Documents Reviewed

## APPENDIX B: DOCUMENTS REVIEWED

| BEG DOCID | END DOCID | |
|---|---|---|
| PLS0000343 PLS0006070 | PLS0000687 PLS0006136 | Ferguson Healthcare and Classification Records |
| DHA00922444 | DHA00922444 | STATUS FILE LIST 12-31-2019 .XLSX |
| EHA00104829 | EHA00104829 | Facility Profiles 7-20-2017.xlsx |
| DHA00931563 | DHA00931563 | Quarterly Beds Report 2019Q4.xlsx |
| DHA00931564 | DHA00931564 | Quarterly Beds Report 2020Q1.xlsx |
| EHA00275708 | EHA00275708 | Weekly Close Management Counts |
| DHA00914037 | DHA00914037 | Master Data Suicide Log from FY 2003/2004 to Present |
| EHA00205998 | EHA00205998 | SPMI Among CM/CM Pending Inmates |
| EHA00215505 | EHA00215505 | Excel Spreadsheet of People with Brain Injury and Dementia in FDC |
| EHA00217734 | EHA00217734 | Total of Psychotic Patients Per Institution |
| EHA00217736 | EHA00217736 | Total CM Patients with MDD or Bipolar Disorder |
| EHA00280936 | EHA00280936 | CM Inmates on 12.6.2019 |
| EHA00301553 | EHA00301553 | Population List of People with Dementia |
| DHA00017301 | DHA00017304 | 33-601.820 Maximum Management |
| DHA00026770 | DHA0002676 | 33-602.222 Disciplinary Confinement |
| DHA00027133 | DHA00027140 | 33-602.220 Administrative Confinement |
| DHA00000088 | DHA00000100 | 33-601.800 Close Management |
| DHA00016046 | DHA00016057 | HSB 15.03.13 Assignment of Health Classification Grades to Inmates |
| PLS0000078 | PLS0000339 | Unverified Supplemental Responses to Harvard's First Interrogatories |
| PLS0000341 | PLS0000342 | ██████████████ |
| PLS0000009 | PLS0000014 | Facilities with Special Housing (PRR Response) |
| PLS0000015 | PLS0000077 | OPPAGA Florida Correctional Facilites Report (October 2019) |

| | | |
|---|---|---|
| PLS0000340 | | Excel Spreadsheet - Exhibit C to Unverified Supplemental Responses to Harvard's Interrogatories (Mental Health Grades in Isolation) |
| PLS0003379 | PLS0003379 | Compiled Data re Isolation at Facilities |
| PLS0003540 | | ██████████████████ |
| PLS0003564 | PLS0003564 | ██████████████████████████ |
| PIR00035178 | PIR00035432 | ████████████ |
| PIR00032779 | PIR00033066 | ██████████ |
| ESP00001536 | ESP00007771 | Espinosa, Juan #419680 (healthcare records only) |
| PLS0004688 | | Index of Espinosa Documents |
| EHA00014790 | EHA00014797 | Updated Mental Health Stats (8/26/2019) |
| EHA00014450 | | FDC Managing Restricted Housing Populations |
| EHA00014451 | EHA00014468 | Managing Restrictive Housing Populations, Briefing Document |
| EHA00109147 | | Mental illness in restricted housing statistics |
| eha00109171 | | "The Gorilla in the Living Room, Manipulation & Malingering" |
| EHA00274310 | | Mental Illness in Segregated Housing |
| EHA00281303 | | Mental Health Grades of CM Inmates (12/27/2019) |
| EHA00286867 | EHA00286871 | Number of Outpatients with SMI in Segregation |
| PLS0004689 | PLS0004756 | The Impacts of Restrictive Housing on Inmate Behavior, Mental Health, and Recidivism, and Prison Systems and Personnel |
| EHA00473023 | EHA00473042 | Residential Mental Health Continuum of Care Program |
| EHA00473099 | EHA00473100 | Statistics re Mentally Ill in Confinement and Disciplinary Reports, Cell Extractions, Use of Force Reports, Etc. |
| EHA00473087 | EHA00473088 | parent email for EHA00473099 |

| | | |
|---|---|---|
| DHA00914038 | | Suicides and Suicide Attempts in Special Housing 1/1/2015 - 12/31/2019 |
| EHA00642470 | | Mental Health Emergency, Self-Harm, SHOS/MHOS and Placement Log |
| EHA00056461 | EHA00056491 | Mental Illness in Corrections, Fact or Fiction?  by Aufderheide |
| PIX0000001 | PIX0000696 | ███████████ |
| PLS0007126 | PLS0007207 | FDC Strategic Plan & Annual Report |
| DHA00922429 | | Isolation Population Data: 3/31/2016 |
| DHA1178489 | | Isolation Population Data:  04/27/2021 |
| DHA01101906 | | Isolation Population Data:  10/9/2020 |
| EHA00000049869 | | ████████████ |
| EHA00112521 | | Managing Restrictive Housing Populations |
| EHA00514428 | | Data including Length of Stay:  06/06/2018 |
| EHA00699031 | EHA00899050 | FDC "Quick Facts" |
| PLS0007208 | PLS0007494 | FDC's Second Supp Reponses to PL Harvard's First of Interrogatories |
| DHA00922429 | | Isolation Population Data:  12/31/2019 |
| EHA00505738 | | Managing Restrictive Housing Population May 2016 |
| PLS0007499 | | FDC Comprehensive Suicide Data |
| PLS0007500 | | FDC Suicide Rate Data |
| | | Burgess Healthcare/Correctional Records |
| | | Espinosa Healthcare/Correctional Records |
| | | Kendrick Healthcare/Correctional Records |
| | | Dean Healthcare/Correctional Records |
| | | J.H. Healthcare/Correctional Records |
| | | Jeremiah Hill Healthcare/Correctional Records |
| | | Harvard Healthcare/Correctional Records |



| Post-Inspection Records | |
|---|---|
| Videos | Apalachee Correctional |
| | Blackwater |
| | CFRC |
| | Charlote CI |
| | Florida State Prison |
| | FSP |
| | Gadsden Correctional |
| | Gulf |
| | Hamilton CI |
| | Homestead Correctional |

Jefferson CI
Lowell
Martin Correctional
New River
NWFRC
Okaloosa CI
Polk
RMC
Santa Rosa
Sumter
Suwanee CI
Taylor Correctional
Tomoka
Union Correctional
Zephyrillis