UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAC'QUANN (ADMIRE)
HARVARD; JEREMIAH HILL;
JUAN ESPINOSA; JEROME
BURGESS (a/k/a SHAM'LA GOD
ALLAH); JAMES W.
KENDRICK, JR.; JOHNNY HILL;
and AMY FERGUSON; on behalf
of themselves and all others
similarly situated,

        Plaintiffs

        v.

MARK INCH, in his official
capacity as Secretary of the Florida
Department of Corrections, and
FLORIDA DEPARTMENT OF
CORRECTIONS, an Agency of the
State of Florida

        Defendants.

Case No.: 4:19-cv-00212-MW-MAF

**DECLARATION OF KATHRYN
A. BURNS, M.D., M.P.H., IN
SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS
CERTIFICATION**

1

I, Kathryn A. Burns, M.D., M.P.H., declare as follows:

1.      I have been retained by counsel for plaintiffs to provide expert psychiatric consultation regarding the effects of restrictive housing, formerly known as segregation in the correctional community, on prisoners confined in those types of housing units, and particularly the effects on prisoners with serious mental illness.  The Florida Department of Corrections (FDC) operates several types of restrictive housing units that include confinement known as Administrative Confinement (AC), Disciplinary Confinement (DC), Close Management (CM) and Maximum Management.

### Expert Qualifications

2.      I am a Psychiatric Medical Doctor licensed in the state of Ohio.  I also have a master's degree in Public Health.  I am Board Certified by the American Board of Psychiatry and Neurology in General Psychiatry and Forensic Psychiatry. I am a Distinguished Life Fellow of the American Psychiatric Association.  I have a clinical faculty teaching appointment at the Ohio State University.

3.      I served as the Chief Psychiatrist for the Ohio Department of Rehabilitation and Correction from May 1995 to August 1999, and also from July 2013, until my retirement from public service July 31, 2018.  I have provided direct psychiatric care to patients in jails, prisons and state hospitals in addition to holding clinical administrative posts in state and county agencies.  I am a Certified

Correctional Health Professional.  I have written correctional mental health policies and procedures and developed staffing plans for correctional mental health services.  I have written and been published in journals and peer reviewed textbooks on topics pertaining to correctional mental health care.

4.     I have served as both a consulting and testifying expert witness in legal cases involving correctional mental health care.  I have conducted assessments of the adequacy of mental health care in individual correctional facilities as well as state systems including Massachusetts, Pennsylvania, Indiana, Illinois, Ohio, Alabama, and Delaware.  I have also been a monitoring expert in correctional litigation cases including *Coleman v Brown* (California), *Disability Rights Network of Pennsylvania v Wetzel* (Pennsylvania), *Disability Law Center v Massachusetts Department of Correction* (Massachusetts), *Graves v Arpaio* (Maricopa County, Arizona) and *Carty v Mapp* (US Virgin Islands).

5.     A copy of my current curriculum vitae, which includes a list of all publications authored and a list of all cases in which I have testified at trial or deposition during the past four years is attached to this report as Appendix A.

***Basis of Expert Opinion***

6.     My opinions in these matters are based on a number of sources, including my direct experience interviewing and evaluating inmates housed in extended lockdown/solitary confinement as well as having developed policies and

procedures regarding placement of inmates into restrictive housing and monitoring the development and implementation of alternative placements for inmates with serious mental illness.  I also continue to review literature and professional standards promulgated by the American Correctional Association and principles and position statements adopted by the Association of State Correctional Administrators (now known as Correctional Leaders Association),[1] the National Commission on Correctional Health Care,[2] the American Psychiatric Association,[3] and the United States Department of Justice Report and Recommendations Concerning the Use of Restrictive Housing.[4]

7.     I also note that the opinions expressed in this declaration are preliminary and partial because I will be touring additional institutions, conducting more interviews and reviewing additional records and documents in order to address broader issues than class certification in a later report.  However, I am

---

[1] Association of State Correctional Administrators, *Restrictive Status Housing Policy Guidelines* (Aug. 2013), https://leg.mt.gov/content/Committees/Interim/2017-2018/Law-and-Justice/Meetings/May-2018/Exhibits/asca-policy-guidelines-sj25-ljic-may-2018.pdf (last visited May 24, 2021).

[2] See Nat'l Comm'n on Corr. Health Care, *Solitary Confinement (Isolation)* (Apr. 2016), https://www.ncchc.org/filebin/Positions/Solitary-Confinement-Isolation.pdf (last visited April 22, 2021).

[3] American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (Dec. 2012), http://nrcat.org/storage/documents/apa-statement-on-segregation-of-prisoners-with-mental-illness.pdf (last visited May 24, 2021).

[4] U.S. Department of Justice, *Report and Recommendations Concerning the Use of Restrictive Housing*, (Jan. 2016), https://www.justice.gov/archives/dag/file/815551/download (last visited May 24, 2021).

confident in these preliminary opinions and simply expect them to be more developed and supplemented as additional information is received.

8.      I reviewed the Class Action Complaint for Declaratory and Injunctive Relief and the Second Amended Complaint for Declaratory and Injunctive Relief in this case as well as a report on Solitary Confinement published by the Southern Poverty Law Center (SPLC: Solitary Confinement - Inhuman, Ineffective, and Wasteful, 2019).  I reviewed numerous FDC  policies and procedures including, but not limited to those pertaining to Assignment of Health Classification Grades to Inmates (HSB 15.03.13); Health Services for Inmates in Special Housing (Procedure 403.003); Behavioral Risk Assessment (DC4-729); Close Management Referral Assessments (DC-128); Planning and Implementation of Individualized Mental Health Services (HSB 15.05.11); Mental Health Staff on Disciplinary Teams (HSB 15.05.13) and Mental Health Services (HSB 15.05.14).  I reviewed FDC Briefing Document NIC-16P3601 - Managing Restrictive Housing Populations and FDC Rules regarding Close Management (FAC 33-601.800), Maximum Management (FAC 33-601.820), Disciplinary Confinement (FAC 33-602-222) and Administrative Confinement (FAC 33-602.220).  I reviewed a presentation entitled, "Mental Illness in Corrections, Fact or Fiction" prepared by Dean Aufderheide, Ph.D., FDC Chief of Mental Health Services that he presented to FDC leadership. (EHA 56461-56491).  I also reviewed various other types of

documents and prisoner medical/mental files.  Appendix B contains a complete list
of the documents considered for this declaration.

9.      I toured Lowell Correctional Institution Annex (November 17-18,
2020), Suwannee Correctional Institution (December 8-9, 2020), Hamilton
Correctional Institution (February 9-10, 2021) and Union Correctional Institution
(February 11-12, 2021).  Site visits consisted of a tour of the spaces in which
inmates received mental health care as well as all restrictive housing units at the
sites.  Such areas included the infirmary, mental health office/treatment spaces, and
cells used to conduct special watches such as suicide watch.  While touring the
restrictive housing units, I was able to directly observe the environmental
conditions in the units and well as the inmates' cell status and property
permitted/allowed. I conducted brief cell front interviews of inmates housing in
AC, DC, and CM.  (I did not tour Maximum Management as it is located only at
Florida State Penitentiary and I was not on that visit.)  I spoke to a total of 139
prisoners in the four sites that I toured.  On the second day of each tour, I
interviewed up to nine inmates at each site individually in an interview room
outside of the cellblocks, for a total of 34 interviews.  I selected persons to
interview based on cell front interviews as well as the rosters provided that
indicated mental health codes.

10.     I briefly reviewed medical records of the individuals interviewed at the time of the interviews to confirm medication prescriptions, psychiatric diagnoses, treatment plans and counseling, group and medication management appointments.  I subsequently requested additional medical records following the site visits though not all have been received as of the date of this declaration.

11.     I reviewed records and interviewed two of the named plaintiffs during site visits.  I interviewed Ms. Amy Ferguson during a site visit to Lowell Correctional Institution on November 18, 2020.   Accompanied by one of plaintiffs' counsel and plaintiff expert, Dr. Homer Venters, I went to Columbia Annex on February 9, 2021, to interview Mr. Juan Espinosa, one of the named plaintiffs.  Dr. Venters and I interviewed Mr. Espinosa together for approximately one hour.

***Adverse Effects of Restrictive Housing***

12.     There had been a documented increase in the use of segregation or solitary confinement, now known as restricted housing, in correctional facilities across the United States over the last several decades.  Such placements are generally related to punishment for not following rules or safety concerns, such as known or suspected gang members, investigation, or protection from other prisoners for a variety of reasons.  In addition to increased use of segregation, it has also been observed and documented that inmates with serious mental illness

are over-represented in segregation or extended lockdown[5] housing units in part due to difficulty conforming to institutional rules specifically because of their mental illness and their stay is prolonged because their mental condition worsens when maintained in lockdown precluding their release.[6]

13.    The harmful effects of solitary confinement on prisoner health and welfare have been recognized by researchers and scholars as well as the United States National Institute of Justice, the World Health Organization, United Nations and other international bodies.  These harmful effects are due to the conditions of confinement in extended lockdown that involve the absence of meaningful social interaction, enforced idleness and lack of environmental stimulation and the restrictive and oppressive security measures.[7]  These harmful effects may be experienced by any and all inmates housed under extended lockdown but are particularly malignant for prisoners with serious mental illness.

14.    The World Health Organization listed the following effects of solitary confinement on prisoner physical health:  gastrointestinal and genitourinary

---

[5] The definition of extended restrictive housing used by the various organizations mentioned varies by a matter of days but generally refers to being held in restrictive housing for 3-4 weeks (American Correctional Association position statement) or 30 days (American Correctional Association.)

[6] Daniel P. Mears, *Restrictive Housing in the U.S.: Issues, Challenges and Future Directions* (Nov. 2016), NCJ 250322, *https://www.ojp.gov/pdffiles1/nij/250322.pdf*  (last visited May 24, 2021).

[7] *See* Stefan Enggist et al., *Prisons and Health*, Ch. 5 (2014), http://www.euro.who.int/__data/assets/pdf_file/0005/249188/Prisons-and-Health.pdf?ua=1 (last visited April 3, 2021).

problems, diaphoresis (sweats), insomnia, deterioration of eyesight, profound

fatigue, heart palpitations, migraines, back and joint pains, weight loss, diarrhea

and aggravation of pre-existing medical problems.  Mental health problems, even

for those with no prior history of mental illness include: anxiety, depression, anger,

diminished impulse control, paranoia, visual and auditory hallucinations, cognitive

disturbances, obsessive thoughts, paranoia, hypersensitivity to stimuli,

posttraumatic stress disorder, self-harm, suicide and psychosis.  Prisoners with pre-

existing mental illness are at particularly high risk of worsening symptoms.

     15.    The harmful effects of restrictive housing have long been recognized

by scholars and have been increasingly recognized by courts, the health

professions and as noted, within the corrections profession itself.  In fact, in

recognition of the harmful effects of restrictive housing on prisoners with serious

mental illness, over the course of the last 10 years or so, many correctional

facilities and systems have taken steps to dramatically reduce the use of restrictive

housing, sometimes in response to litigation.  The American Correctional

Association (ACA), which accredits prisons, including those in Florida, has

adopted additional standards calling for prisoners to be screened prior to placement

in segregation, monitored frequently by medical and mental health staff conducting

rounds in restrictive housing units and have mental health assessments at intervals

of 30-90 days.  In addition, the newly revised standards adopted in August 2018[8]

specifically exclude individuals diagnosed with serious mental illness from

placement in extended restrictive housing unless there is an immediate and present

danger to others or the safety of the institution.  If placed, "there must be an active

individualized treatment plan that includes weekly monitoring by mental health

staff, treatment as necessary and steps to facilitate the transition back into general

population."[9]  All of these standards are for the express purpose of identifying

prisoners experiencing mental health difficulty or worsening symptoms of mental

illness in order to remove them from lockdown and provide them with treatment.

16.    The ACA defines "Serious Mental Illness" as follows:

Psychotic Disorders, Bipolar Disorders, and Major Depressive
Disorder; any diagnosed mental disorder (excluding substance use
disorders) currently associated with serious impairment in
psychological, cognitive, or behavioral functioning that substantially
interferes with the person's ability to meet the ordinary demands of
living and requires an individualized treatment plan by a qualified
mental health professional(s).

Psychological - as relating to the mental and emotional state of an
individual;

Cognitive - as relating to cognitive or intellectual abilities;

---

[8] The standards were developed in 2017 and adopted in August 2018.  The effective date is October 1, 2020

[9] American Correctional Association, *Performance-Based Standards and Expected Practices for Adult Correctional Institutions, Fifth Edition*, Standard 5-ACI-4B-30 (Mar. 2020).

Behavioral - as relating to actions or reactions in response to external or internal stimuli that is observable and measurable.[10]

17.    I will use the ACA definition of Serious Mental Illness for this declaration because FDC routinely seeks and receives ACA accreditation of its institutions.

***Restrictive Housing in FDOC***

18.    As previously noted, FDC operates four types of restrictive housing. Administrative Confinement (AC) is considered a "temporary" housing location while there is an investigation for a pending disciplinary hearing, pending outside charges or an investigation for a prisoner requesting protective housing.  Although considered "temporary," prisoners may remain housed in AC for weeks or months waiting for the investigation and determination of their request for protective management status.  Disciplinary Confinement (DC) results from a finding of guilt for a rule infraction.  The maximum sentence for DC confinement is 60 days per rule infraction for which the prisoner is found guilty.  But a prisoner may be charged with several rule infractions resulting from a single episode of misbehavior and DC time may be run consecutively rather than concurrently.  Therefore, DC time may be quite extensive and not limited to only 60 days.

---

[10] *Id.* at Glossary.

19.     Close Management (CM) is "the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusive the rights and privileges of others."  (FAC 33-601.800) There are three levels of CM with CM level one (CM-I) being most restrictive and the third level (CM-III), the "least" restrictive.  A prisoner must progress through the levels prior to returning to general population.   The duration of each level in CM is indeterminate and can last from months to years.  Prisoners may also be placed back on a previously completed level and required to work through the levels again.

20.     Maximum Management is used for an inmate who has been identified as being an extreme security risk to the Department and requires "an immediate level of control than that available in confinement, close management or death row."  (FAC 33-601.820) As noted, I did not visit or tour Florida State Penitentiary, the only current location for Maximum Management housing.

21.     The types of restrictive housing that I did tour, AC, DC and CM, are virtually indistinguishable from one another.  Prisoners are held in their cells for 22 or more hours a day under the very conditions identified as harmful by the World Health Organization:  the absence of meaningful social interaction, enforced idleness, lack of environmental stimulation and restrictive and oppressive security

12

measures.  Personal property is extremely limited as is telephone contact with

family members and visitation.  Prisoners are not permitted outdoor recreation at

all for the first 30 days of confinement in any of the types of restrictive housing.

Even after the 30 days of not being permitted outdoors, prisoners reported, and

documentation confirms that they are not provided appropriate access to outdoor

recreation sometimes due to the unavailability of the necessary number of security

staff to supervise the activity.  Prisoners may also be placed on "Property

Restriction" within restrictive housing which prisoners appropriately refer to as

being place on "strip":  all property, including clothing, socks, shoes, bedding and

mattress are removed from the prisoner for three days.

22.    These conditions are common to all prisoners housed in these types of

restrictive housing regardless of the name or type of restrictive housing and expose

them to the risk of developing serious mental consequences, including serious self-

harm and death by suicide.  Although I did not tour Maximum Management, FDC

itself acknowledges that it is the most restrictive of the restrictive housing units

operated with more extreme social isolation, out of cell time and security

procedures.

23.    FDC is aware that the prevalence rate of prisoners with mental illness,

including serious mental illness, in restrictive housing is much higher than the

prevalence of prisoners with these conditions housed in general population.[11] FDC is also aware that inmates requiring transfer from CM to higher levels of mental health care for exacerbations of psychiatric illness comprise a larger percentage of such admissions than those admitted from general population housing.[12]  FDC is also aware of the positions of the Correctional Leaders Association, the ACA and the National Commission on Correctional Health Care.

24.    In spite of this, FDC procedures and practices do not exclude prisoners with serious mental illness from placement and continued stay in restrictive housing.  There is a pre-screening before placement and periodic mental health assessments, but neither lead to exclusion from such placement or prevent continued stay.  Even when prisoners decompensate to the point of requiring placement on Self Harm Observation Status (suicide precautions) or transfer to a Transitional Care Unit (TCU), Crisis Stabilization Unit (CSU), or a psychiatric hospital known as a Corrections Mental Health Treatment Facility (CMHTF), they are discharged back into restrictive housing, under the very same conditions that they were unable to tolerate that led to the need for transfer to a higher level of care.

---

[11] *See* Ex. D1, Dean Aufderheide, *Mental Illness in Corrections, Fact or Fiction* (May 2017), at Bates Nos. EHA00056461-EHA00056491.

[12] *Id.*

25.     Mental health staff do amend the prisoners' Individual Service Plans (treatment plans) to include a problem titled:  Limited Social/Environmental Stimulation (due to housing in Close Management or other confinement setting),[13] but the interventions remain a monthly individual contact with a mental health counselor and periodic (90 days) appointments for psychotropic medication management with a psychiatrist or nurse practitioner.  Some prisoners are also provided a weekly group meeting conducted by mental health staff on the unit during which they are hand cuffed and shackled and made to stand in cage-like structures for the group session or secured to a bench or wall --- conditions that are difficult to envision as therapeutic.  These interventions are not sufficient to alleviate the risk of risk of harm to prisoners with serious mental illness in restrictive housing.  This is evidenced in part by FDC's acknowledgement that prisoners with mental illness housed in CM represent almost half of the prisoners requiring court-ordered treatment at a Corrections Mental Health Treatment Facility, the highest and most intensive level of inpatient mental health care available to prisoners.[14]  Clearly, the increase in mental health services to inmates in restrictive housing is insufficient to ameliorate the risk of such placement

---

[13] See, *HSB 15.05.11 Appendix I Mental Health Problem Index* (Rev. July 2016), at Bates Nos. DHA00000582-00000588.

[14] Aufderheide, *supra* n. 11.

inasmuch as conditions deteriorate to the point of requiring hospitalization from that setting.

**General observations of putative class members**

26.     Prisoners in restrictive housing of all types were subjected to enforced idleness and the absence of meaningful social interaction; had extremely limited property, limited out of cell time, minimal access to outdoor recreation and limited mental health treatment – all conditions known to have harmful effects on prisoners confined in restrictive housing.   Trends observed during the interviews and FDC record reviews included prisoners reporting and/or displaying symptoms of anxiety, depression, appetite and sleep disturbances, self-injury, poor impulse control and limited coping skills.  Some had histories of suicide attempts and multiple SHOS placements as well as transfers to higher levels of mental health care from restrictive housing.  Some reported experiencing auditory hallucinations and paranoia since being confined in restrictive housing.  One man was ███████

██████████████████████████████████████████████; ████████

████████████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████ ████████████████████████████████ ████████████

████████████████████████████████ ████ .[15]

### Named Plaintiffs

### Juan Espinosa

27.    I reviewed Mr. Espinosa's mental health record and interviewed him with Dr. Venters for approximately one hour on February 9, 2021 at Columbia Correctional Institution Annex.   He was no longer in CM at the time of our interview but had spent 16 months in CM in Marion, Florida State Penitentiary and RMC.  Mr. Espinosa has been unable to speak since having surgery on his throat to remove a tumor in late December 2018.  He has been provided no accommodation to assist him in communication.  He was given a sign to wear with his ID card that indicates he is "MUTE."  Consequently, the interview consisted of either Dr. Venters or I posing questions and Mr. Espinosa writing his responses to the questions on a tablet of paper that we provided to him.

28.    Mr. Espinosa is diagnosed with Bipolar Disorder (a serious mental illness) and is prescribed Abilify (an antipsychotic) and Paxil (an antidepressant).  According to his mental health records, he has a history of having attempted

---

[15] *See* Medical Records of Prisoner ████████████, ████████████████████████

████████████████████████████████████████████████████

███████████████████████

suicide on multiple occasions, the last of which was in 2012.  He is currently

classified as being at a mental health outpatient level of care.

29.     During the time he was in CM, Mr. Espinosa reported he was

permitted to shower three times a week and was given outdoor recreation once

weekly for two hours although it was sometimes cancelled due to weather

conditions or not having sufficient correctional staff.  In those instances, he did not

receive any out of cell recreation that week.  Mr. Espinosa said that he continued to

have psychiatric appointments every 2-3 months when he was in CM and these

were held in a location outside of his cell.  He received his prescribed medications

when he was in CM. The documentation in his medical record confirms his

account of doctor visits and prescriptions.

30.     Mr. Espinosa reported that the correctional officers in CM were

disrespectful towards him, but he was never physically abused or threatened but he

saw officers physically beat other inmates "many times."  Mr. Espinosa was placed

on "strip" one time after being told contraband was found in his cell when it was

searched while he was on a legal visit.  (Mr. Espinosa explained that the

contraband was a pen, but the officer said it could be used as a needle for drug

use.)  Mr. Espinosa was taken out of the cell for the visit in handcuffs and ankle

restraints per the usual procedure and on the way back to the unit, he tripped and

fell injuring his foot in the fall.  He was placed back into his CM cell on "strip".

18

His foot was painful and swollen.  He showed his injury to both the officer and a nurse but was told he had to wait to see the doctor.  He spent 3 days in "strip" status with no property, no mattress, and dressed only in boxer shorts.  After 3 days, he was seen by the doctor, again after being placed in handcuffs and ankle restraints.  He was not given crutches or a wheelchair and had to hobble to the medical appointment.  The doctor ordered an X-ray of his foot, but it was not taken for an additional 4 days.  The X-ray revealed his foot was fractured in three places.

31.     During the interview, Mr. Espinosa was pleasant and cooperative.  He answered all questions posed to him by writing his responses on the paper provided to him.  His responses were relevant to the questions posed and there was no evidence of thought disorganization, mood disturbance or delusional thoughts.  Mr. Espinosa was alert and oriented. He was able to focus his attention and sustain his concentration.  His intelligence is estimated to be within the average range of intellectual ability.  No memory problems were apparent.

32.     Mr. Espinosa has a serious mental illness, namely Bipolar Disorder. He has a history of having attempted suicide multiple times according to his FDC mental health records.  Nevertheless, he was placed into and held in restrictive housing.  His case and care, including untimely access to medical care for foot fractures, placement on "strip" status, mental health treatment consisting essentially only of psychotropic medication when in confinement, and failure to

provide accommodation for his medically caused inability to speak, are typical of all prisoners housed in confinement.  His case and care are typical of all those prisoners in extended lockdown; he is both a member the sub-class of prisoners with serious mental illness.  There is no reason to believe that Mr. Espinosa could not make reasoned decisions or serve as a representative of the putative class and sub-class of persons with serious mental illness.

**Amy Ferguson**

33.    Ms. Ferguson arrived in FDC on November 11, 2019, as an interstate transfer from the Illinois Department of Correction.  She was placed into CM directly upon arrival and has remained there except when transferred out into higher levels of mental health care including Crisis Stabilization, Transitional Care Unit and Correctional Health Treatment Facility (CMHTF) as well as multiple placements on Self-Harm Observation Status (suicide watch.)

34.    Ms. Ferguson has a lengthy history of recurrent self-inflicted injury that includes attempted overdose by hoarding medications, cutting herself and attempted hanging.  She also has an extensive history of verbal threats and physical fights with other inmates as well as staff assaults that include spitting, throwing objects, hitting and other behaviors.

35.    Ms. Ferguson has been given a number of psychiatric diagnoses including Schizoaffective Disorder and Antisocial Personality Disorder, though

current diagnoses reflected in her FDOC records are Post Traumatic Stress

Disorder (PTSD), Bipolar Disorder with psychotic features and Antisocial

Personality Disorder.  She has been prescribed many types of psychotropic

medications including antipsychotic medications, antidepressants and mood

stabilizers, alone and in various combinations.  Currently, she is prescribed Prozac

(antidepressant), Abilify (antipsychotic that also has mood stabilizing properties)

and Vistaril (a mild anti-anxiety medication.)

36.    Ms. Ferguson was on CM-II when I interviewed her in a private

interview room on November 18, 2020.  She was polite and cooperative

throughout the interview.  Ms. Ferguson said that she received her medications in

CM and a weekly individual counseling session that lasts approximately 10

minutes.  There are no group sessions.

37.    Ms. Ferguson was alert and fully oriented.  She was able to focus her

attention and sustain her concentration.  Although she does experience auditory

hallucinations at times as a symptom of her illness, she was not hearing any when

we met.  She also reported experiencing flashbacks and nightmares of childhood

physical and sexual abuse but was not experiencing any during meeting.  She did

not appear preoccupied or distracted.  Ms. Ferguson spoke in a normal tone of

voice and at a regular rate.  Her responses were relevant to the questions posed and

her thinking was organized.  Her intelligence was estimated to be in the low average range of intellectual functioning.

38.     Ms. Ferguson has a serious mental illness, namely Bipolar Disorder with psychotic features and PTSD.  She has been exposed to the brutal and inhumane conditions of restrictive housing for a protracted period of time and her condition has deteriorated as evidenced by multiple instances of self-harm and need to be transferred out to higher levels of mental health care, only to be returned to the harmful conditions in CM when stabilized.  Her case and care are typical of all those prisoners in restrictive housing; she is both a member of the putative class as well as the sub-class of prisoners with serious mental illness.  In spite of her psychiatric diagnosis, Ms. Ferguson's condition remained stable at the time of her interview.  She was not depressed or manic; she was not experiencing psychotic symptoms and her thought form was well organized.  She was able to focus her attention and had no memory disturbance.  She appeared to be of low average intellectual ability.  There is no reason to believe that Ms. Ferguson could not make reasoned decisions or serve as a representative of the putative class and sub-class.

### *Conclusions*

39.     The conditions of confinement in FDC prisons for inmates held in restrictive housing:  absence of meaningful social interaction, enforced idleness,

the lack of environmental stimulation, and restrictive and oppressive security measures are common to all prisoners housed there and expose all of them to the risk of developing serious mental consequences, including serious self-harm and suicide death.

40.     These conditions are particularly noxious for prisoners with serious mental illness and placed them at high risk of experiencing worsening symptoms such as paranoia, hallucinations, mood disturbances including depression, anxiety, and reduced impulse control, among other symptoms and cause intense suffering and may lead to serious self-injury and suicide.

41.     FDC policies and practices do not exclude inmates with serious mental illness from restrictive housing except for relatively brief periods of time. Even when inmates become so ill as to require placement on SHOS or transfer to a CSU, TCU, or psychiatric hospitalization, they are returned to restrictive housing upon discharge and placed under the very same conditions as those that originally precipitated the transfer to a higher level of care.  Consequently, prisoners with mental illness, including those with serious mental illness, are over-represented in restrictive housing in FDC.

42.     The proposed class representatives discussed have the same essential characteristics of those in the putative class with claims that are typical of all prisoners as well as prisoners in the subclass of prisoners with serious mental

illness.   Mr. Espinosa and Ms. Ferguson are able to adequately represent and protect the interests of the putative class and subclass of prisoners with serious mental illness.

43.     I hold all of the above opinions to a reasonable degree of medical certainty.

Under 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing declaration is true and correct. Executed on the 27th  day of April, 2021.

__/s/ *Kathryn Burns*_____

Kathryn A. Burns, M.D., M.P.H.

# Appendix A

## Curriculum Vitae

**Curriculum Vitae**

## Kathryn A. Burns, M.D., M.P.H.

1391 W 5th Ave, Unit #265
Columbus OH 43212

440-382-1535

| | |
|---|---|
| **Education:** | Cleveland State University<br>Cleveland, Ohio (1976-1980)<br>B.S. in Biology, Magna Cum Laude |
| | Case Western Reserve University School of Medicine<br>Cleveland, Ohio (1981-1985)<br>M.D. |
| | Ohio State University School of Medicine & Public Health<br>Columbus, Ohio (1997)<br>M.P.H. |
| **Training:** | Psychiatric Resident (1985-1989)<br>University Hospitals of Cleveland<br>CWRU School of Medicine |
| | Chief Resident, Department of Psychiatry (1988-1989)<br>University Hospitals of Cleveland |

**Specialized Education:**

Forensic Fellow, Department of Psychiatry (1989-1990)
University Hospitals of Cleveland
CWRU School of Medicine

CWRU School of Law:  *Criminal Law; Criminal Law & Psychiatry; Civil Law & Psychiatry* (1989-1990)

Cleveland-Marshall College of Law:  *Law & Psychiatry in the Criminal Justice System* (1989)

**Academic Appointments:**

Case Western Reserve University School of Medicine
Assistant Clinical Professor of Psychiatry

The Ohio State University College of Medicine
Auxiliary Faculty - Assistant Professor of Psychiatry

**Professional Licenses:**

State Medical Board of Ohio, License # 35-05-7006

**Certification:**   American Board of Psychiatry & Neurology
Psychiatry, Certificate No. 35117 (1992)

American Board of Psychiatry & Neurology
Forensic Psychiatry, Certificate No. 36 (1994)

National Commission on Correctional Health Care
Certified Correctional Health Professional (2000)

**Professional Memberships:**

**American Psychiatric Association** (1986-Present)
Appointed to Task Force to Revise APA Report on Jails & Prisons,
Council on Psychiatric Services (1997-2000)
Elected to Distinguished Fellow (12/01/99)
Distinguished Life Fellow (2020-)

**Ohio Psychiatric Physicians Association** (1986-Present)

**American Academy of Psychiatry & the Law** (1988-Present)
Institutional & Correctional Psychiatry Committee (2000-2002)
Criminal Behavior Committee (1997-1999)
Public Information Committee (1991)

**Midwestern Chapter of the American Academy of Psychiatry & the Law** (1988-Present)
Annual Meeting Program Committee Chair (1992)
Chapter President (1993-1994)

**International Academy of Law and Mental Health**
(1992-Present)

2

**Professional Experience**:

Mentally Disordered Offender Program:
Psychiatrist, Senior Psychiatrist (1988-1994)
*(Outpatient mental health treatment for adults with serious mental illnesses granted probation for felony level offenses)*

Money & Mailboxes:  Psychiatric Consultant (1988, 1991-1993)
*(Outpatient mental health treatment for homeless persons with serious mental illnesses)*

Lorain Community Hospital:  Staff Psychiatrist (1989)

Cuyahoga County Court Psychiatric Clinic:  Staff Psychiatrist (1989-1993)
*(Pre-trial and post-conviction psychiatric evaluations of adults on issues of competency to stand trial, criminal responsibility, drug dependency, civil commitment)*

CWRU School of Medicine, University Hospitals of Cleveland Department of Psychiatry:
Assistant Professor of Psychiatry (1990-1992)

SAMI/M-Power Program:  Staff Psychiatrist (1990-1994)
*(Outpatient community mental health day treatment program for adults with co-occurring substance abuse and mental illness.)*

Western Reserve Psychiatric Hospital:  Psychiatric Consultant (1990-1992)

Cleveland Psychiatric Institute:  Director, Court Evaluation Unit (1991-1994)

Neighborhood Counseling Services:  Medical Director (1992-1994)
In addition to Medical Director, served as treating psychiatrist for Conditional Release Unit *(community mental health treatment for persons found Not Guilty by Reason of Insanity)*

Cuyahoga County Community Mental Health Board:  Chief Clinical Officer (1994-1995, 2002-2007)

Ohio Department of Rehabilitation and Correction:  Chief Clinical Officer
Bureau of Mental Health Services (1995-1999); Chief Psychiatrist (2013-2018)

Wright State University School of Medicine:  Assistant Clinical Professor of Psychiatry (1995-2000)

Twin Valley Behavioral Healthcare – Columbus Campus:
Director of Forensic Services (1999-2002)

The Ohio State University College of Medicine:  Assistant Clinical Professor of Psychiatry  (1999-2002; 2012-present)   O*utstanding Faculty Award (June 2002)*

Shawnee Forensic Center:  Psychiatric Consultant (1998-2010)

National Commission on Correctional Health Care:  Physician Surveyor (1998-present)

3

Forensic Center of District IX, Inc.:  Psychiatric Consultant (2000-present)

Editorial Board Member/Contributing Editor:  Correctional Mental Health Report
Civic Research Institute, Inc., Kingston, NJ (1999-present)

Forensic Psychiatric Center of Northeast Ohio, Inc.: Psychiatric Consultant (2005-present)

Appointed to Forensic Psychiatry Committee of the American Board of Psychiatry & Neurology (2009 - 2016)

Alcohol, Drug and Mental Health Board of Franklin County:  Chief Clinical Officer (2007-2013)

Ohio Addiction Recovery Center:  Medical Director (2020-2021)


**Presentations:**

***Attempted Family Murder:  Dissociation vs. Dissimulation***
Phillip J. Resnick, MD, co-presenter
CWRU Department of Psychiatry Grand Rounds, Cleveland OH (January 1990)
Ohio Association of Forensic Directors, Columbus OH (March 1990)

***Working with the Forensic Client in Community Treatment***
Phillip J. Resnick, MD, co-presenter
National Case Management Conference, Cincinnati OH (September 1990)

***Corrections & Community Collaboration:  The Mentally Disordered Offender Program***
American Psychiatric Association 43rd Institute on Hospital & Community Psychiatry, Los Angeles CA (October 1991)

***Not Mad, Still Bad, What Now?:  The Disposition of Non-Mentally Ill Insanity Acquittees***
American Academy of Psychiatry & the Law – Midwestern Chapter Meeting
Cleveland OH  (April 1992)

***Forensic Psychiatry in the Community:  The Cuyahoga County Experience***
American Academy of Psychiatry & the Law – Midwestern Chapter Meeting
Detroit MI (April 1994)

***Treatment/Placement Implications & Strategies for the 18+ Offender***
Ohio Department of Youth Services Annual Program Conference
Columbus OH (December 1994)

***Assertive Community Treatment Teams:  Stopping the State Hospital Revolving Door***
MetroHealth Medical Center Department of Psychiatry Grand Rounds, Cleveland OH (January 1995)
All Ohio Institute on Community Psychiatry, Cleveland OH (March 1995)

***Can We Talk:  Emergency Psychiatry Meets Managed Care***
Kenneth Serta, MD, co-presenter
American Psychiatric Association Annual Meeting, Miami Beach FL (May 1995)
***Legal & Program Aspects of Staff Victimization***
Fred Cohen, moderator
American Correctional Association Annual Meeting, Indianapolis IN (January 1997)

***Hot Off the Press:  New Guidelines for Jails & Prisons***
H. Weinstein, C. Newkirk, J. Zil, co-presenters
American Psychiatric Association Annual Meeting, Toronto, Canada (May 1998)

***Legal vs. Moral Wrongfulness Schism***
S. Noffsinger, M. Carroll, D. Pinals, co-presenters
American Academy of Psychiatry & the Law Annual Meeting
New Orleans LA (October 1998)

***So You're Incompetent to Stand Trial – Now What?***
S. Noffsinger, J. Radio, A. Hernandez, co-presenters
American Academy of Psychiatry & the Law Annual Meeting
Baltimore MD (October 1999)

***APA Guidelines for Correctional Psychiatry***
American Academy of Psychiatry & the Law – Midwestern Chapter Annual Meeting
Cleveland OH (April 2000)

***Forensic Psychiatry Board Review Course***
Topics presented:  Competencies:  Civil & Criminal; Managed Care
Boston MA (October 2001)

***Firearms Risk Management in Inpatient Psychiatric Care***
XXVIIth International Congress on Law & Mental Health
Amsterdam, The Netherlands (July 2002)

***Course:  Correctional Psychiatry***
H. Weinstein, C. Newkirk, K. Gilbert, A. Hanson, J. Zil, co-presenters
53rd Institute on Psychiatric Services, APA Annual Fall Meeting, Orlando FL (October 2001)
H. Weinstein, K. Gilbert, A. Hanson, J. Zil, co-presenters
54th Institute on Psychiatric Services, APA Annual Fall Meeting, Chicago IL (October 2002)
H. Weinstein, K. Gilbert, A. Hanson, J. Zil, co-presenters
55th Institute on Psychiatric Services, APA Annual Fall Meeting, Boston MA (October 2003)

***Practicing Rewarding Psychiatry in Jails and Prisons – A Practicum***
H. Weinstein, K. Gilbert, A. Hanson, co-presenters
American Psychiatric Association Annual Meeting, Atlanta GA
(May 2005)

***Providing Mental Health Care at the Prison's Back Door: Re-Linking Mentally Ill Offenders to Community Treatment***
XXIX International Congress on Law & Mental Health
Paris, France (July 2005)

***Preventing Suicide in Correctional Facilities***
H. Weinstein, K. Gilbert, A. Hanson, co-presenters
57th Institute on Psychiatric Services, APA Annual Fall Meeting, San Diego, CA
(October 2005)

***Prescribing Controlled Substances in Prison***
K. Appelbaum, J. Metzner, R. Trestman, co-presenters
American Academy of Psychiatry & the Law Annual Meeting
Montreal Canada (October 2005)

***Jail Suicide Prevention***
Ohio Department of Mental Health 2006 Annual Forensic Conference
Sandusky OH (August 2006)

***Jail Mental Health Services***
Ohio Department of Mental Health 2007 Annual Forensic Conference
Wilmington OH   (August 2007)

***Psychiatric Services in Jails & Prisons:  It's Time to Revise the APA Guidelines***
H. Weinstein, co-presenter
American Psychiatric Association Annual Meeting, Washington DC
(May 2008)

***Psychopharmacology in Jails and Prisons: Principles, Practice and Special Issues***
H. Weinstein, E. Roskes, B. Bay, co-presenters
61st Institute of Psychiatric Services, APA Annual Fall Meeting, New York, NY
(October 2009)

***Practicing in the Pokey – What It's All About***
30th Annual Spring Midwest American Academy of Psychiatry and the Law Meeting, Columbus, OH (March 2013)

**Publications:**

Sherman M, Burns K, et al.:  Firearms Risk Management in Psychiatric Care. *Psychiatric Services* 52: 1057-1061, 2001.

Burns K:  Creating a Mental Health Classification System. *Correctional Mental Health Report* 4(1):3, 2002.

Burns K:  Mental Health Screening.  *Correctional Mental Health Report* 4(2):19, 2002.

Burns K:  Mental Health Evaluation.  *Correctional Mental Health Report* 4(3):35, 2002.

Burns K:  "Jail Diversion and Correctional Psychotropic Medication Formularies"; Management and Administration of Correctional Health Care, J. Moore, ed.  Kingston NJ:  Civic Research Institute, 2003.

Burns K:  "Psychopharmacology in Correctional Settings"; Handbook of Correctional Mental Health Care. C.L. Scott and J.B. Gerbasi, eds. Arlington VA:  American Psychiatric Publishing, Inc., 2005.

Burns K:  The Red Zone: Boundaries of Clinical Versus Forensic Work in Correctional Settings.  *Correctional Health Care Report* 7(5):67, 2006; also appears as Chapter 19 Correctional Psychiatry Practice Guidelines and Strategies.  O.J. Thienhaus and M. Piasecki, eds.  Kingston NJ: Civic Research Institute, 2007.

Burns K: Commentary: The Top Ten Reasons to Limit Prescription of Controlled Substances in Prisons.  J Am Acad Psychiatry Law 37:50-2, 2009.

Burns K:  "Pharmacotherapy in Correctional Settings"; Handbook of Correctional Mental Health Care, Second Edition. C.L. Scott, ed. Arlington VA:  American Psychiatric Publishing, Inc., 2010.

Burns, K:  Psychiatry behind bars: Practicing in jails and prisons.  Current Psychiatry 10:2-15, 2011.

Cloyes KG and Burns KA: "Aging prisoners and the provision of correctional mental health"; Oxford Textbook of Correctional Psychiatry. RL Trestman, KL Appelbaum, JL Metzner, eds. New York NY: Oxford University Press, 2015.

Burns K: Correctional Psychotropic Medication Formularies. Correctional Health Care Report 18(1):1, 2016.

Burns K: "Psychopharmacology in correctional settings"; Principles and Practice of Forensic Psychiatry, Third Edition. R. Rosner, CL Scott, eds. Boca Raton FL: CRC Press, Taylor and Francis Group, 2017.

Burns K: "Coordinating Physical and Mental Health Care – Why? Why Now? How?"; Correctional Health Care Practice, Administration and Law. F Cohen, ed. Kingston NJ: Civic Research Institute, 2017.

Burns K: "Correctional Psychotropic Medication Formularies"; <u>Correctional Health Care Practice, Administration and Law</u>. F Cohen, ed. Kingston NJ: Civic Research Institute, 2017.

Member of Task Force of American Academy of Psychiatry and the Law (AAPL) on Prescribing Medication in Corrections:  AAPL Practice Resource for Prescribing in Corrections.  J Am Acad Psychiatry Law 46, No 2, 2018 Supplement.

**Correctional Mental Health Care Consultation and Monitoring:**

*Ralph Coleman, et al. v Edmund G. Brown, Jr., et al.*
No. 2:90-cv-0520 KJM DAD
US District Court, Eastern District of California
Served as a mental health expert on Special Master's monitoring team to assess delivery of mental health care to inmates confined in California Department of Corrections and Rehabilitation

*Fred Graves, et al., v Joseph Arpaio, et al.*
No. CV-77-0479-PHX-NVW  United States District Court, District of Arizona
Appointed as expert by Court to evaluate delivery of mental health care at Maricopa County Jails, assist in development of a plan demonstrating compliance with Second Amended Judgment and report on implementation of the plan

*Disability Laws Center, Inc., v Massachusetts Department of Correction, et al.*
No. 07-10463 (MLW) US District Court, District of Massachusetts
Retained by Disability Law Center as designated expert to assess MDOC compliance with the terms of a Settlement Agreement

*Disability Rights Network of Pennsylvania v John Wetzel, Secretary Pennsylvania Department of Corrections* (US District Court, Middle District of PA  Civil Case No. 1:13-CV-00635)
Initially consulting expert to plaintiffs then jointly selected by parties to assess and report the DOC's implementation of the terms of Settlement Agreement

*Carty v Mapp*
Case 3:94-CV-78  District Court of the Virgin Islands, Division of St. Thomas & St. John
Parties' joint expert in Mental Health Care to assess compliance with terms of a Settlement Agreement at Criminal Justice Complex and the Alva Swan Annex, located in St. Thomas, Territory of the United States Virgin Islands.


I have also served as a consulting expert on the provision of mental health care to inmates in state correctional facilities in Alabama, Florida, Georgia, Indiana, Illinois, Montana, New Jersey, Pennsylvania and St. Croix, US Virgin Islands.

8

**Expert Witness Disclosure:**


*Carty v Mapp*
Case 3:94-CV-78  District Court of the Virgin Islands, Division of St. Thomas and St. John
(Parties' joint expert, testimony in multiple status hearings 2015, 2016, 2017, 2018, 2019)


*Joshua Dunn, et al. v. Jefferson Dunn, et al.* now
*Edward Braggs, et al. v. Jefferson Dunn, et al.*
Case no. 2:14-CV-00601-MHT-GMB United States District Court, Middle District of Alabama, Northern District
(Retained by plaintiff, report, deposition and trial testimony 12/16; hearing testimony
 2017, 2018, 2019, 2020; deposition testimony 4/21)


*Brenda Quinn, as administrator for the Estate of Travis Frederiskson v. Wexford Health Sources, Inc., et al.*
Case No. 3:17-cv-00669-MJR-RJD United States District Court, Southern District of Illinois
(Retained by plaintiff, report and deposition testimony 5/14/19)


*Estate of Rachelle Stewart v Correct Care Solutions, LLC and Katrena Mitchell*
Claim No. 1018408 Before the Department of Insurance, State of Indiana
(Retained by plaintiff, report and deposition testimony 8/22/19)


*Estate of Kyra Warner v Wellpath, et al.*
Case no. 1:19-CV-774-RLY-MJD United States District Court, Southern District of Indiana, Indianapolis Division
(Retained by plaintiff, report and deposition testimony 3/4/20)


*Tellis v LeBlanc, et al.*
Civil Action No. 5:18-CV-00541 United States District Court, Western District of Louisiana
(Retained by plaintiff, report and deposition testimony 4/24/21)


Apr  2021

# Appendix B

## List of Documents Reviewed

*Appendix B:  Information Reviewed*

1. Class Action Complaint for Declaratory and Injunctive Relief

2. Second Amended Class Action Complaint for Declaratory and Injunctive Relief

3. Southern Poverty Law Center Report:  Solitary Confinement Inhumane, Ineffective and Wasteful

4. Assignment of Health Classification Grades to Inmates HSB 15.03.13 (DHA 16046-57)

5. Close Management FAC 33-601.800 (DHA 88-100)

6. Maximum Management FAC 33-601.820 (DHA 17301-04)

7. Disciplinary Confinement FAC 33-602.222 (DHA 26770-76)

8. Administrative Confinement FAC 33-602.220 (DHA 27133-140)

9. Classification of Grievance Appeal (DHA 2683-84)

10. Information & Formal & Appeal Grievance Logs.xlsx (DHA 2685)

11. Facilities with Special Housing (PLS 9-14)

12. OPPAGA October 2019 Report Florida Correctional Facilities (PLS 15-77)

13. FDC's Unverified Supplemental Responses to Harvard's Fist Interrogatories (PLS 78-339)

14. Mental Health Grade in Isolation Spreadsheet (PLS 340)

15. Map of Institutions (PLS 341-342)

16. Procedure 401.011, Health Services Administration (DHA00000011-DHA00000015 Healthcare Policy/Procedure)

17. Procedure 403.003:  Health Services for Inmates in Special Housing (DHA00000041-DHA00000050 Healthcare Policy/Procedure)

18. Procedure 403.013: Inmate Impairment and Disabilities Services (DHA00000058-DHA00000064 Healthcare Policy/Procedure)

19. Procedure 604.101: Americans with Disabilities Act Provisions for Inmates (DHA00000065-DHA00000086 Healthcare Policy/Procedure)

1

*Appendix B:  Information Reviewed*

20. DC4-729, Behavioral Risk Assessment (DHA00000255-DHA00000257 Correctional Policy/Procedure)

21. DC-128, Close Management Referral Assessments (DHA00000258-DHA00000258 Correctional Policy/Procedure)

22. HSB 15.05.03 Screening and Treatment for Sexual Disorder (DHA00000563-DHA00000568 Healthcare Policy/Procedure)

23. HSB 15.05.10 Psychiatric Restraint (DHA00000569-DHA00000581 Healthcare Policy/Procedure)

24. HSB 15.05.11 Appendix 1 Mental Health Problem Index revised date 7/7/16 (DHA00000582 -DHA00000588 Healthcare Policy/Procedure; this is same as EHA00013606-EHA00013612, also reviewed)

25. HSB 15.05.11 Planning and Implementation of Individualized Mental Health Services (DHA00000589-DHA00000597 Healthcare Policy/Procedure)

26. HSB 15.05.13 Mental Health Staff on Disciplinary Teams (DHA00000598-DHA00000600 Healthcare Policy/Procedure)

27. HSB 15.05.14 Mental Health Services effective 02/02/16 (DHA00000601-DHA00000604 Healthcare Policy/Procedure; same as EHA00014725-EHA00014728)

28. HSB 15.05.17 Intake MH Screening at Reception Centers (DHA00000605-DHA00000610 Healthcare Policy/Procedure)

29. HSB 15.05.19 Appx: Testing Standards for Psychotropic Medication Usage Revised 8/1/10 (DHA00000630-DHA00000631 Healthcare Policy/Procedure)

30. HSB 15.05.20 Medical and Dental Care for Mentally Disordered Inmates - Effective date 08/01/19 (DHA00000632-DHA00000634 Healthcare Policy/Procedure)

31. HSB 15.05.21 MH Re-Entry Aftercare Planning Services (DHA00000635      DHA00000646 Healthcare Policy/Procedure)

32. FDC Proc. No. 403.003 Health Services for Inmates in Special Housing Effective 2/23/18 (DHA00000647-DHA00000656 Healthcare Policy/Procedure; same as DHA 41-50)

33. FDC Proc. No. 404.002 Isolation Management Rooms and Observation Cells (DHA00000657-DHA00000663 Healthcare Policy/Procedure; also received as DHA 1175-1181; effective 3/15/18)

34. FDC Proc. No. 404.003 Mental Health Transfers (DHA00000664-DHA00000674
    Healthcare Policy/Procedure)

35. FDC Proc. No. 404.004 -- MH Inpatient Multidisciplinary Treatment and Services –
    Effective date 6/28/18 (DHA00000675-DHA00000697 Healthcare Policy/Procedure)

36. FDC Proc. No. 404.005 Residential Continuum of Care Units  (DHA00000698-
    DHA00000710 Healthcare Policy/Procedure; Residential Continuum of Care (CTU, DTU,
    STU) No issue or effective date is indicated

37. FDC Proc. No. 403.012 ID and Management of Transgender Inmates and Inmates
    Diagnosed with Gender Dysphoria (DHA00001193-DHA00001198 Healthcare
    Policy/Procedure; effective 7/13/17)

38. HSB 15.03.25: Services for Inmates with Auditory, Mobility, or Vision Impairments and
    Disabilities (DHA00001243-DHA00001249 Healthcare Policy/Procedure; effective date
    11/1/18). See also DHA 16069 which has new effective date: 12/15/19

39. Technical Instruction No. 15.05.08 MH Services for Inmates Who Are Assigned to
    Confinement, Protective Management, or Close Management Status (DHA00001848-
    DHA00001854                     Healthcare Policy/Procedure; effective date 7/9/02)

40. HSB 15.05.19 Psychotropic Medication Use Standards and Informed Consent
    (DHA00001855-DHA00001868 Healthcare Policy/Procedure)

41. HSB 15.02.01, MEDICAL AND MENTAL HEALTH CARE INQUIRIES, COMPLAINTS, AND
    INFORMAL GRIEVANCES (DHA00016022-DHA00016026 Healthcare Policy/Procedure
    effective 07/31/19; this is newer version  of EHA00014720-EHA00014724 with effective
    date 2/1/18

42. HEALTH SERVICES BULLETIN NO. 15.02.02, HEALTH CARE CLEARANCE/HOLDS
    (DHA00016027-DHA00016033 Healthcare Policy/Procedure)

43. HEALTH SERVICES BULLETIN 15.03.13, ASSIGNMENT OF HEALTH CLASSIFICATION
    GRADES TO INMATES (DHA00016046-DHA00016057 Healthcare Policy/Procedure;
    effective date 12/15/19)

44. HEALTH SERVICES BULLETIN NO: 15.03.25, SERVICES FOR INMATES WITH AUDITORY,
    MOBILITY, OR VISION IMPAIRMENTS AND DISABILITIES (DHA00016069- DHA00016075
    Healthcare Policy/Procedure; same as above DHA00001243-DHA00001249 EXCEPT
    Effective date 12/15/19)

45. HEALTH SERVICES BULLETIN. 15.03.29, PRE-RELEASE PLANNING FOR CONTINUITY OF HEALTH CARE (DHA00016101-DHA00016108 Healthcare Policy/Procedure; Effective 11/1/18)

46. DC4-642S, INPATIENT WELL-BEING AND MENTAL STATUS EXAM (DHA00016237-DHA00016237 Healthcare Policy/Procedure; Form for exam including confinement, PM CM)

47. DC4-650, OBSERVATION CHECKLIST (DHA00016238-DHA00016239 Healthcare Policy/Procedure)

48. DC4-657, DISCHARGE SUMMARY FOR INPATIENT MENTAL HEALTH CARE (DHA00016240-DHA00016240 Healthcare Policy/Procedure)

49. DC4-673B, Mental Health Nursing Evaluation (DHA00016241-DHA00016246 Healthcare Policy/Procedure)

50. DC4-683A, Mental Health Emergency Protocol (DHA00016256-DHA00016257 Healthcare Policy/Procedure)

51. DC4-683A, Mental Health Emergency Protocol (DHA00016258      DHA00016259 Healthcare Policy/Procedure; Older version of form, revised 1/27/11)

52. DC4-683A, Mental Health Emergency Protocol (DHA00016260-DHA00016261 Healthcare Policy/Procedure; this version revised 6/6/18)

53. DC4-683A, Mental Health Emergency Protocol (DHA00016262-DHA00016263 Healthcare Policy/Procedure; this version was revised 10/6/15)

54. DC4-781A, Mental Health Emergency Log (DHA00016477)

55. Level System Access to Care, Property, Activities, and Privileges in MH Units -- Attachment #1 to HSB 15.05.05 (DHA00017115-DHA00017119 Healthcare Policy/Procedure; Residential Continuum of Care -  CTU, DTU, STU; MH hospital unit - CSU, TCU, MHCF)

56. Blank log sheet for Grievance, Inmate Request, or Inquiry (EHA00014719)

57. HSB 15.02.01: Medical and Mental Health Care Inquiries, Complaints, and Informal Grievances (EHA00014720-EHA00014724 Healthcare Policy/Procedure; Effective date 02/01/18; newer version at   DHA00016022-DHA00016026 with effective date 07/31/19)

*Appendix B:  Information Reviewed*

58. <u>American Correctional Association Audits</u>
    Desoto Annex 2017 (DHA00013916- DHA00014004)
    Hamilton CI 2017 (DHA00014005- DHA00014084)
    Homestead CI 2017 (DHA 14252-14332)
    Dade, March 2020 (DHA 922657-922724)
    Homestead, March 2020 (DHA 922725-922789)
    Hernando, February 2020 (DHA 922790-922789)
    Okaloosa, February 2020 (DHA 922845-922902)
    DeSoto, February 2020 (DHA922903-922948)
    Walton, February 2020 (DHA 922949-923006)

59. <u>Medical/Mental Health Records</u>
    <u>Lowell</u>
    - Amy Ferguson
    - ██████████
    - ██████████
    - ██████
    - ████████████
    - ████████
    - █████████
    - ██████████
    - ██████████

    <u>Suwannee</u>
    - ████████
    - █████████
    - █████
    - █████████
    - ███████
    - ████████
    - ████████
    - █████████
    - █████████████

    <u>Hamilton</u>
    - ████████
    - █████████
    - █████
    - █████████
    - █████████
    - ██████████
    - █████████

*Appendix B: Information Reviewed*

<u>Columbia Annex</u>
- Juan Espinosa

<u>Union</u>
