# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF FLORIDA
# TALLAHASSEE DIVISION

JAC'QUANN (ADMIRE)
HARVARD; JEREMIAH HILL;
JUAN ESPINOSA; JEROME
BURGESS (a/k/a SHAM'LA GOD
ALLAH); JAMES W.
KENDRICK, JR.; JOHNNY HILL;
and AMY FERGUSON; on behalf
of themselves and all others
similarly situated,

               Plaintiffs

               v.

MARK INCH, in his official
capacity as Secretary of the Florida
Department of Corrections, and
FLORIDA DEPARTMENT OF
CORRECTIONS, an Agency of the
State of Florida

               Defendants.

Case No.: 4:19-cv-00212-MW-MAF

**DECLARATION OF HOMER
VENTERS, M.D., M.S., IN
SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS
CERTIFICATION**

1

I, Homer Venters, M.D., M.S., declare as follows:

1.      The purpose of this declaration is to present my preliminary findings regarding the risk of harm to the physical health of people in restrictive housing settings in the Florida Department of Corrections (FDC). I have been retained by Plaintiffs' counsel to assess this issue for persons held in Administrative Confinement (AC), Disciplinary Confinement (DC), Maximum Management ("Max") and Close Management (CM).  I will refer to these types of isolation collectively as "confinement" or "isolation" and make specific mention of individual units and types as necessary.

2.      I characterize my findings as "preliminary" because my understanding is that I will have additional access to information, including more inspections and interviews, FDC records, and deposition transcripts, as this case proceeds and will be writing a more comprehensive report based on all the information available at a later date.  I am confident, however, that my preliminary findings are well supported by all the data currently available to me.

## I.      Expert Qualifications

3.      I am a physician, internist, and epidemiologist with over a decade of experience providing, improving, and leading health services for incarcerated people.

2

4.     My clinical training includes residency training in internal medicine at Albert Einstein/Montefiore Medical Center (2007) and a fellowship in public health research at the New York University School of Medicine (2009).  My fellowship experience in correctional health includes two years visiting approximately ten immigration detention centers and analyzing physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security.  This work resulted in collaboration with U.S. Immigration and Customs Enforcement (ICE) on numerous individual cases of medical release, the formulation of health-related policies, as well as providing testimony before the U.S. Congress regarding mortality inside ICE detention facilities.

5.     After my fellowship training, I became the Deputy Medical Director of the Correctional Health Services of New York City. This position included both direct care to approximately 1,000 persons held in New York City's 12 jails, as well as oversight of medical policies for their care.  Within this role I oversaw the chronic care, sick call, specialty referral, and emergency care of incarcerated persons. I was eventually promoted to the positions of Medical Director, Assistant Commissioner, then called Chief Medical Officer. In the latter two roles, I was responsible for all aspects of health services to detainees, including physical and mental health, addiction, quality improvement, re-entry and morbidity and mortality reviews as well as all training and oversight of physicians, nursing and

pharmacy staff. In these roles, I was also responsible for evaluating and making recommendations on the health implications of numerous security policies and practices including use of force and restraints, solitary confinement, and injury prevention.

6.      In March 2017, I left Correctional Health Services of New York City to become the Director of Programs for Physicians for Human Rights. In this role, I oversaw all programs of Physicians for Human Rights, including training of physicians, judges and law enforcement staff on forensic evaluation and documentation, analysis of mass graves and mass atrocities, documentation of torture and sexual violence, and analysis of attacks against healthcare workers.

7.      Between December 2018 and April 2020, I served as the Senior Health Fellow and President of Community Oriented Correctional Health Services ("COCHS"), a nonprofit organization that promotes evidence-based improvements to correctional practices across the United States. I have also worked as a medical expert in cases involving correctional health since 2017, including inspections of approximately 50 facilities, and I wrote and published a book on the health risks of jail, *Life and Death in Rikers Island*, which was published in early 2019 by Johns Hopkins University Press.

8.      Since April 2020, I have worked on COVID-19 responses in detention settings. During this time, I have conducted approximately 30 physical inspections

of federal, state and local detention facilities, prisons, and jails to assess the adequacy of their COVID-19 responses.  I have been named as an independent monitor for COVID-19 response in all Connecticut State Prisons and have been invited to present COVID-19 guidance to several organizations including the National Academy of Sciences three times as well as the National Association of Counties and the American Medical Association.  I have also been appointed the independent health services monitor for the Santa Barbara, CA, county jail and the Fluvanna Women's Correctional Institution on Virginia. In February 2021 I was nominated by President Biden to serve on the Biden-Harris COVID-19 Health Equity Task Force.  A copy of my curriculum vitae is attached as Appendix A to this report.

9.     During my career, I have led multiple initiatives aimed at identifying and reducing the health risks of solitary confinement (i.e., isolation) as well as reducing use of force related injuries and managing patients with serious infraction histories.  These projects include measuring the ways in which exposure to solitary confinement harms physical health, as well as creating and implementing alternatives to solitary confinement that reduce violence, injury and increase treatment engagement.[1]  In addition, I have led projects to identify how the practice

---

[1] Sarah Glowa-Kollisch, et al., *From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails*, Int. J. Eviron. Res. Pub. Health, 13(2), 182 (Feb. 2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4772202/ (last visited May 28, 2021); Fatos Kaba

of solitary confinement can compromise the mission and work of health professionals, who often encounter pressure to curtail or limit their work in ways that harm the health of their patients and neglect their role and health professionals.[2]  As part of these projects, I have interviewed over 200 people in solitary confinement in more than 20 facilities.

10.     When I was the Chief Medical Officer of the Correctional Health Services of New York City, I oversaw the beginning of significant reforms to the use of the solitary confinement in all our jails.  We first prohibited its use for pregnant detainees, people with serious mental illness, and juveniles.  After my departure, the administration continued these reforms to ban isolation of people with asthma, seizures, diabetes, lung disease, liver disease, kidney disease, or being treated with blood thinners; as well as people who use wheelchairs or walkers or are blind or deaf.[3]  There are currently proposals to end any use of isolation in the

---

et al., *Solitary Confinement and Risk of Self-Harm Among Jail Inmates*, Am. J. Pub. Health 104(3): 442–447 (Mar. 2014),  https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3953781/ (last visited May 28, 2021).

[2] Sarah Glowa-Kollisch, et al., *Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail*, Health & Hum. Rts. J., 17(1) (June 2015), https://www.hhrjournal.org/2015/03/data-driven-human-rights-using-dual-loyalty-trainings-to-promote-the-care-of-vulnerable-patients-in-jail/ (last visited May 28, 2021).

[3] Erin Durkin, *New York City plans to end solitary confinement in jails,* Politico (June 2020), https://www.politico.com/states/new-york/albany/story/2020/06/29/new-york-city-plans-to-end-solitary-confinement-in-jails-1295882 (last visited May 28, 2021).

New York City jails.[4]  This is consistent with the growing national trend to eliminate or reduce the use of solitary confinement.[5]

## II.     Methodology and General Observations of Conditions in FDC

11.     To formulate my findings and write this declaration, I have relied on my professional expertise and knowledge, including a review of the prevailing literature regarding the health impacts of solitary confinement.  I have also conducted physical inspections of several FDC facilities and interviewed people currently detained in isolation.  I reviewed approximately 1,100 grievances and appeals.  I also reviewed medical records, FDC policies and procedures, and the transcript of a deposition of FDC witness Paula Foskey, Chief of Nursing Services.

12.     I conducted facility inspections and/or interviewed people in the following facilities:

- Florida State Prison

- Santa Rosa Correctional Institution and Annex

- Columbia Correctional Institution[6]

---

[4] Cassidy McDonald, *New York City is moving to end solitary confinement after a 27-year old died in jail. Her sister says the changes aren't enough*, CBS News (Mar. 2021), https://www.cbsnews.com/news/new-york-city-solitary-confinement-end/ (last visited May 24, 2021).

[5] Correctional Leaders Association & The Arthur Liman Center for Public Interest Law at Yale Law School, *Time-In-Cell 2019: A Snapshot of Restrictive Housing based on a Nationwide Survey of U.S. Prison Systems*, at pp. 80 – 85, available at https://law.yale.edu/sites/default/files/area/center/liman/document/time-in-cell_2019.pdf (last visited May 24, 2021).

[6] I visited this institution for the sole purpose of interviewing named Plaintiff Juan Espinosa.

- Hamilton Correctional Institution and Annex

- Union Correctional Institution

- Lowell Correctional Institution Annex

13.     These inspections generally included walking through the facility medical clinic, mental health clinic, and housing areas dedicated to confinement, including unoccupied cells.  I was also able to inspect the sick call or triage rooms, when they existed, in the various isolation units.  FDC staff and counsel were present during these inspections, as well as the other members of the Plaintiffs' legal team.

14.     During the inspections, no matter which type of isolation unit I was in, I observed that the inside of the cells were essentially the same, with a vision panel in each cell and a food slot and interior toilet and sink. The Max cells also included an interior grill gate within the cell that staff could close to create several feet between the incarcerated person and the exterior cell door.  Many of the housing areas I toured had trash and debris across common surfaces and the cells themselves were often dirty. I observed roaches in every facility that I toured throughout the physical plant areas of the isolation wings.  I often observed stacks of food trays or garbage piled on floor areas.

15.     Also during the inspections, I had brief conversations with 157 confined people in housing areas and then conducted in-depth interviews of 51 of

those people in confidential settings the same or following day.  For housing area discussions, I introduced myself as a correctional physician that had been retained to look into the health care and health problems for people in AC/DC/CM/MM and that speaking with me was voluntary.

16.    I asked the following questions to frame these initial discussions: 1) Has being in AC/DC/CM/Max interfered with your ability to get the health care you need? and 2) Did you develop any new health problems during your time in AC/DC/CM/Max?  Based on the answers to these questions, and their willingness to later participate in a longer discussion, I selected people for in-depth interviews. I also considered the input from other members of Plaintiffs' legal team in this selection process.

17.    During the voluntary, in-depth interviews, I asked a series of questions of each person relating to their health status before confinement, any new health problems encountered as they entered confinement, and issues with access to health services while in confinement.  Each interview lasted between 20-60 minutes and was conducted in a confidential setting with a legal team member present.  I relayed concerns about acute medical problems to FDC staff or Plaintiffs' legal team.  I also relayed reports of threats, abuse, or retaliation people encountered because they chose to speak with me, which were alarmingly frequent, to Plaintiffs' legal team.

### III.   The Adverse Physical Health Effects of Solitary Confinement

18.     The link between the use of solitary confinement in prisons and jails and risks to physical health is well established.  Many factors contribute to these risks to physical health, each of which requires mechanisms to detect and treat health problems in a way that mitigates these common and expected issues.

19.     Several studies document that the conditions and stressors intrinsic to isolation cause people to suffer from physiological symptoms.[7]  One such condition is the severe restriction on the access to exercise, which, if prolonged, may contribute to the development or exacerbation of several different chronic diseases.  For example, the development of blood clots of the lower extremities, referred to as deep vein thrombosis, is an example of a potentially fatal problem for which inactivity is a risk factor.  Other risk factors for deep vein thrombosis include having cancer, clotting problems, recent trauma or surgery, being overweight or being older.  As a result, people with any of these conditions face even higher risk for illness or death while in isolation.[8]

20.     Two additional factors contributing to the risk of physical health consequences for people in isolation are 1) they may have new injuries or urgent

---

[7] Peter S. Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, Crime and Justice, 34 (1) 477, 485, 488-490 (2006).

[8] Center for Disease Control and Prevention, *Venous Thromboembolism (Blood Clots)*, https://www.cdc.gov/ncbddd/dvt/facts.html (last visited May 24, 2021).

needs for care at the time of placement into isolation; and 2) once in isolation, they face barriers to care for both new and chronic health problems.  At the time of entry, people placed in isolation are likely to have new injuries related to the use of force by correctional officers or a physical altercation with another incarcerated person that precipitated the placement.  These injuries could include bone fractures, head injuries, or lacerations that require immediate and follow-up care and monitoring.  There is also typically a high prevalence rate of chronic disease for people entering isolation requiring regular monitoring and treatment.  ███████

████████████████████████████████████████████████████

████████████████████████████.[9]  Also, people in isolation are more likely to engage in physical self-harm from the stress associated with conditions in isolation.[10]   As a result of the prevalence of new injuries, pre-existing healthcare conditions, and the stress associated with the conditions, people entering isolation need *increased* access to healthcare at the time of entry, throughout their stay, and after their release to address any lingering physical health consequences caused by isolation.

---

[9] *See* ██████████████████. PLS0003380.

[10] Ariel Ludwig et al., *Injury Surveillance in New York City Jails*, Am. J. Public Health 102(6): 1108–1111 (June 2012),   https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3483942/ (last visited May 24, 2021); Kaba, *supra* n. 1.

21.     Isolation, however, intrinsically makes it more difficult for patients to access healthcare providers and for healthcare providers to monitor and treat their patients.  People in isolation cannot, for example, walk over to a centralized location to access and turn in a sick call form to request healthcare as they can in the general population.  Instead, they must rely on staff to provide and turn in the forms on their behalf.  They must also rely on correctional officers to observe and notify medical staff of symptoms that require emergent care.  Unlike those in general population, they cannot walk over to a pill window to access centrally-stored medications.  Instead, they must rely on nursing staff to deliver their medications at cell-front.  Similarly, medical providers must rely on correctional staff to bring their patients to the clinic, which requires the willingness and sufficient numbers of correctional staff, and defer to their security-based decisions regarding how people will be restrained and whether and which correctional officers will be present during healthcare encounters.

## IV.   Necessary Mitigation Measures to Prevent Physical Harm in Isolation

22.     In recognition of the well-established harms to physical and mental health posed by isolation settings, the National Commission on Correctional Health Care (NCCHC) adopted its current segregation policy in 2016, recommending that no one should be isolated for punishment reasons; people with mental illness, juveniles, and pregnant women should never be isolated for any duration; and

12

isolation should never exceed 15 days.[11]  During those 15 days and in the "rare cares" that extended isolation is necessary for safety reasons, NCCHC advised:

> "Health care staff should evaluate individuals in solitary confinement upon placement and thereafter, on at least a daily basis. They should provide them with prompt medical assistance and treatment as required."

And

> "Health care staff must advocate so that individuals are removed from solitary confinement if their medical or mental health deteriorates or if necessary services cannot be provided."[12]

23.    American Correctional Association standards also require that any transfer of a person into isolation involve immediate notification and review by health staff and that everyone housed in these units be visited at least daily by health staff.[13]  In accordance with these guidelines, most jails and prisons have implemented at a minimum the following procedures to address the common and predictable threats to physical health in isolation.

---

[11] Nat'l Comm'n on Corr. Health Care, *New Position Statement Provides Guidance on Solitary Confinement* (Apr. 2016), https://www.ncchc.org/solitary-confinement-position-statement (last visited May 24, 2021).

[12] *Id.*

[13] Rachel Weiss, *SJ 25 Study: Review of Restricted Housing Standards and Guidelines* (Sep. 2017), available at https://www.stopsolitaryforkids.org/wp-content/uploads/2019/02/Montana-Background-Paper-II-SJ25-Study-Solitary.pdf (last visited May 24, 2021).

## A. Pre-confinement Assessment

24.     A pre-confinement assessment is crucial to identify new injuries, including those associated with uses of force, and also identify potential medical and psychological causes of behavioral disturbances that may lead to self-harm or other new incidents in isolation.  This encounter is usually conducted by nursing staff, but because of the likelihood of finding new injuries, such as bone fractures and head trauma, as well as the common occurrence of lapsed medications contributing to the behavioral problems, it is essential to involve mid-level and physician staff in these encounters at the moment that any potential issues arise that are out of the scope of nursing care.

25.     These encounters are also crucial for identifying health problems that have been misidentified or mischaracterized as security or behavioral issues.  For example, a diabetic person with hypoglycemia or a person acutely intoxicated or suffering from medication side effects may appear as combative or even violent to security staff.  Without proper medical attention, their actions may be misinterpreted as requiring isolation by security staff, delaying the impacted person access to medical care and greatly increasing their chance of death or disability. The pre-confinement encounter should be overseen with a quality assurance metric that tracks whether each encounter occurs, is timely, is adequate and which also periodically validates this data with patient interviews.

14

## B. Medical Rounds

26.     The proper use of medical rounds is necessary to decrease the physical health risks of confinement.  These encounters are often termed "segregation rounds," and should be conducted daily with every occupied cell and should involve a physician or mid-level provider at least once per week.  This allows health staff to determine if any person has urgent medical issues, which may range from untreated injuries and missed medications to new health problems. This process does not replace the regular administration of necessary medications or the sick call process, which allows people in all settings, including isolation, to obtain a sick call form on any given day to report a health issue and subsequently receive timely and appropriate care.  The goal of segregation rounds is to identify people who are unable to report any urgent health problems due to being too ill, confused, or facing other barriers to reporting.  These encounters should be overseen with a quality assurance metric, that includes periodic interviews of patients, to track whether the rounds occur on each unit each day at least once.

## C. Monitoring Barriers to Access to Care

27.     The third area of mitigation for the physical health threats from isolation is ensuring that sick call and scheduled health care encounters occur as clinically needed.  To address the barriers to accessing sick call forms, there should be quality assurance metrics that document the forms are present and periodic

interviews of patients to confirm the same.  Once submitted, these sick call forms must be reviewed and care must be provided in a timely manner, meaning that a face-to-face nursing encounter occurs in a clinical space, usually a triage or sick call room near the isolation unit, with appropriate referral to higher levels of care when needed.  Because sick call is decentralized in most isolation settings, there must be an ongoing quality assurance process to measure the adequacy of the sick call process in isolation specifically and identify what barriers may contribute to delays or other problems, including correctional staffing for escorting patients.

28.     During scheduled medical encounters it is crucial to ensure that placement in isolation has not resulted in a lower level or interrupted care. This should include asking and documenting whether patients are experiencing any issues receiving their medications as well as ensuring that refusals of care are genuine and not due to intimidation or coercion.  Because the escorted movement of restrained people in and out of isolation cells requires an elevated security response, security staff may seek to limit these movements even to the detriment of health access.  To offset this risk, patients with more than one or two unsigned refusals should be interviewed by health staff to determine whether the missed encounter is truly voluntary.  There must be a quality assurance measurement of refusals as well as rescheduled and missed care encounters in isolation settings.

## V. Failure to Address the Harms to Physical Health in FDC

29.     In accordance with the NCCHC recommendations for those extreme circumstances when people must be detained in isolation, I analyzed whether, to mitigate the risk of physical harm, FDC's takes appropriate measures to 1) detect injuries and other acute needs at the time of transfer into isolation and 2) ensure access to care once placed into isolation, including daily rounds, sick call, and scheduled medical encounters.  My inspection of FDC facilities; interviews with people in confinement; and review of grievances, medical records, and other information makes clear that FDC fails to take these basic steps to prevent harms to physical health.  Specifically, FDC is deficient in a systematic manner in three main areas: (1) appropriate pre-confinement medical assessments, (2) daily medical rounds, and (3) ensuring access to medical care once confined.  These deficiencies are supported by a lack of basic quality assurance efforts to oversee them.

### A. Harsh Security Measures and Systemic Abuse Contributing to the Risk to Physical Health

30.     In addition to these three systemic deficiencies discussed below, it is important to highlight that isolation in FDC goes beyond simply limiting access to care and actually presents new health risks to some people in these settings.  For example, the practice of taking medications away from people while on property restriction, or "strip," is extremely dangerous, especially for people with asthma

who have their inhalers taken (as reported to me by at least four people).  This
scenario poses even greater risk when people are simultaneously forced to sleep on
the cement floor or steel bunk in their cell.

31.     I must also note the risk of injuries from physical abuse that people
consistently reported to me across facilities and types of solitary confinement.
Among the 51 interviews I conducted, 23 people reported experiencing some form
of abuse at the hands of correctional staff.  Physical abuse included reports of
being struck with fists, boots, keys, radios, or otherwise physically harmed by staff
and was often reported as occurring after a person had already been restrained.
Many reported other types of retributory abuses by officers, including being
sprayed with chemical agents after declining to sign false refusal forms or being
placed on "strip" as punishment for filing grievances.  While FDC is not the only
setting in which I have encountered a systematic exposure of people to physical or
sexual violence by staff, it is the most extreme I have encountered in the United
States.

## B. Inadequate Pre-confinement Assessments

32.     Across the facilities I inspected, people reported or medical records
revealed cursory, nonexistent, or inadequate pre-confinement assessments before
they were moved into isolation. Several of the cases I reviewed provide examples
of these deficiencies. For example:

18

33. ██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

34. ████████████ ██████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

██████████████ ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████

████████████████

35.     These cases and others that I reviewed reveal a systematic weakness in how new injuries and other acute health problems are detected at the time people are transferred into CM, especially the nature of the pre-confinement encounters. Many other people reported similar problems, and my review of additional grievances and medical records supported this as an area of systemic concern. Among the 51 people I interviewed, 19 reported that acute health problems were not identified or addressed at the time they were transferred into isolation.

36.     The testimony of Paula Foskey, Chief of Nursing Services, underscores FDC's insufficient quality assurance of these pre-confinement assessments.  For example, Nurse Foskey stated that nursing staff will include a patient's reports of how and where they were injured, but many of the forms I reviewed do not reflect input from patients.[14]  Similarly, Nurse Foskey indicated that patients with injuries that are potentially serious will be referred immediately

---

[14] Ex C1 at 26:4 – 29:17.

for physician or mid-level care before placement into confinement but many of the cases listed above show the opposite; that people with obvious signs of trauma and injury are seen by the nurse, enter confinement without further care or assessment, and are left to attempt to gain the attention of a passing nurse or get a sick call form to request the care they need.[15]  When asked whether there was any tracking of whether pre-confinement encounters actually occur, Nurse Foskey replied "no."[16]

37.     Nurse Foskey's testimony also revealed FDC's inattention to ensuring patients have their "keep-on-person" (KOP) medications when they enter isolation. Multiple people reported to me that when transferred, they were unable to bring their KOP medications with them, and that it took days or weeks of asking nursing staff for assistance before their medications were restarted.  When asked whether the pre-confinement assessment requires nursing staff to document whether a person with KOP medications physically has them, Nurse Foskey stated, "It is not the nurse's responsibility to remind security to bring it just because of -- you know, it is a security procedure.  If the inmate -- the inmate normally will say -- during special housing rounds will say, Hey, I haven't received my medication yet."[17]  The

---

[15] Ex. C-1, 29:23-30:18; 32:21-35:7.

[16] Ex. C-1, 177:17-178:13.

[17] Ex. C-1, 63:2-64:14.

problem with this approach is that interruption of medications is a new form of health problem for which nursing staff should proactively intervene at every opportunity.  The lack of an effective process to ensure the continuity of medications, and the attitude that patients will simply be able to get the attention of nursing staff and even obtain a sick call form once placed into isolation, shows both a disregard for their health and ignores the reality of how these settings operate.

### C. Inadequate Monitoring and Training for Rounds

38.     FDC also has not implemented appropriate quality assurance measures and training to monitor and ensure that meaningful daily medical rounds occur in isolation.  FDC has also failed to include physicians and mid-level providers in these rounds, at least weekly, as recommended by, for example, the World Health Organization.[18]

39.     FDC's monitoring of medical rounds is deficient because it relies solely on nurses' self-reporting on a cursory form.[19] ███████████████

███████████████████████████████

---

[18] Ex C1 at 71:4-11; Jean-Pierre Restellini, *Prison-specific ethical and clinical problems*, Health in prisons: A WHO guide to the essentials in prison health, 36 (2007), available at https://www.euro.who.int/__data/assets/pdf_file/0009/99018/E90174.pdf (last visited May 24, 2021) ("Doctors must pay particular attention to this population of detainees and visit them regularly on their own initiative, as soon as possible after an isolation order has taken effect and thereafter daily, to assess their physical and mental state and determine any deterioration in their well-being").

[19] Ex. C1 at 101:3-6.

██████████████.[20]  No direct supervisors review these forms, nor do they

speak to incarcerated people to monitor whether the rounds occur.[21]  Nursing

auditors also do not interview incarcerated people to monitor whether rounds occur

because FDC does not view this as a "high priority."[22]  FDC also does not review

video footage to make sure the rounds occur.[23]  Instead, an auditor monitoring

whether FDC's private healthcare provider is complying with its contract checks

only whether nurses have sufficiently completed the form.[24]

    40.    In FDC, nurses communicate with people during rounds through

closed cell doors.[25]  FDC provides no training manual to nursing staff explaining

how they are to effectively communicate with people with vision, hearing, and

speech impairments through a closed door; the only written guidance they receive

is a procedure requiring them to provide "appropriate accommodations."[26]  To

ensure effective communication with people with vision, hearing, and speech

impairments, nursing staff should keep a roster of people with these impairments in

---

[20] Ex. C-1, 93:6-95:17.

[21] Ex. C-1, 95:24-96:9; 100:3-8.

[22] Ex. C-1, 100:18-101:2.

[23] Ex. C-1, 98:24-99:3.

[24] Ex. C-1, 101:3-6.

[25] Ex. C-1, 75:10-13.

[26] Ex. C1, 88:19-90:11

isolation and receive specific training, including written instruction, requiring them to not only elicit any health concerns during their medical rounds, but also conduct out of cell encounters using assistive devices/certified deaf interpreters and other basic accommodations to monitor their health given their unique vulnerabilities.

41.     FDC has no special approach to rounds for people placed on property restriction, or "strip," in these units.[27]  Given the threat to physical health posed by taking away people's medications and assistive devices, forcing people to sleep on concrete or steel, and leaving them in their underwear for 72 hours, nursing staff should be notified of who is on property restriction and pay special attention, especially to those with chronic illness and disabilities, to monitor for declining health.

### D. Insufficient Measures to Ensure Access to Medical Care

42.     Another major systemic deficiency creating a risk of harm to physical health from isolation involves barriers to medical care once placed in confinement. My review of FDC records and grievances, inspection of facilities, and interviews with incarcerated people subject to isolation reveal multiple deficiencies in critical areas related to accessing care.  The high volume of grievances describing barriers to accessing healthcare is indicative of a systemic problem.  Of the 51 people in confinement with whom I conducted private interviews, 39 reported barriers to

---

[27] Ex C1 at 110:2-21.

sick call or scheduled care once in isolation and 20 people specifically reported

being coerced or forced to refuse health care encounters which were scheduled by

health staff.  For example:

43.

45.



50.     Nurse Foskey's testimony makes very clear that FDC has failed to implement basic quality assurance measures designed to identify whether patients in confinement suffer from interruptions in or barriers to accessing medical care in confinement, which explains, at least in part, the proliferation of these same issues in my record/grievance reviews and interviews.

51.     For example, Nurse Foskey stated that she had never received a complaint from nursing staff about security staff being unwilling to remove a

restraint during medical encounters.[28]  My experience in providing and overseeing

care in isolation settings is that the mixture of injuries and high security measures

results in a predictable need to negotiate with security staff about physical

examination.  This process requires that health staff seek the approval of security

staff to remove restraints in order to conduct their examinations and assessments. I

have never encountered a correctional health setting where this did not result in

some amount of disagreement, even if rare, about how to proceed.

52.     Despite many grievances reporting an inability to access sick call

forms in confinement, Nurse Foskey testified that she was unaware of any

complaints and that FDC takes no specific measures nor does any monitoring to

ensure sick call forms are actually present and available to people in

confinement.[29]  Although FDC monitored the availability of these forms in the

past, it stopped because auditors found that the forms were present in the officers'

station.[30]  But to effectively monitor whether these forms are in fact present, staff

should have no notice of the audit, and Nurse Foskey could not point to any

unannounced audits of this measure.[31]  On top of the grievances, the many

---

[28] Ex. C1 at 48:24 – 49:4.

[29] Ex C1 at 109:15-23; 104:8 – 105:2.

[30] Ex C1 at 105:10 – 106:14.

[31] Ex. C1 at 107:4-23.

consistent reports during my interviews of the difficulties accessing forms demonstrates this is an ongoing problem causing a risk of harm to physical health in isolation.

53.     Despite many grievances reporting that security staff were falsely documenting or coercing people to refuse their appointments, Nurse Foskey testified that there was no tracking of complaints about security staff in confinement not bringing patients to their appointments, that she was unaware of patients reporting this problem, and that she was unaware of any corrective action FDC is taking to address this issue.[32]  She also testified that she was unaware of any reports that patients are coerced to refuse health encounters or sign refusal forms and that FDC does not monitor whether refusals are in fact voluntary.[33]  I find this lack of awareness and monitoring concerning given the many grievances and the high number of people during my interviews reporting that they have been forced to refuse medical care.

54.     More broadly, Nurse Foskey testified that she was unaware of any review or study of the health effects of placement in solitary confinement for chronic care patients and was unaware of any discussions with security staff about whether people with specific conditions should be precluded from solitary

---

[32] Ex. C-1, 166:19-167:12; 169:12-18.

[33] Ex. C-1, 195:8-11; 210:14-212:13.

confinement.[34]  Nurse Foskey did not believe there was any cause for concern

about patient care, despite scores of grievances reporting problems and reports

from her staff that nursing vacancies were making it "extremely challenging" to

provide medical services, because audits measuring solely whether FDC's private

healthcare provider was complying with its contract did not show a problem.[35]

## VI. Named Plaintiffs

55.    I interviewed and reviewed the records of four named Plaintiffs in this

case: Jerome Burgess, James Kendrick, Johnny Hill, and Juan Espinosa.  Based on

my review of their medical records and interviews with them, as well as the

concerns I have outlined above, I have specific concerns about their health while

inside isolation in FDC facilities.  The risk of harm to their physical health is

emblematic of the risk all people face due to the conditions in isolation and FDC's

failures to take appropriate mitigation measures.

### A. Jerome Burgess

56.    I conducted a phone interview with named Plaintiff Jerome Burgess

on May 10, 2021.  FDC placed Plaintiff Burgess in confinement for many years

despite having an active seizure disorder and his use of a wheelchair due to a

stroke that caused ongoing loss of function in his left leg.  He reported that he has

---

[34] Ex. C-1, 194:8-13; 195:1-7.

[35] Ex. C-1, 202:15-204:15.

sustained multiple falls inside his confinement cell and that officers often yell at him and even threaten him with disciplinary reports if he is not standing at his door when expected. He reports that while in confinement ████████████████████ ████████, he was unable to access recreation because he could not access the recreation area via his wheelchair.  He also reports that despite requiring four catheters per day and supplies for self-catheterization, he inconsistently received the supplies he needed while in confinement, causing repeated urinary tract infections.  His records reveal this issue being present in many sick call requests and grievances. Despite these requests, Mr. Burgess was hospitalized while in CM due to these chronic disease exacerbations.

57.     Mr. Burgess reported numerous forced or coerced refusals of medical care for his multiple health problems. His medical records also show that he suffered seizures while in confinement. Neither his disability nor seizure disorder was addressed in his medical records as reasons that he should be removed from or more closely monitored in confinement. In addition, the inability or unwillingness of staff to provide adequate catheter supplies, combined with the extremely unsanitary conditions I observed throughout the isolation settings in FDC, create a real risk of infection.  Based on this information I view his placement in confinement, under the conditions imposed by FDC, as posing a serious risk to his physical health.

**B. James Kendrick**

58.     I interviewed named Plaintiff James Kendrick during the facility inspection of Florida State Prison on September 16, 2020, and reviewed his records.  FDC has diagnosed Mr. Kendrick with diagnosed with diabetes, high blood pressure, and obesity.  Given these co-existing morbidities, it is essential that Mr. Kendrick receive regular activity and exercise, which he cannot do in isolation, to avoid developing heart disease.  He is prescribed insulin as well as multiple other medications.  Although he lost 13 pounds during his first few months in isolation, I saw no medical encounters exploring or monitoring this rapid weight loss.  Mr. Kendrick reported that while in CM, he has missed multiple medical encounters for these conditions and reported being forced to sign refusals, including one instance in which a correctional officer threatened him with being sprayed with pepper spray if he did not sign a refusal for an EKG encounter that health staff requested.

59.     Mr. Kendrick also reported difficulty in obtaining his blood sugar checks and insulin injections through the food slot of his confinement cell door. I observed multiple refusals of care in his records, consistent with his reports.  I also observed that his blood pressure monitoring was extremely limited while in confinement, and more regular during his time out of confinement.  Based on this

information I view his placement in confinement, under the conditions imposed by FDC, as posing a serious risk to his physical health.

**C. Johnny Hill**

60.    I interviewed named Plaintiff Johnny Hill during the Santa Rosa Correctional Institution inspection on October 14, 2021.  He reported having serious mental illness as well as hypertension.  He reported that his medications are often interrupted, including both his hypertension and mental health medications while in confinement at Santa Rosa Correctional Institution. His blood pressure check was checked inconsistently while in confinement and despite reporting that he had never refused medical care, Mr. Hill had multiple unsigned refusals in his records.  Based on this information I view his placement in confinement, under the conditions imposed by FDC, as posing a serious risk to his physical health.

**D. Juan Espinosa**

61.    I interviewed named Plaintiff Juan Espinosa at Columbia Correctional Institution Annex on February 9, 2021.  He reported and his records confirmed that he is mute since a 2019 procedure to remove throat tumors, and that he also suffers from bipolar disease and schizophrenia and depression.  He also reported, and his records confirm, that he sustained a complicated foot fracture from falling while restrained in November 2018.  Mr. Espinosa reported that he was unable to get the attention of medical or security staff to care for his foot despite immediately being

in severe pain and unable to walk when he fell.  His medical records indicate that

he was not seen until three days after the injury, after a nurse finally responded to a

sick call request. I note also from his correctional records that he was on property

restriction during the three days he waited for health care, which likely exacerbated

his pain and suffering.  At a minimum, nursing staff should have detected this

injury during daily rounds, especially if they had been taking special care because

he was on property restriction, and brought him to a clinic for an emergent triage

instead of waiting for him to turn in a sick call request.  Based on the failure to

appropriately respond to this health problem, and FDC's clear inability or

unwillingness to provide accommodations for Mr. Espinosa's disability, including

an effective way for him to communicate with staff from his cell during rounds or

emergencies.  I view his placement in confinement, under the conditions imposed

by FDC, as posing a serious risk to his physical health.

## V. Conclusion

62.    The information I have reviewed makes clear that exposure to

confinement in FDC creates a significant risk of harm to physical health.  FDC

imposes this risk on people in confinement in a manner that is systematic and in

violation of official FDC policies and basic correctional standards of care.  This

conclusion is supported by: 1) the over one thousand grievances I reviewed

revealing similar complaints in confinement units at all FDC facilities, including

denials and delays of medical appointments, missing or delayed medications and medical supplies (such as catheters), complaints of falsified medical records, ignored sick call requests, and other complaints about medical care in confinement; 2) my review of medical records; 3) my observations of conditions during facility inspections; 3) my review of Nurse Foskey's deposition transcript; and 4) the reports of individual incarcerated people that are highly consistent as a group and highly consistent with the other data sources outlined above.

63.     Because FDC employs isolation for an extremely large percentage of the prison population, and because people are held in isolation far longer than most prison settings, the harms of these practices are compounded.  Accordingly, addressing these systemic harms caused by isolation requires not only addressing the mitigation efforts that are deficient, but also addressing the scope and length of isolation.  This process, which I have been part of in other settings, and which most prison settings have embarked on already, is critical to improving both health and security outcomes for incarcerated people as well as staff.

Under 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing

declaration is true and correct. Executed on the 24th day of May, 2021.


_____

Homer Venters, M.D., M.S.

# Appendix A

## Curriculum Vitae

# Dr. Homer D. Venters
hventers@gmail.com,

_____

**Health Administrator**              **Physician**              **Epidemiologist**

## *Professional Profile*

- Award winning epidemiologist focused on the intersection of health, criminal justice and human rights.
- Leader in provision and improvement of health services to patients with criminal justice involvement.
- Successful implementer of nations' first electronic health record, performance dashboards and health information exchange among pre-trial patients.
- Human rights leader with experience using forensic science, epidemiology and public health methods to prevent and document human rights abuses.

## *Professional Experience*

**Member, Biden-Harris COVID-19 Health Equity Task Force,** 2/26/21-present
- Work with Task Force members to provide President Biden with interim recommendations to address COVID-19 Health inequities.

**Medical/Forensic Expert**, 3/2016-present
- Independent correctional health monitor
  - ➢ CT Corrections Department (COVID only, 2020). Oversee and report on the adequacy of COVID-19 responses with other monitoring panel members throughout CT DOC combined jail/prison system.
  - ➢ Santa Barbara County Jail, CA (ongoing). Serve as independent, court-appointed monitor of health services in a County Jail Complex.
  - ➢ Fluvanna Women's Correctional Center, VA (ongoing). Serve as independent, court-appointed health services monitor in a women's prison.

- U.S. Department of Justice, Civil Rights Investigations medical expert. Work with the USDOJ to investigate correctional health conditions and provide recommendations for addressing.
- Review COVID-19 policies and procedures in detention settings including in-person inspections of;
  - ➢ MDC Brooklyn (BOP), NY
  - ➢ MCC Manhattan (BOP), NY
  - ➢ FCI Danbury (BOP), CT
  - ➢ Cook County Jail, IL
  - ➢ Broome County Jail, NY
  - ➢ Sullivan County Jail, NY
  - ➢ Shelby County Jail, TN
  - ➢ Farmville Detention Center (ICE), VA
  - ➢ Lompoc Prison (BOP), CA
  - ➢ Southern Mississippi Correctional Facility, MS
  - ➢ Central Mississippi Correctional Facility, MS
  - ➢ FDC Philadelphia (BOP), PA
  - ➢ Osborn Correctional Institution, CT

➢ Robinson Correctional Institution, CT
➢ Hartford Correctional Center, CT
➢ Dallas County Jail, TX
➢ Cheshire Correctional Institution, CT
➢ Calhoun County Jail, MI
➢ York Correctional Institution, CT
➢ Pender Correctional Institution, NC
➢ Craven Correctional Institution, NC
➢ Central Prison, NC
➢ North Carolina Correctional Institution for Women, NC
➢ Chesapeake Detention Facility, MD
➢ Lompoc Prison Re-inspection (BOP), CA

o   Conduct analysis of health services and outcomes in detention settings.
o   Conduct site inspections and evaluations in detention settings.
o   Produce expert reports, testimony regarding detention settings.

**President**, Community Oriented Correctional Health Services (COCHS), 1/1/2020-4/30/20.
o   Lead COCHS efforts to provide technical assistance, policy guidance and research regarding correctional health and justice reform.
o   Oversee operations and programmatic development of COCHS
o   Serve as primary liaison between COCHS board, funders, staff and partners.

**Senior Health and Justice Fellow**, Community Oriented Correctional Health Services (COCHS), 12/1/18-12/31/2018
o   Lead COCHS efforts to expand Medicaid waivers for funding of care for detained persons relating to Substance Use and Hepatitis C.
o   Develop and implement COCHS strategy for promoting non-profit models of diversion and correctional health care.

**Director of Programs,** Physicians for Human Rights, 3/16-11/18.
o   Lead medical forensic documentation efforts of mass crimes against Rohingya and Yazidi people.
o   Initiate vicarious trauma program.
o   Expand forensic documentation of mass killings and war crimes.
o   Develop and support sexual violence capacity development with physicians, nurses and judges.
o   Expand documentation of attacks against health staff and facilities in Syria and Yemen.

**Chief Medical Officer/Assistant Vice President**, Correctional Health Services, NYC Health and Hospitals Corporation 8/15-3/17.
o   Transitioned entire clinical service (1,400 staff) from a for-profit staffing company model to a new division within NYC H + H.
o   Developed new models of mental health and substance abuse care that significantly lowered morbidity and other adverse events.
o   Connected patients to local health systems, DSRIP and health homes using approximately $5 million in external funding (grants available on request).
o   Reduced overall mortality in the nation's second largest jail system.

o      Increased operating budget from $140 million to $160 million.
o      Implemented nation's first patient experience, provider engagement and racial disparities programs for correctional health.

**Assistant Commissioner,** Correctional Health Services, New York Department of Health and Mental Hygiene, 6/11-8/15.
o      Implemented nation's first electronic medical record and health information exchange for 1,400 staff and 75,000 patients in a jail.
o      Developed bilateral agreements and programs with local health homes to identify incarcerated patients and coordinate care.
o      Increased operating budget of health service from $115 million to $140 million.
o      Established surveillance systems for injuries, sexual assault and mental health that drove new program development and received American Public Health Association Paper of the Year 2014.
o      Personally care for and reported on over 100 patients injured during violent encounters with jail security staff.

**Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 1/10-6/11.
o      Directed all aspects of medical care for 75,000 patients annually in 12 jails, including specialty, dental, primary care and emergency response.
o      Direct all aspects of response to infectious outbreaks of H1N1, Legionella, Clostridium Difficile.
o      Developed new protocols to identify and report on injuries and sexual assault among patients.

**Deputy Medical Director,** Correctional Health Services, New York Department of Health and Mental Hygiene, 11/08-12/09.
o      Developed training program with Montefiore Social internal medicine residency program.
o      Directed and delivered health services in 2 jails.

**Clinical Attending Physician,** Bellevue/NYU Clinic for Survivors of Torture, 10/07-12/11.

**Clinical Attending Physician,** Montefiore Medical Center Bronx NY, Adult Medicine, 1/08-11/09.

## *Education and Training*

**Fellow, Public Health Research,** New York University 2007-2009. MS 6/2009
Projects: Health care for detained immigrants, Health Status of African immigrants in NYC.

**Resident, Social Internal Medicine**, Montefiore Medical Center/Albert    Einstein University 7/2004- 5/2007.
**M.D.,** University of Illinois, Urbana, 12/2003.
**M.S.** Biology, University of Illinois, Urbana, 6/03.
**B.A.** International Relations, Tufts University, Medford, MA, 1989**.**

## *Academic Appointments, Licensure*

Clinical Associate Professor, New York University College of Global Public Health, 5/18-present.

Clinical Instructor, New York University Langone School of Medicine, 2007-2018.

M.D.   New York (2007-present).

Print articles and public testimony
Oped: Four ways to protect our jails and prisons from coronavirus. The Hill 2/29/20.

Oped: It's Time to Eliminate the Drunk Tank. The Hill 1/28/20.

Oped: With Kathy Morse. A Visit with my Incarcerated Mother. The Hill 9/24/19.

Oped: With Five Omar Muallim-Ak. The Truth about Suicide Behind Bars is Knowable. The Hill 8/13/19.

Oped: With Katherine McKenzie. Policymakers, provide adequate health care in prisons and detention centers. CNN Opinion, 7/18/19.

Oped: Getting serious about preventable deaths and injuries behind bars. *The Hill*, 7/5/19.

Testimony: Access to Medication Assisted Treatment in Prisons and Jails,  **New York State Assembly Committee on Alcoholism and Drug Abuse, Assembly Committee on Health, and Assembly Committee on Correction.** NY, NY, 11/14/18.

Oped: Attacks in Syria and Yemen are turning disease into a weapon of war, *STAT News*, 7/7/17.

Testimony: Connecticut Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for prisoners. Hartford CT, 2/3/17.

Testimony: Venters HD, New York Advisory Committee to the U.S. Commission on Civil Rights: Regarding the use of solitary confinement for juveniles in New York. July 10, 2014. NY NY.

Testimony: New York State Assembly Committee on Correction with the Committee on Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Testimony: New York State Assembly Committee on Correction with the Committee on

Mental Health: Regarding Mental Illness in Correctional Settings. November 13, 2014. Albany NY.

Oped: Venters HD and Keller AS, The Health of Immigrant Detainees. Boston Globe, April 11, 2009.

Testimony: U.S. House of Representatives, House Judiciary Committee's Subcommittee on Immigration, Citizenship, Refugees, Border Security, and International Law: Hearing on Problems with Immigration Detainee Medical Care, June 4, 2008.

## *Peer Reviewed Publications*

Parmar PK, Leigh J, **Venters H**, Nelson T. Violence and mortality in the Northern Rakhine State of Myanmar, 2017: results of a quantitative survey of surviving community leaders in Bangladesh. Lancet Planet Health. 2019 Mar;3(3):e144-e153.

**Venters H.** Notions from Kavanaugh hearings contradict medical facts. *Lancet.* 10/5/18.

Taylor GP, Castro I, Rebergen C, Rycroft M, Nuwayhid I, Rubenstein L, Tarakji A, Modirzadeh N, **Venters H,** Jabbour S. Protecting health care in armed conflict: action towards accountability. *Lancet.* 4/14/18.

Katyal M, Leibowitz R, **Venters H**. IGRA-Based Screening for Latent Tuberculosis Infection in Persons Newly Incarcerated in New York City Jails. *J Correct Health Care.* 2018 4/18.

Harocopos A, Allen B, Glowa-Kollisch S, **Venters H**, Paone D, Macdonald R. The Rikers Island Hot Spotters: Exploring the Needs of the Most Frequently Incarcerated.
*J Health Care Poor Underserved*. 4/28/17.

MacDonald R, Akiyama MJ, Kopolow A, Rosner Z, McGahee W, Joseph R, Jaffer M, **Venters H**.  Feasibility of Treating Hepatitis C in a Transient Jail Population.
*Open Forum Infect Dis*. 7/7/18.

Siegler A, Kaba F, MacDonald R, **Venters H**. Head Trauma in Jail and Implications for Chronic Traumatic Encephalopathy. *J Health Care Poor and Underserved.* In Press (May 2017).

Ford E, Kim S, **Venters H**. Sexual abuse and injury during incarceration reveal the need for re-entry trauma screening. *Lancet.* 4/8/18.

Alex B, Weiss DB, Kaba F, Rosner Z, Lee D, Lim S, **Venters H,** MacDonald R. Death After Jail Release. *J Correct Health Care*. 1/17.

Akiyama MJ, Kaba F, Rosner Z, Alper H, Kopolow A, Litwin AH, **Venters H**, MacDonald R. Correlates of Hepatitis C Virus Infection in the Targeted Testing Program of the New York City Jail System. *Public Health Rep.* 1/17.

Kalra R, Kollisch SG, MacDonald R, Dickey N, Rosner Z, **Venters H**. Staff Satisfaction, Ethical Concerns, and Burnout in the New York City Jail Health System. *J Correct Health Care.* 2016 Oct;22(4):383-392.

**Venters H.** A Three-Dimensional Action Plan to Raise the Quality of Care of US Correctional Health and Promote Alternatives to Incarceration. *Am J Public Health*. April 2016.104.

Glowa-Kollisch S, Kaba F, Waters A, Leung YJ, Ford E, **Venters H**. From Punishment to Treatment: The "Clinical Alternative to Punitive Segregation" (CAPS) Program in New York City Jails. *Int J Env Res Public Health*. 2016. 13(2),182.

Jaffer M, Ayad J, Tungol JG, MacDonald R, Dickey N, Venters H. Improving Transgender Healthcare in the New York City Correctional System. *LGBT Health*. 2016 1/8/16.

Granski M, Keller A, Venters H. Death Rates among Detained Immigrants in the United States. *Int J Env Res Public Health*. 2015. 11/10/15.

Michelle Martelle, Benjamin Farber, Richard Stazesky, Nathaniel Dickey, Amanda Parsons, **Homer Venters**. Meaningful Use of an Electronic Health Record in the NYC Jail System. *Am J Public Health*. 2015. 8/12/15.

Fatos Kaba, Angela Solimo, Jasmine Graves, Sarah Glowa-Kollisch, Allison Vise, Ross MacDonald, Anthony Waters, Zachary Rosner, Nathaniel Dickey, Sonia Angell, **Homer Venters**. Disparities in Mental Health Referral and Diagnosis in the NYC Jail Mental Health Service. *Am J Public Health*. 2015. 8/12/15.

Ross MacDonald, Fatos Kaba, Zachary Rosner, Alison Vise, Michelle Skerker, David Weiss, Michelle Brittner, Nathaniel Dickey, **Homer Venters**. The Rikers Island Hot Spotters. *Am J Public Health*. 2015. 9/17/15.

Selling Molly Skerker, Nathaniel Dickey, Dana Schonberg, Ross MacDonald, **Homer Venters**. Improving Antenatal Care for Incarcerated Women: fulfilling the promise of the Sustainable Development Goals. *Bulletin of the World Health Organization*.2015.

Jasmine Graves, Jessica Steele, Fatos Kaba, Cassandra Ramdath, Zachary Rosner, Ross MacDonald, Nathanial Dickey, **Homer Venters** Traumatic Brain Injury and Structural Violence among Adolescent males in the NYC Jail System *J Health Care Poor Underserved*. 2015;26(2):345-57.

Glowa-Kollisch S, Graves J, Dickey N, MacDonald R, Rosner Z, Waters A, **Venters H**. Data-Driven Human Rights: Using Dual Loyalty Trainings to Promote the Care of Vulnerable Patients in Jail. *Health and Human Rights*. Online ahead of print, 3/12/15.

Teixeira PA[1], Jordan AO, Zaller N, Shah D, **Venters H**. Health Outcomes for HIV-Infected Persons Released From the New York City Jail System With a Transitional Care-Coordination Plan. 2014. *Am J Public Health*. 2014 Dec 18.

Selling D, Lee D, Solimo A, **Venters H.** A Road Not Taken: Substance Abuse Programming in the New York City Jail System. *J Correct Health Care*. 2014 Nov 17.

Glowa-Kollisch S, Lim S, Summers C, Cohen L, Selling D, **Venters H**. Beyond the Bridge: Evaluating a Novel Mental Health Program in the New York City Jail System. *Am J Public Health*. 2014 Sep 11.

Glowa-Kollisch S, Andrade K, Stazesky R, Teixeira P, Kaba F, MacDonald R, Rosner Z, Selling D, Parsons A, **Venters H**. Data-Driven Human Rights: Using the Electronic Health Record to Promote Human Rights in Jail. *Health and Human Rights*. 2014. Vol 16 (1): 157-165.

MacDonald R, Rosner Z, **Venters H**. Case series of exercise-induced rhabdomyolysis in the New York City Jail System. *Am J Emerg Med*. 2014. Vol 32(5): 446-7.

Bechelli M, Caudy M, Gardner T, Huber A, Mancuso D, Samuels P, Shah T, **Venters H.** Case Studies from Three States: Breaking Down Silos Between Health Care and Criminal Justice. *Health Affairs*. 2014. Vol. 3. 33(3):474-81.

Selling D, Solimo A, Lee D, Horne K, Panove E, **Venters H**. Surveillance of suicidal and non-suicidal self-injury in the new York city jail system. *J Correct Health Care*. 2014. Apr:20(2).

Kaba F, Diamond P, Haque A, MacDonald R, **Venters H**. Traumatic Brain Injury Among Newly Admitted Adolescents in the New York City Jail System. *J Adolesc Health*. 2014. Vol 54(5): 615-7.

Monga P, Keller A, **Venters H**. Prevention and Punishment: Barriers to accessing health services for undocumented immigrants in the United States. *LAWS*. 2014. 3(1).

Kaba F, Lewsi A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, **Venters H**. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.

MacDonald R, Parsons A, **Venters H.** The Triple Aims of Correctional Health:   Patient   safety, Population Health and Human Rights. *Journal of Health Care for the Poor and Underserved*. 2013. 24(3).

Parvez FM, Katyal M, Alper H, Leibowitz R, **Venters H.** Female sex workers incarcerated in New York City jails: prevalence of sexually transmitted infections and associated risk behaviors. *Sexually Transmitted Infections*. 89:280-284. 2013.

Brittain J, Axelrod G, **Venters H.** Deaths in New York City Jails: 2001 – 2009. *Am J Public Health*. 2013 103:4.

Jordan AO, Cohen LR, Harriman G, Teixeira PA, Cruzado-Quinones J, **Venters H.** Transitional Care Coordination in New York City Jails: Facilitating Linkages to Care for People with HIV Returning Home from Rikers Island. *AIDS Behav. Nov.* 2012.

Jaffer M, Kimura C, **Venters H.** Improving medical care for patients with HIV in New York City jails. *J Correct Health Care*. 2012 Jul;18(3):246-50.

Ludwig A, Parsons, A, Cohen, L, **Venters H.** Injury Surveillance in the NYC Jail System, *Am J Public Health* 2012 Jun;102(6).

**Venters H**, Keller, AS. *Psychiatric Services*. (2012) Diversion of Mentally Ill Patients from Court-ordered care to Immigration Detention. Epub. 4/2012.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2011) Mental Health Concerns Among African Immigrants. 13(4): 795-7.

**Venters H,** Foote M, Keller AS. *Journal of Immigrant and Minority Health.* (2010) Medical Advocacy on Behalf of Detained Immigrants. 13(3): 625-8.

**Venters H,** McNeely J, Keller AS. *Health and Human Rights.* (2010) HIV Screening and Care for Immigration Detainees. 11(2) 91-102.

**Venters H,** Keller AS. *Journal of Health Care for the Poor and Underserved.* (2009) The Immigration Detention Health Plan: An Acute Care Model for a Chronic Care Population. 20:951-957.

**Venters H**, Gany, F. *Journal of Immigrant and Minority Health* (2009) African Immigrant Health. 4/4/09.

**Venters H**, Dasch-Goldberg D, Rasmussen A, Keller AS, *Human Rights Quarterly* (2009) Into the Abyss: Mortality and Morbidity among Detained Immigrant. 31 (2) 474-491.

**Venters H**, *The Lancet* (2008) Who is Jack Bauer? 372 (9653).

**Venters H**, Lainer-Vos J, Razvi A, Crawford J, Shaʼon Venable P, Drucker EM, *Am J Public Health* (2008) Bringing Health Care Advocacy to a Public Defender's Office. 98 (11).

**Venters H**, Razvi AM, Tobia MS, Drucker E. *Harm Reduct J.* (2006) The case of Scott Ortiz: a clash between criminal justice and public health. Harm Reduct J. 3:21

Cloez-Tayarani I, Petit-Bertron AF, **Venters HD**, Cavaillon JM (2003) *Internat. Immunol.* Differential effect of serotonin on cytokine production in lipopolysaccharide-stimulated human peripheral blood mononuclear cells.15,1-8.

Strle K, Zhou JH, Broussard SR, **Venters HD**, Johnson RW, Freund GG, Dantzer R, Kelley KW, (2002) *J. Neuroimmunol.* IL-10 promotes survival of microglia without activating Akt. 122, 9-19.

**Venters HD,** Broussard SR, Zhou JH, Bluthe RM, Freund GG, Johnson RW, Dantzer R, Kelley KW, (2001) *J. Neuroimmunol.* Tumor necrosis factor(alpha) and insulin-like growth factor-I in the brain: is the whole greater than the sum of its parts? 119, 151-65.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Ann. N. Y. Acad. Sci.* Tumor necrosis factor-alpha induces neuronal death by silencing survival signals generated by the type I insulin-like growth factor receptor. 917, 210-20.

**Venters HD,** Dantzer R, Kelley KW, (2000) *Trends. Neurosci.* A new concept in neurodegeneration: TNFalpha is a silencer of survival signals. 23, 175-80.

**Venters HD,** Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA.* A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137142.

**Venters HD**, Tang Q, Liu Q, VanHoy RW, Dantzer R, Kelley KW, (1999) *Proc. Natl. Acad. Sci. USA*. A new mechanism of neurodegeneration: A proinflammatory cytokine inhibits receptor signaling by a survival peptide, 96, 9879-9884.

**Venters HD,** Ala TA, Frey WH 2nd , (1998) Inhibition of antagonist binding to human brain muscarinic receptor by vanadium compounds. *Recept. Signal. Transduct.* 7, 137142**.**

**Venters HD**, Bonilla LE, Jensen T, Garner HP, Bordayo EZ, Najarian MM, Ala TA, Mason RP, Frey WH 2nd, (1997) Heme from Alzheimer's brain inhibits muscarinic receptor binding via thiyl radical generation. *Brain. Res.* 764, 93100.

Kjome JR, Swenson KA, Johnson MN, Bordayo EZ, Anderson LE, Klevan LC, Fraticelli AI, Aldrich SL, Fawcett JR, **Venters HD**, Ala TA, Frey WH 2nd (1997) Inhibition of antagonist and agonist binding to the human brain muscarinic receptor by arachidonic acid. *J. Mol. Neurosci.* 10, 209217.

## *Honors and Presentations (past 10 years)*

**Invited presentation,** Screening and treatment for sexually transmitted infecitons in justice. National Academy of Sciences Committee on Law and Justice, remote, September14th, 2020.

**Invited presentation,** Vaccination for COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, August 20th, 2020.

**Invited Presentation,** Documenting Deaths in Custody, National Association for Civilian Oversight of Law Enforcement (NACOLE), remote, August 3rd, 2020.

**Invited presentation,** COVID-19 in correctional settings. Briefing for U.S. Senate Staff, sponsored by The Sentencing Project, remote, May 29, 2020

**Invited presentation,** COVID-19 in correctional settings. Briefing for Long Island Voluntary Organizations Active in Disaster , sponsored by The Health & Welfare Council of Long Island, remote, May 29, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Academy of Sciences Committee on Law and Justice, remote, May 12, 2020.

**Invited presentation,** COVID-19 in correctional settings. National Association of Counties, Justice and Public Safety Committee, remote, April 1, 2020.

**Keynote Address**, Academic Correctional Health Conference, April 2020, Chapel Hill, North Carolina, postponed.

**TedMed Presentation**, Correctional Health, Boston MA, March 15, 2020.

**Finalist, Prose Award for Literature**, Social Sciences category for *Life and Death in Rikers Island*, February, 2020.

**Keynote Address,** John Howard Association Annual Benefit, November 2019, Chicago IL.

**Keynote Address,** Kentucky Data Forum, Foundation for a Healthy Kentucky, November 2019, Cincinnati Ohio.

**Oral Presentation,** Dual loyalty and other human rights concerns for physicians in jails an prisons. Association of Correctional Physicians, Annual meeting. 10/16, Las Vegas.

**Oral Presentation,** Clinical Alternatives to Punitive Segregation: Reducing self-harm for incarcerated patients with mental illness. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Analysis of Deaths in ICE Custody over 10 Years . American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Medication Assisted Therapies for Opioid Dependence in the New York City Jail System. American Public Health Association Annual Meeting, November 2015, Chicago IL.

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. American Public Health Association Annual Meeting, November 2014, New Orleans, LA.

**Training,** International Committee of the Red Cross and Red Crescent, Medical Director meeting 10/15, Presentation on Human Rights and dual loyalty in correctional health.

**Paper of the Year,** American Public Health Association. 2014. (Kaba F, Lewis A, Glowa-Kollisch S, Hadler J, Lee D, Alper H, Selling D, MacDonald R, Solimo A, Parsons A, Venters H. Solitary Confinement and Risk of Self-Harm Among Jail Inmates. *Amer J Public Health*. 2014. Vol 104(3):442-7.)

**Oral Presentation,** Pathologizing Normal Human Behavior: Violence and Solitary Confinement in an Urban Jail. *American Public Health Association* Annual Meeting, New Orleans LA, 2014.

**Oral Presentation,** Human rights at Rikers: Dual loyalty among jail health staff. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Poster Presentation**, Mental Health Training for Immigration Judges. American Public Health Association Annual Meeting, New Orleans LA, 2014.

**Distinguished Service Award;** Managerial Excellence. Division of Health Care Access and Improvement, NYC DOHMH. 2013.

**Oral Presentation,** Solitary confinement in the ICE detention system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Self-harm and solitary confinement in the NYC jail system. American Public Health Association Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Implementing a human rights practice of medicine inside New York City jails. American Public Health Association Annual Meeting, Boston MA, 2013.

**Poster Presentation,** Human Rights on Rikers: integrating a human rights-based framework for healthcare into NYC's jail system. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Poster Presentation**, Improving correctional health care: health information exchange and the affordable care act. *American Public Health Association* Annual Meeting, Boston MA, 2013.

**Oral Presentation**, Management of Infectious Disease Outbreaks in a Large Jail System. American Public Health Association Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Diversion of Patients from Court Ordered Mental Health Treatment to Immigration Detention. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Initiation of Antiretroviral Therapy for Newly Diagnosed HIV Patients in the NYC Jail System. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Medical Case Management in Jail Mental Health Units. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation**, Injury Surveillance in New York City Jails. *American Public Health Association* Annual Meeting, Washington DC, 2011.

**Oral Presentation,** Ensuring Adequate Medical Care for Detained Immigrants. Venters H, Keller A, American Public Health Association Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** HIV Testing in NYC Correctional Facilities. Venters H and Jaffer M, *American Public Health Association,* Annual Meeting, Denver, CO, 2010.

**Oral Presentation,** Medical Concerns for Detained Immigrants. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Growth of Immigration Detention Around the Globe. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Role of Hospital Ethics Boards in the Care of Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Oral Presentation,** Health Law and Immigration Detainees. Venters H, Keller A, *American Public Health Association* Annual Meeting, Philadelphia, PA, November 2009.

**Bro Bono Advocacy Award,** Advocacy on behalf of detained immigrants. Legal Aid Society of New York, October 2009.

**Oral Presentation,** Deaths of immigrants detained by Immigration and Customs Enforcement. Venters H, Rasmussen A, Keller A, *American Public Health Association* Annual Meeting, San Diego CA, October 2008.

**Poster Presentation,** Death of a detained immigrant with AIDS after withholding of prophylactic Dapsone. Venters H, Rasmussen A, Keller A, *Society of General Internal Medicine* Annual

Meeting, Pittsburgh PA, April 2008.

**Poster Presentation,** Tuberculosis screening among immigrants in New York City reveals higher rates of positive tuberculosis tests and less health insurance among African immigrants. *Society of General Internal Medicine* Annual Meeting, Pittsburgh PA, April 2008.

**Daniel Leicht Award for Achievement in Social Medicine,** Montefiore Medical Center, Department of Family and Social Medicine, 2007.

**Poster Presentation**, Case Findings of Recent Arestees. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Toronto Canada, April 2007.

**Poster Presentation,** Bringing Primary Care to Legal Aid in the Bronx. Venters H, Deluca J, Drucker E. *Society of General Internal Medicine* Annual Meeting, Los Angeles CA, April 2006.

**Poster Presentation**, A Missed Opportunity, Diagnosing Multiple Myeloma in the Elderly Hospital Patient. Venters H, Green E., *Society of General Internal Medicine* Annual Meeting, New Orleans LA, April 2005.

## *Grants: Program*

San Diego County: Review of jail best practices (COCHS), 1/2020, $90,000.

Ryan White Part A - Prison Release Services (PRS). From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/17 (Renewed since 2007). Annual budget $ 2.7 million.

Ryan White Part A - Early Intervention Services- Priority Population Testing. From HHS/HRSA to Correctional Health Services (NYC DOHMH), 3/1/16-2/28/18 (Renewed since 2013). Annual budget $250,000.

Comprehensive HIV Prevention. From HHS to Correctional Health Services (NYC DOHMH), 1/1/16-12/31/16. Annual budget $500,000.

HIV/AIDS Initiative for Minority Men. From HHS Office of Minority Health to Correctional Health Services (NYC DOHMH), 9/30/14-8/31/17. Annual budget $375,000.

SPNS Workforce Initiative, From HRSA SPNS to Correctional Health Services (NYC DOHMH), 8/1/14-7/31/18. Annual budget $280,000.

SPNS Culturally Appropriate Interventions. From HRSA SPNS to Correctional Health Services (NYC DOHMH), 9/1/13-8/31/18. Annual budget $290,000.

Residential substance abuse treatment. From New York State Division of Criminal Justice Services to Correctional Health Services (NYC DOHMH), 1/1/11-12/31/17. Annual budget $175,000.

Community Action for Pre-Natal Care (CAPC). From NY State Department of Health AIDS Institute to Correctional Health Services (NYC DOHMH), 1/1/05-12/31/10. Annual budget $290,000.

Point of Service Testing. From MAC/AIDS, Elton John and Robin Hood Foundations to Correctional Health Services (NYC DOHMH), 11/1/09-10/31/12. Annual budget $100,000.

Mental Health Collaboration Grant. From USDOJ to Correctional Health Services (NYC DOHMH), 1/1/11-9/30/13. Annual budget $250,000.

## Teaching

**Instructor,** Health in Prisons Course, Bloomberg School of Public Health, Johns Hopkins University, June 2015, June 2014, April 2019.

**Instructor**, Albert Einstein College of Medicine/Montefiore Social Medicine Program Yearly lectures on Data-driven human rights, 2007-present.

## Other Health & Human Rights Activities

**DIGNITY Danish Institute Against Torture**, Symposium with Egyptian correctional health staff regarding dual loyalty and data-driven human rights. Cairo Egypt, September 20-23, 2014.

**Doctors of the World,** Physician evaluating survivors of torture, writing affidavits for asylum hearings, with testimony as needed, 7/05-11/18.

**United States Peace Corps**, Guinea Worm Educator, Togo West Africa, June 1990- December 1991.
-*Primary Project;* Draconculiasis Eradication. Activities included assessing levels of infection in 8 rural villages and giving prevention presentations to mothers in Ewe and French

*Secondary Project;* Malaria Prevention.

## Books

**Venters H.** *Life and Death in Rikers Island*. Johns Hopkins University Press. 2/19.

## Chapters in Books

**Venters H.** Mythbusting Solitary Confinement in Jail. In Solitary Confinement Effects, Practices, and Pathways toward Reform. Oxford University Press, 2020.

MacDonald R. and **Venters H.** Correctional Health and Decarceration. In Decarceration. Ernest Drucker, New Press, 2017.

## Membership in Professional Organizations

**American Public Health Association**

*Foreign Language Proficiency*

**French**     Proficient
**Ewe**        Conversant

*Prior Testimony and Deposition*

Benjamin v. Horn, 75 Civ. 3073 (HB) (S.D.N.Y.) as expert for defendants, 2015

Rodgers v. Martin 2:16-cv-00216 (U.S.D.C. N.D.Tx) as expert for plaintiffs, 10/19/17

Fikes v. Abernathy, 2017 7:16-cv-00843-LSC (U.S.D.C. N.D.AL) as expert for plaintiffs 10/30/17.

Fernandez v. City of New York, 17-CV-02431 (GHW)(SN) (S.D.NY) as defendant in role as City Employee 4/10/18.

Charleston v. Corizon Health INC, 17-3039 (U.S.D.C. E.D. PA) as expert for plaintiffs 4/20/18.

Gambler v. Santa Fe County, 1:17-cv-00617 (WJ/KK) as expert for plaintiffs 7/23/18.

Hammonds v. Dekalb County AL, CASE NO.: 4:16-cv-01558-KOB as expert for plaintiffs 11/30/2018.

Mathiason v. Rio Arriba County NM, No. D-117-CV-2007-00054, as expert for plaintiff 2/7/19.

Hutchinson v. Bates et. al. AL, No. 2:17-CV-00185-WKW- GMB, as expert for plaintiff 3/27/19.

Lewis v. East Baton Rouge Parish Prison LA, No. 3:16-CV-352-JWD-RLB, as expert for plaintiff 6/24/19.

Belcher v. Lopinto, No. 2:2018cv07368 - Document 36 (E.D. La. 2019) as expert for plaintiffs 12/5/2019.

Imoerati v. Semple, U.S. District Court, CT. No 3:18cv01847 (RNC), as expert for plaintiffs, 3/11/20.

USA v. Pratt. Western Dist of PA. Criminal No. 19-213, as expert for plaintiffs (Video Hearing 4/28/20).

USA v. NELSON Western Dist. Of PA. No: 1:19-cr-00021-DSC, as expert for plaintiffs (Video Hearing 5/4/20).

Chunn v. Edge, No: 1:20-CV-01590-RPK-RLM, as expert for plaintiffs (Video Hearing 5/12/20, Video Deposition 4/30/20).

Dianthe Martinez-Brooks et al v. D. Easter, Warden No. 3:20-cv-569 (MPS), as expert for plaintiffs (Video deposition 6/8/20. Video Hearing 6/11/20).

Busby v. Booner, Western District of Tennessee, No. 3:20-cv-2359-SHL, as expert for plaintiffs (Video hearing 7/10/20).

## Fee Schedule

Case review, reports, testimony $500/hour.
Site visits, $2,500 per day (not including travel costs).

# Appendix B

## List of Documents Reviewed

*Appendix B: Information Reviewed*

1. Class Action Complaint for Declaratory and Injunctive Relief

2. STATUS FILE LIST 12-31-2019 .XLSX (DHA00922444 FDC Report)

3. Facility Profiles 7-20-2017.xlsx (EHA00104829)

4. Weekly Close Management Counts (EHA00275708)

5. SPMI Among CM/CM Pending Inmates (EHA00205998)

6. Excel Spreadsheet of People with Brain Injury and Dementia in FDC (EHA00215505)

7. Total of Psychotic Patients Per Institution (EHA00217734 FDC Report)

8. Total CM Patients with MDD or Bipolar Disorder (EHA00217736)

9. CM Inmates on 12.6.2019 (EHA00280936 FDC Report)

10. FDC's Unverified Supplemental Responses to Harvard's First Interrogatories (PLS0000078- PLS0000339 Discovery Response)

11. ██████████ (PLS0000341-PLS0000342)

12. Facilities with Special Housing (PLS000009-PLS0000014)

13. OPPAGA October 2019 Report Florida Correctional Facilities (PLS0000015-PLS0000077)

14. Excel Spreadsheet - Exhibit C to Unverified Supplemental Responses to Harvard's Interrogatories (Mental Health Grades in Isolation) (PLS0000340 Discovery Response)

15. Compiled Data re Isolation at Facilities (PLS0003379)

16. Classification of Grievance/Appeal (DHA00002683- DHA00002684)

17. Informal and Formal and Appeal Grievance Logs (DHA00002685)

18. Procedure 403.007: Medication Administration and Refusals (DHA00000023- DHA00000027 Healthcare Policy/Procedure)

19. Procedure 403.003: Health Services for Inmates in Special Housing (DHA00000647- DHA00000656 Healthcare Policy/Procedure)

20. DC4-696, Nursing Special-Housing Rounds (DHA00188654-DHA00188655 Healthcare Policy/Procedure)

21. Spreadsheet of Patients in Chronic Illness Clinics (DHA00016571-DHA00016571)

22. Daily Operations Log, Hamilton CI Annex (EHA00319392-EHA00319415 OBIS-HS Report)

23. Daily Operations Log, Tomoka CI (EHA00319366-EHA00319390 OBIS-HS Report)

24. Nursing Special Housing Rounds, Suwannee CI (DHA00195725-DHA00195732)

*Appendix B:  Information Reviewed*

25. Nursing Special Housing Rounds, Charlotte CI (DHA00195464-DHA00195473)

26. Nursing Special Housing Rounds, Charlotte CI (DHA00195456-DHA00195463)

27. Nursing Special Housing Rounds, FWRC (DHA00195611-DHA00195612)

28. Monthly Special Housing Inspection, Baker CI (DHA00191507)

29. Monthly Special Housing Inspection, Baker CI (DHA00191505)

30. Monthly Special Housing Inspection, Baker CI (DHA00191508)

31. COVID healthcare directives (DHA01080573-DHA01080595 Healthcare Policy/Procedure)

32. COVID healthcare directives (PLS0003367-PLS0003378 Policy/Procedure)

33. ███████████████ (PLS0003380)

34. ███████████████ (PLS0003381)

35. ███████████████ (PLS0003382)

36. ███████████████ (PLS0003383)

37. 20201007_HSS53_Inmate_Profile Report - Santa Rosa CI (PLS0003385 OBIS-HS Report)

38. 20201007_GHS17_Santa_Rosa_Chronic_Illness_Report (PLS0003386 OBIS-HS Report)

39. 20201007_GHS53_Santa_Rosa_Discrepancy_Report (PLS0003387 OBIS-HS Report)

40. Healthcare Grievance Index (PLS0003389)

41. Healthcare Grievances Responsive to Inch RFP 120

42. ███████████████ (PLS0003540)

43. Index of Espinosa Documents (PLS0004688)

44. FDC Managing Restricted Housing Populations (EHA00014450 Powerpoint)

45. The Impacts of Restrictive Housing on Inmate Behavior, Mental Health, and Recidivism, and Prison Systems and Personnel (PLS0004689- PLS0004756 Report)

46. ███████████ (PIX0000001- PIX0000696)

47. Blood Pressure Readings for ███████████ (PLS0007495 PIR Summary Document)

48. Blood Pressure Readings for ███████████ (PLS0007496 PIR Summary Document)

49. Deposition Transcript of Paula Foskey, March 25, 2021

50. <u>Medical/Mental Health Records</u>

- James Kendrick
- Juan Espinosa

*Appendix B: Information Reviewed*

- Johnny Hill
- Jerome Burgess
- ███████████
- ████████████
- ████████████
- █████████████
- █████████
- ██████████
- █████████
- █████████████
- ████████
- ██████████
- ██████████
- █████████
- █████████
- █████████
- ██████████
- ██████████
- ██████████
- ██████████
- ████████
- ███████████
- █████████
- ██████████
- █████████
- ██████████
- █████████
- ██████████
- ██████████
- █████████
- ██████████
- ███████
- ██████████
- ████████
- ███████████
- ████████████
- █████████
- ███████████
- █████████
- █████████
- █████████
- █████████████

*Appendix B:  Information Reviewed*

