UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

| | |
|---|---|
| JAC'QUANN (ADMIRE) HARVARD; JEREMIAH HILL; JUAN ESPINOSA; JEROME BURGESS (a/k/a SHAM'LA GOD ALLAH); JAMES W. KENDRICK, JR.; JOHNNY HILL; and AMY FERGUSON; on behalf of themselves and all others similarly situated, | Case No.: 4:19-cv-00212-MW-MAF |
| Plaintiffs | |
| v. | **DECLARATION OF LOUIS J. KRAUS, M.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** |
| MARK INCH, in his official capacity as Secretary of the Florida Department of Corrections, and FLORIDA DEPARTMENT OF CORRECTIONS, an Agency of the State of Florida | |
| Defendants. | |

1.     This declaration is submitted in support of the Motion for Class Certification filed by the Plaintiffs in this case. If called upon to testify, I could and would do so competently as follows.

## QUALIFICATIONS

2.     I am currently Professor and Chief of Child and Adolescent Psychiatry at Rush University Medical Center in Chicago, Illinois. In that capacity, I supervise and train child and adolescent psychiatry fellows in various placements, including in-patient, residential treatment, and outpatient programs for children, adolescents, and young adults. I am also currently the Psychiatric Director at the Sonia Shankman Orthogenic School, a residential treatment program for children and adolescents in need of support for profound emotional issues; the Founding Director of the Autism Assessment, Research, Treatment and Services Center at Rush University Medical Center; and the Medical Director of the Chicago Metropolitan Easter Seals Therapeutic School, a school providing a continuum of services for children with autism. I also have a private practice where I assess and treat children and adolescents and provide therapy and psychopharmacological services.

3.     I have worked with juveniles in correctional settings for the past 30 years, including for nine years from 1990 to 1999 as the treating psychiatrist at the Illinois Maximum Security Youth Center in Joliet, Illinois. From 2003 to 2004, I

was a consultant to the Civil Rights Division of the United States Department of Justice on a Civil Rights of Institutionalized Person Act (CRIPA) investigation in Maryland. I also consulted with the American Civil Liberties Union of Illinois in a case challenging conditions in the Cook County Juvenile Temporary Detention Center which resulted in system-wide restructuring of mental health services for juveniles held in pre-trial detention. I have served as a consultant on various other correctional and juvenile justice matters. I more recently worked as an expert in Palm Beach County, New York, and in several cases in Seattle, Washington.

4.      I have been appointed to serve as monitor in consent decrees involving reform in juvenile justice systems in Arizona and Illinois, both of which included reform to the use of solitary confinement against juveniles in those systems. In my role in Illinois, which is currently ongoing, I am assessing and restructuring the mental health programming of the Illinois Department of Juvenile Justice. *See R.J. v. Bishop*, No. 1:12-cv-07289 (N.D. Ill.). In the Arizona case, I assisted the Department of Justice from 2005 to 2008 in restructuring the mental health, medical services, and dental services in two state facilities. *See United States v. Arizona*, No. 2:04-cv-01926-EHC (D. Ariz.).

5.      I have also been involved in special education consulting and development of Individualized Education Programs and Plans (IEPs) for the past twenty-six years. I am currently a consultant on special education issues to over

fifteen school districts in Illinois. I typically complete one educational evaluation every week, assist with developing IEPs, and attend IEP meetings. I have testified regarding special education issues in due process hearings under the Individuals with Disabilities Education Act as well as in other civil cases.

6.     I have authored a number of publications on treatment of juveniles in correctional settings. I am the primary author of the American Academy Child and Adolescent Psychiatry's ("AACAP") Policy Statement on Solitary Confinement.[1] I assisted in the completion of the American Psychological Association policy statement on Solitary Confinement of Juveniles, I co-edited two monographs on juvenile justice reform for the AACAP, I co-edited a book through Cambridge University Press entitled *The Mental Health Needs of Young Offenders*, and also edited a book through the Child and Adolescent Psychiatric Clinics of North America entitled *Adjudicated Youth*, published in January of 2016. I wrote the Practice Parameter for Child and Adolescent Forensic Evaluations for child and adolescent psychiatry, which was published in the Journal of Child and Adolescent Psychiatry.

7.     I have served in a number of professional appointments in my field. From June 2014 to 2015, I served as the chair-elect of the American Medical

---

[1] American Psychiatric Association, *Position Statement on Solitary Confinement (Restricted Housing) of Juveniles* (May 2018), available at: https://www.psychiatry.org/File%20Library/About-APA/Organization-Documents-Policies/Policies/Position-2018-Solitary-Confinement-Restricted-Housing-of-Juveniles.pdf (last visited May 25, 2021).

Association's Council on Science and Public Health, and from 2015 to 2016, I served as chair. From May 2012 to May 2015, I was the chair of the American Psychiatric Association's Council on Children, Adolescents and Their Families, which I had served in for 18 years. From October 2000 to October 2015, I was the chair of the AACAP's Juvenile Justice Reform Committee, and from 2011 to 2013, I was chair of the AACAP Assembly.

8.      I was on the Board of Directors of the National Commission of Correctional Health Care ("NCCHC") from 1997 to 2003. I was appointed chairman of the NCCHC Committee on Juvenile Health Care from 1999 to 2003, and served as vice-chairman of the same committee in 1998.

9.      I obtained my Doctor of Medicine degree, M.D., from the Chicago Medical School in 1987 and my Bachelor of Science degree, B.S., from Syracuse University in 1983.

10.      I have included a copy of my Curriculum Vitae attached as Appendix A which includes all publications that I have authored in the past ten years.

**INVOLVEMENT IN THIS CASE**

11.      In this case, I was retained by Plaintiffs to perform professional services as an expert in connection with litigation challenging the use of isolation of juveniles under 21 years old in the custody of the Florida Department of Corrections ("FDC"). The term "isolation" refers to FDC's use of Administrative

Confinement, Disciplinary Confinement, Close Management, and Maximum
Management. Plaintiffs have specifically retained me to assess the risk of harm to
youths from isolation in FDC.

12.    My opinions in this declaration are partial and preliminary based on
the information available to me at this time. Based on the materials and records
that I have reviewed, the interviews that I conducted, and the facility inspections I
conducted, I am confident in the preliminary opinions that I have formulated about
FDC's isolation conditions, policies, and practices. I anticipate that these opinions
will be further developed and supplemented as more information becomes
available. To prepare this declaration, I reviewed several documents, including the
Class Action Complaint for Declaratory and Injunctive Relief, the Second
Amended Complaint for Declaratory and Injunctive Relief, the Stipulation for
Entry on Land for Inspection and Confidential and Privileged Client and Putative
Class Member Interviews, and exhibits produced by Defendant Florida Department
of Corrections in response to Plaintiff Espinosa's Interrogatory No. 3 in this case. I
also reviewed FDC policies and procedures about, for example, youthful offenders,
confinement, education, and mental health services. A complete list of the
documents that I reviewed to form my preliminary opinions are listed in Appendix
B.

13.     I also inspected Suwannee Correctional Institution ("Suwannee CI")

on December 8-9, 2020, which houses individuals under 21 years old and includes

young people designated by a criminal court or FDC as "youthful offenders" or

"young adult offender."[2] (I use the term "youth" in this declaration to refer to

anyone in FDC custody who is under age 21.) I also inspected the Sumter

Correctional Institution on May 25-26, 2021.  As part of these facility inspections,

I viewed the restrictive housing areas; the cells in the units; the areas where

individuals receive mental health care and medical care, and recreation; and cells

where people are placed on suicide or self-harm observation.[3] In connection with

the facility inspections at Suwannee CI, I also completed brief cell front interviews

with 46 youth and adults in isolation and conducted longer, individual interviews

up to one hour, with 9 youth, 7 of who were currently housed in isolation. The

individual interviews were conducted in a room outside the housing areas. I

selected individuals for longer interviews based primarily on my cell front

interviews and the rosters of the persons housed at each facility. The persons with

whom I conducted brief cell front interviews at these facilities were housed in

Administrative Confinement, Disciplinary Confinement, and Close Management.

---

[2] *See* Florida Department of Corrections' Procedure No. 601.211, Designation of Youthful Offenders
Young Adult Offenders, and Youthful Offender Facilities, at Bates Nos. DHA00000101-DHA00000110.
[3] There was no dayroom in the restrictive housing unit at Sumter Correctional Institution.

14.     At each facility where I conducted individual interviews, I briefly reviewed the charts and mental health interventions made available to me and performed a 45-60 minute evaluation, consisting of background history, a mental status exam, and a clinical interview. Following the inspection at Suwannee CI, I requested certain records be made available to me for further review and I reviewed these records.[4]

15.     On March 31, 2021, I conducted a telephone interview for approximately one hour with named Plaintiff Jeremiah Hill while he was housed at Santa Rosa Correctional Institution. I also reviewed Jeremiah Hill's records.

16.      In forming my opinions below, I relied on my review of the documents, observations of the facilities, and my evaluations of the youth and young adults that I interviewed. I also relied on my academic and clinical experience, as well as the extensive body of literature regarding the psychiatric effects of solitary confinement, cognitive and behavioral development in adolescents, juveniles, and youth in correctional settings cited in this preliminary opinion.

17.     It is my understanding that as the litigation progresses, I may be reviewing additional documents and information regarding the isolation and mental

---

[4] These records are Bates Nos.: PIR00031121-PIR00042601 (███.); PIR00034535-PIR00043599 (███.); PIR00035852-PIR00043248 (███.); PIR00028935-PIR00042624 (███.); PIR00033121-PIR00049084 (███); PIR00031272-PIR00031456 (███); PIR00040815-PIR449977) (███); PIR00032185-PIR00049058 (███); and PIR00039420-PIR00044891 (███).

health treatment of youth under age 21 in FDC custody, and that I will be

providing additional services and opinions based on those documents and

information.

## OPINIONS AND BASES OF OPINIONS

### *The Significant Risk of Psychological Consequences to Youth From Isolation*

18.     Although the term "solitary confinement" does not appear in FDC's

policies, the policy and practice of "restrictive housing" used by FDC constitutes

"solitary confinement" as the term is commonly used by professional organizations

in the field. The United States Department of Justice defines "isolation" or

"solitary confinement" as "the state of being confined to one's cell for

approximately 22 hours per day or more, alone with other prisoners, that limits

contact with others."[5] FDC has a policy and practice of isolating youth alone or

with a cellmate in a locked cell for 22 hours or more with severe restrictions on

contact with anyone outside their cell. This policy and practice is solitary

confinement.

19.     Solitary confinement can be dangerous for anyone, but youths, as a

group, are particularly vulnerable to a risk of significant psychological effects from

---

[5] *See* U.S. Department of Justice, *Investigation of State Correctional Institution at Cresson* at 5 (May 31, 2013), available at http://www.justice.gov/crt/about/spl/documents/cresson_findings_5-31-13.pdf  (last visited May 25, 2021).

9

solitary confinement.[6] Youths are still developing socially, psychologically, and neurologically which makes them especially susceptible to psychological harm when they are isolated from other people. Research suggests that removing them from their regular routines, school, mental health treatment, and opportunities for interaction with peers can result in long-term lack of trust, hypervigilance, and paranoia.[7] There is no research to show that the negative impact of the developing brain is any different in 17 year olds as compared to 18, 19, or 20 year olds.[8] Rather, research supports that the brain continues to develop until the age of 25.[9]

20.     Solitary confinement negatively impacts youth by perpetuating, worsening, or precipitating mental health concerns, including but not limited to post-traumatic stress disorders, psychosis, anxiety disorders, major depression, hypervigilance, agitation, general lack of trust, suicidal ideation, suicidal intent, self-mutilation, and suicidal behavior.[10] Solitary confinement has a high likelihood

---

[6] Andrew Clark, *Juvenile Solitary Confinement as a Form of Child Abuse*, J Am Acad Psychiatry Law., 45 (3) 350-357 (Sep. 2017), available at http://jaapl.org/content/45/3/350 (last visited May 25, 2021).

[7] Jay N. Giedd, et al., *Brain development during childhood and adolescence: a longitudinal MRI study*, 2 Nature Neuroscience 861, 861-63 (Oct. 1999), available at https://www.researchgate.net/profile/Jay-Giedd-2/publication/12807832_Brain_Development_during_Childhood_and_Adolescence_A_Longitudinal_MRI_Study/links/0046351b08eef02d5a000000/Brain-Development-during-Childhood-and-Adolescence-A-Longitudinal-MRI-Study.pdf (last visited May 25, 2021).

[8] *Id.*

[9] Karen Kerstig, *Brain research advances help elucidate teen behavior* (July/Aug 2004), American Psychological Association Monitor on Psychology, available at https://www.apa.org/monitor/julaug04/brain (last visited May 25, 2021).

[10] *See* supra at note 2; and Karen M. Abram, Linda A. Teplin, et al., *Posttraumatic Stress Disorder and Trauma in Youth in Juvenile Detention*, 61 Archives Gen. Psychiatry 403, 403-10 (April 2004), available at https://jamanetwork.com/journals/jamapsychiatry/fullarticle/481985 (last visited May 25, 2021).

of bringing on acute symptoms, even if the symptoms are not already present in the individual. For the estimated 60 percent of youth in correctional settings[11] who already have mental illness, the incidence of presenting it again after isolation is much higher.[12]

21.     These mental health concerns can cause long-term harm. Solitary confinement can lead to chronic conditions like depression which, in teenagers and young adults, can manifest as anger or as self-harm. Youths who experience depression and anxiety in isolation are at a higher risk of presenting with these diagnoses again after their release from isolation.[13] In addition, the damage from solitary confinement associated with low self-esteem, vegetative features, and hopelessness associated with depression can be similarly long-standing. Depression in the general population is associated with a 10-15% mortality rate for suicide, and solitary confinement increases the risk of depression and suicide substantially compared to the general population.[14]

---

[11] Linda A. Teplin, et al., *Psychiatric Disorders in Youth in Juvenile Detention*, 59 Archives Gen. Psychiatry 1133, 1133-43 (Dec. 2002), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2861992/ (last visited May 25, 2021).
[12] Lindsay M. Hayes, *Juvenile Suicide in Confinement, A National Survey, Office of Juvenile Justice Delinquency and Prevention* at vii. (Feb. 2009), available at https://www.ncjrs.gov/pdffiles1/ojjdp/213691.pdf  (last visited May 25, 2021).
[13] Stuart Grassian, *Psychopathological Effects of Solitary Confinement*,140 Am. J. Psychiatry 1450 (Nov. 1983), available at https://www.nmlegis.gov/handouts/CCJ%20102716%20Item%203%20Dr%20Grassian%20Psychopathological%20Effects%20of%20Solitary%20Confinement.pdf (last visited May 25, 2021).
[14] *See* Hayes, *supra* n. 11; and n. 12.

22.     Solitary confinement of juveniles can also lead to long-term trust issues with adults, including paranoia, anger, and hatred directed at others.[15] This makes it difficult to create a trusting, therapeutic relationship and can lead to noncompliance with treatment in the future, making it hard for people to get the help that they need to address the mental health concerns resulting from solitary confinement.

23.     Medical research on adolescent brains explains why youth are more vulnerable to the risk of long-term harm from solitary confinement. In the adolescent and young adult brain, the connections between the frontal lobe and the mid-brain, which is the part of the brain responsible for the flight-or-fight response, have not fully developed.[16] If a youth is traumatized in certain ways, it can cause permanent changes in brain development and structure, and create a higher risk of developing permanent psychiatric symptoms like paranoia and anxiety.[17] Trauma, such as what is induced by solitary confinement, has a high likelihood of causing these permanent changes.[18]

---

[15] *See* supra n. 3.

[16] *See* supra n. 6; Jay N. Giedd, et al., Quantitative magnetic resonance imaging of human brain development: ages 4-18, 6 Cerebral cortex 551, 551-59 (1996), https://www.researchgate.net/publication/14530244_Quantitative_Magnetic_Resonance_Imaging_of_Human_Brain_Development_Ages_4-18 (last visited May 25, 2021).

[17] Child Welfare Information Gateway, *Understanding the Effects of Maltreatment on Brain Development* (April 2015), https://www.childwelfare.gov/pubPDFs/brain_development.pdf (last visited May 25, 2021).

[18] Nat'l Comm'n on Corr. Health Care, *Solitary Confinement (Isolation)* (April 2016), https://www.ncchc.org/filebin/Positions/Solitary-Confinement-Isolation.pdf (last visited May 25, 2021).

24.     Youths in prison are vulnerable to a risk of serious harm from solitary confinement for the additional reason that they are more likely to have diagnosed mental illness, learning disabilities, and a high incidence of trauma.[19] Research shows that over 60 percent of youths in correctional settings have an underlying major mental illness.[20] Girls are identified as having an even higher incidence of mental illness and are at increased risk for victimization.[21]

25.     There is a clear medical consensus that for those youth with mental illness, the risk of serious harm from solitary confinement is especially great.[22] People with mental illnesses already have deficits in their brain structure or biochemistry. They already have weakened defensive mechanisms, making them less resilient than the general population. They are at a higher risk for mental health symptoms and are more susceptible to the significant trauma of social isolation. The trauma of social isolation that can occur for those with mental illnesses will be even more significant and long-lasting than for those without a mental illness.[23] Furthermore, the open-ended solitary confinement experienced by many of the youths in restrictive housing exacerbates these mental health

---

[19] Teplin, *supra* n. 10.; Abram, *supra* n. 9.
[20] Teplin, *supra* n. 10.
[21] *Id.*
[22] American Psychiatric Association, *supra*  n. 1.
[23] *Id.*

conditions as they can perceive they are subjected to seemingly endless amounts of time in isolation.[24]

26.     For these reasons, a number of health, medical, corrections, and professional organizations have condemned solitary confinement of youth recognizing that they are particularly vulnerable to the adverse psychiatric consequences of such confinement. A number of organizations have condemned solitary confinement of any youth under the age of 18 and those over 18 with mental illness, as a categorical matter, recognizing that they are particularly vulnerable to the adverse psychiatric consequences of such confinement. The American Academy of Child and Adolescent Psychiatry, for example, opposes the use of solitary confinement for youth in correctional facilities, recognizing the damaging impacts from solitary confinement relevant to their developmental vulnerabilities and that the majority of suicides in juvenile correctional facilities occur when the individual is isolated or in solitary confinement.[25] The National Commission on Correctional Health Care, a major accrediting agency, takes the position that juveniles should be excluded from solitary confinement.[26] The

---

[24] *See supra,* n. 3.

[25] *See* American Academy of Child & Adolescent Psychiatry, *Solitary Confinement of Juvenile Offenders* (April 2012), available at
https://www.aacap.org/aacap/policy_statements/2012/solitary_confinement_of_juvenile_offenders.aspx#:
~:text=Solitary%20confinement%20is%20defined%20as,form%20of%20discipline%20or%20punishmen
t.&text=They%20specifically%20prohibit%20the%20solitary%20confinement%20of%20juvenile%20off
enders (last visited May 25, 2021).
[26] *See* Nat'l Comm'n on Corr. Health Care, *supra* n. 17.

14

American Medical Association has called for correctional facilities to halt the isolation of youth in solitary confinement for disciplinary purposes,[27] with support from the American Psychiatric Association.[28] The United Nations Rules for the Protection of Juveniles Deprived of their Liberty specifically prohibit the solitary confinement of youthful offenders.[29] The American Psychiatric Association position is that solitary confinement of youths should be avoided.[30] The World Health Organization has recognized that the United Nations and other international treaties call for a complete ban on solitary confinement for juveniles and young people, noting the particular vulnerabilities of children, who are developing physically, mentally and socially, and the high rates of mental illness and suicide among young people.[31] The Council of Juvenile Correctional Administrators opposes the use of solitary confinement for youths based on research that shows that placing detained youth in isolation has "negative public safety consequences,

---

[27] *See* American Medical Association, *Solitary Confinement of Juveniles in Legal Custody H-60.922* (2016), available at https://policysearch.ama-assn.org/policyfinder/detail/solitary%20confinement?uri=%2FAMADoc%2FHOD.xml-0-5016.xml (last visited May 25, 2021).

[28] *See* American Psychiatric Association, *supra* n. 1.

[29] *See* U.N. Convention on the Rights of the Child, opened for signature Nov. 20, 1989, 1577 U.N.T.S. 3 (entered into force Sept. 2, 1990) ("CRC"); U.N. Guidelines for the Prevention of Juvenile Delinquency, G.A. Res. 45/112, Annex, 45 U.N. GAOR Supp. (No. 49A), U.N. Doc. A/45/49, at 201 (Dec. 14, 1990) ("The Riyadh Guidelines"); U.N. Rules for the Protection of Juveniles Deprived of their Liberty, G.A. Res. 45/113, Annex, 45 U.N. GAOR Supp. (No. 49A), U.N. Doc. A/45/49, ¶ 67 (Dec. 14, 1990) ("The Beijing Rules").

[30] American Psychiatric Association, *supra* n. 1.

[31] *See* Stefan Enggist et al., *Prisons and Health*, Ch. 5 (2014),  available at http://www.euro.who.int/__data/assets/pdf_file/0005/249188/Prisons-and-Health.pdf?ua=1 (last visited May 25, 2021).

does not reduce violence and likely increases recidivism" and can cause permanent psychological damage and is highly correlated with suicide.[32]  In 2016, the United States Department of Justice ended the practice of using solitary confinement for youth in all federal prisons because of the growing consensus of the risk of harm for children.[33]

### The Use of Isolation by the Florida Department of Corrections for Youths Under Age 21

27.     FDC policy and practice uses restrictive housing, or isolation, under several names: Administrative Confinement, Disciplinary Confinement, Close Management, and Maximum Management. No matter what the name, these are all "solitary confinement" (also known as isolation) as recognized in the scientific, correctional, and medical literature discussed above. Under FDC policy, youths are subject to restrictive housing without exception despite the known risk of harm to this population.

28.     FDC subjects youths to isolation for disciplinary reasons that involve violating facility rules and regulations. This is referred to as Disciplinary Confinement ("DC"). FDC policy provides that DC can last up to 60 days, but the

---

[32] Council of Juvenile Correctional Administrators, *Toolkit: Reducing the Use of Isolation* (March 2015), available at http://dcfs.nv.gov/uploadedFiles/dcfsnvgov/content/Programs/JJS/CJCA%20Toolkit%20Reducing%20the%20use%20of%20Isolation.pdf (last visited May 25, 2021).

[33] Robert L. Listenbee, Jr., et al., *Report of the Attorney General's Task Force on Children Exposed to Violence*, at 178 (Dec. 12, 2012), available at https://www.justice.gov/defendingchildhood/cev-rpt-full.pdf (last visited May 25, 2021).

time period for this isolation can be extended where an individual has been found guilty of multiple disciplinary violations. Fla. Admin. Code R. 33-602.222.

29.   FDC also subjects youth to Administrative Confinement ("AC"). Under FDC policy, Administrative Confinement is intended to be the temporary placement of an inmate in isolation until a permanent housing decision is made pending an investigation for a disciplinary charge or in cases where protective housing is requested. Fla. Admin. Code R. 33-602.220. As a general rule, people are supposed to spend no longer than 20 days in AC, but, FDC policy imposes no maximum time limit and, in practice, some individuals spend significantly more time in AC.  Ex. D-3 at Nos. 126 and 144-46.

30.   FDC policy also subjects individuals to restrictive housing in Close Management ("CM"). CM is "the confinement of an inmate apart from the general population, for reasons of security or the order and effective management of the institution, where the inmate, through his or her behavior, has demonstrated an inability to live in the general population without abusive the rights and privileges of others." Fla. Admin. Code R. 33-601.800. CM ranges in levels from one to three, but all levels are "restrictive housing." Fla. Admin. Code R. 33-601.800. While FDC policy requires an individual's close management status be reviewed weekly "to reduce the inmate's status to the lowest management level possible or return the inmate to general population as soon as the facts of the case indicate that

this can be done safely," the youths who I spoke with reported they usually experience much longer periods for reviews. FDC policy does not provide any limit on how long someone must remain in CM. Since individuals can be subject to CM for safety and security issues "or other circumstances" until State Classification decides to release them, people tend to spend anywhere from 18 months to decades in CM.[34]

31.     Under FDC policy, Maximum Management ("MM") is used for an individual identified as being "an extreme security risk" to the Department and requires "an immediate level of control than that available in confinement, close management or death row." Fla. Admin. Code R. 33-601.820. (I was not on the inspections team that went to Florida State Prison which is the only prison with Maximum Management restrictive housing.)

32.     Through policy and practice, the FDC subjects youths to isolation (called "restrictive housing" by FDC). FDC's use of isolation, including the conditions in confinement, exposes youths in their care to a risk of harm because of their continuing emotional, psychological, and physiological development. This is a statewide policy that is authorized by administrative rules and official procedures. As explained below, there are several aspects of FDC's isolation policies and practices that, in totality, cause this risk of harm. Although the FDC

---

[34] *See* Exhibit E-4, Close Management Spreadsheet (Bates No. EHA00514428).

uses different names for isolation, in practice, the conditions are basically the same in AC, DC, and CM.

33.     FDC subjects youths to a risk of harm by locking them in small cells by themselves or with one roommate for at least 22 hours each day. As I toured the restrictive housing units where these cells are located, I observed that the cells appeared to be similar in size and layout. Through the cell doors, I could see that the cells had only a bed, toilet, and sink. In some cells, I saw a few personal items. There was a small opening on the door to look into the unit. The lights in the cells were on. There was little, to no, natural light coming into the cells. Under FDC policy, youthful offenders are supposed to receive a 10-minute shower, two to three times per week. The youth that I spoke with consistently reported that this does not always happen.

34.     Youth in restrictive housing are deprived of basic human contact. They eat alone, or with a roommate, in their cells. Staff come to their cell doors occasionally, but these are minimal and cursory interactions that occur through a locked cell door. The youths that I interviewed reported that they could get in trouble through a Disciplinary Report if they yell to try to speak to security from behind the door. Youths also reported that they are not allowed to talk to others from their cells and can be punished with additional time in isolation if they try to

do so. Their access to phone calls and visits with family was non-existent or very limited.

35.     Youth in restrictive housing are also deprived of recreation. For example, under FDC's policy, very little recreation time is provided; this is important for all human beings, but especially for youths who are still physically and emotionally developing. The youths that I interviewed reported often being denied recreation time or refusing it based on incidents where security staff would come into the cell while they were at recreation and either "mess up," "destroy," or "take" the youths' personal property. The youths consistently informed me that they strongly feel this is done to deter them from going to recreation. Youth are required to go to recreation in large cages resembling dog kennels and form a barrier to socializing with one another. In the recreation cages, I did not see athletic equipment, like basketballs, or gym equipment other than pull-up and dip bars available for use.

36.     The youths in restrictive housing are also deprived of environmental stimulation. Their access to personal property is very restricted. Youths do not have access to television or tablets in their cells. Their access to reading material is also greatly limited. Youths reported they received little to no contact with education staff and did not receive much, if any, schoolwork while in restrictive housing and were idle. This is a problem for all youths, but even more devastating

for those who are required by federal law to receive special education, including through an Individualized Education Plan ("IEP").

37.     None of the youths that I spoke with could give a clear explanation of exactly what behaviors would subject them to or prolong their time in restrictive housing. These individuals told me to "get out" of isolation, they were generally told they needed to avoid getting new Disciplinary Reports, but even when they did, positive behavior did not result in their release from isolation.

38.     This lack of any upper limit on a youth's time in restrictive housing results in increases in their anxiety, fear, and mistrust because they have no way of predicting when and for how long they will be isolated. This uncertainty, and the resulting feelings, exacerbates the mental health conditions that juveniles experience in isolation is part of what can cause the onset of the harmful effects of solitary confinement for youth, even where they may not have a pre-existing mental health diagnosis.

39.     It is my opinion that the FDC is failing to address the risk of serious harm that is correlated to the use of isolation, for all youths, but especially for those with mental health needs. As supported by the studies and literature about the psychological harms of isolation, especially for youths, this group should not be subject to isolation because of the risk of harm to their continuing physiological, emotional, and social development. Given this risk, the very minimal, at best,

mental health interactions or clinical interventions provided (or not) in policy or practice do not ameliorate this risk. For example, FDC policy provides for a cursory mental health status check before a youth is subject to restrictive housing and 30 days after they are placed in restrictive housing. The youths I spoke to described any interactions with someone identified with mental health as cursory, infrequent, and taking place through a locked cell door. In my opinion, these brief checks are insufficient to properly assess the youth's mental health status, or, to address the risk of harm they are exposed to, especially given the prevalence of mental health conditions and prior traumas for youth in the adult prison system.

***Interviews with Named Plaintiff Jeremiah Hill and Putative Class Members***

40.    I conducted an interview by phone with Jeremiah Hill for approximately one hour on March 31, 2021, while he was at Santa Rosa Correctional Institution. It took several times to schedule this interview; one of these times, Jeremiah informed me that there was an officer present in the room and he was uncomfortable speaking with me, so we rescheduled. He reported that he was currently on CM2. He reported that he was removed from the inpatient mental health Transitional Care Unit recently and had his dorm switched since that time.

41.    He is 19 years old and was sent to prison when he was only age 14. FDC first put Jeremiah Hill in restrictive housing (AC and DC) only two months

after he arrived at age 14. He cycled in and out of AC/DC for the next two years,

until at age 16. FDC isolated him in CM (CM1, CM2, and CM3) for 15

consecutive months at Florida State Prison (FSP). While in restrictive housing at

FSP, Jeremiah reported that typically he would have showers two to three times a

week. Recreation time was typically quite minimal. He said that even when he

went to showers that it was not uncommon that the guards would come into his

room, mess things up, and even take things. This happened to the point that he

would even be resistant to go to showers because he did not want this to happen.

He reported not trusting the security staff. Jeremiah reported that on CM1 or CM2

he has no contact visits with his family, and these were only possible on CM3. He

reported that it can take up to a year to get onto CM3. Jeremiah reported that he

was placed on close management, CM1, again in June 2020.  He reported in

around September 2020, he was sent to the TCU at Santa Rosa Annex. He had

hoped that once he was out of TCU that he would be able to go back to Hardee CI.

FDC has continued his close management status.

42.     FDC has conducted psychological testing on Jeremiah which reported

an intellectual impairment and a low IQ. At some point, he saw a psychiatrist who

briefly put him on Buspar which he is no longer prescribed. Jeremiah described

having significant stressors since he has been in FDC, some of which he did not

want to talk about. His records included a number of mental health emergency

documents dated from March to September 2017. He has been diagnosed with Anxiety, Depression, Intermittent Explosive Disorder, but also expressed that he feels he may have Post Traumatic Stress Disorder. He described a depressed mood, trouble sleeping, most notably falling asleep. He described having nightmares which have lessened but are still present. He has also described having recurrent memories of traumatic events. Jeremiah felt that mental health services have been far less than what they should be and have provided him with little support. Jeremiah presented with symptoms of PTSD, as well as depression and anxiety.

43.     Jeremiah described the devastating impact of being in solitary confinement. He described a loss of trust, isolation, and fear when he has a roommate when he does not know if he is going to get attacked at night. He reported that his current roommate has been incarcerated since 2004. He felt that solitary confinement has made him more violent and that this is essentially a coping strategy. Being in isolation has changed his life and he expressed that he does not know whether it would ever return back to any type of normality. In my interview, I noted a worsening of PTSD symptoms, anxiety, depression, describing himself as "a monster," and having lost even more trust while in isolation.

44.     During the interview, Jeremiah was alert and oriented to person, time, and place. His thought processes seemed logical and goal directed. His thought

content described an issue of depression and anxiety. His speech was fluid, although with some articulation struggles.

45.     Despite his very young age when he was sentenced to FDC, he was put in isolation and remained there for extended periods of time. Although he was diagnosed at some point with low intellectual functioning, FDC continues to subject him to isolation even after a time in the inpatient mental health unit. I have no reason to believe that he cannot serve as a representative of the Youth Subclass in this case. Indeed, his experiences and symptoms are typical of the harm that occurs when youth are subject to isolation.

46.     During my inspection of Suwannee CI, I observed evidence of similar types of serious harm and a risk of serious harm among youths in restrictive housing. I also found through my individual interviews that the majority of the youths I spoke with had mental illnesses.

47.     For example, at Suwannee CI, out of the nine youth I interviewed confidentially, ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

███████████████████████████████████



48.     Based on my experience, scientific research, youth records, and the clinical interviews, my opinion is that these symptoms, or worsening of symptoms, directly correlate to being subject to isolation. It is also important to note that the youth may have likely been minimizing their symptoms in my interviews because they were afraid of repercussions from security. All of the youth interviewed

described concern of speaking to Plaintiffs' team because security spoke to them in a threatening way as to what they would say.

49.     The reports of abuse and harassment by the youths in restrictive housing from security are concerning and further compound the harm and the risk of harm. Security threatening and harassing youths can also worsen their anxiety, stress, depressive symptoms, and suicidal ideations and potentially present them with other forms of harm, like post-traumatic stress disorder.

50.     It is my opinion, within a reasonable degree of medical certainty, that all youth who are subject to FDC's statewide policy and practice of restrictive housing, as described above, are at a risk of serious harm to their social, psychological, and emotional development. I base this opinion on all the information available to me about FDC, research demonstrating that juveniles and young adults as a group are vulnerable to the risk of serious harm from solitary confinement (i.e., isolation), and research showing that a high percentage of youths in correctional settings have mental illnesses that exacerbate those risks of harm. I observed these serious harms and risks of harm in the youths that I interviewed during my visit.

51.     Even youths who had been or were in FDC restrictive housing and were not currently exhibiting obvious serious harms during my visit are at a risk of harm. Isolation can lead to underlying anxiety, hypervigilance, and other signs of

acute stress reactions, and some youths are better at minimizing or concealing those effects. Moreover, the youths are at risk of additional harm because they are or can be punished with additional solitary confinement for minor reasons and for prolonged periods of many months to years.

52.     Isolation inhibits youths' ability to cope with stressful situations and leaves them angrier and more disturbed, and therefore leading to more misbehavior and rules infractions. The youth that I interviewed expressed increased anger, aggression, depression, anxiety, and vindictiveness correlated to being in solitary confinement. The youths feel victimized by being placed in restrictive housing and this leads to an increased desire for retribution.

Under 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing declaration is true and correct. Executed on the 25th day of May, 2021.

Louis J. Kraus, M.D.

# Appendix A

## Curriculum Vitae

## LOUIS JAMES KRAUS, M.D., DFAPA, FAACAP
Woman's Board Professor of Child and Adolescent Psychiatry
Chief, Section of Child and Adolescent Psychiatry
Rush University Medical Center

910 Skokie Boulevard, Suite 230
Northbrook, IL 60062
Office Telephone: (847) 559-0560
Cell: (847) 217-7755
Email: rkraus9@mac.com

**PERSONAL DATA:**

Louis James Kraus, MD
DOB:  12-3-1960 USA

**EDUCATION:**

| | |
|---|---|
| 1987 | M.D., University of Health Sciences, The Chicago Medical School |
| 1983 | B.S., Syracuse University |

**POSTGRADUATE TRAINING:**

| | |
|---|---|
| 7/1/92-6/30/94 | Child and Adolescent Psychiatry Fellow, The University of Chicago, Chicago, Illinois |
| 10/1/88-6/30/92 | Psychiatry Resident, Northwestern University, Chicago, Illinois |
| 7/1/91-12/31/91 | Chief Resident, Psychiatry, Northwestern University, Chicago, Illinois |
| 7/1/87-6/30/88 | Surgical Intern, Boston University, Boston, Massachusetts |

**ACADEMIC APPOINTMENTS:**

| | |
|---|---|
| July 2016 – Present | Professor of Clinical Psychiatry, Rush University Medical Center |
| July 2003 – June 2016 | Associate Professor of Clinical Psychiatry, Rush University Medical Center |
| March 2001 – 2002 | Visiting Associate Professor of Psychiatry, University of Illinois at Chicago |
| July 2001 – 2002 | Assistant Professor of Psychiatry, Northwestern University |
| November 1997 – July 2001 | Clinical Instructor, Dept. of Psychiatry, Northwestern University |
| July 1994 – August 1997 | Assistant Professor, Department of Psychiatry, University of Chicago |

1

| | |
|---|---|
| July 1994 – August 1997 | Director of Child and Adolescent Forensic Psychiatry, University of Chicago |

**BOARD CERTIFICATION:**

| | |
|---|---|
| May, 2015 | Maintenance of Certification in Child and Adolescent Psychiatry, by The American Board of Psychiatry and Neurology, Certification No. 3956 |
| June, 1999 | Board Certified in Forensic Psychiatry, by the American Board of Psychiatry and Neurology, Certification No. 1079 |
| October, 1995 | Board certified in Child and Adolescent Psychiatry, by The American Board of Psychiatry and Neurology, Certification No. 3956 |
| December, 1993 | Board certified in General Psychiatry, by The American Board of Psychiatry and Neurology, Certification No. 38252 |

**LICENSE:**

| | | |
|---|---|---|
| State of Illinois | No. 036-079584 | Expires: 07/31/2020 |
| State of Florida | No. ME 83084 | Expires: 01/31/2021 |
| State of Arizona | No. 33456 | Expires: 04/03/2021 |

**HONORS AND AWARDS:**

- 2020 Agnes Purcell McGavin Award for Distinguished Career Achievement in Child and Adolescent Psychiatry from the American Psychiatric Association (APA) and APA Foundation.
- Child and Adolescent Psychiatry, Award: "Scholarship and Perseverance in the Creation of our Practice Parameter for Child and Adolescent Forensic Evaluations", 58th Annual Meeting, Toronto, Canada, October 2011.
- Fellow, American Academy of Child and Adolescent Psychiatry (2006)
- Distinguished Fellow, American Psychiatric Association (2004)
- Woman's Board Professor of Child and Adolescent Psychiatry, Rush University Medical Center (2004)
- AMA Glaxo Welcome Emerging Leaders Development Program (1998)
- Top Doctor – 1997 - 2001
- Resident Fellowship of The American Psychoanalytic Association (1992)
- Laughlin Fellow, Northwestern University (1991)
- Magna Cum Laude, Syracuse University
- Phi Beta Kappa Honor Society
- Honors Program in Biology, Syracuse University

**PROFESSIONAL SOCIETY MEMBERSHIPS**

American Medical Association
American Academy of Child and Adolescent Psychiatry
American Academy of Psychiatry and the Law
American Psychiatric Association

2

Illinois State Medical Society
Illinois Council of Child and Adolescent Psychiatry
Illinois Psychiatric Association
Chicago Medical Society

**TEACHING EXPERIENCE:**

| | |
|---|---|
| May 2008 – Present | American Psychiatric Association Mentor for psychiatric residents through the Council on Children, Adolescents and Their Families |
| July 2006 – Present | Supervise Rush child and adolescent psychiatry fellows at the Sonia Shankman Orthogenic School (a residential school) |
| July 2002 – Present | Supervise general residents and child and adolescent fellows at Rush University Medical Center |
| July 2002 – Present | Developed forensic rotation at Rush University Medical Center for child and adolescent fellows allowing them to observe forensic evaluations in court, and the Cook County Juvenile Pre-Detention Facility |
| July 2002 – Present | Develop school consult didactics as well as didactics dealing with Autism; Supervise Rush University Medical Center's child and adolescent fellows in their school Autism rotation at the Chicago Metropolitan Easter Seals Therapeutic Day Schools |
| July 2002 - Present | Develop and teach the child and adolescent forensic psychiatry course for child and adolescent psychiatry fellows at University of Illinois at Chicago and Rush University Medical Center |
| July 2002 - Present | Teach and supervise medical students in clinical rotations through child and adolescent psychiatry at Rush University Medical Center |
| March 2001 – July 2002 | Supervise and lecture residents at University of Illinois |
| August 1997 – March 2001 | Teaching and lecturing to general psychiatry residents at Northwestern University |
| August 1997 – March 2001 | Supervise child and adolescent psychiatry residents and general psychiatry residents at Northwestern University |
| August 1994 – 1997 | Provide child and adolescent forensic psychiatry course offered to residents and fellows at the University of Chicago |

August 1993 – 1997      Supervise child and adolescent psychiatry fellows, psychiatry residents and psychology trainees at the University of Chicago

July 1991- July 1992    Supervise psychiatry residents at Northwestern University


**ELECTED POSITIONS:**
June 2008 – Present         Chair, AACAP Delegation to AMA House of Delegates
July 2015 – June 2016       Chair, AMA Council on Science and Public Health
July 2014 – June 2015       Chair Elect, AMA Council on Science and Public Health
2011 – 2013                 Chair, AACAP Assembly
2011 – 2013                 AACAP Executive Committee
July 2008 – June 2016       AMA Council on Science and Public Health
2009 – 2011                 Vice-Chair, AACAP Assembly
2007 – 2009                 AACAP Assembly Treasurer
2007 – 2013                 AACAP Council
2002 – 2004                 AACAP Assembly Representative to the Executive Committee


**REVIEWER:**
Guest Reviewer – Journal of The American Academy of Child and Adolescent Psychiatry
Panelists –AMA Organized Medical Staff on Science and Public Health June 6, 2018
 Guest

**TRAINEES AND MENTOREES:**
2005 – Present                    Ongoing Mentoring for AACAP and APA Mentor Programs
2005 – 2007 (Jada Johnson, MD)    Chair, Psychiatry, Illinois Masonic Hospital
2002 – 2004 (Shiraz Butt, MD)     Medical Director, Maryville Academy
1998 – 2000 (Lucyna Puszkarska,   Medical Director, River Edge Hospital
MD)

**PROFESSIONAL SOCIETY APPOINTMENTS**
May 2015 – Present          American Psychiatric Foundation (APF BOD), Board of Directors

2014 – Present              CMS District 1, Delegate to 2014 Illinois House of Delegates

May 2012 – Present          Chair – Council on Children, Adolescents and Their Families, American Psychiatric Association

May 2012 – May 2014         Chicago Medical Society, District 1 Councilor

May 2012 – May 2013         Chicago Medical Society District 1, Alternate Delegate to Illinois 2013 House of Delegates

November 2010 – June 2011   APA Task Force on Prevention of Bullying.

2009 – Present              APA Political Action Committee (PAC) Board

| | |
|---|---|
| October 2009 – Present | AACAP Committee on Juvenile Justice Reform |
| April 2008 – 2009 | Member APA Council on Children, Adolescents and Their Families. |
| 2008 – Present | AACAP Delegate to AMA House of Delegates |
| May 2007 – Present | Member – Council on Children, Adolescents and Their Families, American Psychiatric Association |
| September 2001 – Present | Co-chairman of the AACAP committee on Juvenile Justice Reform. |
| May 2001 – 2010 | Chairman of the American Psychiatric Association Committee on Juvenile Justice Issues |
| December 2000 – 2007 | AACAP Alternate Delegate to the AMA House of Delegates 2007 |
| June 2000 – June 2002 | President, Illinois Council of Child & Adolescent Psychiatry |
| December 1999 – December 2000 | AACAP Delegate for Young Physicians to the AMA |
| November 1999 – 2001 | Evanston Northwestern Healthcare Child Protection Committee |
| September 1999 – March 2001 | Member, Evanston Mental Health Board, Substance Abuse Task Force |
| June 1999 – 2001 | Member, AMA Advisory Board on Alcohol Intervention Project for Youth |
| January 1999 – January 2003 | Chairman, National Commission on Correctional Health Care, Committee on Juvenile Health Care |
| 1998- 2010 | Member of the American Psychiatric Association Committee on Juvenile Justice Issues |
| October 1998 – Present | Delegate, for The Illinois Council of Child and Adolescent Psychiatry to American Academy of Child and Adolescent Psychiatry (AACAP) |
| September 1998 – 2000 | Clinical Advisor, Chicago Metropolitan Child and Adolescent Comprehensive Community Services Systems Network Advisory Council |
| April 1998 – December 1998 | Vice Chairman, National Commission on Correctional Health Care, Committee on Juvenile Health Care |
| April 1998 – December 1998 | Vice Chairman, National Commission on Correctional Health Care, Task Force for Revision of the NCCHC Standards for Health Services in Juvenile Detention and Confinement Facilities |
| June 1997 – January 1999 | Chairperson of AACAP Committee for New Physicians |

| | |
|---|---|
| June 1997 – January 2003 | Board of Directors, National Commission on Correctional Health Care |
| January 1997 – July 2000 | Program Chairman, Illinois Council for Child and Adolescent Psychiatry |
| July 1995 – July 1996 | Program Chairman for Chicago Society for Adolescent Psychiatry |
| September 1994 – October 1999 | AACAP Committee on Foster and Adoptive Families |
| March 1994 – December 1996 | AACAP Alternate Delegate for Young Physicians to the AMA |

**CONSULTING POSITIONS**

| | |
|---|---|
| January 2013-Present | Federal Consent Decree appointment, Assessment and restructuring of the mental health programming for the Illinois Department of Juvenile Justice (IDJJ) under a Consent Decree filed with the Attorney General's Office by the American Civil Liberties Union (ACLU) of Illinois in December 2012 (RJ v. Bishop) |
| February 2006 – Present | Consultant to the ACLU |
| May 2003 – 2008 | Consultant, United States Department of Juvenile Justice, Civil Rights Division |
| March 2001 – June 2002 | Director, Child and Adolescent Forensic Psychiatry, University of Illinois at Chicago |
| 1993 – Present | Forensic testimony in Juvenile Court (abuse/neglect & delinquency), Family Court focusing on custody and expert testimony in other state and federal cases. Previously worked as an Expert for the Cook County Public Guardian's Office and DCFS. |
| September 1992-1993 | Psychiatrist Chairperson of the Physician Review Board for the City of Chicago, Department of Mental Health – 1992 |
| 1992 – Present | Expert testimony in juvenile and domestic relations courts in a variety of cases ranging from transfer hearings, abuse including Munchausen by Proxy, Child Advocacy Focusing on Custody and "Best Interest" of the Child |
| April 1990 – June 1990 | Psychiatric Consultant to Illinois Youth Center, Joliet, Illinois; General Population and the Intensive Reintegration Unit |
| January 1990 – 1992 | City of Chicago, South East Community Mental Health Center |

**ADMINISTRATIVE SERVICES:**

| | |
|---|---|
| 2011 - Present | Development of the Autism Assessment, Research, Treatment and Services (AARTS) Center at Rush University Medical Center |
| 2006 – Present | Director of the Sonia Shankman Orthogenic School and Rush University Medical Center's clinical rotation for child and adolescent psychiatry fellows at Rush |
| 2006 – Present | Director of Psychiatric Services, Sonia Shankman Orthogenic School |
| 2002 – Present | Chief of Child and Adolescent Psychiatry, Rush University Medical Center |
| 1999 – Present | Medical Director of the Chicago Metropolitan Easter Seals Therapeutic Schools |

**CLINICAL SERVICE:**

| | |
|---|---|
| 2012 - Present | Director, Autism Assessment, Research, Treatment and Services Center at Rush University Medical Center |
| July 2005 – Present | Psychiatric Director Sonia Shankman Orthogenic School at Chicago |
| June 2005 – Present | Psychiatric Consultant to New Trier, Niles North and Niles West High Schools |
| February 2000 – June 2001 | Director, Child and Adolescent and Forensic Psychiatry, University of Illinois at Chicago |
| January 1999 – present | Medical Director, Chicago Metropolitan Easter Seals Therapeutic School |
| September 1998 – Present | Psychiatric Consultant to Evanston Township High School |
| August 1997 – February 2000 | Division Head of Child/Adolescent Psychiatry, Evanston Northwestern Healthcare |
| May 1997 – June 1999 | Psychiatric Consultant to Youth Campus (A DCFS contracting agency) |
| September 1992 – May 1993 | Psychiatrist Chairperson of the Physician Review Board for the City of Chicago, Department of Mental Health – 1992 |
| July 1994 – August 1997 | Assistant Director of Child and Adolescent Inpatient Services, University of Chicago |

**MEDIA**
1. October 26, 1994, Chicago Sun Times, TV-Violence Line Elusive.
2. November 6, 1994, Chicago Tribune, "Mental health tests for kids spark debate;" Screening: Testing

would help parents, supporters say.

3. November 19, 1994, Chicago Tribune, Try Sandifer suspect as kid, experts say.  Louis Kraus testified, "Derrick Hardaway suffers from a *conduct disorder* that developed in his early adolescence because of family tensions, physical abuse and other problems."

4. February 25, 1997, Chicago Tribune, Leniency sought for teen convicted of killing Sandifer.

5. March 13, 1997, Chicago Tribune, Return girl slowly to mom, psychiatrist say.

6. March 30, 1997, Chicago Tribune, Student-Teacher contact is becoming a danger zone. Kraus was quoted to say, "The students are drawn into the relationship because they idolize their teacher and often don't see anything wrong until much later. At that point they might feel depressed and used and have trouble forming relationships."

7. March 25, 1998, Chicago Tribune, 4 pupils, teacher die in schoolyard ambush.

8. March 25, 1998, Chicago Sun Times, Kids ambush kids; Shooting stuns school.

9. March 29, 1998, Violence is linked to genetics, early abuses that set patterns

10. April 6, 1998, Chicago Tribune, Teen smokers a pack short of a carton in wisdom department.

11. June 3, 1998, Toronto, Canada, American Psychiatric Association, The Daily Bulletin, Presidential Sessions on "A Time of Violence."

12. June 1998, Chicago Parenting, "Keeping rage from turning into tragedy."

13. August 14, 1998, Chicago Sun Times, Making Sense of kids' case.

14. August 14, 1998, Chicago Tribune, Young suspects sent home. Dr. Kraus testament was paramount in the 7-year-old being allowed to go home with his family.

15. Possley, M. and Puente, T., "Young Suspects Sent Home", Chicago Tribune, August 14, 1998

16. Kotlowitz, A., "The Unprotected", The New Yorker. February 8, 1999

17. March 7, 1999, Chicago Tribune, Aftermath an ordeal for parents, kids.

18. November 11, 1999, Northwest Herald, Boy who shot clerk sentenced.

19. February 23, 2000, Tribune Allied Health, Safety nets for teens.

20. April 9, 2000, Chicago Tribute, School provides unique antidote for depression.

21. January 30, 2001, Chicago Tribune, Files in Ryan Harris case shed new light. Disclosure of the results of the psychiatric interview changed interview process of minors.

22. December 7, 2001, Psychiatric News, AACAP Kraus was quoted "We certainly disagree with the Supreme Court ruling and believe the death penalty constitutes cruel and unusual punishment."

23. July 9, 2002, Psychiatric News, AMA Vows to Prevent Future Psychologist Prescribing Laws.

24. April 4, 2003, Study Questions Youths' Ability to Understand Trial Process, *Study Implications.*

25. July 18, 2003, Psychiatric News, Psychiatrist Wins AMA Leadership Post: *Psychiatry Scores in HOD*. Kraus argued successfully in favor of an amendment to a resolution asking that the AMA support comprehensive health education for female delinquent, including information on responsible sexual behavior and the prevention of sexually transmitted diseases and HIV/AIDS." Kraus also testified, "Medicaid reaches 44 million Americans, more than Medicare or any other form of health insurance and covers Americans who are among the poorest and most disadvantaged populations in the country."

26. February 13, 2004, Chicago, Metro North Shore, Abuse of cold medicine rising.

27. Tresniowski, A.  Hewitt, B., "Escape from Hell", People Magazine. September 25, 2006

28. Reuters, "Experts say video games not an addiction in AMA Meeting", June 25, 2007

29. Neergaard, L. "Easy nondrug helps ADHD Kids", USA Today. September 3, 2007

30. Tanner, L. "Shock Treatment Sought for Autistic Man", USA Today. September 3, 2007

31. Reuters, "Antidepressant warnings scared parents, doctors", September 9, 2007

32. Fox News, "Study: Brains of ADHD Children Develop More Slowly than Brains of other Youngsters", November 13, 2007

33. Bynum, R., Stobbe, M., "Experts Dubious of Ga. 3rd- Grader Plot", Associated Press. April 2, 2008

34. October 31, 2008, The Wall Street Journal, Therapy, Antidepressants Ease Anxiety in Children.
35. Tanner, L., "Kids with ADHD on meds test better than peers", Associated Press. April 27, 2009
36. Tanner, L., "Jackson kids face hurdles coping with his death, universal trauma of losing a parent may be eased if stability can be offered", Associated Press. July 5, 2009
37. Fox News, "Psychiatrists say Blagojevich's choice to have daughters join him at court may be stressful", July 7, 2010
38. FOX – Judge Jeanine, "8-year Old Boy's Commitment to a Psychiatric Ward", February 19, 2011
39. CNN, Anderson Cooper 360, "KTH: Mass. School called 'house of horrors', May 24, 2012,
40. Fox News Chicago, "Beauty may no longer be in the eye of the beholder", May 10, 2012
41. CNN, Anderson Cooper 360, "Anderson Cooper Investigates Shocking RTC Treatment", June 4, 2012
42. Moran, M. "More research needed on SSRI's for treating Autism Disorders", Psychiatric News. Volume 47, Number 11. June 11, 2012
43. CNN, Anderson Cooper 360, "Crime and Punishment, The Sandusky Trial", June 12, 2012
44. NBC News Chicago, "How to Talk to Your Kids about Conn. Shooting", December 14, 2012
45. Niedowski, E., Tanner, L. "How to Talk to Your Kids about Conn. Shooting", Associated Press. December 15, 2012
46. CNN, Anderson Cooper 360, "Former Child Hostage Describes Captivity Underground", February 4, 2013
47. Fox News Chicago, "Violence has long term effects on children", August 12, 2013
48. England, C. "Helping young adults make the transition", Chicago Medicine Magazine, September 2013
49. Schmadeke, S., "State's youth prison system violates inmates' rights, experts say", Chicago Tribune. September 25, 2013
50. NBC News, "Black Box warning on antidepressants raised suicide attempt", July 18, 2014
51. FOX News, "How far should we go to discipline our kids", September 2014
52. FOX News, "Could a self-esteem booster turn your child into a narcissist?", March 2015
53. Al Jazeera America, "US Only Nation to Imprison Kids for Life," March 2015
54. US Today, "Doctor:  Impact-separating-families tragic June 19, 2018
55. Fox News,  "Medical experts warn that separating children from parents causes psychological damage June 20, 2018
56. March 20, 2019, Chicago Tribune, "Local autism community cheers Amy Schumer's loving disclosure that her husband has a form of autism". Kraus was quoted stating "To have someone like Amy Schumer come out and talk about this is really amazing. I think it will be wonderful for people (with autism) and perhaps generate interest in the dating population about autism"
57. AP News, "Linked by pain: 2 school massacre survivors, dad kill selves", March 25, 2019


**SCIENTIFIC ACTIVITIES**
*a)  Grants*:

| | |
|---|---|
| 2011-Present | Effects of memantine vs. placebo on motor planning and memory in children with autism spectrum disorders. $74,176 |
| 2010 | Rush Women's Board, Assessment of prevalence of Bipolar Disorder in adolescent population in a residential placement, $30,000 |
| April, 1999 | Department of Human Service, State of Illinois Grant – Bridges Program for Development of School and Home-based Therapeutic Services for Adolescents, $100,000 per year |
| March, 1998 | Evanston Northwestern Healthcare Auxiliary Grant for Development of a Community-based Adolescent Mental Health and Substance Abuse |

Program, $1,000,000

**b)  *Research***

| | |
|---|---|
| 2011 – Present | Development of Research Program at the Rush AARTS Center |
| 1984 - 1986 | Research under direction of Max Harry Weil, Ph.D., Chairman, Department of Medicine, University of Health Sciences, The Chicago Medical School, on the reversal of academia during cardiopulmonary resuscitation |
| 1999 – 2001 | Outcomes research focusing on adolescent dual diagnosis; early diagnosis and intervention in a community based treatment program. |

**c)  *Poster Presentations***

Grunewald, S., Kraus, L., Youngkin, S., Wade, K. H., Forburger, N., Owley, T., Loftin, R., Fogg, L. & Soorya, L. (May 2014). *Access to care: Familial and racial variables associated with limited service access for individuals with ASD.* Poster presented at 2014 Annual International Meeting for Autism Research (IMFAR). Atlanta, GA.

Poster Presentation:  APA Meeting, Washington, DC "Monitoring Resident Supervision in Times of Change," May 1992.

**SCHOLARSHIP**

**a)  *Books and Chapters***

1.  Thomas, C.R., Kraus, L.J. "Public Policy Implications of Research on Aggression and Antisocial Behavior", The Origins of Antisocial Behavior.  Oxford University Press, 2012.
2.  Galatzer-Levy, R., Kraus, L., Galatzer-Levy, J., The Scientific Basis of Child Custody Decisions. **Cambridge Press**, 2009.
3.  Kessler, C., Kraus, L, The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007.
4.  Geraghty, R., Kraus, L, Fink, P, "Assessing children's competence to stand trial and to waive Miranda rights: new directions for legal and medical decision-making in juvenile courts" in The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007,
5.  Kraus L, Sobel, H, "Post-adjudicatory assessment of youth" in The Mental Health Needs of Young Offenders. **Cambridge Press**, 2007.
6.  Galatzer-Levy, R., Kraus, L.J., eds, The Scientific Study of Child Custody Decisions, **Wiley Press,** 1999.
7.  Kraus, L, "Understanding the Relationship between Children and Caregivers" in The Scientific Basis of Child Custody Decisions, **Wiley Press**, Ed. Galatzer-Levy R. and Kraus, L 1999.
8.  Leventhal, B. Kelman, J., Galatzer-Levy, R., Kraus, L., "Divorce, Custody, and Visitation in Mid-Childhood" in The Scientific Basis of Child Custody Decisions, **Wiley Press,** Ed. Galatzer-Levy R. and Kraus, L 1999.
9.  Kraus, L.J., Trivedi, H.K. "Adjudicated Youth: Child and Adolescent Psychiatric Clinics of North America" in Clinics Review Articles Volume 25. **Elsevier,** 2016.

**b)  *Peer Reviewed Publications***

1.  1988 Practice Parameter for "Child and Adolescent Forensic Evaluations", Kraus, L, JAACAP, Vol 50,

No.12, Dec. 2011 pp1299-1312.

2. Geraghty, T.F., Kraus, L, "Treating the Mentally-Ill Offender: The Challenge of Creating an Effective, Safe and Just System," **The Journal of Criminal Law and Criminology**, Northwestern University School of Law 89 (1) Fall, 1998.

3. von Planta, M., Gluldipati, R., Weil, M.H., Kraus, L.J., Rackow, E., "Bicarbonate and Tromethamine (Tham) Buffers Fail to Improve Resuscitability During Porcine C.P.R.," **Federation Proceedings 46** (4), 1145, 1987

4. von Planta, M, Gudipati, R., Weil, M.H., Kraus, L.J., Rackow, E., "Effects of Tromethamine and Sodium Bicarbonate Buffers During Cardiac Resuscitation," **Journal of Clinical Pharmacology 28,** 594-599, 1987

*c) Other Publications*

1. Kraus, L., Arroyo, W. "Recommendations for Juvenile Justice Reform, Second Edition", American Academy of Child and Adolescent Psychiatry Committee on Juvenile Justice Reform. October 2005.

2. Kraus, L, Arroyo, W. Editors, "Recommendations for Juvenile Justice Reform", **Monograph**, October 2001, American Academy Child and Adolescent Psychiatry.

3. Kraus, L. "Standards for Juvenile Detention and Confinement Facilities", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.

4. Kraus, L. "Females in the Juvenile Justice System", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.

5. Kraus, L, Morris R. "Seclusion and Restraint Standards in Juvenile Corrections", Recommendations for Juvenile Justice Reform, **Monograph**, October 2001.

6. Kraus, L, "Tackling Juvenile Justice," **AACAP News**, Volume 31, Issue 2, March/April 2000, pp. 75-76.

**PRESENTATIONS:**

American Psychiatric Association, "*Mentally-Healthy Schools in Times of a Pandemic*" Speaker - Wednesday, August 19th, 2020.

Community SAFETY/ & The Future of Illinois' Youth Prisons.  Children and Family Justice Center, "Harm Instead of Healing: Imprisoning Youth with Mental Illness", March 2020.

American Psychiatric Association, "Children & Adolescents In Juvenile Detention", October 7, 2018
Harvard University Conference, "Behind Bars: Health and Human Rights in U.S. Prisons" November 28, 2017
AACAP 64th Annual Meeting, Washington, DC October 23-28, 2017
Keynote Speaker, Eugene J-M.A. Thonar, PhD, Award Presentation, Rush University Medical Center, October 14, 2014

Grand Rounds, Rush University Medical Center, "Psychiatric Malpractice: Dos and Don'ts." May 21, 2014

**Chair**, AACAP Douglas B. Hansen, MD 39th Annual Review Course in Child and Adolescent Psychiatry, *Child and Adolescent Forensic Psychiatry*, Westin Chicago River North, Chicago, IL, March 22-23, 2014.

Autism, Behavioral Challenges and Complex Medical Needs (ABC) Conference, "Making Systems Work Across the Lifespan for Children with Special Needs," *Treatment and Advocacy for the Autistic Teen as they Transition into Adulthood*, Kraus, LJ, Palos Hills, IL November 22, 2013.

11

Illinois State Board of Education, Kraus, LJ, **Keynote Speaker**, "The Complexity of Diagnosis and Behavior of Students Placed Residentially."  November 7, 2013.

Illinois State Board of Education, Kraus, LJ, "Juvenile Justice, Social Maladjustment and Associated Mental Health Disorder: How do we educate this difficult population and what do we do when they get out?" November 7, 2013.

7th Congress of Asian Society for Child and Adolescent Psychiatry & Allied Professions and 12th Biennial Conference of Indian Association for Child and Adolescent Mental Health; Kraus, LJ., **Chair,** "Cyberage and Child Mental Health." September 26, 2013, New Delhi, India.

12th Biennial Conference of Indian Association for Child and Adolescent Mental Health; Kraus, LJ., **Chair**, "Role in the Changing Landscape of Child and Adolescent Psychiatry and Mental Health," September 25, 2013, New Delhi, India.

12th Biennial Conference of Indian Association for Child and Adolescent Mental Health, Kraus, LJ., "DSM-V: Implications for Child and Adolescent Psychiatry," September 25, 2013, New Delhi, India.

Illinois Institute for Continuing Legal Education, IIT Chicago-Kent College of Law, "Cutting Edge Child Custody Symposium", *Professional Training and Requirements*, June 21, 2013.

Illinois Institute for Continuing Legal Education, IIT Chicago-Kent College of Law, "Cutting Edge Child Custody Symposium," *Point and Counterpoint: Adoption of Custody Evaluation Standards*, June 21, 2013.

American Psychiatric Association (APA) Annual Meeting Workshop; "A Career in Child and Adolescent Psychiatry: From a Developmental Perspective." San Francisco, CA May 22, 2013.

Office of Juvenile Justice and Delinquency Prevention in Collaboration with the National Center for Youth in Custody "The Impact of Isolation Practices in Confinement Facilities," National Webinar, April 3, 2013.

19th Judicial Circuit Child Representative/Guardian ad Litem Training, "Psychology of Child Development and Age Appropriate Visitation." College of Lake County, Grayslake, Illinois, September 12, 2012.

Abraxas Education Forums; "The Role of Child and Adolescent Psychiatry in Public and Private Special Education." Woodridge, IL March 30, 2012.

Learning Disabilities Association of America, 49th International Conference, "Dissecting a Bully: Interventions for the Bullied." February 22-25, 2012, Chicago, IL.

APA Annual Meeting, "Wayward Youth Revisited", May 17, 2011, Honolulu, Hawaii.

APA Annual Meeting, "Teen Bullying", May 17, 2011, Honolulu, Hawaii.

ISBA Chicago Regional Meeting (Effective Advocacy for Juveniles with Mental Health Needs) "Diagnosis and Treatment of Mental Health in the Juvenile Justice System", May 11, 2011.

American Academy of Child and Adolescent Psychiatry (AACAP) 57th Annual Meeting, "Variations in State Decisions on Custody" October 29, 2010, NY, NY.

AACAP 57th Annual Meeting, "Role of the Expert in Child & Adolescent Psychiatry Malpractice" October 29, 2010, NY, NY.

AACAP 57th Annual Meeting, "Advocacy for Children with Autism: How to Find the Right Services" October 29, 2010, NY, NY.

ISBA Family Law Section, Springfield, IL. "Custody Evaluations When Children Have Major Psychiatric Disorders", October15, 2010.

ISBA Family Law Section, Chicago, IL. "Custody Evaluations When Children Have Major Psychiatric Disorders", September 23, 2010.


DePaul University College of Law, "Juvenile Competency to Stand Trial and Understand Miranda", April 11, 2009.

Illinois State Bar Association (ISBA) and the Committee on Continuing Legal Education, Attorney Education in Child Custody and Visitation Matters, "Factoring a Child's Development into Custody and Visitation" November 21, 2008.

AACAP Members Forum, Practice Parameter for Child and Adolescent Forensic Evaluations, October 31, 2008.

55th Annual AACAP Meeting Chicago, "The Role of the Child Psychiatrist in Juvenile Competency" October 30, 2008.

Rush University Medical Center, Department of Pediatrics Grand Rounds, "Perspectives on Delinquency, Past and Present", August 12, 2008.

American Medical Association (AMA), "How has science impacted juvenile justice regarding competency, waiver hearings, adjudications, dispositions, and treatment (psychopharmacology)". Annual Meeting, Washington DC, July 2008.

Spring Midwest American Academy of Psychiatry and the Law (AAPL) Meeting, Chicago, IL, "Juvenile Competency to Stand Trial and Understand Miranda," Louis J. Kraus, MD, April 21, 2007.

National APA Meeting in San Diego, "Workshop on Juvenile Justice Presentation on Child Competency to Stand Trial and Understand Miranda. May 2007.

53rd Annual American Academy of Child & Adolescent Psychiatry, San Diego, CA, "The Psychiatrist's Role in Child Custody: A Mock Hearing," Louis J. Kraus, MD, October 28, 2006.

Rush University Medical Center, Department of Psychiatry Grand Rounds, "Capital Punishment for Teenagers – The Recent Supreme Court Decision Roper v Simmons: Discussion and Forensic Application of Current Neuroimaging Research on Teenagers ", April 20, 2005.

Cambridge Hospital, Department of Psychiatry Grand Rounds, "Juvenile Delinquency", September 2004

AACAP National Meeting, San Francisco – Symposium – "Addressing the Needs of Behavior Disordered Children Within the School System", San Francisco, CA, October 25, 2002.

University of Chicago – Workshop "Early Onset Bipolar Disorder", December 14, 2001.

Juvenile Justice Reform – Media Workshop, National AACAP meeting, Honolulu, Hawaii, October 2001.

Hephzibah Children's Association – Workshop "Child and Adolescent Psychiatric Diagnoses and Medications" September 28, 2001

A&E Television Broadcast on "Shattered Innocence - Fells Acres Abuse Case", August 8, 2001

15th Annual Statewide Forensic Conference, October 16-17, 2000 Loyola University Chicago, Illinois Department of Human Services

Speaking engagements at parent groups, managed care meetings, University of Chicago, the Department of Corrections and Probation

Media interviews on television, radio and in newspapers and various publications.

American Psychiatric Association – "Littleton – One Year Later, The Assessment of the Potentially Violent Child Within The School System," May 15, 2000.

Institute of Psychoanalysis, Conference on Youth and Violence, "Diagnosis and Treatment of Delinquents in a Maximum Security Youth Center," May 12, 2000

Evanston Northwestern Healthcare – Pediatric Grand Rounds, "Connections Program – Development of a Community-Based Adolescent Alcohol and Drug Treatment Program," May 2, 2000.

Evanston Northwestern Healthcare – Pediatric Grand Rounds, "ADHD, Differential Diagnosis and Treatment" April 4, 2000.

New Trier High School – Peer Helping, "Adolescent Youth Violence," March 2, 2000.

Response Center, Skokie, IL, "Adolescent School Violence," February 16, 2000.

Chicago Bar Association Matrimonial Law Committee, "Physical, Mental and Emotional Abuse in Custody Cases," February 14, 2000.

Cook County Public Guardian's Office, "Domestic Violence and How It Affects Children," January 31, 2000.

Illinois Psychological Association, "Assessment of Violence in Children and Adolescents, November 11, 1999.

New Trier Township, "School Violence - Treatment and Community Intervention," May 12, 1999.
Shand Morahan Worksite Lunch Program, "Signs of ADD/ADHD and Possible Treatment," April 21, 1999.

Evanston Northwestern Healthcare Health Watch Program, "Childhood Attention Deficit Disorder: Treatment Options," April 7, 1999.

Evanston Northwestern Healthcare, Department of Psychiatry, Professional Conferences, "School Violence," April 6, 1999.

The Warren Wright Adolescent Center, Stone Institute of Psychiatry, Northwestern Memorial Hospital, "Violence in Schools," November 6, 1998.

Institute for Women's Health, Evanston Northwestern Healthcare "Helping Kids Cope with Divorce," October 1998.

Illinois Society of Child and Adolescent Psychiatry, "Juvenile Transfer Hearings – The Psychiatric Evaluation," October 1998.

APA Meeting, Toronto, Ontario, Canada, "Treatment of Severe Delinquents in a Maximum Security Youth Center," June 1998.

Evanston Northwestern Healthcare Pediatric Lecture Series, "The Continuum of Behavior Disorders," April 1998.

Evanston Northwestern Healthcare Department of Psychiatry, Professional Conferences, "Transfer Hearings in Juvenile Court: Evaluation of Behavior Disordered Youth," January 1998.

Evanston Northwestern Healthcare Department of Psychiatry, Professional Conferences, "The Use of Attachment Theory in Custody Evaluations," January 1998.

Juvenile Justice Division of the Circuit Court of Cook County, "Psychiatric Assessments in Juvenile Justice Cases," June 1997.

Chicago Bar Association-Juvenile Law Committee, "Utilizing Psychiatric Evaluations In Juvenile Justice Cases: Transfer And Dispositional Hearings," February 1997.

Genesis Schools/Illinois Association of Counsel for Children, "Helping Incarcerated Youth Overcome Delinquency and Mental Illness," December 1996.

University of Chicago, Laboratory School Lower School Parents Association Lecture Series, "Is My Child's Behavior Normal?" November 1995.

CAUSES - Illinois Masonic Hospital, "Attachment Theory In The Use Of Bonding Evaluations," September 1995.

Illinois Probation and Court Services 1995 Annual Spring Conference, "Kids Killing Kids," March 1995.

Grand Rounds: Columbus Hospital Department of Pediatrics.  "Delinquency, Etiology and Intervention," July 1994.

Cook County Juvenile Court, Office of the Public Guardian.  "Munchausen By Proxy," July 1994.

Columbus Hospital, Department of Pediatrics Grand Rounds, "Delinquency, Risk Factors, and Interventions," July 1994.

International Correctional Education Association Conference, Chicago " Attention Deficit Hyperactivity Disorder," May 1993.

The American Psychoanalytic Association National Conference, New York, "Attachment Theory - Forensic Implications for Best Interest of the Child," December 1993.

Poster Presentation:  APA Meeting, Washington, DC "Monitoring Resident Supervision in Times of Change," May 1992.

The University of Health Sciences, The Chicago Medical School, "Effects of Tham and NaHCO3 on Acid Base Balance During CPR," 1984.

Presentation: Lake County Bar Association Seminar, "Preparing a Client for a 604.10 Evaluation and/or Mediation," April 23, 2021.

# **Appendix B**

## List of Documents Reviewed

**ADDENDUM B**

**Documents Reviewed**

- Stipulation for Entry on Land for Inspection and Confidential and Privileged Client and Putative Class Member Interviews
- Class Action Complaint for Declaratory and Injunctive Relief, dated 5/8/2019
- First Amended Class Action Complaint for Declaratory and Injunctive Relief
- Procedures for Health Services for Inmates in Special Housing
- Procedures for Designation of Youthful Offenders, Young Adult Offenders, and Youthful Offender Facilities
- Procedures for Academic Education Programs
- Procedures for Special Education Services
- Procedures for Isolation Management Rooms and Observation Cells
- Procedures for Title 1 Program
- Administrative rules about Disciplinary Confinement, Administrative Confinement, and Close Management
- Health Services Bulletin No. 15.05.10; Psychiatric Restraint
- Health Services Bulletin No. 15.05.11; Planning and Implementation of Individualized Mental Health Services
- Health Services Bulletin No. 15.05.13; Mental Health Staff on Disciplinary Teams
- Health Services Bulletin No. 15.03.13; Assignment of Health Classification Grades to Inmates
- Technical Instruction No. 15.05.08; Mental Health Services for Inmates Who Are Assigned to Confinement, Protective Management, or Close Management Status
- Commission of Accreditation for Corrections; Standards Compliance Reaccreditation Audit 9/21/28-9/21/18
- Youthful Offender Restricted Housing Summary
- 2015-2016 Exceptional Student Education Monitoring and Assistance On-Site Visit Report
- 2017-2018 Exceptional Student Education Monitoring and Assistance On-Site Visit Report
- Defendant, Florida Department of Corrections' Notice of Service of Third Supplemental Responses to Plaintiff Espinosa's First Set of Interrogatories

1

- ███████████████████████████████████████
- ████████████████████████████████████████████
- Medical and Mental Health Records for the youth and young adults interviewed