UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAC'QUANN (ADMIRE)
HARVARD; JEREMIAH HILL;
JUAN ESPINOSA; JEROME
BURGESS (a/k/a SHAM'LA GOD
ALLAH); JAMES W.
KENDRICK, JR.; JOHNNY HILL;
and AMY FERGUSON; on behalf
of themselves and all others
similarly situated,

          Plaintiffs

          v.

MARK INCH, in his official
capacity as Secretary of the Florida
Department of Corrections, and
FLORIDA DEPARTMENT OF
CORRECTIONS, an Agency of the
State of Florida

          Defendants.

Case No.: 4:19-cv-00212-MW-MAF

**DECLARATION OF DAN
PACHOLKE IN SUPPORT OF
PLAINTIFFS' MOTION FOR
CLASS CERTIFICATION**

I, Dan Pacholke, declare as follows:

1.     This declaration has been prepared at the request of Plaintiffs' counsel in the above captioned action regarding their motion for class certification.  It is my opinion that the code, policies, and practices governing operations in the restrictive housing/confinement units[1] at the Florida Department of Corrections (FDC) create a culture and practice of unnecessary deprivation and abuse.  The conditions in FDC restrictive housing have negative impacts on inmates and do not serve the penological goals of rehabilitation and maintaining safe and secure facilities.  Further, staff and management are not held accountable for their actions or held to the professional standards necessary to fulfill the correctional duty to protect those in their custody in restrictive housing.  The state of deprivation makes the conditions in FDC restrictive housing unnecessarily stark, intensifying the already negative impacts of segregation and leading to less-safe prison facilities for those who work and live there.

## I.     Summary of Qualifications

2.     I have thirty-five (35) years of experience and related training and education in the field of adult institutional corrections.  This experience includes eight years in administration in the Washington State Department of Corrections

---

[1] As further detailed below, based on the conditions of confinement in which inmates live and the restricted nature of out-of-cell activity, the Administrative Confinement, Disciplinary Confinement, Close Management, and Maximum Management units used by FDC are forms of restricted housing that fall within what is generally understood to be "solitary confinement" or "segregation."  For the purposes of this declaration, I will refer to all these types of confinement as "restrictive housing."

(WADOC), including as Secretary, Deputy Secretary, Director Prisons, and Deputy Director Prisons, as well as more than twenty years in other corrections positions as follows: Correctional Officer (2.5 years); Lieutenant (3 years); Captain (6 years); Superintendent (5 years); Director of Performance Management (4 years). I have performed consulting and expert work in over 20 states and six jurisdictions outside of the continental United States.

3.      My correctional experience included responsibility for, and a focus on, people housed in conditions that in FDC are referred to as restrictive housing. As a Correctional Sergeant and Captain, I directly managed segregation units, which are what FDC refers to as "restrictive housing." As a Superintendent and Deputy Director, I led efforts to reform the system-wide use of long-term segregation in Washington State, which resulted in an over 50% decrease in the number of people housed in this setting, while also lowering system-wide violence for eight consecutive years. This effort is described in more detail in a U.S Department of Justice policy paper I co-authored, "More than Emptying Beds: A Systems Approach to Segregation Reform."[2]

4.      I have served as a trainer and consultant with the National Institute Corrections and Defense Technology Corporation, and New York University.

---

[2] Dan Pacholke & Sandy Felkey Mullins, *More Than Emptying Beds: A Systems Approach to Segregation Reform*, U.S. Dep't of Justice (May 2016), *available at* https://www.bja.gov/publications/MorethanEmptyingBeds.pdf.

With these agencies I provided training nationally in emergency operations, security management, leadership, and correctional reform development and implementation.  At New York University, I was also co-director of Segregation Solutions, an initiative that assisted correctional agencies to reduce the use of segregation while also maintaining or improving safety in prison facilities.

5.     I am currently a consultant for the U.S. Department of Justice Civil Rights Division advising in their investigations of two state correctional agencies.

6.     I have published a number of articles related to corrections and segregation, to include prison safety, restricted housing reform, crisis management and innovative programs.

7.     I have served as an expert witness and correctional consultant for cases and disputes. I have testified in the following cases:

    a.   *Strange v. The District of Columbia* (Civil No. 2016 CA 001250 B. Sup. Ct. D.C. Civil Division).

    b.   *Hampton v. Lashbrook, et al.* (Civil No. 3:17-cv-00936-DHR. U.S. Dist. Ct. Southern Dist. of IL).

    c.   *Hall v. Wetzel*, *et al.* (Civil No. 17-CV-4738 U.S. Dist. Ct. Eastern Dist. of PA).

    d.   *Flores v. Morris et al.* (No. 16-02756. U.S. Dist. Ct. Dist. of AZ).

e. *White v. Stephens et al*. (Case No. A16CV059. U.S. Dist. Ct. Western Dist. of TX).

f. *H'Shaka v. O'Gorman et al*. (Case No. 9:17-cv-00108GTS-ATB. U.S. Dist. Ct. Northern Dist. of NY).

g. *Vermillion v. Levenhagen, et al*. (Case No. 1:15-cv605-RLY-TAB. U.S. Dist. Ct. Southern Dist. of IN).

h. *Tay Tay v. Baldwin, et al.* (Case No. 19-cv-501. U.S. Dist. Ct. Southern Dist. of IL).

i. *Tate v. Wexford Health Services INC., et al.* (Case No. 16-cv-92. U.S. Dist. Ct. Southern Dist. of IL).

j. *Sanders v. Moss, et al.* (Case No. 16-cv-01366-JBM. U.S. Dist. Ct. Central Dist. of IL).

k. *Monroe v. Baldwin, et al*. (Case No. 19-CV-01060. U.S. Dist. Ct. Central Dist. of IL).

l. *Hampton v. Baldwin, et al.* Case No. 3:18-CV-550-NJR-RJD. U.S. Dist. Ct. Southern Dist. of IL.).

m. *Fletcher v. Whittington, et al.* Case No. 5:18-cv-01153-SMH-KLH. U.S. Dist. Ct. Western Dist. of LA.).

n. *Harvard, et al v. Inch, et al.* (Case No. 4:19-cv00212-MW-CAS. U.S. Dist. Ct. Northern Dist. of FL).

o. *Tellis, et al v. LeBlanc, et al.* (CIVIL ACTION No. 5:18-cv-0541.

U.S. Dist. Ct. Western Dist. of LA).

8.     Several of these cases involved issues similar to those in this case,
specifically *H'Shaka v. O'Gorman, et al*, *Vermillion v. Levenhagen, et al*, and
*Sanders v. Moss, et al*.  Likewise, I have recently consulted in an investigation and
litigation addressing system-wide issues regarding long term restricted housing in
two states.

9.     A complete copy of my curriculum vitae is attached as Appendix A.

10.     As an expert in penology, I have been asked by Plaintiffs' counsel to
offer my opinions about whether FDC policies, procedures, and practices with
regard to the management, placement, retention, and conditions of confinement in
restrictive housing comply with generally accepted correctional practices,
principles and standards.

## II.     Bases for My Opinions

11.     I have reviewed and analyzed a large variety of materials in
preparation for this declaration.  These materials include documents related to
Plaintiffs' and others' experiences as inmates in Maximum Management, Close
Management, Disciplinary Confinement, and Administrative Confinement at FDC
facilities.  I also reviewed materials related to the management of restrictive
housing units within FDC that included, among other documents, Florida

Administrative Code, inmate handbooks, emails, Daily Records of Special Housing, meeting minutes, and depositions.  A list of the materials I reviewed is attached to this declaration as Appendix B.

12.  I participated in facility tours and inmate interviews at six institutions:

a.  Florida State Prison (09.15.20 & 09.16.20): I conducted twenty-two (22) inmate interviews at the cell doors and an additional ten (10) interviews one-on-one in the gymnasium.

b.  Santa Rosa Correctional Institution (10.13.20 - 10.15.20): I conducted forty-seven (47) inmate interviews at the cell doors and an additional fifteen (15) interviews one-on-one in an office.

c.  Lowell Correctional Institution (11.17.20 & 11.18.20): I conducted eighteen (18) inmate interviews at the cell doors and an additional ten (10) one-on-one interviews in an office.

d.  Suwannee Correctional Institution (12.08.20 & 12.09.20): I conducted forty-six (46) inmate interviews at the cell doors and an additional ten (10) one-on-one interviews in an office.

e.  Hamilton Correctional Institution (02.09.21 & 02.10.21): I conducted fourteen (14) inmate interviews at the cell doors and an additional ten (10) one-on-one interviews in an office.

      f.   Union Correctional Institution (02.11.21 & 02.12.21): I conducted twenty-five (25) inmate interviews at the cell doors and an additional ten (10) one-on-one interviews in an office.

13.    The cell-side interviews were random in that I would walk the tiers and speak with inmates who were willing to speak to me.  For the private interviews, I focused on named plaintiffs and inmates who had served long sentences on Close Management; however, I also spoke with people serving shorter stays on Administrative or Disciplinary Confinement.  Additionally, after speaking with inmates at their cells, I selected some for private follow-up interviews who shared information requiring further detail.

14.    In preparing this declaration, I also relied upon my 35 years of correctional experience and related training and education, as described above.

15.    My work on this matter is ongoing and my opinions are partial and preliminary, based on the available information I have reviewed to date.  It is my understanding that additional documents and information will be forthcoming during the course of this litigation.  I am confident in the preliminary opinions contained in this declaration, and I anticipate that these opinions will be further developed and supplemented as more information becomes available.

III.        Opinions

### Use of Segregated Housing Nationally

16.     For decades, efforts have steadily increased to understand and mitigate the use and negative impacts of segregation.  This is largely in response to an ever-growing body of research on the effects of segregation, especially long term use of segregation, on the inmates living in these conditions.  Another motivator is cost.  When segregation units are properly managed, they are the most expensive beds in a correctional system due to the more intensive staff resources necessary to cover checks, escorts, meal and deliveries, and other security measures.  In recent years, most states have taken measures to reduce the percentage of the inmate population in these beds and reduce the amount of time those in segregation spend there.[3]

17.     In Washington State, our acuity around this issue was initially informed by the work of Dr. David Lovell and Dr. Lorna Rhodes from the University of Washington, beginning with a study they published in 2000 examining who we were keeping in segregation.[4]  Washington State was not alone

---

[3] The Ass'n of State Corr. Adm'rs & The Liman Ctr. For Pub. Interest Law at Yale Law Sch., *Reforming Restrictive Housing: The 2018 ASCA-Liman Nationwide Survey of Time-in-Cell* 60-65, 119-122 (2018); Eli Hager & Gerald Rich, *Shifting Away from Solitary: More States Have Passed Solitary Confinement Reforms This Year Than in the Past 16 Years*, The Marshall Project (Dec. 23, 2014), https://www.themarshallproject.org/2014/12/23/shifting-away-from-solitary; *See Safe Alternatives to Segregation Initiative: Findings and Recommendations*, Vera Inst. of Justice (May 2019), https://www.vera.org/publications/safe-alternatives-segregation-initiative-findings-recommendations.

[4] David Lovell et al., *Who Lives in Super-Maximum Custody? A Washington State Study*, 64 Fed. Probation 33 (2000).

in these efforts.  Across the country, many states and the federal government have initiated policies to reduce the use of segregation, building on the growing recognition that long-term isolation is harmful, counterproductive, and costly.[5]

18.     Nationally, prominent mental health professionals have been writing about the psychological impacts of segregation since at least the late 1980s. Among other organizations monitoring carceral conditions, Human Rights Watch issued a report in 1997, "Cold Storage: Super-Maximum Security Confinement in Indiana,"[6] which criticized the operations of both super-max facilities operated by the Indiana Department of Corrections and assessed how they failed to comply with human rights standards in the hope of "assist(ing) the people and government of Indiana evaluate their legality, wisdom, and impact."[7]  This report made recommendations for segregation reform in the treatment and conditions of confinement for mentally ill prisoners, lengths of stay, improvements in physical conditions at the facilities, use of "harsh and counterproductive practices," and monitoring.[8]  The National Institute of Corrections has been offering training on the effects of restrictive housing since the early 2000s.

---

[5] Léon Digard et al., *Rethinking Restrictive Housing Lessons from Five U.S. Jail and Prison Systems*, Vera Inst. of Justice 5-8 (May 2018), *available at* https://www.vera.org/publications/rethinking-restrictive-housing.
[6] Human Rights Watch, *Cold Storage: Super-Maximum Security Confinement in Indiana* (Oct. 1997), *available at* https://www.hrw.org/legacy/reports/1997/usind/.
[7] *Id.* at 3.
[8] *Id.* at 7-9.

19.     After decades of this work, there is no shortage of notice for any U.S. correctional system that they must monitor and reform their segregation practices if they are to meet the evolving standards of decency.  In 2013, the Association of State Correctional Administrators (ASCA), now called the Correctional Leaders Association, issued Restrictive Status Housing Policy Guidelines.[9]  In 2016, the U.S. Department of Justice also issued a set of guiding principles on the use of restrictive housing and stated that segregation should be used only as a last resort, when "officials conclude, based on evidence, that no other form of housing will ensure the inmate's safety and the safety of staff, other inmates, and the public."[10] Also in 2016, the American Correctional Association (ACA) adopted new performance-based standards[11] for the use of restricted housing.  The latest edition (5th) of the ACA standards fully incorporates the new segregation standards.[12]

20.     The ACA is a professional organization for people who work in the field of corrections.  In addition to professional development opportunities, they develop standards for correctional facilities and promote an accreditation process. ACA standards do not represent innovative national practices, but, instead set the

---

[9] *Restrictive Status Housing Policy Guidelines*, Ass'n of State Corr. Adm'rs (Aug. 9, 2013), *available at* https://leg.mt.gov/content/Committees/Interim/2017-2018/Law-and-Justice/Meetings/May-2018/Exhibits/asca-policy-guidelines-sj25-ljic-may-2018.pdf.

[10] *Report and Recommendations Concerning the Use of Restrictive Housing*, U.S. Dep't of Justice 98 (Jan. 2016), *available at* https://www.justice.gov/dag/file/815551/download.

[11] The full 2016 standards are available online at www.aca.org. Select "Standards & Accreditation," then "Standards & Committees," and then select "Restrictive Housing Committee."

[12] American Correctional Association, *Performance-Based Standards and Expected Standards for Adult Correctional Institutions* 135 (5th ed. 2021).

basic practices in which all correctional systems should operate at minimum.  The guidelines and the standards reflect several decades of research, litigation, correctional trade publication articles and discussion at conferences, training events, and national and regional correctional professional meetings.  In my experience, ACA accreditation does not necessarily guarantee safe and humane operations in practice, but it is one method to ensure that an agency has met the most basic measures of safe and humane operations in its written policies and procedures, as agreed upon by a consensus of U.S. correctional professionals.

21.    In addition to guidance on discipline, mental health, and other aspects impacting people in segregation, the latest edition of the ACA standards include direction for stepdown programs.  New standard (5-ACI-4B-31) requires that by October 1, 2020, stepdown programs are offered to prisoners in Extended Restrictive Housing that include monthly evaluations using a multidisciplinary approach to gradually increase group interactions, out-of-cell time, programming, and privileges.[13]  ACA defines Multidisciplinary Service Teams as a provider of "integrated services by assessing a prisoner's needs; developing an individualized plan and ensuring that services are delivered in an effective manner to assist the prisoner in transition to general population or the community."[14]  ASCA's 2013 Guidelines also suggested that systems "provide structured and progressive levels

---

[13] Id. at 304.
[14] Id.

that include increased privileges as an incentive for positive behavior and/or program participation."[15]

22.     Educational and other programs can help address underlying criminogenic needs, which are the factors that research has found most directly relate to an individual's likelihood to re-offend.  Of these, anti-social values, anti-social personality, criminal peers, dysfunctional family, low self-control, substance abuse, and a lack of a prosocial way to occupy one's time, such as work or school, are the criminogenic needs that if addressed, make the biggest impact on future criminal behavior.  These programs provide participants with new skills in order for them to live more productively in general population or when released and they allow an inmate to demonstrate a willingness to change.  These programs are even more important in indefinite placements in segregation, usually intended to be used for prisoners that pose the highest safety and security risks to the institution. Without meaningful programs, the facility or system has by default decided that merely residing in segregation for an undefined period of time will correct the deficit that got prisoners there in the first place, in effect, which is not consistent with rehabilitation.

23.     Congregate activities give prisoners a chance to interact with others, reducing isolation and helping to mitigate the negative psychological impacts of

---

[15] Ass'n of State Corr. Adm'rs, *supra* note 9, at 2.

segregation.  These activities are also necessary for assessing their behavior around others, e.g., do they interact appropriately with the instructors and engage in prosocial practices with their peers in the classroom?  Observations about these interactions are an important part of the segregation review process.  Without these opportunities, correctional professionals lack the information they need to adequately assess a prisoner's current abilities and limitations in interacting with other people.

24.    Current accepted practices also include use of structured and progressive levels that include increased privileges as an incentive for positive behavior and/or program participation.[16]  Providing incentives for positive behavior is more effective than only addressing negative behavior.  Managing prisoner behavior is central to the work of corrections.  Providing decent and humane conditions, being fair, and meeting the legitimate needs of prisoners is the primary way correctional systems deter unwanted behavior.  For individuals who demonstrate challenging behavior, there is consensus in the field that there are far more effective ways to manage and modify behavior than segregation.  In my experience, overly harsh discipline, especially involving long terms of segregation, disconnection from family and support systems, and increased idleness, makes behavior worse and decreases facility and community safety.

---

[16] Digard et al., *supra* note 5, at 33; Ass'n of State Corr. Adm'rs, *supra* note 9, at 2.

### FDC's Use of Restrictive Housing

25.    As an initial matter, based on my review, FDC's Central Office promulgates policies that are generally implemented uniformly statewide.  Any differences between the institutions and types of isolation are insignificant.  All forms of segregation in FDC (AC, DC, CM, and MM) by policy or practice meet the definition of "solitary confinement" or "restrictive housing" as defined by the U.S. Department of Justice[17] and ACA.[18]

26.    ***Leaving Segregation.***  FDC policies, heavy in process, give the semblance of fair placement and review processes.  There are many levels of approval and inmates are allowed to offer verbal, written, or in-person input.  They are, however, unfair, at the most fundamental level, as these reviews fail to offer inmates a pathway out of segregation.  Giving an inmate regular reviews without offering benchmarks and appropriate support to meet those benchmarks leaves the inmate with little hope or motivation to change, especially for those in the indefinite status of CM.  The Institutional Classification Team (ICT) is not required to set goals for the inmate to meet before the next review to demonstrate their readiness to move to a lower custody level.  Inmates are not offered a course of programming to assist in their transition.  In AC, DC, and CM, an ICT member

---

[17] U.S. Dep't of Justice, *supra* note 10, at 3 ("[1] removal from the general inmate population, whether voluntary or involuntary; [2] placement in a locked room or cell, whether alone or with another inmate; and [3] inability to leave the room or cell for the vast majority of the day, typically 22 hours or more.").

[18] American Correctional Association, *supra* note 12, at 309. ("Restrictive Housing - a placement that requires an inmate to be confined to a cell at least 22 hours per day for the safe and secure operation of a facility.").

is required to frequently review inmates for the purpose of reducing the inmate's status to the lowest management level or returning the inmate to the general population when it can be done so safely.[19]  Here again, it is not clear what is supposed to inform this decision.  With no opportunity to demonstrate their readiness for a lower custody status, the ICT member can only rely on past behavior and even if the inmate is infraction free, how long must they remain so before they are deemed safe to return to general population?  For inmates in AC for protective custody, what is FDC doing to help them feel and be safe so they can return to the general population?

27.     The importance of providing support and a clear pathway out of segregation was affirmed in a 2020 report by Florida State University.[20]  Their research found that FDC inmates who released to the community directly from long-term segregation, specifically CM1, had an increased likelihood of recidivating than those who released from general population or a less restrictive CM status following an initial stay in CM1.  They found no evidence of CM1 placement having a beneficial effect on recidivism.[21]  This is not surprising given the lack of programming or group activity provided to people who are released

---

[19] DHA00027140 (FAC 33-602.220), DHA00026774 (FAC 33-602.222), & DHA0000089 (FAC 33-602.800).
[20] Daniel P. Mears et al., *Impacts of Restrictive Housing on Inmate Behavior, Mental Health, and Recidivism, and Prison Systems and Personnel*, Nat'l Inst. of Justice (Jan. 2021), *available at* https://www.ojp.gov/pdffiles1/nij/grants/256000.pdf?utm_content=default&utm_medium=email&utm_source=govdelivery.
[21] *Id.* at v.

directly to the community.  There does not appear to be any effort to reintegrate people back into general population for even a modest period of time prior to release to the community.

28.     The Florida State researchers conducted focus groups with prison staff and administrators at ten FDC facilities and almost all of these groups recommended improving inmate review protocols to ensure that inmates who warrant restrictive placement go there and that inmates who do not warrant this placement do not.  They specifically noted that the rules mandate CM1 in certain situations regardless of the inmate's level of involvement.[22]

29.     Using multidisciplinary review teams that can assess an inmate's treatment and programming needs in addition to security concerns has become a standard practice among state correctional agencies to conduct regular and holistic reviews of people in segregation and provide them with a pathway to a lower custody level.  The latest edition of the ACA Standards creates several standards requiring use of multidisciplinary service teams.  Standard 5-ACI-4B-31 requires that stepdown programs are offered to prisoners in extended restrictive housing to facilitate the reintegration of the inmate back into general population or the community and that this includes a coordinated multidisciplinary team approach that includes mental health, case management, and security practitioners, among

---

[22] *Id.* at 28.

other requirements.[23]  Using multidisciplinary teams that include treatment and

programming staff to review segregation placements, or at least using these teams

in tandem with the ICT to provide guidance and support for the inmate releasing to

a lower custody level is consistent with current correctional practices as it supports

the safety of staff and prisoners and the penological goal of rehabilitation.

30.     FDC's ICTs used to review segregation placements are not

multidisciplinary review teams.  Requiring only the Warden or Assistant Warden,

Classification Supervisor, and Chief of Security to be members of the ICT leaves it

unequipped to fulfill its stated purpose: making work, program, housing, and

inmate status decisions.  Although the ICT is required to review reports from

mental health staff, there is no requirement that a mental health professional sit on

the team.  Likewise, there are no staff on the team representing the inmate's

treatment or programming needs, all of which should be considered in reviewing

segregation placements.[24]  A multidisciplinary service team is only used in CM to

develop an Individualized Service Plan *if* deemed necessary by mental health staff.

It appears to be linked specifically to the provision of mental health services, is

reviewed every 180 days after the 120 review, can be closed if mental health staff

---

[23] *Id.* at 135.

[24] The lack of focus on the inmate's programming needs may be a result of lack of programming options for inmates in restrictive housing, as I discuss in more detail below.

determine that care is no longer necessary, and is not required to be considered in the ICT reviews.[25]

### FDC Restrictive Housing Conditions

31.    ***Overly Punitive and Easy to Fail***.  FDC segregation is a highly regimented system, with requirements rarely found in correctional institutions in modern time.  For example, confinement cell inspections occur twice daily. Inmates must remain quiet when a staff enters the wing and they may only talk to staff if they are in front of their cell.  Depending on the facility, bunks need to be made as early as 5 am and must remain so until 4 pm, despite the fact that inmates spend up to 24 hours in their cell.[26]  As spelled out in the Santa Rosa Inmate Handbook, "class A" uniforms (blue shirt, blue pants, and authorized footwear) are required to be worn between the hours of 7:00 AM to 4:00 PM Monday through Friday.  Bunks are to be made by 7:00 AM excluding weekends and holidays with a six-inch white collar and to remain so until 4:00 PM.  The handbook directs that "(i)nmates are to conduct themselves in a quiet and orderly manner at all times," that "(t)here will be no talking between cells at any time," and that they "are not permitted to yell at staff members to gain their attention unless it is a true emergency."[27]  At Lowell Correctional Institution, "(i)nmates are not permitted to

---

[25] DHA00000093 (FAC 601.800).
[26] MED00000461, DHA00190079.
[27] DHA00190079-DHA00190079.

talk or in any way attempt to communicate with other inmates while being escorted outside of their cell" which "includes but is not limited to showers, haircuts, recreation, hearings, callouts, appointments and work/education assessments."[28]

32.     While there is nothing wrong with requiring that inmates keep their cells neat, these specific and rigid expectations, especially in segregation units, set inmates up to fail.  For example, inmates in these housing units are expected to dress and straighten their beds for inspection as if they were actually leaving their cell, when in reality, they are more likely to be in their cell all day than they are to even go to recreation or to shower.  Many inmates I interviewed, especially at Florida State Prison and Santa Rosa, described receiving disciplinary reports for minor transgressions, such as failing to make a bed, that could result in loss of privileges or even placement on property restriction (also known as strip status, a form of informal discipline which I will discuss later in this declaration).  Even more troubling, these otherwise benign infractions can also lead to a longer stay in segregation, even though these transgressions say little about readiness to progress to a lower custody level.  These types of requirements are highly punitive, are not grounded in modern penological justifications, and exacerbate the negative environment of deprivation and abuse in FDC's confinement units.

---

[28] DHA00027047.

33.   ***Access to Natural Light***.  ACA Standard 5-ACI-2D-03 requires that all inmate rooms or cells provide access to natural light[29] and ACA Standard 5-ACI-4B-04 requires that restrictive Housing units provide living conditions that approximate those of the general inmate population with all exceptions clearly documented.[30]  FDC policy and practice does not meet these standards.  In FDC's AC & DC cells, FDC policy just states that when sufficient natural light is unavailable, interior cells lights shall be left on during day and evening hours.[31]  Administrative code on CM and on Maximum Management are silent as to the natural light requirements for these cells.[32]  Many of the cells in the segregation units I toured had rear windows that had been made opaque so the inmates couldn't see out and inmates are not allowed to stand at the front windows where they might have seen natural light in the unit.  The lack of natural light, especially given that most inmates in AC, DC, CMI, CMII, Maximum Management, and CMIII (in practice though not in policy) spend almost every hour of every day in their cell, is disorienting and cruel.

34.   ***Maintenance and Cleanliness.***  In my facility tours, I found most facilities to be in poor shape.  I saw rodents, toilets that looked like there was moss growing from the bottom, and other toilets leaking so badly that inmates built dams

---

[29] American Correctional Association, *supra* note 12, at 61.
[30] *Id*. at 124.
[31] DHA00027136 (FAC 33-602.220) & DHA00026770 (FAC 33-602.222).
[32] FAC 33-601.800 & FAC 33-601.820.

around them out of towels and socks.  It is unacceptable to not maintain the toilets in a prison facility, especially the toilets in a cell that people must live in up to 24 hours a day.  Other than the damaged toilets, the inmates' cells were cleaner than the dayrooms and showers.  It was obvious in almost every facility that new paint had just been applied and the inmates told us that by the new paint and new shirts they had been issued, they knew someone was coming.  Of all the facilities, Union, which I believe is the oldest facility we toured, was the only one that I observed as neat and well-kept.

35.    ***Communication With and Observation by Staff***.  ACA Standard 5-ACI-4B-04 requires that restrictive housing cells permit the inmates assigned to them to converse with and be observed by staff members.[33]  AC, DC, and CM cells are required to permit verbal communication and unobstructed observation by staff.[34]  The administrative code is silent as to the staff communication and observation requirements in Maximum Management.[35]  In practice, communications and observations by staff in all types of restrictive housing in FDC are severely limited.  FDC has a policy and practice of covering cell door windows with magnetic strips.  Deputy Director of Institutional Operations Carl Wesley Kirkland testified that there is no prohibition on using these coverings on

---

[33] American Correctional Association, *supra* note 12, at 124.
[34] DHA00027136 (FAC 33-601.220), DHA00026770 (FAC 33-602.222) & DHA00000093 (FAC 33-601.800).
[35] FAC 33-601.820.

cells with inmates that have a history of self-injury.  He states that people with this history can be alone in their cell with the cell covered, out of sight from staff, for 30 minute stretches until an officer pulls away the cover to do their required checks.  Kirkland also confirmed that there is nothing prohibiting the use of window coverings on cells with inmates with mental or physical health issues or who are under 18.[36]  At Union Correctional Institution, I observed three cells with the cell door windows covered in this way.  These coverings do not allow the inmates to see out and more importantly staff cannot not see in.  Not only is this in violation of ACA Standards and administrative code, these windows have a purpose.  They allow staff to look in as they walk by to make sure inmates aren't in crisis.  And contrary to FDC's prohibition of standing at the window, these windows are also designed to allow inmates to look out, so they won't feel as isolated, can see natural light, or get the attention of staff if needed.  Covering cell-front windows is a bad practice, threatening the safety and health of the inmates inside these cells.

36.   ***Dayrooms***.  Inmates in AC, DC, CMI, or Maximum Management are not permitted access to a dayroom.  Under FDC policies, CMII inmates, following 30 days in close management status and having no major rule violations during this period, are allowed access to the dayroom for social purposes to include watching

---

[36] Kirkland Deposition, 376:3-376:7, 376:14-377:7.

television programs for up to two days per week but not to exceed four hours per session.  Also under FDC policies, inmates in CMIII, following 30 days in close management status and having no major rule violations during this period, are allowed access to the dayroom area for social purposes to include watching television programs for up to five days per week but not to exceed four hour per session.[37]  In practice, however, CM II and CIII inmates do not consistently receive dayroom privileges.  ███████████████████████████████████████

███████████████████████████████████████████

███████.[38]  In a June 2016 email, Warden Coker describes how Santa Rosa cancelled dayroom activities 33 times in the previous two months due to a lack of staff.[39] ███████████████████████████████████████████

███████████████████████████████████.[40]  The lack of dayroom is an example of how the conditions in AC, DC, and CM are practically the same.

37.     Time in a dayroom, even with just a few other people, gives inmates an opportunity to interact with others and get more comfortable in a congregant setting, which is especially important for people who have served longer terms of segregation or are on protective custody.  This also allows staff to assess an inmate's readiness to move to a lower custody level.

---

[37] DHA00000097 (FAC 33-601.800).
[38] Kirkland Deposition, 421:12-422:22.
[39] EHA00064132.
[40] Kirkland Deposition, 502:16-503:3.

38.   ***Work Activities***.  In CMI, inmates are restricted from all outside cell work activities.  Under FDC policies, in CMII, inmates are eligible for work assignments on a restricted labor squad, in CMI or CMII units, or in death row units.  Also under FDC policies, CMII inmates are eligible for work assignments either inside or outside of the close management units, to include restricted labor squads and work assignments within non-close custody units.[41]  But again, in practice, few CM II and CM III receive work assignments.  Less than ten of the inmates I spoke to had jobs; each of them were in-unit janitors.  Inmates in AC, DC and Maximum Management, like CMI, are not eligible for work activities.[42]  Work activities are often valuable to inmates as it gives them a chance to stay busy and demonstrate responsibility.  They also provide a very small income that can be used by inmates with no outside support to purchase commissary or other allowable comfort items.

39.   ***Reading Materials***.  FDC policies limit access to reading materials in all types of restrictive housing.  In AC, inmates can check-out only one paperback book at a time.[43]  In DC, only scriptural and devotional reading materials are permitted and can be taken away if there is an indication of a threat to the safety, or

---

[41] DHA00000089 & DHA00000098 (FAC 33-601.820).
[42] FAC 33-602.222 & FAC 33-601.820.
[43] DHA00027138 (FAC 33-602.220).

security or sanitation of the institution.[44]  In CM, an inmate may check out three paperback books from the library at least once per week and possess no more than three books at any given time and may receive no more than one periodical which is available more frequently than weekly and four other periodicals which are available weekly or less frequently than weekly.[45]  In Maximum Management reading materials are limited to a bible, religious testament, or other reading material specifically related to an inmate's faith.[46]  ACA Standard 5-ACI-4B-23 requires that inmates in restrictive housing have access to reading materials and should be provided a sufficient quantity of reading materials and have an opportunity to borrow reading materials from the institution's library.[47]  Though this is a new standard effective October 1, 2020, to which FDC will hopefully soon comply, their current code works against public safety.  Restricting DC and Maximum Management to only religious reading materials is an outdated concept designed to provide the bare minimum necessary to address inmates' rights to practice their religion and focus solely on religious materials as the conduit to inspire them to change and repent.  Over the years, I have heard many, many inmates recall what made them want to change and often this was inspired by something they read, sometimes a religious text but often not.  Additionally, given

---

[44] DHA00026773 (FAC 33-602.222).
[45] DHA00000096-DHA00000097 (FAC 33-601.820).
[46] DHA00017302 (FAC 33-601.820).
[47] American Correctional Association, *supra* note 12, at 13.

that no inmates in segregation are allowed to have TVs, and many inmates do not have radios, reading is the only form of engagement available to them that helps make isolation more bearable, mitigating the anxiety and anger that leads inmates to lash out at staff.

40.    ***Audio Visual and Other Technology***.  FDC policies limit access to audio visual and other technology in all types of restrictive housing.  People in AC may retain the same personal property as permitted in general population unless there is a threat to safety or security,[48] although this is contradicted by a recent update to FAC 33-602.220 stating that inmates in this status are not permitted to possess a tablet or have access to kiosks, kiosk services, tablet services, or video visitation privileges.[49]  Radios are not listed as a privilege permitted in DC[50]and the updated FAC 33-602.222 also prohibits tablets and access to kiosks, kiosk services, tablet services, or video visitation privileges.[51]  In CM, Walkman-type radios are permitted unless an exception is made or it is removed[52]but here too, updated FAC 33-601.800 prohibits tablets and access to kiosks, kiosk services, tablet services, or video visitation privileges for CMI and CMII.[53]  In Maximum Management, after twelve consecutive months and approval from the ICT, an

---

[48] DHA00027137 (FAC 33-602.220).
[49] Available at https://www.flrules.org/gateway/ruleNo.asp?id=33-602.220.
[50] FAC 33-602.222.
[51] Available at https://www.flrules.org/gateway/RuleNo.asp?ID=33-602.222.
[52] DHA00000094 (FAC 33-601.800).
[53] Available at https://www.flrules.org/gateway/RuleNo.asp?ID=33-601.800.

inmate has the ability to have a Walkman-type radio[54]and a newly updated version of the Maximum Management FAC 33-601.820, states that inmates in this status are not permitted to possess a tablet or have access to kiosks, kiosk services, tablet services, or video visitation privileges.[55]  After 30 days in CM status with no major infractions, CMII and CMIII inmates have access to a shared TV when they are taken to  the dayrooms.[56]  Individual televisions are not permitted at any custody in FDC.[57]

41.     FDC's policies and practices that severely limit audio visual technology, if they have any access at all, is a punitive approach to segregation management that undermines the goal of safety and security.  Similar to reading materials, rather than disallowing audio visual and other technology, these should be used as tools to occupy the time and minds of people who spend 22 hours or more each day of their lives in a cell.  These inmates live in isolating and stark conditions and audio visual offers inmates a way to stay connected to the outside world and serve as a distraction to keep them from dwelling non-stop on their current circumstances.  In my experience, these distractions help relieve the tension that would otherwise build up when a prisoner has nothing to do but be inside his own head, building up frustration and anger that often leads to staff assaults and

---

[54] DHA00017303 (FAC 33-601.820)
[55] Available at https://www.flrules.org/gateway/RuleNo.asp?ID=33-601.820
[56] DHA00000097 & DHA00000098 (FAC 33-601.800)
[57] FAC33-602.201.

other infractions.  With tablets, inmates could participate in educational, cognitive behavioral, and treatment support without leaving their cell, though this should be supplemented with congregant activities.  As discussed later, the increased visiting and communication made possible by tablets will reinforce ties to loved ones and keep inmates in segregation focused on their larger life goals.  Finally, if FDC were to change course and allow these privileges, they would give these inmates something to lose and, as such, they can be used as a powerful deterrent to negative behavior in segregation.

42.    *Phones***.**  FDC's policies severely limit access to phones in all types of restrictive housing.  In AC and DC, phone access is only permitted in emergency situations, for court access, or when the call is authorized by the warden or deputy warden.[58]  In CMI, inmates are permitted one phone call every 30 days after 30 days in close management without major rule violations as well as emergency and legal calls.  In CMII, inmates are permitted one call every 14 days after 30 days in close management without major rule violations.  In CMIII, inmates are permitted one call every seven days after 30 days in close management without major rule violations.[59]  In my review of daily records in these units, it is apparent that these calls are happening less frequently than permitted.

---

[58] DHA00027138 (FAC 33-602.220) & DHA00026772 (FAC 33-602.222).
[59] DHA00000096 & DHA00000097 (FAC 33-601.800).

43.     There are many concerns about an inmate's lack of phone access including the lack of communication with family and their support system and the lack of ability to report a Prison Rape Elimination Act (PREA)[60] allegation and other prison misconduct.  Telephones are available to people in general population seven days a week including holidays.[61]  In contrast, people in segregation have little, if any, access to phones which deprives these inmates of contact with the outside world and greatly reduces their ability to maintain relationships with their loved ones.  Whether it's calling your child on their first day of school, getting an update on an aging parent, or coordinating a visit, being able to connect to life outside of a prison is essential for a person to stay motivated and stable, and maintain a sense of humanity while living in a stark institutional setting.

44.     *Visiting*.  FDC's policies and practices limit personal visits in all types of restrictive housing.  In AC and DC, non-contact visits are only allowed when authorized by the warden or designee.[62]  In CMI, inmates may receive one two-hour non-contact visit every 30 days if no major rule violations.[63]  In CMII and CMIII, inmates may receive one non-contact visit after 30 days and every 14 days thereafter if in compliance.[64]  FAC 33-601.820 on Maximum Management is silent

---

[60] 28 CFR Part 115
[61] Id. p.14.
[62] DHA00027138 (FAC 33-602.220) & DHA00026772 (FAC 33-602.222).
[63] FAC 33-601.800
[64] DHA00000096 & DHA00000097 (FAC 33-601.800).

as to visitation privileges, so presumably there are none.[65]   ACA Standard 5-ACI-4B-21 requires that inmates in restrictive housing have opportunities for visitation unless there are substantial documented reasons for withholding such privileges.[66] FDC's current policies, which immediately restrict visitation regardless of individual considerations and without substantiated documented reasons, violate this standard.  It is unfortunate that FDC has already banned video visitation in these units because it would be a safe and convenient tool to foster connection, incentivize positive behavior, and offer hope.

45.     Not only does connection with family and loved ones offer inmates a lifeline to their life outside of prison, providing them with support and human contact, but it is a powerful behavioral management tool.  I have found that few things are more important to and appreciated by inmates than contact with family. For penological purposes, these relationships are a powerful incentive for people to want to change, take advantage of opportunities to improve, and behave positively. Facilitating more contact also keeps outside supporters engaged with their incarcerated loved one, helping to mitigate the harmful impacts of the inmate's incarceration on families, especially children.  This engagement is especially important as an inmate prepares to return to the community where they will need to rely on these supporters for help reintegrating and maintaining a crime-free life.

---

[65] DHA00017301.
[66] American Correctional Association, *supra* note 12, at 130.

46.   ***Showers***.  FDC's policies permit inmates in AC, DC, and CM to shower only three times a week.[67]  I reviewed the Daily Records of Special Housing for 10 men in these units, charting 7 to 49 weeks depending on the records made available to me and found that often inmates are not showering three days a week and sometimes significantly less.  These records showed inmates participating in their three weekly showers approximately 38% to 71% of the time.  However, as often as not, the record sheets contained blanks where entries should have been included but they were omitted, making it impossible to obtain an accurate assessment of how often inmates shower.  In restrictive housing, it is important to understand who is showering, going to yard, or eating meals.  If certain inmates are not engaging in these activities, it can be an indicator that an individual is decompensating or needs additional one-on-one services.  If many inmates aren't engaging, it is an indicator that something is wrong in the administration of these rights and services.  As a manager or administrator, I would expect that record sheets are legible and complete so that they can be used to monitor and troubleshoot individual, staff, or systemic issues.  Without accurate documentation, this analysis cannot occur.

47.   ***Recreation***.  FDC's recreation policies are extremely limited and their practices are even more so in all types of restrictive housing.  In AC and DC,

---

[67] DHA00027137 (FAC 33-602.220), DHA00026771(FAC 33-602.222), & DHA00000094 (FAC 33-601.800).

inmates get no recreation time for 30 days.  If the confinement extends beyond a 30-day period, they are entitled to a minimum of three hours per week of outside recreation.[68]  In Maximum Management, recreation is limited to two hours once every 30 days for the first 60 days and two hours twice every thirty days thereafter or until the inmate's recreation privileges are restored.  Recreation privileges can only be restored after six consecutive months on Maximum Management if the Regional Director determines an inmate has displayed "satisfactory adjustment" to maximum management.  At that time, recreation privileges up to two two-hour sessions per week.  After nine consecutive months, recreation privileges in Maximum Management can increase up to two two-hour sessions per week and after twelve consecutive months, recreation privileges up to three two-hour sessions per week.[69]  In CM, after 30 days, inmates are entitled to a minimum of six hours per week (two hours three days per week) of recreation.  However, if the inmate is on a labor squad required to work outside at least one day a week, the minimum exercise requirements for the week are "satisf(ied)."[70]

48.     ACA Standard 5-ACI-4A-24 (4-4270 in previous edition) requires that inmates in restrictive housing receive a minimum of one hour of exercise per day outside their cells, five days per week, unless safety considerations dictate

---

[68] DHA00027138 (FAC 33-602.220) & DHA00026773 (FAC 33-602.222).
[69] DHA00017302 & DHA00017303 (FAC 33-601.820).
[70] DHA000096 (FAC 33-601.800).

otherwise.  This standard exists to ensure that inmates have a daily break from their

cell, exercise, see the outdoors and natural sunlight, breathe fresh air, and perhaps

talk with people in yards adjacent to them.  Offering the same number of hours in

fewer days does not achieve this objective and FDC policy and practice does not

meet this requirement.  In AC, DC, and CM, officers are required to document

inmates' exercise periods on the Daily Record of Special Housing, Form DC6-

229.[71]  I reviewed a number of these records, and it seems that more often than not,

even when eligible, inmates do not receive six hours of recreation each week.  Of

the five male facilities that I toured (FSP, Santa Rosa, Suwannee, Hamilton and

Union), only once did I see inmates participating in recreation.  Eight inmates I

spoke to at Santa Rosa indicated that they had missed recreation from anywhere from a

week to six months and one man stated that he had never been to recreation.  10

inmates I spoke to at cell front at Florida State Prison indicated that they have

no recreation from one month to eight months.  Three indicated that they never

go to the yard.  12 inmates I spoke to at Suwannee indicated that that day was the

first day they were offered recreation.  Even though COVID-19 restrictions

impacted general population in many ways, the daily routines of restrictive housing

should have been maintained to avoid the severe impacts that would be caused by

placing further limitations in this already highly-restricted environment.  The

---

[71] DHA00027138 (FAC 33-6-2.220), DHA00026773 (FAC 33-602.222), and DHA00000096 (FAC 33-601.800).

inmates I spoke with at Lowell, Hamilton, and Union were on AC or DC, many in their first 30 days so not yet entitled to recreation and had not received any.  Two inmates at Union were on sanctions which prohibited them from recreation for 15 days and one stated that it's hard to go to recreation because the process they must follow in order to makes it difficult.  As one inmate described, to request recreation, their bed must be made, they had to be in their class A uniform, and their personal items laid out for inspection.  If they did all of this and the officer walking by stopped, they might be able to sign up for recreation.  If staff kept walking, they couldn't knock on the window for fear of getting a disciplinary report or being placed on strip-status.  To further complicate matters, sometimes the rules concerning how to sign up for recreation changed.  And when this occurred, they only learned about it by watching, which leaves people unprepared.

49.   ***Access to Programming***.  FDC's policies and practices restrict access to programming in all types of restrictive housing.  Inmates in AC, DC, Maximum Management, and CMI are not permitted to participate in out-of-cell educational and program opportunities.[72]  By policy, inmates in CMII and CMIII may participate in educational and program opportunities in-cell or out-of-cell as determined by security and program staff,[73] but in practice they do not regularly have access to such programming.  Bureau Chief for the Bureau of Education

---

[72] FAC 33-602.220, FAC 33-602.222, FAC 33-601.820 & FAC 33-601.800 (DHA00000096).
[73] DHA00000097 (FAC 33-601.800).

Gwen Brock testified that other than some exceptions for inmates assessed as needing special education who can receive paper-based cell-front instruction,[74] FDC does not enroll inmates in CM in vocational programs.[75]  Under policy, inmates in CM may request academic courses and receive the content, but again, whether they would be able to participate in small group instruction is a determination made locally and FDC does not provide guidance as to how that determination should be made.[76]  Bureau Chief of the Bureau of Substance Use Treatment Maggie Agerton testified that other than two brief intervention short curricula primarily administered cell-side, people in AC and DC do not participate in any other cognitive behavioral programs.[77]  She also said it was possible that no one currently in AC and DC were receiving those brief interventions.[78]  Agerton could also not recall any inmate in Maximum Management receiving a brief intervention in the past five years.  The recent report released by Florida State University found that staff cited limited access to rehabilitative programming as one of the biggest impediments to the effectiveness of long-term CMI[79]and

---

[74] Brock Deposition, 83:2-83:4, 93:25-84:8.
[75] *Id.*
[76] Brock Deposition, 95:17-96:8, 98:17-99:6.
[77] Agerton Deposition, 73:12–74:4, 74:24–75:18, 83:21–85:8.
[78] Agerton Deposition, 86:13 – 87:13.
[79] Mears et al., *supra* note 20, at 26.

believed that more programming at FDC would improve inmate behavior and reduce the need for long-term segregation.[80]

50.     The lack of programming for people in FDC's segregation units is counter-productive to the penological goals of rehabilitation and facility safety. This is the population that is most in need of programming, especially group programming, where prisoners can acclimate to being around other people in preparation to go back to general population while addressing their criminogenic needs to reduce the likelihood that they'll recidivate when they return to their communities. [81]

## **Unnecessary and Retributory Security Measures**

51.     ***Privilege Suspension***.  In FDC, The ICT can suspend privileges, such as recreation, visits, dayroom, or phone calls, if there are "safety and security concerns" for up to 30 days and beyond with approval from the State Classification Office.[82]  These privilege suspensions are imposed separately from privilege restrictions imposed as part of a disciplinary action.  There does not appear to be any limit for how long a privilege suspension initiated through the ICT can be imposed as long as it is approved every 30 days.  FDC does not appear to have any process for reviewing or auditing what privileges inmates in close management had

---

[80] *Id.* at 29.
[81] Digard et al., *supra* note 5, at 33.
[82] DHA00000097-DHA00000098 (FAC 33-601.800 912)).

lost and for how long[83] at a system or facility level.  This additional process to

suspend privileges, outside of the disciplinary process, is just one example of

FDC's ability and propensity to impose overly-punitive and excessive

deprivations.  These deprivations increase inmates' tension, leaving them nothing

to look forward to or to distract them from the conditions they live in.  Based on

my experience and knowledge, this tension often leads to anger, making staff less

safe, or despair, potentially driving an inmate to self-harm.

52.    ***Escort Procedures and Cell Searches***.  FDC's policies require similar

escort procedures and cell searches in all types of restrictive housing.  Inmates in

AC and DC are escorted in restraints, and if taken outside the housing unit, with

leg-irons.[84]  In these statuses, cell searches may be conducted at any time but are

required, at a minimum, each time an inmate is removed from the cell for a

shower.[85]  Inmates in Maximum Management must be strip-searched prior to

leaving and upon returning to their cell and require restraints, leg-irons, and a two-

staff escort whenever they leave their cell.  Their cell is searched each time they

leave their cell or at least three times a week.[86]  In CMI and CMII, inmates are

searched before leaving their cell and are escorted in restraints and when taken

outside the housing units, with leg-irons.  CMII can be authorized by the senior

---

[83] Kirkland Deposition, 431:16-431:24.
[84] DHA00027139 (FAC 33-602.220) & DHA00026773 (FAC 33-602.222).
[85] DHA00027136 (FAC 33-602.220) & DHA00026711 (FAC 33-602.222).
[86] DHA00017304 (FAC 33-601.820).

correctional officer to approve unrestrained participation in group and individual counseling, dayroom access, and inside work assignments.  Only CMIII can move on and off the unit without restraints. [87]

53.     The unnecessarily onerous personal and cell search requirements, especially in Maximum Management, deters inmates from showering and going to recreation.  Inmates described receiving disciplinary reports for having small items that would not cause a safety or security risk, like a mustard package.  One man I spoke with received an infraction for a pat of butter, which he had saved from his food tray to use as lotion because they are not allowed to have lotion in their cell. By requiring a cell search each time an inmate takes a shower or leaves their cell, FDC has created a mechanism for officers seeking to retaliate against and deter inmates from availing themselves of showers, recreation, medical and mental health appointments.  During Rule 34 inspections, inmates consistently mentioned that they did not want to leave their cells in fear that their personal items would be broken or taken during a cell inspection.  Using cell inspections as a means of abuse appears to be condoned by prison leadership.  I reviewed minutes from an Officer in Command meeting on 04.20.18 in which Jefferson Correctional Institute's Warden Holland is transcribed as stating "search all cells during

---

[87] DHA00000098 (FAC 33-601.800).

showers, go in and wreak havoc."[88]  This leaves cell searches a ripe opportunity for

abuse, making it a logical choice for an inmate to avoid this by simply staying in

their cell.  FDC again works against its best interests, depriving inmates of the

minimal out-of-cell activities they are permitted, which leads to increased anxiety,

anger, and deteriorating mental health, all of which increases the likelihood of

unwanted behavior.  It also sets them up to fail given the unnecessarily sparse

amount of property they are allowed to have in their cells.

54.  ***Property Restriction also known as Strip Status***.  FDC has a policy

and practice of using "property restriction," or "strip status," in all types of

restrictive housing and only in restrictive housing.[89]  The policies require as

follows: in AC, DC and CM, "any item may be removed from the cell in order to

prevent the inmate from inflicting injury to himself or herself or others or to

prevent the destruction of property or equipment."  If clothing is removed, the

inmate shall receive a "modesty garment."  Bedding and linen may be removed

"based on a potential harm to individuals or a clear threat to the security of the

institution."[90]  In AC and CM, the Shift Supervisor or the Confinement Lieutenant

must approve the action initially and document it in the Daily Record of Special

Housing.  The Chief of Security makes the final decision as to the "appropriateness

---

[88] DHA00211037.
[89] Kirkland Deposition, 379:18–380:25.
[90] DHA00027137 (FAC 33-602.220), DHA 00026771(FAC 33-602.222) & DHA00000094 (FAC 33-601.800).

of the action" no later than the next business day.[91]  In DC, there is no requirement for initial approval to remove these items, just a notation in the Daily Record of Special Housing and approval from the Chief of Security (time frame for approval not noted).[92]  In Maximum Management, "if the inmate's behavior requires" their clothing and bedding may be removed and the solid door be closed "for security reasons" at initial placement or at any time during Maximum Management status. The Shift Supervisor must notify the Warden and if in agreement, the Warden must notify the Regional Director for final approval no later than the first business day following the Shift Supervisor's action.[93]  Though the bar may be lower in Maximum Management to initiate strip status (undefined inmate behavior), it requires a higher level of approval than imposing this status in AC, DC, or CM.

55.    There are no policies governing any of the four types of segregation that require strip status to be reserved as a last resort nor is there clarification as to how long an inmate can remain on this status if approved by the Warden every 72 hours.  FDC does not track statewide or by institution how many inmates are subjected to strip-status.[94]  There is also no prohibition on using strip-status on people with certain mental health grades in restrictive housing units.  There is no prohibition on using strip status on a juvenile or someone who is pregnant.  There

---

[91] DHA00027137 (FAC 33-602.220) & DHA00000094 (FAC 33-601.800).
[92] DHA00026771 (FAC 33-602.222).
[93] DHA00017302 (FAC 33-601.820).
[94] Kirkland Deposition, 387:10–387:16.

41

is no documentation of the state property that was removed.  There is no requirement that an incident report is completed.[95]  Strip status exists outside the formal disciplinary process and as such, has no due process protections nor does it include an avenue for the inmate to appeal the placement.  I saw no evidence that there is a tracking system at the facility level to record who is in strip status, what property had been taken, and for how long.  In testimony last year, Major Richter confirmed he was aware that an inmate was placed on property restriction and it was not listed on their Daily Record of Special Housing as required in code.[96]  He also confirmed that if an inmate's state issue uniform and mattress was taken away, the inmate property list does not have to be filled out.[97]  As Kirkland stated, the rule for strip-status does allow an inmate to have every item in their cell removed and to be left only in their boxers.[98]

56.     In the Officer in Command meeting minutes from 04.20.18, Warden Holland is also transcribed as giving the direction to "continue using strip status as a correctional tool."[99]  This statement demonstrates strip status is not used solely for the safety and security of prisons, but rather as a show of force and a means to degrade, dehumanize, and inflict suffering.  It is a punishment that is ripe for abuse; a quick and easy way to retaliate against inmates.  This power is easily

---

[95] Kirkland Deposition, 394:6-394:12.
[96] PLS00004365.
[97] PLS00004366 & PLS00004367.
[98] Kirkland Deposition, 385:8-385:18.
[99] DHA00211037.

abused by staff given the attitude of leadership and the lack of documentation or formal disciplinary process, as reflected in the interviews of many inmates at multiple facilities.

57.     ACA Standard 5-ACI-4A-15 (4-4261 in the previous edition) offers guidance on the most basic items that inmates should be able to have in their cells while in restricted housing.  It requires that all inmates in restrictive housing are provided suitable clothing, and access to basic personal items "unless there is imminent danger that an inmate or any other inmate(s) will destroy an item or induce self-injury."  In comment it notes that basic personal items include things such as personal hygiene, eyeglasses, and writing materials.  Adjustments to clothing should be only that "necessary for self-protection, such as removal of a belt to prevent a suicide attempt."  It also notes that "an appropriate official" must justify clothing adjustments in writing.  If there is "imminent danger that an inmate will destroy an item or use it to induce self-injury", a supervisor may decide that the item can be taken away.  However, if they do, "every effort should be made to supply a substitute for the item or to permit the inmate to use the item under the supervision of an officer."[100]  It appears to me that that in practice FDC regularly violates this standard.  Rather than a careful consideration of the minimal amount of items that can be removed from an inmate to maintain their safety and stop

---

[100]American Correctional Association, *supra* note 12, at 128.

property destruction, FDC's property restriction is an all-or-nothing removal of everything in a cell.  This is clear in inmate and staff descriptions of imposing property restriction and FDC's common terminology for this practice: strip status.

58.     I reviewed 193 incident reports generated when inmates were placed on strip status. Of those, 145 listed the reason for placing the inmate on this status as cell in disarray, sleeping, clothing on light fixture, property not stored properly, or inmate not dressed properly. Staff placing inmates on this status were members of the ICT, disciplinary officers, captains, sergeants, colonels, assistant wardens, and shift supervisors. Rather than issuing infractions or a more appropriate corrective response during the formal cell inspection, any staff at any time during the day can cause an inmate to receive a minor violation that results in property restriction. Since they rarely leave their cell, they live all hours of the day under constant threat of inspection and violation.

59.     One incident report notes that at 8am an announcement was made for inmates to be in their Class A attire and inspection-ready from 8am to 5pm.  At 10:30am two cell mates were seen with their beds unmade and not in their Class A attire.  For this they were given disciplinary reports and placed on property restriction to include removal of their mattresses and bedding for three days.  In this scenario, there is no threat to the safety of the institution noted nor justification for placement on strip status; it clearly violates the ACA Standard. Despite this, the

acting warden approves this punishment and notes, "Good job Lt."[101]  In another

incident report, a colonel and assistant warden were conducting ICT and inspecting

AC where they found an inmate not properly dressed with his property "strewn

about his cell." For this he received a disciplinary report and 72 hours of strip

status with nothing but his boxers.  The incident report includes the comment that

no items are to be returned to the inmate until there is a "positive behavioral

adjustment."  Since the negative behavior he is being punished for involves his

attire and his property, I'm not sure what would be considered a positive

behavioral adjustment given that they have left him with nothing.[102]

60.    Inmates reported during inspections that strip status was more

frequently applied in the winter, leaving those subjected to these conditions

without clothes and bedding, unable to lie down on the cold bunk or floor, and

depriving them of the ability to sleep.  I observed one inmate on strip status at

Union.  He was in his cell without his property, linens, blanket, mattress and was

dressed only in boxers.  Of the inmates I spoke with, three at Santa Rosa, five at

Florida State Prison, 11 at Suwannee, two at Hamilton, and 10 at Union indicated

that they had been on strip status.  One inmate at Suwannee described to me how,

while on strip status in winter in nothing but his boxers, he perched on the edge of

his toilet trying to make it through the night.  When his suffering became too much

---

[101] DHA00080975-DHA00080976.
[102] DHA00074852-DHA00074853.

for him to bear, he scraped into his wrist so that he would be taken to the medical unit where he was given a warm shower, clothes, and a cell with bedding.  I was told that at Union inmates who are not on strip status are issued 2 blankets and a jacket in the winter months.  Given the experience described to me by multiple inmates subjected to strip status in the winter, this appears to be a purposeful infliction of severe physical pain and suffering.  This practice, that FDC uses only in restrictive housing, is cruel, inhumane, and inconsistent with accepted correctional practice and the evolving standard of decency.

61.    ***Air Trays.***  During my interviews, multiple inmates reported staff punish them in restrictive housing with "air trays."  In testimony last year, FDC staff confirmed knowledge of this practice, describing it as a "slang term" for when an inmate doesn't get any food or receive a tray.[103]  I find it incredible that the act of withholding food as a form of punishment or retribution is so common that it has its own slang-term known by both inmates and staff. I have also reviewed an incident report in which an inmate's mother contacted Suwannee after she had received word that her son had been receiving an empty food tray while in administrative confinement for pending disciplinary action for disrespecting an official. She had contacted the facility several days earlier after receiving emails

---

[103] PLS00004428 & PLS00004429.

from her son asking for her to check on him because he was worried about officers inciting him to act out so they could lay hands on him.[104]

62.  ***Impact of Staff's Retributory Conduct.***  During Rule 34 inspections, an alarming number of prisoners reported retaliatory conduct by guards that was, among other things, dissuading them from coming out of their cells.  Given the infrequent contact between these inmates from different segregation units within the prisons, their reports had greater credibility, as it would be difficult for them to coordinate their responses.

63.  At Florida State Prison, inmates described how staff treated any movement they make out of their cells as an inconvenience that often results in some type of retaliatory behavior from staff.  They reported retributory abuse by officers that included: giving them food trays with no food or "air trays;" giving them disciplinary reports for assault after the officers perpetrated assaults against them; writing false disciplinary reports; "tearing up" cells, including destroying personal property; spraying them with pepper spray while they slept; assaulting them in the medical unit; beating them while they were handcuffed; threatening inmates with abuse; preferring to spray them with pepper spray in the summer when it was hot; and preferring to place them on strip status in the winter when it was cold.  As an inmate there described, "Strip status in winter months and gassed

_____

[104] DHA00914945.

in the summer." This retaliatory conduct deters inmates from taking the limited privileges available to them. Many described how it wasn't worth taking the risk of angering or annoying particular staff so they chose to just forgo showers and yard time.

64.     Inmates at Florida State Prison did not view the grievance process as legitimate and they consistently reported that they receive no response if they file grievances or are retaliated against for writing grievances. Some noted that if they do receive a response, it is "rubber-stamped" and nothing changes, leaving them with no system to report wrong-doing.

65.     At Santa Rosa Correction Institution, inmates were also fearful of retaliation if officers perceived them to be an inconvenience by using their privileges. For example, across the board, inmates reported that they rarely get recreation and that, if they do request this, they fear officers will beat them, toss their cells, or take their property and destroy it. One inmate provided his theory as to why officers were so aggressive in discouraging inmates from using their privileges, stating that "COs don't like to work."

66.     They also reported retaliatory acts included the denial of food, denial of access to the communication kiosks, denial of access to the canteen, or the withholding of toilet paper, socks, towels, or sheets. Inmates described being "jumped," beaten, and slapped by staff, including while in handcuffs, and during

48

cell extractions. They described use of pepper spray as a frequent occurrence, usually for no discernible reason. They described being placed on "loaf" - a form of punishment in which food is ground together and formed into an undesirable, sometimes frozen, loaf. Similar to those housed at Florida State Prison, inmates at Santa Rosa believed the grievance system at Santa Rosa to be useless.

67.    In restrictive housing units, it is especially important that the grievance system is functioning and fair. Inmates in these units live in extremely restrictive and isolating conditions. They interact with a limited number of staff and their communication with the outside world is primarily through letters. They don't have many witnesses, as there usually are in general population, to the conditions they live in and how they are treated. The grievance system is what they are instructed to use when they have a complaint or an unresolved issue. If a correctional facility does not respond appropriately to grievances from inmates in segregation, such as ignoring it, or worse, retaliating against an inmate for bringing a grievance forward, inmates will stop attempting to advocate for themselves through this mechanism. This leaves them with few courses of action, if possible, other than litigation or outside advocacy, to which a correctional system would respond by inquiring if there had been grievances logged on the issue. And of course, if inmates have been deterred from using this system, there may be no records of their complaints.

68.     I heard similar stories of retaliation at the other prisons I inspected. Inmates repeatedly told me that they were discouraged from participating in recreation, showers, or from leaving their cell for any reason.  They also indicated that there would be a "price" to be paid if they left their cell and oftentimes this would come in the form of a destructive cell search, new disciplinary reports and/or being placed on strip status.  An inmate at Union stated, "I fear for retaliation, life is cheap here, I don't go to recreation."  12 inmates I spoke to at their cell fronts at Suwannee Correctional Institution indicated that this was the first day they were offered recreation, stating "if you go to recreation they might place you on strip status" and "your cell gets torn up if you go to recreation."

69.     At Hamilton Correctional Institution, inmates again reported a culture of retaliation when they asked to access the privileges to which they were entitled. This was not limited to showers, recreation, and other services.  In one-on-one interviews, several inmates also described officers threatening retaliation if they talked with us.  One inmate stated, they "told everyone on the wing this morning not to come out, you're snitching."  Another stated, "0630hrs to 0800hrs the officers were tearing cells up.  They were mad about people talking to you guys." Another stated that "a lot of people signed refusals (for one-on one-interviews) were forced too."  That day, multiple inmates refused one-on-one interviews with us that had previously agreed to meet. Three of these were with me, the most

refusals I experienced across all the prisons we visited.  These descriptions of staff behavior in response to our visit was in keeping with inmates' reports of the overall culture of intimidation and retaliation in their units.

### **Mental Health**

70.     I am not a mental health clinician, so I have reviewed FDC's practices in responding to inmates experiencing mental health issues from my experience and perspective as a correctional officer, supervisor, and administrator.  Given the large proportion of prisoners who have mental illness, operational practitioners in this field, like myself, spend a great deal of time managing prisoners with mental health needs and problem-solving and collaborating with mental health practitioners to meet those needs.  Suicide prevention is always a top concern. Correctional staff must be able to recognize signs of mental health crisis and deterioration to ensure that inmates are referred to mental health services. Correctional officers are also responsible for ensuring that those who intend to hurt themselves are in a safe environment while also trying not to make the person in crisis worse by leaving them in a state of deprivation and hopelessness.

71.     In my interviews with inmates in FDC CM units, they also described strip status being used as a response when people showed signs of mental health decompensation.  They didn't view this as a legitimate response intended to protect an individual from self-injury or suicide, but rather as a means to punish someone

for behavior that was inconvenient or disruptive.  Whether staff are intending to
deter inmates from displaying signs of mental health decompensation or if they see
strip status as a legitimate strategy for the penological purpose of keeping inmates
safe from self-harm, this does not comport with modern correctional practices.
Correctional suicide prevention plans now recognize that, just as we would not cut
off suicidal people to basic comforts in the outside world to stop them from
wanting to hurt themselves, subjecting inmates to isolation and cruel conditions is
not an appropriate strategy to address mental health issues or perform a suicide
watch.

72.     As of September 30, 2019, 19% of FDC inmates were diagnosed as
having a mental health disorder.  Inmates with Severe and Persistent Mental Illness
(psychotic, bipolar, major depressive disorders) represent 13.2% of the inmate
population. Inmates with mental illness are 67% more likely to receive a
disciplinary report for a major rule violation and nine times more to commit
suicide than non-mentally ill inmates.[105]  A 2017 report by FDC's Chief of Mental
Health Services states that in 2016, approximately 3% of their total inmate
population was in CM status and 40% of these inmates receiving inpatient mental
health treatment came from CM status.[106]  FDC inmates' mental health needs were

---

[105] Email from Dr. Aufderheide. EHA00014790.
[106] Aufderheide, D. Mental Health in Corrections: Fact or Fiction?. Florida Department of Corrections. 2017. p. 18.
EHA00056483.

lower before CM1 placement and higher during and after CM1 placements.[107] Inmates in CM are more than three times more likely to have a severe and persistent mental illness than inmates in general population.[108]

73.     As a correctional administrator, this data indicates to me that (a) FDC needs different strategies to address mental illness in the inmate population and (b) conditions in CM have a detrimental impact on inmates' mental health.

74.     ACA Standard 5-ACI-4B-30 states that "an individual diagnosed with a serious mental illness will not be placed in Extended Restrictive Housing, unless a multidisciplinary service team determines that there is an immediate and present danger to others or the safety of the institution."[109]  This standard was expected to be implemented no later than October 1, 2020, but a draft of this standard was published in 2016 and, as I discussed earlier, the negative impact of the stark and isolating conditions traditionally found in segregation units have been researched and discussed for decades.  Likewise, the field of corrections has evolved in the behavioral management of inmates with mental illness, using less restrictive and more therapeutic environments to address these inmates' disciplinary issues through targeted interventions, increased mental health staffing, and more mental health treatment.

---

[107] Mears et al., *supra* note 20, at 19.
[108] Aufderheide. EHA00056484.
[109] American Correctional Association, *supra* note 12, at 135.

75.     Based on my experience, knowledge, and observations, the conditions in FDC's segregation units- isolation, minimal access to sunlight and the outdoors, lack of activities to stimulate the mind and body, minimal and infrequent contact with loved ones and the outside world- all while living in constant fear of abuse and retaliation, negatively impact the mental health of the inmates housed in these units.

76.     Florida State University researchers recommended that FDC provide more staff training on mental health, including how to recognize and interpret the symptoms associated with different mental health disorders.[110]  While I do not disagree, I don't think that training alone will suffice. FDC must engage in deep reform for it to comport with current correctional norms.

**Conclusions**

77.     I have been in restrictive housing units in Alaska, California, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Nebraska, Pennsylvania, Virginia, and Washington State.  The conditions in the restrictive housing units in FDC are by far more restrictive and stark than the national norm.  Their units seem to belong to an older time, when the field of corrections was instructed that nothing works to rehabilitate, so inmates were managed punitively with little effort to change behavior.  Not only were the conditions I saw in these units not conducive

---

[110] Mears et al., *supra* note 20, at 27.

to rehabilitation, they actively worked against the penological goal of maintaining safe and secure facilities.

78.    The administrative code, department directives, and internal audit procedures do not protect inmates from unnecessary deprivation, abuse, and retribution.  This has created a culture in which staff and management are not held accountable for their actions or held to the standard necessary to fulfill the correctional duty to protect those in your custody.  As a result, staff have free rein to deny inmates their rights and privileges, leaving them to live in stark and inhumane conditions.  They have been allowed to act cruelly and abusively, well outside of professional standards or legal conduct.  Their leaders have overtly or tacitly condoned this behavior.

79.    This abusive and retributory conduct has resulted in the people in their care living in fear and being denied their rights and privileges.  This state of deprivation makes the conditions they live in unnecessarily stark, intensifying the already negative impacts of segregation and leading to less-safe prison facilities for those who work and live there.

Under 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing

declaration is true and correct. Executed on the 24 day of May, 2021.

_____

Dan Pacholke

# Appendix A

## Curriculum Vitae

**DAN PACHOLKE**

**PROFILE**

Served the Washington State Department of Corrections for 33 years, starting as a Correctional Officer and retiring as Secretary. Leader in segregation reform and violence reduction in prisons. Extensive experience in program development and implementation, facility management, and marshaling and allocating resources. Proven ability to make change.  Led efforts resulting in a 30% reduction in violence and a 52% reduction in use of segregation in Washington State Prisons. Co-founder of Sustainability in Prisons Project. Champion of humanity, hope and legitimacy in corrections.

**EMPLOYMENT HISTORY**

**Principal, Dan Pacholke Consulting, LLC.** 2018 to Present
>    Offering a full range of consulting services in the field of corrections.

**New York University, Litmus at Marron Institute of Urban Management**
**Associate Director** 2016-2017
>    Collaborate with researchers and practitioners to develop alternatives to segregation and transform corrections management. Advance stakeholder-led research and innovation by soliciting, supporting, and disseminating the best new strategies to create safer, more rehabilitative corrections environments.

**Washington State Department of Corrections**
**Secretary** 2015-2016
>    Governor appointee providing executive oversight of the agency with a yearly operating budget of 850 million and 8,200 full time employees. Reorganized agency to allow for greater emphasis on effective reentry. Led department through response and recovery from a crisis resulting from the discovery of a sentencing calculation error that had occurred for over 13 years.

**Deputy Secretary** 2014-2015
>    Oversight over operations divisions: Offender Change; Correctional Industries; Community Corrections (16 Work Releases and 150 field offices); Prisons (15 facilities); and Health Services.  These combined operations had a yearly operating budget of 700 million and 7,166 full time employees.  Emphasis on core correctional operations, violence reduction, and performance management leadership to affect positive and sustainable system wide change.

**Director, Prisons Division** 2011-2014
>    Oversight over 15 institutions and contract relationships with jails and out of state institutions incarcerating approximately 18,000 offenders.  Also responsible for providing emergency response and readiness oversight to all facilities and field offices of all divisions. Advanced multi-faceted violence reduction strategy to include the development and implementation of the "Operation Ceasefire" group violence reduction strategy for application in close custody units in prisons. Expanded Sustainability in Prisons Project programs to all prison facilities. Implemented classroom-setting congregant programming in intensive management units.

**Deputy Director, Prisons Division** 2008-2011

Administrator over 6 major facility prisons, multi-custody level for adult male offenders with a biennial budget of 290 million. Provided leadership and appointing authority decision making to six facility Superintendents. Through Great Recession implemented staffing reductions, offender movement alterations and cost savings initiatives while maintaining safety and security. Represented the Department in legal issues, labor relations, media, staff discipline hearings, union relations and bargaining. Oversaw statewide operations of Emergency Preparedness and Response, Intelligence & Investigations, Intensive Management Units, Offender Grievance Program, Offender Disciplinary Program, Food Service, Sustainability and Close Custody Operations. Implemented statewide system of security advisory councils and security forums to improve staff safety.

**Monroe Correctional Complex**
**Interim Superintendent** 2008
Led a 2,486-bed, multi-custody facility for adult male offenders.

**Stafford Creek Corrections Center**
**Superintendent** 2007-2008
Led a 2,000-bed, multi-custody facility for adult male offenders with a biennial budget of 39 million. Implemented Sustainability in Prisons Project initiatives to include large scale composting to include zero-waste garbage sorting. Initiated first dog training programs for male offenders.

**Cedar Creek Corrections Center**
**Superintendent** 2003-2007
Led a 400-bed, minimum-security adult male correctional facility, with a biennial budget of 7.3 million.-Directed operational and related program activities to include security and custody programs, medical services, plant maintenance, education, and food service. Co-founded the Sustainability in Prisons Project with Nalini Nadkarni, PhD.

**Monroe Correctional Complex**
**Special Assignment Deputy Superintendent** 2002
Formulated new strategic direction in order to enhance operations and security at the Complex, which consists of four separate units and houses approximately 2,300 adult male felons. Managed unit operations and security. Supervised the Intelligence Investigative Unit and Offender Grievance System. Developed and implemented capital construction initiatives at the Special Offender Unit and the Washington Reformatory Unit to enhance security of these Units.

**Headquarters**
**Performance System Administrator** 1999-2002
Led the development and implementation shift from staff training department to an organizational performance system. Administered staff performance academies, supervised five regional teams, four Program Managers and provided leadership for policy development to support this department wide program. Administered the Department's Emergency Response Plan, Emergency Operations, Officer Safety Program and Firearms Training Unit.

**Headquarters**
**Emergency Response Manager** 1995-1999
Developed and implemented statewide emergency response system. Directed the development of departmental policy, emergency response team academies and

response protocols. Managed emergencies and security events. Directed Critical Incident Review Teams in the post incident analysis of critical incidents department wide. Led development of security plans for the management of high-risk operations to include 400 offenders out of state, Y2K, and execution security.

**Clallam Bay Corrections Center**
**Correctional Captain** 1989-1995

Responsible for the security management of a maximum, close, and medium custody male facility. Oversaw facility mission changes including: close custody conversion; implementation of blind feeding; facility double bunking; opening of an intensive management unit; opening of first direct supervision unit; and developed the facility's Emergency Response Plan.

**Clallam Bay Corrections Center**
**Correctional Lieutenant** 1986 -1989

**Washington Corrections Center**
**Correctional Sergeant** 1985-1986

**McNeil Island Corrections Center**
**Correctional Officer** 1982-1985

**PUBLICATIONS**

Useem, Bert, Dan Pacholke, and Sandy Felkey Mullins. "Case Study–The Making of an Institutional Crisis: The Mass Release of Inmates by a Correctional Agency." *Journal of Contingencies and Crisis Management* (2016)

Pacholke, Dan (2016, July 27). Change is relative to where you begin. Vera Institute of Justice. Think Justice Blog. https://www.vera.org/blog/addressing-the-overuse-of-segregation-in-u-s-prisons-and-jails/change-is-relative-to-where-you-begin

Pacholke, Dan and Sandy Felkey Mullins. *More Than Emptying Beds: A Systems Approach to Segregation Reform*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Assistance, 2016. NCJ 249858.

Pacholke, D. (2014, March). Dan Pacholke: How prisons can help inmates lead meaningful lives [Video file]. Retrieved from https://www.ted.com/talks/dan_pacholke_how_prisons_can_help_inmates_live_meaningful_lives?language=en

Young, C., Dan Pacholke, Devon Schrum, and Philip Young. *Keeping Prisons Safe: Transforming the Corrections Workplace*. 2014.

Aubrey, D., LeRoy, C. J., Nadkarni, N., Pacholke, D. J., & Bush, K. Rearing endangered butterflies in prison: Incarcerated women as collaborating conservation partners. 2012.

**AWARDS**

Olympia Rotary Club, Environmental Protection Award, 2013
Governor's Distinguished Managers Award, 2012
Secretary of State, Extra Mile Award, 2007
Governor's Sustaining Leadership Award, 2003

**CONSULTING**

Sustainability in Prisons Project, Co-Director
2004-2015

Nebraska Department of Correctional Services
2015
>With Bert Useem, PhD, provided system assessment following May 2015 disturbance at Tecumseh State Correctional Institution in which two inmates were killed. Identified underlying causal factors and provided recommendations.

National Institute of Corrections
1998 to 2002
>Provided training and consultation services to state, territory and federal correctional systems. Responsible for delivering of training to include: Management of Security, Entry Level Supervision, Emergency Preparedness Assessment, Disturbance Management and Basic Security.

Defensive Technology Corporation
Senior Instructor
1995 to 1998
>Provided tactical and specialty munitions training to correctional and law enforcement personnel throughout the U.S.

Security Auditing & Critical Incident Reviews
Lead Auditor
>Completed security audits and critical incident fact finding reviews in facilities throughout the Washington State Department of Corrections and two correctional jurisdictions in other states, one of which involved multi-jurisdictional entities.

**EDUCATION:**
>The Evergreen State College, BA, Olympia, Washington

Career Highlights

- Reduced violence in Washington State prison system by over 30% while also reducing the number of people held in long-term administrative segregation by over 50%.

- Designed and implemented congregate group programming in the intensive management units (IMU's). The programs offered included evidence based programs and other complimentary offerings. Today all IMU's in Washington State prisons offer congregate programming.

- Designed and implemented the first prison Ceasefire model. This deterrence-based model reduced serious violent incidents (assault against staff, use of a weapon and multi on single man fights) by 50% and continues to be utilized in Washington State close custody (Level IV) prison to reduce serious violence.

- Co-authored a protocol for in-custody Swift, Certain and Fair sanctioning. This deterrence-based model offers a strategy for the reduction of low-level in-custody violations.

- Implemented the Correctional Officer Pre-Service training model at Clallam Bay Corrections Center. This 10-week program offered half-time course work and half-time OJT in order to certify newly hired correctional officers. This program was implemented state wide as the CORE Program, a six-week standardized training required of all staff that work in prisons.

- Served as a lead design team member on the creation and implementation of the Correctional Officer Achievement Program (COACH), a yearlong, on-the-job training program accredited by the WA State Board for Technical and Community Colleges.

- Led the design and development of a comprehensive agency-wide Emergency Response Plan and complimentary learning academies: Emergency Response Instructor (40 hrs.); Emergency Response Team (40 hrs.); Special Emergency Response Team (40 hrs.); Crisis Negotiator (40 hrs.); Joint Operations (24 hrs.); and the Designated Incident Management Team (multiple ICS certifications).

- Co-Authored, *Keeping Prisons Safe, Transforming the Corrections Workplace* and accompanying field guide which are used in CORE and Annual In-Service Training at WA DOC.

- Co-founder and past co-director of the Sustainability In Prisons Project; this program brings nature into prison and features science education. It is recognized internationally and features programs to restore endangered species e.g., Oregon Spotted Frog, Taylor Checker spot Butterfly, Indigenous Box Turtles and over fifty different rare and endangered native prairie plants. http://sustainabilityinprisons.org.

- Offered two TEDx events in prison. These events featured inmates, staff and volunteers as TEDx speakers.

- Implemented Dog retraining programs in all Washington State Prisons.

Supplemental Information: Dan Pacholke

Compensation:

- $200.00 dollars an hour for research, report writing, and all associated casework. $100.00 dollars an hour for travel and $300.00 dollars an hour for courtroom testimony and depositions.

Expert Work: Required a Deposition or Courtroom Testimony.

1. *Gregory Strange v. The District of Columbia* (Civil No. 2016 CA 001250 B. Superior Court of the District of Columbia Civil Division)—Deposition

2. *Deon Hampton v. Jacqueline Lashbrook, et al* (Civil No. 3:17-cv-00936-DRH. United States District Court for the Southern District of Illinois)—Courtroom Testimony, twice.

3. *Darrick Hall v. John Wetzel, et al (*Civil No. 17-CV-4738 United States District Court for the Eastern District of Pennsylvania)—Courtroom Testimony

4. *Fransisca Flores as the Personal Representative of the Estate of Lino Flores v. Stephen Morris, et al* (No. 16-02756 (D.AZ) In the United States District Court for the District of Arizona)—Deposition

5. *Terry White v. William Stephens, et al* (Case No. A16CV059 In the United States District Court for the Western District of Texas, Austin Division) – Courtroom Testimony

6. *Imhotep H'Shaka v. James O'Gorman, et al* (Case No. 9:17-cv-00108-GTS-ATB In the United States District Court Northern District of New York) – Deposition 3/2019

7. *Jay F. Vermillion, Plaintiff, v. Mark E. Levenhagan*, et al., (Case No. 1:15-cv-605-RLY-TAB) Southern District Court, Southern District of Indiana, Indianapolis Division. Plaintiff's Third Amended Compliant Under Title 42 U.S.C 1983 – Deposition 5/31/19

8. *Tay Tay v. John Baldwin,* et al., (Case No. 19-cv-501); Tate vs. Wexford Health Services, INC., et. al., Case No. 16-cv-92 In The United States District Court For The Southern District of Illinois – Deposition 12/20/19

9. *Cordell Sanders v. Andrea Moss,* et. al., (Case No. 16-cv-01366-JBM) In The United States District Court For The Central District of Illinois – Deposition 1/17/20

10. *Janiah Monroe v. John Baldwin*, Director Illinois Department of Corrections (Case No. 19-cv-01060). In the United States District Court for the Central District of Illinois – Deposition 1/29/20

11. *Deon Hampton v. John Baldwin,* Director Illinois Department of Corrections (Case No.: 3:18-CV-00550) *et. al.* –Deposition 8/18/20

12. *Thomas B. Fletcher v. Julian C. Whittington, et al.,* (Case No. 5:18-cv-01153-SMH-KLH (W.D. of L.A.) –Deposition 12/18/20

13. *Jac'quann (Admire) Harvard, et al., v. Mark Inch, et al.,* (Case No.: 4:19-cv-00212-mw-cas. – Courtroom Testimony 1/15/21

14. *Anthony Tellis and Bruce Charles v. James M. Le Blanc, Secretary, et al.,* Civil Action No.: 5:18-cv-00541-EEF-MLH. – Deposition 3/23/21

# Appendix B

## List of Documents Reviewed

*Appendix B:  Information Reviewed*

1. Class Action Complaint for Declaratory and Injunctive Relief

2. Second Amended Class Action Complaint for Declaratory and Injunctive Relief

3. STATUS FILE LIST 12-31-2019 .XLSX (DHA00922444 FDC Report)

4. Facility Profiles 7-20-2017.xlsx (EHA00104829)

5. Quarterly Beds Report 2019Q4.xlsx (DHA00931563 FDC Report)

6. Quarterly Beds Report 2020Q1.xlsx (DHA00931564 FDC Report)

7. Weekly Close Management Counts (EHA00275708)

8. Master Data Suicide Log from FY 2003/2004 to Present (DHA00914037 FDC Report)

9. Maximum Management FAC 33-601.820 (DHA00017301-DHA00017304 Correctional Policy/Procedure)

10. Disciplinary Confinement FAC 33-602.222 (DHA00026770-DHA0002676 Correctional Policy/Procedure)

11. Administrative Confinement FAC 33-602.220 (DHA00027133-DHA00027140 Correctional Policy/Procedure)

12. Close Management FAC 33-601.800 (DHA00000088-DHA00000100 Correctional Policy/Procedure)

13. HSB 15.03.13 Assignment of Health Classification Grades to Inmates (DHA00016046-DHA00016057 Healthcare Policy/Procedure)

14. FDC's Unverified Supplemental Responses to Harvard's First Interrogatories (PLS0000078- PLS0000339 Discovery Response)

15. ███████████ (PLS0000341-PLS0000342)

16. Facilities with Special Housing (PLS000009-PLS0000014)

17. Ferguson Classification Records (PLS0000688- PLS0000953 Prisoner Classification Records)

18. Compiled Data re Isolation at Facilities (PLS0003379)

19. Procedure 602.051: Wellness Education Program for Inmates (DHA00000223-DHA00000234 Correctional Policy/Procedure)

20. Procedure 501.106: Academic Education Programs (DHA00000401- DHA00000411 Correctional Policy/Procedure)

*Appendix B:  Information Reviewed*

21. Procedure 501.201: Special Education Services (DHA00000412- DHA000004125 Correctional Policy/Procedure)

22. Procedure 502.001: Career and Technical Education for Inmates (DHA00000426- DHA00000437 Correctional Policy/Procedure)

23. Chapter 33-103: Inmate Grievance Procedure (DHA00001199-DHA00001218 Correctional Policy/Procedure)

24. DC1-303: Request for Administrative Remedy or Appeal Form (DHA00001222 Other documents)

25. Form DC1-306: Grievance Approval Action Form (GAAF) (DHA00001223 Other documents)

26. Form DC1-307: Acknowledgment of Receipt of Grievance Orientation (DHA00001224 Other documents)

27. Form DC6-236: Inmate Request (DHA00001227)

28. Form DC1-303: Request for Administrative Remedy or Appeal (DHA00001296)

29. DC6-265, Close Management Waiver (DHA00001508 Correctional Policy/Procedure)

30. Classification of Grievance/Appeal (DHA00002683- DHA00002684)

31. Isolation Grievances 9/1/19-11/3/19 (DHA00002685)

32. Letter re: Happiness: The Ladder Up (DHA00002798)

33. Liman-ASCA Survey of Extended Restricted Housing - Fall 2015 (DHA00002805- DHA00002829)

34. Confinement Related Course Rosters Attended by Staff (DHA00002830 Training Docs)

35. DC6-236, Inmate Request (DHA00016486-DHA00016487 Correctional Policy/Procedure)

36. DC6-236, Inmate Request (DHA00016490- DHA00016491 FDC Report)

37. Procedure 304.009: Management of Hunger Strikes (DHA00016514-DHA00016518 Healthcare Policy/Procedure)

38. DC4-529: Staff Request/Referral Form (DHA00016572 Healthcare Policy/Procedure)

39. DC4-711A: Refusal of Health Care Services Form (DHA00016579-DHA00016580 Healthcare Policy/Procedure)

40. 164 – Unredacted Attendance - FSP.pdf (DHA00016687-DHA00016863 Alternative housing programs)

41. 164 – Unredacted Attendance – New River.pdf (DHA00016864-DHA00016873 Alternative housing programs)

42. Log of "Report of Administrative Confinement, DC6-233A" from 8/1/19 - 10/31/19 (DHA00026599 FDC Report)

43. Log of "Report of Close Management, DC6-233C" 8/1/19 - 10/31/19 (DHA00026600 FDC Report)

44. Log of "Disciplinary Reports" 7/15/19 - 7/22/19 (DHA00026601 FDC Report)

45. Log of "Disciplinary Reports" prepared for violations of department rules arising out of transactions, occurrences, or incidents by prisoners in isolation 8/1/19 - 10/31/19 (DHA00026602 FDC Report)

46. Referrals to Maximum Management, DC6-101 (DHA00920267-DHA00920304 FDC Report)

47. Referrals to Maximum Management, DC6-101 (DHA00920305-DHA00920342 FDC Report)

48. Def FDC's Second Supp Responses to Pl Harvard's First Set of Interrogatories - Interrogatory 5 (RHP Program) (PLS0003356-PLS0003366)

49. FW: Restrictive Housing Program Update (DHA00007484 Email)

50. Program Provision Plan for Restrictive Housing Proposal (DHA00007526-DHA00007551 FDC Memorandum)

51. Restrictive Housing Summary and Program Recommendation (DHA00008711-DHA00008712 Correctional Policy/Procedure)

52. Restrictive Housing Progression Plan (DHA00008713- DHA00008714 Correctional Policy/Procedure)

53. Record and Statement of Understanding: Restrictive Housing (DHA00008715 Correctional Policy/Procedure)

54. Restrictive Housing Summary and Program Recommendation (DHA00008735-DHA00008736 Correctional Policy/Procedure)

55. FW: RHP Implementation Update.msg (EHA00000046542-EHA00000046543 Email)

56. Restrictive Housing Program Implementation Status (EHA00000046544)

57. Fwd: Education Chair Pictures .msg (EHA00000046878-EHA00000046880)

58. IMG_0056.JPG (EHA00000046881)

59. IMG_0059.JPG (EHA00000046882)

60. Talking points for Abe.msg (EHA00071365)

61. Talking points ASCA.docx (EHA00071369)

62. Florida State Prison Restrictive Housing Program (EHA00071370-EHA00071371)

63. Alternative Housing PP.pptx (EHA00071372)

64. Bi-weekly Bureau Project Reports (EHA00075249-EHA00075349 Alternative Housing Programs)

65. Florida State Prison Restrictive Housing Program - Data Entry Instructions - Distributed 02262018 JEAN 2-26-18.pdf (DHA00201964-DHA00201974 Alternative Housing Programs)

66. Santa Rosa Restrictive Housing Program - Data Entry Instructions - Distributed 02262018 JEAN 2-26-18 2.pdf (DHA00201975-DHA00201985 Alternative Housing Programs)

67. RH Programming – Santa Rosa.docx (EHA00160079 Alternative Housing Programs)

68. Restrictive Housing Summary and Program Recommendation - Proposed - 07062016.docx (EHA00160087- EHA00160089 Alternative Housing Programs)

69. CLOSE MANAGEMENT SCHEDULE TENTATIVE SCHEDULE (santa rosa) (2).XLSX (EHA00160108 Alternative Housing Programs)

70. Restrictive Housing Program Plan Draft.docx (EHA00160110-EHA00160112 Alternative Housing Programs)

71. Mapping-Matrix-Linked-to-manuals-5-11-16.pdf (EHA00160239-EHA00160245)

72. Restrictive Housing Flow Chart1.docx (EHA00160253-EHA00160254 Alternative Housing Programs)

73. Taff RHP Proposal.docx (EHA00160258-EHA00160259 Alternative Housing Programs)

74. CM RE-ENTRY SUGGESTIONS.docx (EHA00160264-EHA00160265 Alternative Housing Programs)

*Appendix B:  Information Reviewed*

75. Program Provision Plan for Restrictive Housing Proposal [RH Program Provision Proposal to FSP for Reference.docx] (EHA00160278- EHA00160296 Alternative Housing Programs)

76. ███████████████████████████████ (DHA00932107- DHA00932120 FDC Report)

77. COVID healthcare directives (DHA01080573-DHA01080595 Healthcare Policy/Procedure)

78. COVID healthcare directives (PLS0003367-PLS0003378 Policy/Procedure)

79. Inmate Handbook (EHA00000682-EHA00000703)

80. Inmate Orientation Handbook, Reception Center Processing (DHA00001271- DHA00001282 FDC Memorandum)

81. Jefferson Correctional Institution Inmate Handbook (DHA00026518- DHA00026519)

82. Baker Inmate Handbook (DHA00026727- DHA00026760)

83. Franklin Correctional Institution Institutional Inmate Handbook (DHA00026862- DHA00026889)

84. Manual of Instruction and Information for Inmates at Hamilton Correctional Institution (DHA00026893- DHA00026894)

85. Holmes Inmate Handbook Revised (DHA00026896- DHA00026921)

86. Jackson Inmate Handbook (DHA00026922- DHA00026980)

87. Marion Inmate Handbook (DHA00027081- DHA00027114)

88. New River Inmate Handbook (DHA00027115)

89. Suwanee Inmate Handbook (DHA00027143- DHA00027166)

90. Inmate Orientation Handbook (DHA00189318- DHA00189329)

91. Apalachee Correctional Institution Inmate Manual (DHA00189330- DHA00189392)

92. Columbia Correctional Institution Inmate Handbook (DHA00189393- DHA00189425)

93. Cross City Correctional Institution Inmate Handbook (DHA00189426- DHA00189453)

94. Dade Correctional Institution Inmate Handbook (DHA00189454- DHA00189513)

95. Everglades Correctional Institution Inmate Handbook (DHA00189514- DHA00189559)

96. Franklin Correctional Institution Inmate Handbook (DHA00189594- DHA00189617)

97. Gulf Correctional Institution Inmate Handbook (DHA00189618- DHA00189644)

*Appendix B:  Information Reviewed*

98. Hamilton Correctional Institution Inmate Handbook (DHA00189645- DHA00189705)

99. Hernando Correctional Institute Inmate Handbook (DHA00189706- DHA00189732)

100.     Lancaster Correctional Institution Inmate Handbook (DHA00189733-DHA00189766)

101.     Lawtey Correctional Institution Inmate Handbook Addendum (DHA00189767-DHA00189801)

102.     Liberty Correctional Institution Inmate Handbook (DHA00189802-DHA00189848)

103.     Madison Correctional Institution Inmate Handbook (DHA00189882-DHA00189921)

104.     Mayo Correctional Institution Annex Inmate Handbook (DHA00189922-DHA00189956)

105.     Okaloosa Correctional Institution Inmate Guidebook (DHA00189990-DHA00190015)

106.     Polk Correctional Institution Inmate Handbook (DHA00190016- DHA00190054)

107.     Santa Rosa Correctional Institution Inmate Handbook (DHA00190067-DHA00190093)

108.     Sumter Correctional Institution Inmate Handbook (DHA00190094-DHA00190134)

109.     Tomoka Correctional Institution Inmate Handbook (DHA00190161-DHA00190228)

110.     Walton Correctional Institution Inmate Handbook (DHA00190265-DHA00190278)

111.     Apalachee Confinement Rules (DHA00026726)

112.     Hernando Correctional Institution (DHA00026895)

113.     Madison Confinement Inmate Rules and Regulations (DHA00027080)

114.     Columbia CI - Confinement Rules of Conduct (DHA00252616- DHA00252617)

115.     Holmes CI - Confinement Rules and Regulations (DHA00252928)

116.     NWFRC Confinement Rules (DHA00252992)

*Appendix B:  Information Reviewed*

117.    Program Assignment Grievances from this Bates range (DHA00918507- DHA01081966)

118.    ███████████████████ (PLS0003380)

119.    ████████████████████ (PLS0003381)

120.    ███████████████████ (PLS0003382)

121.    █████████████████████ (PLS0003383)

122.    Program Assignment Grievance Index (PLS0003384)

123.    Office of Governor Review of Complaint Regarding Former FDC Inspector General 7.24.20 (PLS0003390- PLS0003539)

124.    ████████████████ (PLS0003540)

125.    ██████████████████████ (PLS0003564)

126.    ███████████████████ (PLS0003565)

127.    DOJ Lowell Report, Dated December 2020 (PLS00003764- PLS00003799 Report)

128.    Transcript of Hearing on Motion for Protective Order, January 11-15, 2021 (PLS00003800- PLS00004687)

129.    FDC Managing Restricted Housing Populations (EHA00014450 PowerPoint)

130.    Managing Restrictive Housing Populations, Briefing Document (EHA00014451- EHA00014468)

131.    The Impacts of Restrictive Housing on Inmate Behavior, Mental Health, and Recidivism, and Prison Systems and Personnel (PLS0004689- PLS0004756 Report)

132.    Residential Mental Health Continuum of Care Program (EHA00473023- EHA00473042)

133.    Statistics re Mentally Ill in Confinement and Disciplinary Reports, Cell Extractions, Use of Force Reports, Etc. (EHA00473099- EHA00473100)

134.    Parent email for EHA00473099 (EHA00473087-EHA00473088)

135.    ████████████████████████████████ ███████████████ (EHA00184982- EHA00185018)

136.    Staffing Level Guidelines (DHA00910872)

137.    Level I Post Vacancy Report 2.25.16 (EHA00375451)

138.    ███████████████████████████████████████████████
        (EHA00427153- EHA00427543)

139.    Mental Health Emergency, Self-Harm, SHOS/MHOS and Placement Log
        (EHA00642470)

140.    ████████████████  (PIX0000001- PIX0000696)

141.    FAC 33-103 Inmate Grievance Procedure (PLS0006031- PLS0006050)

142.    FAC 33-602.210 Use of Force (PLS0006051- PLS0006069)

143.    FAC 33-602.204 (PLS0005922- PLS0005924)

144.    ████████████████████████████████  (DHA00885657-
        DHA00885661)

145.    █████████████████████████████  (EHA01075671-
        EHA01075682)

146.    █████████████████████████████  (DHA00885631-
        DHA00885641)

147.    █████████████████████████████  (DHA00887069-
        DHA00887076)

148.    DHA00025361-DHA00025362        Correctional Policy/Procedure

149.    DHA00027047-DHA00027079        Correctional Policy/Procedure

150.    DHA00206870-DHA00206890        Correctional Policy/Procedure

151.    DHA00211034-DHA00211039        Correctional Policy/Procedure

152.    EHA00020943-EHA00021012 Correctional Policy/Procedure

153.    EHA00064130-EHA00064133 Correctional Policy/Procedure

154.    EHA00353664-EHA00353668 Correctional Policy/Procedure

155.    EHA00358255-EHA00358269 Correctional Policy/Procedure

156.    EHA00378693-EHA00378697 Correctional Policy/Procedure

157.    PLS0005955-PLS0005967        Correctional Policy/Procedure

158.    <u>Post Inspection Records</u>

        a.  Odell Lee

        b.  Michael Lowery

*Appendix B:  Information Reviewed*

    c.  Derrick Grantley

    d.  Curley Williams

    e.  Lewis Johnson

    f.  Mack Simmons

    g.  Marcus Broadnax

159.  <u>Named Plaintiff Records</u>

    a.  Johnny Hill

    b.  James Kendrick

    c.  Juan Espinosa

    d.  Jerome Burgess

    e.  Jac'Quann Harvard

    f.  Jeremiah Hill

160.  <u>Transcripts reviewed:</u>

    a.  Johnny Hill Depo Transcript

    b.  Jeremiah Hill Depo Transcript

    c.  ███████████████████████

    d.  █████████████████████

    e.  ██████████████████████

    f.  ██████████████████████

161.  ICT doc review summary (PLS0007497- PLS0007498 Spreadsheet)

162.  193 Property Restriction Incident Reports