UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAC'QUANN (ADMIRE)
HARVARD; JEREMIAH HILL;
JUAN ESPINOSA; JEROME
BURGESS (a/k/a SHAM'LA GOD
ALLAH); JAMES W. KENDRICK,
JR.; JOHNNY HILL; and AMY
FERGUSON; and TRACEY DEAN
on behalf of themselves and all
others similarly situated,

       Plaintiffs,

vs.                                CASE NO.:  4:19-cv-00212-MW-MAF

MARK INCH, in his official
capacity as Secretary of the Florida
Department of Corrections, and
FLORIDA DEPARTMENT OF
CORRECTIONS, an Agency of the
State of Florida,

       Defendants.

_____/

**DEFENDANTS' RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION [D.E. 311]**

Defendants, Mark Inch in his official capacity as Secretary of the Florida

Department of Corrections and the Florida Department of Corrections ("FDC")

(hereinafter "Defendants") respond to Plaintiffs' Motion for Class Certification

[D.E. 311 ("Motion")] as follows:

## I.    __INTRODUCTION__

Federal Rule of Civil Procedure 23 cannot be used as a means to bypass the legislative and administrative process and ask a district court to implement and oversee policies and practices regarding almost all aspects of prison life. Yet, that is what Plaintiffs seek to accomplish with their Motion. Instead of challenging one discrete policy or practice, Plaintiffs ambitiously attempt to seek court intervention over numerous policies and practices regarding housing, maintenance, security, medical, mental health, and disability accommodations. Plaintiffs ask this Court to weigh in on whether a vague and broad "policy and practice" of confining inmates in cells is constitutional and whether FDC has a "system" in place to address disabled inmates. Plaintiffs essentially request this Court, under the pretext of the Eighth Amendment, Americans with Disabilities Act (ADA), and Rehabilitation Act (RA), to confer upon itself jurisdiction to assert control over the FDC to implement and oversee all policies regarding restrictive housing. But, "[f]ederal courts sit not to supervise prisons but to enforce the constitutional rights of all 'persons,' including prisoners." *Cruz v. Beto*, 405 U.S. 319, 321 (1972).

Plaintiffs' Motion should be denied because they propose overly broad and ill-defined classes, they fail to meet their burden in demonstrating the Rule 23 requirements have been met, and their proposed class action would violate established principles of federalism.

## II.    <u>STATEMENT OF THE FACTS</u>

The FDC consists of 50 major institutions, 16 annexes, and 7 private facilities which house more than 80,000 inmates. *See* Declaration of Carl Wesley Kirkland, Jr. at ¶ 58. Each facility has differing missions, inmate populations, and staffing levels. *Id.* The cell conditions in each restrictive housing unit varies by facility and even within the facility. *Id.* at ¶ 59

The Florida Administrative Code (F.A.C.) provides the policies regarding inmates in restrictive housing, which includes administrative confinement, (AC, Rule 33-602.220), disciplinary confinement, (DC, Rule 33-602.222), close management, (CM, Rule 33-601.800), and maximum management. (MM, Rule 33-601.820). Those policies are supplemented by written procedures, post-orders, and health service bulletins. Kirkland Decl. at ¶ 7. For inmates in restrictive housing 17 years old and under, different policies apply to them based on the Prison Rape Elimination Act (PREA). *Id.* at ¶¶ 7, 50, 51.

FDC audits its facilities in many ways to ensure compliance with the written policies. *Id.* at ¶¶ 64-81. FDC also has a grievance system which allows inmates to raise concerns regarding all aspects of prison life. *See generally* Declaration of Alan

McManus. The approval rate for grievances filed by inmates in CM from January 1 to August 31, 2021 exceeds 25%. *Id.* at ¶ 16.[1]

The privileges and restrictions afforded to an inmate depend on their level of restrictive housing. Kirkland Decl. at ¶¶ 6-57. Inmates in CM III have the least amount of restrictions and the most amount of privileges, whereas inmates in MM have the most restrictions and the least amount of privileges. *Id.*

Education is available to inmates in restrictive housing. *See* **Exhibit O** (Deposition Transcript of Gwen Brock) at 31:5-24, 49:24-50:8, 72:12-20, 73:23-77:19, 95:17-96:8, 97:16-100:6, 102:21-104:11, 108:3-20. In addition, FDC has implemented a Restrictive Housing Program which was created to provide pro-social programming for inmates in CM. *See* **Exhibit N** (Deposition Transcript of Maggie Agerton) at 60:19-62:7.

FDC recognizes that staffing is an ongoing concern at *all* institutions, not just as it relates to restrictive housing. However, staffing issues do not indicate that the privileges under the F.A.C are not provided on a wide-spread or uniform basis. Kirkland Decl. at ¶¶ 98-101.

Medical and mental health care is provided to inmates in restrictive housing. *See generally* Declaration of Paula Foskey; **Exhibit Q** (Procedure 403.003). Health

---

[1] Plaintiffs' expert testified that a grievance approval rate of greater than 25% is evidence that the grievance system is legitimate. *See* **Exhibit H** (Deposition Transcript of Dan Pacholke) at 183:24-184:16.

care decisions, including mental health care, are made based on the individual circumstances of the inmate's medical condition and mental health. Foskey Decl. at ¶ 7; **Exhibit P** (Deposition Transcript of Dr. Dean Aufderheide) at 56:20-59:14, 126:22-134:14.

FDC has robust ADA policies and procedures. *See* Foskey Decl. at ¶¶ 8-9, 35-46. Decisions regarding medical care and disability accommodations are made on a case-by-case basis depending on the particular needs of the inmate. *Id.* at ¶¶ 7, 23.

## III.  <u>LEGAL STANDARD</u>

Plaintiffs bear the burden of proof under Federal Rule of Civil Procedure 23. *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016). "All else being equal, the presumption is against class certification because class actions are an exception to our constitutional tradition of individual litigation." *Id.*

"Although the trial court should not determine the merits of the plaintiffs' claim at the class certification stage, the trial court can and should consider the merits of the case to the degree necessary to determine whether the requirements of Rule 23 will be satisfied." *Babineau v. Fed. Express Corp.*, 576 F.3d 1183, 1190 (11th Cir. 2009) (citation omitted).

## IV.  <u>THE PROPOSED CLASSES ARE OVERBROAD</u>

Plaintiffs bear the burden to establish that their proposed class is "adequately defined and clearly ascertainable," and they must satisfy this requirement before the

district court can consider whether the class satisfies the enumerated prerequisites of Rule 23(a). *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021).[2] "A class is inadequately defined if it is defined through vague or subjective criteria." *Id.* (citation omitted).

***All Classes***:  ***First***,  the proposed classes are overbroad on their face because they include six different housing statuses (AC, DC, CM I-III, and MM), all of which have different restrictions and privileges. *See* F.A.C. 33-602.220, 33-602.222, 33-601.800, 33-601.820. For example, an inmate on CM III gets a tablet, up to twenty hours of dayroom time and six hours of recreation weekly, can have a job assignment, weekly telephone calls, bi-monthly contact visitation of up to four hours, and is unrestrained during out-of-cell events. *Id.* at 33-601.800. By contrast, an inmate in DC does not receive those privileges. *Id.* at 33-602.222. Despite these apparent differences, Plaintiffs seek a class based on the false notion that because FDC refers to these statuses as "restrictive housing" that the conditions are "substantially similar." Motion at 32. They plainly are not. Because of the material differences in these housing statuses these classes cannot be certified.

---

[2] Defendants recognize that courts have held that the ascertainability requirement is not required for a Rule 23(b)(2) class. *See Jones v. Desantis*, No. 4:19cv300-RH/MJF, 2020 WL 5646124, at *6 (N.D. Fla. Apr. 7, 2020) (citing *Carpenter v. Davis*, 424 F.2d 257, 260 (5th Cir. 1970)). However, the *Cherry* decision does not restrict the ascertainability requirement to Rule 23(b)(3) classes and specifically states that requirement relates to the Rule 23(a) analysis. 986 F.3d at 1302. Therefore, Defendants preserve this argument here.

**Second**, all proposed classes are defined as including "[a]ll people in the custody of FDC who are, or will be in the future, in [AC, DC, CM, MM] or any substantially equivalent restrictive housing unit used by FDC where people are locked in their cells, alone or with a cellmate, for 22 hours or more per day." Motion at 3-4. These classes are overbroad because it is not clear whether the "22 hours or more per day" requirement applies to those in AC, DC, CM, and MM statuses or not. If it does not, then there is no fit with Plaintiffs' expert opinions which assess the risk of harm based on their definition of "solitary confinement" which is 22 hours a day in cell. *See* **Ex. H** at 21:18-20, 23:6-24, 80:20-81:10 (stating he is comfortable with an inmate spending less than 22 hours a day in cell; 20 hours a day "would be fine"); **Exhibit I** (Deposition Transcript of Dr. Homer Venters) at 130:17-21. However, under the F.A.C. inmates in CM II and CM III spend less than 22 hours a day, on average, in their cells. *See* F.A.C. 33-601.800. And, some inmates classified as "CM inmates" are housed in secure treatment units or in in-patient care, where they spend less than 22 hours a day in-cell. **Exhibit M** (Deposition Transcript of Rusty McLaughlin) at 168:13-170:21; **Exhibit R** (Procedure 404.005), **Exhibit S** (Procedure 404.004); *see also* **Exhibit D** (Deposition Transcript of Jac'Quann (Admire) Harvard) at 22:1-24:24; **Exhibit G** (Deposition Transcript of Tracey Dean) at 112:18-115:24.

*Third*, the classes are overbroad because there is no durational limit—they include inmates who will spend only a single day in restrictive housing. Yet, Plaintiffs' experts have testified that restrictive housing is permissible for a short period of time. **Ex. H** at 102:5-22, 142:8-16; **Exhibit K** (Deposition Transcript of Dr. Craig Haney) at 97:16-98:2.

*Fourth*, "substantially equivalent restrictive housing unit" is not defined and membership is not objectively determinable. As phrased, it may include general population inmates, for example, who spend 22 hours a day in their cell during a facility-wide lockdown.

*Youth Subclass*: This subclass is overbroad because it includes inmates under the age of 21, but the policies applied to inmates 17 years of age and under in restrictive housing differ from the policies applied to inmates 18 years and older. *See* Kirkland Decl. at ¶¶ 7, 50, 51.

*SMI Subclass*: The SMI subclass is overbroad because it contains no objective criteria to determine who is a member of the class. Plaintiffs rely on the FDC's definition of "serious mental illness," Motion at 4 n.5; however, that definition requires individual determinations to be made by a mental health professional based on the individual characteristics and limitations of the inmate. **Ex. P** at 42:20-55:21; *see also* **Exhibit J** (Deposition Transcript of Dr. Kathryn Burns) at 59:19-62:18 (agreeing that for those with mental illness other than

schizophrenia, bipolar, and major depressive disorder, the SMI diagnosis will require individual assessment); *see also* Declaration of Dr. Gregory Saathoff at ¶ 87.

***Physical Disability Subclass***: This subclass is overbroad because membership in this class is based on the determination of whether the inmate has a "disability" as defined in the ADA or RA. Motion at 4. However, as explained in Section V.A.(2), the determination of whether an inmate is "disabled" under the ADA or RA requires individual inquiry.

Because the proposed classes are overbroad and inadequately defined, this Court cannot determine whether the requirements of Rule 23(a) have been met and Plaintiffs' Motion should be denied.

## V.    PLAINTIFFS FAIL TO SATISFY RULE 23(a)

### A.    No common questions or answers

Class certification is appropriate only when the "issues involved are common to the class as a whole" and when they "turn on questions of law applicable in the same manner to each member of the class." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982) (citation omitted). "What matters to class certification," is whether a class action would "generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). In other words, Rule 23(a) demands not only that each class member's claim "depend upon a common contention," but that the common contention "is capable of classwide

resolution—which means that determination of [the contention's] truth or falsity will resolve an issue that is central to the validity of each one of the [member's] claims in one stroke." *Id.* In determining whether a common question will generate a common answer, a court must consider any dissimilarities between the class members. *Id.* at 359. This is because dissimilarities within the proposed class can "impede the generation of common answers." *Id.* at 350.

(1)    The Eighth Amendment Claim

The Eighth Amendment prohibits "inflictions of pain . . . that are totally without penological justification." *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (quotations and citations omitted). In prison litigation, the Eighth Amendment is violated when the defendant "is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020) (quoting *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016)). "As applied in the prison context, the deliberate-indifference standard sets an appropriately high bar." *Id.* "A plaintiff must prove that the defendant acted with 'a sufficiently culpable state of mind.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Even where "'prison officials . . . actually knew of a substantial risk to inmate health or safety,' they may nonetheless 'be found free from liability if they responded reasonably to the risk'" and "even if the harm ultimately was not averted." *Id.* at 1286.

10

(a)    *Plaintiffs' Non-Specific Challenge to "Isolation Policies and Practices" is Too Broad to Satisfy Commonality*

Plaintiffs claim that "FDC's systemic isolation policies and practices subject all people in isolation to the same substantial risk of serious harm." Motion at 30-31. Plaintiffs are entirely unclear, however, as to which policies and practices are at issue, are common, and are sought to be certified. Instead, Plaintiffs spend twelve pages discussing some policies and practices which, admittedly, only apply to "some" or "many" inmates in certain situations, at certain prison facilities, and at some unknown point in time. *See id.* at 5-16. Rather than providing a list of common questions, Plaintiffs instead state that a common question will be "whether the cumulative impact of the deprivations and conditions in isolation subject all class members, regardless of their individual risk factors, to a substantial risk of serious harm." *Id.* at 37. The exact "deprivations and conditions" which are at issue, is however, anyone's guess.

For example, Plaintiffs' Motion identifies a few provisions from the F.A.C. regarding visitation, telephone calls, radios, tablets, recreation, and dayroom privileges, as well as security measures such as restraints and cell searches. *Id.* at 9-12. This appears simple enough. But then, Plaintiffs go a step further and cite housing unit instructions which they mischaracterize as preventing communication between inmates (they do not). *Id.* at 9. They complain about cell conditions that only "some" inmates experience, including less than half of their inmate declarants.

11

*Id.* at 8-9. They identify "practices," not based on the F.A.C., but rather performed in violation of the F.A.C. – such as not "consistently" giving inmates dayroom time and not providing the prescribed recreation to "most" inmates. *Id.* at 10-11.[3] They describe various discretionary practices which are provided for in the F.A.C. and procedure, but which plainly do not apply to all inmates in restrictive housing. *Id.* at 9-10 (suspension of privileges),[4] 13 (property restriction, use of chemical agents and physical force, and cell extractions). They discuss security practices such as restraints, cell searches, and physical searches – practices which their own expert agrees are penologically justified. *Id.* at 12-13; **Ex. H** at 68:5-69:24, 226:18-228:8. Finally, there are several allegations which obviously cannot form their constitutional claim. For example, Plaintiffs state that some inmates are sexually harassed during their physical searches, Motion at 12; yet, the Eleventh Circuit has

---

[3] No evidence has been presented demonstrating that these purported failures to follow the F.A.C. were condoned by the FDC. And, Plaintiffs' expert testified that he had not read anything from "central office down" that would lead him to believe that "Tallahassee" is promulgating these types of practices. **Ex. H** at 232:1-233:1. Section 1983 liability does not rest on a *respondeat superior* theory and liability against an entity depends on constitutional deprivations resulting from (1) an unconstitutional action taken pursuant to an officially promulgated policy statement, decision, regulation, or ordinance; or (2) governmental custom, even though not authorized by written law *See Martinez v. City of Opa-Locka*, 971 F.2d 708, 713 (11th Cir. 1992) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690-91 (1978)). The answer to this question will also require individual inquiry.

[4] Plaintiffs' expert agrees the suspension of privileges, like phone calls and visits, can be penologically justified, depending on the circumstances. **Ex. H** at 251:9-252:6, 258:4-259:15.

repeatedly held that verbal abuse alone is insufficient to state a constitutional claim. *See Edwards v. Gilbert*, 867 F.2d 1271, 1274 n.1 (11th Cir. 1989); *Hernandez v. Fla. Dep't of Corr.*, 281 F. App'x 862, 866 (11th Cir. 2008).

"The question is not whether a constellation of disparate but equally suspect practices may be distilled from the varying experiences of the class; rather, Plaintiffs must first identify the 'policy or custom' they contend violates the dictates of [the Constitution] and then establish that the 'policy or custom' is common to the class." *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 326 (D.D.C. 2011). Rather than identifying the policies or practices sought to be certified, Plaintiffs' proposed "common question" of "whether the cumulative impact of the deprivations and conditions in isolation subject all class members . . . to a substantial risk of serious harm," Motion at 37, "stretch[es] the notions of commonality by attempting to aggregate several amorphous claims of systemic or widespread conduct into one 'super-claim.'" *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 844 (5th Cir. 2012) (quotations and citations omitted); *see also Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 478 (8th Cir. 2016) ("[M]erely advancing a question stated broadly enough to cover all class members is not sufficient under Rule 23(a)(2)."). "Mere allegations of systemic violations of the law . . . will not automatically satisfy Rule 23(a)'s commonality requirement . . . ." *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010).

Describing a series of policies and practices that *may* apply to an inmate in restrictive housing is not sufficient to demonstrate that there is a common answer apt to drive this litigation. *See, e.g.*, *Sabata v. Neb. Dep't of Corr. Servs.*, 337 F.R.D. 215, 264 (D. Neb. 2020) (finding the prison isolation subclass "defies commonality"). If it is Plaintiffs' contention that not a single policy on its own violates the Constitution, but rather all policies and all practices (that allegedly violate the policies), taken together, are the constitutional violation, *see* D.E. 346, – then it should be evident that this class should not be certified because by Plaintiffs' own admission, not all of the policies and practices identified in Plaintiffs' Motion are experienced by the putative class.

       (b)     *Whether the Confinement Policies in the FAC Are Constitutional Cannot be Answered on a Class-wide Basis*

Despite these various allegations, Defendants understand this case to address the written policies regarding restrictive housing and understand these other allegations to constitute mere background information. *See* Motion at 35 ("None of these conditions and deprivations common to FDC's isolation units throughout the system are in dispute *because FDC's written policies expressly require them*.") (emphasis added); *see also* [D.E. 343].

To the extent this case is about the written policies, then Defendants' response is two-fold. First, if Plaintiffs are making a facial challenge to the written policies, then Defendants agree that commonality is satisfied under the Eighth Amendment.

However, if Plaintiffs are making an as-applied challenge, *see* [D.E. 346 at 26], then commonality has not been met, even if this case is only about the written policies.[5]

"A facial challenge is an attack on a law itself as opposed to a particular application." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015); *United States v. Frandsen*, 212 F.3d 1231, 1235 (11th Cir. 2000). By contrast, where "plaintiffs seek to vindicate their own rights, the challenge is as-applied." *Jacobs v. The Fla. Bar*, 50 F.3d 901, 906 (11th Cir. 1995); *see also Ross v. Duggan*, 402 F.3d 575, 582 n.3 (6th Cir. 2004) ("In an as-applied challenge, the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional. Therefore, the constitutional inquiry in an as-applied challenge is limited to the plaintiff's particular situation." (quotations omitted)). However, an as-applied challenge is difficult to certify because it would entail an analysis of how the policy was applied to each individual class member. *See, e.g.*, *Hudson v. City of Chicago*, 242 F.R.D. 496, 505 (N.D. Ill. 2007) (finding plaintiffs are attacking the ordinance as applied, which would necessarily entail an analysis of how the ordinance was applied to each individual class member).

---

[5] At the time of the filing of this Response, Defendant Inch's Motion for Partial Summary Judgment on this issue remains pending. *See* [D.E. 343].

Prisoner conditions of confinement claims are inherently case specific. *See DeSpain v. Uphoff*, 264 F.3d 965, 974 (10th Cir. 2001) ("An inquiry into conditions of confinement by necessity relies on the particular facts of each situation[.]"). Whether a condition of confinement is unconstitutional under the Eighth Amendment will depend on the circumstances of the confinement, including the duration, the actual conditions imposed, the penological justification, and the wantonness of the purported conduct. These individual considerations are not common among the putative class.

***First***, the conditions imposed for each inmate in restrictive housing will vary depending on their level of confinement (*i.e.,* AC, DC, CM I-III, MM), as well as any additional privileges or restrictions imposed on the inmate under the discretion afforded by the F.A.C. and procedure. *See* Kirkland Decl. at ¶¶ 6-57. Additionally, several of the "punitive" security measures identified by Plaintiffs are not uniformly applied and instead only occur when there is a security risk, as determined by the institution, necessitating the imposition of those additional restrictions. (*i.e.,* use of force, cell extraction, chemical agent, property restriction). Kirkland Decl. at ¶¶ 82-97. Thus, to determine whether any purported "condition of confinement" is constitutional, the first question would be to determine the actual conditions imposed on each individual putative class member. *See* [D.E. 346 at 24 ("[A] decision as to

[the Eighth Amendment claim] requires the factfinder to evaluate evidence about the actual conditions.")].

**Second**, the constitutionality of the condition cannot be evaluated without considering duration because whether a prisoner's exposure to a particular condition amounts to a constitutional violation depends largely on the duration of that exposure. *See Hutto v. Finney*, 437 U.S. 678, 686 (1978); *Chandler v. Crosby*, 379 F.3d 1278, 1295 (11th Cir. 2004) ("[T]he Eighth Amendment is concerned with both the 'severity' and the 'duration' of the prisoner's exposure to inadequate cooling and ventilation."); *Stallworth v. Wilkins*, 802 F. App'x 435, 443 (11th Cir. 2020) ("[W]ithout facts indicating the duration of [plaintiff's] discomfort, we cannot say he stated a claim under the 8th Amendment."); *see also* [D.E. 346 at 26 ("The degree of that risk of harm—including whether there is some minimal number of days in Restrictive Housing that may be constitutionally tolerable . . . is among the disputed issues of fact.")].

Here, the duration of confinement varies widely across the putative class. Some inmates will spend a single day in restrictive housing, while others may spend years. As the Supreme Court stated, "[a] filthy, overcrowded cell and a diet of 'grue' might be tolerable for a few days and intolerably cruel for weeks or months." *Hutto*, 437 U.S. at 686-87. In fact, Plaintiffs' own experts testified that they find periods of "solitary confinement" of short duration permissible. *See* **Ex. H** at 102:5-22, 142:8-

16; **Ex. K** at 97:16-98:2. And Plaintiffs' experts agree that the length of confinement impacts the risk of harm. *See* **Ex. K** at 72:6-16; **Ex. J** at 130:24-131:5.

***Third,*** the penological justification for the imposition of the "condition" will have to be analyzed on an individual basis. *See generally* Declaration of Larry Reid. For example, in *Bass v. Perrin,*170 F.3d 1312, 1315 (11th Cir. 1999), two CM inmates challenged their suspension of outdoor recreation time under the Eighth Amendment. The Eleventh Circuit found that while restriction on outdoor exercise certainly involves the "infliction of pain," this pain could not be said to be unnecessary – *i.e.,* "totally without penological justification" because of the safety and security threat posed by the two plaintiffs. *Id.* at 1316. The court noted that both plaintiffs were incarcerated for violent crimes, and since incarceration both plaintiffs had continued to engage in violent behavior, including murder, and both plaintiffs attempted to escape during outdoor recreation. *Id.* The Eleventh Circuit concluded that under these circumstances the "complete denial to the plaintiffs of outdoor exercise, although harsh, did not violate the Eighth Amendment." *Id.* at 1317.

Thus, as demonstrated by *Bass,* a determination that any restriction imposed on any putative class member in restrictive housing is unconstitutional will first have to look at the particular circumstances of the inmate to see whether it was penologically justified. *See, e.g.*, **Ex. H** at 49:20-51:19 (agreeing that placing an inmate who commits a violent act into restrictive housing is appropriate; explaining

that an individual assessment is needed); **Ex. J** at 62:19-63:18 (discussing the "rare exceptions" where an SMI inmate can be placed in restrictive housing, such as when there is a "risk of harm to others" and no alternative readily available); **Ex. K** at 57:21-58:5 (does not think restrictive housing should be abolished; concerns over "[h]ow you do it, for how long you do it, and to whom or with whom you do it") This cannot be done on a class-wide basis.

**Fourth**, Plaintiffs will have to prove that Defendants were wanton, an element of proof that will vary by inmate. Again in *Bass*, the Eleventh Circuit found the FDC was not wanton because it took various steps to ensure the plaintiffs were not harmed as a result of their conditions of confinement, including daily cell-front medical evaluations, weekly mental health evaluations, and a booklet providing methods for in-cell exercise. *See* 179 F.3d at 1317. Accordingly, whether the FDC was wanton for any particular class member will require individual inquiry into the steps the FDC took to alleviate any purported harm caused by their imposed conditions.

**Finally**, an as-applied challenge to the written policies fails to satisfy commonality because the question of whether there is a "substantial risk of serious harm" caused by any particular restrictive housing policy will vary by inmate. Saathoff Decl. at ¶ 90. A prisoner must show that he is presently suffering "serious harm" or is at a "substantial risk" of suffering serious harm and that prison officials are deliberately indifferent to that harm or risk. *Farmer*, 511 U.S. at 828. Substantial

risk of future harm can be a viable injury, but only if Plaintiffs can show a policy is "sure or very likely to cause" serious medical harm in the imminent future. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (in "the next week or month or year").

As this requirement implicates the question of commonality, one district court described the calculus as follows:

> This means that Prisoner A's and Prisoner B's Eighth Amendment claim might differ in three ways that bear on the issue of commonality. First, setting aside the risk and the harm, the two prisoners might be affected by two different prison officials (or two different sets of officials) such that one official's state of mind says little about the other's. Prisoner A and B's Eighth Amendment claims might also differ in the amount of risk: there might be less than a 1% chance that Prisoner A will experience serious harm but a 20% chance that Prisoner B will experience serious harm. Perhaps the former is not "substantial" in the Eighth Amendment sense but the latter is. Third, even if Prisoner A and B are at similar risk of harm and from the same prison officials, Prisoner A's harm (if it arises) might be very minor while Prisoner B's (if it arises) might be "serious" in the Eighth Amendment sense.

*Dearduff v. Washington*, 330 F.R.D. 452, 464 (E.D. Mich. 2019). The *Dearduff* court examined whether there was evidence that the policy or practice challenged exposed nearly every class member – no matter their dental health – to similar risk of harm. It concluded that if the putative class members were not at a similar risk of harm, then the "door to individualized inquiry would be left ajar." *Id.* at 466. The court found commonality had not been met because in a class of about 19,000 inmates one would expect a "wide-spectrum of dental health" indicating the risk of harm was not

similar. *Id.*; *see also Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 555 (7th Cir. 2016) (decertifying class regarding alleged treatment delay in jail and finding "the length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment" and "[t]he more significant the dental pain, the more immediate is the need for treatment").[6]

Here, Plaintiffs' expert agrees that although there is a "risk of harm" for all inmates (including those in general population), the actual harm and risk of harm may vary by individual inmate, their circumstances, their setting, the duration of confinement, and their treatment. **Ex. K** at 48:25-55:23, 71:8-72:20, 109:16-111:22; [D.E. 311-9, ¶ 43]. This admission demonstrates that the risk of harm cannot be said to be "similar" across the putative class. *See also* **Ex. I** at 39:25-40:19, 156:8-157:6, 180:17-182:9 (describing various levels of risk based on whether medication is

---

[6] Plaintiffs cite *Parsons v. Ryan*, 754 F.3d 657, 663 (9th Cir. 2014) for the proposition that "every inmate suffers exactly the same constitutional injury when he is exposed to a single statewide . . . policy or practices that creates a substantial risk of serious harm." Motion at 31, 40. Yet, at least six judges of the Ninth Circuit disagreed with the reasoning of the *Parson's* opinion. In particular, Judge Sandra Ikuta, with five judges joining her, authored a dissent from the denial to rehear *Parsons en banc. Parsons v. Ryan*, 784 F.3d 571, 572-81, 574 n.3 (9th Cir. 2015) (Ikuta, J., dissenting) (It may be there were not enough votes for rehearing *en banc* because the case settled after the panel opinion issued). Judge Ikuta believed that there was not a key question, capable of a single answer, underlying the claims of all prisoners of the Arizona Department of Corrections. Judge Ikuta explained that the "diversity of needs" among the prisoners meant that the question of whether ADC's practices and policies violated the Eighth Amendment could not "be answered in a single stroke." *Id.* at 579.

provided, length of stay, severity of disease, conditions of confinement, level of control of health problem, age, and physical capability of inmate); **Ex. J** at 50:16-56:25, 105:3-24, 205:24-206:25, 209:11-21, 213:5-20, 215:10-216:4, 244:8-24 (agreeing that how people react to the experience of being in isolation depends on several factors; the "harmful effects" may or may not be experienced by inmates in restrictive housing); **Exhibit L** (Deposition Transcript of Dr. Louis Kraus) at 63:1-64:15, 67:4-10.

Further, Dr. Haney's opinions regarding risk of harm are based on an amorphous definition of "solitary confinement" which he defines "in terms of the kinds of activities that are available to prisoners when they're out of their cells[.]" **Ex. K** at 198:22-25. He offers no opinions of "substantial risk of serious harm" based on the conditions in Florida prisons or restrictive housing as defined by the FDC. Instead, he assesses risk of harm based on whether the individual inmate has found his or her out-of-cell time "meaningful."[7] Obviously, whether an inmate found his or her out-of-cell time meaningful will require individual inquiry and will vary by inmate. *See id.* at 192:11-25 ("[T]o some of them, the conversations might have been meaningful. I don't know. I'd need to interview them.").

---

[7] Dr. Haney defines "meaningful social contact" as "[c]ontact which is purposeful contact which allows for genuine unmonitored communication which allows for the [sic] establishing and nurturing of social relations and social relationships, social contact that's unmediated by bars and screens, glass windows, et cetera; social contact between friends, peers, loved ones." **Ex. K** at 191:23-192:6.

In fact, Plaintiffs' assertion that inmates refuse out-of-cell time because of a fear that their cell will be "tossed" demonstrates the point that the value or meaning received from out-of-cell time (or any denied privilege) will vary by inmate. Some inmates may find their time in the recreation area meaningful, and choose to go to recreation even though it will involve a strip and cell search when they leave. Other inmates may not value the social interaction on the recreation yard, and forego that opportunity. *See* **Ex. J** at 186:3-187:23 (indicating some inmates refuse recreation because there is no place to sit down, no equipment, there is nothing to do, they may not be able to use the restroom, or their cell may be tossed); **Ex. K** at 193:2-24 (describing some inmates do not go to dayroom because "there's nothing to do" or "[i]t's a hassle"),  208:15-22 ("[B]eing given access to only meaningless or empty out of cell time which they found not worth the hassle of participating."); 68:23-70:4 (inmates reported they "didn't go precisely because it was unsatisfying or because of the way in which the activity took place and what they had to do in order to get there and come back"); 73:19-74:13 ("[E]ven when [dayroom] does occur, it provides [inmates] with relatively little meaningful activity in which to engage, no programming really of any kind."). What this demonstrates is that if the purported "serious harm" is a result of the lack of "meaningful social interaction" – then whether the interaction is meaningful will necessarily vary by inmate and that

inmate's perceptions as to the "meaning" received from of the out-of-cell time as compared to other concerns.[8]

Plaintiffs must demonstrate through evidence that the policies challenged (whatever they may be) expose nearly every class member to a similar risk of harm. There is no evidence presented of a substantial risk of serious harm flowing from any policy specific to Florida or any policy standing alone or in conjunction with another policy, much less evidence that that risk or harm is similar across the class. *See generally* Declaration of Dr. Reed Paulson; Saathoff Decl.; Declaration of Dr. Ryan Labrecque; Declaration of Dr. J.C. Barnes. Plaintiffs have failed to meet their burden and their claim cannot be certified.

> (c)    *The Claimed "Practices" Do Not Satisfy Commonality*

To the extent Plaintiffs seek to certify a class based on unwritten practices which, if occurred, would violate the written policies, then those claims fail the commonality requirement.

A challenge to a purported system-wide policy or practice requires "significant proof" that the alleged policy or practice is in fact system-wide. *Wal-Mart*, 564 U.S. at 353; *Mathis v. GEO Grp., Inc.*, No. No. 2:08–CT–21–D, 2012 WL 600865, at *6 (E.D.N.C. Feb. 23, 2012) (finding commonality not met because the

---

[8] It is not clear how a privilege which is viewed as a "hassle" or not worth the effort can be found to be constitutionally required.

plaintiff-inmate was not challenging a concrete policy, but rather a "constellation of unspecified 'organizations, systems, policies, procedures, practices, acts, and omissions' that allegedly have led to unconstitutional individual deprivations"); *see Love v. Johanns*, 439 F.3d 723, 729 (D.C. Cir. 2006) (holding that "anecdotal evidence" offered by 622 subclass members "may give the declarants standing to bring *individual* suits," but "[do] not require the District Court to infer the existence of a 'common policy of discrimination' that affected the *non*-declarants, as well").

Here, Plaintiffs offer no "significant proof" that the purported unauthorized practices occur system-wide. For some purported practices, they offer only a few of the thirty-eight filed declarations as support for their "wide-spread" claim. *See* Motion at 10 (no tablets;  6/38 declarants); 11 (recreation not provided; 10/38 declarants); 12 (sexual harassment during strip searches;  10/38 declarants); 13 (destructive cell searches; 16/38 declarants).

For other described practices, they do not even cite to a single inmate declaration. Instead, Plaintiffs rely on a mis-cited housing unit instruction, *id.* at 8 (citing Ex. E-3); deposition testimony summarizing the F.A.C. and written procedures, *id.* at 9-10 (citing Exs. C-5 and C-7); and three meeting minutes from several years ago regarding two facilities. *Id.* at 12-13 (citing Exs. B-8, F-1, F-2). And, in support of their statement that "dangerous levels of understaffing" have resulted in inmates not receiving services such as recreation and dayroom, Plaintiffs

cite to a document which speaks of the prison system generally, not restrictive housing, *Id.* at 14 (citing Ex. G-2), and three emails from several years ago discussing institution-specific staffing issues, such as rounds being completed by the chaplain. *See id.* (citing Exs. G-3, G-4, G-5). This sparse evidence is not sufficient to support the broad statement that understaffing has led to inmates not receiving their privileges under the F.A.C.

In response to 789 requests for production, Defendants have produced over 2.5 million pages of emails and documents.[9] In addition, following eight facility inspections, Defendants produced over 99,000 pages of documents for 186 inmates. The fact that Plaintiffs can only point to three emails, three meeting minutes, and non-controversial summaries of the policies and procedures in support of their claim of "wide-spread" practices is telling. The alleged "practices" are not system-wide and certainly cannot be said to be common.

In addition, Plaintiffs' Motion entirely ignores the fact their deposition testimony contradicts any argument that such practices are uniform. For example, some Plaintiffs attended out-of-cell programming and education. **Exhibit B** (Deposition Transcript of James Kendrick) at 151:20-159:3; **Ex. D** at 55:23-57:11. Many Plaintiffs admitted to being able to communicate with neighboring inmates while in their cell. **Ex. B** at 162:9-163:9; **Ex. D** at 44:18-46:18; **Exhibit A**

---

[9] As of October 4, 2021.

(Deposition Transcript of Jeremiah Hill) at 61:6-62:4, 110:24-111:22; **Exhibit C** (Deposition Transcript of Jerome Burgess) at 107:22-108:10, 178:1-179:13. Not all of the Plaintiffs have been placed on property restriction while in CM. **Ex. B** at 198:25-199:2; **Ex. A** at 208:3-8. Many of the Plaintiffs testified to making regular telephone calls in compliance with the CM Rule. **Ex. B** at 199:25-202:4; **Ex. D** at 51:7-19; **Exhibit E** (Deposition Transcript of Johnny Hill) at 17:13-23, 26:21-27:20. Radios were widely used by the Plaintiffs. **Ex. B** at 221:8-222:21; **Ex. C** at 120:9-121:17; **Ex. E** at 178:9-21, 179:17-181:5. Tablets were also used by the Plaintiffs to watch movies, play video games, listen to music, and email friends and family. **Ex. A** at 152:5-13; **Ex. C** at 111:18-115:10, 153:23-155:10; **Ex. D** at 63:7-24. As for recreation, Jeremiah Hill testified that he received recreation three times a week, sometimes for four hours a day, while in CM at Hardee. **Ex. A** at 215:19-217:6. And, while he was there, nothing happened to his belongings. *Id.* at 218:7-9. Other Plaintiffs also admitted to receiving recreation in compliance with, and in excess of, the CM Rule. **Ex. D** at 50:6-8, 59:16-60:25; **Exhibit F** (Deposition Transcript of Juan Espinosa) at 99:8-16.[10]

---

[10] These statements of "wide-spread" practice are also refuted by Plaintiffs' experts' notes of interviews during facility inspections. *See* **Ex. H** at 96:2-4 (agreeing that some inmates reported receiving recreation three times a week), 160:6-11 (only saw one inmate on property restriction during inspections), 177:15-178:14 (saw classrooms and program rooms, but could not say if inmates used them because he "didn't really pursue the issue"), 212:22-214:6 (some inmates had jobs).

The fact that not *all* of the named Plaintiffs, much less *all* of the self-selected thirty-one other declarants, can state the unwritten practice occurs uniformly warrants denial of the certification of these claims. Nevertheless, even if every one of these accounts were true, the self-report of thirty-eight inmates[11] does not demonstrate a statewide policy across the class. *See Wal-Mart*, 564 U.S. at 358 ("Even if every single one of [the 120] accounts [of discrimination] is true, that would not demonstrate that the entire company operate[s] under a general policy of discrimination, which is what respondents must show to certify a companywide class." (quotations and citations omitted)); *Dearduff*, 330 F.R.D. at 468 (discussing plaintiff's expert's opinion based on the dental records of only 12 prisoners and finding "[t]hat a handful of prisoners did not receive an appropriate treatment plan . . . does not establish a standard practice across all MDOC correctional facilities").

Plaintiffs' experts' conclusory reports are also insufficient to establish wide-spread practice,[12] including the fact that their experts did not "drill down" when an inmate said they did not go to recreation or the dayroom to determine the reason, or

---

[11] "[C]ourts should approach prisoner claims of retaliation 'with skepticism and particular care' due to the 'near inevitability' that prisoners will take exception with the decisions of prison officials and 'the ease with which claims of retaliation may be fabricated.'" *Manley v. Paynter*, No. 4:07cv392-WS, 2009 WL 2489229, at *3 (N.D. Fla. Aug. 12, 2009) (citation omitted).

[12] Contemporaneous with this Response, Defendants are filing a Motion to Strike Plaintiffs' Expert Declarations.

whether that experience was different pre-COVID-19. *See, e.g.*, **Ex. J** at 157:2-158:6, 161:15-23, 180:2-182:20, 187:15-189:12; **Ex. K** at 67:13-19.

"Allegations of individual instances of mistreatment, without sufficient evidence, do not constitute a systemic deficiency or overarching policy of wrongdoing." *Willis v. City of Seattle*, 943 F.3d 882, 885 (9th Cir. 2019). For example, in *Willis*, the City enacted several administrative rules and guidelines regarding removal procedures for unauthorized encampments on state property. *Id.* at 884. The plaintiffs sought class certification on claims that the City engaged in an alleged policy and practice of "sweeps" that destroyed property and which violated the federal and state constitutions. *Id.* The district court denied the motion for class certification and the Ninth Circuit affirmed.

The Ninth Circuit found that the plaintiffs failed to proffer sufficient evidence and articulate a practice that was common to the claims of the proposed class, and stated:

> Although the record contains voluminous declarations, photographs, and videos in support of a broad description of "sweeps," Appellants notably do not point to a specific practice that applies uniformly to all proposed class members. Despite the broad allegations in their complaint, there is no evidence that every Appellant has experienced the same challenged practice or suffered the same injury due to the implementation of the MDARs or the WSDOT Guidelines.

*Id.* at 885. The Ninth Circuit found the plaintiffs were not challenging a written law or policy as unconstitutional, but rather the "practice and policy" at issue for certification was the alleged pattern of destroying personal property "with utter disregard of even their own regulations." *Id.* at 886. As such, commonality was not met.

As opposed to a challenge of a written policy, Plaintiffs' claims based on various "practices" such as destructive cell searches and failure to provide recreation will necessarily rely on the individual circumstances of the event to determine whether, in each instance, the conduct occurred and, if so, it was in violation of the Constitution. *See, e.g.*, *Salem v. Mich. Dep't of Corr.*, No. 13-cv-14567, 2019 WL 4409709, at *6 (E.D. Mich. Sept. 16, 2019) (finding no commonality where the challenge was not to the written search policy, but claimed conduct in searching of inmates in violation of the written search policy); *Klein v. DuPage Cnty.*, 119 F.R.D. 29, 31 (N.D. Ill. 1988) (declining to certify a class of inmates who complained about routine "strip-and-cavity searches" where the reasonableness of each search was dependent upon "special institutional security concerns" and where each search may have been conducted in a "variety of ways").

Further, even if a selection of inmates claim a certain practice occurred at one point in time, that does not mean the practice is uniform or still in effect. The inmate declarations offered are non-specific on time. And, the three emails and three

meeting minutes offered in support were written well over three years ago. Further, as Plaintiffs testified, whether the F.A.C. is followed is often officer-specific and institution-specific. *See* **Ex. A** at 143:12-144:9, 146:2-11; **Ex. B** at 69:2-15; **Ex. C** at 108:4-15, 137:14-139:24; **Ex. D** at 42:5-43:9, 57:12-58:8; **Ex. F** at 111:6-16; **Ex. G** at 64:11-65:1. There is no "significant proof" that any of these alleged practices are still occurring, much less that they occur at all institutions.[13]

Whether a constitutional violation has occurred can be resolved only by assessing each individual class member's exposure to the alleged conditions, and then determining whether those conditions violated that individual's constitutional rights. This cannot be done on a class-wide basis.

(d)    *The Claimed Cell Conditions Are Not Common*

Again, without knowing which policies and practices are actually sought to be certified, it is unclear whether Plaintiffs contend the various cell conditions alleged by "some" inmates are common across the state for all class members and whether they form Plaintiffs' claimed constitutional violation. Nevertheless, Defendants respond in much the same way they do to Plaintiffs' allegations

---

[13] For example, Plaintiff Burgess testified that his second experience on CM at Suwannee changed from the first time he was on CM at Suwannee – there was a "big makeover" and "a lot of officers got fired and stuff for things they were doing." **Ex. C** at 107:5-108:15. The second time it was more "open" meaning you could talk on the door and officers let you watch TV sometimes when you were not supposed to watch it. *Id.*

regarding the supposed "practices" – there is no evidence that such conditions are uniform across the class. Plaintiffs admit that only "some" inmates have a frosted or covered window. Motion at 8 (citing 9/38 declarants). In fact, most of the named Plaintiffs admitted to being able to see out of a window while in restrictive housing. **Ex. A** at 99:9-100:6, 103:10-19, 183:6-18, 186:14-21; **Ex. B** at 52:14-16, 100:11-17, 111:13-112:17, 163:24-164:5; **Ex. D** at 37:13-39:11; **Ex. E** at 121:18-122:1; **Ex. F** at 67:22-68:4.

Plaintiffs state only that "many" cells are grimy and are infested with rats and cockroaches. Motion at 9 (citing 12/38 declarants). And, their expert admits these conditions were not uniform. **Ex. H** at 106:5-11 (stating Union "felt like a more well-maintained facility, in the sense of cleanliness"), 107:11-108:12 (only saw rodents at one facility), 108:15-18 ("I saw insects, but I don't know that it was anything concerning or alarming."), 109:2-3 ("The cells were actually the cleanest aspect of most of the tours, other than the toilets."), 110:1-7 (inmates reported receiving cleaning chemicals at some facilities); *see also* Paulson Decl. at 3-6; Reid Decl. at ¶ 55. Issues regarding maintenance additionally appears to be a random occurrence. Motion at 9 (citing 11/38 declarants). And, the concern over flushing toilets is an institution-specific concern. Kirkland Decl. at ¶ 62; **Ex. B** at 123:19-22, 159:4-160:10; **Ex. C** at 147:3-25; **Ex. F** at 68:5-9; **Ex. G** at 77:12-24, 129:6-16.

"[T]he Constitution does not mandate comfortable prisons, and prisons of [this] type, which house persons convicted of serious crimes, cannot be free of discomfort." *Rhodes*, 452 U.S. at 349. The FDC cannot guarantee that no toilet or sink will ever break, that no window will crack, that no insect will make its way into a cell, or that inmates will adequately clean their cells. However, it has procedures in place to rectify these complaints (if made), Kirkland Decl. at ¶¶ 67-69, and Plaintiffs have failed to present "significant proof" of a common policy affecting the putative class on these issues.

(e)    Subclasses

Plaintiffs do not discuss the Physical Disability subclass in the Eighth Amendment commonality section. As such, the Court should decline to certify that subclass. *See also infra* V.A.(2).

As for the Youth and SMI subclasses, there are no purported common policies and practices described regarding those two subclasses, separate and apart from those claimed by the broader "Plaintiff Class." It appears the Plaintiffs seek subclasses because their ultimate goal is to "exclude [these inmates] from isolation." Motion at 38; **Ex. J** at 190:10-12 ("That's what this case is about . . . excluding people with serious mental illness from segregation.") However, there are distinct policies that affect the Youth and SMI subclasses that are different from those that affect the broader Plaintiff Class.

33

For example, the Youth Subclass is comprised of inmates under 21 years of age. Motion at 3-4. However, the FDC has different policies for inmates 17 years and younger who are placed in restrictive housing. *See* Kirkland Decl. at ¶¶ 7, 50, 51.  And, there is no evidence that this subclass is at a heightened risk of harm. *See* Labrecque Decl. at ¶¶ 43-44, 46. Thus, this class cannot be certified.

Further, the SMI subclass has different policies applied to it depending on if the inmate is in the secure treatment unit or in-patient care. *See* **Exs. R** and **S**. And, for the reasons discussed *supra* IV, commonality cannot be met for the "SMI subclass" because of individual issues involved in determining their "SMI" status. Finally, there is no evidence that this subclass is at a heightened risk of harm. *See* Labrecque Decl. at ¶¶ 43, 45-46.

(2)   The  Disability Claims

As with the Eighth Amendment claim, commonality cannot be met for the disability claims because Plaintiffs' burden of proof on those claims requires individualized determinations not capable of class-wide resolution.

To state a claim under the ADA, a plaintiff must show: (1) that he or she is a qualified individual with a disability; (2) that he or she was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by a public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of his or her disability.

*Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990, 992 (11th Cir. 2015); *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007).[14] "The purpose of the Act is to place those with disabilities on an equal footing, not to give them an unfair advantage." *Kornblau v. Dade Cnty.*, 86 F.3d 193, 194 (11th Cir. 1996); *see also Concerned Parents to Save Dreher Park Ctr. v. City of West Palm Beach*, 846 F. Supp. 986, 990 n.11 (S.D. Fla. 1994) ("[T]he ADA does not require that persons with disabilities be given 'adequate recreational programs' or, for that matter, *any* recreational programs. However, the ADA does require that persons with disabilities be given *equal* access to whatever benefits the City offers to persons without disabilities.")  In addition, failure to provide adequate medical treatment alone does not violate the ADA. *Finn v. Haddock*, 459 F. App'x 833, 837-38 (11th Cir. 2012).

Commonality is not met for the disability claims. ***First***, Plaintiffs' common contention appears to be that FDC fails to implement a "system" to ensure reasonable accommodations for people with disabilities in restrictive housing. Motion at 19; *see also id.* at 45 ("Nor do Plaintiffs' ADA and [RA] claims require the Court to

---

[14] Section 504 of the RA similarly provides that an otherwise qualified individual with a disability cannot be "excluded from the participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The ADA and RA are similar in substance and except for the federal funding requirement in the RA, "cases interpreting either are applicable and interchangeable." *Badillo v. Thorpe*, 158 F. App'x 208, 214 (11th Cir. 2005). Hereinafter, Defendants will refer to both the ADA and RA claims collectively as the "disability claims" or "ADA."

determine what specific modifications must be provided to which specific individuals in isolation. Rather, this case calls for FDC to implement a system-wide policy and procedure for ensuring that people with disabilities in restrictive housing are assessed for and provided necessary accommodations.")

Yet, with their Motion, Plaintiffs implicitly recognize that there is a "system" in place, they just do no not agree with how the system is utilized or certain individual decisions made under that system. *See id.* at 19 ("FDC identifies and tracks people in their custody who qualify as having a disability[.]"),  20 (FDC provides a pre-special housing health assessment which includes indicating whether the inmate has infirmities or impairment and accommodations needed), 23 ("FDC policy permits people with visual impairments to have a talking book player in isolation[.]"),  46 ("FDC's accommodations for people with physical disabilities in isolation are limited to providing assistive equipment."), *id.* ("FDC has implemented an unreasonable and obtuse process for requesting accommodations[.]").

Plaintiffs' testimony also confirms there is a system in place, they just take issue with their medical treatment and accommodations offered under that system *See* **Ex. B** at 174:15-24, 187:7-197:6 (receives insulin; complaints with timing of insulin); **Ex. C** at 84:21-85:14, 94:9-101:11 (was provided a wheelchair and foot brace; wishes he was given a different foot brace, physical therapy, shower set-up and had different equipment in the recreation area); **Ex. D** at 28:23-33:3, 88:3-90:6

(received monthly individual counseling, monthly psychiatric appointments, weekly group therapy, and medication for mental illness; wishes that she had weekly individual counseling and that her prescriptions were changed sooner); **Ex. E** at 234:10-235:12, 246:3-21 (was provided blind cane, audiobook player, and magnifying sheet; wants documents from FDC to be printed in larger print); **Ex. F** at 152:18-159:24 (could not list anything he was denied access to because of his disability except a job assignment; but then admitted that it was because he never made the request to classification); **Ex. G** at 50:9-54:13, 118:2-10 (received hearing aids and is happy with them; received regular mental health counseling and medications; been at in-patient unit for mental illness since July 2020).

There is no system-wide failure to provide accommodations. There can be no dispute that ADA accommodations are offered to the physical disability subclass and mental health treatment is offered to the SMI subclass. The purported "failure" proposed by Plaintiffs are a series of individualized decisions which Plaintiffs second-guess and which are not common among the two subclasses. And, the decision as to what accommodation to offer and what medical or mental health response is appropriate requires a case-by-case inquiry. *See Bircoll*, 480 F.3d at 1085-86; *see Parent/Pro. Advoc. League v. City of Springfield*, 934 F.3d 13, 31 (1st Cir. 2019) (finding the question: 'does the failure to provide school-based behavior

services violate the ADA?' likely to yield individualized rather than common answers).

Further, in the "prison context, whether accommodations are reasonable must be judged 'in light of the overall institutional requirements.'" *Siskos v. Sec'y, Dep't of Corr.*, No. 4:17-cv-186-RH-GRJ, 2018 WL 2452204, at *7 (N.D. Fla. May 18, 2018) (quoting *Love v. Westville Corr. Ctr.*, 103 F.3d 558, 561 (7th Cir. 1996)). "Security concerns, safety concerns, and administrative exigencies would all be important considerations to take into account." *Id.*[15] These institutional requirements will also vary on an inmate-by-inmate basis.

**Second**, the disability claims cannot be certified because membership in either the SMI or physical disability subclasses is not objectively determinable and would require individual inquiry. *See Hoffer v. Inch*, 382 F. Supp. 3d 1288, 1298 (N.D. Fla. 2019) (decertifying disability class and finding ADA claim requires individual inquiry), *rev'd in part on other grounds*, *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263 (11th Cir. 2020).

---

[15] Consider for example, Plaintiff Burgess who complains about the type of brace issued by FDC. However, Burgess has been found to have attempted to smuggle in cellphones through a "medical boot;" therefore, security concerns are present regarding Plaintiff Burgess' choice of footwear. *See* Kirkland Decl. at ¶ 106. And, Plaintiff Johnny Hill had his blind cane confiscated by security due to his breaking off the metal tip of the cane, which if unattached, is contraband. *Id.* at ¶ 108.

Further, a "physical [or mental] impairment, standing alone . . . is not necessarily a disability as contemplated by the ADA." *Gordon v. E.L. Hamm & Assocs., Inc.*, 100 F.3d 907, 911 (11th Cir. 1996). "The determination of whether an impairment substantially limits a major life activity requires an individualized assessment." 28 C.F.R. § 35.108(d)(1)(vi); *see also Siskos*, 2018 WL 2452204, at *6.

It is true that FDC identifies and tracks inmates who would qualify as having a disability under the ADA; however, the FDC's ADA determinations are limited to those inmates with certain hearing, vision, and mobility impairments and developmental disabilities. Foskey Decl. at ¶ 31. The FDC does not categorize inmates with other medical or mental health issues as "ADA" inmates. *Id.*

For these reasons, commonality is not met on Plaintiffs' disability claims. *See, e.g.*, *Sabata*, 337 F.R.D. at 264    ("Plaintiffs' proposed disability subclass [is overbroad because] . . . [i]ts members have different disabilities requiring unique and disparate accommodations, vitiating any commonality.").

## B.    Plaintiffs Are Not Typical

To satisfy typicality, "a class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Falcon*, 457 U.S. at 156 (quotation omitted); *see also Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (stating typicality "focuses on whether a sufficient

nexus exists between the legal claims of the named class representatives and those individual class members to warrant class certification"); *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (noting class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation); *Conigliaro v. Norwegian Cruise Line Ltd.*, No. 05–21584–CIV, 2006 WL 7346844, at *7 (S.D. Fla. Sept. 1, 2006) ("If proof of the representatives' claims would not necessarily prove all the proposed class members' claims, the representatives' claims are not typical of the proposed members' claims." (citation omitted)).

"It is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to one of many claims he wishes to assert. Rather, each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim." *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1280 (11th Cir. 2000) (quotations and citation omitted). When, as here, Plaintiffs seek to represent a very broad class, they are required to identify a representative plaintiff who shares these broad claims. *Cooper v. S. Co.*, 390 F.3d 695, 715 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 457-58 (2006).

Plaintiffs' are atypical for the following reasons:

***First***, Plaintiffs state they are typical because their claims arise from the same isolation policies and practices and are based on the same legal theories. Motion at 48. This statement is based on the false-assertion that the amorphous "isolation policies" are used system-wide. *Id.* at 49. But for the reasons commonality is lacking, Plaintiffs cannot establish that they have experienced all the same claimed policies and practices as the putative class.

***Second***, Plaintiffs cannot establish that they have suffered the same injury as the class. Plaintiffs assert that they "suffer the same injury—a baseline substantial risk of serious harm—as the other class members." Motion at 49.  But, they offer no evidence that: (1) they have been harmed by restrictive housing policies (much less which policies); or (2) that any symptomology they may have was *caused* by a restrictive housing policy. *See Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995) (finding for a Section 1983 claim, a plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation"); *Cruz v. Med. Dr.*, No. 5:20-cv-248-TKW-MJF, 2021 WL 3353967, *2 (N.D. Fla. July 12, 2021).

Plaintiffs' experts agree that every person in prison faces a psychological risk of harm. **Ex. K** at 57:2-9; **Ex. L** at 67:11-20. Yet, they performed no analysis to determine whether the reported symptomology by Plaintiffs or any interviewed inmate pre-existed placement in restrictive housing or was as a result of another

psychological stressor, such as a death in the family, COVID-19, or the inmates' criminal case. *See* **Ex. K** at 7:20-23 (no differential diagnosis); 11:22-12:10 (did not have general population inmate data to compare against); 221:23-223:12 (did not ask "compare and contrast questions" because he was assessing current symptoms); 227:12-229:8 (regarding Johnny Hill who reported ruminations regarding "his dead daughter and other bad things", Dr. Haney stated "I'm not suggesting that Mr. Hill's ruminations are . . . caused by or wouldn't be things he would experience in another setting"); **Ex. J** at 173:5-175:2; **Ex. L** at 137:3-138:25.

Furthermore, the "Eighth Amendment does not protect against all harm, only serious harm; and it does not prohibit all risks, only substantial risks." *Valle v. Singer*, 655 F.3d 1223, 1231-32 (11th Cir. 2011). "Case law is clear that mental deterioration caused by isolation in and of itself does not constitute cruel and unusual punishment." *Hargrove v. Henderson*, No. 95–1601–CIV–T–17A, 1996 WL 467516, at *8 (M.D. Fla. Aug. 13, 1996).

> The mental, physical, and emotional status of individuals, whether in or out of custody, do deteriorate and there is no power on earth to prevent it . . . . We decline to enter this uncharted bog. If the State furnishes its prisoners with reasonably adequate food, clothing, shelter, sanitation, medical care, and personal safety, so as to avoid the imposition of cruel and unusual punishment, that ends its obligations under Amendment Eight. The Constitution does not require that prisoners, as individuals or as a group, be provided with any and every amenity which some person may think is needed to avoid mental, physical, and emotional deterioration.

*Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir. 1977), *rev'd in part on other grounds*, *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). Simply because Plaintiffs experts have identified symptomology consistent with their self-selected literature review does not mean that any one Plaintiff has suffered "serious harm" or a "substantial risk of serious harm" as a result of any restrictive housing policy, practice, or condition.

**Third**, many of the named Plaintiffs are no longer in restrictive housing and have received the enhanced mental health care requested. *See* Espinosa (released from CM to general population on November 2019); Burgess (released from CM to general population on September 2019); Harvard (placed in the secure treatment unit in May 2019 and released to general population on November 2020); Dean (in in-patient since July 2020). These Plaintiffs are not typical.

**Fourth**, Plaintiffs have individual vulnerabilities which may increase their risk of harm, in contrast to other inmates. For example, the only Plaintiff who is not presently classified as an S-3 inmate (an inmate with mental illness according to Plaintiffs' experts) is Jeremiah Hill. Yet, Mr. Hill has his own purported vulnerabilities based on his age and suspected intellectual disability. *See* [D.E. 311-12 at ¶¶ 40-45]. Plaintiffs' experts have repeatedly expressed their opinion that inmates with mental illness or who are under 21 years old are at an increased risk of harm. Therefore, Plaintiffs do not have a representative who is typical of the non-

mentally ill or non-"youth" inmate and who can demonstrate a substantial risk of serious harm nonetheless. *See Prado-Steiman*, 221 F.3d at 1280.

*Fifth*, unique defenses will apply to the Plaintiffs, such as their repeated refusals to go to recreation, dayroom, and mental health appointments – the very out-of-cell time they claim to want more of in this case. *See* **Ex. A** at 109:2-15, 129:2-130:3; **Ex. B** at 166:12-174:24, 205:18-208:15, 256:19-258:9; **Ex. D** at 57:12-19, 60:17-61:5, 64:11-14*;* **Ex. E** at 126:1-130:18, 135:1-137:14; **Ex. F** at 99:23-100:4, 106:4-10, 118:6-121:3; **Ex. G** at 54:24-56:4, 91:4-25, 96:14-24. If Plaintiffs have determined that having a tidy cell is more important to them than out-of-cell time, then they cannot adequately represent a class who actually used the out-of-cell time offered. Any "harm" suffered by Plaintiffs from insufficient out-of-cell time is in essence self-inflicted and they are not typical of the broader class.

*Sixth*, many Plaintiffs testified that they were treated differently from other inmates in confinement. *See* **Ex. A** at 159:2-160:15 (treated differently because he was a juvenile); **Ex. B** at 208:16-211:14 (officers do not like inmates that are accused of battery on officer); **Ex. D** at 78:4-12 (for being transgender), **Ex. C** at 126:1-127:18, 135:23-137:13 (because he is in a wheelchair); **Ex. E** at 109:25-110:6, 153:8-154:3 (because he masturbates publicly). These admitted facts makes them atypical of the class.

***Seventh***, many of the named Plaintiffs' experiences on restrictive housing were sufficiently unique to make them atypical of the class. *See* Saathoff Decl. ¶¶ 26-29, 38, 89; Paulson Decl. 29-41. For example, Plaintiff Espinosa's experience on CM was impacted by his ongoing chemotherapy treatment, which he admitted made him tired and caused him pain. **Ex. F** at 40:5-13, 59:20-61:21.  Plaintiff Jeremiah Hill complains that while he was on CM he was not allowed to socialize with other inmates in the dayroom and at recreation because he was 17 years old at the time, **Ex. A** at 159:22-160:18; but this policy is not typical of the other members of the Youth Subclass who were 18 years and older.

***Eighth***, as for the disability claims, it is not clear that many of the Plaintiffs even have a disability claim to pursue. *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) ("A named plaintiff in a class action who cannot establish the requisite case or controversy between himself and the defendants simply cannot seek relief for anyone—not for himself, and not for any other member of the class."). The ADA require the Plaintiffs to prove that they were denied participation in or denied the benefits of a service, program or activity by reason of their disability. *Lonergan*, 623 F. App'x at 992.

In their declarations, Plaintiffs fail to identify any program or service they were precluded from participating in because of their disability. And, during deposition, when asked such a question, many Plaintiffs could not think of one. *See,*

*e.g.*, **Ex. B** at 250:6-10, 257:1-258:2; **Ex. E** at 254:2-22; **Ex. F** at 152:18-159:24; **Ex. G** at 153:10-154:21. Instead, Plaintiffs' disability claims appear to be complaints about the types of accommodations offered and the medical decisions made with respect to their treatment – not that they were denied any benefit because of their disability.

*Ninth*, the disability classes are broader that the types of disabilities as represented by the Plaintiffs. As such, there is an insufficient nexus between the claims on behalf of the broad disability classes and Plaintiffs.

For these reasons, Plaintiffs have failed to satisfy Rule 23(a)(3).

## C.    Plaintiffs Are Not Adequate

Rule 23(a)(4) requires that the representative party "must adequately protect the interests of those he purports to represent." *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). This adequacy requirement "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Id.* (citation omitted). "If substantial conflicts of interest are determined to exist among a class, class certification is inappropriate." *Id.*

Plaintiffs are not adequate for the same reasons they are not typical. In addition, Plaintiffs are not adequate because of potential conflicts of interest. For

one, there is a conflict raised by Plaintiffs' invocation of the Fifth Amendment Privilege in this case.  For example, Defendants propounded requests for admission seeking information as to whether the Plaintiffs had cellphones while in restrictive housing. Plaintiffs' refused to answer under the Fifth Amendment. *See, e.g.* **Exhibit T** (Burgess' Rsp. to Defs.' 3d Req. for Admissions). Plaintiffs' refusal to answer this question could potentially implicate their continued position in this case that they have no communication with friends and family.

Further, Plaintiffs have admitted, for the purpose of this case, that the conduct underlying their disciplinary reports may be taken as true. [D.E. 75]. This admission conflicts with putative class members who may dispute the charge that led to their placement in restrictive housing and its penological justification. If Plaintiffs are making an as-applied challenge, then this admission forecloses any putative class member from arguing that the policies *as applied* are unconstitutional because they are not guilty of the disciplinary charge levied against them.

Finally, Plaintiffs' lack of credibility renders them inadequate. *Pines Nursing Home (77), Inc. v. Rehabcare Grp., Inc.*, No. 1:14-cv-20039-UU, 2014 WL 12531512, at *3 (S.D. Fla. June 20, 2014). For example, Plaintiff Burgess claims that he has paralysis on the left side of his body, that he needs a full leg brace and walker or wheelchair to move around, and that he has trouble accessing the showers. [D.E. 311-7, ¶¶ 6, 10, 13]. Yet, he testified that he can walk, and that he does not

have paralysis in his left foot, and video footage shows Mr. Burgess having no difficulty standing while taking a shower.  **Ex. C** at 84:21-85:14; Kirkland Decl. at ¶ 105.

### D.    Numerosity is Not Satisfied

Plaintiffs claim their class is sufficiently numerous based on their broad definition of the class. Motion at 28-30. To the extent this Court subclasses this case, despite no request from Plaintiffs, then Defendants respond that Plaintiffs have not provided evidence that any purported subclass meets the numerosity requirement. *See Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267-68 (11th Cir. 2009) (finding district court erred when certified the more narrow, Florida-only class based on evidence presented for nationwide class).

Further, the broad figures cited by Plaintiffs make no account for which of those inmates within each category actually experienced the policies and practices alleged to be common and which of those inmates are at a "substantial risk of serious harm." Again, the numbers quoted include inmates that spend a single day in restrictive housing, inmates in in-patient care, and otherwise "resilient" inmates who will not be affected by restrictive housing. *See* **Ex. K** at 86:18-24. And, as for the disability classes, Plaintiffs themselves recognize that not every "disabled" inmate has an ADA claim. *See, e.g.*, **Ex. G** at 53:2-22 (stating no issues with her hearing

aids) and [D.E. 309 (not listed as a class representative on the ADA claims for the physical disability subclass)].

## II.    PLAINTIFFS DO NOT MEET RULE 23(b)(2)

A Rule 23(b)(2) class cannot be certified unless it is cohesive. *Zehel-Miller v. Astrazenaca Pharms., LP*, 223 F.R.D. 659, 664 (M.D. Fla. 2004). In fact, "the cohesiveness requirement . . . is more stringent than the predominance" requirement of Rule 23(b)(2). *Ebert*, 823 F.3d at 480. A class is cohesive when: (1) the plaintiffs have been harmed in essentially the same way by the defendant's acts and; (2) the common injury can be addressed by class-wide injunctive or equitable remedies. *See Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 (11th Cir. 1983). Thus, a class is not suitable for 23(b)(2) certification when the defendant's "conduct cannot be evaluated without reference to the individual circumstances of each plaintiff." *Avritt v. Reliastar Life Ins. Co.*, 615 F.3d 1023, 1036 (8th Cir. 2010); *see also Heffner v. Blue Cross & Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1345 (11th Cir. 2006) (finding error to certify (b)(2) class when relief "will not automatically flow to the class 'as a whole'"); *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, 763 F.3d 1280, 1291 (11th Cir. 2014) ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted." (quoting *Wal-Mart*, 564 U.S. at 360)). Thus, certification is generally inappropriate in actions raising significant individual liability or defense issues.

Additionally, although the precise terms of the injunction need not be decided at class certification, a plaintiff must present evidence and arguments "sufficient to allow the district court to see how it might satisfy Rule 65(d)'s constraints and thus conform with Rule 23(b)(2)'s requirement."[16] *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 605 n.4 (10th Cir. 2008); *see also Colomar v. Mercy Hosp., Inc.*, 242 F.R.D. 671, 683 (S.D. Fla. 2007).

Here, the class cannot be certified under Rule 23(b)(2). **First**, Plaintiffs' Motion does not specifically identify the final, injunctive relief requested. This reason is sufficient on its own to deny class certification. *See Lakeland Reg'l Med. Ctr., Inc.*, 763 F.3d at 1291 (affirming denial of class certification because the Plaintiff did not specify the injunctive relief they sought which prevented the district court from analyzing whether class-wide injunctive relief was possible).

**Second**, based on the over-breadth of the Motion, it is clear that any relief sought by Plaintiffs will lack cohesiveness. *See, e.g.*, [D.E. 309 at 101].[17]

---

[16] The specificity requirement of Rule 65 is "necessary to protect those who are enjoined by informing them of what they are called upon to do or to refrain from doing in order to comply with the injunction or restraining order." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1200 (11th Cir. 1999) (quotations and citation omitted). "Thus, an injunction must contain an operative command capable of enforcement." *Id.*

[17] Defendants asked Plaintiffs for their requested form of relief. Plaintiffs refused to answer. *See* **Exhibit U (**Harvard's Supp. Rsp. to Defendants' 1st Interrog., No. 15).

For example, in *Shook*, 543 F.3d at 600, county jail inmates brought a putative class action alleging that jail conditions for mentally ill inmates violated the Eighth Amendment. Now-Justice Gorsuch, writing for the Tenth Circuit, affirmed the district court's denial of class certification under Rule 23(b) finding the proposed class was not cohesive in that the proposed class injuries were not sufficiently similar so that they could be addressed in a single injunction that need not differentiate between class members. *Id.* at 605-06. In fact, "much of the relief plaintiffs seek would require the district court to craft an injunction that distinguishes—based on individual characteristics and circumstances—*between* how prison officials may treat class members, rather than prescribing a standard of conduct applicable to *all* class members." *Id.* at 605.

As was the case with *Shook,* any proposal by Plaintiffs would require this Court to craft an injunction that relies too heavily on individual circumstances and characteristics of the putative class members. In the Third Amended Complaint, Plaintiffs seek an injunction that prohibits the continued "unlawful acts" and orders Defendants to develop a "plan to eliminate the substantial risk of serious harm" while still taking into consideration the "legitimate penological purpose" for placing some inmates in restrictive housing. [D.E. 309 at 101]. There is no "standard of conduct applicable to *all* class members" described as Plaintiffs inherently recognize there

can be a penological purpose for restrictive housing and whether the purpose is satisfied will necessarily be inmate-specific.

"That the plaintiffs have superficially structured their case around a claim for class-wide injunctive and declaratory relief does not satisfy Rule 23(b)(2) if as a substantive mater the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made; this kind of relief would be class-wide in name only, and it would certainly not be final." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 499 (7th Cir. 2012).

Assuming that Plaintiffs could show a common injury, they still could not show that this injury can be remedied by a class-wide injunction. In this case, no single injunction would remedy the Plaintiffs' alleged violations for any class or subclass.

## VI.    CLASS CERTIFICATION WOULD VIOLATE ESTABLISHED CONSTITUTIONAL PRINCIPLES

Class certification of the classes proposed would violate established principles of federalism and separation of powers. The Supreme Court recognizes that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)); *see Lewis v. Casey*, 518 U.S. 343, 349 (1996) ("[I]t is not the role of the courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and

the Constitution."). The "role of courts [is] to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm," *Lewis*, 518 U.S. at 349; it is not "to become virtually continuing monitors of the wisdom and soundness of" the other branches. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 577 (1992) (quotations omitted); *see also Elizabeth M. v. Montenez*, 458 F.3d 779, 783, 788 (8th Cir. 2006) (finding the certification decision did not pay "sufficient heed" to federalism interests where the class action sought "sweeping injunctive relief which, if granted, would require the district court to mandate and monitor detailed programs governing nearly every facet of the State's operation of . . . three residential facilities")

For example, in *Sabata*, 337 F.R.D. at 270, the plaintiffs sought certification of classes and claims similar to those sought here. The district court denied class certification and noted the plaintiffs "ask the Court to certify a class so broad that it would essentially confer[] upon itself jurisdiction to assert control over the operation of Nebraska's prison system. The Court agrees that it is not its role, but rather that of the executive and legislative branches of the state of Nebraska, to shape the policy of the correctional institutions." *Id.* at 271 (quotations and citation omitted).

Here, based on the breadth of the claims, the relief sought would require this Court to assume control over the operation of the FDC with respect to prison operations, security decisions, mental health care, medical care, and ADA

accommodations. This level of control and interference in the administration of Florida's prison system, without any showing of actual, serious harm, or substantial risk of serious harm, impermissibly and unnecessarily intrudes upon the State of Florida's sovereignty and violates principles of federalism.

## VII.   <u>CONCLUSION</u>

For the foregoing reasons, Defendants request this Court deny Plaintiffs' Motion for Class Certification.

## <u>CERTIFICATE OF WORD COUNT</u>

I certify that this Memorandum complies with the word count limitation set forth in Local Rule 7.1(F) because this Memorandum contains 12,945 words, excluding the parts exempted by said Local Rule.

Respectfully submitted,

/ s / Samantha Duke
DANIEL J. GERBER, ESQUIRE
Florida Bar No. 0764957
SAMANTHA C. DUKE, ESQUIRE
Florida Bar No. 091403
RUMBERGER, KIRK & CALDWELL
Lincoln Plaza, Suite 1400
300 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida  32802-1873
Telephone:  (407) 872-7300
Telecopier:  (407) 841-2133
Email:  dgerber@rumberger.com
          sduke@rumberger.com

and

54

NICOLE SMITH, ESQUIRE
Florida Bar No. 0017056
JEFFREY J. GROSHOLZ, ESQUIRE
Florida Bar No. 1018568
RUMBERGER, KIRK & CALDWELL
Post Office Box 10507
Tallahassee, Florida  32302-2507
Telephone:  (850) 222-6550
Telecopier:  (850) 222-8783
E-mail:   nsmith@rumberger.com

and

JOSHUA D. LERNER, ESQUIRE
Florida Bar No.:  0455067
RUMBERGER, KIRK & CALDWELL
Brickell City Tower, Suite 3000
80 Southwest 8th Street
Miami, Florida 33130-3037
Telephone:  (305) 358-5577
Telecopier:  (305) 371-7580
E-mail:  jlerner@rumberger.com

**Attorneys for Defendants,**
 **Mark Inch and Florida**
 **Department of Corrections**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 21, 2021, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system which will send

a notice of electronic filing to the following:   Leonard J. Laurenceau at

leo.laurenceau@splcenter.org;  Kelly  Jean  Knapp  at  Kelly.knapp@splcenter.org;

Krista  Dolan  at  Krista.dolan@splcenter.org;  Dante  Pasquale  Trevisani  at

dtrevisani@floridajusticeinstitute.org; Laura Anne Ferro at lferro@floridajusticeinstitute.org and mllosa@floridajusticeinstitute.org; Sam Thypin-Bermeo at sthypin-bermeo@floridajusticeinstitute.org; Marcel A. Lilavois, Jr., at mlilavois@floridajusticeinstitute.org; Kara Sheli Wallis at kwallis@floridajusticeinstitute.org; Andrea Costello at andrea@floridalegal.org; Christopher M. Jones at Christopher@floridalegal.org; Rachel M. Ortiz at rachel.ortiz@floridalegal.org; Alexis Alvarez at alexis.alvarez@floridalegal.org; Rebecca R. Klonel at rebecca.klonel@floridalegal.org; and Lori Rifkin at lrifkin@rifkinlawoffice.com.

/ s / Samantha Duke
DANIEL J. GERBER, ESQUIRE
Florida Bar No. 0764957
SAMANTHA C. DUKE, ESQUIRE
Florida Bar No. 091403
RUMBERGER, KIRK & CALDWELL
Lincoln Plaza, Suite 1400
300 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida  32802-1873
Telephone:  (407) 872-7300
Telecopier:  (407) 841-2133
Email:  dgerber@rumberger.com
            sduke@rumberger.com

and

NICOLE SMITH, ESQUIRE
Florida Bar No. 0017056
JEFFREY J. GROSHOLZ, ESQUIRE
Florida Bar No. 1018568
RUMBERGER, KIRK & CALDWELL

Post Office Box 10507
Tallahassee, Florida  32302-2507
Telephone:  (850) 222-6550
Telecopier:  (850) 222-8783
E-mail:   nsmith@rumberger.com

and

JOSHUA D. LERNER, ESQUIRE
Florida Bar No.:  0455067
RUMBERGER, KIRK & CALDWELL
Brickell City Tower, Suite 3000
80 Southwest 8th Street
Miami, Florida 33130-3037
Telephone:  (305) 358-5577
Telecopier:  (305) 371-7580
E-mail:  jlerner@rumberger.com

**Attorneys for Defendants,
 Mark Inch and Florida
 Department of Corrections**

15660017.v1