UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAC'QUANN (ADMIRE)
HARVARD; JEREMIAH HILL;
JUAN ESPINOSA; JEROME
BURGESS (a/k/a SHAM'LA GOD
ALLAH); JAMES W. KENDRICK,
JR.; JOHNNY HILL; AMY
FERGUSON; and TRACEY DEAN
on behalf of themselves and all
others similarly situated,

       Plaintiffs,

vs.                                        CASE NO.:  4:19-cv-00212-MW-MAF

MARK INCH, in his official
capacity as Secretary of the Florida
Department of Corrections, and
FLORIDA DEPARTMENT OF
CORRECTIONS, an Agency of the
State of Florida,

       Defendants.

_____/

## DECLARATION OF DR. REED PAULSON IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

I, Reed Paulson, M.D., declare as follows:

I have been asked by the Florida Department of Corrections to offer my

opinion on the opinions contained in the Declaration of Dr. Homer Venters filed in

support of Plaintiffs' Motion for Class Certification.  The following contains my

opinions regarding his declaration and opinions, as well as additional opinions

related to the issues raised in Plaintiffs' Motion for Class Certification

## I.   **Expert Qualifications and Background**

I can provide expert opinions in this case from a long career and study in

emergency medicine, family medicine and correctional medicine. I have

experience in correctional medicine from my posting in the Hopi Nation where we

provided all of the care for the Hopi Nation corrections. Again, in the small city of

Lebanon, Oregon we provided emergency care, urgent care and 'clearance for

incarceration' for the local authorities and jail for 7 years. Finally, over 12 years

with the Oregon Department of Corrections – 5 years of which included the Coffee

Creek Intake Facility (much like a jail with continually new and short stay patients)

and 9 years at the Oregon State Penitentiary where I provided care and oversight

for all levels of inmate management in medical care. My curriculum vitae is

attached to this Declaration.

As a Correctional Medicine Expert, I provided deposition testimony for

*Hamblin v. Santa Fe County Adult Detention Center, et al*: Case No. D-101-CV-

2018-01413, State of New Mexico, County of Santa Fe, First Judicial District;

*Rojas v. Correct Care Solutions, et al*: Case No. CV2018-004077, In The Superior

Court Of The State Of Arizona, County of Maricopa; *Estate of John Kleutsch v.*

*State of Washington Dept. Of Corrections*, Case No. 20-2-06902-7, in the Superior

Court of the State of Washington in and for King County; *Alejandro Gallegos v. K. Seeley, MD, Centinela State Prison*: Case No. 18CV1322 JAH BGS, In the United States District Court for the State of California.

In preparation for this opinion, I have reviewed around 40,000 pages of material, including multiple medical records, security records, logs, policies and procedures, motions, declarations, depositions, educational materials, reference materials, etc. Rumberger/Kirk attorneys have a more detailed listing.

II.   **Inspections and Interviews**

I have conducted unimpeded inspections and widespread interviews of 11 FDC institutions with restrictive housing: Charlotte, Hardee, Lowell, RMC, FSP, Union, New River, Suwannee, Hamilton, Wakulla and Santa Rosa. I was focused on restrictive housing and medical facilities, but my group was allowed, indeed encouraged, to view any area – without prior notice. I interviewed staff at every level, from leadership to line staff.

I found every facility to be clean, but lived-in, with small scraps of paper, etc. in the occasional corner. I found this to be above average, in my experience of prison facilities. These facilities were clearly not prepped, especially for us. There was, however, no substantial amount of dirt, no filth, no food scraps. There were no stacks of food trays – these seem only likely to be present during the time of collection of trays after meals. It is a silly notion that trays would be left on the unit

– the kitchens needs them collected as soon as possible so that they can be washed and refilled for the next meal. Facilities do not have excess trays available to leave on the various housing units.

After reading Plaintiffs' experts' declarations, I was on special lookout for cockroaches. I checked in numerous corners and under things at every institution, but did not see a single cockroach anywhere. The facilities have pest control contracts for regular, plus as-needed, treatments. The treatments are logged and audited to ensure the contract is fulfilled. The facility managers freely admitted having intermittent issues with pests – the most problematic being ants driven indoors by soaking rains or floods. It is Florida, after all. When such is detected, they call for extra treatment. At least for the facilitates I visited, cockroaches have not been much of a problem, but would be treated immediately if present.

It was explained to me that cell sanitation is done at least weekly by the occupant(s) of the cell, using cleaning solutions, etc. supplied to each that day, and as needed. The cells are all inspected regularly with attention to cleanliness. There would necessarily be some differences from cell to cell as to the fine details of this, with the inmates in charge of their own space to some extent. This is an area where the restrictive housing experience can be different from inmate to inmate. You can maintain a very, very clean space, the minimum cleanliness, or somewhere in between.

The facility maintenance and repair seemed to be quite good, with a staff focus to have everything working well and quickly fixed when not. We toured immediately after a major tropical storm. We repeatedly asked about what would be done with specific plumbing, lighting, etc. failures that might come up. The invariable goal expressed was to not leave an inmate in a dysfunctional cell of this nature for any substantial period of time – certainly not overnight. The inmate would be moved if there was any delay necessary before repair.

I observed paint to be in various stages of normal use, as is expected for institutions in 24/7 intensive use. The norm is to have supervised inmate paint crews working year-round, prepping and repainting. This is customary in prisons, and painting is a desired job. Painting is a useful skill and a "parolee friendly" occupation in the community. The constant training of inmates in painting is very favorable, even if some cosmetic chipped spots have to wait for the next painting rotation. This is an area where the inmate experience varies – you might be in a freshly painted dorm or cell, in an area awaiting a repainting soon, or somewhere in between.

I found no moss in toilets or any other areas, as indicated by plaintiffs' expert witness. It would be very unlikely for moss to grow in a regularly flushed water pool. There was, however, hard water concretions of varying colors and to

varying degrees in toilets and sinks in many institutions. My understanding is this is caused by the very hard water in some areas of Florida. The staff living nearby report having the same at home. The colors vary with the chemical and sediment content of the water. It is very difficult to remove (at least it is at my house), but does not represent uncleanliness or unsanitary conditions.

Plaintiffs' expert witness Dr. Venters mentioned that, "The Max cells also included an interior grill gate within the cell that staff could close to create several feet between the incarcerated person and the exterior cell door." (D.E. 311-11, p. 8). I'm not sure what he is describing, but part of the Max Management at Florida State Prison had a barred, double chase-way in front of some cell units. There was an outer chase that Dr. Venters perhaps went down, then about a 3-foot inner chase right next to the single door to each cell. I walked through the inner chase, where the inmate is located. Another area (former Death Row) had double cell doors with (as I recall) a small area in between. Regardless, the Maximum Management unit is definitely different than any other place I saw. This simply illustrates another way that the restrictive housing experience is different from place to place in FDC, and there is not a uniform experience across the system.

## III.   <u>Access to Medical Care</u>

In reviewing the medical care at each facility, access is a key factor. In a critical opinion of their national health system, the Supreme Court of Sweden famously wrote: "Access to a queue is not access to care." In review of multiple medical records from multiple facilities I found that access to care in FDC restrictive housing was appropriately triaged, adequately timed, unimpeded by security, management or approval process, and driven by the medical urgency, not the security level.

The pre-confinement and post-use-of-force evaluations were consistently done, to American Correctional Association (ACA) standards and reasonable and appropriate medical standards.

In fact, the restrictive housing inmates have quicker and easier access to medical care and medical staff than general population inmates. They have a nurse come to their cell every day to inquire as to their needs, and this nurse has the ability to treat or triage on the unit - immediately if needed. Inmates have sick call requests given to them at cell-side on request and collected cell-side. Sick call request forms were at every station I saw, with the expectation to always have them available, to be distributed by officers or a nurse. Grievance forms were similarly available, and collected by a grievance coordinator, allowing for a third avenue of assisted communication.

In restrictive housing, inmates also have better and more access to emergency medical care. I checked again and again with the line staff in the various facilities about how they would handle true medical emergencies. Every staff member gave appropriate responses. The staff were all first responders with first aid and CPR training. In terms of observing and reporting medical emergencies, line staff is considered part of the medical team. There is no barrier to line staff declaring an emergency and no need to wait for medical staff permission to call 911 if truly needed. In the event of an emergency, the nurse is called immediately and, if necessary, the nurse can call 911 without delay or permission. Or, the nurse is able to seek physician advice 24/7, if desired.

In contrast, General Population (GP) inmates cannot simply walk over to the medical offices and meet with the nurse any time they want. Such inmate would be considered to be in an "unauthorized area" and subject to immediate removal and consequences. These restrictions are necessary to maintain staff safety and the security of medical instruments, sharps, devices and drugs. Instead, the process in GP is for inmates to walk to the appropriate central area (when movement is allowed), pick up a request form (sick call or inmate request), retreat to where the form can be filled out, fill out the form, then go to the appropriate drop box and drop off the form. Then the inmate waits for a callout time/date to allow him or her

to go to a medical area to receive care for the issue. Typically, the GP inmates have to go to a particular spot at their assigned time and wait in line.

In some ways, inmates in restrictive housing have better access to medical care than individuals in the community. For example, most people do not have a nurse that comes to their location each day to check on them. A nurse who knows them and knows their medical problems and needs. A nurse who will respond to their location immediately, anytime they think they have a medical emergency – with no cost and no penalty if they overuse the privilege. A nurse who will evaluate them and take care of any problem she can, arrange a clinic appointment for them or send them to the hospital for emergencies. (The inmate doesn't have to drive or arrange a ride to the hospital and find parking. And, they usually get faster treatment there because the hospital staff want the escorts to be able to return to duty.) A nurse who can contact doctors and get a new medical order or change in orders any day, 24/7 if needed. A nurse who brings their timed controlled medications to them several times a day, as well as refills of the medications they keep in their room.

Restrictive housing inmates clearly <u>do not</u> have <u>less</u> access to medical care than GP inmates – they have <u>more</u> and <u>easier</u> access.

IV.   **Solitary Confinement/Isolation Defined**

The National Commission on Correctional Health Care's (NCCHC) leadership in setting standards for health services in correctional facilities is widely recognized. Established by the health, mental health, legal and corrections professions, NCCHC's *Standards* present recommendations for the management of a correctional health service systems. NCCHC's origins date to the early 1970s, when an American Medical Association study of jails found inadequate, disorganized health services and a lack of national standards. In collaboration with other organizations, the AMA established a program that in 1983 became NCCHC, an independent, not-for-profit 501(c)(3) organization whose mission has been to evaluate and develop policy and programs.

Plaintiffs' medical and mental health experts are affiliated with and/or reference the NCCHC in their declarations. Louis Kraus, MD is the plaintiffs' chosen expert in juvenile psychiatry. He spent 6 years on the NCCHC Board of Directors, and as Vice Chairman on multiple NCCHC committees. Kathryn Burns, MD is the plaintiffs' chosen expert in psychiatry. She has been a Certified Health Professional of the NCCHC for more than a decade. Homer Venters, MD is the plaintiffs' chosen expert in correctional medical care. Dr. Venters uses the NCCHC as his leading authority in the section of his declaration, "Necessary Mitigation Measures to Prevent Physical Harm in Isolation" and cites the NCCHC's 2016

position statement, "Solitary Confinement (Isolation)." (D.E. 311-11, pp. 12-13).
Craig Haney, PhD, JD, the plaintiffs' chosen expert in psychology also cites this.
(D.E. 311-09, p. 31, FN 58). The NCCHC's 2016 position statement defines
"solitary confinement" as, "the housing of an adult or juvenile with minimal to rare
meaningful contact with other individuals."[1]

In its 2018 Prison Health Standards, the NCCHC clarifies this definition:
"Solitary confinement (also referred to as isolation) is an extreme form of
segregation where an inmate is isolated and encounters staff or other inmates fewer
than three times a day." The NCCHC quantifies Isolation/Solitary Confinement as
when an inmate "encounters staff or other inmates fewer than three times a day."

Both Dr. Burns and Dr. Venters cite the World Health Organization (WHO)
in regard to potential harm to inmates in solitary confinement/isolation. The WHO
also defines solitary confinement: "The term 'solitary confinement' refers to the
physical and social isolation of an individual in a single cell for 22.5 to 24 hours a
day;" It further clarifies the "social isolation" component as "[t]he deprivation of
human contact inherent in solitary confinement."[2]

---

[1]  https://ncchc.org/solitary-confinement (last visited September 27, 2021).

[2]  https://www.euro.who.int/__data/assets/pdf_file/0005/249188/Prisons-and-Health.pdf, p. 27
(last visited September 27, 2021).

By citing and supporting these national and international authorities as they have, the plaintiffs' medical, psychiatric and psychological experts all endorse definitions of Isolation/Solitary Confinement that describe an extreme deprivation of human contact/encounters.[3]

In my inspection of 11 facilities with restrictive housing and discussion with staff at all levels, I can confidently say the following:  <u>None of the FDC's facilities hold any inmates in conditions that could be called Isolation/Solitary Confinement - as per the authorities and definitions cited and/or supported by the plaintiffs' own experts.</u> Those definitions demand extreme social isolation, not present in FDC, for any circumstance to be defined as Solitary Confinement/Isolation.

At an absolute, bare minimum, every inmate can encounter and briefly interacts with a correctional officer twice an hour, for a total of 48 opportunities a day. There are also daily rounds with the nurse and potentially medication passes several times a day. The inmates are allowed to talk between cells, as long as it is not too loud (for the safety of all). I double checked the allowance of talk-between-cells on many units and it is permitted. There is daily grievance collection. They

---

[3] The American Correctional Association (ACA) and the Commission on Accreditation for Corrections do not use or define the terms Isolation or Solitary Confinement in their *Performance – Based Standards and Expected Practices for Adult Correctional Institutions, 5th edition, March 2021*. These terms are not even in their Glossary. This is the latest publication of their Standards. They use the term "Restrictive Housing" for the types of segregated housing in FDC and discussed here. The plaintiffs and their experts refer to the ACA as an authority in their motion and declarations. The terms "Isolation" or "Solitary Confinement" do not apply.

can have sick call and medical appointments. There are weekly rounds with the
Duty Wardens. Some have mental health visits. Those who qualify have outside
exercise time where they can socialize with inmates nearby. Some have day room
with other inmates. There are education and outside visitor opportunities. Beyond
the minimums, the various levels and individual privileges have different
opportunities for encounters/interactions/contacts. These are different from facility
to facility to some extent and vary different based on level, privileges and
activities. Contacts are different from inmate to inmate concerning medical and
mental health interactions. Peer interactions are individual. It is unlikely that any
one restrictive housing inmate's human contact experience is quite like the next.

It is, therefore, absolutely <u>incorrect</u> to say that there is any common class of
inmates in regard to this central and crucial area of human encounter; the area that
is at the core of the very definition of Isolation and Solitary Confinement.

V.   **<u>Claim of Coerced or Forged Medical Refusals</u>**

The Plaintiffs' claim, without substantiation, appears to be that restrictive
housing inmates are often forced or coerced to refuse medical care and also that
refusal forms are forged by staff. Dr. Venters states that in his interviews with non-
plaintiffs: "20 people specifically reported being coerced or forced to refuse health
care encounters." (D.E. 311-11, p. 25). Among the plaintiffs: "Mr. Burgess
reported numerous forced or coerced refusals of medical care," (*Id*., p. 31);

"despite reporting that he had never refused medical care, Mr. Hill had multiple unsigned refusals." (*Id.*, p. 33). In fact, my review of the file shows Mr. Hill had around 20 signed refusals and around 400 unsigned refusals over the years.

In reality, incidents of coercion or forgery would likely have to involve two or more staff. "Refused to sign" refusals are generally signed and then witnessed by a second staff member. Attempting to bring an inmate out of their restrictive housing cell requires two staff members.

Here, Plaintiffs claim that inmates being coerced or forced to refuse medical care is happening with great frequency. Dr. Venters offered that 40% of the inmates he interviewed reported this. (D.E. 311-11, pp. 24-25). The plaintiffs contend such conduct is happening in multiple units and multiple institutions over the span of years. If such claims are representative, then one would have to assume tens of thousands of coerced or forged refusals. To rise to the level that Plaintiffs claim, thousands upon thousands of staff would have to be involved - including line correctional officers, their supervisors, grievance coordinators, the Duty Wardens (who round the restrictive housing units every week), and medical staff (who work for a different employer). This ignores that a restrictive housing inmate could complain to any of these individuals about being coerced/forced to refuse medical care and have the complaint investigated.

Plaintiffs' allegations amount to an enormous, inconceivably complex conspiracy, involving thousands of employees from every level and two major employers. Every one of the employees would be at risk of losing their job ,or worse, each and every time they violate their employers' policies. It would involve many institutions at once. It would have to involve the inmate orderlies (who could let the word out). It would have to be held in perfect secrecy for years and years. Thousands of people risking their jobs tens of thousands of times, and only in restrictive housing units, is frankly unbelievable.

FDC officials and institution leaders readily admit that there have been bad apples among the staff that they have had to sanction, fire, and/or refer for prosecution. Bad apples act badly in all large enterprises. Behavior such as physical mistreatment, sexual mistreatment, drug and contraband smuggling have happened in prisons around the country. FDC reviews grievances and inmate reports of staff mistreatment separate from the institution leadership, including through the Office of Inspector General, and admits that complaints are sometimes substantiated and action taken. However, this wide-spread coercion and forgery of medical refusals has not been found. It has also not been reported in the media. Aside from inmates' self-serving statements, the plaintiffs offer no confirming evidence to support their allegation – it is simply an unbelievable, unsupported claim that should be rejected.

Dr. Venters alleges, without substantiation, that inhalers are often taken away from inmates. He states that this should never be done, then in depositions that it would be "extremely rare" and "it's just incredibly dangerous." First of all, he does not distinguish between inhalers that are for timed use (as little as once a day) and "rescue" inhalers (nearly always albuterol). It could be that the inmates he spoke to had their timed inhalers put onto "Staff Control" (Restrictive Housing nurse). This is very commonly done.

The alternative is an albuterol (rescue) inhaler. Having over 12 years of prison medical experience, we fairly regularly restrict these when they are being abused. The inmate can spray multiple doses onto a smooth, hard surface, then lick it to get a stimulant high. Some inmates "sell" theirs to another inmate for abuse. Some of the devices have a metal spring that can be turned into a weapon. This can be safely done with asthmatics under moderately good control where there is a nurse nearby. Asthma is not an instant killer; it takes time for the inflammatory response to build up and the person to become substantially distressed. For this point, I can additionally rely on my 16 years of ER experience. To my knowledge, we have never had a bad outcome from this practice. Removal from KOP (keep on person) to Staff Control is always a decision that is coordinated with medical. It is done with a medical order. I asked about this scenario at multiple Restrictive

Housing sites and their practice in Florida is the same – that it is coordinated with medical and the officers would not remove such an inhaler on their own.

## VI.   **Lack of Evidence of Medical Harm**

The plaintiffs' motion and experts allude to "the adverse physical health effects of solitary confinement." (*See e.g.*, D.E. 311, generally, D.E. 311-11, p. 10). In support, Dr. Venters cites Peter Scharff Smith's 2006 article: "The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature." (*Id.*, p. 10, FN 7). In this article, Smith admits that "Bonta and Gendreau stated that 'careful empirical evaluations' had 'failed to uncover . . . pervasive negative effects of incarceration'" and that "Haney and Lynch chose a different approach. 'In the absence of a single, definitive piece of research that effectively establishes a causal connection, we rely on the method of 'triangulation.'"[4] In all, Smith offers no evidence from the modern literature of lasting physical harm from what he calls isolation in prison.

The plaintiffs' motion, Dr. Venters' declaration, and Smith in his review can only cite "physiological symptoms" as associated with isolation. Symptoms, not harm. Nowhere do the plaintiffs offer medical evidence of modern restrictive housing being the cause of lasting medical harm.

---

[4] Peter Scharff Smith, *The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature*, Crime and Justice, 34 (1) 441, 450 (2006) (citations in original).

Dr. Venters tries to make a connection between restrictive housing and blood clots without offering any study of the matter in a prison setting, stating: "For example, the development of blood clots of the lower extremities, referred to as deep vein thrombosis, is an example of a potentially fatal problem for which inactivity is a risk factor." (D.E. 311-11, p. 10). However, as I demonstrate in this declaration in the section regarding Mr. Kendrick, restrictive housing does not bar an inmate from vigorous and completely adequate exercise and mobility. The FDC promotes and makes available their "IN-CELL EXERCISE PROGRAM" (N11-090 5/07). The WHO offers: "STAY PHYSICALLY ACTIVE DURING SELF-QUARANTINE."[5] This explains and outlines a full exercise program that they show being done within the confines of a yoga mat.

Continuing with deep vein thrombosis (DVT), Dr. Venters makes another unsubstantiated claim: "Other risk factors for deep vein thrombosis include having cancer, clotting problems, recent trauma or surgery, being overweight or being older. As a result, people with any of these conditions face even higher risk for illness or death while in isolation." (D.E. 311-11, p. 10). He offers no medical evidence for this claim of "higher risk of illness or death while in isolation."

---

[5] https://www.euro.who.int/en/health-topics/health-emergencies/coronavirus-covid-19/publications-and-technical-guidance/noncommunicable-diseases/stay-physically-active-during-self-quarantine (last visited September 27, 2021).

Rather, for this proposition he cites a CDC flyer to the public: "Venous Thromboembolism (Blood Clots)." (*Id*., FN 8). This flyer does not contain anything about a "higher risk of illness or death while in isolation." Instead, the CDC flyer lists mobility risk factors:

- Confinement to bed (e.g., due to medical condition or after surgery);

- Limited movement (e.g., a cast on a leg to help heal an injured bone);

- Sitting for a long time, especially with crossed legs; or

- Paralysis.[6]

None of these include anything like being in a cell with unencumbered space, enough to do the FDC or WHO exercise programs as often as desired. The CDC flyer clearly does not apply to the restrictive housing inmate.

## VII.  **Review of Individual Inmates/Plaintiffs**

Providing reasonable and necessary medical care requires a highly individualized inquiry that is dependent on the particular inmates' medical conditions, needs and circumstances. The inmates referred to by Dr. Venters in his declaration suffer from a wide variety of illness and diseases, each of which must be treated on a case by case basis at the time the inmate presents for medical care.

---

[6] https://www.cdc.gov/ncbddd/dvt/facts.html (last visited September 27, 2021).

██████████ Dr. Venters' declaration states that ████████ claims that officers beat him with a radio and ██████████████████ on purpose on 4/17/19. (D.E. 311-11, p. 19). ██████████ claims that the officers bragged to the nurse about this. (*Id.*) My review of ████████████████████████



██████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████████

██████████████

██████████████ Dr. Venters' declaration states that ████████ reported

████████████████████████████████████████████ (D.E.

311-11, p. 19). My review of his file shows that ████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████



complained that he had been coerced into refusing care by the officers. (D.E. 311-11, p.25).

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

        █████████████████████████ is reported to have her ██████████████████████

██████████████████████████████████████████ (D.E. 311-11, p.

26). ████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

(D.E. 311-11, p. 26).

I reviewed his records from 2016 to 2020.

(D.E. 311-11, pp. 26-27).

(D.E. 311-11, p. 27).

██████████████████████████████████████████████████████

████████████████

████████████████████████ told Dr. Venters that his ██████████

████████████████████████████████ (D.E. 311-11, p. 27). ██████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

(D.E. 311-11, p. 27).

███████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████████

Plaintiff Jerome Burgess:  Mr. Burgess is reported to have had a stroke in 2006 related to a hypertensive crisis. He has some residual weakness in the left leg, with left foot drop (for which he wears a brace). He can stand and walk some - better with the brace on (per physical therapy notes and video of Mr. Burgess[7]). He uses a wheelchair, presumably for distances. I reviewed Mr. Burgess' medical records in detail back to 2014 as this is the period of time most pertinent to current concerns. Previous records were scanned in less detail. Regarding falls in restrictive housing, I could only find one record of an injury not caused by fighting with officers or other inmates. That injury was a minor scrape when he fell onto his wheelchair. No fractures, no lasting effect.

Dr. Venters stated that Mr. Burgess has a seizure disorder. (D.E. 311-11, p. 30). However, Mr. Burgess' neurologist, Dr. Gama, thought that he was having psychogenic or pseudo – "seizures" (on 12/18/2014) and later confirmed the diagnosis (on 1/22/2015) after exams and review of EEG, MRI and records. Pseudo-seizures are when a person stiffens and shakes, but is not actually having

---

[7] AEO_DOCAV0649

epileptic activity in the brain. It is often related to anxiety and panic, sometimes it is purposeful and factitious. Mr. Burgess has refused to see neurology since then, but his primary doctor, Dr. Gaxiola, has confirmed the diagnosis of pseudosiezures as recently as June of 2020.

Regardless, the episodes have been infrequent. Through the years, the patient regularly reports having more than a year between episodes. The few episodes in the record show the security and medical staff responding in an appropriate and caring manner. Mr. Burgess has been given seizure medication - I assume in an abundance of caution.

Having epilepsy does not restrict most citizens regarding their housing or activities. Being an airline pilot or commercial truck or bus driver are generally out, but very little else. People live alone with epilepsy, they drive, they work nearly all jobs, and they are not barred from hard or stressful work. There is no reason for someone to be exempted from restrictive housing for epilepsy unless their doctor feels the condition is unstable and perhaps would be better managed in a restrictive infirmary cell.

Mr. Burgess reported that he was unable to access recreation because of his wheelchair. The only documentation I found of Mr. Burgess complaining of this was an informal grievance dated 6/30/2015. He wrote: "Every inmate in the USA

is guaranteed recreation, but due to this institution not being a "ADA" approved wheelchair camp I am unable to seek recreation."

The answer is illuminating:

> "I/M Burgess,
> A review of your records reveals that the reason you are not going to recreation is due your current DC status. Once you meet criteria for recreation for DC inmates, accommodation will be made."

The institution was aware of Mr. Burgess' disability and ready to make accommodation based upon his individual disability and needs. There is no reason that a facility cannot accommodate an inmate in a wheelchair in restrictive housing.

Mr. Burgess also makes claims of inconsistently receiving self-catheterization supplies. (D.E. 311-11, p. 31). Although supply chain problems can happen to any enterprise, and since each institution's medical supply is through the same medical stores, in or out of CM, there would be the same lack of supplies in GP as CM. I only found evidence of one informal grievance from him regarding this, in April 2016.

This answer is also illuminating:

> "O: Inmate complains of not receiving enough catheter supplies. A: Per K-Dorm nurse Walker he is receiving the amount of supplies that was ordered by the Dr. P: Informal Denied."

There was no formal grievance following this, so it seems the problem was solved.

31

In addition, Mr. Burgess regularly saw the Urologist through these years. It would be natural to expect that Mr. Burgess would let the urologist know about any serious catheter supply problem. There is never any notation that I could find, or corrective order made regarding a lack of adequate catheter supplies. There is no complaint to any other medical provider or nurse that I found.

Mr. Burgess also claims repeated urinary tract infections. (D.E. 311-11, p. 31). Through the 6 years reviewed, I only found 2 periods of time when antibiotics were prescribed, February/March 2019 and February 2016. Both of these episodes were immediately following urologic procedures and presumably prophylactic. I saw a number of normal urinalyses (none positive) and no positive urine cultures. Mr. Burgess' kidney function has been normal and unaffected throughout (from 4/20/2013 to 3/27/2020), proving that he has come to no renal harm, regardless of complaint or insinuation.

Additionally, Mr. Burgess claims he was hospitalized while in CM due to these chronic disease exacerbations. (D.E. 311-11, p. 31). Regarding hospitalization during the period I reviewed, in June of 2020, Mr. Burgess was hospitalized for evaluation of possible Cerebrovascular Accident (CVA) but no CVA was found. In October of 2020, he was hospitalized for monitoring of head trauma following an altercation (released without complication). In August of

2019, he was hospitalized to remove a broken catheter tip from his urethra (removed by urology). In January of 2015, he was hospitalized for evaluation of possible CVA (none found, normal MRI and EEG). I do not find any relationship between these hospitalizations, his housing and his chronic conditions.

Plaintiff James Kendrick:  Dr. Venters had 5 areas of complaint regarding Mr. Kendrick. The first was that "it is essential that Mr. Kendrick receive regular activity and exercise, which he cannot do in isolation, to avoid developing heart disease." (D.E. 311-11, p. 32). This is not true – that exercise cannot be done in restrictive housing (there is no isolation in FDC). Besides exercise yard time, exercise can also be done in cell, as many inmates do. The FDC promotes and makes available their "IN-CELL EXERCISE PROGRAM" (N11-090 5/07). It is available in a 4-page handout with figures demonstrating the exercises.

Dr. Venters has touted the WHO as an authoritative resource in his declaration. The WHO has a recommended exercise program for those at home due to the pandemic. Entitled "STAY PHYSICALLY ACTIVE DURING SELF-QUARENTINE," this explains and outlines an exercise program that they show being done within the confines of a yoga mat. This is even smaller than the unencumbered space in CM cells.[8]  We expect our sailors in crowded ships,

---

[8] https://www.euro.who.int/en/health-topics/health-emergencies/ coronavirus-covid-19/publications-and-technical-guidance/noncommunicable-diseases/stay-physically-active-during-self-quarantine (last visited September 27, 2021).

astronauts in the space station and our friends and family at home to remain healthy and fit with limited space; it is obviously possible.

Dr. Venters complained that Mr. Kendrick "lost 13 pounds during his first few months." (D.E. 311-11, p. 32). To me, this works out to around 4 pounds a month. The CDC recommends a healthy weight loss at the rate of 1-2 pounds per week (or 4-8 pounds a month).[9]  Mr. Kendrick, at 5"9", has floated around 280-300 pounds.  The maximum healthy weight for him would be 162 pounds. The minimum to leave the obese category and be in the high overweight range is 196 pounds.[10]  Mr. Kendrick's health would be a lot better off to continue this rate of weight loss for 2-3 years.

Dr. Venters decided to believe him when "Mr. Kendrick reported that while in CM, he has missed multiple medical encounters for these conditions and reported being forced to sign refusals." (D.E. 311-11, p. 32).  Again, this is an impossible conspiracy theory that would involve the complete and inerrant collaboration of multiple shifts of officers, multiple shifts of nurses, the Duty Wardens rounding, the Grievance Coordinator team, educators, inmate orderlies, mental health providers and others. Mr. Kendrick could have reported to any, or all

---

[9]  https://www.cdc.gov/healthyweight/losing_weight/index.html (last visited September 27, 2021).

[10]  https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmi_tbl (last visited September 27, 2021).

of them and any one of these could have let the word out about this supposed recurrent abuse.

"Mr. Kendrick also reported difficulty in obtaining his blood sugar checks and insulin injections." (*Id*.)  Although Mr. Kendrick did refuse care multiple times (to multiple different nurses, each time with an officer escort), he was noncompliant to care more often <u>prior</u> to CM.  But we must not forget that the actual goal of diabetes care is not some set number of glucose checks, but to reduce the complications of diabetes that harm the patient and <u>person</u> in front of you. This is done best through monitoring of the HbA1c level throughout care. Mr. Kendrick came into FDC at Graceville with a (barely) in-range level of 6.9 (10/2016). Through very poor compliance to care and medication, his level rose distressingly to 12.4 (6/18) – a very high level. This was while he was still at Graceville. After transfer to FSP and CM, and in CM care, his level reduced to 8.3 (8/18), then to excellent control at 5.9 (9/19) and stayed good at the last available of 5.9 (4/20). All of this improvement was while under care at FSP. He certainly didn't come to any medical harm due to diabetes management while at FSP. In fact, he was much healthier in this regard.

In his declaration, Dr. Venters states, "I also observed that his blood pressure monitoring was extremely limited while in confinement, and more regular during his time out of confinement." (D.E. 311-11, p. 32). The goal of hypertensive care is

not some set rate of blood pressure checks, but to reduce the complications of high blood pressure to your patient, the <u>person</u> in front of you. Best practices in hypertensive care involve timing blood pressure monitoring to the likely need of intervention. Generally, if the person is under good control and stable on medication, the timing can be infrequent – as little as 1-2 times a year (VA/D0D Clinical Practice Guideline for the Diagnosis and Management of Hypertension in the Primary Care Setting. Version 4.0 - 2020.) Little or no intervention is needed. More frequent measurement is needed when b/p is in less in control and medications are being adjusted or changed (more interventions are needed). This can be monthly, weekly, even daily or continually in extreme cases. Mr. Kendrick had poorer b/p control at Graceville before admission to CM – 169/118 (4/17), 171/123 (7/17), 170/113 (9/17) 174/113 (2/18) etc. and needed more frequent checks. He had much better control at FSP - 130/88 (about 2 months after transfer), 126/86 (10/19), 114/62 (9/20) and needed less frequent checks. There is no evidence that he came to any medical harm due to hypertension management while at FSP. In fact, he was much healthier in this regard.

 <u>Plaintiff Johnny Hill</u>:  Dr. Venters states that Mr. Hill "reported that his medications are often interrupted, including both his hypertension and mental health medications." (D.E. 311-11, p. 32). However, Dr. Venters does not offer any evidence of such interruptions, their frequency, length, or which medications. He

does not offer any evidence of harm to Mr. Hill stemming from this unsubstantiated allegation.

Dr. Venters states that "His blood pressure was checked inconsistently." (*Id.*) When I looked at the records for the past 2 years, I found multiple blood pressure readings. This was despite Mr. Hill's frequent refusals of health care services (I estimated 400 overall). I found: 132/72 (2/18/19), 116/83 (5/16/19), 130/84 (8/12/19), 148/85 (12/9/19 – after an altercation), 131/76 (3/5/20), 132/62 (5/20/20), 106/77 (7/2/20), 132/67 (8/17/20), 118/82 (10/30/20), 131/86 (12/24/20), 116/72 (1/21/21). There didn't seem to be any medication changes and these readings and frequency are quite acceptable for good community standard care.

Dr. Venters relates Mr. Hill's "reporting that he had never refused medical care" and "Mr. Hill had multiple unsigned refusals in his records." (*Id.*) I found about 20 refusals signed by Mr. Hill. If Dr. Venters is suggesting that the 400 "refused to sign" refusal forms are false and created by staff, he is himself creating another impossible conspiracy theory. These forms are staff validated/signed and cosigned by a second staff member. There are hundreds of them over six years, in many, many different handwritings. That would be dozens and dozens of staff members involved in the conspiracy to falsify Mr. Hill's records, keeping perfect collaboration and secrecy for six years.

The simple truth of this is that Mr. Hill is a very difficult to serve patient, who obstructs his own care on a frequent basis. Despite this, the amazingly tolerant and empathetic staff have been beyond patient with him and have protected his health for years. They deserve commendation, not unsubstantiated allegations.

Plaintiff Juan Espinosa:  Mr. Espinosa has been diagnosed with "FUNCTIONAL APHASIA" by Iman Naseri, MD, and Otolaryngology Specialist (10/7/19). This was after a long workup and a "normal" exam of the larynx (on 10/7/19) which Dr. Naseri also described as having "No evidence of disease." Dr. Naseri later expanded this to "FUNCTIONAL DYSPHONIA – APHASIC, PSYCHOSOMATIC ORIGIN" (8/10/20). Functional aphasia and dysphonia means that the person is <u>capable</u> of producing speech and sounds, but does not.

> *Functional aphonia or dysphonia can usually be diagnosed by demonstrating normal sound production on prompted coughing or throat clearing or other signs of inconsistency of presentation. Functional Neurological Disorder: A Common and Treatable Stroke Mimic. Stoyan Popkirov, Jon Stone, Alastair Buchan: Stroke 2020;51:1629-1635*

Mr. Espinosa has claimed many times through the years that his speech problems have been due to "throat cancer." Initially it was "lymphoma," then switched to "laryngeal cancer" - after his three sets of neck lymph node biopsies were all negative for lymphoma. He has never been diagnosed with either of these diseases and they are not on his medical problem lists. The neck biopsies were followed by biopsies of the throat and esophagus during a normal appearing

endoscopy exam. These were also negative for cancers. He had a very long and thorough evaluation of his neck including multiple tests, exams, biopsies and scans over the course of several years. He started to complain of hoarseness after a needle aspiration then excision of a nodule under his chin (nowhere near any throat nerves). He was found to have normal appearing and <u>functioning</u> vocal cords during a laryngoscopy exam after this. On 12/8/18 he had excision of 3 lymph nodes of the neck (normal). It was after this that he claimed to be unable to speak, even though this surgery, also, did not enter areas of laryngeal nerves.

It is not at all clear that Mr. Espinosa is disabled at all, regarding his functional aphasia. He has not been diagnosed with a conversion disorder by psychiatry. He does not have a medical diagnosis causing mutism. I currently have a patient in my practice who has been intentionally mute, as part of a personal vow, since his criminal conviction. He is pleasant and easy to work with, but not deemed to be disabled. Just completely silent. We communicate by notes on his part.

On 11/28/18 (10 days prior to his 12/8/18 surgery), Mr. Espinosa claims to have twisted his foot while walking restrained. This occurred while he was still talking. He has later claimed that he was unable to get any attention for three days, until a sick call request was responded to. This is very hard to believe, since he was still talking and there was an officer at his door about every 30 minutes (48 times a

day), as well as the nurse during daily rounds and med passes. He could wave or speak up when they appeared, or knock on the cell door in between rounds.

He wrote grievances on 12/10/18 and 12/13/18 (just days after his injury) without mention of his supposed ordeal with being unable to get any help for 3 days. These grievances were just complaints about personal property. The grievance system was a third way to get attention for his foot problem, separate from the block officers and nurses. But he did not use this avenue either.

He was seen by the nurse at sick call and an x-ray was ordered. A few days later, the x-ray was done on 12/5/18 and read as NEGATIVE for fracture. He was given an order for crutches. He had an evaluation by the Nurse Practitioner. On follow-up 10 days later he was still quite swollen, despite wrap and elevation, and a second x-ray was ordered - he was obviously receiving concerned attention and not indifference. The second x-ray showed nondisplaced fractures of the 3rd and 4th metatarsal bones. With intact, stabilizing 1st, 2nd and 5th metatarsal bones flanking the fractures on both sides, this is a quite stable injury and did not require surgery or casting. He was appropriately treated (confirmed by consulting orthopedic surgeon) and had an uneventful healing. Final x-ray on 3/8/18 showed good healing. He was treated well and appropriately, and had a good outcome.

Regarding the concept of someone who is mute on a restrictive housing unit. At every facility and restrictive housing unit I asked how would someone who is

unable to speak get attention and medical attention for a medical emergency. They all said the inmate could wave someone down during rounds or pound on the door in between. There are officers on the floors most of the time and consistent audio monitoring of all the units from the central control station. A knocking on the cell door would be heard and responded to. I believe that this is better access than he would have on many G.P. units.

Dr. Venters also mentioned that Mr. Espinosa was on property restriction during the period of his initial foot injury. (D.E. 311-11, p. 34). However, he doesn't say what particular property was restricted (since the property restricted in FDC is based on the misuse of the particular articles). He does not say why that particular property being unavailable would lead to a situation "which likely exacerbated his pain and suffering." (*Id*.) If Mr. Espinosa, for example, had misused a particular book by carving it out for contraband or weapon stash and had that book restricted, why would this necessarily "exacerbate his pain and suffering"?

## VIII.   **Conclusion**

Reasonable and necessary medical care is a highly individualized inquiry dependent on the particular inmates' medical conditions, needs and circumstances. The plaintiffs' representatives and medical experts make various general and inmate specific allegations regarding the experience for restrictive housing inmates

versus their general population (GP) peers. My conclusions regarding those allegations follow:

1. Allegations that the Florida Department of Corrections holds inmates in Isolation/Solitary Confinement. In my inspection of 11 facilities with restrictive housing and discussion with staff at all levels, I can confidently say the following:  <u>None of the FDC's facilities house any inmates in conditions that could be called Isolation/Solitary Confinement - as per the authorities (NCCHC, WHO, ACA) and definitions cited and/or supported by the plaintiff's own experts.</u> Those definitions demand extreme social isolation, not present in FDC, for any such circumstance to be defined as Solitary Confinement/Isolation.

2. Allegations of increased risk of medical harm to inmates held in restrictive housing. The plaintiffs' motion, Dr. Venters' declaration and the research by Peter Scharff Smith in his review can only cite "physiological symptoms" as associated with isolation. Symptoms, not harm. Nowhere do the plaintiffs offer medical evidence of modern restrictive housing being the cause of lasting physical harm.

3. Allegations that inmates in restrictive housing are unable to exercise and are also at increased risk of death from Deep Vein Thrombosis. These allegations do not consider being in a cell with enough unencumbered space

to do the FDC or WHO exercise programs as often as desired. The CDC
mobility risk factors for DVT clearly do not apply to the restrictive housing
inmate. I find these allegations to be unsubstantiated.

4. Allegations that facility conditions were run-down and below safe use
standard. I find these allegations to be unsubstantiated. My inspection of
multiple housing and medical units of 11 facilities showed them to be in
quite adequate condition. Also, there was no attempt to compare conditions
to GP.

5. Allegations of filth, food scraps, cockroaches and other pests in the housing
units. My inspection of multiple housing and medical units in 11 facilities
found them to be quite clean as a whole, including occupied and unoccupied
cells. There was some variability in the orderliness of some occupied cells,
but all were quite acceptable for occupation. No pests or sign of them were
found. Pest control contracts and logs were in order. Also, there was no
attempt to compare to GP.

6. Complaint of "moss in toilets." I find these allegations to be unsubstantiated.
Plaintiffs' team failed to consider the presence of hard water concretions.

7. Allegations of constricted access to medical care in restrictive housing.
There was no substantiation offered beyond statements by inmates. Review

shows that restrictive housing inmates have better and easier access to medical care than their GP peers.

8.  Allegations that pre-confinement and post-use-of-force medical evaluations were substandard for the restrictive housing inmates. Review of a multitude of these evaluations, including specific instances mentioned by the plaintiffs, found them to be well done, clinically accurate (proven by outcomes) and within ACA and NCCHC standards.

9.  Allegations of interrupted chronic care for inmates in restrictive housing compared to GP. Those instances mentioned by the plaintiffs were investigated and found to be unsubstantiated. In fact, there was evidence of better chronic care measures in the restrictive housing group.

10. Allegations of forced or coerced refusals of medical care in restrictive housing. No substantiation was offered by the plaintiffs beyond statements by inmates. Consideration of the allegation being widespread, or even just the number that plaintiffs claimed, showed the allegations to be statistically and rationally unsupportable. Also, there was no attempt to compare to GP.

11. Allegations of forged refusals of medical care in restrictive housing. No substantiation was offered by the plaintiffs. Consideration of the allegation being widespread, or even just the number that plaintiffs claimed, showed

the allegations to be statistically and rationally unsupportable. Also, there was no attempt to compare to GP.

12. Allegations of interrupted prescription medication and medical supply availability to inmates in restrictive housing. The examples offered were found to be non-supportive of the claim. Therefore, I find these allegations to be unsubstantiated. Also, there was little attempt to compare to GP.

13. Specific allegations and opinions regarding certain inmates and Plaintiffs Kendrick, Burgess, Hill, and Espinosa, I find these allegations to be unsubstantiated based upon my review of the medical records.


My opinions contained in this Declaration are given within a reasonable degree of medical certainty. I reserve the right to modify my opinions based on additional information learned in discovery.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing declaration is true and correct.  Executed on October 9, 2021.


Reed Paulson, M.D.

# CURRICULUM VITAE

## Reed E. Paulson MD, MPH, CCHP-P, FAAFP
## Chief Medical Officer - Oregon State Penitentiary

Corrections Physician Specialist for the State of Oregon
Masters of Public Health – University of California, Berkeley
Certified Correctional Health Provider, Physician, - National Commission on
Correctional Health Care
Certification in Opioid Use Disorder Treatment - USDEA/SAMHSA
Member, American College of Correctional Physicians
Fellow, American Academy of Family Physicians

## PERSONAL DETAILS

| | |
|---|---|
| Name | Reed Eric Paulson, MD |
| Address | ██████████████ |
| Email Address | reedpaulson@me.com |
| Nationality | USA |
| Oregon License Number | MD 19597 |

## EDUCATION

| | |
|---|---|
| Masters of Public Health 1989-90 | University of California at Berkeley School of Public Health Berkeley, California 94720 |

| | |
|---|---|
| Doctor of Medicine<br>1984 | Creighton University<br>School of Medicine<br>2500 California Street<br>Omaha, Nebraska 68178 |
| Masters Training and Research<br>1978-80 | San Jose State University<br>125 S. Seventh Street<br>San Jose, California 95192 |
| Bachelors of Biology<br>1975-78 | San Jose State University<br>125 S. Seventh Street<br>San Jose, California 95192 |

## MEDICAL TRAINING

| | |
|---|---|
| Doctor of Medicine<br>1984 | Creighton University<br>School of Medicine<br>2500 California Street<br>Omaha, Nebraska 68178<br>USA |
| Internship<br>1984-85 | University of California, Los Angeles<br>Harbor/UCLA Medical Center<br>1000 West Carson Street<br>Torrance, California 90502<br>USA |
| Residency Training<br>1985-87 | University of California, Los Angeles<br>Harbor/UCLA Medical Center<br>1000 West Carson Street<br>Torrance, California 90502<br>USA |

## CORRECTIONAL MEDICAL EXPERIENCE

*Years-long, hands-on clinical experience in each of the following areas:

Men's Maximum Security general population
Women's Maximum Security general population
Men's Infirmary
Women's Infirmary
Men's Intake Facility
Women's Intake Facility
Men's Mental Health Infirmary
Women's Mental Health Infirmary
Men's Death Row
Women's Death Row
Men's Behavioral Health Unit and Intermediate Care Housing
Men's Segregation
Women's Segregation
Women's Medium and Minimum Security general population
Hospice

## SELECTED CORRECTIONAL MEDICINE TEACHING

ODOC Health Services Spring 2017 Provider Meeting, April 13-14
- *Suturing Skills Workshop*

ODOC Health Services Fall 2015 Provider Meeting, September 10-11
- *Management of Musculoskeletal Pain*
- *The Emperor Has No Clothes – The Truth About Gabapentinoids*

ODOC Health Services Fall 2014 Provider Meeting, September 11-12
- *Splinting and Casting Workshop*

ODOC Health Services Spring 2013 Provider Meeting, May 16-17
- *American Heart Association/American College of Cardiology Guidelines on Lipid Management*

ODOC Health Services Fall 2011 Provider Meeting, September 29-30
- *Hands on Demo: Suturing, Casting and Splinting*

ODOC Health Services Spring 2010 Provider Meeting, May 13-14
- *Evaluating a Journal Article: Understanding POEM*

ODOC  -    New Physician's On The Job Training Manual
              2011, 2013, 2015, 2017, 2019, (Currently under revision)

NCCHC 2021 National Conference on Correctional Health Care
     -    *Recognition, Management, and Pitfalls in Substance Intoxication and Withdrawal*

## CERTIFICATIONS

| | |
|---|---|
| 1981,1983, 1985 | National Board of Medical Examiners - Parts 1, 2, 3 |
| 1985 to 1996 (lapsed after move to Oregon) | California Board of Medical Examiners Licensed Physician and Surgeon |
| 1995 to present | Oregon Board of Medicine Licensed Physician and/or Surgeon |
| 1987 to present | American Board of Family Medicine Board Certification 1987, 1994, 2001, 2008, 2018 - 2028 |
| 1995 to 2005 | Certificate of Added Qualification in Sports Medicine American Boards of Family Medicine, Pediatrics, and Emergency Medicine |
| 1987 to 1992, 2001 to 2011 | Advanced Trauma Life Support Certification American College of Surgeons |
| 1982 to 2011 | Advanced Cardiac Life Support Certification American Heart Association |
| 1989 to 2010 | Advanced Pediatric Life Support Certification American Academy of Pediatrics |
| 2019 | Certified Correctional Health Care Provider – Physician National Commission on Correctional Health Care |

# APPOINTMENTS

| | |
|---|---|
| Correctional Physician Specialist and Chief Medical Officer 2009 to present | Oregon Department of Corrections Oregon State Penitentiary 2575 Center Street NE Salem, OR 97301 503 378-5593 |
| Emergency Medicine 2001 to 2009 | Emergency Department Samaritan Lebanon Community Hospital Lebanon, OR 97355 |
| Family Practice/Sports Medicine 1995 to 2001 (outpatient care) | Northwest Permanente, PC 500 NE Multnomah St. , Suite 100 Portland, OR 97232 503 813-3860 |
| Medical Staff 1995 to 2001 (in-hospital care) | Salem Hospital PO Box 14001 Salem, OR 97309 503 370-5200 |
| Emergency Medicine/Sports 1989 to 1995 | The Permanente Medical Group, Inc Kaiser Martinez Medical Center 200 Muir Road Martinez, CA 94553 510 987-3855 |
| Family Practice 1987 to 1989 | U. S. Public Health Service Indian Health Service Keams Canyon PHS Hospital Keams Canyon, Arizona 86034 |
| Emergency Medicine | St. Lukes Medical Center Rosing Emergency Medical Group 2632 E. Washington Blvd. Pasadena, CA 91109 |

# PRESENT APPOINTMENT
## Description

Chief Medical Officer, Oregon State Penitentiary
Oregon Department of Corrections

This has been the most medically challenging practice of my career. The Penitentiary is the medical hub and referral center for the entire Oregon state corrections system. We have the largest medical infirmary, the largest mental health infirmary, mental/behavioral units, disciplinary units and death row. We have access to all specialties and the Oregon Health Sciences University. Patients are sent to us from all over the state for advanced diagnosis and care.

I have learned much more medicine here than in my previous practices. Such things as bone marrow transplant, any and all cancers, end-stage heart disease/transplant candidates, ischemic/rhythmic/myometrial heart disease challenge us. Diverse neurologic, gastrointestinal, ophthalmologic, infectious, dermatologic, surgical, and urologic disorders (as well as many others) are our daily bread. We are the largest HCV treatment center in the state of Oregon. I am in daily consultation with multiple specialists. We also provide the largest comprehensive hospice care program in the state system.

As Chief Medical Officer I am in charge of the infirmary and I support and offer medical consultative support to the entire staff. I am responsible for Quality Management physician input and provider staff counseling. I am the lead physician/provider orientation instructor for the system.

I have also provided care at the intake center, where many of the new inmates have had partial or no diagnosis/care for serious maladies. The women's prison shares this site and I provided comprehensive women's health care at this facility for years. Prenatal care, mammography and hemodialysis are provided on-site. Diagnosis and treatment of all conditions are managed directly or co-managed with specialists

Adding to all of the above are the challenges of limited resources, staffing shortages, and facility shortcomings.

## MANAGEMENT AND ADMINISTRATION

Chief Medical Officer                      Oregon State Penitentiary

Quality Management (Medical)               Oregon State Penitentiary

Nurse Protocols and Provider               Oregon Department of Corrections
Guidelines                                 Health Services

Medical Student Preceptor                  Oceana University School of
                                           Medicine

Masters of Public Health                   University of California at Berkeley
- Program Planning

Clinical Preceptor                         Lebanon Community Hospital

Continuous Quality Assurance               Lebanon Community Hospital
Committee

Physician Team Leader                      Northwest Permanente – Salem

Physician Liaison – Call Center            Northwest Permanente – Salem

Quality Management Committee               Northwest Permanente – Salem

Standing/Preprinted Orders                 Northwest Permanente – Salem
Project

Chief of Medical Services                  1998 Nike World Masters Games

Quality Assurance Chief                    Kaiser Martinez Medical Center
Department of Emergency Services

CQI Project – Musculoskeletal              The Permanente Medical Group
Disorders

Clinical Guidelines – Low Back Pain        The Permanente Medical Group

Director of Medical Education               Keams Canyon PHS Hospital
And Resident Preceptorship

## VOLUNTEER ACTIVITIES

Young Life Ministries – Wildhorse Canyon: Medical Advisory Committee and
active physician volunteer.
Boy Scouts of America – many years volunteer and Scoutmaster
Christian Medical and Dental Society
Institute for Christian Conciliation
Crisis Pregnancy Center – Oakland, California: 1990 – 1995
Mexican Medical Ministries: 1991 – 1995
International Covenant Church Missions: 1992 - 1995
Los Medicos Voladores – The Flying Doctors 1989 -1995
The Institute for Latin American Concern 1983 – 1989
Venice Family Clinic 1986 – 1987
Indian – Chicano Health Center 1982 – 1984