# EXHIBIT I

# DR. HOMER VENTERS DEPOSITION TRANSCRIPT WITH EXHIBITS

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

CASE NO.: 4:19-cv-00212-MW-CAS

JAC'QUANN (ADMIRE) HARVARD;
J.H., a minor, by and through
his parents and natural
guardian, Valentine Robinson;
ANGEL MEDDLER; JUAN ESPINOSA;
JEROME BURGESS (a/k/a SHAM'LA
GOD ALLAH); JAMES W. KENDRICK,
JR.; and JOHNNY HILL; on
behalf of themselves and all
others similarly situated,

        Plaintiffs,

vs.

MARK INCH, in his official
capacity as Secretary of the
Florida Department of
Corrections, and FLORIDA
DEPARTMENT OF CORRECTIONS,
an Agency of the State of
Florida,

        Defendants.
_____/


REMOTE VIDEOCONFERENCE DEPOSITION OF
HOMER D. VENTERS, M.D.


August 10, 2021
9:02 A.M. - 4:49 P.M.
Port Washington, New York


Stenographically Reported By:

Kimberly Arsenault, RPR
Registered Professional Reporter

```
 1   APPEARANCES:

 2   For the Plaintiffs:

 3        Florida Justice Institute
          100 SE 2nd Street, Suite 3750
 4        Miami, Florida 33131
          Ph.: (305)358-2081
 5        E-mail: kwallis@floridajusticeinstitute.org
          BY: KARA SHELI WALLIS, ESQ.
 6
          Southern Poverty Law Center
 7        P.O. Box 10788
          Tallahassee, Florida 32302-2788
 8        Ph.: (850)521-3000
          E-mail: krista.dolan@splcenter.org
 9        BY: KRISTA A. DOLAN, ESQ.

10        Southern Poverty Law Center
          4770 Biscayne Boulevard
11        Miami, Florida 33137
          Ph.: (786)347-2056
12        E-mail: kelly.knapp@splcenter.org
          BY: KELLY JEAN KNAPP, ESQ.
13
     For the Defendants:
14
          Rumberger, Kirk & Caldwell
15        101 N. Monroe Street, Suite 120
          Tallahassee, Florida 32301-1549
16        Ph.: (850)222-6550
          E-mail: nsmith@rumberger.com
17                jgrosholz@rumberger.com
          BY: NICOLE S. SMITH, ESQ.
18            JEFFREY J. GROSHOLZ, ESQ.

19        Rumberger, Kirk & Caldwell
          300 S. Orange Avenue, Suite 1400
20        Orlando, Florida 32801-1873
          Ph.:(407)872-7300
21        E-mail: sduke@rumberger.com
                  dgerber&rumberger.com
22        BY: SAMANTHA C. DUKE, ESQ.
              DANIEL J. GERBER, ESQ.
23
      Also Present: Cayla Moseley,
24                  Donna Beard

25    *All parties appeared using remote videoconferencing
```

```
 1              INDEX OF PROCEEDINGS

 2   DEPOSITION OF HOMER D. VENTERS, M.D.          PAGE

 3   DIRECT EXAMINATION BY MS. SMITH                 5

 4

 5   CERTIFICATE OF OATH                           278

 6   CERTIFICATE OF REPORTER                       279

 7   ERRATA SHEET                                  280

 8   WITNESS REVIEW LETTER                         281

 9

10               PLAINTIFF'S EXHIBITS

11   NO.   DESCRIPTION                            PAGE

12             **** None Marked ****

13               DEFENDANT'S EXHIBITS
14
     NO.   DESCRIPTION                            PAGE
15
     1     Injury Surveillance in New York City   277
16         Jails

17   2     Civil Minutes - General Martinez v. The 277
           GEO Group
18
     3     Position Statements                    277
19
     4     Federal Register Document Dated 12/20/08 277
20

21

22

23

24

25
```

```
 1                    PROCEEDINGS

 2       Deposition taken before Kimberly Arsenault,

 3  Registered Professional Reporter and Notary Public in

 4  and for the State of Florida at Large in the above

 5  cause.

 6                -   -   -   -   -   -

 7            (Court Reporter Viewed Driver's License.)

 8            COURT REPORTER:  The attorneys participating

 9       in this deposition acknowledge that I am not

10       physically present in the deposition room and that

11       I will be reporting this deposition remotely.

12       They further acknowledge that, in lieu of an oath

13       administered in person, I will administer the oath

14       remotely.  This arrangement is pursuant to the

15       Florida Supreme Court Administrative Order No.

16       AOSC-20-23.  The parties and their counsel consent

17       to this arrangement and waive any objections to

18       this manner of reporting.

19            Please indicate your agreement by stating

20       your name and your agreement on the record.

21            MS. SMITH:  Nicole Smith for defendants.  We

22       agree.

23            MS. WALLIS:  Kara Wallis for plaintiffs.  We

24       agree.

25            COURT REPORTER:  Doctor, would you raise your
```

```
 1        right hand, please.

 2            Do you solemnly swear the testimony you shall

 3        give to be the truth, the whole truth and nothing

 4        but the truth so help you God?

 5            DR. VENTERS:  I do.

 6            COURT REPORTER:  Thank you.

 7   THEREUPON,

 8                 HOMER D. VENTERS, M.D.

 9   having been first duly sworn, was examined and

10   testified as follows:

11                 DIRECT EXAMINATION

12   BY MS. SMITH:

13        Q.  Good morning, Dr. Venters.

14        A.  Good morning.

15        Q.  My name is Nicole Smith, and I represent the

16   defendants in this lawsuit, the Florida Department of

17   Corrections and Secretary Inch.  We've met before,

18   correct?

19        A.  Correct.

20        Q.  All right.  Could you please say and -- well,

21   you've already spelled your name, so just say your

22   name for the record.

23        A.  Homer Venters.

24        Q.  Dr. Venters, where are you located today?

25        A.  Port Washington, New York.
```

1        Q.   Are you alone today in the room where you're
2    testifying?
3        A.   Yes, to the best of my ability.   If there is
4    any interruption, I will inform you and, if needed,
5    interrupt.   But I -- I plan to be uninterrupted.
6        Q.   Thank you.
7             So, Dr. Venters, you have your report
8    accessible to you today?
9        A.   I do, yes.
10       Q.   All right.   And did you bring any documents
11   with you today, or do you have any documents
12   accessible to you today that you relied upon in
13   preparing your report?
14       A.   I have my report.   That's the only thing that
15   I have opened up for today.
16       Q.   Okay.   Did you provide documents to
17   plaintiffs' counsel that you relied upon in preparing
18   your report?
19       A.   I believe the documents that I relied on to
20   prepare my report I received from them, so I don't
21   think I've sent them anything that -- to -- in -- that
22   I used to prepare my report.
23       Q.   Okay.   What about handwritten notes that you
24   may have taken.
25       A.   No, I haven't provided them with anything

1    like that.

2         Q.   Okay.  I may show you some to ask you about.

3              And what about your Appendix B that is

4    attached to your report.  Do you have those documents

5    accessible to you today?

6         A.   I am not sure.  All those -- some of those

7    are -- the documents I've reviewed are on servers or

8    secure file platforms that -- I think the links expire

9    intermittently, so I'm not sure I do have access to

10   everything there.

11        Q.   Okay.  Did you review your notice setting

12   your deposition duces tecum for today?

13        A.   I believe at some point I did, yes.

14        Q.   Okay.  And did you understand that you were

15   asked to bring certain documents with you to your

16   deposition?

17        A.   I -- I don't recall the specific language,

18   but I recall that there might -- there was a request

19   that I be prepared to talk about my report and the

20   things that I used to make the report.

21        Q.   Okay.  But you don't have any documents

22   accessible to you today except for your report,

23   correct?

24        A.   I haven't pulled up any files to -- to have

25   open today.  I could -- some of them, as I said

1    earlier, I could look for, but some of them if they're

2    on a -- you know, thousands and thousands of patients'

3    records, for instance, that's actually too large to

4    sit on my computer.  And so for both security reasons

5    but also for just practicality reasons those types of

6    files sit on some secure platforms that I don't have

7    opened today.

8         Q.   Okay.  So your testimony is that some of the

9    documents that you list on Appendix -- or -- or all of

10   the documents that you list on your Appendix B are

11   documents that were provided to you by plaintiffs'

12   counsel via some sort of a -- a server, and you're not

13   sure whether you have access to those servers as you

14   sit here today.

15        A.   No.  Some of those documents, such as patient

16   records maybe, but I think if -- if you have questions

17   about that Appendix B, it would be helpful to -- for

18   me to be able to look at it.  Is that okay if I --

19        Q.   Of course, please.  If you want to pull out

20   your report and take a look at your appendix so I can

21   get a better understanding of what documents you have

22   access to today during your deposition.

23        A.   I believe that most of the files in the

24   first -- let's say 1 through 49 are mostly

25   spreadsheets or administrative files and then the --

1  point 50 is medical and mental health records, and so

2  those are much larger and I think may take more work

3  to access.  But my understanding is that if you have

4  questions about any of these, I'll be able to review

5  them.  So if you can provide me with the portion of

6  these, because these are -- many of these are

7  thousands of pages, I would be happy to look at any

8  specific files that you have a question about.

9       Q.  And I appreciate that, Dr. Venters.  And I'm

10 just trying to establish a baseline of what you have

11 with you today and what you have access to today.

12          So I think I understood your testimony that

13 starting at bullet point 50 of your Appendix B, the

14 medical/mental health records, those files are too

15 large to be maintained on your computer so you may not

16 have access to those today.  But as for 1 through 49

17 do you have access to those today?

18      A.  I -- I don't have them all open, so it may

19 take me some time to find a specific page of a

20 specific file, but I think those are files that I

21 would have access to with a little bit of looking.

22      Q.  Okay.  But you don't have a discrete file set

23 that contains just the documents that were listed in

24 Appendix B, correct?

25      A.  I would have these files somewhere.  I

```
 1   can't -- I don't -- I'm not sure about the name of the
 2   file or the type of -- like, how it's labeled, but I
 3   think that I could find most of these with a little
 4   bit of looking.
 5        Q.  Okay.  And -- and I'm not trying to be
 6   confusing.  I just want to understand.
 7            There is not one folder, for example, on your
 8   computer that has documents in Appendix B 1 through 49
 9   that you can easily access today, correct?
10        A.  I'm -- I don't recall if it's just one file
11   or if it's a couple of files.
12        Q.  Okay.  Do you know how it was that you
13   received files from plaintiffs' counsel?
14        A.  I believe there are several ways in which I
15   would have received files.  Some files may have
16   come -- some documents may have come via e-mail, some
17   documents may have been provided through a Box account
18   and some files may have been accessible through a
19   separate -- a separate platform.  Not Box, but a
20   separate platform.  So I -- I would believe at least
21   three -- three different ways.
22        Q.  All right.  Well, let's start at the
23   beginning, if we could.  And -- and if I have specific
24   questions about you having access to documents, I'll
25   ask you additional ones along the way.
```

1              When were you retained by the plaintiffs'

2    counsel for this lawsuit?

3         A.   I would -- I believe between one and two

4    years ago sometime.

5         Q.   Okay.  If I represent to you you signed your

6    retainer letter on February 14th, 2019, does that

7    sound right to you?

8         A.   Yes.

9         Q.   Okay.  And before you were retained by the

10   plaintiffs' counsel had you worked with any of them

11   previously?

12        A.   Not to my recollection.

13        Q.   Okay.  Had you previously served as a -- an

14   expert for Southern Poverty Law Firm?

15        A.   I don't recall if I had or not.  I -- I think

16   this might have been the first case, but I don't

17   recall with certainty.

18        Q.   Okay.  And what about Florida Legal Services.

19   Had you ever served as an expert for them before this

20   case?

21        A.   I don't believe so.

22        Q.   And Florida Justice Institute, FJI, did you

23   ever serve as an expert for them before this case?

24        A.   I don't believe so.

25        Q.   All right.  Do you know when you were first

1  retained by the plaintiffs' counsel in this lawsuit at

2  that point in time the complaint had not been filed,

3  correct?

4      A.  I don't recall.

5      Q.  Okay.  Did you have an opportunity to review

6  the complaint before it was filed?

7      A.  I don't recall.

8      Q.  Okay.  What was the first thing you do recall

9  doing in this lawsuit?

10     A.  Having phone conversations about the

11  potential role I would play in the case.

12     Q.  Okay.  And who did you have those phone

13  conversations with?

14     A.  I don't recall other than it would be Kelly

15  Knapp.  There may have been other people that were on

16  the call.

17     Q.  Okay.  And from those phone conversations

18  what did you understand your role in this lawsuit to

19  be?

20     A.  To assess the harms to physical health or

21  barriers to health care that people would encounter or

22  could encounter in segregation settings in the Florida

23  Prison System.

24     Q.  Okay.  And has your understanding of what you

25  just described your role to be changed at all over

1    time?

2         A.  I don't believe so.

3         Q.  And do you understand whether you've been

4    retained by the plaintiffs' lawyers in this case to

5    offer opinions on the -- whether this class should be

6    certified?

7         A.  I -- understand that the legal arguments or

8    the legal discussions are outside of my purview, so I

9    haven't -- I'm not a lawyer and have not been retained

10   to give legal advice, which the question about class

11   certification sounds like a -- a legal decision.  But

12   I have been retained to give my opinion about the

13   extent to which the harms to health and barriers to

14   accessing health care for people in segregation are

15   systemic problems, problems that accrue to or risks

16   that accrue to more than just a handful of

17   individuals.  And so I don't know if that's responsive

18   to your question, but that's the framework of how I've

19   been retained.

20        Q.  Fair enough.

21             What was your understanding of why you were

22   drafting the report that you've submitted to the

23   Court?

24        A.  I understand that the -- this -- the stage of

25   the case right now has to do with class certification.

1   I'm not sure I understand the legal nuances of what

2   that means or how lawyers will argue or what judges

3   use to make their decisions, but I understand that

4   generally to be the stage that the case is at.

5       Q.   Okay.  Anything else that you understand

6   about why you submitted the report?

7       A.   No.

8       Q.   Now, what is your understanding, if you have

9   one, as to which proposed classes the plaintiffs have

10  set forth in this lawsuit?

11      A.   Well, as I said, my understanding has to do

12  with my role in assessing the risk to people who go

13  into segregation settings, these health risks and

14  barriers to health care.  And so beyond that I'm not

15  familiar whether part -- certainly not part of the

16  legal decision making about the legal arguments in the

17  case.

18      Q.   Understood.

19           Have you reviewed plaintiffs' complaint?

20      A.   I believe I've seen some of the -- yes, I

21  believe -- I don't know if there is more than one, but

22  I believe at some point I've seen some of the -- the

23  complaints.

24      Q.   And have you reviewed plaintiffs' motion for

25  class certification?

1    A.   I believe so, yes.

2    Q.   Okay.  So I don't want your -- I'm not asking

3  you for any legal understanding; but in reading

4  plaintiffs' motion for class certification, what is

5  your understanding of what the proposed class is that

6  are set forth in the complaint?

7    A.   Well, as I said, I don't recall the -- the

8  legal categories.

9         My understanding is that -- and my focus is

10  on the risks to people who -- the health risk to

11  people who enter into segregation settings.

12    Q.   Okay.

13    A.   But I would be happy -- if you have a

14  document for me to review, I would be happy to look at

15  it.

16    Q.   Thank you.

17         Do you have any understanding as to whether

18  the plaintiffs have brought a subclass or inmates in

19  FDC with physical disabilities?

20    A.   I don't recall as I sit here if there is a

21  separate section or if that group of people is part of

22  another group.

23    Q.   Okay.  Are you offering any opinions in this

24  lawsuit as to whether inmates with physical

25  disabilities, whether that subclass, if there is one,

1   should be certified?

2       A.  Well, my opinion focuses on, as I've said,

3   the health risks.  And so certainly people who have

4   physical disabilities face specific harms by being

5   placed in these segregation settings and -- and

6   specific risks to their health.  And so I -- my

7   opinion would be that they do suffer harm by dint of

8   having a disability when they're placed into

9   segregation or they face potential harm.

10          I'm not sure about the legal ramifications of

11  that opinion of mine.

12      Q.  Okay.  Insofar as inmates in Florida who have

13  disabilities, can you describe to me any policies or

14  procedures that you've reviewed regarding the -- let's

15  start with the Americans -- compliance -- Florida's

16  compliance with the Americans with Disabilities Act.

17      A.  I have not done an analysis of the Americans

18  with Disabilities Act as part of the preparation of my

19  report.

20      Q.  Okay.  Have you ever in any of your previous

21  expert engagements provided opinions about a prison or

22  jail whether they comply with the Americans

23  Disabilities -- with Disabilities Act?

24      A.  Certainly in my role as the head doctor of a

25  large correctional health service part of my

1   responsibility was to ensure -- or address compliance

2   issues for people with disabilities.  Again, this is

3   clinical assessment.  So I'm not a lawyer.  I have

4   never been a lawyer.  So I'm not sure -- I don't

5   believe I've ever been in the position of establishing

6   legal compliance or asserting legal compliance either

7   working to run a health service or in assessing a

8   health service, but I certainly have worked to review

9   and improve access for people with disabilities when I

10  have run a correctional health service.

11          I also was engaged, you know, I think in

12  Georgia to look specifically at disability access for

13  people in segregation in the state prisons there.  And

14  I'm sure I've -- in some of the -- I'm sure I've done

15  it in other places, too.  But I've never applied a

16  legal lens where I've tried to infer or deduce legal

17  compliance with the Americans with Disabilities Act.

18      Q.   Okay.  So the two places that you mentioned

19  were in your job when you were working for the

20  Correctional Health Services of New York City and some

21  work you did at Georgia, correct?

22      A.   Yes.  And I believe that I also -- I'm also

23  the independent compliance monitor for a prison in

24  Virginia where part of my role as the court appointed

25  or independent monitor for health services does

1  include assessing access to disability accommodation.

2      Q.   Okay.  And what about in Georgia?  Who

3  retained you in that case?

4      A.   It may have been the Southern Poverty Law

5  Center.  I don't recall.  I think it was the -- either

6  the NAACP or the Southern Poverty Law Center.

7      Q.   Do you know the name of the Georgia case that

8  you're referring to?

9      A.   I do not.

10      Q.   Okay.  Have you offered any reports yet in

11  that case?

12      A.   No.

13      Q.   Okay.  You told me previously that you had

14  not been retained by Southern Poverty Law Center, and

15  my question now for you is since your retention in

16  this case I understand possibly you were retained by

17  them in Georgia.  Are there any other matters that

18  you've been retained by Southern Poverty Law Center?

19      A.   Yes.  I believe I would have been retained in

20  some COVID cases.  I don't recall which ones, but I've

21  conducted about two dozen court ordered COVID

22  inspections of jails and prisons around -- and

23  immigration detention centers around the country, and

24  some of those would have been -- I would have been

25  retained initially by the Southern Poverty Law Center.

1    Q.  Okay.  And what about Florida Justice

2    Institute.  Since you began working on this case any

3    other retentions besides the Harvard lawsuit?

4    A.  I don't believe so.  I recently did a COVID

5    inspection of the Broward County Jail, and there was a

6    local -- I believe that was not the Florida Justice

7    Institute.  I believe it was some other local group in

8    Florida, but I don't -- not to my knowledge.

9    Q.  Okay.  And same question for Florida Legal

10   Services.  Besides this lawsuit any other retentions

11   for them?

12   A.  No, not to -- not to my knowledge.

13   Q.  So going back to the disability issue for a

14   moment.  Is it your testimony that you have not yet

15   conducted an analysis as to whether the Florida

16   Department of Corrections is complying with the

17   Americans with Disabilities Act?

18   A.  I have not conducted and would not plan to

19   conduct a legal analysis about compliance.  As I said

20   earlier, it is clear that people with physical

21   disabilities have special health risks and health

22   harms that they face in segregation.  But I have not

23   offered a -- a -- an analysis of how that tracks with

24   the specific mandates of the Americans with

25   Disabilities Act.

1     Q.  Understood.

2         Have you conducted any analysis in this case

3  as to how inmates with disabilities are categorized?

4     A.  I am not sure the nature of that question.

5  Do you mean medically?

6     Q.  Any -- any sort of let's say labels that

7  inmates with disabilities are given in Florida.  For

8  example, you know, if one is -- if an inmate is

9  hearing impaired, do you understand if they're given a

10  certain grade or -- or label here in Florida?

11     A.  I have not reviewed the classification system

12  for disability designations.

13     Q.  Have you had -- have you reviewed any

14  settlement agreements that Florida has entered into in

15  connection with providing services to inmates with

16  disabilities?

17     A.  I don't recall having reviewed any such

18  settlements.

19     Q.  Are you familiar with a lawsuit brought by

20  Disability Rights Florida against the Florida

21  Department of Corrections involving issues with

22  inmates with disabilities?

23     A.  I believe I'm generally aware that such a

24  suit exists.  I'm not sure I've reviewed the suit or

25  the -- the metrics for compliance.

1     Q.   Understood.

2          Okay.   So if there was any settlement

3     agreement that exists that forms the basis for that

4     I'm going to call -- if I call it DRF lawsuit, will

5     you understand that I'm referring to Disability Rights

6     Florida?

7     A.   Understood.

8     Q.   Okay.   So you haven't reviewed any settlement

9     agreement that underlies that Disability Rights

10    Florida lawsuit?

11    A.   I don't recall reviewing.   And I'm just

12    looking at my appendix also for confirmation for one

13    moment.   Excuse me.

14          Yes.   So other than any extent to which some

15    of the elements of that settlement or suit are present

16    in some of the documents that I list in my appendix.

17    If parts of that settlement, for instance, are in a

18    policy or a practice or something.   I don't recall

19    separately reviewing that suit.

20    Q.   Okay.   And -- and looking at your Appendix B

21    for a moment.   I just want to make sure.   Are there

22    any documents that you have reviewed that are not

23    listed on your appendix?

24    A.   I think -- to the best of my recollection

25    everything that I've used to form the opinions in my

1   report is listed in this Appendix B.

2       Q.  Understood.

3           Okay.  And the only deposition that you

4   mentioned aside -- well, let's stick with --

5           MS. SMITH:  Strike that.

6       Q.  Of the Florida Department of Corrections'

7   witnesses who have testified in this case the only

8   deposition transcript that you have reviewed is of

9   Paula Foskey, correct?

10      A.  Yes, I believe that's correct.

11      Q.  Okay.  So you have not seen any deposition

12  testimony from an individual named Chris Sexton,

13  correct?

14      A.  No, I don't believe so.

15      Q.  Nor have you seen any deposition testimony

16  from an individual named Michelle Chouest?

17      A.  I do not believe so.

18      Q.  Have you reviewed any information regarding

19  ADA quarterly meetings that are conducted here in

20  Florida?

21      A.  No, I don't believe so.

22      Q.  So it's fair to say you haven't reviewed any

23  training videos that may have been created as a part

24  of those ADA quarterly meetings?

25      A.  I don't believe so.

1      Q.   Do you have any knowledge of any training

2   that was done in facilities in connection with

3   complying with disability -- the disability settlement

4   that we just spoke about?

5      A.   I don't believe so.

6      Q.   Now, looking at your appendix for a moment

7   longer have you reviewed what we refer to as the

8   sections of the Florida Administrative Code that

9   specifically outline the requirements for close

10   management?  And that's 33-601.800.  And I didn't see

11   it on your appendix.

12      A.   No.  And it would be similar to my response

13   about the disability lawsuit, which is only to the

14   extent that features of that code may appear in some

15   of the documents that I've listed.

16      Q.   Okay.

17      A.   I don't recall at any time separately

18   reviewing any part of the Florida Administrative Code.

19      Q.   Okay.  Fair enough.

20           What about health services bulletins.  Have

21   you reviewed any of those?

22      A.   Not unless, again, features or parts of those

23   health services bulletins were somehow present in some

24   of the documents that I've listed.  But I don't recall

25   separate and apart from what I've listed in the

1    appendix reviewing those documents.

2         Q.   Did you review any video footage?

3         A.   I don't -- I believe that I reviewed some

4    images.  I don't recall reviewing video for this case.

5    I'm just confirming by looking through my list on

6    Appendix B.

7              I believe that I just reviewed images.  That

8    I didn't review video footage.

9         Q.   And the images that you reviewed were images

10   of what?

11        A.   I believe they were images that we -- that

12   were taken during our inspections.

13        Q.   Oh --

14        A.   The facility inspections.

15        Q.   -- I understand.

16             Okay.  So photographs that were taken at the

17   facility inspections in this case.

18        A.   Yes.

19        Q.   Okay.  And just going back for a second.  I

20   think you told me this already, but your testimony is

21   that you didn't review any portion of the Florida

22   Administrative Code separately.  That your only review

23   would have been if portions of the code are actually

24   incorporated in one of the items that you list in your

25   Appendix B; is that correct?

1       A.   That's my recollection, yes.

2       Q.   Okay.  What about post orders.  Did you

3   review any post orders?

4       A.   I don't know if -- it would be the same

5   answer.  I don't -- I'm not sure what constitutes a --

6   a post order and how that could be the same or overlap

7   with what I have listed in the appendix, but I don't

8   recall separate post order review other than the

9   extent to which post orders may have been -- some

10  element of them may have been in the documents that

11  I've listed.

12      Q.   Did you review any ACA -- well, do you know

13  what ACA is?

14      A.   I'm presuming you mean the American

15  Correctional Association.  So, yes, I do -- I am

16  familiar with the ACA.

17      Q.   Okay.  So if we say ACA, we'll be referring

18  to the American Correctional Association and you'll

19  understand that, right?

20      A.   Yes.

21      Q.   So did you review any ACA audits of Florida?

22           MS. SMITH:  Let me strike that and ask a

23      cleaner question.

24      Q.   Have you reviewed any audits that ACA

25  conducted of Florida institutions?

1        A.   No, I don't believe so.

2        Q.   What about the Correctional Medical

3   Authority.  Are you familiar with that entity --

4        A.   I --

5        Q.   -- the CMA?

6        A.   And I don't believe I've seen audits by that

7   group.

8        Q.   Okay.  And that was my next question.

9             So more broadly, have you looked at any type

10   of audits, whether they be external or internal

11   audits, conducted of Florida facilities?

12        A.   I have not reviewed -- I didn't review any

13   audits for the purpose of preparing this report.  I

14   was shown one audit on a prep call yesterday, and I

15   don't recall who did the audit.  It seemed to be some

16   sort of internal audit, but I don't actually know who

17   did it.  But I didn't review -- I don't believe I

18   reviewed any audits for the purpose of this report.

19        Q.   Okay.  So the audit that you were shown

20   yesterday you don't know who conducted the audit?

21        A.   I believe it was a -- an internal audit.  It

22   looked like a -- an internal audit.  There were just

23   two elements that I looked at in the audit that had to

24   do with -- I think there was a -- a metric about

25   segregation rounds and maybe about the preconfinement

1    assessment, but I don't know who -- I'm -- I presume

2    it was an internal audit done by the Florida

3    Department of Correction or somebody in their employ.

4         Q.   Okay.  And this is something that the

5    plaintiffs' lawyers showed you yesterday?

6         A.   Yes.

7         Q.   Do you know what facility the audit was of?

8         A.   I don't.

9         Q.   Have you reviewed any -- aside from that one

10   audit that you looked at yesterday on the call with

11   plaintiffs' lawyers have you looked at any documents

12   that show what the performance measures are here in

13   Florida for health services?

14        A.   I am looking through my appendix and -- I

15   don't believe I've reviewed a -- a list or anthology

16   of all of the performance measures.  I don't recall

17   whether or not, similar to my other answers, some of

18   those performance measures are mentioned in specific

19   policies that I have reviewed.

20        Q.   Okay.  But no -- no separate list of

21   performance measures that we may use here in Florida,

22   correct?

23        A.   Correct.

24        Q.   What about operational reviews?  Do you know

25   what those are?

1        A.   Sorry.   Could you repeat the question?

2        Q.   Sure.

3             Do you know what operational reviews are here

4    in Florida Department of Corrections?

5        A.   I do not.

6        Q.   Okay.   So it's fair to say you haven't

7    reviewed any of those reports from operational reviews

8    that may have been conducted of Florida --

9        A.   Not to -- not to my knowledge.

10       Q.   Now, I see on your Appendix B, if we look at

11   the tab 50, you reviewed four of the plaintiffs'

12   medical records, correct?

13       A.   I don't recall the exact number, but I do

14   recall that some of the medical records I reviewed

15   were those of named plaintiffs.

16       Q.   Okay.   In looking at tab 50, do you know

17   which of the individuals are named plaintiffs in this

18   case?

19       A.   I do not recall.

20       Q.   Okay.

21       A.   But I also would concede.   If you identify it

22   as four of those people, then I would have no reason

23   to disagree.

24       Q.   Okay.   I will represent to you that there are

25   seven plaintiffs in this lawsuit.   And my question for

1    you is, is there a reason why you didn't review all of

2    the plaintiffs' medical records in this case?

3         A.   I don't know if I -- I don't recall at the

4    time how many I spoke with individually and what

5    facilities they were at.  I would guess that was part

6    of it.  But I don't -- I don't actually recall why --

7    other than the just very large volume of records why

8    those individuals were -- their records were reviewed

9    and not others.

10        Q.   Okay.  So just to be clear, if -- if an

11   individual plaintiff is not listed on tab 50, it means

12   that you did not review records for that individual,

13   correct?

14        A.   I believe that's correct.

15        Q.   What about deposition transcripts of

16   plaintiffs.  Did you read any of those?

17        A.   I don't recall reviewing the depositions

18   of -- of people.

19        Q.   Aside from -- was Ms. Foskey the only

20   deposition that you reviewed that was taken in this

21   case?

22        A.   That is my recollection, yes.

23        Q.   Okay.  So as you sit here, you don't -- well,

24   if it's not -- if the plaintiffs' depositions are not

25   listed on your appendix, that means you didn't review

1  them, right?

2      A.  Or that I certainly didn't review them for

3  the purpose of this report.  I don't -- some of these

4  file sharing systems may have thousands of other files

5  that technically I could go find or look at, but

6  particularly for -- if there were files that were

7  posted, let's say a deposition transcript after I

8  submitted the report I wouldn't know it's there even

9  though technically I could go find it today.  So this

10  is the list, to the best of my recollection, of

11  everything I used to form these opinions.

12      Q.  Sure.

13          And I understand the plaintiffs' lawyers have

14  made a slew of documents available to you on these

15  servers that you describe, but Appendix B describes ==

16  or lists the documents that you've actually reviewed,

17  correct?

18      A.  That's right.  To the best of my recollection

19  this is the set of documents that I used to form these

20  opinions.

21      Q.  Okay.  Do you believe it would have been

22  important for you to review the depositions of the

23  plaintiff inmates in this lawsuit?

24      A.  I don't believe it would have changed my

25  opinions.  I think at a later stage when this

1    preliminary -- this is a preliminary report, and so

2    there is always more information that comes -- becomes

3    available as the case progresses.  But I did not feel

4    limited in my confidence about my opinions for lack of

5    reviewing or seeing their depositions.

6         Q.  Okay.  But as you sit here today, you don't

7    know whether the plaintiffs in any way contradicted

8    your opinions that are set forth in your report, do

9    you?

10        A.  I wouldn't know that or anything else that

11   they said in their depositions.  I haven't reviewed

12   them.

13        Q.  Right.

14            You stated that this is a -- a preliminary

15   report, Dr. Venters, correct?

16        A.  Yes.

17        Q.  Okay.  So is this report incomplete?

18        A.  No.

19        Q.  What work do you have left to do in this

20   case?

21        A.  My understanding with how a case like this

22   proceeds is a -- I'm not a lawyer, as I said -- is

23   that if there is a finding of I think it's class

24   certification, that there then could be more extensive

25   fact-finding.  A separate -- like a second stage of

1    the case.

2         I'm very confident in the opinions I put into

3    this report, but there -- my understanding is if the

4    case were to progress, there -- for instance, I might

5    conduct one or two or three more facility inspections,

6    I might review more medical records and conduct more

7    fact-finding as the case progresses.

8         Q.   Are there any particular documents that you

9    intend to review as a part of the fact-finding that

10   you just described?

11        A.   I don't know.  I think that if the case -- if

12   and when the case progresses, part of the discussion

13   with the attorneys would be to ask them and learn from

14   them what documents may exist, what facilities it's

15   possible for me to inspect in addition to what has

16   been done so far.

17        Q.   Okay.  So as you sit here today, you don't

18   have anything specific in mind?

19        A.   I would presume there would be more

20   facilities to inspect, there would be potentially more

21   records, administrative and medical, but nothing -- I

22   don't have anything more specific in mind than that.

23        Q.   Okay.  For the three plaintiffs in this case

24   for whom you did not review their records my question

25   is do you believe it would have been relevant to know

1    if those three individuals did not have complaints

2    about the medical care that they received here in

3    Florida?

4        A.   I'm not sure it would.  My focus is on

5    identifying either harms to health or barriers to

6    health care that are systemic, and so I think that

7    there might be individuals who don't experience

8    systemic health risks or systemic health problems.

9    And so my focus here was to understand which of these

10   problems are system wide or throughout the segregation

11   system.  And so my goal was to talk to enough people

12   and review enough records to understand if these are,

13   in fact, systems problems.  And so there could be

14   individuals.  The lack of talking to one or two or

15   three individuals wouldn't necessarily weaken my

16   ability to understand the presence of these systems

17   issues.

18       Q.   Okay.  So just focusing on the seven

19   plaintiffs for a moment, do you agree with me that you

20   would have had a more complete view of the systems had

21   you actually looked at records for all seven?

22       A.   No.

23       Q.   Why not?

24       A.   Well, because the system is not seven people.

25   The system is thousands of people.  And so my role in

1    the case is to understand if these are systems issues

2    or barriers to health care and harms to health that

3    everybody who goes through seg might experience.  And

4    so my view is not that one person is more important

5    than another.  It's that -- it's that I seek to

6    understand the extent to which these are systems

7    problems that are present throughout segregation.

8         Q.   Okay.  So if I heard you right in talking

9    about systems problems, you mentioned, you know,

10   problems that everybody goes through in seg.  Did I

11   understand that?

12        A.   Well, they would be risks.  Not everybody

13   would experience them.  But the health risks come from

14   systems as opposed to, you know, individual -- an

15   individual error here or there.

16        Q.   Okay.  So why don't you then -- I don't want

17   to put words in your mouth.  Can you explain to me

18   what you mean by a systems problem?

19        A.   Well -- certainly.  I think that segregation

20   is a system.  It's an administrative system.  We know

21   that segregation is associated with health risks, and

22   some of those are risks directly from segregation,

23   such as the harm segregation can do to somebody's

24   health, physical health.  Other risks have to do with

25   how segregation interrupts ongoing health care or

1    creates barriers to health care for new problems or,

2    you know, previously identified problems.  Those are

3    all systems.

4            And so the extent to which those problems

5    that are spread throughout segregation are identified,

6    mitigated and even addressed those are all examples of

7    systems problems.  They don't have to do with what one

8    provider did on one day or one patient said on one

9    day.

10       Q.  Okay.  So for the analysis you just described

11   you only did that for -- or you didn't do that for

12   three of the seven plaintiffs, right?

13       A.  No.  I -- I think we're talking about very

14   different things.  I'm talking about understanding how

15   a system -- a health system works.  And so the way

16   health systems analysis works we don't place -- the --

17   we try and understand how -- the way a system works

18   impacts people in lots of different areas and lots of

19   different venues.  And so it's true -- but I would

20   agree with you.  There is I guess three of the named

21   plaintiffs I didn't speak with.  I don't view that as

22   an impediment to my analysis.

23       Q.  Okay.  Was part of your fact-finding mission

24   in this case to determine whether everyone in the

25   Florida Department of Corrections who enters into some

1   sort of segregation encounters a risk to their health?

2       A.  Well, I think that, yes, to the extent that

3   these are risks that are spread throughout incarcer --

4   the segregation settings.  However, not -- there is a

5   difference -- an important difference between a risk

6   and the health outcome.

7           So if, for instance, somebody is more likely

8   to be denied sick call in segregation than outside

9   segregation, it doesn't mean that that happens

10  100 percent of the case or, you know, all the time,

11  but the relative risk, the likelihood that it happens

12  and the -- how the system creates that risk is

13  something that was my frame in terms of -- and this is

14  known in correctional health all over the country.

15  Segregation creates both new health risks for harm,

16  but also it creates barriers to care.  And so those

17  systems -- just like the NCCAC and the ACA have

18  identified already those are the systemic risks that I

19  was looking for.

20      Q.  Okay.  Got it.

21          But for the three plaintiffs that you did not

22  speak to or review their files you don't know whether

23  the system created any barriers to their care,

24  correct?

25      A.  Well, I don't -- the -- the three people I

1  didn't speak to, just like anybody else I didn't speak

2  to or whose records I reviewed, I wouldn't have

3  knowledge about what harms they potentially

4  experienced.

5      Q.  Do you believe that it was your role to

6  identify only those individuals who experienced the

7  barriers to health care and the problems that you just

8  described?

9      A.  I believe that it was my role to understand

10  the systemic risks to health.  And so understanding

11  how those risks are translated into adverse outcomes

12  involves talking to people who experience the risk and

13  also talking to people who may have experienced the

14  harms.

15      Q.  Okay.  What about talking to people who

16  didn't experience the risks?

17      A.  So there would be -- there were people I

18  spoke to I'm sure who didn't experience a harm, but

19  they may have experienced -- these risks are spread

20  throughout the system, and so the difference is -- and

21  this is the nature of looking for systems problems, is

22  a systems problem doesn't translate to 100 percent bad

23  outcomes.

24          Like if a -- there is a systems problem with

25  how an airplane is manufactured, it may not result in

1    all airplanes of that type falling out of the sky.

2    But it's important to understand when the systemic

3    problem leads to bad outcomes, how does that happen.

4    What part of the system is broken.  And so it does

5    make it important in this case to talk to people who

6    both experienced the risks and then also experienced

7    the -- the outcomes.

8         Q.   Okay.  So do you believe that it's important

9    to also identify individuals in the Florida Department

10   of Corrections who have been segregated and have not

11   experienced bad outcomes?

12        A.   That could be important for understanding --

13   for quantifying, for instance, whether these systemic

14   risks create -- if it's risk to 50 percent,

15   70 percent, 90 percent.  But understanding -- and

16   it -- there is value to understanding how the risks

17   occur and how they translate to harm.  And so

18   certainly there is value to and I did learn from

19   people who experienced the health system who, for

20   instance, received care as -- not just those who

21   didn't receive care.

22        Q.   Got it.

23             And did you identify those -- any of those

24   people that you just described in your report?

25        A.   Well, many of the people -- and this is

1    characteristic of segregation.  Many of the people in

2    my report that I highlight received care.  And so in

3    the moment of that day, for instance, if somebody

4    received a medication, they may have received it.  So

5    that's a success.  That's a -- the system -- we want a

6    person to receive their medication.  But there may

7    have been, for instance, delays to getting the care or

8    it may have taken some intervention or escalation.

9    And so I don't think it's a -- neither in my report

10   nor in analysis of health services is it simply that

11   there is a group that got everything right and a group

12   that got everything wrong.  It's actually

13   understanding how the system produces these risks, and

14   that includes a mix of things going right and things

15   going wrong.

16        Q.  Okay.  So for the occasions where you spoke

17   to an inmate and things went right, did you always

18   note that, meaning did you write that down,

19   memorialize that in any way?

20        A.  I don't recall if I had a specific notation.

21   Many of the people, for instance, I spoke to took no

22   medications, and so I might have noted that they take

23   no meds.  But I don't recall -- I guess the simplest

24   answer is I don't recall.

25        Q.  Okay.  So for an individual as you've just

1  described who doesn't take any medication, would that

2  individual, in your opinion, then be at less risk than

3  somebody who is reliant on medication?

4      A.  Well, they would be at less risk for health

5  problems relating to interruption of medication, yes.

6  There is an outline in the report.  There are several

7  systemic health risks and health -- and barriers to

8  health care in this system.  And so -- you know, for

9  instance, if somebody came into segregation and they

10  were injured but they may not need a medication or

11  they may not be on a medication, that would be a

12  particular risk that is -- relates to being in

13  segregation.  If they receive an inadequate

14  preconfinement assessment or it's delayed or it's not

15  complete, it would be separate.

16          So I lay out in my report separate areas

17  where I think it's clear that systems risks exist, but

18  I don't think in any of the cases I say everybody

19  experienced every one of these risks.

20      Q.  Okay.  I want to make sure I understand the

21  different systems risks that we're talking about here.

22  So are they outlined starting on page 17 of your

23  report in Roman Numeral V, A through D?

24      A.  Yes.

25      Q.  Okay.  So we will go through all those.  I

1    just want to make sure.

2            So are -- are there any other risks --

3    systems risks --

4            MS. SMITH:  Well, strike that.

5        Q.  So these risks that you've outlined in your

6    report have to do with the physical health care that's

7    being delivered to inmates in segregation in Florida,

8    correct?

9        A.  These are either risks to physical harm or

10   risks -- or barriers to health care all relating to

11   physical risks for people in segregation, yes, in

12   Florida state prisons.

13       Q.  Right.  And -- and just to be clear, you are

14   a doctor of -- of physical medicine.  You're an

15   internist and an epidemiologist; is that right?

16       A.  That's right.

17       Q.  Okay.  You -- you are not a trained

18   psychiatrist or psychologist?

19       A.  That is correct.

20       Q.  Okay.  And so I just wanted to make sure we

21   were on the same page when I used the word physical

22   health.  I'm defining that to mean, you know, separate

23   and apart from the mental health specialties.  Would

24   you agree with --

25       A.  Yes.  Although I would qualify that.  When a

1    person experiences psychological distress from being

2    in segregation or solitary confinement and then they

3    physically harm themselves, so they cut themselves,

4    they hit their head against the wall, they do

5    something that causes a physical injury, that then is

6    a -- a prime example of how segregation contributes to

7    physical health problems.  And there is lots of

8    evidence to show that segregation promotes this

9    physical health outcome even though one could argue,

10   and I think it's fair, that, like, the pathway

11   involves a -- a mental health or psychological

12   stressor.

13        Q.  Okay.  But your opinions in this lawsuit are

14   based upon your expertise in the realm of physical

15   health not mental health, correct?

16        A.  Yes.  But, again, much of my expertise has to

17   do with how segregation promotes physical health,

18   harms physical health and much of that does involve

19   and much of my career has involved how to mitigate,

20   usually by eliminating segregation, the risk to

21   physical health that starts with psychological

22   distress.  So it's a little hard to distinguish the

23   two.

24        Q.  Okay.  Let me ask a more precise question.

25            So you're not offering any opinions in this

```
 1   lawsuit regarding the adequacy of the delivery of
 2   mental health care to inmates in Florida, are you?
 3        A.  No, I don't believe so.  Not at this point.
 4        Q.  Okay.  And when you worked for the New York
 5   City Correctional Health System, you had psychiatrists
 6   and psychologists and -- and other trained mental
 7   health professionals that worked along with you,
 8   correct?
 9        A.  I was -- I oversaw the care they delivered,
10   so I was in charge of how they provided their care,
11   assessing the quality of their care, but I did not --
12   I'm not a psychologist, I'm not a psychiatrist or a
13   social worker.
14        Q.  Right.  So you were in the administrative
15   oversight role when you were in New York City jails,
16   but you never actually delivered any mental health
17   treatment to the inmates, correct?
18        A.  I'm not sure that's correct.  A lot of mental
19   health care is delivered by the primary care
20   physician.  That's true in the community, it's true in
21   jails and prisons.  So chronic care encounters while I
22   was not a mental health professional, I wasn't, as I
23   said, any of those licensed professionals, there is
24   quite a bit of mental health care and engagement that
25   occurs during chronic care encounters.  It occurs
```

1    during intakes.  The first, you know, crucial part of

2    identifying mental health problems is often in the

3    initial intake.  And so those providers -- and I

4    conducted plenty of these intakes -- are part of the

5    mental health team.  I was also part of case

6    conferencing, many mental health patients' management,

7    so --

8         Q.  Sure.

9         A.  --  but, again, I would -- so I was

10   intimately involved with the care, but I was never

11   identified as a -- you know, a mental health

12   professional in any correctional setting as my primary

13   job.

14        Q.  Got you.

15             So, for example, if an inmate in the New York

16   City jails was given some sort of a patient care plan

17   for a problem he was having with his mental health,

18   that would be then done by the mental health

19   professionals not you?

20        A.  Correct.  I would be involved if, for

21   instance, there was a bad outcome in leading the

22   morbidity and mortality review or looking at the

23   adequacy of the care the person received.

24        Q.  Got it.

25             Okay.  What did you do to prepare for today's

1  deposition?

2      A.  I had two calls with the attorneys, which I

3  think were 90 minutes or 2 hours each maybe, and I

4  reviewed my report.  And I believe that's pretty much

5  it.

6      Q.  Did you take any notes while preparing for

7  your deposition today?

8      A.  No.

9      Q.  How many hours would you say you spent

10  preparing the declaration that you submitted in this

11  case?

12      A.  I don't recall.  I would have to -- I would

13  have put it I guess into the invoice, but I don't -- I

14  don't recall.

15      Q.  Okay.  So I've reviewed your invoices.  And

16  separating out the inspections, at least with what

17  we've been provided, we added up the total hours for

18  record review, for example, to be about 20.5.  Does

19  that sound right to you?

20      A.  Yes.  I wouldn't disagree with that.

21      Q.  Okay.  And then the total number of

22  inspection hours we totaled up at 90.  Does that sound

23  right to you?

24      A.  Again, that sounds approximately correct to

25  me.

1        Q.   Okay.  And the overall total that you have

2   billed, at least at the point that your -- the lawyers

3   in this case provided us the records, was

4   approximately $40,000.  Does that sound right to you?

5        A.   I wouldn't disagree with that.

6        Q.   Okay.  And your hourly rate is $250 for

7   research, telephone calls, report writing and

8   preparing testimony?

9        A.   I -- again, I wouldn't disagree with that if

10   that's what is on the invoice.

11        Q.   Now, you told me that during yesterday's call

12   you were shown some sort of an internal audit.  My

13   question for you is during the two calls that you had

14   with the lawyers' team to prepare for today's

15   deposition were you shown any other documents?

16        A.   I think that's the only time that -- because

17   I can recall that was the only time we tried to use

18   the share screen, so I think that's the only -- my

19   recollection is that's the only thing I looked at.

20        Q.   Uh-huh.  And you -- you told me your

21   recollection it was some sort of audit regarding

22   preconfinement assessment; is that right?

23        A.   As I recall, there was a list of lots of

24   different audit areas.  I didn't really look at them.

25   I just recall that there were two specific ones that

1  had a -- that dealt with -- that -- this topic.  One

2  was -- had to do with preconfinement assessments and

3  one I believe had to do with the rounds, the daily

4  nursing rounds.

5      Q.  And did you request to see that information,

6  or did the lawyers volunteer it to you?

7      A.  I don't -- I don't recall.  I don't -- I

8  don't recall how it came up, if I had requested it or

9  if they volunteered it.  I think we were discussing

10  the topic.

11      Q.  Okay.  And is there --

12          MS. SMITH:  Well, strike that.

13      Q.  Let's talk about the -- the medical records

14  that you reviewed in this case on your Appendix B

15  bullet point 50.  Can you explain to me for those

16  particular records did you request them specifically

17  from the lawyers' team?

18      A.  I believe so.

19      Q.  Okay.  Were there documents that were

20  provided to you that you did not request, meaning of

21  tab -- or number 50?

22      A.  There -- there may have been.  I don't --

23  I -- I just wouldn't have seen them.  They're --

24  each -- because this is a paper medical record system

25  there are -- each of these is thousands, if not tens

1  of thousands of pages, so I really am not sure.  There

2  could be many thousands of pages of records that I

3  never looked at that, you know, might not have been

4  what I specifically wanted.  I'm not -- I really just

5  know that these are the records that I reviewed for

6  the report.

7     Q.  Okay.  So for -- let's talk about the

8  plaintiff records that you reviewed in this case.

9       Did you review their entire medical records,

10 or did you only review records from times when they

11 were in some sort of confinement status?

12    A.  I -- I don't recall the date ranges of care

13 for the -- for -- for any of the patients.  I think

14 there may have been an agreement about how far back to

15 look, but I don't recall.

16    Q.  An agreement with plaintiffs' counsel?

17    A.  No.  I -- my recollection was that between

18 you all, the attorneys, there was some -- there may

19 have been some agreement or determination about how

20 far back to look, but I don't -- I guess the safest

21 answer is I don't recall how our -- how the look-back

22 period was determined.

23    Q.  Got it.

24       And I'm less concerned -- or my question

25 wasn't focused on date ranges.  My question is focused

1    on -- and let's talk about the records that you

2    requested.

3              Did you request medical records for inmates

4    only during their periods of confinement, or did you

5    ask for all records for an inmate?

6         A.   I'm not sure I would have specified because

7    it -- my understanding is it's pretty hard to

8    distinguish the two the way these paper records are

9    put together.   But -- and having looked at these

10   records it's actually hard to distinguish the two.   So

11   I would have assumed that the records would include

12   both.

13        Q.   In your review of inmate records did you do

14   any type of analysis to compare the type of medical

15   treatment that the inmate received while they were in

16   general population versus when they were in some sort

17   of confinement status?

18        A.   I believe that I may have referenced some

19   of -- of that in my report.

20        Q.   Okay.   So besides what is referenced in your

21   report did you do any sort of broader or aggregate

22   type analysis of the inmates whose records you studied

23   for the purpose of comparing the medical treatment

24   they received while they were in general population

25   versus when they were in some type of confinement

1   status?

2        A.   I believe that the -- the information that I

3   reviewed is in my report that is responsive to that

4   question, such as the interruption of medications or

5   the interruption of care.

6        Q.   Okay.  So other than what is in your report

7   you didn't conduct any sort of separate analysis,

8   right?

9        A.   I believe that my report contains the

10   analysis that I conducted, so there is no other

11   analysis that I have that I didn't include in the

12   report.

13        Q.   Okay.  So for the individual inmates that you

14   referenced in your report you may say that they

15   received medications in general population and then

16   when they moved to confinement, it was interrupted.

17   That's -- that's sort of the analysis that you did?

18        A.   Well, that is one of the frames with which I

19   looked at charts was -- and records was were

20   medications interrupted.  There are other areas, such

21   as were preconfinement assessments adequate or were

22   people able to access sick call or other things; but

23   that is one of the frameworks, yes.

24        Q.   Okay.  So aside from the medicine being

25   interrupted do you have any specific recollection of

```
 1    doing any type of analysis to compare the medical
 2    treatment that any of the inmates that you reviewed
 3    received in GP versus a confinement status?
 4         A.  Well, I think it would be similar to my prior
 5    answer.  I would be happy to go back and review the
 6    report because I believe there may be elements of that
 7    access to care issue or access to sick call or other
 8    types of preexisting care that are mentioned.
 9              For instance, people that enter segregation
10    settings and are coerced to refuse scheduled medical
11    appointments.  That is a -- an example of something
12    that could -- that, you know, flows where the
13    treatment in general population is different than the
14    treatment in segregation.  It's a new health risk.
15         Q.  Okay.
16         A.  And I believe I mention that in my report.
17         Q.  Okay.  And we'll -- we'll go through your
18    report in more detail.  I'm just trying to understand.
19              So I think the answer is no you didn't do any
20    sort of aggregate kind of analysis comparing medical
21    treatment in GP to treatment that inmates receive in
22    restrictive housing; is that correct?
23         A.  Well, this report is focused on these systems
24    and how the systems work differently in segregation
25    than they do in general population.  The health risks
```

1  are different.  So it is an analysis of the difference
2  in health care in the two settings.
3     Q.  Okay.  Did you prepare any sort of
4  quantifiable outcomes that we could look at to
5  understand the difference that you found in medical
6  treatment that an inmate in general population
7  received versus in segregation?
8     A.  And -- sorry.  Could you -- do you mean in
9  terms of how much more likely or -- or what -- what
10  the -- the relative risk is of the health risk or the
11  health outcome?
12    Q.  Any sort of quantification that you did.
13    A.  No.  I've worked to identify the systems
14  problems.  I think that part of -- and I have
15  conducted this type of creating a predictive model,
16  for instance, for the harms of segregation.  That type
17  of model is difficult in a paper world -- it's one of
18  the reasons why electronic medical records are
19  important -- creating a predictive model.  So I
20  haven't conducted that kind of analysis here.
21    Q.  Okay.  And, I'm sorry.  Did you call it a --
22  a predictive model of the risks that inmates face in
23  segregation?
24    A.  Yes.  So, for instance, we know that people
25  who go into segregation have a six or seven times

1    higher likelihood of being in the group of people who

2    commit physical self-harm.  But the way we know that

3    is by looking at hundreds of thousands of people going

4    through a system and figuring out with statistical

5    methods which people are in these different groups,

6    segregation and not segregation, self-harm, not

7    self-harm.  But that type of analysis while it's

8    common in community health systems is difficult in

9    correctional health systems often because systems have

10   failed to implement electronic medical records.  So it

11   makes it hard to -- you know, it's very labor

12   extensive to extract hundreds of thousands of charts.

13        Q.  Understood.

14             Okay.  So that predictive model of risk that

15   you just described you haven't been able to do that in

16   Florida, correct?

17        A.  That's right.  And that, just to be clear, is

18   about quantification.  The extent -- quantifying the

19   extent of a systemic risk.  That's different than what

20   we start with in health administration, which is

21   looking at where are the systemic failings.  And so in

22   this system the systemic failings are pretty apparent.

23   And I think that parsing out the fine points with

24   confidence intervals of how extreme these health

25   systems risks are is -- could be like a research or

```
1    academic enterprise, but the systemic problems are
2    pretty apparent.
3         Q.  Okay.  And we'll get into your report in more
4    detail.  I'm just trying to understand what you did
5    and didn't do as a part of your engagement.
6              Where have you conducted this predictive
7    model of risks that you just described?
8         A.  In New York City.
9         Q.  Anywhere else?
10        A.  I don't believe so, no.
11        Q.  Okay.  And if I could take a step back for a
12   minute.  And forgive me.  I should have done this at
13   the beginning of the deposition.
14             We've been throwing around the words
15   restrictive housing, confinement, segregation.  Can we
16   agree for purposes of this deposition unless we
17   specify administrative confinement, disciplinary
18   confinement, close management and maximum management
19   that we are referring to those forms of housing here
20   in Florida when we use the terms confinement,
21   segregation and restrictive housing?
22        A.  Yes.
23        Q.  Okay.  So when you reviewed the medical
24   records that you have listed in your Appendix B at
25   bullet point 50, did you take any notes?
```

1    A.   My practice is to have the report that I am

2  writing open; and then as I look at the medical

3  records, type in relevant aspects about a person and

4  then that sits in that document, which gets revised

5  over time.  And so I don't have a separate -- I'm not

6  sure how I would do it, actually, given just kind of

7  having two monitors and I don't have a separate set of

8  notes.

9    Q.   In preparing your report, did the plaintiffs'

10 lawyers ask you to make any type of assumptions?

11   A.   I don't recall them giving me assumptions.  I

12 believe I was just asked to engage in this work, you

13 know, with the -- the framework that I already

14 mentioned.

15   Q.   Have you spoken to any other experts in this

16 case regarding your report?

17        Let me ask it a better way.  In -- in

18 preparing your report, did you speak to any other

19 experts?

20   A.   No, not to my knowledge.  We -- I -- and

21 we're -- I was on the inspection tours with other

22 experts in the case, but I don't believe I ever spoke

23 to them about the contents of my report.

24   Q.   Have any of the other experts in this case

25 reached out to you regarding information they needed

1    to prepare their reports?

2        A.  No, I don't believe so.

3        Q.  All right.  Now, I want to talk, if I can for

4    a moment, about the plaintiffs that you did speak with

5    in this case.  And I want to start with Mr. Kendrick.

6    My understanding from your report is that you spoke

7    with him during the inspection at Florida State

8    Prison; is that correct?

9        A.  I don't recall that conversation

10   specifically, but I -- if that's how I've identified

11   it in my report, then, yes, I would say that's

12   correct.

13       Q.  Okay.  Do you know how long you spent

14   speaking with Plaintiff Kendrick during his interview?

15       A.  No.  I believe most of my interviews were

16   between 20 and 60 minutes.  I don't recall how long

17   that conversation was.

18       Q.  Okay.  And for inmates with whom you had a

19   confidential interview at an inspection can you tell

20   me what preparation, if any, you did to talk to the

21   inmate?

22       A.  I believe most of the people I spoke to I

23   encountered at the cell side or somehow in their

24   housing area and may have had a brief several minute

25   conversation with them.  And then if they were

1    interested and were -- and I identified them as

2    somebody to have a longer conversation with, then I

3    would keep record of their name and give it to the

4    attorneys in the case to speak with the person the

5    next day.

6        Q.  Okay.  What about for plaintiffs that you

7    were interviewing at the facilities where the

8    inspection was taking place.  Did you do any sort of

9    additional preparation to meet with those inmates?

10       A.  I am -- I don't recall doing -- I don't

11   recall if I did any preparation about their cases.

12   I -- for instance, I'm not -- I don't recall if --

13   some of them are mentioned in the original complaint,

14   and I don't -- maybe I -- I don't know if I would have

15   read the original complaint, but I don't recall doing

16   any specific preparation for those interviews with the

17   named plaintiffs.

18       Q.  Okay.  I suspect you're going to give me the

19   same answer, but I'll ask just in case you remember.

20   Johnny Hill.  Did you meet with him during the Santa

21   Rosa inspection?

22       A.  I believe so.  And I would refer to my

23   report.  If I've indicated that he's a person -- I

24   recall that name.  I don't recall him by face and I

25   don't recall how long we spoke; but as with the other

1    interviews, I think they were all between about 20 and

2    60 minutes.

3         Q.  All right.  And Mr. Espinosa.  I understand

4    from your report and your notes that you spent about

5    one hour speaking with him at Columbia CI and that you

6    did that with Dr. Burns; is that correct?

7         A.  I believe.  And I believe -- yes.  And I

8    believe, if I recall correctly, that that was a case

9    where we didn't conduct a -- an actual inspection of

10   the facility, and so I wouldn't have encountered him

11   out in the housing area.  It was -- we only went to

12   the facility just to sit down and do the interview

13   with him.

14        Q.  Okay.  And -- and so you and Dr. Burns both

15   asked Mr. Espinosa questions.  And that interview

16   lasted about an hour, right?

17        A.  That's my recollection.

18        Q.  And Mr. Espinosa do you recall is the inmate

19   who is mute, who cannot speak and has to write his

20   answers, correct?

21        A.  I -- now that you -- I had forgotten that,

22   but now that you mention it I do recall it.

23        Q.  All right.  Did you do any sort of

24   preparation to speak with Mr. Espinosa?

25        A.  Not that I recall.

1        Q.   And it was a poor question.   Forgive me.

2             Did you review his medical records or do

3    anything before you went to speak with him that day?

4        A.   Not that I recall.

5        Q.   All right.   And then Mr. Burgess.   You stated

6    in your report that you conducted a -- a phone

7    interview with him at his facility.   Do you know how

8    long that phone conversation lasted?

9        A.   I think also it was in this 20 to 60 minute

10   range.   I -- I don't recall the length of the call

11   exactly.

12       Q.   And did you review any of Mr. Burgess'

13   records in anticipation of speaking with him?

14       A.   Not that I -- not that I recall.

15       Q.   Okay.   So when you met with Mr. Espinosa, if

16   I could go back for a moment, he wrote down his

17   answers to your questions, right?

18       A.   That is my recollection.

19       Q.   Do you know whether it was on a piece of

20   paper or cards?   How did he communicate with you?

21       A.   I don't recall other than he wrote out

22   answers.

23       Q.   Okay.   What happened to the answers that he

24   wrote out?   Where -- where are those documents?

25       A.   I don't know.   I wouldn't have kept anything

1  that was something that the detainee had.  So I would

2  have been recording my questions to him in my notes

3  and how he responded to my questions, but I don't -- I

4  don't have a knowledge of what happened -- what the --

5  what was done with those pieces of paper.

6      Q.  Okay.  But you don't have them?

7      A.  No.

8      Q.  Okay.  Do you know if Dr. Burns took them

9  with her?

10      A.  I have no idea if he kept them or if it was

11  his own paper or -- yeah, I just have no idea.

12      Q.  Got you.

13          Now, what about the lead plaintiff in this

14  case Ms. Harvard.  Have you ever spoken with her?

15      A.  I don't recall.  I would need to consult my

16  report.

17      Q.  Inmate Harvard I can represent to you wasn't

18  specifically mentioned in your report or in the

19  appendix.  So is it fair to say if there is no mention

20  of her, that you did not speak with her?

21      A.  Yes, that is correct.  That's fair.

22      Q.  Okay.  And what about Jeremiah Hill.  Do you

23  have any recollection of speaking with that plaintiff?

24      A.  I do not.

25      Q.  Okay.  And the same question.  If -- if

1    Jeremiah Hill is not listed in your report or in

2    Appendix B, we can conclude that you did not speak

3    with him?

4        A.   That is fair, yes.

5        Q.   And what about plaintiff Tracey Dean.   Any

6    recollection of speaking with her?

7        A.   No.

8        Q.   Okay.   And same question.   If -- if Ms. Dean

9    is not mentioned in your report or in your appendix,

10   we can conclude that you did not speak with her,

11   correct?

12       A.   Yes, that is a fair conclusion.

13       Q.   All right.   Let me, if I could, take a step

14   back.   I just want to cover some of your background,

15   if we could.

16            Your highest level of education, sir?

17       A.   Would be a medical doctor.

18       Q.   Okay.   And you received your degree from the

19   University of Illinois in 2004; is that right?

20       A.   I believe that's right.   But, yes, the

21   University of Illinois.

22       Q.   Okay.   And then you did your residency in

23   internal medicine at Montefiore?

24       A.   Montefiore.   It's the hospital of the -- of

25   Albert Einstein University.

1       Q.   Got it.

2            And that was in 2007, correct?

3       A.   Yes, I believe so.

4       Q.   And then you did a two-year fellowship in

5   public health research at NYU?

6       A.   Yes.

7       Q.   And do you hold any board certifications?

8       A.   Yes.  I originally had the -- I'm -- I'm

9   certified as an internist in internal medicine.  When

10  I started, that certification was through something

11  called the ABIM, which is the American Board of

12  Internal Medicine.  And then at some point, maybe

13  2000, I don't know, '15 or '16 I switched over to a

14  different certification organization called the --

15  let's see.  Is it -- I think N -- N, as in Nancy, B,

16  as in boy, P-A-S.  NBPAS, which I think is the

17  National Board of Physicians and Surgeons.  And so I

18  probably had dual certification for a while for a few

19  years there while I switched over.

20           But they're basically both accrediting

21  agencies.  One is for just internists.  That's where I

22  started, the ABIM.  The second group, the NBPAS,

23  accredits -- like, I'm accredited as an internist with

24  them, but it's a broader group that includes public

25  health, doctors -- physicians who work in public

1  heath, health administration, surgery.  Kind of a

2  broader scope of clinical services.  And that probably

3  for at least four years has been my sole

4  certification.

5       Q.  Thank you.

6           Are you certified by the National Commission

7  on Correctional Health Care?

8       A.  No.

9       Q.  Okay.  And if we refer to that organization

10 as NCCHC, you'll understand that's what we're

11 referring to?

12      A.  Yes.

13      Q.  And I'm sure I'll get that acronym wrong,

14 so...

15          Have you ever been certified by NCCHC?

16      A.  No.

17      Q.  Any particular reason why you never obtained

18 certification from that organization?

19      A.  It didn't seem helpful to my job.  And I

20 certainly have worked closely with the NCCHC

21 leadership over the years giving them advice on

22 policies and procedures, but it just was never a -- a

23 certification that seemed that it would be helpful to

24 me or that I needed.

25      Q.  Have you ever sat on any of the NCCHC

1  committees?

2       A.   I have -- I'm not sure how you're referring

3  to committees.  I've been asked by the NCCHC to give

4  presentations over the years at their national

5  meetings on various correctional health issues, but

6  I'm not a -- a member -- well, I'm not sure it's a

7  member -- it's not a membership organization.  I don't

8  have correctional health certification.

9       Q.   Have you ever held any position of leadership

10  within the NCCHC?

11       A.   No.  I was -- they requested that I join

12  their board as a board member several years ago and I

13  decided not to.

14       Q.   Why did you decide not to?

15       A.   I think that the -- for me mostly it was a

16  matter of time.  I simply -- I spend a lot of time

17  doing inspection work, and the needs for board members

18  are pretty extensive in terms of, like, the time

19  commitment.  And so it wasn't something that I was

20  going to be able to -- to do.

21       Q.   Okay.  And going back for a minute.  When I

22  said committees, let me just clarify that.

23            Is it your understanding that NCCHC sometimes

24  issues position statements?

25       A.   Yes.

1    Q.  Okay.  And that those position statements

2    aren't necessarily the view of NCCHC, but that

3    committees can be formed in order to issue various

4    position statements?

5    A.  I don't -- I don't know.  As I said, since

6    I've never sat on the board of the NCCHC I'm not

7    sure -- for instance, I don't think that the NCCHC as

8    an organization would put out position statements that

9    were inconsistent with what the board or the

10   organization thought was good policy.  So, yeah, that

11   would be my response.  I would -- I would be -- it

12   wouldn't make sense to me that an organization would

13   put out a position statement that was not a stated

14   opinion on a matter of, you know, whatever the

15   position statement was on.

16   Q.  Okay.  And we can look at that more deeply

17   because I know you have an NCCHC position statement in

18   your report.

19        But would you agree with me, Dr. Venters,

20   that a position statement is separate and apart from

21   the actual formal standards that the NCCHC

22   promulgates?

23   A.  Yes.

24   Q.  Okay.  Have you ever participated in a

25   position statement that was issued by NCCHC?

1      A.   I don't recall.  I did work with the NCCHC

2    about -- on standardization of health data and

3    clinical outcomes.  And I don't recall if that -- that

4    project, which was called CHORDS, C-H-O-R-D-S, which I

5    was part of for some time, it was a committee I think.

6    I don't know how it was officially designated.  I

7    think they may have put out some position statements,

8    or it may have morphed into a program.  I'm just -- I

9    don't recall.

10      Q.   Okay.  And, I'm sorry, what was it about?

11      A.   It was about how to track clinical quality

12    and clinical outcomes.  So how to apply basic quality

13    assurance to the tracking of health data for people

14    who are in jails and prisons.

15      Q.   Any other licenses or certifications you hold

16    that we haven't discussed?

17      A.   No, I don't believe so.

18      Q.   What states are you certified to practice

19    medicine in?

20      A.   New York State only.

21      Q.   And you -- so you've never practiced medicine

22    in Florida, correct?

23      A.   Correct.

24      Q.   And you've never delivered patient care in

25    Florida?

1      A.   Correct.

2      Q.   Do you --

3      A.   I should add for completeness there Florida

4   does have some -- I think it's called -- they may call

5   it a certificate, but it has to do with operating or

6   functioning as a medical expert in the State of

7   Florida that's a requirement of physicians that I

8   believe I obtained at some point.  I don't remember

9   when, but that's a -- I don't know how you would -- if

10  that fits your criteria for what a certificate is.

11     Q.   Okay.  Thank you.

12          Have you ever studied community healthcare

13  practices here in Florida other than what you've done

14  here in the Harvard lawsuit?

15     A.   I -- only to the extent of what is in my CV

16  or what I've mentioned.  So, for instance, I've

17  conducted an analysis, which is ongoing, of the COVID

18  response in the Broward County Jail.  I think that's

19  the only thing I can think of that involves healthcare

20  practices in Florida that are, you know, related to

21  community standards and correctional health.

22     Q.   With whom are you presently employed?

23     A.   I work as a medical consultant, so I am --

24  all of my employment now is as essentially an

25  independent consultant.  And so it -- that all -- that

1    mostly has to do with correctional health and some --

2    a small amount of COVID work that is congregate

3    settings but not correctional health.

4         Q.   Understood.

5              And -- and just to clarify, I wasn't -- maybe

6    I got it wrong.  But how long have you been a

7    medical/forensic expert?  Your -- your CV says from

8    March 2016 to present, but then your report mentioned

9    2017.  So can you explain that?

10        A.   Yes.  I -- I worked in the city jail system,

11   New York City jails I think through 2016.  And so I

12   started to do some small amount of medical expert work

13   when I left that position, but then over time I

14   probably spent four years -- three or four years after

15   that working in the nonprofit sector where I was doing

16   small amounts of -- or increasing amounts of this

17   medical expert work.

18             I believe it's just since COVID, since April

19   of 2020 that this is my full-time job or my full-time

20   position.  But between when I left Rikers and April of

21   2020 I did work in those years with two different

22   nonprofit organizations.

23             And so the first, Physicians for Human

24   Rights, I was working a lot abroad.  I was in Iraq and

25   Asia quite a bit, and so I did a very small amount of

1   medical expert work.  And then I went to a -- a

2   nonprofit that focuses on correctional health and --

3   called COCHS, C-O-C-H-S.  Did that work and was able

4   to do more independent consulting.  And then in April

5   of 2020 handed off the reins of that organization and

6   have been doing almost all COVID work since then.

7        Q.  Okay.  And the work that you do, Dr. Venters,

8   as an expert have you formed a company that you --

9        A.  I have not.

10       Q.  Okay.  Do you have any employees that work

11  for you in your role as an expert?

12       A.  No.  No.

13       Q.  So the work that you've done in the Harvard

14  lawsuit is it fair to say there was no research

15  assistant or anybody else doing the work with you?  It

16  was just you, correct?

17       A.  Correct.

18            MS. SMITH:  All right.  I'm going to convene

19       a break, if we could.  We've been going for a

20       while.  It's 10:45.  Everybody okay if we come

21       back in 5 minutes?

22            THE WITNESS:  Sure.  Thank you.

23            MS. WALLIS:  Sounds good.

24            MS. SMITH:  All right.  Thank you.

25            (A recess was taken from 10:45 to 10:52.)

1           MS. SMITH:  All right.  Dr. Venters, are you
2      ready?
3           THE WITNESS:  Yes.
4      Q.  (By Ms. Smith) All right.  So I want to go
5  through some more of your background, if we could.
6           You have not worked in a prison system
7  before, correct?
8      A.  I've never directly provided care.  I've been
9  retained by a prison system before, but not as a -- as
10  a doctor.
11      Q.  Right.  And -- and thank you for clarifying
12  that.
13           So the direct patient care that you provided
14  was in the New York City jails, right?
15      A.  That's correct.
16      Q.  Okay.  So I reviewed some of the testimony
17  that you gave in other cases, and I want to read to
18  you how you described the -- or how you quantified the
19  patient care that you gave in the New York City jails.
20           So in a case called Fikes versus Alabama you
21  provided testimony in 2017.  So would that have been
22  close to the time that you left the New York City
23  jails?
24      A.  Maybe.  Yeah, within a year or so.
25      Q.  Okay.  Do you remember that lawsuit?

1      A.   I don't.  But I do remember this general
2   cadence of decrease in clinical work that I presented
3   in deposition before, yes.
4      Q.   Okay.  So is -- you said in that deposition
5   that I saw patients throughout my time in the New York
6   City jails.  However, with each promotion I had less
7   direct patient contact.  Is that an accurate
8   statement?
9      A.   Yeah.  I think that really the accurate -- to
10   be most accurate about it is I -- I was -- I had
11   plenty of patient contact; but as the provider of
12   care, the person providing the clinical encounter,
13   that the amount of time I spent on that went down over
14   the years.
15      Q.   Okay.  And you also said:  My initial
16   position, deputy medical director, I oversaw a part of
17   the administrative and policy and quality tasks of the
18   health system.  I also had I believe a 40 percent
19   clinical time.  Is that an accurate statement?
20      A.   I think -- I think it could have been 40 or
21   50 percent.  Some weeks it could have been less, but I
22   think that's fair.  It was that -- you know, my first
23   job I had close to half my time clinical and then each
24   subsequent job -- job or promotion that time allotment
25   decreased.

1      Q.  Right.

2          So you also stated:  Then I was promoted to

3    medical director, where I oversaw all aspects of

4    medical care, about 800 health staff and I had

5    probably one clinical day a week.  Correct statement?

6      A.  Yes.  I -- I think that, as I said, it went

7    down over time.  So I don't know if it was 25 percent

8    or 20 percent or 30 percent, but it would have been

9    less at that position and then less at the subsequent

10   ones.

11     Q.  Okay.  Would you agree that your memory would

12   be more accurate closer to the time that you left the

13   New York City jails than it is today?

14     A.  I think that the way I phrased it there isn't

15   the greatest.  So, for instance, saying I had one

16   clinical session per week, I wouldn't disagree that

17   that's true.  But a lot of the patients I saw I didn't

18   see during a clinical session.  So as time went on,

19   for instance, I started to see patients that were in

20   segregation that were injured during uses of force.

21   So those patients that would be clinical care outside

22   of, like, a dedicated clinical session.

23     Q.  Okay.

24     A.  So -- but I think generally I agree and would

25   continue to say, which is the truth, that the amount

1    of time I was spending on clinical care went down

2    with each promotion.  I wouldn't -- I'm not sure if,

3    like -- I don't think I've actually put an exact or

4    measured the percentage of time, but this is an

5    estimation.

6         Q.  Okay.  And then you also said:  Then when I

7    was promoted to the assistant commissioner position

8    and later to the Chief Medical Officer position where

9    I oversaw all the mental health services in addition

10   to the medical, I probably had a half a day of

11   clinical time each week and sometimes struggled to do

12   that.  Accurate statement?

13        A.  I would say that it's accurate in that it's

14   decreased.  I'm not sure -- it's similar to what I

15   just said, which is I don't know if I always had a

16   clinic appointment because a lot of the patients I saw

17   were outside of the clinic.  But I would agree that --

18   and I think it's accurate.  And probably the best way

19   it to say it is each promotion I saw -- had less time

20   to physically see patients.

21        Q.  Got you.

22             So is it fair to say that when you were

23   working for New York City jails, would it have been in

24   your first position as the deputy medical director

25   when you had the most direct patient care?

1      A.   In a jail setting, yes.  I think that, you
2  know, I was also doing work, like, as a hospitalist in
3  the hospital.  But in terms of, like, correctional
4  health care, the most direct patient care by quantity
5  would have been in the early years of that position.
6      Q.   And in your CV under the deputy medical
7  director position you say you directed and delivered
8  health services in two jails, but then I noticed in
9  the report you reference 12.  So which -- which was
10  it?
11      A.   Well, I think that the deputy -- they're
12  not -- they're different things.
13      Q.   Okay.
14      A.   They're not consistent.
15           So at the time I worked in the New York City
16  jails there were either 12 or 13 jails functioning,
17  depending on what year it was.  So from an
18  administrative standpoint, let's say overseeing
19  chronic care, even -- as the deputy medical director,
20  I would have had a role in making sure we were doing a
21  good job in all of the jails.  So that's a leadership
22  position that oversees all of the jails to some -- to,
23  you know, that extent.
24           But then the places I directly saw patients
25  would have been just probably two jails where I saw

1    more patients, most of my patients in those initials

2    years.  And so it's a -- maybe a distinction that's

3    not too meaningful, but there is the place I was doing

4    most of my clinical care, which is just a couple of

5    places, and I had set up a preceptorship with

6    residents to come precept with me versus my

7    administrative role, which did have a -- always had a

8    view towards the full breadth of the system.

9         Q.  I think I understand.  Thank you.

10             For the two jails that you were doing your

11   clinical time in your early years -- well, which jails

12   were those over the years?

13        A.  Well, really the primary jail would have

14   been -- it was a barge, a prison barge that floats off

15   of Hunts Point called VCBC.  V, as in Victor, B as in

16   boy.  VCBC.  And that's a -- these are mostly

17   preconfinement or pretrial facilities.  That's where I

18   spent most of my clinical time.

19             I also saw a fair number of patients in what

20   was the biggest jail then, AMKC.  And I guess I also

21   saw a fair number of patients in a third jail, the

22   CDU.  The communicable disease unit.  But that

23   wasn't -- that was kind of sporadic.

24             But that was kind of my -- I would say really

25   most of my time was in this one VCBC where I --

1    residents would come and precept with me to care for

2    patients.

3          Q.   What was the -- how large was the inmate

4    population at VCBC?

5          A.   It was probably between 600 and 750.

6               And at AMKC it would have been closer to

7    2000.

8          Q.   Okay.  And at VCBC were there at the time

9    when you worked primarily --

10              MS. SMITH:  Or strike that.

11         Q.   When you were doing clinical time at VCBC,

12   can you describe for me what type of restrictive

13   housing existed?

14         A.   In that facility there was just a series of

15   cells that were kind of generic lock-in cells that

16   would be used.  So as with a lot of jails, the jail

17   system did not have administrative segregation at the

18   time.  They had plenty of punitive segregation, which

19   is where I saw most of the patients I would see in my

20   later years.  But this facility had some lock-in cells

21   that were sometimes used for what might be thought of

22   as, like, a -- a prehearing detention, or if there is

23   an incident, somebody is locked in, they might be

24   awaiting transfer over or they might be awaiting a

25   hearing in place, I think.  But they were kind of

1    generic lock-in cells.  Probably, I don't know, one

2    side of one unit.  Like, probably 10 or 20.

3         Q.  Okay.  10 or 20 cells?

4         A.  I would guess.  And I don't -- I actually

5    don't recall, like, the exact number.  It could even

6    be less than that.

7         Q.  Okay.  What about at AMKC.  Can -- can you

8    describe what type of restrictive housing was present

9    at that facility when you worked there?

10        A.  That facility had -- and I should say that

11   facility -- and then now that I think of it there is

12   another facility where I spent a fair amount of time

13   seeing patients.

14             But AMKC had punitive segregation units.  I

15   don't know how many.  But they certainly had them.

16             I also saw -- there is another facility that

17   even in the early years I spent a lot of time at,

18   which is RNDC.  That was for adolescence.  And that

19   facility I spent a lot of time at.  And those -- that

20   facility I think when we started looking, had up to

21   25 percent of the people in -- adolescence, the kids,

22   about 25 percent of them were in seg at some point.

23   So it had a fairly heavy footprint.

24             Most of the jail system over the years about

25   7 percent of people went into some sort of seg

1    setting, but the adolescent facility where I did see

2    quite a few patients had a higher density.

3        Q.   And -- and how many inmates were at RNDC at

4    the time you worked?

5        A.   I -- I'm going to guess 500.  I don't recall.

6        Q.   And then what about CDU?  How many inmates?

7        A.   That was a medical unit, so there would have

8    been people in medical isolation for, you know,

9    medical isolation reasons, but there was no

10   segregation itself.

11       Q.   Do New York City jails have different levels

12   of custody or security?  Like, are there places that

13   people go, you know, if they commit a more violent

14   crime versus, you know, a crime for -- which is

15   considered less severe?

16            Do you understand my question?

17       A.   Yeah.  And so like most -- yes.  Like most

18   systems I have worked in or seen they had security

19   classifications that had both kind of a low, medium,

20   high flavor.  There were also different designations

21   for close custody, for max custody, different

22   designations for people who had, for instance, a

23   history of escape attempt or a history of assault on

24   staff or -- and so they had a whole wrath of those so

25   that there were -- over time I started to see more and

1    more of the patients who were in these either high

2    custody or segregation settings.  But there were whole

3    buildings dedicated to punitive segregation.

4           There were some wings and -- I'm not sure

5    there were buildings, but certainly wings of buildings

6    dedicated to high security or close custody separate

7    and apart from who was being punished through punitive

8    segregation.

9       Q.  And when you say punitive segregation, are

10   you referring to inmates who got into some sort of

11   disciplinary trouble after they came into the jail

12   system and were being punished?

13      A.  Yes.  Although depending on what year there

14   were people who had old what were thought of as, like,

15   outstanding days on a punitive segregation ticket so

16   that they -- you know, if they were given 100 days,

17   they went home from jail after 50 days.  In the early

18   years when they came back, they would what is called

19   owe those 50 days even though nothing new had

20   happened.  So, yes.  But disciplinary segregation.

21   Something based on the -- what the facility says is

22   the behavior of the person regarding institutional

23   rules as opposed to administration segregation, which

24   is just kind of a -- a hypothetical thought about

25   somebody's dangerousness based on not their behavior

1   right then but something else about them.

2       Q.   Okay.   I've got it.

3           So was it your testimony then that at the

4   time you worked in the New York City jails there was

5   not that administrative segregation?

6       A.   Well, I think that they didn't have a large

7   footprint.   I think that in reality there were people

8   that would go into essentially administrative

9   segregation, but it was not as large as the punitive

10  segregation footprint.   And that's just -- you know,

11  that's my recollection.

12      Q.   And can you tell me -- VCBC you mentioned

13  low, medium, high security.   What was -- what was

14  VCBC?

15      A.   Well, I think like most because it's a jail

16  and jails -- county jails have to be able to

17  accommodate everything, it would have all three.   But

18  there would be a limited -- there would be a small

19  number, like, maybe one tier or one housing area for

20  people that were high custody or high security

21  classification.   That's my recollection.   Most of it

22  would be low and medium.

23          And then I think the process, as I recall,

24  would have been people who have a high security

25  classification -- it's a -- you know, jails are

1    functioning as intakes all the time.  People coming

2    from local arrests then they may be transferred to one

3    of the other more central locations where more --

4    there is a heavier concentration of high security

5    people.

6         Q.   Okay.  So your recollection is VCBC did not

7    have a high concentration of the high security

8    inmates?

9         A.   Compared to the other jails, no.

10        Q.   Okay.  Any idea, like, what percentage of the

11   inmates there were high security?

12        A.   No.

13        Q.   Okay.

14        A.   But I would guess it would be a relatively

15   small percent.

16        Q.   What about --

17        A.   There were always people coming in the door

18   who would be assessed as being high security, but then

19   they would transfer to another facility.

20        Q.   Okay.  What was the inmate makeup at AMKC in

21   terms of security and custody levels?

22        A.   It would be pretty equal split of all

23   security levels.  I -- that's my recollection.

24        Q.   And what about at RNDC?

25        A.   Also -- I would say weighted towards higher

1    security because at the time this was an adolescent

2    facility.  So New York was one of just a few states

3    that still routinely had adolescents going into the

4    adult jail complex.  And so my experience as a --

5    I'm not a, you know, security person -- expert, is

6    that it -- most of the low and medium security

7    adolescents wouldn't go to jail.  They were, you know,

8    diversion programs.  And so it seemed as if there was

9    a higher concentration of high security detained

10   people there than in most of the other jails.  Not

11   all.

12        Q.   And when you say adolescents, what were --

13   what were the ages of the inmates at RNDC?

14        A.   I believe they were 16, 17 and 18.

15        Q.   Okay.  Do you know does that facility still

16   operate as an adolescent facility today?

17        A.   No.  New York State changed its practices

18   statewide I would say halfway or two-thirds of the way

19   through my -- maybe, actually, at the end of my time,

20   but the -- through changes in state law adolescents do

21   not routinely go into an adult jail setting.

22        Q.   So the end of your time would that be 2016 or

23   2017?

24        A.   I would guess, yes.  There was an effort

25   called Raise the Age.  And I don't remember when it

1    made it through the legislature, but it's relatively

2    recent.

3         Q.   All right.  And CDU I know you told me was a

4    medical facility.  But in terms of the inmate makeup,

5    what -- what was it for --

6         A.   Well --

7         Q.   And I'm asking for security and custody.

8         A.   -- people would go there for medical reasons.

9    So just like the infirmary, which is separate, but --

10   you know.  Or a mental health unit.  People would go

11   into that unit for a communicable disease reason.

12   That -- CDU stands for Communicable Disease Unit.  So

13   it wouldn't be -- it would be any -- any security

14   level.

15        Q.   Okay.  And you mentioned the punitive type

16   segregation that existed in New York City jails at the

17   time you worked there.  What was it -- was it called

18   disciplinary segregation?

19        A.   Either disciplinary or punitive segregation.

20   We -- by the time I became medical director much of

21   the care I was providing and work I was doing was in

22   these various segregation units.  And so security

23   staff would refer to them as P seg, which is, you

24   know, for punitive segregation or disciplinary

25   segregation.

1    Q.   And you said there was a very small footprint

2   for the administrative segregation.  Was there any

3   other type of restrictive housing in the New York City

4   jails at the time that you worked there?

5    A.   There were several iterations of adolescent

6   units that were referred to as restrictive housing

7   units that may -- that the Department of Corrections

8   would not include as -- so they -- they would identify

9   them as separate so that they developed several

10  restrictive housing unit models that in theory

11  contributed to more out of cell time or had some

12  difference that allowed them -- that led them to not

13  include them in their roster of regular punitive

14  segregation units, but -- so there were some, you

15  know, other units.  But the bulk of the units that I

16  would consider in this segregation context were I

17  believe classified as punitive or disciplinary

18  segregation units.

19   Q.   Okay.  And you mentioned when you were the

20  medical director, that you were providing some sort of

21  care to inmates that were in these segregation units.

22  Can -- can you describe for me was that different than

23  the type of, you know, direct patient care that you

24  were doing when you were the deputy medical director?

25   A.   Well, I think that over time I came to

1    provide direct care to patients who had been injured

2    in uses of force or who were having -- where there was

3    a need for a comprehensive plan for their care.

4    Patients who had either been persistently injured,

5    were having problems accessing care.  And so this work

6    led me to spend more time seeing patients out in the

7    unit, either in their cells or in adjacent triage

8    rooms and provide much less care inside clinics where

9    it's sometimes hard to get the patients too.

10        Q.  Got it.

11            So you were no longer providing sort of the

12   daily -- or weekly patient care.  You were coming in

13   to try to fix problems with these inmates' care?

14        A.  Or in many cases seeing patients for the

15   first time who hadn't been seen yet after a use of

16   force.  So there were plenty of times where I was the

17   health person who was there, you know, minutes after

18   an injury occurred.  So they may have just been

19   injured or something like that.  But I -- I would say

20   less time -- much less time with, like, a dedicated

21   clinic slot where I was going to be in this jail's

22   clinic for this 3 or 4-hour period of time.

23        Q.  Got it.

24            And what about by the time you were assistant

25   commissioner.  Were you still doing the duties that

1   you just described?

2       A.   I think that by that time I was probably

3   seeing just a handful of patients a week, and it would

4   be -- almost all of the cases would have been people

5   who were -- you know, where there was -- either I was

6   concerned -- we had developed reports to let us know

7   when somebody was seriously injured or whether -- if

8   there was a concern about injury during use of force

9   or some problem in a segregation setting.  And so

10  every -- pretty much everything I was doing at that

11  point was focusing on these patients.

12      Q.   Okay.  In addition to all your administrative

13  duties?

14      A.   Yes.  But most of my time was on

15  administrative work.  This was a, you know, small

16  fraction of my time to actually physically see these

17  patients.

18      Q.   Got it.

19           And that would be the same as when you were

20  Chief Medical Officer, or would it have been then even

21  less?

22      A.   No.  The -- actually, the -- the -- when I

23  was Assistant Commissioner of Health and when I was

24  Chief Medical Officer, I had more or less the same

25  job.  The difference in those titles came because up

```
 1    to the point where I was Assistant Commissioner of

 2    Health for the City we had a model where we had 12 or

 3    13 jails and then we had private either for profit or

 4    nonprofit vendors providing the health care in many of

 5    the places.  And so a big part of my job was to

 6    oversee those contracts, make sure they were doing a

 7    good job.

 8              But then we switched that whole model

 9    where -- at the time I worked for the Commissioner of

10    Health, so I was part of the Health Department of New

11    York City.  We actually switched to an all public

12    model where everybody became part of the public

13    hospital system of New York City.  And so when we made

14    that move, my job didn't change too much because I was

15    still the head doctor for the jails, but the title

16    change for me when I went from the Health Department

17    into the public hospital system was to go from

18    Assistant Commissioner of Health to become Chief

19    Medical Officer and Assistant Vice President for the

20    New York City Health and Hospitals.

21        Q.  Got it.

22              At any time during the period that you worked

23    for New York City jails were inmates required to make

24    any type of a copayment for medical treatment?

25        A.  Not that I'm aware of.
```

1      Q.  Do you know in Florida whether inmates are

2  required to make any type of a copayment or I should

3  say do you know in Florida --

4          MS. SMITH:  So let's strike that.

5      Q.  Do you know in Florida whether facilities

6  request inmates to make copayments in connection with

7  certain medical treatment?

8      A.  My understanding is that is the case.

9      Q.  And -- and do you know how much that is?

10      A.  I -- I can't recall if I put it in my report

11  anywhere or if I noted it.  I -- I think I might

12  recall $5.  But that's not a -- I don't recall with

13  confidence.

14      Q.  Okay.  Can you tell me how correctional

15  health care differs from noncorrectional health care?

16      A.  Well, the first -- one of the first elements

17  is that incarceration creates health risks.  So being

18  in a jail or a prison can create new health risks for

19  people who come there.  So that is one really

20  important difference.  And those risks are not spread

21  out uniformly across a jail or a prison.  We know --

22  we have good evidence that those risks actually are

23  focused in a lot of ways, and segregation is a good

24  example.

25          So one important difference is this new --

1   the new health risks that happen when you become

2   incarcerated.  The second is that --

3         Q.  Can I ask you a question about that?

4         A.  Go ahead.

5         Q.  So the new health risk is that created to

6   some extent for all inmates that enter a jail or a

7   prison even in general population?

8         A.  Well, I think that the -- these risks are

9   different depending on what health risks we're talking

10  about.

11             So, for instance, you know, a new -- probably

12  one of the most common health risks of incarceration

13  is injury, physical injury.  And there are lots of

14  different causes.  Most correctional settings don't

15  report out kind of statistics, but we know from the

16  few that do that your risk of being physically injured

17  probably isn't the same for everybody who walks in the

18  door.  So your risk of being physically injured could

19  be impacted both -- by kind of things about what group

20  you fall into.  So if you're a person who has serious

21  mental illness or if you're a person who has a

22  disability or a fall risk, you might have a higher

23  risk of being injured.  There are also lots of

24  institutional or environmental factors that play into

25  that one physical risk.

1          So if you're in a place that's old, that has

2     lots of standing water, if you, you know, are older,

3     but you also have to climb stairs or you can't get

4     a -- a bottom bunk or there are environmental factors

5     that contribute to or affect your personal risk.  And

6     I would say that for all of these risks there is often

7     an intersection between things about the person and

8     things about the environment that doesn't actually

9     spread it out evenly.

10        Q.   Okay.  And what you just described there have

11    you personally been involved in -- in any of the

12    research to actually, you know, arrive at those

13    conclusions that you just laid out?

14        A.   Yeah.  I think it's actually quality

15    assurance.  It's not even research.

16             But in terms of -- so we had a team at the

17    New York City jails that would collect information

18    about injuries, as an example.  And they would look at

19    these -- some of them -- they're public health and

20    clinical folks.  They would look at who was injured

21    and why they were injured.  And so -- and where they

22    were injured.  And so we -- that -- our team published

23    a series of reports that were really quality assurance

24    on injuries behind bars.  And so that's one example of

25    how we sought to use a -- some -- we started with a

1    paper record and then we moved to electronic records.

2    But the team of people who looked at the data itself

3    were thinking about how people come to become injured.

4         Q.  Got it.

5             Was one of those publications born out of the

6    quality management that you just described called

7    Injury Surveillance in New York City Jails?

8         A.  Yes.

9         Q.  All right.  And in that article you stated it

10   was difficult to calculate injury rates because of

11   inmates' perceived biases.  And you went on to explain

12   about the different types of secondary gains at issue.

13            Do you recall those statements?

14       A.  I think that I mentioned -- secondary gain is

15   one element, so I would have mentioned it.  But there

16   are -- a lot of the reporting about injuries is

17   impacted by fear or retaliation.  But, yes, those are

18   factors.  All of those go into essentially how

19   sensitive your injury reporting is.  Many injuries go

20   unreported.

21       Q.  Understood.

22            So when you were studying at a systemic level

23   injuries in New York City jails, you acknowledge that

24   there were going to be certain limitations to your

25   work because of these perceived secondary gains,

1    correct?

2         A.  Well, I don't know if -- I think that -- for

3    instance, if a fear of retaliation is a -- I guess

4    that's a secondary gain; and that if you're hoping to

5    not get retaliated against, that's a -- I don't

6    remember how we termed it, but that's a -- I guess a

7    perceived secondary gain.

8              But, yes, the accuracy of information is at

9    the core of, you know, both understanding how people

10   came to be injured and then also how do you prevent

11   injuries.

12        Q.  Okay.

13             MS. SMITH:  Can we pull up this article -- I

14        want to take a look at it with Dr. Venters -- and

15        mark it as Defendant's Exhibit 1?

16        Q.  (By Ms. Smith) I just want to refresh your

17   recollection, if I could, Dr. Venters, to make sure I

18   understand what you wrote.  It's called Injury

19   Surveillance in New York City Jails.

20             MS. SMITH:  Okay.  If we could go down,

21        please.

22        Q.  (By Ms. Smith) Well, first of all, is this

23   the -- do you recognize this --

24        A.  Yes.

25        Q.  -- as the article that you wrote with your

1   colleagues?

2       A.   Yes.

3       Q.   Okay.

4            MS. SMITH:   Could we keep scrolling down?

5       Second page.   Okay.   We can stop there.

6       Q.   (By Ms. Smith) So here the highlighted

7   section you state:   Conversely, some injuries may have

8   been fabricated by inmates seeking medical attention

9   for other reasons, e.g., those seeking attention and

10  those wishing to be moved away from, or closer to,

11  other inmates.

12           Did I read that correctly?

13      A.   Yes.

14      Q.   All right.   So when you're studying inmates

15  and injuries that they may have suffered, there is

16  always going to be a problem with some inmates

17  fabricating information in order to seek attention or

18  maybe be moved to other inmates.   Is -- is that

19  accurately summarizing your statement there?

20      A.   No, I don't think I would have used the word

21  always.   Anyway, I don't think we even use that in

22  this publication.

23           I would -- I think that what is fair about

24  this -- and this comes after the rest of the

25  discussion, which we haven't gone through -- is that

```
1    one limitation is if a person presents with a report
2    of injury, if no physical injury is observed, it may
3    not be clear or it may not be possible for the health
4    service to ascertain the nature of the injury.  So if
5    a person says they were, you know, beat up, but there
6    is no evidence that they were, you know, physically
7    harmed, then it may be -- it doesn't mean that that
8    didn't happen.  And I would still say most of the time
9    it is important to take the -- the reports of the
10   patients very seriously.  But like in community health
11   there are circumstances where people might report
12   something for secondary gain.  That certainly does
13   happen sometimes.
14        Q.  Got it.
15            And -- and if you would, the highlighted
16   portion here can you read that to yourself?
17        A.  Certainly.
18            THE WITNESS:  Can you scroll down?  I would
19        like to see what is above it.  I'm not sure what
20        the rest of that paragraph says.
21            Okay.  Thank you.
22        A.  So, conversely, some injuries may have been
23   fabricated by inmates seeking medical attention for
24   other reasons, e.g., those seeking attention and those
25   wishing to be moved away from, or closer to, other
```

1    inmates.  Some narrative reports did not contain

2    sufficient information for analysis and were,

3    therefore, not included.

4         Q.  (By Ms. Smith) Okay.  Could you stop there.

5            So do you agree with this statement?

6         A.  Yes.

7         Q.  Do you --

8         A.  Yeah.  This -- and this is a statement about

9    this data set, but I agree generally that one of the

10   factors to consider when looking at reports of

11   injuries is whether or not there was also a concurrent

12   documentation of the physical injury that occurred.

13        Q.  Okay.  Could you keep reading that next

14   paragraph?

15        A.  Additional limitations stem from systemic

16   biases in injury reporting, including biases due to

17   perceived secondary gains such as compensation from

18   possible lawsuits, a desire for transfer, or simply a

19   desire to go to the hospital.  In addition, some

20   inmates --

21        Q.  Can we stop right there.

22        A.  -- may choose to report an injury --

23        Q.  Is that an accurate statement that you read,

24   that first sentence?

25        A.  Sorry.  Could you ask that again?

1     Q.  Yeah.  I'm so sorry.  I didn't mean to cut

2  you off.

3          But the -- the sentence that you read that

4  started with additional limitations, that's an

5  accurate statement, correct?

6     A.  Yes.

7     Q.  Okay.  Go ahead.

8     A.   In addition, some inmates may choose to

9  report an injury as accidental, e.g., as a slip and

10 fall, as opposed to reporting the real reason, such

11 as, as a result of fear, shame, or other motives.

12 Consequently, our calculated injury rates may either

13 be underestimates or overestimates of the actual

14 rates.

15     Q.  All right.  And those two additional

16 sentences that you read still accurate statements?

17     A.  Yes.

18     Q.  So --

19          MS. SMITH:  You can take that down.  Thank

20     you.

21     Q.  (By Ms. Smith) Now, you -- you mentioned that

22 even in the community that a person reporting an

23 injury could be motivated by secondary gain, right?

24     A.  Yes.

25     Q.  Okay.  But would you also agree with me that

1    an inmate in a prison setting has -- that there is

2    going to be higher incidence of that secondary gain at

3    play?

4         A.  No.  I would -- I'm not sure I've seen a

5    comparison.  I think that there are -- if you've ever

6    known somebody who provided occupational health care,

7    worked in an emergency room, worked in drug treatment,

8    worked in chronic care, I don't think that would be

9    accurate.  I think my assessment would be that the

10   reasons for or the potential perceived benefits of

11   secondary gain would be different behind bars than in

12   the community.

13        Q.  Okay.  But you think that the secondary gains

14   that you described in the article that we just read

15   together that that generally describes what sort of

16   secondary gains are at play in both jails and prison

17   settings?

18        A.  I think that fear of retaliation, potential

19   housing area considerations, I think that those are --

20   I don't think that was a comprehensive list, but I

21   think that's fair.  I wouldn't say that any of that

22   was inaccurate.

23        Q.  Okay.  Have you -- I know you haven't worked

24   in prison settings, but have you undertaken any sort

25   of independent analysis to determine whether the

1   secondary gains are different in a jail versus a

2   prison?

3        A.   I'm not -- I don't believe so.

4        Q.   So when treating inmates, was it your

5   experience that sometimes they were untruthful about

6   the medical problems that they reported to you?

7        A.   Well, I think that this is -- this lends --

8   so doctors are not lie detectors, and so I think the

9   clinical training that I would provide my staff and

10  that I would -- what I would follow would be to try

11  and understand if the injury presentation was

12  consistent.  The subjective and the objective were

13  consistent with each other.  And that's very different

14  than saying somebody is a liar or somebody is

15  untruthful, which is, like, a very moralistic approach

16  to medicine, which we know is actually a very bad

17  approach to -- we provide poor care when we're trying

18  to make moral judgments about our patients.

19             So that for injury assessment, just

20  specifically injury assessment what we train staff to

21  do is to try and understand if the -- what the patient

22  reports in the subjective part of the encounter is

23  consistent with what we find in the objective part,

24  and then we make an assessment and plan based on the

25  integration.

1          And there are lots of good reasons why

2     there -- why inconsistencies exist both in the

3     community and in jails, but we want our assessment and

4     plan based on the integration of those two, the

5     subjective and the objective.

6          Q.   Okay.  So you would agree it's a bad idea to

7     only rely upon the subjective narrative of the inmate?

8          A.   I would say that the subjective response --

9     the subjective -- in -- in performing the injury

10    encounter, that we want the clinical staff, the

11    nurses, the doctors to rely both on subjective and

12    objective information.

13         Q.   Got it.

14              Are they equally important?

15         A.   I think that they're both essential.  It's

16    not that you get to weigh one against the other.

17    They're both essential.

18         Q.   Now, in the Fikes' deposition that we talked

19    about earlier, you were asked a question how do you as

20    a professional physician discern between a patient

21    telling the truth or telling a lie about his

22    condition.  And you responded:  I have found that the

23    two most effective methods in assessing the true

24    clinical needs of a patient are, first, to talk to the

25    patient and conduct a thorough history taken --

1    taking, excuse me; and, secondly, to rely on a careful

2    physical examination.  When needed, testing or other

3    supplementary assessments that can help guide the

4    clinic -- clinical assessment process.

5             Do you still agree with that answer that you

6    gave?

7         A.  Yes.

8         Q.  Okay.  I have a few more background questions

9    for you, and then we're going to get to your report.

10            How many -- how many times approximately have

11   you served as an expert?

12        A.  I don't know.  I have a list of depositions

13   where I've provided testimony at the end of my CV, but

14   there have been other cases where I didn't provide

15   testimony.  So that would be -- it would be some

16   number greater than the number of those depositions or

17   testimony.

18        Q.  Okay.  And I -- I have your -- your list here

19   that you're referring to, the prior testimony and --

20   and deposition list.

21        A.  Yes.

22        Q.  Okay.  And, I'm sorry, you said there would

23   be other cases where you served as an expert but did

24   not provide testimony; is that correct?

25        A.  Yes.

1        Q.   Okay.  And how many of those cases can -- if
2   you can approximate what they --
3        A.   I don't know.  They would be I would guess
4   twice as many or at least the same number again.  I
5   don't keep a list of all the cases I've been involved
6   in.  I put the names -- I try and keep track of the
7   depositions or testimonies, but it would be a larger
8   number.
9        Q.   Have you ever served as an expert, Dr.
10  Venters, in a class certification case?
11       A.   I believe so.  I believe I'm a -- I'm -- one
12  of the cases where -- I don't recall if I've testified
13  before this case yet -- but is a -- regards
14  immigration detention.  It's a class action called
15  Fraihat.  It's F-R-A-I-H-A-T.  And so I think that's a
16  case where I'm retained I think actually by the
17  Southern Poverty Law Center as a medical expert.  And
18  that's a -- I think that's a class action case.
19            There may be others.  I just can't -- I think
20  maybe the time I testified on behalf of the City in
21  New York, which is probably the first testimony I
22  gave, Benjamin, I think that might have been a class
23  action case too.
24       Q.   The Fraihat case that you mentioned do you
25  know what court that is pending in?

1        A.  I think it's in California.  I'm not -- I

2   think it's the Federal Court in California.  I'm not

3   sure.

4        Q.  Have you provided any opinions at -- and when

5   I say opinion, I mean have you provided any written

6   opinions in that Fraihat case?

7        A.  I think regarding COVID I have.  I think I

8   have -- I don't think we -- I've done any work on the

9   general medical side.  I think only -- there would

10  be -- there might be reports on, like, COVID

11  vaccination or infection control.

12       Q.  Does the Fraihat case involve conditions of

13  confinement?

14       A.  The parts that I've worked on so far only

15  relate to -- all the opinions I've written so far I

16  think are just about COVID.  So I don't know if, like,

17  infection control or access to hand sanitizer, I don't

18  know if you would -- if you would say that's part of

19  conditions of confinement.  But they all have to do

20  with specific COVID responses.

21       Q.  Okay.  And let me ask it maybe a different

22  way.

23           Is it your understanding that the Fraihat

24  lawsuit deals generally with inmates, and meaning not

25  just inmates just in respective housing?

1      A.   No, there is no focus on segregation or

2   restrictive housing.  I think -- this is immigration

3   detention, so I think that it's very different than

4   a -- a prison system in terms of, like -- but I don't

5   think there is a -- a focus of this case at all on --

6   on restrictive housing or segregation.

7      Q.   Okay.  And the Benjamin case where you

8   testified was that when you were still employed with

9   New York City jails?

10     A.   Yes.  And so I think I was testifying -- that

11  case has to do with heat sensitivity on high heat days

12  and that some part of that did involve remediation in

13  close custody or segregation settings on high heat

14  days if a facility did not have air conditioning.

15     Q.   Okay.  And the opinions that you provided on

16  behalf of the City -- well, were you -- were you

17  defending the City?

18     A.   I was there -- I guess.  I was there as -- I

19  wasn't a paid medical expert, but I was there in my

20  role as the I think medical director at the time to

21  talk about how we would find and respond to heat

22  stroke or heat stressed patients and how we would keep

23  track of which patients were -- every patient coming

24  into the city jails would be designated as heat

25  sensitive, and so I was there to testify as to how do

1    we make that determination, how do we keep track of

2    those patients, how do we know who is heat sensitive

3    and who isn't.

4        Q.  Aside from the Benjamin case have you ever

5    testified on behalf of a defendant as an expert?

6        A.  I don't believe so.

7        Q.  And let me ask it --

8        A.  Not that I --

9        Q.  I'm sorry.  Were you done?

10       A.  Oh, not that I recall.  I think that the

11   testimony -- I think my testimony has either been as

12   an independent monitor or independent inspector or --

13   with plaintiffs, and my law enforcement engagements

14   have not resulted in testimony.

15       Q.  Yeah.  And let me ask it more broadly.

16           Have you ever been retained as an expert to

17   provide opinions on behalf of a defendant in a

18   lawsuit?

19       A.  I don't believe so.

20       Q.  Okay.  Have -- have you ever been retained by

21   a state Department of Corrections?

22       A.  Yes, I've been detained -- detained.  I've

23   been -- hopefully not.  I have been retained by the

24   Washington Department of Corrections, the state prison

25   system, to help them assess their healthcare service.

1  And that's relatively recently, in the last I guess

2  couple of months.  And then I don't know if this

3  qualifies.  I've been retained by -- as an expert by

4  the Department of Justice, which is law enforcement.

5  But that work has been as a monitor or inspecting --

6  working with them on their -- their investigations.

7       Q.  Okay.  And the work that you're doing for the

8  Washington Department of Corrections is there any

9  focus on segregation?

10      A.  I don't believe so.  I think that it --

11  because I have looked at the full scope of health

12  services I have seen some of their segregation units,

13  but the focus of the engagement is mostly on things

14  like electronic medical records, staffing, how clinics

15  work.  And so there is no -- how the infirmaries work.

16  And so it's -- there is no real -- or overt focus on

17  segregation settings.

18      Q.  What is your understanding of the retention?

19  Are you -- have you been asked to provide some sort of

20  written guidance or -- or what is there?  You're --

21      A.  Actually, it's that I'm kind of helping --

22  having seen many of their facilities and worked with a

23  team I'm helping them write their own what would be a

24  new quality plan.  So they will produce a -- a product

25  of their own that's not -- you know, I don't think

1    they need a report from me.  They are simply taking --

2    I'm kind of facilitating a process by which they can

3    review and think a little bit broadly about how to

4    integrate physical health, mental health,

5    disability -- some of the other parts of the

6    healthcare system.  But it's a product that is their

7    own.

8         Q.  Okay.  And you said recently.  When -- when

9    were you retained by Washington State?

10        A.  I think in the last month or so.

11        Q.  And was this retention in any way through

12   expert Dan Pacholke?

13        A.  I don't know.  I don't -- the secretary, the

14   new secretary of corrections reached out to me, so I

15   wouldn't be surprised if they know each other.  I

16   think they do know each other.  I'm sure they know

17   each other.  But he's not part of the -- he hasn't

18   been part of any calls I've been on, he hasn't been

19   part of the process that I've engaged in.

20        Q.  Okay.  Did -- did -- what is the new

21   secretary's name?

22        A.  Cheryl Strange.  S-T-R-A-N-G-E.

23        Q.  When director -- Secretary Strange contacted

24   you, did she mention Mr. Pacholke?

25        A.  I don't know.  It could be.  It could be he

1   connected us.  I just don't recall.

2        Q.  And that retention is it your understanding

3   that it's not this -- in connection with active

4   litigation?

5        A.  I don't know.  I -- I certainly -- there is

6   no specific case that's been identified, so I guess

7   the -- the best answer is not that I'm aware of.

8        Q.  Okay.  On your list of testimony that you

9   provided were any of those trials or arbitrations?

10       A.  I don't think except -- I think the first

11  testimony, the Benjamin v. Horne that I mentioned I

12  think that case had gone to trial.  But my testimony

13  was after a settlement had been reached.  But I don't

14  believe any of the other cases have gone to trial that

15  I've been -- I certainly have not -- that's the only

16  time, for instance, I went to a courthouse.  And so

17  everything else has been a deposition or a -- or a

18  hearing or something, but no trials that I'm aware of.

19       Q.  Okay.  And it's just -- well, actually, I was

20  going to say it's hard for me to tell, but there is a

21  couple here.  So Busby versus Bonner in the Western

22  District of Tennessee you say a video hearing.  Do you

23  know what that hearing involved?

24       A.  I believe that was one of the COVID cases.

25            So most of the work I've done since April of

1    2020 has been to do COVID -- court ordered COVID

2    inspections.  So I think in that case I drove to

3    Memphis, did an inspection over two or three days of

4    the -- it's the county jail.  I think it's Shelby

5    County.  And then gave a report to the -- you know, at

6    a hearing about my findings and recommendations about

7    the COVID efforts that were ongoing.

8         Q.   Okay.  Have you testified in any hearings as

9    an expert that did not involve COVID?

10        A.   I think that at least -- well, I'm appointed

11   as the health monitor, compliance monitor at a couple

12   of places, and so one of those, Fluvanna, which is the

13   women's prison in Virginia -- I'm not sure if we've

14   had a hearing.  I've been on the phone with attorneys

15   and maybe the Court.  I'm not sure if those are -- I'm

16   not sure how those have been characterized.  If those

17   discussions have been official hearings or not.  But

18   those would have been very recent also.  But not that

19   I can recall.  I believe all of the hearings that I've

20   been part of to my recollection are COVID related.

21        Q.   Sorry if I asked you this, but I don't know

22   if I did.

23             Any of the cases that you've been retained

24   for as an expert did they involve the conditions of

25   confinement, meaning restrictive housing focus?

```
1          A.   I don't believe that I've -- no, I don't

2     believe so.

3          Q.   Fluvanna you said was a women's prison or a

4     women's jail?

5          A.   It's the women's prison for the State of

6     Virginia.  I think it's the main women's facility in

7     the DOC.

8          Q.   And -- and who retained -- or who hired you?

9          A.   I'm appointed by the Court as the independent

10    health monitor or compliance monitor.

11         Q.   And you said that was recent.

12         A.   Yes.  I -- I just submitted my first

13    inspection report maybe two months ago.

14              And to -- just in case you're -- you're going

15    to ask, I don't think they actually have any

16    segregation or what would fall under the definitions

17    of what we've been talking about as segregation in

18    this facility.

19         Q.   All right.  Besides Fluvanna have you been

20    appointed by any court to serve as an independent

21    expert for either a -- either a prison or a jail?  And

22    this question is not including COVID.

23         A.   Yes, I've been appointed by Federal Court to

24    be the health monitor for the Santa Barbara County

25    Jail in California.  And that's a -- there are other
```

1   monitors.  I just -- my focus is on the medical care,

2   medical and nursing care.

3        I -- aside -- and then I just recently, I

4   think Friday, was appointed as the health monitor for

5   a facility in the Virgin Islands.  And I'm not sure

6   what jurisdiction that is, but it's a Federal

7   appointment, and there is -- as with the Santa

8   Barbara, there is other monitors.  And it's a case

9   that's been around for a while I think.  And those are

10  the -- I believe the only non-COVID independent

11  appointments.

12       Q.   Okay.  But neither Santa Barbara nor the

13  recent Virgin Islands appointments are focused on

14  restrictive housing issues, correct?

15       A.   Correct.

16       Q.   Okay.  Now, in your report you go through the

17  different facility inspections that you have

18  conducted.  For example, in paragraph 7 of your report

19  you say I have also worked as a medical expert in

20  cases involving correctional health since 2017,

21  including inspections of approximately 50 facilities.

22       So my question for you, Dr. Venters, is,

23  the -- the 50 facilities that you're mentioning there,

24  do those include the -- the COVID inspections that

25  you've conducted?

1        A.   I believe so.   I think that in the last two

2    years I would say -- certainly most of the facilities

3    I've been in in the last 18 months have been

4    COVID-related, and then there would be obviously some

5    others that are not.   But I would say it would be

6    inclusive of the COVID inspections, yes.

7        Q.   Okay.   And in that next paragraph, paragraph

8    8 -- I think that's what you just said, it says, since

9    April of 2020 I've worked on COVID-19 responses in

10   detention settings.   During this time I've conducted

11   approximately 30 physical inspections.

12             So you're including the approximately 30 in

13   the 50 total?

14       A.   I believe so.   I think that -- I don't have

15   a -- one list of all the facilities I've been in, but

16   I think it's fair to say that at least in the last

17   five years that -- well, I should say in the last

18   18 months most of the places I've gone into have been

19   for these COVID inspections, and that's got to be 30

20   or more.   And then during the last two or three years

21   it wouldn't be that much -- many more other facilities

22   that I've gone into.   So I think that that makes sense

23   that in the last few years I've probably been in about

24   50 places, and probably more than half of that has

25   been just for COVID reasons.

1      Q.  So if I call them the non-COVID inspections,
2  you'll understand what I mean?
3      A.  Yes.
4      Q.  Okay.  So for the non-COVID inspections are
5  you including the five inspections that you did for
6  FDC facilities?
7      A.  Yeah, I think so.  I -- to be fair, I think
8  the number -- I just haven't made an exact list, but
9  there have been several states where I've gone to
10  multiple prisons.  Florida is one, Massachusetts is
11  one, Georgia is one, Washington is one.  So those --
12  I -- I would -- I think I would include the Florida
13  facilities.
14      Q.  Okay.  And just to confirm, none of the
15  non-COVID inspections you conducted were focused on
16  restrictive housing aside from Florida?
17      A.  There -- my -- the -- my engagement with the
18  U.S. Department of Justice where I'm retained as a
19  medical expert did focus on the -- kind of both
20  restrictive housing in terms of segregation, but also
21  mental health housing.  So all the different -- the
22  full spectrum of administrative, disciplinary
23  segregation, as well as mental health housing and the
24  mental health watch or -- or suicide watch.
25      Q.  And the U.S. Department of Justice inspection

1    that you just mentioned were you -- who -- who were

2    you hired by to do that inspection?

3         A.  By the U.S. Department of Justice.  The civil

4    I guess -- I don't know if it's called the Civil

5    Rights Division, but the people who conduct these

6    Civil Rights investigations.  And I think it might be

7    the Civil Rights Division.  And that involves going

8    to -- I don't know if it was -- some -- between five

9    and ten prisons in Massachusetts inspecting these

10   settings, talking to people, reviewing records.  And

11   then ultimately the product that came out of that was

12   the DOJ comes up with its own findings report that was

13   published publicly and had to do with -- most of the

14   focus was on people with serious mental illness who go

15   between segregation settings and mental health

16   settings and back and forth.

17        Q.  And in that Massachusetts matter do you know

18   if it was just a DOJ inspection or -- or did it

19   actually become litigation?

20        A.  I don't -- there was some sort of letter that

21   was sent out saying that they assert -- the DOJ

22   asserts that there is some constitutional violations

23   occurring.

24             My understanding is there is a discussion --

25   a -- there is settlement discussions happening, but I

1    don't know anything more about the case legally than

2    that.

3        Q.  Okay.  But you did prepare some type of

4    report that you provided to the Department of Justice?

5        A.  I believe so.  Excuse me.

6        Q.  Does that -- sorry.

7        A.  I believe either a report or we had a series

8    of phone conferences.  Yeah, I don't -- I don't

9    recall.

10       Q.  Okay.  The DOJ investigation into

11   Massachusetts is there a -- like a named complainant,

12   or how is the -- the matter titled?

13       A.  Usually when I look -- if I look it up, I

14   just Google DOJ Massachusetts prison, it comes up with

15   the findings letter on their website.  I don't recall

16   the name of the case.

17       Q.  Okay.  And then you mentioned of the

18   non-COVID inspections you said you did about five as a

19   part of the DOJ investigation you just described?

20       A.  I think between five and ten.  I don't

21   recall.  We took four or five trips, and we often went

22   to more than one facility I think.  So I would guess

23   between five and ten.

24       Q.  And of the non-COVID inspections you also

25   mentioned Washington State.  Is -- is that a part of

1    the retention that you mentioned to me, or is that

2    something different?

3         A.   Yes.   That's -- and part of that was I went

4    out a couple of weeks ago and was in maybe five or six

5    facilities.

6         Q.   And then what about Georgia?   Were you --

7         A.   Georgia was the disability case, and I -- I

8    think I went into, again, probably between five and

9    ten prisons looking at health access for people with

10   disabilities who were in -- and part of that was in

11   segregation, so I was going to segregation units.   But

12   that's not a -- that case that was happening right

13   before COVID, and so I haven't produced a report.   And

14   that case is kind of in a bit of stasis, I believe.

15        Q.   And that's the one you thought was for

16   Southern Poverty?

17        A.   I believe so, yes.

18        Q.   And what is -- is it a part of active

19   litigation?

20        A.   I don't actually know because I haven't done

21   anything on the case in a long time, and so I don't

22   know if the -- I believe that that case was -- there

23   had been active litigation, and we might have been

24   there to assess compliance.   I believe there had been

25   litigation in the past.   I just don't know what the

1    status is of the litigation right now.  And I haven't

2    been involved in any work for quite some time.

3         Q.  Is there a name of that case?

4         A.  Not that I recall off the top of my head, but

5    I think I could find it and report it with a little

6    looking.

7         Q.  Okay.  So have we covered all of the

8    non-COVID inspections that you've conducted?

9         A.  I think the recent inspections.  There have

10   been times over the years when I have gone to prisons.

11   While I was working at Rikers I would be asked to go

12   to prison for various reasons, but I don't -- in terms

13   of recent times I've been in a prison, I believe just

14   thinking about -- I believe that that covers the, you

15   know, work in the last few years.

16        Q.  Okay.

17        A.  And work in the United States.

18        Q.  Understood.

19             Let's see.  Have you ever been excluded as an

20   expert?

21        A.  No, not to my knowledge.

22        Q.  Or have any of your -- let me ask it a

23   different way.

24             Have you had portions of your opinions

25   excluded?

1        A.   I don't think any of my medical opinions have
2   ever been excluded.  I can't remember if it's either
3   happened or if we anticipated it, that if I had an
4   opinion about a security matter, that it -- a judge
5   either would have put it aside or that lawyers
6   counseled me -- you know, that we took it out of our
7   report.  I don't -- that's -- I don't remember a
8   specific instance, but I would guess that that's the
9   only thing that would have happened is if I opined on
10  a security matter and I wasn't a security -- you know,
11  wasn't established as a security expert.
12       Q.   Okay.  Did that happen in the Omar Arnoldo
13  Rivera Martinez versus The -- The GEO Group case?
14       A.   I don't -- I don't recall if it -- I
15  wouldn't -- if -- if that's the case, then I wouldn't
16  dispute it.  That's the only thing I can think of.
17  But I don't recall instances where that's happened
18  specifically.
19       Q.   Okay.
20            MS. SMITH:  Could we pull up the order in the
21       Martinez case?  I just want to show it to Dr.
22       Venters to refresh his recollection.
23            MS. DUKE:  Just a moment.  It's taking a
24       moment to open.
25            MS. SMITH:  Thanks.

1          MS. DUKE:  Nicole, is it the motion -- the

2      order on the motion in limine?

3          MS. SMITH:  Yes.

4          MS. DUKE:  Okay.

5      Q.  (By Ms. Smith) While we're waiting for that

6  to open do you remember, Dr. Venters, what the

7  Martinez case was about?

8      A.  I think you mentioned GEO, so I think there

9  was a case involved where there was a use of force.

10  And I may have -- and so my role might have been in

11  giving opinions on the clinical response to the use of

12  force; and that was pretty balled up with the security

13  response, so the security use of force.

14          MS. SMITH:  Okay.  And we'll mark this as

15      Exhibit 2.

16          If you would scroll down to page 19.

17      Q.  (By Ms. Smith) And do you remember was

18  Mr. Martinez -- was he -- was he injured, was he

19  killed?  What is your recollection of what happened to

20  him?

21      A.  I don't recall.  I would need to review

22  records.

23      Q.  Okay.  And do you recall that the defendants

24  in this case, GEO, were arguing that your testimony

25  consisted not just of security opinions but of legal

1    conclusions on issues reserved for the jury and it

2    lacked proper foundation?

3         A.   I do not.

4         Q.   Have you seen this order before that we're

5    showing you?

6         A.   I don't know if -- I may have.  It's -- I

7    certainly don't remember reading it.  I haven't seen

8    it recently in the last -- you know, in recent months

9    or the last year or two.

10        Q.   Okay.  Well, just --

11             MS. SMITH:  Could we go down just a little

12        bit to the bottom here.

13        Q.   (By Ms. Smith) So page 19 of 20 do you see

14   the bottom where it says:  Although expert testimony

15   about an ultimate issue is not per se improper, an

16   expert witness cannot give an opinion as to her legal

17   conclusion.

18             MS. SMITH:  And then if we can keep scrolling

19        down.

20        Q.   (By Ms. Smith) And the top of page 20:  Some

21   of Dr. Venters' proposed testimony crosses this line.

22             So does this refresh your recollection about

23   this order?

24        A.   I'm not -- as I said, I don't recall seeing

25   this, but I don't dispute that it -- you know, I'm

1   reading it here.

2       Q.   Uh-huh.  And the Court also stated that you

3   may not testify based on speculation about what

4   occurred nor may you testify -- well -- oh.  Nor may

5   you testify about what occurred based on hearsay

6   statements made by others.  It is up to the percipient

7   witnesses to testify to the events in question.

8            Does that refresh your recollection of what

9   the Court decided?

10      A.   As I recall vaguely, the Court made a

11  decision about my ability or inability to opine on the

12  security matters, the use of force.  I don't -- I'm

13  not sure I've read this before, but I'm not disputing

14  that this is the -- what was written.

15      Q.   Okay.  Is it your general understanding, Dr.

16  Venters, that in rendering opinions that you can't

17  base them made -- base them on statements made by

18  other people?

19      A.   I'm not a lawyer, so I'm not sure what the

20  legal guidelines are for evidence or for forming

21  opinions.

22           I would say that, for instance, in health

23  care we think that -- we view the -- what patients

24  tell us about their care to be important.  It's not

25  the only source of data.  We want to see if that's

1   consistent with other sources of data.  But that is

2   different from legal opinions, which I'm not an expert

3   in.

4        Q.  Is it your understanding that as an expert in

5   rendering opinions that you have to base them on

6   actual facts?

7        A.  So as I said, it's -- in rendering my

8   opinions or coming to my opinions, I'm looking for

9   consistency in different sources of data.  One of the

10  sources of data is what people tell us happened to

11  them.  It's not the only source.  But it is not my

12  opinion that when a person says or reports what

13  happened to them, that that either is inconsequential

14  or should be ignored.  That's certainly not the

15  standard that we have in health care.  That's not the

16  standard I would take.

17       Q.  Okay.  Do you recall what it was that you --

18  the -- when the Court says that you cannot speculate

19  about what occurred, is it your understanding that you

20  were providing some type of opinion as to whether

21  plaintiff sought medical care after being released

22  from the facility?

23       A.  I don't recall the specifics of the case, but

24  I would be happy to review whatever you have.

25       Q.  I just -- we have the order, and I think the

1   order speaks for itself.  I just wanted to give you

2   the opportunity to explain your understanding of the

3   testimony that was excluded here.

4        A.  My understanding of it has to do with -- I

5   think I see a -- a reference to expertise about

6   testifying regarding use of force and a person posing

7   a threat, so... but, again, I wouldn't -- I'm happy to

8   read through any part of this you want to ask me to

9   look at.

10       Q.  Sure.  Why don't you read that -- the next

11  couple of paragraphs and tell me if it refreshes your

12  recollection as to what testimony you were trying to

13  submit and -- and what the Court excluded.

14       A.  I'm not sure what -- can you point out which

15  paragraph you would like me to read or highlight it?

16       Q.  The next paragraph that starts the bigger

17  concern.

18            MS. SMITH:  And then if we could scroll down,

19       we'll have you read -- read quickly the next one.

20       A.  Yes, I see those two paragraphs.  The one

21  that started with the bigger concern and then but

22  defendants.  Is there a paragraph after that you would

23  like me to review?

24       Q.  (By Ms. Smith) No.  You -- you read the

25  paragraph the defendants raised serious concern?

1       A.   Yes.

2       Q.   Okay.  So now that you've read that what were

3  the opinions regarding use of force that you were

4  trying to offer that the Court excluded?

5       A.   I don't have my report in front of me, so I

6  don't recall the exact opinions I provided.  But

7  taking this -- simply looking at these two paragraphs

8  and trying to extrapolate based on my memory, my

9  understanding is it had to do with health care that

10 was provided to and potential injuries among people

11 that experienced a use of force.

12       MS. SMITH:  Okay.  We can take this down,

13       Samantha.  Thank you.

14       Q.   (By Ms. Smith) So you do not have expertise

15 to testify about security matters, correct?

16       A.   Only to the extent that they involve the

17 intersection between security and health.  So I have

18 lots of experience in helping create policies for

19 security officers, training them directly, working

20 with security leadership and oversight when it comes

21 to health-related practices.  So segregation is a --

22 is an area where the two are really intimately

23 connected.  But I'm not a correctional officer, I've

24 never worked for a corrections agency and I wouldn't

25 hold myself out as a security expert.

1      Q.   Okay.  As a doctor in the New York City jails

2    or as a medical administrator, did you ever have an

3    inmate accuse you of misconduct?

4      A.   No.  I -- I think that as the Medical --

5    maybe not the Medical Director, the Chief Medical

6    Officer, I might have been named in a lawsuit about

7    medical care, but that would be -- it's -- but not a

8    patient that I personally ever saw, but it would be in

9    my role as the, you know, head doctor.  But I wouldn't

10   preclude that there weren't people who sometimes were

11   unhappy with the care I provided.  I just am not aware

12   of a -- an instance like that.

13     Q.   Okay.  Well, while you're working in the New

14   York City jails if you received a complaint from an

15   inmate claiming one of your staff had been engaged in

16   some type of misconduct, you know, directed at an

17   inmate, what would you do with that?  What would your

18   steps be to investigate?

19     A.   Well, there are several systems that existed

20   then that still exist now, I presume.  One is that if

21   a patient reported something that involved a criminal

22   matter, sexual abuse, something like that, or

23   something that needed to be investigated outside of

24   our health service, then that would go either -- and

25   generally we would send it to the general counsel of

1  our agency who would then coordinate contacting other

2  law enforcement agencies or other external partners.

3         When we received complaints about medical

4  care, like let's say a patient -- a patient reports

5  that a provider is dismissive or doesn't listen to

6  them or, you know, is rude to them, something that

7  doesn't require outside review, then that all went to

8  something called the patient relations group.

9         And this is one of the parts of our -- it's

10  part of the quality assurance team.  And so every --

11  every report or complaint about patient care would go

12  to this group, every one of them would be reviewed by

13  a clinical person and then they would be substantiated

14  or not substantiated.  And then all the substantiated

15  complaints without regard to whether or not they were

16  ever appealed or had to go anywhere else they would go

17  to -- they would have a corrective action plan and

18  then the quarterly quality committee would review all

19  those corrective action plans.  So that's kind of the

20  spectrum of things we would do.

21     Q.  Okay.  So for a medical complaint that an

22  inmate made you wouldn't just take the inmate's word

23  as true.  You would take it seriously, but there would

24  be some sort of a review or investigation that the

25  team would do to either substantiate it or not,

1    correct?

2         A.   Yes, generally that was the -- the approach.

3    Sometimes -- and that often involved talking to the

4    patient.  Not just, you know, looking at what was on

5    paper.

6         Q.   Understood.

7              Would part of the review also involve looking

8    at the inmate's records?

9         A.   It could.  It could be looking -- it could

10   involve looking at the medical records, it could be

11   looking at other documents, like a policy, or it could

12   involve talking to staff.

13        Q.   Okay.  And now you mentioned if there was

14   some type of misconduct that rose to the level of

15   necessity -- necessitating outside review in New York.

16   Was there some sort of oversight or -- or independent

17   authority that was charged with investigating those

18   types of claims?

19        A.   Yes.  It's New York, so there are several.  I

20   think that the -- my job and the job of my team was to

21   get them to -- whether I was at the DO -- Department

22   of Health or I was at the public hospital system we

23   had the same general initial workflow for people on

24   the health side was to get it to our general counsel's

25   office.  They then would coordinate.

1              There is a State Commission of Corrections,

2    there is a City -- New York City Board of Corrections.

3    They have different roles.  There is also, like, just

4    frank law enforcement agencies, so prosecutors or

5    D.A.'s for the different boroughs.  But all of that

6    would be through discussion with -- and I think there

7    is even an Inspector General.  So all of that would

8    be, you know, going to our general counsel for

9    support.

10        Q.  Thank you.

11             So my question is, Dr. Venters, have you

12   reviewed what systems Florida has in place for

13   independent oversight of claims of misconduct directed

14   against inmates?

15        A.  I don't believe I've reviewed the systems for

16   misconduct.  No, I don't believe so.

17        Q.  Are you familiar with whether Florida has an

18   Office of Inspector General that oversees

19   investigations involving misconduct?

20        A.  My understanding is that does exist.

21        Q.  As a part of preparing your report, did you

22   review any OIG documents in connection with any of the

23   inmates that you wrote about?

24        A.  With my -- as with my previous responses,

25   unless some of those reports are somehow referenced in

1    something I've listed in Appendix B I don't believe I
2    have separately reviewed any OIG reports.
3         Q.   Okay.   What about MINS reports?   Those are
4    not included in your appendix.   So is it fair to say
5    you did not review MINS reports?
6         A.   I believe that's the case.
7              THE WITNESS:   I was wondering if, like, in
8         the next 10 minutes or so we could break for,
9         like, 20 minutes or 15.
10             MS. SMITH:   Yeah.   Yeah.   Well, what I was
11        going to say I'm -- I'm at a stopping point now.
12        So what I would like to do, Dr. Venters, is take a
13        quick lunch break.   I don't need long.   It's
14        12:20, so could we come back at 12:45 and resume
15        and everybody can sort of freshen up and get
16        something to eat.
17             THE WITNESS:   That sounds great.
18             MS. WALLIS:   Works for me.
19             MS. SMITH:   Okay.   Thank you.   We'll be back.
20             THE WITNESS:   Thank you.
21             (A recess was taken from 12:19 to 12:46.)
22             MS. SMITH:   All right.   Dr. Venters, are you
23        ready?
24             THE WITNESS:   Yes.
25        Q.   (By Ms. Smith) All right.   I just had a

1    couple of wrap-up questions for you.  Forgive me if I

2    asked them.  I don't think I did.

3            Is it correct that you did not conduct any

4    physical examinations of any of the plaintiffs?

5        A.  That is correct.  I think there might be one

6    or two people for whom I observed what appeared to be

7    injuries where I may have reported it to health staff

8    or to -- through the attorneys, to you all, and I

9    think there might be one case in my report where

10   somebody who seemed to have injuries to his face or

11   had -- I mention in the report.  But I never -- didn't

12   make physical contact with or otherwise physically

13   examine people other than those observations.

14       Q.  All right.  And then I think you answered my

15   next question, which was aside from the plaintiffs and

16   what you mentioned in your report any observations you

17   made, you didn't conduct any physical examinations of

18   any of the inmates who are listed in your Appendix B

19   bullet point 50.

20       A.  Correct.

21       Q.  So let's turn, if we could, to your report.

22   And I want to start, if we could, on page 10.  If you

23   wouldn't mind, Dr. Venters, going to that page.

24       A.  Yes.

25       Q.  All right.  So on page 10 Roman Numeral III

1    your report discusses the adverse physical health

2    effects of solitary confinement, yes?

3         A.  Yes.

4         Q.  And in reading Section III of your report,

5    you set forth various risk factors that you believe

6    exist for inmates in restrictive housing, correct?

7         A.  I think that there are both risks that sol --

8    this section is about the risk that solitary

9    confinement confers to people, but there also could be

10   intersections between those risks and the health

11   problems of those -- of people themselves.

12        So, yes, this is primarily about how solitary

13   posses a risk to health or could harm health, but part

14   of that involves intersection between solitary and the

15   risks of individuals.

16        Q.  I think I understand.

17        And for purposes of this section of your

18   report how are you defining solitary confinement?

19        A.  Generally I consider solitary confinement to

20   be being confined into a cell without meaningful human

21   contact for 22 or more hours a day.

22        Q.  Okay.  And what do you mean by meaningful

23   human contact?

24        A.  Contact being able to speak with people

25   outside the cell.  So I would adopt what I think the

1    Department of Justice has identified as, for instance,

2    having a cellmate.  But being locked in 22 hours a day

3    is still solitary, so that wouldn't, in my view,

4    constitute meaningful human contact even though it's

5    some human contact.

6         Q.  And are you considering CMI, II and III to be

7    solitary confinement?

8         A.  My understanding from speaking to people is

9    that people face prolonged periods of time in their

10   cells in CMI, CMII and CMIII.  So I'm thinking of

11   those altogether in this world of -- of segregation or

12   solitary as we consider it here.

13        Q.  Okay.  Do you know on average how many hours

14   an inmate in CMIII spends in his or her cell?

15        A.  The reports that I got from people I spoke

16   with is that they often spend 22 hours a day in their

17   cell because many of the programs or out-of-cell

18   opportunities may not occur.  And so I'm considering

19   CMIII as one of the segregation settings along with

20   CMII, CMI and the other administrative disciplinary

21   segregation units.

22        Q.  Okay.  So my question is, if an inmate spends

23   less than 22 hours a day in his or her cell, do you

24   still consider that to be solitary confinement?

25        A.  Well, I think that spending -- if -- every

1    day or -- you know, the -- the person is generally out

2    of their cell more, if they spend less than 22 hours a

3    day in their cell, then I wouldn't necessarily

4    consider that to be solitary confinement.

5              I think there is -- in my report I talk

6    about, in this section, the health risks of solitary

7    confinement.  There are other health barriers that are

8    conserved in other segregation settings, even if

9    somebody -- even if this -- so, for instance, if

10   somebody is getting out let's say, you know, 3 hours a

11   day, so they're averaging 19 hours a day, the other

12   risks that I talk about in this report in my

13   experience also continue on.

14             So, for instance, problems with sick call,

15   interruptions of care when people come into the units.

16   But I would use the 22 hours as a good definition of

17   what is solitary.

18        Q.   And if an inmate spends one day in

19   disciplinary confinement, would you still consider

20   that solitary confinement?

21        A.   Well, I think that solitary confinement --

22   as -- as I said, a good definition is 22 hours a day.

23   I think that the risks -- some of these risks

24   accumulate, but some of them actually happen pretty

25   early on.  So our experience in the jails was that

1    people who are in solitary for days or a week could

2    often experience these health risks.  So I -- I think

3    that short stays are generally less harmful than long

4    stays, but it doesn't mean that the -- the risk is

5    eliminated.

6         Q.   Okay.  And when you say short stays, do you

7    mean days or up to a week?  What are you -- how are

8    you defining short stays?

9         A.   Yes.  Most correctional settings I'm familiar

10   with are working to use segregation in, you know, very

11   limited periods.  Like a day or two in extreme

12   circumstances and certainly not to go past 14 days.

13   So I would consider short to be, you know, a day or

14   two or three.

15        Q.   So the harms or the risk of harm that you're

16   discussing in your report if we could go through

17   those.

18             I understand in paragraph 19 you're -- the

19   risk of harm that you're describing there is caused by

20   the severe restriction on the access to exercise.  Is

21   that -- I'm trying to put them in buckets, and I don't

22   want to put words in your mouth --

23        A.   Sure.

24        Q.   -- so paragraph 19, what is that risk?

25        A.   Yeah.  I think it's -- activity is probably a

1    better physiologic term than exercise because I

2    think -- the idea that -- like, just the way humans

3    are they don't -- like, access to, like, a brief

4    period of exercise is different and not as

5    physiologically helpful as just general activity.

6    But, yes, I would say this -- this area that involves

7    the kind of deconditioning and blood clot risk has to

8    do with activity level.

9        Q.   Okay.  And the restriction on activity level

10   you state may contribute to the development or

11   exacerbation of several different chronic diseases.

12   So my question is, do you believe that a system of

13   solitary confinement -- is there any way to mitigate

14   against this risk?

15       A.   I think that if people are locked in a cell

16   22 hours a day, it is not possible to mitigate their

17   lack of activity.  If people can't walk around, if

18   they can't move around, then the deconditioning, the

19   muscle wasting, the fall risk is not something that

20   can be addressed with, you know, short stints of -- of

21   taking them to a separate cage for them to, I don't

22   know, be outside in a cage.  So I think these are

23   risks that are intrinsic to the practice of -- of

24   locking somebody in a cell most of the day or all of

25   the day.

1    Q.   Okay.  And I want to go into each risk, but

2  let me take a step back for a second, if I could.

3         Do you believe that the only way to eliminate

4  the harms that you outline -- or the risk of the harms

5  that you outline in your report is to eliminate

6  solitary confinement?

7    A.   I think that many of these risks can be

8  largely mitigated through some intervention.

9         So, for instance, one of the risks that I

10  talk about is the risk that people who go into

11  segregation settings don't get an adequate

12  preconfinement assessment or they don't get their

13  medications.  Those are things that could be fixed.

14  If there was adequate quality assurance, if there were

15  efforts to address it, those things could be largely

16  addressed.

17         The inherent risk that solitary confinement

18  or segregation posses that's an inherent risk.  So

19  it's like any other inherent risk.  It's part of the

20  practice.  And so that's one of the reasons that

21  prison systems around the country are working to use

22  this practice rarely or eliminate it because they --

23  like, you know, the ACA and the NCCHC recognize this

24  is a foundation -- this is a -- a basic risk, health

25  risk of this practice.

1      Q.   Okay.  So you're -- I just want to make sure

2   I understood.

3           So your testimony is some of the risks can be

4   mitigated, but the risks cannot be eliminated?

5      A.   I would say some of these risks can be

6   mitigated others cannot.

7      Q.   Okay.  So you gave me the example of the

8   inactivity.  That's one that you stated if an inmate

9   is placed in solitary confinement, that risk cannot be

10  mitigated at all, right, in your opinion?

11     A.   I think it is exceedingly difficult.  I don't

12  think -- like, having worked in an operational

13  capacity I -- I'm not eager to -- I don't talk in

14  terms of absolutes.  I talk about, you know, we think

15  about what we can do.  And so it's next to impossible

16  to address this issue, activity, for people in

17  solitary.  Some of the other risks I think can be more

18  easily mitigated.

19     Q.   Okay.  And -- so let's keep going.  In

20  paragraph 20 the risk that you talk about there I

21  think is one that you sort of eluded to, that the

22  inmates may have new injuries or urgent needs for care

23  at the time of placement into isolation.  Let's take

24  that one first.

25          So is that one that you believe can be

1    mitigated through a proper system of -- of

2    preconfinement assessments?

3         A.   Yes.   And I think that really the core of

4    this is it's not too hard to come up with an idea of,

5    like, a preconfinement form or assessment.   But if

6    there is adequate quality assurance to make sure that

7    the -- the -- what is happening is adequate, that's a

8    good example of a necessary tool that can help

9    mitigate this risk.

10        Q.   Okay.   And then what about your second prong

11   there in paragraph 20.   You state once in isolation

12   they face barriers to care for both new and chronic

13   health problems.

14             Is that one that you believe a state

15   correctional system can mitigate?

16        A.   I think that there are tools to work to

17   mitigate it that are required.   However, my experience

18   is in my career large segregation settings, settings

19   where lots and lots of people, hundreds and hundreds

20   of people are in segregation inexorably end up

21   creating barriers to care.   And so there are important

22   mitigation efforts, but it is -- when you build a silo

23   for this one practice, it -- it, by definition, makes

24   it harder for all the other things to happen.

25             So I think this is a -- I would put this in

1   the middle.  I would say that this is something that
2   there are tools that you must use to try and address
3   it, but I don't think that -- it is very likely that
4   large scale segregation programs will fail to
5   interrupt or create barriers to care.
6        Q.  So -- I just want to make sure I heard that.
7   So large scale -- scale segregation systems you think
8   will inherently create barriers to care.  Is that what
9   you said?
10       A.  Well, I think that -- yes.  And that's the
11  position of ACA and the NCCHC is that segregation as
12  an institution creates barriers to care.  And my
13  qualification of not wanting to choose an all or a
14  nothing in talking about this is that there are
15  important tools that should be in place to try and
16  limit that.  But I think that at its heart segregation
17  is something that does create barriers to care.
18       Q.  Okay.  And -- so I understand your report,
19  when you're talking about tools, are your tools listed
20  on page 14, 15 and 16?  And there you talk about
21  preconfinement assessment -- assessment, medical
22  rounds, monitoring barriers to access to care.  Are
23  those what you're talking about when you say tools?
24       A.  I think those are -- that's one level of
25  tool.  That's the -- the work that we would hope to --

1    that we would expect to see in these units.  I think

2    there is another level of kind of overriding concern,

3    which has to do with quality assurance.  So how much

4    do any of these different tools get monitored in terms

5    of whether or not the policies are being followed and

6    whether or not what happens is adequate.  And it's two

7    different -- very different questions.

8              It's -- you know, segregation is a place

9    where people may have lots of contact or some contact

10   with health staff, but we have to know if it was

11   adequate or not.  And so that is at the core -- and

12   part of that is talking to patients.  So that's at the

13   core of this overlay of quality assurance that I talk

14   about.  It's not a separate section, but it overlays

15   these individual areas.

16        Q.  And when you say whether what happens is

17   adequate, can you give me some examples of -- of how

18   would -- one would make that determination.  You

19   mentioned talking to patients.  Can you describe for

20   me a little bit about what that would look like?

21        A.  Well -- so preconfinement assessments is a

22   good example where simply looking to see did a

23   preconfinement assessment occur is one part of quality

24   assurance.  But it -- because we know that it's a high

25   risk situation and it's also the patients going into a

1  high risk environment we want to know were the

2  assessments adequate.  So did they meet the clinical

3  criteria.  Did the staff do what they're supposed to

4  do and did they find the problems that they should.

5  Did they -- you know, subjective, objective,

6  assessment and plan.  Were each of those areas -- it's

7  a clinical assessment about how well the encounters

8  occur.

9          And so very standard in quality assurance in

10  correctional health is not just to look at the

11  process, like, did the thing happen, but to have a

12  clinical audit tool and framework for was it -- was

13  the thing that happened adequate.  So part of that

14  involves adequacy of individual encounters by clinical

15  leadership, part of it involves validation with

16  patients, talking to them, using that together with

17  data around just did the encounter happen at all.

18          And the same general approach can be

19  provided -- can and should be applied to other things

20  we measure in quality assurance.

21      Q.  Okay.  So if a state correctional system is

22  functioning well and officials are doing the

23  preconfinement assessment, they're doing medical

24  rounds, they're monitoring barriers to access to care,

25  they are doing the quality assurance that you just

1   described, in a system like that, Dr. Venters, do you

2   believe that the risks to an inmate in solitary

3   confinement can be mitigated?

4        A.   As I said, some of them can be mitigated and

5   some cannot.  So the inherent risk to a person's

6   health by being locked in a cell 22 hours a day

7   those -- those structures you just talked about won't

8   mitigate that risk.  They may help to find the person

9   earlier let's say in the case of a medical emergency,

10  but they won't actually mitigate the risk itself.

11       Some of the risks, such as not having your

12  medications, if -- if there is an effort to determine,

13  like, does the person who has an asthma pump have the

14  asthma pump when they go through their preconfinement

15  assessment or do they get their -- are they getting

16  their medicines, if those are effective, those

17  measures are effective, then that's an example of

18  risk -- a risk that could be mitigated.

19       So I think that some of these efforts --

20  first of all, all these efforts are necessary when

21  health staff are placed in the position of working

22  with patients who are in segregation because it's not

23  the, you know, health staff's decision about whether

24  or not this process gets used, so it's all necessary.

25  But it won't be sufficient to completely overcome the

1    inherent risk of these settings.

2         Q.   Okay.  Going back to page 10 and 11.  I think

3    I understand the tools that you've laid out and that

4    we've just discussed.  We've talked about paragraph 19

5    and we've talked about the beginning of paragraph 20

6    and you've told me which of those risks you believe

7    could be mitigated to a certain extent.

8              Now, later in paragraph 20 you also talk

9    about -- after the -- the footnote 9 you say:  Also,

10   people in isolation are more likely to engage in

11   physical self-harm from the assess -- I'm sorry, from

12   the stress associated with conditions in isolation.

13             So is that a risk of harm that you believe

14   can be mitigated?

15        A.   No.  That's a good example of being in

16   isolation -- and I think we talked about this loop a

17   little earlier -- can create a level of psychological

18   stress that results in self-harm.  It could result in

19   other things, but the part that I am most familiar

20   with and have conducted a lot of work on is self-harm.

21   And so you could load up -- if you had adequate daily

22   segregation rounds and nursing staff were going to

23   every door every day, you may detect new injuries, but

24   that doesn't go towards the kind of inherent risk

25   that's happening as people are in segregation feeling

1  that stress.  It's very difficult to mitigate because

2  the -- the stress, the cause of the problem is the

3  solitary itself.

4      Q.  Okay.  I just want to make sure we've --

5  we've covered -- did I miss any of the other risks of

6  harm if we're trying to put them into different

7  buckets?  We talked about the inactivity, we talked

8  about the inmates having new injuries, we talked about

9  the barriers to access to care, we talked about the

10  stress and -- and how it could cause self-harm.  Were

11  there any other risks of harms that I haven't covered

12  here that are outlined in your report?

13     A.  I think in my report I talk about a couple of

14  other features.  I don't know how one would categorize

15  these based on our discussion here.  But, you know,

16  there are -- so, for instance, when people report that

17  they're coerced to sign a refusal when they're in

18  segregation or that they don't get their chronic

19  medical care appointment -- scheduled care

20  appointments or there is some other barrier, like

21  having difficulty getting a sick call form, those are

22  barriers to care.  Many of those -- those specific

23  ones could be mitigated against with proper

24  administrative practices and -- and quality assurance

25  by the health team especially.

1          But in terms of inherent risks, I think we've

2    covered most of them.  I think there is one feature

3    that I'm not an expert in why or how this is used, but

4    this is the first system I've seen that uses this

5    practice of strip.  I don't know what the

6    administrative term is, but where people have their

7    clothes and mattresses and belongings taken away, and

8    that, to my mind, posses a unique health risk that's

9    separate and apart from just being in a cell 22 hours

10   a day.

11        Q.  Okay.  And -- and am I correct that the

12   practice of strip, is it your opinion that could be

13   mitigated?

14        A.  I don't know.  I think that for people that

15   are -- have health problems -- so, for instance,

16   people who have asthma who have to lay on a floor

17   that's, like -- that has -- is dirty and has lots of

18   cockroach eggs and other debris on it I'm not sure --

19   if they -- if as part of that they also have their

20   asthma inhaler taken away, I'm not sure -- I guess the

21   mitigation would be to not do it.  But it -- it's --

22   from what I have heard from patients and seen during

23   inspections it seems like a risky practice for a

24   variety of reasons, both for potential to cause

25   injuries but also worsening of preexisting health

1    problems.

2        Q.  Okay.  And -- and maybe that was a poor

3    question.

4            So if a state correctional system either

5    didn't have the practice of strip or somehow modified

6    it according to the individual inmate, those are two

7    examples of -- of how the system could mitigate risks

8    that would otherwise be caused by that practice, yes?

9        A.  Those would be two efforts.  I'm not sure how

10   effective.  I wouldn't opine on the effectiveness of

11   them without knowing what they are, but I -- I agree

12   those are two ways to do it.  You could not do it, or

13   you could try and do it and try and mitigate the

14   risks.

15       Q.  Okay.  But your opinion here, I just want to

16   make sure I understand, is that because of the

17   inherent risks caused by inactivity to inmates that

18   are in solitary confinement and the stressors to

19   individuals in solitary confinement your opinion is

20   that because of those there is nothing that a state

21   correctional system can do to mitigate those risks.

22       A.  I think that maybe, just to be precise about

23   it, those risks can't be eliminated.  I think that

24   there are -- I think that the responsibility is to try

25   and mitigate them.  And I'm using the term mitigate

1    meaning to try and reduce or address.  But it is -- it

2    is inherent and it is acknowledged by correctional

3    leaders, organizations all over this county, all over

4    the world that the practice of segregation or solitary

5    confinement posses a risk to health.  And that --

6    there are lots of ways to try and reduce those risks,

7    but they can't all be eliminated.

8         Q.  Understood.

9              And your position is that those risks that

10   you just described can happen even in the short-term

11   space?

12        A.  Certainly.  I think that our data from Rikers

13   showed that, for instance, self-harm was very high in

14   the initial days of segregation.  And so I haven't

15   reviewed data on self-harm here, but I think that

16   based on what I've learned in my career the

17   interaction between personal characteristics and the

18   systemic health risks of solitary can result in

19   worsening health quite quickly.

20        Q.  Do those risks get greater the longer one is

21   in solitary confinement in --

22             MS. SMITH:  Well, strike that.  I -- I -- I'm

23        not -- I don't want to ask you questions about

24        suicide risk because I don't believe that's your

25        role here.

1      Q.   Let me ask you a different question.

2           The -- in paragraph 18 when you say the --

3   the link between the use of solitary confinement in

4   prisons and jails and risks to physical health is well

5   established, my question for you is, can you cite me

6   to any study that has analyzed the permanent harms

7   that are caused by putting an inmate in solitary

8   confinement?  And I'm not speaking of mental health.

9   I'm -- I'm specifically asking you about permanent

10  effects on an inmate's physical health.

11     A.   Well, I think death is a pretty permanent

12  effect.  I haven't -- there is a very robust

13  literature on this.  Again, the reason that this is

14  not even questioned by correctional leaders, by the

15  NCCHC and the ACA is because these risks -- the risk

16  of this practice was established decades ago.  So I

17  haven't produced a literature review for this report.

18  I could, but this is not something that I really meet

19  correctional leaders who question these risks.

20          Death is the most permanent health outcome.

21  I am not -- I would need to review recent studies to

22  see what percentage of deaths during solitary are

23  attributable solely to physical health problems as

24  opposed to those that are from suicide or mental

25  health exacerbation.  But I would say death and injury

1    are two very permanent health risks.

2        Q.  Okay.  And I understand you -- you haven't

3    done a literature review, but I just want to know are

4    there -- putting death aside can you point me to any

5    studies, any papers, any research that has talked

6    about the lasting permanent effect on the physical

7    health of inmates who have been placed in solitary

8    confinement?

9        A.  I would need to conduct a literature review

10   because the way you've asked the question permanence

11   of injuries actually sidesteps how we would approach

12   this in public health, so -- having conducted much of

13   this work.

14           For instance, when we did this quality

15   assurance work in the New York City jails, we looked

16   at all self-harm and then we looked at a cohort of

17   people who had high fatality self-harm.  So people

18   that could have died or did die.  So we weren't

19   looking and most public health officials that I know

20   that look at solitary aren't looking to see which

21   fractures create disability afterwards.

22           That's certainly an interesting idea, but I'm

23   not sure -- the way you phrase the question I'm not

24   sure how the literature would reflect that, the

25   permanence, as opposed to let's say short-term

1   physical pain or -- or near death or -- or high

2   fatality.  So I would need to conduct a -- a more

3   recent -- an updated literature just with that

4   question in mind.

5        Q.  Okay.  And I understand you as a -- an

6   official in a prison system is doing that.  Just to be

7   clear, I wasn't talking about anything you were doing.

8   I was talking about either an academic, a doctor,

9   somebody coming in for the purpose of conducting that

10  sort of analysis.  Are you aware of any as you sit

11  here?

12       A.  I don't -- I don't know.  I would also need

13  to review the -- the NCCHC when they talk about the

14  harm to health and -- and the studies that they cite

15  or the Department of Justice.  I'm not sure -- I would

16  need to review the citations they relied on to see if

17  they specifically reference permanence of the -- the

18  health risk.  They usually mention death and -- and

19  other health outcomes, but I'm not actually sure about

20  which of these studies and would need to review

21  literature to see which of these studies address your

22  question of permanence.

23       Q.  So we talked a little bit about the NCCHC.

24  And I just want to be clear.  When you're mentioning

25  them in your answer, are you referring to the position

1   statement that you cited in your report, the 2016

2   position statement?

3        A.   Well, the -- I cite that report in one

4   specific part -- or that position statement in one

5   specific part of my report.  But the NCCHC has

6   multiple standards about the need for segregation

7   rounds, the need to have a higher level of

8   surveillance for people in segregation.  So the -- I

9   think throughout both jail and prison standards there

10  are multiple places where the existing standards

11  contemplate the risks of segregation or solitary

12  confinement as well as some of the efforts to try and

13  mitigate those risks.

14       Q.   Okay.  And the most recent standards for

15  NCCHC are the 2018 standard, correct?

16       A.   I think that those are the most recent prison

17  standards.  There are several sets of standards; and

18  some of them overlap with each other, but I -- my

19  recollection is that's the most recent set of

20  standards.

21            They also provide updated opinions on how to

22  interpret the standard.  So, for instance, on their

23  website most of us will consult people send in

24  questions about how to interpret a standard, and then

25  they'll give a Q and A where they say this is what we

1   mean.  And so there are lots of updated explanations

2   about, you know, what does it -- like what does it

3   mean to record sick call records or, you know, things

4   of that nature.  So there are several sources of

5   standards, but the most updated prison I believe are

6   from 2019.

7         Q.  And there is a separate -- separate set of

8   standards for jails, correct?

9         A.  Yes.  And then there is a separate mental

10  health standard that could apply more broadly and then

11  juvenile standards.

12        Q.  Okay.  So we'll talk more about those, but

13  let's get back, if we could, to your report.

14           I want to go back, if I could for a minute,

15  paragraph 10.  This is the paragraph when you talk

16  about when you were working in New York City jails and

17  you oversaw the beginning of significant reforms to

18  the use of solitary confinement in jails.  When was it

19  that those reforms began?

20        A.  I believe 2014 and '15.  Maybe 2013, '14,

21  '15.

22        Q.  Okay.  So -- and then you say after your

23  departure the administration continued these reforms

24  to ban isolation of certain people.  So that would

25  have been after 2016 or '17?

1          A.   Yes.   I -- I don't -- some of those may have

2    kind of been underway or being contemplated when I

3    left; but I think that I cite an article, and it was

4    related to some City decisions in 2020.

5          Q.   Okay.

6          A.   And I should say the City has since

7    completely eliminated or has declared their intention

8    to completely eliminate the use of solitary

9    confinement.

10         Q.   And you use the word in this sentence the

11   reforms to ban isolation of -- of certain people.  Do

12   you know whether there are any security exceptions to

13   that ban?

14         A.   Well, the -- there are security overrides.

15   So there are -- the system that was in place when I

16   was there and I think continues is that on an

17   individual basis security could request an override if

18   a person was persistently violent or aggressive, but

19   that they would need to go to the City Board of

20   Correction, which is the oversight body, and seek

21   approval, but that as a matter of course the first

22   major reform that we initiated was that people with

23   serious mental illness would be categorically

24   prohibited from going into segregation settings and we

25   had to build new, you know, therapeutic units.   But

1    that didn't preclude over the years the security

2    service from seeking an individual override for one

3    case or another.

4         Q.  And these specific medical conditions that

5    are listed here in paragraph 10, asthma, seizures,

6    diabetes, lung disease, liver disease, kidney disease

7    or being treated with blood thinners -- and I'll stop

8    there for a second.

9         So is it your position or your opinion that

10   here in Florida inmates with these medical conditions

11   should not be put into restrictive housing?

12        A.  Well, I think that -- I'm not sure that this

13   list is the right list.  I report this because this is

14   a list that was produced after I left.

15        I think that people who face significant

16   health risks that's over and above the baseline risk

17   in segregation should -- there should be alternative

18   dispositions for them.  And so certainly one of those

19   that's really apparent to me is seizure disorders.

20        So people -- that was not new.  That was

21   longstanding when I was in the city jails.  People

22   with active seizure disorders, people who had had

23   recent seizures shouldn't be locked in a cell by

24   themselves where they can have ongoing seizures and

25   nobody notice.  So that's a -- a good example.

1              Some of these other --

2        Q.   Can I ask you a question about that, Dr.

3   Venters.

4              So the -- the recent seizures disorders what

5   do you mean by that?  Or recent seizures.  I'm sorry.

6        A.   So generally if a person had had a seizure in

7   the last six months, that would be considered a recent

8   seizure.

9              A clinical team may decide -- the clinical

10  service should come up.  There is no NCCHC definition

11  for this.  There is not a -- but my experience is that

12  generally if you've had a seizure within the last

13  three to six months, those are considered recent

14  seizures.  Some neurologists use a full year to

15  constitute a recent seizure.

16             Some of these other conditions I'm not sure

17  if they were on the list or were a criteria for

18  exclusion when I was in the -- leading the health

19  service, and they're a little ill-defined.  So, as I

20  said, I'm not sure this is the right list, but I think

21  that they do represent that the health risk of

22  segregation are not spread out uniformly.  So people

23  who have more health problems, physical, mental health

24  problems, substance abuse problems they're more likely

25  to accrue these environmental risks.

1     Q.  So let's just -- and I get this is not the

2   perfect list, but let's just talk about these as

3   examples.

4         So is it your opinion that all inmates in

5   Florida who have been diagnosed as suffering from

6   asthma should not be placed in restrictive housing, or

7   do you believe that there are some people who have

8   milder forms of the disease and it's well treated

9   and -- and they might be able to be confined for a

10  certain period of time?

11    A.  Well, I -- a couple of things.  One is I

12  would agree that there are -- we classify asthma based

13  on level of control.  And so there is a much different

14  risk profile in general for morbidity or mortality if

15  you have severe persistent asthma that's poorly

16  controlled as opposed to having mild asthma that's

17  well controlled.  That's true no matter where you are.

18        I think that one of the important elements of

19  the NCCHC statement is that health providers shouldn't

20  be the ones deciding how people get punished.  Health

21  providers and me as a health professional we're not

22  punishment experts.  I think that segregation is

23  pretty ineffective, but it's not my job to opine on

24  how the security service punishes people.

25        I do think that it is important to represent

1    the true risk of the practices and to try and mitigate

2    them.  So I think that, for instance, people with

3    active seizures, people with insulin dependent

4    diabetic -- diabetes those are examples of health

5    problems that are very difficult to treat when people

6    are in segregation settings.

7        Q.  Okay.  I think I understood the answer.

8            So going back to asthma for a moment, is it

9    your position that it would depend on the level of

10   severity of the inmate's condition whether or not the

11   harm was too great to place them into restrictive

12   housing?

13       A.  So I believe that the health risk that

14   solitary or segregation possess to somebody with

15   asthma could vary depending on not just the severity

16   of their disease, but, as I mentioned, and I think I

17   may have mentioned in my report, patients with asthma

18   reported being put on strip and being forced to sleep

19   on extremely dirty filth-ridden floors.  So that's a

20   huge new risk to morbidity or mortality from asthma,

21   and it's not clear to me if that's something that can

22   or would be mitigated by the department, but it's an

23   example of how their health status, asthma, could

24   interact with the environment.

25           So I certainly think that people need to have

1    their asthma inhalers, they need to have access to

2    emergency care and chronic care for asthma.  And to

3    the extent that that's not made available or possible

4    in segregation then I think that there should be some

5    other approach used that doesn't create this health

6    risk.

7         Q.  Okay.  So the hypothetical of an inmate who

8    is placed into let's say administrative segregation

9    for one week and they have asthma but it's mild and

10   they are provided their inhaler and they're not put on

11   strip, is that appropriate?

12        A.  Again, I'm not opining on the appropriateness

13   of segregation as a security tool because it seems

14   largely ineffective.

15        Q.  No.  Let me rephrase it.

16        A.  I would say that the health risks --

17        Q.  Go ahead.

18        A.  I'm talking about the health risks.  And so

19   the health risks just of a -- having an asthma

20   exacerbation would be much less for somebody with mild

21   asthma who has access to inhalers and is not in a

22   dirty cell as -- as opposed to, say, somebody who has

23   more severe or poorly controlled asthma and doesn't

24   have access to their inhaler or is in a dirty cell.

25   Those would all be things that would increase the

1    risk.

2         Q.   Okay.  Thank you.  Yeah.  And -- and

3    appropriate was -- was a -- a bad term.  So thank you

4    for rephrasing it to risk.

5              So an inmate who has had a seizure ten years

6    ago but isn't currently on any medication and needs to

7    be placed into disciplinary confinement for 30 days

8    does that inmate have any significant health risks?

9    And I'm -- I'm speaking specifically as to, you know,

10   having had a seizure ten years ago.

11        A.   Well, if a patient has distant seizures,

12   doesn't report any recent seizures, doesn't have any

13   recent seizures, then that -- while there may be

14   health risks associated with placement in segregation

15   it may not be that that relates to seizure disorder if

16   it's also the case that they've been examined for new

17   head trauma.  That's a part of new seizures in

18   segregation that is really an important feature to

19   kind of keep an eye on.

20        Q.   Okay.  So that's kind of circling back to the

21   preconfinement assessment process to make sure that

22   that's completed.

23        A.   And is adequate.

24        Q.   Okay.  And are you familiar in Florida, Dr.

25   Venters, when an inmate is placed in administrative

1    confinement, that they do receive a physical

2    examination?

3         A.   I'm familiar with the -- the process, yes.

4         Q.   Okay.  And -- and I know we've talked about

5    the preassessment form, but you told me before that

6    you hadn't looked at the Florida Administrative Code.

7    So that was why I was asking that question.

8              Let me take it out.  Well, of course the one

9    that I have is not highlighted, so I will come back to

10   that.

11             But your testimony is you understand that

12   there is a physical evaluation conducted of an inmate

13   before they go into administrative confinement?

14        A.   I understand that that -- that there is a

15   policy that details that process.

16        Q.   Okay.  So going back to paragraph 10 in this

17   list here are there any conditions on here that you

18   don't believe would be medical conditions that would

19   put an inmate at such a heightened risk that they

20   could never go into any form of restrictive housing?

21        A.   Well, again, I -- I don't believe it's my job

22   to opine on how the department or any department

23   punishes people.  My role here is to understand the

24   health risks.  Sort of reflect what I think are the

25   health risks.

1              So I think that having a list of diseases is
2    not the only approach to this that's important.  It's
3    also important to think about the level of control.
4    So I -- we just discussed asthma, for example, where
5    having a mild case of a health problem -- and not just
6    a mild case but a case that's well controlled in my
7    estimation could involve less risk just from solitary
8    confinement or segregation than if somebody had a
9    disease that was moderately or poorly controlled.  And
10   so this -- this would apply to any list you come up
11   with where the potential for a person to get more sick
12   or to die isn't uniform just because they have the
13   same, you know, label or the same diagnosis.
14        Q.  Okay.  And would a health practitioner need
15   to look at the inmate's medical files and conduct, you
16   know, a -- some sort of an assessment with the inmate
17   to determine, you know, what the particular severity
18   is of that inmate's condition?
19        A.  I think in some cases, yes.  I think there
20   are -- we know enough to know that there are some
21   health problems that are often the source of
22   preventable deaths in these settings.  And so I think
23   that there -- it does make sense in some circumstances
24   to have categorical groups that should never be
25   exposed to this.

1           So it -- it also is important because it
2    doesn't -- putting health providers -- as the NCCHC
3    says quite clearly, putting health providers into the
4    job of deciding who gets punished and how they get
5    punished is a real ethical violation.  It -- it really
6    creates incredible pressure on the providers to do
7    what security wants them to do.  But people who
8    have -- for instance, who are on dialysis, people who
9    are in wheelchairs, people who have poorly controlled
10   diabetes, people who have active seizures, people who
11   have serious mental illness, these are groups of
12   people that I think we can all agree shouldn't be in
13   segregation because they have really much higher risk
14   than baseline for illness or death.
15        Q.   Any other groups that you can think of or
16   other medical conditions that you would put in that
17   category?
18        A.   There are -- certainly.  There are people
19   with dementia, people with advanced liver disease.
20   You know, people on blood thinners I think is an
21   important group to also consider because being in
22   segregation contributes to deconditioning,
23   deconditioning contributes to falls.  Being on a blood
24   thinner increases your risk of bleeding and bleeding
25   to death if you fall down.  So this is a great example

1    of how the environment creates health risks, but

2    they're not uniformly spread out.

3          So I haven't really considered a full list of

4    these things recently because my experience with

5    correctional settings is they're doing away with this

6    practice because it's so harmful to health and it's so

7    difficult to try and mitigate all these harms.

8          Q.  So you've mentioned with NCCHC, you know, how

9    physicians should not be involved in the -- the

10   punishment aspect.  But would you -- would you agree

11   with me that not all forms of restrictive housing are

12   punishment.  For example, you -- you mentioned the

13   administrative segregation in New York City, right?

14         A.  I'm not sure I would agree.  I don't -- I

15   think there is a big difference between the stated

16   purpose of segregation and then the actual effect.

17   The actual effect of being locked in a cell or of

18   let's say being on strip, whatever the stated purpose

19   is, it's -- it's -- it's harmful and it's punishing.

20   And so I would agree with you that there is lots of

21   different administrative rationales for using

22   segregation.  I think that it is a harmful practice

23   and people experience it as punishment.  Even if

24   somebody says we're not locking you in a cell 22 hours

25   a day because you did something bad, it's because we

1    think you're a bad person, that's still punishment for

2    that person or that group of people.

3         Q.   Okay.   So when you said punishments in your

4    testimony, you were more broadly referring to all

5    forms of restrictive housing?

6         A.   To this administrative segregation or -- or

7    punitive segregation.

8         Q.   Okay.   Now, I want to understand though what

9    you're saying about what you believe medical

10   providers' roles should be in making the determination

11   as to whether somebody is too sick to go into

12   restrictive housing.   You're not saying that they

13   shouldn't be involved in the process, right?

14        A.   I think that the health staff should always

15   be involved in finding people who need care and higher

16   levels of care or alternative -- more healthy

17   placements.   I think that what the NCCHC calls out in

18   their position statement and what other medical

19   organizations have called out for decades is that in

20   the heat of the moment when an individual nurse is

21   placed in the position of deciding who gets punished

22   with solitary and who goes back to a less punishing

23   environment, that that creates a very difficult, if

24   not impossible, pressure on that health professional.

25   That pressure is called dual loyalty.

1              And it's not the only example of dual

2      loyalty.  But we measure the problem and -- and map

3      out the problem and try to mitigate the problem in our

4      setting, but it is -- and it doesn't mean that health

5      staff shouldn't do important work to find injuries, to

6      find examples of care, but it's another example of how

7      the practice of segregation creates a pressure on the

8      health service that tends to warp the role of health

9      providers.

10         Q.   I see.  Okay.  So for medical providers

11     though -- well, let's talk about Florida for a minute.

12              Do you agree that in Florida the -- the

13     procedure provides that an inmate who exhibits an

14     acute health problem, whether it be medical, dental or

15     mental, will not be placed in special housing until

16     the inmate's health problems has been evaluated within

17     the respective disciplines, scope of practice by

18     healthcare staff.  And I read that from Procedure

19     403.003, which is on your appendix.  So I assume

20     you're familiar with it.

21         A.   That's my understanding of the policy.

22         Q.   Okay.  So as the policy is -- is written, do

23     you agree that that is a good approach to try to make

24     sure that the inmates who exhibit acute health

25     problems are not placed into special housing until the

1    inmate's health issue can be evaluated by healthcare

2    staff who has familiarity with that particular area?

3         A.   I agree that implementing and ensuring that

4    practice is a -- is an important mitigation step.

5    It's one of the tools, essentially, that I identify in

6    my report.

7         Q.   Okay.  So you agree that's a good procedure.

8    You -- you may disagree that it's being executed

9    properly, but you agree in theory that it's a good

10   procedure?

11        A.   Yes.

12        Q.   And I know you take the position that this is

13   a foregone conclusion, but explain to me why somebody

14   who is in a wheelchair cannot be placed into

15   restrictive housing.

16        A.   That their ability to move in and out of the

17   cell, to get to shower, to go to rec is often

18   compromised by the segregation unit they're in.  In

19   addition, there is almost no capacity for a person in

20   a wheelchair to engage in any activity in their cell,

21   and so they're left really inactive, immobile while

22   they're in their cell.

23        Q.   Okay.  What about an inmate in a wheelchair

24   that has a roommate.  Does that change the analysis at

25   all?

1        A.   Well, I think that that is also extremely

2   concerning because they're at high risk for being

3   victimized in that setting where they're locked in a

4   cell all day.  I just -- I haven't really encountered

5   this as a practice before, putting people in

6   wheelchairs in segregation, so I was shocked when I

7   came across it.  But I think that my general thought

8   is this is a very high risk group of people.  They

9   have special risks that accrue to them by being in

10   segregation cells and that having a roommate does not

11   mitigate those risks and may come with other risks.

12        Q.   Okay.  So your opinion is that there is no

13   accommodations that could be provided to an inmate who

14   is in a wheelchair that would make it medically

15   appropriate for he or she to be placed in a

16   confinement cell?

17        A.   I think if they were able to move and come

18   out of their cell more than 2 hours a day, if --

19   basically if they were in a setting that was not

20   solitary segregation, then I think that would be an

21   appropriate mitigation.  But I just don't think that

22   it's safe for a person who is in a wheelchair, based

23   on the segregation units I saw, to be locked in a

24   segregation cell for 22 hours a day.

25        Q.   Can you envision a scenario where an inmate

1    who is in a wheelchair is actually very violent and

2    perhaps has killed somebody.  Do you believe that

3    under those circumstances it may be -- and I

4    understand you're not opining about security; but if

5    security has determined that an inmate is too

6    dangerous to live among other inmates, do you believe

7    that medical professionals could put their heads

8    together to come up with some type of accommodations

9    to make it reasonably safe for an inmate in a

10   wheelchair to be placed into a confinement cell?

11        A.   My experience is those accommodations involve

12   a place that's physically separate but is not being

13   locked in a cell 22 hours a day.  So I've had to make

14   exactly those types of determinations myself with

15   patients that were persistently aggressive or violent

16   who had assaulted staff.  But keeping a person who is

17   persistently aggressive separate from others is not

18   the same as locking them in a small cell.  There are,

19   in almost every facility I've ever been in, ways to

20   keep people physically separate without locking them

21   in a small cell all day.

22        Q.   Okay.  So when you say keeping them

23   physically separate, what -- what are you describing

24   there?

25        A.   I think that having people in a housing area

1   where there is some physical separation between them

2   and others, which can happen with more than 2 hours

3   out-of-cell time a day is very possible.  I would need

4   to look at a facility or review a plan, but that's

5   something I've done many, many times and it's a --

6   it's a cardinal distinction between what is the

7   security risk, which is how to keep a person separate

8   from other people, and what ends up being the security

9   practice, which is just lock them in a small cell.

10  And that's where -- the lock-in in a small cell all

11  day is where the health risks come in.

12       Q.   Okay.  And what about on this -- I think you

13  said an inmate who is blind should never be placed

14  into solitary confinement.  Did I hear you correctly?

15       A.   I think that people with vision and hearing

16  disabilities I think that they have higher risk.  They

17  face increased risk, health risks from being in

18  segregation.  And so those risks can be due to

19  injuries, they can also be due to, like, just an

20  increased loss of -- of, like, interaction with

21  other -- anybody passing by, which are psychological

22  risks, which I won't go into.  But my experience is

23  disabilities -- physical disabilities do bring

24  increased risk for people in segregation.

25       Q.   Do you believe that there are accommodations

1   that could be provided to an inmate who is blind that

2   would mitigate against those risks?

3       A.  I'm not sure -- I have not seen them

4   effectively implemented.  So, for instance, people may

5   not know when sick call is occurring or they may not

6   know how to get forms, sick call forms, not know how

7   to get the attention of correctional officers or hear

8   announcements.  Those are things that are pretty

9   universal and unique risks, people with hearing and

10  vision impairment in segregation.  I just have not

11  seen systems that effectively mitigate against those.

12  It doesn't -- if I were presented with a practice that

13  did so, I would be happy to review it.  I just haven't

14  come across that in my career.

15      Q.  Okay.  For the inmate who is blind just a

16  question.  You said they may not know that rounds are

17  coming through.  Is it your understanding that

18  Procedure 403.003 requires the arrival of healthcare

19  staff to announce -- to be announced by a correctional

20  officer to all inmates by voicing healthcare staff is

21  now conducting rounds.  Is there any reason why a

22  blind inmate wouldn't be able to hear that just as

23  easily as a sighted inmate?

24      A.  Well, I think that's a great example of the

25  difference between policy and practice.

1          So my experience in working units as well as

2   talking to people, hundreds of people in segregation

3   housing, is that that actual announcement rarely

4   happens in a way that people can hear it.  And that

5   sometimes they might hear it, but often they don't.

6   And so because health staff are in a hurry, they're

7   trying to get on and off the unit, they often don't

8   announce it or the correctional staff don't announce

9   it in a way people can hear it.

10          Now, they may see it and people may yell to

11   each other to try and alert each other.  But that is a

12   really quintessential example of the difference

13   between what is on paper and what happens for people

14   on these units.

15      Q.  Okay.  So same question as before.  The

16   policy as written you think is a good one, that aspect

17   of it?

18      A.  If there was a -- if that policy was

19   written -- I haven't reviewed it with a specific

20   lens -- to ensure that everybody who is on the unit

21   was made aware of something happening, then I -- I

22   think that that would be important.  People who have

23   vision impairment were somehow made aware, people who

24   have hearing impairment, people who don't speak

25   English were all -- if there was a way to universally

1   apprise people of the fact that something important is

2   happening for health or for other health-related

3   reasons, then, yes, I think that would be an important

4   policy.

5        Q.  Do you have any facts, you know, actual

6   evidence to support your statement that the

7   announcement in these dorms by correctional staff that

8   healthcare staff is now conducting rounds, that that

9   is not occurring?

10       A.  I would need to review my notes.  I would say

11  that I find this to be almost universal.  I certainly

12  don't -- I -- I would need to review my notes.  I

13  just -- this is such a common comment.  If -- anybody

14  who has ever worked in segregation settings and talked

15  to patients and done these rounds themselves knows

16  that there is often a perfunctory announcement.

17            And also there -- you know, my experience in

18  these settings, actually having observed some of this

19  happen, it isn't very loud.  And so I do personally

20  recall that it would be -- it's very hard to hear

21  these announcements when in a seg unit -- segregation

22  unit where people are yelling, security staff are

23  yelling out orders.  It's very hard to hear what is

24  happening when there is one announcement.  So I

25  haven't done a separate analysis of this, but my -- I

1    would say my opinion is that this would be a -- a --

2    given the noise level I encountered in these

3    segregation units, many of them, it would be hard to

4    hear.

5        Q.  Okay.  So I -- I think my question though

6    wasn't answered.

7            So as you sit here, you can't think of any

8    inmate that told you they were unable to hear when the

9    announcement was made?

10       A.  I don't recall any specific names.  I would

11   need to review my notes to recall if that specific

12   problem was reported.

13       Q.  And if -- if an inmate communicated that to

14   you, you would have written it in your notes?

15       A.  I'm not sure because I think that the

16   general -- the most prevalent problems with accessing

17   health care I did report.  So, for instance, problems

18   around accessing sick call forms or getting these

19   forced or coerced refusals.  And so I don't recall

20   that I -- I didn't put it in, so it probably means --

21   so that means that it wasn't something that was one of

22   the most consistently reported themes.  But it

23   doesn't -- that's different than me saying nobody ever

24   stated that to me.  I would need to review my records

25   to answer that question.

1    Q.   Okay.   But your notes should reflect it one

2    way or the other.

3         MS. SMITH:   Well, let me -- strike that.   Let

4    me ask it a different way.

5    Q.   Aside from your notes is there any other way

6    for you to determine whether an inmate reported that

7    to you?

8    A.   I don't think so.   I don't think we recorded

9    any interviews with people.   So I think if people had

10   reported it to me, it would be in my notes.

11   Q.   And when you were doing the cell side

12   interviews at the facilities, did you take notes?

13   A.   Yes.

14   Q.   Okay.   And when you were conducting the

15   confidential interviews, you took notes, correct?

16   A.   Yes.

17   Q.   And if an inmate told you at cell side that

18   they were having no problems, would you write that

19   down?

20   A.   I think -- it depends what part of the health

21   service, but I may have written down something to that

22   effect.

23   Q.   Okay.   When you were doing the inspection at

24   FSP, do you remember that you saw some cells that were

25   open bar stock?

1      A.   I believe so.

2      Q.   Okay.   And returning to your report, if we

3   could, paragraph 14, you talked about observing

4   roaches in every facility that you toured, correct?

5      A.   Yes.

6      Q.   Okay.   So describe that for me.   Like, was it

7   many roaches?   Did you see more than one roach at each

8   facility?   How many did you see?

9      A.   I don't recall.   I think that I saw -- I

10   don't -- I don't recall.   I just recall that it was

11   something that I noticed in all the facilities I went

12   to.   But I don't -- I don't think I made a record of

13   how many or what specific location and if it was in a

14   cell or outside a cell.

15      Q.   Okay.   It wasn't like the facilities were

16   swarming with roaches, right?

17      A.   I don't think I saw anyplace where, you know,

18   scores of roaches were in one place.

19      Q.   And when you were in New York jails, did you

20   ever have roaches in your facilities?

21      A.   Some of them, yes.

22      Q.   And did one or two roaches necessarily mean

23   that there was a problem?

24      A.   I mean, I think that it was something that

25   the security staff would -- or the environmental staff

1   would work to address.  I don't know that one or two

2   roaches would constitute a -- a major problem.

3          Q.  In this case did you request Florida's

4   policies on pest control for its prisons?

5          A.  No.

6          Q.  Did you review any documents regarding pest

7   control efforts that the facilities undertake?

8          A.  No.  I think that the only -- I don't know if

9   this is relevant or responsive, but some of the

10  patients told me about rat bites; but I don't think

11  that I looked at any environmental records.  I didn't

12  request any environmental records.

13         Q.  Okay.  So do you know whether the facilities

14  have contracts for regular pest control to be

15  performed?

16         A.  No.  I would assume they would.

17         Q.  Okay.  Do you agree with me that pest control

18  is a component that's monitored by the ACA?

19         A.  I -- I wouldn't dispute that.  I -- I'm

20  not -- I'm not an expert in pest control.

21         Q.  Okay.  So it's fair to say you don't know

22  whether Florida prisons conduct any internal or

23  external audits of pest control issues, correct?

24         A.  That's fair.

25         Q.  Okay.  In paragraph 14 you also say that you

1    saw stacks of food trays or garbage stacked on the

2    floor in many of the housing units --

3         A.   Yes.

4         Q.   -- during your inspections.

5              So during your tours of the dorms did any of

6    them coincide with meal service?

7         A.   I'm sure some did.

8         Q.   And you can't say how long the food trays or

9    the garbage had been on the floor, can you?

10        A.   That's correct.

11        Q.   And you can't say whether they were picked up

12   after you left the unit, right?

13        A.   That's correct.

14        Q.   During your cell-front interviews or your

15   confidential interviews at the inspections did you ask

16   the inmates about any issues they may have experienced

17   regarding their medical care while they were in

18   general population?

19        A.   I -- yes, that would have been part of

20   understanding what changed about their health care

21   when they went into segregation.  So I don't think

22   that I -- the way that those conversations worked was

23   to ask people about their health issues and then ask

24   them about how health care changed when they went --

25   or healthcare access changed when they went into

1  segregation.  So part of that would be understanding

2  what their treatment was outside seg and then once

3  they got there.

4      Q.  When you spoke to inmates at the facilities,

5  did you ask them whether any of their medical

6  conditions had improved or resolved during the time

7  that they were in restrictive housing?

8      A.  I think I generally asked about whether or

9  not their -- how their access had changed or their

10 care had changed and so -- I don't recall if I

11 specifically said what has gotten better.  I would ask

12 what has changed, what is different about health care

13 when you go into segregation settings.

14     Q.  Did any of the inmates that you spoke to

15 communicate to you that they had had medical problems

16 that had improved or resolved during the time they

17 were in restrictive housing?

18     A.  I'm not sure anybody ever reported a problem

19 that got better.  I think that there were plenty of

20 problems that may have -- I'm not sure if resolved is

21 the right way, but --

22          So, for instance, people who were injured as

23 they -- shortly before then they came into

24 segregation, those injuries may have past the point of

25 potential treatment or they may have resolved and

1    that, you know, the injury was no longer an active

2    acute injury.  So those are examples of things that

3    would have resolved.  I don't know that anybody

4    reported -- I don't think anybody reported any health

5    problem before they went into seg and then that

6    problem was gone once they were in seg.

7        Q.  For injuries that had been treated in

8    restricted housing would you have noted that?

9        A.  Well, I think that I do discuss in -- I think

10   that -- and many of these injuries I believe healed on

11   their own or may have received some care, but I do

12   talk about --

13           COURT REPORTER:  I'm sorry.  I didn't hear

14       the end of his answer.  There is a storm here, and

15       I think that may be interfering with my internet.

16       A.  I think my last answer was many of those

17   injuries would have received some care and also many

18   of those injuries would have healed, whether it was on

19   their own or in response to the care that they

20   received.

21       Q.  (By Ms. Smith) And paragraph 19, which we've

22   talked about a little bit already, you talk about

23   physical activity.  Did you review any security

24   policies regarding recreation?

25       A.  No.  I think that the security staff

1    generally would tell us about recreation while we were

2    conducting inspections, and they would show us the

3    recreation areas.  But I don't -- I didn't conduct a

4    review of the policies.

5         Q.  Did you review any -- sorry.  Go ahead.

6              THE WITNESS:  Oh, I was going to ask for,

7         like, a 5-minute break, but I can wait a couple of

8         minutes if it's helpful.

9              MS. SMITH:  Let's see.  Yeah.  No, this is --

10        this is fine.  This is going to take me a few

11        minutes to get through.  So let's take a 5-minute

12        break.  It's 2:04.  We'll be back at 2:10.

13             THE WITNESS:  Thank you.

14             MS. SMITH:  Thanks.

15             (A recess was taken from 2:04 to 2:10.)

16        Q.  (By Ms. Smith) All right.  So we were talking

17    about paragraph 19 of your report.  You told me you

18    had not reviewed any policies regarding recreation.

19    Did you review any post orders regarding recreation?

20        A.  Not to my recollection.

21        Q.  Did you review any materials that -- that are

22    given to inmates regarding exercise that they can do

23    in their cells?

24        A.  No, I don't believe so.

25        Q.  Okay.  Are you aware of fact that the Florida

1    Department of Correction currently provides wellness

2    info to inmates regarding exercise that they can do in

3    their cell?

4        A.   I think I'm generally aware of that from what

5    correctional staff reported.

6        Q.   Now, when you say correctional staff, you did

7    not have the opportunity to speak directly to

8    correctional staff at the facilities, correct?

9        A.   Yes.   I don't know who -- when we would go

10   out to the rec areas, people would -- some people who

11   were not me or were not the lawyers would identify the

12   recreation areas, and in that process would sometimes

13   my recollection -- my recollection is report some

14   practices around recreation.   And so I think in that

15   general context I recall hearing that there was a -- a

16   cell exercise program of some sort.

17       Q.   Okay.   Would you agree with me that an inmate

18   can do exercises in his or her cell, like pushups,

19   crunches, jumping jacks, air squats, that kind of

20   thing?

21       A.   I think that some people, certainly young,

22   healthy people can do those exercises.   Many of those

23   exercises are not -- most older people, people with

24   health problems have a hard time actually doing them.

25   But I wouldn't dispute that some people are able to do

1   some of those calisthenics or exercises.

2        Q.  Okay.  And you told me you did not read any

3   of the plaintiffs' depositions, correct?  So you don't

4   know whether they testified that they did exercises in

5   their cells during times that they were in

6   confinement?

7        A.  If it -- correct.  If it's in the

8   depositions, then I wouldn't have seen those.

9        Q.  So do you have any evidence to support the

10  proposition that an inmate in confinement developed a

11  blood clot as a result of being in a confinement cell?

12       A.  I think that this is -- inactivity is a risk

13  for deep vein thrombosis or blood clots that is well

14  accepted.  I'm not aware of whether or not this has

15  even ever been tracked by the Department of

16  Corrections, but it's -- it's not in dispute that when

17  people can't -- when they have periods of inactivity,

18  that that's associated with an increased risk for deep

19  vein thrombosis.

20       Q.  Okay.  And I'm not talking about the risk of

21  a deep vein thrombosis.  My question was do you have

22  any evidence as you sit here today whether through a

23  review of inmate records or speaking with any inmate

24  that an inmate in the custody of the Florida

25  Department of Corrections developed a deep vein

1   thrombosis as a result of being in a confinement cell?

2        A.   Not that I'm aware of at this time.

3        Q.   Would you agree with me that if an inmate

4   does exercises in his cell, that that would reduce the

5   risk of developing a deep vein thrombosis?

6        A.   If a person is capable of exercising and

7   can -- and then does that, that would likely reduce

8   the risk -- or activity, including exercise, would

9   reduce the risk of deep vein thrombosis.

10        Q.   So would an individual in the community that

11   is highly inactive, doesn't exercise, would they be at

12   risk of developing a deep vein thrombosis?

13        A.   Yes.   Long periods of inactivity are --

14   create a risk, an increased risk for deep vein

15   thrombosis.

16        Q.   Okay.   If Plaintiff Harvard testified that

17   she did squats, lunges, situps about four, five times

18   a week in her cell, would you agree with me that that

19   would mitigate the increased risk that an inmate would

20   face of developing a chronic illness due to

21   inactivity?

22        A.   That sounds like that practice of -- of

23   exercises could mitigate some of these potential

24   health risks.

25        Q.   Okay.   So you're not taking the position --

1   or you don't have the opinion that an inmate is unable

2   to exercise in his or her cell, correct?

3        A.   I think that many people are unable to

4   exercise in their cells because they may have physical

5   mobility issues or have chronic illness at baseline

6   that simply makes it not practical or possible for

7   them to do this kind of in-cell calisthenics, but I

8   would also allow that some people can do those.

9        Q.   Okay.  So chronic illness.  You would

10  categorize diabetes as a chronic illness?

11       A.   Yes.  Although I -- I wouldn't -- I agree

12  that diabetes is a chronic illness.  I would not say

13  that people with diabetes can't exercise.  They --

14  many of them do.  But there are many people who once

15  placed in the -- the segregation cell won't be able to

16  or it won't be practical for them to be able to do

17  these exercises.  And so my response is simply this --

18  against this notion that in-cell exercise is somehow a

19  remedy for the lack of mobility for being locked in a

20  cell.  It's simply -- it could be applicable to some

21  people, but certainly not all people.  And the sicker

22  the people are at the beginning, in other words, the

23  higher their risk of actually getting a DVT before

24  they get into seg, the less likely it is they're going

25  to be able to do these -- follow a pamphlet of how to

1   do in-cell pushups or situps.

2       Q.  So an individual out in the community that

3   suffers from some type of -- well, let's -- give me an

4   example of a chronic illness that might stop an inmate

5   from doing regular exercise inside his cell.

6       A.  Well, I think people that have advanced lung

7   disease, heart disease, kidney disease, people for

8   whom exertion is very difficult, also people who have

9   physical immobility or disability issues.  Those are

10  groups of people for whom it's not practical to

11  imagine that they're going to be doing in-cell pushups

12  or dips or whatever the exercises are.  But as I said,

13  I wouldn't preclude that many people, including

14  healthy people can do that.

15      Q.  An individual who has advanced lung disease

16  would have trouble exercising out in the community as

17  well, right?

18      A.  They may.  I think that the difference is

19  that one of the most effective exercises is walking

20  and using weightbearing exercise, and that's very

21  difficult to do in a cell.

22      Q.  Why can't you use your body as weight and do

23  simple squats in your cell?

24      A.  I'm not a physiologist, but my experience

25  with patients is some people could do that and some

1   people would have a hard time getting back up.  So I'm

2   not quibbling with the idea or arguing with the idea

3   that some people can do some amount of exercise.  My

4   point is that -- and this is from a career working in

5   correctional health, is that some of the sickest that

6   are at highest risk for bad outcomes, the health risk

7   of segregation, are the people that are least likely

8   to be helped with this idea of in-cell exercise.

9        Q.  Okay.  So that the -- the inmates that you've

10  described that would be not able to exercise would

11  they face similar challenges in general population as

12  well?

13       A.  Well, I think that that depends.  So, for

14  instance, people with heart disease and lung disease

15  that don't have a lot of stamina many of those people

16  figure out how to do some amount of walking or some

17  amount of less stressful or straining exercise.  Those

18  are the types of things that are very hard to do in a

19  cell and those are the patients for whom I fear when

20  they are locked in a cell 22 hours a day, they just

21  sit in that cell 22 hours a day.

22       Q.  Okay.  And for the inmates that are being

23  taken out to rec pursuant to -- well, let's start with

24  the CM policy, three times a week for several hours at

25  a time would that mitigate against the effects that

1   you're talking about?

2       A.  Well, I think that there are a couple

3   problems.  First of all, many of the patients, and

4   even some of the security staff reported that these

5   rec times just don't happen.  So I think it's not -- I

6   wouldn't agree with the idea that this is a regular

7   and reliable practice, recreation.  But separate and

8   apart from that simply taking a person, a human from

9   one small cage or cell and putting them in another

10  cage or cell doesn't, in my mind, reflect actual

11  activity or recreation.

12          And so, you know, many of the -- again, I'll

13  return to this refrain.  For some of the sickest

14  people being taken to what looks like a dog kennel and

15  then being given access to a pullup bar or a dip bar

16  isn't really meaningful activity.  These are, you

17  know, people that -- in many prison systems people

18  would be outside, they would be having some sort of

19  outside sports, they may be having yoga, they may be

20  gardening, things like that.  So I don't find that

21  the -- that just moving them, shuttling them from

22  their seg cell to one of these kind of dog kennel

23  cages is a meaningful activity.  Maybe the walk there

24  and the walk back is some activity, but I don't -- I

25  don't view that as, like, a meaningful effort to get

1    them to be active.

2          Q.   Would you agree with me that the rec cages

3    that you saw in your inspections that an inmate could

4    walk around the perimeter of it and get a good amount

5    of walking if he or she wanted to do so over the

6    course of the recreation period?

7          A.   Yes, I would.  We actually never or almost

8    never saw anybody in those cages, but I would presume

9    that somebody could walk around the periphery of one

10   of those cages.

11         Q.   Now, you mentioned in your testimony a moment

12   ago that security staff mentioned to you that they

13   were not getting inmates out for rec.  Did I hear that

14   correctly?

15         A.   I can't recall what facility, but I think

16   both patients -- that people I spoke to who are

17   detained and also the people who worked in these

18   facilities referenced that, for instance, if there was

19   bad weather or if there was some -- there could --

20   there were different impediments to getting people out

21   to the rec cages, and so it seemed like a petty

22   consistent report.

23         Q.   Okay.  Did you conduct any type of analysis

24   of inmates in Florida's restrictive housing units to

25   determine how many of them actually suffer from some

1    of the diseases that you say are caused by a lack of

2    activity?

3         A.   No.  And I would say that I'm not simply

4    making the point that segregation or inactivity causes

5    disease.  I -- in some cases some -- we've talked

6    about how that can happen.  But what I'm saying is --

7    my point is more broad, is that people who have health

8    problems many of those health problems get worse when

9    they're in segregation.  So I'm not making the case

10   that these are all new health problems that are all

11   attributable to segregation.

12        Q.   Would you agree with me that people have

13   health problems in general population that may get

14   worse as well?

15        A.   Yes.

16        Q.   And would you agree with me that there is

17   people out in the community that might have health

18   problems that get worse?

19        A.   Yes.

20        Q.   In paragraph 20 of your report, if we could

21   go back to that, you are talking about new injuries

22   that -- new injuries or urgent needs for care at the

23   time of placement into isolation.  So I have some

24   questions for you.

25             I think you also say here that inmates likely

1   have injuries from uses of force when they're placed

2   into restrictive housing; is that correct?

3        A.  Or I say they're likely, and I mean likely as

4   compared to in the general population setting more

5   likely to have an injury either from a use of force or

6   an altercation with another detained person.  But some

7   new injury.  Some -- my experience is something

8   happened that initiated the transfer of a person into

9   segregation that often involves some sort of force or

10  violence, and that is one of the reasons that new

11  injuries are relatively common in people as they go

12  into these settings.

13       Q.  Have you reviewed Florida's use of force

14  policies?

15       A.  No.

16       Q.  Have you reviewed any documentation that

17  Florida uses for its use of force incidents?

18       A.  No.

19       Q.  So do you know that medical staff is required

20  to conduct a physical evaluation of the inmate who has

21  been involved in a use of force?

22       A.  Yes, I believe I'm aware of that.

23       Q.  Okay.  Have you seen the documents that

24  medical staff are required to complete when a use of

25  force takes place?

1      A.   I believe so.

2      Q.   Okay.  So you know that it has a -- a diagram

3  that must be completed as to any sort of injuries,

4  lacerations, bruisings.  A diagram of the human body.

5  Have you seen that form?

6      A.   Yes.

7      Q.   Okay.  So then -- you believe that's a good

8  policy, correct?

9      A.   I believe that everybody who sustains -- who

10  has a use of force should have an immediate assessment

11  for potential injury or other health-related problem.

12      Q.   Okay.  And do you know if Florida is doing

13  that?

14      A.   I -- as I write in my report, my concern is

15  that because some of these encounters are occurring at

16  the same time as people enter into segregation or very

17  proximate in time my concern is that there are

18  incomplete encounters and that the adequacy of these

19  encounters, how well they are being conducted are

20  subject of -- of meaningful appearance by the -- the

21  leaders at the correctional health service.

22      Q.   Okay.  And that was a poor question.

23           So when I asked if you Florida is doing this,

24  I was referring to use of force incidents, whether

25  Florida is documenting -- documenting inmates'

1   injuries after use of force incidents.  Have you

2   reviewed any documents to make that determination?

3       A.   Only to the extent that I have reviewed the

4   cases and the frame of people going into segregation.

5   So I have not -- I presume that even with segregation

6   many of the uses of force and medical evaluations for

7   use of force occur outside segregation settings, and

8   so I wouldn't have reviewed those.  So I haven't

9   conducted an independent assessment of all -- the way

10  we did in New York City of all of the -- the use of

11  force incidents and the adequacy of all the injury

12  assessments.

13      Q.   Well, you didn't do any review of the use of

14  force documents and the adequacy of how they're filled

15  out, did you?

16      A.   Well, to the extent that people had -- some

17  people who go into seg it's clear from their medical

18  records they're being evaluated.  If you look at their

19  medical records, they may have a preconfinement form

20  and an injury assessment form that are essentially

21  filled out almost contemporaneously.  And so some of

22  those records I would have reviewed.  But I did not do

23  a broad review of -- so I'm aware of the process, I'm

24  aware that it happens.  I'm not aware of -- and I'm

25  concerned about the adequacy or the following of

1   the -- the practices as opposed to the -- the policy

2   as stated.

3        Q.   Okay.  So the policy as stated you agree is

4   fine.  It's the implementation of it.

5        A.   That's -- that's my area of concern.

6             But, again, with a specific focus on this

7   subset of people who are going into segregation I

8   haven't reviewed -- I don't believe I reviewed

9   injury -- any injury encounters from people outside of

10  segregation settings, I don't think, or for people who

11  never went into segregation.

12       Q.   Yeah.  And -- and to be clear, that wasn't my

13  question.

14            My question was directed at inmates who are

15  placed into segregation.  You didn't do any type of

16  analysis of the subset of inmates who were involved in

17  a use of force, correct?

18       A.   Well, I think that it's actually -- I talk in

19  the report quite a bit about people who had injuries

20  at the time of entry.  It's a little unclear to me as

21  to what the cause of those injuries were, and I'm not

22  sure I was in a position or -- or making an assessment

23  about -- other than to say -- I do say that patients

24  report -- lots of people report being injured during

25  uses of force, but I didn't do a separate analysis of

1  use of force for this -- this assessment, this -- this

2  report.

3      Q.   Okay.  So as I understood your report, one of

4  the problems you had with the preassessment form was

5  that nurses were filling them out; is that correct?

6      A.   No, it's not that -- I think that it's

7  appropriate for a nurse to conduct a -- this injury

8  assessment and the preconfinement assessment.  Those

9  are all fine.  But when there is a question about, for

10  instance, pain in a joint or a blow to the head, those

11  are things that then require a physician or a midlevel

12  provider to assess right away.  So I didn't have a

13  categorical objection to, and I've, you know, relied

14  on nursing staff to be the initial point of contact

15  when providing this first assessment.

16      Q.   Okay.  So you agree with Florida's policy

17  then that nurses can be the -- the individuals who are

18  doing the initial triage of the inmate who is coming

19  into confinement?

20      A.   Yes.  As long as there is both oversight,

21  which I have not seen, and as long as there is a

22  prompt escalation or elevation of the level of

23  assessment when it's needed.  And those are the areas

24  of concern that I talk about in the report.

25      Q.   Okay.  So Florida's use of force

1    requirement -- or policy requires that any noticeable

2    physical injury shall be examined by a physician and

3    the physician shall re -- prepare a report documenting

4    the extent of the injury and the treatment prescribed.

5         So do you agree with me that -- that that is

6    a policy that at least you're outlining in your report

7    should take place here in Florida?

8         A.   I believe that if it occurs, that's a --

9    that's a good approach to have when there is a -- a

10   question of whether or not an injury is there or an

11   injury has been identified to have a physician opine

12   on the assessment and the plan for the treatment of

13   that injury or the need for more diagnostics.

14        Q.   Okay.  So you like that policy.  You're just

15   not sure if it's being implemented, right?

16        A.   I think that's an appropriate policy, and I

17   have concerns about whether or not it's implemented.

18   Yes, I agree.

19        Q.   Okay.  And are you familiar with any FDC

20   policies regarding the requirement that an inmate who

21   has been involved in a use of force needs to be

22   videotaped?

23        A.   I don't -- I'm not sure I'm -- I've reviewed

24   the videotape policies or not.

25        Q.   Okay.  So would you agree that it's a good

1  policy to videotape an inmate after he's been involved
2  in a use of force?
3      A.  Well, what would be a better idea is to
4  videotape before the use of force.  These are planned
5  use of forces.  And so I don't know if that's a policy
6  also.  I think it's important to document injuries
7  that -- and when these are injuries that are a result
8  of or there is a question about the use of force, then
9  I agree it's important to document those injuries.
10         My experience actually is that video is not
11 very good from a forensic standpoint.  That still
12 photos that are competently taken of injuries is --
13 are better because they can be put into medical
14 records, they can be reviewed a little bit more easily
15 than going through videos.  But putting that aside I
16 agree that it is important to document injuries from
17 use of force and that there is an interest both in the
18 health service and the security service in accurate
19 documentation.
20     Q.  Okay.  And I just want to make sure the
21 comment that you said about videotaping the inmate
22 before you were referring to an organized use of
23 force, correct?
24     A.  A planned use of force or an anticipated use
25 of force.

1      Q.   Okay.  But with a -- reactionary type use of

2  force you would agree with me that that's not always

3  possible.

4      A.   Well, if the department decides not to

5  implement body cameras, then it will never be

6  possible.  That's true.

7      Q.   Okay.  Do you have body cameras in New York

8  jails?

9      A.   I believe they are in the process of -- a

10 procurement process.  I think most of the DOCs I'm

11 familiar with are in the process of considering this

12 because of this exact issue, that it's hard to plan --

13 like cell extractions certainly you can do quality

14 assurance afterwards to see was a video used, was it

15 really a -- was it knowable that it was going to

16 happen.  But just like in community law enforcement --

17 and I say this as -- not as an expert, but my

18 experience is most correctional settings are looking

19 at this as a way to address the difference in level of

20 documentation of planned and unplanned uses of force.

21     Q.   Okay.  But New York City jails doesn't have

22 body cams today, right?

23     A.   I -- they may in some settings.  I don't

24 actually recall.  I saw that they were going to -- I

25 think they're going to get them, and I think they may

1    have them in some facilities and not others.  I'm just

2    not sure.

3        Q.  And do you know how many State Department of

4    Corrections actually use body cams today?

5        A.  No.

6        Q.  Do you know of any that do?

7        A.  I -- I don't know.  I believe some do, but I

8    would need to -- I only mentioned that as -- I'm not a

9    security expert, but I do think that you raised a very

10   important point, which is the need to document

11   injuries from use of force is more difficult in

12   unplanned uses of force than it is in planned uses of

13   force.

14       Q.  Do you know in Florida if facilities are

15   required to provide information on use of force

16   incidents to the Office of Inspector General?

17       A.  I would expect there are reporting

18   requirements.  I'm not sure I've reviewed what those

19   are.

20       Q.  Okay.  Would you agree that that would be a

21   good practice, to have the OIG to have some oversight

22   over uses of forces that occurs -- that occur in

23   facilities?

24       A.  Yes.

25       Q.  And would you agree that any time a physician

1   suspects abuse of an inmate that they should report it

2   to either the warden or to the OIG's office?

3       A.   Yes.   They should have an independent -- all

4   physicians health staff should be trained and have an

5   easy mechanism to report abuse and neglect of patients

6   that's outside the chain of command of where they

7   work.

8       Q.   Paragraph 20 of your report you mention that

9   20 percent of inmates in FSP restrictive housing were

10  enrolled in a chronic care clinic.   My question is,

11  did you look at any other facilities to ascertain the

12  percentage of chronic care patients in restrictive

13  housing?

14      A.   No, I'm not sure I had data from other

15  settings, otherwise I think I would have included it.

16      Q.   Well, isn't it true, Dr. Venters, that you

17  were provided with rosters in advance of each of the

18  inspections that you attended and it included chronic

19  care information?

20      A.   It may be.   I don't -- I don't actually

21  recall.   I would -- I would assume that the percentage

22  would be the same or higher.   I'm actually a little

23  bit surprised at how low it is since we know that the

24  rates of chronic health problems are generally much

25  higher.

1          Q.   What do you mean we know that?

2          A.   In correctional health I think we have lots

3     of documentation that when we look inside segregation

4     settings, we find high rates of people with serious

5     mental illness.  And serious mental illness is not

6     just its own problem, but it's also a proxy for high

7     rates of serious physical health problem.

8               So that we know, for instance, in the

9     community the reason that people with serious mental

10    illness live shorter lives is largely due to having

11    chronic health problems, physical health problems that

12    are untreated.  And so when we've looked in

13    segregation settings in correctional settings, we also

14    see a similar -- similar phenomenon.

15              But I didn't mean to exclude any of these

16    rates for any reason from the other facilities.  I

17    would presume they're, you know, not far from each

18    other.  I would -- or that -- I would say an easy way

19    to say it is I would presume that a significant

20    portion of people in all of these segregation settings

21    have a chronic health problem.

22         Q.   Okay.  And -- and, again, that's just an

23    assumption on your part.  You haven't done any

24    analysis of the percentage of inmates in restrictive

25    housing in Florida and, you know, how many have

1    chronic illnesses, correct?

2         A.  I recall from the -- those handouts you

3    mentioned that there was a -- a significant

4    representation of people with chronic health problems

5    in all the facilities we went to.  I'm not too

6    concerned if it's 18 percent or 30 percent or

7    20 percent.  I wasn't trying to make the point that

8    that percentage is important.  My point in this part

9    of the report is to say that in these segregation

10   settings we have a fair number of people who have

11   chronic health problems and that that represents a

12   potential interaction between the health risks of the

13   place and the health risks of the people.

14        Q.  Okay.  Did you look at any percentages in

15   general population of inmates that suffer from chronic

16   illnesses in Florida?

17        A.  No.

18        Q.  Do you agree it's a good thing that Florida

19   has these chronic illness clinics that it enrolls

20   inmates in?

21        A.  Yes.

22        Q.  And because these particular inmates are

23   enrolled in these chronic illness clinics they are

24   more highly monitored than inmates who are not.  Do

25   you agree with that?

1          A.   I'm not sure I -- I'm not sure I would -- I

2     know enough to characterize it that way.  I understand

3     that there is a dedicated chronic care clinic that is

4     very standard in correctional health.  I'm not sure --

5     it would take much more investigation than I've done

6     to compare, for instance, the frequency or adequacy of

7     care in that general chronic care approach to some of

8     the other types of care.

9          Q.   Fair enough.

10              I guess the better question is, do you know

11    what the policies are for these chronic illness

12    clinics in terms of how often inmates are monitored

13    for their conditions?

14         A.   My understanding is that there is a fair

15    amount of variability with how the appointments are

16    scheduled so that individuals may be seen every three

17    months, every six months or more frequently based on

18    their clinical acuity, but that's part of the chronic

19    care clinic as determining how often they should be

20    seen.  And then -- so, yes, I'm aware that there is

21    generally some chronic care frequency, but that

22    individual clinicians have the -- schedule these

23    appointments based on what they think the patient

24    needs.

25         Q.   Got it.

1            And -- and did you -- what you just stated
2    there did you -- how did you discern that?  Upon a
3    review of inmates' medical records, or what do you use
4    to determine that?
5         A.  I guess.  Because it's -- it's -- and it's
6    very standard in correctional health.  You'll see on
7    the chronic care forms there is different forms used
8    for this type of care as opposed to let's say sick
9    call or emergency or hospital return.  And so there
10   will be standard frequencies that are pretty easy to
11   see as you review forms about the frequency of visits,
12   and then you'll see that there is a -- and I take
13   that -- I can't recall if I also saw that in the
14   policy.  I would assume it's in there somewhere.  But
15   generally what is in the policy is very broad, and
16   then clinicians are scheduling these encounters one
17   hopes based on, you know, the clinical needs of the
18   patient.
19        Q.  Okay.  And do you agree with me that an
20   inmate does not cease participation in one of these
21   chronic illness clinics just because he goes into
22   restrictive housing?
23        A.  Sorry.  Could you repeat the first part of
24   the question?  An inmate does not...
25        Q.  Sure.

1             I asked do you agree with me that an inmate

2     does not cease participation in one of these chronic

3     illness care clinics just because he goes into

4     restrictive housing.

5        A.   I agree that that's not the policy.  And my

6     concern is that access to chronic care is impacted.

7     But I agree that I've -- there is nothing I've

8     reviewed that would indicate that somebody gets kicked

9     out of the chronic care clinic or stops being a

10    chronic care patient just because they transfer into

11    segregation settings.

12       Q.   Okay.  So you agree that's the policy then?

13       A.   Yes.

14       Q.   So in paragraph 20 you also say that inmates

15    need increased medical care when they enter

16    restrictive housing.  Did you examine the number of

17    medical encounters an inmate has in general population

18    as compared to restrictive housing to determine

19    whether they're getting increased medical care?

20       A.   I didn't aggregate a number of encounters in

21    one setting and in another setting.  I did look at

22    the -- the cases I mentioned in the report and whether

23    or not I assessed that they received the care they

24    needed or whether or not there was an interruption in

25    their care.  I don't -- I didn't -- but I didn't do an

1   aggregate comparison of the numbers of encounters pre

2   and post.

3        Q.  Do you know if inmates in general population

4   are getting daily rounds of nursing care?

5        A.  I would assume that most are not.

6        Q.  Okay.  And is -- is that just based upon your

7   correctional experience, that general population

8   settings don't typically do daily rounds of nursing

9   care?

10        A.  And also the -- I believe the testimony of

11   Nurse Foskey goes into where these daily rounds

12   occurred.  I think it specifies segregation.  But,

13   yes, it's also my correctional experience that there

14   are -- outside of the need for daily segregation

15   rounds there aren't -- there are a few other places

16   where there might be daily rounds, but there aren't

17   many and that often if there is a lot of segregation,

18   that's the most common place where these types of

19   rounds occur.

20        Q.  Do you know, Dr. Venters, what the wait time

21   is for an inmate in general population who puts in a

22   sick call request versus what it is in restrictive

23   housing?

24        A.  My understanding is that many people submit

25   sick calls in segregation that go unresponded to, but

1    that's separate and apart from the policy.  And so I

2    am not aware of the policy for general population

3    settings.  I would imagine it's a matter of days.

4         Q.  In general population?

5         A.  I would imagine.  I mean, usually the

6    standard is if somebody reports in sick call a new

7    medical problem, that they have a face-to-face

8    encounter within 24 hours.  Some places go up to

9    72 hours.  But it would be, you know, a matter of a

10   day or two or sometimes three.

11        Q.  Okay.  And I want to get back into the sick

12   call request going unanswered.  But let me ask you a

13   few more questions, if I could, on this section of

14   your report.

15            In paragraph 21 you speak about having

16   medicines delivered rather than going to a pill window

17   to pick it up.

18            What is wrong with having medicine delivered

19   to you?

20        A.  Well, it's a much more labor intensive

21   process, and so it requires that health staff come out

22   to the unit, that the person -- they come to the

23   individual cells or that somehow they connect one by

24   one with the people who are in their cells.  And

25   then that if -- let's say the medication isn't there

1    or there is a problem with a medication, that --

2    that then that same interaction happened again later

3    on.  And so that's just a -- most places try and

4    maximize keep on-person medicines, medicines that

5    people can get for -- you know, have a supply that

6    goes on for several days or a week or two.

7            But the autonomy of the patient to go get

8    their medicines or seek medications or forms -- this

9    is another good example -- if all of that requires the

10   nurse to go by the -- the front of the cell with a

11   cart, then it leaves the patient much less autonomy

12   to, like, redress when things don't work the way

13   they're supposed to.

14       Q.  So in terms of autonomy, would you agree with

15   me that an inmate in general population that goes to a

16   pill window is still relying upon the nursing staff to

17   provide them with the correct medication?

18       A.  Yes.  But if it's not there, they could go

19   back or they can -- you know, they have a lot more

20   capacity to advocate for themselves.  They can go to

21   the back of the line, they can then -- you know, they

22   can -- there are a lot of things that are available to

23   them that don't leave them kind of sitting in a cell

24   by themselves, which is what happens with the -- the

25   pill pass rounds.

1        Q.  So with the pill pass rounds is it your

2   understanding from Ms. Foskey's testimony that they

3   occur more than once a day?

4        A.  Yes.  I -- I can't remember her testimony,

5   but generally there are three or four pill passes in

6   most prison settings.

7        Q.  Okay.  So if an inmate, you know, on the

8   first pass didn't get his medication, do you agree

9   with me that there are several other opportunities

10  during the later pill passes for that inmate to get

11  his medication?

12       A.  If there is a -- if it's provided.  The

13  difference is that -- my experience is that a

14  medication that's missed on the first encounter a lot

15  needs to happen or it may not be the case that it's

16  magically presented on the second pill pass or the

17  third pill pass.  Whereas when a patient is out in

18  general population, if they don't get their

19  medication, they can go back to the place that has

20  medications.

21            And the medication carts are loaded with a

22  preset list of medications.  They're based on what the

23  person doing that pill pass anticipates on doing.  So

24  it's very common for a medication that's missed on the

25  first go-round to, you know, not -- still not be

1    second -- present on the second go-round.

2          The same for forms.  If a patient can't get a

3    sick call form the first time the nurse comes by,

4    there is nothing necessarily magical that's going to

5    get the nurse to put more sick call forms on that

6    cart.  And, in fact, what I heard from many patients

7    was that the nurse would say it's -- it's not their

8    responsibility.  So I don't think that the repeated

9    nature of the pill pass carts addresses all of these

10   kind of basic problems.

11      Q.  And, again, we'll get to the -- the sick call

12   forms.  That's an important area that I want to talk

13   to you about.

14          But as far as the medications are concerned,

15   do you have any specific evidence other than what

16   have -- what was mentioned in your report that nurses

17   are routinely forgetting to give inmates medications

18   on the first pass and then refusing to give them on

19   the later passes during the day?

20      A.  No.  And I don't think that's actually how it

21   happens when I've done -- like, if I had access to the

22   pharmacy records, I wouldn't be looking to see if

23   somebody forgot a medication and then if they refused

24   it later.  It really comes down to it -- why is it

25   missed.  But there are always missed medications.  And

1    then -- then on the repeat they're often missed for

2    the same reason they were missed in the first place,

3    which is just wasn't available or somebody didn't put

4    it in correctly.

5           So I don't -- I don't mean to state that the

6    reason people would not get their medicines have to do

7    with either a nurse forgetting or necessarily a nurse

8    refusing.  But I do think that it's physically

9    possible for the nurse who does the second or third or

10   fourth pill pass to address a missed medication in the

11   initial.  But, you know, reviewing -- as I detail in

12   the report, people who not just told many staff

13   members about missing medications, but had to submit

14   grievances that went on for weeks.  It seems like this

15   process has some systemic flaws.

16        Q.   Okay.  So, again, the inmates that were

17   mentioned in your report would be the examples of

18   occasions when medications were not passed out?

19        A.   I think that the -- those are the -- the

20   records I've reviewed, the people I've spoken with and

21   the -- and then the lack of quality assurance of these

22   tasks that the director of nursing reports those

23   are -- and then obviously the grievances.  Those are

24   different sources of data that are consistent with

25   each other and that lead me to identify this

1   medication access as an issue.

2        Q.  Were you able to quantify, based upon your

3   review of the records you just described, how often a

4   nurse misses giving an inmate a pill during their

5   passing?

6        A.  No.  I think that that would be -- so I think

7   these are systemic problems.  I think when it comes to

8   identifying the prevalence of each of these systemic

9   problems, there are other data sources.  And so I

10  think my frame in this report and in this engagement

11  so far has been to identify what are the systemic

12  harms to health or health barriers.  And I'm confident

13  that these represent systemic issues.

14            I think that more in-depth quantification of

15  let's say the rates of missed medication in one seg

16  setting than another, those are things that would

17  require much more data analysis, but could be done

18  down the road.

19       Q.  Okay.  But all you've done now is what is

20  laid out in your report as to these issues, correct?

21       A.  Correct.

22       Q.  Now, would you agree with me that in Florida

23  in restrictive housing units that the policy provides

24  that inmates are allowed to have keep-on-person

25  medication -- medications in their cells and

1    self-administer as prescribed?

2        A.   I -- I wouldn't dispute that.  I'm not sure

3    I've seen that post policy.  I've also seen that

4    Nurse -- Director Foskey said it's not the job of the

5    nursing staff to be concerned with that.  And so I

6    don't -- I haven't reviewed that post policy, but I

7    wouldn't dispute if -- if you say that -- you

8    represent that's a policy that's in existence.

9        Q.   Well, now the -- the comment you made about

10   Nurse Foskey was when an inmate is transferred into

11   restrictive housing, that security is involved with

12   making sure that the inmate's property is -- is

13   transferred.  Is that what -- what you're referring

14   to?

15       A.   Yes.  And the -- really what I think is the

16   crucial failing, which is the health service is seeing

17   the person, and so the health service has in that

18   moment in time an opportunity and should not only

19   assess any new health problems like injuries, but it

20   is their obligation to ensure that the patient has

21   access to their medications because there is multiple

22   reasons why going into segregation could interrupt

23   your medications, not the least of which is the person

24   bringing the medication might not know you're there.

25   And so it is crucial for the health service in

1    conducting this preconfinement assessment to reflect

2    confidence that they know what medicines the person is

3    on and that they're going to get them.  And that's a

4    really crucial failing to the extent that her

5    testimony reflects reality.  You know, it's consistent

6    with what patients reported to me, but it is a -- a

7    crucial problem.

8         Q.  So -- we'll get to that in a minute, but I

9    just want to stick with the -- so it's -- it's on your

10   Appendix B, Procedure 403.007, which has to do with

11   the medication.  So subsection 5 deals with special

12   housing.

13        You would agree with me that this is a good

14   procedure.  That inmates in special housing would

15   be -- will be allowed to have keep-on-person

16   medication in their cells and self-administer as

17   prescribed.

18        A.  Yes, I agree that should occur.

19        Q.  And would you also agree with me that

20   sometimes keep-on-person medications are not

21   appropriate for the inmate.

22        A.  I think there are times when some medications

23   or under some circumstances directly observed therapy

24   or, you know, dose-by-dose administration could be

25   more appropriate.

1      Q.   Okay.  And -- and the -- and the medical

2   professionals would need to be the ones to determine

3   on a case-by-case basis whether an inmate, for

4   example, is not taking his medication on his own or

5   he's abusing the medication so that it would need to

6   be brought to him, correct?

7      A.   I think that those are examples of when

8   directly observed therapy could be appropriate, a

9   pill-by-pill or dose-by-dose administration.

10      Q.   And then would you also agree with me that

11   there can be instances of an inmate who has a

12   disability, blindness, for example, where it would not

13   be best for the inmate to have the KOP medication?

14      A.   I think if there is an issue about patient

15   safety, that could be a reason for dose-by-dose.  But,

16   you know, most people who are blind in the community

17   who take medications take them without somebody giving

18   to it to them dose-by-dose.  But I wouldn't -- I

19   believe that patient's safety is a rationale for

20   considering how patients get their medicines and take

21   them.

22      Q.   So the testimony that you mentioned about

23   Ms. Foskey and inmates who transfer into special

24   housing not having their medications immediately

25   available, my question for you there, Dr. Venters, is,

1   were you able to discern from review of any medical

2   records if patients did not have their medications for

3   any significant period of time?  And by significant I

4   mean more than a -- a couple of days.

5        A.  I think that -- we can go through all the

6   cases in my report, but I think there were cases where

7   I report people not getting their medications.  And

8   I'll have to -- some of those were instances the

9   patients reported to me, some of them were discernible

10  in medical records, some weren't.  And so I think that

11  there are certainly instances where that was a concern

12  in my report.

13       Q.  Okay.  So any of those instances of inmates

14  not receiving medications upon transfer to restrictive

15  housing units you would have outlined in your report,

16  correct?

17       A.  I think I've -- among the people I spoke with

18  and records I've reviewed I've included those in the

19  report.

20       Q.  Okay.  And some of those reports were based

21  on inmate accounts, correct?

22       A.  Yes, I think some were.

23       Q.  Okay.  So if we could move to page 22 of your

24  report.  I'm sorry.  Paragraph 22.  Forgive me.  Page

25  12.  Are you with me?

1       A.   Yes.

2       Q.   Okay.  So we've talked a bit already about

3  NCCHC.

4            Do you consider the NCCHC standards to be

5  binding upon a state correctional system?

6       A.   No, generally not.

7       Q.   Okay.  Are they recommended best practices?

8       A.   I would say they're a floor.  They're not --

9  I'm not sure they're the best practices, but they're

10 standards of a sort.  I think both the NCCHC and the

11 ACA represent some effort to create correctional

12 health standards or correctional standards, but there

13 are -- I'm not sure they would -- but we don't have,

14 for instance, State Departments of Health or CMS or

15 ARC -- we don't have community structures that say

16 these are the best standards of care involved in this

17 world.  So this is kind of what we have.  But I

18 wouldn't ever call them a -- a best standard.  They

19 would be, as I often refer to them, a -- a floor not a

20 ceiling.

21      Q.   Okay.  Is there any Federal standard for

22 medical care in state prisons that is binding or

23 authoritative?

24      A.   No.  There are -- so the Federal Bureau of

25 Prisons has its own standards for its own, you know,

1    130 or so facilities and the private facilities that

2    it contracts with.  But part of the systemic problem

3    in correctional health care is we have kind of left

4    this area -- this critical area of health care out of

5    real meaningful oversight and quality control and --

6    and standards of care.  So as it stands now, the NCCHC

7    and the ACA standards are probably the most cited

8    standards, and they're probably the most comprehensive

9    in scope.

10          There are some local and probably state

11   settings where there is more thorough health policies

12   or standards established.  And as I mentioned, the

13   BOP, the Bureau of Prisons, has health standards for

14   their prison systems.  But I'm not -- we just are very

15   lacking in our country with having adequate and

16   uniform health standards for correctional settings.

17        Q.  Okay.  So in paragraph 22, the first

18   sentence, you say the NCCHC adopted its current

19   segregation policy in 2016, correct?

20        A.  Yes.

21        Q.  Okay.  But what you reference here on the

22   next page in the footnote 11 is the position -- the

23   new position statement from 2016, correct?

24        A.  Yes.

25        Q.  Okay.  And we've already discussed that the

1    actual NCCHC standards are the ones from 2018, right?

2         A.   Yes.   There is a difference in terms of the

3    organization stating this is our opinion, this is our

4    policy, which is what is happening here in 2016.

5    Getting that implemented into the standards is -- I

6    think they -- even they would allow for -- take some

7    time to implement in how their auditors and the

8    facilities that seek their accreditation implement

9    this idea -- these ideas.

10        Q.   Okay.   So I'll represent to you that on the

11   NCCHC website there is a whole page describing what

12   position statements are.   And it says once approved by

13   the Governance Board, they -- oh.

14        MS. SMITH:   Cayla, can you pull up -- or,

15   Samantha, can you pull up the disclaimer

16   statement?   My copy got cut off here.   The NCCHC.

17   We'll look at it together.

18        MR. GROSHOLZ:   Sorry, Nicole.   I'm -- I'm on

19   exhibits at the moment.   What -- where -- what is

20   this one?   The NCCHC?

21        MS. SMITH:   I'll see if I can do it, Jeff.

22        MR. GROSHOLZ:   NCCHC standard?

23        MS. SMITH:   It's a disclaimer.

24        Let me see if I can get it quickly.

25        Okay.   It's called position statements in the

1       folder called NCCHC, Jeff.

2             MR. GROSHOLZ:  All right.  I've got that.

3       Let me do the share screen.

4             MS. SMITH:  Thank you.

5             If you could scroll down so Dr. Venters can

6       read it.  Maybe this is not it.

7             MS. WALLIS:  For the record, Nicole, is this

8       Defendants' Exhibit 3?

9             MS. SMITH:  Thank you, Kara.

10            It's at the bottom, Jeff, what I'm trying to

11      get to.  Important disclaimer.

12      Q.  (By Ms. Smith) Okay.  So that that's what I

13      was trying to read to you, Dr. Venters.

14            So do you see here it says in the second

15      sentence -- actually, the third sentence it says --

16      well, second sentence.

17            Once approved by the Governance Board, they

18      become official positions and guidances of NCCHC.  In

19      no sense do they represent NCCHC standards.

20            So -- at the bottom here, also, it says

21      position statements are not intended to and should not

22      be treated as legal, medical, or business mandates.

23            So based upon reading that disclaimer about

24      position statements would you agree with me that the

25      2018 standards are the actual policies that are

1    applicable here?

2         A.  Well, they're the standards.  That's an

3    important distinction.  So the -- they're very clear

4    on these disclaimers to say that there is a difference

5    between what they say is their opinion or the policies

6    that should be followed and the standards that they're

7    using.  And so I agree that the -- for prison health

8    care the most current standards from the NCCHC do --

9    they're the 2018 standards.  But I think that reading

10   this it does not mean that this is not important or

11   that we shouldn't address the health risk of

12   incarceration.

13         I mean, I don't know how -- you know, the

14   NCCHC did not say as a trivial matter that people

15   shouldn't be isolated for punishment reasons.  They

16   didn't say that because they don't believe it.  It's

17   true that that is not reflected.  That that opinion of

18   this organization is not reflected in the 2018

19   standards.  So I'm in agreement there.  But I think

20   it goes too far to say that it doesn't matter or that

21   we -- somehow the NCCHC was -- was not serious when it

22   took this position statement.

23         MS. SMITH:  Jeff, you can take that down.

24    Thank you.

25    Q.  (By Ms. Smith) Well, have you actually

1    compared the 2018 standard to the 2016 position

2    statement to see if they comport?

3         A.  I think that much of this has not yet been --

4    I haven't done that recently.  I recall when these

5    came out looking at -- and when the 2018 standards

6    came out, I've -- I've looked at them with this lens.

7              I think that one of the things that the NCCHC

8    says clearly is we should move towards a -- a setting

9    where we're not isolating people for punishment, we're

10   not isolating over 15 days.  So those are things that

11   I know haven't yet been put into the 2018 standards.

12        Q.  Right.

13             So in the 2016 position statement that you

14   cite here there was a recommendation that no one with

15   mental illness, juveniles and pregnant women should

16   never be isolated for any duration.  That was not

17   carried through into the 2018 standard, was it?

18        A.  Yeah, I'm not disputing it.  I think I opened

19   this discussion with I acknowledge that the 2018

20   standards haven't -- that it -- in any body like this

21   it takes awhile for them to implement a new policy

22   direction, and so I don't ever take the position that

23   they've -- they've taken all of these opinions and put

24   them already into the standards that, you know, were

25   just -- just came out very shortly thereafter.

1       Q.   Okay.  Would you agree with me that this is

2   still an evolving area and the standards have not yet

3   fully been developed?

4       A.   Well, the idea that segregation harms health

5   is not an evolving area.  It's established.  How

6   Departments of Correction eliminate to this practice

7   and tend to the health harms that are caused in these

8   settings I agree is an evolving practice.  It's

9   evolving at different speeds in different states, but

10  it is pretty much evolving in that direction.  But

11  there is no -- it's -- you know, the -- the -- the --

12  the question of whether or not segregation or solitary

13  confinement harms health is settled.  There is nobody

14  that I know credibly in correctional health that

15  disputes that.  I was shocked to see that Nurse

16  Foskey, who -- as the head of the nursing service in

17  this system stated that she was unaware of health

18  risks of incarceration -- of segregation.  I just

19  haven't read into that before.

20      Q.   I understand.  I understand that in your mind

21  it's a foregone conclusion, and we could have a -- a

22  healthy discussion about that.  But I want to keep

23  moving, if I could, with some questions here.

24          NCCHC differ -- the 2018 standards

25  differentiates between different degrees of isolation,

1    right?

2         A.  Yes.  As I recall, they're -- I haven't

3    reviewed these in the last -- recently; but as I

4    recall, there were maybe three types -- three levels.

5    I can't recall.

6         Q.  Okay.  And it states that the health

7    professionals' monitoring of a segregated inmate is

8    based upon the degree of isolation.

9         A.  I recall that, yes.

10        Q.  Okay.  And of the different levels the more

11   extreme the confinement the more rounds, for example,

12   should be done.  Do you recall that?

13        A.  Generally, yes.

14        Q.  Okay.  And the standard is that for inmates

15   in solitary confinement with little or no contact with

16   other individuals they should be monitored daily by

17   medical staff and at least once a week by mental

18   health staff, right?

19        A.  I do recall that, yes.

20        Q.  Okay.  And would you agree with me that at

21   least in policy Florida is complying with that?

22        A.  I agree that there is a policy, yes, that

23   includes those stipulations.

24        Q.  And inmates who are segregated -- but, again,

25   I think they're distinguishing from solitary

1    confinement.  They say inmates who are segregated and

2    have limited contact with staff or other inmates are

3    monitored three days a week by medical or mental

4    health staff.

5          So would you agree with me that in policy

6    Florida complies with that standard?

7          A.  I'm not sure -- my understanding -- I haven't

8    reviewed settings outside of the segregation settings

9    that we've discussed, and so to my understanding

10   the -- the AC, the DC and the CMI through III as

11   they're practiced would all fall into that first

12   category we discussed.  And so -- but I haven't

13   reviewed the policies for any kind of health

14   surveillance outside of administrative seg, you know,

15   disciplinary seg and the CMs.

16         Q.  Understood.  Okay.

17             But -- but assuming you're right, that AC,

18   DC, CM, MM all fall within that category of solitary

19   confinement, Florida in policy is complying with the

20   2018 NCCHC standards, correct?

21         A.  I believe with that -- yes, with that element

22   of the -- the standards.

23         Q.  Okay.  And you also mention in your report

24   the ACA.  And I think -- well, you don't cite which

25   edition here.

1           Do you agree with me that it's the fifth

2  edition of the ACA that would be optimal?

3      A.  I believe so, yes.  I believe -- I believe

4  there is a -- I believe there is a -- is it -- I can't

5  remember if it's 2019 or -- but whatever the most

6  recent edition is of the ACA standards.

7      Q.  Okay.  And healthcare screening -- let me ask

8  it more generally.

9           Do you know if policy of Florida complies

10  with that fifth edition of the ACA?

11      A.  I believe that the policy, which is in this

12  circumstance very similar to the NCCHC, involves a

13  daily visitation of people in segregation settings by

14  a health staff member.  And so the policy, if

15  implemented for daily segregation rounds, would meet

16  that requirement, I believe.

17      Q.  Okay.  Is it your understanding that Florida

18  is an ACA state, meaning we are accredited?  Our

19  facilities are accredited by the ACA?

20      A.  That's my understanding.

21      Q.  And as you sit here, do you know of any

22  facilities that have not attained accreditation from

23  the ACA here in Florida?

24      A.  I don't -- I haven't reviewed the -- the

25  accreditation status of all the different facilities,

1    so I'm -- I'm not aware.  I'm generally just aware

2    that ACA accreditation is the accreditation that's

3    sought by the state prisons in Florida.

4         Q.  Okay.  Page 15 of your report -- I'm sorry,

5    page 18 of your report you talk about rescue inhalers

6    that were taken from inmates by security.  So my -- my

7    question for you is -- is, is that based solely upon

8    inmate accounts, or did you actually see any records

9    in the files that confirmed that inhalers were taken

10   from inmates?

11        A.  I believe that this was reported by four

12   people.  I'm not sure how I would see in the medical

13   records the absence of a -- an inhaler.  But these --

14   this specific problem was reported by four people.

15        Q.  Okay.  Do you know whether there is a policy

16   in Florida or in -- did you read it in Ms. Foskey's

17   deposition testimony that medications are not supposed

18   to be taken away from inmates when they're placed into

19   restrictive housing?

20        A.  As I recall and the source of my concern was

21   that she made a statement that security staff had a

22   policy that they should allow people to keep these

23   medications, but it was not the business or the focus

24   of the health staff to ensure that that occurred.

25        Q.  Well, again, I think that statement you're

1    taking out of context.

2          Wasn't that statement just made when an

3    inmate is transferred from general population to

4    restrictive housing?

5        A.  Yes, that was -- my understanding is that's

6    one of the -- aside from strip that was really the

7    kind of primary way why people lose their access is

8    that they're moving in.  Like everybody who comes into

9    segregation obviously moves in at some point, and

10   that's the most common, like, it seems, like, transit

11   point.  But I -- you're -- I -- you're right.  I stand

12   corrected that her comment had to do specifically with

13   the preconfinement assessment and that there are other

14   ways that somebody -- and strip as an example of how

15   they could have their medications taken away.  And I

16   acknowledge that there is a policy that says that's

17   not supposed to happen.

18       Q.  Okay.  Could there be circumstances like we

19   talked about before with medications where an inmate

20   is not safely -- for the inmate's safety the inhaler

21   would be taken under staff control by medical order

22   and -- and just given to the inmate as needed?

23       A.  That would be extreme -- exceedingly rare and

24   it -- because it's very dangerous.  So in my career

25   running the health service in Rikers, that probably --

1    I'm not sure that ever happened.  If it did, it would

2    have been just one or two times.  It's just an

3    incredibly dangerous thing to have somebody who has

4    asthma who doesn't have their inhaler with them.

5        Q.  Okay.  So it would be extremely rare.  Just

6    if an inmate is -- is somehow harming themselves or

7    abusing the inhaler, right, then it may be

8    appropriate?

9        A.  I would need to think about what the

10   circumstance is.  The risk is just so high.  And the

11   real downsides of somebody have their -- having a

12   rescue inhaler are relatively rare.  So I'm not -- I

13   just haven't --

14       Q.  That's fine.  We don't need to spend time on

15   this.

16       A.  Yeah, I -- I would say it's the kind of thing

17   that I guess is theoretically possible.  I just

18   haven't encountered and been part of making that

19   decision to take somebody's inhaler away.

20       Q.  Well, I'm just -- I'm trying to understand.

21   The -- the inmates that you discuss in paragraph 30

22   that allegedly had their inmate -- their -- I'm sorry,

23   their inhalers taken away from them I just want to

24   make sure I'm clear that that was based on inmate

25   accounts only, right?

1        A.   Yes.

2        Q.   Okay.

3        A.   And I should say these aren't people that

4   said they got in trouble and the only thing that

5   happened was that their inhaler was taken away.  It's

6   that they get put on strip, all the stuff is taken out

7   of their cell.  That includes their matters, it

8   includes their inhaler, it includes whatever happens

9   to be there.  So it may not -- I'm not alleging that

10  this was a target just at their medications, but that

11  it's a security practice that, by these four accounts,

12  happens to loop in medications as something that gets

13  taken away as part of a broader whatever this strip

14  practice is.

15       Q.   Well, and this strip practice that you just

16  described where allegedly everything is taken away, is

17  that based on inmate account as well?

18       A.   We observed quite a few people who were on

19  strip who had no mattress or had no clothes or -- so I

20  don't -- but I didn't look into each -- and I'm not a

21  security expert, so I'm not saying I know what

22  happened to -- what administrative actions were taken

23  to cause that to happen, but we certainly observed a

24  lot of people who seemed to be on strip who really --

25  you know, they were sleeping on the floor or they had

1   nothing to sleep on.  But I'm not holding myself out

2   as an expert on why that happened or what the

3   purported security benefit is.

4        Q.  Did you find it unusual during your facility

5   inspections if you came across an inmate who was on

6   you -- what you just described as being on strip?

7        A.  We came across numerous people.  I don't

8   know -- I didn't keep track of how many people it was

9   because I'm not really -- it's not my area of

10  expertise.  But I certainly hadn't encountered this in

11  other settings, so I was surprised by it.  But I

12  didn't record how many people.  And any circumstance

13  that I came across where I had a medical concern for a

14  person I would pass it along to, you know, the lawyers

15  or facility staff.  But this was not something that I

16  tracked in terms of frequency.

17       Q.  Okay.  So when you say several or many, there

18  is nowhere for us to go back and look at your notes

19  and -- and try to figure out how many people were

20  observed by you to be on strip during your tours of

21  these facilities?

22       A.  No.  I think that one of the other experts,

23  who is a security expert, would have made records of

24  this security practice.  My interest is in reporting

25  that this practice, to the extent it occurs, can be

1    dangerous to health or it can have -- it's an

2    additional new health risk that is kind of added on to

3    the baseline health risk of segregation.

4         Q.  Fair enough.

5         Do you know if this policy of strip that

6    you're describing is actually memorialized in FDC

7    procedure?

8         A.  I assume it is or some version of it is.  I

9    haven't reviewed those policies to look at them or

10   compare them to what we saw --

11        Q.  Okay.

12        A.  -- or what people reported.

13        Q.  You talk about the inadequate preconfinement

14   assessments also on page 18.  I want to talk to you a

15   bit about that --

16        A.  Sure.

17        Q.  -- as well.

18        THE WITNESS:  And I apologize.  I just

19        wondered if we would take, like, a very quick

20        break.

21        MS. SMITH:  Sure.  5 minutes.

22        THE WITNESS:  Great.

23        And is it possible either before or at the

24        end of the break to get a count of where we're at

25        with total time?

1          MS. SMITH:  Yes.  We'll work on that.

2          THE WITNESS:  Okay.  Great.  I'll be back in

3      5 minutes.  Thank you.

4          MS. SMITH:  Okay.  Thanks.

5          (A recess was taken from 3:30 to 3:36.)

6      Q.  (By Ms. Smith) Okay.  So, Dr. Venters --

7          MS. SMITH:  Or, actually, let's go off the

8      record if we could for a second.

9          (Discussion off the record.)

10     Q.  (By Ms. Smith) Okay.  So we were talking

11 about preconfinement assessments.  And my question for

12 you is Ms. Foskey testified that the Department

13 utilizes 40 or so different assessment protocols in

14 connection with the preassessment process.  My

15 question is, did you review any of those?

16     A.  I don't -- I wasn't sure of what she was

17 referring to with the 40 or -- I took that to mean a

18 very general reference, all sorts of types of

19 assessments.  So the only forms that I would have seen

20 are the ones that are in people's records who go into

21 seg, which -- and I can't recall the name of that

22 form, but I think it's called a preconfinement form.

23     Q.  Uh-huh.  A DC4-769?

24     A.  I don't -- I don't recall, I apologize, the

25 title of the form.

1          But my -- when she stated that they don't do

2     quality assurance on the forms, I took that to mean

3     the -- where she was talking in the deposition about

4     the forms that are used for preconfinement assessment.

5          Q.  Okay.  Well, I'll represent to you that the

6     DC4 series has -- I haven't counted them.  I'm

7     assuming approximately 40 is right.  But there are

8     several different protocol forms.  DC4-683A, which

9     starts with a mental health emergency protocol all the

10    way down to DC4-683Y, which is a bite protocol.  I

11    think she mentioned in her testimony abrasion/

12    laceration protocols, fracture and sprain protocols.

13    So is it fair to say that you didn't review any of

14    those?

15         A.  I may have seen some of those forms in

16    medical records if somebody had a -- had a bite or an

17    abrasion or something, but my focus in the -- the

18    section of the report was on whether or not there was

19    quality assurance or an effort to ensure the quality

20    or the adequacy of the preconfinement forms, which I

21    understand is a subset of this much larger set of

22    forms.

23         Q.  Okay.  And I -- I know you state in your

24    report that Florida doesn't track whether the

25    preassessment forms were being filled out, but isn't

1    it true that Ms. Foskey talked about different audit

2    measures that are in place to review the

3    preconfinement assessment forms to confirm that they

4    are being filled out adequately?

5         A.   I recall that she had said they don't QA the

6    preconfinement forms for completeness.  But she may

7    have said two different things in her deposition.

8         Q.   Right.  So I think what you stated in your

9    report you used the word tracking.  So I think there

10   was a question that was asked in her deposition about,

11   like, aggregate tracking, you know, that Florida does

12   to see if preconfinement forms are not completed.  But

13   can we agree that her testimony is what her testimony

14   is about different audits that Florida may do

15   regarding these preassessment confinement forms?

16        A.   Yes.  I -- I wouldn't -- if there is some

17   effort that's not part of the quality assurance but is

18   recorded somewhere else and that's called tracking, I

19   wouldn't -- I'm not disputing the words that she used.

20        Q.   Okay.  Well, did you review her testimony

21   when -- when she described what type of reviews that

22   she and her team conduct of these preassessment forms?

23        A.   Yes.  And as I recall, she said they don't do

24   quality assurance for the completeness of these forms.

25   Is that incorrect?

1      Q.  So I can refer you to page 176 of her

2   testimony where she discusses -- she states our

3   standards are not just that black and white, that it

4   was done or not done.  It's also evaluated on the

5   appropriateness of how it was completed or did they do

6   the 650 or they did not stamp it, did they leave the

7   profiles blank.  So it's not just looking at the

8   standard and saying it was done or not.  We look at

9   the whole picture, and we're making sure it was

10   completed.

11         So does that change your opinion as to

12   whether Florida is -- is doing oversight of these

13   preassessment forms?

14      A.  I would need to review because -- can you

15   answer my question?  I don't understand how it is that

16   she would say they don't do quality assurance of these

17   preconfinement forms for --

18      Q.  I -- I don't believe she testified to that

19   fact, Dr. Venters.

20         I can tell you on page 177 of her deposition

21   she also said:  Well, in our audits we monitor pools

22   of inmates who had special housing assessments

23   completed, we pull those by an OBUS report of PC,

24   preconfinement assessments that are completed so we do

25   not audit charts of inmates that do not have a

1  preconfinement assessment report.

2         So I think what she was describing was there

3  is not some aggregate master report that says if a

4  preconfinement assessment form is not done.  But her

5  testimony was that they do go back and they do do

6  quality management over these preconfinement

7  assessment forms.

8         So in hearing what I've read to you today,

9  does that change your opinion as to whether Florida is

10 looking at these preassessment forms to see if they're

11 properly filled -- properly filled out?

12     A.  No.  I -- I think that -- but certainly if

13 you have audits for me to review that happen every

14 month or happen every quarter that track this.  I

15 think maybe one of the disconnects here, is quality

16 assurance isn't something that's done -- is done

17 sporadically, like, once in a while we look at this.

18 There should be a monthly metric of some known sample

19 of let's say preconfinement assessments, and we should

20 know that, I don't know, some amount a month or a

21 quarter get reviewed and they get reviewed for both

22 whether or not they were done and also if they were

23 done adequately.

24         And so I haven't seen, and my impression from

25 her testimony is not only that she said that that

1    doesn't happen, but that she had many other comments

2    that kind of dismissed the importance.

3         She said that the quality assurance of the

4    seg rounds, for instance, wasn't a high priority or --

5    or that there is no process for looking at the health

6    issues on strip or -- you know, there -- her testimony

7    seemed to consistently show a lack of dedicated

8    quality assurance.  It doesn't mean that there haven't

9    been audits over the years, but quality assurance is

10   something that we measure every month or every

11   quarter.

12        Q.  Understood.

13        But, Dr. Venters, you didn't request any of

14   the internal audits, did you, from the plaintiffs'

15   legal team?

16        A.  Well, when the head of the entire nursing

17   service says that we don't QA -- you know, that the

18   seg rounds is of -- not a high priority so we don't

19   have quality assurance, you know, that's a -- then I

20   would -- I would be surprised if -- either that head

21   of nursing is not aware of the process or it's not an

22   important process to that person.

23        Q.  Well, again, respectfully that was not Dr. --

24   Ms. Foskey's testimony.  Ms. Foskey's testimony was

25   that they previously did audit the nursing rounds, and

1   they stopped using that as one of the audit measures

2   because they found that their health contractor was

3   adequately doing the rounds so that they focused

4   more --

5       A.  Well, that's -- I have to say that's

6   terrifying to me.

7           COURT REPORTER:  I'm sorry.  I'm sorry.  I

8       didn't hear the end of your question because you

9       were talking at the same time.

10      Q.  Well, I -- I don't want to argue with you,

11  Dr. Venters.  It sounds to me like you didn't read Ms.

12  Foskey's deposition.  But we can agree that her

13  testimony is what her testimony is, and that you did

14  not review any internal audits; and as you sit here

15  today, you don't know what the performance measures

16  are that are currently in place and how often those

17  internal audits are conform -- performed.

18          MS. WALLIS:  So I -- I do want to object at

19      this time because this is mischaracterizing

20      Foskey's testimony as well as Dr. Venters'

21      testimony and is argumentative and a compound

22      question.

23      A.  So I'm happy to respond to say that I

24  disagree with almost everything you've just said.

25          I will agree that she stated in her testimony

1    that quality assurance of the segregation rounds was

2    not a high priority, and that's of great, great grave

3    concern to me given what -- the -- the place we're

4    talking about.  But I will also agree that I have not

5    reviewed the internal audits of the Florida DOC.

6            Q.   (By Ms. Smith) Okay.  And have you reviewed

7    Correctional Medical Association documents?  I think

8    you already told me no you had not, right?  So if

9    there is any external entities that are coming in and

10   reviewing Florida's medical practices -- practices,

11   you have not reviewed those either, right?

12           A.   Correct.

13           Q.   Okay.  And as you sit here today, you have

14   not looked at any list that would tell you what the

15   exact performance measures are that Florida is

16   auditing?

17           A.   That is correct.

18           Q.   Okay.  Let's talk about, if we could, subpart

19   C of your report, which talks about inadequate

20   monitoring and training for rounds.  So I think this

21   starts at paragraph 38, which is on page 22.

22               So my first question, Dr. Venters, is, to

23   your knowledge does this lawsuit include any

24   allegations by the plaintiffs of a failure to train

25   staff?

1       A.   Well, I -- as a health administrator, I would

2   include when evaluating if the staff do their job or

3   not, it's not always clear to me if they don't do it

4   because they haven't been trained or if there is some

5   other barrier.  So I would include it as an important

6   part of why barriers exist.  I don't recall if there

7   is a mention of the word training or element of the --

8   the training program specifically in the legal

9   arguments.

10      Q.   Okay.  You mention the World Health

11  Organization, WHO.  Are -- are WHO guidelines or

12  recommendations binding on any prison in the United

13  States?

14      A.   I don't believe the WHO or the other guide --

15  like, the NCCHC I don't think they are binding on a

16  correctional setting.

17      Q.   Do you know any state correctional system

18  that actually follows WHO guidelines?

19      A.   Well, right now many correctional settings

20  rely on both CDC and WHO guidelines, for instance, for

21  COVID response.

22      Q.   COVID.  Forgive me.  My question was as to

23  restrictive housing.

24           Do you know of any state correctional systems

25  that comply with WHO guidelines in connection with

1    restrictive housing?

2         A.   I don't.

3         Q.   Okay.   In paragraph 38 is where you talk

4    about rounds.   That FDC is not ensuring that

5    meaningful daily rounds occur in isolation.

6              Do you agree with me, Dr. Venters, that

7    inmates have some responsibility to make sure the

8    rounds are meaningful?   And what I mean by that is

9    when a nurse comes around and talks to the inmate, do

10   you agree that the inmate has some role in sharing any

11   medical complaints that the inmate may have with that

12   nurse?

13        A.   Yes.

14        Q.   Okay.   And, in fact, the close management

15   housing unit instructions that are given to inmates

16   instructs them that inmates are required to respond to

17   healthcare staff during daily rounds, sick call and

18   weekly house rounds.   Would you -- you agree with

19   that, that that's appropriate?

20        A.   Yes.   And I think it's an important area to

21   ensure occurs.   But I agree that that's an important

22   policy.

23        Q.   Okay.   Did any inmate actually tell you that

24   nurses were not completing daily rounds?

25        A.   To the extent that --

1          (Simultaneous crosstalk.)

2      Q.   I'm sorry.  I didn't mean to interrupt you.

3      A.   To the extent that people were unable to get

4  a response from a nurse or get a -- a sick call form

5  or some other -- have a communication with a nurse,

6  then I think those -- I would all -- I would view

7  those as rounds that were not completed.  I don't know

8  if I broke out, for instance, a nurse not responding

9  to a request versus a nurse physically not going

10  into -- past a cell or not going into the unit.  I

11  don't think I got reports that nurses don't go to the

12  unit, for instance.

13      Q.   Okay.  You seem to have a problem that nurses

14  have to self-report their daily rounds.  Are you

15  assuming that nurses are going to misrepresent that

16  they've completed their rounds?

17      A.   No.  But it really displays, like, one of the

18  essential differences between this health system and

19  how health systems should operate.  You know, we

20  wouldn't ask a hospital to tell us how quickly people

21  got from the emergency room to a -- a cath lab.

22          Self-reporting may be appropriate in some

23  circumstances; but when quality assurance comes down

24  to people doing something they're supposed to do,

25  then -- and you're not doing anything to validate

1    that, then that really represents a core deficiency in

2    how quality assurance functions.

3           But I don't dis -- if -- if somebody is going

4    to ask nurses and doctors do you do all the things we

5    say we should do in policies, what I'm going to guess

6    as a health administrator is that they're all going to

7    say pretty much yes we did it all.  That's not quality

8    assurance.

9       Q.  Okay.  So on a 228 Form, for example, do you

10   know if the facilities are documenting when nurses

11   come in to do rounds and when they leave?

12      A.  Yes.  But that's not the part of the seg

13   rounds that I'm most concerned about.  I'm not -- I

14   don't doubt that, and I think I just said I rarely

15   even get reports the nurses don't enter the unit or

16   aren't on the unit.  My concern is on the -- the gap

17   in the quality assurance here seems to be what happens

18   in these individual interactions between patients and

19   nurses.

20      Q.  Okay.  So you've told me you haven't read the

21   plaintiffs' depo, but I can represent to you that I

22   think it was four of the seven plaintiffs reported

23   and -- or testified in their depositions that the

24   nurses did do rounds in their units.  So if four of

25   the seven plaintiffs said that these rounds are

1  happening, how can you say that they're not?

2      A.  Well, I haven't said that -- I think this

3  will be the third time I've said this.  I'm not saying

4  and I wouldn't assert that nurses don't show up to do

5  these rounds.  What I'm concerned about and what --

6  the lack of quality assurance in this system that

7  really alarms me is the review of how adequate are

8  these interactions between people.

9          And so one of the very common problems in

10  segregation settings is that nurses do very quick

11  perfunctory rounds and they either don't respond to or

12  they don't elicit or address the problems that people

13  want to report to them, and so I've mentioned that in

14  my report.

15          I will say I've personally had experience

16  when we had a for profit vendor under my -- you know,

17  under my medical supervision we had a very similar

18  problem.  I had to put my own nursing staff in to do

19  rounds behind the vendor medical staff because I was

20  worried about this very problem, and I couldn't ignore

21  it.  And so I had senior nursing staff that would have

22  been in Nurse Foskey's type role talking to patients,

23  conducting rounds because I -- I wasn't -- I couldn't

24  simply rely on people checking off yes I went to the

25  unit or yes I was on the unit this day.  It's much

1   more important to understand what they did when they

2   went by cell side.

3          And that's the big gaping gap I see in the

4   lack of not just quality assurance but the lack of

5   concern.  The fact that the -- the head of the nursing

6   service -- service says this isn't a high priority is

7   really terrifying given the -- the setting we're

8   talking about.

9   Q.  Well, again, we can disagree on your

10   characterization of her testimony, but...

11          In terms of communicating through the closed

12   cell door during nursing rounds, do you have any

13   concerns about that?

14   A.  Well, again, this goes towards the adequacy

15   of the encounter.  So for a patient that can't get up

16   off their bed or a patient that has a, you know,

17   reason that their voice can't be heard at cell side or

18   when the nurse is only going to spend 5 seconds at the

19   cell door, those are all circumstances where, yes,

20   it's completely inadequate.  But in order to know if

21   it's being done correctly, it takes more than simply

22   looking at checkoffs did the nurse go to this unit on

23   this day.  It's talking to patients and getting a

24   sense of the adequacy of these encounters.

25   Q.  So do you agree with me that a person can

1    come into a unit, just like you did during the

2    facility tours, and have a conversation with an inmate

3    cell front?

4         A.   I agree that is physically possible in some

5    circumstances.

6         Q.   Okay.  And, in fact, during the inspections

7    you were able to gather information from inmates

8    regarding their experiences in confinement and about

9    medical issues through those cell-front interviews?

10        A.   Yes.

11        Q.   And you're relying on the information that

12   you've gathered from those cell-front interviews as a

13   part of forming your opinions in this case, right?

14        A.   Well, I think that for a variety of reasons

15   if -- to understand what was going on with people it

16   required often sitting down with them in a quiet,

17   confidential setting.  But I agree that the -- I did

18   have brief interactions with people at the cell side

19   and have done that in many other circumstances as a

20   provider.

21        Q.   So in part D, which is on page 24, paragraph

22   42 is when you speak about insufficient measures to

23   ensure access to medical care.  If you could turn your

24   attention there.

25             So you said that 39 of the 51 inmates you

1   spoke to in private interviews reported barriers to

2   sick call or scheduled care once in isolation, right?

3       A.  Yes.

4       Q.  So does that mean that 12 people did not

5   report those issues to you?

6       A.  I would presume so, yes.

7       Q.  And of the 39 inmates you claim reported

8   these barriers to access to medical care -- I think

9   we've already talked about this -- some of those are

10  based solely upon the inmates' statements to you,

11  right?

12      A.  Some are, yes.

13      Q.  Okay.  So, for example, paragraph 44 when you

14  talk about ████████████ reported that CM officers

15  often tell him he must falsely refuse medical

16  encounters and he also reported he may not learn of a

17  missed medical encounter until a nurse comes to his

18  cell to ask him to sign a refusal, that was based

19  solely on the inmate's statement?

20      A.  Yes.

21      Q.  And, similarly, paragraph 46, ███████████

22  ████████   If you could take a look at that paragraph.

23  Was that based upon inmate reporting to you?

24      A.  Yes.

25      Q.  And paragraph 47, if you could take a quick

1  look at that.  Was that also based upon inmate

2  reporting to you?

3       A.   Yes.  I think in that circumstance one of the

4  correctional officers, as he was talking to me, might

5  have said something about the cord, but I don't

6  recall.  But that -- that account there is -- is what

7  he told me.

8       Q.   Yeah.  And I'm troubled, sir, because you

9  keep saying you talked to security staff.  But part of

10  the stipulation for inspections was that you were not

11  supposed to be talking to security staff, so...

12      A.   I can represent that I did not seek any

13  contact with security staff, so I didn't initiate

14  contact.

15      Q.   Okay.

16      A.   But it wasn't uncommon, as you would have

17  seen, especially late in the day when the lawyers were

18  off on one side of the facility, that a security

19  officer would say something.  And so I had no control

20  over whether or not that occurred.

21      Q.   Okay.

22      A.   But I did not seek out contact --

23      Q.   Understood.

24      A.   -- with or conversation with security staff.

25      Q.   Understood.  I just want to make sure.

1              You didn't have any conversations with

2      security staff at Florida facilities that were outside

3      the privy of one of these inspections, right?

4          A.   Correct.

5          Q.   Okay.  And paragraph 48 was that also based

6      upon inmate reporting to you?

7          A.   Yes.

8          Q.   Okay.  And of the seven plaintiffs do you

9      know how many of them in -- well, you didn't review

10     their depositions, so let me represent to you that,

11     for example -- well, Mr. Espinosa.  Let's start with

12     him.  You met with him, right, at Columbia?

13         A.   Yes.

14         Q.   Mr. Espinosa, if you recall, is the -- the

15     mute gentleman.

16         A.   Yes.

17         Q.   And we can look at your notes, but I can also

18     represent to you that you wrote no prob with med, if

19     needed write out sick call, sick call slips yes got

20     when needed.

21              So in your mind Mr. Espinosa was one of those

22     inmates that did not have any issues with his

23     medications or with sick call, right?

24         A.   Yes.

25         Q.   Okay.  And I can represent to you that Tracey

1    Dean also testified that nurses conducted daily rounds

2    and she was able to make sick call requests and that

3    she believed she received adequate medical care.

4             Plaintiff Harvard testified that if she put

5    in a sick call, she got to see the doctor and that she

6    was never refused.  She was never denied a medical

7    appointment.

8             Jeremiah Hill similarly testified that he did

9    not report -- there was never a medical problem during

10   checks that was not responded to.

11            So if four of the seven plaintiffs say they

12   have not experienced problems with sick call requests,

13   how can you say that the majority of inmates in

14   restrictive housing in Florida have?

15        A.  Well, I would return to what I said in my

16   report, which is of the people I spoke with, it was a

17   very common complaint that they had trouble accessing

18   sick call, sometimes sick call forms and their

19   scheduled encounters.  And so the nature of these

20   systems -- this is completely predictable in

21   segregation settings.  But these are systems problems.

22   So I wouldn't dispute that one could find three or

23   five or even 15 people that said they didn't have one

24   problem or another.  That's not my -- my goal here is

25   to understand what are the systems problems and

1    systems barriers to health.  So I'm not concerned with

2    the -- I believe that some people get the care they

3    need and, in fact, some people might even get all the

4    care they need.  But that's not the -- that's a

5    different lens than are there harm -- risks to health

6    or harms to healthcare access that occur because of

7    being in segregation.  And that seems pretty evident

8    to me that those do exist.

9         Q.  Okay.  Based upon what is set forth in your

10   report, right?

11        A.  Yes.

12        Q.  So inmates, for example, in close management

13   they have opportunities to request sick call forms

14   from correctional officers and medical staff, right?

15        A.  No.  That's -- my understanding is that -- I

16   should qualify.

17             My understanding is that some of the time

18   some inmates or patients are able to get sick call

19   forms from one or both of those groups, but that there

20   are other times where they are unable to get those

21   forms from either of those groups.

22        Q.  Okay.  So let me ask it a different way.

23             Let's -- let's say that an inmate has

24   requested a sick call form from a -- from correctional

25   officers and from nursing staff and they were

1    unsuccessful.  Is there any reason why the inmate

2    couldn't ask the housing supervisor, who is required

3    to make daily rounds of the unit, for a sick call

4    form?

5         A.   Certainly.  There are many reasons they I

6    guess could and maybe some do, but that certainly

7    could invite retaliation.

8         Q.   Any other reason that you can think of?

9         A.   The housing area officers may walk through

10   the unit, but they may not respond to a request.

11   So they may -- it may not be possible for an

12   individual person to make that request of a

13   supervisor.  They simply may not be there or may not

14   listen to them.

15        Q.   You would agree with me though that it -- it

16   may very well be possible when a housing supervisors

17   makes his or her daily rounds of the unit if an inmate

18   was unable to get a sick call request form, that they

19   could ask that person, right?

20        A.   I would agree that under -- that sometimes,

21   and certainly if things work the way they should,

22   that a person could request something of a supervisor

23   that they weren't able to get from the housing area

24   staff.

25        Q.   Okay.  And same question for classification

1  officers who make daily rounds of these units.  It

2  would be very possible for an inmate to request a sick

3  call request from that person too, right?

4      A.  I would say similarly with the qualifications

5  about fear of retaliation or not physically being able

6  to get their attention.  It would be possible if the

7  person listened to them for them to make that request.

8      Q.  Okay.  And what about from the duty warden

9  rounds.  If a colonel, an assistant warden, a warden

10  who weekly is making rounds of this unit it would be

11  possible for an inmate to request a sick call form

12  from that person too, right?

13      A.  I -- I would have a very -- the same answer.

14  Basically that it's physically possible if it's -- if

15  the person would stop and listen to them and if there

16  is not a -- a fear of some negative consequence in the

17  patient -- among the patients.

18      Q.  Okay.  And the same question for educational

19  staff who makes rounds.  The inmate could also request

20  a sick call form from them?

21      A.  I presume so.  I'm not sure what the policies

22  are for the educational staff; but if you represent

23  that part of their duties are to respond to these

24  requests -- these types of requests, then I would

25  allow for the fact that it's, again, physically

1  possible with the qualifications I just mentioned.

2        Q.  And on the -- in that same vein it would be

3  possible for an inmate to make a request of a chaplain

4  who is doing rounds to get a sick call form, right?

5        A.  In the same manner, yes.

6        Q.  Okay.  Would you agree with me that it would

7  be against FDC policy if staff is refusing to provide

8  an inmate with a sick call form?

9        A.  I would agree that to the extent -- yes, that

10  the policy is that people should be provided with sick

11  call forms.

12        Q.  Okay.  And would you agree with me that it

13  would be against FDC policy if staff were to coerce

14  people into refusing their medical appointments?

15        A.  Yes, I would agree that that would be in

16  violation of the stated policy.

17        Q.  And would you also agree with me that it

18  would be against FDC policy for staff to falsely

19  document that an inmate had refused a medical

20  appointment when, in fact, they had not?

21        A.  Yes.

22        Q.  Do you have any evidence that FDC leadership

23  has condoned staffs' failure to give sick call forms

24  to inmates in restrictive housing?

25        A.  Well, I don't -- I'm not sure that -- kind of

1   how you interpret the word condone, but I was shocked

2   to see the director of nursing say that she was

3   unaware of any complaints of sick call forms being

4   unavailable, but also then quickly say that there were

5   no audits of this process.  So that to me is actually

6   a way that these practices are condoned because we

7   know that this is a problem in segregation settings;

8   and so if we're not looking for it, it's as if we

9   never looked for germs in a hospital.  If we're not

10  looking for it, we can be confident that it's there.

11  And so I do interpret this lack of basic quality

12  assurance as a form of supporting or condoning these

13  practices.

14      Q.  Do you have any evidence that FDC leadership

15  has condoned of staff coercing people into refusing

16  medical appointments?

17      A.  I -- the same -- the same answer.  When --

18  when the -- Nurse Foskey, the head nurse of this

19  system, said that she wasn't aware of any complaints

20  of coerced refusals but there is no real tracking she

21  said of security not bringing people or of these

22  instances, that to me is a form of -- of supporting or

23  condoning, even though I don't believe that this nurse

24  or the health staff explicitly have implemented this

25  policy.  But the failure to have quality assurance

1   means that these bad practices evolve in segregation

2   settings.

3        Q.  So do you have any evidence to support the

4   idea that FDC leadership has knowledge of the problems

5   that you are describing with the sick call?

6        A.  Well, I presume that if a third or half of

7   people that I spoke with have reported these problems,

8   even if the overall prevalence is -- is lower, I

9   would -- I would be surprised that these were new

10  to -- new problems or new reports to the health

11  service.  And so what is very concerning to me is the

12  lack of meaningful quality assurance.  It displays a

13  disregard for what is a real likelihood that these

14  problems exist.  They're just almost universal in

15  terms of developing in segregation settings.  So I

16  would expect when -- I was shocked when I saw that

17  the -- the director of nursing said she was unaware of

18  some of these problems because they're quite uniform

19  and ubiquitous in segregation.

20       Q.  So, Dr. Venters, are you saying that even

21  though four of the seven plaintiffs testified that

22  they didn't have problems accessing sick call or

23  medical appointments that this is still a universal

24  problem within restrictive housing in Florida?

25       A.  I don't think I've used the word universal,

1   and I would not use the word universal.  I would say

2   these are systemic problems, and these are systemic

3   problems inside the footprint of segregation.  And so

4   I would allow that it -- you could find in any

5   facility a collection of people who have experienced

6   these problems and a collection of people who haven't.

7   But the system as it is functioning currently creates

8   new harms to health and barriers to accessing health

9   care.  And so this -- these are systemic problems that

10  flow throughout segregation.  But just because it's a

11  systemic problem doesn't mean it touches every single

12  person.

13          So, no, I don't find or I'm not concerned or

14  it doesn't implicate the confidence of my opinions if

15  there are three people who said they didn't have one

16  of these problems or didn't experience one of these

17  problems.

18      Q.  Is the only basis for your contention that

19  FDC leadership had actual knowledge of these problems

20  what -- what you just described?

21      A.  I believe that the -- the information

22  contained in my report is -- forms the basis for what

23  I think should be -- what are very clear health --

24  systemic health problems in segregation for the FDC

25  leadership.

1    Q.  Okay.  So nothing aside from what is in your

2  report and what we've discussed here today.  I just

3  want to make sure I cover everything that you're

4  saying provides --

5    A.  Not that I'm aware of.

6    Q.  Okay.  Let me just finish the question.

7       -- provides evidence for your contention that

8  FDC leadership had knowledge of these issues.

9    A.  Correct.

10    Q.  Okay.

11       MS. SMITH:  So let's, if we could -- I think

12       we're approaching the 30-minute countdown, so let

13       me, if I could, take a 5-minute break.  I'm going

14       to look at my notes so I can effectively use it.

15       So it is 4:13.  So if we could come back in 5

16       minutes, please.

17          THE WITNESS:  Thank you.

18          MS. SMITH:  Thank you.

19          (A recess was taken from 4:13 to 4:18.)

20    Q.  (By Ms. Smith) All right.  Dr. Venters, I

21  know you reviewed some grievances as a part of

22  preparing your report.  My question for you is, is did

23  you select the grievances that you reviewed or how

24  did -- how did that work?

25    A.  As I recall, I asked for a time frame of

1   grievances.  And so it would have been people who were

2   in segregation at a certain time point.  I can't

3   remember what the time frame was.

4        Q.  Okay.  And you only reviewed grievances for

5   inmates in restrictive housing, right?

6        A.  Some -- yes, yes, that's right.  I don't

7   think I reviewed -- the only grievances I might

8   have -- I can't recall if there were any grievances in

9   medical records for some people when they were not in

10  restrictive housing.  But, no, the category of -- of

11  grievances that I -- a big file was produced of was

12  people in segregation.

13       Q.  Okay.  Do you know the percentage here in

14  Florida of grievances that are approved?

15       A.  Could you --

16       Q.  Sure.  That was poorly phrased.

17           Do you know how many grievances, you know,

18  percentage wise are approved here in Florida?

19       A.  I do not.

20       Q.  Okay.  Is it fair to say you don't know if

21  there are more grievances that are filed in

22  restrictive housing versus in general population with

23  regard to medical care?

24       A.  That's correct.  That was not part of my

25  review.

1      Q.   Okay.  So for Inmate Burgess, if we could

2   talk about him briefly.  You reference him on page 30

3   starting at paragraph 56.

4      A.   Yes, I see that.

5      Q.   Okay.  Did you review any records from

6   outside hospitals indicating that there was no

7   evidence of senior -- seizures or strokes or

8   paralysis?

9      A.   I don't believe I reviewed any outside

10  records for him or for anyone.

11     Q.   Did you know that Mr. Burgess was diagnosed

12  with pseudoseizures and referred to mental health?

13     A.   I don't -- I don't recall off the top of my

14  head if I knew that.

15     Q.   If Mr. Burgess did not suffer from seizures,

16  would your opinions regarding whether he should be

17  confined change?

18     A.   Well, I -- as I recall and I see here, there

19  was also concern about his catheterization and access

20  to catheterization supplies.  And that's a -- a

21  problem that I think several other people reported to

22  me.  So I think it's a good example of a systemic

23  risk.  I think that if he is seriously mentally ill,

24  then that would be a separate issues for him to not be

25  in confinement.  I guess it could be a different

1   reason than if he was -- if he had seizures.

2       Q.  Do you know what Mr. Burgess' mental health

3   grade is?

4       A.  I do not.

5       Q.  Do you know the last time it was that he

6   states that he had a seizure?

7       A.  I don't recall.

8       Q.  If Mr. Burgess testified in deposition that

9   he testified that he received catheters while in

10  confinement at some institutions, would that change

11  your opinion that there is a systemic problem with

12  regard to providing catheters in restrictive housing?

13      A.  No.  I think it would support this idea that

14  confinement creates these risks.  And so if some

15  places provide catheters and some places provide sick

16  call or some places provide some of the care, it's

17  a -- it's exactly what I would predict, which is that

18  these -- the segregation environment creates health

19  risks and they're not uniform.  But the segregation

20  itself creates the barriers; and so if he said

21  sometimes or some places he got catheters and others

22  he didn't, that would not allay my fears about the

23  systemic risks that he faced.

24      Q.  And, I'm sorry, my question -- I don't know

25  if I asked it properly -- was if he testified that

1  while he was in restrictive housing at other

2  institutions he had received catheters, would that

3  change your opinion as to whether there is a systemic

4  problem?

5       A.  I don't believe so.  I believe that this was

6  a pretty consistent report that I received.  But,

7  again, without seeing what he said and, you know, what

8  those facilities were and matching it to what other

9  people told me at other facilities I don't -- I don't

10  view it as a dispositive as to whether or not I think

11  this is a systemic problem.

12       Q.  Mr. Kendrick at paragraph 58.  Is it your

13  opinion that diabetes is always an illness that should

14  preclude placement into restrictive housing, or does

15  it depend on the severity of the condition?

16       A.  I would say that the way I would frame it is

17  people with diabetes face special health risks in

18  segregation.  And so, again, without opining on why

19  segregation is used or when it should be used, I would

20  say that if you're diabetic, that there are special

21  health risks that come with being in segregation.

22       Q.  Okay.  But I think you acknowledge that his

23  weight levels and diabetes levels were actually worse

24  when he was in GP, right?

25       A.  I think I mention in my report that his -- he

1    had weight loss, and that's -- that's all I see in my

2    report.  I -- I don't think I recall his hemoglobin

3    A1C or his blood sugar levels.

4          Q.  I'm sorry.  I stand corrected.

5              So is there anything wrong with a person who

6    is diabetic and overweight losing weight?  That's a

7    good thing, right?

8          A.  Not necessarily.  A person could have cancer,

9    they could be -- part of insulin dependent diabetes --

10   diabetic pathology could be weight loss.  So I

11   don't -- when a person who has one -- certainly a

12   person who has multiple chronic health problems loses

13   weight, you need to know, just to answer your

14   question, is it a good thing or is it a bad thing.

15   And I would hope that it has to do with activity and

16   diabetes care and healthy eating, but it also could

17   be -- you know, patients in the early stages of cancer

18   lose weight, patients who have poorly controlled

19   diabetes or who have other chronic health problems

20   could lose weight. So I don't -- what alarmed me in

21   his records is that it didn't seem like anybody was

22   paying attention to it and that's -- that's a concern.

23   That's exactly at the heart of kind of what can happen

24   in segregation is nobody is looking.

25         Q.  Okay.  But you're -- you're just speculating

1    there, right?  You didn't ask Mr. Kendrick, hey, were

2    you trying to lose weight.  You didn't -- you don't

3    know why he lost weight, right?

4         A.  Yes, I agree.  I don't -- I don't -- I don't

5    know, and it's certainly not in his medical records

6    why he had this weight loss.

7         Q.  Okay.  Paragraph 60, Johnny Hill.  Is it your

8    opinion that Mr. Hill's hypertension is

9    life-threatening?

10        A.  I don't actually -- hypertension is a serious

11   medical problem.  So if hypertension is poorly treated

12   or treatment is interrupted, then that can cause --

13   increase the risk of stroke or other hypertensive

14   emergencies.  Excuse me.  But I'm not -- I -- I don't

15   think I made an assessment in my report that there

16   was a point in time where he was in a medical

17   emergency.

18        Q.  Okay.  So putting his other issue aside you

19   don't have a reason to believe that his hypertension

20   alone would be a medical condition that would preclude

21   him from being placed in restrictive housing, do you?

22        A.  Well, I think if -- as he reports and I saw

23   in his records, that your treatment for hypertension

24   is interrupted when you're in segregation.  That

25   increases your risk of serious illness or death.  And

1    so that's a -- that's a serious health risk that is

2    attributable to segregation.  Again, I'm not opining

3    on why or how the Florida DOC came to use segregation,

4    but I do view it as a serious risk to his health.

5        Q.  Now, when you're saying your treatments are

6    interrupted, as far as Mr. Hill's going, that

7    statement that you just made is based upon him

8    reporting to you that his blood pressure treatment was

9    interrupted, correct?

10       A.  I can't -- if I -- you can prevail on me for

11   a second.  Johnny Hill.  I thought I might have

12   reviewed his records because I make a mention in there

13   of -- let me go to the bottom.  Sorry.

14           Sorry.  This is Johnny Hill?

15       Q.  Yes.

16       A.  Yeah.  So I think I did -- and I -- the

17   reason I wanted to check is because I looked -- I'm

18   coming back to the -- sorry.  Which paragraph were we

19   on because I went to the bottom?

20       Q.  Paragraph 60.

21       A.  60.  60.  Oh, okay.

22           Yes, I think that was not an artful sentence

23   I have there.  But I have a sentence in that his blood

24   pressure check was checked inconsistently while in

25   confinement and despite reporting that he had never

1    refused medical care.  So I believe that I reviewed --

2    yes, and I also mentioned on-site refusal.  So I did

3    review his medical records and did make an assessment

4    that he had inconsistent checking of his blood

5    pressure, which was consistent with what he reported

6    to me.  This kind of interruption of his hypertensive

7    care.

8         Q.  And I understand that about the blood

9    pressure check, but my question was about his

10   medications, quote, being often interrupted.  Was that

11   based upon his reporting to you?

12        A.  I believe so.

13        Q.  And when you say his blood check -- pressure

14   was checked inconsistently, assuming for a moment that

15   an inmate is being treated with blood pressure

16   medication and is stable, what is your opinion as to

17   how often that person should be having his blood

18   pressure checked?

19        A.  Well, I think when a person is well

20   controlled, their blood pressure is not just stable

21   but is, you know, under -- is in the -- the area of

22   well controlled, then it could be once a month.

23   Patients should have an ability to get their blood

24   pressure checked when they need it though, whenever

25   they want it.  Because patients will generally feel

```
 1   when they're having -- their blood pressure is up.
 2   And so I think certainly at a minimum once a month,
 3   but also then having the capacity to -- and this is a
 4   big difference between general population and
 5   segregation is patients in segregation with blood
 6   pressure problems often don't have the ability to get
 7   their blood pressure checked when they're feeling
 8   sick.  When they feel, like, a hypertensive crisis
 9   happening.  So I would say minimum once a month, but
10   with the ability to get it checked when the patient
11   feels ill.
12        Q.  So -- I asked my brother if I could represent
13   this to you.  My -- my brother has ███████████████
14   ████████████████████████████████████████████████
15   ████████████████████████████████████████████████
16   Is -- is there some sort of community standard then
17   that's different than in prisons, this once a month
18   standard?  Where -- where are you getting that from is
19   what I'm trying to understand.
20        A.  So I'm certainly not going to comment on your
21   brother or any other patient's --
22        Q.  I'm not asking you to, yeah.
23        A.  -- medical care.
24            I'm just saying as a doctor who has worked in
25   and run correctional health services, when a patient
```

1    has well controlled blood pressure once a month is a

2    good standard.  The gross difference is that people

3    who are behind bars do not have the autonomy often to

4    seek care, so it takes them awhile to get care when

5    they feel ill.

6              But, again, what I found in this person's

7    records and what he reported to me were both

8    consistent, which is that he seemed to have an

9    interruption of the frequency with which he could

10   check his blood pressure and that that seemed to be

11   coincident with and not coincidental to being placed

12   in segregation.

13        Q.  How often do the records demonstrate that

14   Mr. Hill was having his blood pressure checked while

15   he was in restrictive housing?

16        A.  I don't recall off the top of my head.

17        Q.  Moving to Mr. Espinosa, paragraph 61.  You

18   make mention about him hurting his foot.  And let me

19   get to him.  This is at the bottom of page 33 and

20   going onto page 34.

21              So did you review -- you reviewed Mr.

22   Espinosa's records -- medical records, correct?

23        A.  As I recall, yes.

24        Q.  Okay.  So I can represent to you that he

25   injured his foot while he was at Martin on

1   November 30th, 2018, and he filed a sick call request

2   and it was stamped at 9:00 a.m. and he was seen at

3   1:15.  Is that an acceptable response to you for at

4   least that first step?

5        A.  I think if somebody reports a problem and

6   they're seen that day or, you know, within hours, then

7   that's an appropriate response.

8        Q.  Okay.  And he was scheduled for an x-ray and

9   at least he was given an order for crutches.  Is that

10  an appropriate response?

11       A.  Well, they should be seen by a physician or a

12  midlevel provider right away.  I don't know if that's

13  part of what you -- what you reported happened.

14       Q.  Well, he was given an x-ray, correct?

15       A.  I take you at your words that he -- I don't

16  recall the -- the medical records.  So if what

17  happened was he was seen by somebody and then received

18  an x-ray, then I think that those are good first

19  steps.  But with new pain, particularly pain that

20  could potentially be a fracture, that a person should

21  be seen by a physician or a midlevel provider.

22       Q.  Okay.  So if an x-ray revealed normal

23  alignment of the tarsals with metatarsals, in other

24  words, there wasn't any fracture revealed on the first

25  x-ray, is -- an inmate being given crutches and

1    possibly, you know, pain medication is that

2    appropriate?

3         A.  Well, this is -- again, goes back to why you

4    need to have a physician or midlevel provider assess

5    an injury immediately because, you know, things like

6    let's say fractures of the nose, fractures of the

7    ankle, the foot, the hands, the important immediate

8    response is to assess the extent of the injury, which

9    may not be a fracture.  It may be a -- a soft tissue

10   issue -- injury, which can be quite serious and

11   require surgery, like a torn ligament.  And so it --

12   the -- the lack of -- this is a good example of how

13   an -- an x-ray that looks normal and is seen as normal

14   may actually prevent adequate care because what the

15   patient needed was to be seen by a physician or a

16   midlevel provider right away.

17        Q.  Well, isn't it the case that sometimes

18   fractures appear bigger on x-ray a week or two after

19   the injury, meaning they're more visible?

20        A.  I think in both our cases it really depends

21   on the mechanism of the injury and the extent to which

22   there is mal or nonalignment.  But this is not -- this

23   is really a -- chasing an x-ray is not the point.  The

24   point is, is if a patient is in pain and they have an

25   injury, they need to be seen by a physician or a

 1    midlevel provider to assess what they need right

 2    away.  And part of that might be more diagnostics;

 3    but the fact is the patient may need, you know, a cast

 4    or a boot or something to support that injury that is

 5    not -- the x-ray is also important diagnostically, but

 6    the -- the first step here is the patient is injured

 7    so they see a -- a provider.

 8         Q.  Okay.  Well, in Mr. Espinosa's case isn't it

 9    true that once the fracture was diagnosed that he was

10    prescribed a protective boot?

11         A.  Yeah.  And so it's a great example of this is

12    a complete failure.  This patient -- I guess those

13    three days -- putting aside those three days of pain

14    and lack of support, I mean, the -- moving around with

15    a -- with a -- a fracture that's minimally displaced

16    for three days in my view would be a contributor to

17    the -- why it shows up more on the x-ray.  It's not

18    simply, like, a matter of time.  Like, x-rays -- you

19    know, fractures somehow -- the tendons and ligaments

20    around bones generally tend to pull the bones back

21    into alignment, and so -- or they often, I should say.

22    And so I view this as a -- a real core failure, an

23    example of the failures of seg because this man needed

24    to be seen by a doctor or a midlevel provider when he

25    was hurt.  Instead he was left in pain without a

1    supportive device or some sort of cast.  And then when

2    the diagnostic image was -- you know, the second

3    diagnostic image showed up, then something was done.

4    But it's -- it's really a -- yeah, it's a very

5    concerning case.

6        Q.  Okay.  But you don't know if the exact same

7    sequence may have happened in general population, do

8    you?

9        A.  I haven't assessed the adequacy of the health

10   care in segregation.

11       Q.  You mean general population.

12       A.  Or, sorry.  In general -- I apologize.  Thank

13   you.

14           I have not accessed -- assessed the adequacy

15   of the health care in general population.

16       Q.  Okay.  And then for Mr. Espinosa you also

17   mentioned that he was on some type of property

18   restriction in November of -- well, I don't think you

19   say when.  You just say he was on some type of

20   property restriction, right?  Do you know specifically

21   what property he was restricted -- restricted from at

22   that time?

23       A.  I don't recall as I sit here today.

24       Q.  So when you say that the property restriction

25   exacerbated his pain and suffering, are -- are you

1  speculating there?

2       A.  I believe that -- as I recall, he mentioned

3  that he may have had his mattress taken away.

4            But if somebody is sleeping on the floor or

5  they're somehow forced to be on the floor, that would

6  certainly be a more painful experience when you have

7  a -- a broken foot.  Just the ability to get up and

8  down and -- and transfer back and forth.

9       Q.  Okay.  But as you sit here, you don't know

10 if -- if his mattress was taken away from him at that

11 time?

12      A.  I don't recall at this moment.

13      Q.  Are you familiar with the Osterback lawsuit

14 here in Florida?

15      A.  I'm not sure that I am.

16      Q.  Do you know if at any point Florida's system

17 of close management has been reviewed by a court?

18      A.  I -- I wouldn't -- just because I know this

19 has happened in lots of states I wouldn't be surprised

20 that there had been litigation or a court review at --

21 at some point.

22      Q.  Okay.  But you don't know specifically what

23 the terms of that court review may have been here in

24 Florida --

25      A.  Correct.

1          Q.  -- of the -- of the CM system?  Okay.

2              All right.  And I apologize for doing this at

3     the end of the day, but something was brought to my

4     attention that I need to ask you about.

5              MS. SMITH:  Jeffrey, could you bring up the

6         last exhibit.

7              And Madam Court Reporter, what are we on?

8              COURT REPORTER:  We are on No. 3.

9              MS. SMITH:  Are we 3?  I think we're 4,

10        right, Kara?

11             MS. WALLIS:  Yeah, we're 4.

12             COURT REPORTER:  Then I don't know what 3

13        was.

14             MS. SMITH:  Was it the NCCHC?

15             MS. WALLIS:  Yes.

16             COURT REPORTER:  Oh, okay.  Maybe I didn't

17        hear you say that you wanted it marked as 3.

18             MS. SMITH:  No problem.

19        Q.  (By Ms. Smith) Okay.  So it's come to my

20    attention, Dr. Venters, there was some finding of

21    scientific misconduct in connection with when you were

22    a graduate student; is that correct?

23        A.  Yes.

24        Q.  Okay.  And the Office of Research Integrity

25    and the Assistant Secretary for Health conducted an

1    investigation against you and found that you had

2    committed misconduct in science; is that correct?

3         A.   Yes.

4         Q.   Okay.  And -- and what was -- what was the --

5    the penalty that you faced as a result of that

6    misconduct?

7         A.   As I recall, there were some -- several

8    figures in a paper that I alerted the publication to

9    the lack of reliability of those figures, which

10   amounted to a retraction of part of a paper.  And then

11   I entered into a period of I think what is called

12   voluntary monitoring where for I think two or

13   three years if I did research after this settlement,

14   then I would have an extra basically advisor review my

15   data before I published.  And so I went through that

16   process and then came out of it in good standing and

17   the period of monitoring ended.

18        Q.   Okay.  So there was a -- a voluntary

19   settlement that you reached with the Office of

20   Research Integrity and the Assistant Secretary of --

21   of Health; is that right?

22        A.   Yes.

23        Q.   Okay.  And as part of that voluntary

24   settlement, did you admit that you had engaged in what

25   they're calling misconduct in science?

1      A.   Yes.

2      Q.   And did the misconduct involve -- was it

3   falsifying some kind of a -- of data?

4      A.   It involved how images were represented.   And

5   so -- I don't really recall the specifics, but I -- I

6   agreed with them about the -- the terms of the

7   settlement, which included that it involved misconduct

8   and that I would take the actions that they -- that

9   were laid out in the voluntary agreement.

10      Q.   Okay.  And this was after you had obtained

11   your -- your M.D., correct?

12      A.   I'm not sure.  I think these experiments

13   might have been done in 2000 or 2001, and so I think I

14   graduated medical school after.  Yeah, this is before

15   I was an M.D..

16      Q.   So this is --

17      A.   I think that the settlement, which occurred

18   years later in 2008, was I think after I was -- yes,

19   the settlement occurred after I became -- after I

20   graduated from medical school, but this -- these

21   experiments and this kind of investigation happened

22   before.

23      Q.   Okay.  And did this -- these findings, did

24   they impact your ability to obtain your license to --

25   to practice medicine?

```
1         A.   No.
2         Q.   Have you had any findings of scientific
3    misconduct aside from this one?
4         A.   No.
5              MS. SMITH:  All right.  Let me take one
6         last -- I only need, like, 2 minutes.  I just want
7         to wrap up, and then we'll finish up.  Thank you.
8              You can take that down, Jeff.
9              (A recess was taken from 4:46 to 4:48.)
10             MS. SMITH:  All right.  We're back on.
11             Dr. Venters, I don't have any further
12        questions for you today.  Thank you very much for
13        your time, sir.  I appreciate it.
14             THE WITNESS:  Thank you.
15             MS. SMITH:  All right.
16             Kara, nothing from you?
17             MS. WALLIS:  Nope, nothing from me.
18             MS. SMITH:  Okay.  Thank you.
19             We will order a copy of the deposition,
20        please.
21             MS. WALLIS:  And, Court Reporter, we would
22        also like a copy of the deposition as well.
23             COURT REPORTER:  Okay.  Thank you.
24             (Discussion off the record.)
25             MS. WALLIS:  And, I apologize, I also wanted
```

1           to add that we want a copy of the transcript to

2        also read and sign.

3               COURT REPORTER:  Perfect.  Thank you.

4               (The deposition was concluded at 4:49 p.m..)

5               (Defendant's Exhibits 1 - 4 were marked.)

6    (Reading and signing of the deposition was not waived

7    by the witness and all parties.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE OF OATH

2

3

4    STATE OF FLORIDA

5    COUNTY OF ORANGE

6

7          I, Kimberly Arsenault, Registered Professional

8    Reporter, Notary Public, State of Florida, certify

9    that HOMER D. VENTERS, M.D. appeared before me by

10   remote videoconferencing on the 10th day of August

11   2021 and was duly sworn.

12         Signed this 17th day of August 2021.

13

14

15

16                   *Kimberly Arsenault*

17                   _____
                     Kimberly Arsenault, RPR
18                   Notary Public, State of FL
                     Commission No. GG 251326
19                   Expires:  10/26/2022

20

21

22

23

24

25

```
1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA

4    COUNTY OF ORANGE

5

6         I, Kimberly Arsenault, Registered Professional

7    Reporter, certify that I was authorized to and did

8    stenographically report the deposition of HOMER D.

9    VENTERS, M.D., Pages 1 through 277; that a review of

10   the transcript WAS requested; and that the transcript

11   is a true and complete record of my stenographic

12   notes.

13        I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative or employee of any of the parties'

16   attorneys or counsel connected with the action, nor am

17   I financially interested in the action.

18        Dated this 17th day of August 2021.

19                    Kimberly Arsenault

20                    _____

21                    Kimberly Arsenault, RPR
                      Registered Professional Reporter

22

23

24

25
```

```
1                        ERRATA SHEET
2    DO NOT WRITE ON THE TRANSCRIPT~ENTER CHANGES ON THIS PAGE
3      IN RE:   JAC'QUANN (ADMIRE) HARVARD; J.H., a minor, by
                and through his parents and natural guardian,
4                Valentine Robinson; ANGEL MEDDLER; JUAN
                ESPINOSA; JEROME BURGESS (a/k/a SHAM'LA GOD
5                ALLAH); JAMES W. KENDRICK, JR.; and JOHNNY HILL;
                on behalf of themselves and all others similarly
6                situated v. MARK INCH, in his official capacity
                as Secretary of the Florida Department of
7                Corrections, and FLORIDA DEPARTMENT OF
                CORRECTIONS, an Agency of the State of Florida
8
     Witness: HOMER D. VENTERS, M.D.
9    Date:  August 10, 2021
     U.S. Legal Support Job No. 2481884
10
     Page No.   Line No.      Change            Reason
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   Under penalties of perjury, I declare that I have read
     the foregoing document and that the facts stated in it
24   are true.
25   _____         _____
        Date                        HOMER D. VENTERS, M.D.
```

```
 1   August 17, 2021

 2   Homer D. Venters, M.D.
     c/o Kara S. Wallis, Esq.
 3   Florida Justice Institute
     100 SE 2nd Street, Suite 3750
 4   Miami, Florida 33131


 5
      IN RE:   JAC'QUANN (ADMIRE) HARVARD; J.H., a minor, by
 6             and through his parents and natural guardian,
               Valentine Robinson; ANGEL MEDDLER; JUAN
 7             ESPINOSA; JEROME BURGESS (a/k/a SHAM'LA GOD
               ALLAH); JAMES W. KENDRICK, JR.; and JOHNNY
 8             HILL; on behalf of themselves and all others
               similarly situated v. MARK INCH, in his
 9             official capacity as Secretary of the Florida
               Department of Corrections, and FLORIDA
10             DEPARTMENT OF CORRECTIONS, an Agency of the
               State of Florida
11
      Witness: HOMER D. VENTERS, M.D.
12    Date:  August 10, 2021
      U.S. Legal Support Job No. 2481884
13

14   The transcript of the above-referenced proceeding has
     been prepared and is being provided to your office for
15   review by the witness.

16   We respectfully request that the witness complete
     their review within 30 days and return the errata
17   sheet to our office.

18
     Sincerely,
19

20   Kimberly Arsenault, RPR
     U.S. Legal Support, Inc.
21   149 South Ridgewood Avenue, Suite 400
     Daytona Beach, Florida 32114
22   (386)423-1963

23
     CC via transcript:
24
     Nicole S. Smith, Esq.
25   Kara S. Wallis, Esq.
```

# Dr. Homer Venters
# Exhibit 1 Injury Surveillance in New York City Jails

| RESEARCH AND PRACTICE

# Injury Surveillance in New York City Jails

Ariel Ludwig, MPH, Louise Cohen, MPH, Amanda Parsons, MD, MBA, and Homer Venters, MD, MS

To characterize injuries occurring in jails, we analyzed injury report forms from the New York City jail system. We abstracted data from 4695 injury report forms representing 3863 patients. Of the injuries reported, 66% were classified as intentional. The 2 leading causes of injuries were inmate-on-inmate aggression (40%) and slips and falls (27%). Injuries place a considerable burden on jail health care systems, and there is a need for more studies on this problem and development of injury prevention programs. (*Am J Public Health.* 2012;102:1108–1111. doi:10.2105/AJPH.2011.300306)

Although inmate injuries place a considerable burden on both individuals and the jail health care system, there is little published research on the topic.[1–4] These injuries also have an impact on the communities to which inmates return and have been found to compound existing barriers to employment, education, housing, and substance abuse treatment, which can affect reintegration into the community and increase the likelihood of recidivism.[5–10]

New York City has one of the largest jail systems in the United States, with more than 90 000 admissions annually and a daily inmate population of approximately 13 000. Inmates are in the custody of the New York City Department of Correction (DOC), and the New York City Department of Health and Mental Hygiene (DOHMH) is responsible for their health care. According to protocols developed by the 2 agencies, all inmates who are injured or suspected of being injured are taken to the jail clinic by the DOC for medical evaluation even if their injuries appear minor or if they intend to refuse treatment. We

analyzed New York City jail system injury report data in an effort to gain a better understanding of the extent and nature of injuries occurring in jails.

## METHODS

DOC protocols require that all staff-observed or inmate-reported injuries be followed by an injury report by DOC staff as well as an evaluation by medical staff. The report contains elements that are completed by the DOC (such as the narrative of the circumstances of the injury and the location of the injury) as well as by medical staff (including a physical examination and disposition). As part of DOHMH's routine surveillance of injury statistics in the jail system, we reviewed 5454 injury reports from all 11 New York City jails that were logged between January 1, 2010, and April 30, 2010. Injury reports were assessed for completeness, and only the 4695 (86%) complete reports were coded for analysis. Of these reports, 3062 (65%) included a detectable medical injury based on a physical examination conducted by a medical staff member.

Injuries were categorized according to Centers for Disease Control and Prevention classifications as either unintentional (e.g., slips, falls, seizures, occupational accidents) or intentional (inmate-on-inmate violence, use of force by a correction officer, or a self-inflicted injury) based on the DOC staff's narrative description of the injury. Because multiple injuries may occur during a single incident and be recorded on a single report, up to 3 injuries were included from each report.

We used SPSS version 17.0 (SPSS Inc, Chicago, IL) in our data analyses. To calculate injury rates, we used the average daily inmate census of 12 500 and 0.33 years as the denominator for exposure time (based on the 4-month report review period). Unadjusted injury rates are reported in person-years.

Separately, we used a daily emergency log completed by the DOHMH to review all cases during this period referred by medical or correctional staff for emergency treatment or treatment that required equipment not available in the regular prison health clinics. This log records all emergencies that occur within the jail system and includes information on whether

the patient is treated in the regular jail clinic, a jail urgent care clinic, or a local hospital emergency department. The log is cross checked on a daily basis with a similar log maintained by the DOC. As a means of validating observed injury rates, we reviewed emergencies listed in the log to determine whether they appeared to involve an injury and, if so, whether an injury report form had been submitted.

## RESULTS

The 4695 complete injury reports represented 3863 unique individuals, of whom **832 had more than one report. Ultimately,** 3062 (65%) reports representing 2519 in-**dividuals contained a detectable medical injury. Table 1 shows selected characteristics of** inmates with injury reports who were found by medical staff to have a confirmed injury. These individuals had a median age of 26 years (mode = 17 years) at the time of their injury and had been incarcerated for a median of 71 days (mode = 1 day).

Table 2 shows the characteristics associated with the 3062 confirmed injury reports. The majority of injuries were reported as intentional (66%), and all types of injuries with the exception of neck and spinal injuries were more likely to be classified as intentional. Housing areas (29%) were the most common location at which injuries occurred. The most prevalent types of injuries were soft tissue or muscle injuries (35%), followed by skin and soft tissue injuries (27%), which ranged from minor abrasions to severe lacerations and puncture wounds. Of all confirmed injuries reported, 39% were deemed not resolvable by facility medical staff and required further evaluation or treatment at jail urgent care clinics or local hospital emergency departments. The rate of reported, medically detectable injuries was 736 per 1000 person-years.

Self-injury (classified as the cause of 8% of injuries) and asphyxiation (accounting for 2% of injuries) represent overlapping and important indicators of mental illness in jail settings. Of these injuries, approximately 40% required evaluation and care outside the jail. All self-injurious behavior results in immediate medical and mental health evaluations.

In our separate review of the daily emergency log used by the DOHMH, we observed

▢▢▢ ▢▢▢▢  **Def 1**
Witness: Venters
Date: 8/10/21
Court Reporter: Kimberly Arsenault

TABLE 1—Selected Characteristics of Inmates With Reported Injuries:
New York City Jails, January–April 2010

| Characteristic | Sample (n = 3062), Mean (Range) or No. (%) |
| --- | --- |
| Age, y | 31 (17–76) |
| Length of stay at time of injury, d | 142 (1–3761) |
| No. of previous arrests | 4 (0–14) |
| Gender | |
| Male | 2786 (91) |
| Female | 276 (9) |
| Mental illness diagnosis (current or history) | |
| Yes | 1163 (38) |
| Na | 1877 (61) |
| Data missing | 22 (1) |
| Illicit drug use (current or history) | |
| Yes | 980 (32) |
| Na | 2059 (67) |
| Data missing | 23 (1) |
| Self-reported alcohol abuse | |
| Yes | 337 (11) |
| Na | 2695 (88) |
| Data missing | 30 (1) |
| Self-reported smoking status | |
| Smoker | 1592 (52) |
| Nonsmoker | 1317 (43) |
| Former smoker | 92 (3) |
| Data missing | 61 (2) |
| Jail housing category | |
| General housing | 2878 (94) |
| 23-h isolation | 184 (6) |

that injuries were reported for 32% (324) of the 1014 patients transferred to hospital emergency departments and 42% (1238) of the 2948 patients transferred to jail urgent care clinics during the 4-month study period. Of injury-related transfers to jail urgent care clinics or hospital emergency departments, 33% did not involve an associated injury report in the medical record and were therefore not included in our classification analysis.

## DISCUSSION

We found that injuries were relatively common medical problems in jail settings. The injury rates observed in this study differ from those reported in the community, which are generally between 90 and 300 per 1000 person-years for all medically consulted injuries.[11–17] However, unlike in the community setting, every report of injury, assault, and use of force in the correctional settings assessed here must be documented and investigated, leading to higher rates of documented injuries. A more useful comparison can be made with state prisons. A brief report on injuries from a state prison in 1995 revealed injury rates similar to ours but with a concentration in sports-related injuries.[18] The most serious injuries in jails, those resulting in death from accident, homicide, or suicide, represent approximately 35% of all deaths.[19]

Although this summary of injuries occurring in jails is an important initial step, our analysis has several limitations. Despite the jail protocol, our medical emergency log review revealed potential gaps in injury reporting.

One third of injury-related transfers to hospitals and urgent care clinics recorded in the emergency log lacked a corresponding injury report in the medical record. Conversely, some injuries may have been fabricated by inmates seeking medical attention for other reasons (e.g., those seeking attention and those wishing to be moved away from, or closer to, other inmates). Some narrative reports did not contain sufficient information for analysis and were therefore not included.

Additional limitations stem from systemic biases in injury reporting, including biases due to perceived secondary gains such as compensation from possible lawsuits, a desire for transfer, or simply a desire to go to the hospital. In addition, some inmates may choose to report an injury as accidental (e.g., as a "slip and fall"), as opposed to reporting the real reason, as a result of fear, shame, or other motives. Consequently, our calculated injury rates may be either underestimates or overestimates of the actual rates.

Ultimately, we found that almost 40% of the urgent care and emergency department care for inmates is injury related, which has both medical and financial significance. Injuries represent an important health risk for those who are incarcerated, and their treatment often requires medical staff to interrupt their regularly scheduled sick call and chronic care appointments.

Because of the security response associated with some injuries, the movement of other patients to and from the clinic may be curtailed. Injuries requiring transportation outside the jail necessitate dedicated correction officers to accompany the patient. A conservative estimate is that 750 emergency department visits each year by inmates in New York City are injury related, creating significant additional costs for the DOC, the DOHMH, and emergency medical services, as well as hospital emergency departments and jail health staff. Some of these costs could be offset through investments in diagnostic equipment and personnel usually reserved for hospital settings, although a comprehensive cost–benefit analysis would be needed to assess the feasibility of this solution.

Given the dearth of published research on injuries in incarcerated populations, future studies are needed to thoroughly investigate

| RESEARCH AND PRACTICE |

**TABLE 2—Characteristics of Medically Detectable Injuries Reported in New York City Jails, January–April 2010**

| Characteristic | Confirmed Injuries (n = 3062), No. (%) |
|---|---|
| Intentionality | |
| Unintentional | 979 (32) |
| Intentional | 2021 (66) |
| Unknown/data missing | 62 (2) |
| Reported cause | |
| Inmate-on-inmate fight | 1230 (40) |
| Slip or fall | 813 (27) |
| Use of force | 369 (12) |
| Self-inflicted | 254 (8) |
| Occupational | 85 (3) |
| Alleged attack by staff | 63 (2) |
| Attack by unknown assailant | 57 (2) |
| Vehicle | 21 (<1) |
| Environmental | 15 (<1) |
| Seizure related | 15 (<1) |
| Other | 46 (2) |
| Data missing | 94 |
| Type of injury | |
| Soft tissue injury (contusion, no fracture concern) | 1694 (55) |
| Skin and soft tissue injury (abrasion, laceration) | 1262 (41) |
| Possible fracture | 856 (28) |
| Head injury | 398 (13) |
| Neck/spinal injury | 172 (6) |
| Chemical burn | 109 (4) |
| Foreign body | 61 (2) |
| Asphyxiation | 58 (2) |
| Dental | 43 (1) |
| Sexual assault | 16 (<1) |
| Splash | 14 (<1) |
| Other | 23 (<1) |
| Data missing | 93 |
| Location/area in which injury reportedly occurred | |
| Housing | 895 (29) |
| Common area[a] | 593 (19) |
| Shower | 309 (10) |
| Recreation area | 163 (5) |
| Intake/holding pen | 146 (5) |
| Transportation/court | 110 (4) |
| Occupational setting | 80 (3) |
| School | 59 (2) |
| Clinic | 49 (2) |
| Visit area | 22 (1) |
| Search by Department of Correction | 16 (<1) |
| Other | 42 (1) |
| Data missing | 578 (19) |

[a]Including mess hall, dayroom, and corridors.

the incidence and circumstances of these injuries. The results of these studies can be used to inform injury prevention strategies in correctional facilities. ∎

## About the Authors

*The authors are with Correctional Health Services, New York City Department of Health and Mental Hygiene, New York, NY.*

*Correspondence should be sent to Homer Venters, MD, MS, 115 W Perimeter Rd, Rikers Island, East Elmhurst, NY 11370 (e-mail: hventer1@health.nyc.gov). Reprints can be ordered at http://www.ajph.org by clicking on the "Reprints" link.*

*This article was accepted May 19, 2011.*

## Contributors

A. Ludwig and H. Venters wrote the first draft of the article. L. Cohen worked on an outline of the first draft and on subsequent revisions. A. Parsons contributed to subsequent revisions and to revisions of tables. H. Venters made final changes on all subsequent revisions of both the article and the tables.

## Human Participant Protection

Because this study was part of routine health surveillance and involved no personal health information, no protocol approval was needed.

## References

1. Beck AJ, Harrison PM. *Sexual Victimization in Local Jails Reported by Inmates, 2007.* Washington, DC: Bureau of Justice Statistics; 2008.

2. Mumola CJ. *Suicide and Homicide in State Prisons and Local Jails.* Washington, DC: Bureau of Justice Statistics; 2005.

3. Noonan M. *Deaths in Custody Reporting Program.* Washington, DC: Bureau of Justice Statistics; 2010.

4. Sung H- E. Nonfatal violence-related and accident-related injuries among jail inmates in the United States. *Prison J.* 2010;90(3):353–368.

5. Michaels AJ, Michaels CE, Smith JS, Moon CH, Peterson C, Long WB. Outcome from injury: general health, work status, and satisfaction 12 months after trauma. *J Trauma.* 2000;48(5):841–848.

6. Resnick H, Acierno R, Kilpatrick D. Health impact of interpersonal violence 2: medical and mental health outcomes. *Behav Med.* 1997;23(2):65–78.

7. Steel J, Youssef M, Pfeifer R, et al. Health-related quality of life in patients with multiple injuries and traumatic brain injury 10+ years post injury. *J Trauma.* 2010;69(3):523–530.

8. Holbrook TL, Anderson JP, Sieber WJ, Browner D, Hoyt DB. Outcome after major trauma: 12-month and 18-month follow-up results from the Trauma Recovery Project. *J Trauma.* 1999;46(5):765–771.

9. Miller TR, Pindus NM, Douglass JB, Rossman SB. *Databook on Nonfatal Injury: Incidence, Costs and Consequences.* Washington, DC: Urban Institute Press; 1995.

10. Zatzick D, Jurkovich GJ, Rivara FP, et al. A national US study of posttraumatic stress disorder,

## RESEARCH AND PRACTICE

depression, and work and functional outcomes after hospitalization for traumatic injury. *Ann Surg.* 2008;248(3):429–437.

11. Adams PF, Dey AN, Vickerie JL. Summary health statistics for the U.S. population: National Health Interview Survey, 2005. *Vital Health Stat 10.* 2007; 233:1–104.

12. National Center for Injury Prevention and Control. *CDC Injury Fact Book.* Atlanta, GA: Centers for Disease Control and Prevention; 2006.

13. New York City Dept of Health and Mental Hygiene. Summary of vital statistics 2002. Available at: http://www.nyc.gov/html/doh/downloads/pdf/vs/2002sum.pdf. Accessed March 27, 2012.

14. *Hospital Admissions for Injuries.* New York, NY: New York City Dept of Health and Mental Hygiene; 2004.

15. Tiesman H, Zwerling C, Peek-Asa C, Sprince N, Cavanaugh JE. Non-fatal injuries among urban and rural residents: the National Health Interview Survey, 1997–2001. *Inj Prev.* 2007;13(2):115–119.

16. 10 leading causes of hospitalizations (live discharges)—New York City: 2002–2006. Available at: http://www.nyc.gov/html/doh/downloads/pdf/ip/ip-hosp-all-rank.pdf. Accessed March 27, 2012.

17. Wilt SA, Gabrel CS. A weapon-related injury surveillance system in New York City. *Am J Prev Med.* 1998;15(suppl 3):75–82.

18. Centers for Disease Control and Prevention. Injury surveillance in correctional facilities—Michigan, April 1994–March 1995. *MMWR Morb Mortal Wkly Rep.* 1996;45(3):69–72.

19. Office of Justice Programs, Bureau of Justice Statistics. Local jail deaths, 2000–2006. Available at: http://bjs.ojp.usdoj.gov/content/dcrp/tables/dcst06lj2.cfm. Accessed March 27, 2012.

# Dr. Homer Venters
# Exhibit 2 Civil Minutes – General
# Martinez v The Geo Group

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |

| | |
|---|---|
| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |

| | | |
|---|---|---|
| Present: The Honorable | SHERI PYM, United States Magistrate Judge | |
| Kimberly I. Carter | | None |
| Deputy Clerk | | Court Reporter / Recorder |

| | |
|---|---|
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
| None | None |

| | |
|---|---|
| Proceedings: | **(In Chambers) Order Granting Motion to Bifurcate Trial [146], and Granting in Part and Denying in Part Motions in Limine [147, 148, 149, 151, 152, 153, 154]** |

# I. **INTRODUCTION**

Before the court are three motions in limine filed by plaintiffs (docket nos. 147-49), four motions in limine filed by defendants (docket nos. 151-54), and defendants' motion to bifurcate trial (docket no. 146). The parties filed their motions on December 30 and 31, 2019, their oppositions to the motions on January 7, 8, and 9, 2020, and their replies on January 14, 2020.

The court held a pretrial conference and heard argument on the motions on January 21, 2020. The court rules on (or reserves ruling on) each motion as set forth below, and for the reasons discussed at the pretrial conference.

# II. **BACKGROUND**

On August 15, 2019, plaintiffs filed the operative Second Amended Complaint ("SAC") based on federal and state law violations that allegedly occurred while plaintiffs, refugees from El Salvador and Honduras, were detained at the Adelanto Processing Center in Adelanto, California. Defendant GEO Group is a private corporation that operates the Adelanto facility subject to ICE guidelines, and individual defendants Jane Diaz and Giovanni Campos were employed by GEO Group as supervisory officers at Adelanto. Plaintiffs allege they undertook a hunger strike to protest the conditions at

□□□ □□□□ **Def 2**
Witness: Venters
Date: 8/10/21
Court Reporter: Kimberly Arsenault

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

Adelanto, and defendants responded by beating them, using pepper spray, improperly decontaminating them, and failing to provide adequate medical treatment.

On January 7, 2020, the court granted in part and denied in part defendants' motions for summary judgment. The court granted defendants summary judgment on the federal civil rights claims, and dismissed the City of Adelanto as a defendant from the case. The motions were denied in all other respects.

## III. DISCUSSION

### A.  Legal Standard

A party may use a motion in limine to exclude inadmissible or prejudicial evidence before it is actually offered at trial. *See Luce v. U.S.*, 469 U.S. 38, 40 n.2, 105 S. Ct. 460, 83 L. Ed. 2d 443 (1984). A motion in limine is "an important tool available to the trial judge to ensure the expeditious and evenhanded management of the trial proceedings." *Jonasson v. Lutheran Child & Family Services*, 115 F.3d 436, 440 (7th Cir. 1997). It also reduces the likelihood that unduly prejudicial evidence will ever reach the jury. *See Brodit v. Cambra*, 350 F.3d 985, 1004-05 (9th Cir. 2003) (citation omitted).

Motions in limine that seek exclusion of broad and unspecific categories of evidence, however, are generally disfavored. *Sperberg v. Goodyear Tire and Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975). Courts have recognized that they are "almost always better situated during the actual trial to assess the value and utility of evidence." *Wilkins v. Kmart Corp.*, 487 F. Supp. 2d 1216, 1218 (D. Kan. 2007). Therefore, when confronted with this situation, "a better practice is to deal with questions of admissibility of evidence as they arise [in actual trial]" as opposed to tackling the matter in a vacuum on a motion in limine. *Sperberg*, 519 F.2d at 712; *see U.S. v. Marino*, 200 F.3d 6, 11 (1st Cir. 1999) (recognizing that proffered evidence can be more accurately assessed in the context of other evidence).

Further, "a motion in limine should not be used to resolve factual disputes or weigh evidence." *C & E Services, Inc. v. Ashland Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008). That is the province of the jury. *See Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Nor should a motion in limine be used as a substitute for a motion for summary judgment. *C & E Services*, 539

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

F. Supp. 2d at 323.

Regardless of a court's initial decision on a motion in limine, it may revisit the issue at trial. *See* Fed. R. Evid. 103, Advisory Committee's note to 2000 Amendment ("Even where the court's ruling is definitive, nothing in the amendment prohibits the court from revisiting its decision when the evidence is to be offered."); *Luce*, 469 U.S. at 41-42 ("[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."). "The Supreme Court has recognized that a ruling on a motion in limine is essentially a preliminary opinion that falls entirely within the discretion of the district court." *U.S. v. Bensimon*, 172 F.3d 1121, 1127 (9th Cir. 1999) (citing *Luce*, 469 U.S. at 41-42). Rule 103 does not require a court to rule on a motion in limine. *CFM Commc'ns, LLC v. Mitts Telecasting Co.*, 424 F. Supp. 2d 1229, 1233 (E.D. Cal. 2005) (citation omitted).

A.   <u>Defendants' Motion to Bifurcate Trial (docket no. 146)</u>

Defendants move to bifurcate the trial into two phases: one regarding liability and compensatory damages, and another regarding punitive damages. Defendants argue separating punitive damages will avoid presenting unnecessary evidence about defendants' personal finances and net worth, which will help expedite trial proceedings. Mtn. at 3-4. Defendants anticipate that the jury would still decide in the first phase if punitive damages are warranted, but determination of the amount would be reserved for the second phase. *Id.* at 3.

On January 7, 2020, plaintiffs filed a Statement of Non-Opposition to defendants' motion. Although plaintiffs state that their non-opposition is conditioned on defendants' agreement that defendants will not mention their own ability or inability to pay during the first phase of the trial, avoiding such information in phase one is the reason for defendants' motion. The parties are thus in agreement that the trial should be bifurcated.

Under Federal Rule of Civil Procedure 42(b), a court may order a separate trial of one or more separate issues "for convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). Rule 42(b) "confers broad discretion upon the district court to bifurcate a trial, thereby deferring costly and possibly unnecessary proceedings pending resolution of potentially dispositive preliminary issues." *Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002). Accordingly, defendants'

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |

motion to bifurcate the trial into two phases, one about liability and compensatory damages, and the second concerning the amount of punitive damages provided the jury decides to award punitive damages in phase one, is granted.

### B. Plaintiffs' Motion in Limine No. 1 (docket no. 148)

Plaintiffs seek to exclude evidence of plaintiff Rivera Martinez's two prior felony convictions from El Salvador. Plaintiffs state that both convictions occurred over 10 years ago, one of the convictions was for assault, and plaintiff Rivera Martinez incurred these convictions in 2006 and served a seven-year sentence from 2006 to 2013. Mtn. at 1, 3. Plaintiffs contend any evidence of the convictions must be excluded under Rules 401 and 403 because the evidence is not relevant to this litigation, and the prejudicial effect would substantially outweigh any probative value. *Id.* at 1. Plaintiffs argue the assault conviction is not probative of plaintiff Rivera Martinez's credibility as a witness, and the convictions should be excluded because, although Rivera Martinez was released from confinement less than ten years ago, putting the convictions within the ambit of Rule 609(a), the age of the actual convictions and lack of connection to the claims here support their exclusion. *Id.* at 3-4. If evidence of plaintiff Rivera Martinez's convictions are introduced, plaintiffs contend he should be allowed to present evidence that he maintains his innocence as to both convictions. *Id.* at 4.

Defendants have agreed to exclude any reference of the nature of the underlying convictions, but maintain that felony convictions are admissible for impeachment purposes. Opp. at 2. Defendants state the felony convictions were for sexual assault/rape and theft, and must be admitted under Rule 609(a). *Id.* Defendants further contend Rule 608(b) provides a separate basis for inquiring into specific instances of misconduct in a witness's past on cross-examination. *Id.* As to whether the convictions would be prejudicial and not probative of plaintiff Rivera Martinez's truthfulness, defendants argue they will not seek to introduce the nature of the crimes and only rely on the sanitized fact that the felony convictions exist. *Id.* at 3. Finally, defendants argue evidence of plaintiff Rivera Martinez's innocence is unnecessary, and in any case, allowing plaintiff to offer a single statement of his innocence would consume little to no time at trial. *Id.*

In their Reply, plaintiffs argue evidence that plaintiff Rivera Martinez was convicted of two felonies is unnecessarily cumulative because he served a single seven-year sentence for both convictions. Reply at 2. Plaintiffs further argue the impeachment

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

value of the convictions is low because the convictions are almost 14 years old and arose out of El Salvador, which according to plaintiffs, is a country with insufficient due process protections. *Id.* at 1.

Federal Rule of Evidence 609 governs impeachment by evidence of a criminal conviction. Under Rule 609(a), evidence of a crime that was punishable by death or by imprisonment for more than one year in the convicting jurisdiction must be admitted in a civil case, subject to Rule 403. Fed. R. Evid. 609(a)(1)(A). Rule 403 provides that a court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403.

Although defendants contend Rule 608(b) provides a separate basis for the felony convictions to be introduced to impeach plaintiff Rivera Martinez, Rule 608 is a broader rule that covers witness testimony in general. Because Rule 609 specifically governs impeachment by evidence of a criminal conviction, it is the applicable rule here. *See U.S. v. Osazuwa*, 564 F.3d 1169, 1175 (9th Cir. 2009) ("[W]e hold that Rule 608(b) permits impeachment only by specific acts that have not resulted in a criminal conviction. Evidence relating to impeachment by way of criminal conviction is treated exclusively under Rule 609, to which we now turn.").

Plaintiff's sexual assault/rape conviction does not involve dishonesty or a false statement, and if the nature of the conviction were admitted there would be some risk that the prejudicial effect to plaintiff would outweigh any probative value. But where, as here, defendants are willing to only elicit testimony about the fact that the convictions exist and not their underlying substance, the prejudicial effect is mitigated. *See Howard v. Cty. of Riverside*, 2014 WL 12589655, at *8 (C.D. Cal. June 3, 2014) (ruling that defendants may introduce only the fact that plaintiff has been convicted of a felony to impeach him after weighing the probative value against the risk of prejudice); *see also Thomas v. Garcia*, 2013 WL 3773861, at *2 (E.D. Cal. July 17, 2013) (reaching same conclusion and permitting defendants to introduce the fact of a conviction and sentence served); *Martinez v. Davis*, 2011 WL 486255, at *3-4 (C.D. Cal. Feb. 4, 2011) (permitting defendants to introduce evidence only of the plaintiff's conviction and sentence, but not the nature of the conviction). Thus, Rule 403 does not warrant exclusion of the fact that plaintiff Rivera Martinez has two felony convictions.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

A somewhat closer question is whether the procedural protections afforded
criminal defendants in El Salvador are sufficient to warrant admission of the fact of
plaintiff's El Salvador felony convictions. *See U.S. v. Wilson*, 556 F.2d 1177, 1178 (4th
Cir. 1977) (not error to allow testimony regarding fact of felony conviction in Germany
where "defendant has not shown that the German legal system lacks the procedural
protections necessary for fundamental fairness"). The court will not permit a mini trial
before the jury on the fairness of plaintiff's convictions here; it is for the court to decide
whether plaintiff's El Salvador convictions may be admitted. Plaintiffs point to a State
Department report on human rights in El Salvador, but the lack of a right to a jury and
somewhat less developed forensic capabilities does not prove a lack of fundamental
fairness. *See id.* ("a jury trial is not essential for fairness in every system of justice").
And while El Salvador may suffer from greater corruption than the United States,
plaintiffs have made no showing that corruption played any role in plaintiff Rivera
Martinez's convictions.

Accordingly, the court denies plaintiffs' motion in limine no. 1. The parties may
elicit testimony establishing that plaintiff Rivera Martinez incurred two felony
convictions in El Salvador, and that he maintains he was innocent. All other details
regarding the convictions are excluded.

**C.     Plaintiffs' Motion in Limine No. 2 (docket no. 147)**

Plaintiffs' second motion in limine concerns references to and evidence of
plaintiffs' immigration backgrounds. Plaintiffs seek to preclude defendants from
introducing any references or evidence about plaintiffs' entries to or departures from the
United States that use terms such as "unlawful entry," "without inspection,"
"deportation," or "order of deportation." Pls.'s Proposed Order (docket no. 147-1) at 2.
Plaintiffs argue references and evidence that presume plaintiffs' actions in entering the
country were unlawful should be precluded because they are irrelevant, unfairly
prejudicial, could confuse the jury, and could constitute improper character evidence
under Rule 404. *Id.* at 1-3. Plaintiffs additionally argue evidence of plaintiffs' departures
from the United States should be precluded on the same grounds. *Id.* at 2. Plaintiffs
explain that they do not seek to exclude all evidence about plaintiffs' immigration status
– because, for instance, because the parties will need to explain to the jury why plaintiffs
were civil detainees in ICE custody – but only those references or evidence about
plaintiffs entering the country unlawfully and that some plaintiffs were later deported. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

at 5-6.

Defendants contend the parties should be limited to using only neutral references and evidence, or the door should be opened to all terms, both good and bad. Opp. at 2. Allowing plaintiffs to use sympathetic terms such as "asylum" or introduce evidence about conditions in Central America, their journeys to the border, or their asylum claims, according to defendants, is not relevant and would unduly prejudice defendants. *Id.* Defendants propose limiting information about plaintiffs' immigration histories to facts such as that they arrived in California on a certain date and were housed at Adelanto for a specific time period. *Id.* at 2-3. To the extent that plaintiffs are concerned about what the jury will be told if some plaintiffs are unable to attend trial in-person, defendants state these concerns can be addressed with a jury instruction. *Id.* at 3. Defendants request that the court determine a sanitized method of discussing plaintiffs' detention without referring to them as either illegal immigrants or asylum-seekers. *Id.* at 3.

In their Reply, plaintiffs argue they are entitled to provide the jury with some factual context about their backgrounds, and the absence of any explanation of who they are and why they were detained at Adelanto would confuse the jury and prejudice plaintiffs, especially given that Adelanto resembles a correctional facility in many respects. Reply at 2-3. Plaintiffs further argue defendants do not explain why plaintiffs' backgrounds and status as asylum seekers would prejudice them other than by stating that "asylum" is a sympathetic term. *Id.* at 2.

Courts have held that references to a party's immigration status may expose that party to a risk of unfair prejudice, especially where the evidence of that party's immigration status is not relevant to the underlying claims. *See Rivera v. NIBCO, Inc.*, 384 F.3d 822, 828 n.8 (9th Cir. 2004) (noting that the trial court granted a motion in limine precluding questioning of the plaintiffs' immigration status in an employment discrimination case); *see also Andrade v. Walgreens-Optioncare, Inc.*, 784 F. Supp. 2d 533, 535 (E.D. Pa. 2011) (reviewing caselaw from various district courts and the First Circuit holding that references to a party's immigration status may expose that party to a substantial risk of unfair prejudice absent some specific reason for the information's relevance). Because of the nature of the claims in this case, however, plaintiffs must necessarily provide the jury with some information about how they came to be detained at Adelanto, and that they were civil detainees in ICE custody.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

In contrast, plaintiffs' subsequent immigration histories, such as whether they left the country subject to a deportation order, have no bearing on the claims at issue here. Evidence and terms used to describe plaintiffs' subsequent immigration histories such as "deportation" and "order of deportation" are irrelevant and therefore inadmissible under Rule 402. Plaintiffs may state where they are living now and what they are doing, but neither side may elicit testimony regarding plaintiffs' current immigration status, or how those who have left the U.S. came to do so.

With respect to how plaintiffs came to be detained at Adelanto, plaintiffs may identify their home countries, state that they were taken into civil immigration custody upon entry to the U.S., and requested asylum. The court appreciates defendants' concerns that "asylum" is a sympathetic term, but it is also an accurate term here that fairly explains plaintiffs' circumstances to the jury. Given the claims here, the court will also permit plaintiffs to testify briefly as to why they left their home countries. But the court cautions plaintiffs that excessive emphasis on sympathetic details, or testimony about their journeys from Central America, may open the door to defendants being permitted to delve into less sympathetic facts about plaintiffs. Likewise, the court may permit defendants to cross-examine plaintiffs regarding any inconsistent statements. These warnings aside, the court grants plaintiffs' motion to exclude references to plaintiffs' unlawful status and entries.

**D.    Plaintiffs' Motion in Limine No. 3 (docket no. 149)**

Plaintiffs seek to preclude defendants from introducing evidence about any conclusions reached by the U.S. government or its consultants after an investigation of the June 12, 2017 incident in this case. Plaintiffs argue this evidence constitutes an impermissible legal conclusion. Mtn. at 2-3. Even if the court determines that the evidence does not qualify as a legal conclusion, plaintiffs contend the probative value of the government's conclusions is outweighed by the danger of unfair prejudice, invades the province of the jury, and would create a trial within a trial so as to delay the proceedings. *Id.*

Defendants contend factual findings from government investigations are admissible under Rule 803(8)(A)(iii), and here, ICE officials engaged in an After-Action Review of the incident and concluded that the actions taken were reasonable and appropriate. Opp. at 2-3. According to defendants, the conclusions in the After-Action

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

Review about defendants' use of force are not purely legal conclusions, and plaintiffs have already relied on this report in opposing defendants' motions for summary judgment. *Id.* at 3. Defendants further contend they should be permitted to introduce evidence of the government's factual conclusions or findings on the GEO Group's compliance with ICE standards if plaintiffs intend to have their experts testify on the same topics. *Id.* at 4-5.

In their Reply, plaintiffs clarify that their motion in limine does not concern the After-Action Review, but is about conclusions made by a third-party ICE contractor, the Nakamoto Group, about the June 12, 2017 incident. Reply at 1. At the hearing plaintiffs also expressed concern regarding unspecified Department of Justice conclusions.

The record before the court does not include any reports from the Nakamoto Group or Department of Justice, nor have the parties produced these reports as attachments to their briefs. The court cannot determine whether this evidence should be excluded when it is unclear what the content of this evidence is and which specific portions are objectionable. Further, it is clear that any use of such evidence at trial will be context-specific.

Accordingly, plaintiffs' motion in limine no. 3 is denied without prejudice. If defendants seek to introduce or reference any such investigations or conclusions at trial, they must alert plaintiffs to give them an opportunity to object.

## E. **Defendants' Motion in Limine No. 1 (docket no. 151)**

Defendants seek to exclude evidence of other alleged bad acts by defendants, including but not limited to: (1) protests related to the treatment of immigrant detainees at Adelanto; (2) complaints and/or lawsuits filed against defendants related to other incidents, including complaints within GEO employees' personnel files; and (3) investigations or matters about other incidents of alleged mistreatment of detainees that purport to document rule violations or sanctions against defendants, including the September 2018 report by the Office of the Inspector General ("2018 OIG Report"), and internal GEO investigations and reports about unrelated incidents from employees' personnel files. Mtn. at 1-2. Defendants argue this evidence is irrelevant, unduly prejudicial relative to its probative value, would consume time, is inadmissible under Rule 404(b)(1), and much of the evidence is inadmissible hearsay. *Id.* at 2.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

The categories of evidence disputed by the parties are somewhat broad. For instance, defendants seek to exclude all "complaints and/or lawsuits made against Defendants related to other incidents" and "investigations or matters regarding/related to other incidents of alleged mistreatment of immigrant detainees." Reply at 9. But apart from the specific items of evidence disputed by the parties, namely, evidence regarding protests at Adelanto, prior bad acts by defendant Diaz and Officer Reyes from their employee personnel files, and the 2018 OIG Report, the parties provide no information about what "other incidents" these documents refer to and the evidentiary issues they raise. The court will not issue a blanket ruling on broad categories of evidence, and instead limits its rulings to the specific evidentiary issues identified by the parties.

### 1.    Evidence Regarding Protests by Private Citizens

Evidence regarding protests are not relevant to the claims at issue in this case. The protests referenced by the parties here are those undertaken by private citizens outside the boundaries of the facility. *See* Mtn., Ex. C (Deposition of James Janecka) at 100 ("In Adelanto, there are infrequent vigil march protests at the facility on the outside reflecting detainee complaints" and "you are talking about vigils outside by citizens presumably, but not by a detainee for that."). Plaintiffs contend evidence about these protests is relevant to their negligent training and supervision claims because the protests placed defendants on notice of violations at Adelanto. But it is unclear why protests undertaken by private citizens would have placed defendants on notice of any training or supervision issues within the facility, and none of the cases cited by plaintiffs supports such a proposition. This is particularly so since the protests typically concerned issues unrelated to those in this case. Plaintiffs argue Warden Janecka's response to those protests goes to his state of mind. Statements by the Warden are addressed in a separate motion below. But as to bare evidence of external protests, such evidence is irrelevant to plaintiffs' negligent training and supervision claim and will be excluded.

### 2.    Evidence of Prior Bad Acts by Defendant Diaz and Officer Reyes from their Personnel Files

Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid.
404(b)(2).

Defendants anticipate plaintiffs will rely on the following evidence from defendant
Diaz and Officer Reyes's personnel files to impeach them: (1) a April 2019 complaint
and investigation into defendant Diaz's use of pepper spray, and a finding that Diaz
obstructed the investigation by providing incomplete information to the investigator that
ultimately led to her termination from GEO Group; and (2) a February 2018 complaint
and investigation into Officer Reyes's alleged verbal abuse of a detainee that also resulted
in his termination. Mtn. at 8-9.

Defendants contend the probative value of these complaints is outweighed by the
danger of undue prejudice because the jury may conclude that defendants here acted in
the same way during the incident in question, and would constitute improper character
evidence under Rule 404(b). *Id.* at 6-8. Defendants cite *Gates v. Rivera*, 993 F.2d 697
(9th Cir. 1993), and other cases for the proposition that the past conduct of officers is
neither admissible nor relevant to a civil rights case, and does not bear on whether the
officer used excessive force during the incident in question. *Id.* at 7-8.[1]

Plaintiffs argue under *Duran v. City of Maywood*, 221 F.3d 1127, 1132-33 (9th Cir.
2000), "other acts" evidence is admissible under Rule 404(b) if the following test is
satisfied: (1) there is sufficient proof for the jury to find the defendant committed the
other act; (2) the other act is not too remote in time; (3) the other act is introduced to
prove a material issue in the case; and (4) the other act is, in some cases, similar to the
offense charged. Opp. at 4. But even if all four conditions are met, the evidence may
still be excluded under Rule 403 if the probative value of the evidence is substantially
outweighed by the danger of unfair prejudice. *Duran*, 221 F.3d at 1133.

---

[1] Defendants also argue evidence of prior bad acts is automatically barred under
Rules 402 and 404 if the court determines that only state law claims remain viable
because the remaining claims are solely related to the incident itself. Mtn. at 3. The
court disagrees. Given that the remaining claims involve questions about defendants'
training and supervision, evidence of prior bad acts is not per se barred and the court
addresses the specific items of evidence contested by the parties below.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

     Plaintiffs state they intend to introduce evidence of these separate incidents to prove defendant GEO Group negligently trained and supervised its employees. Opp. at 3. Plaintiffs contend all of the factors under *Duran* are satisfied here because the evidence exists in defendant Diaz and Officer Reyes's personnel files, the subsequent incidents occurred within two years of the June 2017 at issue in this case, the evidence of these other acts is probative of the material issue that GEO Group negligently trained and supervised its employees, and the other acts are sufficiently similar because they pertain to the mistreatment of detainees. *Id.* at 4-5. To the extent that evidence of these other acts may be prejudicial to defendants, plaintiffs argue improper uses of pepper spray and verbal abuse of detainees is highly probative of GEO Group's negligent training and supervision of its employees, and outweighs any prejudicial effect. *Id.* at 5-6. Plaintiffs additionally argue that because defendant Diaz was found to have obstructed the investigation of the April 2019 complaint by not providing complete information to the investigator, this evidence is probative of her character for truthfulness and is admissible on cross-examination under Rule 608.

     First, as to the complaint of verbal abuse in Officer Reyes's file, although plaintiffs categorize this complaint as being about the mistreatment of detainees, the underlying incident at issue here does not involve any verbal abuse. Nor would a subsequent incident of verbal abuse pertain to any negligent training or supervision by GEO Group about the use of force or provision of medical care. Thus, this "other act" evidence does not satisfy the third and fourth factors under *Duran* – that the other act be relevant to a material issue in the case and be similar to the offense charged – and is inadmissible under Rule 404(b). Because plaintiffs identify no other basis on which this evidence could be admitted to support their negligent training and supervision claim, it must be excluded.

     The "other acts" evidence in defendant Diaz's personnel file, however, is substantively different. This evidence pertains to a complaint in which defendant Diaz was alleged to have improperly used pepper spray, and in which a finding was made that Diaz had obstructed the investigation by providing incomplete information. The evidence of this complaint satisfies the *Duran* factors because the records of the complaint and investigation exist in her personnel file, the subsequent incident occurred within two years of the June 12, 2017 incident at issue here, the fact that Diaz allegedly used pepper spray in an improper manner would be introduced to prove the adequacy of GEO Group's use of force training, and the facts are very similar to those at issue here.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

The evidence is presumptively admissible under Rule 404(b) subject to the balancing test in Rule 403. *Duran*, 221 F.3d at 1133 ("Even if all four conditions are met, the evidence may still be excluded if under Rule 403, the probative value of the evidence is substantially outweighed by the danger of unfair prejudice."). Although evidence of defendant Diaz's subsequent misconduct would have a significant prejudicial effect, the probative value of the information as it pertains to defendant GEO Group's negligent training and supervision significantly outweighs the risk of prejudice. *See Fogleman v. Cty. of Los Angeles*, 2012 WL 13005832, at *7 (C.D. Cal. July 25, 2012) (permitting evidence of a history of complaints brought against a specific officer where the case involved allegations of a custom and practice of brutality at that jail); *but see Webb v. Ackerman*, 2017 WL 5665000, at *4-5 (C.D. Cal. Feb. 15, 2017) (excluding evidence of an officer's prior uses of force in an excessive force case where the only "material point" the incident could be offered to prove is that because the officer allegedly used excessive force on prior occasions, he did so during the incident in question).

Furthermore, if defendant Diaz testifies at trial, her obstruction of the previous investigation may be inquired into on cross-examination under Rule 608. Rule 608 provides that a witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness. Fed. R. Evid. 608(a). But apart from a criminal conviction under Rule 609, "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in other to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b). A court may allow these specific instances of conduct to be inquired into on cross-examination if they are probative of the witness's character for truthfulness or untruthfulness. *Id.* Because the investigation of the April 2019 complaint included a finding that defendant Diaz obstructed the investigation by providing incomplete information to the investigator, this constitutes an act that is probative of Diaz's character for truthfulness. Plaintiffs may inquire into defendant Diaz's obstruction of the investigation on cross-examination.

### 3. Evidence of Conclusions from the 2018 OIG Report

Defendants seek to exclude the 2018 OIG Report on the grounds that it relates to issues identified at the facility unrelated to the use of force, and that these issues were identified and reported on 11 months after the incident at issue here. Mtn. at 5. Defendants further argue mentioning these unrelated incidents would unfairly prejudice

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

defendants by inflaming the passions and prejudices of the jury, and could mislead the jury into thinking that these additional incidents should be taken into account here. *Id.* Defendants state they are willing to exclude any conclusions reached by the Nakamoto Group, which is partially the basis of plaintiffs' motion in limine no. 3, if plaintiffs agree to exclude the 2018 OIG Report. *Id.* at 2. Whether the parties can agree to exclude some items of evidence is not a matter for the court to decide, and the court does not address this question here.

Plaintiffs argue the 2018 OIG Report is relevant because it tends to show that defendant GEO Group failed to remedy institutional problems that plaintiffs had complained of beforehand. Opp. at 7. Plaintiffs further argue the report could be used to impeach defense witnesses who claim they were not on notice of problems at the facility, and rehabilitate plaintiffs' credibility if they are impeached regarding the conditions they faced at Adelanto. *Id.* at 6-7.

Given that the inspection took place in May 2018 and the report was issued in September 2018, this report released after the incident could not have placed defendants on notice of the issues raised by plaintiffs in June 2017. Nor do plaintiffs explain how defendant GEO Group's alleged failure to remedy institutional problems is relevant to proving their claims arising out of the June 12, 2017 incident.

Plaintiffs point out, however, that the conditions of the facility are at issue to the limited extent that plaintiffs will explain what prompted their hunger strike. They want to be able to use the 2018 OIG Report to rehabilitate plaintiffs' credibility if they are impeached about the conditions. The court notes that conditions at the facility are not directly at issue, and any testimony plaintiffs give about the conditions should be limited. To the extent defendants open the door by impeaching plaintiffs' testimony about the conditions, the court will permit plaintiffs to make limited use of the OIG Report to bolster their credibility. Otherwise, it is excluded.

Accordingly, defendants' motion in limine no. 1 is granted in part and denied in part, as described above.

## F.    Defendants' Motion in Limine No. 2 (docket no. 152)

Defendants' motion in limine no. 2 seeks to exclude evidence related to plaintiffs'

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

immigration backgrounds such as the reasons why plaintiffs left their home countries, their journeys from their home countries to the United States, their status as asylum seekers, and their current immigration status. Mtn. at 3. Defendants contend this evidence is irrelevant, unduly prejudicial to defendants relative to its probative value, would consume time, and is inadmissible under Rule 403. *Id.* at 3-4. Defendants contend plaintiffs will introduce this biographical evidence to garner sympathy from the jury and distract them from the elements of the case. *Id.* at 3.

Defendants' motion overlaps with the subject of plaintiffs' motion in limine no. 2, as discussed above. As set forth above, plaintiffs may testify briefly to why they left their home countries and that they requested asylum. Otherwise, defendants' motion is granted.

## G. Defendants' Motion in Limine No. 3 (docket no. 153)

Defendants seek to exclude plaintiffs from introducing any media articles such as from radio, television, newspapers, and the internet that pertain to the instant action, the underlying incident, or other unrelated incidents at Adelanto. Mtn. at 1. Defendants argue these media references and third-party complaints are hearsay and unduly prejudicial. *Id.*; Reply at 1-5.

Defendants contend media articles specifically pertaining to the instant action and plaintiffs are hearsay under Rule 801(c) because they are offered to prove the truth of the matter asserted, and statements quoted in an article often constitute double hearsay. Mtn. at 2. Defendants argue the media articles also are not admissible under the residual hearsay exception under Rule 807 because defendants are not aware of the entire universe of articles plaintiffs intend to rely on, these articles lack guarantees of trustworthiness, and may contain double hearsay. *Id.* at 2-3. Defendants additionally argue the articles are irrelevant and prejudicial, and therefore inadmissible. *Id.*

Defendants raise similar arguments about media articles reporting on unrelated incidents at Adelanto, and contend they are inadmissible because they are irrelevant to the claims in this case, hearsay, and may be construed as improper character evidence under Rule 404(b)(1). *Id.* at 4-5. Even if the court were to find that media articles about unrelated incidents are relevant, defendants argue these articles should still be barred under Rule 403 because the risk of prejudice outweighs any probative value given that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

the articles may be inaccurate, based on hearsay and speculation, will confuse the issues, mislead the jury, cause undue delay, and waste time. *Id.* at 6.

Plaintiffs argue news articles are relevant to their negligent training and supervision claim because plaintiffs intend to offer such evidence to prove defendants were on notice of deficient training policies and practices. Plaintiffs maintain media reports offered to prove notice are not hearsay if they are not admitted for the truth of their contents, and are trustworthy because they are self-authenticating documents. Opp. at 1-3. Additionally, plaintiffs contend they should be permitted to ask Warden Janecka about admissions he made to the press, which should be considered statements of a party-opponent that are not hearsay. *Id.* at 3-4. Plaintiffs further argue media reports do not constitute character evidence of any individual defendant because the articles in question concern institutional issues at Adelanto and not the character of any individual. *Id.* at 4-5. Finally, plaintiffs argue their statements in these news reports can be used to rehabilitate them if their credibility is attacked, and any risk of confusing the jury or wasting time can be mitigated by explanations of the relevant portions of the news reports and the purpose they are being offered for. *Id.* at 5.

The parties provide a non-exclusive list of the articles already produced in discovery. Mtn. at 4-5; Aguado Decl. (docket no. 153-1) ¶ 3, Ex. A. These articles cover the hunger strikes at Adelanto, an incident of a GEO Group whistleblower exposing First Amendment violations, inadequate training, poor conditions, and deaths of detainees at Adelanto. *Id.* Several articles specifically cover plaintiffs' hunger strike. *Id.* The parties do not identify any specific statements made by Warden Janecka that may constitute a statement of a party opponent.

The media articles are inadmissible because they do not meet the basic relevance requirements of Rule 401 and are largely inadmissible hearsay. Rule 401 provides that evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. Media coverage of either the June 12, 2017 incident or unrelated incidents at Adelanto have no bearing on the claims at issue here, nor do they demonstrate defendants were placed on notice of institutional issues. *See, e.g., Perez v. Cty. of Los Angeles*, 2012 WL 13005790, at *3 (C.D. Cal. Feb. 6, 2012) (granting defendants' motion in limine to exclude news articles or media referencing the underlying use of force incident or other use of force incidents involving the Los Angeles

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. | | |

County Sheriff's Department).

Plaintiffs argue reported statements by Warden Janecka are admissible as admissions of a party opponent, but they do not point to any specific statements. Plaintiffs ask for the opportunity to ask Janecka about his reported statements, and to rehabilitate plaintiffs with prior consistent statements plaintiffs themselves made to the media. Statements made by Janecka or plaintiffs may be properly used in examination, but plaintiffs must first allow defendants an opportunity to object at sidebar before using any such statements. As to media articles generally, however, defendants' motion in limine no. 3 is granted.

## H. Defendants' Motion in Limine No. 4 (docket no. 154)

Defendants seek to exclude the testimony of plaintiffs' expert Dr. Homer Venters. Dr. Venters is a physician and epidemiologist who specializes in health services for the incarcerated. Aguado Decl. (docket no. 154-1) ¶ 3, Ex. A (Expert Report of Dr. Venters and Curriculum Vitae) at 4.[2]

Federal Rule of Evidence 702 requires that a testifying expert be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Rule 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

Under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), a trial judge acts as a "gatekeeper" to insure that expert testimony "is not only relevant, but reliable." *Id.* at 589. The court has broad discretion in assessing both requirements. *See U.S. v. Alatorre*, 222 F.3d 1098, 1100 (9th Cir. 2000). The reliability requirement ensures "that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

---

[2] Citations to page numbers in Dr. Venters's expert report and curriculum vitae refer to those designated by CM/ECF.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

The offering party must show by a preponderance of the evidence: (1) that the expert is qualified to render the opinion; and (2) that the opinion offered has adequate support. *Daubert*, 509 U.S. at 588-90. Expert testimony is not admissible if it is speculative. *See Gen. Elec. v. Joiner*, 522 U.S. 136, 143-46, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997). To satisfy the relevance requirement, the proffered expert testimony must assist the trier of fact in understanding or determining a fact in issue. *Daubert*, 509 U.S. at 591. In assessing relevance, the court looks to the governing substantive legal standard.

Dr. Venters offers the following opinions in his incident review:

(1) GEO Group security staff used force in a manner that was inconsistent with GEO use of force policy and ICE standards on use of force. The detainees were not posing a security threat to anyone. GEO Group staff did not exhaust the use of force continuum before using force, and their efforts to de-escalate the conflict was minimal at best, and fell below generally accepted de-escalation practices. Facial trauma sustained by plaintiffs during the incident would not have resulted from exposure to pepper spray. Health staff were not notified or consulted about the planned use of force for consideration of special medical vulnerabilities.

(2) GEO Group security staff violated GEO policy, ICE policies, and generally accepted correctional and healthcare policies and practices when they denied detainees exposed to pepper spray access to basic health and decontamination care.

(3) GEO Group security staff violated GEO and ICE policies by responding with force instead of first notifying and involving health staff regarding a declared hunger strike.

(4) Plaintiffs' failure to seek medical care upon their release from ICE custody was typical of how formerly incarcerated patients behave.

Aguado Decl. ¶ 3, Ex. A at 6-10.

Defendants contend Dr. Venters's testimony fails to satisfy the requirements of Rules 702 and 703 because his intended testimony consists of legal conclusions on issues reserved for the jury and lacks proper foundation. Mtn. at 1. Defendants argue evidence

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

of violations of internal policies are irrelevant because these violations do not create civil liability for an entity or its employees, and questions about whether the force used was objectively reasonable and plaintiffs' emotional distress are issues for the jury to decide. *Id.* at 4-5. Defendants also argue the jury is well-equipped to read the relevant policies, watch video recordings, and listen to witness testimony to reach their own conclusions, and do not need the assistance of an expert for these tasks, nor do they require Dr. Venters's opinions on his personal experience with pepper spray. *Id.* at 5-6.

Defendants further argue Dr. Venters is not qualified to opine on officers' policies and practices on the use of force or decontamination because Dr. Venters is a physician and epidemiologist, and has no training or experience in law enforcement, the security operations of a correctional facility, or supervising security staff at a correctional facility. *Id.* at 6-9. Defendants additionally argue Dr. Venters's opinions on whether plaintiffs sought medical care after being released from Adelanto and if this is typical of formerly incarcerated patients, and how plaintiffs sustained their injuries is speculative and lacks foundation. *Id.* at 9. Finally, defendants argue Dr. Venters's opinions should be excluded because they are cumulative of those of plaintiffs' expert Jeffrey Schwartz, who will also provide testimony about the use of force. *Id.* at 10.

Plaintiffs argue Dr. Venters is qualified to opine on the use of force and decontamination procedures used here based on his background as a physician, epidemiologist, and health administrator in the field of correctional health services, and state Dr. Venters has conducted over 50 trainings for security staff on the use of force and de-escalation policies. Opp. at 1. Plaintiffs state Dr. Venters also has personal experience in responding to hunger strikes where he not only provided patient care but participated in de-escalating conflicts between detainees and security staff. *Id.* Plaintiffs further argue Dr. Venters's experience in use of force and healthcare policies would be of assistance to the jury, he has sufficient foundation for his opinions on why plaintiffs did not immediately seek care after being released from Adelanto, and presents opinions that differ from those of plaintiffs' other expert, Dr. Schwartz, because they have different backgrounds, education, and training. *Id.* at 3-7.

Although expert testimony about an ultimate issue is not "per se improper," "an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n. 10 (9th Cir. 2002), overruled on other grounds by *Estate of Barabin v. AstenJohnson, Inc.*,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | ED CV 18-1125-SP | Date | January 23, 2020 |
|---|---|---|---|

| Title | Omar Arnoldo Rivera Martinez, et al. v. The GEO Group, et al. |
|---|---|

740 F.3d 457 (9th Cir. 2014). Some of Dr. Venters's proposed testimony crosses this line. Dr. Venters also may not testify based on speculation about what occurred, nor may he testify to what occurred based on hearsay statements made by others. It is up to the percipient witnesses to testify to the events in question.

The bigger concern with Dr. Venters's testimony, however, is whether Dr. Venters has the expertise to render all of the opinions he offers. Certainly he has medical expertise, particularly in caring for incarcerated patients, and may testify to plaintiffs' injuries, what caused them, the care they should have received after exposure to pepper spray, and the typicality of failure to seek medical care upon release from custody.

But defendants raise serious questions as to whether Dr. Venters has the expertise to testify regarding use of force, including whether the detainees posed a threat, whether the use of force was in compliance with policy, and what de-escalating actions should have been taken. The court will not rule on this issue until it has had a chance to hear from Dr. Venters at a *Daubert* hearing. As discussed at the pretrial conference, the court will hold such a hearing at some point during trial.

Accordingly, the court will reserve its ruling on motion in limine no. 4 until after Dr. Venters has been examined outside the jury's presence at trial.

**IV.**
**CONCLUSION**

IT IS THEREFORE ORDERED that defendants' motion to bifurcate be granted, and the parties' motions in limine be granted in part and denied in part as set forth above, with certain issues reserved for later adjudication as also set forth above.

# Dr. Homer Venters
# Exhibit 3 Position Statements



| | | | |

# Position Statements

The National Commission's position statements express NCCHC's expert opinion on important issues that are not addressed in the *Standards*.

Along with the *Standards*, these statements may assist correctional facilities in designing policies and procedures. *(Please see disclaimer at bottom of page.)*

| | |
|---|---|
| Administrative Management for People Living With HIV in Correctional Institutions (2020) | **html** |
| Adolescent Sleep Hygiene (2019) | **html** |
| Breastfeeding in Correctional Settings (2018) | **html** |
| Charging Inmates a Fee for Health Care Services (2017) | **html** |
| Competency for Execution (2017) | **html** |
| Correctional Health Professionals' Response to Inmate Abuse (2017) | **html** |
| COVID-19 Vaccination in Correctional Settings (2021) | **html** |
| Detention of Immigrant Children (2019) | **html** |
| Health Care Funding for Incarcerated Youth (2019) | **html** |
| Health Services Research in Correctional Settings (2020) | **html** |
| Health Services to Adolescents in Adult Correctional Facilities (2018) | **html** |
| Management of Noncancer Chronic Pain (2018) | **html** |
| Naloxone in Correctional Facilities for the Prevention of Opioid Overdose Deaths (2020) | **html** |
| Nonuse of Restraints for Pregnant and Postpartum Incarcerated Individuals (2020) | **html** |
| Opioid Use Disorder Treatment in Correctional Settings (2021) | **html** |
| Optimizing Insurance Coverage for Individuals Postrelease (2020) | **html** |
| Prevention of Violence in Correctional Settings (2013) | **html** |
| Restrictive Housing in Juvenile Correctional Settings (2021) | **html** |
| Sharing of Patient Health Records Upon Release From Incarceration (2021) | **html** |
| Solitary Confinement (Isolation) (2016) | **html** |

⬚⬚ ⬚⬚⬚ **Def 3**
Witness: Venters
Date: 8/10/21
Court Reporter: Kimberly Arsenault

STI Testing for Adolescents and Adults Upon Admission to Correctional Facilities (2020)        **html**

Suicide Prevention and Management in Juvenile Correctional Settings (2019)        **html**

Transgender and Gender Diverse Health Care in Correctional Settings (2020)        **html**

Use of Humanizing Language in Correctional Health Care (2021)        **html**

Women's Health Care in Correctional Settings (2020)        **html**

## Important Disclaimer

Position statements that are approved by the National Commission on Correctional Health Care Governance Board are typically generated from NCCHC committees, comprised of experts in multiple disciplines. Once approved by the

Governance Board, they become official positions and guidance of NCCHC. In no sense do they represent NCCHC standards. The applicability of position statements, as guidance for appropriate health services, must be determined by the relevant authorities considering all relevant circumstances. Adherence to these position statements will not ensure successful outcomes in every situation. As with all NCCHC guidance, position statements should not be deemed inclusive of all proper health services or methods of care, nor exclusive of other decisions reasonably directed to obtaining the same results. Position statements are not intended to and should not be treated as legal, medical, or business mandates. Statements are reviewed and, as necessary, revised at least every five years, or allowed to expire. An expired statement no longer represents NCCHC's position. (rev. 3/11/21)

# Dr. Homer Venters
# Exhibit 4 Federal Register Document
# Dated 12/20/08

(NIOSH), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Department of Health and Human Services (HHS) gives notice as required by 42 CFR 83.12(e) of a decision to evaluate a petition to designate a class of employees at the Vitro Manufacturing in Canonsburg, Pennsylvania, to be included in the Special Exposure Cohort under the Energy Employees Occupational Illness Compensation Program Act of 2000. The initial proposed definition for the class being evaluated, subject to revision as warranted by the evaluation, is as follows:

*Facility:* Vitro Manufacturing.

*Location:* Canonsburg, Pennsylvania.

*Job Titles and/or Job Duties:* All Atomic Weapons Employer employees.

*Period of Employment:* August 13, 1942 through December 31, 1957.

**FOR FURTHER INFORMATION CONTACT:** Larry Elliott, Director, Office of Compensation Analysis and Support, National Institute for Occupational Safety and Health (NIOSH), 4676 Columbia Parkway, MS C–46, Cincinnati, OH 45226, Telephone 513–533–6800 (this is not a toll-free number). Information requests can also be submitted by e-mail to *OCAS@CDC.GOV.*

Dated: December 4, 2008.

**Christine M. Branche,**

*Acting Director, National Institute for Occupational Safety and Health.*

[FR Doc. E8–29244 Filed 12–9–08; 8:45 am]

**BILLING CODE 4163–19–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**National Institute for Occupational Safety and Health**

**Final Effect of Designation of a Class of Employees for Addition to the Special Exposure Cohort**

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Notice.

**SUMMARY:** The Department of Health and Human Services (HHS) gives notice concerning the final effect of the HHS decision to designate a class of employees at Connecticut Aircraft Nuclear Engine Laboratory in Middletown, Connecticut, as an addition to the Special Exposure Cohort (SEC) under the Energy Employees Occupational Illness Compensation Program Act of 2000. On October 24,

2008, as provided for under 42 U.S.C. 7384q(b), the Secretary of HHS designated the following class of employees as an addition to the SEC:

All employees of the Department of Energy (DOE), its predecessor agencies, and DOE contractors or subcontractors who worked at the Connecticut Aircraft Nuclear Engine Laboratory in Middletown, CT, from January 1, 1958 through December 31, 1965 for a number of work days aggregating at least 250 work days occurring either solely under this employment or in combination with work days within the parameters established for one or more other classes of employees in the Special Exposure Cohort.

This designation became effective on November 23, 2008, as provided for under 42 U.S.C. 7384*l*(14)(C). Hence, beginning on November 23, 2008, members of this class of employees, defined as reported in this notice, became members of the Special Exposure Cohort.

**FOR FURTHER INFORMATION CONTACT:** Larry Elliott, Director, Office of Compensation Analysis and Support, National Institute for Occupational Safety and Health (NIOSH), 4676 Columbia Parkway, MS C–46, Cincinnati, OH 45226, Telephone 513–533–6800 (this is not a toll-free number). Information requests can also be submitted by e-mail to *OCAS@CDC.GOV.*

Dated: December 5, 2008.

**Christine M. Branche,**

*Acting Director, National Institute for Occupational Safety and Health.*

[FR Doc. E8–29246 Filed 12–9–08; 8:45 am]

**BILLING CODE 4163–19–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Office of the Secretary**

**Findings of Scientific Misconduct**

**AGENCY:** Office of the Secretary, HHS.

**ACTION:** Notice.

**SUMMARY:** Notice is hereby given that the Office of Research Integrity (ORI) and the Assistant Secretary for Health have taken final action in the following case:

*Homer D. Venters, Jr., M.D., University of Illinois at Urbana-Champaign:* Based on the report of an investigation conducted by the University of Illinois at Urbana-Champaign (UIUC) and extensive additional image analysis conducted by the Office of Research Integrity (ORI), the U.S. Public Health Service (PHS) found that Dr. Homer D. Venters, former graduate student, Neuroscience

Program, UIUC, engaged in scientific misconduct in research supported by National Institute of Mental Health (NIMH), National Institutes of Health (NIH), awards R01 MH051569 and F30 MH12558 and National Institute on Aging (NIA), NIH, award R01 AG06246.

Specifically, PHS found that the Respondent committed misconduct in science:

• By intentionally and knowingly preparing and including duplicate image data in Figures 5 and 10 of PHS fellowship application F31 MH12558, "Neurodegeneration via TNF-alpha inhibition of IGF–1," submitted in 1999, which was funded as F30 MH12558 from June 1, 2000, to May 31, 2003. Because the duplicate data were labeled as having been obtained from different experiments, the results for at least one of the two figures were intentionally falsified and constitute an act of scientific misconduct.

• By intentionally and knowingly preparing and including duplicate image data in Figure 3 and/or 4 of a manuscript submitted and published as: Venters, H.D., *et al.* "A New Mechanism of Neurodegeneration: A Proinflammatory Cytokine Inhibits Receptor Signaling by a Survival Peptide." *Proceedings of the National Academy of Sciences U.S.A.* 96:9879–9884, 1999.

• By preparing and providing to his dissertation committee in March 2000 a thesis proposal entitled "An Alternate Mechanism of Neurodegeneration: Silencing of Insulin-like Growth Factor-I survival signals by Tumor Necrosis Factor-a," which contained five falsified figures: Figures 1.3, 1.4a, 2.1b, 2.3e, and 2.5b. In each figure, he reused data within the same figure or in another thesis proposal figure as representing differently treated samples or as data obtained with different immunoblotting antisera.

• In March and April 2001, Respondent included several of the same falsified figures as in the thesis proposal and multiple additional falsified figures in his dissertation "Silencing of Insulin-like Growth Factor I Neuronal Survival Signals by Tumor Necrosis Factor-a." In all, Figures 3.3, 3.4a, 3.4b, 4.1b, 4.3a, 4.5b, 5.1a, 5.2, 5.4a, 5.5a, 5.6a, 5.7a, and 5.8a were falsified. In each instance, he assembled figures by reusing significant data, on some occasions after manipulating the orientation of the data, either within the same figure or in other figures related to his thesis and represented the data falsely as coming from different samples or different experiments.

Dr. Venters has entered into a Voluntary Settlement Agreement

EXHIBIT   Def 4
Witness: Venters
Date: 8/10/21
Court Reporter: Kimberly Arsenault

(Agreement) in which he has voluntarily agreed, for a period of three (3) years, beginning on November 19, 2008:

(1) That any institution that submits an application for PHS support for a research project on which the Respondent's participation is proposed or that uses the Respondent in any capacity on PHS-supported research, or that submits a report of PHS-funded research in which the Respondent is involved, must concurrently submit a plan for monitoring of the Respondent's research to the funding agency and ORI for approval; the monitoring plan must be designed to ensure the scientific integrity of the Respondent's research contribution; Respondent agreed that he will not participate in any PHS-supported research until such a monitoring plan is submitted to ORI and the funding agency;

(2) That Respondent will ensure that any institution employing him will submit to ORI, in conjunction with each application for PHS funds or report, manuscript, or abstract of PHS-funded research in which the Respondent is involved, a certification that the data provided by the Respondent are based on actual experiments or are otherwise legitimately derived, and that the data analyses, procedures, and methodology are accurately reported in the application or report; Respondent must ensure that the institution sends a copy of each certification to ORI; and

(3) To exclude himself from serving in any advisory capacity to PHS, including but not limited to service on any PHS advisory committee, board, and/or peer review committee, or as a consultant or contractor to PHS.

Respondent also voluntarily agreed that within 30 days of the effective date of this Agreement:

(4) He will submit a letter to the journal editor, with copies to his coauthors, identifying his falsification of Figures 3 and/or 4 in the following article: Venters *et al.* "A New Mechanism of Neurodegeneration: A Proinflammatory Cytokine Inhibits Receptor Signaling by a Survival Peptide." *Proceedings of the National Academy of Sciences* 96:9879–9884, 1999.

**FOR FURTHER INFORMATION CONTACT:**
Director, Division of Investigative Oversight, Office of Research Integrity, 1101 Wootton Parkway, Suite 750, Rockville, MD 20852, (240) 453–8800.

**Chris B. Pascal,**
*Director, Office of Research Integrity.*
[FR Doc. E8–29203 Filed 12–9–08; 8:45 am]
**BILLING CODE 4150–31–P**

---

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Health Resources And Services Administration**

**Agency Information Collection Activities: Proposed Collection: Comment Request**

In compliance with the requirement for opportunity for public comment on proposed data collection projects (section 3506(c)(2)(A) of Title 44, United States Code, as amended by the Paperwork Reduction Act of 1995, Pub. L. 104–13), the Health Resources and Services Administration (HRSA) publishes periodic summaries of proposed projects being developed for submission to OMB under the Paperwork Reduction Act of 1995. To request more information on the proposed project or to obtain a copy of the data collection plans and draft instruments, call the HRSA Reports Clearance Officer on (301) 443–1129.

Comments are invited on: (a) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information shall have practical utility; (b) the accuracy of the agency's estimate of the burden of the proposed collection of information; (c) ways to enhance the quality, utility, and clarity of the information to be collected; and (d) ways to minimize the burden of the collection of information on respondents, including through the use of automated collection techniques or other forms of information technology.

**Proposed Project: Health Centers Patient Survey—(NEW)**

The Health Center program supports Community Health Centers (CHCs), Migrant Health Centers (MHCs), Health Care for the Homeless (HCH) projects, and Public Housing Primary Care (PHPC) programs. Health Centers (HCs) receive grants from HRSA to provide primary and preventive health care services to medically underserved populations.

The proposed Patient Survey will collect in-depth information about HC patients, their health status, the reasons they seek care at HCs, their diagnoses, the services they utilize at HCs and elsewhere, the quality of those services, and their satisfaction with the care they receive, through personal interviews of a stratified random sample of HC patients. Interviews are planned to take approximately 1 hour and six minutes each.

The Patient Survey builds on previous periodic User-Visit Surveys which were conducted to learn about the process and outcomes of care in CHCs and HCH projects. The original questionnaires were derived from the National Health Interview Survey (NHIS) and the National Hospital Ambulatory Medical Care Survey (NHAMCS) conducted by the National Center for Health Statistics (NCHS). Conformance with the NHIS and NHAMCS allowed comparisons between these NCHS surveys and the previous CHC and HCH User-Visit Surveys. The new Patient Survey was developed using a questionnaire methodology similar to that used in the past, and will also potentially allow some longitudinal comparisons for CHCs and HCH projects with the previous User-Visit survey data, including monitoring of process outcomes over time. In addition, this survey will include interviews of patients drawn from migrant populations and from residents of public housing, populations not included in the previous surveys.

The estimated response burden for the survey is as follows:

SURVEY

| Type of respondent; activity involved | Number of respondents | Responses per respondent | Total number of responses | Burden per response (hours) | Total hour burden |
|---|---|---|---|---|---|
| Grantee/Site Recruitment and Site Training .. | 115 | 3 | 345 | 3.75 | 1294 |
| Patient Recruitment ........................................ | 5658 | 1 | 5658 | .167 | 945 |
| Patient Survey 4526 ...................................... | 4526 | 1 | 4526 | 1.1 | 4979 |
| Total ......................................................... | 5773 | ............................. | 10529 | ............................. | 7218 |