UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAC'QUANN (ADMIRE)
HARVARD; JEREMIAH HILL; JUAN
ESPINOSA; JEROME BURGESS
(a/k/a SHAM'LA GOD ALLAH);
JAMES W. KENDRICK, JR.;
JOHNNY HILL; and TRACEY DEAN,
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

vs.                     CASE NO.: 4:19-cv-00212-MW-CAS

MARK INCH, in his official
Capacity as Secretary of the Florida
Department of Corrections, and
FLORIDA DEPARTMENT OF
CORRECTIONS, an Agency of the
State of Florida,

        Defendants.
_____/

## DEFENDANTS' MOTION TO STRIKE
## PLAINTIFFS' EXPERT DECLARATIONS

      Defendants, Mark Inch, in his official capacity as Secretary of the Florida

Department of Corrections, and the Florida Department of Corrections ("FDC" or

"the Department") (collectively, "Defendants"), move to strike the expert

declarations of Dr. Craig Haney, (D.E. 311-9); Dr. Kathryn Burns, (D.E. 311-10);

Dr. Homer Venters, (D.E. 311-11); Dr. Louis Kraus, (D.E. 311-12); and Dan Pacholke, (D.E. 311-13).

## I. **INTRODUCTION**

In support of their Motion for Class Certification, Plaintiffs offer the declarations of five experts. These declarations should be stricken under Federal Rule of Evidence 702 and *Daubert* because they are based on insufficient facts and data, unreliable methodology, do not fit Plaintiffs' theories of the case, and offer nothing but the transmission of hearsay and anecdotal evidence, collected in the midst of a pandemic, to support their unsupportable conclusions that the unspecified cumulativeness of various policies, practices, and conditions in FDC restrictive housing units causes inmates, including the named Plaintiffs, a substantial risk of serious harm.

## II. **LEGAL STANDARD**

"The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by *Daubert* and its progeny." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (footnote omitted). Under Rule 702 and *Daubert,* district courts must act as "gatekeepers" which admit expert testimony only if it is both reliable and relevant. *Id.* (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). As such, per *Daubert*, district courts "must engage in a rigorous inquiry to determine whether: '(1) the expert is qualified to testify competently

regarding the matters he [or she] intends to address; (2) the methodology by which the expert reaches his [or her] conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.'" *Rink*, 400 F.3d 1291–92 (citation omitted).

"The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." *Id.* at 1292. "This means that the expert's bald assurance of validity is not enough. Rather the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." *Reynard v. NEC Corp.*, 887 F. Supp. 1500, 1507 (M.D. Fla. 1995) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995)). "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). And, while the Court has leeway in assessing whether the methodology of an expert is reliable, "[t]he trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." *United States v.*

*Frazier*, 387 F.3d 1244, 1261–62 (11th Cir. 2004); *see also* Fed. R. Evid. 702 Advisory Committee's Note (2000 amend.).

Importantly, "when an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *Sher v. Ratheon Co.*, 419 F. App'x 887, 890 (11th Cir. 2011) (quoting *Am. Honda Motors Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010)); *see also Navelski v. Int'l Paper Co.*, 244 F. Supp. 3d 1275, 1285 (N.D. Fla. 2017); *Lee-Bolton v. Koppers, Inc.*, 319 F.R.D. 346, 371 (N.D. Fla. 2017).

## III. <u>The Declaration of Dr. Craig Haney (D.E. 311-9)</u>

Dr. Haney's declaration should be stricken in its entirety because it does not satisfy Rule 702 or *Daubert*. Dr. Haney is not qualified to opine on the mental health of the Plaintiffs, the proposed classes, or that restrictive housing in Florida causes psychological harm, and his conclusions are based on unreliable and insufficiently established scientific methodology.

### a. Dr. Haney's Lack of Qualification

The first prong of *Daubert* requires that the expert "is qualified to testify competently regarding the matters he intends to address." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). Dr. Haney does not meet the burden for qualification as an expert and should be stricken.

Dr. Haney opines that solitary confinement causes inmates psychological harm and that the conditions of confinement in the various FDC restrictive housing units place the inmates housed there at significant risk of serious psychological harm. (D.E. 311-9 (hereinafter "Haney Decl.") at ¶¶ 11–14). He also opines that the risk of psychological harm is "significantly heightened" for mentally ill inmates housed in restrictive housing and that the conditions of restrictive housing aggravate their symptoms of existing mental illness. *Id.* at ¶ 15. But, psychological harm and causation cannot be determined on a class-wide basis and certainly not through a social psychologist, like Dr. Haney, who is not qualified to determine such harm and causation.

Clinical psychologists are the *only* subset of psychologist that are able to assess and treat persons with psychological issues. *See* Federal Judicial Center, Reference Manual on Scientific Evidence, 824 (3d ed. 2011). In contrast, social psychologists like Dr. Haney only teach or research a certain academic aspect of the field of psychology. *Id.* In his deposition, Dr. Haney admitted he is not a psychiatrist, he cannot diagnose a person's mental illness, nor can he provide a differential diagnosis of mental illness. (D.E. 356-19 (hereinafter "Haney Dep.") at 7:15–8:2). Dr. Haney also admitted he does not prescribe medication or treatment or therapy to individuals. *Id.* at 8:3–11. In fact, he is not even a licensed or clinical psychologist; rather, he is a professor and social psychologist. *Id.* at 7:6–14. As such, his belief

that "being housed in solitary confinement is known to produce a number of negative psychological effects and . . . place[s] prisoners at significant risk serious of serious psychological harm," Haney Decl. at ¶ 11, is based on little more than speculation and his subjective belief.

At one point, Dr. Haney testified that he is qualified to offer opinions on causation simply because he was told information from the inmates he interviewed: He testified:

> Q:  When you used the term appear to have precipitated their decompensation, it is outside of your ability to make that causal link.
> Correct?
>
> A: Well, I'm reporting what they reported to me so, no, I don't think it is. . . .

*Id.* at 206:16–21. Essentially, Dr. Haney's qualification is that he is an accurate reporter of hearsay statements from inmates. But, if all Dr. Haney can do is relay what was reported to him—which is inadmissible hearsay—then he is not qualified to offer these opinions. *See Williams v. Illinois*, 567 U.S. 50, 80 (2012).

### b.  Dr. Haney's Opinions Are Based on Insufficient Facts and Data

"[R]elevant testimony from a qualified expert is admissible only if the expert knows of facts which enable him [or her] to express a reasonably accurate conclusion as opposed to conjecture or speculation." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988). Under Rule 702, the district court's "'gatekeeper' role is

designed to ensure that 'speculative unreliable expert testimony does not reach the jury.'" *Lee-Bolton*, 319 F.R.D. at 371 (quoting *Kilpatrick v. Breg, Inc.*, 613 F.3d 1329, 1335 (11th Cir. 2010)). The "'knowledge' requirement which qualifies an expert under Rule 702 connotes 'more than subjective belief or unsupported speculation.'" *Id.* at 372 (quoting *Daubert*, 509 U.S. at 590). Such "*ipse dixit* opinion[s], unsupported by any reliable methodology or sufficient facts and data," *Quattry v. Covington Specialty Ins. Co.*, No. 6:18-cv-1112-Orl-41DCI, 2019 WL 7423548, at *10 (M.D. Fla. Oct. 30, 2019), should be excluded.

Here, in support of his opinions that conditions of confinement in FDC restrictive housing units cause a significant risk of serious psychological harm and a heightened risk of harm for mentally ill inmates, Dr. Haney relies almost exclusively on his own "knowhow," self-selected publications (many of which are his own), and the say-so of 33 inmates. Dr. Haney admits that he did not review any depositions except for that of the FDC's corporate representative on mental health topics. Haney Dep. at 21:25–22:4. He did not review the deposition transcripts of the named Plaintiffs because he "didn't think it was necessary." *Id.* at 22:5–12. And, since his last litigated case in Florida in 2005, he did not visit any restrictive housing unit in Florida until *after* his report was finalized. *Id.* at 119:24–120:4, 126:2–19.[1] Dr.

---

[1] Dr. Haney testified that he did not visit the prison facilities in person because of COVID-19 concerns. Haney Dep. at 66:11–15. While Defendants recognize the impact of COVID-19, the pandemic should not excuse an expert from having

Haney's disregard for the actual facts in this case including the Plaintiffs' own depositions, and over-reliance on his long-held belief that "solitary confinement" causes psychological harm, was on great display during his deposition where he even refused to concede that he was incorrect about the average length of time an inmate spends in close management. Even when faced with the actual document cited in his declaration, Dr. Haney refused to admit that *his* facts were wrong. *See, e.g.*, Haney Dep. at 106:16–20, 120:16–22, 210:12–23, 211:25–214:24, 250:11–252:3, Haney Dep. Ex. 3 (as referenced in footnotes 69 and 71 of his declaration). This blatant neglect of the facts for the sake of advocacy demonstrates Dr. Haney's lack of reliability.

Furthermore, Dr. Haney's reliance on the purported "extensive and updated published literature" that he "cited to and summarized" is not helpful because that "literature" does not concern restrictive housing in Florida. Haney Dep. at 45:25–48:17, 231:8–14; *see also* (D.E. 356-5 (hereinafter "Labrecque Decl.") at ¶¶ 9–16). Thus, its applicability to the conditions and effects present in Florida is questionable.

Additionally, it is misleading for Dr. Haney to characterize the literature on the effects of restrictive housing as substantial or extensive because the majority of what is written on this topic is non-empirical. Labrecque Decl. at ¶¶ 13–16. And, in

---

sufficient facts and information supporting his opinions. As is evident, Plaintiffs other four experts visited the prison facilities in person, as well as the thousands of FDC staff members who went into the prison facilities on a daily basis.

fact, there is no consensus in the scientific community that the restrictive housing setting causes harm. *Id.* at ¶ 42. Most scholars, in fact, have made calls for the need for *more* methodologically rigorous research on this topic. *Id.* Even Dr. Burns, a fellow expert of Plaintiffs, conceded in her deposition that "everyone agrees, I think, in the field that additional studies need to be undertaken." (D.E. 356-18 (hereinafter "Burns Dep.") at 90:24–91:8).

And, as to the studies on mentally ill prisoners, most empirical studies on this topic have not separated the effects between the mentally ill and non-mentally ill. Labrecque Decl. at ¶ 45; *see also* Burns Dep. at 90:22–91:8 (stating that "[t]his is a difficult subject to study" and "one of the reasons is because all of these systems define mental illness in a different way").

Dr. Haney's reliance on non-empirical studies, many of which are litigation-related, as a source render his opinions in this case unreliable. Because Dr. Haney's factual support is lacking, his opinions on the conditions of confinement in FDC restrictive housing units and the harm that may or may not be caused as a result is nothing more than pure speculation and should be excluded.

### c. Dr. Haney's Methodology is Flawed

As for his actual work in Florida – the 33 telephonic interviews – the Court must determine if Dr. Haney's methodology is reliable under *Daubert.* There is no consensus in the scientific community that restrictive housing *per se* causes a

substantial risk of serious psychological harm. *See* Labrecque Decl. at ¶ 42. Thus, this Court must apply the *Daubert* analysis to both Dr. Haney's: (1) methodology for determining whether the conditions of confinement in restrictive housing units similar to those in Florida can, in general, cause the harm alleged,[2] and (2) the methodology used to determine whether the policies, practices, and conditions at issue caused the named Plaintiffs their specific claimed harm. *See Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1196 (11th Cir. 2010).

Because he is not a clinician, Dr. Haney did not perform a structured diagnostic interview or psychological or neuropsychological test for any inmate he interviewed. Instead, he "administered a series of questions" that consisted of "known symptoms of psychological stress and trauma [and] known symptoms of psychopathological effects of isolation". Haney Dep. at 17:19–18:7. From the responses of 33 hand-picked inmates, Dr. Haney concludes that their reported symptomology was caused by restrictive housing. There are many methodological flaws underlying this conclusion.

*First*, Dr. Haney did not use a control group or compare the inmate responses to inmates in general population. Haney Dep. at 11:22–12:10. This methodological

---

[2] Again, as stated in Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification, (D.E. 356), the actual policies, practices, and conditions sought to be certified is unclear and unarticulated. As such, Plaintiffs' Experts' opinions based on unspecified "cumulative conditions" says nothing about the purported harm caused any specific policy, practice, or condition alone or in connection with others.

flaw precludes him from offering opinions on causation. *See* Labrecque Decl. at ¶ 19; *see also Vital Pharms., Inc. v. Monster Energy Co.*, No. 19-60809-CIV-ALTMAN/Hunt, 2019 WL 5212859, at *9 (S.D. Fla. Oct. 16, 2019) (finding a study "almost comically flawed" and "wholly unreliable," in part because it did "not contain a control group—a basic hallmark of any legitimate scientific study"). "Uncontrolled anecdotal information offers one of the least reliable sources to justify opinions about both general and individual causation." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005); *see also Scheinberg v. Smith*, 550 F. Supp. 1112, 1119 (S.D. Fla. 1982) ("[A]necdotal evidence, as compared to well controlled scientific studies based upon control groups and cross tabulation, appears to be an unreliable means of determining the issue before the Court.")

*Second*, Dr. Haney did not perform a differential diagnosis. Haney Dep. at 7:20–23. He asked 27 questions without follow-up. *Id.* at 221:23–222:4, 226:20–228:11. He did not account for pre-existing mental health conditions or other factors that may have caused the reported symptom. As Dr. Haney admits for one of his questions – trouble sleeping – it "could be caused by anything." *Id.* at 152:16–153:2; *see also* 156:19–157:7 (agreeing that many of his questions are multivariate problems – *i.e.*, caused for many different reasons). Dr. Haney's "methodology" is flawed because he did not seek to evaluate whether the reported symptoms were present prior to placement in restrictive housing and did not attempt to identify

alternative causes for such symptoms. As he admits, inmates in general population are at a risk of harm. *Id.* at 57:2–9. Yet, he chose to disregard this fact as well as other factors and essentially determined that the mere presence of restrictive housing causes psychological harm. Because Dr. Haney's questionnaire does not consider pre-existing conditions as a potential source for decompensation, it is not a reliable source of information to determine causality and further undermines the validity of his methodology and conclusions.

And, importantly, Dr. Haney's interviews occurred in the midst of a once-in-a-generation pandemic. Yet, his conclusions do not differentiate between—or generally even reference—the stressors and complications induced by the COVID-19 pandemic versus the general stressors of incarceration versus any particular stressors caused by the policies, practices, and conditions in FDC restrictive housing units. *See* (D.E. 356-4 (hereinafter, "Saathoff Decl.") at ¶ 79).

*Third*, Dr. Haney did not use a random sample to conduct his interviews. Haney Dep. at 23:2–24:7. Because the samples were not randomized, Dr. Haney cannot generalize his conclusions to the broader inmate population. Labrecque Decl. at ¶ 50; *see also* (D.E. 356-8 (hereinafter "Barnes Decl.") at 14 (noting because Plaintiffs' experts did not rely on random sampling, it is impossible to know whether the results are generalizable to other inmates in restrictive housing). In fact, Dr. Haney admits that from the inmate interviews he did not make any statistical

calculations and generalized them to the larger system because "it was a small sample and I was trying to find out what this group of people experienced and described and how this group of people was affected by what happened to them." Haney Dep. at 151:12–152:12; *see also* Barnes Decl. at 16. Thus, it seems by Dr. Haney's own admission, he is only offering opinions as to these 33 inmates alone, not the class in general as suggested.

*Fourth*, while the data derived from Dr. Haney's questions may have been peer reviewed, the questionnaire itself has not. Haney Dep. at 19:22–20:4. Dr. Haney's method has not been psychometrically validated to ensure that it measure what it is intended to measure. *Id.* at 18:8–20:4.

*Fifth*, Dr. Haney's opinion is solely based on temporal proximity and thus does not offer reliable evidence of causation. Simply because an inmate reports that he experienced headaches or trouble sleeping after being placed in restrictive housing does not mean that such symptomology was *caused* by the restrictive housing placement or conditions. Dr. Haney's methodology of essentially taking the inmates at their word and determining that such symptoms were caused by restrictive housing solely based on temporal association is not reliable. *See McClain*, 401 F. 3d at 1243 ("The *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence . . . . It is called a fallacy because it makes an assumption based on the false inference that a temporal relationship proves causal relationship.").

To establish causality, one must show: (1) temporal sequencing (*i.e.*, restrictive housing must come before psychological outcomes), (2) non-spurious relationship (*i.e.*, the observed relationship did not happen by chance alone – use of statistical significance tests), and (3) no alternative causes (*i.e.*, no other intervening or unaccounted variables may account for the observed relationship). Labrecque Decl. at ¶ 18. The methodology used by Dr. Haney fails to demonstrate these three elements

*Sixth*, Dr. Haney's reliance on inmate self-reports renders his method unreliable. Dr. Haney's method for validating the information given to him by the 33 inmates was his determination that the reported information was "consistent." Haney Dep. at 131:19–132:9 ("I gauge the reliability in part on what appears to be the veracity of what a prisoner is telling me, how consistent it is to what other prisoners are saying about the same environment. And . . . I cross checked a lot of this information against what's in a prisoner's file."); 133:16–20 ("I looked at a pattern of responses. . . . I'm relying on a pattern of responses that were consistently reported to me, not just by one person but by a number of different people.").

Although Dr. Haney testified that he cross-checked the medical files, *id.* at 132:7–9, the ability to cross-check a medical file is not within his expertise or qualification. And, in taking inmates at their word, Dr. Haney also did not account for response bias. Barnes Decl. at 17–20.

Further, as to the supposed "pattern" or "consistency," Dr. Haney's non-precise terms in his report of "some" and "many" offer no guidance to be able to discern any recognizable pattern or consistency. *See* Haney Dep. at 132:10–138:19. If only "some" of 33 inmates reported a symptom or event, it is not clear how that establishes the veracity of any single inmate's report. Dr. Haney's reliance on consistency as a means to establish reliability is flawed and his opinions based on the inmate interviews are not reliable.

In sum, Dr. Haney's opinions are essentially that several case studies of different environments, and different conditions, have shown that sometimes with some people there might be a connection between solitary confinement and complaints of harm. He interviewed 33 inmates and based on their self-reported symptomology, has opined that "[t]here are clear indications of the effects of the severe isolation to which the prisoners in these units are being subjected and the significant risk of psychological and even physical harm to which they are exposed." Haney Decl. at ¶ 85. "Indication" is not correlation and it is certainly not causation and the fact that 33 inmates in restrictive housing have reported sleeplessness, headaches, and anxiety, does not mean that those symptoms were *caused* by any practice, policy, or condition of restrictive housing in Florida.

### d. Dr. Haney's Opinions Regarding Five Named Plaintiffs Should Be Excluded

Dr. Haney's declaration is offered in support of the notion that the named Plaintiffs are typical because they all share the same baseline risk of harm as the putative class. (D.E. 311 at 49). He is also cited in support of the theory that Plaintiffs Harvard and Hill share the same injury of a heightened risk of serious harm with the serious mental illness ("SMI") subclass members because of their vulnerabilities related to their mental illness. *Id.* To the extent Plaintiffs are offering Dr. Haney's opinions as evidence of the harm suffered by the five named Plaintiffs he interviewed (Harvard, Kendrick, Johnny Hill, Burgess, and Dean), then his opinions regarding those Plaintiffs should be excluded because Dr. Haney applied the same flawed methodology described above in his interviews of those Plaintiffs.

Dr. Haney testified that in interviewing the aforementioned named Plaintiffs, he was not doing a "case study" and felt it was unnecessary to go into the details of their past history or ask about symptomology pre-dating restrictive housing. Haney Dep. at 221:23–223:12. He also "didn't think it was necessary" to read their depositions. *Id.* at 22:5–9. He is not a clinician and not qualified to offer opinions on causation or harm. Thus, Dr. Haney's opinions that these five named Plaintiffs have suffered harm as a result of the conditions of confinement in FDC restrictive housing units (to the extent one is being made) should be excluded.

In fact, delving into the report, it is not clear that Dr. Haney is even offering an opinion regarding the specific Plaintiffs. Instead, he spends five paragraphs

summarizing what was reported to him by the Plaintiffs during their hour-long interview. *See* Haney Decl. at ¶¶ 74–78. But, an expert cannot be used as a mere conduit of inadmissible hearsay. *Williams*, 567 U.S. at 80.

Although Federal Rule of Evidence 703 permits expert witnesses to base their opinions on inadmissible hearsay in limited circumstances, it "provides a presumption against disclosure to the jury of information used as the basis of an expert's opinion and not admissible for any substantive purpose." Fed. R. Evid. 703, Advisory Committee Notes (2000 amend.). "Rule 703 . . . is not an open door to all inadmissible evidence disguised as expert opinion." *United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir.1987). "[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (internal citation and quotation omitted); *see also Schafer v. Time,* 142 F.3d 1361, 1374 (11th Cir. 1998) (district court did not err in preventing testifying expert from referring to inadmissible evidence – finding "[t]he Pondisco memorandum is hardly the type of learned treatise or statistical data, the prototypical subjects of Rule 703 decisions, that an expert might rely upon within the ordinary course of his or her profession"); *Pelster v. Ray*, 987 F.2d 514, 527 (8th Cir.1993) (parties may not "bring inadmissible hearsay and documents before the jury in the guise of expert testimony to prove subsidiary facts in their evidentiary chain that the

jury is entitled to decide for itself by examining evidence that meets the requirements for admissibility"); *Pinson v. Prieto*, No. ED CV 10-811-SP, 2016 WL 11519338, at *10 (C.D. Cal. Oct. 6, 2016) (finding corrections expert could not simply act as a conduit and introduce hearsay testimony at trial). Thus, Dr. Haney's parroting back what the Plaintiffs told him cannot be offered up as "expert opinion" in this case.

### e. Dr. Haney's Opinions Do Not Fit the Claims in This Case

In addition to applying a flawed methodology, Dr. Haney's opinions do not "fit" Plaintiffs' case. The third prong of *Daubert*—helpfulness, or fit—"goes primarily to relevance." 509 U.S. at 591. "Relevance means the evidence has a scientific connection to the facts of the case such that it 'logically advances a material aspect of the proposing party's case.'" *Lee-Bolton*, 319 F.R.D. at 371 (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999)). Although the basic standard of relevance is a liberal one, "if an expert opinion does not have a 'valid scientific connection to the pertinent inquiry,' it should be excluded because there is no 'fit.'" *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009) (quoting *Daubert*, 509 U.S. at 591–92); *see also Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002).

As examples of Dr. Haney's poor "fit," Dr. Haney frequently uses the term "long-term" in relation to restrictive housing, *e.g.*, Haney Decl. at ¶ 12; yet Plaintiffs attempt to use Dr. Haney's opinions in support of why all types of restrictive housing

are harmful, including for stints as short as one day in restrictive housing. *See, e.g.*, (D.E. 311 at 16). Dr. Haney further defines "solitary confinement" not just "in terms of the kinds of activities that are available to prisoners when they're out of their cells," but whether that out-of-cell time is "meaningful." Haney Dep. at 198:20–199:8, 192:11–25. Thus, per Dr. Haney's definition, an inmate is in solitary confinement even if the inmate is out of their cell often (such as CMIII inmates). Not only is such a definition logically inconsistent, it does not fit with Plaintiffs' class definition of solitary confinement, which defines it as 22 hours a day in a cell. *E.g.*, (D.E. 311 at 3). Further, Dr. Haney opines that all six levels of restrictive housing "impose the type of conditions that are typically considered 'solitary confinement.'" Haney Decl. at ¶¶ 17, 58, 59. This is based on his incorrect assumption that inmates in all six levels receive the same privileges and restrictions. They do not. *See* (D.E. 356-1 (hereinafter "Kirkland Decl.") at ¶ 6). And, Dr. Haney has not stratified his report based on the length of stay in any of the six levels of confinement. Haney Dep. at 88:7–90:16. Thus, his opinions can never fit the claims or facts in this case, no matter which claims, if any, are certified.

Finally, Dr. Haney has many opinions that seem to suggest that lack of adequate mental health care is one of the causes of the harms alleged by Plaintiffs. *See, e.g.*, Haney Decl. at ¶ 70; Haney Dep. at 235:23–236:21. But once again, Dr. Haney's opinions do not line up with Plaintiffs' asserted goals for this lawsuit.

Namely, Plaintiffs are not moving to certify mental health care policies and have repeated that that is not a part of their case. *See* (D.E. 287 at 11 ("Plaintiffs' claims center on whether the cumulative conditions of isolation, *not a lack of mental health care*, categorically subject human beings to a substantial risk of harm." (emphasis added)), 13 ("[I]n a systemic injunctive relief case such as this one that is not about inadequate mental health care.")). Thus, if part of the "cumulative" conditions which cause the harm also includes inadequate mental health care, then there is no fit and Dr. Haney's opinions must be excluded.

Dr. Haney offers only speculative assertions about the purported harms of restrictive housing, speaking generally to restrictive housing or solitary confinement practices. But, he does not then conform these opinions to FDC policies or practices or Plaintiffs' asserted theories on class certification or this case. As a result, his declaration should be excluded.

## IV.    Declaration of Dr. Kathryn Burns (D.E. 311-10)

For many the same reasons Dr. Haney's declaration should be excluded, Dr. Burns' declaration too should be excluded. Namely, Dr. Burns relies on anecdotal evidence without any scientifically validated methodology to arrive at her opinions in this case.

### a.  Dr. Burns Also Relies on Insufficient Facts and Data

As Dr. Burns states, she was retained to provide opinions "regarding the effects of restrictive housing . . . on prisoners confined in those types of housing units, and particularly the effects on prisoners with serious mental illness." (D.E. 311-10 (hereinafter "Burns Decl.") at ¶ 1). To support her opinions, though, Dr. Burns did not read the Plaintiffs' depositions. Burns Dep. at 100:3–9. She also did not review any "research" specific to Florida or Florida's restrictive housing regime. Instead, like Dr. Haney, she relies on "literature" which is not applicable to Florida. *See* Burns Decl. at ¶ 13; Burns Dep. at 48:12–49:6. Yet, by her own admission, citations to studies from other states "may have absolutely no applicability to Florida." Burns Dep. at 92:11–16; *see also id*. at 94:18–95:6. And Dr. Burns agrees with respect to other studies, reports, articles, *etc*. on restrictive housing/solitary confinement that this is a "difficult subject to study" and that in fact "everyone agrees . . . that additional study need to be undertaken" because "all of these systems define mental illness in a different way . . . they define restrictive housing in a different way," and that "facilities differ in terms of the conditions." *Id*. at 90:24–91:8. She even concedes that there is no "apples-to-apples" comparison between the scientific studies and the risk extrapolated from those studies to FDC. *Id*. at 91:14–92:6. Thus, her reliance on those studies in support of her opinions renders her opinions unreliable.

At bottom, Dr. Burns' opinions as to the "effects of restrictive housing" are not specific to Florida, to these Plaintiffs, or even this case. Her opinions are the same opinions given in all other cases concerning restrictive housing, no matter the regime, conditions, or practices. Dr. Burns' pre-formed opinions about restrictive housing, divorced from the facts of this case, render her opinions unreliable.

### b. Dr. Burns' Methodology Is Flawed

Like Dr. Haney, Dr. Burns relies on her interviews with selected inmates to tie her pre-formed opinions to this case. However, her methodology is flawed for many the same reasons Dr. Haney's methodology is flawed.

Essentially, Dr. Burns' methodology was to review medical records and conduct short cell-front interviews and longer clinical interviews with 34 inmates. Dr. Burns has not published a peer-reviewed paper which mirrors the task that she had or the role that she played in this case, nor has she subjected her methodology in this case to peer review. Burns Dep. at 27:25–28:6. She also has not tested her hypothesis, *i.e.*, she has not tested whether her assessment method is valid. *Id.* at 28:7–11. Dr. Burns' forensic assessment or case study is not sufficiently reliable. *See* Labrecque Decl. at ¶ 49; *McClain*, 401 F.3d at 1253–54.

The questionability of Dr. Burns' reliance on anecdotal evidence to support her opinions that restrictive housing causes harm is further compounded by the fact that Dr. Burns did not ask clarifying questions during many of her interviews. *See,*

*e.g.*, Burns Dep. at 180:25–181:7, 182:13–20. Dr. Burns' failure to "drill down" shows there was no level of expertise applied; rather, she merely took the inmates at their word without attempting to understand the "why" or seeking to learn whether what the inmate was saying was accurate. Thus, it is incongruous for Dr. Burns to devote portions of her declaration to the insufficient mental health care for inmates in restrictive housing, *see* Burns Decl. at ¶¶ 25–26, but when given the opportunity to ask a putative class member whether the reason he was not receiving one-on-one counseling was "because he didn't go to counseling or didn't want to go to counseling," she declined to do so. Burns Dep. at 189:6–10; *see also* 149:12–150:7 (replying that the blanks in her notes from inmate interviews either refer to questions she did not ask or answers she did not receive).

Further, in her declaration, Dr. Burns argues FDC's practice of discharging inmates from specialized care units (*e.g.*, Self-Harm Observation Status, Transitional Care Unit, Crisis Stabilization Unit) back into restrictive housing subjects these inmates to "the very same conditions as those that originally precipitated the transfer to a higher level of care." Burns Decl. at ¶ 41. However, she conceded that she did not conduct any study regarding this practice "with sufficient statistical power following appropriate analysis." Burns Dep. at 83:14–23. As such, this claim is little more than an unfounded assumption.

Dr. Burns' opinion also rests on unsupported analytical leaps. For example, in arguing why FDC's restrictive housing policies are detrimental, Dr. Burns points to the number of suicides that occur in restrictive housing. *Id.* at 93:11–15. But she admitted that she has not conducted a causation analysis of any suicide in the Florida Department of Corrections. *Id.* at 132:16–25. And, one of the alleged causes of the harms of restrictive housing identified by Dr. Burns is FDC's practice of placing inmates on property restriction. Burns Decl. at ¶ 21. Yet, Dr. Burns admitted she is unaware of a scientific validation between the use of this practice and increased suicide. Burns Dep. at 94:7–13. She further conceded she did not have any studies or data suggesting the use of property restriction is correlated with a higher substantial risk of worsening symptoms for those with pre-existing mental illnesses placed in restrictive housing. *Id.* at 95:7–12.

Dr. Burns' methodology of interviewing a few inmates and reporting on what she was told in the form of expert opinion is insufficiently reliable to meet the standards set forth in *Daubert* and therefore should be excluded.

### c. Dr. Burns' Opinions on Plaintiff Espinosa Should Be Excluded

Like Dr. Haney, Dr. Burns is cited in support of the proposition that the Plaintiffs are typical because they suffered the same baseline risk of harm. However, Dr. Burns only interviewed one named Plaintiff – Juan Espinosa. And, as to Mr. Espinosa, it is not clear she is even offering an opinion as to his level of harm or

even the cause of it. In fact, she remarked that Mr. Espinosa was in general population at the time of her interview and was doing "pretty well." Burns Dep. at 82:10–16.

From her declaration, it appears Dr. Burns' opinion on Espinosa is limited to her assertion that his "case and care are typical of all those prisoners in extended lockdown." Burns Decl. at ¶ 32. Specifically, Dr. Burns opines that Plaintiff Espinosa's "case and care, including untimely access to medical care for foot fractures, placement on 'strip' status, mental health treatment consisting essentially only of psychotropic medication when in confinement, and failure to provide accommodation for his medically caused inability to speak, are typical of all prisoners housed in confinement." *Id.* Yet Dr. Burns' own declaration contradicts her claim that all Espinosa received was medication for his mental health. *See id.* at ¶ 29 (admitting Espinosa continued to "have psychiatric appointments every 2-3 months when he was in CM and these were held in a location outside of his cell," that he "received his prescribed medications when he was in CM," and that the "documentation in his medical record confirms his account of doctor visits and prescriptions").

Had Dr. Burns read Espinosa's deposition, she would have seen that he admitted he was seen by mental health staff even more frequently than her declaration claims; indeed, he testified that while he was in Close Management at

multiple facilities, mental health staff would come for visits roughly once a month. (D.E. 356-14 (hereinafter "Espinosa Dep.") at 87:8–19). Espinosa also testified that while in general population, he sees a psychiatrist and counselor every two months; while he was on Close Management he actually saw them more frequently: once a month. *Id.* at 134:5–135:11. Dr. Burns herself even testified that the psychiatrist appointments Espinosa received every two or three months is the same as he is receiving in general population. Burns Dep. at 145:20–146:16.

Additionally, as to accommodations—something else Dr. Burns claims Espinosa lacks—Espinosa in fact testified that while in restrictive housing he would communicate with staff through written communication, similar to the way he testified at his deposition. Espinosa Dep. at 114:5–116:13. Also, while Dr. Burns testified that Espinosa cycled between restrictive housing and inpatient care, Burns Dep. at 82:2–4, the records do not support this claim. Nor does Dr. Burns' declaration make such a claim. *See* Burns Decl. at ¶¶ 27–32.

Thus, based on the foregoing, it is clear Dr. Burns' basis for her "typicality" statement is clearly lacking and her opinions regarding Plaintiff Espinosa should be excluded.[3]

---

[3] Espinosa's "case and care" also do not fall within the "typical" variety given his specific health concerns, *e.g.*, Espinosa received both chemotherapy and surgery as a result of his thyroid cancer. *See* Espinosa Dep. at 39:19–41:1.

### d. Dr. Burns' Opinions Do Not Fit the Claims in This Case

Dr. Burns' opinions regarding the harm caused by FDC's restrictive housing policies, practices, and conditions are hampered by the fact she inappropriately included what she viewed as deficient practices by FDC with her assessment of whether FDC's policies are constitutionally infirm. *See, e.g.*, Burns Decl. at ¶¶ 24, 41; see also Burns Dep. at 123:24–125:12. However, as discussed in Defendants' Response in Opposition to Plaintiffs' Motion for Class Certification, (D.E. 356), it is anyone's guess as to which policies, practices, or conditions are at issue and sought to be certified. Thus, to the extent this case is about anything other than unwritten practices, then Burns' opinions do not fit the facts of this case.

Additionally, Dr. Burns concedes that restrictive housing may be appropriately used as a short-term punishment for inmates who break prison rules. Burns Dep. at 54:24–55:6. Her concession that restrictive housing is appropriate in some circumstances undercuts Plaintiffs' assertion in their Motion for Class Certification that FDC's restrictive housing scheme is unconstitutional in total.

There is further no fit between Dr. Burns' opinions regarding mentally ill and non-mentally ill inmates. For example, Dr. Burns noted she specifically looked for inmates with a S3 mental health grade, as those inmates are receiving outpatient mental health services; as such her sample size is admittedly "weighted to S3s as opposed to a random sample." Burns Dep. at 37:8–9, 38:19–20. She also testified

she would select inmates that were on antipsychotic medication, that told her they were bipolar or schizophrenic, that had just returned from an inpatient stay, or had returned from a self-harm observation status. *Id.* at 38:24–39:7; *see also id.* at 42:8– 11 (noting she did not interview S1 or S2 inmates because "[her] specific portion of the case is to look at the risk of harm to people with serious mental illness"). Her opinions are therefore only applicable, at most, to the SMI subclass and not the broader Plaintiff class.

Dr. Burns also lacks the requisite "fit" because, like Dr. Haney, her opinions seem to rely on the alleged lack of mental health care. *See* Burns Decl. at ¶ 32 (discussing Plaintiff Espinosa and focusing on his alleged lack of access to care); Burns Dep. at 85:9–89:15. But, as noted above Plaintiffs are not seeking to certify any issue regarding a lack of access to mental health care. Accordingly, Dr. Burns' opinion on this is irrelevant and does not assist the trier of fact.

## IV. <u>Declaration of Dr. Homer Venters (D.E. 311-11)</u>

Dr. Venters states that the "purpose of this declaration is to present my preliminary findings regarding the risk of harm to the physical health of people in restrictive housing settings in the Florida Department of Corrections." (D.E. 311-11 (hereinafter "Venters Decl.") at ¶ 1). His declaration should be stricken because his findings and opinions rest on unreliable principles and methods, lack sufficient facts and data, and are not helpful to the trier of fact.

### a. Dr. Venters' Opinions Are Pure Speculation Based on Unreliable Methodology and Insufficient Facts

During his deposition, Dr. Venters admitted he did not review: (1) the deposition transcripts of any named Plaintiffs; (2) FDC's classification system for disability designations; (3) any settlement agreements from previous/ongoing litigation brought against FDC relating to inmates with disabilities; (4) "any part of the Florida Administrative Code"; (5) any health service bulletins; (6) any post orders; (7) any audits conducted by the American Correctional Association or Correctional Medical Authority of FDC facilities; (8) any operational reviews of FDC facilities; (9) any systems FDC has in place for independent oversight of claims of misconduct directed against inmates; or (10) any reports from the Office of Inspector General or MINS[4] reports. (D.E. 356-17 (hereinafter "Venters Dep.") at 20:6–21:19, 23:6–24:1, 24:19–25:11, 25:24–26:7, 28:6–9, 29:15–18, 127:11–128:6. This is a non-exhaustive list of critical items Dr. Venters admitted he did not review prior to proffering his opinion. Such an insufficient fact base reveals the frailty to Dr. Venters' opinion and speaks to why it should be excluded, – *i.e.*, it is based on speculation and not on the actual relevant evidence. *See Gen. Elec. Co. v. Joiner*,

---

[4] Management Information Notification System ("MINS") refers to an automated system for the prompt and efficient transmission of information concerning Departmental incidents, events, and complaints to the Office of Inspector General.

522 U.S. 136, 143 (1997) (noting expert testimony is not admissible if it is speculative).

Rather than reading critical evidence, such as the health service bulletins or even the Plaintiffs' depositions, Dr. Venters offers opinions of pure speculation. This is not the first time: Dr. Venters has, in the past, been prevented from "testify[ing] based on speculation about what occurred," and he has also been prevented from "testify[ing] to what occurred based on hearsay statements based on others." *Martinez v. GEO Grp.*, No. 5:18-cv-01125-SP, ECF No. 202 at 19–20 (C.D. Cal. Jan. 23, 2020) (order granting in part and denying in part defendants' motion to exclude testimony of Dr. Venters, noting that some of "Dr. Venters's proposed testimony crosses [the] line" into testifying about the ultimate issue); *see also* Venters Dep. at 118:5–123:11, Venters Dep. Ex. 2. Yet, that is exactly what he seeks to do here.

In his declaration, Dr. Venters details various insufficient measures allegedly in place that bar access to medical care. *See id.* at ¶¶ 42–49. Yet, he did not read the Plaintiffs' depositions, which contradict these opinions. *See, e.g.*, Espinosa Dep. at 85:5–88:19; (D.E. 356-15 (hereinafter "Dean Dep.") at 87:3–15, 105:2–19, 134:19–135:3); (D.E. 356-12 (hereinafter "Harvard Dep.") at 86:11–87:10); (D.E. 356-9 (hereinafter "Jeremiah Hill Dep.") at 78:22–79:6).

Instead, Dr. Venters' opinions rest primarily on his own views of restrictive housing and anecdotal evidence from a small selection of inmates during facility inspections. Venters Decl. at ¶¶ 43–49. This is precisely the kind of hearsay he was previously excluded from testifying about. *Martinez*, ECF No. 202 at 20. This anecdotal evidence, as discussed above, is not sufficiently reliable to offer an opinion on causation under *Daubert*.

### b. Dr. Venters' Opinions on Plaintiffs Burgess, Kendrick, Johnny Hill, and Espinosa Should be Excluded

Based on his interviews of four Plaintiffs (Burgess, Kendrick, Johnny Hill, and Espinosa), Dr. Venters concludes that their "placement in confinement, under the conditions imposed by FDC, [pose] a serious risk to [their] physical health." Venters Decl. at ¶¶ 57, 59, 60, 61. These opinions are unsupported because they are based on insufficient facts and data and unreliable methodology.

For example, with Plaintiff Burgess, Dr. Venters' sole interaction with him was via telephone interview. Venters Decl. at ¶ 56. Based on this interview, Dr. Venters took Burgess at his word and thus offered his opinions in this case. Dr. Venters did not review any records from outside hospitals regarding Burgess, and was thus unaware that there was inadequate evidence Burgess suffers from seizures or strokes or paralysis. Venters Dep. at 259:1–14; *see also* (D.E. 356-6 (hereinafter "Paulson Decl.") at 29–31).

Dr. Venters was similarly unaware Burgess was diagnosed with pseudoseizures and was referred to mental health as a result; he was also unaware of Burgess' mental health grade. Venters Dep. at 259:11–14, 260:2–4; *see also* Paulson Decl. at 29–30. Inexplicably, when asked whether knowing Burgess did not suffer from seizures would change his opinion on him, Dr. Venters did not answer and instead focused on the alleged lack of catheters provided to Burgess. Venters Dep. at 259:15–260:1. When asked if knowing Burgess received catheters at some institutions while in restrictive housing—something Burgess himself testified to during his deposition, *see* (D.E. 356-11 (hereinafter "Burgess Dep.") at 72:16–22)— Dr. Venters said that while he did not "believe so," that his assertion was hampered by his failure to know what Burgess said. Venters Dep. at 260:8–261:11.

Dr. Venters' failure to review accessible and available materials shows his methodology is built on an insufficient fact base. The above regarding Burgess is illustrative of Dr. Venters' unreliable methodology.

Dr. Venters' opinions on named Plaintiffs Kendrick, Johnny Hill, and Espinosa, *see* Venters Decl. at ¶¶ 58–61, similarly suffer from his failure to perform a sufficient review of the materials and/or his failure to seek the answers for his concerns.

For example, Dr. Venters expresses concern over Kendrick's weight loss in confinement; but he did not ask about this during their interview and could only

speculate on the matter. Venters Dep. at 262:25–263:6; *see also* Paulson Decl. at 33–34.

For Johnny Hill, Dr. Venters expresses concern about his medications being interrupted; again, this was based solely on Hill's reporting to Dr. Venters and not on any actual record review. Venters Dep. at 265:8–12; *see also* Paulson Decl. at 36–37.

For Espinosa, Dr. Venters expresses concern that he was allegedly on property restriction while waiting for care for his injured foot and that this "likely exacerbated his pain and suffering," Venters Decl. at ¶ 61; however, Dr. Venters admitted he was unaware what, if any, property Espinosa did not have access to during this time, aside from believing Espinosa told him "he may have had his mattress taken away." Venters Dep. at 271:16–272:3. Once more, Dr. Venters is reduced to speculation due to his failure to review the available materials. Given the pervasive speculation that bleeds into Dr. Venters' declaration and opinion, it becomes impossible to discern which, if any, of his conclusions are based on reliable methodologies and which are instead based on assumptions and contrived conclusions. Accordingly, he should be excluded.

### c. Dr. Venters' Opinions Do Not Fit the Claims in This Case

As with Dr. Haney and Dr. Burns, Dr. Venters challenges access to care, specifically medical and mental health care. Yet, "access to care" is not an issue sought to be certified in Plaintiffs' Motion for Class Certification. *See* (D.E. 311).

Dr. Venters also claims restrictive housing restricts exercise and can cause chronic disease. Venters Decl. at ¶ 19. This lacks fit because it ignores the fact that inmates can (and often do) exercise in their cells.[5] *E.g.*, Burgess Dep. at 105:10–17; Harvard Dep. at 47:15–25; Jeremiah Hill Dep. at 112:3–18; (D.E. 356-13 (hereinafter "Johnny Hill Dep.") at 174:3–12); Espinosa Dep. at 78:14–79:1; (D.E. 356-10 (hereinafter "Kendrick Dep.") at 102:13–19); Dean Dep. at 85:24–86:10. As such, his concerns over lack of exercise are irrelevant in face of the fact that inmates in restrictive housing can and do exercise.

Dr. Venters also takes issue with the pre-confinement assessments inmates receive. Venters Decl. at ¶ 32. But this, like many of Plaintiffs' experts' concerns, is not an issue sought to be certified. Further, there is no common issue of whether inmates do not receive adequate pre-confinement health screenings or whether there is a systematic weakness in detecting new injuries or urgent medical needs at time of placement. Of the 31 declarations submitted by putative class members,[6]

---

[5] In addition, inmates are provided exercise pamphlets for in-cell exercise. *See* Kirkland Decl. at ¶ 10 n.4.

[6] Although a named Plaintiff, Tracey Dean's declaration is included with the rest of the putative class members in Plaintiffs' Motion, due to the proximity between the

Defendants are unaware of any who complained of this. *See generally* (D.E. 311-8). By way of example, one individual detailed in Dr. Venters' declaration, Kiko Rogers, submitted a declaration as a putative class member but did not mention any of the issues Dr. Venters focuses on in his own declaration. *Compare* Venters Decl. at ¶ 33, *with* (311-8 at A-19). That this falls outside the areas Plaintiffs seek to certify means this lacks the requisite "fit" and should be excluded.

Another issue Dr. Venters focuses on is barriers to health care. Venters Decl. at ¶ 42. This is also not an issue sought to be certified and, even if it were, there is no common issue of whether inmates in restrictive housing face such barriers to health care. When deposed, multiple named Plaintiffs testified they did not have criticisms of the medical care they received. *See* Espinosa Dep. at 85:17–25, 86:1–9, 87:6–7; Dean Dep. at 87:8–15, 105:2–19, 134:19–24; Harvard Dep. at 87:3–10; Jeremiah Hill Dep. at 74:6–9. Another issue that lacks "fit" due to its irrelevance to this case.

Finally, in his conclusion, Dr. Venters states that it is "clear that exposure to confinement in FDC creates a significant risk of harm to physical health," and that "FDC imposes this risk on people in confinement in a manner that is systematic and in violation of official FDC policies." Venters Decl. at ¶ 62. He thus concedes that

---

time she became a named Plaintiff and the time Plaintiffs' Motion for Class Certification was filed. *See* (311-8).

his conclusion—and by extension his opinions—are not based on any written FDC policy, but rather on alleged "systematic . . . *violation*[*s*]" of FDC policies. *Id.* (emphasis added). Given the foundation for his opinion rests on various unwritten practices, *i.e.*, deviations from FDC's policies, Dr. Venters must be excluded because Plaintiffs are challenging FDC's restrictive housing policies facially, not as-applied. (D.E. 36 at 2–3; D.E. 343).

## V.   Declaration of Dr. Louis Kraus (D.E. 311-12)

Dr. Kraus' declaration should be stricken because it too is based on anecdotal evidence, inapplicable "literature," and does not satisfy Rule 702 or *Daubert*.

### a.  Dr. Kraus' Methodology Is Not Reliable

Dr. Kraus has been retained by Plaintiffs "to perform professional services as an expert in connection with litigation challenging the use of [restrictive housing] of juveniles under 21 years old in the custody of [FDC]." (D.E. 311-12 (hereinafter "Kraus Decl.") at ¶ 11). However, the studies he relied upon primarily focused on individuals aged 18 and under. (D.E. 356-20 (hereinafter "Kraus Dep.") at 14:14–19, 21:8–22:11, 51:22–25).[7] This does not apply to Plaintiffs' definition of the youth subclass, and calls into question both Dr. Kraus' methodology but also the relevance of his claims (*i.e.*, the "fit").

---

[7] And they did not concern Florida. *Id.* at 93:20–94:5.

Like the other experts, Dr. Kraus performed a clinical assessment of a small sample of inmates and from that anecdotal evidence offers an opinion on FDC restrictive housing writ large. In fact, he admitted he only interviewed three or four inmates under the age of 18 and three or four inmates between the ages of 18 to 21. Kraus Dep. at 19:5–11. But for the same reasons discussed above, this anecdotal evidence does not inform a reliable opinion as to causation. For example, Dr. Kraus recognized that all the inmates he interviewed had some traumatic situation at some point in their lives and that inmates in general population have a risk of harm. Kraus Dep. at 28:18–29:2; 67:11–16. He also recognized that "a clinical interview is different than, say, systematic research based interview for publication." *Id.* at 41:14–16. Simply because inmates reported symptoms of harm does not mean that such harm was caused by conditions of confinement in FDC restrictive housing units.

Dr. Kraus himself recognizes the importance of randomization. He testified: "[s]o the importance of looking at this in a random nature was important so that you could put together percentages and they had some meaning; in other words, if you only identified those kids with major depression, said hey, look 100 percent of the kids have major depression, that wouldn't help a study. But if it's random and you've taken a group, it's representative of the whole institution." Kraus Dep. at 23:16–25.

Thus, by Dr. Kraus' own estimation, his non-random interviews cannot be generalized to the larger population.

Dr. Kraus also baselessly speculates in his declaration that the inmates he spoke with may have been "minimizing their symptoms . . . because they were afraid of repercussions from security." Kraus Decl. at ¶ 48. He goes on to claim that even those youths "not currently exhibiting obvious serious harms . . . are at a risk of harm." *Id.* at ¶ 51. Statements as these show the foundation for Dr. Kraus' opinion is purely assumptive, and as such his methodology should be questioned and excluded.

### b. Dr. Kraus' Opinions on Plaintiff Jeremiah Hill Should be Excluded

The only Plaintiff interviewed by Dr. Kraus was Jeremiah Hill. Dr. Kraus admitted he did not read Jeremiah Hill's deposition before preparing his declaration,[8] even though Jeremiah Hill serves as Plaintiffs' exemplar plaintiff for the youth subclass. Kraus Dep. at 125:2–126:21. After reading his deposition, Dr. Kraus testified that Hill's deposition did not make "a significant difference in my opinion." *Id.* at 126:24–25. This is despite the fact that Dr. Kraus recognized that Hill gave answers inconsistent to those attributed to him in Dr. Kraus' report. *Id.* at 127:6–17, 131:22–137:2. Dr. Kraus' blind allegiance to his opinions, in the face of

---

[8] Dr. Kraus' deposition did not take place until after Plaintiffs' other four experts had been deposed, and each had been repeatedly asked whether they read the Plaintiffs' depositions and, if not, the reasons they had declined to do so.

contradictory testimony, renders his opinions regarding Jeremiah Hill unreliable and they should be stricken.

## IV. Declaration of Dan Pacholke (D.E. 311-13)

It is not clear what purpose Mr. Pacholke's declaration serves at class certification other than to support Plaintiffs' ill-conceived notion that the practices, conditions, and policies described in their Motion for Class Certification are common. *See* (D.E. 311 at 5–16). But, Mr. Pacholke understood the purpose of his declaration to be to "provide [his] insight and opinions as it relates to those conditions of confinement and their compliance with nationally accepted standards." (D.E. 356-16 (hereinafter "Pacholke Dep.") at 16:10–13). It is not clear how this task bears any relevance to class certification or why his declaration was offered. But, to the extent his declaration is relevant to class certification, it should be stricken because it is unreliable.  He offers no expertise on the facts at hand, and merely summarizes what is found in FDC policy and documents and regurgitates back unverified statements from inmates. Mr. Pacholke's declaration is not proper expert opinion under Rule 702 or *Daubert*.

### a.  Mr. Pacholke's Methodology Is Unreliable

Mr. Pacholke claims it is his opinion "that the code, policies, and practices governing operations in the restrictive housing . . . units at [FDC] create a culture and practice of unnecessary deprivation and abuse." (D.E. 311-13 (hereinafter

"Pacholke Decl.") at ¶ 1). The main flaw with Mr. Pacholke's methodology is that the majority of his opinions and conclusions are based on inmate reports and nothing else. As such, he merely serves as a conduit for hearsay which is inadmissible expert evidence.

Further, these hearsay statements were not even verified by Mr. Pacholke. *See* Pacholke Dep. at 97:16–19 (did not review all interviewed inmate files to verify what he was told). Mr. Pacholke took the inmates at their word simply because the reports were "consistent,"[9] and did no independent verification of the veracity of their claims.

In addition to his over-reliance on inmate complaints, Mr. Pacholke's declaration otherwise summarizes documents, policies, and procedures with a plaintiff-friendly slant. *See, e.g.*, Pacholke Decl. at ¶¶ 31, 36, 38, 39, 40, 42, 44, 46, 47, 49, 51, 52, 54. But this Court does not need an expert to summarize documents and an expert cannot be presented solely for the purpose of constructing a factual narrative based upon record evidence. *See Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1330 (M.D. Fla. 2015); *In re: Trasylol Prods. Liab. Litig.*, 709 F. Supp. 2d 1323, 1346–47 (S.D. Fla. 2010) (excluding expert's testimony, including expert's

---

[9] Mr. Pacholke's insistence that the reports were consistent is belied by his recognition that not all of the complaints were uniformly made. *See, e.g.*, Pacholke Dep. at 93:4–22, 95:23–96:8.

references to defendant's internal documents, finding that the expert was simply "Plaintiffs' advocate rather than expert").

And, as is a common theme, Mr. Pacholke did not review all of the Plaintiffs' depositions "comprehensively" and does not know if their testimony contradicts any of his opinions. Pacholke Dep. at 82:8–18. They do. *Compare* Pacholke Decl. at ¶ 49 (access to programming and education), *with* Kendrick Dep. at 151:20–159:3 (describing education), *and* Harvard Dep. at 55:23–56:24 (describing programming); *compare* Pacholke Decl. at ¶ 42 (access to phone calls), *with* Kendrick Dep. at 199:25–202:7 (describing calls), *and* Harvard Dep. at 51:7–19 (same), *and* Johnny Hill Dep. at 17:13–23, 26:21–27:5 (same); *compare* Pacholke Decl. at ¶ 39 (access to reading materials), *with* Kendrick Dep. at 21:4–18, 22:9–25 (describing books he reads), *and* Johnny Hill Dep. at 174:23–175:25 (describing his audiobooks), *and* Burgess Dep. at 119:1–6 (describing his books).

Mr. Pacholke also did not review any deposition transcript of FDC's corporate representatives, save the second day of a two-day deposition of FDC's representative on security issues. Pacholke Dep. at 82:19–83:15. He did not review all relevant procedures or technical manuals which describe the policies and practices upon which he offers opinions. *Id.* at 85:10–86:8. And his review of other case materials was at the discretion and selection of Plaintiffs' counsel. For example, in opining on property restriction, Mr. Pacholke reviewed only the 193 specifically selected (not

random) incident reports provided to him by Plaintiffs' counsel, not the other thousands of documents produced on this same subject in discovery. *Id.* at 87:1–89:6.

Mr. Pacholke's opinions in this case are based on nothing but mere speculation and conjecture. They should be excluded.

### b. Mr. Pacholke's Declaration Lacks a Fit to This Case

Mr. Pacholke's opinion lacks "fit" to this case because his declaration is merely a recitation of what he was told by inmates and thus it is unclear what, if any, level of expertise he brings to bear. It does not assist the trier of fact to allow Mr. Pacholke to simply relay unsubstantiated, otherwise inadmissible hearsay from various inmates. Moreover, while he concludes that FDC's restrictive housing units are more restrictive than the norm, he does not offer any recommendations for how FDC can and should improve these conditions. *E.g.*, Pacholke Decl. at ¶¶ 77–79; *see also id.* at ¶ 73 (claiming that as a "correctional administrator," he believes FDC "needs different strategies to address mental illness in the inmate population," but declining to offer what these strategies may be).

In Plaintiffs' Motion for Class Certification, Mr. Pacholke is cited in the section concerning alleged common practices in restrictive housing. *See* (D.E. 311 at 5–16). However, Mr. Pacholke is an administrator; he is not a statistician. He is unqualified to evaluate whether or not certain practices truly are common, and his

opinion on the matter—uninformed by any particular expertise—is therefore irrelevant to the trier of fact. He is instead just summarizing what he was told and the documents he reviewed. Mr. Pacholke should not be given the imprimatur of legitimacy experts are afforded, just to convey information the trier of fact could easily review.

Moreover, Mr. Pacholke conceded during his deposition that restrictive housing is appropriate in certain circumstances, *e.g.*, when an inmate acts out violently. Pacholke Dep. at 49:20–50:22. Mr. Pacholke also agreed that when an inmate commits a violent act, "that that inmate should not be permitted to engage in congregate activities for a certain period of time." *Id.* at 50:17–20. Similar to Dr. Burns, this undercuts Plaintiffs' claim that FDC's restrictive housing scheme must be abolished entirely.

Additionally, Mr. Pacholke agreed during his deposition that inmates in restrictive housing were being offered the privileges Plaintiffs claim they are being denied, *e.g.*, recreation, *id.* at 93:4–10. Instead, it was the practice Mr. Pacholke seemed to take issue with. *See id.* at 94:20–21 ("[J]ust because it's written in code doesn't mean you necessarily get it," referring to inmates in restrictive housing not receiving recreation as often as they should due to various cancellations.).

Yet, as noted, Plaintiffs are challenging Defendants' restrictive housing policies as written. (D.E. 36 at 2–3; D.E. 343). Mr. Pacholke's declaration concedes

that FDC's policies, although allegedly "heavy in process, give the semblance of fair placement and review processes." Pacholke Decl. at ¶ 26. Again, it is the practices he takes issue with. And even for those practices, Mr. Pacholke cannot say with any degree of certainty that they occur state-wide; rather "he is willing to believe" they do. Pacholke Dep. at 99:14–100:2. This is not proper, admissible expert opinion.

Moreover, Mr. Pacholke agreed that per his definition of solitary confinement—"22 hours a day in a cell or more," *id.* at 136:14–17—inmates on CMII and III status, *see* Fla. Admin. Code R. 33-601.800, arguably do not even qualify as being in solitary confinement. Pacholke Dep. at 136:18–138:4. Specifically, Mr. Pacholke stated that "[i]f, in fact, you're following [FDC's restrictive housing] rules," then inmates on CMII and III status would average less than 22 hours a day in cell, and thus not qualify as being in solitary confinement. *Id.* at 137:25–138:4. More evidence that Mr. Pacholke's opinions are unnecessary for the trier of fact, given he concedes FDC's *as written* policies pass muster.

### c. Mr. Pacholke's Opinion Regarding FDC's State of Mind Should be Stricken

Mr. Pacholke declares:

> The administrative code, department directives, and internal audit procedures do not protect inmates from unnecessary deprivation, abuse, and retribution. This has created a culture in which staff and management are not held accountable for their actions or held to the standard necessary to fulfill the correctional duty to protect those in your custody. As a result, staff have free rein to deny

> inmates their rights and privileges, leaving them in stark and inhumane conditions. They have been allowed to act cruelly and abusively, well outside of professional standards or legal conduct. Their leaders have overtly or tacitly condoned this behavior.

Pacholke Decl. at ¶ 78. It is not clear on what Mr. Pacholke bases this statement except the say-so of some inmates. He could not remember reviewing any ACA audits of Florida, simply stating "I may have." Pacholke Dep. at 116:10–21. In his list of materials reviewed, there were no audits present. *See* Pacholke Decl., App'x B. He also did not review any reports or documents regarding officer discipline. *See id.* He did not review any documents from the Office of the Inspector General. *See id.* And, Mr. Pacholke did recognize that Florida is accredited by the ACA. Pacholke Dep. at 117:3–6. Further, Mr. Pacholke admitted that he had not read anything from "central office down" that would lead him to believe that leadership in Tallahassee was promulgating this type of practice. *Id.* at 233:21–234:17. Thus, the above statement is entirely based on speculation and should be stricken.

Furthermore, it is improper opinion testimony because Mr. Pacholke seeks to opine on the FDC's state of mind. *See Kaufman v. Pfizer Pharms., Inc*., No. 1:02–CV–22692, 2011 WL 7659333, at *9 n.8 (S.D. Fla. Aug. 4, 2011) (excluding all of plaintiff's expert's opinions "about Defendants' motives and state of mind, regardless of where or how they appear in her expert report").

### a. Mr. Pacholke's Opinions on Mental Health Policies Should Be Stricken

Although he is "not a mental health clinician," Mr. Pacholke spends seven paragraphs of his declaration discussing mental health issues. Pacholke Decl. at ¶¶ 70–76. Mr. Pacholke is—per his own admission—not qualified to offer opinions regarding mental health illness, procedure, or practices. Pacholke Dep. at 25:17–26:14. As such, any opinions on this topic should be stricken.

## II. <u>CONCLUSION</u>

A review of Plaintiffs' experts' declarations show they came to this case with their minds made up about the alleged harms of restrictive housing. Their methodologies are flawed, and their facts and claims do not conform to Florida or the facts of this case. They picked and chose which facts would substantiate their preconceived opinions, ignoring the rest. The Federal Rules require more, and accordingly, Plaintiffs' experts should be excluded.

WHEREFORE, Defendants, Mark Inch, in his official capacity as Secretary of the Florida Department of Corrections, and the Florida Department of Corrections, request this Court enter an order striking Plaintiffs' expert declarations filed in support of their Motion for Class Certification, and for any and all further relief this Court deems just and equitable.

## <u>CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(B)</u>

The undersigned counsel certifies that he has conferred with counsel for Plaintiffs and said counsel objects to the relief requested herein.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(F) AND COURT ORDER (D.E. 353)

I certify that this Motion complies with the word count limitation set forth in Local Rule 7.1(F) and the Court's order granting Defendants' motion to increase word count limit, (D.E. 353), because this Motion contains 10,682 words, excluding the parts exempted by said Local Rule.

Respectfully submitted,

/ s / Jeffrey J. Grosholz
DANIEL J. GERBER, ESQUIRE
Florida Bar No. 0764957
SAMANTHA C. DUKE, ESQUIRE
Florida Bar No. 091403
RUMBERGER, KIRK & CALDWELL
Lincoln Plaza, Suite 1400
300 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida 32802-1873
Telephone: (407) 872-7300
Telecopier: (407) 841-2133
Email: dgerber@rumberger.com
sduke@rumberger.com

and

NICOLE SMITH, ESQUIRE
Florida Bar No. 0017056
JEFFREY J. GROSHOLZ, ESQUIRE
Florida Bar No. 1018568
RUMBERGER, KIRK & CALDWELL
Post Office Box 10507
Tallahassee, Florida 32302-2507
Telephone: (850) 222-6550

Telecopier: (850) 222-8783
E-mail: nsmith@rumberger.com
jgrosholz@rumberger.com

and

JOSHUA D. LERNER, ESQUIRE
Florida Bar No.: 0455067
RUMBERGER, KIRK & CALDWELL
Brickell City Tower, Suite 3000
80 Southwest 8th Street
Miami, Florida 33130-3037
Telephone: (305) 358-5577
Telecopier: (305) 371-7580
E-mail: jlerner@rumberger.com

**Attorneys for Defendants,**
 **Mark Inch and Florida**
 **Department of Corrections**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 22, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following: Leonard J. Laurenceau at leo.laurenceau@splcenter.org; Kelly Jean Knapp at Kelly.knapp@splcenter.org; Krista Dolan at Krista.dolan@splcenter.org; Dante Pasquale Trevisani at dtrevisani@floridajusticeinstitute.org; Laura Anne Ferro at lferro@floridajusticeinstitute.org and mllosa@floridajusticeinstitute.org; Sam Thypin-Bermeo at sthypin-bermeo@floridajusticeinstitute.org; Marcel A. Lilavois, Jr., at mlilavois@floridajusticeinstitute.org; Kara Sheli Wallis at

kwallis@floridajusticeinstitute.org; Andrea Costello at andrea@floridalegal.org; Christopher M. Jones at Christopher@floridalegal.org; Rachel M. Ortiz at rachel.ortiz@floridalegal.org; Alexis Alvarez at alexis.alvarez@floridalegal.org; Rebecca R. Klonel at rebecca.klonel@floridalegal.org; and Lori Rifkin at lrifkin@rifkinlawoffice.com.

/ s / Jeffrey J. Grosholz
DANIEL J. GERBER, ESQUIRE
Florida Bar No. 0764957
SAMANTHA C. DUKE, ESQUIRE
Florida Bar No. 091403
RUMBERGER, KIRK & CALDWELL
Lincoln Plaza, Suite 1400
300 South Orange Avenue (32801)
Post Office Box 1873
Orlando, Florida  32802-1873
Telephone:  (407) 872-7300
Telecopier:  (407) 841-2133
Email:  dgerber@rumberger.com
   sduke@rumberger.com

and

NICOLE SMITH, ESQUIRE
Florida Bar No. 0017056
JEFFREY J. GROSHOLZ, ESQUIRE
Florida Bar No. 1018568
RUMBERGER, KIRK & CALDWELL
Post Office Box 10507
Tallahassee, Florida  32302-2507
Telephone:  (850) 222-6550
Telecopier:  (850) 222-8783
E-mail:   nsmith@rumberger.com
   jgrosholz@rumberger.com

and

JOSHUA D. LERNER, ESQUIRE
Florida Bar No.: 0455067
RUMBERGER, KIRK & CALDWELL
Brickell City Tower, Suite 3000
80 Southwest 8th Street
Miami, Florida 33130-3037
Telephone: (305) 358-5577
Telecopier: (305) 371-7580
E-mail: jlerner@rumberger.com

**Attorneys for Defendants,
Mark Inch and Florida
Department of Corrections**