## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### Tallahassee Division

_____

JAC'QUANN (ADMIRE)                      )
HARVARD, et al.,                        )
                                        )
          *Plaintiffs*,                 )
                                        )
v.                                      ) Case No.: 4:19-cv-00212-AW-MAF
                                        )
RICKY D. DIXON,[1] et al.,              )
                                        )
          *Defendants*.                 )
_____       )

## PLAINTIFFS' REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION FOR CLASS CERTIFICATION (ECF 356)

Plaintiffs provided ample evidence to demonstrate class certification is appropriate.  In response, Defendants try to reframe this case as a challenge to distinct deprivations or the application of restrictive housing to each putative class member, repeatedly emphasizing the kinds of factual variations that are inevitable when unique individuals experience restrictive housing.  For reasons the Court has already found, this inaccurately characterizes Plaintiffs' case.  ECF  54 at 20; ECF 52 at 2.  Defendants also reiterate their mistaken belief that Plaintiffs' case is a facial

_____

[1] Ricky D. Dixon was appointed as Secretary of the Florida Department of Corrections in November 2021 and is automatically substituted in this action pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1

challenge to written policies.   As this Court and Plaintiffs have also already explained, it is not.   ECF 346 at 1-3; ECF 54 at 15, 20, 22.

In fact, Plaintiffs challenge Defendants' systemic use of isolation that consists of locking people in tiny cells for 22-24 hours a day and depriving them of essential human contact, exercise, and environmental stimulation and subjecting them to dehumanizing security measures.   Defendants' systemwide implementation of restrictive housing raises common questions, including whether: 1) the isolation is so severe that it deprives people of basic human needs; 2) the isolation subjects everyone to an unconstitutional baseline substantial risk of serious harm; 3) the isolation subjects youths and people with serious mental illness to a heightened risk of harm; 4) Defendants know of these risks of harm; 5) there are reasonable systemic alternatives that meet security concerns and reduce the risk of harm; and 6) Defendants have a system to effectively ensure reasonable accommodations for people with disabilities in restrictive housing.   Since each of these questions can be answered in one sweep, class certification is appropriate.

Defendants also prematurely focus on attacking the merits of Plaintiffs' case and the precision of the proposed injunctive relief.   For example, Defendants' assert that Plaintiffs have not proven a shared risk of harm or sufficiently severe deprivations—but these are arguments about the *answers* to common questions that make this case suitable for class litigation.   Plaintiffs are not required to prove the

ultimate merits of their case at the class certification stage.  Nor must Plaintiffs now enumerate the precise terms of an injunction.  Plaintiffs need only demonstrate that an injunction could provide relief to the entire class, which they have done.  *See Dockery v. Fischer*, 253 F. Supp. 3d 832, 848 (S.D. Miss. 2015) ("[T]he only consideration at the class certification stage is whether the issues are appropriate for classwide litigation.").

Defendants also exaggerate the breadth of possible injunctive relief, conjuring the specter of a federal takeover of the Florida prison system.  Plaintiffs request targeted relief to remedy the conditions specifically in the restrictive housing units FDC uses for 10% of the prison population.  Thus, the Court can ultimately fulfill its well-established power to remediate the unconscionable and unconstitutional harms Defendants inflict on the Plaintiff class in a manner that is appropriately narrow and deferential to prison officials.  Plaintiffs have established this case should proceed as a class.

## I.   PLAINTIFFS MEET THE CLASS CERTIFICATION PREREQUISITES.

Plaintiffs have established they satisfy the four prerequisites of Rule 23(a) and "at least one of the alternative requirements of Rule 23(b)."  *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187–88 (11th Cir. 2003).

### A. Plaintiffs Adequately Defined the Class and Subclasses.

#### 1.   All Classes

3

Defendants argue the proposed classes are overbroad because they include different isolations statuses, are not sufficiently defined, and do not include a durational limit. Each of these arguments fail.

Defendants argue the proposed classes are overbroad based on variations in FDC's written policies. This assumes either that Plaintiffs bring a facial challenge, or that putative class members receive everything afforded in the policies. Neither is true. ECF No. 346. Plaintiffs have provided sufficient evidence that—despite FDC's written policies—the core conditions and deprivations in FDC's use of isolation are the same no matter the name of the isolation. ECF 311 at 9-17.

Plaintiffs also have sufficiently defined the class and subclasses with "straightforward, objective standard[s]." *Braggs v. Dunn*, 317 F.R.D. 634, 673 (M.D. Ala. 2016). Class members are people in Administrative Confinement (AC), Disciplinary Confinement (DC), Close Management (CM), or Maximum Management (MM).

In the event FDC creates another label for restrictive housing, Plaintiffs' class definitions also include those in "any substantially equivalent restrictive housing unit used by FDC where people are locked in their cells, alone or with a cellmate, for 22 hours or more per day." ECF 311 at 3; *see also Liles v. Ward*, 424 F. Supp. 675, 677 -679 (S.D.N.Y. 1976) (admonishing prison officials for attempting to skirt due process requirements for psychiatric hospital transfers because the hospital was

called a correctional facility); *see also McDonald v. Armontrout*, 908 F.2d 388, 389-90  (8th Cir. 1990) (affirming modification of a consent decree to include a new death row because it had been "foreshadowed" in the original decree); *Inmates of Allegheny County Jail v. Wecht,* 612 F. Supp. 874 (W.D. Pa. 1985) (finding women held in dire conditions in a city jail were class members when retained there to avoid a consent decree addressing the same conditions in the county jail).  Defendants' expert Larry Reid recognizes that "restrictive housing" is a "nationally recognized term[] within the correctional community" that involves "removal from the general inmate population." ECF 356-7 at ¶¶37, 38.  By definition, people who remain in general population on a "facility-wide lockdown" are not included in the class.  ECF 356 at 8.

Defendants' remaining arguments related to the class definitions are also unfounded.  Plaintiffs do not allege that patients in security treatment units or in-patient mental health care are class/subclass members.  ECF 309 at ¶¶22, 44, 45, 52, 54, 58, 140.  Nor do Plaintiffs rely on their experts to make legal decisions about class definitions; so any expert testimony using a more expansive definition of "solitary confinement" has no bearing on the more specific proposed class/subclass definitions.  *See Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990) (experts' purpose is not to offer legal conclusions).

Defendants mischaracterize Plaintiffs' experts' testimony to argue the class definitions must include a durational limit.  Plaintiffs' experts have not testified that restrictive housing *as it is used by FDC* is permissible for a short period of time. ECF 356-16 at 90:10-92:23 (Mr. Pacholke testifying how FDC restrictive housing, including for terms under 30 days, "creates a culture and practice of unnecessary deprivation and abuse"); ECF 356-19 at 58:21-59:6 (Dr. Haney testifying it may be "appropriate to separate people from the general prison population.  How you do it, for how long you do it, and to whom or with whom you do it, those things are different issues."); *id.* at 98:20-99:13 (Dr. Haney testifying that restrictive housing is "no solution at all" when there is no attempt to "understand and deal with whatever the underlying issue is").

In fact, Defendants habitually subject people to restrictive housing for extended periods of time.  ECF 346 at 15-16.  Whether there is some minimal period of FDC's use of restrictive housing that is constitutionally tolerable and whether Defendants systemically go beyond it is an element of Plaintiffs' common Eighth Amendment claim that Plaintiffs need not prove to define or certify the class.  *See Chandler v. Crosby*, 379 F.3d 1278, 1295 (11th 2004) (holding that the severity and duration of the prisoner's exposure to conditions are Eighth Amendment considerations) (internal punctuation omitted); *see also Jones v. Desantis*, No. 4:19CV300-RH/MJF, 2020 WL 5646124, at *6 (N.D. Fla. Apr. 7, 2020) ("Class

membership typically turns on having a claim, not on showing at the outset that the claim will succeed on the merits.").

### 2. Subclasses

Defendants incorrectly assert that the Youth Subclass is overbroad because different policies in restrictive housing apply for teenagers under 18 years old than for 18-20 year-olds. The only "evidence" Defendants offer on this point are vague and conclusory statements from an FDC official that fail to explain how the federal Prison Rape Elimination Act translates into significantly different conditions between the two age groups. ECF 356-1 at ¶ 51 ("Based on requirements under the PREA, . . . these inmates' experience on CM is different from other inmates 18 years and older."). This is contradicted by another FDC official's testimony that out-of-cell time for people under 18 mirrors that of those over 18, and the only difference is the schedule of when it is provided. Ex. 13 at 254:14-256:5

Defendants also erroneously contend there are no objective criteria to identify the subclasses of people with serious mental illness (SMI Subclass) and people with physical disabilities (Physical Disability Subclass). The SMI Subclass definition uses Defendants' definition of "serious mental illness," which FDC uses as an admission criterion for its treatment unit for people in CM. ECF 309 at ¶183; Ex. 1 at 3, 8. FDC clinicians' regular reliance on this definition to make objective treatment eligibility decisions demonstrates its suitability for determining who is in

the SMI subclass. *See Braggs*, 317 F.R.D. at 673 (finding that a class definition of people with "serious mental illness" sets forth a "straightforward, objective standard"). Similarly, the Physical Disability Subclass definition adopts the objective definition of "disability" in both FDC policy and the ADA. *See* 42 U.S.C.A. § 12102; ECF 356-2 at ¶ 10.

Neither subclass requires individualized determinations to identify members, as Defendants claim, because Plaintiffs seek only injunctive and declaratory relief. *Jones*, 2020 WL 5646124, at *6 (holding there is no need to identify class members before issuing injunction to end unlawful practices); *Braggs*, 317 F.R.D. at 673 (explaining there is no need to specifically identify members of a Rule 23(b)(2) class because there are no damages, notice requirements, or right to opt out).

### B. Plaintiffs have Demonstrated Commonality by Identifying a Common Practice that Raises Common Questions with Common Answers.

Defendants challenge commonality based on three mistaken theories: 1) Plaintiffs have not demonstrated a common practice; 2) the proof for this case is too individualized; and 3) the Court should analyze the merits of Plaintiffs' claims. For the reasons below, these arguments fail.

### 1. <u>Plaintiffs identify a common isolation practice.</u>

Defendants argue that Plaintiffs have not sufficiently identified the policies and practices to be certified. This is untrue. Plaintiffs have repeatedly explained

how Defendants' specific policies, practices, and omissions—in combination—result in their common use of isolation in every restrictive housing at every facility. Specifically, people in all types of restrictive housing habitually spend 22-24 hours a day in their cells due to Defendants' actual and constructive denial of out-of-cell time. As a result, people in all types of restrictive housing suffer from severe deprivations of necessary social interaction, exercise, and stimulation. ECF 311-9 at ¶¶58–65; ECF 54 at 35 ("[I]solation necessarily involves the restrictions imposed by the isolation, such as lack of exercise, human contact, and environmental stimulation.").

In trying to undermine commonality, Defendants renew their attempts—which this Court has already rejected—to break Plaintiffs' Eighth Amendment claim into "separate and distinct conditions of confinement" such as sexual abuse, overzealous cell searches, or the excessive use of chemical agents that may differ amongst the class members. ECF 54 at 34. Plaintiffs challenge the *totality* of the interrelated conditions common to all restrictive housing units. ECF 54 at 22. The non-prison cases Defendants cite for the proposition that Plaintiffs cannot aggregate separate practices into one claim are inapposite. Courts routinely examine prison conditions in combination to determine an Eighth Amendment violation. ECF 356 at 13 (citing cases); *see, e.g., Hutto v. Finney*, 437 U.S. 678, 687-88 (1979) (finding a combination of isolation conditions were unconstitutional); *Rhodes v. Chapman*,

452 U.S. 337, 362-63 (1981) (Brennan, J., concurring) ("a court considering an Eighth Amendment challenge to conditions of confinement must examine the totality of the circumstances"); *see also Jones v. Gusman*, 296 F.R.D. 416, 466 (E.D. La. 2013) ("Whether certain conditions . . . either by themselves, or through a mutually enforcing effect, put inmates at substantial risk of harm is amenable to a common answer.").

Defendants' argument that class certification is inappropriate because not every person has uniformly experienced every practice in restrictive housing is incorrect. *See Jones,* 2020 WL 5646124 at *4 ("Commonality requires common questions with common answers and is not defeated just because a case also presents individual issues."). Commonality does not require all people in restrictive housing to have experienced it in the same way, nor does it require FDC to subject all class members to every security practice in their arsenal. *Cooper v. Southern Co.*, 390 F. 3d 695, 714 (11th Cir. 2004), *overruled in part on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) ("[F]actual differences among the claims of the putative class members do not defeat certification."); *Hughes v. Judd*, No. 8:12-CV-568, 2013 WL 1821077, *23 (M.D. Fla. Mar. 27, 2013) (dismissing defendants' attempts "to emphasize the factspecific instances Plaintiffs include in their complaint" because "commonality may be satisfied . . . despite factual differences between the claims of the named plaintiffs and the claims of the class at large").

10

Instead, Plaintiffs must only identify a practice *common* to each class member—in this case, 22-24 hours of isolation with some degree of serious deprivations of human contact, exercise, and environmental stimulation.   *See Groover v. Prisoner Transportation Servs.*, *LLC*, No. 15-CV-61902, 2018 WL 6831119, at \*9-\*10 (S.D. Fla. Dec. 26, 2018) ("Plaintiff must identify a policy to which every class member was subjected."); *Davis v. Baldwin*, No. 3:16-CV-600-MAB, \*22 (S.D. Ill. June 14, 2021) (commonality analysis focuses on common conditions, despite existence of other differing conditions).

Plaintiffs have presented a wealth of evidence of FDC's common practice throughout its restrictive housing units.  Multiple experts with decades of specialized knowledge about solitary confinement submitted declarations specifically identifying FDC' common practice based on their inspections, interviews, and review of deposition testimony and thousands of FDC documents.  ECF 311-9 at ¶¶14, 58-59; ECF 311-10 at ¶¶ 21-22; ECF 311-12 at ¶ 18; ECF 311-13 at ¶25. Seven Named Plaintiffs and 30 putative class members in various isolation statuses and facilities submitted declarations describing their experiences of being locked in their cells 22-24 hours for prolonged periods of time while subject to the core deprivations Plaintiffs allege.  ECF Nos. 311-1 – 311-8.

Defendants' own testimony and documents similarly evidence FDC's common isolation practice.   ECF 346 at 8-14 (listing evidence of common

conditions, deprivations, dehumanizing security measures, and habitual use of isolation for extended periods of time); *see also* Ex. 2. (legislative budget request stating FDC "currently lacks the staff to meet the minimum out of cell recreation and exercise requirements mandated by Florida Administrative Code or the nationally accepted standards for the ethical and humane treatment of prisoners in special management housing."); Ex 3., Decl. of Dan Pacholke (analysis of 78 FDC records—including 60 FDC self-selected to submit for American Correctional Association certification—demonstrating FDC isolates people in all CM levels at least 22 hours a day and consistently fails to offer out-of-cell time afforded under the written policies).

In addition, Defendants' corrections expert, Larry Reid, describes FDC's use of isolation as a practice that is centrally controlled and consistent across the system. ECF 356-7 at ¶7 (FDC facilities "were consistent in the applications of restrictive housing program requirements); *id.* at ¶ 8 ("[T]he Department's executive level system-wide oversight of restrictive housing decisions, particularly regarding inmates' classification status, is appropriate."); *id.* at ¶ 45 ("Each decision made by correctional staff will depend on FDC's applicable policies …"); *id.* at ¶ 50 ("the officer's decisions to utilize strip status was [sic] was based upon department policy and training they have received"); *id.* at ¶ 64 (suspensions of privileges are reviewed by the State Classification Office and there is "no deviation from the rule"); *see Wal-*

*Mart Stores, Inc. v.* Dukes, 564 U.S. 338, 356 (2011) (commonality required evidence of a "uniform employment practice" with "common direction" for exercising discretion).

Defendants' reliance on *Willis v. City of Seattle* is misplaced because plaintiffs there presented no evidence that every person "has experienced the same challenged practice or suffered the same injury to the implementation" of the practice at issue. 943 F.3d 882, 885 (9th Cir. 2019).  In contrast, Plaintiffs have submitted ample evidence to identify a common isolation practice that exposes everyone to the same injury of a substantial risk of serious harm.  *See Davis*, 2020 WL 241460, at \*22 (finding a common isolation practice based on regulations, admissions by prison officials, "testimony from inmates," and two expert reports); *Baxley v. Jividen*, 338 F.R.D. 80, 87-88 (S.D. W.Va. 2020) (holding that two expert reports and named plaintiff testimony was "sufficient to support a finding that the members of the putative class are commonly exposed to systemic policies and practices").  Indeed, except for one FDC official's declaration describing written policies, Defendants submitted no evidence to dispute that, as implemented, they subject all putative class members to the common isolation practice Plaintiffs describe.

## 2.  Plaintiffs' claims are susceptible to classwide proof.

Defendants argue the class cannot be certified because it would impermissibly require the court to individually analyze the actual conditions, duration of isolation,

penological justification, wantonness, and risk of harm for each person to determine constitutional violations.  This is incorrect.

First, there is no need for individualized determinations "to identify the actual conditions imposed" because Plaintiffs have proven the existence of substantially similar baseline conditions and deprivations in FDC's restrictive housing that subject people to a substantial risk of harm.  ECF 311 at 9-17; Ex. 3; *see also Groover*, 2018 WL 6831119, at *9-10 (finding commonality "satisfied by proof of the existence of systemic policies and practices that allegedly expose putative class members to a substantial risk of harm.")

Second, the Court need not inquire about the duration of isolation for each individual because Plaintiffs challenge FDC's practice of exposing every person to a risk they will spend long periods of time in isolation due to the lack of a cap on isolation terms.  *See DG ex rel. Stricklin v. Devaughn*, 594 F. 3d 1188, 1197 (10th Cir. 2010) (explaining that class certification is appropriate when there is a "shared risk of being subjected to the purportedly unconstitutional practices").

Third, there is no need for individualized determinations about the penological justification for isolating each person because Plaintiffs do not challenge FDC's application of isolation to each particular person.  Rather, Plaintiffs challenge whether FDC has a penological justification for the way it uses restrictive housing on *any* person given the systemic risk of harm to putative class members from this

14

practice and the existence of alternatives to reduce the risk of harm.  *Rhodes*, 452 U.S. at 2412 (Marshall, T., dissenting) ("[T]he State cannot impose punishment that violates the evolving standards of decency that mark the progress of a maturing society.") (internal punctuation and citation omitted).  Both parties' experts agree restrictive housing should be used as a "last resort" and "only for a few days to get someone in a place where they're going to be less likely to engage in violence."  Ex. 4 (Labrecque) at 108:6-109:3, 136:18-137:9; ECF 356-16 (Pacholke) at 71:13-22, 261:19-264:3.  And both parties' experts have identified methods prison administrators can employ to examine the isolation population as whole and identify subsets of people they can remove because they pose no risk.  Ex. 4 (Labrecque) at 131:23-138:11; ECF 356-16 (Pacholke) at 72:14-76:9.  Thus, Plaintiffs can prove Defendants' deliberate indifferent with evidence that Defendants' implement restrictive housing in a way that imposes and does not remediate serious risk of harm, and is not penologically justified.  *See G.H. v. Tamayo*, No. 4:19CV431-RH-MJF, 2021 WL 5150050, at *3 (N.D. Fla. Oct. 22, 2021) (holding that plaintiffs' challenge to the solitary confinement standards, as opposed to the application of the standards to each child, raises a common question with a common answer).

Fourth, Plaintiffs also can prove deliberate indifference through evidence of Defendants' knowledge of a baseline risk of harm classwide in restrictive housing and their failure to significantly reduce the total population and duration in restrictive

housing, exclude especially vulnerable populations such as Youth and SMI Subclass members, and meaningfully implement alternatives.  ECF 346 at 17-21.

Fifth, Defendants' reliance on out-of-context testimony from Plaintiffs' experts does not support a need to individually assess each person's risk of harm. Although Plaintiffs' experts acknowledge varying degrees of risks between individuals, they clearly opine—based on a widespread scientific and professional consensus—that isolation conditions create a baseline substantial risk of serious harm to all persons' physical and mental health.  ECF 356-19 at 50:22–51:6, 55:4-15; ECF 356-18 at 55:4-12; ECF 356-17 at 146:15–147:7; ECF 311-11 at ¶¶62-63; ECF No. 356-20 at 64:1-65:4; ECF 311-12 at ¶32; *see also Tellis,* 2021 WL 4267513 at *7 ("While inmates will likely have different exposure to that risk of serious harm, it does not destroy commonality.").  *Dearduff v. Washington*, in which the court found no common risk of harm from inadequate dental care, is inapposite because there was no comparable scientific consensus of a substantial risk to all persons from the dental practices at issue.  330 F.R.D. 452, 466 (E.D. Mich. 2019). Here, Defendants' experts admit the consensus of a risk of harm to all persons and can point to no national or international correctional or healthcare organization that finds otherwise.  Ex. 5 (Saathoff) at 62:1-63:4, 56:25-57:24; Ex. 4 (Labrecque) at 257:8-258:7; Ex. 6, Decl. of Craig Haney, at ¶¶68-73. Further, Dr. Haney did not use an "amorphous definition" of solitary confinement to opine about a substantial risk of

harm.  ECF 356 at 22.  His opinion is based on the consistency of the conditions and symptoms he observed in FDC's restrictive housing with the findings in the scientific literature about solitary confinement.  ECF 311-9 at ¶¶54-86; Ex. 6. at ¶¶6-7, 9-10, 12-13.

Finally, there is also no need for individualized inquiries into whether people are supposedly isolating themselves by choice, as Defendants claim, because the baseline risk of harm is the same no matter the reason for the isolation.  ECF 356-19 at 95:21-96:17; ECF 356-18 at 206:6–208:16; ECF 356-20 at 67:2-22; *see also* Ex. 3 at ¶15-16 (FDC records support experts' conclusion that people "refuse" out-of-cell time due to fear of retaliation).

In toto, each of Defendants' arguments regarding individualized determinations fail because Plaintiffs do not challenge the "specific application and effect of [isolation] policies on each individual class member."  *Davis*, 2021 WL 2414640, at *20 (finding no need for "individual factual determinations" in a challenge to systemic isolation conditions).

### 3.  <u>The subclasses meet commonality.</u>

#### a.  *Youth and SMI Subclasses*

As Plaintiffs explain in Section I.A.2. *supra*, there are no relevant policy differences within the Youth and SMI subclasses, and thus commonalty is not defeated on that basis.  Defendants' dispute about whether the Youth and SMI

Subclass members face a heightened risk of harm in isolation is a merits questions for trial, not class certification.[2]  *See Dearduff*, 330 F.R.D. at 466 ("[W]hether the risk is 'substantial' and the harm 'serious' in the Eighth Amendment sense is a merits issue.").

### b.  Disability Subclasses

Defendants' claim that Plaintiffs' disability claims are not susceptible to classwide proof is meritless.  The Physical Disability and SMI Subclasses bring an ADA/Section 504 claim based on disability discrimination they face in restrictive housing.[3]  ECF 309 at ¶¶157–167.  Despite Defendants' emphasis on Named Plaintiffs' individual experiences, Plaintiffs have demonstrated a common question for both physical disability and SMI subclasses: does FDC have a system that effectively ensures reasonable modifications of isolation policies and practices so that people with disabilities can access even the minimal programs, activities, and services in isolation?  ECF 311 at 43; *G.H. v. Tamayo*, No. 4:19CV431-RH-MJF, 2021 WL 5150050, at *4 (N.D. Fla. Oct. 22, 2021) (holding the "failure to have in

---

[2] Notably, Defendants' expert, Dr. Saathoff, recognizes people with serious mental illness face a risk of harm in solitary confinement, and agrees with the American Psychiatric Association position that segregation should be avoided.  Ex. 5 at 57:25-59:2, 59:17-60:6, 90:10-91:1.

[3] Plaintiffs do not raise separate common questions under the Eighth Amendment for the Physical Disability Subclass; they are members of the overarching class and suffer from the same baseline risk of harm as every other person in restrictive housing.  ECF 309 at ¶¶192, 197-203.

place a system for accommodating disabilities of children placed in solitary confinement" raises common questions).

Plaintiffs' burden of proof for their disability claim does not require individualized determinations for each subclass member as Defendants assert. First, as explained in Section I.A.2., whether someone has a qualifying disability is not part of the calculus because it is a prerequisite for subclass membership, and something Defendants already must determine as part of their procedures. Second, Plaintiffs are challenging Defendants' policies and practices that result in the lack of an adequate system for ensuring provision of accommodations, not challenging failures to provide accommodations in certain instances. *Dunn v. Dunn*, 318 F.R.D. 652, 663 (M.D. Ala. 2016) (finding no individualized determinations required when plaintiffs alleged the "denial of a system that would have the effect of ensuring that they and their fellow prisoners were appropriately accommodated"). Individualized determinations are required only if Plaintiffs fail to identify "a common, official policy or direction." *Parent/Pro. Advocacy League v. City of Springfield, Mass.*, 934 F.3d 13, 30 (1st Cir. 2019) (requiring plaintiffs to identify a "common, official policy or direction" to avoid the need for individualized disability-related determinations that would defeat commonality).

Here, FDC's Chief of Nursing Services Paula Foskey identified such a "common, official, policy or direction" through her declaration describing FDC's

written procedures for people with disabilities.  ECF 356-2.  Defendants' failure to reasonably accommodate subclass members results from their insufficient implementation of the written procedures in restrictive housing systemwide.  *See Dunn*, 318 F.R.D. at 663; *Tellis*, 2021 WL 4267513, at *10 ("[I]f it is shown that it is not discriminatory for [defendant] not to modify its policies to accommodate prisoners' mental illness, it will resolve all Plaintiffs' claims at once.  The putative subclass has therefore satisfied the commonality requirement of Rule 23(a).")

### 4. <u>Plaintiffs are not required to prove the merits of their claims at class certification.</u>

Defendants' arguments regarding commonality also focus largely on whether Plaintiffs are, in fact, correct in asserting that FDC subjects all class/subclass members to a common core of isolation conditions that rise to the level of constitutional deprivation by creating a substantial risk of serious harm.  But this impermissibly focuses on the merits determination rather than the class certification determination.  *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits inquiries at the class certification stage."); *Vision Construction Ent. Inc. v. Argos Ready Mix LLC*, 2019 WL 11075886, *6 (N.D. Fla. Nov. 7, 2019).  At the class certification stage, Plaintiffs must submit sufficient evidence to show there is a common practice that raises common questions—but the *answers* to the questions— the degree of deprivations and risks of harm resulting from the common practice—

are answered at the merits stage, after discovery is completed.  *See D.G. ex rel.*

*Stricklin v. Devaughn*, 594 F.3d 1188, 1198 (10th Cir. 2010) (holding that plaintiffs

did not need to prove they were "actually exposed to a threat of harm" for class

certification); *see also Tellis*, 2020 WL 4267513, at \*8 (finding "the alleged lack of

scientific proof regarding Plaintiffs' hypothesis that restrictive housing causes or

exacerbates mental illness" is a common question).

### C. Named Plaintiffs are Typical Because FDC Subjects Them to the Common Isolation Practice.

Defendants' contentions that Named Plaintiffs' individual characteristics or

experiences preclude typicality misunderstand this class requirement.  To satisfy

typicality, Plaintiffs must show "the claims or defenses of the class and the class

representative[s] arise from the same event or pattern or practice and are based on

the same legal theory."  *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332,

1337 (11th Cir. 1984).

Plaintiffs demonstrated that Defendants have isolated each Named Plaintiff in

restrictive housing and subjected them to a set of common conditions giving rise to

the claim that Defendants are subjecting them—and all class members—to a

baseline substantial risk of serious harm.  *See Davis,* 2021 WL 2414640, at \*25

(finding typicality when named plaintiffs' and the putative class were "*all* subject to

the same formal policies and systemic practices . . . [and] they all face the risk of the

same constitutional deprivations caused by those policies and practices."); *Dockery*,

253 F. Supp. 3d  at 855 (Typicality "does not require that each class member's claim be identical, but only that the claims have the same essential characteristics of those of the putative class.").  Thus, Named Plaintiffs' testimony illustrating differences in their personal attributes and experiences is irrelevant to class certification because each of them also testified about their exposure to the common conditions and deprivations at issue.[4]  *See Tellis*, 2021 WL 4267513, at *11 ("Any differences . . . between the Named Plaintiffs and the class and subclass[es] are immaterial because the claims of each putative class and subclass member arise from the same policies and practices and are based on the same legal theories, not the facts as applied to a particular inmate.").

In addition, that several Named Plaintiffs are not currently in restrictive housing "does not mean that their claims are atypical of the inmates who remain incarcerated there.  Their claims still arise from the same events and policies as the class and subclass and are premised on the same legal theories." *Id.*

---

[4] *See, e.g.,* ECF 356-12 (Harvard) at 40:6-11, 43:5-18, 49:9-50:3, 55:2-21, 58:12-19, 63:7-25, 152:23-25; ECF 356-9 (J.H.) at 113:19-114:10, 123:1-11, 124:10-17, 131:17-22, 154:5-156:25; ECF 356-10 (Kendrick) at 31:15-32:1, 107:3-10, 166:1-18, 171:7-13, 198:19-24, 205:18-206:17, 228:1-14; ECF 356-11 (Burgess) at 94:10-95:8, 98:13-20, 107:16-23, 117:2-12, 125:7-10, 129:24-130:9, 146:20-147:10, 172:5-17; ECF 356-13 (Johnny Hill) at 27:6-17, 33:7-16. 123:12-14, 124:16-19, 160:16-161:17, 174:6-17, 204:5-208:11, 273:16-274:9; ECF 356-14 (Espinosa) at 65:12-19, 89:24-90:7, 91:17-92:11, 97:14-98:4, 99:19-100:7, 108:6-19, 161:22-162:9; ECF 356-15 (Dean) at 80:5-21, 85:1-86:4, 87:11-13, 89:1-10, 90:11-91:1, 91:13-92:3, 94:10-20, 137:1-14.

Defendants' opposition to typicality also misunderstands the injury that Plaintiffs must prove in a deliberate indifference case. Plaintiffs need not prove "they have been harmed by restrictive housing policies," as Defendants assert. ECF 356 at 41. Rather, the injury is exposure to conditions that create an intolerable risk of future harm. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (finding deliberate indifference even without evidence of "serious current symptoms"). Also, because Plaintiffs do not seek damages, or injunctive relief tailored to remedy specific harm to any one individual, there is no need to analyze for each individual whether psychological stressors were caused by isolation as opposed to some other source. *See Brown v. Plata*, 563 U.S. 493, 506 n.3 (2011) (declining to consider discrete incidents of inadequate health care because plaintiffs sought systemic injunctive relief).

Three Justices of the Supreme Court and courts across the nation have acknowledged the advances in research demonstrating the devastating toll of isolation. *See Apodaca v. Raemisch*, 139 S. Ct. 5, 10 (2018) (Sotomayor, J.) (statement respecting denial of certiorari); *Davis v. Ayala*, 576 U.S. 257, 286-90 (2015) (Kennedy, J., concurring); *Glossip v. Gross*, 576 U.S. 863, 926 (2015) (Breyer, J., dissenting); *Porter v. Pennsylvania Dep't of Corr.,* 974 F.3d 431, 442-43 (3d Cir. 2020) (collecting cases); *H'Shaka v. O'Gorman*, 444 F. Supp. 3d 355, 379-80 (N.D.N.Y. 2020) (collecting cases); *Davis*, 2021 WL 2414640, at *4-5;

23

*Braggs*, 257 F. Supp. 3d at 1236-37; *see also Rhodes v. Chapman*, 452 U.S. 337, 346 (1981) (rejecting a "static test" for the Eighth Amendment because it "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.") (quotation omitted).   The two cases Defendants cite where a court found no substantial risk of serious harm in isolation are more than 20 years old.  *Bass v. Perrin*, 170 F.3d 1312, 1317 (11th Cir. 1999); *Hargrove v. Henderson*, No. 95-16-1-CIV-T-17A, 1996 WL 467516, at *8 (M.D. Fla. Aug. 13, 1996). Indeed, FDC's Chief of Mental Health Services relies on the "clinical research" to provide trainings about the risk of developing "psychiatric symptoms" in isolation. ECF 346-3 at 132; *see also id*. at 137 (FDC training document stating that people— including those who have never received mental health treatment—are more likely to be suicidal in restrictive housing).

To evaluate whether FDC's use of isolation results in systemic risk of harm, and Named Plaintiffs' representation of such risk of harm, Plaintiffs' experts reviewed the conditions, policies, and practices, and any patterns of symptomology, from a cross-section of people in FDC's restrictive housing and compared them to the conditions and symptoms in the scientific research.  Ex. 6. at ¶¶5-8, 12-13, 29 (describing methodology).   Courts regularly rely on this long-established methodology to make findings regarding substantial risk of serious harm.  *Id.* at ¶¶14-21; *see also, e.g., Braggs*, 257 F. Supp. 3d at 1187, 1245 (relying on Dr. Burns'

and Dr. Haney's same methodology to find "segregation practices . . . pose a substantial risk of serious harm to prisoners with serious mental-health needs"); *Indiana Prot. & Advocacy Servs. Comm'n v. Comm'r, Indiana Dep't of Corr.*, No. 1:08-CV-01317-TWP, 2012 WL 6738517, at *10, *17 (S.D. Ind. Dec. 31, 2012) (citing to Dr. Burns' findings of "high levels of psychiatric symptoms" to hold that "the severe conditions in the segregation units cause a predictable deterioration" in mental health); *Ruiz*, 37 F. Supp. 2d at 910, 915 (relying on Dr. Haney's same methodology to find that the deprivations in segregation were "the cause of the cruel and unusual pain and suffering"). Defendants cite no cases discrediting Plaintiffs' experts' methodologies to determine whether isolation causes a risk of harm, nor do such cases exist.

Defendants' experts' criticisms of Plaintiffs' experts' methodologies are ill-founded and duplicitous because, *inter alia*, 1) Defendants' experts have no, or very little, experience in systemic prison conditions cases; 2) they do not identify any viable alternative methodologies; and 3) they use methodologies that are the same or less reliable than Plaintiffs' experts. *See, e.g.,* Ex. 6 (Haney) at ¶¶24-25, 30, 33, 49; Ex. 5 (Saathoff) at 46:5-15 (no systemic prison case expertise), 96:6-97:7 (attorneys selected the facilities he inspected), 101:19-102:10 and 119:13-18 (did not use structured interview or standardized instrument to capture observations), 114:9-24 and 118:23-119:3 (staff interviewees were non-randomly selected for

25

him); Ex. 7 (Paulson) at 24:20-24 and 42:9-14 (no systemic prison case expertise), 33:6-20 (does not know how documents were selected for his review), 47:17-21 and 48:19-22 (did not interview prison medical staff); Ex. 4 (Labrecque) at 94:14-97:18 (did not use psychometrically validated tool to interview prisoners), 165:24-167:4 and 176:11-178:14 (acknowledging the value of qualitative research, including to determine whether isolation causes harm).   Moreover, Defendants' healthcare experts do not actually opine that Named Plaintiffs face an atypical risk of harm compared to the rest of the population in restrictive housing.  Ex. 5 at 196:24-199:23 (Dr. Saathoff testifying he has not reached a conclusion about a typical risk of harm). In fact, Dr. Paulson testified they *do*.  Ex. 7 at 212:4-13.

For example, contrary to Defendants' contention, Named Plaintiff Kendrick aptly demonstrates the baseline substantial risk of serious harm to all putative class members.  ECF 356 at 43-44.  When Defendants isolated Mr. Kendrick in MM in July 2018, FDC categorized him as S-1 (no mental illness).  Ex. 8 at 1, 4.  After eight months in MM and CM, his mental health deteriorated until FDC diagnosed him with "Major Depressive Disorder," prescribed anti-depressants, and reclassified him as S-3.  *Id.* at 1, 3-4. As of February 2020, Mr. Kendrick had attended only *two percent* of the "out-of-cell self-betterment and recreational yard activities" supposedly available.  *Id.* at 1.  Far from being non-representative, Mr. Kendrick's experience is the epitome of the risk of harm to any person in restrictive housing.

26

Nonetheless, if the Court deems it necessary to additionally have a representative who is under age 21 or not currently diagnosed with a serious mental illness, Plaintiffs have identified three people who meet that criteria and request leave to amend to add at least one of them. *See* Ex. 9, Decl. of Corey Milledge; Ex. 10, Decl. of Bryan Hazley; Ex. 11, Decl. of Tarvis Wilson.

Finally, Defendants' assertion that Named Plaintiffs did not testify that they were excluded from a program or service based on their disabilities misstates Plaintiffs' burden of proof for their disability claims and does not defeat typicality. ECF 356 at 45-46. Plaintiffs' legal theory is based on Defendants' failure to reasonably accommodate them in restrictive housing, which does not require proof they were denied participation in or the benefits of a service, program, or activity by reason of disability. *Id.* at 44-46; *Lonergan v. Florida Dep't of Corr.*, 623 F. App'x 990, 994 (11th Cir. 2015) (holding plaintiff pleaded a prima facie ADA claim based on the failure to accommodate even though it was his decision, as opposed to prison officials', not to do outdoor recreation); *G.H. ex. rel. Henry v. Marstiller*, 424 F. Supp. 3d 1109, 1120 (N.D. Fla. 2019) (holding that plaintiffs sufficiently alleged disability discrimination based on, *inter alia*, the failure to modify "isolation policies and practices to provide for adequate out-of-cell time" that results in "self-harm behavior").

27

### D. Named Plaintiffs are Adequate Class Representatives Because They Share the Same Interests as the Putative Class and Subclasses.

Defendants concoct minor conflicts and a false narrative about Plaintiff Burgess's disability to challenge the adequacy of the class representatives. "[T]he existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a fundamental one going to the specific issues in controversy." *Valley Drug Co.*, 350 F.3d at 1189 (quotation omitted). Here, there are no conflicts, let alone "fundamental" ones.

No conflict of interest arises from Named Plaintiffs' refusal, based on Fifth Amendment grounds, to admit or deny use of a cell phone. Plaintiffs have never claimed they have "no communication with friends and family." *See, e.g.,* ECF 309 at ¶104 (describing conditions for personal visits). But even assuming, *arguendo*, they could only communicate with loved ones through use of illegal cell phones, the impact of the disallowance of and/or threat of punishment for engaging in essential human contact is consistent with Plaintiffs' classwide claims. *See, e.g.,* ECF 309 at ¶97 (staff punish people for trying to communicate with people in other cells); ECF 311-9 at ¶¶33-37 (describing harms caused by lack of meaningful contact and "repressive control").

Named Plaintiffs' stipulation that, for the purpose of this case, they do not contest the misconduct alleged in their disciplinary reports is consistent with the

interest of the class.  ECF 356 at 47.  Plaintiffs' claim is that FDC's use of restrictive house subjects people to an unreasonable risk of harm, regardless of the reason for such placement. *See Tellis*, 2021 WL 4267513, at *12 (finding class representatives are adequate when subjected to the same system-wide isolation policies and practices as the class).

Named Plaintiff Burgess's statements related to his disability do not prevent him from being an adequate class representative.  ECF 356 at 47-48.  Defendants incorrectly assert that Mr. Burgess testified he does not have paralysis in his foot. ECF 356-11 at 52:10-13 ("Q. Do you have paralysis? A. Yes. Q. Where do you have paralysis? A. My left foot.").  His claim that he requires an assistive device to "move around" is consistent with his testimony that he can walk, though with a "wobble," about 10 feet with a leg brace.  ECF 311-7 at ¶6; ECF 356-11 at 85:21-86:11.

As recently as November 5, 2021, FDC providers assigned Mr. Burgess a "P3" disability grade, meaning they have determined he has "a medical condition that significantly hinders [his] ability to perform activities of daily living and requiring assignment of a permanent wheelchair or other adaptive device."  Ex. 12; ECF 356-2 at 401. ███████████████████

████████████████████████████

███████████████████████████ ECF

356-1 at ¶105 (Video Ex. 4 at 14:07-14:48); ECF 356-11 at 86:8-14.  Mr. Burgess is

an adequate representative because he seeks to ensure FDC has a system that provides reasonable accommodations to all people with disabilities in restrictive housing. *See Dockery*, 253 F. Supp. 3d at 855 (finding adequacy despite purported lack of medical evidence supporting proposed representatives' claims when they were willing participants seeking "to protect the interests of class members").

### E. The Putative Class and Subclasses are Sufficiently Numerous.

Defendants' specious claim that Plaintiffs have not demonstrated numerosity with respect to the subclasses is directly contradicted by Plaintiffs' evidence. *See* ECF 311-15 and ECF 311-21 at 139-40 (summarizing FDC spreadsheet showing 168 Youth Subclass members and 81 Physical Disability Subclass members); ECF 311-19 at 44 (FDC PowerPoint showing 897 SMI Subclass members in CM alone).

Defendants base the remainder of their numerosity challenge on their disagreement with whether all people in restrictive housing are subjected to the claimed risk of harm and/or disability discrimination in restrictive housing, and the fluidity of the restrictive housing population. ECF 356 at 48-49. But the fluid nature of the proposed class—in that people move between different types of restrictive housing units and between restrictive housing and general population—supports class certification, and the Court will settle the merits-based disagreements at trial. *See Braggs*, 317 F.R.D. at 653 (noting the fluidity of prison populations "counsels

in favor of certification") (citation omitted); *see also Vega v. T-Mobile USA, Inc.,* 564 F.3d 1256, 1267 (11th Cir. 2009) (describing "low hurdle" to satisfy numerosity.

### F. Injunctive Relief Will Provide Relief to all Putative Class and Subclass Members.

Defendants attempt to impose an inappropriately high burden for identifying injunctive relief at class certification.  Rule 23(b)(2) does not require Plaintiffs to "specifically identify the final injunctive relief requested."  ECF 356 at 50.  This is especially true in prison conditions cases:

> [G]iven that an injunction in any such case must closely track the violations established by the evidence at trial, that any such relief must comply with the [Prison Litigation Reform Act]'s extensive requirements, that prison officials must play a role in shaping injunctions, that ultimate proof of some violations but not others might easily change the structure of a remedial plan, that conditions in prisons might change over the course of litigation, and that the class certification hearing is not a dress rehearsal of the trial on the merits (let alone a dress rehearsal of the remedy proceedings.)

*Parsons v. Ryan*, 754 F.3d 657, at 689 n. 35 (9th Cir. 2014).  The appropriate time for such specificity is when Plaintiffs file a "motion for relief or proposed injunction."  *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F.3d 597, 605 n.4 (10th Cir. 2008).

At this stage, Plaintiffs need only provide sufficient information "to permit the district court to assess adequately whether the injunctive relief . . . could provide relief to each member of the class."  *Lakeland Reg'l Med. Ctr., Inc. v. Astellas US, LLC*, 763 F.3d 1280, 1291 (11th Cir. 2014).   Plaintiffs have provided this

information through their motion and expert declarations identifying the policies, practices, and omissions that must be changed to remediate the impermissible risk of harm resulting from isolation conditions for all class members. *See Parsons*, 754 F.3d at 683 (finding expert reports an appropriate source for guidance about injunctive relief); *Yates v. Collier*, 868 F.3d 354, 368 (5th Cir. 2017) (affirming reliance on plaintiffs' experts to provide support for Rule 23(b)(2) injunctive relief).

Summarized in the simplest terms, Plaintiffs seek to change the unconstitutional conditions in FDC restrictive housing. To some degree, given the legal deference due to prison administrators, it is up to Defendants to decide how to effect these changes. Defendants could, for example, remediate the violation by increasing out of cell time and modifying unduly oppressive correctional practices. *See, e.g.,* ECF 311-13 at ¶¶21-24 (describing possible programming reforms), ¶¶51-60 (describing unnecessary security measures). Or, should Defendants elect to maintain their current restrictive housing regime, the remedy could: 1) exclude youths and people with serious mental illness; and 2) reduce the risk of harm for everyone else through limiting measures such as permitting people to be placed in restrictive housing for only so long as they pose a direct threat to safety. *See, e.g.,* ECF 311-13 at ¶19 (describing ACA standards limiting use of segregation to a last resort); ECF 311-9 at ¶52 (describing durational limits and exclusions of vulnerable people). Plaintiffs also seek a plan requiring Defendants to implement a system that

32

ensures provision of auxiliary aids and services, assistive devices and equipment, assistance with activities of daily living, and modifications of policies and practices such that people with disabilities are reasonably accommodated in the conditions unique to restrictive housing.

Defendants' heavy reliance on *Shook* is misguided.   In *Shook*, plaintiffs proposed certification of a class of all persons—or alternatively everyone with serious mental health needs—in a jail and sought a broad injunction covering "a wide range of areas."  543 F.3d at 602, 605-06.  Here, Plaintiffs have focused on one area (Defendants' isolation practice), with subclasses that are "amenable to uniform group remedies," and request "sufficiently objective" classwide injunctive relief.  *Id.* at 606.

The injunctive relief sought by Plaintiffs will not require individualized determinations as to liability, but rather can address "the legality of [Defendants'] behavior with respect to the class as a whole."  *M.D. v. Perry*, 675 F.3d 832, 847-48 (5th Cir. 2012) (rejecting argument that Rule 23(b)(2) class is appropriate only if based on a policy that "uniformly" affects and injures everyone); *see also Gayle v. Mead*, No. 20-21553-CIV, 2020 WL 3041326, at *15–16 (S.D. Fla. June 6, 2020) (Rule 23(b)(2) class was appropriate, despite unique individual COVID risk factors, because they sought "uniform relief from a practice applicable to all of them").  Certification under Rule 23(b)(2) is proper in this case.

## II.   THIS CASE DOES NOT VIOLATE SEPARATION OF POWERS.

The Court can address the problems resulting from FDC's use of restrictive housing without violating federalism and the separation of powers. *See Brown*, 563 U.S. at 493 ("Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.").

Defendants cite *Sabata v. Nebraska Department of Correctional Services*, 337 F.R.D. 215, 224 (D. Neb. 2020), in which the court denied class certification because it would lead to oversight of "a significant portion of the operation of Nebraska's prisons." However, unlike in *Sabata,* where plaintiffs sought to remedy a swath of issues including medical, mental health, and dental care for the entire prison population; parole procedures; disability accommodations; and the grievance process, in the instant case, Plaintiffs request relief specific to FDC restrictive housing units that house 10% of the total FDC population. If, at the merits stage, Plaintiffs demonstrate that Defendants' use of restrictive housing constitutes cruel and unusual punishment necessitating injunctive relief, the Court is well-equipped to meet its obligation to remedy the violations while affording deference to prison officials with respect to the precise contours of that relief. *See, e.g., Hoffer v. Jones*, 323 F.R.D. 694, 699–700 (N.D. Fla. 2017); *Hutto v. Finney*, 437 U.S. 678, 687 n. 9 (1978); *Porter v. Clarke,* 290 F. Supp. 3d 518, 537–38 (E.D. Va. 2018); *Braggs*, 317 F.R.D. at 668.

## III.   CONCLUSION

For all the reasons set forth above and in Plaintiffs' motion, class certification should be granted.

Dated: December 20, 2021                    Respectfully Submitted,

                                                 *s/ Kelly Knapp*
                                                 Kelly Knapp
                                                 Fla. Bar No. 1011018
                                                 Leonard L. Laurenceau
Fla. Bar No. 106987
Krista Dolan
Fla. Bar No. 1012147
Southern Poverty Law Center
2 South Biscayne Boulevard
Miami, FL 33131
Telephone: (786) 457-7310
kelly.knapp@splcenter.org
leo.laurenceau@splcenter.org
krista.dolan@splcenter.org

Dante P. Trevisani
Fla. Bar No. 72912
Laura A. Ferro
Fla. Bar No. 1015841
Sam Thypin-Bermeo
Fla. Bar No. 1019777
Marcel A. Lilavois, Jr.
Fla. Bar No. 1016175
Kara Wallis
Fla. Bar No. 1028563
Florida Justice Institute, Inc.
PO BOX 370747
Miami, FL 33137
Telephone: (305) 358-2081
dtrevisani@floridajusticeinstitute.org

lferro@floridajusticeinstitute.org
sthypin-bermeo@floridajusticeinstitute.org
mlilavois@floridajusticeinstitute.org
kwallis@floridajusticeinstitute.org

Andrea Costello
Fla. Bar No. 532991
Christopher M. Jones
Fla. Bar No. 994642
Rachel Ortiz
Fla. Bar No. 83842
Alexis Alvarez
Fla. Bar. No. 120069
Rebecca Klonel
Fla. Bar No. 1028003
Florida Legal Services
122 E. Colonial Drive, Suite 100
Orlando, FL 32801
Telephone: (407) 801-0332
andrea@floridalegal.org
christopher@floridalegal.org
rachel.ortiz@floridalegal.org
alexis.alvarez@floridalegal.org
rebecca.klonel@floridalegal.org

Lori Rifkin*
CA Bar No. 244081
Rifkin Law Office
3630 High St. #18917
Oakland, CA
Telephone: (510) 414-4132
lrifkin@rifkinlawoffice.com


*Admitted Pro hac vice*

**Attorneys for Plaintiffs**

**<u>Certificate of Word Limit</u>**

The undersigned counsel certifies compliance with the word limit in Order Granting Motion to Increase Word Limit, ECF 367.  This reply contains 7,728 words.

/s/ *<u>Kelly Knapp</u>*_____

Kelly Knapp