

# Transcript of Reed Paulson, M.D.

**Date:** December 8, 2021
**Case:** Harvard -v- Inch

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

HARVARD, et al.,                    Case No.:
     Plaintiffs,                    4:19-cv-00212-AW-MAF
V.
MARK S. INCH, et al.,
     Defendants.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOCONFERENCED DEPOSITION OF

REED PAULSON, M.D.

DECEMBER 8, 2021

(Reported remotely.)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOCONFERENCED DEPOSITION OF

REED PAULSON, M.D., produced as a witness at the instance

of the Plaintiffs, taken in the above-styled and

-numbered cause on the 8th day of December, 2021, A.D.,

beginning at 9:59 a.m. EST, before Kelly Hassell, RPR,

CLR, CSR, in and for the State of Texas, located in

Salem, Oregon, in accordance with the Federal Rules of

Civil Procedure and the agreement hereinafter set forth.

```
 1              R E M O T E   A P P E A R A N C E S

 2    FOR THE PLAINTIFFS:

 3         MR. DANTE P. TREVISANI, ESQ.
           MS. LAURA FERRO, ESQ.
 4         Ms. Michelle Llosa, Paralegal
           Florida Justice Institute, Inc.
 5         100 Southeast 2nd Street
           Suite 3750
 6         Miami, Florida  33131
           (305) 358-2081
 7         dtrevisani@floridajusticeinstitute.org
           mllosa@floridajusticeinstitute.org
 8         lferro@floridajusticeinstitute.org
           -AND-
 9         MS. KELLY KNAPP, ESQ.
           Southern Poverty Law Center
10         2 South Biscayne Boulevard
           Miami, Florida  33131
11         (786) 347-2056
           kelly.knapp@splcenter.org
12

13    FOR THE DEFENDANTS:

14         MS. NICOLE SMITH, ESQ.
           MR. JEFFREY J. GROSHOLZ, ESQ.
15         Ms. Cayla Moseley, Paralegal
           Rumberger, Kirk & Caldwell
16         101 North Monroe Street
           Suite 120
17         Tallahassee, Florida  32301
           (850) 222-6550
18         nsmith@rumberger.com
           jgrosholz@rumberger.com
19         - AND -
           MS. SAMANTHA DUKE, ESQ.
20         Rumberger, Kirk & Caldwell
           300 South Orange Avenue, Suite 1400
21         Orlando, Florida 32801
           (407) 872-7300
22         sduke@rumberger.com

23    ALSO PRESENT:

24         MS. MERINDA EVANS - Remote technician

25
```

1                         I N D E X

2    Appearances.................................. Page     2

3    Stipulations................................. Page   246

4    Exhibit List................................. Page     4

5    Direct Examination by Mr. Trevisani........... Page     6

6    Signature and Corrections.................... Page   247

7    Reporter's Certificate....................... Page   248

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          EXHIBITS

2       EXHIBIT NO.   DESCRIPTION                          PAGE

3
        Exhibit 1     Curriculum vitae of Dr. Paulson,        8
4                     Bates-stamped DHA01210933 through
                      DHA01210945
5
        Exhibit 2     "Declaration of Dr. Reed Paulson in    27
6                     Opposition to Plaintiffs' Motion for
                      Class Certification"
7
        Exhibit 3     Defendants' Response to Plaintiffs' 1st 31
8                     Request for Production," Bates-stamped
                      DHA01211103 through DHA01211153
9
        Exhibit 4     "Solitary confinement as a prison health 95
10                    issue"

11      Exhibit 5     "Performance-Based Standards and       117
                      Expected Practices for Adult
12                    Correctional Institutions"

13      Exhibit 6     FSP video                              136

14      Exhibit 7     NCCHC Position Statement               140

15      Exhibit 8     "The Effects of Solitary Confinement on 183
                      Prison Inmates:  A Brief History and
16                    Review of the Literature," Bates-stamped
                      PLS0010411 through PLS0010472
17
        Exhibit 9     "Florida prisoners 'inches away' from  192
18                    emerge release"

19      Exhibit 10    "FL Legislature 2021:  Top corrections 193
                      chief says state prison system is in
20                    crisis and could collapse"

21      Exhibit 11    Mr. Spires' Daily Record of Special    197
                      Housing, Bates-stamped PIR00093568
22                    through PIR00093573

23      Exhibit 12    "The Safe Alternatives to Segregation  205
                      Initiative:  Findings and
24                    Recommendations for the Oregon
                      Department of Corrections"
25

1                         EXHIBITS CONTINUED

2    EXHIBIT NO.   DESCRIPTION                            PAGE

3    Exhibit 13    "Reforming solitary confinement:  the   209
                   development, implementation, and
4                  processes of a restrictive housing step
                   down reentry program in Oregon"
5
     Exhibit 14    "Florida Department of Corrections       221
6                  Neurology Clinic (NC) Flow Sheet,"
                   Bates-stamped BUR00004163
7
     Exhibit 15    "Florida Department of Corrections       222
8                  Neurology Clinic (NC) Flow Sheet,"
                   Bates-stamped BUR00004172
9
     Exhibit 16    "Florida Department of Corrections       223
10                 Request for Administrative Remedy or
                   Appeal," Bates-stamped BUR00004650
11
     Exhibit 17    "Part B - Response," Bates-stamped       225
12                 BUR00011273 through BUR00011275

13   Exhibit 18    "Part B - Response," Bates-stamped       229
                   KEN00003767 through KEN00003768
14
     Exhibit 19    "Part B - Response," Bates-stamped       231
15                 KEN00003769 through KEN00003770

16   Exhibit 20    "Part B - Response," Bates-stamped       233
                   KEN00005346 through KEN00005347
17
     Exhibit 21    "Refusal of Health Care Services,"       242
18                 Bates-stamped PIR00069753 through
                   PIR00069885
19
     Exhibit 22    E-mail string to Dr. Paulson and Mr.     245
20                 Lerner, from Ms. Moseley, dated May 10,
                   2021, subject:  Harvard/updated
21                 materials, Bates-stamped EHA01266865
                   through EHA01266866
22

23

24

25

```
1                    P R O C E E D I N G S
2                    THE COURT REPORTER:  The time on the
3    record is 9:59 a.m. Eastern Time.
4                    If counsel could please state their
5    appearances for the record.
6                    MR. TREVISANI:  Dante Trevisani for the
7    Plaintiffs.
8                    MS. SMITH:  Nicole Smith, Rumberger Kirk,
9    for Defendants.
10                    THE COURT REPORTER:  I'm Kelly Hassell,
11    Certified Shorthand Reporter, in Dallas, Texas.  The
12    deponent is located in Salem, Oregon.
13                    REED PAULSON, M.D.,
14    having been first duly cautioned and sworn to testify the
15    truth, the whole truth and nothing but the truth,
16    testified on his oath as follows:
17                    THE COURT REPORTER:  Thank you.
18                    You may proceed.
19                    DIRECT EXAMINATION
20    BY MR. TREVISANI:
21        Q    Good morning, Dr. Paulson.
22        A    Good morning.
23        Q    Could you tell us where you are right now?
24        A    I'm in Salem, Oregon.
25        Q    And where in Salem?
```

1      A     South Hills.

2      Q     Oh.  I don't need the address, but are you in

3  your house, in your office?

4      A     I'm in my home, yes.

5      Q     Okay.  Is there anybody there in the room with

6  you?

7      A     No.

8      Q     Okay.  I'm going to go over a couple of basics

9  for the deposition.

10            One is, especially with the Zoom, you have

11  to make sure to respond orally so that the court reporter

12  can take it down.

13            Make sure to wait until I finish the

14  question before you answer so we don't talk over each

15  other.

16            And if you don't understand any of the

17  questions, just let me know.  I will try to rephrase it.

18  But if you don't say anything, I'm going to assume that

19  you understood the question.

20            Is that okay?

21      A     Yes.

22      Q     Okay.  Did you bring -- do you have any

23  documents in -- with you there in the room that you

24  intend to refer to during the deposition?

25      A     Nothing that I intend to refer to.

1        Q     Great.

2              Do you have a copy of your declaration?

3        A     Yes.  That, I have right here.

4        Q     Okay.  Do you have any other documents that you

5   relied on for your opinion available to you on the

6   computer?

7        A     Not easily so.

8        Q     Okay.  So other than your declaration, do you

9   have any other documents there with you?

10       A     I have -- this was not in my declaration,

11  though.  I have a report from the recordations concerning

12  the use of restrictive housing from the Department of

13  Justice, 2016.

14       Q     Okay.  Anything else?

15       A     That's it.

16       Q     Okay.

17             MR. TREVISANI:  Merinda, could we bring up

18  Exhibit DHA01210933, which should be Dr. Paulson's CV.

19             THE REMOTE TECHNICIAN:  Please stand by.

20             This will be Exhibit 1, Paulson 1.

21             MR. TREVISANI:  Yes.  Thank you.

22             (Exhibit 1 marked.)

23             THE REMOTE TECHNICIAN:  It's there on the

24  screen.  Would you like control?

25             MR. TREVISANI:  Yes, please.

1          THE REMOTE TECHNICIAN:  You have control.

2     Q    (BY MR. TREVISANI)  Okay.  Dr. Paulson, I'm

3  going to scroll through here.  I'm going to make it a

4  little bit bigger here for you.

5     A    Okay.

6     Q    If I can figure out how to do that.

7     A    Is this a second window I can move?

8     Q    I don't think you have control here, but --

9     A    Okay.

10    Q    -- I can give it to you, if you need to.  But

11 let me just scroll through it here.

12    A    All right.

13    Q    And, unfortunately, all the page numbers seem

14 to be 2, but the last Bates number is DHA01210945.

15         Is this your current CV, Dr. Paulson?

16    A    What I could see looks like it, yes.

17    Q    Okay.  I want to ask you a couple of questions

18 about your background.  You received a master's in public

19 health in 1990; is that right?

20    A    Yes.

21    Q    Did any of that training for your master's in

22 public health involve any correctional medicine training?

23    A    Not directly so.

24    Q    Okay.  How about indirectly?

25    A    I -- the -- my focus for that was in program

1    planning.

2         Q    Okay.  What's program planning?

3         A    It's, essentially, the -- like it sounds.  It's

4    putting together and writing programs for medical

5    circumstances.

6         Q    Okay.  And then here, it says you received a

7    master's training in research 1978-1980.

8         A    Yes.

9         Q    What is that degree?

10        A    That was in neurophysiology.

11        Q    And then, going down to your residency, did

12   your residency have any particular specialty?

13        A    Family medicine.

14        Q    And did that involve any training or experience

15   with correctional medicine?

16        A    To some extent.  A lot of it was emergency

17   room.  Also, the County of Los Angeles had both a

18   sheriff's office and -- it was a hospital of choice for

19   hospitalizations regarding inmates for that portion of

20   Los Angeles.

21        Q    But you treated those people in a hospital,

22   right?

23        A    In hospital, yes.

24        Q    You didn't treat them in the jail?

25        A    No.

1      Q     Okay.  And then scrolling down on your CV,

2   to -- in 2019, it says, "Certified Correctional Health

3   Care Provider - Physician," from the "National Commission

4   on Correctional Health Care."

5                 Can you tell me about that certification?

6      A     That certification involves two -- two

7   prerequisite certifications and is about essentially

8   being familiar with and reasons for the various standards

9   that the NCCHC holds for jails and prisons.

10     Q     So what do you have to do to become eligible

11  for the certification?

12     A     Study and -- and take an exam.

13     Q     Is there any experience requirement?

14     A     Let me think.

15                 I don't recall.

16     Q     Have you published any papers in any

17  peer-reviewed journals?

18     A     No.

19     Q     Have you conducted any research in correctional

20  medicine?

21     A     Not other than in -- in quality assurance in my

22  position as chief medical officer of the Oregon State

23  Penitentiary.

24     Q     Okay.  And so you haven't also conducted any

25  research in health care provided in solitary confinement?

1          A     Not published, no.

2          Q     Okay.  And same question.  You haven't

3     conducted any research on health care provided to people

4     in restrictive housing?

5          A     Not published, no.

6          Q     And is there unpublished research?

7          A     Well, like I said, doing the quality assurance

8     and monitoring in our own system.

9          Q     So it looks like you started with the Oregon

10    Department of Corrections in 2009.  Is that right?

11         A     That sounds right.

12         Q     All right.  I'm looking for the -- ah, give me

13    a second.  There we go.

14               Okay.  So why did you take that job?

15         A     Number of reasons.  I'd been working emergency

16    most of my career.  And I was in my mid 50s, and the

17    nights were killing me.  That was probably the biggest

18    one.  I had a young family, and I was missing recitals

19    and things, because it's a 24/7 matter.

20               So I was looking for, primarily, something

21    that didn't have night and weekend work.  I knew two

22    physicians who had worked for the department.  One ran --

23    that I worked with as a colleague in the same clinic for

24    a number of years, and another that I graduated from

25    medical school with.  Both had worked, and one of them

1    was continuing to work, with the Oregon Department of

2    Corrections.

3        Q    So your current job is chief medical officer

4    for the Oregon State Penitentiary; is that right?

5        A    Yes, but I'm in transition.

6        Q    And what's the transition?

7        A    I'm transitioning to retiring.  So I'm not

8    seeing patients directly in clinic at this point.  I'm

9    consulting on lots of cases.  And they haven't replaced

10   me as chief medical officer yet.  But when they do, I'll

11   stop those duties.

12       Q    Okay.  So I want to talk to you --

13       A    (Inaudible) sometime next year.

14       Q    Understood.

15            So I want to talk about your job

16   throughout your time at the Oregon State Penitentiary.

17   Have you had the same job from 2009 to the present?

18       A    I've -- I've -- the position of the

19   correctional medi- -- pardon me -- correctional physician

20   specialist in the department gives us ability to move

21   from -- from site to site.  So my job has been the same,

22   but I have had different sites.

23       Q    So in this whole time, were you the chief

24   medical officer for the Oregon State Penitentiary?

25       A    No.

1    Q    Okay.  So what years were you the chief medical

2    officer for the Oregon State Penitentiary?

3    A    That, I always have to think a bit about.  It's

4    been, I think, the last six, almost seven, years.

5    Q    So when you came to the Oregon Department of

6    Corrections in 2009, what was your job?

7    A    My job was to be a physician on -- on staff

8    there.

9    Q    Okay.  So -- and then, did you have any other

10   jobs before you transitioned to becoming the chief

11   medical officer of the Oregon State Penitentiary?

12   A    Well, within my duties there, I was a physician

13   in charge of direct care to the segregated housing units

14   and mental health infirmary, Death Row, behavioral health

15   unit.  I continued that for a while when I was the chief

16   medical officer.

17             Also, I had the same, similar duties at

18   Coffee Creek, what would be on your -- you covered

19   multiple places, but -- and I can't remember.  It's

20   probably -- I was chief medical officer for a year or so

21   when we finally got another staff member and I was able

22   to -- to hand over the segregation and mental health

23   unit's medical care.

24   Q    So what years were you responsible for the

25   medical care in the segregation units and the mental

1    health care?

2         A    That, again, I have to think.  Because for two

3    years, I was working -- I was covering both Coffee Creek,

4    which is the intake center and women's prisons, and OSP.

5    And somewhere in that two-year period, I was

6    transitioning from one to the other and was able to take

7    up the duties.  So that would have been around 2012 or

8    '13, I think.  No.  '13, '14.  Again, it's just a guess.

9         Q    Okay.  And then, I think you said that you

10   became chief medical officer of the Oregon State

11   Penitentiary roughly six or seven years ago?

12        A    Yes.

13        Q    So does 2015 sound about right?

14        A    2014, 2015, something like that.  It's when

15   Dr. Degner retired.

16             Again, since my position doesn't change, I

17   don't have -- you don't apply for these -- these changes.

18   Our -- our credentialing, essentially, is continuous

19   through them.  It's just what I'm doing on a particular

20   day.  And like I said, it -- there isn't a new job

21   description, essentially, that comes from our -- my -- my

22   position has been the same position with the department

23   the whole time.

24        Q    And that position is correctional physician

25   specialist?

1    A    Yeah, correctional physician specialist.

2    Q    So during the time that you were the chief

3  medical officer, what were your duties and

4  responsibilities?

5    A    It's -- it's largely about working to get the

6  best medical care possible.  I work with the physicians

7  and nurse practitioners, PAs when we have them, as a --

8  as a resource.

9          Essentially, it's like being a lead

10 worker.  I've got the most experience, both in practice

11 and in the department.  And on top of that, the --

12 there's a certain amount of QA that's done and a certain

13 amount of -- of review of records that -- where there's a

14 problem, and a certain amount of oversight for the mental

15 health section, particularly in the area of involuntary

16 medication.

17   Q    QA is quality assurance?

18   A    Yes.

19   Q    Is it fair to say that you're responsible for

20 all the medical care provided at the Oregon State

21 Penitentiary?

22   A    No.

23   Q    Is there a person who is responsible for that?

24   A    We have licensed medical professionals being

25 responsible for themselves.

1      Q      So does the chief medical officer -- are you

2   the highest-ranking medical person at Oregon State

3   Penitentiary?

4      A      It's not a ranking.  Like I said, I'm

5   essentially lead worker, there to give people help, to --

6   to make things better.  I don't hire or fire anyone.  I

7   don't write anyone's performance review.  The department

8   has a medical director, but that's not me.  And it's a

9   really good thing, because that way, I'm not a threat to

10  anybody.  I'm just helping them do better medicine for

11  our patients.

12     Q      Does anybody report to you?

13     A      Not report in the sense that -- that their job

14  is -- that I'm responsible for their job.  No.  Like I

15  said, I don't write anyone's performance reviews.

16     Q      Who do you report to?

17     A      To -- to the medical director.

18     Q      And is the medical director somebody who's at

19  the Oregon State Penitentiary, or are they medical

20  director for the entire Oregon Department of

21  Corrections?

22     A      The director is over all the facilities.

23     Q      The entire Department of Corrections?

24     A      Yes.

25     Q      Do you have any responsibility for setting

1   medical policy at Oregon State Penitentiary?

2       A    The policies and procedures, I've had input in

3   that over the years.  I've written several.  And so in

4   that regard, it's kind of a -- we're a small department,

5   so everyone has a say.

6                And like I said, I've -- I've been a

7   writer on several of them in the past.  I haven't done

8   any lately.

9       Q    Okay.  What percentage of your job now is

10  treating patients?

11      A    I don't see patients directly at all right now.

12      Q    Okay.  When did you stop seeing patients?

13      A    September.

14      Q    And so before September, what percentage of

15  your job was treating patients?

16      A    Oh.  Well, 100 percent, essentially, since I've

17  never had carved-out, formal time for the chief medical

18  officer work.

19      Q    Okay.  So do you have any administrative

20  responsibilities as the chief medical officer?

21      A    A certain amount of quality assurance and

22  overseeing cases where there's -- there's a question of

23  care, something like that.  I'm generally the first

24  person to look at that and -- within our -- our facility.

25      Q    What does the quality assurance look like?

1      A      The -- a quality assurance committee for

2    health services in OSP.  I'm the physician sitting on

3    that -- that small committee.  We do reviews of areas,

4    some of them rotating and some of them permanent,

5    essentially charted use of cases.

6                     The rotating ones are generally random.

7    The permanent ones, like I -- I review -- review every

8    death, every hospitalization where I can't get the record

9    before the patient is transferred.  And a certain amount

10   of the emergency transfers, medical emergency transfers.

11     Q      Are there any regular audits of the medical

12   care provided at Oregon State Penitentiary?

13     A      Like I said, there -- there's rotating quality

14   assurance audits.  And the department and OSP are part of

15   the NCCHC, and they audit periodically.

16     Q      Okay.  And the internal audits, are they

17   conducted by Oregon Department of Corrections staff?

18     A      Yes.  Well, there's the quality assurance

19   audits we're talking about, yeah.

20     Q      Have you worked in any other correctional

21   setting, other than the Oregon State Penitentiary?

22     A      Just what's listed in my CV and my introduction

23   declaration.

24     Q      Do you have any expertise in prison

25   administration outside of the medical context?

1      A     No.

2      Q     What about, do you have any expertise in

3  running a solitary confinement unit?

4      A     I'm sorry.  I didn't understand the last part.

5      Q     Do you have any expertise in running a solitary

6  confinement unit?

7                  MS. SMITH:  Objection; vague.

8      A     Only in the medi- -- provision of medical care.

9      Q     (BY MR. TREVISANI)  Okay.  Going down to the

10  page on your CV -- or, I guess, up, rather, there is a

11  list here of various cases.  And it looks like -- it

12  looks like there are 10 cases listed there.

13                  Are those cases where you've served as an

14  expert witnesses?

15      A     Yes.

16      Q     Are there any other than the ones that are

17  listed here?

18      A     Is the last one -- is Harvard in there?

19      Q     Do you mean this case --

20      A     Yes.

21      Q     -- that we're on right now?

22                  Well, other than this case that we're on

23  taking this deposition.

24      A     That needs to be added.  And I'm just taking on

25  another case right now that I'll work on after the first

1    of the year.

2        Q    Okay.  So other than that one and the Harvard

3    case, there's none other than these that are listed here?

4        A    Correct.

5        Q    And then, it looks like, under correctional

6    medical expert file depository experience here, there's

7    this Hamblin case.  And then it looks like the case is

8    listed again in the second section here, Hamblin.

9                    Is that the same case?

10       A    Yes.

11       Q    And in any of these cases, did you give a

12   deposition?

13       A    Well, in the Hamblin case.

14       Q    (Inaudible) other?

15       A    (No response.)

16       Q    Are there any other cases where you gave a

17   deposition?

18       A    Yes.  They're listed in my declaration.

19       Q    Okay.  Can you tell me which ones?

20       A    Hamblin.  Rojas versus Correct Care Solutions.

21   The Estate of John Kleutsch versus State of Washington.

22   Alejandro Gallegos versus K. Seeley.  And, of course,

23   this one right now.

24       Q    Okay.  And did you testify at trial in any of

25   those cases?

1      A    No.

2      Q    In the ones where you did not provide -- or you

3  did not give a deposition, did you prepare an expert

4  report?

5      A    Can you scroll down so I can see more?

6      Q    Sure.

7      A    It's easier to give you the exceptions.  I have

8  not given a report for Ramey or Carol Cole.  The Carol

9  Cole was a case that I dropped out of after reviewing.

10  So that one, I didn't have any involvement past first

11  review.

12      Q    Okay.  Were -- were any of these -- in any of

13  these cases, where you've been an expert, where you were

14  retained by the plaintiff?

15      A    Yes.  This list, Kleutsch, Thomsen, Widmayer.

16             Can you roll on down.

17             Rojas, Ramey, Perry, Hamblin and Ale- --

18  Gallegos.

19      Q    Okay.  So was that all of them that -- where

20  you were retained by the plaintiff?

21      A    All on this list, yes.  I don't think this list

22  is complete.  This lists -- CV is -- could use some

23  updating at this point.

24      Q    Oh.  Well, that's why I asked you, are there

25  any others that are listed here?  I thought you told me

1   there were not.

2        A     There's none that are -- there's none -- I'm

3   sorry.  I might have misunderstood you.  These -- this

4   list is somewhat old and doesn't include everything.

5        Q     Okay.  So what are the other cases where you've

6   been retained by an expert?

7        A     I would have to -- I would have to go to memory

8   at this point, and I don't think I could give it

9   accurately without looking through my records.

10       Q     Well, approximately how many are there, other

11  than the ones --

12       A     It might be another two or three.

13       Q     Okay.  So what percentage of the time, in all

14  of the cases where you've been retained as an expert,

15  were you retained by the plaintiff versus the defendant?

16       A     Oh, perhaps 75 or 80 percent.

17       Q     That was -- the 75, 80 percent was the

18  plaintiff?

19       A     Were the plaintiffs, yes.

20       Q     Okay.  These all -- these all -- the ones that

21  are listed here -- well, I guess, let me ask it a

22  different way.

23             The cases where you've been retained as an

24  expert, were they all involving one individual plaintiff

25  seeking damages?

1       A    Yes.

2       Q    Okay.  So have you ever been retained as an

3  expert to do a case like you -- like you've been retained

4  to do here in Harvard, where you evaluated a medical

5  system?

6       A    Can you -- can you define what you mean there

7  by "like"?

8       Q    Well, have you ever been retained as an expert

9  where you've been asked to identi- -- to evaluate a

10  system rather than just look at the care provided to one

11  individual?

12       A    Well, a lot of cases involve looking at the

13  system, but -- because, a lot of times, then, problems

14  might arise from more than just a medical provider, such

15  as transport or other administrative issues that are part

16  of an individual case.

17            But these -- these have all been

18  individual cases with an -- where an individual inmate is

19  part of the -- the question.

20       Q    That's what I'm asking.  Are there any other

21  cases where you're asking to evaluate a system, not for

22  the care provided to one individual, but for the system

23  as a whole?

24       A    No.

25       Q    So this Harvard case, this is the first time

1    that you've done that?

2                    MS. SMITH:   Objection; vague.

3        A    And let me -- let me extend that a little bit.

4    I obviously help my department in that -- in cases of --

5    involving our department.  And some of those have -- have

6    been regarding the system.

7                    But, again, those -- this isn't the same

8    thing as we've been talking about, being retained as an

9    expert.

10       Q    (BY MR. TREVISANI)  Any of the cases where

11   you've been retained as an expert in the past, did the --

12   did those cases involve medical care that was being

13   provided in solitary confinement or restrictive housing?

14       A    Yes.

15       Q    Which ones?

16       A    Well, let me look at this list.  Thomsen,

17   Widmayer.  Can you roll -- scroll down?

18                   Ramey, Perry.  That's it.

19       Q    Have you ever been excluded as an expert by a

20   court?

21       A    No.

22       Q    Has the court -- has a court ever limited your

23   testimony or your opinions?

24       A    No.

25       Q    Have you ever served as an expert for the

1    Florida Department of Corrections before?

2         A    No.

3         Q    Have you ever been retained by the Rumberger

4    Kirk law firm before?

5         A    No.

6              MR. TREVISANI:  If you could take down

7    this exhibit.

8         Q    (BY MR. TREVISANI)  How did you first become

9    involved with this case?

10        A    I believe I got an e-mail from one of the

11   lawyers at Rumberger Kirk.

12        Q    Okay.  And what were you asked to do for the

13   case?

14        A    I was asked to review the medical care, and

15   particularly regarding the complaint involved.

16        Q    Uh-huh.  And what was your -- what was your

17   assignment, so to speak?

18        A    Essentially, the area of allopathic medicine.

19        Q    Well, I mean, I guess I'm asking, what were you

20   asked to do?  What were you asked to give an opinion?

21        A    About the areas in the complaint, and -- and to

22   review the medical care of the -- of the plaintiffs.

23        Q    Do you have some kind of retainer letter or

24   engagement letter?

25        A    No.  I think there are medical privacy letters,

1    but I don't think there was a formal retainer letter.

2         Q    When were you retained?

3         A    Late winter.  Mid-winter.  Yeah.  January,

4    February, I believe.

5         Q    Of what year?

6         A    2020 -- 2021.

7         Q    What did you do to prepare for today's

8    deposition?

9         A    In -- in -- I've read through various pieces of

10   information regarding the case, part -- things in the

11   list.  In particular, some of the plaintiffs' depositions

12   and the particulars of my declaration, the Third Amended

13   Complaint, and that's about it.

14        Q    Did you speak to anybody to prepare for the

15   deposition?

16        A    No.

17             MR. TREVISANI:  Can we bring up an

18   exhibit.  It's called Dr. Reed Paulson Declaration.

19             THE REMOTE TECHNICIAN:  Please stand by.

20             This would be Paulson Exhibit 2.

21             MR. TREVISANI:  Yes.  Thank you.

22             (Exhibit 2 marked.)

23             THE REMOTE TECHNICIAN:  It's on screen.

24   Would you like control?

25             MR. TREVISANI:  Yes, please.

1      Q    (BY MR. TREVISANI)   I just wanted to be sure

2   we're all looking at the same document.  So let's see.

3   This one is -- scroll down to the bottom.  It's 55 pages

4   long.  Let's see.  The actual declaration is Pages 1

5   through 45.  And then on page 47 through the end is your

6   CV.

7              Is this the declaration that you submitted

8   for this case?

9      A    It looks like it.

10      Q    Okay.

11              MR. TREVISANI:  We can go ahead and take

12   that down.

13      Q    (BY MR. TREVISANI)   I just wanted to make sure

14   we have the exhibit, because I have a copy and I know you

15   have a copy there, Dr. Paulson.

16              Is that right, Dr. Paulson, you have a

17   physical copy of it in front of you?

18      A    Yes.

19      Q    Okay.  Tell me about the process for drafting

20   your report, or your declaration.  How did that go?

21      A    Well, it's a big case with -- with a lot of

22   paperwork.  Spent a lot of time going through the

23   40,000-plus pages of it.  That's my guess about the

24   40,000, based on the thickness.  And with particular

25   interest in the -- in the plaintiffs' medical records and

1    the complaints in the -- in the initial -- initial

2    complaint, I think second amended, and then eventually

3    third.  And added to that the plaintiffs' experts'

4    declarations and then the added individuals that

5    Dr. Venters gave information about.

6         Q    Did you do the first draft of the report

7    yourself?

8         A    Yes.

9         Q    And did you -- did you submit several drafts or

10   did you submit one draft?

11        A    I submitted one draft, and then the lawyers

12   and -- I think just two lawyers, yeah, helped me with --

13   with some grammar, style and formatting so we could

14   format it -- I had created it as a Word document, and

15   they formatted it into what was needed for -- for being

16   presented to the -- to the court.  But my opinions didn't

17   change from the first draft.

18        Q    Did you draft the whole thing yourself?

19        A    Yes.

20        Q    Did you have anybody helping you draft it?

21        A    No.

22        Q    Okay.  Did you -- in forming your opinions for

23   this case, did you speak to any of the other experts?

24        A    Not in forming my opinions.  I did spend a week

25   touring -- Mr. Larry Reid was with us.  I spoke to him a

1   lot, but -- but he not having any medical training, we

2   didn't discuss any of the medical care.

3       Q    Okay.  Any of the other experts, did you speak

4   to them?

5       A    No.

6       Q    So you did reference that you reviewed, what

7   your estimation is, about 40,000 pages of documents.  And

8   on Page 3 of the declaration, you list a couple of

9   categories of documents.

10          Do you have a list of the actual documents

11  that you reviewed in forming your opinions?

12      A    I do.  The updated list was sent to me

13  yesterday, but I had the list with essentially the

14  same -- a bit before that.

15      Q    Okay.

16          MR. TREVISANI:  I'm not sure if this is

17  something that we have.  I don't know if, Nicole, you

18  could send that to me, you know, in the next few minutes.

19  Is this something that could be produced?

20          MS. SMITH:  Yeah, Dante, it was produced,

21  I think, back in October.

22          MR. TREVISANI:  Okay.

23          MS. SMITH:  The materials, it's

24  DHA01211103.  It's a spreadsheet.

25          MR. TREVISANI:  Okay.

1              MS. SMITH:  We tried to make it easy for

2    y'all and list with Bates stamps and --

3              MR. TREVISANI:  Well, it's funny you

4    should mention that.  So very good.

5              Merinda, could you please pull up that

6    exhibit, which is Bates DHA01211103.

7              THE REMOTE TECHNICIAN:  Please stand by.

8              This would be Paulson 3.

9              MR. TREVISANI:  Thank you.

10              (Exhibit 3 marked.)

11              THE REMOTE TECHNICIAN:  It's there on the

12    screen.  Would you like control?

13              MR. TREVISANI:  Yes, please.

14              THE REMOTE TECHNICIAN:  You have control.

15        Q    (BY MR. TREVISANI)  Okay.  So, Dr. Paulson,

16    we're looking at this Exhibit 3.  It's called Defendants'

17    Response to Plaintiffs' First Request for Production.  On

18    the left, there's a list of expert names.  In the middle,

19    there's a description of some files.

20              Is this the list that you're referring to?

21        A    Looks very much like it.

22        Q    Okay.  So if your name is listed here in this

23    left-hand column called "expert," does that mean that you

24    reviewed the corresponding document?

25        A    I can't tell you that from memory.  This is the

1    defense counsel's list of what they -- they said they

2    sent me.  And everything that actually I received, I did

3    go through.

4         Q    Okay.  So that's what I'm trying to clarify.

5              So this is a list of everything that was

6    sent to you, correct?

7         A    This -- this is list that the -- that the

8    counsel for the defense said that they sent to me, and I

9    have no reason to doubt it.

10        Q    Okay.

11        A    But I haven't gone through it page by page.

12   I've got 12 feet of -- a little more than 12 feet of

13   shelf space for this and possibly an equal amount that's

14   not printed up.

15        Q    Can you tell me, if a document is listed here

16   next to your name, does that mean that you reviewed it?

17        A    Again, my answer's the same.  I don't -- I

18   don't know that this list is -- I can't -- I can't

19   testify that this list is exactly what I received,

20   because I haven't had a chance to go through this list

21   and go through the 40,000 pages I've received to

22   reconcile them both.  Obviously, that would be

23   prohibitive.  But everything I received, I went through.

24        Q    Okay.  That's essentially my question.

25              You reviewed everything that you received?

1      A      Correct.

2      Q      So if a document is listed here as something

3   that you received, and you actually did receive it, you

4   reviewed it; is that right?

5      A      If I actually did receive it, yes.

6      Q      How was it decided what documents that you

7   would review?

8      A      Don't know.

9      Q      Did you -- did you have any input into which

10  documents that you wanted to review?

11     A      I -- I did ask for the added inmates that

12  Dr. Venters referred to, their medical records, although

13  I -- come to find out that they were already in the works

14  coming my way.  And the extra-sized sheet that I referred

15  to, I asked for that, although later on, I found I

16  already had it, a couple of things like that.

17     Q      Okay.  So other than those, you did not select

18  which documents you were going to review?

19     A      Not that I -- I didn't select the things on

20  this list, no.

21     Q      Did you review any grievances?

22     A      Quite a number of them.

23     Q      I don't believe there's grievances listed here

24  as something that you reviewed.

25             So are you referring to grievances that

1    were within the medical records of the individuals that

2    you reviewed?

3         A    There were -- there were grievances within

4    the -- the medical records.  And I don't have ability

5    to -- the grievance is a particular sheet, and it doesn't

6    say medical on it.  So having received numerous sheets, I

7    can't say that they were all in the medical record.  But

8    they were in the records that I received.

9         Q    You -- you didn't -- you didn't ask to review

10   medical grievances?

11        A    Not in -- not in isolation, no.  There were

12   grievances about non-medical things.

13             MR. TREVISANI:  We can take this exhibit

14   down.

15        Q    (BY MR. TREVISANI)  When doing your review, was

16   it important for you to review the grievances?

17        A    In certain cases, yes.

18        Q    And why is that?

19        A    Because the patient had referred to the

20   grievance -- or the plaintiffs' experts or counsel had

21   referred -- reviewed -- referred to the patient

22   complaining of this event, and I needed to look at the

23   source.

24        Q    What about more in general, is it important to

25   look at complaints from the patients who are receiving

1    the care in the system that you're evaluating?

2           A     It -- it can be.

3           Q     Okay.  Was it important to you in forming your

4    opinion here?

5           A     Sir, those are -- the things I looked through

6    were important to me, and I think I mentioned some in my

7    declaration.

8           Q     Let's talk about the inspections that you did.

9    It looks -- on Page 3 of your declaration, it lists a

10   number of institutions that you conducted inspections on.

11   And it's Charlotte, Hardee, Lowell, RMC, FSP, Union, New

12   River, Suwannee, Hamilton, Wakulla and Santa Rosa.  Is

13   that right?

14          A     Yes.

15          Q     Are there any others that you inspected?

16          A     Not that I recall.

17          Q     How did you choose which facilities to inspect?

18          A     I -- I didn't choose them in particular.

19   They -- I -- in discussions with -- with the counsel, we

20   decided to try and see all of the camps that had CM in

21   them.  So it was -- and that included some camps that --

22   that the plaintiffs hadn't seen or hadn't seen yet, or

23   hadn't walked through yet, just to be complete so I

24   wouldn't have to take a second trip to Florida.  So I

25   believe that they included all the CM camps.

1      Q     And tell me how the inspections went.  What was

2  your process?

3      A     Well, of course, they were different for each

4  institution, them being different.  But we were allowed

5  unimpeded access.  Pretty much every place, we started

6  out with speaking to senior staff.  Altogether, that was

7  sensible and convenient for them, so they had a time to

8  get their leaders together with us and had discussions

9  and -- and questions.

10                   And then we physically toured the

11  facilities with the focus on the restrictive housing

12  units.  I also went through the medical departments that

13  were -- that were at each place.

14      Q     When we say "restrictive housing" -- this is a

15  good point -- you mean close management, administrative

16  confinement, disciplinary confinement and maximum

17  management; is that right?

18      A     Yes.

19      Q     Okay.  Well, when I say "restrictive housing,"

20  that's what I'm going to be referring to, just to make

21  sure we're all on the same page.  Okay?

22      A     Very good.

23      Q     How long did you spend in each facility?

24      A     Well, roughly half a day in each one.

25      Q     So --

1      A     So we usually went to two facilities a day.  A

2  long day.

3      Q     Who was with you on your tours?

4      A     Mr. Larry Reid and Josh Lerner.  Wes Kirkland

5  was there off and on.  Those were the main ones.

6      Q     Okay.  And then people from each facility, did

7  they accompany you?

8      A     Yes.

9      Q     So what were you looking for when you were

10 doing these inspections?

11     A     Several things.  I was looking for access to

12 medical care.  That's a big one.  I was looking for

13 the -- things in the -- in the complaint and in the --

14 the plaintiffs' experts' declarations up to that point.

15            And just to get the -- a general sense of

16 how things worked and how the facilities were.

17     Q     And so which -- which dorms did you -- well,

18 let me back up.

19            At each facility, did you look at -- did

20 you inspect every dorm in the facility?

21     A     No.

22     Q     Did you just inspect the restrictive housing

23 dorms?

24     A     We inspected the restrictive housing dorms and

25 a certain amount of -- of other places.  Each place --

1    each facility a little different.  The -- several of

2    them, we visited the visiting centers for outside

3    visitors, the intake areas, all the medical areas, and --

4    and some GP housing.  Went in the kitchen once, I think.

5              They let us choose any place we wanted to

6    go, outside of -- outside of the CM units that -- and

7    like I said, we inspected or reviewed the restrictive

8    housing units.

9        Q    What do you -- when you just -- maybe I

10   misheard you.

11             Did you say "outside of the CM units"?

12       A    Well, yes, because often the medical facilities

13   are outside of the restrictive housing units.  Obviously,

14   the intake center is outside of the restrictive housing

15   units, the kitchen.  They all would -- several places we

16   went to there, educational centers and some of the GP

17   housing.

18       Q    How many GP housing units did you see?

19       A    I would -- I would have to guess.  Maybe half a

20   dozen.

21       Q    And when you went to the restrictive housing

22   units, how much time would you spend there?

23       A    It would vary.  Our time was not limited at

24   all.  It would depend on how much -- how much time either

25   Larry or I, actually both of us, would take in talking to

1    staff that were there and reviewing the facility, asking

2    them to show us how certain things worked and where they

3    were.  That part of the touring would be two to four

4    hours sometimes.  Maybe not four hours.  Two to three.

5        Q    Did you observe the operation on the unit?

6        A    Yes.  There -- they nearly all were -- were in

7    use.

8        Q    Did -- did you see medical rounds happening?

9        A    No.

10        Q    Did you see security rounds happening?

11        A    I'm -- can you define what you mean by

12    "security rounds"?

13        Q    Well, I believe the -- there are various -- the

14    security officers are supposed to do security checks at

15    basic intervals.  Did you ever see that happening?

16        A    Yes.

17        Q    What about mental health rounds, did you ever

18    see those happening?

19        A    No.

20        Q    Did you want to see those happening?

21        A    Not particularly.

22        Q    Wouldn't that be important in evaluating the

23    medical care being provided in restrictive housing, to

24    see how the medical rounds were being provided?

25        A    Okay.  But your last question was regarding

1   mental health rounds.

2       Q    Okay.  Well, I'm asking about the medical

3   rounds now.

4       A    Not particularly, unless -- no, I can't -- I

5   can't say that I would -- that I would purposefully

6   choose to watch the nurse going around.  I've seen that

7   quite a number of times.

8       Q    Well, wouldn't the -- the quality and the

9   character of that interaction be important to your

10  opinion?

11      A    The quality and care of the interactions are

12  important, but each one is individual.  And if there's a

13  problem, it would be an individual problem, which is

14  probably better looked at in the medical record as to

15  what the care became, not -- not the fact that there was

16  a nurse standing at -- at the door talking with somebody

17  that I can't hear.

18                  And the -- as you know, the nursing staff

19  are not hired by DOC directly.  They've got a different

20  employer, and they would need to be represented.  And

21  they are not, as far as I know, enjoined in this action.

22  So -- and the inmate would have medical privacy, so I

23  couldn't be listening to what was going on, essentially,

24  for legal restrictions.  I could watch the nurse from

25  afar going from door to door.

1      Q     But you didn't do that?

2      A     No.  I didn't do that, no.

3      Q     Okay.  So you think that you were restricted

4  from listening to medical care being provided?

5      A     If -- I didn't ask.  It would involve all the

6  parties having special arrangements made so that their

7  rights were being respected.

8      Q     Well, you've reviewed lots of medical records,

9  right, and you have a HIPAA order in place?  So --

10     A     Correct.  But -- but the plaint- -- the inmate

11 at any one -- any of them were plaintiffs or going to be

12 plaintiffs would need to be represented, wouldn't they?

13     Q     Well, you review medical records of people who

14 are not named plaintiffs, right?

15     A     Well, of course.

16     Q     Okay.  And you don't -- you don't think that

17 you've violated any medical privacy restrictions, right?

18     A     No.

19     Q     Before doing this, have you ever conducted

20 facility inspections?

21     A     Yes.

22     Q     Okay.  What were those instances?

23     A     Obviously, our facilities, various ones.  I

24 went on a nice tour of the -- of the medical facilities

25 in and around Pueblo, Colorado, over the -- the Colorado

1    Department of Corrections.

2         Q    What was the purpose of that?

3         A    Actually, just my -- my personal interest.  And

4    I was in the area and already had known -- contacted the

5    medical director for that Colorado department and wanted

6    to see what their facilities were like.  Perhaps I could

7    talk my state into giving me better facilities.  Who

8    knows.

9         Q    Have you ever conducted facility inspections

10   for the purpose of evaluating medical care provided?

11        A    Not as an expert witness, no.

12             Outside of this -- this -- this

13   circumstance that we're talking about in Florida.

14   Obviously, I did here.

15        Q    So what are the different levels of restrictive

16   housing for?

17             MS. SMITH:  Objection; vague.

18        A    Are you talking about Florida?

19        Q    (BY MR. TREVISANI)  Yes.

20        A    Pardon me?

21        Q    Yes, Florida.

22        A    Okay.  Because we've gone off into -- into

23   different things like Colorado and such.

24             The -- there's the administrative

25   confinement, disciplinary confinement, Close Management

1    1, 2 and 3, max.  I think -- is Death Row -- I don't know
2    if Death Row is part of that.
3         Q    Okay.  So what's -- who -- let's start with
4    administrative confinement.
5                        Who gets assigned there?
6         A    My understanding of that is -- is incomplete
7    and outside of my expertise.
8                        But it's generally people that are --
9    where the situation is being reviewed, as I understand
10   it.
11        Q    Okay.  And what are the -- what sort of
12   privileges do people get while in administrative
13   confinement?
14        A    I can't -- I can't say reliably by memory.
15        Q    What -- well, what kind of -- let's talk about
16   disciplinary confinement.
17                       Who gets assigned there?
18        A    Again, that's outside of my expertise.
19                       But I believe it's people that -- that
20   have -- had what were initially allegations, but had the
21   allegations founded, and that's beginning of their --
22   their discipline.
23        Q    And what are the privileges that people in
24   disciplinary confinement get?
25        A    I couldn't tell you from memory.

1      Q     Okay.  What about close management, what's the

2   purpose of close management?

3      A     Close management, as I understand it, is a

4   longer term for -- for -- particularly for people that

5   have had repeated or particularly egregious actions.

6                But, again, this is outside my area of

7   expertise.

8      Q     Okay.  And what's the difference between Close

9   Management 1, 2 and 3?

10      A     Again, outside the area of my expertise.

11                But I believe it's a step-wise function

12   with working towards getting back to general population.

13      Q     Are you familiar with the privileges that

14   people get in Close Management 1, 2 and 3?

15      A     Not from memory, no.

16      Q     I want to ask you about the interviews that you

17   conducted.  And I think, from your declaration -- well,

18   let me just ask:  How many people did you interview?

19                MS. SMITH:  Objection; vague.

20      A     During this trip?

21      Q     (BY MR. TREVISANI)  Well, as part of your --

22   all of your work in forming your opinions for this case,

23   how many people did you interview?

24      A     Gosh, I don't know.  Could be -- well, it would

25   go easily 100 or more.

1      Q     Okay.  Did you interview anyone from FDC, or

2  Florida Department of Corrections, Central Office?

3      A     Yes.

4      Q     Who were those?

5      A     I don't remember the name offhand.  Paula

6  Foskey was there and a couple others.

7      Q     So when you say Paula Foskey was there, was

8  this a group interview?

9      A     Right.  Three -- three staff, but I'm blanking

10 on the other guy's name.  But Paula is the one I talked

11 to the most.  The others were there and had input too.

12            I'm sure we can get you those names.

13     Q     Okay.  Who else did you interview?

14     A     Again, what are you referring to?

15     Q     Anybody you interviewed to form your opinion in

16 this case.

17     A     For the entire case, not just the

18 administrative portion?

19     Q     Yes.  Yes.

20     A     Again, there were numerous staff at each of the

21 institutions we went to.  The administrative building

22 and -- and more than I could name.

23     Q     So it sounds like, from what you're describing,

24 there were some people that you actually sat down and had

25 a, quote/unquote, formal interview, and then other people

1    that you just asked some questions during the

2    inspections.  Is that fair to say?

3        A    Well, the -- as I said back towards the

4    beginning, at the -- generally, at the first -- after

5    arrival, we would sit down with the senior staff and --

6    and then -- you know, that was -- you could call formal.

7        Q    Yeah.  And that -- that's --

8        A    And then we also walked the facilities and

9    interacted with any of the staff and -- that -- that we

10   came across and had questions for.  And they were all,

11   you know, very open and willing to talk to us, anyone

12   that I approached.

13       Q    Okay.  How many people, would you say, did you

14   actually have, like, a formal, sit-down interview?

15            MS. SMITH:  Objection; vague.

16       A    Well, that would -- that would at least be 100.

17   But I'm trying to think.  We went to, what, 11 facilities

18   plus the administrative offices, and each of them had six

19   or seven senior staff.  That would be easy to -- and

20   probably more.  That adds up to more than 100, I think.

21       Q    (BY MR. TREVISANI)  Okay.  So I know

22   (inaudible).

23            So at each facility, when you got there,

24   you would have a sit-down interview with some of the

25   senior staff of that facility; is that right?

1      A    Yeah, pretty much.  Right at the beginning.

2      Q    Okay.  Did that include the warden?

3      A    Often did.

4      Q    Okay.  But not always?

5      A    No, not always.  Sometimes it was a

6  representative of the warden.

7      Q    Okay.  Did it include one or more assistant

8  wardens?

9      A    Often, it did.  I don't -- that -- you know, to

10  my limited memory, would be the -- that would be the

11  person who would be in lieu of the warden.

12      Q    What about anybody from the medical department?

13      A    You mean -- what's the name of that company?

14  I'm drawing a blank.  Centurion?

15      Q    Centurion?

16      A    Centurion employees?

17      Q    Anybody who worked for medical staff at the

18  facility.  I'm talking just now about the facility.

19  We'll get to the Central Office in a minute.

20      A    Okay.  No, I didn't do -- interview Centurion

21  employees.

22      Q    Okay.  Other than this initial sit-down

23  interview at the beginning of the facility inspections,

24  were there any other sit-down interviews during your time

25  doing the inspections?

1      A      Sometimes we would sit down again at the end.

2      Q      Okay.  Would this -- would this be with the

3  same people from the beginning or different people?

4      A      Some of the same.  Mostly the same.  Sometimes

5  they would drop out.  They had other things to do.

6  Occasionally, we would catch someone that wasn't able to

7  make the first one.

8              Lot of times it was the chance to get some

9  cold water, because it was in June.  And -- and they

10  would have -- any more questions that we had and anything

11  that they wanted to say to us also on their own.

12      Q      Why didn't you speak to the medical staff?

13      A      Again, for the same reasons that we talked

14  about earlier.  They're not enjoined in this matter.

15  They would need -- need to have their rights protected

16  and possibly have counsel present, things like that.  And

17  there wasn't any particular question I had for -- for

18  particular medical staff.

19      Q      You didn't think it was important to -- when

20  evaluating the provision of medical care, to talk to the

21  medical staff?

22      A      It can be important.

23      Q      Well, was it important in this case?

24      A      In this case, the medical staff wasn't joined

25  by the plaintiffs, so they wouldn't -- they would need to

1    have their rights respected.

2           Q    I'm not asking --

3           A    But there could have been useful information

4    there.  I don't know.  I was able to get enough from what

5    I had available to form my opinion.

6           Q    Would your opinion have been better informed if

7    you'd spoke to the medical staff?

8           A    I don't know.  I doubt it.

9           Q    Okay.  What about the interviews in the Central

10   Office, did you physically go to Tallahassee to do them?

11          A    Yes.

12          Q    Okay.  And who did you interview there?

13          A    Again, it was that -- Paula Foskey was the main

14   one, and there were two others who I am blanking on.

15          Q    That's okay.

16          A    But that level of -- of the administration.

17          Q    So just three people?

18          A    Yes.

19          Q    Did you take any notes during these interviews?

20          A    Yes.

21          Q    And during the interview, did you have a

22   prepared set of questions?

23          A    I felt them as I went along.  There were a

24   number of my questions that -- Larry Reid generally went

25   first in the -- in the more formal discussions.  And a

1    lot of his questions were ones that I had, so -- you see

2    on some of my notes, the questions are written down or --

3    or bits of questions, some of them are long lists.

4            But, generally, I had all of my questions

5    answered everywhere we went, either directly by myself

6    or -- or by something Mr. Reid asked.

7       Q    Would these -- those interviews in Tallahassee,

8    were they at the beginning -- or were they before the

9    inspections or after the inspections?

10      A    They were -- they were after.

11      Q    And what sorts of things did you ask the staff

12   at Central Office?

13      A    My main focus there was -- was about the

14   overall management, oversight of -- of care that Florida

15   did, the contract between Florida and Centurion as it

16   might affect medical care.  Things like that.

17      Q    Okay.  So other than Ms. Foskey, the other two

18   people, were either of them from the Office of Health

19   Services?

20      A    Well, there was a -- the two men -- gosh, I

21   wish I could remember his name.  I think he was -- he was

22   the -- the next up from -- from Paula's position.

23      Q    I guess my question is, is -- would the people

24   that you interviewed, were they -- were they responsible

25   for health care policy at the facility?

1      A      They -- they were responsible -- I'm not sure

2  what you mean by "health care policy."  They -- they --

3  that they were writing the policy?

4      Q      No, that they were in charge of enforcing it,

5  implementing it, versus other operational aspects of the

6  Department of Corrections.

7      A      Right.  The -- now, most of that information

8  did come from Ms. Foskey regarding how they -- they

9  monitor and have oversight of the medical care and

10  facilities and -- and access, things like that.

11      Q      Okay.  Did you speak to any incarcerated

12  people?

13      A      Not beyond saying hi.

14              MR. TREVISANI:  Why don't we take a

15  five-minute break.  Does that sound okay?  Come back at

16  11:15?

17              MS. SMITH:  Okay.

18              (Break taken from 11:10 a.m. to 11:20

19  a.m.)

20      Q      (BY MR. TREVISANI)  Dr. Paulson, you have

21  experience in treating patients in restrictive housing,

22  right?

23      A      Yes.

24      Q      Okay.  And in your experience, is it easier or

25  harder to provide health care to patients in restrictive

1    housing versus the general population?

2          A    I don't find much difference.

3          Q    So it's about the same to you?

4          A    As far as the treatment, yes.

5          Q    So in -- let me refocus my question.

6                So when you're treating somebody in

7    restrictive housing, generally if they need to go to

8    medical, they have to be escorted by security; is that

9    right?

10               MS. SMITH:  Objection; overbroad.

11         A    In our -- in our system at OSP, we send a

12   provider, who used to be me, to the housing unit and do

13   it weekly, and do a weekly clinic there.  The other times

14   either the nurse responds within the unit or someone

15   is -- has an emergency and might be brought up to medical

16   or they might a scheduled appointment in medical and the

17   times that they leave the unit unless they're escorted.

18         Q    How does that work in Florida in terms of

19   people needing medical care in restrictive housing?

20               MS. SMITH:  Objection.

21               THE WITNESS:  Sorry.  Go ahead.

22               MS. SMITH:  We're talking over each other.

23   I just want pose an overbroad objection.

24         A    It seems to me to be about the same except that

25   I don't think that -- pretty much all places had an exam

1  room within there, but I don't recall that they had any

2  of the -- where they had a doctor there or a nurse

3  practitioner on a regular basis to do clinic.  I think

4  they routinely brought them to medical.

5       Q     (BY MR. TREVISANI)  Did you, in your

6  inspections, observe anyone getting moved from a cell to

7  the exam room in the restrictive housing dorm?

8       A     No.

9       Q     Okay.  In Florida when that happens, is

10  there -- does the security have to escort the person?

11            MS. SMITH:  Objection; overbroad;

12  predicate.

13       A     I would assume so.

14       Q     (BY MR. TREVISANI)  But you don't know for

15  sure?

16       A     From the depositions, I think that that's

17  almost universal even in the CM3 because there's an

18  officer there.

19       Q     And when somebody is removed from the cell to

20  go to the medical room, that person has to be searched,

21  right?

22            MS. SMITH:  Objection; predicate;

23  overbroad.

24       A     I think so.  I would assume so.  Again, that's

25  outside my expertise.

1      Q    (BY MR. TREVISANI)   Okay.  Did you ever -- did

2  you learn in doing your work with this case any instance

3  of a medical appointment for somebody in restrictive

4  housing being canceled because the person could not be

5  escorted to the medical area?

6      A    Are you talking as if -- as in there was not an

7  escort officer available?

8      Q    For that or another reason.

9      A    There are lots of reasons why what you want to

10 do ends up not happening.  There weren't any particular

11 documented.  I think it was mentioned in one of the

12 depositions.  I wouldn't find it unusual at all.

13           Things come up and you have to reschedule.

14 The unit could have and an emergency going on.  There

15 might be -- trouble with having enough escort officers

16 for the day and we'll reschedule somebody.  Lots and lots

17 of things can interrupt that process, as again it can for

18 any dorm unit too.

19     Q    But those kinds of interruptions happen more

20 often in restrictive housing versus general population?

21           MS. SMITH:  Objection.

22     A    I don't have any information on that.

23     Q    (BY MR. TREVISANI)  What about your experience

24 in Oregon?

25     A    I don't have any information on that.

1          Q     You don't know whether medical appointments are

2     canceled more often for people in restrictive housing

3     versus general population in your experience in Oregon?

4          A     Yeah, as I said, I don't have any information

5     on that.  We haven't done a study of that because each

6     and every one that might be interrupted for whatever

7     reason is rescheduled and it's taken care of.

8          Q     In Florida, in the general population medical

9     clinic, how many security staff are staffing the medical

10    clinic?

11                MS. SMITH:  Objection; overbroad;

12    predicate; scope.

13          A     I don't know.

14          Q     (BY MR. TREVISANI)  Well, how many staff are

15    there in Oregon?

16          A     And you're talking about the medical clinic or

17    the --

18          Q     Yes.

19          A     -- or the clinic within the restrictive housing

20    units?

21          Q     The medical clinic for general population.

22          A     And are you talking about a restrictive housing

23    inmate going to the medical clinic, or just in general?

24          Q     No, just in general.

25          A     One or two officers.

1      Q     Okay.  And how many -- how many general

2   population inmates typically can you see in a medical

3   clinic in a day?

4      A     In a day, maximum 40.  Generally it's more like

5   30 in a full day.

6      Q     Okay.  How many --

7      A     I see a lot of patients.

8      Q     Do you know how many typically are seen in

9   Florida in general population medical clinic?

10     A     No.

11     Q     Okay.  And in Oregon in your experience, how

12  many restrictive housing inmates do you see in medical

13  in one day?

14     A     I would see every one of them that has to be

15  seen or who needed to be seen; that is, they're triaged

16  through the nurses, each time I visit the unit.

17     Q     Well, let me be clear.  How many --

18     A     Sometimes I would say it was a few and

19  sometimes it was up to 20.

20     Q     Okay.  How many inmates, in your experience,

21  can be brought from a restrictive housing to the medical

22  clinic --

23           MS. SMITH:  Objection; overbroad; vague.

24     Q     (BY MR. TREVISANI)  -- now, in a day?

25     A     In a day, I have no idea.  That would depend on

1    security.

2         Q     Do you think it would be more or less than

3    general population?

4              MS. SMITH:  Objection; vague.

5         A     It -- it -- the -- I wouldn't know because

6    there are different size populations with different

7    needs.

8         Q     (BY MR. TREVISANI)  When the patients in

9    restrictive housing in Florida are seen in medical, are

10   they fully restrained?

11             MS. SMITH:  Objection; overbroad.

12        A     That's a security question.

13        Q     (BY MR. TREVISANI)  So do you know the answer?

14        A     I imagine the answer is they're restrained

15   appropriate for their circumstances.

16        Q     Does having a patient be fully restrained make

17   it harder to provide medical care to them?

18        A     Can you define "fully restrained" for me?

19        Q     Well, let's say handcuffed and leg chains.

20        A     And what was your question again?  I'm sorry.

21        Q     Is it harder to provide medical care to that

22   person when they're fully restrained?

23        A     Not especially.

24        Q     It's just the same as if they were not, they

25   were not restrained?

1      A     Pretty much.  If there's any problem and it

2  involves one of the limbs, then we have to work with

3  that, you know, asking if -- you do what you can with the

4  restraints in place, which is quite a lot generally, and

5  then working with security to see if that limb can be

6  uncuffed and examined, something like that.

7           It's really no big deal.  Like I say, I

8  spent most of my career in the emergency room and when

9  the sheriffs bring someone in, they're in cuffs,

10  sometimes cuffs and shackles, sometimes with a Taser wire

11  still on them.

12     Q    When inmates in restrictive housing in Florida

13  are seen in medical, is an officer present in the exam

14  room?

15     A    I don't know but I wouldn't be surprised.

16           MS. SMITH:  Objection; overbroad.

17           Sorry, Doctor.  Go ahead.

18           THE WITNESS:  No problem.  I'll try and

19  pause a little longer.

20     A    I don't -- I don't know in particular, and I'm

21  sure it would somewhat depend on the circumstance but I

22  wouldn't be surprised at all.

23     Q    (BY MR. TREVISANI)  Okay.  Is that kind of

24  knowledge, is that important to forming your opinion in

25  this case?

1        A     No, that's a security issue.

2        Q     Okay.  And do you think it's, in your

3  experience, is a -- does having a security officer in the

4  room make the medical examination more difficult?

5        A     Not in my experience.

6        Q     Does it make the patient less likely to be

7  candid?

8        A     I have no way of knowing whether or not someone

9  is telling me the truth.

10        Q     Well, if somebody is less candid, that is going

11  to affect the medical care that you provide them; is that

12  right?

13        A     I haven't found it to be a problem.

14        Q     Well, I'm not asking if you found candor to be

15  a problem.  I'm saying, if somebody is -- doesn't want to

16  be fully candid, that can affect the medical care that

17  you provide to them, right?

18        A     Yes, it can.  And it happens all the time no

19  matter where we are.

20        Q     Because they might -- they might not give you

21  the full story, right?

22              MS. SMITH:  Objection; overbroad.

23        A     Yes.

24        Q     (BY MR. TREVISANI)  And you need the full story

25  to provide them with appropriate medical care?

1           MS. SMITH:  Objection; overbroad.

2      A     Sometimes you do.  Sometimes I don't need a

3  story at all.

4      Q     (BY MR. TREVISANI)  You need to interview the

5  person, right?

6      A     I always do but -- but there are times when the

7  interview really doesn't add much to the circumstance,

8  such as looking at a sore throat.

9      Q     Okay.  Could you take a look at Page 7 of your

10 declaration?

11     A     Uh-huh.  Got it.

12     Q     And the paragraph right in the middle, it says,

13 "The preconfinement and post-use-of-force evaluations

14 were consistently done to American Correctional

15 Association, ACA, standards and reasonable and

16 appropriate medical standards."  Do you see that?

17     A     Yes.

18     Q     How did you reach that conclusion?

19     A     From looking at quite a number of

20 post-use-of-force and preconfinement documentations.

21     Q     Okay.  So would this -- were these the

22 documentations that were within the individual sets of

23 medical records that you reviewed?

24     A     Yes.  I can't think of any that weren't.

25     Q     So what -- what you're relying on for that

1    conclusion is the records, right?

2          A     Correct.

3          Q     You didn't actually observe whether these

4    preconfinement and post-use-of-force evaluations were

5    actually happening?

6          A     No.  But I did have the record often beyond

7    the -- beyond the preconfinement or post-use-of-force

8    interview -- I'm sorry, evaluation.  And that is useful

9    information in that regard a lot of times.

10         Q     Okay.  Backing up a little bit, just in

11   general, how does someone in restrictive housing in

12   Florida access health care?

13               MS. SMITH:  Objection; overbroad.

14         A     I think I discussed that in my declaration.

15   They can make a sick call request in paper.  They can

16   mention it to the nurse that comes by each day.  If they

17   have an emergency, they can ask any staff.

18         Q     (BY MR. TREVISANI)  (Inaudible.)

19               THE REPORTER:  I'm sorry.  I didn't hear

20   that.

21               MR. TREVISANI:  Sorry.  I think I was

22   rattling paper.

23         Q     (BY MR. TREVISANI)  How does an inmate in

24   restrictive housing in Florida get a sick call form?

25               THE COURT REPORTER:  How do inmates in

1    restrictive housing get?

2         Q    (BY MR. TREVISANI)  Restrictive housing in

3    Florida get a sick call form.

4         A    My understanding is they can request one from

5    any of the staff, but often get it from the nurse that

6    comes each day, but they can request it from the officers

7    and other staff also.

8         Q    Okay.  But they have to wait for someone to

9    come around to request a sick call form, right?

10        A    It might be 29 minutes.

11        Q    And what are you referencing with the 29

12   minutes?

13        A    That the -- well, the officers are checking

14   roughly every 30 minutes, so they've got another 29 to

15   wait if they missed them a minute ago.

16        Q    And then what happens after that?  They get the

17   sick call form, they fill it out and then what?

18        A    They could turn in --

19              MS. SMITH:  I'm sorry.  Overbroad.

20              Go ahead.

21        A    They can turn it in either to the nurses that

22   come the next day or to any of the officers.

23        Q    (BY MR. TREVISANI)  Okay.  And then what's the

24   next step?

25        A    They put it in with sick call forms, which are

1    collected and gone through, and I assume sick call lists

2    come from that.

3        Q    Okay.  And then what's the next step in terms

4    of how they get to medical or how are they seen?

5                MS. SMITH:  Objection; overbroad.

6        A    My understanding it's a process very similar to

7    ours.  They are reviewed by a nurse and appropriate steps

8    taken for that, depending on what the request is and the

9    circumstance.

10       Q    (BY MR. TREVISANI)  Okay.  So what would the --

11   I am just trying to figure out, like, how does the inmate

12   actually get seen?  What's the next step?

13               MS. SMITH:  Objection; overbroad; asked

14   and answered.

15       A    I'm sorry.  I didn't get the whole question.

16   You broke up.

17       Q    (BY MR. TREVISANI)  What's the next step after

18   the sick call form is collected?

19               MS. SMITH:  Same objection.

20       A    As I said, the nurse goes through them each day

21   and makes determinations of what's an appropriate next

22   step.

23       Q    (BY MR. TREVISANI)  Okay.  And what if the

24   appropriate next step is that the inmate needs to have a

25   medical examination, what happens?

1       A       It would depend on the medical examination that

2  was felt to be needed individually.

3       Q       So would -- how would the -- that determination

4  be made?

5       A       It would be -- it would be made by the

6  registered nurse and his or her professional training.

7       Q       Okay.  And what if the inmate needed to be seen

8  in the medical facility, how would that work?

9       A       They would -- do you mean on a scheduled basis?

10       Q       Yes.

11       A       They would schedule an appointment.

12       Q       Okay.  And then does how the inmate get from

13  their cell to the appointment room?

14       A       They would be escorted by the officers.

15       Q       Okay.  Now, similar questions for general

16  population inmates.  How do general population inmates in

17  Florida access to health care?

18       A       As I understand it, they need to get -- first

19  to get a sick call form.  So they need to leave their

20  cell and go to wherever those are, get one, fill it out

21  someplace and then come to wherever the drop box is for

22  dropping those off.

23       Q       The general population inmates in Florida, are

24  they in individual cells?

25       A       You mean one per cell?

1       Q       Correct.

2       A       I'm sorry?

3       Q       Are general population inmates Florida housed

4    in cells or are they in open-bay dorms?

5       A       I believe it's both.

6       Q       Okay.  So for the general population inmates in

7    open-bay dorms, are those sick call forms in the dorm for

8    them to get?

9       A       That, I don't know for two reasons.  I didn't

10   go to all the dorms in all the places, and I only visited

11   about one-tenth of the facilities.

12      Q       Well, you're offering an opinion comparing the

13   access to medical care in restrictive housing versus

14   general population, correct?

15      A       Correct.

16      Q       So you need to know how the medical care is

17   accessed in general population, right?

18      A       Correct.

19      Q       So without that knowledge, you can't make that

20   comparison, correct?

21      A       I did just explain how the sick call process

22   is -- is -- is to go on in the Florida facilities.  The

23   inmate goes to where the form is, takes a form, goes back

24   to where they can write, writes their sick call request,

25   goes back to a drop box or wherever the forms are turned

1    in to for their particular circumstance.  And it goes on

2    from there.

3              That would be the same, dorm or not dorm,

4    whether it's on the dorm or off the dorm.  That's the

5    process, as I understand it.

6        Q    And how is the process different from the

7    process in restrictive housing?

8        A    The restrictive housing inmate doesn't have to

9    go anywhere.

10       Q    They have to wait for somebody to come by to

11   get the form, correct?

12       A    Correct.

13       Q    Could you -- if you could look at Page 8 of

14   your declaration.

15       A    Yes.

16       Q    The second paragraph starts, quote, In

17   contrast, general population, GP, inmates cannot simply

18   walk over to the medical offices and meet with the nurse

19   any time they want, unquote.

20             I just want to be sure I understand what

21   you're saying there because you agree that inmates in

22   restrictive housing can't do that either, right?

23       A    No, they can't walk over to medical.

24       Q    Okay.  So if -- if an inmate -- well, let me

25   back up.

1        If there are sick call forms available in

2   a general population dorm at the officer station and the

3   general population inmates can walk over and ask for one,

4   it's easier for them to get those forms than somebody in

5   restrictive housing who has to wait for somebody to come

6   around.

7            MS. SMITH:  Objection; vague.

8        Q    (BY MR. TREVISANI)  Do you agree?

9        A    That's your opinion of what easier is.   The

10  other -- other side of easier would be, I don't have to

11  do anything other than stand up and take two steps to the

12  door to get a form, and then fill out and go another two

13  steps to the door to hand it in.

14            That sounds easier to me.

15       Q    (BY MR. TREVISANI)  Okay.  Well, that's what

16  I'm -- I'm trying to -- it's not my opinion.  I'm asking

17  about your opinion, which you have given an opinion that

18  inmates in restrictive housing have better and more

19  access to medical care.

20            So I'm just trying to figure out why you

21  think that is so when it appears that inmates in general

22  population have an easier time in getting sick call

23  forms.

24            MS. SMITH:  Objection; vague.

25       A    Again, that's your opinion.  My opinion is

1  different.

2       Q    (BY MR. TREVISANI)  Your opinion is that it's

3  easier to wait for somebody to come around to get a sick

4  call form versus walking and getting one yourself?

5       A    My opinion is that they -- the restrictive

6  housing inmate has an easier process as far as the ease

7  of doing it.  The waiting is trivial.  Sometimes the walk

8  is long and you -- depending on where things are.

9            But I don't think that the difference in

10  access is -- to the form is all that substantial.

11       Q    Going back to page 8 of your declaration, and I

12  think you just mentioned it, when referencing general

13  population inmates, you say that they can pick up their

14  request form and then, quote, retreat to where the form

15  can be filled out, unquote.  What does that mean?

16       A    That means I'm -- in situations I'm aware of,

17  oftentimes there isn't a pen and a desk at the site where

18  the forms are that the inmate can fill out the form right

19  there.  Oftentimes they take their forms back to their

20  cells where they have a desk and a pen and fill it out

21  there.

22       Q    Do you know if that's true in Florida?

23       A    No.

24       Q    So if there are, in fact, pens and a desk where

25  sick call forms are, then they wouldn't have to retreat

1  to an area to fill it out; is that right?

2      A    No.  They would just have to fill it out there

3  at the desk, perhaps wait for their fellows to fill

4  theirs out first.  I'm sure there are a lot of different

5  sets of circumstances.  The facilities try to work things

6  out for everything to work smoothly.

7      Q    And then where do inmates in general population

8  drop the sick call form?

9      A    To wherever the drop station is.

10     Q    Do you know where they are?

11     A    No, I don't.

12              MS. SMITH:  Objection; overbroad.

13     Q    (BY MR. TREVISANI)  And then we covered this,

14  but just to be clear, inmates in restrictive housing, to

15  turn in the form, they have to wait for somebody to come

16  around to turn it in, correct?

17     A    They -- they have to wait a trivial amount of

18  time, yes.

19     Q    For inmates in general population in Florida,

20  how long does it typically take from submitting a sick

21  call form to being seen in medical?

22              MS. SMITH:  Objection; overbroad.

23     A    I don't know.  And it would be -- it would

24  depend on the circumstance.

25     Q    (BY MR. TREVISANI)  Well, for inmates in

1    restrictive housing in Florida, how long does it

2    typically take from submission of a sick call form to

3    being seen by medical?

4              MS. SMITH:  Objection; overbroad.

5         A    Same answer.

6         Q    (BY MR. TREVISANI)  In restrictive housing in

7    Florida, do some medical appointments happen at cell

8    front?

9              MS. SMITH:  Objection; vague.

10        A    As far as I'm aware, the only opportunity for

11   that would be either a medical emergency where medical

12   staff would respond to wherever the inmate was, including

13   the workstation, or wherever, or restrictive housing

14   where the nurse there -- the nurse is there once a day.

15        Q    (BY MR. TREVISANI)  So are you familiar with

16   any instance where a nurse conducts any kind of medical

17   evaluation in Florida in restrictive housing through the

18   cell door?

19             MS. SMITH:  Objection; vague.

20        A    It's something that certainly could be done for

21   certain circumstances and certain conditions.

22        Q    (BY MR. TREVISANI)  But in your opinion, it

23   should not be the routine practice?

24             MS. SMITH:  Objection; vague.

25        A    It would depend on the medical issue and the

1    circumstance.

2        Q    (BY MR. TREVISANI)  Well, but -- so just to

3    answer my question, like doing the cell-front medical

4    evaluation should not be routine practice unless there's

5    a reason to do it; is that fair?

6                MS. SMITH:  Objection; overbroad.

7        A    The care of the inmate should be appropriate

8    regardless of where it's done.  If someone wants to know

9    what is this little thing right here (indicating).  Well,

10   you can't see my face that well.  And the nurse can take

11   a quick glance and say, oh, that's a skin tag, don't

12   worry about it.  That could be done through a cell door.

13       Q    (BY MR. TREVISANI)  In general, in your

14   opinion, do you think a medical examination through the

15   cell door is better or worse than a medical examination

16   face to face?

17                MS. SMITH:  Objection; overbroad and

18   vague.

19       A    It would depend on the -- on the circumstance.

20   I just gave you an example of something that would be

21   perfectly adequate through the cell door.

22                Now, realistically speaking, I would say

23   that most things can't be done through the cell door, but

24   you were asking me absolutes.

25       Q    (BY MR. TREVISANI)  Why is that, that most

1  things can't be done through the cell door?

2      A    Because most circumstances, in my experience,

3  require more access than can be had through the cell

4  door.

5      Q    And just to confirm, did you try to speak to

6  any inmates through the cell door?

7      A    No, I did not.

8      Q    So you're not aware of how difficult or easy it

9  is to hear through the door?

10     A    Well, I would have to -- have to qualify that a

11 little bit.  I said hi a few times just to be friendly,

12 but nothing more substantial than that.  I was able to

13 see what the -- what the physical circumstances were in

14 the various facilities and dorms and restrictive housing

15 units.

16     Q    Did you assess how easy or hard it is to hear

17 through the cell door?

18     A    Not formally, but I was around as officers

19 talked to inmates through the cell doors as we were going

20 through.  It's not a difficult thing to figure out.

21     Q    Did you see -- well, back up.

22              I think you testified that in many

23 restrictive housing units, there is a medical group in

24 the unit; is that right?

25     A    Correct.

1    Q    Did you see the inside of those units?

2    A    Are you talking about the unit in --

3    Q    I'm sorry.  Let me rephrase that.

4         Did you see the inside of those medical

5    units?

6    A    Yes, many of them.

7    Q    And what's in those rooms typically?

8    A    Typically an exam table, lighting, a desk.

9    Sometimes an ophthalmoscope on the wall, sometimes not.

10   Sometimes blood pressure cuff, sometimes not.  When those

11   aren't, I assume that the nurse is bringing them.

12        When they're doing their evaluations, that

13   would be -- it would be a norm, but sometimes it's

14   hanging on the wall.  Portable lighting, things like

15   that.

16   Q    In your opinion, are those rooms adequate for

17   conducting medical examinations?

18   A    Yes.  Many medical examinations, that would be

19   adequate a lot of the time.

20   Q    Did you see the medical examination rooms in

21   the medical clinics where -- or were they not in the

22   medical wing?

23   A    Well, I saw quite a few of them.

24   Q    What's inside those medical examination rooms?

25   A    Many similar things, things that are

1    appropriate to the average medical office.

2         Q    Is there more equipment in there or less

3    equipment than the rooms, the medical rooms, in the

4    restrictive housing units?

5         A    I can't say.  My guess would be less.

6         Q    Less in which ones?  I'm sorry.

7         A    Less in the restrictive housing units, the ones

8    that I saw of each.  I didn't make a -- a survey of that

9    in particular that I could attest that that's an

10   absolute.

11        Q    Okay.  Can you turn to Page 9 of your

12   declaration?

13        A    Yes.

14        Q    I want to -- okay.  About the third or fourth

15   sentence, there's a sentence that says, "A nurse will

16   respond to their location immediately any time they think

17   they have a medical emergency with no cost, no penalty if

18   they overuse the privilege."  Do you see that sentence?

19        A    Yes.

20        Q    I want to ask about the "no cost" language.

21   Florida inmates have to pay copayments for medical,

22   right?

23        A    I understand for certain things, they do.

24        Q    Okay.  So would -- do you know how much the

25   copayment is?

1    A    No, I don't.  But if you read my sentence, it

2  says, "with no cost and no penalty if they overuse the

3  privilege."

4    Q    So I want to be -- that's why I'm asking you.

5  I want to clarify what you said.

6              I mean, do they have a cost to see

7  medical, correct?

8    A    I was referring to overusing the privilege.

9    Q    Well, that's what I'm asking about.  If an

10  inmate submits a sick call request --

11    A    There's no extra cost for -- no extra cost for

12  an overuse.

13    Q    Beyond the copayment, correct?

14    A    I would assume so.  I don't know they -- if it

15  has the copay for a declared emergency or not.

16    Q    Okay.  So we touched on this a little bit.  We

17  talked a little bit about the preconfinement physical.

18  And do you agree that it's important for somebody to do,

19  to get the preconfinement physical before being put in

20  restrictive housing?

21    A    Are you referring to a preconfinement medical

22  evaluation?

23    Q    Yes.

24    A    Okay.  Because that's not necessarily a

25  physical.

1    Q    Right.  Thank you for correcting me.

2              So do you think it's important for

3    something -- somebody to get the preconfinement medical

4    evaluation before going into restrictive housing in

5    Florida?

6    A    It's often important.

7    Q    Why is it important?

8    A    So that the staff can look for things where --

9    that -- where restrictive housing might need to be

10   altered, such as an ADA situation, or that they have

11   conditions that need more intense nursing, such as

12   someone who has medications three times a day, or

13   insulin, things like that.

14   Q    So why is it particularly important to do it

15   before going into restrictive housing versus, say, just

16   going to another general population dorm?

17              THE WITNESS:  Are you there?

18              MR. TREVISANI:  I'm here.

19              THE WITNESS:  Okay.  You fell off my

20   video, but I see it in the other spot.

21              I'm sorry.  Can you repeat the question?

22   Q    (BY MR. TREVISANI)  Why is it particularly

23   important to do it before going into restrictive housing

24   versus, say, going to another dorm in general population?

25   A    Because they -- they are coming under a

1    different nursing situation, for one.  They're doing --

2    they are then not -- it is also done for people that are,

3    as I understand it, people that are going from one

4    institution to another, a review is done there also.

5        Q    Is part of reason is because it's harder to

6    monitor them when they're in restrictive housing?

7        A    I don't believe so.

8        Q    Okay.  Is part of the reason that they might go

9    a longer time before seeing medical staff in restrictive

10   housing?

11       A    I don't believe so.

12       Q    You agree it's important to do daily nursing

13   rounds in restrictive housing?

14       A    It's a standard practice a lot of the places,

15   and often recommended.  The importance of it would --

16   would depend on the amount of care needed.  If -- if the

17   inmates in a particular unit were all perfectly healthy,

18   taking no medication and having no medical issues, then

19   the daily round by the nurses would be actually a waste

20   of time.

21            But it's done anyway so that -- I assume

22   that it's not missed in the situations where they need to

23   give insulin regularly or medication three times a day.

24   You check on the folks that need more checking, but it's

25   not an absolute benefit to every inmate or even every

1    unit.

2         Q    Well, I'm not asking you about the outcome.

3    I'm just asking you, you agree, as a general matter, it's

4    important to do daily nursing rounds in restrictive

5    housing, correct?

6              MS. SMITH:  Objection; asked and answered.

7         A    As I said, in the overall, but it's not an

8    absolutely that -- it's a benefit that a certain amount

9    of it's overdone.

10        Q    (BY MR. TREVISANI)  Is it recommended by the

11   National Commission on Correctional Health Care?

12        A    I believe so.

13        Q    And why is it recommended?

14             MS. SMITH:  Objection; predicate.

15        A    The "whys" of that, you would have to ask the

16   committee that wrote and approved that, what all they

17   took into account.

18        Q    (BY MR. TREVISANI)  Okay.  So is part of the

19   reason why the daily nursing rounds are done is that

20   because -- well, let me back up.

21             If daily nursing rounds were not done in

22   restrictive housing, would that increase the risk of

23   medical harm to people in restrictive housing?

24             MS. SMITH:  Objection; overbroad.

25        A    I don't think that the issue was whether or

1   not -- is whether or not there are daily rounds.  It's

2   that the appropriate care is provided for each inmate

3   according to their need.

4               If you could -- if you could devise a

5   different method of having that in restrictive housing

6   without a daily nursing round, I would be all for it, but

7   as long as their needs are being met.

8       Q    (BY MR. TREVISANI)  Well, right, again, and I

9   am not asking about the outcome, I am asking about the

10  risk.  Does not doing the daily nursing rounds increase

11  the risk of medical harm to people in restrictive

12  housing?

13              MS. SMITH:  Objection; overbroad.

14      A    The risks are known and come to be known from

15  outcomes.  I'm sorry, they're not -- they're not -- they

16  cannot be -- they cannot be divorced from each other.

17              How do we know what a risk is unless we

18  have known outcomes?

19      Q    (BY MR. TREVISANI)  Well, do you agree that

20  somebody with persistently high blood pressure has a

21  higher risk of having a heart attack?

22      A    That is a risk factor --

23      Q    So --

24      A    -- because the blood pressure is poorly

25  controlled.

1          Well, controlled blood pressure has little

2   effect.

3      Q    So somebody with persistently high and

4   uncontrolled blood pressure has a high risk -- higher

5   risk of having a heart attack even if they never have a

6   heart attack, correct?

7      A    Correct.

8      Q    And so that's the same question I'm asking

9   about the rounds, is if in general, does not doing those

10  nursing rounds in restrictive housing increase the risk

11  of medical harm in restrictive housing?

12          MS. SMITH:  Objection; overbroad; asked

13  and answered.

14     A    I'm afraid I don't understand your connection.

15  Why does -- why is the only way to provide medical care,

16  in your mind, through daily nursing rounds?  Could it be

17  done in other ways?  You're asking me absolutes and I see

18  alternatives.

19     Q    (BY MR. TREVISANI)  Well, you're telling me

20  about the prison system, right, and -- for example, the

21  NCCHC says -- recommends to do the daily nursing rounds.

22  They don't recommend only do them if you've assessed on

23  the people on the wing and only people who are at a

24  higher risk need the daily nursing rounds.  Am I right

25  about that?

1      A     You're right about that.

2      Q     And they make that recommendation for a reason,

3   right?

4            MS. SMITH:  Objection; predicate.

5      A     Yeah, I would assume so.

6      Q     (BY MR. TREVISANI)  Okay.  And that reason is

7   because, in general, if you don't do them, it increases

8   the risk of medical harm to the --

9            MS. SMITH:  Objection.

10           THE COURT REPORTER:  I'm sorry.

11           MS. SMITH:  Sorry.  I didn't -- I thought

12   you were finished, Dante.

13           Did you get his question?

14           THE COURT REPORTER:  No.

15           THE WITNESS:  Yes, I did.

16           MS. SMITH:  Hold on one moment, Doctor.  I

17   was asking Kelly.  Kelly is shaking her head.  I think I

18   might have accidentally talked over him.  I apologize.

19      Q     (BY MR. TREVISANI)  So my turn first.

20           In general -- the reason for that is that

21   in general, if you don't do the daily nursing rounds, it

22   increases the risk of medical harm to people in

23   restrictive housing, right?

24           MS. SMITH:  Objection; overbroad; asked

25   and answered.

1          Go ahead, Doctor.

2     A    I don't know if the NCCHC considered

3  alternative methods of providing appropriate care, so I

4  can't really answer that in that regard.  But the -- the

5  medical care, the need, is what needs to be provided, not

6  any particular format for providing that as long as the

7  need is met.

8     Q    (BY MR. TREVISANI)  Okay.  Let me ask you this

9  in a slightly different direction.  Did you form an

10  opinion on whether the risk to inmates in restrictive

11  housing in Florida -- and let me -- let me start over.

12          Did you form an opinion on whether the

13  medical risk to inmates in restrictive housing in Florida

14  is higher than that in the general population?

15          MS. SMITH:  Objection; overbroad.

16     A    In reviewing the information provided to me,

17  including the information provided by the  -- the

18  Plaintiffs' medical expert, there was not evidence

19  produced that showed historically higher levels of

20  physical harm to inmates in restrictive housing versus

21  general population.

22     Q    (BY MR. TREVISANI)  I don't think you answered

23  my question, Doctor.

24          Did you form an opinion on whether the

25  risk, the medical risk, to inmates in restrictive housing

1   in Florida is higher than that in the general population?

2                   MS. SMITH:  Same objection.

3       A    Like -- as I said, there is no information

4   provided that -- that that showed harm, either

5   historically or within FDC, physical harm to people in

6   restrictive housing of the sort that FDC does.

7                   So I would have to say I have no evidence

8   to support that, that is higher risk.

9       Q    (BY MR. TREVISANI)  So did you form an opinion

10  about the risk of harm?

11                  MS. SMITH:  Objection; asked and answered;

12  vague.

13      A    The same answer.  I looked at the available

14  evidence and arrived at -- and it was inadequate evidence

15  of -- that would support the opinion of harm -- of

16  increased risk of harm to restrictive housing inmates.

17      Q    (BY MR. TREVISANI)  Okay.  So it sounds like

18  you did form an opinion, and you don't think that there

19  was an increased risk; is that fair?

20      A    I would stand by my statement.

21      Q    Okay.  I'm really just trying to figure out

22  what your opinion is.  And I -- you know, I'm not -- it's

23  not a trick question.  I just want to know, did you form

24  an opinion on the risk of harm?

25      A    It's -- it's not a trick answer either.  I've

1    given you my answer, but it's -- it is predicated.

2        Q    We talked a little about the quality assurance

3    you've done in Oregon.  Would you agree that conducting

4    quality assurance is important in a prison medical care

5    system?

6        A    I think it's felt important in all medical care

7    systems.

8        Q    Why is that?

9        A    The goal is -- is to maintain and, whenever

10   possible, improve the quality of care.

11       Q    What sort of outcome should you look at when

12   doing quality assurance?

13       A    That would depend a lot on your particular

14   circumstances and history that, in my opinion, is best

15   individualized.  So we don't do outcome measures on how

16   many of the inmates at OSP get annual mammograms over the

17   age of 50 because there are no women at OSP with breasts.

18       Q    Okay.  Should -- well, in your review of the

19   information for this case, is Florida conducting quality

20   assurance of the medical being provided in restrictive

21   housing?

22       A    As a separate entity?

23       Q    No, just in general.

24       A    But as separate category, restrictive housing

25   as a separate category?  Is that your question?

1      Q      That's what I'm asking.

2      A      I'm not aware.

3      Q      Okay.  Are they -- the same question but more

4   (inaudible).  Are they conducting quality assurance of

5   the medical care being provided generally in Florida

6   prisons?

7      A      Yeah, I understand that that is being done.

8      Q      Did you review any of those quality assurance

9   be reports or documents?

10     A      I don't believe I got any of those, no.

11     Q      Do you think reviewing that is important when

12  evaluating the medical system in prison?

13     A      It depends on what evaluations I was doing.

14     Q      Okay.  For the work in forming your opinion in

15  this case, do you think it would be important to review

16  the quality assurance documents?

17     A      It was important to know that quality assurance

18  was being done.  It would be a little odd, I should

19  think, from what I was asked to do, and I am doing, to

20  redo their work, that is, looked over their shoulder at

21  each of their assessments of each inmate's circumstances

22  and outcome that they looked at for the quality assurance

23  measures.

24     Q      Well, it wouldn't be redoing the work.  It

25  would be looking at the quality assurance documents that

1    were generated as part of their evaluation of the medical

2    care.

3         A    Looking to see that quality assurance was done.

4         Q    And I'm asking also if you could look to see

5    whether -- how they're doing on the quality assurance,

6    whether they're passing or failing, correct?

7                   MS. SMITH:  Objection; vague.

8         A    The circumstance you're talking about would be

9    dependent on -- on what their -- what their history was,

10   and both in the previous quality measures and in their

11   medical outcomes and such and which situations seem to be

12   coming up along with doing periodic reviews of various

13   areas so that they can get a broader look.

14                  Did I answer your question?

15        Q    (BY MR. TREVISANI)  Well, I guess my question

16   is, do you think it's important to review the quality

17   assurance documents for you to form an opinion about the

18   medical care being provided in restrictive housing in

19   Florida?

20        A    They -- since I'm not aware that they were

21   separated out, I'm not sure what I could do.

22                  Now, if they had done measures with

23   restrictive housing inmates separated out and

24   particularly if they had done measures where they showed

25   poor performance in clinical care of restrictive housing

1   inmates, I would be interested in that and interested in

2   what the response to that finding was.

3        Q    Okay.  So, for example, if there were a

4   performance measure responding to sick call requests

5   within a certain amount of time, would you want to see

6   the outcome of that?

7        A    Again, are we talking -- that was a very broad

8   question.  Are you talking in general for -- for the

9   facilities --

10       Q    Yes.

11       A    -- all over Florida?

12       Q    Yes, in general.

13       A    I can say that we periodically do that, but

14  it's not a constant just because we want to make sure

15  that we're staffing well enough and getting that job

16  done.

17       Q    Okay.  If Florida is looking into that and

18  recording that information, that's something that you

19  would want to see, isn't it?

20       A    Now, again, are we talking in general or in

21  general population versus restrictive housing cut out --

22       Q    Just in -- just in general.

23       A    In general, I don't think that would be all

24  that helpful for what I'm doing here which is the

25  question of restrictive housing versus general

1   population.

2              I believe the process is to review all of

3   them daily and make appropriate appointments and such for

4   inmates in or out of restrictive housing.  So that would

5   depend on the individual as to the timing and the

6   appropriateness.

7              But since they're handled together,

8   decision-making process is together and there's not a

9   differentiation.

10      Q    Okay.  What about if there were a measure of

11  whether a prescribed medication was actually provided?

12              MS. SMITH:  Objection.

13      Q    (BY MR. TREVISANI)  If there were a quality

14  assurance measure on that, would you want to see that?

15              MS. SMITH:  Overbroad.

16      A    What do you mean by "provided"?

17      Q    (BY MR. TREVISANI)  Provided to the inmate.

18      A    I'm sorry.  Can you repeat that?

19      Q    Provided to the inmate.

20      A    Are you talking administered?

21      Q    Yes.

22      A    So pill line, essentially, medications?

23      Q    I'm talking about any -- any aspect of

24  providing, administering medications to the inmates.

25              MS. SMITH:  Objection; overbroad and

1    vague.

2         A    So are you including whether or not it's been

3    prescribed in the first place?

4         Q    (BY MR. TREVISANI)  I'm saying if there is an

5    outcome measure that is prescribed medication is actually

6    administered to the inmate, is that something that you

7    would want to see the quality assurance results from?

8         A    Okay.  And we're talking about the

9    administration of medication, which is -- which is

10   someone directly giving that dose to a patient?

11        Q    Yes.

12        A    We don't generally do that.  That would be

13   prohibitive because it's so many.  Generally that's done

14   on a -- on a need basis combined with looking at misses

15   or near events; that is, if a wrong medication was given

16   to somebody on a -- administered to somebody, like giving

17   someone else -- someone else's medication to a -- to a

18   different patient, that sort of thing.

19        Q    So that's not so --

20        A    And I'm -- I'm sorry.

21        Q    Go ahead.

22        A    But as far as I'm aware, that hasn't been

23   parsed out restrictive housing versus general population

24   as far as who gets administered their medication.

25   They -- all of the medications that are administered are

1   logged on the MAR, each and every dose.  But -- go ahead.

2          Q    What about in -- well, let me ask it this way:

3   Is one of the quality assurance issues that you looked at

4   whether requested follow-up visits are actually

5   scheduled?

6          A    Now, are we talking requested as part of an

7   order or protocol or requested by the inmate?

8          Q    No.  As part of -- ordered by a doctor or a

9   provider.

10         A    We -- we periodically look on our wait times

11  for appointments in general and -- and our timing on

12  chronic care.  This is -- we have a series of them, as

13  many do, areas that we have chronic care, special

14  interests in like diabetes, high blood pressure,

15  cardiovascular disease, renal disease and the like.  And

16  whether or not those are kept -- the measures are looked

17  at periodically.  It's not a constant thing.

18         Q    Okay.  Did you look at that in Florida?

19         A    Did I look at that?

20         Q    Correct.

21         A    No, I did not.

22         Q    All right.  What about other kind of --

23         A    That would be prohibitive.

24         Q    Well, I mean, do you look at any quality

25  assurance documents for review?

1        A    I wasn't aware of any documents that parsed out

2    restrictive housing versus general population.

3        Q    So you didn't look at any of those documents?

4        A    Correct.  Because none of them referred to

5    that -- that difference.

6        Q    What about other kinds of --

7        A    Or that I was aware of.  I have to qualify

8    that.

9                  Sorry.  Go ahead.

10       Q    What about in Oregon in your quality assurance,

11   do you look at other medical outcomes like

12   hospitalizations, disease exacerbations, emergency room

13   visits, the outcomes versus the process things?  Do you

14   look at those in Oregon?

15                  MS. SMITH:  Objection; compound; vague;

16   overbroad.

17       A    Are you asking me are we looking at the patient

18   outcomes from the emergency room visits?

19       Q    (BY MR. TREVISANI)  As part of your quality

20   assurance in Oregon, do you look at patient outcomes?

21       A    From -- from which perspective?

22       Q    From the perspective of did they receive

23   appropriate medical care and -- yeah.

24       A    Okay.  But you're talking about a very, very

25   broad picture here in the outcomes.

1      Q     Right.  So I'm asking, I mean -- well, let me

2   ask about one specifically.

3              Do you look at outcomes like

4   hospitalizations?

5              MS. SMITH:  Objections.

6              THE WITNESS:  Go ahead, Nicole.

7              MS. SMITH:   I just said vague, but go

8   ahead.

9      A     We review our hospitalizations, yes, and the

10  outcome that -- that I do most often is whether or not

11  the care was appropriate within the hospital and -- and

12  that's more of our taking a look that we're getting what

13  our patients need.

14     Q     (BY MR. TREVISANI)  Do you agree that's

15  something that's important to do?

16     A     It certainly can be, particularly if we're

17  getting perceived problems with care from a certain

18  facility, but these things are often periodic and

19  focused, not -- not constantly done.

20     Q     Is the Florida Department of Corrections doing

21  that?

22             MS. SMITH:  Objection; vague.

23     A     I'm not aware of -- of any, and particularly

24  I'm not aware of any that parse out restrictive housing

25  versus general population, which is the -- the issue at

1    hand.

2         Q    (BY MR. TREVISANI)  Okay.  Do you think Florida

3    should be doing that?

4              MS. SMITH:  Objection; vague; overbroad.

5         A    Should be doing which?

6         Q    (BY MR. TREVISANI)  Looking at outcomes of

7    hospitalizations, looking at the appropriateness of care

8    just like you said you were doing.

9         A    I think they should be doing it as it's

10   appropriate to their practice.

11        Q    Okay.  Are you aware of any of the Florida

12   Department of Corrections' auditing of the medical care

13   provided by Centurion?

14              MS. SMITH:  Objection; overbroad; asked

15   and answered.

16              Go ahead.

17        A    Just what I read about the discussions

18   particularly in the deposition of Paula Foskey.

19        Q    (BY MR. TREVISANI)  Okay.  And did -- did you

20   review any of those audits?

21        A    No, I haven't, again, because they weren't any

22   parsing out restrictive housing versus general population

23   that I was aware of.

24              MR. TREVISANI:  I think this is maybe a

25   good place to take a lunch break.  Well, it's lunch for

1    us on the East Coast.  Say, half an hour or maybe 35

2    minutes, come back at 1 o'clock Eastern.

3                    MS. SMITH:  Sure.  Eastern, good.

4                    (Lunch break taken from 12:24 p.m. to 1:04

5    p.m.)

6        Q    (BY MR. TREVISANI)  Okay.  Dr. Paulson, if you

7    could turn to Page 11 of your declaration.

8        A    Yes.

9        Q    At the bottom, or the last paragraph, you

10   reference the World Health Organization, right?

11       A    Right.

12       Q    Okay.  Do you agree that the World Health

13   Organization is an authoritative body on this issue in

14   terms of providing health care?

15                   MS. SMITH:  Objection; vague.

16       A    I wouldn't call them that in reference to the

17   Florida Department of Corrections in particular.  Their

18   mission is far too -- too broad for that.

19       Q    (BY MR. TREVISANI)  Okay.  Is this an

20   organization that medical profession should --

21   professionals should listen to?

22                   MS. SMITH:  Objection; vague.  Overbroad.

23       A    I think they certainly can include that

24   particularly when taking a whole world view of diseases.

25                   MR. TREVISANI:  Okay.  Could you pull up

1    the exhibit called "WHO - Prisons and Health."

2                    THE REMOTE TECHNICIAN:  Please stand by.

3                    (Exhibit 4 marked.)

4                    THE REMOTE TECHNICIAN:  This will be

5    Exhibit 4.

6                    MR. TREVISANI:  Great.

7                    THE REMOTE TECHNICIAN:  It's there on

8    screen.  And would you like control?

9                    MR. TREVISANI:  And can you give me

10   control.

11                   THE REMOTE TECHNICIAN:  Sure.

12                   MR. TREVISANI:  Yes, please.

13                   THE REMOTE TECHNICIAN:  You have control.

14        Q    (BY MR. TREVISANI)  All right.  So,

15   Dr. Paulson, this is the World Health Organization

16   article called "Solitary confinement as a prison health

17   issue."  And I've taken it from the certain notes that

18   you've cited.

19                   Did you read this document in preparation

20   your declaration?

21        A    Yes.

22        Q    Okay.  Can you read it there on the screen or

23   do I need to make it bigger?

24        A    I've got it, I think.

25        Q    Okay.  So I just want to ask you a few

1    questions about it.  This first bullet point on here, and

2    it's on Page 27 of the exhibit that reads, "Solitary

3    confinement is used in prison systems across the world."

4              Do you agree with that?

5       A    I don't have any way of agreeing with that.  I

6    haven't looked across the world.  I'm not sure what

7    across the world means.

8       Q    Okay.  The second bullet here, "Research

9    demonstrates that solitary confinement has a negative

10   impact on the health and well-being of those subjected to

11   it, especially for a prolonged time."

12             Do you agree with that?

13      A    I haven't seen such research, and particularly

14   that it might be relevant to Florida.

15      Q    But do you agree that the research exists?

16      A    No.  I haven't seen it.

17      Q    Okay.  So you don't know one way or another?

18      A    Correct.

19      Q    Okay.  And you didn't review any of this

20   research to form your opinion in this case?

21             MS. SMITH:  Objection; vague.

22      A    Obviously, if I haven't seen it.

23      Q    (BY MR. TREVISANI)  Okay.  Next bullet, "Those

24   with pre-existing mental illness are particularly

25   vulnerable to the effects of solitary confinement."

1          Do you agree with that?

2          MS. SMITH:  Objection; overbroad.

3     A     That's outside of my expertise.

4     Q     (BY MR. TREVISANI)  Okay.  So you have no

5 opinion on whether that's true or not?

6     A     It's outside of my expertise.

7     Q     Okay.  Next bullet, "Solitary confinement can

8 affect rehabilitation efforts and former prisoners'

9 chances of successful reintegration into society

10 following their release."

11          Do you agree with that?

12          MS. SMITH:  Objection; overbroad.

13     A     Again, that's outside of my expertise.

14     Q     (BY MR. TREVISANI)  Okay.  So if you -- if you

15 made any statements in your declaration about the former

16 prisoners' chances of successful reintegration, you're

17 saying that those would not be within your area of

18 expertise?

19          MS. SMITH:  Objection; vague.  Overbroad.

20 Predicate.

21     A     It would depend on the circumstance.

22     Q     (BY MR. TREVISANI)  Okay.  Going down here to

23 the bottom, this part that I am highlighting, and it

24 says, "The term 'solitary confinement' refers to the

25 physical and social isolation of an individual in a

1    single cell for 22.5 to 24 hours a day, with the

2    remaining time typically spent exercising in a barren

3    yard or cage."

4              Do you agree with this definition of

5    solitary confinement?

6              MS. SMITH:  Objection; vague.

7         A    I've heard --

8              MS. SMITH:  Go ahead.

9         A    I've heard various definitions.

10        Q    (BY MR. TREVISANI)  So do you agree with this

11   one?

12             MS. SMITH:  Same objection.

13        A    I can't say that I do.  I haven't -- I haven't

14   formed my own definition of solitary confinement.

15   Although, I would point out, and my reason for pointing

16   this out and including it is it includes deprivation of

17   social -- as deprivation of social contact -- did I put

18   that -- that the deprivation of human contact later on

19   such that the hours in or out of cell were not enough

20   even for the World Health Organization to declare

21   something solitary confinement.

22        Q    (BY MR. TREVISANI)  So this one I have just

23   read to you, that's the -- that's the World Health

24   Organization's definition of solitary confinement, right?

25        A    Yes.  I believe a little farther on in the

1    article, you'll see that that's further expanded as far

2    as social isolation.

3         Q    Okay.  Does the administrative confinement, as

4    it exists in Florida on -- according to policy, does that

5    meet this definition of solitary confinement?

6         A    I don't believe so because it doesn't -- it

7    doesn't include deprivation of human contact.

8         Q    So you think -- I'm sorry.

9              MS. SMITH:  Dr. Paulson, are you finished

10   with your answer?

11        A    Yes.  I was checking my wording.

12        Q    (BY MR. TREVISANI)  So you think that the World

13   Health Organization definition of solitary confinement

14   includes more than this definition that I've just read to

15   you which involves the isolation 22.5 to 24 hours a day,

16   correct?

17        A    It says physical and social isolation.

18        Q    Well, it doesn't say that in what I just read

19   you, right?

20        A    It says it right there, "The term solitary

21   confinement refers to the physical and social isolation

22   of an individual in a single cell for 22.5 to 24 hours a

23   day."

24        Q    So what's social isolation?

25              MS. SMITH:  Objection; vague.

1          A     A little further on, they expand that to say

2     the deprivation of human contact inherent in solitary

3     confinement.

4          Q     (BY MR. TREVISANI)  So prisoners in Florida in

5     administrative confinement, they're in their cell 22.5 to

6     24 hours a day, right?

7          A     I'm sorry, could you rephrase that again --

8     that again.

9          Q     Prisoners in administrative confinement,

10    according to policy in Florida, are in their individual

11    cells 22.5 to 24 hours a day, right?

12         A     I don't know that's their policy.  I can't

13    swear to that.

14         Q     Okay.  Is that something that would be

15    important for you to form your opinion?

16         A     Well, it would be a factor --

17         Q     Okay.

18         A     -- to know the overall.  But it's a more

19    complex matter than that.

20         Q     And what sort of human contact could prisoners

21    in administrative confinement have?

22         A     Well, I believe I went through a list.  But it

23    includes contact with the officer every 30 minutes,

24    contact with a nurse once a day, at a minimum, as well as

25    the grievance counselor, the grievance coordinator, and

1  the -- the warden's rounds.  What do you call that?

2        Q     Does that happen in every system?

3              MS. SMITH:  Objection; vague.

4        Q     (BY MR. TREVISANI)  In every prison?  Does that

5  happen in every prison system in the United States?

6              MS. SMITH:  Objection; vague.

7        A     I have no way of knowing that.

8              MS. SMITH:  Predicate.

9        Q     (BY MR. TREVISANI)  Do you know of any prison

10 system in the United States that holds people without

11 doing periodic security checks?

12             MS. SMITH:  Objection; vague.  Overbroad.

13       A     Okay.  You're going to need to be a little more

14 specific for me to answer that.  You just said "holds

15 people."  All prisons hold people in everywhere that they

16 hold -- that they have them.

17       Q     (BY MR. TREVISANI)  Holds people in individual

18 cells?

19             MS. SMITH:  Same objection.

20       A     And again, I am not -- I don't understand your

21 question.  A lot of my general population patients are in

22 a cell -- the solo cells, so they are being held in solo

23 cells in general population.

24       Q     (BY MR. TREVISANI)  Do you know of any system

25 in the United States that uses solitary confinement as

1  you've defined it?

2       A    I --

3            MS. SMITH:  Objection; vague.

4       A    I'm not aware of any.

5       Q    (BY MR. TREVISANI)  So your --

6       A    But again, I didn't -- I haven't defined it.  I

7  have just -- I have just shared other's definition,

8  including the NCCHC which -- which actually gives a

9  number to the human contact, social contact, fewer than

10 three human contacts per 24-hour period.

11      Q    Let me rephrase it.

12           Do you think that -- are you aware of any

13 prison system in the United States that uses solitary

14 confinement as the World Health Organization defines it?

15      A    It would depend on -- on how you would look at

16 social isolation and the deprivation of human contact.

17 By the hours --

18      Q    I agree.

19      A    -- I wouldn't be surprised.  But I don't know.

20      Q    So -- so you're not aware of any system that

21 practices solitary confinement as defined by the World

22 Health Organization?

23            MS. SMITH:  Objection; vague.

24      A    Not that I'm aware of.

25      Q    (BY MR. TREVISANI)  Okay.  So same question.

1    I'm not sure if I asked about disciplinary confinement.

2    But disciplinary confinement, according to policy in

3    Florida, does that meet the W.H.O. definition of solitary

4    confinement?

5         A    I don't believe so.

6         Q    Okay.  Same question for Close Management 1?

7         A    The same answer.

8         Q    And what about Close Management 2?

9         A    The same answer.

10        Q    What about Close Management 3?

11        A    The same answer.

12        Q    What about maximum management?

13        A    The same answer.

14        Q    So if you could read at the bottom right of

15   Page 27, if you could just read this -- the paragraph

16   that starts right here and then continues on to Page 28,

17   and let me know when you're done.

18        A    I can't see part of it.  To the -- to the right

19   it's covered with the Zoom tiles.

20             Can you -- can you roll it down about an

21   inch and a half?  There.

22        Q    There?

23        A    And roll up a little bit.

24             Okay.  I have read it.

25        Q    Okay.  And this sentence that I'm highlighting

1  here which I'm going to read says, "Finally, the degree

2  and quality of human contact prisoners enjoy varies

3  greatly, from no human contact other than with silent

4  prison staff who deliver food and medication to the

5  prisoner inside his cell, to regular contact with family,

6  lawyers, and religious personnel and so on."

7          That sentence is describing solitary

8  confinement, right?

9          MS. SMITH:  Objection; vague.

10     A    That is what this World Health Organization

11  publication has.

12     Q   (BY MR. TREVISANI)  Correct.  So doesn't this

13  mean that the World Health Organization considers

14  something to be solitary confinement even if the inmates

15  have contact with staff delivering food and medication?

16          MS. SMITH:  Objection; predicate.  Calls

17  for speculation.  Overbroad.

18     A   I -- I don't know if this is a -- an approved

19  policy of the World Health Organization at -- at the

20  present time or even at all.  It's -- it's a -- it's a --

21  an article that they include, so I would -- my answer

22  would be that I don't know this is -- is the World Health

23  Organization's current definition as a -- as -- as a

24  group as a whole.

25     Q   (BY MR. TREVISANI)  Well, the definition that

1   I -- that we just went over, that's in this publication,

2   right?

3       A    That's in this publication, but this

4   publication is -- is -- is one person's writing; the

5   World Health Organization publishes it.  I don't know

6   that -- that a counsel or committee has been -- has been

7   put together by the World Health Organization to look

8   into this matter and -- and opine on it similarly to what

9   the U.S. Department of Justice did in 2016.  That's a

10  different matter.  So -- so --

11      Q    Okay.

12      A    -- applying this -- applying this to this is

13  World Health organization's official opinion, is probably

14  going too far.

15      Q    Okay.  So then you don't think this definition

16  from -- that is in this publication, can you say that

17  this is the World health Organization's definition of

18  solitary confinement?

19           MS. SMITH:  Objection; asked and answered.

20      A    I'm not aware this is their official opinion.

21  This is an opinion piece that they --

22      Q    (BY MR. TREVISANI)  Okay.

23      A    That they published, and in my search, I didn't

24  find anything better.  So I don't have any reason for

25  them to -- to -- that they have disagreed with this or

1    they have adopted this as an official policy of the -- of

2    the World Health Organization as -- as a whole.  It is

3    information that's interesting, and as far as I'm aware,

4    they haven't refuted it either.

5         Q    Does the World Organization typically publish

6    these articles without their approval?

7                   MS. SMITH:  Objection; predicate.

8         A    That, I have no way of knowing.

9         Q    (BY MR. TREVISANI)  Okay.  So according to this

10   article, this article believes that solitary confinement

11   in -- can exist even if the inmates have some contact

12   with staff delivering food and medication, correct?

13                  MS. SMITH:  Objection; predicate.

14        A    They say silent staff.

15        Q    (BY MR. TREVISANI)  Okay.  So the -- it's --

16   and, well, similarly, this article considers something to

17   be solitary confinement even if the person has regular

18   contact with family, lawyers, and religious personnel?

19                  MS. SMITH:  Objection; predicate.

20        A    I'm sorry, you've got to roll back up -- or

21   back down for me.  I'm sorry, I've have lost track of

22   where that was.

23                  Oh, there it is, right down there.

24        Q    (BY MR. TREVISANI)  It's right here

25   (indicating).

1      A    Yes, at the end there they say, "to regular

2   contact with family, lawyers, religious personnel and so

3   on."

4      Q    So if prison has this, they can still be in

5   solitary confinement, correct, according to this paper?

6                MS. SMITH:  Objection; predicate.  Vague.

7      A    I imagine if that's included in -- in

8   deprivation of human contact.  So if the family member

9   visits for 30 minutes every other year, that still would

10  be what anyone would call a deprived situation, yet able

11  to have regular contact yearly.

12     Q    (BY MR. TREVISANI)  Back up on Page 27, I want

13  to read you from this area right here.  Do -- let me see.

14  Hold on.

15                Do Florida prisoners in restrictive

16  housing have limited, if any, access to educational,

17  vocational, and recreational activities?

18                MS. SMITH:  Objection; predicate.  Scope.

19     A    Limited, if any -- as far as I am aware, they

20  have limited, if any, access to those things.

21     Q    (BY MR. TREVISANI)  Okay.

22     A    Although I'm not sure regarding education.  I

23  think that's only limited in AC and DC.  I can't be sure.

24     Q    Okay.  In restrictive housing in Florida, is

25  the number and type of personal belongings allowed in

1    prisoners' cells small?

2              MS. SMITH:  Objection; vague.

3        A    That's a --

4        Q    (BY MR. TREVISANI)  My -- my mistake.  Let me

5    rephrase it.

6        A    That's a pretty -- that's a pretty vague

7    opinion.  What's small?

8        Q    My -- that was my fault.  That was a bad

9    question.  Let me ask it again.

10             In Florida in restrictive housing, is the

11   number and type of personal belongings allowed in

12   prisoner cells highly restricted and closely regulated?

13             MS. SMITH:  Objection; compound.  Vague.

14   Overbroad.

15       A    Again, I don't know what highly restricted and

16   closely regulated -- I guess that would exclude mildly

17   restricted.  And I'm not aware of any -- are there any

18   windowless cells?  Maybe.  Anyhow...

19       Q    (BY MR. TREVISANI)  Okay.  In Florida in

20   restrictive housing, are family visits held through a

21   glass barrier?

22             MS. SMITH:  Objection; overbroad.

23       A    My understanding is that some are.

24       Q    (BY MR. TREVISANI)  Okay.  In restrictive

25   housing in Florida, when prisoners leave their cells, are

1    they escorted by a minimum of two guards?

2                    MS. SMITH:  Objection; overbroad.

3        A    It depends.

4        Q    (BY MR. TREVISANI)  Okay.  When prisoners in

5    restrictive housing in Florida leave their cells, are

6    they restrained in handcuffs?

7                    MS. SMITH:  Objection; overbroad.

8        A    It depends.

9        Q    (BY MR. TREVISANI)  Okay.  Are they restrained

10   with leg irons and body belts?

11                   MS. SMITH:  Objection; overbroad.

12       A    It depends.

13       Q    (BY MR. TREVISANI)  Okay.  Before they're

14   returned to their cells, are they body searched?

15                   MS. SMITH:  Objection; overbroad.

16       A    Again, it depends.

17       Q    (BY MR. TREVISANI)  Okay.  Before they're

18   returned to their cell, are they subject to a full body

19   cavity search?

20                   MS. SMITH:  Overbroad.

21       A    Full body cavity search?  I'm not aware of that

22   going on at all, but...

23       Q    (BY MR. TREVISANI)  Okay.

24       A    I (inaudible).

25       Q    Okay.  If you're on Page 28, it says the "three

1    main factors are inherent in all solitary confinement."

2    We talked about social isolation.  Do prisoners in

3    restrictive housing in Florida, are they subjected to

4    reduced activity and environmental input?

5              MS. SMITH:  Objection; overbroad.

6    Compound.  Vague.

7        A    I wouldn't say reduced activity because that's

8    available to them within their cell -- physical activity,

9    that is.  The environment is going to be different, yes.

10       Q    (BY MR. TREVISANI)  Okay.  Are they subjected

11   to a loss of autonomy control almost -- over almost all

12   aspects of daily life?

13             MS. SMITH:  Objection; overbroad.  Vague.

14       A    The almost always is -- is -- almost all is

15   undefined.

16       Q    (BY MR. TREVISANI)  Okay.  So here at the

17   bottom left of Page 28 -- well, let me back up to here --

18   it says,  "The rich body of literature that has

19   accumulated since that time on the effects of" -- "on

20   health of solitary confinement largely echoes these

21   observations and includes anxiety, depression, anger,

22   cognitive disturbances, perceptual distortions, paranoia

23   and psychosis among other symptoms resulting from

24   solitary confinement."

25             Do you agree that those symptoms can

1    result from solitary confinement?

2                    MS. SMITH:  Objection; predicate.

3    Overbroad.

4        A    I haven't done a study of solitary confinement

5    as to these -- you know, by -- by some of these

6    definitions.  I don't -- I'm not aware of -- of

7    circumstances that are -- that are called solitary

8    confinement in systems, so I'm not sure this applies.

9        Q    (BY MR. TREVISANI)  Okay.  The next sentence,

10   "The levels of self-harm and suicide, which are already

11   much higher among prisoners than in the general

12   population, rise even further in segregation units."

13                   Do you agree with that?

14                   MS. SMITH:  Objection; overbroad.

15   Predicate.

16       A    I would have to see the research, but it

17   doesn't define segregated units.

18       Q    (BY MR. TREVISANI)  Well, do you have any basis

19   to disagree with that?

20                   MS. SMITH:  Same objection.

21       A    I would have to see research that proved a

22   negative.

23       Q    (BY MR. TREVISANI)  From your -- the work that

24   you've done here, is this true in restrictive housing in

25   Florida?

1          MS. SMITH:  Objection; vague.

2     A    That's outside of my expertise.

3     Q    (BY MR. TREVISANI)  Okay.  The next sentence

4 says, "The effects on health of solitary confinement

5 include physiologic signs and symptoms," and it gives the

6 whole list there.

7          And I'll give you a minute to just read

8 those.  Let me know when you're done.

9     A    Yes, I've read it.

10     Q    Okay.  That the effects on health of solitary

11 confinement include these physiological signs and

12 symptoms listed here?

13     A    Again, similar to my previous answers, I have

14 not read that literature in solitary confinement and

15 there isn't any solitary confinement in Florida, or that

16 I'm aware of in the United States, that meets the harsh

17 guidelines -- the harsh things that are included in a lot

18 of these definitions and particularly the NCCHC.

19          So I haven't even studied as to --

20     Q    Do you know if --

21     A    I'm sorry.  I haven't made a study of

22 conditions that -- that don't exist in Florida or my own

23 system.

24     Q    Do you know if any of the research supporting

25 this has been conducted on prisoners in the United

1    States?

2         A    I don't know.

3         Q    Okay.  And then the next part says,

4    "Psychological symptoms occur in the following areas and

5    range from acute to chronic," and it lists a whole bunch

6    of psychological issues.

7              Do you have an opinion on whether solitary

8    confinement is associated with these psychological

9    symptoms?

10        A    That's outside of my expertise.

11        Q    Okay.  Going on to Page 29, I'd like to read

12   this sentence here that I'm highlighting.  "There is,

13   however, and regardless of these variables and with a few

14   notable exceptions, a general consensus among health

15   practitioners and researchers that solitary confinement

16   adversely affects health and well-being and prisoners'

17   chances of successful reintegration into society."

18             First question is, do you agree that a

19   general consensus like that exists?

20             MS. SMITH:  Objection; overbroad.

21        A    I don't know where this comes from.

22        Q    (BY MR. TREVISANI)  So do you have an opinion

23   on whether they're -- a general consensus exists?

24        A    I don't know what general consensus that

25   they're referring to in -- in what -- in what area of

1    research.

2              Are we -- are we talking about general

3    over the whole world?  If so, the population in the

4    United States is pretty small.

5         Q    Okay.  Do you -- besides of the general

6    consensus, do you agree that solitary confinement

7    adversely affects health and well-being and prisoners

8    chances of successful reintegration into society?

9              MS. SMITH:  Objection; compound.

10   Overbroad.

11        A    Health and well-being are -- are -- are pretty

12   vague matters.  I haven't seen research that shows good

13   medical evidence of medical harm from the type of

14   restrictive housing that Florida Department of

15   Corrections has.

16             MR. TREVISANI:  We can take down this

17   exhibit now.  Thank you.

18        Q    (BY MR. TREVISANI)  Can you turn to Page 13 of

19   your declaration, please.

20        A    Okay.

21        Q    The last paragraph above the heading, I am

22   going to read it, "It is, therefore, absolutely incorrect

23   to say that there is any common class of inmates in

24   regard to this central and crucial area of human

25   encounter; the area that is at the core of the very

1    definition of Isolation and Solitary Confinement."

2                    Did I read that right?

3        A    Yes.

4        Q    Okay.  Is that a medical opinion?

5                    MS. SMITH:  Objection; vague.

6        A    Medical opinion?  In the sense that this all

7    was a consideration of various types of restrictive

8    housing and including, according from the plaintiff's

9    types of housing, that doesn't exist in Florida

10   Department of Corrections down to housing with a lot

11   of -- of outside time and such and, you know, in

12   comparison and that the experience of -- of the inmates

13   varies a great deal as to -- it -- a great deal as to

14   human encounter.

15       Q    (BY MR. TREVISANI)  But there is -- you didn't

16   use your medical expertise to arrive at that opinion,

17   right?

18       A    In -- in the -- in the sense that -- that -- in

19   the sense that I was responding to the question of

20   whether or not there was a -- a common class of people

21   that are -- that have the same human encounter

22   experience.

23       Q    But that's not a medical question, is it?

24       A    I -- it's not a medical question in a medical

25   diagnosis, no.

1      Q      You -- in terms of your opinion about the
2  common class, you would agree that all of the inmates in
3  restrictive housing in Florida are not in solitary
4  confinement, right?
5                  MS. SMITH:  Objection; vague.  Overbroad.
6      A      That I would agree that not all of the inmates
7  are in solitary confinement, is that the question?
8      Q      (BY MR. TREVISANI)  No.  You told me that you
9  don't think solitary confinement as is practiced in
10  Florida exists, so would you agree that all of the
11  inmates in restrictive housing in Florida are not in
12  solitary confinement?
13      A      As far as I am aware, yes, according to these
14  definitions.
15      Q      So they all have -- they all have that in
16  common, right?
17      A      Well, putting them together, yes, and
18  particularly the NCCHC which defines social isolation
19  as -- as less than three human encounters in a 24-hour
20  period.
21      Q      If you go back to Page 12 of your declaration,
22  Footnote 3, you cite the American Correctional
23  Association; is that right?
24      A      Yes.
25      Q      And you say that they don't have the terms

1    isolation or solitary confinement.  Does the ACA use the

2    term restrictive housing?

3        A    Yes, that's what I wrote here, "They use the

4    term restrictive housing."

5        Q    Do you know what -- sorry.

6        A    I wrote here, they use the term restrictive

7    housing.

8        Q    Do you -- do you know how the ACA defines the

9    term restrictive housing?

10       A    Not off the top of my head.

11       Q    Okay.  Could we pull up the exhibit called "ACA

12   March 2021 - glossary selection."

13                THE REMOTE TECHNICIAN:  Please stand by.

14                MS. SMITH:  Dante, is this going to be

15   Exhibit 5?  Is that what we have?

16                THE REMOTE TECHNICIAN:  This is Exhibit 5.

17                MR. TREVISANI:  I am hoping Merinda is

18   keeping track of that.

19                THE REMOTE TECHNICIAN:  Yeah.  This is

20   Exhibit 5.  Please stand by.

21                (Exhibit 5 marked.)

22                THE REMOTE TECHNICIAN:  It's on screen,

23   and you have --

24                MR. TREVISANI:  Okay.

25                THE REMOTE TECHNICIAN:  You have remote

1   control.

2                   MR. TREVISANI:  Thank you.

3        Q    (BY MR. TREVISANI)  So I have just excerpted

4   the glossary, one page of the glossary there because it's

5   such a long document.

6                   But this is the ACA, that's the cover,

7   that's the first page of the glossary, and then this here

8   the definition of restrictive housing.  Can you read

9   that?

10       A    Yes.  Restrictive housing, "A placement that

11  requires an inmate to be confined to a cell at least 22

12  hours per day for safe and secure operation of the

13  facility."

14       Q    Okay.  Do you agree with that definition of

15  restrictive housing?

16                  MS. SMITH:  Objection; vague.  Overbroad.

17       A    I -- I don't.  When I use restrictive housing,

18  it includes housing that has the more than two hours per

19  day outside the cell as well.

20       Q    (BY MR. TREVISANI) Okay.  Well -- okay.  Well,

21  just -- let's just -- to be clear about a couple things,

22  so this definition of restrictive housing, that doesn't

23  depend on the number of encounters per day, right?

24       A    This definition doesn't state that.

25       Q    Okay.  But this definition is essentially the

1    same as the W.H.O. definition of solitary confinement,

2    right?

3                  MS. SMITH:  Objection; predicate.  Vague.

4         A    No, for two reasons:  That the hours are

5    different and -- and solitary -- and the solitary

6    confinement is not the same thing as restrictive housing.

7         Q    Well, okay, so the hours are different?

8         A    And most -- I'm sorry.  Go ahead.

9         Q    Well, I understand that the hours are

10   different.  But the W.H.O. defines solitary

11   confinement -- I don't have it front of me, but I believe

12   it refers to the physical and social isolation of an

13   individual in a single cell for between 22.5 and 24 hours

14   per day.

15                  Other than the differences in the time,

16   that's essentially the same definition of -- as -- that

17   the ACA uses of restrictive housing, isn't it?

18        A    No.

19                  MS. SMITH:  Objection; vague.

20        Q    (BY MR. TREVISANI)  Why not?

21        A    The social isolation component.

22        Q    Okay.  So the ACA definition of restrictive

23   housing has no social isolation component, right?

24        A    Not in this -- not in this definition, no.

25        Q    Okay.  Do you agree that the ACA definition of

1    restrictive housing describes restrictive housing in

2    Florida?

3              MS. SMITH:  Objection; overbroad.

4         A    No, for reasons I gave before.

5         Q    (BY MR. TREVISANI)  What are those reasons?

6         A    That Florida has -- has inmates with much more

7    out-of-cell time in some of their units and levels.

8         Q    Okay.  Are there any levels of restrictive

9    housing in Florida that meet this ACA definition?

10        A    I don't know.

11        Q    Okay.  What about disciplinary confinement?

12        A    I can't say for absolutely because I haven't

13   seen or -- seen all the DC in the -- in the places and I

14   didn't ask this question in particular.

15              But my -- my general observation is --

16   is -- is that the 22 hours does apply to -- is -- is what

17   the DC housing includes.

18        Q    Okay.  What about --

19        A    I'm thinking that as I'm talking, the various

20   places I've seen and the questions that I asked.  But I

21   think that the DCs are in 22 hours per day or more.

22        Q    Okay.  And what about Close Management 1?

23        A    Close Management 1, I think, is quite similar,

24   but again, I -- I can't swear to it because I can't

25   recall every -- every institution.

1      Q     And just to be clear, when you say quite

2    similar, you mean quite similar to disciplinary

3    confinement?

4      A     Yeah, as I understand it.  Again, this is out

5    the -- this is a bit outside my area, but I believe

6    that's so.

7      Q     Okay.  And I should have asked you this before.

8    But did you review the Florida Administrative Code

9    provisions that describe the privileges and the various

10   levels of restrictive housing?

11     A     I can't recall.

12     Q     Okay.  How did you learn about the various

13   privileges in restrictive housing in Florida?

14     A     Talking to the staff and -- and a large part

15   listening while Mr. Reid talked to the staff and the --

16   and the leaders.

17               MR. TREVISANI:  Okay.  We could take this

18   exhibit down.

19     Q     (BY MR. TREVISANI)  Going back to your

20   declaration at Page 12.

21     A     Okay.

22     Q     The -- the paragraph that starts, "At an

23   absolute bare minimum," I'm going to read it.  "At an

24   absolute bare minimum, every inmate can encounter and

25   briefly interacts with a correctional officer twice an

1    hour, for a total of 48 opportunities a day."

2                    Did I read that right?

3        A    Yes.

4        Q    Okay.  Did you observe these interactions

5    happening when you toured the facility?

6        A    Yes.  I, in fact, a couple of places watched

7    the officers go cell to cell, but not for an entire shift

8    or anything like that.

9        Q    Okay.  So do you know -- your -- your opinion

10   that there are -- they're happening 48 times per day

11   is -- is based on the rule that requires security checks

12   every 30 minutes, correct?

13       A    And speaking to the line officers, their

14   supervisors, and the leadership.

15       Q    Okay.  You didn't -- obviously you didn't

16   observe all 48 encounters happen when you were there,

17   correct?

18       A    Yeah, I didn't spend 24 hours inside any one

19   unit.

20       Q    Did you spend more than half an hour inside any

21   one unit?

22       A    Oh, yeah, absolutely.  We spent an hour or more

23   particularly early on or where they were very different.

24   And then as you see the second and third units within a

25   particular facility, less time is spent; the fourth or

1    the fifth units sometimes.

2         Q    So of all the units, let's -- of all the

3    restrictive housing units that you saw, how many did you

4    spend more than half an hour in?

5         A    I couldn't say.

6         Q    Okay.  How many did you observe the security

7    checks happening?

8         A    Two or three, I think.

9         Q    And by the way, just to confirm -- I think I

10   know the answer -- but those 48, that's in a 24-hour

11   period, so many of those are happening overnight,

12   correct?

13        A    Correct.

14        Q    So those ones that happen overnight when the

15   inmates are asleep, they don't count for purposes of

16   counting an interaction, right?

17        A    It's an opportunity for an interaction if a --

18   if the inmate's having difficulties and is having trouble

19   sleeping, yeah, he could have a brief encounter with

20   somebody, and -- and that's a good thing.

21        Q    So you count that for purposes of determining

22   how many encounters are happening?

23        A    It's an opportunity.

24        Q    But you -- but you count it for your purposes

25   of determining whether it's an interaction in terms of

1  the definition of solitary confinement?

2                    MS. SMITH:  Overbroad.

3       A    If -- if someone has an interaction with the

4  officer during rounds, yes.

5       Q    (BY MR. TREVISANI)  But if they don't, if the

6  inmate is asleep, then that doesn't count, right?

7       A    It counts as an opportunity.

8       Q    But not as an interaction, right?

9       A    Right.

10      Q    Maybe I asked you this, maybe I didn't:  Do you

11  have a definition of solitary confinement?

12      A    No.  My -- I could certainly agree with the

13  NCCHC definition.  That sounds very solitary.

14      Q    Okay.  Did you review any reports -- well, let

15  me back up.  Are you familiar with any reports showing

16  that the security checks are not being conducted

17  regularly?

18      A    I am not aware of any reports of that.

19      Q    Okay.  If those reports existed, would you want

20  to see them?

21                   MS. SMITH:  Overbroad.

22      A    I would want to know, yes, that they -- that

23  there were reports and whether or not they were

24  investigated and whether or not they were --

25  particularly, whether or not they were found to be

1    confirmed.

2        Q    (BY MR. TREVISANI)  Okay.  So in terms of your

3    statement about the 48 opportunities for interactions,

4    you would agree that -- well, let's go with the NCCHC

5    definition which is three interactions.

6        A    Fewer than three.

7        Q    Is that right?

8        A    Fewer than three.

9        Q    Fewer than three.  So that interaction to count

10   as an interaction, it has to involve some human contact,

11   correct?

12                MS. SMITH:  Overbroad.

13       A    I would think.  I would say so, yes.

14       Q    (BY MR. TREVISANI)  Okay.  So if the

15   corrections officer just looks by -- walks by and looks

16   in, but there's no interaction, then that interaction

17   doesn't count for that purpose in solitary confinement,

18   right?

19       A    It's an opportunity, but -- but an opportunity

20   not taken.

21       Q    Okay.  But does that -- does that count?

22       A    This is --

23                MS. SMITH:  Vague.

24       A    I said it's an opportunity for interaction, but

25   an opportunity not taken.

1      Q     (BY MR. TREVISANI)  Right.  But I'm asking in

2  you determining whether something qualifies as solitary

3  confinement, fewer than three interactions, does that

4  count as an interaction for your purpose?

5              MS. SMITH:  Objection; vague.

6      A     If -- if someone chooses not to have any

7  interactions, it -- it doesn't matter where they are,

8  they're choosing not to have any interactions, so you

9  know, I am leaning more on opportunity and reasonable

10  opportunity, but someone could choose not to interact.

11      Q     (BY MR. TREVISANI)  And so, the answer is yes,

12  that would count for your purpose of defining solitary

13  confinement, right?

14      A     If someone chose not to interact?  Well, that's

15  a personal choice.  That's -- it's -- it's a personal

16  isolation, seeking isolation, not -- not -- not isolation

17  necessary -- necessitated by the circumstances.  There's

18  no opportunity for interaction.

19              I'm not saying that every inmate has 48

20  interactions per day, I am saying that they have the

21  opportunity for that and they could easily have many

22  times the minimum each and every day, very easily.

23      Q     Okay.  So in your mind, the definition depends

24  on the opportunity, not the actual interaction, right?

25      A     Right.

1      Q    Okay.

2      A    Reasonable opportunity, mind you.

3      Q    I want -- I want to show a video clip.  So,

4   Michelle, if you're there, can you help me out with this?

5              MS. LLOSA:  Yes, I'm here.  And I'm going

6   to share my screen.  And this is -- we'll forward to the

7   time that's on the stamp.  One second.

8              MR. TREVISANI:  And can you, Michelle,

9   just remind everybody what we're going to do in terms of

10   the -- marking the exhibits.

11              MS. LLOSA:  Yes.  So, Nicole, our proposal

12   was -- since this is a video that both parties have

13   access to, we could play it today.  And then I have

14   prepared like a one-page sheet that Merinda can show at

15   the end that will show the different time stamps, and we

16   can mark that as the exhibit so that we don't have to

17   give the vendor the copy of the video and the software

18   and all that stuff; is that -- is that okay?

19              MS. SMITH:  If you can provide us what

20   you're describing and we have opportunity to actually

21   check it -- I guess what I'm saying is I can't affirm

22   that what you've marked is correct, so yes, subject to

23   that opportunity.

24              MS. LLOSA:  Of course, yes.

25              MS. SMITH:  Thanks.

1          MS. LLOSA:  Uh-huh.

2          MR. TREVISANI:  Sure.

3      Q    (BY MR. TREVISANI)  And while that's coming up,

4  Dr. Reid, [sic] did you review any videos as part of your

5  work for this case?

6      A    Yes, at least one.  I'm trying to remember.  I

7  think that was Mr. Burgess.  Huh.

8      Q    Okay.  Was that the only video you reviewed?

9      A    That's all I recall.

10         MR. TREVISANI:  Okay.  Okay.  So for the

11  record, this is Florida State Prison B wing as in bravo,

12  first floor, August 2nd, 2019, and we're going to go to

13  the time stamp of 7 a.m. and 11 seconds.  Yeah, and you

14  can just play it from there, Michelle, but -- okay.  We

15  can start it, yeah.

16              So right now we're going to start it at

17  65932, but I'm going to note a time stamp when it gets

18  there.

19              (Video played.)

20         MR. TREVISANI:  Okay.  Can you stop it

21  there, Michelle.  Pause it there.

22              (Video stopped.)

23      Q    (BY MR. TREVISANI)  So that's 7 minutes and --

24  or I guess 7 o'clock and 11 seconds you see the two

25  people appear in the frame; is that right, Dr. Paulson?

1          A     I see two people.

2                    MR. TREVISANI:  Okay.  Go ahead, Michelle.

3                    (Video played.)

4                    MR. TREVISANI:  Okay.  And stop it there.

5                    (Video stopped.)

6          Q     (BY MR. TREVISANI)  Okay.  And then it stopped

7     at 7 minutes -- 7 and 1 minute and 11 seconds.  So that

8     took just over a minute, right, Dr. Paulson?

9          A     I'll have to take your word for it.

10         Q     Okay.  And it looked to me -- tell me if you

11    disagree -- like a security officer and a nurse walking

12    up and down the unit; is that right?

13                   MS. SMITH:  Objection; predicate.

14         A     One of them had an -- the officer's uniform on,

15    the other didn't.

16         Q     (BY MR. TREVISANI)  Okay.  Does -- does this

17    look like what a typical nursing round would look like in

18    restrictive housing?

19                   MS. SMITH:  Objection; overbroad.  And

20    vague.

21         A     I -- I don't know.

22         Q     (BY MR. TREVISANI)  Okay.  And I know it's sort

23    of hard to see, but it looks to me like there's maybe

24    about 25 or 26 cells in this wing.  Would you agree with

25    that?

1      A    That's a decent number.  How many of them are

2  occupied?

3      Q    Well, I'm not sure.  But just to -- so the --

4  to ask you, would those -- what you just saw, would

5  those officer and the nurse walking by the cell, does

6  that count as the interaction that you would take into

7  account for determining whether this was solitary

8  confinement?

9           MS. SMITH:  Objection; predicate.

10  Overbroad.

11      A    It would depend.

12      Q    (BY MR. TREVISANI)  It would depend on what?

13      A    Well, it would depend on how many of these

14  cells were occupied.

15      Q    Well, I'm just -- I'm just determining -- I'm

16  just asking for, like, for one person for when the

17  officer walks by and the nurse walked by, does that count

18  as an interaction?

19           MS. SMITH:  Objection; predicate.

20      A    The same answer, it depends on how many of the

21  cells are occupied.

22      Q    (BY MR. TREVISANI)  Why does it depend on how

23  many of the cells are occupied?

24      A    Well, if only three or four of the cells were

25  occupied, they made three or four stops.  I don't know

1    how long that took them, but long enough to say, hey, any

2    medical problems or anything you want, and move on.

3         Q    You -- you saw that in this -- in this video?

4         A    A couple of brief stops, yeah, two or three.

5    That would be enough for someone to say I'm okay.

6         Q    Okay.  I don't know whether these are fully

7    occupied or not, but let's assume all of them are fully

8    occupied.

9              Do these count as interactions for

10   purposes of determining whether this is solitary

11   confinement?

12             MS. SMITH:  Overbroad.  Predicate.

13        A    It certainly could be opportunity for

14   interactions if the norm was -- was to have for the --

15   the inmate could say, hey, you got a second, and then --

16   and then have a brief conversation.  But I don't know how

17   many are occupied.  I don't know how many of the inmates

18   wanted an interaction at this point in -- in their day.

19   There's just no useful information here.

20        Q    (BY MR. TREVISANI)  Okay.  Assuming this was a

21   nursing round, would you consider what you just saw to be

22   an adequate nursing round?

23             MS. SMITH:  Objection; predicate.

24   Overbroad.

25        A    That's too big of an assumption.

1      Q     (BY MR. TREVISANI)  Well, you mean -- what --

2    which assumption?

3      A     You're talking about practically a

4    hypothetical.

5      Q     You're right that I am, and I would like you to

6    assume that they're all full.

7      A     Assuming that they're -- that they're all --

8              MS. SMITH:  Same objection if that was the

9    question.

10              Go ahead.

11      A     Okay.  Assuming that they're all full, I

12    would -- I would say that -- that I would want a closer

13    view to see if they were getting any -- any responses

14    from the inmates as to, hey, no problem or what was going

15    on in each cell as they went by as to their eye contact

16    or whatever was going on.

17              It doesn't seem like much time, but again,

18    there's practically no information to go on.  I can't say

19    how long --

20      Q     (BY MR. TREVISANI)  You can't say --

21      A     I can't say how long a nursing -- a nursing

22    cell site check or -- or round should take.  You know,

23    some of them could take quite a long time and some of

24    them not.

25      Q     Is there a requirement in Oregon DOC policy

1 | that a nurse stop and talk to each inmate?

2 |     A    I don't know whether that is a policy.

3 |             MR. TREVISANI:  Okay.  Michelle, could you

4 | go to time stamp 8:03:16.  That's good.  Yeah, we can

5 | just play it from there.

6 |             (Video played and stopped.)

7 |             MR. TREVISANI:  Okay.  And at 8:03:14,

8 | somebody walks into the frame.

9 |             Go ahead, Michelle.

10 |             (Video played.)

11 |             MR. TREVISANI:  Okay.  And we will stop it

12 | at 8:04:39.

13 |             (Video stopped.)

14 |     Q    (BY MR. TREVISANI)  So similarly, that -- that

15 | took about, let's say, a minute 20 seconds; does that

16 | sound right?

17 |     A    I'll take your word for it.

18 |     Q    Okay.  So actually, does that -- assuming that

19 | was a medical care round, does that look like an adequate

20 | medical care round to you?

21 |             MS. SMITH:  Overbroad.  Predicate.

22 |     A    Same answer as before, it depends a lot about

23 | how many inmates are on the unit, how many are -- are up

24 | and -- and interested in interaction.  They made several

25 | stops, so it looks like at least three or four of the

1    cells have an inmate in them.

2        Q    (BY MR. TREVISANI)  Okay.  And then your answer

3    might be -- might be the same, but the same question,

4    assuming that they are all full, would those interactions

5    count for purposes of determining whether this is

6    solitary confinement?

7                    MS. SMITH:  Overbroad.

8        A    It could be opportunities for interactions, but

9    they -- the stops certainly were interactions.

10                    MR. TREVISANI:  Okay.  And the last --

11    let's go to the last video, to 9:33:19.  Okay.  We're

12    going to start it now at 9:33:05.  Go ahead.

13                    (Video played.)

14                    MR. TREVISANI:  Okay.  It looks like at

15    9:33:21 a security officer appears in the frame.

16                    Go ahead, Michelle.

17                    (Video played.)

18                    MR. TREVISANI:  And stop as he leaves the

19    frame at 9:34:16.

20        Q    (BY MR. TREVISANI)  Dr. Paulson, so assuming

21    this was a security round, do you consider these

22    interactions to be -- to count for purposes of

23    determining whether this is solitary confinement?

24                    MS. SMITH:  Overbroad.  Predicate.  Vague.

25        A    The same answers, really, it depends on how

1    many of the cells are occupied and so, then there was

2    opportunity for interaction.

3        Q    (BY MR. TREVISANI)  Okay.  So again, assuming

4    that they're all occupied, you think that those -- those

5    interactions count for purposes of determining whether

6    it's solitary confinement?

7        A    I think there was opportunity for interactions.

8    I didn't see a stop anywhere.

9        Q    Does it count -- so do they count?

10               MS. SMITH:  Same objection.

11        A    And the same thing, I think there are

12    opportunities for interactions, that people don't have to

13    take every opportunity.

14               MR. TREVISANI:  All right.  We can take

15    down the video.  Thank you, Michelle.

16               MS. LLOSA:  Merinda, do you mind pulling

17    up the cover sheet so Nicole could look at it before we

18    mark it?

19               MS. SMITH:  Yeah, just -- Michelle, go

20    ahead and mark it.  But if you can e-mail it to us so we

21    can look at it and compare it, that would be great.

22    Thank you.

23               MS. LLOSA:  Absolutely.

24               MR. TREVISANI:  Of course.

25               THE REMOTE TECHNICIAN:  This will be

1    Exhibit 6.

2                    (Exhibit 6 marked.)

3                    MR. TREVISANI:  Okay.  Great.  Thank you.

4                    And, Michelle, can you take care of

5    e-mailing that to Nicole?

6                    MS. LLOSA:  Absolutely.

7                    MS. SMITH:  Thank you.

8                    MR. TREVISANI:  Thank you.

9        Q    (BY MR. TREVISANI)  In answering my questions

10   about whether those interactions count for purposes of

11   determining whether it's solitary confinement, is that a

12   medical opinion?

13                   MS. SMITH:  Objection; vague.  Overbroad.

14       A    I don't think that interaction is a -- is a

15   medical diagnosis, and I don't -- I'm not aware of a

16   medical definition that -- that -- that applies there.

17                   But when I walk down my driveway and --

18   and the next-door neighbor waves and says hi and I wave

19   and say hi back, I feel pretty good about that.  That's a

20   little interaction.  It doesn't have to be hours.  I am

21   not saying that that -- that would count either.  I

22   didn't make those definitions.

23       Q    (BY MR. TREVISANI)  Okay.  I think I understood

24   the answer.  But like -- but just to confirm, you didn't

25   use any medical expertise to determine whether those

1    interactions count for purposes of determining whether

2    it's solitary confinement, right?

3              MS. SMITH:  Same objection.

4         A    Human interactions are a social thing.

5         Q    (BY MR. TREVISANI)  So the answer is no?

6         A    That's not a medical definition that I'm aware

7    of.

8         Q    Okay.  Thank you.

9              So let's come to -- I may have already

10   covered this -- but Page 11 of your declaration where you

11   cite the NCCHC definition of solitary confinement.  And

12   as you said, it's where an inmate encounters staff or

13   other inmates fewer than three times a day; is that

14   right?

15        A    Yes.

16        Q    Okay.  And given that -- that -- all that we've

17   discussed about the security checks being an opportunity,

18   so as long as a system has security checks or at least

19   three times in a 24-hour period, that's not going to

20   qualify as solitary confinement under the NCCHC

21   definition in your opinion; is that right?

22             MS. SMITH:  Overbroad.

23        A    If -- yes, it -- well, that would not be

24   solitary confinement if they have had those three human

25   encounters.

1     Q     (BY MR. TREVISANI)  Okay.  Are you aware of any

2  prison or jail system, restrictive housing system in the

3  United States that doesn't have at least three security

4  checks in 24 hours?

5     A     I'm not aware of any.

6     Q     Okay.  So if that's true, then solitary

7  confinement doesn't exist in the United States in your

8  opinion, correct?

9               MS. SMITH:  Overbroad.

10    A     By that one definition which --

11    Q     (BY MR. TREVISANI)  Well, that's the definition

12  you agree with, right?

13    A     No, I said I -- I didn't say that it was my

14  definition.  I said that would be easy to agree with,

15  it's very strict.

16    Q     But you don't have a definition of solitary

17  confinement, right?

18    A     No.

19    Q     Do you agree with the NCCHC definition?

20               MS. SMITH:  Objection; asked and answered.

21    A     I think that that certainly is isolation.  In

22  my mind, fewer than three human encounters a day

23  certainly is isolation.

24               We could argue whether or not four is also

25  isolation, but that definition certainly, in my mind,

1    defines that isolation.

2                        Does that answer your question?

3         Q    (BY MR. TREVISANI)   Yes.

4                        Okay.   You mentioned in your declaration

5    that inmates can talk from one another from cell to cell;

6    is that right?

7         A    Yes.

8         Q    Is that possible to do without shouting?

9                   MS. SMITH:   Objection; predicate.

10   Overbroad.

11        A    I believe so, yes, particularly if they're

12   nearby or if they have a ventilation that's shared.

13        Q    (BY MR. TREVISANI)   How do you know?

14        A    I said I think so.

15        Q    Oh.

16        A    And -- and --

17        Q    Did you -- did you try it?

18        A    In talking to the officers, they said that

19   conversation goes on frequently and they don't mind as

20   long as it's not loud.

21        Q    But you didn't get in a cell and try to talk to

22   somebody in a neighboring cell, right?

23        A    I did not lock myself in a cell, and I didn't

24   have this to redo that next door.

25                   MR. TREVISANI:   This is a good place to

1    take a -- I think, a five-minute break.  So back -- back

2    at 2:25.  Sound okay?

3                    THE WITNESS:  Okay.

4                    MS. SMITH:  That's good.

5                    (Break taken from 2:19 p.m. to 2:26 p.m.)

6                    MR. TREVISANI:  Okay.  Merinda, could you

7    pull up exhibit NCCHC position statements, please.

8                    THE REMOTE TECHNICIAN:  Please stand by.

9                    This will be Exhibit 7.

10                   MR. TREVISANI:  Thank you.

11                   (Exhibit 7 marked.)

12                   THE REMOTE TECHNICIAN:  There on the

13   screen, and you have control.

14       Q    (BY MR. TREVISANI)  Okay.  Dr. Paulson, are you

15   familiar with this NCCHC position statement on solitary

16   confinement, parentheses, isolation?

17       A    When was this from?

18       Q    Well, I don't know.  I'm -- if I had to guess,

19   I would say 2016.  But let's see if it's -- yep, April

20   2016.

21       A    Yes.  I believe this is the one I've seen.

22       Q    Okay.  So if you could read this highlighted

23   portion right here -- I'm going to read it.

24                   "Many national and international

25   organizations have recognized prolonged solitary

1    confinement as cruel, inhumane, and degrading treatment,

2    and harmful to an individual's health."

3                    Do you agree with that statement?

4                    MS. SMITH:  Overbroad.

5        A    I don't know.  I don't think I have looked at

6    enough opinions or -- or statements by national or

7    international organizations to confirm that.

8        Q    (BY MR. TREVISANI)  Okay.  Let me ask you a few

9    questions I forgot.  Sorry.

10                   What is the National Commission on

11   Correctional Health Care?

12       A    It's an organization that --

13       Q    Are you referring to a document right now?

14       A    Yeah.  I'm referring to my document where I

15   describe them.

16       Q    Okay.

17       A    Okay.  Okay.  So it's an organization

18   established by health and mental health and legal and

19   corrections professions.  It started in the early '70s

20   when an American Medical Association study found

21   inadequate, disorganized health services and a lack of

22   standards.

23                   And in collaboration with other

24   organizations, the AMA established a program in 1983 that

25   became the NCCHC, an independent, not-for-profit

1   organization, whose mission has been to evaluate and

2   develop policy and programs.

3       Q    And one of the things they do is they do

4   research on medical care provided in prisons and jails?

5       A    The organization doesn't do research that I'm

6   aware of.

7       Q    Does it review research to come up with its

8   standards and position papers?

9       A    I assume so, but I have not been on any of

10  those committees to know just what the committees do.

11      Q    Okay.  Is NCCHC, in your mind, an authoritative

12  organization on medical care in -- on providing medical

13  care in prison?

14      A    They're a good organization but -- but not

15  absolute.  They are many jails and prisons that do not

16  belong.

17      Q    That do not belong to what?

18      A    To the NCCHC as...

19      Q    I'm sorry.  Were you done?

20      A    Oh, I'm sorry.  Yeah.  They don't belong to

21  NCCHC and, therefore, do not have their accreditation or

22  necessarily fall within the standards.

23      Q    Okay.  Does the Florida Department of

24  Corrections follow the NCCHC standards?

25      A    I'm not sure because the standards are fairly

1    voluminous and include lots of areas.

2         Q    Does NCCHC accredit prison systems?

3         A    Yes.  They have an accreditation program.

4         Q    Is the Florida Department of Corrections

5    accredited by the NCCHC?

6         A    Not that I'm aware of.

7         Q    Do you know if the Florida Department of

8    Corrections has sought NCCHC accreditation?

9         A    I don't know.

10        Q    Down to this highlighted sentence right here,

11   which says, "It is well established that persons with

12   mental illness are particularly vulnerable to the harms

13   of solitary confinement."

14             Do you agree with that?

15             MS. SMITH:  Objection; scope, predicate.

16        A    That's outside my area of expertise.

17        Q    (BY MR. TREVISANI)  Okay.  The next sentence

18   here, "The inherent restriction in meaningful social

19   interaction and environmental stimulation and the lack of

20   control adversely impact the health and welfare of all

21   who are held in solitary confinement."

22             Do you agree with that?

23             MS. SMITH:  Overbroad.

24        A    I wouldn't -- I wouldn't say that I -- that I

25   know the studies behind this because the solitary

1    confinement that the NCCHC defines, you know, does not

2    exist in Florida or other places that I'm aware of with

3    that human interaction component.

4        Q    (BY MR. TREVISANI)  Okay.  Okay.  So going down

5    to Page 4.  I'm going to start from the beginning of this

6    paragraph here -- oops, right here.

7                  "While correctional health care providers

8    often encounter specific obstacles in the performance of

9    their duties, there are specific challenges to the

10   provision of health care to individuals in solitary

11   confinement.  Solitary confinement often makes it more

12   difficult for patients to access care."

13                  Do you agree with that?

14       A    I don't know what "often" means.

15       Q    Well, what does it mean in plain English?

16       A    It could mean that there are -- are ten jails

17   throughout the United States that -- that that's very

18   difficult.  That might be often.  Or 100 jails.  It might

19   be that there are 3 prison systems that that applies to

20   and the other 47 not.

21       Q    Okay.  Well, what is it that you agree with

22   about this statement?  What -- how could the "often" word

23   be changed to make it so that you agree with it, if at

24   all?

25                  MS. SMITH:  Overbroad.

1       A    I could say solitary confinement -- confinement

2   poorly managed can make it difficult for patients to

3   access care.

4       Q    (BY MR. TREVISANI)  Okay.  And then can you

5   just read the rest of the paragraph to yourself.  I don't

6   think I need to read it out loud.  Just let me know when

7   you're done.

8       A    "Many facilities require that individuals in

9   solitary confinement be shackled and accompanied by two

10  officers" --

11      Q    Oh, I'm sorry.  I don't need you to read it out

12  loud.  You can just read it to yourself.  Sorry.  I

13  misspoke.

14      A    All right.

15             I've read it.

16      Q    Okay.  So then the last sentence says, "Such

17  arrangements" -- and, there, the "such arrangements" -- I

18  want to be sure you agree -- are referring to the

19  shackling, the searches, the cell-front encounters

20  through the bars, in a cage, and then in restraints and

21  with an officer in close proximity.  So that's what "such

22  arrangements" is referring to.

23             It says, "Such arrangements are not

24  respectful of an individual's dignity."

25             Do you agree with that?

1              MS. SMITH:  Overbroad.

2        A    Again, it would depend.

3        Q    (BY MR. TREVISANI)  What would it depend on?

4        A    On the individual's situation and how it's

5   managed.  I think it could be managed with dignity.

6        Q    Okay.

7        A    We certainly -- we certainly strive to do that.

8        Q    Okay.  Same question.  Do you agree that such

9   arrangements -- again, referring to what we just

10  discussed -- interfere with privacy and confidentiality?

11       A    It depends.

12       Q    Okay.  And do you agree that such arrangements

13  hamper or prevent the clinician from performing an

14  adequate evaluation?

15              MS. SMITH:  Overbroad.

16       A    I would disagree with that as it -- because

17  it's stated as an absolute.  I think the conditions

18  occasionally hamper a clinician from performing an

19  adequate evaluation in that moment.

20       Q    (BY MR. TREVISANI)  Okay.  So you disagree with

21  the NCCHC about that?

22       A    I think it's poorly worded.  But this -- this

23  position statement -- the position statements are

24  committee output that are put out and talked about,

25  and -- and the pieces of them that seem most important

1    and to -- to be included are included in the -- in the

2    next -- in the next publication of standards.

3              So things that -- that -- not everything

4    in here will become part of a standard.  There were

5    standards published, I believe, 2018 or '19 -- '18 by the

6    NCCHC for prisons, and it's there where you look for what

7    the NCCHC considers most important.

8         Q    Okay.  So going down to the position statement

9    down here, Number 1 says, "Prolonged (greater than 15

10   consecutive days) solitary confinement is cruel,

11   inhumane, and degrading treatment, and harmful to an

12   individual's health."

13             Do you agree with that?

14             MS. SMITH:  Overbroad.

15        A    I would agree with a lot of that contingent to

16   the NCCHC's definition of solitary confinement, but

17   that's personal opinion.

18             I -- I haven't seen evidence of harm to

19   the individual's health as a study within the United

20   States; but, again, there has been solitary confinement

21   in the United States in the past, as I'm aware.  I'm not

22   aware of that going on now to the NCCHC definition.

23        Q    (BY MR. TREVISANI)  Okay.  Do you think the

24   NCCHC thinks that there is no solitary confinement the in

25   United States?

1          MS. SMITH:  Objection; overbroad,

2    predicate.

3        A    I don't know what -- what the group thinks.

4    It's a group of doctors and administrators and nurses and

5    social and all kinds of folks involved in corrections.

6    Their standards make a definition of it, and so they want

7    that to be considered.

8        Q    (BY MR. TREVISANI)  Well, would you agree that

9    it's unlikely that the NCCHC thinks that solitary

10   confinement doesn't exist because, if that were the case,

11   then they would be writing these position statements and

12   standards for nobody in the United States?

13          MS. SMITH:  Objection --

14       Q    (BY MR. TREVISANI)  So don't you think that

15   makes it unlikely that they think that solitary

16   confinement doesn't exist?

17          MS. SMITH:  -- predicate.

18       A    I -- I don't really know, but certainly they --

19   they could want it not to be brought back if there's none

20   of it here.  If there's some it here, they would -- they

21   are objecting to it.

22          They also make standards for jails in

23   their main -- I haven't looked into anything about jails,

24   segregated housing, and health within the United States.

25       Q    (BY MR. TREVISANI)  Okay.  Looking at Number 2,

1  it says, "Juveniles, mentally ill individuals, and

2  pregnant women should be excluded from solitary

3  confinement of any duration."

4          Do you think that juveniles should be

5  excluded from solitary confinement of any duration?

6          MS. SMITH:  Overly broad.

7      A   I -- I think the area of juveniles are areas

8  outside of my expertise.

9      Q   (BY MR. TREVISANI)  Okay.  Do you think

10  mentally ill individuals should be excluded from solitary

11  confinement of any duration?

12      A   Again, area outside of my expertise.

13      Q   Okay.  And do you think pregnant women should

14  be excluded from solitary confinement of any duration?

15      A   That, I can agree with.

16      Q   Okay.  And why is that?

17      A   Because the necessary stressful levels of

18  isolation that that involves and the relative changes

19  that goes on in a woman's body when she's pregnant,

20  including emotional changes and physiologic needs.

21      Q   Okay.  Does Florida exclude pregnant women from

22  restrictive housing?

23      A   Well, again, you're not -- are we talking

24  solitary confinement or any restrictive housing?

25      Q   Restrictive housing.

1        A    I don't know if they -- if they ban them from

2   any restrictive housing, but I don't know.

3        Q    Okay.  And going back to something I don't

4   think I followed up with, but I asked you about mentally

5   ill individuals, and you said that's outside your area of

6   expertise.

7             Are you aware of any research showing the

8   effects of -- the mental health effects of solitary

9   confinement -- or, excuse me, on people in solitary

10  confinement?

11       A    That's outside of my area of expertise.

12       Q    Yeah, I know.  But are you familiar with any of

13  that research?  Are you aware of it?

14            MS. SMITH:  Overbroad.

15       A    I am familiar with some; but, again, I can't

16  speak to it because it's not my expertise.

17            MR. TREVISANI:  Okay.  We can take down

18  this exhibit.

19       Q    (BY MR. TREVISANI)  Okay.  I want to refer you

20  to Page 13 of your declaration.

21            MS. SMITH:  Counsel, can I ask for a

22  one-minute break?  My computer froze the PDF program, and

23  I want to see if I can restart it real fast without

24  losing you guys.

25            MR. TREVISANI:  Sure.

1          MS. SMITH:  Can we just go off the record

2     for a minute?

3          MR. TREVISANI:  No problem.

4          (Break taken from 2:44 p.m. to 2:45 p.m.)

5          MS. SMITH:  Okay.  I'm good.  Thank you.

6     A     So Page 13.

7     Q     (BY MR. TREVISANI)  Page 13, you have some

8     opinions about coerced or forged medical refusals.

9     A     Yes.

10    Q     So did you assess whether there have been any

11    coerced or forged medical refusals in restrictive housing

12    in Florida?

13         MS. SMITH:  Overbroad.

14    A     To some extent, yes.

15    Q     (BY MR. TREVISANI)  And how did you do that?

16    A     Speaking to staff and administration, if they

17    had had issues of that, particularly in the -- any that

18    have been proven valid.  And they were quite open

19    about -- about occasionally having folks act badly but

20    not in that particular context.

21    Q     So, in your conversations, has a coerced or

22    forged refusal in restrictive housing ever happened?

23    A     I can't say ever.

24    Q     Did they tell you whether --

25    A     I'm not sure anyone could.  How could you know

1    that?

2         Q    Well, that's my question for you, Dr. Paulson.

3              Did they tell you whether any had ever

4    occurred, had ever been found -- that they found to have

5    happened, a coerced or forged refusal?

6         A    Each one I talked to said they hadn't heard of

7    that.

8         Q    Okay.  So you acknowledge that Dr. Venters

9    reported that he encountered a number of people who

10   reported coerced or false refusals, and your opinion is

11   that this is not happening; is that correct?

12        A    I don't know that it's not happening, but it

13   would be -- it is unbelievable that it could be happening

14   to the extent that Dr. Venters proposed because of the

15   numbers of people involved over the period of time and

16   keeping that in complete secrecy over a number of

17   institutions.

18             And -- and, like I said, thousands of

19   staff members who work for different employers, any one

20   of them could lose their job or be put in jail themselves

21   for that kind of activity.

22             I can't say it's never happened, but it

23   hasn't happened enough to come to -- to the surface, and

24   it certainly seems statistically impossible to have

25   happened to the extent that Dr. Venters said.

1      Q    Okay.  Is that a medical opinion?

2                MS. SMITH:  Vague.

3      A    That's a statistical opinion.

4      Q    (BY MR. TREVISANI)  Okay.  Are you qualified to

5  render a statistical opinion?

6      A    I do have a Master's of Public Health, which

7  includes epidemiology and includes medical statistics and

8  statistics in general.

9      Q    Right.  But you didn't conduct a statistical

10  analysis in this case, right?

11      A    Only as a theoretical exercise, as I explained.

12      Q    So what did you do to investigate whether or

13  not the coerced or forged refusals -- whether that was

14  happening?

15      A    I looked at a great number of "Refused to Sign"

16  forms from -- from a number of the inmates and signed

17  form for -- of refusals for a number of the inmates and

18  took a look at the numbers and -- of different staff

19  members who have to be involved and extrapolated that to

20  the -- to the circumstances that Dr. Venters proposed.

21  And if you do that, you come up with an absolutely

22  impossible situation.

23           Could it be happening maybe when somebody

24  has a bad day and doesn't want to take someone over to

25  medical?  Is it happening to the extent that -- that

1    Dr. Venters proposed?  I would call that unbelievable.

2         Q    Did you look at any grievances to assist in

3    your determination that you don't think that the

4    medical -- coerced medical and false medical refusals are

5    happening?

6         A    I looked at a number of grievances, and I don't

7    recall any that grieved that particular thing.  No.

8         Q    Okay.  Do you know whether the FDC -- assuming

9    there were grievances about forged or false refusals, do

10   you know whether the FDC investigated those grievances?

11        A    I don't know.

12        Q    Okay.  Did you interview any FDC staff about

13   particular refusals?

14        A    You mean a particular refusal on a particular

15   day?

16        Q    Correct.

17        A    No.

18        Q    Okay.  So you didn't -- when you got a refusal

19   form that Dr. Venters said somebody reported that that

20   was not a true refusal, you didn't take that and go and

21   ask FDC staff, hey, what happened here?

22        A    Well, first of all, it wouldn't just be FDC

23   staff.  It would be FDC and -- I keep trying to say

24   Corizon -- Centurion for the most part.  So digging up

25   both of those line staff would be -- would be an

1    undertaking.

2              And, really, my -- my point and my

3    statistical proof is in the volume, not in the

4    individual.  I am willing to accept that that sort of

5    thing could occasionally happen.  I wouldn't doubt it.

6    But it is certainly not happening anything like what has

7    been proposed.

8         Q    And your opinion on that is just based on the

9    fact that it's unbelievable, right?

10        A    That it's statistically -- statistically

11   impossible it reaches that kind of level.

12        Q    Okay.  So you think that those -- the inmates

13   who made those claims are lying.

14        A    To some extent, yes.

15        Q    Well, to what extent?

16        A    To the -- to the extent that it -- that it

17   creates thousands of people involved in a -- in a

18   conspiracy that lasts for years and is kept in complete

19   secrecy.  I don't know of any -- any enterprise that can

20   do that.  Word gets out.

21        Q    Why would it have to be kept in secret?

22        A    Because there hasn't been anything in the

23   media.  Because the FDC administration hasn't been aware

24   of that particular problem.  They have been aware of

25   other problems and have dismissed staff.  They've sent

1   staff for prosecution for issues but not that particular

2   problem at all, and that's -- that's quite remarkable.

3        Q    Has the FDC investigated this particular

4   problem?

5        A    I don't know.

6        Q    Okay.  So if they haven't investigated it, then

7   they might not know if it's happening.

8        A    They might have investigated it and found it

9   unfounded.  They might have investigated it hundreds of

10  times and found hundreds of them unfounded.  I don't

11  know.

12       Q    Okay.  If a refusal form is unsigned, how do

13  you determine whether it was valid or not?

14       A    Because, generally, two staff members witness

15  the refusal, and this happens all the time.  In our

16  population, we get people refuse to sign every day, and

17  our staff know the drill.  It's just personality stuff,

18  and they witness and countersign that the person refused.

19  And they -- they take that seriously.

20                 I can't imagine any of my staff forging a

21  refusal.  That's kind of crazy talk.  You would put your

22  job on the line just because you don't -- just because of

23  that.  And to have two people do it.  That's what I'm

24  getting at.

25       Q    Well, I guess I'm trying to determine, if you

1    had a refusal that was unsigned and the inmate is saying,

2    I didn't refuse, how do you determine if that was valid

3    or not?

4              MS. SMITH:  Overbroad.

5         A    The individual one?  That would --

6         Q    (BY MR. TREVISANI)  Yes.

7         A    That would be difficult unless there was other

8    staff around to -- who could witness, or if it -- if it

9    was something that happened repeatedly with -- with a

10   single staff member and not anyone else, that would be,

11   you know, someone that -- who is -- seems to be refusing

12   just to a particular officer, but then the forms are not

13   countersigned by the nurse.  Something like that could be

14   suspicious.

15        Q    Have you heard of an instance in Oregon or in

16   your experience of an officer signing as a witness when

17   they didn't actually witness the refusal, but they were

18   just told by another officer that the inmate refused?

19        A    No.  And that would be hard to imagine.  They

20   take their jobs seriously, and they like the paychecks.

21   So they're not going to put their job in jeopardy for

22   something as trivial as that.

23        Q    So the refusal forms, many of them that I've

24   signed [sic] are typed with exception of the signature.

25   So do you know what the process is of staff completing

1  the refusal form?  Like, how does it get from the refusal

2  at cell front to getting typed to getting signed?

3           MS. SMITH:  Objection; overbroad.

4      A    I don't know how they do it.  We have refusal

5  forms pretty much everywhere where we do medical care

6  because it's something that happens a lot.

7                You grab the form; you fill it out right

8  then; the person countersigns right then, gets it done

9  with and doesn't create the hassle of trying to track

10  down the officer who was there at that moment, you know,

11  the next day or the next week.  Just do it right at that

12  moment.

13     Q    (BY MR. TREVISANI)  Okay.  In your experience,

14  have you ever heard of an inmate being coerced into

15  signing a refusal?

16     A    No.  I have never heard that.  I have never --

17  I hadn't heard an inmate tell me that.

18     Q    Okay.  Okay.  Have you ever heard of an inmate

19  signing a refusal because they were told they had to sign

20  a refusal?

21     A    No.  It's -- it's fairly very well-known that

22  you can refuse to sign.  I don't --

23     Q    Okay.  And you would agree, in order for the

24  refusal to be valid, the inmate has to know what they're

25  refusing, correct?

1      A    It depends.

2      Q    Well, if -- if somebody told the inmate that

3  the callout that they were being called for was for

4  something else other than what it was for and the inmate

5  signs the refusal, you would agree that that's not a

6  valid refusal, right?

7                  MS. SMITH:  Overbroad.

8      A    I'm afraid I don't follow your logic there.

9      Q    (BY MR. TREVISANI)  Let's say that the inmate

10  puts in a sick call because they have a hurt hand; and an

11  officer comes and says, okay, you're being called out,

12  but this is for -- just to go look at your medical

13  records.  And the inmate says, well, I don't want to do

14  that, so he signs a refusal; but the callout really was

15  for his hand.  You agree that that wouldn't be a valid

16  refusal, right?

17      A    Well, a couple of issues there.  One, in our

18  system -- and, actually, I don't know the FDC -- the

19  callouts don't give them the medical information; that

20  is, they don't -- they don't say what the callout is for.

21  That's medical information.

22                  I don't believe -- I would be surprised

23  that the FDC gave out that information with the callouts,

24  at this point a callout for medical.

25      Q    And you would agree that if a security officer

1    threatened an inmate and said, hey, I'm going to hurt you

2    unless you refuse, and the inmate signs, you agree that

3    that's not a valid refusal, right?

4        A    Under coercion, that -- that would be invalid,

5    in my mind.

6        Q    Okay.  And so assuming -- let's assume -- if an

7    inmate is coerced into signing a refusal, they're

8    probably not going to file a grievance about it.

9               Would you agree with that?

10              MS. SMITH:  Objection; predicate,

11   overbroad.

12       A    No, I would not agree with that.

13       Q    (BY MR. TREVISANI)  Okay.  So -- well, why not?

14   I mean, if somebody is deterred from signing -- or, you

15   know, deterred from going to the medical appointment,

16   don't you think they would also be deterred from then

17   complaining about it a day or two later?

18       A    I imagine that there would be occasional person

19   who -- and some of my guys are kind of meek and mild and

20   don't want any trouble.  But a lot of folks are perfectly

21   happy to write grievances about lots of stuff about

22   officers all around them all the time.

23       Q    So now I want to ask you sort of the reverse of

24   that.  Let's say an inmate does file a grievance,

25   saying -- well, back up.

1           Let's say -- let's say an inmate -- let me
2     start over again.
3           If an inmate does file a grievance saying,
4     I didn't refuse this appointment, would you consider that
5     to be an indicator that they didn't actually refuse?  In
6     other words, let me ask, would an inmate refuse a medical
7     appointment and then the next day file a grievance about
8     not refusing?
9                MS. SMITH:  Overbroad, vague, compound.
10      A    I don't -- I -- I don't know.  Certainly, that
11    theoretical is possible.  But how often does it happen?
12    I don't know.
13      Q    (BY MR. TREVISANI)  Well --
14      A    Or does it happen at all?  I don't know.
15    You're entirely theoretical here.
16      Q    Well, yeah.  I'm just asking for your opinion.
17    Based on your knowledge of the system, do you think
18    that -- doesn't the existence of the grievance saying,
19    hey, I didn't refuse, indicate that they actually didn't
20    refuse?
21                MS. SMITH:  Objection; vague.
22      A    If that -- if that was there, we have to
23    certainly take that into account and offer them another
24    appointment and make note of that, but I haven't run
25    across that one.

1      Q     (BY MR. TREVISANI)   Did you see that in the

2   grievances that you reviewed for Florida?

3      A     I don't recall that.

4      Q     Okay.  Do you know the rate of grievances being

5   substantiated in the Florida Department of Corrections?

6      A     No.

7      Q     Is that something that you want to know to form

8   your opinion in this case?

9      A     No.

10      Q     I want to ask you about rescue inhalers.

11            What is the policy in restrictive housing

12   in Florida with respect to inmates keeping their rescue

13   inhalers?

14      A     I don't know a written policy about that.

15   Talking to the -- to the staff and officers, the default

16   is for them to have the rescue inhalers.  And -- and it

17   would only be -- be put under staff control for abuse,

18   and that would have to include medical and -- and making

19   that staff-controlled.

20      Q     And you agree that that's an appropriate -- I'm

21   sorry.

22      A     Yeah.  Go ahead.

23      Q     And you agree that that's an appropriate

24   policy, to have the default be to keep the inhaler and

25   make a case-by-case decision about confiscating it?

1    A    That's what we do for the most part.  The

2  exception would be where the offending circumstance

3  included the inhaler.  So someone has been selling hits

4  off their inhaler to -- to one of their -- one of their

5  buddies and that is found out.

6              Then they would -- then they would

7  probably, you know, initially take their -- or someone

8  has taken it apart to take the spring out or something

9  like that.  But they would always clear it with medical

10  as soon as possible.

11   Q    Are you aware of any inmate in Florida selling

12  their inhaler?

13   A    No.  But I wouldn't -- I would be surprised if

14  there weren't.

15   Q    Are you aware of any inmate in Florida using

16  their inhaler to get high?

17   A    Again, no, but I would be surprised if there

18  weren't.

19   Q    Are you aware of any of inmate in Florida using

20  the metal spring in their inhaler as a weapon?

21   A    The same answer.

22   Q    Are you familiar with the practice in Florida,

23  restrictive housing of property restriction?

24   A    To some extent, yes.

25   Q    Okay.  What is it as you understand it?

1      A      That -- the -- the restriction of certain

2   property based on misuse.

3      Q      Okay.  Are you aware in Florida of whether

4   property restriction consists of taking all property

5   including clothes and a mattress?

6                  MS. SMITH:  Overbroad.

7      A      My understanding in talking with the staff is

8   that the property that's taken away is -- is that which

9   is being abused, and if the mattress is being abused, the

10  mattress might be removed for a period of time.  They

11  don't like to leave them overnight without a mattress.

12                  The other -- the other part of it is -- is

13  I'm wondering how often this is being confused with

14  self-harm observation status.  In that case, when the

15  clothing is changed to cut-proof and cleared -- you know,

16  the area cleared, that's -- that's a medical decision.

17                  So if you could straighten those out for

18  me, that would be nice.

19     Q      (BY MR. TREVISANI)  Well, I'm not sure I can do

20  that now, but let's assume property restriction is as I

21  described it.  All your property is taken, including

22  clothes and a mattress.  Is that something that you think

23  is appropriate?

24     A      It would be appropriate in the appropriate

25  circumstances.

1      Q      Could it create a risk of harm to health?

2              MS. SMITH:  Overbroad.

3      A      Not as long as it's appropriately compensated

4  for.

5      Q      (BY MR. TREVISANI)  What does that mean,

6  "compensated for"?

7      A      That the -- things like if it's -- if it's cold

8  outside.  We're colder here in Oregon than in Florida.

9  You know, the person may need to have several cut-proof

10  blankets to stay warm overnight, something like that.

11  However, in Florida or Southern California, certainly

12  safety and -- and reasonable comfort can be -- can be

13  done with less.

14      Q      When people are put on property restriction in

15  Florida, restrictive housing, does that include taking

16  away their rescue inhalers?

17              MS. SMITH:  Overbroad.

18      A      Again, the term "property restriction," as I

19  understand it, is -- is abuse-oriented.  So if the rescue

20  inhaler is being abused, it might be put under staff

21  control, yes.

22      Q      (BY MR. TREVISANI)  So if somebody was not

23  abusing their rescue inhaler and they were put on

24  property restrictions, you agree their inhaler should not

25  be confiscated.

1          MS. SMITH:  Overbroad.

2     A    Again, that's something that they would always

3 check with medical.  That's what I was told and what

4 makes sense.  I don't -- I don't believe that there's a

5 blanket restriction from -- from all those things for --

6 that -- that I am aware that involves something outside

7 of self-harm observation.

8     Q    (BY MR. TREVISANI)  Are you aware of any inmate

9 on property restriction having their mattress confiscated

10 overnight?

11     A    The staff said they didn't -- they didn't want

12 to have it overnight, and if they could release the

13 prisoner from that, they would.  But I think that

14 involved the time of day and the circumstances.

15               If someone is abusing their mattress at

16 midnight, locking the cell door and flooding the cell,

17 and so the need for the -- for the officers to enter the

18 cell through the blockade, that person might not get

19 their mattress back until morning.  I wouldn't be at all

20 surprised at that.  It just depends.

21     Q    Okay.  You talked little bit about -- in your

22 declaration about somebody with asthma having their

23 rescue inhaler.

24               Do you agree that somebody with asthma in

25 restrictive housing needs to have their rescue inhaler on

1  them?

2      A    It depends.

3      Q    Okay.  So what if somebody with asthma doesn't

4  have their inhaler on them and they start having an

5  asthma attack?  How do they get their inhaler?

6      A    They alert the officers, who alert medical, and

7  who brings their inhaler within -- within minutes.

8      Q    How do they alert the officer?

9           MS. SMITH:  Overbroad.

10     A    Yell or pound on the door.

11     Q    (BY MR. TREVISANI)  Would it be difficult to

12  yell if they were having an asthma attack?

13     A    Not early on.  As I explained in my -- in my

14  declaration, asthma as exacerbations tend to take a while

15  because it's an inflammatory process.  It's not a quick

16  and instant process like an allergic reaction to peanut

17  butter.  It's a more gradual process.

18          And for the vast -- vast majority of

19  asthmatics, there is plenty of time to manage that

20  inhaler in a different fashion.

21          Now, the easiest thing for everyone is for

22  the person to have their inhaler and self-manage it in an

23  appropriate way, and -- and that's -- just makes sense

24  for -- for working your -- your institution and

25  population.  You want to do the things that can be done

1  safely, in the easiest fashion.

2              But not having -- having the albuterol --

3  that's what we're talking about here -- having that in

4  staff control is -- is safe the vast majority of times.

5  And the rare occasions when it's not, where someone is

6  having a particularly hard problem or has been having

7  particularly swift attacks, we put them in -- in -- in

8  segregated housing in the infirmary.  We have segregated

9  cells there.  And then we take their inhaler away, but

10 the nurses are closer by.

11    Q    And you agree that that placement is the

12 appropriate practice for somebody with severe asthma?

13    A    It wouldn't be -- it would be the -- it would

14 be a medical decision depending on the type of severity,

15 the person's -- the person's reactions.

16              A patient I know that -- I would know

17 that, although having severe asthma, his attacks always

18 take hours and hours to come on, I would be -- would feel

19 comfortable having a different situation.  A patient that

20 I know has -- has fast onset or a patient I don't know at

21 all, I would probably want to have closer by.

22    Q    Would you agree that having an inmate in

23 restrictive housing with asthma without their rescue

24 inhaler increases the risk of medical harm to them?

25              MS. SMITH:  Overbroad.

1      A    Not necessarily so.

2      Q    (BY MR. TREVISANI)  Okay.  I may have asked you

3  this before but just to confirm:  Have you conducted any

4  research into the possible medical harms of solitary

5  confinement or restrictive housing?

6      A    Okay.  We're talking about two different

7  things.  Solitary confinement, I really haven't.

8  Restrictive housing, in general, I haven't -- I haven't

9  made that a particular study.

10     Q    Okay.  Have you -- have you read any or

11  reviewed any studies about the medical harms of solitary

12  confinement or restrictive housing?

13     A    Again, solitary confinement is a separate

14  issue.  I haven't read anything that -- that documented

15  medical harm to people from restrictive housing in the

16  fashion that it is done in Florida and generally in the

17  United States, as I'm aware.

18     Q    Okay.  Do you have an opinion on whether the

19  use of solitary confinement increases the risk of medical

20  harm to people held there?

21               MS. SMITH:  Objection.

22     A    I haven't seen evidence to support that.

23     Q    (BY MR. TREVISANI)  So you don't have an

24  opinion on that.

25               MS. SMITH:  Objection; predicate,

1    mischaracterizes the testimony.

2         A    My opinion is I haven't seen evidence of that.

3         Q    (BY MR. TREVISANI)  Okay.  Do you have an

4    opinion on whether restrictive housing increases the risk

5    of medical harm to people held there?

6                   MS. SMITH:  Objection.

7         A    Again, I -- I haven't seen evidence of that,

8    medical evidence, good medical evidence, patient-oriented

9    outcomes.

10        Q    (BY MR. TREVISANI)  Do you have an opinion on

11   whether people in restrictive housing in Florida face an

12   increased risk of medical harm?

13        A    I am not aware of that -- that study.

14        Q    But do you have an opinion on that?

15        A    My opinion is I'm not aware of any study that

16   supports that.

17        Q    Okay.  Does that mean that you don't have an

18   opinion?

19                   MS. SMITH:  Objection; misstates,

20   mischaracterizes his testimony.

21        Q    (BY MR. TREVISANI)  Well, let me -- let me

22   clarify.

23                   Is your opinion that you don't -- is your

24   testimony that you don't have an opinion or that you do

25   have an opinion and you don't think that there's an

1  increased risk?

2      A    In order to have an opinion, I would need to

3  see a study that -- that supports the allegation or

4  the -- or the -- the supposition, and there hasn't -- I

5  haven't seen evidence of that, and the -- the plaintiffs

6  haven't really shown evidence of that.

7              So I'm waiting to see evidence.  I am not

8  denying that it couldn't exist, you know, but like I

9  said, I have not seen evidence of that.

10     Q    (BY MR. TREVISANI)  Okay.  So, as of now, you

11  haven't seen any evidence, and that means that you don't

12  have an opinion on that; is that right?

13              MS. SMITH:  Objection; mischaracterizes

14  testimony.

15     A    Again -- again, you're -- I agree; you're

16  mischaracterizing what I'm saying.  And perhaps if you

17  could -- just because of the medical -- the way the

18  medical mind works, I can't say that -- that something

19  doesn't exist as far as a medical condition or a medical

20  treatment or cure.

21              I can only say that -- that -- I haven't

22  seen evidence supporting that athlete's foot powder cures

23  COVID.  Who knows?  It might.  But I can't support that

24  without evidence.

25     Q    (BY MR. TREVISANI)  Well, I think I have it,

1   but I'm just -- you're being tendered as an expert in

2   this case.  Experts have certain opinions.  I am just

3   trying to figure out if you have an opinion on this

4   particular subject.  It sounds like you don't have an

5   opinion, but I don't -- I don't think I need to ask any

6   more about it.

7               MS. SMITH:  Objection to the extent that

8   wasn't a question.

9       Q    (BY MR. TREVISANI)  And do you -- if you'd like

10  to respond to that, that's fine.  I'm happy to hear it,

11  but...

12      A    No, I'm good.

13      Q    Let's go to Page 17 of your declaration.

14      A    Got it.

15      Q    Okay.  So, at the bottom -- the last sentence

16  of the first paragraph under the heading, in reference to

17  this article by Peter Smith, you say, "In all, Smith

18  offers no evidence from the modern literature of lasting

19  physical harm from what he calls isolation in prison."

20              What is -- what's -- what do you consider

21  to be lasting physical harm?

22      A    That would depend.  It would depend on the type

23  and amount of harm and the -- and the expected time

24  course.

25      Q    Well, what did you mean when you said it here

1    in your declaration?

2         A    Well, again, it depends on the circumstances.

3    Someone might be being treated for cancer with a

4    radiation over a course of months and have radiation

5    burns that last for months afterwards.  I would say

6    that's not lasting physical harm as long as it -- as it

7    heals up.

8              There are other things that I might not

9    like to see -- or would need to have last longer before I

10   call it lasting.  It just depends.

11        Q    So does "lasting" mean -- does "lasting" mean

12   permanent?

13        A    Again, not necessarily so.  It might -- it

14   could mean things that are going beyond their -- their

15   expected span.

16        Q    Well, I mean, Doctor, I'm not asking you to

17   apply it to a particular situation.  I'm asking you, what

18   did you mean when you said it in a general sense on

19   Page 17 of your declaration?  How did you mean the word

20   "lasting"?  Do you mean permanent?  Does it have to last

21   a certain amount of time?  What's the definition of the

22   word as you used it?

23        A    As I use it, it -- it -- well, the length of

24   time -- again, it's only -- it's only dependent on -- on

25   what the -- what the expected time frame is.

1             You could say permanent was lasting, but I

2    might also say that some things that go on for years

3    that -- that only -- are only expected to go on for weeks

4    would be lasting also.

5        Q    Is lasting physical harm the only thing -- the

6    only kind of harm that you looked for when you were

7    looking for reviewing Mr. Smith's article on the harm --

8    possible harms of solitary confinement?

9             MS. SMITH:  Objection; vague.

10       A    Well, temporary physical harm really wasn't

11   alluded to.  So someone having a bruise or a cut, I don't

12   think that Mr. Smith got into any of those.  But

13   something that someone would -- would have for a long

14   time after their incarceration, there was no evidence of.

15       Q    (BY MR. TREVISANI)  Is that the only thing that

16   you're looking for when forming your opinion in this case

17   is whether there's lasting physical harm?

18            MS. SMITH:  Overbroad.

19       A    No, not entirely.  Things like pain are another

20   one that doesn't have to be forever would still be a

21   problem if it goes beyond its expected time frame.

22       Q    (BY MR. TREVISANI)  Okay.  So you agree there

23   are other types of medical harms that we should be

24   concerned about, other than lasting physical harm, right?

25            MS. SMITH:  Overbroad.

1      A     Yes.  I cited one, a pain that goes beyond its

2  expecting -- expected time frame.

3      Q     (BY MR. TREVISANI)  Okay.  So if somebody

4  breaks a bone but the bone heals in the regular time

5  frame and then they have no other permanent ailment

6  related to that, would that kind of -- does that count as

7  harm in your -- in your mind?

8                MS. SMITH:  Overbroad.

9      A     Well, again, depends on the context.  If

10 someone's leg is broken on purpose by his cellie, I would

11 call that harm, although temporary.

12     Q     (BY MR. TREVISANI)  Okay.  So what if somebody

13 breaks a leg no matter what the reason and they're in

14 pain, but the medical staff ignore them for a week; and

15 then, a week later, the person is treated, gets a cast,

16 and the bone heals just as normal?  Would you consider

17 that week of being in pain to be harm?

18     A     It depend -- would depend on the circumstances.

19     Q     In the ones I just described to you, would you

20 consider that to be harm?

21     A     It would depend on the circumstance of that

22 one.  How apparent is the fracture?  How bad is the pain?

23 What are the alternatives that are appropriate under the

24 circumstance?

25     Q     What if the staff just deliberately ignored

1    them?

2              MS. SMITH:  Overbroad.

3         A    Deliberately ignored.  Well, that would --

4    would fall under deliberate indifference, and that --

5    that's wrong, right?

6         Q    (BY MR. TREVISANI)  Well, does it count as

7    harm?

8         A    I'm not sure.  It possibly could.

9         Q    Okay.  What if someone had uncontrolled

10   hypertension and staff -- the medical staff did not act

11   appropriately in keeping it under control, and as a

12   result, the person had a heart attack but they -- they

13   recovered and their life has continued as normal for now?

14   Do you consider that to be harm?

15             MS.  SMITH:  Objection; vague.

16        A    It depends -- it would depend entirely on the

17   circumstances.

18             Coronary artery disease from hypertension

19   takes years and years to develop as far as that increased

20   risk.  So coronary artery closure from high blood

21   pressure over a short period of time isn't really at

22   issue here.  It -- the -- the person doesn't have a heart

23   attack caused by high blood pressure for a short period

24   of time.

25        Q    (BY MR. TREVISANI)  Well, what I'm ask -- I'm

1    not asking you to evaluate the appropriateness of the

2    medical care or the reaction to it.  I'm just asking you

3    whether somebody who suffered a heart attack suffered

4    harm.

5            MS. SMITH:  Overbroad.

6        A    It depends on -- on -- on how you're defining

7    harm.  Are you talking about harm that is caused by

8    another person, so that person has received harm from

9    another person, or -- or that person has come to harm

10   from the natural course of a disease?

11       Q    (BY MR. TREVISANI)  I am asking you to -- to

12   use the word "harm" in the -- in the context in which you

13   used it to evaluate the plaintiff's claims in this case,

14   where you have a -- you have a heading that says "Lack of

15   Evidence of Medical Harm," and then you just say that

16   Ms. Smith offers no evidence of lasting physical harm.

17            So I want to know what counts as harm in

18   your mind, and does a heart attack count?

19            MS. SMITH:  Overbroad.

20       A    A heart attack would be harm.

21       Q    (BY MR. TREVISANI)  Okay.

22       A    But -- but it doesn't infer causation.

23       Q    I'm not asking about causation.  I'm just

24   asking about harm.  Okay?

25            In your declaration, you draw a line, I

1    believe, between symptoms and harm.  So what's the

2    difference?

3        A    Symptoms and harm?  Harm involves -- okay.

4    Harm involves things like cellular death or the

5    interruption of a bone or something like that.

6              Having a palpitation isn't -- isn't

7    necessarily harm, but if the palpitation results in

8    cellular death inside the heart, that's harm.

9        Q    So, aside from those examples, can you give me

10   a definition of symptoms versus harm?

11             MS. SMITH:  Overbroad.

12       A    Symptoms are something that you feel.

13       Q    (BY MR. TREVISANI)  Okay.  Symptoms can cause

14   suffering, right?

15       A    Yes.

16       Q    I mean, pain is a symptom, right?  And that --

17   that can cause suffering, right?

18       A    Yes.

19       Q    Shortness of a breath is a symptom, and that

20   can cause suffering, right?

21       A    Yes.

22       Q    Okay.  And you -- as a doctor, when somebody

23   comes to you with symptoms, you try to address those

24   symptoms, right?

25       A    Yes, as well as I can and appropriate to the

1    circumstance.

2         Q    Right.  You don't -- let me phrase it another

3    way.

4                   You wouldn't ignore the patient simply

5    because they were experiencing symptoms but not harm; is

6    that right?

7         A    That's right.

8         Q    You would still treat them, right?

9         A    Appropriate to the circumstances.

10        Q    And symptoms are an indicator of potential

11   harm; is that right?

12                   MS. SMITH:  Vague.

13        A    Not necessarily so.

14        Q    (BY MR. TREVISANI)  It's possible, though,

15   isn't it?

16        A    That's what we -- we look at.

17        Q    I mean, that's the whole way that you evaluate

18   somebody with a medical issue, right?  If somebody comes

19   to you with chest pain and shortness of breath, you

20   evaluate them, right?

21        A    It's certainly part of the way.

22        Q    So if solitary confinement is associated with

23   an increase in symptoms, doesn't that also mean that

24   solitary confinement is associated with an increase in

25   harm?

1      A      No.

2                  MS. SMITH:  I'm sorry.  Overbroad and

3      predicate.

4                  Go ahead.

5      A      No, not necessarily so.

6      Q      (BY MR. TREVISANI)  Why not?

7      A      Because -- because many symptoms are temporary

8      and emotional.

9      Q      But can't even temporary symptoms be an

10     indicator of harm?

11                 MS. SMITH:  Overbroad and vague.

12     A      I'm trying to understand your question.  If --

13     again, it would have to be in a particular medical

14     context for me to work with that.

15     Q      (BY MR. TREVISANI)  Well, I'm just saying --

16     like, you would agree -- I think, just coming to this,

17     you agree that symptoms are a potential indicator of

18     harm, right?

19     A      I listen to my patients' symptoms.  I take them

20     all into account.  I make -- I do medical decision-making

21     entirely on the individual patient and -- and their whole

22     circumstance.

23     Q      Right.

24     A      So some symptoms --

25     Q      So --

1      A      -- are harmless, some symptoms are medically

2   meaningless, and -- and some symptoms I follow, and other

3   symptoms I investigate closer to.  But it is very

4   individual to the patient and the time.

5      Q      Correct.  So if somebody, for example, comes to

6   you with chest pain, you investigate whether it's because

7   of a heart attack or whether it's because of acid reflux,

8   right?

9      A      It depends on the person and the circumstance.

10  It can vary quite a lot.

11     Q      Okay.  And it could be an indicator of a heart

12  attack, right?

13     A      So can many other things.

14     Q      Right.  And so if something like solitary

15  confinement is associated with an increase in symptoms,

16  doesn't that also mean that it's associated with an

17  increase of potential harm?

18           MS. SMITH:  Objection; overbroad, vague,

19  also maybe calls for a legal conclusion.

20           But go ahead.

21     A      Again, it has to be individualized to the -- to

22  the particular patient.  And the people that have been

23  cited here who have looked at it haven't found your

24  conclusion to be supported, that that harm didn't last.

25     Q      (BY MR. TREVISANI)  Right.  But that's --

1  that's my point, that --

2      A    They think that they couldn't --

3      Q    -- harm -- oh.

4      A    That in the -- that there was an -- in their

5  words, it was an absence of a single definitive piece of

6  research that effectively establishes a causal

7  connection.  That's their wording, not mine.

8              MR. TREVISANI:  Okay.  Can we bring up the

9  exhibit PLS0010411-72, which is the Smith article.

10             THE REMOTE TECHNICIAN:  Please stand by.

11             MS. SMITH:  And while she's pulling that

12  up, you're taking a deposition so I presume you haven't

13  seen my e-mail, but I'll just get it in for the record.

14             For the video, we did look into it, and at

15  least from our records, we show that it's from a

16  different date.  We show that it's from September 16th,

17  2019, not August 2nd, 2019.

18             And if it is the same video that

19  plaintiffs used in opposition to defendant's motion for

20  summary judgment, we propose maybe using the Bates stamp

21  number so there's no confusion.

22             But, hopefully, Michelle and team are

23  investigating that as we are here, and we can sort that

24  out.

25             MR. TREVISANI:  Okay.  Thank you for that.

1   Yeah.  When we take another break, we'll look into it.

2                   MS. SMITH:  Yep.

3                   MR. TREVISANI:  Okay.  Thank you.

4                   THE REMOTE TECHNICIAN:  Exhibit 8 is on

5   the screen.

6                   (Exhibit 8 marked.)

7                   MR. TREVISANI:  Okay.

8                   THE REMOTE TECHNICIAN:  And you have

9   control.

10                  MR. TREVISANI:  Thank you.

11                  So let me make it a little bit bigger so

12  we can zoom in.  Thank you.  I'm going to go down to

13  Page 4.  Make it a little bit bigger.

14      Q    (BY MR. TREVISANI)  Could you read this -- this

15  paragraph right here that I'm highlighting called "A

16  Definition of Solitary Confinement."  Just read it

17  yourself and let me know.

18      A    Okay.

19      Q    Okay.  And this is a bit of a repeat of what I

20  asked you before.

21                  But this here, in Mr. Smith's definition

22  of solitary confinement or his description of solitary

23  confinement, he says, "The amount of contact with prison

24  staff can vary and may constitute more than an hour each

25  day, but only rarely will this contact be socially and

1  psychologically meaningful."

2            So do you agree with this framing of the

3  definition of solitary confinement in terms of the

4  contact being socially and psychologically meaningful?

5            MS. SMITH:  Overbroad.

6      A    I would wonder how he came to that opinion.

7            How does he find out rarely from -- how

8  many prisons are there in the world?  Because this is --

9  this is a worldwide looking that he's doing and one

10  through history.  Maybe it goes back to the Middle Ages.

11     Q    (BY MR. TREVISANI)  Okay.  So then he says,

12  "Contact with prison staff typically takes place in

13  connection with being escorted to the exercise yard or

14  the toilet or through brief encounters when meals are

15  delivered to the cell door."

16            So he considers those sorts of contacts to

17  be encompassed within solitary confinement.

18            Do you agree that those -- do you agree

19  with that?

20            MS. SMITH:  Objection; predicate,

21  overbroad.

22     A    That's -- that is what he wrote; so that is his

23  opinion.

24     Q    (BY MR. TREVISANI)  But, I mean -- I'm sorry.

25  It was a bad question.

1           Do you agree that these sorts of things

2    that he's describing can happen and the regimen still be

3    solitary confinement?

4           MS. SMITH:  Overbroad.

5      A    I don't necessarily agree with his definition.

6    And he says "prison staff typically."  How is he getting

7    that typically?  How many -- how many prisons has he

8    studied to be able to say "typically"?  This, I don't

9    know.

10     Q    (BY MR. TREVISANI)  Okay.  And then, in this

11   paragraph here, he says, when describing solitary

12   confinement, "The key factor is that socially and

13   psychologically meaningful contact is reduced to a

14   minimum."

15          Do you agree that that is a key factor in

16   defining whether something is solitary confinement?

17          MS. SMITH:  Overbroad.

18     A    I think that's -- that is consistent with

19   what's said in the NCCHC definition of isolation and

20   solitary confinement.

21     Q    (BY MR. TREVISANI)  Okay.  Okay.  So going down

22   to Page 16 now.  Give me one second.

23          Ah.  Okay.  Sorry.

24          Here, under the heading "Modern Research,"

25   it says, "A few post-World War II studies of solitary

1    confinement in prisons report no or minor health effects,

2    but the vast majority report substantial health effects."

3                    Do you agree with that?

4        A    I am not sure what he's basing that on.  World

5    War II ended 75 years ago; 76, I suppose.

6        Q    Okay.  So going to, here, "The Suedfeld, et al.

7    (1982) study reported numerous adverse health effects

8    (difficulty to adapt, difficulty in concentrating,

9    sleeping disturbances, dizziness, distortion of the sense

10   of time, anger, apathy, impaired memory) in a pilot study

11   but refused to treat these symptoms reported by prisoners

12   as objective negative health effects of solitary

13   confinement."

14                    Did you read this study?

15       A    I did not read that study.

16       Q    All right.  I'm going to go to down to Page 24.

17       A    I might point out that it's almost 40 years

18   old.

19       Q    Yeah.  Did you read any of the studies in this

20   Section II under "Modern Research"?

21       A    Not the original.  I don't recall looking it

22   up.

23       Q    Okay.  Okay.  So under this heading,

24   "Physiological Symptoms and Reactions," Mr. Smith says,

25   "Severe headaches are a common complaint," and he cites a

1  couple of studies.

2               So, first of all, do you agree that

3  headaches are associated with solitary confinement?

4               MS. SMITH:  Overbroad.

5       A    I don't know, but there's nothing here that's

6  that recent.  I mean, the closest is 18 years old, or 19.

7       Q    (BY MR. TREVISANI)  Okay.  Did you read any of

8  these studies cited in this first paragraph here under

9  "Physiological Symptoms and Reactions"?

10      A    Not the originals.

11      Q    Okay.  Well, at least according to Mr. Smith

12  here, he is reporting that these studies have found that

13  prisoners in isolation have complained of headaches.

14               So do you have any reason to disagree with

15  this research?

16      A    That the prisoners in isolation complained of

17  headaches almost 20 years ago?  No.

18      Q    The next sentence says, "Heart palpitations and

19  increased pulse are also common among isolated inmates,"

20  and he cites a couple of research there.

21               Do you agree about heart palpitations and

22  increased pulse are common among inmates in solitary

23  confinement?

24               MS. SMITH:  Overbroad.

25      A    I don't -- I don't dispute -- let's see.

1    "Heart palpitations and increased pulse are also common

2    among isolated inmates."

3                    There's not much to go on there.  I

4    don't -- I don't dispute that -- that; however, again,

5    we're talking about information that's almost 20 years

6    old.

7        Q    (BY MR. TREVISANI)  Okay.  So is that an

8    example of medical harm that's caused by solitary

9    confinement?

10       A    No.

11                   MS. SMITH:  Sorry.  Overbroad.

12       A    Not necessarily so.

13                   MS. SMITH:  Calls for a legal conclusion.

14                   Go ahead.

15       A    No, not necessarily so.

16       Q    (BY MR. TREVISANI)  And why do you say that?

17       A    Because palpitations and increased pulse can be

18   temporary.  They're -- they're often symptoms of other

19   things, particularly anxiety or -- or even exercise.

20       Q    Okay.  So --

21       A    And -- and --

22       Q    -- do you disagree?

23       A    I'm sorry.

24       Q    I'm just wondering, do you disagree with the

25   conclusion of these studies?

1          MS. SMITH:  Objection.

2      A      That they found something common among isolated

3  inmates 20 years ago?  I have no reason to doubt that;

4  although, what does "common" mean, and how does it

5  compare to inmates who are not in isolation?

6      Q      (BY MR. TREVISANI)  Do you think it is

7  important to review research -- these features of

8  research and research like it in forming an opinion on

9  whether there's a lack of evidence of medical harm

10  related to solitary confinement?

11          MS. SMITH:  Overbroad.

12      A      For this, I depended on Mr. Smith's

13  conclusions, and this is the -- what are the names?

14  Haney, Lynch, and the other one.  Yeah, Haney, Lynch.

15          Oh, and Bonta and Gendreau -- or

16  conclusions for that -- that -- that they didn't find --

17  one said, "'careful empirical evaluations' had 'failed to

18  uncover pervasive negative effects of incarceration.'"

19          Haney and Lynch said -- mentioned "the

20  absence of a single, definitive piece of research that

21  effectively establishes a causal connection."

22          I have no reason to doubt their -- their

23  conclusions.

24      Q      (BY MR. TREVISANI)  My -- here's my question:

25  You have an opinion here about the lack of evidence of

1    medical harm, and you say that "Nowhere do the plaintiffs

2    offer medical evidence of modern restrictive housing

3    being the cause of lasting medical harm."

4                    And I'm wondering if these studies that

5    are here in this section -- are these evidence of

6    possible harms of restrictive housing that would be

7    important to review in reaching that opinion?

8                    MS. SMITH:  Overbroad.

9        A    Heart palpitations, increased pulse,

10   headaches -- complaint of headaches without any

11   comparison offered to general population inmates, I

12   don't -- it's not -- they don't say that.  These are --

13   these are things that are noted.

14                   And, again, there's -- there's no offer of

15   lasting physical harm.  These things are common, and --

16   and hardly a person doesn't have them at some point in

17   time in their life without being harmed by them.

18       Q    (BY MR. TREVISANI)  So you don't think that any

19   of these studies here constitute evidence of medical harm

20   associated with solitary confinement.

21       A    Not that I can see here.

22       Q    Okay.  But did -- you didn't read the studies

23   to find that out, right?

24       A    I didn't read the background studies.  I read

25   the conclusion.

1          And I also read the -- I read the

2     plaintiffs' complaint with their experts, and -- and they

3     only offered physiological symptoms.

4               MR. TREVISANI:  Okay.  We can take this

5     exhibit down.

6               Okay.  I think it's time to take maybe

7     another five-minute break.

8               MS. SMITH:  Okay.

9               (Break taken from 3:54 p.m. to 4:06 p.m.)

10     Q     (By MR. TREVISANI)  Okay.  I want to talk about

11     understaffing in Florida prisons.

12               Are you familiar with the understaffing

13     problem in Florida prisons generally?

14     A     No, not really.

15     Q     Okay.  Did you hear, in your interviews with

16     Florida DOC staff, did anybody mention anything about

17     understaffing?

18     A     I don't recall.  I think, yeah, that's a

19     general conversation, I may have even started it a few

20     times, hey, we're understaffed, are you, but didn't go

21     into any particulars.

22               MR. TREVISANI:  Okay.  Could you --

23     Merinda, could you bring up the exhibit, the November

24     11th article?

25               THE REMOTE TECHNICIAN:  Please stand by.

1   This will be Exhibit 9.

2                       Please stand by.

3                       MR. TREVISANI:  Thank you.

4                       THE REMOTE TECHNICIAN:  Sharing screen.

5   And you have control.

6                       (Exhibit 9 marked.)

7                       MR. TREVISANI:  Okay.  Thank you.

8        Q    (BY MR. TREVISANI)  Okay.  So this is a news

9   article, and I'll see if I can find the date.  Sorry,

10  it's kind of jumping around on me.

11                      Let me see.  Okay.  So I just wanted to

12  turn your attention to this part right here.  It says,

13  "Florida Department of Corrections Deputy Secretary Ricky

14  Dixon recently briefed lawmakers adequately and safely

15  staffing a prison requires a vacancy rate at around 3

16  percent and we're at 28 percent, he said in the House of

17  Criminal Justice Pubic Safety Subcommittee hearing in

18  September."

19                      Were you -- well, first of all, did you

20  speak to a Ricky Dixon?

21       A    I don't remember speaking to Ricky Dixon.

22       Q    Are you familiar with his position in the

23  Department of Corrections?

24       A    Not terribly.  I think I've got a -- did he get

25  deposed?  I think I've seen that, but not beyond that.

1      Q    I'm not -- yeah, I'm not sure.  Well, I'll

2  represent to you that he is now the secretary of the

3  Department of Corrections, but that was a recent

4  development.

5             But my question is, were you aware that he

6  had made that statement about the 28 percent vacancy?

7      A    No.

8             MR. TREVISANI:  Okay.  We can take this

9  one down.  And, Merinda, could you bring up the

10  February 22nd article.

11             THE REMOTE TECHNICIAN:  Please stand by.

12  This will be Exhibit 10.

13             (Exhibit 10 marked.)

14             THE REMOTE TECHNICIAN:  Sharing screen and

15  you have control.

16      Q    (BY MR. TREVISANI)  Okay.  This is another

17  article.  This one does have the date, February 22nd,

18  2021.  And I'm going to just -- well, if it will stop

19  moving it here.  Here we go.  Okay.

20             "In an alarming portrait of Florida's

21  prisons, State Department of Corrections Secretary Mark

22  Inch recently warned lawmakers that the system is

23  woefully understaffed and could erupt in violence as

24  tensions mount."

25             For some reason, I can't view the rest of

1    this part right here.  Thank you.  There we go.

2                    "Inch didn't mince words, using words such

3    as 'crisis.'"

4                    THE COURT REPORTER:  I'm sorry.  I'm

5    having a hard time hearing you and you're going really

6    fast when you're reading that.

7                    MR. TREVISANI:  I'm sorry.  I'll slow

8    down.

9        Q    (BY MR. TREVISANI)  Okay.  And then this

10   portion right here I want to draw your attention to that

11   says, "Ask if the prisons are at, quote, emergency

12   staffing, unquote, levels and more soon will be, he said,

13   but inmates in the understaffed prisons cannot be

14   transferred to better staffed prison because there is not

15   enough room."

16                   MR. TREVISANI:  Okay.  You can take this

17   one down.

18       Q    (BY MR. TREVISANI)  Is this something like a --

19   well, were you aware -- or maybe I already asked this.

20   But were you aware be of aware of the 28 percent vacancy

21   rate in security positions in the FDOC?

22       A    No.

23       Q    Is that something that you would want to know

24   in forming your opinion about the adequacy of health care

25   being provided in restrictive housing?

1    A    I don't think that percent would be helpful to

2    me, no.

3    Q    Okay.  Is it possible that the lack of security

4    staff affects the medical care being provided in the

5    restrictive housing?

6             MS. SMITH:  Overbroad.

7    A    I haven't seen evidence presented to that.

8    Q    (BY MR. TREVISANI)  Okay.  Well, to break it

9    down, if something needs to be escorted to a medical

10   appointment but there's no staff member available to do

11   it, then that appointment can't happen; is that right?

12   A    It can't happen that moment, no.

13   Q    So the understaffing of security positions can

14   affect the provision of medical care within restrictive

15   housing, right?

16   A    I haven't seen evidence of that.

17            MS. SMITH:  Objection.

18   Q    (BY MR. TREVISANI)  But what's your opinion on

19   whether, is it likely to affect the provision of health

20   care in restrictive housing?

21            MS. SMITH:  Overbroad.

22   A    It would -- it would depend.  And this is not

23   an unusual thing at all.  I was just at the NCCHC

24   National Conference and everybody is understaffed, and we

25   are understaffed, but the professionals doing the work

1    inside these facilities make up for it.

2                    So I can't say that necessarily any

3    particular level would result in -- in a substantial

4    diminution of medical care because we haven't factored in

5    people working harder and doing more.  So -- well, that's

6    enough for the moment.

7        Q    (BY MR. TREVISANI)  The lack of security staff

8    would have a more pronounced effect on the medical care

9    in restrictive housing versus general population; would

10   you agree with that?

11                   MS. SMITH:  Overbroad.

12       A    Not necessarily.  So that would depend on how

13   they do their staffing models and how well the different

14   groups coordinate themselves.  There's a lot -- there are

15   a lot ways that good people do good work under -- under

16   more difficult circumstances.

17       Q    (BY MR. TREVISANI)  But just in general, you

18   agree, it's more labor-intensive and it takes more

19   security staff to run a restrictive housing unit versus a

20   general population unit, right?

21                   MS. SMITH:  Overbroad.

22       A    Yeah, per inmate, I'm pretty sure that that's

23   the case.  Again, it's outside my expertise.

24       Q    (BY MR. TREVISANI)  Okay.  So given that,

25   wouldn't you think, just based on your experience and

1    common sense, that the lack of staffing would have a more

2    pronounced effect on the medical care being provided in

3    restrictive housing versus understaffed -- general

4    population?

5             MS. SMITH:  Objection; overbroad; asked

6    and answered.

7        A    If you -- if you talk about my experience, my

8    experience has been that we continued to do excellent

9    medical care for all of our inmates, including those in

10   the restrictive housing and have right through the

11   pandemic.  But our staffing levels, yeah, are

12   problematic.  The people -- good people find a way to do

13   good work.

14       Q    (BY MR. TREVISANI)  Okay.  Are you familiar

15   with the FDOC form called the Daily Record of Special

16   Housing, the DC6-229?

17       A    I don't think I'm much -- I may seen one, I'm

18   not sure.

19             MR. TREVISANI:  Okay.  Can we pull up

20   PIR00093568.

21             THE REMOTE TECHNICIAN:  Please stand by.

22   This will be Exhibit 11.

23             Sharing screen.  And you have control

24             (Exhibit 11 marked.)

25       Q    (BY MR. TREVISANI)  Okay.  So Exhibit 11 is a

1  Daily Record of Special Housing, the DC6-229.

2           So does this refresh your memory as to

3  whether you've seen the form?

4      A    I don't recognize it.

5      Q    Were you aware that this form is generally

6  filled out to track what is occurring in restrictive

7  housing in Florida?

8      A    I'm not aware of anything of it.

9      Q    Okay.  So if, in fact, that this form does

10 track the things that are happening in restrictive

11 housing like rounds, is this something that you would

12 have wanted to see to form your opinion on whether or not

13 those things are happening in restrictive housing?

14           MS. SMITH:  Overbroad.

15     A    I don't -- I don't understand this, so I

16 don't -- and this is outside of my expertise, so I can't

17 say.

18           MR. TREVISANI:  Okay.  Can we take the

19 exhibit down.

20     Q    (BY MR. TREVISANI)  I just wanted to show you

21 an example.  But to pose the question another way, you're

22 offering an opinion about the status of medical care in

23 restrictive housing that is based, in part, on security

24 rounds and medical rounds and interactions; is that fair

25 to say?

1        A     Yes.  Pardon me.  Yes.

2        Q     And that your -- your opinion, in order for it

3   to be valid, requires that those things that you describe

4   are actually happening, not that they're just written

5   down in policy; do you agree with that?

6        A     No, I wouldn't agree with that as a

7   requirement.  I mean, I would have to check every unit

8   every hour of every day for whatever period of time

9   you're talking about.  Obviously I can't do that.

10       Q     Well, let's back up.  I think we're saying the

11  same thing, but correct me if I'm wrong.

12              I'm just saying in order for your opinion

13  to be valid, those things that are written down in the

14  policy in terms of rounds and checks, they actually have

15  to happen in practice, right?

16              MS. SMITH:  Objection; overbroad.

17       A     I mean, as far as the opportunity for

18  interactions, yes, they would have to happen for the most

19  part.

20       Q     (BY MR. TREVISANI)  Okay.  So if those are not,

21  in fact, happening, even if they are written in practice,

22  that would affect your opinion, correct?

23       A     If I had evidence that they were not happening

24  to a substantial enough degree.

25       Q     So if, in fact, this daily record of special

1  housing is evidence of what is happening inside the

2  restrictive housing units, isn't that something that you

3  would have wanted to see to form your opinion?

4          MS. SMITH:  Objection; overbroad; scope.

5      A    I didn't see anything in there -- again, I

6  didn't understand the form.  It's not -- it's not in my

7  wheelhouse at all, so I wouldn't be able to form an

8  opinion about -- about what's on that form or not.

9      Q    (BY MR. TREVISANI)  Well, let's say -- I'm not

10 asking you about that particular form.

11          Let's say that there is a form that

12 records each time an officer checks on an inmate, and

13 that is amassed -- that form is recorded for the entire

14 dorm every day and there's one form a day.  Isn't that

15 something you would want to see to see whether or not, in

16 fact, those checks are being documented as happening?

17          MS. SMITH:  Objection; overbroad; scope.

18     A    I'm not aware that they -- I'm not aware that

19 the Plaintiffs have made that argument.

20     Q    (BY MR. TREVISANI)  I am not asking you about

21 what the Plaintiffs are arguing.  I'm asking the question

22 that I asked, which is, would you have wanted to have

23 seen that document to see whether or not those checks are

24 actually happening or as recorded as happening in

25 restrictive housing?

1                MS. SMITH:  Objection; overbroad; vague;

2       scope.

3            A     That might be outside my necessity.  I don't

4       have to prove everything, but I certainly have to look

5       into the things that are alleged.  So my understanding --

6            Q     (BY MR. TREVISANI)  Would it be --

7            A     -- or not understanding of a security staffing

8       document doesn't tell me -- well, even that doesn't tell

9       me whether the rounds are happening or not.

10           Q     Well, it's -- what if the -- what if the

11      documents hypothetically showed that the rounds were not

12      happening, wouldn't you want to know that to form your

13      opinion about whether or not people in restrictive

14      housing are getting enough interaction?

15                MS. SMITH:  Objection.

16           A     If that was what --

17                MS. SMITH:  Hold on.  Objection; vague;

18      overbroad; scope.

19                Go ahead.

20           A     If that was what was alleged, I would want to

21      look into evidence that is offered with that allegation.

22           Q     (BY MR. TREVISANI)  Okay.  Were you aware that

23      the Florida Department of Corrections currently lacks the

24      staff to meet the minimum out-of-cell recreation and

25      exercise requirements required by the Florida

1    Administrative Code?

2                    MS. SMITH:  Objection; predicate;

3    overbroad; scope.

4        A    I had heard that at some of the institutions

5    for some of the time.  I really can't tell you how often

6    that comes about, but I had -- I had heard that they

7    weren't hiding anything that was -- that I could tell.

8        Q    (BY MR. TREVISANI)  Okay.  Does that -- the

9    fact that the inmates are not getting their out-of-cell

10   time affect your opinion?

11                   MS. SMITH:  Objection; predicate; scope;

12   overbroad.

13       A    Not with the information I have.  Again, we

14   don't -- we don't know -- there's no allegation of how

15   often that has happened, and what effects or harms might

16   be -- have come from that.  Yeah, there's nothing to go

17   on.

18       Q    (BY MR. TREVISANI)  All right.  Let's talk

19   about Oregon for a minute.

20                   Does Oregon have solitary confinement?

21                   I'm sorry.  I think I cut out.  What did

22   you say?

23       A    No, not according to the NCCHC definition?

24       Q    Does Oregon have restrictive housing?

25       A    Yes, they do.

1      Q    Okay.  What are the various of levels of

2   restrictive housing that Oregon has?

3      A    The disciplinary type is called segregated

4   housing, and they have various rules around -- around

5   that that, you know, is somewhat equivalent of levels as

6   to -- as to how much in the way of benefit -- or

7   privileges the inmates have in a segregation level.

8                We also have a behavioral health unit and

9   inmate intermediate care unit.  Death row is gone now, I

10  think.  I think they've let the last guy into the GP.

11  And mental health infirmary.

12     Q    Okay.  So is the behavioral health unit, is

13  that a mental health dorm?

14     A    It's a combination.  It's people whose behavior

15  go beyond their mental health problem, but they generally

16  have a mental health problem also, so they are closely

17  worked with by the mental health professionals, and

18  I'm -- and we, of course, provide for their medical care.

19     Q    Okay.  So putting aside the mental health

20  dorms, you've got the disciplinary units, and then what

21  are the other restrictive housing units in Oregon?

22     A    So I mentioned the intermediate care unit.

23     Q    What is that -- I'm sorry to interrupt you.

24                What is the intermediate care unit?

25     A    That's a step-down unit where a lot of them

1    come from the behavioral health, but kind of a step --

2    special population that have had troubles adjusting some.

3    Some of it's due to mental health or -- or cognitive

4    problems and behaviors along with.  So they are -- they

5    are more intensely cared for by -- by mental health and

6    security.  They keep a different yard schedule and things

7    from the general population.

8        Q    Is there a --

9        A    It might be similar -- It might be kind of

10   similar to CM3 maybe.

11       Q    Okay.

12       A    People go --

13       Q    Are there any --

14       A    -- from there to general population.

15            MR. TREVISANI:  And I'm sorry to the court

16   reporter for the cross-talk.

17       Q    (By MR. TREVISANI)  But is there anything in

18   Oregon that is similar to CM1 or CM2 in Florida?

19       A    Again, that's the -- this is not my expertise

20   or my bailiwick at all, but my understanding is that

21   there that are the various levels of privileges and --

22   and management within the segregation unit and I can't

23   tell you what they are exactly.  But there are people

24   that are very managed very closely and people that are

25   less so.

1      Q     Have there been any recent efforts in Oregon to

2   reduce the number of people in restrictive housing?

3      A     That's a political thing I am not involved with

4   or much aware of.

5      Q     Okay.  Were you -- are you familiar with the

6   implementation of the Step Up Program in Oregon?

7      A     Step Up Program.  That's not ringing a bell.

8   Does it have another name?

9      Q     Okay.  Not that I know of, but I've got a few

10  more questions and maybe we'll get there.

11           Are you familiar with the 2015 Vera

12  Institute study of solitary confinement in Oregon?

13     A     No.

14     Q     Okay.

15     A     I've heard the name, but I can't -- I can't

16  bring it to mind.

17           MR. TREVISANI:  Okay.  Can we bring up

18  that document, and I'm looking to see what it's called.

19  It's called Final Report ODOC Vera Safe Alternative.

20           THE REMOTE TECHNICIAN:  Please stand by.

21           This will be Exhibit 12.  Sharing screen.

22  And you have control.

23           (Exhibit 12 marked.)

24           MR. TREVISANI:  Thank you.

25     Q     (BY MR. TREVISANI)  So this is an October 2016

1    report called "The Safe Alternative to Segregation

2    Initiative:  Findings and Recommendations for the Oregon

3    Department of Corrections."  And I am just going to go

4    scroll through here and ask you if this -- if you've seen

5    this or if this rings a bell.

6         A    Not so far.  I don't know where this is from.

7         Q    So this might be obvious, but clearly you were

8    not involved with the collection of information to --

9    to -- that led to this report; is that correct?

10        A    Not to my knowledge.

11        Q    Okay.  So are you familiar with the unit in

12   Oregon called the DSU?

13        A    That's Disciplinary Segregation Unit.

14        Q    Okay.  So that's discipline, okay, got it.

15             So could you just read this paragraph for

16   me to yourself and let me know when you're done.

17        A    I have read it.

18        Q    Okay.  And I want do ask you about this

19   sentence right here.

20             "An adult in custody may experience one or

21   more of these harmful impacts from a stay in DSU, which

22   may make it difficult for him or her to successfully

23   transition back to the general population."

24             Have you seen adults in custody in the DSU

25   suffer from the these symptoms that are described here?

1      A     Yes.  And I've seen patients in the general

2   population and other units having these also.

3      Q     Okay.  Have you seen a higher rates of those

4   symptoms in the DSU versus the general population?

5      A     Not that I can say, no.

6      Q     Okay.  So looking at this paragraph, Finding

7   A14, one of the recommendations is, "By policy DSU at a

8   minimum -- at minimum facilities should not extend beyond

9   14 days."

10              Do you know in Oregon adopted that policy?

11     A     Yeah, I don't know what the minimum facilities

12   are doing in that regard.  I haven't worked at a minimum

13   facility in years, and that was the women's minimum

14   facility.  So how they're handling their DSU -- I assume

15   these are people with additional problems kind of similar

16   to the AC unit that Florida has, but I can't say for

17   sure.

18     Q     Okay.  Let's scroll down.

19              Actually I'm going to keep scrolling down.

20   Sorry, I'm still scrolling.  Oh, okay.

21              Recommendation C1 is they recommend "Enact

22   policies that prohibit placing people with serious mental

23   illness, including those with developmental disability

24   code of DD3 and neurodegenerative diseases in any form of

25   segregated housing that limits meaningful access to

1    social interaction, environmental stimulation, and

2    therapeutic programming"

3              Has Oregon enacted a policy that prohibits

4    placing people with serious mental illness in segregated

5    housing?

6         A    I don't know.

7         Q    Do you think that Florida should have a policy

8    like that?

9              MS. SMITH:  Objection; overbroad; scope.

10        A    I don't know.

11        Q    (BY MR. TREVISANI)  That's not within the scope

12   of your opinion?  Is that within the scope of your

13   opinion?

14        A    I'm just looking at -- again, this sort of

15   thing would be best individualized.  You know, saying

16   such things as "neurodegenerative disease," well, there's

17   a lot of neurodegenerative disease and people can be

18   perfectly responsible for their activities.

19              Developmental disability can take various

20   forms and -- and -- yeah, so I don't know how they came

21   to this.  So I can't recommend it for anybody.  It's

22   just --

23              MR. TREVISANI:  Let's take down --

24        A    -- because I don't know.

25              THE COURT REPORTER:  I'm sorry.  What was

1  the end of your answer?  Because I didn't get it.

2              THE WITNESS:  I said essentially I don't

3  know how they came to this, so I don't have -- I can't

4  recommend this for anybody because I just don't know.

5              MR. TREVISANI:  Okay.  Can we bring up the

6  exhibit called "Labrecque Reforming Restrictive Housing."

7              THE REMOTE TECHNICIAN:  Please stand by.

8              This will be Exhibit 13.  Sharing screen.

9  And you have control.

10             (Exhibit 13 marked.)

11      Q     (BY MR. TREVISANI)  Okay.  Let me make this a

12  little bigger.

13             This is a 2021 research article.  Do you

14  know Ryan Labrecque?

15      A     No, doesn't ring a bell.

16      Q     Okay.  This article is called "Reforming

17  solitary confinement:  The development, implementation,

18  and process of a restrictive housing step down reentry

19  program in Oregon."

20             And as you can see here, this describes

21  the Step Up Program, and maybe you could just the

22  "Background" to yourself and let me know does this

23  refresh your memory or give you any information about

24  what the Step Up program is.

25      A     Yes, I've read it.

1     Q     Okay.  So are you familiar, does this refresh

2  your memory about what the Step Up Program is?

3     A     No.

4     Q     Okay.  So this article appears to be, you know,

5  some data collection that they did in Oregon.  Were you

6  involved at all with this data collection that led to

7  this article?

8     A     Not to my knowledge.

9     Q     So you didn't work on anything preparing this

10 article at all?

11    A     No.

12           MR. TREVISANI:  Okay.  We can take this

13 down.

14    Q     (BY MR. TREVISANI)  I want to ask you some

15 questions now about the individuals whose medical records

16 you reviewed.

17           Do you recall who are the named Plaintiffs

18 in this case whose records you reviewed?

19    A     All of them, I think, to some extent, but more

20 careful or focused for the ones that had specific

21 allegations with Dr. Venters.

22    Q     Okay.  Let me maybe refresh your memory.

23           Did you review your you reviewed Plaintiff

24 Jerome Burgess's records, right?

25    A     Yes.

1      Q      Juan Espinosa?

2      A      Yes.

3      Q      James Kendrick?

4      A      Yes.

5      Q      And Johnny Hill?

6      A      Yes.

7      Q      I don't think you reviewed any other records

8  from named Plaintiffs but maybe I should ask you.

9              Did you review any records of any other

10 named Plaintiffs?

11     A      Oh, yeah.  There's the Jeremiah Hill, Tracey

12 Dean.  I think Amy Ferguson too.  I'm not so sure about

13 that.

14     Q      Okay.  You don't discuss that I see, but

15 correct me if I'm wrong, Jeremiah Hill in your

16 declaration.  So do you have any opinions about his care?

17     A      Nothing in particular.

18     Q      Okay.  I didn't see any discussion of Tracey

19 Dean.  Do you have any opinions about her care?

20     A      Nothing in particular.

21     Q      Same question Amy Ferguson.

22     A      Nothing in particular.

23     Q      Okay.

24              MS. SMITH:  And I'm going to interpose an

25 objection that the doctor may have opinions in the future

1  with regard to his merits report.

2           MR. TREVISANI:  Okay.  Well, I'll get

3  there.

4      Q    (BY MR. TREVISANI)  Do you have an opinion on

5  whether the risk of harm faced by the named Plaintiffs is

6  typical of the risk of harm faced by the population in

7  restrictive housing?

8           MS. SMITH:  Overbroad.

9      A    I haven't seen any -- any evidence offered that

10 it's different.

11     Q    (BY MR. TREVISANI)  So it's -- as far as you

12 know, it's the same?

13     A    As far as I know, it's the same.

14     Q    Okay.  So if you could turn to page 23 in your

15 declaration to Stacey Cillien or "Cillien."

16     A    Yes.

17     Q    So you -- according to your report, she

18 submitted a sick call on January 31st, 2020; is that

19 right?

20     A    Something like that.

21     Q    Okay.

22     A    Says that her --

23     Q    And then she wasn't --

24     A    I'm sorry.  Go ahead.

25     Q    I'm sorry.  And then she wasn't seen in sick

1  call until February 12th, 2020; is that right?

2      A    That's what I have here, is that her

3  prescription expired on January 31st, 2020.

4      Q    So it says in the third sentence,

5  "Ms. Cillien" --

6      A    When she sent a sick call request to have my

7  birth control renewed, I'm not sure that that means that

8  that was the day that the sick call request or that was

9  the day the prescription expired.  It may have been both

10 the same day.

11     Q    Okay.  So, well, if that day, I mean, it took

12 13 days to see her in sick call; is that right?

13          MS. SMITH:  Objection; predicate.

14     A    There's something like a 13-day difference

15 there.

16     Q    (BY MR. TREVISANI)  Okay.  Do you know why it

17 took so long?

18     A    I don't know.

19     Q    Is it problematic in your mind that it took so

20 long?

21          MS. SMITH:  Vague; predicate.

22     A    It would depend on the circumstances and

23 particularly on the sick call request.  If the sick call

24 request was simply for a -- to get a new pack of birth

25 control, then -- then that might not result immediately

1  in a sick call because the complaint wasn't being sick.

2  The complaint might have been, can you send me my next

3  packet of birth control pills.

4      Q   (BY MR. TREVISANI)  Okay.  And then according

5  to your declaration, she saw the doctor on March 12th,

6  2020.

7      A   Yes, that's what I have.

8      Q   That's another month later.  Did you know why

9  it took so long to see the doctor?

10      A   I don't know the reason for that period of

11  time.

12      Q   Okay.  Is that -- that kind of delay consistent

13  with adequate standards of care in providing care in

14  prison, in your opinion?

15            MS. SMITH:  Objection.

16      A   It would be depend on the circumstance.

17            MS. SMITH:  Vague; overbroad.

18            And I'm just going to warn everybody,

19  Kelly has been shaking her head.  I think we're talking

20  over each other.  So let's just be aware of that.

21            Go ahead.

22            THE WITNESS:  I'll slow down.

23      A   It would be depend on the -- on the individual

24  and their needs and the availabilities.  A month is

25  certainly not unusual in our community to wait to see

1  your doctor.  It's usually quite a lot longer.

2       Q    (BY MR. TREVISANI)  Is that consistent with

3  NCCHC standards?

4       A    I don't know if they have a wait time standard

5  for that.  We like to have ours last about a month or six

6  weeks, certainly see that from time to time, the wait

7  time for next available appointment.

8       Q    Do you know if Ms. Cillien was in pain during

9  this time that she didn't have her medication?

10       A    I don't know.

11       Q    Okay.  Let's turn to Demetrius Spires on

12  Page 24.

13       A    Okay.

14       Q    And he is being treated for chronic kidney

15  disease and hypertension according to your declaration,

16  right?

17       A    Yes.

18       Q    Okay.  And then at the end of your opinion

19  about Mr. Spires, you say, "Fortunately for Mr. Spires,

20  his kidney function remained stable through this period

21  of time," and you have more information there.

22            MR. TREVISANI:  Can we bring up

23  PIR00093777.

24            THE REMOTE TECHNICIAN:  Please stand by.

25  PIR000935?  I'm sorry.  Can you --

1          MR. TREVISANI:  Sorry.  Let me start over.

2     It's PIR00093777.

3          THE REMOTE TECHNICIAN:  93777.  I do not

4     have that on this list.

5          MR. TREVISANI:  Okay.

6          THE REMOTE TECHNICIAN:  We have two PIRs.

7          MR. TREVISANI:  Let me see.  Let me see if

8     I have something -- maybe it's called something else.

9          Okay.  I'll come back to that one.

10    Q    (BY MR. TREVISANI)  Let's go to John Meyers on

11    Page 25 of your declaration.  And you say in Page 26, in

12    the middle of the first -- or the second paragraph,

13    "Fortunately those with mild to moderate sleep apnea get

14    so serious health benefit, such as avoiding heart attack,

15    from CPAP."

16         Do you how would you describe the

17    seriousness of  Mr. Meyers' sleep apnea?

18    A    That, I don't know.  I don't know what his AHI

19    score is.

20    Q    So you don't know if it's mild, moderate or

21    severe or something else?

22    A    No.  My comment was regarding the Phillips

23    Respironics recall and the millions of Americans who

24    don't have their CPAP and -- and those with simple CPAP,

25    as Mr. Meyers had, have been told to stop it.

1           Now, for the vast majority -- I don't know

2    if it's the vast majority, but the majority of CPAP users

3    have mild to moderate CPAP and their benefit from the

4    CPAP is better sleep and less snoring.  There hasn't been

5    a difference in cardiovascular problems.

6         Q    So, but if Mr. Meyers does have severe sleep

7    apnea, then he would see a serious health benefit from

8    the CPAP machine, right?

9         A    Over a long period of time, yes.  It's felt

10   like -- it's felt that the benefit comes mostly from --

11   from easier blood pressure control.  And so the benefit

12   from blood pressure control comes over the course of

13   years.

14        Q    So let's look at Jerome Burgess, Page 29 of

15   your declaration.

16             So your opinion is that -- well, let me

17   ask you, is it your opinion that Mr. Burgess is having

18   pseudoseizures?

19        A    That's the opinion of Dr. Gama and -- where's

20   this other one -- Dr. Gaxiola.

21        Q    Do you agree with that opinion?

22        A    I have no reason to disagree with it.  Those

23   are his doctors, and one of them is his neurologist.

24        Q    And you agree or you believe that he has not

25   have epilepsy?

1      A     I have no reason to disagree with his doctors.

2      Q     Well, is it your opinion that he pseudoseizures

3  or epilepsy?

4      A     I don't have a medical opinion beyond the

5  record I haven't examined him myself.

6      Q     Okay.  So you don't have an opinion on what's

7  causing Mr. Burgess's seizures?

8           MS. SMITH:  Objection; predicate.

9      A     I don't have a separate medical opinion about

10  that.  My observation is that his doctors say that

11  they're pseudoseizures, both his neurologist and his

12  general doctor.  But that's going to be the case for any

13  pretty much any inmate that we discuss.  I need to depend

14  on their physicians and such for a -- for a medical

15  opinion of what's going on there for the most part.

16      Q     (BY MR. TREVISANI)  So for all of the

17  individuals that you've reviewed, you don't have a

18  medical opinion on their -- on their diseases?

19           MS. SMITH:  Overbroad.

20      A     I can't lend opinion beyond what's in the

21  record.

22               Now, such a thing as an X-ray that fails

23  to show a fracture is an X-ray fails to a show a

24  fracture.  An X-ray that shows a fracture is an X-ray is

25  shows that fracture.  That's not too hard to work with.

1    But I haven't seen the EEG that Mr. Burgess had.  I saw

2    an MRI report, I believe, and I have not seen him have an

3    event so it's a little more difficult for him to -- for

4    me to have a separate opinion than his doctors.  I simply

5    have no reason to doubt them.

6        Q    Okay.  He's been prescribed seizure

7    medications, right?

8        A    Yes.

9        Q    So there is at least a doctor who believes that

10   he has epilepsy, right?

11       A    I can't say that.

12            MS. SMITH:  Form.

13       A    There was a provider that at one point wanted

14   to cover him for epilepsy apparently or --

15       Q    (BY MR. TREVISANI)  Do you know --

16       A    -- and/or some of these medications are also

17   used for mental health for mood stabilization or for

18   chronic pain for pain control.  So I don't know how he

19   started on that or -- or from what all conditions that

20   he's been continued on that, but it is a bit of an

21   abundance of caution to have a seizure patient on that.

22   It's not unusual.

23       Q    Is that within the standard of care to

24   prescribe epilepsy medication to a patient who -- with

25   pseudoseizures who has no evidence of epilepsy on an EEG?

1          MS. SMITH:  Overbroad; predicate.

2     A    It's certainly is -- is done, and like I said,

3  these medications have multiple uses.

4     Q    (BY MR. TREVISANI)  Do you know why they were

5  prescribed for Mr. Burgess?

6     A    I don't know.

7     Q    So regardless of whether it's pseudoseizures or

8  it's epilepsy, you would agree that he still faces the

9  same risk of falling from a seizure, correct?

10          MS. SMITH:  Overbroad.

11     A    I don't know.  The majority of the

12  pseudoseizures patients fall carefully and don't bump

13  themselves as often as those who have -- to epilepsy and

14  have an event where they're at.

15     Q    (BY MR. TREVISANI)  So do you have an opinion

16  on whether the risk faced to Mr. Burgess is the same or

17  different depending upon whether he has pseudoseizures or

18  epilepsy?

19     A     The risk of fall injury, I think, is less with

20  pseudoseizures.

21     Q    Okay.  At the top of Page 30 of your

22  declaration, you say, "Mr. Burgess has refused to see

23  neurology since then," and I think sometimes refers to

24  2015; is that right?

25     A    That I'm not sure.

1      Q    Well, you're not sure of which part?

2      A    Oh, yeah, I think I -- the 1/22/2015, okay, I

3   see that, yeah.

4                MR. TREVISANI:  Okay.  Can you bring up

5   BUR 00004163.

6                THE REMOTE TECHNICIAN:  Please stand by.

7   This will be Exhibit 14.  Share the screen.  And you have

8   control.

9                MR. TREVISANI:  Okay.  So -- thank you.

10               (Exhibit 14 marked.)

11     Q    (BY MR. TREVISANI)  This is Exhibits 14 is a

12  neurology clinic flow sheet.

13               Does that indicate that Burgess was seen

14  in the neurology chronic care clinic in 5 of 2019?

15     A    I don't know.  It -- he's receiving chronic

16  care clinic visit, but we in primary care see our seizure

17  disorder patients regularly in clinic without being

18  neurologists.  So we -- we have a chronic care form a

19  little different than this, but my filling out that form

20  doesn't make me a neurologist.

21     Q    But he is not -- Mr. Burgess is seen for

22  neurologic care, correct?

23     A    He's seen in the -- in the -- in a seizure

24  disorder chronic illness clinic, but we also see our

25  pseudoseizure patients there.  It depends --

1    Q    So even --

2    A    -- or where you do that documentation.  So I

3  can't say for sure.

4    Q    All I'm asking you is, in this clinic, he is

5  receiving neurologic care, correct?

6    A    I can't -- if you allow me to include

7  pseudoseizure, yes.

8    Q    Okay.  So he did not refuse neurologic care in

9  May of 2019?

10    A    Is this signed by the neurologist?  Because I

11  said that he refused to see neurology.

12    Q    But when you said that, you meant to see an

13  actual neurologist, not neurologic care?

14    A    Right.

15         MR. TREVISANI:  Can we take this down and

16  pull up BUR 00004172.

17         THE REMOTE TECHNICIAN:  Please stand by.

18         This is Exhibit 15.  Sharing screen.  You

19  have control.

20         (Exhibit 15 marked.)

21    Q    (BY MR. TREVISANI)  Okay.  This one is a little

22  harder to read, but this is Jerome Burgess.  It's another

23  neurology clinic flow sheet.  And across here, there are

24  various dates.  These look like 2015, 2016, 2016, 2017

25  and over to 2019.

1              So, again, you agree that on these dates,

2     he was receiving neurologic care?

3         A    He was if you allow me to include

4     pseudoseizures.

5              MR. TREVISANI:  Okay.  Let's take this

6     down.

7         Q    (BY MR. TREVISANI)  On Page 31 of your

8     declaration, sort of in the middle of the page,

9     Mr. Burgess also makes claims that he's consistently

10    receiving self catheretization supplies, and then there's

11    another sentence.

12             And then the last sentence says, "I only

13    found evidence of one informal grievance from him

14    regarding this in April of 2016."  Do you see that?

15        A    Uh-huh.  I do.

16             MR. TREVISANI:  Okay.  Can we bring up

17    BUR 00004650.

18             THE REMOTE TECHNICIAN:  Please stand by.

19             Exhibit 16.  Sharing screen.

20             MR. TREVISANI:  Thank you.  Give me one

21    second.

22             (Exhibit 16 marked.)

23        Q    (BY MR. TREVISANI)  Could you read this,

24    please?

25        A    I can try.

1            MS. SMITH:  Can you make it a little

2    bigger, please?

3            MR. TREVISANI:  Yeah.

4        A    There's a lot of this I can't read.

5        Q    (BY MR. TREVISANI)  Okay.  Well, let me just

6    ask you a question.

7                This is dated February 26, 2019, and right

8    about here (indicating), he's complaining about not

9    getting replacement catheters and that he has to reuse

10   and reuse them; is that right?

11       A    It says that he can't use the catheters.  So is

12   he getting catheters that he can't or won't use or

13   doesn't want to use?  Or using the ones that he is

14   familiar with?  I can't make all this out.

15       Q    Well, all I know is --

16       A    In I any case --

17       Q    -- this is a -- I'm sorry.  Go ahead.

18       A    In any case, I allowed in my opinion that there

19   may have been times when he wasn't getting catheters

20   appropriately, and that can happen in any institution.

21   It happens with us from time to time getting our supplies

22   perfectly right for each person.

23                I guess you might -- is that any different

24   in the restrictive housing versus GP?  And my point is

25   that it's the same supplier within the institution.  It

1    self-services the clinic storeroom, and the same nursing

2    staff.  So, you know, it would -- if they had run out of

3    his preferred catheter, then that would be the case

4    whether he was on GP or restrictive housing.

5         Q     This is a complaint about him got not getting

6    catheters that is after April of 2016, isn't it?

7                   MS. SMITH:  Overbroad; vague.

8         A     I can't read all of that, but "the kind I use,"

9    "I can't use the other catheters," that kind of sounds to

10   me like they were offering him other catheters, but not

11   the particular ones that he preferred.

12                   MR. TREVISANI:  Okay.  Can we take this

13   down.

14        A     Again, I'm not -- okay.  Sorry.

15                   MR. TREVISANI:  And can you bring up the

16   BUR 00011273.

17                   THE REMOTE TECHNICIAN:  Please stand by.

18                   This will be Exhibit 17.

19        Q     (BY MR. TREVISANI)  And I should ask,

20   Dr. Paulson, do you remember seeing that grievance that

21   we just saw?

22        A     I can't remember if it's the one that I saw.

23                   THE REMOTE TECHNICIAN:  And you have

24   control.

25                   (Exhibit 17 marked.)

1      Q    (BY MR. TREVISANI)  Okay.  This is Exhibit 17.

2  I'll make it bigger.  Scroll down to the -- okay.

3           Can you take a minute to read this one.

4           And I'll ask you as you read this, so this

5  is a complaint.  One of his complaints is that he is

6  having problems getting catheters while in CM at

7  Suwannee; is that right?

8      A    He -- he is complaining having difficulty, many

9  problems receiving them, that being his special

10  catheters.  I don't know if he was offered alternatives.

11           MR. TREVISANI:  Okay.  We can take this

12  down now.

13      Q    (BY MR. TREVISANI)  Okay.  So these were --

14  these were, again -- do you remember seeing that

15  complaint in your record review?

16      A    Again, I don't recall if that's the one I saw.

17      Q    Okay.  So these -- but these were complaints

18  about catheters.  They came after April of 2016, correct?

19           MS. SMITH:  Overbroad.

20      A    I'll take your word on the date.  I don't

21  recall seeing that right now.  I wasn't looking there.

22      Q    (BY MR. TREVISANI)  Okay.  Well -- okay.  But

23  so your statement here that you only found evidence of

24  one informal grievance from him regarding this, being the

25  catheters, in April of 2016 --

1        A     Uh-huh.

2        Q     -- that's not correct, right?

3        A     That is correct.  That's -- that's what I

4    found.  I only found -- that is correct that that is what

5    I found.

6        Q     I understand that's correct that's what found.

7    But is that correct that there are records that postdate

8    April of 2016?

9        A     You showed me two grievance forms, yeah.  Is

10   this formal or informal?

11       Q     I'm not sure.

12       A     Okay.

13       Q     Okay.  So let's move to Mr. Kendrick on Page

14   30 -- let's see, Page 34 of your declaration.  You have

15   an opinion about Mr. Kendrick's weight loss.

16             Do you know why Mr. Kendrick lost weight

17   during that time?

18       A     I don't know.

19       Q     Okay.  Is that something important that you

20   think medical staff should look into?

21       A     Certainly if it got to be a substantial weight

22   loss or -- or worse.

23       Q     Well, was Mr. Kendrick trying to lose weight

24   during that period?

25             MS. SMITH:  Predicate.

1      A    I don't know.

2      Q    (BY MR. TREVISANI)  Okay.  Well, assuming he

3  was not, isn't it a cause for concern when a patient

4  losses that much weight without trying?

5      A    Generally we look at a substantial weight loss

6  at a 10 percent.  So people's weights vary, but people

7  who are heavier vary more be.  A 10 percent weight loss

8  with him be 28 to 30 pounds.

9      Q    So this -- in your opinion, this is not

10  something that needed further medical investigation?

11      A    Not unless it continued, unintended weight

12  loss, unwanted weight loss for a period of time to where

13  it became substantial.  13 pound variability in a

14  300-pound man, you know, that's -- that's not cause for

15  alarm generally, but if it continued and he wasn't trying

16  and it got to be more, then more.

17                Now, if he was trying to lose weight, that

18  be would a healthy weight loss, four pounds a week.

19      Q    You noted that Mr. Kendrick refused his insulin

20  several times.

21      A    Are we on the next page?

22      Q    It's in that page and then again at the next

23  page about insulin injections.

24                MR. TREVISANI:  And while you're looking

25  at that, can we pull up KEN 00003767.

1          THE REMOTE TECHNICIAN:  Stand by.

2          This is Exhibit 18.

3          (Exhibit 18 marked.)

4     Q    (BY MR. TREVISANI)  Dr. Paulson --

5     A    Yes.

6     Q    -- do you remember seeing or -- seeing anything

7  in the records indicating any reasons why Mr. Kendrick

8  was refusing his insulin?

9     A    I don't remember that, no.

10     Q    Okay.  This Exhibit 18, which is a grievance

11  that he filed, can you take just a minute to read that.

12     A    Yes, I do remember reading this.

13     Q    Okay.  So in this one, he's complaining that

14  he's getting his insulin but that his food is not getting

15  delivered until more than an hour later, which can be

16  dangerous for from a medical perspective; is that right?

17     A    It's -- the danger for medical perspective

18  would depend.

19     Q    Okay.  Well, is it dangerous for Mr. Kendrick?

20     A    I don't know.  I don't know what all types of

21  insulin that he's getting.  Certainly the NPH wouldn't be

22  dangerous and regular insulin probably not either, and I

23  don't know how closely his blood sugars are under control

24  at this point in time.  If he's under very close control,

25  he might become somewhat symptomatic with a large amount

1  of regular insulin.

2             Although, most people an hour or so with

3  regular insulin is be not a big deal, which is the reason

4  we use regular insulin and the other longer lasting ones

5  like NPH and Lantus, just because they don't bottom

6  people out quickly because the meals at our institution

7  can vary.  There could be a fight kitchen and everybody

8  is two hours late.  You don't want your diabetics falling

9  out.  So it would depend.

10      Q    Okay.  And then so did you read here that he

11  says, "Grievant asserts that when he refuses his

12  injections because of this highly dangerous practice, it

13  is recorded in his medical records as being

14  noncompliant"?  So I guess my question is, did you take

15  this into account when assessing his refusals of insulin

16  injections?

17      A    Did I take this into account?  I read this and

18  that seems to be his reasoning for this period of time.

19  But I don't know whether or not they've counseled him

20  about his insulin and the safety of it regarding time is

21  his general control, where this fits into how closely

22  controlled he is.

23      Q    If he -- I guess my question is, if he indeed

24  refused --

25      A    Uh-huh.

1      Q     -- because of this reason, you wouldn't

2   consider that to be -- well, let me ask, you wouldn't

3   consider that be to a true refusal of health care,

4   correct?

5      A     If that was -- if that was a -- if that was a

6   refusal for a patient I didn't know and had never had

7   never counseled and there's no evidence in the -- in the

8   chart that anyone had talked to be him about, I would

9   bring him up and talk him to about it, or go down there

10  and talk to him about it, if he's a CM patient and -- and

11  try and reassure him that this is indeed not dangerous.

12  If he hasn't bottomed out, he's not likely to bottom out.

13  Certainly let us know if you feel badly, and find out,

14  you know, what his reasoning is and what his fears are on

15  try to work with those.

16     Q     Did that happen here?

17     A     I don't know.

18           MR. TREVISANI:  Okay.  Can we take this

19  one down.  And can we bring up KEN 00003769?

20           THE REMOTE TECHNICIAN:  Please stand by.

21           This is will be Exhibit 19.  Sharing

22  screen.  You have control.

23           (Exhibit 19 marked.)

24     Q     (BY MR. TREVISANI)  Okay.  I am going to scroll

25  down to Mr. Kendrick's grievance.  If you could take a

1   minute and read that.

2                  THE WITNESS:  Can you roll it down a bit.

3   It's blocked by the by the video boxes.  That's good.

4                  Okay.  Can you roll back up again?  That's

5   good.

6        A    Okay.

7        Q    (BY MR. TREVISANI)  Okay.  So here he's

8   complaining that the nurse brought him the wrong insulin;

9   is that right?

10       A    Yes.

11       Q    And if the nurse -- if he has to sign a refusal

12  form from this, you wouldn't consider that to be a true

13  refusal health care, would you?

14       A    No.  If there was -- if there was an honest --

15  or dishonest, rather.  If there was a medication error,

16  he would be completely within his rights of refusing and

17  nothing more for it.  The person goes back and gets the

18  right insulin and injects him.

19                  But it's odd here he's complaining about

20  the -- the syringes coming preloaded at the same time

21  he's complaining about the nurse throwing it down in

22  front of him.  Well, which one is it?

23       Q    I think he might be talking about other

24  instances.

25                  MR. TREVISANI:  But we can take this one

1  down, and this will be the last one for Kendrick.  Can
2  you bring up KEN 00005346.
3              THE REMOTE TECHNICIAN:  Please stand by.
4              This will be Exhibit 20.  And you have
5  control.
6              (Exhibit 20 marked.)
7              MR. TREVISANI:  Thank you.
8       Q    (BY MR. TREVISANI)  And I'm going to scroll
9  down to here.  Could you read Mr. Kendrick's grievance
10 here.  Let me know if I need to move it.
11      A    We're good.
12           Okay.
13      Q    Okay.  So in this one he refused insulin
14 because it was the wrong time; is that right?
15      A    I read it that the timing to his dinner --
16      Q    Right, exactly.
17      A    Okay.  No.
18      Q    So my question is, if you saw this refusal,
19 that he refused, he signed a refusal of this insulin --
20      A    Uh-huh.
21      Q    -- this would be not be indicative -- this
22 would not be indicative of a true medical -- refusal of
23 medical care, correct?
24      A    It would depend.
25      Q    Okay.  Well, he's not refusing his insulin.  He

1  just -- he doesn't want to take it at a time that he

2  thinks it is dangerous for him; is that right?

3      A    Yes, that is what he says.  But I wonder, since

4  this is more, have they talked to him about it and the

5  fact that the NPH insulin has a long activity and a

6  long -- I'm trying to look for the pharmacology of it.

7              In any case -- in any case, the NPH takes

8  a number of hours to peak.  It is practically irrelevant

9  the timing that you're taking it, particularly if you're

10  taking more than once a day, to your meals.  So --

11     Q    But do you think --

12     A    If someone had explained that to him and showed

13  him -- I'll even show people that the PDR information

14  about -- about the medication, you know, look, this one

15  doesn't peak for 12 hours, and it last for 24, and you're

16  taking it twice a day so it's smooth all the through the

17  day and night it's going to make you bottom out no matter

18  what time you eat.  Just make sure you eat and eat

19  healthfully and take care of yourself and get your

20  exercise.

21              If despite doing that and knowing that he

22  understood what I said, he complains about meal times, I

23  wouldn't -- I wouldn't -- I would take that as a mealtime

24  complaint, not a medication complaint.

25     Q    So did anybody in Florida Department of

1   Corrections do what you suggested and try to figure out

2   why Mr. Kendrick was refusing his insulin?

3       A    I don't know.  You didn't -- you didn't let me

4   see the response.

5       Q    Oh, okay.  Well, do you want to see it?

6       A    I guess so.

7                 MR. TREVISANI:  Okay.  Can we pull it back

8   up.

9                 THE REMOTE TECHNICIAN:  Okay.  And that's

10  Exhibit 20.

11                MR. TREVISANI:  I'll have to take your

12  word for it.

13                THE REMOTE TECHNICIAN:  That was the last

14  exhibit.  I'm going to give you control.

15                MR. TREVISANI:  Yeah.  Just scroll up to

16  Dr. Paulson can see it.  No, no, the top part.

17                THE WITNESS:  The top part, yeah.

18                MR. TREVISANI:  Yeah.

19                THE WITNESS:  This is a moving target.

20                THE REMOTE TECHNICIAN:  I can make it

21  bigger.

22      A    All right.  So it showed that he -- they

23  reminded him that he would not get in trouble, and that

24  he was refusing his blood sugar checks and refusing his

25  metformin.  They did contact the kitchen, that's good.

1           What does it say -- oh, yep, you have an

2     upcoming appointment to discuss with your clinician, so

3     they were going to the right thing for him even if they

4     had done it before.  I don't know if his clinician had

5     talked to him before about this, but that was their

6     response this time.  I'm not sure what their response to

7     the previous one was.

8           But even if this was his first time of

9     refusing his insulin for the timing, mealtime purpose,

10    this looks like the right thing to do, including having

11    him see his clinician to discuss it.  And then he can

12    discuss it and say, hey, the timing doesn't matter as far

13    as your insulin and your health with the type of insulins

14    that you're taking.  Do -- you know, work your best with

15    all the things you can do, including taking your

16    metformin, yeah.

17          MR. TREVISANI:  Okay.  Can we take this

18    down.  And now might be a good time to take a five-minute

19    Back at 5:36.

20          (Break taken from 5:31 p.m. to 5:38 p.m.)

21     Q    (BY MR. TREVISANI)  All right.  So the

22    homestretch.  Let's talk about Mr. Espinosa.

23     A    Okay.  Can I quickly jump in.  I took the

24    moment to refresh myself on N.P.H. insulin.  It peaks at

25    six to eight hours after the -- after the injection and

1    lasts for 12 to 16 hours, so if you're taking it twice a

2    day, it just doesn't matter when you eat and if you want

3    it to match the peak, you would eat six hours after the

4    injection.

5              But the peaks and valleys are very mild

6    and it's not like cascade mountain peaks that we have

7    here, it's more like Florida mountain peaks.  So -- so

8    explaining to him once or twice, after that I would say

9    that he's just -- he's just levering to try and get his

10   meals differently or get snacks or something else.  But

11   this is something that could be easily explained and put

12   his mind at ease if his mind is troubled.

13        Q    Okay.  Do you know if that was explained to

14   him?

15        A    I don't know.

16        Q    So moving on to Mr. Espinosa, Page 38 of your

17   declaration.

18        A    Okay.

19        Q    Do you have an opinion on whether his inability

20   to speak is caused by functional aphasia versus some

21   other organic cause from his throat?

22        A    I rather think it's a functional aphasia based

23   on the evidence from his endoscopy and his MRI, and

24   laryngoscopy and multiple biopsies.

25        Q    You would -- you would agree that even if he

1    has functional aphasia, he is unable to speak?

2        A    No, I wouldn't agree.

3        Q    Okay.  How would you describe it?

4        A    I -- he -- he might be unable to speak if -- if

5    his functional aphasia was from a serious and ongoing

6    mental illness just like someone with schizophrenia can't

7    control their hallucinations, but then that might be able

8    to come under control with good psychiatric care.

9             But there are a lot people where it's not

10   a true conversion disorder, just a choice not to speak.

11   And I gave an example in my -- from my little practice.

12       Q    Did the Department of Corrections medical staff

13   attempt to determine whether -- well, strike that.

14            Is the DOC mental health staff, are they

15   treating him for functional aphasia?

16            MS. SMITH:  Scope.  Predicate.

17       A    That, I don't know.

18       Q    (BY MR. TREVISANI)  Do you think that the DOC

19   mental health staff or the medical staff should be

20   pursuing whether Mr. Espinosa needs mental health

21   treatment because of functional aphasia?

22            MS. SMITH:  Scope.

23       A    I don't know whether or not they've assessed

24   him for a major mental health disorder such as a

25   conversion reaction or persistent conversion.  But

1  from -- from an allopathic medical standpoint, from my

2  medical standpoint, I treat my patients how they are.

3  He's not speaking, I'm treating him as though he's not

4  speaking is enough.

5       Q    (BY MR. TREVISANI)  But my question is whether

6  or not they have evaluated him.  You agree that they

7  should evaluate him, correct?

8            MS. SMITH:  Predicate.  Scope.

9       A    If he -- if -- if they have been referred by

10  the -- by his primary doctors, most certainly.  I don't

11  know if they have had another explanation for it or what

12  the circumstances was there that would be more kibitzing

13  than I have information to use for deciding.

14       Q    (BY MR. TREVISANI)  Right.  But you agree that

15  somebody should try to figure that out, right?

16       A    Yeah.  It could be his primary doctor didn't

17  see any evidence of -- of major mental health and

18  continued to treat him as a functional aphasia.

19       Q    Okay.  And you agree that if he does have

20  functional aphasia, that that's a serious mental health

21  problem?

22       A    No.  For some people it's a choice.

23       Q    Well, I thought you explained to me that for

24  some people it's a choice, but true functional aphasia is

25  a mental health disorder?

1      A      No.  A conversion disorder which can cause

2  functional aphasia is -- is a major health -- a major

3  mental health disorder.  But that's rather rare and,

4  particularly, they have it last for a long period of

5  time.

6              And what I'm getting at is I'm not saying

7  that he doesn't have any mental health disorder.  But

8  it's not necessarily contributing or causing his -- his

9  functional aphasia and shouldn't interfere with his

10 medical treatment one way or the other.  He should be

11 cared for properly, regardless of whether he is speaking

12 or not speaking or know the reason for speaking or not

13 speaking.

14     Q      Did you review any of Mr. Espinosa's mental

15 health records?

16     A      I would have at least thumbed through them

17 because they're intertwined with his medical record and

18 other things.

19     Q      Okay.  Let's talk about Brandon Welch.

20     A      What page are we on?

21     Q      I'm looking for it.  It's Page 21 of your

22 declaration?

23     A      Oh, here they are.  Okay.  Never mind.  All

24 right.  Got you.

25              MR. TREVISANI:  And can we pull up, while

1    we're waiting, PIR00069789.

2                    THE REMOTE TECHNICIAN:  Please stand by.

3    69789?

4                    MR. TREVISANI:  Yes, I think so.

5                    THE REMOTE TECHNICIAN:  I never did

6    receive that one.

7                    MR. TREVISANI:  How about PIR00067 --

8    69731.

9                    THE REMOTE TECHNICIAN:  That's it.  I do

10   have that one.

11                   MR. TREVISANI:  Thank you.

12                   THE REMOTE TECHNICIAN:  Please stand --

13   please stand by.  And this would be Paulson 21.  Sharing

14   screen.  And you have got control.

15                   MR. TREVISANI:  Thank you.

16                   THE REMOTE TECHNICIAN:  Uh-huh.

17                   MR. TREVISANI:  So this is actually --

18   okay, now I know why I gave you the first one.  This is a

19   longer document.  So I'm going to scroll to PIR00069731.

20                   Merinda, is there a way to go to a

21   particular page of the PDF here (indicating)?

22                   THE REMOTE TECHNICIAN:  Yes.  Right there,

23   type in the page number.

24                   MR. TREVISANI:  Okay.  Okay.  This is the

25   one I was looking for.

1              (Exhibit 21 marked.)

2       Q    (BY MR. TREVISANI)  So this is, for the

3   record -- well, no, it's the next one.  My bad.  Never

4   mind.  6978.  And this is a fracture dislocation sprain

5   protocol.

6              So Mr. Welch was involved in some kind of

7   altercation.  He says he got hit.  It involved a lock and

8   a sock and -- let's see.  And the -- the date on this is

9   July 13th, 2020; is that right?  Do you see that here?

10      A    Oh, yes, I see that.

11      Q    Okay.  And down here under findings there's a

12  checkbox, and the patient has possible fracture and/or

13  dislocation; do you see that?

14      A    Yes.

15      Q    Okay.  And then over here he's reporting 7 out

16  of 10 pain.  And -- okay.  So -- so the nurse notes a

17  possible fracture and/or dislocation.  And then according

18  to your declaration, he wasn't seen until September 14th

19  of 2020, so it's about two months later; is that right?

20      A    I have it he was X-rayed on September 14th.

21      Q    Okay.  Do you know why it took two months to

22  get him the X-ray?

23      A    No, I don't.

24      Q    All right.  Is that an appropriate delay

25  considering that the nurse noted a possible fracture

1    and/or dislocation two months earlier?

2         A    It -- it would have been appropriate to -- to

3    have -- he received a pain referral for dental to have it

4    X-rayed, I think is what it said; am I right?  And that

5    would be appropriate to have that in a reasonable period

6    of time.

7         Q    But two months is appropriate?

8         A    No.  The -- the immediate referral for dental

9    and -- but then to have that in an appropriate period of

10   time in a few days.  It depend -- it depends somewhat on

11   the -- on the circumstance of the injury and how it

12   looked, if there was -- if the teeth were malaligned, if

13   there was break in the skin, if there was a -- a visible

14   external malalignment, somewhat swelling, that general

15   tenderness without -- without -- without focus, teeth

16   that are aligned properly, no internal or external

17   bleeding, and no palpable step off, that's less of a

18   problem.

19              MR. TREVISANI:  Okay.  We can take this

20   down.

21         Q    (BY MR. TREVISANI)  Other than the opinions

22   that we've already discussed today, are there any other

23   opinions that you intend to offer regarding Plaintiff's

24   motion for class certification or the evidence in support

25   of that motion?

1        A     Nothing that comes to mind.

2        Q     Do you plan to do any other work on this case?

3        A     Only if -- if Nicole asks me to.

4        Q     But right now you have no further plans to do

5   any further work?

6        A     No, I don't have anything in front of me on

7   this case.

8        Q     Okay.  How many hours have you spent on this

9   case so far, do you know?

10       A     Oh, no idea.  Quite a few.

11       Q     Do you know how much you've billed the

12  Department of Corrections so far?

13       A     No.  But there are quite a few hours.

14       Q     Is there anything that you wanted to see, but

15  you were not able to see?

16       A     No.

17       Q     Any information that you wanted, but didn't

18  get?

19       A     No.

20             MR. TREVISANI:  Can you bring up --

21  hopefully I have it -- EHA01266865.

22             THE REMOTE TECHNICIAN:  Please stand by.

23  EHA01266865, correct?

24             MR. TREVISANI:  Yes.

25             THE REMOTE TECHNICIAN:  Okay.  Exhibit 22.

1    Share screen.  You have control.

2                    (Exhibit 22 marked.)

3        Q    (BY MR. TREVISANI)  Scrolling down, this is an

4    e-mail from Cayla Moseley dated May 10th, 2021 to you,

5    Reed Paulson.  And it says, "Good morning, Dr. Paulson,

6    below is a ShareFile link containing programs the

7    department partook in, data was created to track that --

8    was created to track those programs, and Juan Espinosa's

9    deposition."

10                   What are the programs the department

11   partook in and the data that was created to track these

12   programs?  What is that referring to?

13       A    I don't recall.

14                   MR. TREVISANI:  Okay.  You can take this

15   down.

16       Q    (BY MR. TREVISANI)  Do you recall seeing any

17   documents related to an alternative segregation pilot?

18       A    Documents.  Yeah, there was something.  But I

19   really don't remember any details of it.  It was

20   something that was being proposed or we were going to try

21   or -- I don't know.

22       Q    Did you have any discussions with FDC staff

23   about an alternative segregation pilot?

24       A    No.

25       Q    Okay.  What about any documents related to the

1    analysis of the segregation process, do you remember

2    those documents?

3        A    I don't remember.

4                MR. TREVISANI:  I think that's all I have,

5    Doctor.  Thank you for your time.

6                THE WITNESS:  No, thank you.

7                MS. SMITH:  Thank you.  We will read.

8                (Off-the-record discussion.)

9                THE COURT REPORTER:  So this is due in

10   three days, so Monday I was told.  Is that true for you,

11   Mr. Trevisani?

12                MR. TREVISANI:  I think -- I think

13   unfortunately that is true.

14                THE COURT REPORTER:  Oh, no, no, I just --

15   and then, Ms. Smith, did you want to receive it then at

16   the same time?

17                MS. SMITH:  We just need a regular

18   delivery.  We don't need anything expedited.

19                (End of proceedings at 5:56 p.m.)

20

21

22

23

24

25

1                    CHANGES AND SIGNATURE

2     PAGE/LINE            CORRECTION        REASON FOR CHANGE

3     _____

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15        I, _____, have read the foregoing
      deposition and hereby affix my signature that same is
16    true and correct except as noted herein.

17

18                              _____
                                REED PAULSON, M.D.
19                              Case No.
                                4:19-cv-00212-AW-MAF

20
      STATE OF _____ )
21
          Subscribed and sworn to before me by the said
22    witness, REED PAULSON, M.D., on this the _____ day of
      _____, 2021.
23

24                              _____
                                NOTARY PUBLIC IN AND FOR
                                THE STATE OF TEXAS
25    My Commission Expires:

1    STATE OF TEXAS )

2         I, Kelly Hassell, RPR, CLR, CSR, in and for the

3    State of Texas, do hereby certify that, pursuant to the

4    agreement hereinbefore set forth, there came before me on

5    the 8th day of December, A.D., 2021, at 9:59 a.m. EST,

6    located in the City of Salem, State of Oregon, the

7    following named person, to wit:  REED PAULSON, M.D., who

8    was by me duly cautioned and sworn to testify the truth,

9    the whole truth and nothing but the truth, of his

10   knowledge touching and concerning the matters in

11   controversy in this cause; and that he was thereupon

12   carefully examined upon his oath, and his examination was

13   reduced to writing under my supervision; that the

14   deposition is a true record of the testimony given by the

15   witness, same to be sworn to and subscribed by said

16   witness before any Notary Public, pursuant to the

17   agreement of the parties; and that the amount of time

18   used by each party at the deposition is as follows:

19         Mr. Trevisani - 6 hours, 39 minutes;

20       I further certify that I am neither attorney or

21   counsel for, nor related to or employed by, any of the

22   parties to the action in which this deposition is taken,

23   and further that I am not a relative or employee of any

24   attorney or counsel employed by the parties hereto, or

25   financially interested in the action.

1          I further certify that, before completion of the

2     deposition, the Deponent and/or the Plaintiff/Defendant

3     did request to review the transcript.

4          In witness whereof, I have hereunto set my hand and

5     affixed my seal this 12th day of December, A.D., 2021.

6

7                          *Kelly Hassell*

8                          KELLY HASSELL, CSR No. 5729
                           Cert. Expires 10/31/22
9                          Planet Depos
                           Firm Registration No. 686
10                         451 Hungerford Drive
                           Suite 400
11                         Rockville, Maryland 20850
                           888-433-3767

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| A |
|---|

**ability**
13:20, 34:4
**able**
14:21, 15:6,
48:6, 49:4,
72:12, 107:10,
185:8, 200:7,
238:7, 244:15
**above**
114:21
**above-styled**
1:22
**absence**
182:5, 189:20
**absolute**
74:10, 77:25,
121:23, 121:24,
142:15, 146:17
**absolutely**
78:8, 114:22,
120:12, 122:22,
135:23, 136:6,
153:21
**absolutes**
71:24, 80:17
**abundance**
219:21
**abuse**
162:17
**abuse-oriented**
165:19
**abused**
164:9, 165:20
**abusing**
165:23, 166:15
**ac**
107:23, 207:16
**aca**
60:15, 117:1,
117:8, 117:11,
118:6, 119:17,
119:22, 119:25,
120:9
**accept**
155:4
**access**
36:5, 37:11,

51:10, 61:12,
64:17, 65:13,
67:19, 68:10,
72:3, 107:16,
107:20, 127:13,
144:12, 145:3,
207:25
**accessed**
65:17
**accidentally**
81:18
**accompanied**
145:9
**accompany**
37:7
**accordance**
1:26
**according**
79:3, 99:4,
100:10, 103:2,
106:9, 107:5,
115:8, 116:13,
187:11, 202:23,
212:17, 214:4,
215:15, 242:17
**account**
78:17, 130:7,
161:23, 180:20,
230:15, 230:17
**accredit**
143:2
**accreditation**
142:21, 143:3,
143:8
**accredited**
143:5
**accumulated**
110:19
**accurately**
23:9
**acid**
181:7
**acknowledge**
152:8
**across**
46:10, 96:3,
96:6, 96:7,
161:25, 222:23

**act**
151:19, 176:10
**action**
40:21, 248:22,
248:25
**actions**
44:5
**activities**
107:17, 208:18
**activity**
110:4, 110:7,
110:8, 152:21,
234:5
**actual**
28:4, 30:10,
126:24, 222:13
**actually**
32:2, 33:3,
33:5, 38:25,
42:3, 45:24,
46:14, 61:3,
61:5, 63:12,
77:19, 88:11,
89:5, 90:4,
102:8, 127:20,
133:18, 157:17,
159:18, 161:5,
161:19, 199:4,
199:14, 200:24,
207:19, 241:17
**acute**
113:5
**ada**
76:10
**adapt**
186:8
**add**
60:7
**added**
20:24, 29:3,
29:4, 33:11
**additional**
207:15
**address**
7:2, 178:23
**adds**
46:20
**adequacy**
194:24

**adequate**
71:21, 73:16,
73:19, 131:22,
133:19, 146:14,
146:19, 214:13
**adequately**
192:14
**adjusting**
204:2
**administered**
88:20, 89:6,
89:16, 89:24,
89:25
**administering**
88:24
**administration**
19:25, 49:16,
89:9, 151:16,
155:23
**administrative**
5:17, 18:19,
24:15, 36:15,
42:24, 43:4,
43:12, 45:18,
45:21, 46:18,
99:3, 100:5,
100:9, 100:21,
121:8, 202:1
**administrators**
148:4
**adopted**
106:1, 207:10
**adult**
4:19, 206:20
**adults**
206:24
**adverse**
186:7
**adversely**
113:16, 114:7,
143:20
**afar**
40:25
**affect**
50:16, 59:11,
59:16, 97:8,
195:14, 195:19,
199:22, 202:10

affects
113:16, 114:7,
195:4
affirm
127:21
affix
247:16
affixed
249:5
afraid
80:14, 159:8
after
20:25, 22:9,
46:4, 50:9,
50:10, 62:16,
63:17, 174:14,
225:6, 226:18,
236:25, 237:3,
237:8
afterwards
173:5
again
15:2, 15:8,
15:16, 21:8,
25:7, 32:17,
43:18, 44:6,
44:10, 45:14,
45:20, 48:1,
48:13, 49:13,
53:24, 54:17,
57:20, 67:25,
79:8, 87:7,
87:20, 93:21,
97:13, 100:7,
100:8, 101:20,
102:6, 108:9,
108:15, 109:16,
112:13, 120:24,
121:4, 132:17,
135:3, 146:2,
146:9, 147:20,
149:12, 149:23,
150:15, 161:2,
163:17, 165:18,
166:2, 169:13,
170:7, 171:15,
173:2, 173:13,
173:24, 175:9,

180:13, 181:21,
188:4, 190:14,
196:23, 200:5,
202:13, 204:19,
208:14, 223:1,
225:14, 226:14,
226:16, 228:22,
232:4
age
84:17
ages
184:10
ago
15:11, 62:15,
186:5, 187:17,
189:3
agree
66:21, 67:8,
75:18, 77:12,
78:3, 79:19,
84:3, 92:14,
94:12, 96:4,
96:12, 96:15,
97:1, 97:11,
98:4, 98:10,
102:18, 110:25,
111:13, 113:18,
114:6, 116:2,
116:6, 116:10,
118:14, 119:25,
124:12, 125:4,
129:24, 138:12,
138:14, 138:19,
141:3, 143:14,
143:22, 144:13,
144:21, 144:23,
145:18, 145:25,
146:8, 146:12,
147:13, 147:15,
148:8, 149:15,
158:23, 159:5,
159:15, 159:25,
160:2, 160:9,
160:12, 162:20,
162:23, 165:24,
166:24, 168:11,
168:22, 171:15,
174:22, 180:16,

180:17, 184:2,
184:18, 185:1,
185:5, 185:15,
186:3, 187:2,
187:21, 196:10,
196:18, 199:5,
199:6, 217:21,
217:24, 220:8,
223:1, 237:25,
238:2, 239:6,
239:14, 239:19
agreeing
96:5
agreement
1:27, 248:4,
248:17
ah
12:12, 185:23
ahead
28:11, 52:21,
58:17, 62:20,
82:1, 89:21,
90:1, 91:9,
92:6, 92:8,
93:16, 98:8,
119:8, 129:2,
132:10, 133:9,
134:12, 134:16,
135:20, 162:22,
180:4, 181:20,
188:14, 201:19,
212:24, 214:21,
224:17
ahi
216:18
ailment
175:5
al
1:4, 1:7, 186:6
alarm
228:15
alarming
193:20
albuterol
168:2
ale
22:17
alejandro
21:22

alert
167:6, 167:8
aligned
243:16
allegation
171:3, 201:21,
202:14
allegations
43:20, 43:21,
210:21
alleged
201:5, 201:20
allergic
167:16
allopathic
26:18, 239:1
allow
222:6, 223:3
allowed
36:4, 107:25,
108:11, 224:18
alluded
174:11
almost
14:4, 53:17,
110:11, 110:14,
186:17, 187:17,
188:5
along
49:23, 86:12,
204:4
already
33:13, 33:16,
42:4, 111:10,
137:9, 194:19,
243:22
also
2:41, 10:17,
11:24, 14:17,
36:12, 46:8,
48:11, 62:7,
77:2, 77:4,
86:4, 138:24,
148:22, 160:16,
174:2, 174:4,
179:23, 181:16,
181:19, 187:19,
188:1, 191:1,

203:8, 203:16,
207:2, 219:16,
221:24, 223:9
**altercation**
242:7
**altered**
76:10
**alternative**
82:3, 205:19,
206:1, 245:17,
245:23
**alternatives**
4:36, 80:18,
175:23, 226:10
**although**
33:12, 33:15,
98:15, 107:22,
168:17, 175:11,
189:4, 230:2
**altogether**
36:6
**always**
14:3, 47:4,
47:5, 60:6,
110:14, 163:9,
166:2, 168:17
**ama**
141:24
**amassed**
200:13
**amended**
27:12, 29:2
**american**
60:14, 116:22,
141:20
**americans**
216:23
**among**
110:23, 111:11,
113:14, 187:19,
187:22, 188:2,
189:2
**amount**
16:12, 16:13,
16:14, 18:21,
19:9, 32:13,
37:25, 69:17,
77:16, 78:8,

87:5, 172:23,
173:21, 183:23,
229:25, 248:17
**amy**
211:12, 211:21
**analysis**
153:10, 246:1
**angeles**
10:17, 10:20
**anger**
110:21, 186:10
**annual**
84:16
**another**
12:24, 14:21,
20:25, 23:12,
54:8, 62:14,
67:12, 76:16,
76:24, 77:4,
96:17, 139:5,
157:18, 161:23,
174:19, 177:8,
177:9, 179:2,
183:1, 191:7,
193:16, 198:21,
205:8, 214:8,
222:22, 223:11,
239:11
**answer**
7:14, 57:13,
57:14, 70:5,
71:3, 82:4,
83:13, 83:25,
84:1, 86:14,
99:10, 101:14,
103:7, 103:9,
103:11, 103:13,
104:21, 123:10,
126:11, 130:20,
133:22, 134:2,
136:24, 137:5,
139:2, 163:21,
209:1
**answer's**
32:17
**answered**
50:5, 63:14,
78:6, 80:13,

81:25, 82:22,
83:11, 93:15,
105:19, 138:20,
197:6
**answering**
136:9
**answers**
112:13, 134:25
**anxiety**
110:21, 188:19
**anybody**
7:5, 17:10,
17:12, 27:14,
29:20, 45:15,
47:12, 47:17,
191:16, 208:21,
209:4, 234:25
**anyhow**
108:18
**anyone**
17:6, 45:1,
46:11, 53:6,
107:10, 151:25,
157:10, 231:8
**anyone's**
17:7, 17:15
**anything**
7:18, 8:14,
48:10, 67:11,
105:24, 122:8,
131:2, 148:23,
155:6, 155:22,
169:14, 191:16,
198:8, 200:5,
202:7, 204:17,
210:9, 229:6,
244:6, 244:14,
246:18
**anyway**
77:21
**anywhere**
66:9, 135:8
**apart**
163:8
**apathy**
186:10
**aphasia**
237:20, 237:22,

238:1, 238:5,
238:15, 238:21,
239:18, 239:20,
239:24, 240:2,
240:9
**apnea**
216:13, 216:17,
217:7
**apologize**
81:18
**apparent**
175:22
**apparently**
219:14
**appeal**
5:18
**appear**
128:25
**appearances**
3:2, 6:5
**appears**
67:21, 134:15,
210:4
**applies**
111:8, 136:16,
144:19
**apply**
15:17, 120:16,
173:17
**applying**
105:12
**appointment**
52:16, 54:3,
64:11, 64:13,
160:15, 161:4,
161:7, 161:24,
195:10, 195:11,
215:7, 236:2
**appointments**
55:1, 70:7,
88:3, 90:11
**approached**
46:12
**appropriate**
57:15, 59:25,
60:16, 63:7,
63:21, 63:24,
71:7, 74:1,

79:2, 82:3,
88:3, 91:23,
92:11, 93:10,
162:20, 162:23,
164:23, 164:24,
167:23, 168:12,
175:23, 178:25,
179:9, 242:24,
243:2, 243:5,
243:7, 243:9
**appropriately**
165:3, 176:11,
224:20
**appropriateness**
88:6, 93:7,
177:1
**approval**
106:6
**approved**
78:16, 104:18
**approximately**
23:10
**april**
140:19, 223:14,
225:6, 226:18,
226:25, 227:8
**area**
16:15, 26:18,
42:4, 44:6,
44:10, 54:5,
69:1, 97:17,
107:13, 113:25,
114:24, 114:25,
121:5, 143:16,
149:7, 149:12,
150:5, 150:11,
164:16
**areas**
19:3, 26:21,
38:3, 86:13,
90:13, 113:4,
143:1, 149:7
**aren't**
73:11
**argue**
138:24
**arguing**
200:21

**argument**
200:19
**arise**
24:14
**around**
15:7, 40:6,
41:25, 62:9,
67:6, 68:3,
69:16, 72:18,
157:8, 160:22,
192:10, 192:15,
203:4
**arrangements**
41:6, 145:17,
145:22, 145:23,
146:9, 146:12
**arrival**
46:5
**arrive**
115:16
**arrived**
83:14
**artery**
176:18, 176:20
**article**
95:16, 99:1,
104:21, 106:10,
106:16, 172:17,
174:7, 182:9,
191:24, 192:9,
193:10, 193:17,
209:13, 209:16,
210:4, 210:7,
210:10
**articles**
106:6
**aside**
178:9, 203:19
**asked**
22:24, 24:9,
26:12, 26:14,
26:20, 33:15,
46:1, 50:6,
63:13, 78:6,
80:12, 81:24,
83:11, 85:19,
93:14, 103:1,
105:19, 120:20,

121:7, 124:10,
138:20, 150:4,
169:2, 183:20,
194:19, 197:5,
200:22
**asking**
24:20, 24:21,
26:19, 39:1,
40:2, 49:2,
58:3, 59:14,
67:16, 71:24,
75:4, 75:9,
78:2, 78:3,
79:9, 80:8,
80:17, 81:17,
85:1, 86:4,
91:17, 92:1,
126:1, 130:16,
161:16, 173:16,
173:17, 177:1,
177:2, 177:11,
177:23, 177:24,
200:10, 200:20,
200:21, 222:4
**asks**
244:3
**asleep**
123:15, 124:6
**aspect**
88:23
**aspects**
51:5, 110:12
**asserts**
230:11
**assess**
72:16, 151:10
**assessed**
80:22, 238:23
**assessing**
230:15
**assessments**
85:21
**assigned**
43:5, 43:17
**assignment**
26:17
**assist**
154:2

**assistant**
47:7
**associated**
113:8, 179:22,
179:24, 181:15,
181:16, 187:3,
190:20
**association**
60:15, 116:23,
141:20
**assume**
7:18, 53:13,
53:24, 63:1,
73:11, 75:14,
77:21, 81:5,
131:7, 132:6,
142:9, 160:6,
164:20, 207:14
**assuming**
131:20, 132:7,
132:11, 133:18,
134:4, 134:20,
135:3, 154:8,
160:6, 228:2
**assumption**
131:25, 132:2
**assurance**
11:21, 12:7,
16:17, 18:21,
18:25, 19:1,
19:14, 19:18,
84:2, 84:4,
84:12, 84:20,
85:4, 85:8,
85:16, 85:17,
85:22, 85:25,
86:3, 86:5,
86:17, 88:14,
89:7, 90:3,
90:25, 91:10,
91:20
**asthma**
166:22, 166:24,
167:3, 167:5,
167:12, 167:14,
168:12, 168:17,
168:23
**asthmatics**
167:19

**athlete's**
171:22
**attack**
79:21, 80:5,
80:6, 167:5,
167:12, 176:12,
176:23, 177:3,
177:18, 177:20,
181:7, 181:12,
216:14
**attacks**
168:7, 168:17
**attempt**
238:13
**attention**
192:12, 194:10
**attest**
74:9
**attorney**
248:20, 248:24
**audit**
19:15
**auditing**
93:12
**audits**
19:11, 19:14,
19:16, 19:19,
93:20
**august**
128:12, 182:17
**authoritative**
94:13, 142:11
**autonomy**
110:11
**availabilities**
214:24
**available**
8:5, 49:5,
54:7, 67:1,
83:13, 110:8,
195:10, 215:7
**avenue**
2:36
**average**
74:1
**avoiding**
216:14
**aware**
68:16, 70:10,

72:8, 85:2,
86:20, 89:22,
91:1, 91:7,
92:23, 92:24,
93:11, 93:23,
102:4, 102:12,
102:20, 102:24,
105:20, 106:3,
107:19, 108:17,
109:21, 111:6,
112:16, 116:13,
124:18, 136:15,
137:6, 138:1,
138:5, 142:6,
143:6, 144:2,
147:21, 147:22,
150:7, 150:13,
155:23, 155:24,
163:11, 163:15,
163:19, 164:3,
166:6, 166:8,
169:17, 170:13,
170:15, 193:5,
194:19, 194:20,
198:5, 198:8,
200:18, 201:22,
205:4, 214:20
**away**
4:28, 164:8,
165:16, 168:9

**B**
**back**
30:21, 37:18,
44:12, 46:3,
51:15, 65:23,
65:25, 66:25,
68:11, 68:19,
72:21, 78:20,
94:2, 106:20,
106:21, 107:12,
110:17, 116:21,
121:19, 124:15,
136:19, 140:1,
148:19, 150:3,
160:25, 166:19,
184:10, 199:10,
206:23, 216:9,

232:4, 232:17,
235:7, 236:19
**background**
9:18, 190:24,
209:22
**backing**
61:10
**bad**
108:8, 153:24,
175:22, 184:25,
242:3
**badly**
151:19, 231:13
**bailiwick**
204:20
**ban**
150:1
**bare**
121:23, 121:24
**barren**
98:2
**barrier**
108:21
**bars**
145:20
**based**
28:24, 122:11,
155:8, 161:17,
164:2, 196:25,
198:23, 237:22
**basic**
39:15
**basics**
7:8
**basing**
186:4
**basis**
53:3, 64:9,
89:14, 111:18
**bates**
9:14, 31:2,
31:6, 182:20
**bates-stamped**
4:5, 4:13,
4:25, 4:34,
5:10, 5:14,
5:18, 5:20,
5:22, 5:25,

5:27, 5:31, 5:37
**became**
15:10, 40:15,
141:25, 228:13
**because**
12:19, 15:2,
17:9, 24:13,
28:14, 32:20,
34:19, 38:12,
42:22, 48:9,
53:17, 54:4,
55:5, 57:5,
59:20, 66:21,
72:2, 75:24,
76:25, 77:5,
78:20, 79:24,
81:7, 84:17,
87:14, 89:13,
91:4, 93:21,
99:6, 110:7,
118:4, 120:12,
120:24, 142:25,
143:25, 146:16,
148:10, 149:17,
150:16, 152:14,
155:22, 155:23,
156:14, 156:22,
158:6, 158:19,
159:10, 167:15,
171:17, 179:5,
180:7, 181:6,
181:7, 184:8,
188:17, 194:14,
196:4, 208:24,
209:1, 209:4,
214:1, 222:10,
230:5, 230:6,
230:12, 231:1,
233:14, 238:21,
240:17
**become**
11:10, 26:8,
147:4, 229:25
**becoming**
14:10
**been**
6:14, 12:15,
13:21, 14:4,

15:7, 15:22,
18:6, 22:13,
23:6, 23:14,
23:23, 24:2,
24:3, 24:8,
24:9, 24:17,
25:6, 25:8,
25:11, 25:19,
26:3, 49:3,
49:6, 89:2,
89:22, 105:6,
112:25, 142:1,
142:9, 147:20,
151:10, 151:18,
152:4, 155:7,
155:22, 155:23,
155:24, 163:3,
168:6, 181:22,
197:8, 205:1,
213:9, 214:2,
214:19, 216:25,
217:4, 219:6,
219:20, 224:19,
239:9, 243:2
**before**
1:24, 7:14,
14:10, 18:14,
19:9, 26:1,
26:4, 30:14,
41:19, 50:8,
75:19, 76:4,
76:15, 76:23,
77:9, 109:13,
109:17, 120:4,
121:7, 133:22,
135:17, 169:3,
173:9, 183:20,
236:4, 236:5,
247:26, 248:4,
248:16, 249:1
**beginning**
1:24, 43:21,
46:4, 47:1,
47:23, 48:3,
50:8, 144:5
**behavior**
203:14
**behavioral**
14:14, 203:8,

203:12, 204:1
**behaviors**
204:4
**behind**
143:25
**being**
11:8, 16:9,
16:24, 25:8,
25:12, 29:15,
36:4, 39:23,
39:24, 41:4,
41:7, 43:9,
54:4, 69:21,
70:3, 75:19,
79:7, 84:20,
85:5, 85:7,
85:18, 86:18,
101:22, 124:16,
137:17, 158:14,
159:3, 159:11,
162:4, 164:9,
164:13, 165:20,
172:1, 173:3,
175:17, 184:4,
184:13, 190:3,
190:17, 194:25,
195:4, 197:2,
200:16, 214:1,
215:14, 221:17,
226:9, 226:24,
230:13, 245:20
**believe**
26:10, 27:4,
33:23, 35:25,
39:13, 43:19,
44:11, 65:5,
77:7, 77:11,
78:12, 85:10,
88:2, 98:25,
99:6, 100:22,
103:5, 119:11,
121:5, 139:11,
140:21, 147:5,
159:22, 166:4,
178:1, 217:24,
219:2
**believes**
106:10, 219:9

**bell**
205:7, 206:5,
209:15
**belong**
142:16, 142:17,
142:20
**belongings**
107:25, 108:11
**below**
245:6
**belts**
109:10
**benefit**
77:25, 78:8,
203:6, 216:14,
217:3, 217:7,
217:10, 217:11
**besides**
114:5
**best**
16:6, 84:14,
208:15, 236:14
**better**
17:6, 17:10,
40:14, 42:7,
49:6, 67:18,
71:15, 105:24,
194:14, 217:4
**between**
44:8, 50:15,
119:13, 178:1
**beyond**
51:13, 61:6,
61:7, 75:13,
173:14, 174:21,
175:1, 192:25,
203:15, 207:8,
218:4, 218:20
**big**
28:21, 37:12,
58:7, 131:25,
230:3
**bigger**
9:4, 95:23,
183:11, 183:13,
209:12, 224:2,
226:2, 235:21
**biggest**
12:17

**billed**
244:11
**biopsies**
237:24
**birth**
213:7, 213:24,
214:3
**biscayne**
2:17
**bit**
9:4, 14:3,
25:3, 30:14,
61:10, 72:11,
75:16, 75:17,
103:23, 121:5,
166:21, 183:11,
183:13, 183:19,
219:20, 232:2
**bits**
50:3
**blank**
47:14
**blanket**
166:5
**blankets**
165:10
**blanking**
45:9, 49:14
**bleeding**
243:17
**blockade**
166:18
**blocked**
232:3
**blood**
73:10, 79:20,
79:24, 80:1,
80:4, 90:14,
176:20, 176:23,
217:11, 217:12,
229:23, 235:24
**body**
94:13, 109:10,
109:14, 109:18,
109:21, 110:18,
149:19
**bone**
175:4, 175:16,

178:5
**bonta**
189:15
**both**
10:17, 12:25,
15:3, 16:10,
32:22, 38:25,
65:5, 86:10,
127:12, 154:25,
213:9, 218:11
**bottom**
28:3, 94:9,
97:23, 103:14,
110:17, 172:15,
230:5, 231:12,
234:17
**bottomed**
231:12
**boulevard**
2:17
**box**
64:21, 65:25
**boxes**
232:3
**brandon**
240:19
**bravo**
128:11
**break**
51:15, 51:18,
93:25, 94:4,
140:1, 140:5,
150:22, 151:4,
183:1, 191:7,
191:9, 195:8,
236:20, 243:13
**breaks**
175:4, 175:13
**breasts**
84:17
**breath**
178:19, 179:19
**brief**
4:24, 123:19,
131:4, 131:16,
184:14
**briefed**
192:14

**briefly**
121:25
**bring**
7:22, 8:17,
27:17, 58:9,
182:8, 191:23,
193:9, 205:16,
205:17, 209:5,
215:22, 221:4,
223:16, 225:15,
231:9, 231:19,
233:2, 244:20
**bringing**
73:11
**brings**
167:7
**broad**
87:7, 91:25,
94:18, 149:6
**broader**
86:13
**broke**
63:16
**broken**
175:10
**brought**
52:15, 53:4,
56:21, 148:19,
232:8
**bruise**
174:11
**buddies**
163:5
**building**
45:21
**bullet**
96:1, 96:8,
96:23, 97:7
**bump**
220:12
**bunch**
113:5
**bur**
5:10, 5:14,
5:18, 5:21,
221:5, 222:16,
223:17, 225:16
**burgess**
128:7, 217:14,

217:17, 219:1,
220:5, 220:16,
220:22, 221:13,
221:21, 222:22,
223:9
**burgess's**
210:24, 218:7
**burns**
173:5
**butter**
167:17

---
**C**
---

**c1**
207:21
**cage**
98:3, 145:20
**caldwell**
2:26, 2:35
**california**
165:11
**call**
46:6, 61:15,
61:24, 62:3,
62:9, 62:17,
62:25, 63:1,
63:18, 64:19,
65:7, 65:21,
65:24, 67:1,
67:22, 68:4,
68:25, 69:8,
69:21, 70:2,
75:10, 87:4,
94:16, 101:1,
107:10, 154:1,
159:10, 173:10,
175:11, 212:18,
213:1, 213:6,
213:8, 213:12,
213:23, 214:1
**called**
27:18, 31:16,
31:23, 95:1,
95:16, 111:7,
117:11, 159:3,
159:11, 183:15,
197:15, 203:3,
205:18, 205:19,

206:1, 206:12,
209:6, 209:16,
216:8
**callout**
159:3, 159:14,
159:20, 159:24
**callouts**
159:19, 159:23
**calls**
104:16, 172:19,
181:19, 188:13
**came**
14:5, 46:10,
184:6, 208:20,
209:3, 226:18,
248:4
**camps**
35:20, 35:21,
35:25
**can't**
14:19, 19:8,
31:25, 32:18,
34:7, 40:4,
40:5, 40:17,
43:14, 60:24,
65:19, 66:22,
66:23, 71:10,
71:23, 72:1,
74:5, 82:4,
98:13, 100:12,
103:18, 107:23,
120:12, 120:24,
121:11, 127:21,
132:18, 132:20,
132:21, 150:15,
151:23, 152:22,
156:20, 171:18,
171:23, 180:9,
193:25, 195:11,
195:12, 196:2,
198:16, 199:9,
202:5, 204:22,
205:15, 207:16,
208:21, 209:3,
218:20, 219:11,
222:3, 222:6,
224:4, 224:11,
224:12, 224:14,

225:8, 225:9,
225:22, 238:6
**canceled**
54:4, 55:2
**cancer**
173:3
**candid**
59:7, 59:10,
59:16
**candor**
59:14
**cannot**
66:17, 79:16,
194:13
**cardiovascular**
90:15, 217:5
**cared**
204:5, 240:11
**career**
12:16, 58:8
**careful**
189:17, 210:20
**carefully**
220:12, 248:12
**carol**
22:8
**carved-out**
18:17
**cascade**
237:6
**case**
1:4, 20:19,
20:22, 20:25,
21:3, 21:7,
21:9, 21:13,
22:9, 24:3,
24:16, 24:25,
26:9, 26:13,
27:10, 28:8,
28:21, 29:23,
44:22, 45:16,
45:17, 48:23,
48:24, 54:2,
58:25, 84:19,
85:15, 96:20,
128:5, 148:10,
153:10, 162:8,
164:14, 172:2,

174:16, 177:13,
196:23, 210:18,
218:12, 224:16,
224:18, 225:3,
234:7, 244:2,
244:7, 244:9,
247:21
**case-by-case**
162:25
**cases**
13:9, 18:22,
19:5, 20:11,
20:12, 20:13,
21:11, 21:16,
21:25, 22:13,
23:5, 23:14,
23:23, 24:12,
24:18, 24:21,
25:4, 25:10,
25:12, 34:17
**cast**
175:15
**catch**
48:6
**categories**
30:9
**category**
84:24, 84:25
**catheretization**
223:10
**catheter**
225:3
**catheters**
224:9, 224:11,
224:12, 224:19,
225:6, 225:9,
225:10, 226:6,
226:10, 226:18,
226:25
**causal**
182:6, 189:21
**causation**
177:22, 177:23
**cause**
1:23, 178:13,
178:17, 178:20,
190:3, 228:3,
228:14, 237:21,

240:1, 248:11
**caused**
176:23, 177:7,
188:8, 237:20
**causing**
218:7, 240:8
**caution**
219:21
**cautioned**
6:14, 248:8
**cavity**
109:19, 109:21
**cayla**
2:25, 245:4
**cell**
53:6, 53:19,
64:13, 64:20,
64:25, 70:7,
70:18, 71:12,
71:15, 71:21,
71:23, 72:1,
72:3, 72:6,
72:17, 72:19,
98:1, 98:19,
99:22, 100:5,
101:22, 104:5,
109:18, 110:8,
118:11, 118:19,
119:13, 122:7,
130:5, 132:15,
132:22, 139:5,
139:21, 139:22,
139:23, 158:2,
166:16, 166:18,
184:15
**cell-front**
71:3, 145:19
**cellie**
175:10
**cells**
64:24, 65:4,
68:20, 100:11,
101:18, 101:22,
101:23, 108:1,
108:12, 108:18,
108:25, 109:5,
109:14, 129:24,
130:14, 130:21,

130:23, 130:24,
134:1, 135:1,
168:9
**cellular**
178:4, 178:8
**center**
2:16, 15:4,
38:14
**centers**
38:2, 38:16
**central**
45:2, 47:19,
49:9, 50:12,
114:24
**centurion**
47:14, 47:15,
47:16, 47:20,
50:15, 93:13,
154:24
**cert**
249:10
**certain**
16:12, 16:14,
18:21, 19:9,
34:17, 37:25,
39:2, 70:21,
74:23, 78:8,
87:5, 92:17,
95:17, 164:1,
172:2, 173:21
**certainly**
70:20, 92:16,
94:23, 124:12,
131:13, 134:9,
138:21, 138:23,
138:25, 146:7,
148:18, 152:24,
155:6, 161:10,
161:23, 165:11,
179:21, 201:4,
214:25, 215:6,
220:2, 227:21,
229:21, 231:13,
239:10
**certificate**
3:7
**certification**
4:10, 11:5,

11:6, 11:11,
243:24
**certifications**
11:7
**certified**
6:11, 11:2
**certify**
248:3, 248:20,
249:1
**chains**
57:19
**challenges**
144:9
**chance**
32:20, 48:8
**chances**
97:9, 97:16,
113:17, 114:8
**change**
15:16, 29:17,
247:2
**changed**
144:23, 164:15
**changes**
15:17, 149:18,
149:20, 247:1
**character**
40:9
**charge**
14:13, 51:4
**charlotte**
35:11
**chart**
231:8
**charted**
19:5
**check**
77:24, 127:21,
132:22, 166:3,
199:7
**checkbox**
242:12
**checking**
62:13, 77:24,
99:11
**checks**
39:14, 101:11,
122:11, 123:7,

124:16, 137:17,
137:18, 138:4,
199:14, 200:12,
200:16, 200:23,
235:24
**chest**
179:19, 181:6
**chief**
4:31, 11:22,
13:3, 13:10,
13:23, 14:1,
14:10, 14:15,
14:20, 15:10,
16:2, 17:1,
18:17, 18:20
**choice**
10:18, 126:15,
238:10, 239:22,
239:24
**choose**
35:17, 35:18,
38:5, 40:6,
126:10
**chooses**
126:6
**choosing**
126:8
**chose**
126:14
**chronic**
90:12, 90:13,
113:5, 215:14,
219:18, 221:14,
221:15, 221:18,
221:24
**cillien**
212:15, 213:5,
215:8
**circumstance**
42:13, 58:21,
60:7, 63:9,
66:1, 69:24,
71:1, 71:19,
86:8, 97:21,
163:2, 175:21,
175:24, 179:1,
180:22, 181:9,
214:16, 243:11

**circumstances**
10:5, 57:15,
69:5, 70:21,
72:2, 72:13,
84:14, 85:21,
111:7, 126:17,
153:20, 164:25,
166:14, 173:2,
175:18, 176:17,
179:9, 196:16,
213:22, 239:12
**cite**
116:22, 137:11
**cited**
95:18, 175:1,
181:23, 187:8
**cites**
186:25, 187:20
**city**
248:6
**civil**
1:27
**claims**
155:13, 177:13,
223:9
**clarify**
32:4, 75:5,
170:22
**class**
4:10, 114:23,
115:20, 116:2,
243:24
**clear**
56:17, 69:14,
118:21, 121:1,
163:9
**cleared**
164:15, 164:16
**clearly**
206:7
**clinic**
5:9, 5:13,
12:23, 13:8,
52:13, 53:3,
55:9, 55:10,
55:16, 55:19,
55:21, 55:23,
56:3, 56:9,

56:22, 221:12,
221:14, 221:16,
221:17, 221:24,
222:4, 222:23,
225:1
**clinical**
86:25
**clinician**
146:13, 146:18,
236:2, 236:4,
236:11
**clinics**
73:21
**clip**
127:3
**close**
36:15, 42:25,
44:1, 44:2,
44:3, 44:8,
44:14, 103:6,
103:8, 103:10,
120:22, 120:23,
145:21, 229:24
**closely**
108:12, 108:16,
203:16, 204:24,
229:23, 230:21
**closer**
132:12, 168:10,
168:21, 181:3
**closest**
187:6
**closure**
176:20
**clothes**
164:5, 164:22
**clothing**
164:15
**clr**
1:25, 248:2
**cm**
35:20, 35:25,
38:6, 38:11,
226:6, 231:10
**cm1**
204:18
**cm2**
204:18

cm3
53:17, 204:10
coast
94:1
code
121:8, 202:1,
207:24
coerced
151:8, 151:11,
151:21, 152:5,
152:10, 153:13,
154:4, 158:14,
160:7
coercion
160:4
coffee
14:18, 15:3
cognitive
110:22, 204:3
cold
48:9, 165:7
colder
165:8
cole
22:8, 22:9
collaboration
141:23
collapse
4:32
colleague
12:23
collected
63:1, 63:18
collection
206:8, 210:5,
210:6
colorado
41:25, 42:5,
42:23
column
31:23
com
2:31, 2:32,
2:39
combination
203:14
combined
89:14

come
33:13, 51:8,
51:15, 54:13,
62:9, 62:22,
63:2, 64:21,
66:10, 67:5,
68:3, 69:15,
79:14, 94:2,
137:9, 142:7,
152:23, 153:21,
168:18, 177:9,
202:16, 204:1,
216:9, 238:8
comes
15:21, 61:16,
62:6, 113:21,
159:11, 178:23,
179:18, 181:5,
202:6, 217:10,
217:12, 244:1
comfort
165:12
comfortable
168:19
coming
33:14, 76:25,
86:12, 128:3,
180:16, 232:20
comment
216:22
commission
11:3, 78:11,
141:10, 247:33
committee
19:1, 19:3,
78:16, 105:6,
146:24
committees
142:10
common
114:23, 115:20,
116:2, 116:16,
186:25, 187:19,
187:22, 188:1,
189:2, 189:4,
190:15, 197:1
community
214:25

company
47:13
compare
135:21, 189:5
comparing
65:12
comparison
65:20, 115:12,
190:11
compensated
165:3, 165:6
complained
187:13, 187:16
complaining
34:22, 160:17,
224:8, 226:8,
229:13, 232:8,
232:19, 232:21
complains
234:22
complaint
26:15, 26:21,
27:13, 29:2,
37:13, 186:25,
190:10, 191:2,
214:1, 214:2,
225:5, 226:5,
226:15, 234:24
complaints
29:1, 34:25,
226:5, 226:17
complete
22:22, 35:23,
152:16, 155:18
completely
232:16
completing
157:25
completion
249:1
complex
100:19
component
119:21, 119:23,
144:3
compound
91:15, 108:13,
110:6, 114:9,

161:9
computer
8:6, 150:22
concentrating
186:8
concern
228:3
concerned
174:24
concerning
8:11, 248:10
conclusion
60:18, 61:1,
181:19, 181:24,
188:13, 188:25,
190:25
conclusions
189:13, 189:16,
189:23
condition
171:19
conditions
70:21, 76:11,
112:22, 146:17,
219:19
conduct
153:9
conducted
11:19, 11:24,
12:3, 19:17,
35:10, 41:19,
42:9, 44:17,
112:25, 124:16,
169:3
conducting
73:17, 84:3,
84:19, 85:4
conducts
70:16
conference
195:24
confidentiality
146:10
confined
118:11
confirm
72:5, 123:9,
136:24, 141:7,

169:3
**confirmed**
125:1
**confiscated**
165:25, 166:9
**confiscating**
162:25
**confused**
164:13
**confusion**
182:21
**connection**
80:14, 182:7,
184:13, 189:21
**consecutive**
147:10
**consensus**
113:14, 113:19,
113:23, 113:24,
114:6
**consider**
131:21, 134:21,
161:4, 172:20,
175:16, 175:20,
176:14, 231:2,
231:3, 232:12
**consideration**
115:7
**considered**
82:2, 148:7
**considering**
242:25
**considers**
104:13, 106:16,
147:7, 184:16
**consistent**
185:18, 214:12,
215:2
**consistently**
60:14, 223:9
**consists**
164:4
**conspiracy**
155:18
**constant**
87:14, 90:17
**constantly**
92:19

**constitute**
183:24, 190:19
**consulting**
13:9
**contact**
98:17, 98:18,
99:7, 100:2,
100:20, 100:23,
100:24, 102:9,
102:16, 104:2,
104:3, 104:5,
104:15, 106:11,
106:18, 107:2,
107:8, 107:11,
125:10, 132:15,
183:23, 183:25,
184:4, 184:12,
185:13, 235:25
**contacted**
42:4
**contacts**
102:10, 184:16
**containing**
245:6
**context**
19:25, 151:20,
175:9, 177:12,
180:14
**contingent**
147:15
**continued**
5:1, 14:15,
176:13, 197:8,
219:20, 228:11,
228:15, 239:18
**continues**
103:16
**continuing**
13:1
**continuous**
15:18
**contract**
50:15
**contrast**
66:17
**contributing**
240:8
**control**
8:24, 9:1, 9:8,

27:24, 31:12,
31:14, 95:8,
95:10, 95:13,
110:11, 118:1,
140:13, 143:20,
162:17, 165:21,
168:4, 176:11,
183:9, 192:5,
193:15, 197:23,
205:22, 209:9,
213:7, 213:25,
214:3, 217:11,
217:12, 219:18,
221:8, 222:19,
225:24, 229:23,
229:24, 230:21,
231:22, 233:5,
235:14, 238:7,
238:8, 241:14,
245:1
**controlled**
79:25, 80:1,
230:22
**controversy**
248:11
**convenient**
36:7
**conversation**
131:16, 139:19,
191:19
**conversations**
151:21
**conversion**
238:10, 238:25,
240:1
**coordinate**
196:14
**coordinator**
100:25
**copay**
75:15
**copayment**
74:25, 75:13
**copayments**
74:21
**copy**
8:2, 28:14,
28:15, 28:17,

127:17
**core**
114:25
**corizon**
154:24
**coronary**
176:18, 176:20
**correct**
21:4, 21:20,
32:6, 33:1,
41:10, 61:2,
65:1, 65:14,
65:15, 65:18,
65:20, 66:11,
66:12, 69:16,
72:25, 75:7,
75:13, 78:5,
80:6, 80:7,
86:6, 90:20,
91:4, 96:18,
99:16, 104:12,
106:12, 107:5,
122:12, 122:17,
123:12, 123:13,
125:11, 127:22,
138:8, 152:11,
154:16, 158:25,
181:5, 199:11,
199:22, 206:9,
211:15, 220:9,
221:22, 222:5,
226:18, 227:2,
227:3, 227:4,
227:6, 227:7,
231:4, 233:23,
239:7, 244:23,
247:17
**correcting**
76:1
**correction**
247:2
**correctional**
4:20, 9:22,
10:15, 11:2,
11:4, 11:19,
13:19, 15:24,
16:1, 19:20,
21:5, 60:14,

78:11, 116:22,
121:25, 141:11,
144:7

**corrections**
3:6, 4:30,
4:39, 5:8, 5:12,
5:16, 12:10,
13:2, 14:6,
17:21, 17:23,
19:17, 26:1,
42:1, 45:2,
51:6, 92:20,
93:12, 94:17,
114:15, 115:10,
125:15, 141:19,
142:24, 143:4,
143:8, 148:5,
162:5, 192:13,
192:23, 193:3,
193:21, 201:23,
206:3, 235:1,
238:12, 244:12

**corresponding**
31:24

**cost**
74:17, 74:20,
75:2, 75:6,
75:11

**could**
4:32, 6:4,
6:23, 8:17,
9:16, 22:22,
23:8, 26:6,
29:13, 30:18,
30:19, 31:5,
40:24, 42:6,
44:24, 45:22,
46:6, 49:3,
50:21, 54:4,
54:14, 60:9,
62:18, 66:13,
70:20, 71:12,
74:9, 79:4,
80:16, 86:4,
86:21, 94:7,
94:25, 100:7,
100:20, 103:14,
103:15, 117:11,

121:17, 123:19,
124:12, 126:10,
126:21, 127:13,
131:13, 131:15,
132:23, 133:3,
134:8, 135:17,
138:24, 140:6,
140:22, 144:16,
144:22, 145:1,
146:5, 148:19,
151:25, 152:13,
152:20, 153:23,
155:5, 157:8,
157:13, 164:17,
165:1, 166:12,
171:17, 173:14,
174:1, 176:8,
181:11, 183:14,
191:22, 191:23,
193:9, 193:23,
202:7, 206:15,
209:21, 212:14,
223:23, 230:7,
231:25, 233:9,
237:11, 239:16

**couldn't**
40:23, 43:25,
123:5, 171:8,
182:2

**counsel**
6:4, 32:8,
34:20, 35:19,
48:16, 105:6,
150:21, 248:21,
248:24

**counsel's**
32:1

**counseled**
230:19, 231:7

**counselor**
100:25

**count**
123:15, 123:21,
123:24, 124:6,
125:9, 125:17,
125:21, 126:4,
126:12, 130:6,
130:17, 131:9,

134:5, 134:22,
135:5, 135:9,
136:10, 136:21,
137:1, 175:6,
176:6, 177:18

**countersign**
156:18

**countersigned**
157:13

**countersigns**
158:8

**counting**
123:16

**counts**
124:7, 177:17

**county**
10:17

**couple**
7:8, 9:17,
30:8, 33:16,
45:6, 118:21,
122:6, 131:4,
159:17, 187:1,
187:20

**course**
21:22, 36:3,
41:15, 127:24,
135:24, 172:24,
173:4, 177:10,
203:18, 217:12

**court**
1:1, 6:2, 6:10,
6:17, 7:11,
25:20, 25:22,
29:16, 61:25,
81:10, 81:14,
194:4, 204:15,
208:25, 246:9,
246:14

**cover**
118:6, 135:17,
219:14

**covered**
14:18, 69:13,
103:19, 137:10

**covering**
15:3

**covid**
171:23

**cpap**
216:15, 216:24,
217:2, 217:3,
217:4, 217:8

**crazy**
156:21

**create**
158:9, 165:1

**created**
29:14, 245:7,
245:8, 245:11

**creates**
155:17

**credentialing**
15:18

**creek**
14:18, 15:3

**criminal**
192:17

**crisis**
4:32, 194:3

**cross-talk**
204:16

**crucial**
114:24

**cruel**
141:1, 147:10

**csr**
1:25, 248:2,
249:9

**cuff**
73:10

**cuffs**
58:9, 58:10

**cure**
171:20

**cures**
171:22

**current**
9:15, 13:3,
104:23

**currently**
201:23

**curriculum**
4:4

**custody**
206:20, 206:24

**cut**
87:21, 174:11,

202:21
**cut-proof**
164:15, 165:9
**cv**
8:18, 9:15,
11:1, 19:22,
20:10, 22:22,
28:6

**D**

**daily**
4:33, 77:12,
77:19, 78:4,
78:19, 78:21,
79:1, 79:6,
79:10, 80:16,
80:21, 80:24,
81:21, 88:3,
110:12, 197:15,
198:1, 199:25
**dallas**
6:11
**damages**
23:25
**danger**
229:17
**dangerous**
229:16, 229:19,
229:22, 230:12,
231:11, 234:2
**dante**
2:3, 6:6,
30:20, 81:12,
117:14
**data**
210:5, 210:6,
245:7, 245:11
**date**
182:16, 192:9,
193:17, 226:20,
242:8
**dated**
5:35, 224:7,
245:4
**dates**
222:24, 223:1
**day**
1:23, 15:20,

36:24, 37:1,
37:2, 54:16,
56:3, 56:4,
56:5, 56:13,
56:24, 56:25,
61:16, 62:6,
62:22, 63:20,
70:14, 76:12,
77:23, 98:1,
99:15, 99:23,
100:6, 100:11,
100:24, 118:12,
118:19, 118:23,
119:14, 120:21,
122:1, 122:10,
126:20, 126:22,
131:18, 137:13,
138:22, 153:24,
154:15, 156:16,
158:11, 160:17,
161:7, 166:14,
183:25, 199:8,
200:14, 213:8,
213:9, 213:10,
213:11, 213:14,
234:10, 234:16,
234:17, 237:2,
247:27, 248:5,
249:5
**days**
147:10, 207:9,
213:12, 243:10,
246:10
**dc**
107:23, 120:13,
120:17
**dc6**
197:16, 198:1
**dcs**
120:21
**dd3**
207:24
**deal**
58:7, 115:13,
230:3
**dean**
211:12, 211:19
**death**
14:14, 19:8,

43:1, 43:2,
178:4, 178:8,
203:9
**december**
1:15, 1:23,
248:5, 249:5
**decent**
130:1
**decided**
33:6, 35:20
**deciding**
239:13
**decision**
162:25, 164:16,
168:14
**decision-making**
88:8, 180:20
**declaration**
4:8, 8:2, 8:8,
8:10, 19:23,
21:18, 27:12,
27:18, 28:4,
28:7, 28:20,
30:8, 35:7,
35:9, 44:17,
60:10, 61:14,
66:14, 68:11,
74:12, 94:7,
95:20, 97:15,
114:19, 116:21,
121:20, 137:10,
139:4, 150:20,
166:22, 167:14,
172:13, 173:1,
173:19, 177:25,
211:16, 212:15,
214:5, 215:15,
216:11, 217:15,
220:22, 223:8,
227:14, 237:17,
240:22, 242:18
**declarations**
29:4, 37:14
**declare**
98:20
**declared**
75:15
**default**
162:15, 162:24

**defendant**
23:15, 249:2
**defendant's**
182:19
**defendants**
1:8, 2:22,
4:12, 6:9, 31:16
**defense**
32:1, 32:8
**define**
24:6, 39:11,
57:18, 111:17
**defined**
102:1, 102:6,
102:21
**defines**
102:14, 116:18,
117:8, 119:10,
139:1, 144:1
**defining**
126:12, 177:6,
185:16
**definition**
98:4, 98:14,
98:24, 99:5,
99:13, 99:14,
102:7, 103:3,
104:23, 104:25,
105:15, 105:17,
115:1, 118:8,
118:14, 118:22,
118:24, 118:25,
119:1, 119:16,
119:22, 119:24,
119:25, 120:9,
124:1, 124:11,
124:13, 125:5,
126:23, 136:16,
137:6, 137:11,
137:21, 138:10,
138:11, 138:14,
138:16, 138:19,
138:25, 147:16,
147:22, 148:6,
173:21, 178:10,
183:16, 183:21,
184:3, 185:5,
185:19, 202:23

definitions
98:9, 111:6,
112:18, 116:14,
136:22
definitive
182:5, 189:20
degner
15:15
degrading
141:1, 147:11
degree
10:9, 104:1,
199:24
delay
214:12, 242:24
deliberate
176:4
deliberately
175:25, 176:3
deliver
104:4
delivered
184:15, 229:15
delivering
104:15, 106:12
delivery
246:18
demetrius
215:11
demonstrates
96:9
dental
243:3, 243:8
denying
171:8
department
4:39, 5:8,
5:12, 5:16,
8:12, 12:10,
12:22, 13:1,
13:20, 14:5,
15:22, 16:11,
17:7, 17:20,
17:23, 18:4,
19:14, 19:17,
25:4, 25:5,
26:1, 42:1,
42:5, 45:2,

47:12, 51:6,
92:20, 93:12,
94:17, 105:9,
114:14, 115:10,
142:23, 143:4,
143:7, 162:5,
192:13, 192:23,
193:3, 193:21,
201:23, 206:3,
234:25, 238:12,
244:12, 245:7,
245:10
departments
36:12
depend
38:24, 56:25,
58:21, 64:1,
69:24, 70:25,
71:19, 77:16,
84:13, 88:5,
97:21, 102:15,
118:23, 130:11,
130:12, 130:13,
130:22, 146:2,
146:3, 172:22,
175:18, 175:21,
176:16, 195:22,
196:12, 213:22,
214:16, 214:23,
218:13, 229:18,
230:9, 233:24,
243:10
depended
189:12
dependent
86:9, 173:24
depending
63:8, 68:8,
168:14, 220:17
depends
85:13, 109:3,
109:8, 109:12,
109:16, 126:23,
130:20, 133:22,
134:25, 146:11,
159:1, 166:20,
167:2, 173:2,
173:10, 175:9,

176:16, 177:6,
181:9, 221:25,
243:10
deponent
6:12, 249:2
depos
249:11
deposed
192:25
deposition
1:13, 1:20,
7:9, 7:24,
20:23, 21:12,
21:17, 22:3,
27:8, 27:15,
93:18, 182:12,
245:9, 247:16,
248:14, 248:18,
248:22, 249:2
depositions
27:11, 53:16,
54:12
depository
21:6
depression
110:21
deprivation
98:16, 98:17,
98:18, 99:7,
100:2, 102:16,
107:8
deprived
107:10
deputy
192:13
describe
121:9, 141:15,
199:3, 216:16,
238:3
described
164:21, 175:19,
206:25
describes
120:1, 209:20
describing
45:23, 104:7,
127:20, 185:2,
185:11

description
4:2, 5:2,
15:21, 31:19,
183:22
desk
68:17, 68:20,
68:24, 69:3,
73:8
despite
234:21
details
245:19
determination
64:3, 154:3
determinations
63:21
determine
136:25, 156:13,
156:25, 157:2,
238:13
determining
123:21, 123:25,
126:2, 130:7,
130:15, 131:10,
134:5, 134:23,
135:5, 136:11,
137:1
deterred
160:14, 160:15,
160:16
develop
142:2, 176:19
development
5:4, 193:4,
209:17
developmental
207:23, 208:19
devise
79:4
dha
4:5, 4:6, 4:14,
8:18, 9:14,
30:24, 31:6
diabetes
90:14
diabetics
230:8
diagnosis
115:25, 136:15

**difference**
44:8, 52:2,
68:9, 91:5,
178:2, 213:14,
217:5

**differences**
119:15

**different**
13:22, 23:22,
36:3, 36:4,
38:1, 40:19,
42:15, 42:23,
48:3, 57:6,
66:6, 68:1,
69:4, 77:1,
79:5, 82:9,
89:18, 105:10,
110:9, 119:5,
119:7, 119:10,
122:23, 127:15,
152:19, 153:18,
167:20, 168:19,
169:6, 182:16,
196:13, 204:6,
212:10, 220:17,
221:19, 224:23

**differentiation**
88:9

**differently**
237:10

**difficult**
59:4, 72:8,
72:20, 144:12,
144:18, 145:2,
157:7, 167:11,
196:16, 206:22,
219:3

**difficulties**
123:18

**difficulty**
186:8, 226:8

**digging**
154:24

**dignity**
145:24, 146:5

**diminution**
196:4

**dinner**
233:15

**direct**
3:5, 6:19,
14:13

**direction**
82:9

**directly**
9:23, 13:8,
18:11, 40:19,
50:5, 89:10

**director**
17:8, 17:17,
17:18, 17:20,
17:22, 42:5

**disability**
207:23, 208:19

**disagree**
111:19, 129:11,
146:16, 146:20,
187:14, 188:22,
188:24, 217:22,
218:1

**disagreed**
105:25

**disciplinary**
36:16, 42:25,
43:16, 43:24,
103:1, 103:2,
120:11, 121:2,
203:3, 203:20,
206:13

**discipline**
43:22, 206:14

**discuss**
30:2, 211:14,
218:13, 236:2,
236:11, 236:12

**discussed**
61:14, 137:17,
146:10, 243:22

**discussion**
211:18, 246:8

**discussions**
35:19, 36:8,
49:25, 93:17,
245:22

**disease**
90:15, 91:12,
176:18, 177:10,

208:16, 208:17,
215:15

**diseases**
94:24, 207:24,
218:18

**dishonest**
232:15

**dislocation**
242:4, 242:13,
242:17, 243:1

**dismissed**
155:25

**disorder**
221:17, 221:24,
238:10, 238:24,
239:25, 240:1,
240:3, 240:7

**disorganized**
141:21

**dispute**
187:25, 188:4

**distortion**
186:9

**distortions**
110:22

**district**
1:1, 1:2

**disturbances**
110:22, 186:9

**division**
1:3

**divorced**
79:16

**dixon**
192:14, 192:20,
192:21

**dizziness**
186:9

**doc**
40:19, 132:25,
191:16, 238:14,
238:18

**doctor**
53:2, 58:17,
81:16, 82:1,
82:23, 90:8,
173:16, 178:22,
211:25, 214:5,

214:9, 215:1,
218:12, 219:9,
239:16, 246:5

**doctors**
148:4, 217:23,
218:1, 218:10,
219:4, 239:10

**document**
28:2, 29:14,
31:24, 32:15,
33:2, 95:19,
118:5, 141:13,
141:14, 200:23,
201:8, 205:18,
241:19

**documentation**
222:2

**documentations**
60:20, 60:22

**documented**
54:11, 169:14,
200:16

**documents**
7:23, 8:4, 8:9,
30:7, 30:9,
30:10, 33:6,
33:10, 33:18,
85:9, 85:16,
85:25, 86:17,
90:25, 91:1,
91:3, 201:11,
245:17, 245:18,
245:25, 246:2

**doing**
12:7, 15:19,
34:15, 37:10,
41:19, 47:25,
54:2, 68:7,
71:3, 73:12,
77:1, 79:10,
80:9, 84:12,
85:13, 85:19,
86:5, 86:12,
87:24, 92:20,
93:3, 93:5,
93:8, 93:9,
101:11, 184:9,
195:25, 196:5,

207:12, 234:21
**done**
16:12, 18:7,
25:1, 55:5,
60:14, 70:20,
71:8, 71:12,
71:23, 72:1,
77:2, 77:4,
77:21, 78:19,
78:21, 80:17,
84:3, 85:7,
85:18, 86:3,
86:22, 86:24,
87:16, 89:13,
92:19, 103:17,
111:4, 111:24,
112:8, 142:19,
145:7, 158:8,
165:13, 167:25,
169:16, 206:16,
220:2, 236:4
**door**
40:16, 40:25,
67:12, 67:13,
70:18, 71:12,
71:15, 71:21,
71:23, 72:1,
72:4, 72:6,
72:9, 72:17,
139:24, 166:16,
167:10, 184:15
**doors**
72:19
**dorm**
37:20, 53:7,
54:18, 65:7,
66:3, 66:4,
67:2, 76:16,
76:24, 200:14,
203:13
**dorms**
37:17, 37:23,
37:24, 65:4,
65:7, 65:10,
72:14, 203:20
**dose**
89:10, 90:1
**doubt**
32:9, 49:8,

155:5, 189:3,
189:22, 219:5
**down**
5:6, 7:12,
10:11, 11:1,
20:9, 22:5,
22:16, 25:17,
26:6, 28:3,
28:12, 34:14,
45:24, 46:5,
48:1, 50:2,
97:22, 103:20,
106:21, 106:23,
114:16, 115:10,
121:18, 129:12,
135:15, 136:17,
143:10, 144:4,
147:8, 147:9,
150:17, 158:10,
183:12, 185:21,
186:16, 191:5,
193:9, 194:8,
194:17, 195:9,
198:19, 199:5,
199:13, 207:18,
207:19, 208:23,
209:18, 210:13,
214:22, 222:15,
223:6, 225:13,
226:2, 226:12,
231:9, 231:19,
231:25, 232:2,
232:21, 233:1,
233:9, 236:18,
242:11, 243:20,
245:3, 245:15
**dozen**
38:20
**dr**
4:4, 4:8, 5:34,
6:21, 8:18, 9:2,
9:15, 15:15,
27:18, 28:15,
28:16, 29:5,
31:15, 33:12,
51:20, 94:6,
95:15, 99:9,
128:4, 128:25,

129:8, 134:20,
140:14, 152:2,
152:8, 152:14,
152:25, 153:20,
154:1, 154:19,
210:21, 217:19,
217:20, 225:20,
229:4, 235:16,
245:5
**draft**
29:6, 29:10,
29:11, 29:17,
29:18, 29:20
**drafting**
28:19
**drafts**
29:9
**draw**
177:25, 194:10
**drawing**
47:14
**drill**
156:17
**drive**
249:13
**driveway**
136:17
**drop**
48:5, 64:21,
65:25, 69:8,
69:9
**dropped**
22:9
**dropping**
64:22
**dsu**
206:12, 206:21,
206:24, 207:4,
207:7, 207:14
**dtrevisani@flori-
dajusticeinstitu-
te**
2:11
**due**
204:3, 246:9
**duke**
2:34
**duly**
6:14, 248:8

**duration**
149:3, 149:5,
149:11, 149:14
**during**
7:24, 16:2,
44:20, 46:1,
47:24, 49:19,
49:21, 124:4,
215:8, 227:17,
227:24
**duties**
13:11, 14:12,
14:17, 15:7,
16:3, 144:9

**E**

**e-mail**
5:34, 26:10,
135:20, 182:13,
245:4
**e-mailing**
136:5
**each**
7:14, 36:3,
36:13, 36:23,
36:24, 37:6,
37:19, 37:25,
38:1, 40:12,
45:20, 46:18,
46:23, 52:22,
55:5, 56:16,
61:16, 62:6,
63:20, 74:8,
79:2, 79:16,
85:21, 90:1,
126:22, 132:15,
133:1, 152:6,
183:24, 200:12,
214:20, 224:22,
248:18
**earlier**
48:14, 243:1
**early**
122:23, 141:19,
167:13
**ease**
68:6, 237:12
**easier**
22:7, 51:24,

67:4, 67:9,
67:10, 67:14,
67:22, 68:3,
68:6, 217:11
**easiest**
167:21, 168:1
**easily**
8:7, 44:25,
126:21, 126:22,
237:11
**east**
94:1
**eastern**
6:3, 94:2, 94:3
**easy**
31:1, 46:19,
72:8, 72:16,
138:14
**eat**
234:18, 237:2,
237:3
**echoes**
110:20
**education**
107:22
**educational**
38:16, 107:16
**eeg**
219:1, 219:25
**effect**
80:2, 196:8,
197:2
**effectively**
182:6, 189:21
**effects**
4:23, 96:25,
110:19, 112:4,
112:10, 150:8,
186:1, 186:2,
186:7, 186:12,
189:18, 202:15
**efforts**
97:8, 205:1
**egregious**
44:5
**eha**
5:37, 5:38,
244:21, 244:23

**eight**
236:25
**either**
38:24, 50:5,
50:18, 52:14,
62:21, 66:22,
70:11, 83:4,
83:25, 106:4,
136:21, 229:22
**eligible**
11:10
**else**
8:14, 45:13,
89:17, 157:10,
159:4, 216:8,
216:21, 237:10
**else's**
89:17
**emerge**
4:29
**emergency**
10:16, 12:15,
19:10, 52:15,
54:14, 58:8,
61:17, 70:11,
74:17, 75:15,
91:12, 91:18,
194:11
**emotional**
149:20, 180:8
**empirical**
189:17
**employed**
248:21, 248:24
**employee**
248:23
**employees**
47:16, 47:21
**employer**
40:20
**employers**
152:19
**enact**
207:21
**enacted**
208:3
**encompassed**
184:17

**encounter**
114:25, 115:14,
115:21, 121:24,
123:19, 144:8
**encountered**
152:9
**encounters**
116:19, 118:23,
122:16, 123:22,
137:12, 137:25,
138:22, 145:19,
184:14
**end**
28:5, 48:1,
107:1, 127:15,
209:1, 215:18,
246:19
**ended**
186:5
**endoscopy**
237:23
**ends**
54:10
**enforcing**
51:4
**engagement**
26:24
**english**
144:15
**enjoined**
40:21, 48:14
**enjoy**
104:2
**enough**
49:4, 54:15,
87:15, 98:19,
131:1, 131:5,
141:6, 152:23,
194:15, 196:6,
199:24, 201:14,
239:4
**enter**
166:17
**enterprise**
155:19
**entire**
17:20, 17:23,
45:17, 122:7,

200:13
**entirely**
161:15, 174:19,
176:16, 180:21
**entity**
84:22
**environment**
110:9
**environmental**
110:4, 143:19,
208:1
**epidemiology**
153:7
**epilepsy**
217:25, 218:3,
219:10, 219:14,
219:24, 219:25,
220:8, 220:13,
220:18
**equal**
32:13
**equipment**
74:2, 74:3
**equivalent**
203:5
**error**
232:15
**erupt**
193:23
**escort**
53:10, 54:7,
54:15
**escorted**
52:8, 52:17,
54:5, 64:14,
109:1, 184:13,
195:9
**especially**
7:10, 57:23,
96:11
**espinosa**
211:1, 236:22,
237:16, 238:20
**espinosa's**
240:14, 245:8
**esq**
2:3, 2:4, 2:15,
2:23, 2:24, 2:34

**essentially**
10:3, 11:7,
15:18, 15:21,
16:9, 17:5,
18:16, 19:5,
26:18, 30:13,
32:24, 40:23,
88:22, 118:25,
119:16, 209:2
**est**
1:24, 248:5
**established**
141:18, 141:24,
143:11
**establishes**
182:6, 189:21
**estate**
21:21
**estimation**
30:7
**et**
1:4, 1:7, 186:6
**evaluate**
24:9, 24:21,
142:1, 177:1,
177:13, 179:17,
179:20, 239:7
**evaluated**
24:4, 239:6
**evaluating**
35:1, 39:22,
42:10, 48:20,
85:12
**evaluation**
61:8, 70:17,
71:4, 75:22,
76:4, 86:1,
146:14, 146:19
**evaluations**
60:13, 61:4,
73:12, 85:13,
189:17
**evans**
2:43
**even**
53:17, 77:25,
80:5, 98:20,
104:14, 104:20,

106:11, 106:17,
111:12, 112:19,
180:9, 188:19,
191:19, 199:21,
201:8, 222:1,
234:13, 236:3,
236:8, 237:25
**event**
34:22, 219:3,
220:14
**events**
89:15
**eventually**
29:2
**ever**
24:2, 24:8,
25:19, 25:22,
25:25, 26:3,
39:15, 39:17,
41:19, 42:9,
54:1, 151:22,
151:23, 152:3,
152:4, 158:14,
158:18
**every**
19:7, 19:8,
36:5, 37:20,
55:6, 56:14,
62:14, 77:25,
90:1, 100:23,
101:2, 101:4,
101:5, 107:9,
120:25, 121:24,
122:12, 126:19,
126:22, 135:13,
156:16, 199:7,
199:8, 200:14
**everybody**
127:9, 195:24,
214:18, 230:7
**everyone**
18:5, 167:21
**everything**
23:4, 32:2,
32:5, 32:23,
32:25, 69:6,
147:3, 201:4
**everywhere**
50:5, 101:15,

158:5
**evidence**
82:18, 83:7,
83:14, 114:13,
147:18, 169:22,
170:2, 170:7,
170:8, 171:5,
171:6, 171:7,
171:9, 171:11,
171:22, 171:24,
172:18, 174:14,
177:15, 177:16,
189:9, 189:25,
190:2, 190:5,
190:19, 195:7,
195:16, 199:23,
200:1, 201:21,
212:9, 219:25,
223:13, 226:23,
231:7, 237:23,
239:17, 243:24
**exacerbations**
91:12, 167:14
**exactly**
32:19, 204:23,
233:16
**exam**
11:12, 52:25,
53:7, 58:13,
73:8
**examination**
3:5, 6:19,
59:4, 63:25,
64:1, 71:14,
71:15, 73:20,
73:24, 248:12
**examinations**
73:17, 73:18
**examined**
58:6, 218:5,
248:12
**example**
71:20, 80:20,
87:3, 181:5,
188:8, 198:21,
238:11
**examples**
178:9

**excellent**
197:8
**except**
52:24, 247:17
**exception**
157:24, 163:2
**exceptions**
22:7, 113:14
**excerpted**
118:3
**exclude**
108:16, 149:21
**excluded**
25:19, 149:2,
149:5, 149:10,
149:14
**excuse**
150:9
**exercise**
153:11, 184:13,
188:19, 201:25,
234:20
**exercising**
98:2
**exhibit**
3:4, 4:2, 4:4,
4:8, 4:12, 4:16,
4:18, 4:21,
4:22, 4:23,
4:28, 4:30,
4:33, 4:36, 5:2,
5:3, 5:8, 5:12,
5:16, 5:20,
5:22, 5:25,
5:27, 5:30,
5:34, 8:18,
8:20, 8:22,
26:7, 27:18,
27:20, 27:22,
28:14, 31:6,
31:10, 31:16,
34:13, 95:1,
95:3, 95:5,
96:2, 114:17,
117:11, 117:15,
117:16, 117:20,
117:21, 121:18,
127:16, 136:1,

136:2, 140:7,
140:9, 140:11,
150:18, 182:9,
183:4, 183:6,
191:5, 191:23,
192:1, 192:6,
193:12, 193:13,
197:22, 197:24,
197:25, 198:19,
205:21, 205:23,
209:6, 209:8,
209:10, 221:7,
221:10, 222:18,
222:20, 223:19,
223:22, 225:18,
225:25, 226:1,
229:2, 229:3,
229:10, 231:21,
231:23, 233:4,
233:6, 235:10,
235:14, 242:1,
244:25, 245:2
**exhibits**
4:1, 5:1,
127:10, 221:11
**exist**
106:11, 112:22,
115:9, 138:7,
144:2, 148:10,
148:16, 171:8,
171:19
**existed**
124:19
**existence**
161:18
**exists**
96:15, 99:4,
113:19, 113:23,
116:10
**expand**
100:1
**expanded**
99:1
**expected**
4:19, 172:23,
173:15, 173:25,
174:3, 174:21,
175:2

**expecting**
175:2
**expedited**
246:18
**experience**
10:14, 11:13,
16:10, 21:6,
51:21, 51:24,
54:23, 55:3,
56:11, 56:20,
59:3, 59:5,
72:2, 115:12,
115:22, 157:16,
158:13, 196:25,
197:7, 197:8,
206:20
**experiencing**
179:5
**expert**
20:14, 21:6,
22:3, 22:13,
23:6, 23:14,
23:24, 24:3,
24:8, 25:9,
25:11, 25:19,
25:25, 31:18,
31:23, 42:11,
82:18, 172:1
**expertise**
19:24, 20:2,
20:5, 43:7,
43:18, 44:7,
44:10, 53:25,
97:3, 97:6,
97:13, 97:18,
112:2, 113:10,
115:16, 136:25,
143:16, 149:8,
149:12, 150:6,
150:11, 150:16,
196:23, 198:16,
204:19
**experts**
29:3, 29:23,
30:3, 34:20,
37:14, 172:2,
191:2
**expired**
213:3, 213:9

**expires**
247:33, 249:10
**explain**
65:21
**explained**
153:11, 167:13,
234:12, 237:11,
237:13, 239:23
**explaining**
237:8
**explanation**
239:11
**extend**
25:3, 207:8
**extent**
10:16, 151:14,
152:14, 152:25,
153:25, 155:14,
155:15, 155:16,
163:24, 172:7,
210:19
**external**
243:14, 243:16
**extra**
75:11
**extra-sized**
33:14
**extrapolated**
153:19
**eye**
132:15

## F

**face**
71:10, 71:16,
170:11
**faced**
212:5, 212:6,
220:16
**faces**
220:8
**facilities**
17:22, 35:17,
36:11, 37:1,
37:16, 38:12,
41:23, 41:24,
42:6, 42:7,
46:8, 46:17,

51:10, 65:11,
65:22, 69:5,
72:14, 87:9,
145:8, 196:1,
207:8, 207:11
**facility**
18:24, 36:23,
37:6, 37:19,
37:20, 38:1,
39:1, 41:20,
42:9, 46:23,
46:25, 47:18,
47:23, 50:25,
64:8, 92:18,
118:13, 122:5,
122:25, 207:13,
207:14
**fact**
40:15, 68:24,
122:6, 155:9,
198:9, 199:21,
199:25, 200:16,
202:9, 234:5
**factor**
79:22, 100:16,
185:12, 185:15
**factored**
196:4
**factors**
110:1
**failed**
189:17
**failing**
86:6
**fails**
218:22, 218:23
**fair**
16:19, 46:2,
71:5, 83:19,
198:24
**fairly**
142:25, 158:21
**fall**
142:22, 176:4,
220:12, 220:19
**falling**
220:9, 230:8
**false**
152:10, 154:4,

154:9
**familiar**
11:8, 44:13,
70:15, 124:15,
140:15, 150:12,
150:15, 163:22,
191:12, 192:22,
197:14, 205:5,
205:11, 206:11,
210:1, 224:14
**family**
10:13, 12:18,
104:5, 106:18,
107:2, 107:8,
108:20
**far**
40:21, 52:4,
68:6, 70:10,
89:22, 89:24,
94:18, 99:1,
105:14, 106:3,
107:19, 116:13,
171:19, 176:19,
199:17, 206:6,
212:11, 212:13,
236:12, 244:9,
244:12
**farther**
98:25
**fashion**
167:20, 168:1,
169:16
**fast**
150:23, 168:20,
194:6
**fault**
108:8
**fdc**
45:1, 83:5,
83:6, 154:8,
154:10, 154:12,
154:21, 154:22,
154:23, 155:23,
156:3, 159:18,
159:23, 245:22
**fdoc**
194:21, 197:15
**fears**
231:14

**features**
189:7
**february**
27:4, 193:10,
193:17, 213:1,
224:7
**federal**
1:26
**feel**
136:19, 168:18,
178:12, 231:13
**feet**
32:12
**fell**
76:19
**fellows**
69:3
**felt**
49:23, 64:2,
84:6, 217:9,
217:10
**ferguson**
211:12, 211:21
**ferro**
2:4
**few**
30:18, 56:18,
72:11, 73:23,
95:25, 113:13,
141:8, 185:25,
191:19, 205:9,
243:10, 244:10,
244:13
**fewer**
102:9, 125:6,
125:8, 125:9,
126:3, 137:13,
138:22
**fifth**
123:1
**fight**
230:7
**figure**
9:6, 63:11,
67:20, 72:20,
83:21, 172:3,
235:1, 239:15
**file**
21:6, 160:8,

160:24, 161:3,
161:7
**filed**
229:11
**files**
31:19
**fill**
62:17, 64:20,
67:12, 68:18,
68:20, 69:1,
69:2, 69:3,
158:7
**filled**
68:15, 198:6
**filling**
221:19
**final**
205:19
**finally**
14:21, 104:1
**financially**
248:25
**find**
33:13, 52:2,
54:12, 105:24,
184:7, 189:16,
190:23, 192:9,
197:12, 231:13
**finding**
87:2, 207:6
**findings**
4:37, 206:2,
242:11
**fine**
172:10
**finish**
7:13
**finished**
81:12, 99:9
**fire**
17:6
**firm**
26:4, 249:12
**first**
6:14, 18:23,
20:25, 22:10,
24:25, 26:8,
29:6, 29:17,

31:17, 46:4,
48:7, 49:25,
64:18, 69:4,
81:19, 89:3,
96:1, 113:18,
118:7, 128:12,
154:22, 172:16,
187:2, 187:8,
192:19, 216:12,
236:8, 241:18
**fits**
230:21
**five-minute**
51:15, 140:1,
191:7, 236:18
**fl**
4:30
**flooding**
166:16
**floor**
128:12
**florida's**
193:20
**flow**
5:9, 5:13,
221:12, 222:23
**focus**
9:25, 36:11,
50:13, 243:15
**focused**
92:19, 210:20
**folks**
77:24, 148:5,
151:19, 160:20
**follow**
142:24, 159:8,
181:2
**follow-up**
90:4
**followed**
150:4
**following**
97:10, 113:4,
248:7
**follows**
6:16, 248:18
**food**
104:4, 104:15,

106:12, 229:14
**foot**
171:22
**footnote**
116:22
**foregoing**
247:15
**forever**
174:20
**forged**
151:8, 151:11,
151:22, 152:5,
153:13, 154:9
**forging**
156:20
**forgot**
141:9
**form**
45:15, 49:5,
61:24, 62:3,
62:9, 62:17,
63:18, 64:19,
65:23, 66:11,
67:12, 68:4,
68:10, 68:14,
68:18, 69:8,
69:15, 69:21,
70:2, 82:9,
82:12, 82:24,
83:9, 83:18,
83:23, 86:17,
96:20, 100:15,
153:17, 154:19,
156:12, 158:1,
158:7, 162:7,
197:15, 198:3,
198:5, 198:9,
198:12, 200:3,
200:6, 200:7,
200:8, 200:10,
200:11, 200:13,
200:14, 201:12,
207:24, 219:12,
221:18, 221:19,
232:12
**formal**
18:17, 27:1,
45:25, 46:6,

46:14, 49:25,
227:10
**formally**
72:18
**format**
29:14, 82:6
**formatted**
29:15
**formatting**
29:13
**formed**
98:14
**former**
97:8, 97:15
**forming**
29:22, 29:24,
30:11, 35:3,
44:22, 58:24,
85:14, 174:16,
189:8, 194:24
**forms**
62:25, 65:7,
65:25, 67:1,
67:4, 67:23,
68:18, 68:19,
68:25, 153:16,
157:12, 157:23,
158:5, 208:20,
227:9
**forth**
1:27, 248:4
**fortunately**
215:19, 216:13
**forward**
127:6
**foskey**
45:6, 45:7,
49:13, 50:17,
51:8, 93:18
**found**
33:15, 59:13,
59:14, 124:25,
141:20, 152:4,
156:8, 156:10,
163:5, 181:23,
187:12, 189:2,
223:13, 226:23,
227:4, 227:5,

227:6
**founded**
43:21
**four**
39:3, 39:4,
130:24, 130:25,
133:25, 138:24,
228:18
**fourth**
74:14, 122:25
**fracture**
175:22, 218:23,
218:24, 218:25,
242:4, 242:12,
242:17, 242:25
**frame**
128:25, 133:8,
134:15, 134:19,
173:25, 174:21,
175:2, 175:5
**framing**
184:2
**frequently**
139:19
**friendly**
72:11
**front**
28:17, 70:8,
119:11, 158:2,
232:22, 244:6
**froze**
150:22
**fsp**
4:21, 35:11
**full**
56:5, 59:21,
59:24, 109:18,
109:21, 132:6,
132:11, 134:4
**fully**
57:10, 57:16,
57:18, 57:22,
59:16, 131:6,
131:7
**function**
44:11, 215:20
**functional**
237:20, 237:22,

238:1, 238:5,
238:15, 238:21,
239:18, 239:20,
239:24, 240:2,
240:9
**funny**
31:3
**further**
99:1, 100:1,
111:12, 228:10,
244:4, 244:5,
248:20, 248:23,
249:1
**future**
211:25

**G**

**gallegos**
21:22, 22:18
**gama**
217:19
**gave**
21:16, 29:5,
71:20, 120:4,
159:23, 238:11,
241:18
**gaxiola**
217:20
**gendreau**
189:15
**general**
34:24, 37:15,
44:12, 52:1,
54:20, 55:3,
55:8, 55:21,
55:23, 55:24,
56:1, 56:9,
57:3, 61:11,
64:15, 64:16,
64:23, 65:3,
65:6, 65:14,
65:17, 66:17,
67:2, 67:3,
67:21, 68:12,
69:7, 69:19,
71:13, 76:16,
76:24, 78:3,
80:9, 81:7,

81:20, 81:21,
82:14, 82:21,
83:1, 84:23,
87:8, 87:12,
87:20, 87:21,
87:22, 87:23,
87:25, 89:23,
90:11, 91:2,
92:25, 93:22,
101:21, 101:23,
111:11, 113:14,
113:19, 113:23,
113:24, 114:2,
114:5, 120:15,
153:8, 169:8,
173:18, 190:11,
191:19, 196:9,
196:17, 196:20,
197:3, 204:7,
204:14, 206:23,
207:1, 207:4,
218:12, 230:21,
243:14

**generally**
18:23, 19:6,
43:8, 46:4,
49:24, 50:4,
52:7, 56:4,
58:4, 85:5,
89:12, 89:13,
156:14, 169:16,
191:13, 198:5,
203:15, 228:5,
228:15

**generated**
86:1

**getting**
44:12, 53:6,
67:22, 68:4,
87:15, 92:12,
92:17, 132:13,
156:24, 158:2,
185:6, 201:14,
202:9, 224:9,
224:12, 224:19,
224:21, 225:5,
226:6, 229:14,
229:21, 240:6

**give**
9:10, 12:12,
17:5, 21:11,
22:3, 22:7,
23:8, 26:20,
59:20, 77:23,
95:9, 112:7,
127:17, 159:19,
178:9, 185:22,
209:23, 223:20,
235:14

**given**
22:8, 67:17,
84:1, 89:15,
137:16, 196:24,
248:14

**gives**
13:20, 102:8,
112:5

**giving**
42:7, 89:10,
89:16

**glance**
71:11

**glass**
108:21

**glossary**
117:12, 118:4,
118:7

**go**
7:8, 12:13,
23:7, 28:11,
28:20, 32:3,
32:20, 32:21,
38:6, 44:25,
49:10, 52:7,
52:21, 53:20,
58:17, 62:20,
64:20, 65:10,
65:22, 66:9,
67:12, 77:8,
82:1, 89:21,
90:1, 91:9,
92:6, 92:7,
93:16, 98:8,
116:21, 119:8,
122:7, 125:4,
128:12, 129:2,

132:10, 132:18,
133:4, 133:9,
134:11, 134:12,
134:16, 135:19,
151:1, 154:20,
159:12, 162:22,
172:13, 174:2,
174:3, 180:4,
181:20, 183:12,
186:16, 188:3,
188:14, 191:20,
193:19, 194:1,
201:19, 202:16,
203:15, 204:12,
206:3, 212:24,
214:21, 216:10,
224:17, 231:9,
241:20

**goal**
84:9

**goes**
63:20, 65:23,
65:25, 66:1,
139:19, 149:19,
174:21, 175:1,
184:10, 232:17

**going**
7:8, 7:18, 9:3,
10:11, 20:9,
28:22, 33:18,
36:20, 40:6,
40:23, 40:25,
41:11, 54:14,
55:23, 59:10,
68:11, 72:19,
76:4, 76:15,
76:16, 76:23,
76:24, 77:3,
97:22, 101:13,
104:1, 105:14,
109:22, 110:9,
113:11, 114:22,
117:14, 121:19,
121:23, 127:5,
127:9, 128:12,
128:16, 128:17,
132:14, 132:16,
134:12, 137:19,

140:23, 144:4,
144:5, 147:8,
147:22, 150:3,
157:21, 160:1,
160:8, 160:15,
173:14, 183:12,
185:21, 186:6,
186:16, 193:18,
194:5, 206:3,
207:19, 211:24,
214:18, 218:12,
218:15, 231:24,
233:8, 234:17,
235:14, 236:3,
241:19, 245:20

**gone**
32:11, 42:22,
63:1, 203:9

**good**
6:21, 6:22,
17:9, 31:4,
36:15, 36:22,
93:25, 94:3,
114:12, 123:20,
133:4, 136:19,
139:25, 140:4,
142:14, 151:5,
170:8, 172:12,
196:15, 197:12,
197:13, 232:3,
232:5, 233:11,
235:25, 236:18,
238:8, 245:5

**gosh**
44:24, 50:20

**gp**
38:4, 38:16,
38:18, 66:17,
203:10, 224:24,
225:4

**grab**
158:7

**gradual**
167:17

**graduated**
12:24

**grammar**
29:13

**great**
8:1, 95:6,
115:13, 135:21,
136:3, 153:15
**greater**
147:9
**greatly**
104:3
**grievance**
34:5, 34:20,
100:25, 160:8,
160:24, 161:3,
161:7, 161:18,
223:13, 225:20,
226:24, 227:9,
229:10, 231:25,
233:9
**grievances**
33:21, 33:23,
33:25, 34:3,
34:10, 34:12,
34:16, 154:2,
154:6, 154:9,
154:10, 160:21,
162:2, 162:4
**grievant**
230:11
**grieved**
154:7
**grosholz**
2:24
**group**
45:8, 72:23,
104:24, 148:3,
148:4
**groups**
196:14
**guards**
109:1
**guess**
15:8, 20:10,
23:21, 26:19,
28:23, 38:19,
50:23, 74:5,
86:15, 108:16,
127:21, 128:24,
140:18, 156:25,
224:23, 230:14,

230:23, 235:6
**guidelines**
112:17
**guy**
203:10
**guy's**
45:10
**guys**
150:24, 160:19

**H**

**half**
36:24, 38:19,
94:1, 103:21,
122:20, 123:4
**hallucinations**
238:7
**hamblin**
21:7, 21:8,
21:13, 21:20,
22:17
**hamilton**
35:12
**hamper**
146:13, 146:18
**hand**
14:22, 67:13,
93:1, 159:10,
159:15, 249:4
**handcuffed**
57:19
**handcuffs**
109:6
**handled**
88:7
**handling**
207:14
**haney**
189:14, 189:19
**hanging**
73:14
**happen**
54:19, 70:7,
101:2, 101:5,
122:16, 123:14,
155:5, 161:11,
161:14, 185:2,
195:11, 195:12,

199:15, 199:18,
224:20, 231:16
**happened**
151:22, 152:5,
152:22, 152:23,
152:25, 154:21,
157:9, 202:15
**happening**
39:8, 39:10,
39:15, 39:18,
39:20, 54:10,
61:5, 122:5,
122:10, 123:7,
123:11, 123:22,
152:11, 152:12,
152:13, 153:14,
153:23, 153:25,
154:5, 155:6,
156:7, 198:10,
198:13, 199:4,
199:21, 199:23,
200:1, 200:16,
200:24, 201:9,
201:12
**happens**
53:9, 59:18,
62:16, 63:25,
156:15, 158:6,
224:21
**happy**
160:21, 172:10
**hard**
72:16, 129:23,
157:19, 168:6,
194:5, 218:25
**hardee**
35:11
**harder**
51:25, 57:17,
57:21, 77:5,
196:5, 222:22
**hardly**
190:16
**harm**
78:23, 79:11,
80:11, 81:8,
81:22, 82:20,
83:4, 83:5,

83:10, 83:15,
83:16, 83:24,
114:13, 147:18,
165:1, 168:24,
169:15, 169:20,
170:5, 170:12,
172:19, 172:21,
172:23, 173:6,
174:5, 174:6,
174:7, 174:10,
174:17, 174:24,
175:7, 175:11,
175:17, 175:20,
176:7, 176:14,
177:4, 177:7,
177:8, 177:9,
177:12, 177:15,
177:16, 177:17,
177:20, 177:24,
178:1, 178:3,
178:4, 178:7,
178:8, 178:10,
179:5, 179:11,
179:25, 180:10,
180:18, 181:17,
181:24, 182:3,
188:8, 189:9,
190:1, 190:3,
190:15, 190:19,
212:5, 212:6
**harmed**
190:17
**harmful**
141:2, 147:11,
206:21
**harmless**
181:1
**harms**
143:12, 169:4,
169:11, 174:8,
174:23, 190:6,
202:15
**harsh**
112:16, 112:17
**harvard**
1:4, 5:36,
20:18, 21:2,
24:4, 24:25

**hassell**
1:24, 6:10,
248:2, 249:9
**hassle**
158:9
**head**
81:17, 117:10,
214:19
**headaches**
186:25, 187:3,
187:13, 187:17,
190:10
**heading**
114:21, 172:16,
177:14, 185:24,
186:23
**heals**
173:7, 175:4,
175:16
**health**
4:16, 5:30,
9:19, 9:22,
11:2, 11:4,
11:25, 12:3,
14:14, 14:22,
15:1, 16:15,
19:2, 39:17,
40:1, 50:18,
50:25, 51:2,
51:25, 61:12,
64:17, 78:11,
94:10, 94:12,
94:14, 95:1,
95:15, 95:16,
96:10, 98:20,
98:23, 99:13,
102:14, 102:22,
104:10, 104:13,
104:19, 104:22,
105:5, 105:7,
105:13, 105:17,
106:2, 110:20,
112:4, 112:10,
113:14, 113:16,
114:7, 114:11,
141:2, 141:11,
141:18, 141:21,
143:20, 144:7,

144:10, 147:12,
147:19, 148:24,
150:8, 153:6,
165:1, 186:1,
186:2, 186:7,
186:12, 194:24,
195:19, 203:8,
203:11, 203:12,
203:13, 203:15,
203:16, 203:17,
203:19, 204:1,
204:3, 204:5,
216:14, 217:7,
219:17, 231:3,
232:13, 236:13,
238:14, 238:19,
238:20, 238:24,
239:17, 239:20,
239:25, 240:2,
240:3, 240:7,
240:15
**healthfully**
234:19
**healthy**
77:17, 228:18
**hear**
40:17, 61:19,
72:9, 72:16,
172:10, 191:15
**heard**
98:7, 98:9,
152:6, 157:15,
158:14, 158:16,
158:17, 158:18,
202:4, 202:6,
205:15
**hearing**
192:17, 194:5
**heart**
79:21, 80:5,
80:6, 176:12,
176:22, 177:3,
177:18, 177:20,
178:8, 181:7,
181:11, 187:18,
187:21, 188:1,
190:9, 216:14
**heavier**
228:7

**held**
101:22, 108:20,
143:21, 169:20,
170:5
**help**
17:5, 25:4,
127:4
**helped**
29:12
**helpful**
87:24, 195:1
**helping**
17:10, 29:20
**here**
8:3, 9:3, 9:4,
9:8, 9:11, 10:6,
20:11, 20:17,
21:3, 21:6,
21:8, 22:25,
23:21, 24:4,
31:22, 32:15,
33:2, 33:23,
35:4, 42:14,
71:9, 76:18,
87:24, 91:25,
96:1, 96:8,
97:22, 103:16,
104:1, 106:24,
107:13, 110:16,
110:17, 111:24,
112:12, 113:12,
117:3, 117:6,
118:7, 127:5,
131:19, 140:23,
143:10, 143:18,
144:6, 147:4,
147:9, 148:20,
154:21, 161:15,
165:8, 168:3,
172:25, 176:22,
181:23, 182:23,
183:15, 183:21,
185:11, 185:24,
186:6, 187:5,
187:8, 187:12,
189:25, 190:5,
190:19, 190:21,
192:12, 193:19,

194:1, 194:10,
206:4, 206:19,
206:25, 209:20,
213:2, 222:23,
224:8, 226:23,
230:10, 231:16,
232:7, 232:19,
233:9, 233:10,
237:7, 240:23,
241:21, 242:9,
242:11, 242:15
**here's**
189:24
**hereby**
247:16, 248:3
**herein**
247:17
**hereinafter**
1:27
**hereinbefore**
248:4
**hereto**
248:24
**hereunto**
249:4
**hey**
131:1, 131:15,
132:14, 154:21,
160:1, 161:19,
191:20, 236:12
**hi**
51:13, 72:11,
136:18, 136:19
**hiding**
202:7
**high**
79:20, 80:3,
80:4, 90:14,
163:16, 176:20,
176:23
**higher**
79:21, 80:4,
80:24, 82:14,
82:19, 83:1,
83:8, 111:11,
207:3
**highest-ranking**
17:2

| | | | |
|---|---|---|---|
| **highlighted** | **hospitalization** | 144:3 | **implementation** |
| 140:22, 143:10 | 19:8 | **hundreds** | 5:4, 205:6, |
| **highlighting** | **hospitalizations** | 156:9, 156:10 | 209:17 |
| 97:23, 103:25, | 10:19, 91:12, | **hungerford** | **implementing** |
| 113:12, 183:15 | 92:4, 92:9, 93:7 | 249:13 | 51:5 |
| **highly** | **hour** | **hurt** | **importance** |
| 108:12, 108:15, | 94:1, 102:10, | 159:10, 160:1 | 77:15 |
| 230:12 | 116:19, 122:1, | **hypertension** | **important** |
| **hill** | 122:20, 122:22, | 176:10, 176:18, | 34:16, 34:24, |
| 211:5, 211:11, | 123:4, 123:10, | 215:15 | 35:3, 35:6, |
| 211:15 | 137:19, 183:24, | **hypothetical** | 39:22, 40:9, |
| **hills** | 199:8, 229:15, | 132:4 | 40:12, 48:19, |
| 7:1 | 230:2 | **hypothetically** | 48:22, 48:23, |
| **hipaa** | **hours** | 201:11 | 58:24, 75:18, |
| 41:9 | 39:4, 98:1, | | 76:2, 76:6, |
| **hire** | 98:19, 99:15, | **I** | 76:7, 76:14, |
| 17:6 | 99:22, 100:6, | **idea** | 76:23, 77:12, |
| **hired** | 100:11, 102:17, | 56:25, 244:10 | 78:4, 84:4, |
| 40:19 | 118:12, 118:18, | **identi** | 84:6, 85:11, |
| **historically** | 119:4, 119:7, | 24:9 | 85:15, 85:17, |
| 82:19, 83:5 | 119:9, 119:13, | **ignore** | 86:16, 92:15, |
| **history** | 120:16, 120:21, | 175:14, 179:4 | 100:15, 146:25, |
| 4:24, 84:14, | 122:18, 136:20, | **ignored** | 147:7, 189:7, |
| 86:9, 184:10 | 138:4, 168:18, | 175:25, 176:3 | 190:7, 227:19 |
| **hit** | 230:8, 234:8, | **ii** | **impossible** |
| 242:7 | 234:15, 236:25, | 185:25, 186:5, | 152:24, 153:22, |
| **hits** | 237:1, 237:3, | 186:20 | 155:11 |
| 163:3 | 244:8, 244:13, | **ill** | **improve** |
| **hold** | 248:19 | 149:1, 149:10, | 84:10 |
| 81:16, 101:15, | **house** | 150:5 | **inability** |
| 101:16, 107:14, | 7:3, 192:16 | **illness** | 237:19 |
| 201:17 | **housed** | 96:24, 143:12, | **inadequate** |
| **holds** | 65:3 | 207:23, 208:4, | 83:14, 141:21 |
| 11:9, 101:10, | **however** | 221:24, 238:6 | **inc** |
| 101:14, 101:17 | 113:13, 165:11, | **imagine** | 2:6 |
| **home** | 188:4 | 57:14, 107:7, | **incarcerated** |
| 7:4 | **huh** | 156:20, 157:19, | 51:11 |
| **homestretch** | 128:7 | 160:18 | **incarceration** |
| 236:22 | **human** | **immediate** | 174:14, 189:18 |
| **honest** | 98:18, 99:7, | 243:8 | **inch** |
| 232:14 | 100:2, 100:20, | **immediately** | 1:7, 103:21, |
| **hopefully** | 102:9, 102:10, | 74:16, 213:25 | 193:22, 194:2 |
| 182:22, 244:21 | 102:16, 104:2, | **impact** | **inches** |
| **hoping** | 104:3, 107:8, | 96:10, 143:20 | 4:28 |
| 117:17 | 114:24, 115:14, | **impacts** | **include** |
| **hospital** | 115:21, 116:19, | 206:21 | 23:4, 47:2, |
| 10:18, 10:21, | 125:10, 137:4, | **impaired** | 47:7, 94:23, |
| 10:23, 92:11 | 137:24, 138:22, | 186:10 | 99:7, 104:21, |

112:5, 112:11,
143:1, 162:18,
165:15, 222:6,
223:3
**included**
35:21, 35:25,
107:7, 112:17,
147:1, 163:3
**includes**
98:16, 99:14,
100:23, 110:21,
118:18, 120:17,
153:7
**including**
70:12, 82:17,
89:2, 98:16,
102:8, 115:8,
149:20, 164:5,
164:21, 197:9,
207:23, 236:10,
236:15
**incomplete**
43:6
**incorrect**
114:22
**increase**
78:22, 79:10,
80:10, 179:23,
179:24, 181:15,
181:17
**increased**
83:16, 83:19,
170:12, 171:1,
176:19, 187:19,
187:22, 188:1,
188:17, 190:9
**increases**
81:7, 81:22,
168:24, 169:19,
170:4
**indeed**
230:23, 231:11
**independent**
141:25
**indicate**
161:19, 221:13
**indicating**
71:9, 106:25,

224:8, 229:7,
241:21
**indicative**
233:21, 233:22
**indicator**
161:5, 179:10,
180:10, 180:17,
181:11
**indifference**
176:4
**indirectly**
9:24
**individual**
23:24, 24:11,
24:16, 24:18,
24:22, 40:12,
40:13, 60:22,
64:24, 88:5,
97:25, 99:22,
100:10, 101:17,
119:13, 155:4,
157:5, 180:21,
181:4, 214:23
**individual's**
141:2, 145:24,
146:4, 147:12,
147:19
**individualized**
84:15, 181:21,
208:15
**individually**
64:2
**individuals**
29:4, 34:1,
144:10, 145:8,
149:1, 149:10,
150:5, 210:15,
218:17
**infer**
177:22
**infirmary**
14:14, 168:8,
203:11
**inflammatory**
167:15
**informal**
223:13, 226:24,
227:10

**information**
27:10, 29:5,
49:3, 51:7,
54:22, 54:25,
55:4, 61:9,
82:16, 82:17,
83:3, 84:19,
87:18, 106:3,
131:19, 132:18,
159:19, 159:21,
159:23, 188:5,
202:13, 206:8,
209:23, 215:21,
234:13, 239:13,
244:17
**informed**
49:6
**inhaler**
162:24, 163:3,
163:4, 163:12,
163:16, 163:20,
165:20, 165:23,
165:24, 166:23,
166:25, 167:4,
167:5, 167:7,
167:20, 167:22,
168:9, 168:24
**inhalers**
162:10, 162:13,
162:16, 165:16
**inherent**
100:2, 110:1,
143:18
**inhumane**
141:1, 147:11
**initial**
29:1, 47:22
**initially**
43:20, 163:7
**initiative**
4:37, 206:2
**injection**
236:25, 237:4
**injections**
228:23, 230:12,
230:16
**injects**
232:18

**injury**
220:19, 243:11
**inmate**
24:18, 40:22,
41:10, 55:23,
61:23, 63:11,
63:24, 64:7,
64:12, 65:23,
66:8, 66:24,
68:6, 68:18,
70:12, 71:7,
75:10, 77:25,
79:2, 88:17,
88:19, 89:6,
90:7, 118:11,
121:24, 124:6,
126:19, 131:15,
133:1, 134:1,
137:12, 157:1,
157:18, 158:14,
158:17, 158:18,
158:24, 159:2,
159:4, 159:9,
159:13, 160:1,
160:2, 160:7,
160:24, 161:1,
161:3, 161:6,
163:11, 163:15,
163:19, 166:8,
168:22, 196:22,
200:12, 203:9,
218:13
**inmate's**
85:21, 123:18
**inmates**
4:24, 10:19,
33:11, 56:2,
56:12, 56:20,
58:12, 61:25,
64:16, 64:23,
65:3, 65:6,
66:17, 66:21,
67:3, 67:18,
67:21, 68:13,
69:7, 69:14,
69:19, 69:25,
72:6, 72:19,
74:21, 77:17,

82:10, 82:13,
82:20, 82:25,
83:16, 84:16,
86:23, 87:1,
88:4, 88:24,
104:14, 106:11,
114:23, 115:12,
116:2, 116:6,
116:11, 120:6,
123:15, 131:17,
132:14, 133:23,
137:13, 139:5,
153:16, 153:17,
155:12, 162:12,
187:19, 187:22,
188:2, 189:3,
189:5, 190:11,
194:13, 197:9,
202:9, 203:7
**input**
18:2, 33:9,
45:11, 110:4
**inside**
73:1, 73:4,
73:24, 104:5,
122:18, 122:20,
178:8, 196:1,
200:1
**inspect**
35:17, 37:20,
37:22
**inspected**
35:15, 37:24,
38:7
**inspections**
35:8, 35:10,
36:1, 37:10,
41:20, 42:9,
46:2, 47:23,
47:25, 50:9,
53:6
**instance**
1:21, 54:2,
70:16, 157:15
**instances**
41:22, 232:24
**instant**
167:16

**institute**
2:6, 205:12
**institution**
36:4, 77:4,
120:25, 167:24,
224:20, 224:25,
230:6
**institutions**
4:20, 35:10,
45:21, 152:17,
202:4
**insulin**
76:13, 77:23,
228:19, 228:23,
229:8, 229:14,
229:21, 229:22,
230:1, 230:3,
230:4, 230:15,
230:20, 232:8,
232:18, 233:13,
233:19, 233:25,
234:5, 235:2,
236:9, 236:13,
236:24
**insulins**
236:13
**intake**
15:4, 38:3,
38:14
**intend**
7:24, 7:25,
243:23
**intense**
76:11
**intensely**
204:5
**interact**
126:10, 126:14
**interacted**
46:9
**interaction**
40:9, 123:16,
123:17, 123:25,
124:3, 124:8,
125:9, 125:10,
125:16, 125:24,
126:4, 126:18,
126:24, 130:6,

130:18, 131:18,
133:24, 135:2,
136:14, 136:20,
143:19, 144:3,
201:14, 208:1
**interactions**
40:11, 122:4,
125:3, 125:5,
126:3, 126:7,
126:8, 126:20,
131:9, 131:14,
134:4, 134:8,
134:9, 134:22,
135:5, 135:7,
135:12, 136:10,
137:1, 137:4,
198:24, 199:18
**interacts**
121:25
**interest**
28:25, 42:3
**interested**
87:1, 133:24,
248:25
**interesting**
106:3
**interests**
90:14
**interfere**
146:10, 240:9
**intermediate**
203:9, 203:22,
203:24
**internal**
19:16, 243:16
**international**
140:24, 141:7
**interpose**
211:24
**interrupt**
54:17, 203:23
**interrupted**
55:6
**interruption**
178:5
**interruptions**
54:19
**intertwined**
240:17

**intervals**
39:15
**interview**
44:18, 44:23,
45:1, 45:8,
45:13, 45:25,
46:14, 46:24,
47:20, 47:23,
49:12, 49:21,
60:4, 60:7,
61:8, 154:12
**interviewed**
45:15, 50:24
**interviews**
44:16, 47:24,
49:9, 49:19,
50:7, 191:15
**introduction**
19:22
**invalid**
160:4
**investigate**
153:12, 181:3,
181:6
**investigated**
124:24, 154:10,
156:3, 156:6,
156:8, 156:9
**investigating**
182:23
**investigation**
228:10
**involuntary**
16:15
**involve**
9:22, 10:14,
24:12, 25:12,
41:5, 125:10
**involved**
26:9, 26:15,
148:5, 152:15,
153:19, 155:17,
166:14, 205:3,
206:8, 210:6,
242:6, 242:7
**involvement**
22:10
**involves**
11:6, 58:2,

99:15, 149:18,
166:6, 178:3,
178:4
**involving**
23:24, 25:5
**irons**
109:10
**irrelevant**
234:8
**isolated**
187:19, 188:2,
189:2
**isolation**
34:11, 97:25,
99:2, 99:15,
99:17, 99:21,
99:24, 102:16,
110:2, 115:1,
116:18, 117:1,
119:12, 119:21,
119:23, 126:16,
138:21, 138:23,
138:25, 139:1,
140:16, 149:18,
172:19, 185:19,
187:13, 187:16,
189:5
**issue**
4:17, 59:1,
70:25, 78:25,
92:25, 94:13,
95:17, 169:14,
176:22, 179:18
**issues**
24:15, 77:18,
90:3, 113:6,
151:17, 156:1,
159:17

**J**

**jail**
10:24, 138:2,
152:20
**jails**
11:9, 142:4,
142:15, 144:16,
144:18, 148:22,
148:23

**james**
211:3
**january**
27:3, 212:18,
213:3
**jeffrey**
2:24
**jeopardy**
157:21
**jeremiah**
211:11, 211:15
**jerome**
210:24, 217:14,
222:22
**jgrosholz@rumber-**
**ger**
2:32
**job**
12:14, 13:3,
13:15, 13:17,
13:21, 14:6,
14:7, 15:20,
17:13, 17:14,
18:9, 18:15,
87:15, 152:20,
156:22, 157:21
**jobs**
14:10, 157:20
**john**
21:21, 216:10
**johnny**
211:5
**joined**
48:24
**josh**
37:4
**journals**
11:17
**juan**
211:1, 245:8
**judgment**
182:20
**july**
242:9
**jump**
236:23
**jumping**
192:10

**june**
48:9
**justice**
2:6, 8:13,
105:9, 192:17
**juveniles**
149:1, 149:4,
149:7

**K**

**keep**
154:23, 162:24,
204:6, 207:19
**keeping**
117:18, 152:16,
162:12, 176:11
**kelly**
1:24, 2:15,
2:20, 6:10,
81:17, 214:19,
248:2, 249:9
**ken**
5:23, 5:26,
5:28, 228:25,
231:19, 233:2
**kendrick**
211:3, 227:13,
227:16, 227:23,
228:19, 229:7,
229:19, 233:1,
235:2
**kendrick's**
227:15, 231:25,
233:9
**kept**
90:16, 155:18,
155:21
**key**
185:12, 185:15
**kibitzing**
239:12
**kidney**
215:14, 215:20
**killing**
12:17
**kind**
18:4, 26:23,
43:15, 58:23,

70:16, 90:22,
152:21, 155:11,
156:21, 160:19,
174:6, 175:6,
192:10, 204:1,
204:9, 207:15,
214:12, 225:8,
225:9, 242:6
**kinds**
54:19, 91:6,
148:5
**kirk**
2:26, 2:35,
6:8, 26:4, 26:11
**kirkland**
37:4
**kitchen**
38:4, 38:15,
230:7, 235:25
**kleutsch**
21:21, 22:15
**knapp**
2:15
**knapp@splcenter**
2:20
**knew**
12:21
**knowing**
59:8, 101:7,
106:8, 234:21
**knowledge**
58:24, 65:19,
161:17, 206:10,
210:8, 248:10
**known**
42:4, 79:14,
79:18
**knows**
42:8, 171:23

**L**

**labor-intensive**
196:18
**labrecque**
209:6, 209:14
**lack**
141:21, 143:19,
177:14, 189:9,

189:25, 195:3,
196:7, 197:1
**lacks**
201:23
**language**
74:20
**lantus**
230:5
**large**
121:14, 229:25
**largely**
16:5, 110:20
**larry**
29:25, 37:4,
38:25, 49:24
**laryngoscopy**
237:24
**last**
9:14, 14:4,
20:4, 20:18,
39:25, 94:9,
114:21, 134:10,
134:11, 145:16,
172:15, 173:5,
173:9, 173:20,
181:24, 203:10,
215:5, 223:12,
233:1, 234:15,
235:13, 240:4
**lasting**
172:18, 172:21,
173:6, 173:10,
173:11, 173:20,
174:1, 174:4,
174:5, 174:17,
174:24, 177:16,
190:3, 190:15,
230:4
**lasts**
155:18, 237:1
**late**
27:3, 230:8
**lately**
18:8
**later**
33:15, 98:18,
160:17, 175:15,
214:8, 229:15,

242:19
**laura**
2:4
**law**
2:16, 26:4
**lawmakers**
192:14, 193:22
**lawyers**
26:11, 29:11,
29:12, 104:6,
106:18, 107:2
**lead**
16:9, 17:5
**leaders**
36:8, 121:16
**leadership**
122:14
**leaning**
126:9
**learn**
54:2, 121:12
**least**
46:16, 118:11,
128:6, 133:25,
137:18, 138:3,
182:15, 187:11,
219:9, 240:16
**leave**
52:17, 64:19,
108:25, 109:5,
164:11
**leaves**
134:18
**led**
206:9, 210:6
**left**
31:18, 110:17
**left-hand**
31:23
**leg**
57:19, 109:10,
175:10, 175:13
**legal**
40:24, 141:18,
181:19, 188:13
**legislature**
4:30
**lend**
218:20

**length**
173:23
**lerner**
5:35, 37:4
**less**
57:2, 59:6,
59:10, 74:2,
74:5, 74:6,
74:7, 116:19,
122:25, 165:13,
204:25, 217:4,
220:19, 243:17
**let's**
28:2, 28:4,
35:8, 43:3,
43:15, 57:19,
118:21, 123:2,
125:4, 131:7,
133:15, 134:11,
137:9, 140:19,
159:9, 160:6,
160:24, 161:1,
164:20, 172:13,
187:25, 199:10,
200:9, 200:11,
202:18, 207:18,
208:23, 214:20,
215:11, 216:10,
217:14, 223:5,
227:13, 227:14,
236:22, 240:19,
242:8
**letter**
26:23, 26:24,
27:1
**letters**
26:25
**level**
49:16, 155:11,
196:3, 203:7
**levels**
42:15, 82:19,
111:10, 120:7,
120:8, 121:10,
149:17, 194:12,
197:11, 203:1,
203:5, 204:21
**levering**
237:9

**lferro@floridaju-**
**sticeinstitute**
2:13
**licensed**
16:24
**lieu**
47:11
**life**
110:12, 176:13,
190:17
**lighting**
73:8, 73:14
**likely**
59:6, 195:19,
231:12
**limb**
58:5
**limbs**
58:2
**limited**
25:22, 38:23,
47:10, 107:16,
107:19, 107:20,
107:23
**limits**
207:25
**line**
88:22, 122:13,
154:25, 156:22,
177:25, 247:2
**link**
245:6
**list**
3:4, 20:11,
22:15, 22:21,
23:4, 25:16,
27:11, 30:8,
30:10, 30:12,
30:13, 31:2,
31:18, 31:20,
32:1, 32:5,
32:7, 32:18,
32:19, 32:20,
33:20, 100:22,
112:6, 216:4
**listed**
19:22, 20:12,
20:17, 21:3,

21:8, 21:18,
22:25, 23:21,
31:22, 32:15,
33:2, 33:23,
112:12
**listen**
94:21, 180:19
**listening**
40:23, 41:4,
121:15
**lists**
22:22, 35:9,
50:3, 63:1,
113:5
**literature**
4:25, 110:18,
112:14, 172:18
**little**
9:4, 25:3,
32:12, 38:1,
58:19, 61:10,
71:9, 72:11,
75:16, 75:17,
80:1, 84:2,
85:18, 98:25,
100:1, 101:13,
103:23, 136:20,
166:21, 183:11,
183:13, 209:12,
219:3, 221:19,
222:21, 224:1,
238:11
**llosa**
2:5, 127:5,
127:11, 127:24,
128:1, 135:16,
135:23, 136:6
**located**
1:25, 6:12,
248:6
**location**
74:16
**lock**
139:23, 242:7
**locking**
166:16
**logged**
90:1

**logic**
159:8
**long**
28:4, 36:23,
37:2, 50:3,
68:8, 69:20,
70:1, 79:7,
82:6, 118:5,
131:1, 132:19,
132:21, 132:23,
137:18, 139:20,
165:3, 173:6,
174:13, 213:17,
213:20, 214:9,
217:9, 234:5,
234:6, 240:4
**longer**
44:4, 58:19,
77:9, 173:9,
215:1, 230:4,
241:19
**look**
18:24, 18:25,
24:10, 25:16,
34:22, 34:25,
37:19, 60:9,
66:13, 76:8,
84:11, 86:4,
86:13, 90:10,
90:18, 90:19,
90:24, 91:3,
91:11, 91:14,
91:20, 92:3,
92:12, 102:15,
105:7, 129:17,
133:19, 135:17,
135:21, 147:6,
153:18, 154:2,
159:12, 179:16,
182:14, 183:1,
201:4, 201:21,
217:14, 222:24,
227:20, 228:5,
234:6, 234:14
**looked**
35:5, 40:14,
83:13, 85:20,
85:22, 90:3,

90:16, 96:6,
129:10, 141:5,
148:23, 153:15,
154:6, 174:6,
181:23, 243:12
**looking**
12:12, 12:20,
23:9, 24:12,
28:2, 31:16,
37:9, 37:11,
37:12, 60:8,
60:19, 85:25,
86:3, 87:17,
89:14, 91:17,
93:6, 93:7,
148:25, 174:7,
174:16, 184:9,
186:21, 205:18,
207:6, 208:14,
226:21, 228:24,
240:21, 241:25
**looks**
9:16, 12:9,
20:11, 20:12,
21:5, 21:7,
28:9, 31:21,
35:9, 125:15,
129:23, 133:25,
134:14, 236:10
**los**
10:17, 10:20
**lose**
152:20, 227:23,
228:17
**losing**
150:24
**loss**
110:11, 227:15,
227:22, 228:5,
228:7, 228:12,
228:18
**losses**
228:4
**lost**
106:21, 227:16
**lot**
10:16, 24:12,
24:13, 28:21,

28:22, 30:1,
48:8, 50:1,
56:7, 58:4,
61:9, 69:4,
73:19, 77:14,
84:13, 101:21,
112:17, 115:10,
133:22, 147:15,
158:6, 160:20,
181:10, 196:14,
196:15, 203:25,
208:17, 215:1,
224:4, 238:9
**lots**
13:9, 41:8,
54:9, 54:16,
143:1, 160:21
**loud**
139:20, 145:6,
145:12
**lowell**
35:11
**lunch**
93:25, 94:4
**lying**
155:13
**lynch**
189:14, 189:19

**M**

**machine**
217:8
**made**
41:6, 64:4,
64:5, 97:15,
112:21, 130:25,
133:24, 155:13,
169:9, 193:6,
200:19
**main**
37:5, 49:13,
50:13, 110:1,
148:23
**maintain**
84:9
**major**
238:24, 239:17,
240:2

majority
167:18, 168:4,
186:2, 217:1,
217:2, 220:11
make
7:11, 7:13,
9:3, 17:6,
28:13, 31:1,
36:20, 48:7,
57:16, 59:4,
59:6, 61:15,
65:19, 74:8,
81:2, 87:14,
88:3, 95:23,
136:22, 144:23,
145:2, 148:6,
148:22, 161:24,
162:25, 180:20,
183:11, 183:13,
196:1, 206:22,
209:11, 221:20,
224:1, 224:14,
226:2, 234:17,
234:18, 235:20
makes
63:21, 144:11,
148:15, 166:4,
167:23, 223:9
making
162:18
malaligned
243:12
malalignment
243:14
mammograms
84:16
man
228:14
manage
167:19
managed
145:2, 146:5,
204:24
management
36:15, 36:17,
42:25, 44:1,
44:2, 44:3,
44:9, 44:14,

50:14, 103:6,
103:8, 103:10,
103:12, 120:22,
120:23, 204:22
many
23:10, 38:18,
44:18, 44:23,
46:13, 55:9,
55:14, 56:1,
56:6, 56:8,
56:12, 56:17,
56:20, 72:22,
73:6, 73:18,
73:25, 84:16,
89:13, 90:13,
123:3, 123:6,
123:11, 123:22,
126:21, 130:1,
130:13, 130:20,
130:23, 131:17,
133:23, 135:1,
140:24, 142:15,
145:8, 157:23,
180:7, 181:13,
184:8, 185:7,
226:8, 244:8
mar
90:1
march
117:12, 214:5
mark
1:7, 127:16,
135:18, 135:20,
193:21
marked
8:22, 27:22,
31:10, 95:3,
117:21, 127:22,
136:2, 140:11,
183:6, 192:6,
193:13, 197:24,
205:23, 209:10,
221:10, 222:20,
223:22, 225:25,
229:3, 231:23,
233:6, 242:1,
245:2
marking
127:10

maryland
249:15
master's
9:18, 9:21,
10:7, 153:6
match
237:3
materials
5:37, 30:23
matter
12:19, 48:14,
59:19, 78:3,
100:19, 105:8,
105:10, 126:7,
175:13, 234:17,
236:12, 237:2
matters
114:12, 248:10
mattress
164:5, 164:9,
164:10, 164:11,
164:22, 166:9,
166:15, 166:19
max
43:1
maximum
36:16, 56:4,
103:12
maybe
38:9, 38:19,
39:4, 93:24,
94:1, 108:18,
124:10, 129:23,
153:23, 181:19,
182:20, 184:10,
191:6, 194:19,
204:10, 205:10,
209:21, 210:22,
211:8, 216:8
meal
234:22
meals
184:14, 230:6,
234:10, 237:10
mealtime
234:23, 236:9
mean
20:19, 24:6,

26:19, 31:23,
32:16, 36:15,
39:11, 47:13,
51:2, 64:9,
64:25, 68:15,
75:6, 88:16,
90:24, 92:1,
104:13, 121:2,
132:1, 144:15,
144:16, 154:14,
160:14, 165:5,
170:17, 172:25,
173:11, 173:14,
173:16, 173:18,
173:19, 173:20,
178:16, 179:17,
179:23, 181:16,
184:24, 187:6,
189:4, 199:7,
199:17, 213:11
meaningful
143:18, 184:1,
184:4, 185:13,
207:25
meaningless
181:2
means
68:16, 96:7,
144:14, 171:11,
213:7
meant
222:12
measure
87:4, 88:10,
88:14, 89:5
measures
84:15, 85:23,
86:10, 86:22,
86:24, 90:16
medi
13:19, 20:8
media
155:23
medically
181:1
medication
16:16, 77:18,
77:23, 88:11,

89:5, 89:9,
89:15, 89:17,
89:24, 104:4,
104:15, 106:12,
215:9, 219:24,
232:15, 234:14,
234:24
**medications**
76:12, 88:22,
88:24, 89:25,
219:7, 219:16,
220:3
**medicine**
9:22, 10:13,
10:15, 11:20,
17:10, 26:18
**meek**
160:19
**meet**
66:18, 99:5,
103:3, 120:9,
201:24
**meets**
112:16
**member**
14:21, 107:8,
157:10, 195:10
**members**
152:19, 153:19,
156:14
**memory**
23:7, 31:25,
43:14, 43:25,
44:15, 47:10,
186:10, 198:2,
209:23, 210:2,
210:22
**men**
50:20
**mental**
14:14, 14:22,
14:25, 16:14,
39:17, 40:1,
96:24, 141:18,
143:12, 150:8,
203:11, 203:13,
203:15, 203:16,
203:17, 203:19,

204:3, 204:5,
207:22, 208:4,
219:17, 238:6,
238:14, 238:19,
238:20, 238:24,
239:17, 239:20,
239:25, 240:3,
240:7, 240:14
**mentally**
149:1, 149:10,
150:4
**mention**
31:4, 61:16,
191:16
**mentioned**
35:6, 54:11,
68:12, 139:4,
189:19, 203:22
**merinda**
2:43, 8:17,
31:5, 117:17,
127:14, 135:16,
140:6, 191:23,
193:9, 241:20
**merits**
212:1
**met**
79:7, 82:7
**metal**
163:20
**metformin**
235:25, 236:16
**method**
79:5
**methods**
82:3
**meyers**
216:10, 216:17,
216:25, 217:6
**miami**
2:9, 2:18
**michelle**
2:5, 127:4,
127:8, 128:14,
128:21, 129:2,
133:3, 133:9,
134:16, 135:15,
135:19, 136:4,

182:22
**mid**
12:16
**mid-winter**
27:3
**middle**
31:18, 60:12,
184:10, 216:12,
223:8
**midnight**
166:16
**might**
23:3, 23:12,
24:14, 50:16,
52:15, 52:16,
54:15, 55:6,
59:20, 62:10,
76:9, 77:8,
81:18, 96:14,
134:3, 144:18,
156:7, 156:8,
156:9, 164:10,
165:20, 166:18,
171:23, 173:3,
173:8, 173:13,
174:2, 186:17,
201:3, 202:15,
204:9, 206:7,
213:25, 214:2,
224:23, 229:25,
232:23, 236:18,
238:4, 238:7
**mild**
160:19, 216:13,
216:20, 217:3,
237:5
**mildly**
108:16
**millions**
216:23
**mince**
194:2
**mind**
80:16, 126:23,
127:2, 135:16,
138:22, 138:25,
139:19, 142:11,
160:5, 171:18,

175:7, 177:18,
205:16, 213:19,
237:12, 240:23,
242:4, 244:1
**mine**
182:7
**minimum**
100:24, 109:1,
121:23, 121:24,
126:22, 185:14,
201:24, 207:8,
207:11, 207:12,
207:13
**minor**
186:1
**minute**
47:19, 62:15,
112:7, 129:7,
129:8, 133:15,
151:2, 202:19,
226:3, 229:11,
232:1
**minutes**
30:18, 62:10,
62:12, 62:14,
94:2, 100:23,
107:9, 122:12,
128:23, 129:7,
167:7, 248:19
**mischaracterizes**
170:1, 170:20,
171:13
**mischaracterizing**
171:16
**misheard**
38:10
**missed**
62:15, 77:22
**misses**
89:14
**missing**
12:18
**mission**
94:18, 142:1
**misspoke**
145:13
**misstates**
170:19

mistake
108:4
misunderstood
23:3
misuse
164:2
mllosa@floridaju-
sticeinstitute
2:12
models
196:13
moderate
216:13, 216:20,
217:3
modern
172:18, 185:24,
186:20, 190:2
moment
81:16, 146:19,
158:10, 158:12,
195:12, 196:6,
236:24
monday
246:10
monitor
51:9, 77:6
monitoring
12:8
monroe
2:27
month
214:8, 214:24,
215:5
months
173:4, 173:5,
242:19, 242:21,
243:1, 243:7
mood
219:17
more
22:5, 24:14,
32:12, 34:24,
44:25, 45:22,
46:20, 47:7,
48:10, 49:25,
54:19, 55:2,
56:4, 57:2,
59:4, 67:18,

72:3, 72:12,
74:2, 76:11,
77:24, 85:3,
92:12, 99:14,
100:18, 101:13,
118:18, 120:6,
120:21, 122:20,
122:22, 123:4,
126:9, 144:11,
167:17, 172:6,
183:24, 194:12,
196:5, 196:8,
196:16, 196:18,
197:1, 204:5,
205:10, 206:21,
210:19, 215:21,
219:3, 228:7,
228:16, 229:15,
232:17, 234:4,
234:10, 237:7,
239:12
morning
6:21, 6:22,
166:19, 245:5
moseley
2:25, 5:35,
245:4
most
12:16, 16:10,
45:11, 51:7,
58:8, 71:23,
71:25, 72:2,
92:10, 119:8,
146:25, 147:7,
154:24, 163:1,
199:18, 218:15,
230:2, 239:10
mostly
48:4, 217:10
motion
4:9, 182:19,
243:24, 243:25
mount
193:24
mountain
237:6, 237:7
move
9:7, 13:20,

131:2, 227:13,
233:10
moved
53:6
moving
193:19, 235:19,
237:16
mri
219:2, 237:23
much
31:21, 36:5,
38:22, 38:24,
47:1, 52:2,
52:25, 58:1,
60:7, 74:24,
111:11, 120:6,
132:17, 158:5,
188:3, 197:17,
203:6, 205:4,
218:13, 228:4,
244:11
multiple
14:19, 220:3,
237:24
myself
50:5, 139:23,
218:5, 236:24

## N

name
31:22, 32:16,
45:5, 45:10,
45:22, 47:13,
50:21, 205:8,
205:15
named
41:14, 210:17,
211:8, 211:10,
212:5, 248:7
names
31:18, 45:12,
189:13
national
11:3, 78:11,
140:24, 141:6,
141:10, 195:24
natural
177:10

nc
5:9, 5:13
ncchc
4:22, 11:9,
19:15, 80:21,
82:2, 102:8,
112:18, 116:18,
124:13, 125:4,
137:11, 137:20,
138:19, 140:7,
140:15, 141:25,
142:11, 142:18,
142:21, 142:24,
143:2, 143:5,
143:8, 144:1,
146:21, 147:6,
147:7, 147:22,
147:24, 148:9,
185:19, 195:23,
202:23, 215:3
ncchc's
147:16
nd
193:10, 193:17
near
89:15
nearby
139:12
nearly
39:6
necessarily
75:24, 142:22,
169:1, 173:13,
178:7, 179:13,
180:5, 185:5,
188:12, 188:15,
196:2, 196:12,
240:8
necessary
126:17, 149:17
necessitated
126:17
necessity
201:3
need
7:2, 9:10,
40:20, 41:12,
48:15, 48:25,

52:7, 59:24,
60:2, 60:4,
64:18, 64:19,
65:16, 76:9,
76:11, 77:22,
77:24, 79:3,
80:24, 82:5,
82:7, 89:14,
92:13, 95:23,
101:13, 145:6,
145:11, 165:9,
166:17, 171:2,
172:5, 173:9,
218:13, 233:10,
246:17, 246:18
**needed**
29:15, 34:22,
56:15, 64:2,
64:7, 77:16,
228:10
**needing**
52:19
**needs**
20:24, 57:7,
63:24, 79:7,
82:5, 149:20,
166:25, 195:9,
214:24, 238:20
**negative**
96:9, 111:22,
186:12, 189:18
**neighbor**
136:18
**neighboring**
139:22
**neither**
248:20
**neurodegenerative**
207:24, 208:16,
208:17
**neurologic**
221:22, 222:5,
222:8, 222:13,
223:2
**neurologist**
217:23, 218:11,
221:20, 222:10,
222:13

**neurologists**
221:18
**neurology**
5:9, 5:13,
220:23, 221:12,
221:14, 222:11,
222:23
**neurophysiology**
10:10
**never**
18:17, 80:5,
152:22, 158:16,
231:6, 231:7,
240:23, 241:5,
242:3
**new**
15:20, 35:11,
213:24
**news**
192:8
**next**
13:13, 30:18,
32:16, 50:22,
62:22, 62:24,
63:3, 63:12,
63:17, 63:21,
63:24, 96:23,
97:7, 111:9,
112:3, 113:3,
139:24, 143:17,
147:2, 158:11,
161:7, 187:18,
214:2, 215:7,
228:21, 228:22,
242:3
**next-door**
136:18
**nice**
41:24, 164:18
**nicole**
2:23, 6:8,
30:17, 92:6,
127:11, 135:17,
136:5, 244:3
**night**
12:21, 234:17
**nights**
12:17

**nobody**
148:12
**non-medical**
34:12
**noncompliant**
230:14
**none**
21:3, 23:2,
91:4, 148:19
**norm**
73:13, 131:14
**normal**
175:16, 176:13
**north**
2:27
**northern**
1:2
**not-for-profit**
141:25
**notable**
113:14
**notary**
247:31, 248:16
**note**
128:17, 161:24
**noted**
190:13, 228:19,
242:25, 247:17
**notes**
49:19, 50:2,
95:17, 242:16
**nothing**
6:15, 7:25,
72:12, 187:5,
202:16, 211:17,
211:20, 211:22,
232:17, 244:1,
248:9
**november**
191:23
**nowhere**
190:1
**nph**
229:21, 230:5,
234:5, 234:7
**nsmith@rumberger**
2:31
**number**
9:14, 12:15,

12:24, 33:22,
35:10, 40:7,
49:24, 60:19,
102:9, 107:25,
108:11, 118:23,
130:1, 147:9,
148:25, 152:9,
152:16, 153:15,
153:16, 153:17,
154:6, 182:21,
205:2, 234:8,
241:23
**numbered**
1:23
**numbers**
9:13, 152:15,
153:18
**numerous**
34:6, 45:20,
186:7
**nurse**
16:7, 40:6,
40:16, 40:24,
52:14, 53:2,
61:16, 62:5,
63:7, 63:20,
64:6, 66:18,
70:14, 70:16,
71:10, 73:11,
74:15, 100:24,
129:11, 130:5,
130:17, 133:1,
157:13, 232:8,
232:11, 232:21,
242:16, 242:25
**nurses**
56:16, 62:21,
77:19, 148:4,
168:10
**nursing**
40:18, 76:11,
77:1, 77:12,
78:4, 78:19,
78:21, 79:6,
79:10, 80:10,
80:16, 80:21,
80:24, 81:21,
129:17, 131:21,

131:22, 132:21,
225:1

**O**

**o'clock**
94:2, 128:24
**oath**
6:16, 248:12
**objecting**
148:21
**objection**
20:7, 25:2,
42:17, 44:19,
46:15, 52:10,
52:20, 52:23,
53:11, 53:22,
54:21, 55:11,
56:23, 57:4,
57:11, 58:16,
59:22, 60:1,
61:13, 63:5,
63:13, 63:19,
67:7, 67:24,
69:12, 69:22,
70:4, 70:9,
70:19, 70:24,
71:6, 71:17,
78:6, 78:14,
78:24, 79:13,
80:12, 81:4,
81:9, 81:24,
82:15, 83:2,
83:11, 86:7,
88:12, 88:25,
91:15, 92:22,
93:4, 93:14,
94:15, 94:22,
96:21, 97:2,
97:12, 97:19,
98:6, 98:12,
99:25, 101:3,
101:6, 101:12,
101:19, 102:3,
102:23, 104:9,
104:16, 105:19,
106:7, 106:13,
106:19, 107:6,
107:18, 108:2,

108:13, 108:22,
109:2, 109:7,
109:11, 109:15,
110:5, 110:13,
111:2, 111:14,
111:20, 112:1,
113:20, 114:9,
115:5, 116:5,
118:16, 119:3,
119:19, 120:3,
126:5, 129:13,
129:19, 130:9,
130:19, 131:23,
132:8, 135:10,
136:13, 137:3,
138:20, 139:9,
143:15, 148:1,
148:13, 158:3,
160:10, 161:21,
169:21, 169:25,
170:6, 170:19,
171:13, 172:7,
174:9, 176:15,
181:18, 184:20,
189:1, 195:17,
197:5, 199:16,
200:4, 200:17,
201:1, 201:15,
201:17, 202:2,
202:11, 208:9,
211:25, 213:13,
214:15, 218:8
**objections**
92:5
**objective**
186:12
**observation**
120:15, 164:14,
166:7, 218:10
**observations**
110:21
**observe**
39:5, 53:6,
61:3, 122:4,
122:16, 123:6
**obstacles**
144:8
**obvious**
206:7

**obviously**
25:4, 32:22,
38:13, 41:23,
42:14, 96:22,
122:15, 199:9
**occasional**
160:18
**occasionally**
48:6, 146:18,
151:19, 155:5
**occasions**
168:5
**occupied**
130:2, 130:14,
130:21, 130:23,
130:25, 131:7,
131:8, 131:17,
135:1, 135:4
**occur**
113:4
**occurred**
152:4
**occurring**
198:6
**october**
30:21, 205:25
**odd**
85:18, 232:19
**odoc**
205:19
**off-the-record**
246:8
**offending**
163:2
**offer**
161:23, 190:2,
190:14, 243:23
**offered**
190:11, 191:3,
201:21, 212:9,
226:10
**offering**
65:12, 198:22,
225:10
**offers**
172:18, 177:16
**offhand**
45:5

**office**
7:3, 10:18,
45:2, 47:19,
49:10, 50:12,
50:18, 74:1
**officer**
11:22, 13:3,
13:10, 13:24,
14:2, 14:11,
14:16, 14:20,
15:10, 16:3,
17:1, 18:18,
18:20, 53:18,
54:7, 58:13,
59:3, 67:2,
100:23, 121:25,
124:4, 125:15,
129:11, 130:5,
130:17, 134:15,
145:21, 157:12,
157:16, 157:18,
158:10, 159:11,
159:25, 167:8,
200:12
**officer's**
129:14
**officers**
39:14, 54:15,
55:25, 62:6,
62:13, 62:22,
64:14, 72:18,
122:7, 122:13,
139:18, 145:10,
160:22, 162:15,
166:17, 167:6
**offices**
46:18, 66:18
**official**
105:13, 105:20,
106:1
**often**
38:12, 47:3,
47:9, 54:20,
55:2, 61:6,
62:5, 76:6,
77:15, 92:10,
92:18, 144:8,
144:11, 144:14,

144:18, 144:22,
161:11, 164:13,
188:18, 202:5,
202:15, 220:13
**oftentimes**
68:17, 68:19
**oh**
7:2, 18:16,
22:24, 23:16,
71:11, 106:23,
122:22, 139:15,
142:20, 145:11,
182:3, 189:15,
207:20, 211:11,
221:2, 235:5,
236:1, 240:23,
242:10, 244:10,
246:14
**old**
23:4, 186:18,
187:6, 188:6
**once**
38:4, 70:14,
100:24, 234:10,
237:8
**one-minute**
150:22
**one-page**
127:14
**one-tenth**
65:11
**ones**
19:6, 19:7,
20:16, 21:19,
22:2, 23:11,
23:20, 25:15,
37:5, 41:23,
74:7, 123:14,
175:19, 210:20,
224:13, 225:11,
230:4
**ongoing**
238:5
**only**
20:8, 65:10,
70:10, 80:15,
80:22, 80:23,

107:23, 128:8,
130:24, 153:11,
162:17, 171:21,
173:24, 174:3,
174:5, 174:6,
174:15, 183:25,
191:3, 223:12,
226:23, 227:4,
244:3
**onset**
168:20
**oops**
144:6
**open**
46:11, 151:18
**open-bay**
65:4, 65:7
**operation**
39:5, 118:12
**operational**
51:5
**ophthalmoscope**
73:9
**opine**
105:8
**opinions**
25:23, 29:16,
29:22, 29:24,
30:11, 44:22,
141:6, 151:8,
172:2, 211:16,
211:19, 211:25,
243:21, 243:23
**opportunities**
122:1, 125:3,
134:8, 135:12
**opportunity**
70:10, 123:17,
123:23, 124:7,
125:19, 125:24,
125:25, 126:9,
126:10, 126:18,
126:21, 126:24,
127:2, 127:20,
127:23, 131:13,
135:2, 135:7,
135:13, 137:17,
199:17

**opposition**
4:9, 182:19
**oral**
1:13, 1:20
**orally**
7:11
**orange**
2:36
**order**
41:9, 90:7,
158:23, 171:2,
199:2, 199:12
**ordered**
90:8
**oregon**
1:26, 4:38,
5:6, 6:12, 6:24,
11:22, 12:9,
13:1, 13:4,
13:16, 13:24,
14:2, 14:5,
14:11, 15:10,
16:20, 17:2,
17:19, 17:20,
18:1, 19:12,
19:17, 19:21,
54:24, 55:3,
55:15, 56:11,
84:3, 91:10,
91:14, 91:20,
132:25, 157:15,
165:8, 202:19,
202:20, 202:24,
203:2, 203:21,
204:18, 205:1,
205:6, 205:12,
206:2, 206:12,
207:10, 208:3,
209:19, 210:5,
248:6
**org**
2:11, 2:12,
2:13, 2:20
**organic**
237:21
**organization**
94:10, 94:13,
94:20, 95:15,

98:20, 99:13,
102:14, 102:22,
104:10, 104:13,
104:19, 105:5,
105:7, 106:2,
106:5, 141:12,
141:17, 142:1,
142:5, 142:12,
142:14
**organization's**
98:24, 104:23,
105:13, 105:17
**organizations**
140:25, 141:7,
141:24
**original**
186:21
**originals**
187:10
**orlando**
2:37
**osp**
15:4, 19:2,
19:14, 52:11,
84:16, 84:17
**other**
7:15, 8:4, 8:8,
8:9, 11:21,
14:9, 15:6,
19:20, 19:21,
20:16, 20:22,
21:2, 21:3,
21:14, 21:16,
23:5, 23:10,
24:15, 24:20,
29:23, 30:3,
33:17, 37:25,
45:10, 45:25,
47:22, 47:24,
48:5, 50:17,
51:5, 52:13,
52:22, 62:7,
67:10, 67:11,
76:20, 79:16,
80:17, 90:22,
91:6, 91:11,
104:3, 107:9,
110:23, 119:15,

129:15, 137:13,
141:23, 144:2,
144:20, 155:25,
157:7, 159:4,
161:6, 164:12,
173:8, 174:23,
174:24, 175:5,
181:2, 181:13,
188:18, 189:14,
203:21, 207:2,
211:7, 211:9,
214:20, 217:20,
225:9, 225:10,
230:4, 232:23,
237:21, 240:10,
240:18, 243:21,
243:22, 244:2
**other's**
102:7
**others**
22:25, 35:15,
45:6, 45:11,
49:14
**out**
9:6, 22:9,
33:13, 36:6,
48:5, 62:17,
63:11, 64:20,
67:12, 67:20,
68:15, 68:18,
68:20, 69:1,
69:2, 69:4,
69:6, 72:20,
83:21, 86:21,
86:23, 87:21,
88:4, 89:23,
91:1, 92:24,
93:22, 98:15,
98:16, 98:19,
121:4, 127:4,
145:6, 145:11,
146:24, 155:20,
158:7, 159:11,
159:23, 163:5,
163:8, 164:17,
172:3, 182:24,
184:7, 186:17,
190:23, 198:6,

202:21, 221:19,
224:14, 225:2,
230:6, 230:9,
231:12, 231:13,
234:17, 235:1,
239:15, 242:15
**out-of-cell**
120:7, 201:24,
202:9
**outcome**
78:2, 79:9,
84:11, 84:15,
85:22, 87:6,
89:5, 92:10
**outcomes**
79:15, 79:18,
86:11, 91:11,
91:13, 91:18,
91:20, 91:25,
92:3, 93:6,
170:9
**output**
146:24
**outside**
19:25, 38:2,
38:6, 38:11,
38:13, 38:14,
42:12, 43:7,
43:18, 44:6,
44:10, 53:25,
97:3, 97:6,
97:13, 112:2,
113:10, 115:11,
118:19, 121:5,
143:16, 149:8,
149:12, 150:5,
150:11, 165:8,
166:6, 196:23,
198:16, 201:3
**over**
7:8, 7:14,
14:22, 17:22,
18:3, 41:25,
52:22, 66:18,
66:23, 67:3,
81:18, 82:11,
84:16, 85:20,
87:11, 105:1,

110:11, 114:3,
129:8, 152:15,
152:16, 153:24,
161:2, 173:4,
176:21, 214:20,
216:1, 217:9,
217:12, 222:25,
242:15
**overall**
50:14, 78:7,
100:18
**overdone**
78:9
**overly**
149:6
**overnight**
123:11, 123:14,
164:11, 165:10,
166:10, 166:12
**overseeing**
18:22
**oversight**
16:14, 50:14,
51:9
**overuse**
74:18, 75:2,
75:12
**overusing**
75:8
**own**
12:8, 48:11,
98:14, 112:22

---
**P**

**pack**
213:24
**packet**
214:3
**page**
3:2, 3:3, 3:4,
3:5, 3:6, 3:7,
4:2, 5:2, 9:13,
20:10, 28:5,
30:8, 32:11,
35:9, 36:21,
60:9, 66:13,
68:11, 74:11,
94:7, 96:2,

103:15, 103:16,
107:12, 109:25,
110:17, 113:11,
114:18, 116:21,
118:4, 118:7,
121:20, 137:10,
144:5, 150:20,
151:6, 151:7,
172:13, 173:19,
183:13, 185:22,
186:16, 212:14,
215:12, 216:11,
217:14, 220:21,
223:7, 223:8,
227:13, 227:14,
228:21, 228:22,
228:23, 237:16,
240:20, 240:21,
241:21, 241:23,
247:2
**pages**
28:3, 28:4,
28:23, 30:7,
32:21
**pain**
174:19, 175:1,
175:14, 175:17,
175:22, 178:16,
179:19, 181:6,
215:8, 219:18,
242:16, 243:3
**palpable**
243:17
**palpitation**
178:6, 178:7
**palpitations**
187:18, 187:21,
188:1, 188:17,
190:9
**pandemic**
197:11
**paper**
61:15, 61:22,
107:5
**papers**
11:16, 142:8
**paperwork**
28:22

**paragraph**
60:12, 66:16,
94:9, 103:15,
114:21, 121:22,
144:6, 145:5,
172:16, 183:15,
185:11, 187:8,
206:15, 207:6,
216:12
**paralegal**
2:5, 2:25
**paranoia**
110:22
**pardon**
13:19, 42:20,
199:1
**parentheses**
140:16
**parse**
92:24
**parsed**
89:23, 91:1
**parsing**
93:22
**part**
5:20, 5:22,
5:25, 5:27,
19:14, 20:4,
24:15, 24:19,
27:10, 39:3,
43:2, 44:21,
77:5, 77:8,
78:18, 86:1,
90:6, 90:8,
91:19, 97:23,
103:18, 113:3,
121:14, 128:4,
147:4, 154:24,
163:1, 164:12,
179:21, 192:12,
194:1, 198:23,
199:19, 218:15,
221:1, 235:16,
235:17
**particular**
10:12, 15:19,
27:11, 28:24,
34:5, 35:18,

48:17, 48:18,
54:10, 58:20,
66:1, 74:9,
77:17, 82:6,
84:13, 94:17,
120:14, 122:25,
151:20, 154:7,
154:13, 154:14,
155:24, 156:1,
156:3, 157:12,
169:9, 172:4,
173:17, 180:13,
181:22, 196:3,
200:10, 211:17,
211:20, 211:22,
225:11, 241:21
**particularly**
16:15, 26:15,
39:21, 40:4,
44:4, 44:5,
76:14, 76:22,
86:24, 92:16,
92:23, 93:18,
94:24, 96:13,
96:24, 112:18,
116:18, 122:23,
124:25, 139:11,
143:12, 151:17,
168:6, 168:7,
188:19, 213:23,
234:9, 240:4
**particulars**
27:12, 191:21
**parties**
41:6, 127:12,
248:17, 248:22,
248:24
**partook**
245:7, 245:11
**party**
248:18
**pas**
16:7
**passing**
86:6
**past**
18:7, 22:10,
25:11, 147:21

**patient**
19:9, 34:19,
34:21, 57:16,
59:6, 89:10,
89:18, 91:17,
91:20, 168:16,
168:19, 168:20,
179:4, 180:21,
181:4, 181:22,
219:21, 219:24,
228:3, 231:6,
231:10, 242:12
**patient-oriented**
170:8
**patients**
13:8, 17:11,
18:10, 18:11,
18:12, 18:15,
34:25, 51:21,
51:25, 56:7,
57:8, 92:13,
101:21, 144:12,
145:2, 180:19,
207:1, 220:12,
221:17, 221:25,
239:2
**paula**
45:5, 45:7,
45:10, 49:13,
93:18
**paula's**
50:22
**paulson**
1:14, 1:21,
4:4, 4:8, 5:34,
6:13, 6:21,
8:20, 9:2, 9:15,
27:18, 27:20,
28:15, 28:16,
31:8, 31:15,
51:20, 94:6,
95:15, 99:9,
128:25, 129:8,
134:20, 140:14,
152:2, 225:20,
229:4, 235:16,
241:13, 245:5,
247:20, 247:27,

248:7
**paulson's**
8:18
**pause**
58:19, 128:21
**pay**
74:21
**paychecks**
157:20
**pdf**
150:22, 241:21
**pdr**
234:13
**peak**
234:8, 234:15,
237:3
**peaks**
236:24, 237:5,
237:6, 237:7
**peanut**
167:16
**peer-reviewed**
11:17
**pen**
68:17, 68:20
**penalty**
74:17, 75:2
**penitentiary**
11:23, 13:4,
13:16, 13:24,
14:2, 14:11,
15:11, 16:21,
17:3, 17:19,
18:1, 19:12,
19:21
**pens**
68:24
**people**
10:21, 12:3,
17:5, 37:6,
41:13, 43:8,
43:12, 43:19,
43:23, 44:4,
44:14, 44:18,
44:23, 45:24,
45:25, 46:13,
48:3, 49:17,
50:18, 50:23,

51:12, 52:19,
55:2, 77:2,
77:3, 78:23,
79:11, 80:23,
81:22, 83:5,
101:10, 101:15,
101:17, 115:20,
128:25, 129:1,
135:12, 150:9,
152:9, 152:15,
155:17, 156:16,
156:23, 165:14,
169:15, 169:20,
170:5, 170:11,
181:22, 196:5,
196:15, 197:12,
201:13, 203:14,
204:12, 204:23,
204:24, 205:2,
207:15, 207:22,
208:4, 208:17,
228:6, 230:2,
230:6, 234:13,
238:9, 239:22,
239:24
**people's**
228:6
**perceived**
92:17
**percent**
18:16, 23:16,
23:17, 192:16,
193:6, 194:20,
195:1, 228:6,
228:7
**percentage**
18:9, 18:14,
23:13
**perceptual**
110:22
**perfectly**
71:21, 77:17,
160:20, 208:18,
224:22
**performance**
17:7, 17:15,
86:25, 87:4,
144:8

**performance-based**
4:18
**performing**
146:13, 146:18
**perhaps**
23:16, 42:6,
69:3, 171:16
**period**
15:5, 102:10,
116:20, 123:11,
137:19, 152:15,
164:10, 176:21,
176:23, 199:8,
214:10, 215:20,
217:9, 227:24,
228:12, 230:18,
240:4, 243:5,
243:9
**periodic**
86:12, 92:18,
101:11
**periodically**
19:15, 87:13,
90:10, 90:17
**permanent**
19:4, 19:7,
173:12, 173:20,
174:1, 175:5
**perry**
22:17, 25:18
**persistent**
238:25
**persistently**
79:20, 80:3
**person**
16:23, 17:2,
18:24, 47:11,
53:10, 53:20,
54:4, 57:22,
60:5, 106:17,
130:16, 156:18,
158:8, 160:18,
165:9, 166:18,
167:22, 175:15,
176:12, 176:22,
177:8, 177:9,
181:9, 190:16,
224:22, 232:17,

248:7
**person's**
105:4, 168:15
**personal**
42:3, 107:25,
108:11, 126:15,
147:17
**personality**
156:17
**personnel**
104:6, 106:18,
107:2
**persons**
143:11
**perspective**
91:21, 91:22,
229:16, 229:17
**pervasive**
189:18
**peter**
172:17
**pharmacology**
234:6
**phillips**
216:22
**phrase**
179:2
**physical**
28:17, 72:13,
75:17, 75:19,
75:25, 82:20,
83:5, 97:25,
99:17, 99:21,
110:8, 119:12,
172:19, 172:21,
173:6, 174:5,
174:10, 174:17,
174:24, 177:16,
190:15
**physically**
36:10, 49:10
**physician**
11:3, 13:19,
14:7, 14:12,
15:24, 16:1,
19:2
**physicians**
12:22, 16:6,

218:14
**physiologic**
112:5, 149:20
**physiological**
112:11, 186:24,
187:9, 191:3
**pick**
68:13
**picture**
91:25
**piece**
105:21, 182:5,
189:20
**pieces**
27:9, 146:25
**pill**
88:22
**pills**
214:3
**pilot**
186:10, 245:17,
245:23
**pir**
4:34, 4:35,
5:31, 5:32,
197:20, 215:23,
215:25, 216:2,
241:1, 241:7,
241:19
**pirs**
216:6
**place**
36:5, 36:13,
37:25, 38:5,
41:9, 58:4,
89:3, 93:25,
139:25, 184:12
**placement**
118:10, 168:11
**places**
14:19, 37:25,
38:15, 52:25,
65:10, 77:14,
120:13, 120:20,
122:6, 144:2
**placing**
207:22, 208:4
**plain**
144:15

plaint
41:10
plaintiff
22:14, 22:20,
23:15, 23:18,
23:24, 210:23,
249:2
plaintiff's
115:8, 177:13,
243:23
plaintiffs
1:5, 1:22, 2:2,
4:9, 4:12, 6:7,
23:19, 26:22,
27:11, 28:25,
29:3, 31:17,
34:20, 35:22,
37:14, 41:11,
41:12, 41:14,
48:25, 82:18,
171:5, 182:19,
190:1, 191:2,
200:19, 200:21,
210:17, 211:8,
211:10, 212:5
plan
244:2
planet
249:11
planning
10:1, 10:2
plans
244:4
play
127:13, 128:14,
133:5
played
128:19, 129:3,
133:6, 133:10,
134:13, 134:17
please
6:4, 8:19,
8:25, 27:19,
27:25, 31:5,
31:7, 31:13,
95:2, 95:12,
114:19, 117:13,
117:20, 140:7,

140:8, 182:10,
191:25, 192:2,
193:11, 197:21,
205:20, 209:7,
215:24, 221:6,
222:17, 223:18,
223:24, 224:2,
225:17, 231:20,
233:3, 241:2,
241:12, 241:13,
244:22
plenty
167:19
pls
4:26, 182:9
plus
28:23, 46:18
point
13:8, 22:23,
23:8, 36:15,
37:14, 96:1,
98:15, 131:18,
155:2, 159:24,
182:1, 186:17,
190:16, 219:13,
224:24, 229:24
pointing
98:15
policies
18:2, 207:22
policy
18:1, 50:25,
51:2, 51:3,
99:4, 100:10,
100:12, 103:2,
104:19, 106:1,
132:25, 133:2,
142:2, 162:11,
162:14, 162:24,
199:5, 199:14,
207:7, 207:10,
208:3, 208:7
political
205:3
poor
86:25
poorly
79:24, 145:2,

146:22
population
44:12, 52:1,
54:20, 55:3,
55:8, 55:21,
56:2, 56:9,
57:3, 64:16,
64:23, 65:3,
65:6, 65:14,
65:17, 66:17,
67:2, 67:3,
67:22, 68:13,
69:7, 69:19,
76:16, 76:24,
82:14, 82:21,
83:1, 87:21,
88:1, 89:23,
91:2, 92:25,
93:22, 101:21,
101:23, 111:12,
114:3, 156:16,
167:25, 190:11,
196:9, 196:20,
197:4, 204:2,
204:7, 204:14,
206:23, 207:2,
207:4, 212:6
populations
57:6
portable
73:14
portion
10:19, 45:18,
140:23, 194:10
portrait
193:20
pose
52:23, 198:21
position
4:22, 11:22,
13:18, 15:16,
15:22, 15:24,
50:22, 140:7,
140:15, 142:8,
146:23, 147:8,
148:11, 192:22
positions
194:21, 195:13

possible
16:6, 84:10,
139:8, 161:11,
163:10, 169:4,
174:8, 179:14,
190:6, 195:3,
242:12, 242:17,
242:25
possibly
32:13, 48:16,
176:8
post-use-of-force
60:13, 60:20,
61:4, 61:7
post-world
185:25
postdate
227:7
potential
179:10, 180:17,
181:17
pound
167:10, 228:13,
228:14
pounds
228:8, 228:18
poverty
2:16
powder
171:22
practically
132:3, 132:18,
234:8
practice
16:10, 70:23,
71:4, 77:14,
93:10, 163:22,
168:12, 199:15,
199:21, 230:12,
238:11
practiced
116:9
practices
4:19, 102:21
practitioner
53:3
practitioners
16:7, 113:15

pre-existing
96:24
preconfinement
60:13, 60:20,
61:4, 61:7,
75:17, 75:19,
75:21, 76:3
predicate
53:12, 53:22,
55:12, 78:14,
81:4, 97:20,
101:8, 104:16,
106:7, 106:13,
106:19, 107:6,
107:18, 111:2,
111:15, 119:3,
129:13, 130:9,
130:19, 131:12,
131:23, 133:21,
134:24, 139:9,
143:15, 148:2,
148:17, 160:10,
169:25, 180:3,
184:20, 202:2,
202:11, 213:13,
213:21, 218:8,
220:1, 227:25,
238:16, 239:8
predicated
84:1
preferred
225:3, 225:11
pregnant
149:2, 149:13,
149:19, 149:21
preloaded
232:20
preparation
95:19
prepare
22:3, 27:7,
27:14
prepared
49:22, 127:14
preparing
210:9
prerequisite
11:7

prescribe
219:24
prescribed
88:11, 89:3,
89:5, 219:6,
220:5
prescription
213:3, 213:9
present
2:41, 13:17,
48:16, 58:13,
104:20
presented
29:16, 195:7
pressure
73:10, 79:20,
79:24, 80:1,
80:4, 90:14,
176:21, 176:23,
217:11, 217:12
presume
182:12
pretty
36:5, 47:1,
52:25, 58:1,
108:6, 114:4,
114:11, 136:19,
158:5, 196:22,
218:13
prevent
146:13
previous
86:10, 112:13,
236:7
primarily
12:20
primary
221:16, 239:10,
239:16
printed
32:14
prison
4:16, 4:24,
4:31, 19:24,
80:20, 84:4,
85:12, 95:16,
96:3, 101:4,
101:5, 101:9,

102:13, 104:4,
107:4, 128:11,
138:2, 142:13,
143:2, 144:19,
172:19, 183:23,
184:12, 185:6,
192:15, 194:14,
214:14
prisoner
104:5, 108:12,
166:13
prisoners
4:28, 97:8,
97:16, 100:4,
100:9, 100:20,
104:2, 107:15,
108:1, 108:25,
109:4, 110:2,
111:11, 112:25,
113:16, 114:7,
186:11, 187:13,
187:16
prisons
11:9, 15:4,
85:6, 95:1,
101:15, 142:4,
142:15, 147:6,
184:8, 185:7,
186:1, 191:11,
191:13, 193:21,
194:11, 194:13
privacy
26:25, 40:22,
41:17, 146:10
privilege
74:18, 75:3,
75:8
privileges
43:12, 43:23,
44:13, 121:9,
121:13, 203:7,
204:21
probably
12:17, 14:20,
40:14, 46:20,
105:13, 160:8,
163:7, 168:21,
229:22

problem
16:14, 40:13,
58:1, 58:18,
59:13, 59:15,
132:14, 151:3,
155:24, 156:2,
156:4, 168:6,
174:21, 191:13,
203:15, 203:16,
239:21, 243:18
problematic
197:12, 213:19
problems
24:13, 92:17,
131:2, 155:25,
204:4, 207:15,
217:5, 226:6,
226:9
procedure
1:27
procedures
18:2
proceed
6:18
proceedings
246:19
process
28:19, 36:2,
54:17, 63:6,
65:21, 66:5,
66:6, 66:7,
68:6, 88:2,
88:8, 91:13,
157:25, 167:15,
167:16, 167:17,
209:18, 246:1
processes
5:5
produced
1:21, 30:19,
30:20, 82:19
production
4:13, 31:17
profession
94:20
professional
64:6
professionals
16:24, 94:21,

195:25, 203:17
**professions**
141:19
**program**
5:6, 9:25,
10:2, 141:24,
143:3, 150:22,
205:6, 205:7,
209:19, 209:21,
209:24, 210:2
**programming**
208:2
**programs**
10:4, 142:2,
245:6, 245:8,
245:10, 245:12
**prohibit**
207:22
**prohibitive**
32:23, 89:13,
90:23
**prohibits**
208:3
**prolonged**
96:11, 140:25,
147:9
**pronounced**
196:8, 197:2
**proof**
155:3
**properly**
240:11, 243:16
**property**
163:23, 164:2,
164:4, 164:8,
164:20, 164:21,
165:14, 165:18,
165:24, 166:9
**proposal**
127:11
**propose**
182:20
**proposed**
152:14, 153:20,
154:1, 155:7,
245:20
**prosecution**
156:1

**protected**
48:15
**protocol**
90:7, 242:5
**prove**
201:4
**proved**
111:21
**proven**
151:18
**provide**
22:2, 51:25,
57:17, 57:21,
59:11, 59:17,
59:25, 80:15,
127:19, 203:18
**provided**
11:25, 12:3,
16:20, 19:12,
24:10, 24:22,
25:13, 39:23,
39:24, 41:4,
42:10, 79:2,
82:5, 82:16,
82:17, 83:4,
84:20, 85:5,
86:18, 88:11,
88:16, 88:17,
88:19, 93:13,
142:4, 194:25,
195:4, 197:2
**provider**
11:3, 24:14,
52:12, 90:9,
219:13
**providers**
144:7
**providing**
82:3, 82:6,
88:24, 94:14,
142:12, 214:13
**provision**
20:8, 48:20,
144:10, 195:14,
195:19
**provisions**
121:9
**proximity**
145:21

**pseudoseizure**
221:25, 222:7
**pseudoseizures**
217:18, 218:2,
218:11, 219:25,
220:7, 220:12,
220:17, 220:20,
223:4
**psychiatric**
238:8
**psychological**
113:4, 113:6,
113:8
**psychologically**
184:1, 184:4,
185:13
**psychosis**
110:23
**pubic**
192:17
**public**
9:18, 9:22,
153:6, 247:31,
248:16
**publication**
104:11, 105:1,
105:3, 105:4,
105:16, 147:2
**publish**
106:5
**published**
11:16, 12:1,
12:5, 105:23,
147:5
**publishes**
105:5
**pueblo**
41:25
**pull**
31:5, 94:25,
117:11, 140:7,
197:19, 222:16,
228:25, 235:7,
240:25
**pulling**
135:16, 182:11
**pulse**
187:19, 187:22,

188:1, 188:17,
190:9
**purpose**
42:2, 42:10,
44:2, 125:17,
126:4, 126:12,
175:10, 236:9
**purposefully**
40:5
**purposes**
123:15, 123:21,
123:24, 131:10,
134:5, 134:22,
135:5, 136:10,
137:1
**pursuant**
248:3, 248:16
**pursuing**
238:20
**put**
62:25, 75:19,
98:17, 105:7,
146:24, 152:20,
156:21, 157:21,
162:17, 165:14,
165:20, 165:23,
168:7, 237:11
**puts**
159:10
**putting**
10:4, 116:17,
203:19

---

**Q**

**qa**
16:12, 16:17
**qualified**
153:4
**qualifies**
126:2
**qualify**
72:10, 91:7,
137:20
**quality**
11:21, 12:7,
16:17, 18:21,
18:25, 19:1,
19:13, 19:18,

40:8, 40:11,
84:2, 84:4,
84:10, 84:12,
84:19, 85:4,
85:8, 85:16,
85:17, 85:22,
85:25, 86:3,
86:5, 86:10,
86:16, 88:13,
89:7, 90:3,
90:24, 91:10,
91:19, 104:2

**question**
7:14, 7:19,
12:2, 18:22,
24:19, 32:24,
39:25, 48:17,
50:23, 52:5,
57:12, 57:20,
63:15, 71:3,
76:21, 80:8,
81:13, 82:23,
83:23, 84:25,
85:3, 86:14,
86:15, 87:8,
87:25, 101:21,
102:25, 103:6,
108:9, 113:18,
115:19, 115:23,
115:24, 116:7,
120:14, 132:9,
134:3, 139:2,
146:8, 152:2,
172:8, 180:12,
184:25, 189:24,
193:5, 198:21,
200:21, 211:21,
224:6, 230:14,
230:23, 233:18,
239:5

**questions**
7:17, 9:17,
36:9, 46:1,
46:10, 48:10,
49:22, 49:24,
50:1, 50:2,
50:3, 50:4,
64:15, 96:1,

120:20, 136:9,
141:9, 205:10,
210:15

**quick**
71:11, 167:15

**quickly**
230:6, 236:23

**quite**
33:22, 40:7,
58:4, 60:19,
73:23, 120:23,
121:1, 121:2,
132:23, 151:18,
156:2, 181:10,
215:1, 244:10,
244:13

**quote**
45:25, 66:16,
68:14, 194:11

---

**R**

**radiation**
173:4

**ramey**
22:8, 22:17,
25:18

**ran**
12:22

**random**
19:6

**range**
113:5

**ranking**
17:4

**rare**
168:5, 240:3

**rarely**
183:25, 184:7

**rate**
162:4, 192:15,
194:21

**rates**
207:3

**rather**
20:10, 24:10,
232:15, 237:22,
240:3

**rattling**
61:22

**reach**
60:18

**reaches**
155:11

**reaching**
190:7

**reaction**
167:16, 177:2,
238:25

**reactions**
168:15, 186:24,
187:9

**read**
27:9, 75:1,
93:17, 95:19,
95:22, 98:23,
99:14, 99:18,
103:14, 103:15,
103:24, 104:1,
107:13, 112:7,
112:9, 112:14,
113:11, 114:22,
115:2, 118:8,
121:23, 122:2,
140:22, 140:23,
145:5, 145:6,
145:11, 145:12,
145:15, 169:10,
169:14, 183:14,
183:16, 186:14,
186:15, 186:19,
187:7, 190:22,
190:24, 191:1,
206:15, 206:17,
209:25, 222:22,
223:23, 224:4,
225:8, 226:3,
226:4, 229:11,
230:10, 230:17,
232:1, 233:9,
233:15, 246:7,
247:15

**reading**
194:6, 229:12

**reads**
96:2

**real**
150:23

**realistically**
71:22

**really**
17:9, 58:7,
60:7, 82:4,
83:21, 134:25,
148:18, 155:2,
159:14, 169:7,
171:6, 174:10,
176:21, 191:14,
194:5, 202:5,
245:19

**reason**
32:9, 54:8,
55:7, 71:5,
77:5, 77:8,
78:19, 81:2,
81:6, 81:20,
98:15, 105:24,
175:13, 187:14,
189:3, 189:22,
193:25, 214:10,
217:22, 218:1,
219:5, 230:3,
231:1, 240:12,
247:2

**reasonable**
60:15, 126:9,
127:2, 165:12,
243:5

**reasoning**
230:18, 231:14

**reasons**
11:8, 12:15,
48:13, 54:9,
65:9, 119:4,
120:4, 120:5,
229:7

**reassure**
231:11

**recall**
11:15, 35:16,
53:1, 120:25,
121:11, 128:9,
154:7, 162:3,
186:21, 191:18,
210:17, 216:23,
226:16, 226:21,

245:13, 245:16
**receive**
33:3, 33:5,
91:22, 241:6,
246:15
**received**
9:18, 10:6,
32:2, 32:19,
32:21, 32:23,
32:25, 33:3,
34:6, 34:8,
177:8, 243:3
**receiving**
34:25, 221:15,
222:5, 223:2,
223:10, 226:9
**recent**
187:6, 193:3,
205:1
**recently**
192:14, 193:22
**recitals**
12:18
**recognize**
198:4
**recognized**
140:25
**recommend**
80:22, 207:21,
208:21, 209:4
**recommendation**
81:2, 207:21
**recommendations**
4:38, 206:2,
207:7
**recommended**
77:15, 78:10,
78:13
**recommends**
80:21
**reconcile**
32:22
**record**
4:33, 6:3, 6:5,
19:8, 34:7,
40:14, 61:6,
128:11, 151:1,
182:13, 197:15,

198:1, 199:25,
218:5, 218:21,
226:15, 240:17,
242:3, 248:14
**recordations**
8:11
**recorded**
200:13, 200:24,
230:13
**recording**
87:18
**records**
16:13, 23:9,
28:25, 33:12,
34:1, 34:4,
34:8, 41:8,
41:13, 60:23,
61:1, 159:13,
182:15, 200:12,
210:15, 210:18,
210:24, 211:7,
211:9, 227:7,
229:7, 230:13,
240:15
**recovered**
176:13
**recreation**
201:24
**recreational**
107:17
**redo**
85:20, 139:24
**redoing**
85:24
**reduce**
205:2
**reduced**
110:4, 110:7,
185:13, 248:13
**reed**
1:14, 1:21,
4:8, 6:13,
27:18, 245:5,
247:20, 247:27,
248:7
**reentry**
5:6, 209:18
**refer**
7:24, 7:25,

150:19
**reference**
30:6, 94:10,
94:16, 172:16
**referencing**
62:11, 68:12
**referral**
243:3, 243:8
**referred**
33:12, 33:14,
34:19, 34:21,
91:4, 239:9
**referring**
31:20, 33:25,
36:20, 45:14,
75:8, 75:21,
113:25, 141:13,
141:14, 145:18,
145:22, 146:9,
245:12
**refers**
97:24, 99:21,
119:12, 220:23
**reflux**
181:7
**refocus**
52:5
**reforming**
5:3, 209:6,
209:16
**refresh**
198:2, 209:23,
210:1, 210:22,
236:24
**refusal**
5:30, 151:22,
152:5, 154:14,
154:18, 154:20,
156:12, 156:15,
156:21, 157:1,
157:17, 157:23,
158:1, 158:4,
158:15, 158:19,
158:20, 158:24,
159:5, 159:6,
159:14, 159:16,
160:3, 160:7,
231:3, 231:6,

232:11, 232:13,
233:18, 233:19,
233:22
**refusals**
151:8, 151:11,
152:10, 153:13,
153:17, 154:4,
154:9, 154:13,
230:15
**refuse**
156:16, 157:2,
158:22, 160:2,
161:4, 161:5,
161:6, 161:19,
161:20, 222:8
**refused**
153:15, 156:18,
157:18, 186:11,
220:22, 222:11,
228:19, 230:24,
233:13, 233:19
**refuses**
230:11
**refusing**
157:11, 158:25,
161:8, 229:8,
232:16, 233:25,
235:2, 235:24,
236:9
**refuted**
106:4
**regard**
18:4, 61:9,
82:4, 114:24,
207:12, 212:1
**regarding**
10:19, 25:6,
26:15, 27:10,
39:25, 51:8,
107:22, 216:22,
223:14, 226:24,
230:20, 243:23
**regardless**
71:8, 113:13,
220:7, 240:11
**regimen**
185:2
**registered**
64:6

registration
249:12
regular
19:11, 53:3,
104:5, 106:17,
107:1, 107:11,
175:4, 229:22,
230:1, 230:3,
230:4, 246:17
regularly
77:23, 124:17,
221:17
regulated
108:12, 108:16
rehabilitation
97:8
reid
29:25, 37:4,
49:24, 50:6,
121:15, 128:4
reintegration
97:9, 97:16,
113:17, 114:8
related
175:6, 189:10,
245:17, 245:25,
248:21
relative
149:18, 248:23
release
4:29, 97:10,
166:12
relevant
96:14
reliably
43:14
relied
8:5
religious
104:6, 106:18,
107:2
relying
60:25
remained
215:20
remaining
98:2
remarkable
156:2

remedy
5:17
remember
14:19, 45:5,
50:21, 128:6,
192:21, 225:20,
225:22, 226:14,
229:6, 229:9,
229:12, 245:19,
246:1, 246:3
remind
127:9
reminded
235:23
remote
2:43, 8:19,
8:23, 9:1,
27:19, 27:23,
31:7, 31:11,
31:14, 95:2,
95:4, 95:7,
95:11, 95:13,
117:13, 117:16,
117:19, 117:22,
117:25, 135:25,
140:8, 140:12,
182:10, 183:4,
183:8, 191:25,
192:4, 193:11,
193:14, 197:21,
205:20, 209:7,
215:24, 216:3,
216:6, 221:6,
222:17, 223:18,
225:17, 225:23,
229:1, 231:20,
233:3, 235:9,
235:13, 235:20,
241:2, 241:5,
241:9, 241:12,
241:16, 241:22,
244:22, 244:25
remotely
1:16
removed
53:19, 164:10
renal
90:15

render
153:5
renewed
213:7
repeat
76:21, 88:18,
183:19
repeated
44:5
repeatedly
157:9
rephrase
7:17, 73:3,
100:7, 102:11,
108:5
replaced
13:9
replacement
224:9
report
8:11, 17:12,
17:13, 17:16,
22:4, 22:8,
28:20, 29:6,
186:1, 186:2,
205:19, 206:1,
206:9, 212:1,
212:17, 219:2
reported
1:16, 152:9,
152:10, 154:19,
186:7, 186:11
reporter
6:2, 6:10,
6:11, 6:17,
7:11, 61:19,
61:25, 81:10,
81:14, 194:4,
204:16, 208:25,
246:9, 246:14
reporter's
3:7
reporting
187:12, 242:15
reports
85:9, 124:14,
124:15, 124:18,
124:19, 124:23

represent
193:2
representative
47:6
represented
40:20, 41:12
request
4:13, 5:17,
31:17, 61:15,
62:4, 62:6,
62:9, 63:8,
65:24, 68:14,
75:10, 213:6,
213:8, 213:23,
213:24, 249:3
requested
90:4, 90:6,
90:7
requests
87:4
require
72:3, 145:8
required
201:25
requirement
11:13, 132:25,
199:7
requirements
201:25
requires
118:11, 122:11,
192:15, 199:3
reschedule
54:13, 54:16
rescheduled
55:7
rescue
162:10, 162:12,
162:16, 165:16,
165:19, 165:23,
166:23, 166:25,
168:23
research
10:7, 11:19,
11:25, 12:3,
12:6, 96:8,
96:13, 96:15,
96:20, 111:16,

111:21, 112:24,
114:1, 114:12,
142:4, 142:5,
142:7, 150:7,
150:13, 169:4,
182:6, 185:24,
186:20, 187:15,
187:20, 189:7,
189:8, 189:20,
209:13
**researchers**
113:15
**residency**
10:11, 10:12
**resource**
16:8
**respect**
162:12
**respected**
41:7, 49:1
**respectful**
145:24
**respironics**
216:23
**respond**
7:11, 70:12,
74:16, 172:10
**responding**
87:4, 115:19
**responds**
52:14
**response**
4:12, 5:20,
5:22, 5:25,
5:27, 21:15,
31:17, 87:2,
235:4, 236:6
**responses**
132:13
**responsibilities**
16:4, 18:20
**responsibility**
17:25
**responsible**
14:24, 16:19,
16:23, 16:25,
17:14, 50:24,
51:1, 208:18

**rest**
145:5, 193:25
**restart**
150:23
**restrained**
57:10, 57:14,
57:16, 57:18,
57:22, 57:25,
109:6, 109:9
**restraints**
58:4, 145:20
**restricted**
41:3, 108:12,
108:15, 108:17
**restriction**
143:18, 163:23,
164:1, 164:4,
164:20, 165:14,
165:18, 166:5,
166:9
**restrictions**
40:24, 41:17,
165:24
**result**
111:1, 176:12,
196:3, 213:25
**resulting**
110:23
**results**
89:7, 178:7
**retained**
22:14, 22:20,
23:6, 23:14,
23:15, 23:23,
24:2, 24:3,
24:8, 25:8,
25:11, 26:3,
27:2
**retainer**
26:23, 27:1
**retired**
15:15
**retiring**
13:7
**retreat**
68:14, 68:25
**returned**
109:14, 109:18

**reuse**
224:9, 224:10
**reverse**
160:23
**review**
4:25, 16:13,
17:7, 19:7,
22:11, 26:14,
26:22, 33:7,
33:10, 33:18,
33:21, 34:9,
34:15, 34:16,
41:13, 77:4,
84:18, 85:8,
85:15, 86:16,
88:2, 90:25,
92:9, 93:20,
96:19, 121:8,
124:14, 128:4,
142:7, 189:7,
190:7, 210:23,
211:9, 226:15,
240:14, 249:3
**reviewed**
30:6, 30:11,
31:24, 32:16,
32:25, 33:4,
33:24, 34:2,
34:21, 38:7,
41:8, 43:9,
60:23, 63:7,
128:8, 162:2,
169:11, 210:16,
210:18, 210:23,
211:7, 218:17
**reviewing**
22:9, 39:1,
82:16, 85:11,
174:7
**reviews**
17:15, 19:3,
86:12
**rich**
110:18
**ricky**
192:13, 192:20,
192:21
**rights**
41:7, 48:15,

49:1, 232:16
**ring**
209:15
**ringing**
205:7
**rings**
206:5
**rise**
111:12
**risk**
78:22, 79:10,
79:11, 79:17,
79:21, 79:22,
80:4, 80:5,
80:10, 80:24,
81:8, 81:22,
82:10, 82:13,
82:25, 83:8,
83:10, 83:16,
83:19, 83:24,
165:1, 168:24,
169:19, 170:4,
170:12, 171:1,
176:20, 212:5,
212:6, 220:9,
220:16, 220:19
**risks**
79:14
**river**
35:12
**rmc**
35:11
**rockville**
249:15
**rojas**
21:20, 22:17
**roll**
22:16, 25:17,
103:20, 103:23,
106:20, 232:2,
232:4
**room**
7:5, 7:23,
10:17, 53:1,
53:7, 53:20,
58:8, 58:14,
59:4, 64:13,
91:12, 91:18,

194:15
**rooms**
73:7, 73:16,
73:20, 73:24,
74:3
**rosa**
35:12
**rotating**
19:4, 19:6,
19:13
**roughly**
15:11, 36:24,
62:14
**round**
77:19, 79:6,
129:17, 131:21,
131:22, 132:22,
133:19, 133:20,
134:21
**rounds**
39:8, 39:10,
39:12, 39:17,
39:24, 40:1,
40:3, 77:13,
78:4, 78:19,
78:21, 79:1,
79:10, 80:9,
80:10, 80:16,
80:21, 80:24,
81:21, 101:1,
124:4, 198:11,
198:24, 199:14,
201:9, 201:11
**routine**
70:23, 71:4
**routinely**
53:4
**row**
14:14, 43:1,
43:2, 203:9
**rpr**
1:24, 248:2
**rule**
122:11
**rules**
1:26, 203:4
**rumberger**
2:26, 2:35,

6:8, 26:3, 26:11
**run**
161:24, 196:19,
225:2
**running**
20:3, 20:5
**ryan**
209:14

**S**

**s**
141:19
**safe**
4:36, 118:12,
168:4, 205:19,
206:1
**safely**
168:1, 192:14
**safety**
165:12, 192:17,
230:20
**said**
12:7, 15:9,
15:20, 17:4,
17:15, 18:6,
19:13, 32:1,
32:8, 38:7,
46:3, 55:4,
63:20, 72:11,
75:5, 78:7,
83:3, 92:7,
93:8, 101:14,
125:24, 137:12,
138:13, 138:14,
139:14, 139:18,
150:5, 152:6,
152:18, 152:25,
154:19, 160:1,
166:11, 171:9,
172:25, 173:18,
185:19, 189:17,
189:19, 192:16,
194:12, 209:2,
220:2, 222:11,
222:12, 234:22,
243:4, 247:26,
248:15
**salem**
1:26, 6:12,

6:24, 6:25,
248:6
**samantha**
2:34
**same**
12:2, 12:23,
13:17, 13:21,
14:17, 15:22,
21:9, 25:7,
28:2, 30:14,
32:17, 36:21,
48:3, 48:4,
48:13, 52:3,
52:24, 57:24,
63:19, 66:3,
70:5, 80:8,
83:2, 83:13,
85:3, 98:12,
101:19, 102:25,
103:6, 103:7,
103:9, 103:11,
103:13, 111:20,
115:21, 119:1,
119:6, 119:16,
130:20, 132:8,
133:22, 134:3,
134:25, 135:10,
135:11, 137:3,
146:8, 163:21,
182:18, 199:11,
211:21, 212:12,
212:13, 213:10,
220:9, 220:16,
224:25, 225:1,
232:20, 246:16,
247:16, 248:15
**santa**
35:12
**sat**
45:24
**saw**
73:23, 74:8,
123:3, 130:4,
131:3, 131:21,
214:5, 219:1,
225:21, 225:22,
226:16, 233:18
**say**
7:18, 16:19,

18:5, 34:6,
34:7, 36:14,
36:19, 38:11,
40:5, 43:14,
45:7, 46:2,
46:13, 48:11,
56:18, 57:19,
58:7, 68:13,
71:11, 71:22,
74:5, 76:15,
76:24, 83:7,
87:13, 94:1,
98:13, 99:18,
100:1, 105:16,
106:14, 107:1,
110:7, 114:23,
116:25, 120:12,
121:1, 123:5,
125:13, 131:1,
131:5, 131:15,
132:12, 132:18,
132:20, 132:21,
133:15, 136:19,
138:13, 140:19,
143:24, 145:1,
151:23, 152:22,
154:23, 159:9,
159:20, 160:24,
161:1, 171:18,
171:21, 172:17,
173:5, 174:1,
174:2, 177:15,
185:8, 188:16,
190:1, 190:12,
196:2, 198:17,
198:25, 200:9,
200:11, 202:22,
207:5, 207:16,
215:19, 216:11,
218:10, 219:11,
220:22, 222:3,
236:1, 236:12,
237:8
**saying**
51:13, 59:15,
66:21, 89:4,
97:17, 126:19,
126:20, 127:21,

136:21, 157:1,
160:25, 161:3,
161:18, 171:16,
180:15, 199:10,
199:12, 208:15,
240:6
**says**
4:31, 10:6,
11:2, 60:12,
74:15, 75:2,
80:21, 97:24,
99:17, 99:20,
104:1, 109:25,
110:18, 112:4,
113:3, 136:18,
143:11, 145:16,
145:23, 147:9,
149:1, 159:11,
159:13, 177:14,
183:23, 184:11,
185:6, 185:11,
185:25, 186:24,
187:18, 192:12,
194:11, 212:22,
213:4, 223:12,
224:11, 230:11,
234:3, 242:7,
245:5
**schedule**
64:11, 204:6
**scheduled**
52:16, 64:9,
90:5
**schizophrenia**
238:6
**school**
12:25
**scope**
55:12, 107:18,
143:15, 200:4,
200:17, 201:2,
201:18, 202:3,
202:11, 208:9,
208:11, 208:12,
238:16, 238:22,
239:8
**score**
216:19

**screen**
8:24, 27:23,
31:12, 95:8,
95:22, 117:22,
127:6, 140:13,
183:5, 192:4,
193:14, 197:23,
205:21, 209:8,
221:7, 222:18,
223:19, 231:22,
241:14, 245:1
**scroll**
9:3, 9:11,
22:5, 25:17,
28:3, 206:4,
207:18, 226:2,
231:24, 233:8,
235:15, 241:19
**scrolling**
11:1, 207:19,
207:20, 245:3
**sduke@rumberger**
2:39
**seal**
249:5
**search**
105:23, 109:19,
109:21
**searched**
53:20, 109:14
**searches**
145:19
**second**
9:7, 12:13,
21:8, 29:2,
35:24, 66:16,
96:8, 122:24,
127:7, 131:15,
185:22, 216:12,
223:21
**seconds**
128:13, 128:24,
129:7, 133:15
**secrecy**
152:16, 155:19
**secret**
155:21
**secretary**
192:13, 193:2,

193:21
**section**
16:15, 21:8,
186:20, 190:5
**secure**
118:12
**security**
39:10, 39:12,
39:14, 52:8,
53:10, 55:9,
57:1, 57:12,
58:5, 59:1,
59:3, 101:11,
122:11, 123:6,
124:16, 129:11,
134:15, 134:21,
137:17, 137:18,
138:3, 159:25,
194:21, 195:3,
195:13, 196:7,
196:19, 198:23,
201:7, 204:6
**see**
9:16, 18:11,
22:5, 28:2,
28:4, 35:20,
38:18, 39:8,
39:10, 39:15,
39:18, 39:20,
39:24, 42:6,
50:1, 56:2,
56:7, 56:12,
56:14, 58:5,
60:16, 71:10,
72:13, 72:21,
73:1, 73:4,
73:20, 74:18,
75:6, 76:20,
80:17, 86:3,
86:4, 87:5,
87:19, 88:14,
89:7, 99:1,
103:18, 107:13,
111:16, 111:21,
122:24, 124:20,
128:24, 129:1,
129:23, 132:13,
135:8, 140:19,

150:23, 162:1,
171:3, 171:7,
173:9, 187:25,
190:21, 192:9,
192:11, 198:12,
200:3, 200:5,
200:15, 200:23,
205:18, 209:20,
211:14, 211:18,
213:12, 214:9,
214:25, 215:6,
216:7, 217:7,
220:22, 221:3,
221:16, 221:24,
222:11, 222:12,
223:14, 227:14,
235:4, 235:5,
235:16, 236:11,
239:17, 242:8,
242:9, 242:10,
242:13, 244:14,
244:15
**seeing**
13:8, 18:12,
77:9, 225:20,
226:14, 226:21,
229:6, 245:16
**seeking**
23:25, 126:16
**seeley**
21:22
**seem**
9:13, 86:11,
132:17, 146:25
**seems**
52:24, 152:24,
157:11, 230:18
**seen**
35:22, 40:6,
56:8, 56:15,
57:9, 58:13,
63:4, 63:12,
64:7, 69:21,
70:3, 96:13,
96:16, 96:22,
114:12, 120:13,
120:20, 140:21,
147:18, 169:22,

170:2, 170:7,
171:5, 171:9,
171:11, 171:22,
182:13, 192:25,
195:7, 195:16,
197:17, 198:3,
200:23, 206:4,
206:24, 207:1,
207:3, 212:9,
212:25, 219:1,
219:2, 221:13,
221:21, 221:23,
242:18
**segregated**
14:13, 111:17,
148:24, 168:8,
203:3, 207:25,
208:4
**segregation**
4:36, 14:22,
14:25, 111:12,
203:7, 204:22,
206:1, 206:13,
245:17, 245:23,
246:1
**seizure**
219:6, 219:21,
220:9, 221:16,
221:23
**seizures**
218:7
**select**
33:17, 33:19
**selection**
117:12
**self**
223:10
**self-harm**
111:10, 164:14,
166:7
**self-manage**
167:22
**self-services**
225:1
**selling**
163:3, 163:11
**send**
30:18, 52:11,

214:2
**senior**
36:6, 46:5,
46:19, 46:25
**sense**
17:13, 37:15,
115:6, 115:18,
115:19, 166:4,
167:23, 173:18,
186:9, 197:1
**sensible**
36:7
**sent**
30:12, 32:2,
32:6, 32:8,
155:25, 213:6
**sentence**
74:15, 74:18,
75:1, 103:25,
104:7, 111:9,
112:3, 113:12,
143:10, 143:17,
145:16, 172:15,
187:18, 206:19,
213:4, 223:11,
223:12
**separate**
84:22, 84:24,
84:25, 169:13,
218:9, 219:4
**separated**
86:21, 86:23
**september**
18:13, 18:14,
182:16, 192:18,
242:18, 242:20
**series**
90:12
**serious**
207:22, 208:4,
216:14, 217:7,
238:5, 239:20
**seriously**
156:19, 157:20
**seriousness**
216:17
**served**
20:13, 25:25

**services**
5:30, 19:2,
50:19, 141:21
**set**
1:27, 49:22,
248:4, 249:4
**sets**
60:22, 69:5
**setting**
17:25, 19:21
**seven**
14:4, 15:11,
46:19
**several**
18:3, 18:7,
29:9, 37:11,
38:1, 38:15,
133:24, 165:9,
228:20
**severe**
168:12, 168:17,
186:25, 216:21,
217:6
**severity**
168:14
**shackled**
145:9
**shackles**
58:10
**shackling**
145:19
**shaking**
81:17, 214:19
**share**
127:6, 221:7,
245:1
**shared**
102:7, 139:12
**sharefile**
245:6
**sharing**
192:4, 193:14,
197:23, 205:21,
209:8, 222:18,
223:19, 231:21,
241:13
**sheet**
5:9, 5:13,

33:14, 34:5,
127:14, 135:17,
221:12, 222:23
**sheets**
34:6
**shelf**
32:13
**sheriff's**
10:18
**sheriffs**
58:9
**shift**
122:7
**short**
176:21, 176:23
**shorthand**
6:11
**shortness**
178:19, 179:19
**should**
8:18, 31:4,
70:23, 71:4,
71:7, 84:11,
84:18, 85:18,
93:3, 93:5,
93:9, 94:20,
94:21, 121:7,
132:22, 149:2,
149:4, 149:10,
149:13, 165:24,
174:23, 207:8,
208:7, 211:8,
225:19, 227:20,
238:19, 239:7,
239:15, 240:10
**shoulder**
85:20
**shouldn't**
240:9
**shouting**
139:8
**show**
39:4, 127:3,
127:14, 127:15,
182:15, 182:16,
198:20, 218:23,
234:13
**showed**
82:19, 83:4,

86:24, 201:11,
227:9, 234:12,
235:22
**showing**
124:15, 150:7
**shown**
171:6
**shows**
114:12, 218:24,
218:25
**sic**
128:4, 157:24
**sick**
61:15, 61:24,
62:3, 62:9,
62:17, 62:25,
63:1, 63:18,
64:19, 65:7,
65:21, 65:24,
67:1, 67:22,
68:3, 68:25,
69:8, 69:20,
70:2, 75:10,
87:4, 159:10,
212:18, 212:25,
213:6, 213:8,
213:12, 213:23,
214:1
**side**
67:10
**sign**
153:15, 156:16,
158:19, 158:22,
232:11
**signature**
3:6, 157:24,
247:1, 247:16
**signature-p1kal**
249:6
**signed**
153:16, 157:24,
158:2, 222:10,
233:19
**signing**
157:16, 158:15,
158:19, 160:7,
160:14
**signs**
112:5, 112:11,

159:5, 159:14,
160:2
**silent**
104:3, 106:14
**similar**
14:17, 63:6,
64:15, 73:25,
112:13, 120:23,
121:2, 204:9,
204:10, 204:18,
207:15
**similarly**
105:8, 106:16,
133:14
**simple**
216:24
**simply**
66:17, 179:4,
213:24, 219:4
**since**
15:16, 18:16,
86:20, 88:7,
110:19, 127:12,
220:23, 234:3
**single**
98:1, 99:22,
119:13, 157:10,
182:5, 189:20
**sir**
35:5
**sit**
46:5, 48:1
**sit-down**
46:14, 46:24,
47:22, 47:24
**site**
13:21, 68:17,
132:22
**sites**
13:22
**sitting**
19:2
**situation**
43:9, 76:10,
77:1, 107:10,
146:4, 153:22,
168:19, 173:17
**situations**
68:16, 77:22,

86:11
**six**
14:4, 15:11,
46:18, 215:5,
236:25, 237:3
**size**
57:6
**skin**
71:11, 243:13
**sleep**
216:13, 216:17,
217:4, 217:6
**sleeping**
123:19, 186:9
**slightly**
82:9
**slow**
194:7, 214:22
**small**
18:4, 19:3,
108:1, 108:7,
114:4
**smith's**
174:7, 183:21,
189:12
**smooth**
234:16
**smoothly**
69:6
**snacks**
237:10
**snoring**
217:4
**social**
97:25, 98:17,
99:2, 99:17,
99:21, 99:24,
102:9, 102:16,
110:2, 116:18,
119:12, 119:21,
119:23, 137:4,
143:18, 148:5,
208:1
**socially**
183:25, 184:4,
185:12
**society**
97:9, 113:17,

114:8
**sock**
242:8
**software**
127:17
**solo**
101:22
**solutions**
21:20
**some**
10:16, 19:4,
22:22, 25:5,
26:23, 27:11,
29:13, 31:19,
35:6, 35:21,
38:4, 38:16,
45:24, 46:1,
46:24, 48:4,
48:8, 50:2,
50:3, 70:7,
106:11, 108:23,
111:5, 120:7,
125:10, 132:23,
148:20, 150:15,
151:7, 151:14,
155:14, 160:19,
163:24, 174:2,
180:24, 181:1,
181:2, 190:16,
193:25, 202:4,
202:5, 204:2,
204:3, 210:5,
210:14, 210:19,
219:16, 237:20,
239:22, 239:24,
242:6
**somebody**
17:18, 40:16,
52:6, 53:19,
54:3, 54:16,
59:10, 59:15,
66:10, 67:4,
67:5, 68:3,
69:15, 75:18,
76:3, 79:20,
80:3, 89:16,
123:20, 133:8,
139:22, 153:23,

154:19, 159:2,
160:14, 165:22,
166:22, 166:24,
167:3, 168:12,
175:3, 175:12,
177:3, 178:22,
179:18, 181:5,
239:15
**someone**
48:6, 52:14,
58:9, 59:8,
61:11, 62:8,
71:8, 76:12,
89:10, 89:17,
124:3, 126:6,
126:10, 126:14,
131:5, 153:24,
157:11, 163:3,
163:7, 166:15,
168:5, 173:3,
174:11, 174:13,
176:9, 234:12,
238:6
**someone's**
175:10
**someplace**
64:21
**something**
12:20, 15:14,
18:23, 30:17,
30:19, 33:2,
33:24, 50:6,
58:6, 70:20,
71:20, 76:3,
87:18, 89:6,
92:15, 98:21,
100:14, 104:14,
106:16, 126:2,
150:3, 157:9,
157:13, 157:22,
158:6, 159:4,
162:7, 163:8,
164:22, 165:10,
166:2, 166:6,
171:18, 174:13,
178:5, 178:12,
181:14, 185:16,
189:2, 194:18,

194:23, 195:9,
198:11, 200:2,
200:15, 212:20,
213:14, 216:8,
216:21, 227:19,
228:10, 237:10,
237:11, 245:18,
245:20
**sometime**
13:13
**sometimes**
39:4, 47:5,
48:1, 48:4,
56:18, 56:19,
58:10, 60:2,
68:7, 73:9,
73:10, 73:13,
123:1, 220:23
**somewhat**
23:4, 58:21,
203:5, 229:25,
243:10, 243:14
**somewhere**
15:5
**soon**
163:10, 194:12
**sore**
60:8
**sorry**
20:4, 23:3,
52:21, 57:20,
58:17, 61:8,
61:19, 61:21,
62:19, 63:15,
65:2, 73:3,
74:6, 76:21,
79:15, 81:10,
81:11, 88:18,
89:20, 91:9,
99:8, 100:7,
106:20, 106:21,
112:21, 117:5,
119:8, 141:9,
142:19, 142:20,
145:11, 145:12,
162:21, 180:2,
184:24, 185:23,
188:11, 188:23,

192:9, 194:4,
194:7, 202:21,
203:23, 204:15,
207:20, 208:25,
212:24, 212:25,
215:25, 216:1,
224:17, 225:14
**sort**
43:11, 83:6,
84:11, 89:18,
100:20, 129:22,
155:4, 160:23,
182:23, 208:14,
223:8
**sorts**
50:11, 184:16,
185:1
**sought**
143:8
**sound**
15:13, 51:15,
133:16, 140:2
**sounds**
10:3, 12:11,
45:23, 67:14,
83:17, 124:13,
172:4, 225:9
**source**
34:23
**south**
2:17, 2:36, 7:1
**southeast**
2:7
**southern**
2:16, 165:11
**space**
32:13
**span**
173:15
**speak**
26:17, 27:14,
29:23, 30:3,
48:12, 51:11,
72:5, 150:16,
192:20, 237:20,
238:1, 238:4,
238:10
**speaking**
36:6, 71:22,

122:13, 151:16,
192:21, 239:3,
239:4, 240:11,
240:12, 240:13
**special**
4:33, 41:6,
90:13, 197:15,
198:1, 199:25,
204:2, 226:9
**specialist**
13:20, 15:25,
16:1
**specialty**
10:12
**specific**
101:14, 144:8,
144:9, 210:20
**specifically**
92:2
**speculation**
104:17
**spend**
29:24, 36:23,
38:22, 122:18,
122:20, 123:4
**spent**
28:22, 58:8,
98:2, 122:22,
122:25, 244:8
**spires**
4:33, 215:11,
215:19
**spoke**
29:25, 49:7
**spot**
76:20
**sprain**
242:4
**spreadsheet**
30:24
**spring**
163:8, 163:20
**st**
212:18, 213:3
**stabilization**
219:17
**stable**
215:20

stacey
212:15
staff
14:7, 14:21,
19:17, 36:6,
39:1, 40:18,
45:9, 45:20,
46:5, 46:9,
46:19, 46:25,
47:17, 48:12,
48:18, 48:21,
48:24, 49:7,
50:11, 55:9,
55:14, 61:17,
62:5, 62:7,
70:12, 76:8,
77:9, 104:4,
104:15, 106:12,
106:14, 121:14,
121:15, 137:12,
151:16, 152:19,
153:18, 154:12,
154:21, 154:23,
154:25, 155:25,
156:1, 156:14,
156:17, 156:20,
157:8, 157:10,
157:25, 162:15,
162:17, 164:7,
165:20, 166:11,
168:4, 175:14,
175:25, 176:10,
183:24, 184:12,
185:6, 191:16,
195:4, 195:10,
196:7, 196:19,
201:24, 225:2,
227:20, 238:12,
238:14, 238:19,
245:22
staff-controlled
162:19
staffed
194:14
staffing
55:9, 87:15,
192:15, 194:12,
196:13, 197:1,

197:11, 201:7
stamp
127:7, 128:13,
128:17, 133:4,
182:20
stamps
31:2, 127:15
stand
8:19, 27:19,
31:7, 67:11,
83:20, 95:2,
117:13, 117:20,
140:8, 182:10,
191:25, 192:2,
193:11, 197:21,
205:20, 209:7,
215:24, 221:6,
222:17, 223:18,
225:17, 229:1,
231:20, 233:3,
241:2, 241:12,
241:13, 244:22
standard
77:14, 147:4,
215:4, 219:23
standards
4:18, 11:8,
60:15, 60:16,
141:22, 142:8,
142:22, 142:24,
142:25, 147:2,
147:5, 148:6,
148:12, 148:22,
214:13, 215:3
standing
40:16
standpoint
239:1, 239:2
start
43:3, 82:11,
128:15, 128:16,
134:12, 144:5,
161:2, 167:4,
216:1
started
12:9, 36:5,
141:19, 191:19,
219:19

starts
66:16, 103:16,
121:22
state
1:25, 4:31,
6:4, 11:22,
13:4, 13:16,
13:24, 14:2,
14:11, 15:10,
16:20, 17:2,
17:19, 18:1,
19:12, 19:21,
21:21, 42:7,
118:24, 128:11,
193:21, 247:24,
247:32, 248:1,
248:3, 248:6
stated
146:17
statement
4:22, 83:20,
125:3, 140:15,
141:3, 144:22,
146:23, 147:8,
193:6, 226:23
statements
97:15, 140:7,
141:6, 146:23,
148:11
states
1:1, 101:5,
101:10, 101:25,
102:13, 112:16,
113:1, 114:4,
138:3, 138:7,
144:17, 147:20,
147:21, 147:25,
148:12, 148:24,
169:17
station
67:2, 69:9
statistical
153:3, 153:5,
153:9, 155:3
statistically
152:24, 155:10
statistics
153:7, 153:8

status
164:14, 198:22
stay
165:10, 206:21
step
5:5, 62:24,
63:3, 63:12,
63:17, 63:22,
63:24, 204:1,
205:6, 205:7,
209:18, 209:21,
209:24, 210:2,
243:17
step-down
203:25
step-wise
44:11
steps
63:7, 67:11,
67:13
still
58:11, 107:4,
107:9, 174:20,
179:8, 185:2,
207:20, 220:8
stimulation
143:19, 208:1
stipulations
3:3
stop
13:11, 18:12,
128:20, 129:4,
133:1, 133:11,
134:18, 135:8,
193:18, 216:25
stopped
128:22, 129:5,
129:6, 133:6,
133:13
stops
130:25, 131:4,
133:25, 134:9
storeroom
225:1
story
59:21, 59:24,
60:3
straighten
164:17

**street**
2:7, 2:27
**stressful**
149:17
**strict**
138:15
**strike**
238:13
**string**
5:34
**strive**
146:7
**studied**
112:19, 185:8
**studies**
143:25, 169:11,
185:25, 186:19,
187:1, 187:8,
187:12, 188:25,
190:4, 190:19,
190:22, 190:24
**study**
11:12, 55:5,
111:4, 112:21,
141:20, 147:19,
169:9, 170:13,
170:15, 171:3,
186:7, 186:10,
186:14, 186:15,
205:12
**stuff**
127:18, 156:17,
160:21
**style**
29:13
**subcommittee**
192:17
**subject**
5:36, 109:18,
127:22, 172:4
**subjected**
96:10, 110:3,
110:10
**submission**
70:2
**submit**
29:9, 29:10
**submits**
75:10

**submitted**
28:7, 29:11,
212:18
**submitting**
69:20
**subscribed**
247:26, 248:15
**substantial**
68:10, 72:12,
186:2, 196:3,
199:24, 227:21,
228:5, 228:13
**substantiated**
162:5
**successful**
97:9, 97:16,
113:17, 114:8
**successfully**
206:22
**suedfeld**
186:6
**suffer**
206:25
**suffered**
177:3
**suffering**
178:14, 178:17,
178:20
**sugar**
235:24
**sugars**
229:23
**suggested**
235:1
**suicide**
111:10
**suite**
2:8, 2:28,
2:36, 249:14
**summary**
182:20
**supervision**
248:13
**supervisors**
122:14
**supplier**
224:25
**supplies**
223:10, 224:21

**support**
83:8, 83:15,
169:22, 171:23,
243:24
**supported**
181:24
**supporting**
112:24, 171:22
**supports**
170:16, 171:3
**suppose**
186:5
**supposed**
39:14
**supposition**
171:4
**sure**
7:11, 7:13,
22:6, 28:1,
28:13, 30:16,
36:21, 45:12,
51:1, 53:15,
58:21, 66:20,
69:4, 86:21,
87:14, 94:3,
95:11, 96:6,
103:1, 107:22,
107:23, 111:8,
128:2, 130:3,
142:25, 145:18,
150:25, 151:25,
164:19, 176:8,
186:4, 193:1,
196:22, 197:18,
207:17, 211:12,
213:7, 220:25,
221:1, 222:3,
227:11, 234:18,
236:6
**surface**
152:23
**surprised**
58:15, 58:22,
102:19, 159:22,
163:13, 163:17,
166:20
**survey**
74:8

**suspicious**
157:14
**suwannee**
35:12, 226:7
**swear**
100:13, 120:24
**swelling**
243:14
**swift**
168:7
**sworn**
6:14, 247:26,
248:8, 248:15
**symptom**
178:16, 178:19
**symptomatic**
229:25
**symptoms**
110:23, 110:25,
112:5, 112:12,
113:4, 113:9,
178:1, 178:3,
178:10, 178:12,
178:13, 178:23,
178:24, 179:5,
179:10, 179:23,
180:7, 180:9,
180:17, 180:19,
180:24, 181:1,
181:2, 181:3,
181:15, 186:11,
186:24, 187:9,
188:18, 191:3,
206:25, 207:4
**syringes**
232:20
**system**
4:31, 12:8,
24:5, 24:10,
24:13, 24:21,
24:22, 25:6,
35:1, 52:11,
80:20, 84:5,
85:12, 101:2,
101:5, 101:10,
101:24, 102:13,
102:20, 112:23,
137:18, 138:2,

159:18, 161:17,
193:22
**systems**
84:7, 96:3,
111:8, 143:2,
144:19

**T**

**table**
73:8
**tag**
71:11
**take**
7:12, 11:12,
12:14, 15:6,
26:6, 28:11,
34:13, 35:24,
38:25, 49:19,
51:14, 60:9,
67:11, 68:19,
69:20, 70:2,
71:10, 93:25,
114:16, 121:17,
129:9, 130:6,
132:22, 132:23,
133:17, 135:13,
135:14, 136:4,
140:1, 150:17,
153:24, 154:20,
156:19, 157:20,
161:23, 163:7,
163:8, 167:14,
168:9, 168:18,
180:19, 183:1,
191:4, 191:6,
193:8, 194:16,
198:18, 208:19,
208:23, 210:12,
222:15, 223:5,
225:12, 226:3,
226:11, 226:20,
229:11, 230:14,
230:17, 231:18,
231:25, 232:25,
234:1, 234:19,
234:23, 235:11,
236:17, 236:18,
243:19, 245:14

**taken**
1:22, 51:18,
55:7, 63:8,
94:4, 95:17,
125:20, 125:25,
140:5, 151:4,
163:8, 164:8,
164:21, 191:9,
236:20, 248:22
**takes**
65:23, 176:19,
184:12, 196:18,
234:7
**taking**
20:23, 20:24,
77:18, 92:12,
94:24, 164:4,
165:15, 182:12,
234:9, 234:10,
234:16, 236:14,
236:15, 237:1
**talk**
7:14, 13:12,
13:15, 35:8,
42:7, 43:15,
46:11, 48:20,
133:1, 139:5,
139:21, 156:21,
191:10, 197:7,
202:18, 231:9,
231:10, 236:22,
240:19
**talked**
45:10, 48:13,
72:19, 75:17,
81:18, 84:2,
110:2, 121:15,
146:24, 152:6,
166:21, 231:8,
234:4, 236:5
**talking**
19:19, 25:8,
38:25, 40:16,
42:13, 42:18,
47:18, 52:22,
54:6, 55:16,
55:22, 73:2,
86:8, 87:7,

87:8, 87:20,
88:20, 88:23,
89:8, 90:6,
91:24, 114:2,
120:19, 121:14,
132:3, 139:18,
149:23, 162:15,
164:7, 168:3,
169:6, 177:7,
188:5, 199:9,
214:19, 232:23
**tallahassee**
1:3, 2:29,
49:10, 50:7
**target**
235:19
**taser**
58:10
**team**
182:22
**technician**
2:43, 8:19,
8:23, 9:1,
27:19, 27:23,
31:7, 31:11,
31:14, 95:2,
95:4, 95:7,
95:11, 95:13,
117:13, 117:16,
117:19, 117:22,
117:25, 135:25,
140:8, 140:12,
182:10, 183:4,
183:8, 191:25,
192:4, 193:11,
193:14, 197:21,
205:20, 209:7,
215:24, 216:3,
216:6, 221:6,
222:17, 223:18,
225:17, 225:23,
229:1, 231:20,
233:3, 235:9,
235:13, 235:20,
241:2, 241:5,
241:9, 241:12,
241:16, 241:22,
244:22, 244:25

**teeth**
243:12, 243:15
**tell**
6:23, 11:5,
21:19, 28:19,
31:25, 32:15,
36:1, 43:25,
129:10, 151:24,
152:3, 158:17,
201:8, 202:5,
202:7, 204:23
**telling**
59:9, 80:19
**temporary**
174:10, 175:11,
180:7, 180:9,
188:18
**ten**
144:16
**tend**
167:14
**tendered**
172:1
**tenderness**
243:15
**tensions**
193:24
**term**
44:4, 97:24,
99:20, 117:2,
117:4, 117:6,
117:9, 165:18
**terms**
52:18, 63:3,
94:14, 116:1,
116:25, 123:25,
125:2, 127:9,
184:3, 199:14
**terribly**
192:24
**testified**
6:16, 72:22
**testify**
6:14, 21:24,
32:19, 248:8
**testimony**
25:23, 170:1,
170:20, 170:24,

171:14, 248:14
**texas**
1:25, 6:11,
247:32, 248:1,
248:3
**th**
182:16, 191:24,
213:1, 214:5,
242:9, 242:18,
242:20, 245:4,
249:5
**thank**
6:17, 8:21,
27:21, 31:9,
76:1, 114:17,
118:2, 135:15,
135:22, 136:3,
136:7, 136:8,
137:8, 140:10,
151:5, 182:25,
183:3, 183:10,
183:12, 192:3,
192:7, 194:1,
205:24, 221:9,
223:20, 233:7,
241:11, 241:15,
246:5, 246:6,
246:7
**thanks**
127:25
**theirs**
69:4
**themselves**
16:25, 152:20,
196:14, 220:13
**theoretical**
153:11, 161:11,
161:15
**therapeutic**
208:2
**therefore**
114:22, 142:21
**thereupon**
248:11
**thickness**
28:24
**thing**
17:9, 25:8,

29:18, 71:9,
72:20, 89:18,
90:17, 119:6,
123:20, 135:11,
137:4, 154:7,
155:5, 167:21,
174:5, 174:15,
195:23, 199:11,
205:3, 208:15,
218:22, 236:3,
236:10
**things**
12:19, 17:6,
27:10, 33:16,
33:19, 34:12,
35:5, 37:11,
37:13, 37:16,
39:2, 42:23,
48:5, 48:16,
50:11, 50:16,
51:10, 54:13,
54:17, 68:8,
69:5, 71:23,
72:1, 73:14,
73:25, 74:23,
76:8, 76:13,
91:13, 92:18,
107:20, 112:17,
118:21, 142:3,
147:3, 165:7,
166:5, 167:25,
169:7, 173:8,
173:14, 174:2,
174:19, 178:4,
181:13, 185:1,
188:19, 190:13,
190:15, 198:10,
198:13, 199:3,
199:13, 201:5,
204:6, 208:16,
236:15, 240:18
**thinking**
120:19
**thinks**
147:24, 148:3,
148:9, 234:2
**third**
27:12, 29:3,

74:14, 122:24,
213:4
**thomsen**
22:15, 25:16
**thought**
22:25, 81:11,
239:23
**thousands**
152:18, 155:17
**threat**
17:9
**threatened**
160:1
**three**
23:12, 39:4,
45:9, 49:17,
76:12, 77:23,
102:10, 109:25,
116:19, 123:8,
125:5, 125:6,
125:8, 125:9,
126:3, 130:24,
130:25, 131:4,
133:25, 137:13,
137:19, 137:24,
138:3, 138:22,
246:10
**throat**
60:8, 237:21
**through**
4:5, 4:14,
4:26, 4:35,
5:21, 5:23,
5:26, 5:28,
5:31, 5:38, 9:3,
9:11, 15:19,
23:9, 27:9,
28:5, 28:22,
32:3, 32:11,
32:20, 32:21,
32:23, 35:5,
35:23, 36:12,
56:16, 63:1,
63:20, 70:17,
71:12, 71:14,
71:21, 71:23,
72:1, 72:3,
72:6, 72:9,

72:17, 72:19,
72:20, 80:16,
100:22, 108:20,
145:20, 166:18,
184:10, 184:14,
197:10, 206:4,
215:20, 234:16,
240:16
**throughout**
13:16, 144:17
**throwing**
232:21
**thumbed**
240:16
**tiles**
103:19
**time**
6:2, 6:3,
13:16, 13:23,
15:23, 16:2,
18:17, 23:13,
24:25, 28:22,
36:7, 38:22,
38:23, 38:24,
47:24, 56:16,
59:18, 66:19,
67:22, 69:18,
73:19, 74:16,
77:9, 77:20,
87:5, 96:11,
98:2, 104:20,
110:19, 115:11,
119:15, 120:7,
122:25, 127:7,
127:15, 128:13,
128:17, 132:17,
132:23, 133:4,
152:15, 156:15,
160:22, 164:10,
166:14, 167:19,
172:23, 173:21,
173:24, 173:25,
174:14, 174:21,
175:2, 175:4,
176:21, 176:24,
181:4, 186:10,
190:17, 191:6,
194:5, 199:8,

200:12, 202:5,
202:10, 214:11,
215:4, 215:6,
215:7, 215:9,
215:21, 217:9,
224:21, 227:17,
228:12, 229:24,
230:18, 230:20,
232:20, 233:14,
234:1, 234:18,
236:6, 236:8,
236:18, 240:5,
243:6, 243:10,
246:5, 246:16,
248:17
**times**
24:13, 40:7,
48:8, 52:13,
52:17, 60:6,
61:9, 72:11,
76:12, 77:23,
90:10, 122:10,
126:22, 137:13,
137:19, 156:10,
168:4, 191:20,
224:19, 228:20,
234:22
**timing**
88:5, 90:11,
233:15, 234:9,
236:9, 236:12
**today**
127:13, 243:22
**today's**
27:7
**together**
10:4, 36:8,
88:7, 88:8,
105:7, 116:17
**toilet**
184:14
**told**
22:25, 116:8,
157:18, 158:19,
159:2, 166:3,
216:25, 246:10
**took**
78:17, 129:8,

131:1, 133:15,
153:18, 213:11,
213:17, 213:19,
214:9, 236:23,
242:21
**top**
4:30, 16:11,
117:10, 220:21,
235:16, 235:17
**total**
122:1
**touched**
75:16
**touching**
248:10
**tour**
41:24
**toured**
36:10, 122:5
**touring**
29:25, 39:3
**tours**
37:3
**towards**
44:12, 46:3
**tracey**
211:11, 211:18
**track**
106:21, 117:18,
158:9, 198:6,
198:10, 245:7,
245:8, 245:11
**training**
9:21, 9:22,
10:7, 10:14,
30:1, 64:6
**transcript**
249:3
**transferred**
19:9, 194:14
**transfers**
19:10
**transition**
13:5, 13:6,
206:23
**transitioned**
14:10
**transitioning**
13:7, 15:6

**transport**
24:15
**treat**
10:24, 179:8,
186:11, 239:2,
239:18
**treated**
10:21, 173:3,
175:15, 215:14
**treating**
18:10, 18:15,
51:21, 52:6,
238:15, 239:3
**treatment**
52:4, 141:1,
147:11, 171:20,
238:21, 240:10
**triaged**
56:15
**trial**
21:24
**trick**
83:23, 83:25
**tried**
31:1
**trip**
35:24, 44:20
**trivial**
68:7, 69:17,
157:22
**trouble**
54:15, 123:18,
160:20, 235:23
**troubled**
237:12
**troubles**
204:2
**true**
68:22, 97:5,
111:24, 138:6,
154:20, 231:3,
232:12, 233:22,
238:10, 239:24,
246:10, 246:13,
247:17, 248:14
**truth**
6:15, 59:9,
248:8, 248:9

**try**
7:17, 35:20,
58:18, 69:5,
72:5, 139:17,
139:21, 178:23,
223:25, 231:11,
231:15, 235:1,
237:9, 239:15,
245:20
**trying**
32:4, 46:17,
63:11, 67:16,
67:20, 83:21,
128:6, 154:23,
156:25, 158:9,
172:3, 180:12,
227:23, 228:4,
228:15, 228:17,
234:6
**turn**
62:18, 62:21,
69:15, 69:16,
74:11, 81:19,
94:7, 114:18,
192:12, 212:14,
215:11
**turned**
65:25
**twice**
121:25, 234:16,
237:1, 237:8
**two**
11:6, 12:21,
15:2, 23:12,
29:12, 37:1,
39:3, 39:4,
49:14, 50:17,
50:20, 55:25,
65:9, 67:11,
67:12, 109:1,
118:18, 119:4,
123:8, 128:24,
129:1, 131:4,
145:9, 156:14,
156:23, 160:17,
169:6, 216:6,
227:9, 230:8,
242:19, 242:21,

two-year
15:5
type
107:25, 108:11,
114:13, 168:14,
172:22, 203:3,
236:13, 241:23
typed
157:24, 158:2
types
115:7, 115:9,
174:23, 229:20
typical
129:17, 212:6
typically
56:2, 56:8,
69:20, 70:2,
73:7, 73:8,
98:2, 106:5,
184:12, 185:6,
185:7, 185:8

**U**

uh-huh
26:16, 60:11,
128:1, 223:15,
227:1, 230:25,
233:20, 241:16
unable
238:1, 238:4
unbelievable
152:13, 154:1,
155:9
uncontrolled
80:4, 176:9
uncover
189:18
uncuffed
58:6
undefined
110:15
under
21:5, 76:25,
137:20, 160:4,
162:17, 165:20,
172:16, 175:23,
176:4, 176:11,

185:24, 186:20,
186:23, 187:8,
196:15, 229:23,
229:24, 238:8,
242:11, 248:13
understaffed
191:20, 193:23,
194:13, 195:24,
195:25, 197:3
understaffing
191:11, 191:12,
191:17, 195:13
understand
7:16, 20:4,
43:9, 44:3,
64:18, 66:5,
66:20, 74:23,
77:3, 80:14,
85:7, 101:20,
119:9, 121:4,
163:25, 165:19,
180:12, 198:15,
200:6, 227:6
understanding
43:6, 62:4,
63:6, 108:23,
164:7, 201:5,
201:7, 204:20
understood
7:19, 13:14,
136:23, 234:22
undertaking
155:1
unfortunately
9:13, 246:13
unfounded
156:9, 156:10
uniform
129:14
unimpeded
36:5
unintended
228:11
union
35:11
unit
14:15, 20:3,
20:6, 39:5,

52:12, 52:14,
52:17, 54:14,
54:18, 56:16,
72:24, 73:2,
77:17, 78:1,
122:19, 122:21,
129:12, 133:23,
196:19, 196:20,
199:7, 203:8,
203:9, 203:12,
203:22, 203:24,
203:25, 204:22,
206:11, 206:13,
207:16
unit's
14:23
united
1:1, 101:5,
101:10, 101:25,
102:13, 112:16,
112:25, 114:4,
138:3, 138:7,
144:17, 147:19,
147:21, 147:25,
148:12, 148:24,
169:17
units
14:13, 14:25,
36:12, 38:6,
38:8, 38:11,
38:13, 38:15,
38:18, 38:22,
55:20, 72:15,
72:23, 73:1,
73:5, 74:4,
74:7, 111:12,
111:17, 120:7,
122:24, 123:1,
123:2, 123:3,
200:2, 203:20,
203:21, 207:2
universal
53:17
unless
40:4, 52:17,
71:4, 79:17,
157:7, 160:2,
228:11

unlikely
148:9, 148:15
unpublished
12:6
unquote
45:25, 66:19,
68:15, 194:12
unsigned
156:12, 157:1
until
7:13, 166:19,
213:1, 229:15,
242:18
unusual
54:12, 195:23,
214:25, 219:22
unwanted
228:12
upcoming
236:2
updated
5:36, 30:12
updating
22:23
use
8:12, 19:5,
22:22, 39:7,
115:16, 117:1,
117:3, 117:6,
118:17, 136:25,
169:19, 173:23,
177:12, 224:11,
224:12, 224:13,
225:8, 225:9,
230:4, 239:13
useful
49:3, 61:8,
131:19
users
217:2
uses
101:25, 102:13,
119:17, 220:3
using
163:15, 163:19,
182:20, 194:2,
224:13
usually
37:1, 215:1

## V

**vacancy**
192:15, 193:6,
194:20
**vague**
20:7, 25:2,
42:17, 44:19,
46:15, 56:23,
57:4, 67:7,
67:24, 70:9,
70:19, 70:24,
71:18, 83:12,
86:7, 89:1,
91:15, 92:7,
92:22, 93:4,
94:15, 94:22,
96:21, 97:19,
98:6, 99:25,
101:3, 101:6,
101:12, 102:3,
102:23, 104:9,
107:6, 108:2,
108:6, 108:13,
110:6, 110:13,
112:1, 114:12,
115:5, 116:5,
118:16, 119:3,
119:19, 125:23,
126:5, 129:20,
134:24, 136:13,
153:2, 161:9,
161:21, 174:9,
176:15, 179:12,
180:11, 181:18,
201:1, 201:17,
213:21, 214:17,
225:7
**valid**
151:18, 156:13,
157:2, 158:24,
159:6, 159:15,
160:3, 199:3,
199:13
**valleys**
237:5
**variability**
228:13

**variables**
113:13
**varies**
104:2, 115:13
**various**
11:8, 20:11,
27:9, 39:13,
41:23, 72:14,
86:12, 98:9,
115:7, 120:19,
121:9, 121:12,
203:1, 203:4,
204:21, 208:19,
222:24
**vary**
38:23, 181:10,
183:24, 228:6,
228:7, 230:7
**vast**
167:18, 168:4,
186:2, 217:1,
217:2
**vendor**
127:17
**venters**
29:5, 33:12,
152:8, 152:14,
152:25, 153:20,
154:1, 154:19,
210:21
**ventilation**
139:12
**vera**
205:11, 205:19
**versus**
21:20, 21:21,
21:22, 23:15,
51:5, 52:1,
54:20, 55:3,
65:13, 68:4,
76:15, 76:24,
82:20, 87:21,
87:25, 89:23,
91:2, 91:13,
92:25, 93:22,
178:10, 196:9,
196:19, 197:3,
207:4, 224:24,

237:20
**video**
4:21, 76:20,
127:3, 127:12,
127:17, 128:8,
128:19, 128:22,
129:3, 129:5,
131:3, 133:6,
133:10, 133:13,
134:11, 134:13,
134:17, 135:15,
182:14, 182:18,
232:3
**videoconferenced**
1:13, 1:20
**videos**
128:4
**view**
94:24, 132:13,
193:25
**violated**
41:17
**violence**
193:23
**visible**
243:13
**visit**
56:16, 221:16
**visited**
38:2, 65:10
**visiting**
38:2
**visitors**
38:3
**visits**
90:4, 91:13,
91:18, 107:9,
108:20
**vitae**
4:4
**vocational**
107:17
**volume**
155:3
**voluminous**
143:1
**vulnerable**
96:25, 143:12

## W

**wait**
7:13, 62:8,
62:15, 66:10,
67:5, 68:3,
69:3, 69:15,
69:17, 90:10,
214:25, 215:4,
215:6
**waiting**
68:7, 171:7,
241:1
**wakulla**
35:12
**walk**
66:18, 66:23,
67:3, 68:7,
136:17
**walked**
35:23, 46:8,
130:17
**walking**
68:4, 129:11,
130:5
**walks**
125:15, 130:17,
133:8
**wall**
73:9, 73:14
**want**
9:17, 13:12,
13:15, 39:20,
44:16, 52:23,
54:9, 59:15,
66:19, 66:20,
74:14, 74:20,
75:4, 75:5,
83:23, 87:5,
87:14, 87:19,
88:14, 89:7,
95:25, 107:12,
124:19, 124:22,
127:3, 131:2,
132:12, 145:18,
148:6, 148:19,
150:19, 150:23,
153:24, 159:13,

160:20, 160:23,
162:7, 162:10,
166:11, 167:25,
168:21, 177:17,
191:10, 194:10,
194:23, 200:15,
201:12, 201:20,
206:18, 210:14,
224:13, 230:8,
234:1, 235:5,
237:2, 246:15
**wanted**
28:1, 28:13,
33:10, 38:5,
42:5, 48:11,
131:18, 192:11,
198:12, 198:20,
200:3, 200:22,
219:13, 244:14,
244:17
**wants**
71:8
**war**
185:25, 186:5
**warden**
47:2, 47:6,
47:11
**warden's**
101:1
**wardens**
47:8
**warm**
165:10
**warn**
214:18
**warned**
193:22
**washington**
21:21
**waste**
77:19
**watch**
40:6, 40:24
**watched**
122:6
**water**
48:9
**wave**
136:18

**waves**
136:18
**way**
17:9, 23:22,
33:14, 59:8,
80:15, 90:2,
96:5, 96:17,
101:7, 106:8,
123:9, 167:23,
171:17, 179:3,
179:17, 179:21,
197:12, 198:21,
203:6, 240:10,
241:20
**ways**
80:17, 196:15
**we'll**
47:19, 54:16,
127:6, 183:1,
205:10
**we're**
18:4, 19:19,
20:21, 20:22,
28:2, 31:16,
36:21, 42:13,
52:22, 87:15,
89:8, 92:12,
92:16, 127:9,
128:12, 128:16,
134:11, 165:8,
168:3, 169:6,
188:5, 191:20,
192:16, 199:10,
214:19, 233:11,
241:1
**we've**
25:8, 42:22,
137:16, 243:22
**weapon**
163:20
**week**
29:24, 158:11,
175:14, 175:15,
175:17, 228:18
**weekend**
12:21
**weekly**
52:13

**weeks**
174:3, 215:6
**weight**
227:15, 227:16,
227:21, 227:23,
228:4, 228:5,
228:7, 228:11,
228:12, 228:17,
228:18
**weights**
228:6
**welch**
240:19, 242:6
**welfare**
143:20
**well-being**
96:10, 113:16,
114:7, 114:11
**well-known**
158:21
**went**
32:23, 36:1,
36:12, 37:1,
38:4, 38:16,
38:21, 41:24,
45:21, 46:17,
49:23, 49:24,
50:5, 100:22,
105:1, 132:15
**weren't**
54:10, 60:24,
93:21, 163:14,
163:18, 202:7
**wes**
37:4
**whatever**
55:6, 132:16,
199:8
**wheelhouse**
200:7
**whenever**
84:9
**whereof**
249:4
**wherever**
64:20, 64:21,
65:25, 69:9,
70:12, 70:13

**whether**
55:1, 59:8,
61:3, 66:4,
78:25, 79:1,
82:10, 82:12,
82:24, 86:5,
86:6, 88:11,
89:2, 90:4,
90:16, 92:10,
97:5, 113:7,
113:23, 115:20,
123:25, 124:23,
124:24, 124:25,
126:2, 130:7,
131:6, 131:10,
133:2, 134:5,
134:23, 135:5,
136:10, 136:11,
136:25, 137:1,
138:24, 151:10,
151:24, 152:3,
153:12, 153:13,
154:8, 154:10,
156:13, 164:3,
169:18, 170:4,
170:11, 174:17,
177:3, 181:6,
181:7, 185:16,
189:9, 195:19,
198:3, 198:12,
200:15, 200:23,
201:9, 201:13,
212:5, 220:7,
220:16, 220:17,
225:4, 230:19,
237:19, 238:13,
238:20, 238:23,
239:5, 240:11
**whole**
6:15, 13:23,
15:23, 24:23,
29:18, 63:15,
94:24, 104:24,
106:2, 112:6,
113:5, 114:3,
179:17, 180:21,
248:9
**whys**
78:15

widmayer
22:15, 25:17
willing
46:11, 155:4
window
9:7
windowless
108:18
wing
73:22, 80:23,
128:11, 129:24
winter
27:3
wire
58:10
wish
50:21
wit
248:7
within
14:12, 18:24,
34:1, 34:3,
52:14, 53:1,
55:19, 60:22,
83:5, 87:5,
92:11, 97:17,
110:8, 122:24,
142:22, 147:19,
148:24, 167:7,
184:17, 195:14,
204:22, 208:11,
208:12, 219:23,
224:25, 232:16
without
23:9, 65:19,
79:6, 101:10,
106:6, 139:8,
150:23, 164:11,
168:23, 171:24,
190:10, 190:17,
221:17, 228:4,
243:15
witness
1:21, 42:11,
52:21, 58:18,
76:17, 76:19,
81:15, 92:6,
140:3, 156:14,

156:18, 157:8,
157:16, 157:17,
209:2, 214:22,
232:2, 235:17,
235:19, 246:6,
247:27, 248:15,
248:16, 249:4
witnesses
20:14
woefully
193:23
woman's
149:19
women
84:17, 149:2,
149:13, 149:21
women's
15:4, 207:13
wonder
184:6, 234:3
wondering
164:13, 188:24,
190:4
word
29:14, 129:9,
133:17, 144:22,
155:20, 173:19,
173:22, 177:12,
226:20, 235:12
worded
146:22
wording
99:11, 182:7
words
161:6, 182:5,
194:2
work
12:21, 13:1,
16:6, 18:18,
20:25, 44:22,
52:18, 54:2,
58:2, 64:8,
69:5, 69:6,
85:14, 85:20,
85:24, 111:23,
128:5, 152:19,
180:14, 195:25,
196:15, 197:13,

210:9, 218:25,
231:15, 236:14,
244:2, 244:5
worked
12:22, 12:23,
12:25, 19:20,
37:16, 39:2,
47:17, 203:17,
207:12
worker
16:10, 17:5
working
12:15, 15:3,
16:5, 44:12,
58:5, 167:24,
196:5
works
33:13, 171:18
workstation
70:13
world
94:10, 94:12,
94:24, 95:15,
96:3, 96:6,
96:7, 98:20,
98:23, 99:12,
102:14, 102:21,
104:10, 104:13,
104:19, 104:22,
105:5, 105:7,
105:13, 105:17,
106:2, 106:5,
114:3, 184:8,
186:4
worldwide
184:9
worry
71:12
worse
71:15, 227:22
wouldn't
35:24, 39:22,
40:8, 41:12,
48:25, 54:12,
57:5, 58:15,
58:22, 68:25,
85:24, 94:16,
102:19, 110:7,

143:24, 154:22,
155:5, 159:15,
163:13, 166:19,
168:13, 179:4,
196:25, 199:6,
200:7, 201:12,
229:21, 231:1,
231:2, 232:12,
234:23, 238:2
write
17:7, 17:15,
65:24, 160:21
writer
18:7
writes
65:24
writing
10:4, 51:3,
105:4, 148:11,
248:13
written
18:3, 50:2,
162:14, 199:4,
199:13, 199:21
wrong
89:15, 176:5,
199:11, 211:15,
232:8, 233:14
wrote
78:16, 117:3,
117:6, 184:22

| X |
|---|

x-ray
218:22, 218:23,
218:24, 242:22
x-rayed
242:20, 243:4

| Y |
|---|

y'all
31:2
yard
98:3, 184:13,
204:6
yeah
16:1, 19:19,
27:3, 29:12,

30:20, 46:7,
47:1, 55:4,
81:5, 85:7,
91:23, 117:19,
121:4, 122:18,
122:22, 123:19,
128:13, 128:15,
131:4, 133:4,
135:19, 141:14,
142:20, 150:12,
161:16, 162:22,
183:1, 186:19,
189:14, 191:18,
193:1, 196:22,
197:11, 202:16,
207:11, 208:20,
211:11, 221:2,
221:3, 224:3,
227:9, 235:15,
235:17, 235:18,
236:16, 239:16,
245:18
**year**
13:13, 14:20,
21:1, 27:5,
107:9
**yearly**
107:11
**years**
12:24, 14:1,
14:4, 14:24,
15:3, 15:11,
18:3, 155:18,
174:2, 176:19,
186:5, 186:17,
187:6, 187:17,
188:5, 189:3,
207:13, 217:13
**yell**
167:10, 167:12
**yep**
140:19, 183:2,
236:1
**yesterday**
30:13
**young**
12:18
**yourself**
29:7, 29:18,

68:4, 145:5,
145:12, 183:17,
206:16, 209:22,
234:19

---
### Z
---

**zoom**
7:10, 103:19,
183:12

---
### 0
---

**00003767**
5:23, 228:25
**00003768**
5:23
**00003769**
5:26, 231:19
**00003770**
5:26
**00004163**
5:10, 221:5
**00004172**
5:14, 222:16
**00004650**
5:18, 223:17
**00005346**
5:28, 233:2
**00005347**
5:28
**00011273**
5:21, 225:16
**00011275**
5:21
**00067**
241:7
**00069731**
241:19
**00069753**
5:31
**00069789**
241:1
**00069885**
5:32
**000935**
215:25
**00093568**
4:34, 197:20
**00093573**
4:35

**00093777**
215:23, 216:2
**0010411**
4:26, 182:9
**0010472**
4:26
**00212**
1:5, 247:22
**01210933**
4:5, 8:18
**01210945**
4:6, 9:14
**01211103**
4:14, 30:24,
31:6
**01211153**
4:14
**01266865**
5:37, 244:21,
244:23
**01266866**
5:38
**03**
133:4, 133:7
**04**
94:4, 133:12
**05**
134:12
**06**
191:9

---
### 1
---

**1**
94:4
**10**
4:30, 5:35,
20:12, 51:18,
193:12, 193:13,
228:6, 228:7,
242:16, 245:4,
249:10
**100**
2:7, 18:16,
44:25, 46:16,
46:20, 144:18
**101**
2:27
**11**
4:33, 46:17,

51:16, 51:18,
94:7, 128:13,
128:24, 129:7,
137:10, 191:24,
197:22, 197:24,
197:25
**117**
4:18
**12**
4:36, 32:12,
94:4, 116:21,
121:20, 205:21,
205:23, 213:1,
214:5, 234:15,
237:1, 249:5
**120**
2:28
**13**
5:3, 15:8,
114:18, 150:20,
151:6, 151:7,
209:8, 209:10,
213:12, 213:14,
228:13, 242:9
**136**
4:21
**14**
5:8, 15:8,
133:7, 207:7,
207:9, 221:7,
221:10, 221:11,
242:18, 242:20
**140**
4:22
**1400**
2:36
**15**
5:12, 51:16,
147:9, 222:18,
222:20
**16**
5:16, 133:4,
134:19, 182:16,
185:22, 223:19,
223:22, 237:1
**17**
5:20, 172:13,
173:19, 225:18,

225:25, 226:1
**18**
5:22, 147:5,
187:6, 229:2,
229:3, 229:10
**183**
4:23
**19**
1:5, 5:25,
134:11, 140:5,
147:5, 187:6,
231:21, 231:23,
247:22
**192**
4:28
**193**
4:30
**197**
4:33
**1978**
10:7
**1980**
10:7
**1982**
186:7
**1983**
141:24
**1990**
9:19
**1st**
4:12

**2**

**2**
140:2, 140:5,
151:4
**20**
5:27, 51:18,
56:19, 133:15,
187:17, 188:5,
189:3, 233:4,
233:6, 235:10
**2009**
12:10, 13:17,
14:6
**2012**
15:7
**2014**
15:14

**2015**
15:13, 15:14,
205:11, 220:24,
221:2, 222:24
**2016**
8:13, 105:9,
140:19, 140:20,
205:25, 222:24,
223:14, 225:6,
226:18, 226:25,
227:8
**2017**
222:24
**2018**
147:5
**2019**
11:2, 128:12,
182:17, 221:14,
222:9, 222:25,
224:7
**2020**
27:6, 212:18,
213:1, 213:3,
214:6, 242:9,
242:19
**2021**
1:15, 1:23,
4:30, 5:36,
27:6, 117:12,
193:18, 209:13,
245:4, 247:28,
248:5, 249:5
**205**
4:36
**2056**
2:19
**2081**
2:10
**20850**
249:15
**209**
5:3
**21**
5:30, 134:15,
240:21, 241:13,
242:1
**22**
5:34, 118:11,

120:16, 120:21,
193:10, 193:17,
221:2, 244:25,
245:2, 249:10
**22.5**
98:1, 99:15,
99:22, 100:5,
100:11, 119:13
**221**
5:8
**222**
2:30, 5:12
**223**
5:16
**225**
5:20
**229**
5:22, 197:16,
198:1
**23**
212:14
**231**
5:25
**233**
5:27
**24**
12:19, 94:4,
98:1, 99:15,
99:22, 100:6,
100:11, 102:10,
116:19, 119:13,
122:18, 123:10,
137:19, 138:4,
186:16, 215:12,
234:15
**242**
5:30
**245**
5:34
**246**
3:3
**247**
3:6
**248**
3:7
**25**
129:24, 140:2,
216:11

**26**
129:24, 140:5,
216:11, 224:7
**27**
4:8, 96:2,
103:15, 107:12
**28**
103:16, 109:25,
110:17, 192:16,
193:6, 194:20,
228:8
**29**
62:10, 62:11,
62:14, 113:11,
217:14
**2nd**
2:7, 128:12,
182:17

**3**

**3**
191:9
**30**
56:5, 62:14,
100:23, 107:9,
122:12, 220:21,
227:14, 228:8
**300**
2:36, 228:14
**305**
2:10
**31**
4:12, 212:18,
213:3, 223:7,
236:20, 249:10
**32301**
2:29
**32801**
2:37
**33**
134:11, 134:12,
134:15
**33131**
2:9, 2:18
**34**
134:19, 227:14
**347**
2:19

**35**
94:1
**358**
2:10
**36**
236:19
**3750**
2:8
**3767**
249:16
**38**
236:20, 237:16
**39**
133:12, 248:19

**4**

**4**
191:9
**40**
56:4, 186:17
**40,000**
28:23, 28:24,
30:7, 32:21
**400**
249:14
**407**
2:38
**433**
249:16
**44**
151:4
**45**
28:5, 151:4
**451**
249:13
**47**
28:5, 144:20
**48**
122:1, 122:10,
122:16, 123:10,
125:3, 126:19
**4:-cv--aw-maf**
1:5, 247:22

**5**

**5**
236:19, 236:20,
246:19

**50**
12:16, 84:17
**54**
191:9
**55**
28:3
**56**
246:19
**5729**
249:9
**59**
1:24, 6:3,
248:5

**6**

**6550**
2:30
**65932**
128:17
**686**
249:12
**69731**
241:8
**6978**
242:4
**69789**
241:3

**7**

**70**
141:19
**72**
182:9
**7300**
2:38
**75**
23:16, 23:17,
186:5
**76**
186:5
**786**
2:19

**8**

**80**
23:16, 23:17
**850**
2:30

**872**
2:38
**888**
249:16
**8:**
133:4, 133:7,
133:12
**8th**
1:23, 248:5

**9**

**9**
1:24, 6:3,
248:5
**93777**
216:3
**95**
4:16
**9:**
134:11, 134:12,
134:15, 134:19