UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAC'QUANN (ADMIRE)
HARVARD; JEREMIAH HILL;
JUAN ESPINOSA; JEROME
BURGESS (a/k/a SHAM'LA GOD
ALLAH); JAMES W. KENDRICK,
JR.; JOHNNY HILL; AMY
FERGUSON; and TRACEY DEAN
on behalf of themselves and all
others similarly situated,

        Plaintiffs,

vs.                                          CASE NO.:  4:19-cv-00212-MW-MAF

RICKY DIXON, in his official
capacity as Secretary of the Florida
Department of Corrections, and
FLORIDA DEPARTMENT OF
CORRECTIONS, an Agency of the
State of Florida,

        Defendants.

_____/

## EXPERT REPORT OF DR. REED PAULSON

I, Reed Paulson, M.D. have been asked by the Florida Department of Corrections to offer my opinion on the referenced matter.  I incorporate into this report my opinions expressed in the Declaration dated October 9, 2021 and my deposition dated December 8, 2021 unless expressly contradicted here.

1

## I.   <u>Expert Qualifications and Background</u>

I can provide expert opinions in this case from a long career and study in emergency medicine, family medicine and correctional medicine. I have experience in correctional medicine from my posting in the Hopi Nation where we provided all of the care for the Hopi Nation corrections. Again, in the small city of Lebanon, Oregon we provided emergency care, urgent care and 'clearance for incarceration' for the local authorities and jail for 7 years. Finally, over 12 years with the Oregon Department of Corrections – 5 years of which included the Coffee Creek Intake Facility (much like a jail with continually new and short stay patients) and 9 years at the Oregon State Penitentiary where I provided care and oversight for all levels of inmate management in medical care. My curriculum vitae is attached to this Declaration.

As a Correctional Medicine Expert, I provided deposition testimony for *Hamblin v. Santa Fe County Adult Detention Center, et al*: Case No. D-101-CV-2018-01413, State of New Mexico, County of Santa Fe, First Judicial District; *Rojas v. Correct Care Solutions, et al*: Case No. CV2018-004077, in The Superior Court Of The State Of Arizona, County of Maricopa; *Estate of John Kleutsch v. State of Washington Dept. Of Corrections*, Case No. 20-2-06902-7, in the Superior Court of the State of Washington in and for King County;  *Alejandro Gallegos v.*

*K. Seeley, MD, Centinela State Prison*: Case No. 18CV1322 JAH BGS, in the United States District Court for the State of California.

In preparation for this opinion, I have reviewed around 40,000 pages of material, including multiple medical records, security records, logs, policies and procedures, motions, declarations, depositions, educational materials, reference materials, etc. A copy of all materials reviewed is attached.

## II.   Lack of Evidence of Medical Harm

I have reviewed the files of the seven named Plaintiffs and find no evidence of medical harm as a result of their time in restrictive housing.  I further find that their placement in Restrictive Housing did not place them at a substantial risk of serious medical harm because as further described below, their medical care was appropriate and similar to, if not better than, the care they received in General Population.

### a.   Juan Espinosa

Juan Espinosa is a 61 year old Hispanic (Cuban-American) male with a medical history of esophagitis/gastritis and prostate enlargement.[1] The most recent medication listing I have shows him taking Abilify and Paxil (which he refuses regularly) for mental health and Flomax for his prostate. I reviewed his medical

---

[1] The medical records indicate Mr. Espinosa has had good care for his bladder and prostate, including a cystoscopy of the bladder with biopsies.  He has also had good care of his esophagitis/gastritis and dysphagia from this. He has had evaluations and endoscopy with biopsies and dilation. He has not seemed to have problems with this recently.

records with particular attention to 2018 onward. I find that his general medical care to be up to or exceeding medical and correctional medical standards. I find no difference in his medical care between General Population and Restrictive Housing. I find his access to medical care to be better while in Restrictive Housing.

Mr. Espinosa was approved for Close Management 1 in July 2018.  He was then approved for Close Management 2 in January 2019, Close Management 3 in August 2019, and released to General Population in November 2019.  During the majority of his time on Close Management, Mr. Espinosa was housed at Reception and Medical Center to receive medical treatment.

Mr. Espinosa claims that he is an Americans with Disabilities Act ("ADA") inmate because he is unable to speak.  He claims he permanently and completely lost his voice after a surgical procedure to remove one of the tumors in his throat. (Espinosa Declaration, ¶ 5).

Mr. Espinosa has been diagnosed with "FUNCTIONAL APHASIA" by Iman Naseri, MD, and Otolaryngology Specialist (10/7/19). This was after a long workup and a "normal" exam of the larynx (on 10/7/19) which Dr. Naseri also described as having "No evidence of disease." Dr. Naseri later expanded this to "FUNCTIONAL DYSPHONIA – APHASIC, PSYCHOSOMATIC ORIGIN" (8/10/20). Functional aphasia and dysphonia means that the person is capable of producing speech and sounds, but does not.

Functional aphonia or dysphonia can usually be diagnosed by demonstrating normal sound production on prompted coughing or throat clearing or other signs of inconsistency of presentation.[2]

Mr. Espinosa has claimed many times through the years that his speech problems have been due to "throat cancer." Initially it was "lymphoma," then switched to "laryngeal cancer," "thyroid cancer" and "tumors invading the thyroid" – even after his four sets of throat and neck biopsies were all negative for cancer. He has never been diagnosed with any of these diseases and they are not on his medical problem lists. Three neck biopsies were followed by biopsies of the throat and esophagus during a normal appearing endoscopy exam. These were all negative for cancers. He had a very long and thorough evaluation of his neck including multiple tests, exams, biopsies and scans over the course of several years. He started to complain of hoarseness after a needle aspiration then excision of a nodule under his chin (nowhere near any throat nerves). He was thereafter found to have normal appearing and functioning vocal cords during a laryngoscopy exam.

On 12/28/18 he had excision of 3 lymph nodes of the neck (negative). It was after this that he claimed to be unable to speak, even though this surgery, also did not enter areas of laryngeal nerves. He has claimed repeatedly that "They removed

---

[2] *Functional Neurological Disorder: A Common and Treatable Stroke Mimic*. Stoyan Popkirov, Jon Stone, Alastair Buchan: Stroke 2020; 51:1629-1635.

my voice box" (deposition, pg. 41) during the 12/18/18 surgery but his larynx was never touched.

Mr. Espinosa was actually able to speak after his 12/28/18 surgery. On 12/29/18 he spoke to nurse S. Lee RN (ESP00001670). On 1/5/19 he was seen by his psychiatrist, Dr. Greenfield, who found that he was "still hoarse" (ESP00001667).

He has also claimed to have been treated with chemotherapy for his "thyroid cancer" and represented, "I'm in remission" (deposition, pgs. 33-38), and stated that they removed his thyroid (deposition, pg. 41). None of these things happened.

As a result of my review of Mr. Espinosa's medical records, I question whether Mr. Espinosa is disabled regarding his functional aphasia. This condition has not been diagnosed as a delusional disorder by psychiatry. He does not have a medical diagnosis causing mutism.[3] I do not know the reason Mr. Espinosa has chosen to act as though he is mute if he is not mute – it could be for secondary motivations or secondary gains.  For example, even before his 12/28/18 surgery, Mr. Espinosa was asking to be released from CM due to the stress of his previous biopsies, upcoming biopsy and personal concern of cancer. He even gave a subtle threat of legal recourse (ESP00001937).

---

[3] I currently have a patient in my practice who has been intentionally mute, as part of a personal vow, since his criminal conviction. He is pleasant and easy to work with, but not deemed to be disabled. Just completely silent. We communicate by notes on his part.

Barely a month after the 12/28/18 surgery, Mr. Espinosa was asking to be released from CM due to his new mutism (ESP00000637). He also cited the ADA. Yet, despite these concerns, Mr. Espinosa refused his post-op evaluation on 12/29/18. On 1/8/19 he put in a sick call request and was seen in clinic. None of these contained a complaint of being unable to speak. On his 1/24/19 Pre Special Housing Medical Evaluation, he had no medical complaints (ESP00001662). On 2/5/19 he wrote a sick call request regarding weight loss with no mention of being unable to speak. Release and protection from further Restrictive Housing could be a powerful secondary gain for functional aphasia.

Mr. Espinosa has also made allegations regarding an incident in December 2018 (Declaration, ¶ 11). The medical records reveal that on 11/28/18 (10 days prior to his 12/8/18 surgery), Mr. Espinosa twisted his foot while walking restrained. This occurred while he was still talking. He has later claimed that he was unable to get any attention for three days, until a sick call request was responded to. This is difficult to understand since he was still talking and there was an officer at his door about every 30 minutes (48 times a day), as well as the nurse during daily rounds and medication passes. He could wave or speak up when they appeared, or knock on the cell door in between rounds.

Mr. Espinosa wrote grievances on 12/10/18 and 12/13/18 (just days after his injury) without mention of his supposed ordeal with being unable to get any help

for 3 days. These grievances were just complaints about personal property. The grievance system was a third way to get attention for his foot problem, separate from the block officers and nurses. But he did not use this avenue either.

He was seen by the nurse at sick call and an x-ray was ordered. A few days later, the x-ray was done on 12/5/18 and read as NEGATIVE for fracture. He was given an order for crutches. He had an evaluation by the Nurse Practitioner. On follow-up 10 days later he was still quite swollen, despite wrap and elevation, and a second x-ray was ordered - he was obviously receiving concerned attention and not indifference. The second x-ray showed nondisplaced fractures of the 3rd and 4th metatarsal bones. With intact, stabilizing 1st, 2nd and 5th metatarsal bones flanking the fractures on both sides, this is a quite stable injury and did not require surgery or casting. He was appropriately treated (confirmed by consulting orthopedic surgeon) and had an uneventful healing. Final x-ray on 3/8/18 showed good healing. He was treated well and appropriately, and had a good outcome.

Regarding the concept of someone who is mute on a Restrictive Housing unit. At every facility and Restrictive Housing unit I toured, I asked how someone who is unable to speak would get attention for a medical emergency. They all said the inmate could wave someone down during rounds or pound on the door in between. There are officers on the floors most of the time and consistent audio monitoring of all the units from the central control station. A knocking on the cell

door would be heard and responded to. I believe that this is better access to an emergency medical response than he would have on many general population units.

After extensive review of over 1,000 pages of medical records and an equal number of supporting documents, I find that Mr. Espinosa did not have barriers to access of medical care while in Restrictive Housing and did not suffer any physical harm caused by Restrictive Housing.

In my opinion, Mr. Espinosa did not suffer any medical harm as a result of being placed in Restrictive Housing.  His access to medical care while in Restrictive Housing was adequate and commensurate with the care he has received while in general population.  Further, in my opinion, Mr. Espinosa's claimed "mutism" is not a disability under the ADA because that condition does not substantially limit one or more major life activity as there is no evidence that he is actually mute.  Regardless, my understanding is that Mr. Espinosa is being housed at a facility for inmates who suffer from hearing impairments and has been classified as having an H3 hearing impairment in order to provide him access to a TTY phone. Additionally, he is accommodated by being able to communicate through writing.  There is no medical basis to exclude him from placement in Restrictive Housing.

### b.  James Kendrick

James Kendrick is a 42 year old black male with a medical history of Type II diabetes (on insulin), hypertension, hyperlipidemia and CDC Class III (severe) obesity. I reviewed his medical records (over 1,000 pages) with particular attention to 2018 onward. I find that his general medical care to be up to or exceeding medical and correctional medical standards. I find no difference in his medical care between General Population and Restrictive Housing. I find his access to medical care to be better while in Restrictive Housing.

Mr. Kendrick claims that he did not have issues with his diabetes in General Population but has had issues while in confinement. (Declaration ¶ 11). For example, Mr. Kendrick reported difficulty in obtaining his blood sugar checks and insulin injections. (Id.)  Extensive review of the record revealed that Mr. Kendrick refused care multiple times (to multiple different nurses, each time with an officer escort), but he was noncompliant to care more often prior to CM.  But we must not forget that the actual goal of diabetes care is not some set number of glucose checks, but to reduce the complications of diabetes that harm the patient and person in front of you. This is done best through monitoring of the HbA1c level throughout care. Mr. Kendrick came into FDC at Graceville with a (barely) in-range level of 6.9 (10/2016). Through very poor compliance to care and medication, his level rose distressingly to 12.4 (6/18) – a very high level – this was

while he was in General Population at Graceville. After transfer to FSP (6/20/18) and CM, and in CM care, his level reduced to 8.3 (8/23/18), then to excellent control at 5.9 (9/11/19) and remained good at the last available of 5.9 (4/20). All of this improvement was while under care in Restrictive Housing. He certainly did not come to any medical harm due to diabetes management while in Restrictive Housing. In fact, he was much healthier in this regard.

Mr. Kendrick has used the Grievance process to discuss a perceived problem with insulin timing compared to meal timing. Mr. Kendrick's regular and NPH insulin dosing (with NPH predominating) is generally slow acting, with the NPH peaking 6 to 10 hours after injection. This is a good practice in correctional settings because meal times and insulin times can vary, due to issues outside of housing staff or medical staff control. This helps to keep our diabetics from substantial hypoglycemia (bottoming out).  In reviewing Mr. Kendrick's record again, with particular focus from 2018 on, I did not find episodes of hypoglycemia causing any medical urgency or requiring intervention.

When it comes down to it, Mr. Kendrick has very little serious complaint that his medical conditions are not treated properly. In his deposition, Mr. Kendrick is asked, "Other than your shoulder, do you have any other medical conditions which you believe are not treated properly?" to which he responded, "Not that I can recall."  (Deposition, pg. 216).

I believe it is important for Mr. Kendrick to engage in regular activity and exercise. Besides exercise yard time, exercise can also be done in cell, as many inmates do. The FDC promotes and makes available their "IN-CELL EXERCISE PROGRAM" (N11-090 5/07). It is available in a 4-page handout with figures demonstrating the exercises.

And, Mr. Kendrick agrees. In his deposition, he responded as follows:

Q: While on DC, were you able to exercise in your cell?

A: I don't remember a time, told I couldn't.

Q: So you were able to?

A: Yes.

(Deposition, pgs. 114-115).

The WHO has a recommended exercise program for those at home due to the pandemic, entitled "STAY PHYSICALLY ACTIVE DURING SELF-QUARENTINE," which explains and outlines an exercise program that they show being done within the confines of a yoga mat. This is even smaller than the unencumbered space in CM cells. We expect our sailors in crowded ships, astronauts in the space station and our friends and family at home to remain healthy and fit with limited space; it is obviously possible.

At one point, Mr. Kendrick reported that while in CM, he has missed multiple medical encounters for his conditions and reported being forced to sign

refusals. (D.E. 311-11, p. 32). It is true that Mr. Kendrick refused care multiple times, but the allegation of so many forced signatures is an impossible conspiracy theory that would involve the complete and inerrant collaboration of multiple shifts of officers, multiple shifts of nurses, the Duty Wardens rounding, the Grievance Coordinator team, educators, inmate orderlies, mental health providers and others. Mr. Kendrick could have reported to any, or all of them and any one of these could have let the word out about this supposed recurrent abuse.

Mr. Kendrick had good, standard of care management of his blood pressure. Best practices in hypertensive care involve timing blood pressure monitoring to the likely need of intervention. Generally, if the person is under good control and stable on medication, the timing can be infrequent – as little as 1-2 times a year (VA/D0D Clinical Practice Guideline for the Diagnosis and Management of Hypertension in the Primary Care Setting. Version 4.0 - 2020). Under the foregoing scenario, little or no intervention is needed. More frequent measurement is needed when blood pressure is less in-control and medications are being adjusted or changed (more interventions are needed). This can be monthly, weekly, even daily or continually in extreme cases. Mr. Kendrick had poorer blood pressure control in General Population at Graceville before admission to CM – 169/118 (4/17), 171/123 (7/17), 170/113 (9/17), 174/113 (2/18), etc. and needed more frequent checks. He had much better control at FSP (and Restrictive

Housing) - 130/88 (about 2 months after transfer), 126/86 (10/19), 114/62 (9/20) and needed less frequent checks. There is no evidence that he came to any medical harm due to hypertension management while at FSP. In fact, he was much healthier in this regard.

After extensive review, I find that Mr. Kendrick did not have barriers to access of medical care while in Restrictive Housing and did not suffer any physical harm caused by Restrictive Housing. Further, in my opinion, Mr. Kendrick does not have a disability under the ADA because based on a review of his records, no claimed medical condition substantially limits one or more major life activity. Even assuming his conditions qualify as disabilities, they have been well-treated and managed appropriately during his time in Restrictive Housing. There is no medical basis to exclude him from placement in Restrictive Housing.

### c.  Jerome Burgess

Jerome Burgess is a 49 year old black male. He has a medical history of hypertension, cerebrovascular accident with residual left sided weakness (particularly left foot drop), seizure-like activity, and urinary retention (requiring self-catheterization). Medications include: Lisinopril, Citalopram, Amlodipine, aspirin, Keppra and Dilantin. I reviewed his medical records (about 800 pages) with particular attention to 2014 onward. I find that his general medical care to be up to or exceeding medical and correctional medical standards. I find no difference

in his medical care between General Population and Restrictive Housing. I find his access to medical care to be better while in Restrictive Housing.

Through the years, Mr. Burgess had numerous chronic care clinic appointments to follow and manage his conditions. This continued right through times in Restrictive Housing. He had numerous scheduled and unscheduled visits for urgent and non-urgent matters without any pattern of denial of needed care – regardless of housing.

Mr. Burgess is reported to have had a stroke in 2006 related to a hypertensive crisis. He has some residual weakness in the left leg, with left foot drop (for which he wears an AFO brace). He can stand and walk some - better with the brace on (per physical therapy notes and post-use-of-force video of Mr. Burgess). He uses a wheelchair, presumably for distances. In his declaration Mr. Burgess complains of an increased risk of falls. Although this may be true with his partial left sided leg weakness, there is no evidence that this risk is increased in Restrictive Housing. Regarding falls in Restrictive Housing, I could only find one record of an injury not caused by fighting with officers or other inmates. That injury was a minor scrape when he fell onto his wheelchair. There were no fractures or lasting effects from this incident.

In his declaration, Mr. Burgess stated that he needed a metal hinged brace for his leg that will support his weight, but was given a plastic brace in CM.

Hinged braces can be useful for joints that have torn supporting ligaments and joint instability from this. They do not support or restrict motion in the natural joint mobility and direction (unless the hinge is "locked" – which would defeat Burgess' intent). They do not support weak muscles in the normal directions of motion.

Mr. Burgess is currently diagnosed with a foot drop. This is where the muscles that lift the top of the foot are weak and when you lift up your leg the foot drops downward toward the floor. This creates a tripping hazard, because your foot gets in the way. A foot-drop type Ankle-Foot Orthotic (AFO) is designed to support only the weight of the foot when you lift it off the floor so that you don't trip on your foot. They are commonly plastic. It does not support your body weight. His doctor has prescribed an AFO for him, regardless of his housing, and that is what he has been using.

Mr. Burgess stated that he has a seizure disorder. However, Mr. Burgess' neurologist, Dr. Gama, thought that he was having psychogenic or pseudo – "seizures" (on 12/18/2014) and later confirmed the diagnosis (on 1/22/2015) after exams and review of EEG, MRI and records. Pseudo-seizures are when a person stiffens and shakes, but is not actually having epileptic activity in the brain. It is often related to anxiety and panic, sometimes it is purposeful and factitious. Mr. Burgess has refused to see neurology since then, but his primary doctor, Dr.

Gaxiola, has confirmed the diagnosis of pseudo-seizures as recently as June of 2020.

Regardless, the episodes have been infrequent. Through the years, the patient regularly reports having more than a year between episodes. The few episodes in the record show the security and medical staff responding in an appropriate and caring manner. Mr. Burgess has been given seizure medication - I assume in an abundance of caution.

Having epilepsy does not restrict most citizens regarding their housing or activities. Being an airline pilot or commercial truck or bus driver are generally out, but very little else. People live alone with epilepsy, they drive, they work nearly all jobs, and they are not barred from hard or stressful work. There is no reason for someone to be exempted from Restrictive Housing for epilepsy unless their doctor feels the condition is unstable and perhaps would be better managed in a restrictive infirmary cell.

Mr. Burgess reported that he was unable to access recreation because of his wheelchair. The only documentation I found of Mr. Burgess complaining of this was an informal grievance dated 6/30/2015. He wrote: "Every inmate in the USA is guaranteed recreation, but due to this institution not being a 'ADA' approved wheelchair camp I am unable to seek recreation."

The answer to the grievance is illuminating:

17

"I/M Burgess,
A review of your records reveals that the reason you are not going to
recreation is due your current DC status. Once you meet criteria for
recreation for DC inmates, accommodation will be made."

The institution was aware of Mr. Burgess' disability and ready to make

accommodation based upon his individual disability and needs. There is no reason

that a facility cannot accommodate an inmate in a wheelchair in Restrictive

Housing.

Mr. Burgess also makes claims of inconsistently receiving his preferred self-

catheterization supplies (coude'-tip type). (D.E. 311-11, p. 31). Although supply

chain problems can happen to any enterprise, and since each institution's medical

supply is through the same medical stores, in or out of CM, there would be the

same lack of a particular item in GP as CM in the same institution at the same

time. I only found evidence of one informal grievance from him regarding this, in

April 2016.

This answer to the grievance is also illuminating:

"O: Inmate complains of not receiving enough catheter supplies. A: Per K-
Dorm nurse Walker he is receiving the amount of supplies that was ordered
by the Dr. P: Informal Denied."

There was no formal grievance following this, so it seems the problem was solved.

In addition, Mr. Burgess regularly saw the Urologist through these years. It

would be natural to expect that Mr. Burgess would let the urologist know about

any serious catheter supply problem. There is never any notation that I could find,

or corrective order made regarding a lack of adequate catheter supplies. There is no complaint to any other medical provider or nurse that I found.

Mr. Burgess also claims repeated urinary tract infections. (D.E. 311-11, p. 31). Through the 6 years reviewed, I only found 2 periods of time when antibiotics were prescribed, February/March 2019 and February 2016. Both of these episodes were immediately following urologic procedures and presumably prophylactic. I saw a number of normal urinalyses (none positive) and no positive urine cultures. Mr. Burgess' kidney function has been normal and unaffected throughout (from 4/20/2013 to 3/27/2020), proving that he has come to no renal harm, regardless of complaint or insinuation.

Additionally, Mr. Burgess claims he was hospitalized while in CM due to these chronic disease exacerbations. (D.E. 311-11, p. 31). Regarding hospitalization during the period I reviewed, in June of 2020, Mr. Burgess was hospitalized for evaluation of possible Cerebrovascular Accident (CVA) but no CVA was found.

In October of 2020, he was hospitalized for monitoring of head trauma following an altercation (released without complication).

In August of 2019, he was hospitalized to remove a broken catheter tip from his urethra (removed by urology); this broken tip was from was Mr. Burgess' preferred coude'-tip type catheter.

In January of 2015, he was hospitalized for evaluation of possible CVA (none found, normal MRI and EEG). I do not find any relationship between these hospitalizations, his housing and his chronic conditions.

After extensive review of about 800 pages of medical records and a number of supporting documents, I find that Mr. Burgess did not have barriers to access of medical care while in Restrictive Housing and did not suffer any physical harm caused by Restrictive Housing.  I also find there is no medical basis to exclude him from placement in Restrictive Housing.

### d.  Johnny Hill

Johnny Hill is a 34 year old black male with a medical history of hypertension and vision problems. The most recent medication listing I have shows him taking Lisinopril, Abilify, Zoloft, Norvasc and aspirin.

Looking back through the years I see that Mr. Hill has been seen regularly in "Cardiovascular" Chronic Illness Clinic. When I looked at the records for the past 2 -3 years, I found multiple blood pressure readings. This was despite Mr. Hill's frequent refusals of health care services (I estimated 400 overall). I found: 132/72 (2/18/19), 116/83 (5/16/19), 130/84 (8/12/19), 148/85 (12/9/19 – after an altercation), 131/76 (3/5/20), 132/62 (5/20/20), 106/77 (7/2/20), 132/67 (8/17/20), 118/82 (10/30/20), 131/86 (12/24/20), 116/72 (1/21/21). There did not seem to be

any medication changes and these readings and frequency are quite acceptable for good community standard care.

Mr. Hill had a long history of gastrointestinal symptoms with intermittent bleeding from irritated esophagus or small tear from vomiting. He has had good and more than appropriate care with multiple upper endoscopies, biopsy, scans, medications, hospitalizations, blood work and colonoscopy. He has a history of repeated swallowing of foreign objects, including razor blades. He has been treated appropriately each time and has come to no avoidable harm.

In his deposition, Mr. Hill stated that he lost his vision in August of 2016 associated with a self-cutting incident just prior to a hanging incident. The hanging incident was 8/6/16 and he states he tied part of a sheet around his neck, but an officer interrupted him. There were no injuries noted on exam after the "hanging," with no note of abrasions or ligature marks on the neck. There was no report of loss of consciousness and he denied it in his psychological evaluation. Prior to this he had several cutting incidents with minor injury, the most proximate on 7/29/16. In all of these there were no loss of conscious, no low blood pressure, and no complaint of vision loss at the time of post-event evaluations.

The working diagnosis for Mr. Hill's vision complaint has been asphyxiation causing anoxic (no oxygen) brain injury from the hanging incident because this was the history that Mr. Hill provided. His ophthalmic clinic histories do not

mention cutting (with normal blood pressure). It makes sense that medical staff would note strangulation (knowing no details of the actual incident) because anoxic vision loss takes more than minor blood loss and feeling dizzy. It takes a profound and prolonged cutoff of blood flow/oxygen to cause cell death in anoxic retinal, optic nerve or brain injury associated with permanent vision loss. It is similar to a stroke, where blood flow/oxygen is cut off by a clot in an artery. We know that if blood flow can be restored within some minutes then damage is unlikely. We also know that once the stroke happens and stabilizes for hours, then the patient gets no worse (except if there is a second stroke) and may get better.

The eye doctors were able to rule out retinal and optic nerve disease to explain Mr. Hill's claimed change in vision. They could not diagnose anoxic brain injury, but left that as the most likely next explanation – if the visual change was accurate. Acute anoxic brain injury is not in the realm of ophthalmology. It does not happen in the eye clinic, nor does it happen in the neurologist's office. Acute anoxia happens in the Emergency Room, the Operating Room, or the Intensive Care Unit. Management of acute anoxia is the responsibility of the Emergency Physician, Anesthesiologist or Intensivist. As an Emergency Physician over 17 years, managing/minimalizing acute anoxia and anoxic brain injury was on my mind at all times and part of my daily practice – as it must be for all Emergency Physicians. Those precious minutes get the entire team's sole focus and the

parameters of how injury comes about are seared into our consciousness. Here, Mr. Hill did not have any event recorded or reported by him then or since that explains a bi-occipital visual cortex anoxic injury. He would likely have had coma associated and other brain areas destroyed. Also, any visual change should have been immediate and perhaps improve, not worsen, over months.

When Mr. Hill had an eye exam on 9/16/2016 (three or more weeks after the cuttings and two weeks after the hanging gesture. He gave the history of "car accident 2013, Back of Head" – no other causes mentioned. The exam showed "Best visual acuity 20/40-2 bilateral, patient history car accident." Two to three weeks after his incidents he showed 20/40 vision – he should have been stable from previous anoxia injury and might improve (HIL00012670). On 2/2/17 (six months after the incident) he showed 20/30 best corrected vision (HIL00012671). One of the challenges that can occur in assessing vision is that the examiner is very dependent on the cooperation of the patient. If someone tells you that they cannot see the 3rd line on the chart, but actually can see it, you have no immediate way of knowing that from what you are being told by the patient. The examiner simply writes down the visual acuity corresponding to the 4th line. The assumption is that the patient wants to demonstrate best vision, but there are occasionally circumstances where secondary gain comes into play.

There is no way for the clinic examiner to tell if the patient is not giving accurate cooperation regarding what he can see. Cooperation and accuracy come into question when the patient's actions show substantially different abilities than the claimed vision should allow.

On 2/27/17 (less than a month after the 20/30 exam from 2/2/17) Mr. Hill gives an exam of "finger count" vision only, with no improvement on refraction. This is where the patient cannot even see the big "E." The history Mr. Hill gave was "pt tried to hang himself July – then visual acuity went out October – No Improvement" "hanging explained" "Return to clinic as needed." Both of the above exams were well after October when his vision supposedly "went out" and he had "No Improvement" after (HIL00012672).

If true, this is extremely profound vision loss. He could find his food tray, but would not be able to identify what was on it without feeling or tasting the food. He would not be able to read or write, and not even be able to tell one paper from another except by size. He would not know which end was up. Yet, he continued (and continues today) to write sick call requests and grievances in small print and beautiful handwriting – even correcting his errors (that he should not be able to see). Additionally, Mr. Hill had 20/30 vision 3 weeks before (3 months after October).

On 5/13/17 he writes, "My vision has gotten real blurry and is getting dimmer and dimmer until the point where I can no longer read properly or at a distance" (HIL00003680). This would mean his vision is worse than the "count fingers" exam from 3 months before. But worse than "count fingers" is "hand motion." At this point, he would be challenged to find the door in a room. He would be unable to read at all, let alone write this inmate request. This makes no sense.

In June 2017 he shows 20/200 vision without correction (HIL00003677) – a substantial improvement from 2/28/17 (while he says he is worse in the 5/13/17 sick call request) - but miles below the capacity for ordinary reading. An exam on 4/17/18 shows 20/400 in his right eye and "hand motion" in his left eye (marginally better and worse than "finger count." History given: "Pt tried to hang himself in July 2016. Vision slowly dimmed and October 2016 pt noticed vision was gone.") (HIL00003677).

Yet, in deposition, Mr. Hill reports that he can read ordinary print with a "magnifying sheet," but it is somewhat difficult and would like to receive his documents in a larger font. This sort of 2-3X prismatic magnifying sheet gives about the same aid as the non-prescription "readers" by the registers at Walmart. If he is able to read with simple correction, he might not even be visually disabled, let alone profoundly blind.

In his deposition, Mr. Hill stated that he could not see the features of the face of a woman 2-3 feet from him. He could not tell what color her eyes were, could not tell the pattern on her coat or the color of it, and could not tell the color of the jacket of the attorney deposing him. However, during his evaluation with Dr. Saathoff, Mr. Hill could see objects to which Dr. Saathoff pointed. He could see and identify a tie, wedding ring, watch and clamp – everything offered him. Mr. Hill also told Dr. Saathoff that he does not really like sleeping during the day because he "might miss something." When asked, "Like what?" Mr. Hill replied, "Whatever might be going on outside of the door. I be trying to see everything I can."  Mr. Hill says he wants to be a witness to uses of force and officers violating [inmates' rights] and that he likes to see new inmates and certain staff coming into the wing. These statements are deeply inconsistent with his deposition testimony.

I do not often look up the criminal or other backgrounds and prison disciplinary charges of my patients. I treat my patients the same, regardless of their crimes and misbehaviors. Looking up this information can be medically useful though, when the patient's medical situation becomes puzzling or conflicting. For example, a patient who is asking for various medications for various conditions for which there are no objective findings, and the medications all have sedative side effects. If I look up and find that my patient has a long history of sedative drug

abuse, that is very helpful information for treating my patient well. I do not want to harm him by fueling a previous addiction.

Mr. Hill has a pre-prison criminal history of sexual battery and domestic abuse, among other things. In prison, he has around 30 disciplinary charges for lewd and lascivious conduct – much of it masturbating toward female staff. This includes nurses and mental health workers.

Unfortunately, sexual offenders are often targeted in prison for violence and vigilantism. The vast majority of the guys in prison have mothers, daughters, wives or sweethearts – and, personal "codes" regarding sexual abuse against such. Interestingly, in my experience, they can be very, very protective of our nurses, who are frequently a comfort to them. Many have little faith in our criminal justice system. The officers and systems try and try hard to stop such activities, but there is only so much they can do -- especially in General Population. Thus, we regularly find sexual offender inmates trying to use Medical to create some sort of protection. I believe Mr. Hill inadvertently alluded to this during his deposition:

Q. Okay. Do you have any concerns about your safety when you

move back to general population?

A. Yes and no.

Q. Explain that answer, please.

A. Well, there's always concern for a person's safety in prison,

especially a person with a disability. Right. But I feel that I would be

more -- I would be safer in general population for the simple fact that

I will be around more people, **more officers that can protect me if**

**need be, and there would be ultimately more eyes on me**, so I'm --

in that sense I'm not worried about my safety. But being in prison,

there's always a concern for a person's safety, whether you have a

disability or not.

Q. Do you believe there's any increased risk for you by being in

general population? And I mean as to your safety.

A. No, I don't believe that.

(Deposition, pgs. 145-146, emphasis added).

As an ordinary inmate in prison blues, among hundreds of other inmates in

blue out on the yard or in the dorm, he would likely not stand out in the officers'

eyes (it is unclear why there be "more eyes" on him).  But, with a white cane and

"blind-guy" sunglasses (that he is asking for despite saying everything is dim and

dark), he would stand out tremendously. It would be a great boost in his perceived

safety. And the cane can be an offensive and defensive weapon.

No conclusive evidence exists that this is Mr. Hill's incentive and plan;

however, this is a plausible explanation for the nonsensical incongruities of various

visual presentations and activities. This sort of thing is common in prison and I have regularly seen similar behaviors for secondary gain through the years.

Mr. Hill has been given accommodations that are beyond what his functional state seems to be. This is, I am sure, in an abundance of caution. I do not believe he can rightly claim that he has been deprived of reasonable accommodation in Restrictive Housing. Even ignoring his very high functioning and assuming the profound blindness that Mr. Hill reports during eye exams, he is being given reasonable accommodation.

The simple truth of this is that Mr. Hill is a very difficult patient to serve, as he obstructs his own care on a frequent basis. Despite this, the amazingly tolerant and empathetic staff have been beyond patient with him and have protected his health for years. They deserve commendation.

Mr. Hill does not register any particular complaint about his medical care (deposition, pg. 247), except that he would like to have the staff control his Lisinopril and give to him daily.

After extensive review of over 2,000 pages of medical records and an equal number of supporting documents, I find that Mr. Hill did not have barriers to access of medical care while in Restrictive Housing and did not suffer any physical harm caused by Restrictive Housing.  I also find there is no medical basis to exclude him from placement in Restrictive Housing.

### e. Tracey Dean

Tracey Dean is a 29 year old white female. I have reviewed the available medical record, with particular focus on 2018 onward, over 1,500 pages. I find that her general medical care to be up to or exceeding medical and correctional medical standards. I find no difference in her medical care between General Population and Restrictive Housing. I find her access to medical care to be better while in Restrictive Housing.

Ms. Dean has a medical history of previous mild hypothyroidism, possibly related to medication, that has normalized for some years. She had an abnormal (HSIL) PAP (5/5/20), for which follow-up has been recommended. At last check (2/5/20) she declined follow-up in FDC, preferring to do so post-parole.

Ms. Dean has moderate hearing loss (45-60 dB range) in both ears that predates incarceration. She has been prescribed hearing aids as a reasonable and appropriate accommodation.

Ms. Dean has a history of repeated self-harm, mostly cutting but a few incidents of suspected medication overdose. The majority of cutting incidents have been of the hesitation-type with very superficial injury, requiring only cleansing and bandaging. She has required sutures, and has received this care appropriately when needed. She has not required transfusion or hospitalization for this. She has

received post-injury/post-use-of-force medical evaluations appropriately through these incidents and SHOS treatment appropriately.

In her deposition, Ms. Dean agrees that she has been able to do in-cell exercise while in Restrictive Housing (Deposition pg. 86).

In her deposition, Ms. Dean had no complaints about her access or the quality of the medical care while in Restrictive Housing. And, when asked specifically, "Do you believe you received adequate medical care while you're in CM at Lowell?" she said, "Yeah." (Deposition, pg. 105).

After extensive review of over 1,500 pages of medical records and an equal number of supporting documents, I find that Ms. Dean did not have barriers to access of medical care while in Restrictive Housing and did not suffer any physical harm caused by Restrictive Housing.  I also find there is no medical basis to exclude her from placement in Restrictive Housing.

### f.  Jacquann Harvard

Jac'quann (Admire) Harvard is a 32 year old black, transgender woman. I have reviewed the available medical record, with particular focus on 2018 onward, about 900 pages. I find that her general medical care to be up to or exceeding medical and correctional medical standards. I find no difference in her medical care between General Population and Restrictive Housing. I find her access to medical care to be better while in Restrictive Housing.

Ms. Harvard began hormonal therapy for gender dysphoria in April of 2019. She had a formal Psychological Evaluation for Gender Dysphoria on 10/21/2018. Medically she has insulin dependent diabetes (diagnosed 7/22/21), hypertension (pre-incarceration) and hyperlipidemia. Medications include metformin, estradiol, insulin, spironolactone, Cogentin, Olanzapine and Effexor. After diagnosis and initial treatment for diabetes, she was transitioned to Chronic Illness Clinic (7/26/21) for long term management.

She had years of periodic health evaluations appropriate to her health care needs. Since her recent diagnosis of diabetes, she has had more attention – also appropriate to her current needs.

Type 1 diabetes is an autoimmune disorder with familial links. It is not believed to come from lifestyle and would not be caused by housing circumstances, such as Restrictive Housing:  Type 1 diabetes is thought to be caused by an autoimmune reaction (the body attacks itself by mistake) that destroys the cells in the pancreas that make insulin, called beta cells. This process can go on for months or years before any symptoms appear.

Some people have certain genes (traits passed on from parent to child) that make them more likely to develop type 1 diabetes, though many will not go on to have type 1 diabetes even if they have the genes. Being exposed to a trigger in the

environment, such as a virus, is also thought to play a part in developing type 1 diabetes. Diet and lifestyle habits do not cause type 1 diabetes.[4]

Ms. Harvard has been in various Restrictive Housing facilities. She describes widely different conditions and inmate experiences at the various facilities and circumstances, which demonstrate that the inmate experience is far from uniform across the various facilities and levels. Regardless, Ms. Harvard has no specific complaints about medical care and access in Restrictive Housing. Her declaration contains no complaints. She provided the following information during her deposition:

> Q. Okay, so I separate the world into medical care and mental health care, okay: so not counting mental health care, I'm just asking about medical, do you believe that you received adequate medical care while in CM?
>
> A. For the most part.
>
> Q. If you put in a sick call, did you get to see the doctor?
>
> A. Yes.
>
> Q. Were you ever refused?
>
> A. No.

---

[4]   *See* "What is Type 1 Diabetes?" https://www.cdc.gov/diabetes/basics/what-is-type-1-diabetes.html, last visited February 14, 2022.

Q. Did you ever request a medical appointment while in CM and you were denied?

A. No.

(Harvard Deposition, pgs. 86-87).

After extensive review, I find no evidence of lessening of her access to medical care in Restrictive Housing and no evidence of physical harm.  I also find there is no medical basis to exclude her from placement in Restrictive Housing.

### g.  Jeremiah Hill

Jeremiah Hill is a 20 year old black male. I have reviewed the available medical record, with particular focus on 2018 onward, over 500 pages, along with at least an equal number of pages of supporting document. I find that his general medical care to be up to or exceeding medical and correctional medical standards. I find no difference in his medical care between General Population and Restrictive Housing. I find his access to medical care to be better while in Restrictive housing.

Mr. Hill has no chronic medical problems. He has had multiple medical examinations and had blood pressure, etc. taken without finding any chronic medical problems. His only steady medication through the years was Buspirone in various doses. I saw no evidence that it was ever withheld from him or changed without a medical provider's order.

Mr. Hill has received multiple post-injury/post-use-of-force medical evaluations and was treated appropriately through these incidents and received SHOS treatment appropriately.

Shortly after having a below average score on an IQ test (he stated he was intoxicated during the test), he was brought out of CM to TCU for evaluation as to appropriate care going forward. His initial structured evaluation on 2/08/2021 stated the following: "SUBJECTIVE: Chief Complaint/Patient Statement(s): Patient stated that he is not sure why he was taken out of CM, but he believes that it is because of his current IQ score. Patient reports that he has been fine in CM and wants to go back as soon as possible. Patient stated that he has been DR free for almost a year and that his anger issues have become significantly better." (JH00002736). At this point he had been in CM/TCU for 10 months, progressing to CM2 and would progress to CM3 less than 2 months after release from TCU evaluation.

In his deposition, Mr. Hill agrees that he has been able to do in-cell exercise while in Restrictive Housing. (Deposition, pg. 112).

In his deposition, Mr. Hill had no complaints about his access or the quality of the medical care while in Restrictive Housing. And, when asked specifically, "Have you ever had a medical problem or a reported medical problem during checks that was not responded to?" he responded, "No, sir." (Deposition, pg. 74).

Mr. Hill also said that he did not remember ever asking to see a doctor or a nurse and being refused the opportunity to see one. (Deposition, pg. 71).

After extensive review of over 500 pages of medical records and at least an equal number of supporting documents, I find that Mr. Hill did not have barriers to access of medical care while in Restrictive Housing and did not suffer any physical harm caused by Restrictive Housing.  I also find there is no medical basis to exclude him from placement in Restrictive Housing.

## III.   <u>Conclusion</u>

I have reviewed the medical records of the seven named Plaintiffs with a particular focus on those records generated 2018 onward.  I find their access to care while in Restrictive Housing to be appropriate.  I find no evidence that any of the Plaintiffs have suffered any physical harm as a result of being in Restrictive Housing.

My opinions contained in this Declaration are given within a reasonable degree of medical certainty. I reserve the right to modify my opinions based on additional information learned in discovery.

Executed on February 17, 2022.



Reed Paulson, M.D.

# CURRICULUM VITAE

## Reed E. Paulson MD, MPH, CCHP-P, FAAFP
## Chief Medical Officer - Oregon State Penitentiary

Corrections Physician Specialist for the State of Oregon
Masters of Public Health – University of California, Berkeley
Certified Correctional Health Provider, Physician, - National Commission on Correctional Health Care
Certification in Opioid Use Disorder Treatment - USDEA/SAMHSA
Member, American College of Correctional Physicians
Fellow, American Academy of Family Physicians

## PERSONAL DETAILS

| | |
|---|---|
| Name | Reed Eric Paulson, MD |
| Address | 3855 Kalakala Circle, South Salem, Oregon 97306 |
| Telephone | 503 391-6064 (home) 503 932-9265 (work cell) |
| Email Address | reedpaulson@me.com |
| Date of Birth | June 27th, 1956 |
| Nationality | USA |
| Oregon License Number | MD 19597 |

## EDUCATION

| | |
|---|---|
| Masters of Public Health | University of California at Berkeley |

| | |
|---|---|
| 1989-90 | School of Public Health<br>Berkeley, California 94720 |
| Doctor of Medicine<br>1984 | Creighton University<br>School of Medicine<br>2500 California Street<br>Omaha, Nebraska 68178 |
| Masters Training and Research<br>1978-80 | San Jose State University<br>125 S. Seventh Street<br>San Jose, California 95192 |
| Bachelors of Biology<br>1975-78 | San Jose State University<br>125 S. Seventh Street<br>San Jose, California 95192 |

## MEDICAL TRAINING

| | |
|---|---|
| Doctor of Medicine<br>1984 | Creighton University<br>School of Medicine<br>2500 California Street<br>Omaha, Nebraska 68178<br>USA |
| Internship<br>1984-85 | University of California, Los Angeles<br>Harbor/UCLA Medical Center<br>1000 West Carson Street<br>Torrance, California 90502<br>USA |
| Residency Training<br>1985-87 | University of California, Los Angeles<br>Harbor/UCLA Medical Center<br>1000 West Carson Street<br>Torrance, California 90502<br>USA |

## CORRECTIONAL MEDICAL EXPERIENCE

*Years-long, hands-on clinical experience in each of the following areas:

Men's Maximum Security general population
Women's Maximum Security general population
Men's Infirmary
Women's Infirmary
Men's Intake Facility
Women's Intake Facility
Men's Mental Health Infirmary
Women's Mental Health Infirmary
Men's Death Row
Women's Death Row
Men's Behavioral Health Unit and Intermediate Care Housing
Men's Segregation
Women's Segregation
Women's Medium and Minimum Security general population
Hospice

## SELECTED CORRECTIONAL MEDICINE TEACHING

ODOC Health Services Spring 2017 Provider Meeting, April 13-14
- *Suturing Skills Workshop*

ODOC Health Services Fall 2015 Provider Meeting, September 10-11
- *Management of Musculoskeletal Pain*
- *The Emperor Has No Clothes – The Truth About Gabapentinoids*

ODOC Health Services Fall 2014 Provider Meeting, September 11-12
- *Splinting and Casting Workshop*

ODOC Health Services Spring 2013 Provider Meeting, May 16-17
- *American Heart Association/American College of Cardiology Guidelines on Lipid Management*

ODOC Health Services Fall 2011 Provider Meeting, September 29-30
- *Hands on Demo: Suturing, Casting and Splinting*

ODOC Health Services Spring 2010 Provider Meeting, May 13-14
- *Evaluating a Journal Article: Understanding POEM*

ODOC - New Physician's On The Job Training Manual
2011, 2013, 2015, 2017, 2019, (Currently under revision)

NCCHC 2021 National Conference on Correctional Health Care
- *Recognition, Management, and Pitfalls in Substance Intoxication and Withdrawal*

# CERTIFICATIONS

| | |
|---|---|
| 1981,1983, 1985 | National Board of Medical Examiners - Parts 1, 2, 3 |
| 1985 to 1996 (lapsed after move to Oregon) | California Board of Medical Examiners Licensed Physician and Surgeon |
| 1995 to present | Oregon Board of Medicine Licensed Physician and/or Surgeon |
| 1987 to present | American Board of Family Medicine Board Certification 1987, 1994, 2001, 2008, 2018 - 2028 |
| 1995 to 2005 | Certificate of Added Qualification in Sports Medicine American Boards of Family Medicine, Pediatrics, and Emergency Medicine |
| 1987 to 1992, 2001 to 2011 | Advanced Trauma Life Support Certification American College of Surgeons |
| 1982 to 2011 | Advanced Cardiac Life Support Certification American Heart Association |
| 1989 to 2010 | Advanced Pediatric Life Support Certification American Academy of Pediatrics |
| 2019 | Certified Correctional Health Care Provider – Physician National Commission on Correctional Health Care |

## APPOINTMENTS

| | |
|---|---|
| Correctional Physician Specialist and Chief Medical Officer 2009 to present | Oregon Department of Corrections Oregon State Penitentiary 2575 Center Street NE Salem, OR 97301 503 378-5593 |
| Emergency Medicine 2001 to 2009 | Emergency Department Samaritan Lebanon Community Hospital Lebanon, OR 97355 |
| Family Practice/Sports Medicine 1995 to 2001 (outpatient care) | Northwest Permanente, PC 500 NE Multnomah St. , Suite 100 Portland, OR 97232 503 813-3860 |
| Medical Staff 1995 to 2001 (in-hospital care) | Salem Hospital PO Box 14001 Salem, OR 97309 503 370-5200 |
| Emergency Medicine/Sports 1989 to 1995 | The Permanente Medical Group, Inc Kaiser Martinez Medical Center 200 Muir Road Martinez, CA 94553 510 987-3855 |
| Family Practice 1987 to 1989 | U. S. Public Health Service Indian Health Service Keams Canyon PHS Hospital Keams Canyon, Arizona 86034 |
| Emergency Medicine | St. Lukes Medical Center Rosing Emergency Medical Group 2632 E. Washington Blvd. Pasadena, CA 91109 |

## PRESENT APPOINTMENT
### Description

Chief Medical Officer, Oregon State Penitentiary
Oregon Department of Corrections

This has been the most medically challenging practice of my career. The Penitentiary is the medical hub and referral center for the entire Oregon state corrections system. We have the largest medical infirmary, the largest mental health infirmary, mental/behavioral units, disciplinary units and death row. We have access to all specialties and the Oregon Health Sciences University. Patients are sent to us from all over the state for advanced diagnosis and care.

I have learned much more medicine here than in my previous practices. Such things as bone marrow transplant, any and all cancers, end-stage heart disease/transplant candidates, ischemic/rhythmic/myometrial heart disease challenge us. Diverse neurologic, gastrointestinal, ophthalmologic, infectious, dermatologic, surgical, and urologic disorders (as well as many others) are our daily bread. We are the largest HCV treatment center in the state of Oregon. I am in daily consultation with multiple specialists. We also provide the largest comprehensive hospice care program in the state system.

As Chief Medical Officer I am in charge of the infirmary and I support and offer medical consultative support to the entire staff. I am responsible for Quality Management physician input and provider staff counseling. I am the lead physician/provider orientation instructor for the system.

I have also provided care at the intake center, where many of the new inmates have had partial or no diagnosis/care for serious maladies. The women's prison shares this site and I provided comprehensive women's health care at this facility for years. Prenatal care, mammography and hemodialysis are provided on-site. Diagnosis and treatment of all conditions are managed directly or co-managed with specialists

Adding to all of the above are the challenges of limited resources, staffing shortages, and facility shortcomings.

## MANAGEMENT AND ADMINISTRATION

| | |
|---|---|
| Chief Medical Officer | Oregon State Penitentiary |
| Quality Management (Medical) | Oregon State Penitentiary |
| Nurse Protocols and Provider Guidelines | Oregon Department of Corrections Health Services |
| Medical Student Preceptor | Oceana University School of Medicine |
| Masters of Public Health - Program Planning | University of California at Berkeley |
| Clinical Preceptor | Lebanon Community Hospital |
| Continuous Quality Assurance Committee | Lebanon Community Hospital |
| Physician Team Leader | Northwest Permanente – Salem |
| Physician Liaison – Call Center | Northwest Permanente – Salem |
| Quality Management Committee | Northwest Permanente – Salem |
| Standing/Preprinted Orders Project | Northwest Permanente – Salem |
| Chief of Medical Services | 1998 Nike World Masters Games |
| Quality Assurance Chief Department of Emergency Services | Kaiser Martinez Medical Center |
| CQI Project – Musculoskeletal Disorders | The Permanente Medical Group |
| Clinical Guidelines – Low Back Pain | The Permanente Medical Group |

Director of Medical Education          Keams Canyon PHS Hospital
And Resident Preceptorship

## VOLUNTEER ACTIVITIES

Young Life Ministries – Wildhorse Canyon: Medical Advisory Committee and
active physician volunteer.
Boy Scouts of America – many years volunteer and Scoutmaster
Christian Medical and Dental Society
Institute for Christian Conciliation
Crisis Pregnancy Center – Oakland, California: 1990 – 1995
Mexican Medical Ministries: 1991 – 1995
International Covenant Church Missions: 1992 - 1995
Los Medicos Voladores – The Flying Doctors 1989 -1995
The Institute for Latin American Concern 1983 – 1989
Venice Family Clinic 1986 – 1987
Indian – Chicano Health Center 1982 – 1984

16310695.v1

Reed E. Paulson MD, MPH, CCHP, FAAFP
**Medical-Legal Consulting**

Fee Schedule for Reed Paulson — 2020

| | |
|---|---|
| Hourly Consulting Fee (Record review, Phone conversations, Research, Reports drafting and revision, etc.) | $400/hour |
| Depositions in Oregon  (minimum 4 hours) | $450/hour |
|     Travel time portal to portal | $200/hour |
| Court Appearances in Oregon  (minimum 4 hours) | $475/hour |
|     Travel time portal to portal | $200/hour |

Depositions and Court Appearances outside Salem Oregon

| | |
|---|---|
| No overnight stay required, travel time portal to portal | $200/hour |
| Overnight stay required, daily rate<br>(No additional fees for travel time) | $3500/day |
| Depositions   (minimum 4 hours) | $400/hour |
| Court Appearances (minimum 4 hours) | $450/hour |

| | |
|---|---|
| Travel expenses (Air, ground transport, hotel, etc.) | Billed at cost |
|     Meals and incidentals | Federal |
| per diem | |
|     Mileage | Federal rate |

**Invoices payable upon receipt.**

**Materials Provided to Dr. Reed Paulson**

| Description/Filename | Bates | Confidentiality |
|---|---|---|
| █████████████████████ | AEO_DOCAV0562 | AEO |
| | AEO_DOCAV0563 | AEO |
| ████████████████████████ | AEO_DOCAV0564 | AEO |
| | AEO_DOCAV0649 | AEO |
| Plaintiff's Motion for Class Certification | DE 311 | |
| Robert Lee Adams 2021.02.26 | DepoTrans/EXH | |
| Maggie Agerton 2021.03.23 | DepoTrans/EXH | |
| Gwen Brock 2021.03.25 | DepoTrans/EXH | |
| John DeBell 2021.03.05 | DepoTrans/EXH | |
| David Ensley 2021.03.26 | DepoTrans/EXH | |
| Paula Foskey 2021.03.25 | DepoTrans/EXH | |
| Tammy Edwards 2021.03.05 | DepoTrans/EXH | |
| Wes Kirkland 2021.03.15 | DepoTrans/EXH | |
| Wes Kirkland 2021.03.16 | DepoTrans/EXH | |
| Rusty McLaughlin 2021.03.03 | DepoTrans/EXH | |
| Rusty McLaughlin 2021.03.11 | DepoTrans/EXH | |
| Michelle Schouest 2021.03.25 | DepoTrans/EXH | |
| Douglas Sexton 2021.03.25 | DepoTrans/EXH | |
| Jac'Quann Harvard | DepoTrans/EXH | |
| James Kendrick | DepoTrans/EXH | |
| Jerome Burgess | DepoTrans/EXH | |
| Johnny Hill | DepoTrans/EXH | |
| Dean Aufderheide 2021.03.30 | DepoTrans/EXH | |
| Tracey Dean | DepoTrans/EXH | |
| Dr. Homer Venters | DepoTrans/EXH | |
| Dan Pacholke | DepoTrans/EXH | |
| 403.008 Inmate Health Services Orientation & Education (eff 7-10-19) | DHA00000001 | |
| 604.101 Americans with Disabilities Act Provisions for Inmates (eff 10-30-18) | DHA00000065 | |
| F.A.C. 33-601.800 Close Management | DHA00000088 | |
| 601.211 Designation of Youthful Offenders (eff 9-12-19) | DHA00000101 | |
| 601.223 Institutional Classification Unit (eff 10-17-17) | DHA00000146 | |
| ████████████████████████ | DHA00000168 | AEO |
| | DHA00000181 | AEO |
| 602.036 Gender Specific Security (eff 2-6-19) | DHA00000187 | |
| 602.051 Wellness Education Program for Inmates (eff 8-15-18) | DHA00000223 | |
| 602.053 Prison Rape (eff 7-31-18) | DHA00000235 | |
| NI1-046 Close Management Housing Unit Instructions | DHA00000269 | |
| 501.106 Academic Education Programs (eff 8-30-18) | DHA00000401 | |
| 501.201 Special Education Services (eff 7-28-16) | DHA00000412 | |
| 502.001 Career & Technical Education for Inmates (eff 8-22-18) | DHA00000426 | |
| 501.310 General Library Programs (eff 8-16-19) | DHA00000483 | |
| 15.05.03 Screening and Treatment for Sexual Disorder (eff 2-6-14) | DHA00000563 | |
| 15.05.10 Psychiatric Restraint (2-2-16) | DHA00000569 | |
| 15.05.17 Intake Mental Health Screening (eff 11-8-16) | DHA00000605 | |
| 15.05.18 Outpatient Mental Health Services (eff 2-19-18) | DHA00000611 | |

## Materials Provided to Dr. Reed Paulson

| Description/Filename | Bates | Confidentiality |
|---|---|---|
| 15.05.20 Medical and Dental Care for Mentally Disordered Inmates (eff 8-1-19) | DHA00000632 | |
| 403.003 Health Services for Inmates in Special Housing (eff 2-23-18) | DHA00000647 | |
| 404.002 Isolation Management Rooms and Observation Cells (eff 3-15-18) | DHA00000657 | |
| F.A.C. 33-103 Inmate Grievances | DHA00001199 | |
| Mental Illness in Corrections: An Inconvenient Truth | DHA00002834 | |
| 15.01.06 Health Care Reception Process for New Commitments (7/31/19) | DHA00016013 | |
| 15.02.01 Med & MH Care Inquires,  Complaints  & Informal Grievances (7/31/19) | DHA00016022 | |
| 15.02.02 Health Care Clearance-Holds (eff 6-26-19) | DHA00016027 | |
| 15.03.05 Chronic Illness Monitoring and Clinic Guidelines (Rev 7-31-19) | DHA00016034 | |
| 15.03.13 Assignment of Health Classification Grades to Inmates (12/15/19) | DHA00016046 | |
| 15.03.22 Medical Emergency Care Plan & Guidelines (2/2/18) | DHA00016059 | |
| 15.03.25 Services for Inmates with Auditory,  Mobility  or Vision Impairments (Rev 12-15-19) | DHA00016069 | |
| 15.03.25.01 Auditory Services (eff 12-15-19) | DHA00016078 | |
| 15.03.25.02 Mobility Services (eff 12-15-19) | DHA00016084 | |
| 15.03.25.03 Vision Services (eff 12-15-19) | DHA00016091 | |
| 15.03.29 Pre-Release Planning for Continuity of Health Care (11/1/18) | DHA00016101 | |
| 15.14.04 Pharmacy Operations (eff 5-10-16) | DHA00016160 | |
| 501.108 Correspondence Study Courses (eff 10-30-18) | DHA00016217 | |
| 15.03.26 Infirmary Services (12/20/19) | DHA00016492 | |
| 403.009 Management of Hunger Strikes (12-20-18) | DHA00016514 | |
| 602.053 Prison Rape (eff 1-27-16) | DHA00016537 | |
| 602.053 Prison Rape (eff 8-15-16) | DHA00016554 | |
| 15.03.04 Periodic Screenings (7-31-19) | DHA00016654 | |
| NI1-122 Character Awareness and Motivation Program | DHA00017109 | |
| NI1-122 Character Awareness and Motivation Program | DHA00017109 | |
| 302.001 Admin Responsibilities and General Requirements (eff 9-5-18) | DHA00017263 | |
| 501.101 Title 1 Program (eff 3-7-19) | DHA00017328 | |
| 501.104 GED Testing (eff 5-30-18) | DHA00017353 | |
| 501.401 Admissible Reading Material Institutions (eff 9-27-18) | DHA00017392 | |
| 506.032 Faith and Character-based Residential Programs (eff 2-6-19) | DHA00017440 | |
| 506.102 Service Dog Training (eff 8-16-19) | DHA00017453 | |
| Health Services Bulletin Index | DHA00017900 | |
| F.A.C. 33-602.220 Administrative Confinement | DHA00026761 | |
| F.A.C. 33-602.222 Disciplinary Confinement | DHA00026770 | |
| Close Management Confinement Rules | DHA00027042 | |
| ███████████████████ | DHA00036786 | CONFID |
| 15.02.16 Inmate Medical Passes (eff 4-1-14) | DHA00055233 | |
| 15.14.05 Inmate Prescription Refills (eff 11-17-17) | DHA00071556 | |
| 602.213 Civil Commitment of Sexually Violent Predators (eff 9-2-18) | DHA00115780 | |
| ACA Audit Charlotte CI 2019 | DHA00157941 | |
| ACA Audit New River CI 2019 | DHA00158186 | |
| 15.14.03 Drug Formulary Process (eff 4-11-16) | DHA00188647 | |
| ASCA Use of Force Assessment (8-31-16) | DHA00188818 | |

**Materials Provided to Dr. Reed Paulson**

| Description/Filename | Bates | Confidentiality |
|---|---|---|
| 601.211 Designation of Youthful Offenders (eff 10-11-17) | DHA00189117 | |
| ███████████████████ | DHA00190419 | CONFID |
| Procedure Index (eff 4-6-20) | DHA00883772 | |
| Post Order Index (updated 3-27-19) | DHA00883875 | |
| Correctional Officer Mental Health Topics Instructor Guide (Rev 2018) | DHA00883984 | |
| Incarceration Confinement Management and MH Training Module | DHA00884204 | |
| ███████████████████ | DHA00885575 | AEO |
| ███████████████████ | DHA00885609 | AEO |
| ███████████████████ | DHA00885642 | AEO |
| ███████████████████ | DHA00885647 | AEO |
| ███████████████████ | DHA00885672 | AEO |
| ███████████████████ | DHA00885687 | AEO |
| ███████████████████ | DHA00885697 | AEO |
| ███████████████████ | DHA00885702 | AEO |
| ███████████████████ | DHA00885712 | AEO |
| ███████████████████ | DHA00886963 | AEO |
| AC Placement & Review (Rev 3-18) | DHA00887011 | |
| ███████████████████ | DHA00887069 | AEO |
| NI1-071 Health Comfort Items | DHA00887169 | |
| ███████████████████ | DHA00910946 | AEO |
| ███████████████████ | DHA00911046 | AEO |
| Alternative Segregation Pilot | DHA00911071 | |
| Analysis of the Segregation Process | DHA00911131 | |
| ███████████████████ | DHA00912864 | AEO |
| ███████████████████ | DHA00912880 | AEO |
| ███████████████████ | DHA00912900 | AEO |
| ACA 2016 ACI 4th Edition | DHA00922603 | |
| OHS-Mental Health Systems and Processes Review Okaloosa | DHA00923192 | |
| OHS-Mental Health Systems and Processes Review Calhoun | DHA00923195 | |
| OHS-Mental Health Systems and Processes Review Columbia | DHA00923208 | |
| OHS-Mental Health Systems and Processes Review Baker | DHA00928302 | |
| Nursing Site Visit Report Standards | DHA00928490 | |
| Nursing Site Visit Report Avon Park (2019) | DHA00928516 | |
| Nursing Site Visit Report Baker (2019) | DHA00928540 | |
| Nursing Site Visit Report Calhoun (2019) | DHA00928551 | |
| Nursing Site Visit Report CFRC East (2019) | DHA00928574 | |
| Nursing Site Visit Report Columbia Annex (Oct-Dec 2019) | DHA00928614 | |
| Nursing Site Visit Report Cross City (April-June 2019) | DHA00928659 | |
| Nursing Site Visit Report Dade (Sept-Nov 2019) | DHA00928696 | |
| Nursing Site Visit Report DeSoto (Oct-Dec 2019) | DHA00928730 | |
| Nursing Site Visit Report Everglades (Sept-Nov 2019) | DHA00928764 | |
| ███████████████████ | DHA00931598 | CONFID |
| ███████████████████ | DHA00933234 | AEO |
| 15.03.05 Chronic Illness Monitoring and Clinic Guidelines (Rev 1-7-15) | DHA00936559 | |
| 15.03.05 App #7 Neurology Clinic (rev 1-15) | DHA00936587 | |
| 15.03.05 App #8 Gastrointestinal Clinic (rev 1-15) | DHA00936590 | |

**Materials Provided to Dr. Reed Paulson**

| Description/Filename | Bates | Confidentiality |
|---|---|---|
| ███████████████████ | DHA01051146 | AEO |
| ███████████████████ | DHA01051326 | AEO |
| ███████████████████ | DHA01056085 | AEO |
| ███████████████████ | DHA01056310 | AEO |
| 404.005 Residential Continuum of Care Units (7-31-20) | DHA01083387 | |
| ███████████████████ | DHA01084942 | CONFID |
| ███████████████████ | DHA01102789 | AEO |
| ███████████████████ | DHA01102793 | AEO |
| ███████████████████ | DHA01102825 | AEO |
| ███████████████████ | DHA01102837 | AEO |
| ███████████████████ | DHA01103062 | CONFID |
| The Role of Security in Mental Health Inpatient Units | DHA01104850 | |
| Restoration Room Manual 2017 | DHA01118774 | |
| Scenic Room Operation Process | DHA01121703 | |
| Restrictive Housing Mental Health PowerPoint | DHA01140197 | |
| Restrcitive Housing MH 2018 | DHA01140197 | |
| Restrictive Housing NCCHC 2014 | DHA01140316 | |
| ███████████████████ | DHA01141302 | CONFID |
| 403.006 Sick Call Process and Emergencies (eff 6-19-20) | DHA01166081 | |
| 404.002 Isolation Management Rooms and Observation Cells (eff 6-9-20) | DHA01166081 | |
| Amend #1 | DHA01182821 | |
| Amend #2 | DHA01182823 | |
| FL accts lookup | DHA01182829 | |
| Gregory Pest Control-Signed Contract | DHA01182830 | |
| 6-16-2021 Cell Extraction IM Williams | DHA01183312 | |
| Examples for review | DHA01183313 | |
| Justice Quarterly JQ | DHA01184014 | |
| ███████████████████ | DHA1157556 | CONFID |
| ███████████████████ | DHA1157644 | AEO |
| 15.01.06 Health Care Reception Process for New Commitments (5/15/19) | DHA1157651 | |
| 15.02.01 Med & MH Care Inquires,  Complaints  & Informal Grievances (6/26/19) | DHA1157660 | |
| 15.03.04 Periodic Screenings (12-13-18) | DHA1157665 | |
| 15.03.25 Services for Inmates with Auditory,  Mobility  or Vision Impairments (Rev 2-2-18) | DHA1157685 | |
| 15.03.29 Pre-Release Planning for Continuity of Health Care (2/2/18) | DHA1157736 | |
| 15.03.25 Impaired Inmate Services (5/10/16) | DHA1157750 | |
| The Impacts of Restrictive Housing | DHA1162953 | |
| 604.101 Americans with Disabilities Act Provisions for Inmates (eff 8-18-20) | DHA1165831 | |
| 403.003 Health Services for Inmates in Special Housing (eff 10-2-20) | DHA1165857 | |
| ███████████████████ | DHA1165910 | CONFID |
| ███████████████████ | DHA1165923 | CONFID |
| ███████████████████ | DHA1165945 | CONFID |
| 601.211 Designation of Youthful Offenders (eff 10-12-20) | DHA1165991 | |
| 601.223 Institutional Classification Unit (eff 3-2-20) | DHA1166020 | |
| ███████████████████ | DHA1166031 | CONFID |

**Materials Provided to Dr. Reed Paulson**

| Description/Filename | Bates | Confidentiality |
|---|---|---|
| ███████████████████ | DHA1166050 | CONFID |
| 302.001 Admin Responsibilities and General Requirements (eff 2-2-21) | DHA1166119 | |
| 501.108 Correspondence Study Courses (eff 1-22-20) | DHA1166142 | |
| 501.108 Correspondence Study Courses (eff 12-15-20) | DHA1166149 | |
| ███████████████████ | DHA1166166 | AEO |
| 501.201 Special Education Services (eff 5-4-20) | DHA1166187 | |
| 502.001 Career & Technical Education for Inmates (eff 3-2-20) | DHA1166206 | |
| 506.032 Faith and Character-based Residential Programs (eff 5-20-20) | DHA1166218 | |
| 506.102 Service Dog Training (eff 6-25-20) | DHA1166232 | |
| 501.310 General Library Programs (eff 9-24-20) | DHA1166286 | |
| 501.401 Admissible Reading Material Institutions (eff 1-22-20) | DHA1166300 | |
| Health Service Bulletin Index (12-4-2020) | DHA1168528 | |
| 15.01.06 Health Care Reception Process for New Commitments (3-30-2020) | DHA1168899 | |
| 15.03.22 Att 1 (10-2-2020) | DHA1168944 | |
| 15.03.22 Medical Emergency Care Plan & Guidelines (10-2-2020) | DHA1168945 | |
| 15.14.04 App E (9-1-2020) | DHA1168973 | |
| 15.14.04 Pharmacy Operations (9-1-2020) | DHA1168974 | |
| 15.14.04 App A (9-1-2020) | DHA1168981 | |
| 15.14.04 App B (9-1-2020) | DHA1168991 | |
| 15.14.04 App C (9-1-2020) | DHA1169001 | |
| 15.14.04 App D (9-1-2020) | DHA1169009 | |
| 15.02.02 Health Care Clearance-Holds (9-1-2020) | DHA1169018 | |
| 15.14.03 Drug Formulary Process (10-2-2020) | DHA1169041 | |
| 15.02.16 Inmate Medical Passes (7-10-2020) | DHA1169044 | |
| 15.03.04 Periodic Screenings (11-13-2020) | DHA1169048 | |
| FW: Help | EHA00000046210 | |
| Disincentive Prison Names | EHA00000046211 | |
| 60 Minutes Segment on the German Prison System | EHA00001193 | |
| download (DOJ Final Report) | EHA00001194 | |
| SI402P3216042512310 (tablets/video visits) | EHA00001322 | |
| Meeting Statewide reorganization | EHA00001324 | |
| Fwd: K-2 Pilot Program | EHA00032502 | |
| K2 Dorm final Draft | EHA00032507 | |
| Restricted Housing Teams | EHA00039493 | |
| Alternative Housing FINAL | EHA00039496 | |
| Close Management Programming FINAL | EHA00039501 | |
| Close Management Release Programming FINAL | EHA00039506 | |
| Disciplinary Confinement FINAL | EHA00039510 | |
| Mental Health FINAL | EHA00039519 | |
| Restraint Levels FINAL | EHA00039525 | |
| Executive Order Tracking Document - Incentives - Disincentives CM-Specia... | EHA00039529 | |
| Executive Order Tracking Document - Focus Group-Inmate Behavior Manageme.. | EHA00039537 | |
| Alternative Housing - Step Down | EHA00069253 | |
| Agency Goals and Accomplishments | EHA00076572 | |

**Materials Provided to Dr. Reed Paulson**

| Description/Filename | Bates | Confidentiality |
|---|---|---|
| FDC Agency Goal 1 | EHA00076573 | |
| FDC Agency Goal 2 | EHA00076585 | |
| FDC Agency Goal 3 | EHA00076590 | |
| FDC_Agency Accomplishments Final 10-13 | EHA00076593 | |
| FW: Restrictive Housing Issue Documents | EHA00085332 | |
| 16-011 Confinement Step-Down Approach (Revised) | EHA00085333 | |
| 17-002 Restrictive Housing Metrics | EHA00085348 | |
| RE: decreasing inpatient population | EHA00273779 | |
| FW: Alternative Housing Briefing Sheet.msg | EHA00348576 | |
| Alternative Housing Update-final | EHA00348577 | |
| Survey Request (ASCA Members)- Restrictive Housing Litigation | EHA00413034 | |
| Restrictive Housing Litigation | EHA00413037 | |
| CMA Corrective Action Plan Polk | EHA00519766 | |
| TheMDSTProcess | EHA00527681 | |
| TheMDSTteam | EHA00527682 | |
| TPC Case Management | EHA00527684 | |
| FDC Restrictive Housing def | EHA00615484 | |
| CMA Corrective Action Plan Okeechobee | EHA00640935 | |
| FW: Teams for Processes Improvement Project.msg | EHA00656830 | |
| FW: RHP Flow Chart.msg | EHA00657072 | |
| Restrictive Housing Flow Chart | EHA00657073 | |
| Restrictive Housing Program Update | EHA00660524 | |
| Blackwater River CF.msg | EHA00661140 | |
| Blackwater River CF | EHA00661141 | |
| Program Expectations for Close Management - sent to Melvin.msg | EHA00661144 | |
| ATTCH: Program Expectations for Close Management - sent to Melvin | EHA00661145 | |
| SAMPLE StepDown Program PlanA | EHA00661363 | |
| ███████████████████████████ | EHA00661521 | AEO |
| ███████████████████████████████ | EHA00661523 | AEO |
| ████████████████████████████████████ | EHA00661525 | AEO |
| ██████████████████████████ | EHA00661535 | AEO |
| ██████████████ | EHA00661536 | AEO |
| DC5-704 - Substance Abuse Program Daily Status Change Sheet | EHA00661536 | |
| FSP RHP-Weekly Report 2018.03.01 | EHA00661799 | |
| FSP RHP-Weekly Report 2018.03.08 | EHA00661905 | |
| FSP RHP-Weekly Report 2018.03.14 | EHA00662012 | |
| FW Project Scope | EHA00662035 | |
| New River Correctional Institution UPDATED 08 01 17 | EHA00662036 | |
| APP C New River DC53 Projection | EHA00662043 | |
| APP B Access Program | EHA00662044 | |
| APP A NERCI Program Implementation Schedule jan 18 | EHA00662045 | |
| New River CI Orientation Video | EHA00662049 | |
| FSP RHP-Weekly Report 2018.03.22 | EHA00662110 | |
| FSP RHP-Weekly Report 2018.03.29 | EHA00662190 | |
| FSP RHP-Weekly Report 2018.04.05 | EHA00662215 | |

**Materials Provided to Dr. Reed Paulson**

| Description/Filename | Bates | Confidentiality |
|---|---|---|
| New River Working Schedule Template | EHA00662242 | |
| 04102018 Santa Rosa RHP Schedule | EHA00662261 | |
| FSP RHP-Weekly Report 2018.04.12 | EHA00662268 | |
| FSP RHP-Weekly Report 2018.04.19 | EHA00662339 | |
| FSP RHP-Weekly Report 2018.04.25 | EHA00662458 | |
| FSP RHP-Weekly Report 2018.05.03 | EHA00662460 | |
| FW: Phase One Incentive Comparables | EHA00662480 | |
| Phase One Incentive Comparables | EHA00662482 | |
| FSP RHP-Weekly Report 2018.05.10 | EHA00662501 | |
| FSP RHP-Weekly Report 2018.05.17 | EHA00662556 | |
| FSP RHP-Weekly Report 2018.05.24 | EHA00662567 | |
| FW: New River Incentive Comparable | EHA00662601 | |
| New River Incentive Comparables | EHA00662603 | |
| FSP RHP-Weekly Report 2018.05 31 | EHA00662643 | |
| NRCI Program Description Memo 4-2018 | EHA00662700 | |
| FSP RHP-Weekly Report 2018.06.07 | EHA00662736 | |
| FSP RHP-Weekly Report 2018.06.14 | EHA00662753 | |
| FSP RHP-Weekly Report 2018.06.21 | EHA00662783 | |
| FSP RHP-Weekly Report 2018.06.28 | EHA00662801 | |
| FSP RHP-Weekly Report 2018.07.05 | EHA00662823 | |
| FSP RHP-Weekly Report 2018.07.12 | EHA00662834 | |
| FSP RHP-Weekly Report 2018.07.19 | EHA00662850 | |
| FSP RHP-Weekly Report 2018.07.26 | EHA00662865 | |
| FSP RHP-Weekly Report 2018.08.02 | EHA00662895 | |
| FSP RHP-Weekly Report 2018.08.09 | EHA00662918 | |
| FSP RHP-Weekly Report 2018.08.16 | EHA00662955 | |
| Restrictive Housing Program | EHA00662968 | |
| FSP RHP-Weekly Report 2018.08.23 | EHA00662974 | |
| FSP RHP-Weekly Report 2018.08.30 | EHA00663016 | |
| FSP RHP-Weekly Report 2018.09.13 | EHA00663083 | |
| FSP RHP-Weekly Report 2018.09.20 | EHA00663089 | |
| FSP RHP-Weekly Report 2018.09.27 | EHA00663106 | |
| FSP RHP-Weekly Report 2018.10.04 | EHA00663127 | |
| FSP RHP-Weekly Report 2018.10.11 | EHA00663177 | |
| FSP RHP-Weekly Report 2018.10.18 | EHA00663204 | |
| FSP RHP-Weekly Report 2018.10.25 | EHA00663271 | |
| FSP RHP-Weekly Report 2018.11.01 | EHA00663314 | |
| FSP RHP-Weekly Report 2018.11.08 | EHA00663339 | |
| FSP RHP-Weekly Report 2018.11.15 | EHA00663355 | |
| FSP RHP-Weekly Report 2018.11.26 | EHA00663483 | |
| FSP RHP-Weekly Report 2018.12.03 | EHA00663500 | |
| FSP RHP-Weekly Report 2018.12.10 | EHA00663578 | |
| FSP RHP-Weekly Report 2018.12.17 | EHA00663832 | |
| FSP RHP-Weekly Report 2018.12.26 | EHA00663837 | |
| FSP RHP-Weekly Report 2019.01.02 | EHA00663965 | |
| FSP RHP-Weekly Report 2019.01.07 | EHA00664635 | |

**Materials Provided to Dr. Reed Paulson**

| Description/Filename | Bates | Confidentiality |
|---|---|---|
| FSP RHP-Weekly Report 2019.01.14 | EHA00665428 | |
| FSP RHP-Weekly Report 2019.01.24 | EHA00665769 | |
| Stepdown report 1.29 | EHA00666508 | |
| FSP RHP-Weekly Report 2019.01.31 | EHA00666674 | |
| FSP RHP-Weekly Report 2019.02.06 | EHA00667447 | |
| FSP RHP-Weekly Report 2019.02.14 | EHA00668279 | |
| FSP RHP-Weekly Report 2019.02.21 | EHA00669340 | |
| FSP RHP-Weekly Report 2019.02.28 | EHA00669601 | |
| FSP RHP-Weekly Report 2019.03.07 | EHA00669914 | |
| FSP RHP-Weekly Report 2019.03.14 | EHA00670601 | |
| FSP RHP-Weekly Report 2019.03.21 | EHA00670716 | |
| FSP RHP-Weekly Report 2019.03.28 | EHA00671159 | |
| FSP RHP-Weekly Report 2019.04.04 | EHA00671542 | |
| FSP RHP-Weekly Report 2019.04.11 | EHA00671979 | |
| FSP RHP-Weekly Report 2019.04.25 | EHA00673587 | |
| FSP RHP-Weekly Report 2019.05.02 | EHA00674430 | |
| FSP RHP-Weekly Report 2019.05.09 | EHA00675985 | |
| FSP RHP-Weekly Report 2019.05.15 | EHA00676344 | |
| FSP RHP-Weekly Report 2019.05.22 | EHA00677560 | |
| Stepdown Program 5.24 | EHA00677865 | |
| FSP RHP-Weekly Report 2019.05.29 | EHA00678812 | |
| FSP RHP-Weekly Report 2019.06.05 | EHA00679859 | |
| FSP RHP-Weekly Report 2019.06.12 | EHA00680792 | |
| FSP RHP-Weekly Report 2019.06.19 | EHA00682009 | |
| FSP RHP-Weekly Report 2019.06.26 | EHA00682826 | |
| FSP RHP-Weekly Report 2019.07.03 | EHA00684123 | |
| FSP RHP-Weekly Report 2019.07.10 | EHA00684926 | |
| FSP RHP-Weekly Report 2019.07.17 | EHA00686162 | |
| FSP RHP-Weekly Report 2019.07.24 | EHA00686949 | |
| FSP RHP-Weekly Report 2019.07.31 | EHA00687523 | |
| FSP RHP-Weekly Report 2019.08.07 | EHA00687969 | |
| FSP RHP-Weekly Report 2019.08.14 | EHA00688324 | |
| FSP RHP-Weekly Report 2019.08.21 | EHA00688825 | |
| FSP RHP-Weekly Report 2019.08.28 | EHA00689656 | |
| FSP RHP-Weekly Report 2019.09.04 | EHA00689776 | |
| FSP RHP-Weekly Report 2019.09.11 | EHA00690412 | |
| FSP RHP-Weekly Report 2019.09.18 | EHA00690823 | |
| Fwd Additional Information | EHA00691049 | |
| RHP Information Sheet | EHA00691051 | |
| 2019 Revised Agency Award for RHP – 04052019 | EHA00691052 | |
| New River CI - Program Information Sheet – 09182019 | EHA00691057 | |
| FSP RHP-Weekly Report 2019.09.25 | EHA00691230 | |
| Stepdown report 10.24 | EHA00694168 | |
| RE: Anger Management Books.msg | EHA00697565 | |
| Personal Growth- Introspection, Insight & Initiative | EHA00697571 | |
| Learning From Situations 7-E | EHA00697594 | |

**Materials Provided to Dr. Reed Paulson**

| Description/Filename | Bates | Confidentiality |
|---|---|---|
| Planning Ahead 7-D | EHA00697603 | |
| RE: Self-Reflection Packet.msg | EHA00697947 | |
| New River StepDown - Reflection Packet - Confinement 02182020 | EHA00697950 | |
| Useful Idea Map – SelfReflection | EHA00697962 | |
| Standalone Concept Boxes | EHA00697963 | |
| Loose Page - Personal Action List | EHA00697966 | |
| RE: MM Step Down Program.msg | EHA00698721 | |
| ATTCH: Review of MM Proposal | EHA00698727 | |
| ATTCH: FSP - MM to CM 3.4.20 | EHA00698728 | |
| ███████████████ | EHA00741425 | HIPAA |
| FW: CM / DC Conference Call.msg | EHA00773762 | |
| ATTCH: Analysis of the Segregation Process – White Paper 20160113 FINAL | EHA00773764 | |
| Fwd Disciplinary instruction follow up.msg | EHA00807735 | |
| 20161026 Disciplinary Process and Confinement | EHA00807737 | |
| email proposed penalty changes_2017_02_01_09_17_31_786 | EHA00807740 | |
| Penalty Scale as of 05032019-2 | EHA00807742 | |
| Administrative Overview of Restrictive Housing.msg | EHA00865410 | |
| Administrative Overview of Restrictive Housing 08022019 | EHA00865411 | |
| FW: CM Programming | EHA00978291 | |
| Tracking Document - CM Programming | EHA00978293 | |
| Restrictive Housing Summary & Program Recommendation - Proposed - 0706... | EHA00978296 | |
| Program Provision Plan  07082016 | EHA00978299 | |
| Proposed CM Program Schedule | EHA00978325 | |
| Fwd: Survey Results - Reduced Restraints - Jefferson CI | EHA00985688 | |
| Inmate Behavior Final 2 | EHA00988682 | |
| Survey Results - Reduced Restraints 6-2-2016 | EHA00988755 | |
| RE Restrictive Housing Curriculum Team.msg | EHA00997689 | |
| Taff RHP Proposal | EHA00997694 | |
| FW: Charlotte CM Proposal revised | EHA01056948 | |
| ███████████████ | EHA01056950 | AEO |
| | EHA01056951 | AEO |
| | EHA01056952 | AEO |
| | EHA01056953 | AEO |
| | EHA01056954 | AEO |
| Reduced Restraint Pilot Stats | EHA01121666 | |
| Copy of RR Monthly Chart and Data for October 2017- 112917 | EHA01121667 | |
| Reduced Restraint Pilot | EHA01121685 | |
| RR Monthly Chart and Data | EHA01121686 | |
| Charts for CM/AC/DC | EHA01121981 | |
| Inmate Pop - CM-DC-AC Total Charts | EHA01121982 | |
| Incentivized Prison – Everglades CI | EHA01122663 | |
| EPIC CommunityFinal | EHA01122664 | |
| Team - Metrics 20170313 | EHA01122665 | |
| Everglades Incentivized Prison- Programs 3-14-17 | EHA01122669 | |
| Team – Eligibility | EHA01122671 | |

**<u>Materials Provided to Dr. Reed Paulson</u>**

| Description/Filename | Bates | Confidentiality |
|---|---|---|
| Copy of Incentivized Prison- Incentives Analysis1 | EHA01122674 | |
| Team – Programs | EHA01122675 | |
| RE: Incentivized Prison / Everglades.msg | EHA01122685 | |
| Everglades Concept 5-15-17 | EHA01122687 | |
| RE: Reduced Restraint Metrics | EHA01126556 | |
| Reduced Restraints - Jefferson 170228 | EHA01126558 | |
| Reduced Restraints - Columbia Annex 170228 | EHA01126559 | |
| RE: Data for Restrictive Housing.msg | EHA01128689 | |
| ATTCH: RHP 19JUN19 | EHA01128694 | |
| FW: DC Summary with Charts | EHA01132397 | |
| DC Summary with Charts | EHA01132398 | |
| FW Alternative Housing Pilot.msg | EHA01133748 | |
| ATTCH: AH Stats 110117 | EHA01133750 | |
| Restricted Housing Update – Comerford | EHA01133805 | |
| Restricted Housing Update – Comerford | EHA01133806 | |
| FW: | EHA01133944 | |
| rule notice Incentivized Prison Program – Copy | EHA01133947 | |
| Incentivized Prison expansion  05 21 2019 | EHA01134466 | |
| Everglades Incentivized Prison Charts and Facts | EHA01134532 | |
| Everglades C.I. (Incentivized Prison) Charts May 2019 | EHA01134533 | |
| Incentivized Prison Fact Sheet 6-24-19 | EHA01134534 | |
| Incentivized Prison Fact Sheet (Long) 6-24-19 | EHA01134536 | |
| FW: ECI Orientation Lesson Plan | EHA01141123 | |
| ECI Orientation Lesson Plan | EHA01141125 | |
| Orientation Lesson Plan 10.01.2018 - Warden Glenn Morris | EHA01141145 | |
| FW: Inmate Orientation | EHA01141486 | |
| Everglades Incentivized Prison | EHA01141489 | |
| Everglades Incentivized Prison excerpt 01.10.2019 | EHA01141490 | |
| FW: IPC – Incentivized Prison Concept Everglades | EHA01142299 | |
| Everglades Concept Full 6-22-17 | EHA01142300 | |
| Incentivized Prison Concept Timeline 062317 | EHA01142304 | |
| Copy of Incentivized Prison- Incentives Analysis-062317 | EHA01142307 | |
| Incentivized Prison Briefing 6-29-17 | EHA01142308 | |
| Incentivized Prison Conference Call Minutes 2-24-17 | EHA01142634 | |
| Incentivized Prison update 2  2 07 2020 | EHA01142787 | |
| Inmate Handbook | EHA01156056 | |
| FW: Administrative Management Unit | EHA01178678 | |
| DRAFT A - 33-601.xxxx Administrative Management Unit Draft 12-02-2019 | EHA01178680 | |
| DRAFT B - 33-601.xxx Administrative Management Unit Draft 12-02-2019 | EHA01178686 | |
| DRAFT C - 33-601.xxx Administrative Management Unit Draft 12-02-2019 | EHA01178689 | |
| Drafts A, B,  & C Pros and Cons - Administrative Management Unit 12-02-2019 | EHA01178698 | |
| ██████████████████ | EHA01181262 | CONFID |
| Demetrius Spires #890758 | PIR00000251-1647 | HIPAA |
| Frank Taylor #119422 | PIR00002753-3115 | HIPAA |
| Kiko Rogers #B06280 | PIR00011785-12882 | HIPAA |

**Materials Provided to Dr. Reed Paulson**

| Description/Filename | Bates | Confidentiality |
|---|---|---|
| Tracey Wright #361209 | PIR00022613-23080 | HIPAA |
| | PIR00026417-27770 | |
| Stacey Cilien #157126 | PIR00040461-40814 | HIPAA |
| | PIR00044939-44944 | |
| | PIR00047131-47137 | |
| John Meyers #084289 | PIR00050847-51375 | HIPAA |
| Freddie White #D47975 | PIR00056494-56981 | HIPAA |
| | PIR00064946-65428 | |
| Brandon Welch #T63355 | PIR00069731-69936 | HIPAA |
| | PIR00055207-55213 | |
| Johnny Hill 1st RP-19 | PLS0000001-3 | |
| Juan Espinosa 1st RP-19 | PLS0000004-6 | |
| Jerome Burgess 1st RP-19 | PLS0000007-8 | |
| Dan Pacholke's Notes FSP (not redacted) | PLS0003567-3763 | |
| Dan Pacholke's Notes on Santa Rosa (not redacted) | PLS0003625-3763 | AEO |
| AEO FSP Inspection Photos 4th RP-14 | PLS0006200-6337 | AEO |
| AEO Hamilton Inspection Photos 4th RP-14 | PLS0006338-6402 | AEO |
| AEO Lowell Inspection Photos 4th RP-14 | PLS0006403-6563 | AEO |
| AEO Santa Rosa Annex Inspection Photos 4th RP-14 | PLS0006564-6591 | AEO |
| AEO Santa Rosa Main Inspection Photos 4th RP-14 | PLS0006592-6683 | AEO |
| AEO Suwannee Inspection Photos 4th RP-14 | PLS0006684-6765 | AEO |
| AEO Union Inspection Photos 4th RP-14 | PLS0006766-6848 | AEO |
| LF Espinosa 4th RP-13 | PLS0006909-7002 | |
| Supplemental Response to RFP #13 (4th RP) | PLS0007843-7926 | |
| Supplemental Response to RFP #14 (4th RP) | PLS0007927-7944 | |
| Juan Espinosa Medical & Classification Records: 2015-Present | | |
| Jac'Quann Harvard Medical & Classification Records: 2015-Present | | |
| Jeremiah Hill Medical & Classification Records: 2015-Present | | |
| Johnny Hill Medical & Classification Records: 2015-Present | | |
| James Kendrick Medical & Classification Records: 2015-Present | | |
| Jerome Burgess Classification Records: 2015-Present & Medical Records: 2002-Present | | |
| Tracey Dean Medical & Classification Records | | |
| DF FDC's 1st RP to PL Burgess | | |
| DF FDC's 1st RP to PL Espinosa | | |
| DF FDC's 1st RP to PL Harvard | | |
| DF FDC's 1st RP to PL Jeremiah Hill | | |
| DF FDC's 1st RP to PL Johnny Hill | | |
| DF FDC's 1st RP to PL Kendrick | | |
| DF FDC's 2nd RP to PL | | |
| DF FDC's 3rd RP to PL | | |
| DF FDC's 4th RP to PL | | |
| PL Burgess' Amended Response to DF's 1st RP | | |
| PL Espinosa's Amended Response to DF's 1st RP | | |
| PL Harvard's Amended Response to DF's 1st RP | | |
| PL Jeremiah Hill's Amended Response to DF's 1st RP | | |

## Materials Provided to Dr. Reed Paulson

| Description/Filename | Bates | Confidentiality |
| --- | --- | --- |
| PL Johnny Hill's Amended Response to DF's 1st RP | | |
| PL Kendrick's Amended Response to DF's 1st RP | | |
| PL's Response to DF's 2nd RP | | |
| PL's Response to DF's 3rd RP | | |
| PL's Response to FD's 4th RP | | |
| PL's 2nd Supplemental Response to FD's 4th RP | | |
| DF FDC's INT to PL Burgess | | |
| DF FDC's INT to PL Espinosa | | |
| DF FDC's INT to PL Harvard | | |
| DF FDC's INT to PL Jeremiah Hill | | |
| DF FDC's INT to PL Johnny Hill | | |
| DF FDC's INT to PL Kendrick | | |
| PL Burgess' Verified Supplemental Response to FDC's INT | | |
| PL Espinosa's Verified Supplemental Response to FDC's INT | | |
| PL Harvard's Verified Supplemental Response to FDC's INT | | |
| PL Johnny Hill's Verified Supplemental Response to FDC's INT | | |
| PL Burgess' Verified Supplemental Response to FDC's INT | | |
| PL Kendrick's Verified Supplemental Response to FDC's INT | | |
| DF's RSP to PL's 1st RP to FDC | | |
| DF's RSP to PL's 2nd RP to FDC | | |
| DF's RSP to PL's 3rd RP to FDC | | |
| DF's RSP to PL's 4th RP to FDC | | |
| DF's RSP to PL's 5th RP to FDC | | |
| PL's 1st RP to FDC | | |
| PL's 2nd RP to FDC | | |
| PL's 3rd RP to FDC | | |
| PL's 4th RP to FDC | | |
| PL's 5th RP to FDC | | |
| DF's RSP to PL's 1st RP to INCH | | |
| DF's RSP to PL's 2nd RP to INCH | | |
| DF's RSP to PL's 3rd RP to INCH | | |
| DF's RSP to PL's 4th RP to INCH | | |
| DF's RSP to PL's 5th RP to INCH | | |
| DF's RSP to PL's 6th RP to INCH | | |
| DF's RSP to PL's 7th RP to INCH | | |
| DF's RSP to PL's 8th RP to INCH | | |
| DF's RSP to PL's 9th RP to INCH | | |
| DF's RSP to PL's 10th RP to INCH | | |
| DF's RSP to PL's 11th RP to INCH | | |
| PL's 1st RP to INCH | | |
| PL's 2nd RP to INCH | | |
| PL's 3rd RP to INCH | | |
| PL's 4th RP to INCH | | |
| PL's 5th RP to INCH | | |
| PL's 6th RP to INCH | | |
| PL's 7th RP to INCH | | |

## Materials Provided to Dr. Reed Paulson

| Description/Filename | Bates | Confidentiality |
|---|---|---|
| PL's 8th RP to INCH | | |
| PL's 9th RP to INCH | | |
| PL's 10th RP to INCH | | |
| PL's 11th RP to INCH | | |
| Dr. Homer Venters' Appendix B Documents | | |
| DRF 2 Settlement Agreement Fully Executed | DHA01217478 | |
| Juan Espinosa #419680 2021.12.19.PDF | DHA01218016 | |
| Johnny Hill #J33728 2021.12.18.PDF | DHA01218141 | |
| Juan Esinposa Notes from CME.PDF | DHA01218371 | |
| Jac'Quann Harvard #L66795 2022.01.02 CME | DHA01219456 | |
| James Kendrick #Y06426 2021.12.31 VOL 1 CME | DHA01219693 | |
| James Kendrick #Y06426 2021.12.31 VOL 2 CME | DHA01219900 | |
| Jeremiah Hill #J56775 2022.01.01 CME | DHA01220070 | |
| Jerome Burgess #990922 2022.01.03 CME | DHA01220315 | |
| Juan Espinosa's book | PLS0031681 | |
| 15.03.13 Assignment of Health Classification Grades to Inmates (3/30/2020) | DHA01140303 | |