EXHIBIT M

EXHIBIT M

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAC'QUANN (ADMIRE) HARVARD; JEREMIAH HILL; JUAN ESPINOSA; JEROME BURGESS (a/k/a SHAM'LA GOD ALLAH); JAMES W. KENDRICK, JR.; JOHNNY HILL; and TRACEY DEAN; on behalf of themselves and all others similarly situated,

        Plaintiffs

v.

RICKY DIXON, in his official capacity as Secretary of the Florida Department of Corrections, and FLORIDA DEPARTMENT OF CORRECTIONS, an Agency of the State of Florida

        Defendants.

Case No.: 4:19-cv-00212-AW-MAF

**SUPPLEMENTAL EXPERT REPORT OF HOMER VENTERS, M.D., M.S.**

1

I, Homer Venters, M.D., M.S., declare:

1.      I have personal knowledge of the matters set forth herein and if called as a witness I would competently so testify.

## II.     NATURE AND BASIS OF EXPERT OPINION

2.      To formulate my findings and reach the supplemental opinions in this report, I have relied on my professional expertise and knowledge as well as observations from additional facility inspections. Since my last report, I have conducted physical inspections of Columbia Correctional Institution and Annex (Columbia) on March 15 and 16, 2022, and Reception and Medical Center (RMC) on March 17, 2022. I reserve the right to supplement my opinion with additional facts and data, including from Columbia and RMC healthcare records that Plaintiffs requested and Defendants have 30 days to produce.

3.      My inspections at RMC and Columbia generally included walking through the facility medical clinic, mental health clinic, and housing areas dedicated to confinement, including unoccupied cells. I was also able to inspect the sick call or triage rooms in both facilities in the various isolation units. FDC staff and counsel were present during these inspections, as well as other members of Plaintiffs' legal team.

4.      During these two inspections, I had brief conversations with 69 confined people in restrictive housing areas and then conducted in-depth

2

interviews of 10 people at Columbia. My approach in these discussions was as previously described, including stating to each person that speaking with me was voluntary.

5. As I reported previously, it is my expert opinion that FDC subjects people to a serious risk of death and illness through its use of confinement. The two recent inspections I conducted have only served to strengthen my opinion that the serious risks to health imposed on people in confinement by FDC are systematic and widespread. RMC was noteworthy in particular because FDC had transported several people there to receive medical care for serious health-related issues (not for disciplinary or other punishment reasons), but held them in restrictive housing despite their heightened vulnerabilities to isolation conditions.

6. My overall opinion continues to be that so long as FDC fails to comport with correctional norms and standards to eliminate the widespread and prolonged use of solitary confinement in its facilities, FDC will continue to maintain a system that subjects all persons to a serious risk of death and illness.

### III.   SYSTEMIC HEALTH RISKS PRESENT IN CONFINEMENT IN COLUMBIA AND RMC FACILITIES

7. I observed the following health risks and deficiencies in care for people in confinement in the two recent FDC facilities I recently inspected.

8. **Lack of nursing rounds**. By far the most reported deficiency in these two confinement settings was a near total lack of daily nursing rounds to the cells

3

of each person in confinement. FDC has stated that they have a policy of making rounds on every cell every day inside confinement settings. My prior report included evidence that FDC is aware it has not consistently implemented this policy, despite the assurances of their medical expert that these rounds are meaningfully and reliably completed. During these most recent inspections, 64 people reported to me that there is no daily rounding of every cell, and no person reported that nurses complete rounds in all cells on a daily basis. Instead, people consistently reported that if a person is scheduled to receive a medication, a nurse may go to their cell door for that purpose, but that no daily check of each cell occurs by nursing staff. These reports are highly consistent with the findings in my prior expert report that were based on my interviews with other detained people, as well as my review of video footage of nurse rounds at other institutions, emails, and audits identifying this deficiency.

9.      **False or coerced refusals of medical care**. Another risk to health in FDC confinement that I previously reported is the practice of either coercing refusal for scheduled health appointments, or simply failing to bring people to their appointments and falsely documenting a refusal without the signature of the patient. This practice is often reported to stem from security staff not taking people out of their cells to their scheduled appointments. During these two inspections, 23 people reported experiencing this practice. This practice was so commonplace that

4

several people did not perceive being offered a food tray or other reward to skip a medical appointment as contrary to FDC policies. As with my prior inspections, people reported that they were sometimes threatened with "Strip" or being "gassed" if they did not take the rewards for skipping an appointment, and others reported that they simply were never told when they missed an appointment because security staff never took them. One person at Columbia reported that in confinement, he filled out a sick call form for coughing up blood, but that he was not seen for more than a week, and when he was finally seen, he was asked why he refused his call out, which he reported being unaware of and never refusing. Another person at Columbia who reported having hypertension and kidney failure stated that he had been recorded as refusing an appointment with a kidney specialist while in confinement and that he was only made aware of this when he went to a sick call for an unrelated rash weeks later and the provider asked why he had refused such an important and difficult to schedule encounter.

10.     **Lack of access to sick call**. A third barrier to health care reported among people I spoke with at both institutions involved an inability to access sick call when they had new medical problems. Among the people I spoke with, 28 reported that they were unable to either request sick call or receive a sick call encounter in less than one week. Part of the barriers to sick call involve an inability to speak with the nurse who passes by, either to deliver medications or to pick up

5

sick call slips. People consistently reported that if they attempted to stand at their door to get the attention of the nurse, they were threatened by correctional officers to get off their door, with potential punishments of being gassed, put on strip, or being beaten. Because the nurses did not always collect sick call forms in the doors, and because these slips were sometimes not available to people in confinement, the inability to make contact with the passing nurse meant that they were unable to initiate sick call requests. People also reported that sick call requests routinely went unanswered for more than one week, with some requests never responded to. One person at Columbia with multiple medical and psychiatric diagnoses and medications reported that he had given up on sick call because of the numerous requests that went unanswered.

11.   **Medication expiration**. An important subset of health care barriers in confinement involves people who are unable to receive their medications, despite pre-existing prescriptions and diagnoses for health problems. This issue was reported by 32 of the people I spoke with. People reported at both institutions that while their keep-on-person (KOP) or daily administered medications may have been available in the initial days of confinement, their medication orders would expire and it would take many days and even weeks of trying to get the attention of passing nurses before their medications were restarted. One man at Columbia who reported being on medications for multiple medical and psychiatric diagnoses

6

reported that all his medications were intermittently stopped during confinement because he was unable to get the attention of health staff to restart them when a prescription ran out. He further reported that this resulted in one to three week interruptions of his medications for HIV, hypertension, and psychiatric problems. Another person at Columbia reported a history of heart attacks, coronary bypass surgery, and interruption of his heart medications for multiple weeks when in confinement. Another person at Columbia with longstanding HIV reported that being placed into confinement usually meant at least a one-week interruption in his antiretroviral medications, even after he tried submitting multiple sick call requests and asking nurses for assistance over a period of weeks. These same people also showed me the blister packs that have a shaded area for the last part of the medication cycle, indicating that a renewal slip should be submitted, and reported they followed the procedure to submit refill slips before their medications ran out in confinement. One person at Columbia who reported following this procedure said his hypertension medicines were not renewed, leaving him for one month untreated at the time of our interview. He reported submitting written requests that went unanswered and trying to ask passing nurses for help, but they would not stop at his door and security staff would yell at him for trying to get the nurses' attention. Multiple people at both institutions reported that even when they told the nurse that brings them their daily psychiatric medications that they did not have

7

their KOP medications, this problem went unresolved. One person at RMC who reported taking multiple medications for hypertension stated that when he told the nurse that brought his daily psychiatric medications about not getting these medications, the response was for him to fill out a sick call slip. After 30 days, multiple reports of this problem to the nurses, and filling out sick call slips, he reported still being without his medications in confinement.

12. **Interruption of accommodation/disability**. A significant number of people at both institutions reported that accommodations FDC had established and provided in general population were ignored or cancelled by staff once they transferred into confinement. This included people who identified as trans and who had paperwork showing that FDC also recognized their trans status, but who reported that in confinement they were searched by men (even though they clearly identified as trans women), and that correctional officers told them to go to showers unclothed and sexually harassed them.

13. In addition, several people who have assistive devices issued to them by FDC reported that once in confinement, they could not get these devices repaired when they broke. They also reported that they had never seen the ADA coordinator in confinement settings, and that nursing and correctional staff in confinement were not responsive to their issues. They also reported that the presence and working condition of their assistive devices was never checked

8

during their pre-confinement assessment. One person at Columbia who relies on hearing aids reported that he had been unable to get his hearing aid replaced or repaired in confinement. Unable to hear, and threatened if he stood close to the door, he reported, "I'm lost, I don't know what COs say, I'm lost." This same person reported that his psychiatric medications were interrupted in confinement, resulting in auditory hallucinations that were worsened by his inability to hear and the overall conditions in isolation. One person at Columbia who was in a wheelchair reported that he could not take a shower because the shower seat in the confinement unit was broken. One person at RMC reported that correctional officers took his glasses on the day he was put into confinement and they had not been replaced or returned two months later, making it difficult to see what was happening around him. Anotherperson at RMC reported having a longstanding seizure disorder and that both his medications and low bunk order were stopped when he was placed into confinement. He reported having multiple seizures in confinement and being threatened by security staff to "get off the door" when he tried to report his health issues to passing nurses. One person at Columbia reported that correctional officers refused to take him to the outdoor recreation cages because he uses a wheelchair and a Sergeant told him that bringing him to recreation would represent a liability.

14. **Additional concerns.** In addition to the categories of health care risks and barriers to care reported above, people reported several other issues that were related to health risks in confinement. Three people reported not receiving any pre-confinement assessment before being taken to confinement, which I reported in my earlier report and FDC emails confirm as a problem. Four people reported that correctional officers took away their KOP medications when they were placed in confinement. (They further reported that medical staff would not intervene and that property requests to get these medications went unanswered.) One person at RMC reported that after security staff took his asthma inhaler, he did not have one for 30 days while in confinement before he was able to get the attention of health staff to write a new prescription. Another person who was at RMC to see a kidney specialist reported nurses did his blood sugar checks and insulin administration through the food slot in his cell door, which was almost impossible for him because of the discomfort of stooping over and also required only using his arms for injection sites. Patients should be able to periodically rotate the sites they utilize to inject insulin, including their abdomen, upper arms, thighs, and buttocks.[1]

---

[1] The American Diabetes Association explains, The ADA explains, "If you inject insulin near the same place each time, hard lumps or extra fatty deposits may develop. Both of these problems are unsightly and make the insulin action less reliable." American Diabetes Association, *Insulin Routines*, https://www.diabetes.org/healthy-living/medication-treatments/insulin-other-injectables/insulin-routines (last visited April 13, 2022).

15.     **Retaliation for speaking with inspection team**. Multiple people at both institutions reported an unwillingness to speak with me in housing areas due to fears of retaliation from security staff. While I am accustomed to some reports of intimidation or fear of retaliation during inspections of segregation settings, the frequency of these reports in FDC far exceeds what I typically encounter, as do reports of being physically beaten by FDC staff. In addition, the people I met with for longer interviews at Columbia reported that security officers applied their handcuffs and black boxes for my interviews in a way that they had never experienced before. They reported that this new restraint procedure was more painful in part because the handcuffs were not double locked, so that any small movements would tighten the cuffs on their hands. One person reported that when he complained about this pain to an offer, the officer responded, "You're a fag, you like tight things." I observed that the handcuffs were not in fact double locked on multiple individuals, which meant the cuffs would constrict with the predictable movements of walking, sitting, and standing. I also observed on these same individuals pressure marks where their handcuffs were applied.

16.     Overall, these two inspections reaffirm my concerns that the FDC use of confinement in a widespread and prolonged manner create serious health risks for people in these settings.

12

Under 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing declaration is true and correct. Executed on 12th day of April 2022.

_____
Homer Venters, M.D., M.S.